No. 25-8129

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA; et al.,

*Plaintiffs-Appellees*,

v.

ARKEMA INC., by and through its agent, Legacy Site Services LLC,

*Intervenor-Appellant,*

v.

ACF INDUSTRIES, LLC; et al.,

*Defendants-Appellees,*

GUNDERSON, LLC; et al.,

*Intervenors.*

On Appeal from the U.S. District Court for the District of Oregon
Case No. 3:23-cv-1603-SI
Hon. Michael H. Simon

**APPELLANT'S EXCERPTS OF RECORD**
**VOLUME 1 OF 6**

Matthew J. Stock
Jessica C. Kerr
HILLIS CLARK MARTIN &
PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
(206) 623-1745
Email: matthew.stock@hcmp.com
Email: jessica.kerr@hcmp.com
*Attorneys for Legacy Site Services LLC,*
*agent for Appellant Arkema Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**; the **STATE OF OREGON**; the **CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON**; the **CONFEDERATED TRIBES OF THE SILETZ INDIANS**; **CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION**; **CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON**; and **NEZ PERCE TRIBE**, | Case No. 3:23-cv-1603-SI  **AMENDED OPINION AND ORDER** |
| Plaintiffs, | |
| v. | |
| **ACF INDUSTRIES, LLC**; **AIRGAS USA, LLC**; **AIR LIQUIDE AMERICA L.P.**; **ASH GROVE CEMENT COMPANY**; **ASHLAND INC.**; **BEAZER EAST, INC.**; **BNSF RAILWAY COMPANY**; **CALBAG METALS CO.**; **CITY OF PORTLAND**; **ESCO GROUP LLC**; **EVRAZ INC. NA** f/k/a **OREGON STEEL MILLS AND GILMORE STEEL**; **GOULD ELECTRONICS INC.**; **HAJ INC.** d/b/a **CHRISTENSON OIL COMPANY**; **HERCULES LLC**; **KOPPERS INC.**; **MCCALL OIL & CHEMICAL CORP.**; **MCCALL OIL REAL ESTATE COMPANY LLC**; **MOREC FRONT LLC**; **GWC PROPERTIES, LLC**; **GWC FRONT, LLC**; **TANKER BASIN LLC**; **MMGL LLC**; **NORTHWEST PIPE COMPANY** f/k/a | |

PAGE 1 – AMENDED OPINION AND ORDER

ER-2

**NORTHWEST PIPE & CASING COMPANY** f/k/a **NORTHWEST PIPE AND CASING COMPANY; PACIFICORP, AN OREGON CORPORATION; PORT OF PORTLAND; PORTLAND GENERAL ELECTRIC COMPANY (PGE); PORTLAND TERMINAL RAILROAD COMPANY; RADIUS RECYCLING, INC.** f/k/a **SCHNITZER STEEL INDUSTRIES, INC.; SILTRONIC CORPORATION; SULZER PUMPS (US) INC.;** and **VALVOLINE INC.**,

        Defendants

**ARKEMA INC.; GUNDERSON LLC; FMC CORPORATION;** and **NW NATURAL**,

        Intervenors.

---

Adam R.F. Gustafson, Acting Assistant Attorney General, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENTAL & NATURAL RESOURCES DIVISON; Michael James Zevenbergen, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENTAL ENFORCEMENT SECTION, C/O NOAA Damage Assessment, 7600 Sand Point Way NE, Seattle, WA 98155. Of Attorneys for Plaintiff United States of America.

Dan Rayfield, Attorney General; Sadie Forzley, Assistant Attorney General; Christina L. Beatty-Walters, and Gary Lee Vrooman, OREGON DEPARTMENT OF JUSTICE,100 SW Market Street, Portland, OR 97201. Of Attorneys for Plaintiff State of Oregon.

Holly Ray Partridge, CONFEDERATED TRIBES OF GRAND RONDE - TRIBAL ATTORNEY'S, 9615 Grand Ronde Road, Grand Ronde, OR 97347. Of Attorneys for Plaintiff Confederated Tribes of the Grand Ronde Community of Oregon.

Julie A. Weis, HAGLUND KELLEY LLP, 2177 SW Broadway, Portland, OR 97201. Of Attorneys for Plaintiff Confederated Tribes of the Siletz Indians.

Joseph R. Pitt, CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION OFFICE OF LEGAL COUNSEL, 46411 Timine Way, Pendleton, OR 97801. Of Attorneys for Plaintiff Confederated Tribes of the Umatilla Indian Reservation.

Josh Newton, BEST BEST & KRIEGER LLP, 360 SW Bond St., Ste. 400 Bend, OR 97702. Of Attorneys for Plaintiff Confederated Tribes of the Warm Springs Reservation of Oregon.

PAGE 2 – AMENDED OPINION AND ORDER

Courtney B. Johnson, CRAG LAW CENTER, 3141 E Burnside St., Portland, OR 97214. Of Attorneys for Plaintiff Nez Perce Tribe.

C. Marie Eckert and Jeffrey C. Miller, MILLER NASH LLP, 1140 SW Washington St., Suite 700, Portland, OR 97205. Of Attorneys for Defendants ACF Industries, LLC and Beazer East, Inc.

Christine L. Hein, Jeffrey W. Ring, and Mark P. Strandberg, RING BENDER LLP, 920 SW Sixth Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Defendants Airgas USA, LLC and Air Liquide America L.P.

Brian Ferrasci-O'Malley, Leslie Nellermoe, and Tara Marie O'Hanlon, NOSSAMAN LLP, 719 Second Avenue, Suite 1200, Seattle, WA 98104; Christopher T. Carson, KILMER, VOORHEES & LAURICK, P.C., 2701 NW Vaughn Street, Suite 780, Portland, OR 97210. Of Attorneys for Defendant Ash Grove Cement Company.

John Cooke and Andrew Zabel, HOULIHAN LAW, 100 N. 35th Street, Seattle, WA 98103. Of Attorneys for Defendants Ashland, Inc., Hercules LLC, and Valvoline Inc.

Jay Kevin Griffith and Robert B. Lowry, KELL, ALTERMAN & RUNSTEIN, L.L.P., 520 SW Yamhill Street, Suite 600, Portland, OR 97204. Of Attorneys for BNSF Railway Company.

Jennifer L. Gates, PEARL LEGAL GROUP, 529 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Defendant Calbag Metals Co.

Samantha Gamboa, Deputy City Attorney; Tina M. Richards, and Nanci L. Klinger, CITY OF PORTLAND ATTORNEY'S OFFICE, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for Defendant City of Portland.

Nicholas W. Van Aelstyn, SHEPPARD MULLIN RICHTER & HAMPTON LLP, Four Embarcadero Center, 17th Floor, San Francisco, CA 94111; Fred J.W. Chung, SHEPPARD MULLIN RICHTER & HAMPTON LLP, 1540 El Camino Real, Suite 120, Menlo Park, CA 94025; Paul J. Kaufman, SHEPPARD MULLIN RICHTER & HAMPTON LLP, 12275 El Camino Real, Suite 100, San Diego, CA 92130. Of Attorneys for Defendant ESCO Group LLC.

David C. Weber and Loren R. Dunn, BEVERIDGE & DIAMOND, P.C., 600 University St., Suite 1601, Seattle, WA 98101; Nicole Bishop Weinstein, BEVERIDGE & DIAMOND P.C., 825 Third Avenue, 16th Floor, New York, NY 10022. Of Attorneys for Defendants Evraz Inc. NA f/k/a Oregon Steel Mills and Gilmore Steel and Portland General Electric Company (PGE).

Anne Devlan Foster, SMITH FOSTER KING LLP, 25 NW 23rd Place, Suite 6 #125, Portland, OR 97210. Of Attorneys for Gould Electronics Inc.

James P. Murphy, MURPHY ARMSTRONG & FELTON LLP, 701 Millennium Tower, 719 Second Avenue, Seattle, WA 98104; Katherine L. Felton, NOSSAMAN LLP, 719 Second Avenue, Suite 1200, Seattle, WA 98104. Of Attorneys for Defendant HAJ, Inc. d/b/a Christenson Oil Company.

PAGE 3 – AMENDED OPINION AND ORDER

Gregory L. Baird, GORDON & POLSCER, LLC, 9020 SW Washington Square Road, Suite 560, Tigard, OR 97223; Alan S. Miller, HOUSTON HARBAUGH, P.C., 401 Liberty Avenue, Three Gateway Center, 22nd Floor, Pittsburgh, PA 15222. Of Attorneys for Defendant Koppers Inc.

Jeffrey C. Miller, MILLER NASH LLP, 1140 SW Washington St., Suite 700, Portland, OR 97205. Of Attorneys for Defendants McCall Oil & Chemical Corp., McCall Oil Real Estate Company LLC, Morec Front LLC, GWC Properties, LLC, GWC Front, LLC, and Tanker Basin LLC.

Greg A. Christianson and Megan Ault, ALSTON & BIRD, 55 2nd Street, Suite 2100, San Francisco, CA 94105; Thomas A. Ped, WILLIAMS KASTNER, 805 SW Broadway, Suite 2440, Portland, OR 97205. Of Attorneys for Defendants MMGL LLC and Radius Recycling, Inc. (fka Schnitzer Steel Industries, Inc.)

Michael B. Merchant, BLACK HELTERLINE, LLP, 805 SW Broadway, Suite 2600, Portland, OR 97205. Of Attorneys for Defendant Northwest Pipe Company f/k/a Northwest Pipe & Casing Company f/k/a Northwest Pipe and Casing Company.

Matthew D. Wells, FOSTER GARVEY PC, 1111 Third Avenue, Suite 3000, Seattle, WA 98101. Of Attorneys for Defendant PacifiCorp, an Oregon Corporation.

Crystal S. Chase, PORT OF PORTLAND, 7200 NE Airport Way, PO Box 3529, Portland, OR 97218; James Christopher Baird and Rachel Sinsheimer, CORVID LAW PLLC dba HEADWATERS LAW GROUP, 92 Lenora Street, Seattle, WA 98103. Of Attorneys for Defendant Port of Portland.

Elizabeth C. Knight, Ana Lanikeha and Rosa Ching, DUNN CARNEY LLP, 851 SW Sixth Avenue, Suite 1500, Portland, OR 97204; Michael B. Merchant, BLACK HELTERLILNE LLP, 805 SW Broadway St., Suite 2600, Portland, OR 97205. Of Attorneys for Defendant Portland Terminal Railroad Company.

David A. Rabbino, JORDAN RAMIS PC, 1211 SW Fifth Avenue, Suite 2700, Portland, OR 97204. Of Attorneys for Defendant Siltronic Corporation.

Daniel K. Reising, FUCILE & REISING LLP, 1120 SE Madison St., Portland, OR 97214. Of Attorneys for Defendant Sulzer Pumps (US) Inc.

Matthew J. Stock, HILLIS CLARK MARTIN & PETERSON P.S., 999 3rd Ave., Suite 4600, Seattle, WA 98104. Of Attorneys for Intervenor Arkema Inc.

Maureen Bayer and Zachary W.L. Wright, TONKON TORP LLP, 1300 SW 5th Avenue, Suite 2400, Portland, OR 97201. Of Attorneys for Intervenor Gunderson LLC.

Bradley T. Crittenden, CHENOWETH LAW GROUP, PC, 510 SW Fifth Avenue, Suite 400, Portland, OR 97204; Christopher I. Rendall-Jackson, Hayleigh Shobar, and James H. Colopy, FARELLA BRAUN & MARTEL LLP, 1 Bush Street, Suite 900, San Francisco, CA 94104. Of Attorneys for Intervenor FMC Corporation.

PAGE 4 – AMENDED OPINION AND ORDER

Heather Tourgee and Patricia M. Doust, PEARL LEGAL GROUP, PC, 529 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Intervenor NW Natural.

**Michael H. Simon, District Judge.**

Plaintiffs the United States, the State of Oregon, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe (collectively, "Trustees") have sued Defendants, who allegedly polluted the Willamette River ("Willamette River" or "Willamette"), for Natural Resource Damages under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a). After nearly two decades of negotiations among the parties, environmental impact studies, notice-and-comment periods, and public information sessions, Trustees have moved for entry and approval of two settlement agreements that would resolve Defendants' liability. *See* the Restoration Credit Consent Decree (ECF 4-1, 5-1, 6-1, 7-1, 8-1, and 9-1) and the Cash-Out Consent Decree (ECF 11-1) (together, "the Consent Decrees"). Intervenors, four property owners who did not settle with Trustees, oppose the Consent Decrees. For the reasons that follow, and over the objections of Intervenors, the Court grants Trustees' Motion.

**STANDARDS**

"In order to approve a CERCLA consent decree, a district court must conclude that the agreement is procedurally and substantively 'fair, reasonable, and consistent with CERCLA's objectives.'" *Arizona v. City of Tucson*, 761 F.3d 1005, 1011-12 (9th Cir. 2014) (quoting *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 748 (9th Cir. 1995)). The party seeking approval must provide a court "evidence sufficient to evaluate the terms of the agreement," and the court must "actually engage with that information and explain in a reasoned disposition why

PAGE 5 – AMENDED OPINION AND ORDER

the evidence indicates that the consent decrees" meet those requirements. *Id.* at 1012. To do so, a district court must "gauge the adequacy of settlement amounts to be paid by settling parties by comparing the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them, and then . . . factor into the equation any reasonable discount for litigation risks, time savings, and the like," also appraising "what the government is being given by the settling part relative to what the settling party is receiving." *Id.* (cleaned up).

"To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990).[1] Substantive fairness, by contrast, asks whether the terms of the settlement are fair as between the settling parties. *See id.* at 87. "Thus, in order to approve a CERCLA consent decree, a district court must find that the agreement is 'based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done.'" *Arizona*, 761 F.3d at 1012 (quoting *Cannons*, 899 F.2d at 87).

In the substantive fairness inquiry, however, the federal government is entitled to considerable deference. *See Montrose*, 50 F.3d at 746; *see also Arizona*, 761 F.3d at 1013-15 (clarifying that *Montrose* deference applies only to a federal agency). "Although 'the true measure of the deference due depends on the persuasive power of the agency's proposal and

---

[1] The Ninth Circuit regularly relies on *Cannons* to describe the standard of review for CERCLA consent decrees. *See, e.g.*, *Arizona*, 761 F.3d at 1013; *Montrose Chem. Corp.*, 50 F.3d at 746-48 (each citing and quoting *Cannons*). The Court therefore considers *Cannons* highly persuasive authority.

PAGE 6 – AMENDED OPINION AND ORDER

rationale,'[2] a district court reviewing a proposed consent decree 'must refrain from second-guessing the Executive Branch.'" *Montrose*, 50 F.3d at 746 (quoting *Cannons*, 899 F.2d at 84) (footnote added). This "deference is appropriate given '[t]hat so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment.'" *Montrose*, 50 F.3d at 746 (quoting same).[3] Courts in the Ninth Circuit extend that deference because of CERCLA's extraordinary "policy of encouraging early settlements," which "is strengthened when a government agency charged with protecting the public interest 'has pulled the laboring oar in constructing the proposed settlement.'" *Id.* (quoting same).

A consent decree is reasonable when it is likely to effectively benefit the environment, "satisfactorily compensate[ ] the public for the actual (and anticipated) costs of remedial and response measures" and considers the "relative strength of the parties' litigating positions." *Cannons*, 899 F.2d at 89-90. Further, CERCLA has "two major policy concerns" that a court should evaluate: (1) giving the federal government "a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal"; and (2) making "those responsible for problems caused by the disposal of chemical poisons bear the costs and

---

[2] In *Arizona*, the Ninth Circuit observed that "courts have not established whether the deference that we afford the EPA [when it seeks judicial approval of a proposed CERCLA consent decree] is . . . the deference described in *Skidmore v. Swift & Co.*, or some other type of deference." 761 F.3d at 1013 n.6 (citations omitted). But the sliding-scale approach described in *Cannons*, 899 F.2d at 84, and quoted by the Ninth Circuit in *Montrose*, 50 F.3d at 746, looks like *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

[3] *See also* 42 U.S.C. § 9622(a) ("[T]he President *shall act* to facilitate agreements under this section that are in the public interest . . . *in order to expedite* effective remedial actions and minimize litigation." (emphases added)).

PAGE 7 – AMENDED OPINION AND ORDER

responsibility for remedying the harmful conditions they created." *Id.* at 90-91 (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986)).

## BACKGROUND

### A. Natural Resource Damage to the Willamette River

In the late 1800s, the Portland Harbor section of the lower Willamette River became an industrial hub for shipping and manufacturing. *See* ECF 130-26 at 17 (Declaration of Jennifer Hughes). Newly built navigation channels, wharves, and piers made accessing the shoreline easier than ever. *Id.* But the boats that traversed the river brought more than industry to Oregon: runoff from practices like maintenance dredging, wood treatments, and chemical manufacturing soon contaminated the river, which over the next hundred years became heavily polluted with oil and other hazardous substances. *See id.*; Declaration of Troy Baker ("First Baker Decl.") ¶ 6 (ECF 85-1). The once-vibrant ecology of the Willamette enfeebled; fish, wildlife, and their habitats suffered as a result.

That pollution went unaddressed until 2010, when Trustees joined forces. Availing themselves of the benefits of CERCLA, 42 U.S.C. §§ 9601, *et seq.*, and other federal statutes and regulations, Trustees created a Natural Resource Damage Assessment ("NRDA") to address the pollution in the Willamette River.[4] Trustees' "iterative, four-phased approach" intended to "encourage participation by parties potentially responsible for releases of contamination and discharges of oil" to work with Trustees to clean the river. *See* ECF 130-26 at 10.

---

[4] The other statutes are the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.*, and the Clean Water Act, 33 U.S.C. § 1251. Trustees are authorized under both Federal and state regulations to conduct a NRDA (NCP 40 Code of Federal Regulations (C.F.R.) Subpart G, § 300.600, 300.605, 300.610). Executive Orders 12580 and 12777 also authorize Trustees' actions. *See* Hughes Decl., Ex. 26 at 10-12.

PAGE 8 – AMENDED OPINION AND ORDER

During Phase 1, Trustees developed an assessment plan to identify pollutants in the river and a work plan to restore the environment. *See* ECF 130-1 at 3. Trustees also performed preliminary scientific studies "to fill data gaps" related to salmon and osprey—two injured species in the river—and reviewed initial data collected in the "remedial process" to determine the "preliminary injury and damages" to the Willamette. ECF 130-26 at 10. In addition, Trustees began their public outreach efforts by soliciting comments on their plans. *Id.*

In Phase 2, Trustees performed an ecological study to identify potentially responsible parties ("PRPs") who could have caused the pollution in the Willamette River. *See id.* at 10-11. Also during Phase 2, Trustees proposed settlement agreements with PRPs. *Id.* During the final Phases, Trustees would finish their ecological studies to determine the full breadth of damage to the Willamette (Phase 3) and sue any PRPs who did not settle for damages (Phase 4). *Id.* at 11-12.

To identify the PRPs, Trustees first defined where on the Willamette River they would assess ecological injury. They decided on a roughly thirteen-mile stretch to survey (the "Assessment Area") "from approximately river mile (RM) 12 to RM 1, and the upper one mile of Multnomah Channel." *Id.* at 11. Trustees next identified all current and historic owners of real property "at or from which there have been releases of hazardous substances and/or discharges of oil" to the Assessment Area and classified them as PRPs. *See* ECF 85 at 11 (Trustees' Motion to Enter Consent Decrees).

To evaluate the ecological damage to the Assessment Area for settlement purposes, Trustees performed a habitat equivalency analysis ("HEA"). *See* ECF 85-3 at 8 (Trustees' response to notice-and-comment regarding proposed settlements explaining the HEA process). "HEA is a method of converting the diverse flow of ecological services provided by a habitat, for

PAGE 9 – AMENDED OPINION AND ORDER

example, food and shelter for animals, into a common currency." *Id.* That currency is called a discounted service acre year ("DSAY"). *Id.* One DSAY "represents the total amount of ecological services provided by an acre of a given habitat (e.g., marsh, mudflat, forested uplands) over the course of one year." *Id.* Unlike other assessments that do not measure DSAYs, HEA assumes that building a new, equivalent habitat will provide the same services as an old habitat:

> Thus, for example, a party could provide compensation for lost wetland ecological services by creating additional wetland ecological services through restoration of existing wetland habitat or creation of new wetland habitat. HEA allows natural resource trustees engaged in the NRDA process to quantify both the ecological service losses (injuries) to habitat caused by contamination, as well as the amount of restoration necessary to generate ecological services that will compensate the public for those losses.

*Id.* Trustees chose an HEA because it could measure compensation through restoration or creation. *See id.*

Trustees designed the HEA to measure the injuries resulting from twelve contaminants in river sediments. First Baker Decl. ¶¶ 7-8. The twelve contaminants were hazardous substances and oil released from the PRPs shoreline property along the Assessment Area. *Id.* To ensure that the HEA properly measured the contaminants' impact, Trustees made contaminant footprint maps for each of the twelve contaminants of concern. *Id.* ¶ 8. Each map reflected the "degree of contamination relative to threshold concentrations for injury to aquatic resources" and defined the "sediment contaminant concentrations that exceed[ed] these threshold levels." *Id.* The maps also reflected Oregon and Washington State sediment standards and contaminant thresholds established in the scientific literature. *Id.*

With their twelve targeted contaminants and methodology in hand, Trustees performed the HEA. Trustees measured the size of the Assessment Area (in acres), the severity of the ecological injury (by percent of ecological service loss), the duration of the injury (how long the

PAGE 10 – AMENDED OPINION AND ORDER

environment suffered without the ecological service), and the timing of the injury (when the ecological services was lost). ECF 85-3 at 16. The result of the HEA was 4,130 DSAYs. First Baker Decl. ¶ 10; *see also* Cash-Out Consent Decree ¶ K; Restoration Credit Consent Decree at ECF 4-1 ¶ P.

Trustees then assigned those DSAYs to the PRPs. Trustees "first developed estimates of the share of the total injuries attributable to hazardous substances released from each property along the Assessment Area" by reviewing publicly available documents obtained from the United States Environmental Protection Agency ("EPA") and the Oregon Department of Environmental Quality ("DEQ"), as well as summary documents published by federal, state, and local authorities to evaluate activities that took place at those facilities that resulted in the release or likely release of hazardous substances and oil discharges. First Baker Decl. ¶ 11. Each PRP then "identified the properties and facilities it owns or operates, and/or formerly owned or operated" and "submitted information regarding its activities and operations for these identified properties, which Trustees reviewed for accuracy." *Id.* ¶ 12. Based on the PRPs' submissions, Trustees determined the contaminants likely associated with the activities.

After making that determination, Trustees compared the "[c]ontaminants associated with activities at Defendants' properties . . . with contaminant footprints in Willamette River sediments in the Assessment Area." *Id.* Trustees then used a three-step process to determine whether a property would be potentially subject to allocation for a particular contaminant:

> First, a pathway must exist for the contaminant to travel from the property or facility to the Assessment Area.
>
> Second, contaminants associated with activities on the property or facility were found in contaminated sediment footprints.
>
> Finally, those footprints were in sufficiently close proximity to the property or facility, or a site-related outfall to the Willamette River. If a connection existed between contaminated sediments and

PAGE 11 – AMENDED OPINION AND ORDER

> a Defendant's property or facility, then that property or facility was assigned natural resource damages liability for the contaminated footprint. The amount of assigned liability (in DSAYs) depended on the estimated injury to natural resources (in DSAYs) caused by contaminants in the sediment footprint and whether other properties and facilities also contributed contaminants to that footprint.

*Id.* (reformatted). Trustees also considered the substance type when assigning contaminants to properties.

"[F]or most hazardous substances, there was a 'footprint' of contamination in the sediments that was attributed to particular facilities or properties." *Id.* ¶ 13. But "more ubiquitous and diffuse contaminants" like polycyclic aromatic hydrocarbons ("PAHs")—chemicals found in substances like oil that are created when organic matter is burned—have no clear footprint. *Id.* For those diffused contaminants, Trustees used a relative index approach, "where liability was divided among the facilities and properties that were known to have released the ubiquitous and diffuse contaminants . . . based on the nature of the waste-producing activities located at the facility or property, the area involved and the time period during which these activities occurred." *Id.*

Using this methodology, Trustees assigned 97% of the contaminated sediment footprints to properties or facilities near or adjacent to the Assessment Area. *Id.* Trustees then developed a proposed liability allocation, in DSAYs, for each property or facility by the Assessment Area and then for each PRP. *Id.* ¶ 14. Trustees shared those allocations and their factual bases with the PRPs and gave each PRP an opportunity to provide more information if it disagreed with Trustees' proposed allocations:

> For example, a PRP might provide information that it did not use a particular type of process or chemical at the site in question. If Trustees agreed that the additional information warranted revisions to the factual basis of their initial allocation, revisions to the factual basis and associated DSAY allocations were made.

PAGE 12 – AMENDED OPINION AND ORDER

*Id.* Trustees did not, however, significantly revise a PRP's allocation without a factual basis. Considerations like litigation risk or uncertainty, to the extent they impacted PRPs' allocations at all, only accounted for "modest equitable downward revisions." *Id.* Trustees never published, however, their precise allocation figures, claiming that they were privileged settlement communications.

Through this Phase 2 process, Defendants agreed to settle with Trustees and pay an amount commensurate with the number of DSAYs assigned to them by the HEA. Trustees finalized the allocations for that group, allocating 471.389 DSAYs between Defendants in the Consent Decrees. *Id.* ¶ 15. Those DSAYs represent about 11.4% of the estimated total natural resource damages for the Assessment Area. *Id.* Roughly 70% of the pollution to the Willamette was caused by four chemicals. Second Declaration of Troy Baker ("Second Baker Decl.") ¶¶ 4-5 & Ex. 1 (ECF 128-1). Defendants were allocated 12.8 DSAYs for three of the four chemicals, or roughly 1% of the harm for them. *Id.* ¶ 6. Defendants were allocated 151 DSAYs for the fourth chemical, PAHs, which amounts for 9.3% of the total harm to the Willamette caused by PAHs. *Id.* ¶ 7. Although all Defendants were associated with PAH activities, only two were associated with heavy PAH pollution. ECF 130-7, 130-22.

While preparing the Consent Decrees to settle their claims with Defendants, Trustees continued to perform additional ecological testing. *See* ECF 130-26 at 34-39 (describing planned and ongoing ecological testing during Phase 3); *see also id.* at 49-53 (describing parameters for study management, quality assurance, and data validation during ecological studies). This testing is more precise than the HEA analysis that Trustees used for settlement purposes, and it will form the basis of Trustees' Phase 4 damages claims against non-settling PRPs. *See id.* at 29-33 (describing loss quantification model for damages); 34-53.

PAGE 13 – AMENDED OPINION AND ORDER

**B.  Consent Decrees**

Each Defendant agreed to one of two proposed consent decrees. The Cash-Out Consent Decree and the Restoration Credit Consent Decree both require Defendants to purchase their allocated number of DSAYs, but they differ on how Defendants purchase those DSAYs and on what the proceeds are spent. In the Cash-Out Consent Decree, Defendants purchase DSAYs in cash at a value of $70,500/DSAY, and Trustees may spend the proceeds as they see fit. In the Restoration Credit Consent Decree, Defendants purchase DSAY Credits, which may be used to fund one of four restoration projects—habitat building projects that were designed by Trustees in connection with specific Defendants for the express purpose of the Restoration Credit Consent Decree.

Each Consent Decree also has an additional cash payment associated with it. Defendants participating in the Cash-Out Consent Decree pay for Trustees' past and interim costs, such as the costs of ecological testing, creating the restoration projects, and litigation. *See* Cash-Out Consent Decree ¶¶ K, 8-10. For Defendants participating in the Restoration Credit Consent Decree, each must make an additional cash payment, calculated by totaling the following figures: (a) for each DSAY purchased, add $1,742 to "compensate for recreational service losses and tribal service losses"; (b) for each DSAY not purchased but allocated, add $70,500; (c) add the Defendant's "Final Allocated Share of Trustee Council Assessment Costs"; and (d) subtract the total funding received from the Defendant by the Trustee Council under the Funding and Participation Agreements. Trustees have published a detailed accounting explaining how much and to which Restoration Project each Defendant is paying.

The Trustees designed four restoration projects in connection with the Restoration Credit Consent Decree by performing targeted HEAs on discrete habitats and species. From there, Trustees assigned each restoration project a "Forecast DSAY Value" that represented the

PAGE 14 – AMENDED OPINION AND ORDER

anticipated ecological value the project would yield. For example, the HEA for the Alder Creek Restoration Project, which would produce 52.28 acres of restored, enhanced, and protected habitat for juvenile salmon, yielded a Forecast DSAY Value of 734.21 DSAYs. As proposed, Defendants agreeing to the Restoration Credit Consent Decree would purchase DSAYs at an amount proportional to their polluting activities, which would be determined by the *initial* HEA. The project developers for each restoration project are parties to the Restoration Credit Consent Decree, and the terms of each restoration project are set forth in the associated habitat development plan attached to the Consent Decree. Restoration Credit Consent Decree at ECF 4-1 ¶¶ 18, 27. Trustees may only release restoration credits in the projects when ecological milestones are reached, and each project contains permanent stewardship requirements.

The four restoration projects are designed to reap ideal ecological rehabilitation at the Willamette River: three are near one another, providing habitat connectivity between the project sites. The fourth project site is located on a river bar park, providing additional connecting habitat outside the boundaries of the project. Accordingly, Trustees predict that the habitat restoration will mutually benefit fish, birds, and other animals as they move between one project to another. The projects also are structured to achieve mature habitats, because all four of these restoration projects are already constructed with habitat development underway.

In consideration, Trustees agree not to sue Defendants for natural resource damages resulting from releases of hazardous substances or discharges of oil before the Effective Date from the properties and facilities identified in the Consent Decree into the Assessment Area. *See* Restoration Credit Consent Decree at ECF 4-1 ¶ 3.d; Cash Out Consent Decree ¶ 3.b (Definitions of "Covered Natural Resource Damages"); Restoration Credit Consent Decree at ECF 4-1 § XIII; Cash-Out Consent Decree § IX (Covenants Not to Sue by Plaintiffs). That covenant is not

PAGE 15 – AMENDED OPINION AND ORDER

absolute, however, and is subject to reservations of rights. *See* Restoration Credit Consent Decree at ECF 4-1 § XIV; Cash-Out Consent Decree § X. Trustees also reserve

> the right to institute proceedings against Settling Defendants . . . for: Covered Natural Resource Damages if conditions, factors or information in the Portland Harbor Natural Resource Damage Assessment Area, not known to Trustees as of the Effective Date of this Consent Decree, are discovered that, together with any other relevant information, indicates that there is injury to, destruction of, loss of and/or loss of use of natural resources of a type unknown, or of a magnitude significantly greater than was known, to Trustees as of the Effective Date.

Restoration Credit Consent Decree at ECF 4-1 § XV; Cash-Out Consent Decree § XI. The Consent Decrees would also be enforceable against non-settling PRPs and protect Defendants from contribution actions or claims by other PRPs as to covered natural resource damages. The total value of the claims resolved between the two consent decrees would be about $36.2 million. ECF 85 at 7.

Throughout the settlement process, Trustees ensured that the public had an active voice in the cleanup of the Willamette. Trustees communicated with the public in several ways, including by making informational YouTube videos, writing short blurbs about the science underpinning HEAs and the restoration projects on their website, and hosting town hall sessions. Trustees also published the proposed Consent Decrees in the Federal Register to solicit public comments for a total of 75 days. *See id.* at 17; 88 Fed. Reg. 78063. Trustees received comments from: John Lee Marshall; Arkema Inc.; FMC Corporation; Gunderson LLC; Yakama Nation (more formally known as the Confederated Tribes and Bands of the Yakama Nation); Willamette Riverkeeper; and Northwest Environmental Defense Center. Trustees responded to each comment in the Federal Register before moving for approval and entry of the Consent Decrees.

PAGE 16 – AMENDED OPINION AND ORDER

## DISCUSSION

Interventors are four PRPs that, as of the date of this Opinion and Order, have not settled with Trustees and oppose the pending Consent Decrees. They now ask the Court to deny approval and entry of the Consent Decrees.[5] After considering the submissions made by Intervenors and all filed responses, the Court rejects Intervenors' arguments.

According to the HEA, the Consent Decrees benefit Trustees *more* than is appropriate per Defendants' comparative fault. Trustees estimate that Defendants are liable for 11.4% of damage to the Willamette. According to the HEA, the Willamette has total damages of 4,130 DSAYs, with each DSAY worth $70,500. Thus, proportional to their collective fault, Defendants (allocated roughly 471 DSAYs) owe about $33.2 million. But the value of the Consent Decrees is *higher*, at approximately $36 million, because Defendants are paying approximately $3 million of Trustees' costs to assess Natural Resource Damages. Defendants have also *already* advanced Trustees approximately $8 million during the course of the settlement process in support of the early restoration process for services like ecological surveys and restoration project development. *See* Cash-Out Consent Decree App. C at 118 ($4,619,472.39 already received); Restoration Consent Decree App. C at 1 ($3,560,356.85 already received). The Consent Decrees also carry with them the classic benefit of settlement: that Trustees avoid the risk of litigation with Defendants and minimize the cost of later damages suits. Thus, as explained more thoroughly below, the Court finds that the Consent Decrees are fair, reasonable, and consistent with CERCLA's objectives. Approval of the Consent Decrees is appropriate.

---

[5] Intervenors raise several objections to the Consent Decrees through four separate briefs. *See* ECF 111 (Arkema Inc.); ECF 112 (FMC Corporation); ECF 115 (Gunderson LLC); and ECF 119 (NW Natural). The Court discusses below Intervenors' primary objections. The Court has considered but declines to discuss Intervenors' remaining objections and finds them unpersuasive.

PAGE 17 – AMENDED OPINION AND ORDER

## A.  Judicial Review

As a threshold matter, Intervenors argue that the Court cannot perform meaningful judicial review of the Consent Decrees because the Court has insufficient information about the Parties' negotiations and Trustees' allocations. That objection is not well founded. A district court's "review of a CERCLA consent decree may not be made in an 'informational vacuum,' or where the record contains 'no evidence at all on an important point.'" *Arizona*, 761 F.3d at 1012 (quoting *Montrose*, 50 F.3d at 746-47). Here, Intervenors point to no category within the *Montrose* factors where Trustees offer "no evidence at all." *See id.* (quoting *Montrose*, 50 F.3 at 746). Instead, Intervenors simply take issue with the level of detail that Trustees provide in the record. Intervenors argue, for example, that Trustees offer no specific formula to explain the allocations or discount given to each Defendant. *See, e.g.*, ECF 115 at 17-18; ECF 119 at 8-10. But the record describes the HEA methodology and how the DSAY allocations were made to each Defendant. Those general contours are sufficient to guide the Court's analysis as to whether that methodology is fair, reasonable, and consistent with CERCLA's objectives.[6] To the extent that Trustees may have produced insubstantial evidence to justify certain terms of the Consent Decrees, those deficiencies are relevant to whether the terms of the Consent Decrees are substantively fair, not to the ability of the Court to perform meaningful judicial scrutiny.

Further, "the mere fact that evidence sufficient to evaluate the terms of an agreement is . . . in the parties' possession is not alone sufficient" to approve a CERCLA consent decree. *Arizona*, 761 F.3d at 1012. Intervenors argue that the record is lacking in this case because Trustees did not adequately "show their work" by putting all relevant information from the

---

[6] Indeed, Intervenors themselves used this kind of record evidence to argue that Trustees' calculations were *inappropriate*. The Court agrees with Trustees that "the basic fairness of the allocation can be assessed using available information." ECF 128 at 35.

PAGE 18 – AMENDED OPINION AND ORDER

administrative record into the Court's docket.[7] Nothing in CERCLA or Ninth Circuit precedent, however, requires that the government place *all* information relevant to proposed settlements into the judicial record, and for good reason: that rule would unduly burden the Judiciary by requiring the district courts to cull through massive administrative records. Because the Court has sufficient information meaningfully to perform judicial scrutiny, the Court proceeds to discuss the factors identified in *Montrose*.

## B. Procedural Fairness

Turning to the first *Montrose* factor, the negotiation process between Trustees and Defendants was procedurally fair. Trustees gave the PRPs substantial bargaining power in the allocation process. Trustees approached each PRP with a proposed DSAY allocation with factual evidence underlying the proposed allocation. Trustees also permitted the PRPs to submit evidence to Trustees to rebut the proposed allocations. In response to PRPs' factual rebuttal submissions, Trustees adjusted the DSAY allocations. That collaborative allocation process demonstrates that the government did not hold an inappropriate bargaining power over Defendants.

The negotiation process also was open to the public. Indeed, the public record contains more than 700 documents, ranging from technical reports aimed at scientific audiences to

---

[7] For example, at the Court's hearing held on September 29, 2025, one Intervenor argued that Trustees should compile "for each site in which there's a settlement[,] the DSAYs allocated to that site, the contaminants contributed to each site and which of those are being settled by each defendant, which footprints of damages are being settled or partially settled, and which DSAYs are attributable to those footprints, which footprints are attributable to which sites being settled, and whether the settling defendants' allocated DSAYs were adjusted as the Trustees reallocated the footprints from time to time through the allocation . . . . [A]ll of this information exists and should be readily available in existing tables or could be compiled by [Trustees] without much trouble. We're just asking really what our eighth grade algebra teachers asked all of us, that we show—that we showed our work." ECF 144, 35:10-25.

PAGE 19 – AMENDED OPINION AND ORDER

newsletters and YouTube videos aimed at public audiences. Trustees held two public meetings in addition to the notice and comment period. As a result, the Consent Decrees were reached under fair circumstances. *See Cannons*, 899 F.2d at 86 ("[T]he government conducted negotiations forthrightly and in good faith, and the record is replete with indications to that effect.").

## C. Substantive Fairness

The lodestar of the next *Montrose* factor—substantive fairness—is comparative fault. *See Arizona*, 761 F.3d at 1012; *Cannons*, 899 F.2d at 87. Intervenors argue that the Consent Decrees do not properly map comparative fault because the HEA is unreliable and there is insufficient information about the DSAY allocations. These attacks on the government's methodology are interconnected, and the Court does not find them persuasive.

On the outset, the Consent Decrees are accompanied by detailed accounting that shows the number of DSAYs allocated to each Defendant, the contaminant datasets and footprints used by Trustees in the HEA model, each Defendant's activities, and Trustees' conclusions about the contamination associated with those activities. That information, taken together, is sufficient to conclude that the DSAYs were allocated to Defendants according to rational estimates of comparative fault.

Indeed, a rough comparison of the DSAY allocation demonstrates that, as a general principle, the more polluting a Defendant did, the more DSAYs Trustees required that Defendant to purchase. Looking to two Restoration Credit Consent Decree Defendants, for example:

- The City of Portland's liability was calculated at 61.03 DSAYs. *See* ECF 130-10 at 1. The City of Portland has 34 allocation sites in the Assessment Area. *Id.* Four of the City's sites had no polluting activities; many of the sites have had, or currently have, different owners (*e.g.*, Site 61 is owned by Schnitzer Steel; Site 126 by Steel Hammer Properties, *id.* at 5). *Id.* at 10-13. The City's allocation sites have a total of 76

PAGE 20 – AMENDED OPINION AND ORDER

polluting activities. *Id.* Twenty of those activities, however, occurred before 1980. *Id.* Accordingly, the City was required to purchase roughly two DSAYs per allocation site with pollution; or roughly 0.8 DSAYs per polluting activity.

- Evraz Inc.'s liability was calculated at 45.5 DSAYs. *See* ECF 130-12 at 1. Evraz was associated with nine allocation sites but only conducted relevant activities on five. *Id.* at 1, 6-7. Unlike the City of Portland, however, Evraz's sites had more extensive polluting activities. *See id.* The 145-acre site that Evraz has operated on since 1969 (Site 13) has had 19 polluting activities. *Id.* at 4, 6. Another site that Evraz used to separate scrap metal solids from liquids before discarding the latter into the Willamette (Site 182) has had 11 polluting activities. *Id.* at 5, 7. Evraz was required to purchase roughly 1.34 DSAYs per polluting activity.

Defendants signing the Cash-Out Consent Decree[8] have a similar symmetry between the number of DSAYs purchased per polluting activity:

- Ash Grove's liability was calculated at 16.97 DSAYs. *See* ECF 130-55 at 1. Ash Grove was associated with two allocation sites. *Id.* at 1. Similar to Evraz, each allocation site had substantial polluting activities: there were 17 at Site 12 and 13 at

---

[8] As compared to the Restoration Credit Consent Decree Defendants, it appears that the Cash-Out Consent Decree Defendants are required to purchase less DSAYs on average per polluting activity. That variance makes sense, however, given the total value of the two Consent Decrees. The value of the Cash-Out Consent Decree ($8,202,136.12, *see* Cash-Out Consent Decree at ¶ Q) is significantly lower than the value of the Restoration Credit Consent Decree ($27,952,073.33, *see* Restoration Credit Consent Decree at ¶ V). Sixteen Defendants are settling through the former, whereas seven Defendants are settling through the latter. *See* Cash-Out Consent Decree at 1; Restoration Credit Consent Decree at 1. Thus, it is reasonable that Trustees would require Cash-Out Defendants to purchase less DSAYs per polluting activity than the Restoration Credit Defendants.

PAGE 21 – AMENDED OPINION AND ORDER

Site 275. *Id.* at 5. Ash Grove was required to purchase roughly 0.57 DSAYs per polluting activity.

- Koppers' liability was calculated at 3 DSAYs. *See* ECF 130-15 at 1. Koppers was associated with one allocation site, with five polluting activities. *Id.* at 1, 5. Koppers was required to purchase roughly 0.6 DSAYs per polluting activity.

Of course, not all pollution is equal; there is not and should not be a perfect correlation between the number of polluting activities and the number of DSAYs purchased. As Trustees explained, the allocation process weighed when Defendants owned each property, when Defendants polluting took place, and the severity of the ecological injury caused by the pollution. The Court nonetheless notes the rough correlation between the number of DSAYs and the number of polluting activities to demonstrate with its own "comparative analysis" that Trustees' model generally tracks comparative fault. *Cf. Arizona*, 761 F.3d at 1012 ("[N]owhere in the district court's opinion is there an analysis comparing each party's estimated liability with its settlement amount, or an explanation of why the settlements are fair, reasonable, and consistent with CERCLA's objectives." (quotation marks omitted)).

Intervenors also contend that Trustees' comparative fault analysis is too imprecise. That criticism is not well founded. As the Ninth Circuit explained in *Arizona*, "to approve a CERCLA consent decree, a district court must find that the agreement is 'based upon, and *roughly correlated with*, *some acceptable measure* of comparative fault, apportioning liability among the settling parties according to rational (*if necessarily imprecise*) estimates of how much harm each [potentially responsible party] has done.'" 761 F.3d at 1012 (alteration in *Arizona*) (quoting *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996) (quoting *Cannons*, 899 F.2d at 87) (emphases added).

PAGE 22 – AMENDED OPINION AND ORDER

Here, the record supports that Trustees' HEA and DSAYs methodology is roughly correlated with some acceptable measure of comparative fault. First, the record establishes that the HEA and DSAY allocation is an acceptable measure of comparative fault. Various federal regulations, agency guidance documents, and peer-reviewed literature recognize HEA as a measure of comparative fault, and HEA has been used as the basis for several high-profile ecological NRDA settlements. *See* ECF 85-3 at 14-15. Second, the record establishes that the HEA survey and DSAY allocation performed here was correlated to comparative fault. The HEA determined "the share of the total injuries attributable to hazardous substances released from each property along the Assessment Area," then Trustees determined which PRP owned or operated which properties or facilities in the Assessment Area and compared the "[c]ontaminants associated with activities at Defendants' properties . . . with contaminant footprints in Willamette River sediments in the Assessment Area." First Baker Decl. ¶¶ 11-15.

Trustees also explained why they chose the HEA and the DSAY allocation method for settlement purposes—doing so allowed Trustees to measure the value of habitat restoration *and* the value of building new habitats. Because of that plausible explanation, the choice of HEA is entitled to deference. In *Cannons*, for example, the First Circuit gave considerable deference to the federal government's choice of comparative fault formula, holding that "[w]hatever formula or scheme [the federal government] advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs." 899 F.2d at 87. The Ninth Circuit endorses that deferential approach where, as here, the federal government proposes the consent decree. *See Montrose*, 50 F.3d at 746 (quoting with approval *Cannons*, 899 F.2d at 87); *Arizona*, 761 F.3d

PAGE 23 – AMENDED OPINION AND ORDER

at 1013-15 (clarifying that *Montrose* deference applies only to federal agency). Intervenors'

remaining critiques of the HEA model[9] are resolved by this deference and the "reasonable

linkage" Trustees have provided between the factors it included in the HEA (the sediment

footprints measuring the chemicals released from Defendants' properties and resulting ecological

damage to the Willamette) and the proportionate shares of DSAYs assigned to Defendants (the

amount of chemicals released from each property). *See Cannons*, 899 F.2d at 87.

Moreover, Trustees established that the Consent Decrees' aggregate allocation of 11.4%

of total injury to Defendants is appropriate. The Court notes that no Intervenor or public

commentor disputed the aggregate allocation figure prior to briefing on the Motion to Enter.

*See generally* ECF 85-3. Additionally, a chart measuring the relative contribution to natural

resource damages of each of the twelve chemicals measured by the HEA "shows that some

[chemicals] contributed much more to the harm to natural resources than other[s]," and that

Defendants have little responsibility for the chemicals that did the most harm to the Willamette

River. *See* Second Declaration of Troy Baker ("Second Baker Decl.") ¶¶ 4-5 & Ex. 1

(ECF 128-1). Specifically, Trustees explained that roughly 70% of the pollution to the

Willamette was caused by four chemicals. *Id.* ¶ 5. Defendants were allocated 12.8 DSAYs for

three of the four chemicals, or roughly 1% of the harm for them. *Id.* ¶ 6. That allocation aligned

with the activities identified for each Defendant, particularly because none of Defendants'

industrial activities involved manufacturing, distribution, or storage of any of those three

chemicals. See ECF 130-2 (Table 2-3 of the Phase 2 Allocation Methodology Report, explaining

that the three chemicals are generated by pesticide storage, formulation, and manufacturing);

---

[9] Intervenors critique the HEA model, for example, because it was adapted from an HEA
model designed for use at a different site.

PAGE 24 – AMENDED OPINION AND ORDER

ECF 128 at 39 (observing that "none of the Settling Defendants conducted industrial activities that involved manufacture, distribution, or storage of" pesticides after reviewing party-specific allocation summary memoranda exhibits attached to ECF 130).

Defendants also were allocated 151 DSAYs for the fourth chemical, PAHs, which amounts for 9.3% of the harm caused by PAHs. Second Baker Decl. ¶ 7 & Ex. 1. Although all Defendants were associated with PAH activities, only two were associated with heavy PAH pollution. ECF 130-7, 130-22. Trustees explained that, because a large majority of the total damages were caused by the four chemicals, "it stands to reason that a group of settling parties with relatively little responsibility" for contributing to pollution of them "would be assigned a relatively small share of the total damages." *See* ECF 128 at 40; *see also id.* at 38-40 (explaining how the allocation methodology supported this conclusion).

Intervenors also argue that the Consent Decrees cannot be substantively fair when ongoing natural resource damage testing is still occurring at the Willamette River. Indeed, Trustees conducted the HEA that the Consent Decrees are based on for purposes of reaching a settlement with certain PRPs in Phase 2. Additional testing is occurring now that will inform the damages awards that Trustees will seek from non-settling PRPs in Phase 4. Intervenors argue that this additional testing should govern the terms of the Consent Decrees, but this too is a red herring. "Having selected a reasonable method of weighing comparative fault, the agency need not show that it is the best, or even the fairest, of all conceivable methods." *Cannons*, 899 F.2d. at 88. Trustees have established that the HEA methodology is an appropriate way to measure the damage to the Willamette River and to apportion liability to PRPs commensurate with their polluting activities. Nothing in CERCLA requires Trustees to wait to settle with PRPs until the most accurate ecological testing is complete. Indeed, CERCLA's language expressly

PAGE 25 – AMENDED OPINION AND ORDER

contemplates that settlements will precede complete information about the total scope of an environmental disaster, lest the Court contravene Congress's goals of the government reaching early settlements to "expedite effective remedial action and minimize litigation." *See* 42 U.S.C. § 9622(a); *see also Cannons*, 899 F.2d at 90 (explaining that one of the policy concerns underlying CERCLA is "that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal" (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986)); *Charter*, 83 F.3d at 520 ("Perhaps mindful of the huge resources going into the transactions costs of CERCLA litigation, rather than to remediating the sites, Congress sought in [CERCLA amendments] to encourage earlier resolutions by agreement.").

Finally, Intervenors argue that the Consent Decrees are not substantively fair because there is insufficient site-specific information about the Trustees' allocations. This is a problem, Intervenors argue, because multiple PRPs operate out of the same properties along the Assessment Area. For example, two Defendants, two Intervenors, and one defunct entity have each operated at Site 186. In situations like these, with multiple entities operating out of the same plot of land, Intervenors object that there is nothing in the record that explains how Trustees made allocations to Defendants. At bottom, Intervenors are concerned that they may wrongly pay too much in damages at Phase 4 because Trustees' site-specific allocations as memorialized in the Consent Decrees are wrong.

For two reasons, that objection does not render the Consent Decrees substantively unfair. First, "CERCLA makes potentially responsible parties jointly and severally liable" for damages. *See Confederated Tribes of the Colville Rsrv. v. Teck Cominco Metals Ltd*, --- F.4th ----, 2025

PAGE 26 – AMENDED OPINION AND ORDER

WL 2525853, at *3 (9th Cir. Sept. 3, 2025). Thus, if Intervenors are sued for damages at Phase 4, they will be free to argue that they are liable for *no* damages, or that their polluting activities only account for a certain amount of harm to the Willamette River. The site-by-site allocations are only relevant to the Consent Decrees—they will not limit Intervenors' arguments or defenses at Phase 4.

Second, even if Intervenors are correct that Trustees allocated less DSAYs to Defendants than is strictly proportionate to the pollution they contributed, that variance does not offend the purpose or terms of CERCLA. "CERCLA contemplates that responsible parties who fail to enter into an early settlement agreement 'may ultimately bear a disproportionate share of the CERCLA liability.'" *See AmeriPride Serv's Inc. v. Tex. E. Overseas Inc.*, 782 F.3d 474, 487 (9th Cir. 2015) (quoting *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 875 (9th Cir. 2014)). "Congress intended [the federal government] to have considerable flexibility in negotiating and structuring settlements" and "district court[s] should give the [government's] expertise the benefit of the doubt when weighing substantive fairness—particularly when the agency, and hence the court, has been confronted by ambiguous, incomplete, or inscrutable information." *Cannons*, 899 F.2d at 88. For that reason, courts in this Circuit recognize that "[t]he court is not asked to accomplish the 'scientifically difficult and economically infeasible' task of definitively assigning liability" when approving a CERCLA settlement. *See City of Torrance v. Hi-Shear Corp.*, 2025 WL 2819366, at *3 (C.D. Cal. Aug. 6, 2025) (quoting *Cal. Dep't of Toxic Substances Control v. NL Indus., Inc.*, 636 F. Supp. 3d 1092, 1111 n.15 (C.D. Cal. 2022)).

Here, Trustees explained how they reasonably adapted to the limits of the HEA and DSAY allocation process: for example, by implementing the relative index approach for "diffused contaminants" that did not have a clear contaminant footprint. Consistent with *Arizona*,

PAGE 27 – AMENDED OPINION AND ORDER

the Court may defer to the federal government's expertise in the site-by-site allocation process for settlement purposes. "In sum, having undertaken the requisite comparative analysis demanded by controlling Ninth Circuit precedent, this Court finds that the terms of the proposed consent decree create a reasonable and fair outcome to what could otherwise become a costly and lengthy CERCLA lawsuit." *See United States v. BNSF Railway Co.*, 2020 WL 9048798, at *5 (D. Mont. Nov. 30, 2020).

## D. Reasonableness

The Consent Decrees also are reasonable. Between the two Consent Decrees, the public will receive millions of dollars in cash—compensation for the actual and anticipated costs of remedial and response measures—and habitat restoration. The restoration projects in the Restoration Credit Consent Decree were also designed to ensure meaningful habitat restoration. For example, Trustees may only release restoration credits in the projects when ecological milestones are reached, which ensures that the settlement goals in the Consent Decrees are actualized and based on realized habitat restoration. Defendants also manage the restoration projects, and the terms of the projects are defined within the Consent Decrees. Each project also contains permanent stewardship requirements. Further, the projects will benefit several at-risk species by creating ecological diversity. The Consent Decrees therefore are reasonable. *See Cannons*, 899 F.2d at 89-90.

## E. CERCLA Policy Concerns

The Consent Decrees also advance both major policy concerns of CERCLA by ensuring that the federal government has a prompt and effective tool to respond to the release of oil and other chemicals into the Willamette River, and those that are responsible for that pollution bear

PAGE 28 – AMENDED OPINION AND ORDER

the cost and responsibility of remedying it. *See id.* at 90-91 (describing the two policy concerns underlying CERCLA).[10]

Intervenors argue that the contribution protections afforded to Defendants are too broad, because they might cover pollutants other than the twelve surveyed in the HEA or extend to other disputes between the same parties. But the Consent Decrees' contribution protections apply only to *covered* natural resource damages, and the Consent Decrees' terms also expressly prohibit Defendants from using those protections in any other forums. The Consent Decrees also contain a reopener provision through which Trustees reserve, without prejudice, the right to initiate suit against Defendants for covered natural resource damages if the results of the Phase 4 testing "indicates that there is injury to, destruction of, loss of and/or loss of use of natural resources of a type unknown, or of a magnitude significantly greater than was known, to the Trustees as of the Effective Date [of the Consent Decrees]." *See* Cash-Out Consent Decree ¶ 17; Restoration Credit Consent Decree ¶ 85. With these considerations, the contribution protections are not so disproportionately favorable to Defendants that they undermine CERCLA's statutory concern that Defendants bear the cost and responsibility of remedying the ecological damage to the Willamette.

---

[10] Declining to enter the Consent Decrees would arguably contravene the purposes of CERCLA. For one, it would waste millions of dollars that Defendants have spent on restoration to the Willamette River. Under the Consent Decrees, Defendants have borne the cost of ecological testing and the creation of the restoration projects. Accepting Intervenors' arguments at this juncture would arguably force Defendants to bear more than their share of responsibility for remedying the pollution in the Willamette by rendering unusable the viable HEA test results and restoration projects that Defendants paid for. Further, declining to enter the Consent Decrees after nearly two decades of research and collaboration between federal, state, and tribal governments and PRPs would undermine Congress's intent that CERCLA enable prompt settlement.

PAGE 29 – AMENDED OPINION AND ORDER

Further, the HEA demonstrates that Defendants are paying a premium to assume higher legal protections in the Consent Decrees. As previously discussed, the Consent Decrees are valued at $36 million—roughly $3 million higher than the $33.2 million in damage cumulatively assigned to Defendants by the HEA. Parties like Defendants who pay a premium in settlement may "assume no ongoing responsibilities," or at least enjoy significant legal protections, as compared to settlors who convey less value to the government. *See Cal. Dept. of Toxic Substances Control v. Exxon Mobil Corp.*, 2024 WL 645417, at *5 (E.D. Cal. Feb. 14, 2024) (citing *Cannons*, 899 F.2d at 88).

When reviewing a CERCLA settlement, the proper role of a court is not to serve as mediator or to impose the best or most neutral terms. Instead, the role of the Court is to ensure that the government has collected enough information to learn about the comparative fault of the parties and the Court then adequately determines whether the terms of the settlement are fair, reasonable, and consistent with the statute. The Court is satisfied that the answers to these questions are all 'yes.'

## CONCLUSION

The Court GRANTS Plaintiffs' Motion to Enter Consent Decrees, ECF 83.

**IT IS SO ORDERED**.

DATED this 13th day of March, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 30 – AMENDED OPINION AND ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**; the **STATE OF OREGON**; the **CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON**; the **CONFEDERATED TRIBES OF THE SILETZ INDIANS**; **CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION**; **CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON**; and **NEZ PERCE TRIBE**,<br><br>        Plaintiffs,<br><br>        v.<br><br>**ACF INDUSTRIES, LLC**; **AIRGAS USA, LLC**; **AIR LIQUIDE AMERICA L.P.**; **ASH GROVE CEMENT COMPANY**; **ASHLAND INC.**; **BEAZER EAST, INC.**; **BNSF RAILWAY COMPANY**; **CALBAG METALS CO.**; **CITY OF PORTLAND**; **ESCO GROUP LLC**; **EVRAZ INC. NA** f/k/a **OREGON STEEL MILLS AND GILMORE STEEL**; **GOULD ELECTRONICS INC.**; **HAJ INC.** d/b/a **CHRISTENSON OIL COMPANY**; **HERCULES LLC**; **KOPPERS INC.**; **MCCALL OIL & CHEMICAL CORP.**; **MCCALL OIL REAL ESTATE COMPANY LLC**; **MOREC FRONT LLC**; **GWC PROPERTIES, LLC**; **GWC FRONT,** | Case No. 3:23-cv-1603-SI<br><br>**ORDER** |

PAGE 1 – ORDER

**LLC**; **TANKER BASIN LLC**; **MMGL LLC**;
**NORTHWEST PIPE COMPANY** f/k/a
**NORTHWEST PIPE & CASING**
**COMPANY** f/k/a **NORTHWEST PIPE AND**
**CASING COMPANY**; **PACIFICORP, AN**
**OREGON CORPORATION**; **PORT OF**
**PORTLAND**; **PORTLAND GENERAL**
**ELECTRIC COMPANY (PGE)**;
**PORTLAND TERMINAL RAILROAD**
**COMPANY**; **RADIUS RECYCLING, INC.**
f/k/a **SCHNITZER STEEL INDUSTRIES,**
**INC.**; **SILTRONIC CORPORATION**;
**SULZER PUMPS (US) INC.**; and
**VALVOLINE INC.**,

          Defendants

**ARKEMA INC.**; **GUNDERSON LLC**; **FMC**
**CORPORATION**; and
**NW NATURAL**,

          Intervenors.

**Michael H. Simon, District Judge.**

On October 23, 2025, the Court granted by Opinion and Order Plaintiffs' Motion to Enter

Consent Decrees. *See United States v. ACF Industries, LLC*, 2025 WL 2985281, at *1, *13 (D.

Or. Oct. 23, 2025). Intervenor Arkema, Inc. appealed. ECF 154. Intervenor NW Natural then

moved for an indicative ruling in this Court, asking the Court for its views on correcting a

misstatement in the Opinion and Order under Rule 60(a) of the Federal Rules of Civil Procedure.

ECF 169. The Court granted that motion. ECF 171. The Ninth Circuit remanded the case to this

Court for the limited purpose of considering NW Natural's motion. ECF 175.

For the reasons stated in the Court's Order on Indicative Ruling, ECF 171, the Court

GRANTS NW Natural's Rule 60(a) motion, ECF 169. Consistent with the Court's subsequent

Order, ECF 173, the Court enters an Amended Opinion and Order granting Plaintiffs' Motion to

PAGE 2 – ORDER

Enter Consent Decrees that replaces the sentence "Intervenors are four PRPs who opted out of settlement negotiations" with the sentence "Interventors are four PRPs that, as of the date of this Opinion and Order, have not settled with Trustees and oppose the pending Consent Decrees."

**IT IS SO ORDERED.**

DATED this 13th day of March, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 3 – ORDER

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**; the **STATE OF OREGON**; the **CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON**; the **CONFEDERATED TRIBES OF THE SILETZ INDIANS**; **CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION**; **CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON**; and **NEZ PERCE TRIBE**, | Case No. 3:23-cv-1603-SI <br><br> **ORDER ON INDICATIVE RULING** |
| Plaintiffs, | |
| v. | |
| **ACF INDUSTRIES, LLC**; **AIRGAS USA, LLC**; **AIR LIQUIDE AMERICA L.P.**; **ASH GROVE CEMENT COMPANY**; **ASHLAND INC.**; **BEAZER EAST, INC.**; **BNSF RAILWAY COMPANY**; **CALBAG METALS CO.**; **CITY OF PORTLAND**; **ESCO GROUP LLC**; **EVRAZ INC. NA** f/k/a **OREGON STEEL MILLS AND GILMORE STEEL**; **GOULD ELECTRONICS INC.**; **HAJ INC.** d/b/a **CHRISTENSON OIL COMPANY**; **HERCULES LLC**; **KOPPERS INC.**; **MCCALL OIL & CHEMICAL CORP.**; **MCCALL OIL REAL ESTATE COMPANY LLC**; **MOREC FRONT LLC**; **GWC PROPERTIES, LLC**; **GWC FRONT,** | |

PAGE 1 – ORDER

**LLC**; **TANKER BASIN LLC**; **MMGL LLC**;
**NORTHWEST PIPE COMPANY** f/k/a
**NORTHWEST PIPE & CASING
COMPANY** f/k/a **NORTHWEST PIPE AND
CASING COMPANY**; **PACIFICORP, AN
OREGON CORPORATION**; **PORT OF
PORTLAND**; **PORTLAND GENERAL
ELECTRIC COMPANY (PGE)**;
**PORTLAND TERMINAL RAILROAD
COMPANY**; **RADIUS RECYCLING, INC.**
f/k/a **SCHNITZER STEEL INDUSTRIES,
INC.**; **SILTRONIC CORPORATION**;
**SULZER PUMPS (US) INC.**; and
**VALVOLINE INC.**,

      Defendants

**ARKEMA INC.**; **GUNDERSON LLC**; **FMC
CORPORATION**; and
**NW NATURAL**,

      Intervenors.

**Michael H. Simon, District Judge.**

Intervenor NW Natural has moved this Court under Rule 62.1 of the Federal Rules of

Civil Procedure for an indicative ruling stating that this Court would grant a motion under

Rule 60(a) of the Federal Rules of Civil Procedure if the Ninth Circuit remanded the case for that

limited purpose. For the reasons stated below, the Court grants the motion.

<strong>STANDARDS</strong>

**A. Indicative Ruling**

Rule 62.1 of the Federal Rules of Civil Procedure provides:

> (a) Relief Pending Appeal. If a timely motion is made for relief
> that the court lacks authority to grant because of an appeal that has
> been docketed and is pending, the court may:
>
> (1) defer considering the motion;
>
> (2) deny the motion; or

PAGE 2 – ORDER

ER-36

> (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

Fed. R. Civ. P. 62.1(a). If a court states that it would grant the motion or that the motion raises a substantial issue, the movant must promptly notify the circuit clerk, and the Court of Appeals may then decide whether to remand for further proceedings. *See* Fed. R. Civ. P. 62.1(b); Fed. R. App. P. 12.1(a) & (b). When a party makes a "freestanding" motion under Rule 62.1 that contains sufficient argument on the merits of the intended underlying motion, the Court will infer the existence of the underlying motion. *Index Newspapers LLC v. City of Portland*, 2022 WL 72124, at *2 (D. Or. Jan. 7, 2022).

## B. Rule 60(a)

Rule 60(a) of the Federal Rules of Civil Procedure allows a district court to "correct a clerical mistake or a mistake arising from oversight or omission." Arithmetic or spelling errors are "quintessential" clerical errors. *Tattersalls*, 745 F.3d at 1297 (citing Moore's Federal Practice § 60.11); *see also Jones & Guerrero Co. v. Sealift Pac.*, 650 F.2d 1072, 1074 (9th Cir. 1981) (collecting cases). So too are instances "where what is spoken, written or recorded is not what the court intended to speak, write or record." *In re Jee*, 799 F.2d 532, 535 (9th Cir. 1986). To that end, a district court may also use Rule 60(a) "to clarify a judgment in order to correct a failure to memorialize part of its decision, to reflect the necessary implications of the original order, to ensure that the court's purpose is fully implemented, or to permit enforcement." *Garamendi v. Henin*, 683 F.3d 1069, 1078 (9th Cir. 2012) (cleaned up). Courts may not, however, use Rule 60(a) to "substantially rewrite" their opinions. *See Miller v. Heimuller*, 2025 WL 2962448, at *5 (D. Or. Oct. 20, 2025).[1] Because the rule's "touchstone is fidelity to the

---

[1] Rule 60(a) provides the fix for "blunders in execution," whereas Rule 60(b) may be used to address substantive mistakes "where the court *changes its mind.*" *Tattersalls, Ltd. v.*

PAGE 3 – ORDER

intent behind the original judgment," *Garamendi*, 683 F.3d at 1078, it "does not allow a court to make corrections that, under the guise of mere clarification, 'reflect a new and subsequent intent because it perceives its original judgment to be incorrect,'" *id.* at 1080 (quoting *Burton v. Johnson*, 975 F.2d 690, 694 (10th Cir. 1992)). Thus, if a court resorts to Rule 60(a) to clarify the language of its judgment, the new language "'must reflect the contemporaneous intent of the district court as evidenced by the record.'" *Id.* (quoting same).

### DISCUSSION

On October 23, 2025, the Court granted by Opinion and Order Plaintiffs' Motion to Enter Consent Decrees. *See United States v. ACF Industries, LLC*, 2025 WL 2985281, at *1, *13 (D. Or. Oct. 23, 2025). Plaintiffs offered the consent decrees to Defendants and Intervenors to settle their Natural Resource Damages under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), for pollution in the Willamette River. *See id.* at *1, *6-7. Defendants are parties who agreed to settle with one of the consent decrees. Intervenors are four parties who were offered that opportunity but declined. The Court first described Intervenors as "four property owners who did not settle with [Plaintiffs]." *Id.* at *1. Later, the Court described the Intervenors as companies "who opted out of settlement negotiations." *Id.* at *7.

NW Natural, an Intervenor, argues that the latter characterization is inaccurate. In its Opposition to Motion to Enter Consent Decrees, NW Natural described its "long-term

---

*DeHaven*, 745 F.3d 1294, 1297 (9th Cir. 2014) (quotation marks omitted and emphasis in original); *see also Blanton v. Anzalone*, 813 F.2d 1574, 1577 n.2 (9th Cir. 1987) (explaining that Rule 60(a) cannot be used "where the court changes its mind, either because it made a legal or factual mistake in making its original determination, or because on second thought it has decided to exercise its discretion in a manner different from the way it was exercised in the original determination").

PAGE 4 – ORDER

cooperation in the Portland Harbor remedial and NRD processes." ECF 119 at 4. As explained in

that brief:

> Over the 25 years since the identification of Portland Harbor as a Superfund site, NW Natural has worked consistently and cooperatively with EPA and other [potentially responsible parties], taking a major role in the investigation of contamination and drafting of a feasibility study identifying possible remedial actions. NW Natural currently is completing remedial design for three project areas within the Site and is negotiating with EPA and the United States Department of Justice toward a remedial action consent decree.
>
> Concurrent with its involvement in the response work at Portland Harbor, NW Natural also worked cooperatively with the Plaintiffs to evaluate potential NRD at the Site. In January 2007, Plaintiffs began a natural resource damage assessment ("Assessment"), conducting it in phases and in cooperation with certain PRPs. NW Natural provided funding for and participated in the phased NRD assessment in cooperation with Plaintiffs and began settlement negotiations in Phase 2.

*Id.* at 3 (citations omitted). Importantly, NW Natural's "negotiations had not concluded at the

time Plaintiffs commenced this action, nor by the time Plaintiffs filed their Motion to Enter." *Id.*

During the Court's hearing on the Motion to Enter, NW Natural echoed its desire to settle.

*See* ECF 170-1 at 30 ¶ 24 ("We generally support the settlement process . . . ."); 36 ¶¶ 1-2 ("NW

Natural very much wants to settle this case."). No party contested those written or oral

representations.

The Court agrees that NW Natural did not "opt out of settlement negotiations," and that

the Opinion's characterization of the Intervenors in that manner does not "reflect the

contemporaneous intent of the district court as evidenced by the record." *See Garamendi*, 683

F.3d at 1080. Rather, it is more accurate to describe NW Natural (and the other Intervenors) as a

party that "did not settle" by joining the consent decrees, as the Court did elsewhere in the

Opinion. *See ACF Industries*, 2025 WL 2985281, at *1. Clarifying this language ensures that

PAGE 5 – ORDER

NW Natural and the other Intervenors are not unduly prejudiced in future CERCLA liability proceedings. On limited remand from the Ninth Circuit, the Court would replace the offending language with the phrase "who did not settle." That change, however, would not alter the reasoning or outcome of the Court's Opinion, nor would it impact the entry or implementation of the consent decrees.

## CONCLUSION

The Court GRANTS NW Natural's motion for an indicative ruling, ECF 169. The Court would grant the Rule 60(a) motion consistent with this Order if the Ninth Circuit were to remand the case for that purpose. NW Natural shall promptly notify the Clerk of the United States Court of Appeals for the Ninth Circuit pursuant to Rule 12.1(a) of the Federal Rules of Appellate Procedure of the Court's indicative ruling.

**IT IS SO ORDERED.**

DATED this 20th day of February, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 6 – ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA; the
STATE OF OREGON; the
CONFEDERATED TRIBES OF THE
GRAND RONDE COMMUNITY OF
OREGON; the CONFEDERATED TRIBES
OF THE SILETZ INDIANS;
CONFEDERATED TRIBES OF THE
UMATILLA INDIAN RESERVATION;
CONFEDERATED TRIBES OF THE
WARM SPRINGS RESERVATION OF
OREGON; and NEZ PERCE TRIBE,

       Plaintiffs,

    v.

ACF INDUSTRIES, LLC; AIRGAS USA,
LLC; AIR LIQUIDE AMERICA L.P.; ASH
GROVE CEMENT COMPANY;
ASHLAND INC.; BEAZER EAST, INC.;
BNSF RAILWAY COMPANY; CALBAG
METALS CO.; CITY OF PORTLAND;
ESCO GROUP LLC; EVRAZ INC. NA f/k/a
OREGON STEEL MILLS AND GILMORE
STEEL; GOULD ELECTRONICS INC.;
HAJ INC. d/b/a CHRISTENSON OIL
COMPANY; HERCULES LLC; KOPPERS
INC.; MCCALL OIL & CHEMICAL
CORP.; MCCALL OIL REAL ESTATE
COMPANY LLC; MOREC FRONT LLC;
GWC PROPERTIES, LLC; GWC FRONT,
LLC; TANKER BASIN LLC; MMGL LLC;
NORTHWEST PIPE COMPANY f/k/a

Case No. 3:23-cv-1603-SI

OPINION AND ORDER

PAGE 1 – OPINION AND ORDER

**NORTHWEST PIPE & CASING COMPANY** f/k/a **NORTHWEST PIPE AND CASING COMPANY**; **PACIFICORP, AN OREGON CORPORATION**; **PORT OF PORTLAND**; **PORTLAND GENERAL ELECTRIC COMPANY (PGE)**; **PORTLAND TERMINAL RAILROAD COMPANY**; **RADIUS RECYCLING, INC.** f/k/a **SCHNITZER STEEL INDUSTRIES, INC.**; **SILTRONIC CORPORATION**; **SULZER PUMPS (US) INC.**; and **VALVOLINE INC.**,

        Defendants

**ARKEMA INC.**; **GUNDERSON LLC**; **FMC CORPORATION**; and **NW NATURAL**,

        Intervenors.

Adam R.F. Gustafson, Acting Assistant Attorney General, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENTAL & NATURAL RESOURCES DIVISON; Michael James Zevenbergen, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENTAL ENFORCEMENT SECTION, C/O NOAA Damage Assessment, 7600 Sand Point Way NE, Seattle, WA 98155. Of Attorneys for Plaintiff United States of America.

Dan Rayfield, Attorney General; Sadie Forzley, Assistant Attorney General; Christina L. Beatty-Walters, and Gary Lee Vrooman, OREGON DEPARTMENT OF JUSTICE,100 SW Market Street, Portland, OR 97201. Of Attorneys for Plaintiff State of Oregon.

Holly Ray Partridge, CONFEDERATED TRIBES OF GRAND RONDE - TRIBAL ATTORNEY'S, 9615 Grand Ronde Road, Grand Ronde, OR 97347. Of Attorneys for Plaintiff Confederated Tribes of the Grand Ronde Community of Oregon.

Julie A. Weis, HAGLUND KELLEY LLP, 2177 SW Broadway, Portland, OR 97201. Of Attorneys for Plaintiff Confederated Tribes of the Siletz Indians.

Joseph R. Pitt, CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION OFFICE OF LEGAL COUNSEL, 46411 Timine Way, Pendleton, OR 97801. Of Attorneys for Plaintiff Confederated Tribes of the Umatilla Indian Reservation.

Josh Newton, BEST BEST & KRIEGER LLP, 360 SW Bond St., Ste. 400 Bend, OR 97702. Of Attorneys for Plaintiff Confederated Tribes of the Warm Springs Reservation of Oregon.

PAGE 2 – OPINION AND ORDER

Courtney B. Johnson, CRAG LAW CENTER, 3141 E Burnside St., Portland, OR 97214. Of Attorneys for Plaintiff Nez Perce Tribe.

C. Marie Eckert and Jeffrey C. Miller, MILLER NASH LLP, 1140 SW Washington St., Suite 700, Portland, OR 97205. Of Attorneys for Defendants ACF Industries, LLC and Beazer East, Inc.

Christine L. Hein, Jeffrey W. Ring, and Mark P. Strandberg, RING BENDER LLP, 920 SW Sixth Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Defendants Airgas USA, LLC and Air Liquide America L.P.

Brian Ferrasci-O'Malley, Leslie Nellermoe, and Tara Marie O'Hanlon, NOSSAMAN LLP, 719 Second Avenue, Suite 1200, Seattle, WA 98104; Christopher T. Carson, KILMER, VOORHEES & LAURICK, P.C., 2701 NW Vaughn Street, Suite 780, Portland, OR 97210. Of Attorneys for Defendant Ash Grove Cement Company.

John Cooke and Andrew Zabel, HOULIHAN LAW, 100 N. 35th Street, Seattle, WA 98103. Of Attorneys for Defendants Ashland, Inc., Hercules LLC, and Valvoline Inc.

Jay Kevin Griffith and Robert B. Lowry, KELL, ALTERMAN & RUNSTEIN, L.L.P., 520 SW Yamhill Street, Suite 600, Portland, OR 97204. Of Attorneys for BNSF Railway Company.

Jennifer L. Gates, PEARL LEGAL GROUP, 529 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Defendant Calbag Metals Co.

Samantha Gamboa, Deputy City Attorney; Tina M. Richards, and Nanci L. Klinger, CITY OF PORTLAND ATTORNEY'S OFFICE, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Of Attorneys for Defendant City of Portland.

Nicholas W. Van Aelstyn, SHEPPARD MULLIN RICHTER & HAMPTON LLP, Four Embarcadero Center, 17th Floor, San Francisco, CA 94111; Fred J.W. Chung, SHEPPARD MULLIN RICHTER & HAMPTON LLP, 1540 El Camino Real, Suite 120, Menlo Park, CA 94025; Paul J. Kaufman, SHEPPARD MULLIN RICHTER & HAMPTON LLP, 12275 El Camino Real, Suite 100, San Diego, CA 92130. Of Attorneys for Defendant ESCO Group LLC.

David C. Weber and Loren R. Dunn, BEVERIDGE & DIAMOND, P.C., 600 University St., Suite 1601, Seattle, WA 98101; Nicole Bishop Weinstein, BEVERIDGE & DIAMOND P.C., 825 Third Avenue, 16th Floor, New York, NY 10022. Of Attorneys for Defendants Evraz Inc. NA f/k/a Oregon Steel Mills and Gilmore Steel and Portland General Electric Company (PGE).

Anne Devlan Foster, SMITH FOSTER KING LLP, 25 NW 23rd Place, Suite 6 #125, Portland, OR 97210. Of Attorneys for Gould Electronics Inc.

James P. Murphy, MURPHY ARMSTRONG & FELTON LLP, 701 Millennium Tower, 719 Second Avenue, Seattle, WA 98104; Katherine L. Felton, NOSSAMAN LLP, 719 Second Avenue, Suite 1200, Seattle, WA 98104. Of Attorneys for Defendant HAJ, Inc. d/b/a Christenson Oil Company.

PAGE 3 – OPINION AND ORDER

Gregory L. Baird, GORDON & POLSCER, LLC, 9020 SW Washington Square Road, Suite 560, Tigard, OR 97223; Alan S. Miller, HOUSTON HARBAUGH, P.C., 401 Liberty Avenue, Three Gateway Center, 22nd Floor, Pittsburgh, PA 15222. Of Attorneys for Defendant Koppers Inc.

Jeffrey C. Miller, MILLER NASH LLP, 1140 SW Washington St., Suite 700, Portland, OR 97205. Of Attorneys for Defendants McCall Oil & Chemical Corp., McCall Oil Real Estate Company LLC, Morec Front LLC, GWC Properties, LLC, GWC Front, LLC, and Tanker Basin LLC.

Greg A. Christianson and Megan Ault, ALSTON & BIRD, 55 2nd Street, Suite 2100, San Francisco, CA 94105; Thomas A. Ped, WILLIAMS KASTNER, 805 SW Broadway, Suite 2440, Portland, OR 97205. Of Attorneys for Defendants MMGL LLC and Radius Recycling, Inc. (fka Schnitzer Steel Industries, Inc.)

Michael B. Merchant, BLACK HELTERLINE, LLP, 805 SW Broadway, Suite 2600, Portland, OR 97205. Of Attorneys for Defendant Northwest Pipe Company f/k/a Northwest Pipe & Casing Company f/k/a Northwest Pipe and Casing Company.

Matthew D. Wells, FOSTER GARVEY PC, 1111 Third Avenue, Suite 3000, Seattle, WA 98101. Of Attorneys for Defendant PacifiCorp, an Oregon Corporation.

Crystal S. Chase, PORT OF PORTLAND, 7200 NE Airport Way, PO Box 3529, Portland, OR 97218; James Christopher Baird and Rachel Sinsheimer, CORVID LAW PLLC dba HEADWATERS LAW GROUP, 92 Lenora Street, Seattle, WA 98103. Of Attorneys for Defendant Port of Portland.

Elizabeth C. Knight, Ana Lanikeha and Rosa Ching, DUNN CARNEY LLP, 851 SW Sixth Avenue, Suite 1500, Portland, OR 97204; Michael B. Merchant, BLACK HELTERLILNE LLP, 805 SW Broadway St., Suite 2600, Portland, OR 97205. Of Attorneys for Defendant Portland Terminal Railroad Company.

David A. Rabbino, JORDAN RAMIS PC, 1211 SW Fifth Avenue, Suite 2700, Portland, OR 97204. Of Attorneys for Defendant Siltronic Corporation.

Daniel K. Reising, FUCILE & REISING LLP, 1120 SE Madison St., Portland, OR 97214. Of Attorneys for Defendant Sulzer Pumps (US) Inc.

Matthew J. Stock, HILLIS CLARK MARTIN & PETERSON P.S., 999 3rd Ave., Suite 4600, Seattle, WA 98104. Of Attorneys for Intervenor Arkema Inc.

Maureen Bayer and Zachary W.L. Wright, TONKON TORP LLP, 1300 SW 5th Avenue, Suite 2400, Portland, OR 97201. Of Attorneys for Intervenor Gunderson LLC.

Bradley T. Crittenden, CHENOWETH LAW GROUP, PC, 510 SW Fifth Avenue, Suite 400, Portland, OR 97204; Christopher I. Rendall-Jackson, Hayleigh Shobar, and James H. Colopy, FARELLA BRAUN & MARTEL LLP, 1 Bush Street, Suite 900, San Francisco, CA 94104. Of Attorneys for Intervenor FMC Corporation.

PAGE 4 – OPINION AND ORDER

Heather Tourgee and Patricia M. Doust, PEARL LEGAL GROUP, PC, 529 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Intervenor NW Natural.

**Michael H. Simon, District Judge.**

Plaintiffs the United States, the State of Oregon, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe (collectively, "Trustees") have sued Defendants, who allegedly polluted the Willamette River ("Willamette River" or "Willamette"), for Natural Resource Damages under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a). After nearly two decades of negotiations among the parties, environmental impact studies, notice-and-comment periods, and public information sessions, Trustees have moved for entry and approval of two settlement agreements that would resolve Defendants' liability. *See* the Restoration Credit Consent Decree (ECF 4-1, 5-1, 6-1, 7-1, 8-1, and 9-1) and the Cash-Out Consent Decree (ECF 11-1) (together, "the Consent Decrees"). Intervenors, four property owners who did not settle with Trustees, oppose the Consent Decrees. For the reasons that follow, and over the objections of Intervenors, the Court grants Trustees' Motion.

## STANDARDS

"In order to approve a CERCLA consent decree, a district court must conclude that the agreement is procedurally and substantively 'fair, reasonable, and consistent with CERCLA's objectives.'" *Arizona v. City of Tucson*, 761 F.3d 1005, 1011-12 (9th Cir. 2014) (quoting *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 748 (9th Cir. 1995)). The party seeking approval must provide a court "evidence sufficient to evaluate the terms of the agreement," and the court must "actually engage with that information and explain in a reasoned disposition why

PAGE 5 – OPINION AND ORDER

the evidence indicates that the consent decrees" meet those requirements. *Id.* at 1012. To do so, a district court must "gauge the adequacy of settlement amounts to be paid by settling parties by comparing the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them, and then . . . factor into the equation any reasonable discount for litigation risks, time savings, and the like," also appraising "what the government is being given by the settling part relative to what the settling party is receiving." *Id.* (cleaned up).

"To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990).[1] Substantive fairness, by contrast, asks whether the terms of the settlement are fair as between the settling parties. *See id.* at 87. "Thus, in order to approve a CERCLA consent decree, a district court must find that the agreement is 'based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done.'" *Arizona*, 761 F.3d at 1012 (quoting *Cannons*, 899 F.2d at 87).

In the substantive fairness inquiry, however, the federal government is entitled to considerable deference. *See Montrose*, 50 F.3d at 746; *see also Arizona*, 761 F.3d at 1013-15 (clarifying that *Montrose* deference applies only to a federal agency). "Although 'the true measure of the deference due depends on the persuasive power of the agency's proposal and

---

[1] The Ninth Circuit regularly relies on *Cannons* to describe the standard of review for CERCLA consent decrees. *See, e.g.*, *Arizona*, 761 F.3d at 1013; *Montrose Chem. Corp.*, 50 F.3d at 746-48 (each citing and quoting *Cannons*). The Court therefore considers *Cannons* highly persuasive authority.

PAGE 6 – OPINION AND ORDER

rationale,'[2] a district court reviewing a proposed consent decree 'must refrain from second-guessing the Executive Branch.'" *Montrose*, 50 F.3d at 746 (quoting *Cannons*, 899 F.2d at 84) (footnote added). This "deference is appropriate given '[t]hat so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment.'" *Montrose*, 50 F.3d at 746 (quoting same).[3] Courts in the Ninth Circuit extend that deference because of CERCLA's extraordinary "policy of encouraging early settlements," which "is strengthened when a government agency charged with protecting the public interest 'has pulled the laboring oar in constructing the proposed settlement.'" *Id.* (quoting same).

A consent decree is reasonable when it is likely to effectively benefit the environment, "satisfactorily compensate[ ] the public for the actual (and anticipated) costs of remedial and response measures" and considers the "relative strength of the parties' litigating positions." *Cannons*, 899 F.2d at 89-90. Further, CERCLA has "two major policy concerns" that a court should evaluate: (1) giving the federal government "a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal"; and (2) making "those responsible for problems caused by the disposal of chemical poisons bear the costs and

---

[2] In *Arizona*, the Ninth Circuit observed that "courts have not established whether the deference that we afford the EPA [when it seeks judicial approval of a proposed CERCLA consent decree] is . . . the deference described in *Skidmore v. Swift & Co.*, or some other type of deference." 761 F.3d at 1013 n.6 (citations omitted). But the sliding-scale approach described in *Cannons*, 899 F.2d at 84, and quoted by the Ninth Circuit in *Montrose*, 50 F.3d at 746, looks like *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

[3] *See also* 42 U.S.C. § 9622(a) ("[T]he President *shall act* to facilitate agreements under this section that are in the public interest . . . *in order to expedite* effective remedial actions and minimize litigation." (emphases added)).

PAGE 7 – OPINION AND ORDER

responsibility for remedying the harmful conditions they created." *Id.* at 90-91 (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986)).

## BACKGROUND

**A.  Natural Resource Damage to the Willamette River**

In the late 1800s, the Portland Harbor section of the lower Willamette River became an industrial hub for shipping and manufacturing. *See* ECF 130-26 at 17 (Declaration of Jennifer Hughes). Newly built navigation channels, wharves, and piers made accessing the shoreline easier than ever. *Id.* But the boats that traversed the river brought more than industry to Oregon: runoff from practices like maintenance dredging, wood treatments, and chemical manufacturing soon contaminated the river, which over the next hundred years became heavily polluted with oil and other hazardous substances. *See id.*; Declaration of Troy Baker ("First Baker Decl.") ¶ 6 (ECF 85-1). The once-vibrant ecology of the Willamette enfeebled; fish, wildlife, and their habitats suffered as a result.

That pollution went unaddressed until 2010, when Trustees joined forces. Availing themselves of the benefits of CERCLA, 42 U.S.C. §§ 9601, *et seq.*, and other federal statutes and regulations, Trustees created a Natural Resource Damage Assessment ("NRDA") to address the pollution in the Willamette River.[4] Trustees' "iterative, four-phased approach" intended to "encourage participation by parties potentially responsible for releases of contamination and discharges of oil" to work with Trustees to clean the river. *See* ECF 130-26 at 10.

---

[4] The other statutes are the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.*, and the Clean Water Act, 33 U.S.C. § 1251. Trustees are authorized under both Federal and state regulations to conduct a NRDA (NCP 40 Code of Federal Regulations (C.F.R.) Subpart G, § 300.600, 300.605, 300.610). Executive Orders 12580 and 12777 also authorize Trustees' actions. *See* Hughes Decl., Ex. 26 at 10-12.

PAGE 8 – OPINION AND ORDER

During Phase 1, Trustees developed an assessment plan to identify pollutants in the river and a work plan to restore the environment. *See* ECF 130-1 at 3. Trustees also performed preliminary scientific studies "to fill data gaps" related to salmon and osprey—two injured species in the river—and reviewed initial data collected in the "remedial process" to determine the "preliminary injury and damages" to the Willamette. ECF 130-26 at 10. In addition, Trustees began their public outreach efforts by soliciting comments on their plans. *Id.*

In Phase 2, Trustees performed an ecological study to identify potentially responsible parties ("PRPs") who could have caused the pollution in the Willamette River. *See id.* at 10-11. Also during Phase 2, Trustees proposed settlement agreements with PRPs. *Id.* During the final Phases, Trustees would finish their ecological studies to determine the full breadth of damage to the Willamette (Phase 3) and sue any PRPs who did not settle for damages (Phase 4). *Id.* at 11-12.

To identify the PRPs, Trustees first defined where on the Willamette River they would assess ecological injury. They decided on a roughly thirteen-mile stretch to survey (the "Assessment Area") "from approximately river mile (RM) 12 to RM 1, and the upper one mile of Multnomah Channel." *Id.* at 11. Trustees next identified all current and historic owners of real property "at or from which there have been releases of hazardous substances and/or discharges of oil" to the Assessment Area and classified them as PRPs. *See* ECF 85 at 11 (Trustees' Motion to Enter Consent Decrees).

To evaluate the ecological damage to the Assessment Area for settlement purposes, Trustees performed a habitat equivalency analysis ("HEA"). *See* ECF 85-3 at 8 (Trustees' response to notice-and-comment regarding proposed settlements explaining the HEA process). "HEA is a method of converting the diverse flow of ecological services provided by a habitat, for

PAGE 9 – OPINION AND ORDER

example, food and shelter for animals, into a common currency." *Id.* That currency is called a discounted service acre year ("DSAY"). *Id.* One DSAY "represents the total amount of ecological services provided by an acre of a given habitat (e.g., marsh, mudflat, forested uplands) over the course of one year." *Id.* Unlike other assessments that do not measure DSAYs, HEA assumes that building a new, equivalent habitat will provide the same services as an old habitat:

> Thus, for example, a party could provide compensation for lost wetland ecological services by creating additional wetland ecological services through restoration of existing wetland habitat or creation of new wetland habitat. HEA allows natural resource trustees engaged in the NRDA process to quantify both the ecological service losses (injuries) to habitat caused by contamination, as well as the amount of restoration necessary to generate ecological services that will compensate the public for those losses.

*Id.* Trustees chose an HEA because it could measure compensation through restoration or creation. *See id.*

Trustees designed the HEA to measure the injuries resulting from twelve contaminants in river sediments. First Baker Decl. ¶¶ 7-8. The twelve contaminants were hazardous substances and oil released from the PRPs shoreline property along the Assessment Area. *Id.* To ensure that the HEA properly measured the contaminants' impact, Trustees made contaminant footprint maps for each of the twelve contaminants of concern. *Id.* ¶ 8. Each map reflected the "degree of contamination relative to threshold concentrations for injury to aquatic resources" and defined the "sediment contaminant concentrations that exceed[ed] these threshold levels." *Id.* The maps also reflected Oregon and Washington State sediment standards and contaminant thresholds established in the scientific literature. *Id.*

With their twelve targeted contaminants and methodology in hand, Trustees performed the HEA. Trustees measured the size of the Assessment Area (in acres), the severity of the ecological injury (by percent of ecological service loss), the duration of the injury (how long the

PAGE 10 – OPINION AND ORDER

environment suffered without the ecological service), and the timing of the injury (when the ecological services was lost). ECF 85-3 at 16. The result of the HEA was 4,130 DSAYs. First Baker Decl. ¶ 10; *see also* Cash-Out Consent Decree ¶ K; Restoration Credit Consent Decree at ECF 4-1 ¶ P.

Trustees then assigned those DSAYs to the PRPs. Trustees "first developed estimates of the share of the total injuries attributable to hazardous substances released from each property along the Assessment Area" by reviewing publicly available documents obtained from the United States Environmental Protection Agency ("EPA") and the Oregon Department of Environmental Quality ("DEQ"), as well as summary documents published by federal, state, and local authorities to evaluate activities that took place at those facilities that resulted in the release or likely release of hazardous substances and oil discharges. First Baker Decl. ¶ 11. Each PRP then "identified the properties and facilities it owns or operates, and/or formerly owned or operated" and "submitted information regarding its activities and operations for these identified properties, which Trustees reviewed for accuracy." *Id.* ¶ 12. Based on the PRPs' submissions, Trustees determined the contaminants likely associated with the activities.

After making that determination, Trustees compared the "[c]ontaminants associated with activities at Defendants' properties . . . with contaminant footprints in Willamette River sediments in the Assessment Area." *Id.* Trustees then used a three-step process to determine whether a property would be potentially subject to allocation for a particular contaminant:

> First, a pathway must exist for the contaminant to travel from the property or facility to the Assessment Area.
>
> Second, contaminants associated with activities on the property or facility were found in contaminated sediment footprints.
>
> Finally, those footprints were in sufficiently close proximity to the property or facility, or a site-related outfall to the Willamette River. If a connection existed between contaminated sediments and

PAGE 11 – OPINION AND ORDER

> a Defendant's property or facility, then that property or facility was assigned natural resource damages liability for the contaminated footprint. The amount of assigned liability (in DSAYs) depended on the estimated injury to natural resources (in DSAYs) caused by contaminants in the sediment footprint and whether other properties and facilities also contributed contaminants to that footprint.

*Id.* (reformatted). Trustees also considered the substance type when assigning contaminants to properties.

"[F]or most hazardous substances, there was a 'footprint' of contamination in the sediments that was attributed to particular facilities or properties." *Id.* ¶ 13. But "more ubiquitous and diffuse contaminants" like polycyclic aromatic hydrocarbons ("PAHs")—chemicals found in substances like oil that are created when organic matter is burned—have no clear footprint. *Id.* For those diffused contaminants, Trustees used a relative index approach, "where liability was divided among the facilities and properties that were known to have released the ubiquitous and diffuse contaminants . . . based on the nature of the waste-producing activities located at the facility or property, the area involved and the time period during which these activities occurred." *Id.*

Using this methodology, Trustees assigned 97% of the contaminated sediment footprints to properties or facilities near or adjacent to the Assessment Area. *Id.* Trustees then developed a proposed liability allocation, in DSAYs, for each property or facility by the Assessment Area and then for each PRP. *Id.* ¶ 14. Trustees shared those allocations and their factual bases with the PRPs and gave each PRP an opportunity to provide more information if it disagreed with Trustees' proposed allocations:

> For example, a PRP might provide information that it did not use a particular type of process or chemical at the site in question. If Trustees agreed that the additional information warranted revisions to the factual basis of their initial allocation, revisions to the factual basis and associated DSAY allocations were made.

PAGE 12 – OPINION AND ORDER

*Id.* Trustees did not, however, significantly revise a PRP's allocation without a factual basis. Considerations like litigation risk or uncertainty, to the extent they impacted PRPs' allocations at all, only accounted for "modest equitable downward revisions." *Id.* Trustees never published, however, their precise allocation figures, claiming that they were privileged settlement communications.

Through this Phase 2 process, Defendants agreed to settle with Trustees and pay an amount commensurate with the number of DSAYs assigned to them by the HEA. Trustees finalized the allocations for that group, allocating 471.389 DSAYs between Defendants in the Consent Decrees. *Id.* ¶ 15. Those DSAYs represent about 11.4% of the estimated total natural resource damages for the Assessment Area. *Id.* Roughly 70% of the pollution to the Willamette was caused by four chemicals. Second Declaration of Troy Baker ("Second Baker Decl.") ¶¶ 4-5 & Ex. 1 (ECF 128-1). Defendants were allocated 12.8 DSAYs for three of the four chemicals, or roughly 1% of the harm for them. *Id.* ¶ 6. Defendants were allocated 151 DSAYs for the fourth chemical, PAHs, which amounts for 9.3% of the total harm to the Willamette caused by PAHs. *Id.* ¶ 7. Although all Defendants were associated with PAH activities, only two were associated with heavy PAH pollution. ECF 130-7, 130-22.

While preparing the Consent Decrees to settle their claims with Defendants, Trustees continued to perform additional ecological testing. *See* ECF 130-26 at 34-39 (describing planned and ongoing ecological testing during Phase 3); *see also id.* at 49-53 (describing parameters for study management, quality assurance, and data validation during ecological studies). This testing is more precise than the HEA analysis that Trustees used for settlement purposes, and it will form the basis of Trustees' Phase 4 damages claims against non-settling PRPs. *See id.* at 29-33 (describing loss quantification model for damages); 34-53.

PAGE 13 – OPINION AND ORDER

**B. Consent Decrees**

Each Defendant agreed to one of two proposed consent decrees. The Cash-Out Consent Decree and the Restoration Credit Consent Decree both require Defendants to purchase their allocated number of DSAYs, but they differ on how Defendants purchase those DSAYs and on what the proceeds are spent. In the Cash-Out Consent Decree, Defendants purchase DSAYs in cash at a value of $70,500/DSAY, and Trustees may spend the proceeds as they see fit. In the Restoration Credit Consent Decree, Defendants purchase DSAY Credits, which may be used to fund one of four restoration projects—habitat building projects that were designed by Trustees in connection with specific Defendants for the express purpose of the Restoration Credit Consent Decree.

Each Consent Decree also has an additional cash payment associated with it. Defendants participating in the Cash-Out Consent Decree pay for Trustees' past and interim costs, such as the costs of ecological testing, creating the restoration projects, and litigation. *See* Cash-Out Consent Decree ¶¶ K, 8-10. For Defendants participating in the Restoration Credit Consent Decree, each must make an additional cash payment, calculated by totaling the following figures: (a) for each DSAY purchased, add $1,742 to "compensate for recreational service losses and tribal service losses"; (b) for each DSAY not purchased but allocated, add $70,500; (c) add the Defendant's "Final Allocated Share of Trustee Council Assessment Costs"; and (d) subtract the total funding received from the Defendant by the Trustee Council under the Funding and Participation Agreements. Trustees have published a detailed accounting explaining how much and to which Restoration Project each Defendant is paying.

The Trustees designed four restoration projects in connection with the Restoration Credit Consent Decree by performing targeted HEAs on discrete habitats and species. From there, Trustees assigned each restoration project a "Forecast DSAY Value" that represented the

PAGE 14 – OPINION AND ORDER

anticipated ecological value the project would yield. For example, the HEA for the Alder Creek Restoration Project, which would produce 52.28 acres of restored, enhanced, and protected habitat for juvenile salmon, yielded a Forecast DSAY Value of 734.21 DSAYs. As proposed, Defendants agreeing to the Restoration Credit Consent Decree would purchase DSAYs at an amount proportional to their polluting activities, which would be determined by the *initial* HEA. The project developers for each restoration project are parties to the Restoration Credit Consent Decree, and the terms of each restoration project are set forth in the associated habitat development plan attached to the Consent Decree. Restoration Credit Consent Decree at ECF 4-1 ¶¶ 18, 27. Trustees may only release restoration credits in the projects when ecological milestones are reached, and each project contains permanent stewardship requirements.

The four restoration projects are designed to reap ideal ecological rehabilitation at the Willamette River: three are near one another, providing habitat connectivity between the project sites. The fourth project site is located on a river bar park, providing additional connecting habitat outside the boundaries of the project. Accordingly, Trustees predict that the habitat restoration will mutually benefit fish, birds, and other animals as they move between one project to another. The projects also are structured to achieve mature habitats, because all four of these restoration projects are already constructed with habitat development underway.

In consideration, Trustees agree not to sue Defendants for natural resource damages resulting from releases of hazardous substances or discharges of oil before the Effective Date from the properties and facilities identified in the Consent Decree into the Assessment Area. *See* Restoration Credit Consent Decree at ECF 4-1 ¶ 3.d; Cash Out Consent Decree ¶ 3.b (Definitions of "Covered Natural Resource Damages"); Restoration Credit Consent Decree at ECF 4-1 § XIII; Cash-Out Consent Decree § IX (Covenants Not to Sue by Plaintiffs). That covenant is not

PAGE 15 – OPINION AND ORDER

absolute, however, and is subject to reservations of rights. *See* Restoration Credit Consent

Decree at ECF 4-1 § XIV; Cash-Out Consent Decree § X. Trustees also reserve

> the right to institute proceedings against Settling Defendants . . .
> for: Covered Natural Resource Damages if conditions, factors or
> information in the Portland Harbor Natural Resource Damage
> Assessment Area, not known to Trustees as of the Effective Date
> of this Consent Decree, are discovered that, together with any other
> relevant information, indicates that there is injury to, destruction
> of, loss of and/or loss of use of natural resources of a type
> unknown, or of a magnitude significantly greater than was known,
> to Trustees as of the Effective Date.

Restoration Credit Consent Decree at ECF 4-1 § XV; Cash-Out Consent Decree § XI. The

Consent Decrees would also be enforceable against non-settling PRPs and protect Defendants

from contribution actions or claims by other PRPs as to covered natural resource damages. The

total value of the claims resolved between the two consent decrees would be about $36.2 million.

ECF 85 at 7.

Throughout the settlement process, Trustees ensured that the public had an active voice in

the cleanup of the Willamette. Trustees communicated with the public in several ways, including

by making informational YouTube videos, writing short blurbs about the science underpinning

HEAs and the restoration projects on their website, and hosting town hall sessions. Trustees also

published the proposed Consent Decrees in the Federal Register to solicit public comments for a

total of 75 days. *See id.* at 17; 88 Fed. Reg. 78063. Trustees received comments from: John Lee

Marshall; Arkema Inc.; FMC Corporation; Gunderson LLC; Yakama Nation (more formally

known as the Confederated Tribes and Bands of the Yakama Nation); Willamette Riverkeeper;

and Northwest Environmental Defense Center. Trustees responded to each comment in the

Federal Register before moving for approval and entry of the Consent Decrees.

PAGE 16 – OPINION AND ORDER

## DISCUSSION

Intervenors are four PRPs who opted out of settlement negotiations. They now ask the Court to deny approval and entry of the Consent Decrees.[5] After considering the submissions made by Intervenors and all filed responses, the Court rejects Intervenors' arguments.

According to the HEA, the Consent Decrees benefit Trustees *more* than is appropriate per Defendants' comparative fault. Trustees estimate that Defendants are liable for 11.4% of damage to the Willamette. According to the HEA, the Willamette has total damages of 4,130 DSAYs, with each DSAY worth $70,500. Thus, proportional to their collective fault, Defendants (allocated roughly 471 DSAYs) owe about $33.2 million. But the value of the Consent Decrees is *higher*, at approximately $36 million, because Defendants are paying approximately $3 million of Trustees' costs to assess Natural Resource Damages. Defendants have also *already* advanced Trustees approximately $8 million during the course of the settlement process in support of the early restoration process for services like ecological surveys and restoration project development. *See* Cash-Out Consent Decree App. C at 118 ($4,619,472.39 already received); Restoration Consent Decree App. C at 1 ($3,560,356.85 already received). The Consent Decrees also carry with them the classic benefit of settlement: that Trustees avoid the risk of litigation with Defendants and minimize the cost of later damages suits. Thus, as explained more thoroughly below, the Court finds that the Consent Decrees are fair, reasonable, and consistent with CERCLA's objectives. Approval of the Consent Decrees is appropriate.

---

[5] Intervenors raise several objections to the Consent Decrees through four separate briefs. *See* ECF 111 (Arkema Inc.); ECF 112 (FMC Corporation); ECF 115 (Gunderson LLC); and ECF 119 (NW Natural). The Court discusses below Intervenors' primary objections. The Court has considered but declines to discuss Intervenors' remaining objections and finds them unpersuasive.

PAGE 17 – OPINION AND ORDER

## A.  Judicial Review

As a threshold matter, Intervenors argue that the Court cannot perform meaningful judicial review of the Consent Decrees because the Court has insufficient information about the Parties' negotiations and Trustees' allocations. That objection is not well founded. A district court's "review of a CERCLA consent decree may not be made in an 'informational vacuum,' or where the record contains 'no evidence at all on an important point.'" *Arizona*, 761 F.3d at 1012 (quoting *Montrose*, 50 F.3d at 746-47). Here, Intervenors point to no category within the *Montrose* factors where Trustees offer "no evidence at all." *See id.* (quoting *Montrose*, 50 F.3 at 746). Instead, Intervenors simply take issue with the level of detail that Trustees provide in the record. Intervenors argue, for example, that Trustees offer no specific formula to explain the allocations or discount given to each Defendant. *See, e.g.*, ECF 115 at 17-18; ECF 119 at 8-10. But the record describes the HEA methodology and how the DSAY allocations were made to each Defendant. Those general contours are sufficient to guide the Court's analysis as to whether that methodology is fair, reasonable, and consistent with CERCLA's objectives.[6] To the extent that Trustees may have produced insubstantial evidence to justify certain terms of the Consent Decrees, those deficiencies are relevant to whether the terms of the Consent Decrees are substantively fair, not to the ability of the Court to perform meaningful judicial scrutiny.

Further, "the mere fact that evidence sufficient to evaluate the terms of an agreement is . . . in the parties' possession is not alone sufficient" to approve a CERCLA consent decree. *Arizona*, 761 F.3d at 1012. Intervenors argue that the record is lacking in this case because Trustees did not adequately "show their work" by putting all relevant information from the

---

[6] Indeed, Intervenors themselves used this kind of record evidence to argue that Trustees' calculations were *inappropriate*. The Court agrees with Trustees that "the basic fairness of the allocation can be assessed using available information." ECF 128 at 35.

PAGE 18 – OPINION AND ORDER

administrative record into the Court's docket.[7] Nothing in CERCLA or Ninth Circuit precedent, however, requires that the government place *all* information relevant to proposed settlements into the judicial record, and for good reason: that rule would unduly burden the Judiciary by requiring the district courts to cull through massive administrative records. Because the Court has sufficient information meaningfully to perform judicial scrutiny, the Court proceeds to discuss the factors identified in *Montrose*.

## B.  Procedural Fairness

Turning to the first *Montrose* factor, the negotiation process between Trustees and Defendants was procedurally fair. Trustees gave the PRPs substantial bargaining power in the allocation process. Trustees approached each PRP with a proposed DSAY allocation with factual evidence underlying the proposed allocation. Trustees also permitted the PRPs to submit evidence to Trustees to rebut the proposed allocations. In response to PRPs' factual rebuttal submissions, Trustees adjusted the DSAY allocations. That collaborative allocation process demonstrates that the government did not hold an inappropriate bargaining power over Defendants.

The negotiation process also was open to the public. Indeed, the public record contains more than 700 documents, ranging from technical reports aimed at scientific audiences to

---

[7] For example, at the Court's hearing held on September 29, 2025, one Intervenor argued that Trustees should compile "for each site in which there's a settlement[,] the DSAYs allocated to that site, the contaminants contributed to each site and which of those are being settled by each defendant, which footprints of damages are being settled or partially settled, and which DSAYs are attributable to those footprints, which footprints are attributable to which sites being settled, and whether the settling defendants' allocated DSAYs were adjusted as the Trustees reallocated the footprints from time to time through the allocation . . . . [A]ll of this information exists and should be readily available in existing tables or could be compiled by [Trustees] without much trouble. We're just asking really what our eighth grade algebra teachers asked all of us, that we show—that we showed our work." ECF 144, 35:10-25.

PAGE 19 – OPINION AND ORDER

newsletters and YouTube videos aimed at public audiences. Trustees held two public meetings in addition to the notice and comment period. As a result, the Consent Decrees were reached under fair circumstances. *See Cannons*, 899 F.2d at 86 ("[T]he government conducted negotiations forthrightly and in good faith, and the record is replete with indications to that effect.").

## C. Substantive Fairness

The lodestar of the next *Montrose* factor—substantive fairness—is comparative fault. *See Arizona*, 761 F.3d at 1012; *Cannons*, 899 F.2d at 87. Intervenors argue that the Consent Decrees do not properly map comparative fault because the HEA is unreliable and there is insufficient information about the DSAY allocations. These attacks on the government's methodology are interconnected, and the Court does not find them persuasive.

On the outset, the Consent Decrees are accompanied by detailed accounting that shows the number of DSAYs allocated to each Defendant, the contaminant datasets and footprints used by Trustees in the HEA model, each Defendant's activities, and Trustees' conclusions about the contamination associated with those activities. That information, taken together, is sufficient to conclude that the DSAYs were allocated to Defendants according to rational estimates of comparative fault.

Indeed, a rough comparison of the DSAY allocation demonstrates that, as a general principle, the more polluting a Defendant did, the more DSAYs Trustees required that Defendant to purchase. Looking to two Restoration Credit Consent Decree Defendants, for example:

- The City of Portland's liability was calculated at 61.03 DSAYs. *See* ECF 130-10 at 1. The City of Portland has 34 allocation sites in the Assessment Area. *Id.* Four of the City's sites had no polluting activities; many of the sites have had, or currently have, different owners (*e.g.*, Site 61 is owned by Schnitzer Steel; Site 126 by Steel Hammer Properties, *id.* at 5). *Id.* at 10-13. The City's allocation sites have a total of 76

PAGE 20 – OPINION AND ORDER

polluting activities. *Id.* Twenty of those activities, however, occurred before 1980. *Id.* Accordingly, the City was required to purchase roughly two DSAYs per allocation site with pollution; or roughly 0.8 DSAYs per polluting activity.

- Evraz Inc.'s liability was calculated at 45.5 DSAYs. *See* ECF 130-12 at 1. Evraz was associated with nine allocation sites but only conducted relevant activities on five. *Id.* at 1, 6-7. Unlike the City of Portland, however, Evraz's sites had more extensive polluting activities. *See id.* The 145-acre site that Evraz has operated on since 1969 (Site 13) has had 19 polluting activities. *Id.* at 4, 6. Another site that Evraz used to separate scrap metal solids from liquids before discarding the latter into the Willamette (Site 182) has had 11 polluting activities. *Id.* at 5, 7. Evraz was required to purchase roughly 1.34 DSAYs per polluting activity.

Defendants signing the Cash-Out Consent Decree[8] have a similar symmetry between the number of DSAYs purchased per polluting activity:

- Ash Grove's liability was calculated at 16.97 DSAYs. *See* ECF 130-55 at 1. Ash Grove was associated with two allocation sites. *Id.* at 1. Similar to Evraz, each allocation site had substantial polluting activities: there were 17 at Site 12 and 13 at

---

[8] As compared to the Restoration Credit Consent Decree Defendants, it appears that the Cash-Out Consent Decree Defendants are required to purchase less DSAYs on average per polluting activity. That variance makes sense, however, given the total value of the two Consent Decrees. The value of the Cash-Out Consent Decree ($8,202,136.12, *see* Cash-Out Consent Decree at ¶ Q) is significantly lower than the value of the Restoration Credit Consent Decree ($27,952,073.33, *see* Restoration Credit Consent Decree at ¶ V). Sixteen Defendants are settling through the former, whereas seven Defendants are settling through the latter. *See* Cash-Out Consent Decree at 1; Restoration Credit Consent Decree at 1. Thus, it is reasonable that Trustees would require Cash-Out Defendants to purchase less DSAYs per polluting activity than the Restoration Credit Defendants.

PAGE 21 – OPINION AND ORDER

Site 275. *Id.* at 5. Ash Grove was required to purchase roughly 0.57 DSAYs per polluting activity.

- Koppers' liability was calculated at 3 DSAYs. *See* ECF 130-15 at 1. Koppers was associated with one allocation site, with five polluting activities. *Id.* at 1, 5. Koppers was required to purchase roughly 0.6 DSAYs per polluting activity.

Of course, not all pollution is equal; there is not and should not be a perfect correlation between the number of polluting activities and the number of DSAYs purchased. As Trustees explained, the allocation process weighed when Defendants owned each property, when Defendants polluting took place, and the severity of the ecological injury caused by the pollution. The Court nonetheless notes the rough correlation between the number of DSAYs and the number of polluting activities to demonstrate with its own "comparative analysis" that Trustees' model generally tracks comparative fault. *Cf. Arizona*, 761 F.3d at 1012 ("[N]owhere in the district court's opinion is there an analysis comparing each party's estimated liability with its settlement amount, or an explanation of why the settlements are fair, reasonable, and consistent with CERCLA's objectives." (quotation marks omitted)).

Intervenors also contend that Trustees' comparative fault analysis is too imprecise. That criticism is not well founded. As the Ninth Circuit explained in *Arizona*, "to approve a CERCLA consent decree, a district court must find that the agreement is 'based upon, and *roughly correlated with*, *some acceptable measure* of comparative fault, apportioning liability among the settling parties according to rational (*if necessarily imprecise*) estimates of how much harm each [potentially responsible party] has done.'" 761 F.3d at 1012 (alteration in *Arizona*) (quoting *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996) (quoting *Cannons*, 899 F.2d at 87) (emphases added).

PAGE 22 – OPINION AND ORDER

Here, the record supports that Trustees' HEA and DSAYs methodology is roughly correlated with some acceptable measure of comparative fault. First, the record establishes that the HEA and DSAY allocation is an acceptable measure of comparative fault. Various federal regulations, agency guidance documents, and peer-reviewed literature recognize HEA as a measure of comparative fault, and HEA has been used as the basis for several high-profile ecological NRDA settlements. *See* ECF 85-3 at 14-15. Second, the record establishes that the HEA survey and DSAY allocation performed here was correlated to comparative fault. The HEA determined "the share of the total injuries attributable to hazardous substances released from each property along the Assessment Area," then Trustees determined which PRP owned or operated which properties or facilities in the Assessment Area and compared the "[c]ontaminants associated with activities at Defendants' properties . . . with contaminant footprints in Willamette River sediments in the Assessment Area." First Baker Decl. ¶¶ 11-15.

Trustees also explained why they chose the HEA and the DSAY allocation method for settlement purposes—doing so allowed Trustees to measure the value of habitat restoration *and* the value of building new habitats. Because of that plausible explanation, the choice of HEA is entitled to deference. In *Cannons*, for example, the First Circuit gave considerable deference to the federal government's choice of comparative fault formula, holding that "[w]hatever formula or scheme [the federal government] advances for measuring comparative fault and allocating liability should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs." 899 F.2d at 87. The Ninth Circuit endorses that deferential approach where, as here, the federal government proposes the consent decree. *See Montrose*, 50 F.3d at 746 (quoting with approval *Cannons*, 899 F.2d at 87); *Arizona*, 761 F.3d

PAGE 23 – OPINION AND ORDER

at 1013-15 (clarifying that *Montrose* deference applies only to federal agency). Intervenors'

remaining critiques of the HEA model[9] are resolved by this deference and the "reasonable

linkage" Trustees have provided between the factors it included in the HEA (the sediment

footprints measuring the chemicals released from Defendants' properties and resulting ecological

damage to the Willamette) and the proportionate shares of DSAYs assigned to Defendants (the

amount of chemicals released from each property). *See Cannons*, 899 F.2d at 87.

Moreover, Trustees established that the Consent Decrees' aggregate allocation of 11.4%

of total injury to Defendants is appropriate. The Court notes that no Intervenor or public

commentor disputed the aggregate allocation figure prior to briefing on the Motion to Enter.

*See generally* ECF 85-3. Additionally, a chart measuring the relative contribution to natural

resource damages of each of the twelve chemicals measured by the HEA "shows that some

[chemicals] contributed much more to the harm to natural resources than other[s]," and that

Defendants have little responsibility for the chemicals that did the most harm to the Willamette

River. *See* Second Declaration of Troy Baker ("Second Baker Decl.") ¶¶ 4-5 & Ex. 1

(ECF 128-1). Specifically, Trustees explained that roughly 70% of the pollution to the

Willamette was caused by four chemicals. *Id.* ¶ 5. Defendants were allocated 12.8 DSAYs for

three of the four chemicals, or roughly 1% of the harm for them. *Id.* ¶ 6. That allocation aligned

with the activities identified for each Defendant, particularly because none of Defendants'

industrial activities involved manufacturing, distribution, or storage of any of those three

chemicals. See ECF 130-2 (Table 2-3 of the Phase 2 Allocation Methodology Report, explaining

that the three chemicals are generated by pesticide storage, formulation, and manufacturing);

---

[9] Intervenors critique the HEA model, for example, because it was adapted from an HEA model designed for use at a different site.

PAGE 24 – OPINION AND ORDER

ECF 128 at 39 (observing that "none of the Settling Defendants conducted industrial activities that involved manufacture, distribution, or storage of" pesticides after reviewing party-specific allocation summary memoranda exhibits attached to ECF 130).

Defendants also were allocated 151 DSAYs for the fourth chemical, PAHs, which amounts for 9.3% of the harm caused by PAHs. Second Baker Decl. ¶ 7 & Ex. 1. Although all Defendants were associated with PAH activities, only two were associated with heavy PAH pollution. ECF 130-7, 130-22. Trustees explained that, because a large majority of the total damages were caused by the four chemicals, "it stands to reason that a group of settling parties with relatively little responsibility" for contributing to pollution of them "would be assigned a relatively small share of the total damages." *See* ECF 128 at 40; *see also id.* at 38-40 (explaining how the allocation methodology supported this conclusion).

Intervenors also argue that the Consent Decrees cannot be substantively fair when ongoing natural resource damage testing is still occurring at the Willamette River. Indeed, Trustees conducted the HEA that the Consent Decrees are based on for purposes of reaching a settlement with certain PRPs in Phase 2. Additional testing is occurring now that will inform the damages awards that Trustees will seek from non-settling PRPs in Phase 4. Intervenors argue that this additional testing should govern the terms of the Consent Decrees, but this too is a red herring. "Having selected a reasonable method of weighing comparative fault, the agency need not show that it is the best, or even the fairest, of all conceivable methods." *Cannons*, 899 F.2d. at 88. Trustees have established that the HEA methodology is an appropriate way to measure the damage to the Willamette River and to apportion liability to PRPs commensurate with their polluting activities. Nothing in CERCLA requires Trustees to wait to settle with PRPs until the most accurate ecological testing is complete. Indeed, CERCLA's language expressly

PAGE 25 – OPINION AND ORDER

contemplates that settlements will precede complete information about the total scope of an environmental disaster, lest the Court contravene Congress's goals of the government reaching early settlements to "expedite effective remedial action and minimize litigation." *See* 42 U.S.C. § 9622(a); *see also Cannons*, 899 F.2d at 90 (explaining that one of the policy concerns underlying CERCLA is "that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal" (quoting *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986)); *Charter*, 83 F.3d at 520 ("Perhaps mindful of the huge resources going into the transactions costs of CERCLA litigation, rather than to remediating the sites, Congress sought in [CERCLA amendments] to encourage earlier resolutions by agreement.").

Finally, Intervenors argue that the Consent Decrees are not substantively fair because there is insufficient site-specific information about the Trustees' allocations. This is a problem, Intervenors argue, because multiple PRPs operate out of the same properties along the Assessment Area. For example, two Defendants, two Intervenors, and one defunct entity have each operated at Site 186. In situations like these, with multiple entities operating out of the same plot of land, Intervenors object that there is nothing in the record that explains how Trustees made allocations to Defendants. At bottom, Intervenors are concerned that they may wrongly pay too much in damages at Phase 4 because Trustees' site-specific allocations as memorialized in the Consent Decrees are wrong.

For two reasons, that objection does not render the Consent Decrees substantively unfair. First, "CERCLA makes potentially responsible parties jointly and severally liable" for damages. *See Confederated Tribes of the Colville Rsrv. v. Teck Cominco Metals Ltd*, --- F.4th ----, 2025

PAGE 26 – OPINION AND ORDER

WL 2525853, at *3 (9th Cir. Sept. 3, 2025). Thus, if Intervenors are sued for damages at Phase 4, they will be free to argue that they are liable for *no* damages, or that their polluting activities only account for a certain amount of harm to the Willamette River. The site-by-site allocations are only relevant to the Consent Decrees—they will not limit Intervenors' arguments or defenses at Phase 4.

Second, even if Intervenors are correct that Trustees allocated less DSAYs to Defendants than is strictly proportionate to the pollution they contributed, that variance does not offend the purpose or terms of CERCLA. "CERCLA contemplates that responsible parties who fail to enter into an early settlement agreement 'may ultimately bear a disproportionate share of the CERCLA liability.'" *See AmeriPride Serv's Inc. v. Tex. E. Overseas Inc.*, 782 F.3d 474, 487 (9th Cir. 2015) (quoting *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 875 (9th Cir. 2014)). "Congress intended [the federal government] to have considerable flexibility in negotiating and structuring settlements" and "district court[s] should give the [government's] expertise the benefit of the doubt when weighing substantive fairness—particularly when the agency, and hence the court, has been confronted by ambiguous, incomplete, or inscrutable information." *Cannons*, 899 F.2d at 88. For that reason, courts in this Circuit recognize that "[t]he court is not asked to accomplish the 'scientifically difficult and economically infeasible' task of definitively assigning liability" when approving a CERCLA settlement. *See City of Torrance v. Hi-Shear Corp.*, 2025 WL 2819366, at *3 (C.D. Cal. Aug. 6, 2025) (quoting *Cal. Dep't of Toxic Substances Control v. NL Indus., Inc.*, 636 F. Supp. 3d 1092, 1111 n.15 (C.D. Cal. 2022)).

Here, Trustees explained how they reasonably adapted to the limits of the HEA and DSAY allocation process: for example, by implementing the relative index approach for "diffused contaminants" that did not have a clear contaminant footprint. Consistent with *Arizona*,

PAGE 27 – OPINION AND ORDER

the Court may defer to the federal government's expertise in the site-by-site allocation process for settlement purposes. "In sum, having undertaken the requisite comparative analysis demanded by controlling Ninth Circuit precedent, this Court finds that the terms of the proposed consent decree create a reasonable and fair outcome to what could otherwise become a costly and lengthy CERCLA lawsuit." *See United States v. BNSF Railway Co.*, 2020 WL 9048798, at \*5 (D. Mont. Nov. 30, 2020).

## D. Reasonableness

The Consent Decrees also are reasonable. Between the two Consent Decrees, the public will receive millions of dollars in cash—compensation for the actual and anticipated costs of remedial and response measures—and habitat restoration. The restoration projects in the Restoration Credit Consent Decree were also designed to ensure meaningful habitat restoration. For example, Trustees may only release restoration credits in the projects when ecological milestones are reached, which ensures that the settlement goals in the Consent Decrees are actualized and based on realized habitat restoration. Defendants also manage the restoration projects, and the terms of the projects are defined within the Consent Decrees. Each project also contains permanent stewardship requirements. Further, the projects will benefit several at-risk species by creating ecological diversity. The Consent Decrees therefore are reasonable. *See Cannons*, 899 F.2d at 89-90.

## E. CERCLA Policy Concerns

The Consent Decrees also advance both major policy concerns of CERCLA by ensuring that the federal government has a prompt and effective tool to respond to the release of oil and other chemicals into the Willamette River, and those that are responsible for that pollution bear

PAGE 28 – OPINION AND ORDER

the cost and responsibility of remedying it. *See id.* at 90-91 (describing the two policy concerns underlying CERCLA).[10]

Intervenors argue that the contribution protections afforded to Defendants are too broad, because they might cover pollutants other than the twelve surveyed in the HEA or extend to other disputes between the same parties. But the Consent Decrees' contribution protections apply only to *covered* natural resource damages, and the Consent Decrees' terms also expressly prohibit Defendants from using those protections in any other forums. The Consent Decrees also contain a reopener provision through which Trustees reserve, without prejudice, the right to initiate suit against Defendants for covered natural resource damages if the results of the Phase 4 testing "indicates that there is injury to, destruction of, loss of and/or loss of use of natural resources of a type unknown, or of a magnitude significantly greater than was known, to the Trustees as of the Effective Date [of the Consent Decrees]." *See* Cash-Out Consent Decree ¶ 17; Restoration Credit Consent Decree ¶ 85. With these considerations, the contribution protections are not so disproportionately favorable to Defendants that they undermine CERCLA's statutory concern that Defendants bear the cost and responsibility of remedying the ecological damage to the Willamette.

---

[10] Declining to enter the Consent Decrees would arguably contravene the purposes of CERCLA. For one, it would waste millions of dollars that Defendants have spent on restoration to the Willamette River. Under the Consent Decrees, Defendants have borne the cost of ecological testing and the creation of the restoration projects. Accepting Intervenors' arguments at this juncture would arguably force Defendants to bear more than their share of responsibility for remedying the pollution in the Willamette by rendering unusable the viable HEA test results and restoration projects that Defendants paid for. Further, declining to enter the Consent Decrees after nearly two decades of research and collaboration between federal, state, and tribal governments and PRPs would undermine Congress's intent that CERCLA enable prompt settlement.

PAGE 29 – OPINION AND ORDER

Further, the HEA demonstrates that Defendants are paying a premium to assume higher legal protections in the Consent Decrees. As previously discussed, the Consent Decrees are valued at $36 million—roughly $3 million higher than the $33.2 million in damage cumulatively assigned to Defendants by the HEA. Parties like Defendants who pay a premium in settlement may "assume no ongoing responsibilities," or at least enjoy significant legal protections, as compared to settlors who convey less value to the government. *See Cal. Dept. of Toxic Substances Control v. Exxon Mobil Corp.*, 2024 WL 645417, at *5 (E.D. Cal. Feb. 14, 2024) (citing *Cannons*, 899 F.2d at 88).

When reviewing a CERCLA settlement, the proper role of a court is not to serve as mediator or to impose the best or most neutral terms. Instead, the role of the Court is to ensure that the government has collected enough information to learn about the comparative fault of the parties and the Court then adequately determines whether the terms of the settlement are fair, reasonable, and consistent with the statute. The Court is satisfied that the answers to these questions are all 'yes.'

## CONCLUSION

The Court GRANTS Plaintiffs' Motion to Enter Consent Decrees, ECF 83.

**IT IS SO ORDERED**.

DATED this 23rd day of October, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 30 – OPINION AND ORDER