No. 25-8129

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA; et al.,

*Plaintiffs-Appellees*,

v.

ARKEMA INC., by and through its agent, Legacy Site Services LLC,

*Intervenor-Appellant,*

v.

ACF INDUSTRIES, LLC; et al.,

*Defendants-Appellees,*

GUNDERSON, LLC; et al.,

*Intervenors.*

On Appeal from the U.S. District Court for the District of Oregon
Case No. 3:23-cv-1603-SI
Hon. Michael H. Simon

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 2 OF 6

Matthew J. Stock
Jessica C. Kerr
HILLIS CLARK MARTIN &
PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
(206) 623-1745
Email: matthew.stock@hcmp.com
Email: jessica.kerr@hcmp.com
*Attorneys for Legacy Site Services LLC,*
*agent for Appellant Arkema Inc.*

[Counsel for Plaintiffs are identified
On Plaintiffs' signature pages]

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF PORTLAND; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); MMGL LLC; PACIFICORP, AN OREGON CORPORATION; PORT OF PORTLAND; SCHNITZER STEEL INDUSTRIES, INC.; AND SILTRONIC CORPORATION, <br><br> Defendants. | No. 3:23-cv-1603-SI <br><br> **CONSENT DECREE** |

ER-72

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     RECITALS ..................................................................................................... 1

III.    JURISDICTION AND VENUE ................................................................... 13

IV.     PARTIES BOUND ...................................................................................... 13

V.      DEFINITIONS............................................................................................. 14

VI.     GENERAL PROVISIONS .......................................................................... 22

VII.    TERMS AND CONDITIONS APPLICABLE ONLY TO RESTORATION CREDIT

        SELLERS…………………………………………………………….………..23

        A.    General Consent Decree Provisions For Restoration Credit Sellers.......................... 23
        B.    Changes to Habitat Development Plans .................................................................. 25
        C.    Restoration Project Construction .......................................................................... 26
        D.    Development of Restoration Project Vegetation and Habitat ................................... 29
        E.    Restoration Project Long-Term Stewardship Transition Obligations........................35
        F.    Restoration Project DSAY Credits ........................................................................39
        G.    Restoration Project Performance Guarantees.......................................................... 43
        H.    Restoration Credit Sellers Indemnification; Insurance ........................................... 48
        I.    Access to Information and Restoration Project Locations ........................................50
        J.    Prepayment and Reimbursement of Trustees' Restoration Implementation and
              Oversight Costs ...................................................................................................52

VIII.   COMPENSATION FOR, AND PAYMENT OF, COVERED NATURAL RESOURCE

        DAMAGES……………………………………………………………………………...53

IX.     FORCE MAJEURE ..................................................................................... 57

X.      DISPUTE RESOLUTION............................................................................ 59

Restoration Credit Consent Decree                    ii

XI.    INTEREST ON LATE PAYMENTS ...................................................................... 63

XII.   STIPULATED PENALTIES .............................................................................. 63

XIII.  COVENANT NOT TO SUE BY PLAINTIFFS.................................................... 67

XIV.   RESERVATIONS OF RIGHTS ......................................................................... 67

XV.    ADDITIONAL RESERVATION FOR UNKNOWN CONDITIONS OR INFORMATION
       …………………………………………………………………………………...69

XVI.   COVENANT NOT TO SUE BY SETTLING DEFENDANTS.......................................... 70

XVII.  EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION ..................................... 71

XVIII. RETENTION OF RECORDS............................................................................. 73

XIX.   NOTICES AND SUBMISSIONS........................................................................ 74

XX.    RETENTION OF JURISDICTION ..................................................................... 82

XXI.   INTEGRATION/APPENDICES ........................................................................ 82

XXII.  MODIFICATION .......................................................................................... 87

XXIII. ENFORCEMENT .......................................................................................... 87

XXIV.  26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION.................................... 88

XXV.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ........................................ 88

XXVI.  SIGNATORIES/SERVICE............................................................................... 88

XXVII. FINAL JUDGMENT ..................................................................................... 89

Restoration Credit Consent Decree                    iii

## TABLE OF APPENDICES

A  Identifies The Properties For Each Settling Defendant

B  Electronic Wire Transfer Payment Instructions

C  DSAY Credits To Be Purchased By Settling Defendant

D  Documents For The Alder Creek Restoration Project

D1  Habitat Development Plan For The Alder Creek Restoration Plan

D2  Performance Guarantees For The Alder Creek Restoration Project

D2-A  Left Blank Because Construction Is Complete For The Alder Creek Restoration Project

D2-B  Irrevocable Letter Of Credit For The Alder Creek Restoration Project

D2-C  Letter Of Credit For Lamprey Monitoring Events For Years 10, 15 And 20

D3  Credit Release Schedule For The Alder Creek Restoration Project

D4  Deed Restriction And Conservation Easement For The Alder Creek Restoration Project

D4-A  Deed Restriction For The Alder Creek Restoration Project

D4-B  Conservation Easement For The Alder Creek Restoration Project

D5  Long-Term Management Framework For The Alder Creek Restoration Project

D6  Endowment Fund Information And Analysis (PAR)

D7  Exemplar Endowment Agreement Funding Form

E  Documents For The Linnton Mill Restoration Site

E1  Habitat Development Plan For The Linnton Mill Restoration Site

Restoration Credit Consent Decree    iv

E2      Performance Guarantees For The Linnton Mill Restoration Site

E2-A    Left Blank Because Construction Is Complete For The Linnton Mill Restoration Site

E2-B    Escrow Agreement For Adaptive Management For The Linnton Mill Restoration Site

E2-C    Performance Bond For Interim Management, Contingency And Lamprey Monitoring Security (IMCS)

E3      Credit Release Schedule For The Linnton Mill Restoration Site

E4      Deed Restrictions And Conservation Easements For The Linnton Mill Restoration Site

E4-A    Deed Restrictions For The Linnton Mill Restoration Site

E4-B    Conservation Easements For The Linnton Mill Restoration Site

F       Documents For The Rinearson Natural Area Restoration Project

F1      Habitat Development Plan For The Rinearson Natural Area Restoration Project

F2      Performance Guarantees For The Rinearson Natural Area Restoration Project

F2-A    Left Blank Because Construction Is Complete For The Rinearson Natural Area Restoration   Project

F2-B    Letter Of Credit For Interim Management, Contingency And Lamprey Monitoring Security In Project Years 1-10 (IMCS) For The Rinearson Natural Area Restoration

F2-C    Escrow Agreement For Adaptive Management For The Rinearson Natural Area Restoration Project

F2-D    Letter Of Credit For Lamprey Monitoring In Project Years 15 & 20 For The Rinearson Natural Area Restoration Project

F3      Credit Release Schedule For The Rinearson Natural Area Restoration Project

Restoration Credit Consent Decree                    v

F4       Deed Restrictions And Conservation Easements For The Rinearson Natural Area Restoration Project Location

F4-A    Deed Restrictions For The Rinearson Natural Area Restoration Project

F4-B    Conservation Easements For The Rinearson Natural Area Restoration Project

G        Documents For The Harborton Restoration Project

G1       Habitat Development Plan For The Harborton Restoration Project

G2       Financial Assurances For The Harborton Restoration Project

G2-A    Left Blank Because Construction Is Complete For The Harborton Restoration Project

G2-B    Letter Of Credit For Adaptive Management For The Harborton Restoration Project

G2-C    Letter Of Credit For Years 15 And 20 Lamprey Monitoring For The Harborton Restoration Project

G2-D    Letter Of Credit For Interim Management And Contingency And Years 1-10 Lamprey Monitoring

G3       Credit Release Schedule For The Harborton Restoration Project

G4       Deed Restrictions And Conservation Easement For The Harborton Restoration Project

G4-A    Deed Restrictions For The Harborton Restoration Project

G4-B    Conservation Easement For The Harborton Restoration Project

H        Forms Used To Report To The Trustees Every Sale And Purchase Of DSAY Credits By Restoration Credit Sellers And Settling Defendants

Restoration Credit Consent Decree                    vi

# I. INTRODUCTION

The United States of America ("United States"), on behalf of the National Oceanic and Atmospheric Administration ("NOAA") of the U.S. Department of Commerce and the U.S. Department of the Interior; the State of Oregon (the "State"); the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe (collectively "Plaintiffs" – *see* definition of "Plaintiffs" in Section V) have filed a Complaint in this case against a number of parties pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607; the Oregon Hazardous Waste and Hazardous Materials Act, ORS § 465, and ORS § 468B.060; Section 311 of the Clean Water Act ("CWA"), 33 U.S.C. § 1321; and Section 1002(b)(2)(A) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2702(b)(2)(A). This Consent Decree addresses the claims asserted in the Complaint against Settling Defendants (as defined below) for Covered Natural Resource Damages (as defined below).

# II. RECITALS

A.    The U.S. Department of Commerce, acting through NOAA; the U.S. Department of the Interior; the State of Oregon acting through the Oregon Department of Fish and Wildlife; the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe (collectively the "Trustee Council" and each individually a "Trustee" – *see* definition of "Trustees" in Section V), under the authority of Section 107(f) of CERCLA, 42 U.S.C. § 9607(f), Section 1006(b) of OPA, 33 U.S.C. § 2706(b), and 40 C.F.R. Part 300, subpart G, serve as trustees for natural resources for

Restoration Credit Consent Decree                    1

the assessment and recovery of damages for injury to, destruction of, loss of and/or loss of use of natural resources and/or the services provided by those resources under their trusteeship.

B.      Investigations conducted by the U.S. Environmental Protection Agency ("EPA"), the Trustee Council and others have detected over forty-five (45) hazardous substances in the sediments, soils and groundwater of the Portland Harbor Natural Resource Damage Assessment Area (as defined below), including, but not limited to, polycyclic aromatic hydrocarbons ("PAHs"), polychlorinated biphenyls ("PCBs"), cadmium, copper, lead, mercury, tributyltin ("TBT"), bis 2-ethylhexyl phthalate, dichlorodiphenyltrichloroethane ("DDT"), dichlorodiphenyldichloroethylene ("DDE"), dichlorodiphenyldichloroethane ("DDD"), and 4-methyl phenol.

C.      In January 2007, the Trustee Council conducted a pre-assessment screen and determined that it was reasonable to pursue an assessment of natural resource damages in the Portland Harbor Natural Resource Damage Assessment Area by finding that hazardous substances had been released into the Portland Harbor Natural Resource Damage Assessment Area; that public trust natural resources had likely been injured by the releases; that data sufficient to pursue a natural resource damage assessment were available or could likely be obtained at a reasonable cost; and that, without further action, implemented and planned response actions would not adequately remedy the resource injuries.  See Preassessment Screen for the Portland Harbor Superfund Site (January 2007).  The Trustee Council then notified representatives of known potentially responsible parties ("PRPs") of its intent to conduct a damage assessment.

D.      The Trustee Council began an iterative, phased cooperative natural resource damage assessment with a number of PRPs that elected to participate in the assessment. Participating PRPs entered into Funding and Participation Agreements ("FPAs") with the Trustee

Restoration Credit Consent Decree                    2

Council to fund the phased assessment and define the terms of their participation. Phase 1 consisted of the development of an Assessment Plan and settlement-oriented Workplan and was conducted with the cooperation of twenty (20) PRPs. The Trustee Council released the Assessment Plan for public comment on November 23, 2009 and finalized it on June 1, 2010. Subsequently, thirty (30) PRPs entered into FPAs with the Trustee Council for the current assessment phase, Phase 2, which focuses on implementing the Workplan and conducting initial restoration planning with the goal of arriving at realistic early settlements with cooperating parties. The primary studies undertaken to fill identified data gaps include the Pacific Lamprey Toxicity Study (Stratus and Oregon State University 2013); Data Report for Lower Columbia Juvenile Salmon Persistent Organic Pollutant Exposure Assessment (NOAA Undated); and the Analysis of Osprey *(Pandion haliaetus)* Egg Tissue Collected from Portland Harbor and Surrounding Areas: Progress Report (Portland Harbor Natural Resource Trustee Council 2009). The Trustee Council also released the Draft Portland Harbor Programmatic EIS and Restoration Plan (NOAA and Parametrix 2012) for public comment on July 9, 2012 followed by the release of the Final Portland Harbor Programmatic EIS and Restoration Plan ("PEIS") in June 2017. 82 *Fed. Reg.* 28,643 (June 23, 2017). As part of the Phase 2 assessment activities, the Trustee Council (a) conducted a sediment-based Habitat Equivalency Analysis ("HEA") and a qualitative evaluation of losses to other species of concern to determine ecological injury; (b) quantified recreational losses; and (c) completed an evaluation of injured natural resources of tribal importance ("tribal service losses").

E.    Prior to completion of the Phase 2 assessment activities, restoration project developers began discussions with the Trustee Council and PRPs about developing restoration projects as a means of both compensating for injured natural resources in the Portland Harbor

Restoration Credit Consent Decree                3

Natural Resource Damage Assessment Area and resolving liabilities of PRPs that contributed to those injuries. Portland Harbor Holdings II, LLC ("PHH"), Linnton Water Credits LLC ("Linnton"), Rinearson Natural Area, LLC ("Rinearson"), and Portland General Electric Company ("PGE") are four of those restoration project developers. The general concept behind those discussions is that restoration project developers would sell credits in their restoration projects to PRPs, and the Trustees could accept such credits as a basis for resolving the liability of PRPs.

F.      In the course of those discussions, the Trustee Council and PHH entered into a Memorandum of Agreement ("MOA") in October 2011, which was later amended by a First Addendum to the Memorandum of Agreement on May 7, 2014. The Trustee Council and Linnton entered into a Memorandum of Agreement ("MOA") in May 2013, which was later amended by a First Amendment in December 2018. The Trustee Council and Rinearson entered into a Memorandum of Agreement ("MOA") in December 2013, which was later amended by an Addendum in April 2019. The Trustee Council and PGE entered into a Memorandum of Agreement ("MOA") in November 2013, which was later amended by an Addendum in June 2021. Collectively, these documents are referred to as the MOAs, and PHH, Linnton, Rinearson, and PGE are defined below as the "Restoration Credit Sellers." The MOAs establish a framework under which Restoration Credit Sellers are developing the restoration projects further described in the body and Appendices of this Consent Decree. The MOAs are intended solely as a framework, not as legally binding documents. The MOAs are not part of this Consent Decree, nor are they enforceable pursuant to this Consent Decree.

G.      The MOAs establish a process in which the Trustees determine the ecological value of each Restoration Project using a Habitat Equivalency Analysis ("HEA") (defined below)

Restoration Credit Consent Decree                4

methodology.  The ecological value of each Restoration Project is quantified in terms of ecological units called discounted service acre-years, or DSAYs (defined below).  The MOAs also recite the Trustees' intention to allow PRPs to resolve their liability to the Trustees by purchasing sufficient DSAY credits in approved restoration projects, such as the Restoration Projects listed above.  This arrangement allows PRPs to resolve their liability to the Trustees by financing compensatory restoration projects, without requiring PRPs to develop or maintain those projects themselves.

H.     In contemplation of this Consent Decree, Settling Defendants have purchased, or have entered into legally binding commitments to purchase, DSAY credits in the Restoration Projects from Restoration Credit Sellers as the means of resolving Settling Defendants' liability as stated in this Consent Decree.  As contemplated by the MOAs, the Trustees in this Consent Decree are accepting Restoration Project DSAY credits purchased by Settling Defendants from Restoration Credit Sellers as consideration for resolving Settling Defendants' liability as set forth in this Consent Decree.

I.     Restoration Credit Sellers' status as parties to this Consent Decree does not, in and of itself, make them liable parties, as described more specifically in Paragraphs 7-8.  Restoration Credit Sellers are parties to this Consent Decree because they are responsible for the development and maintenance of the Restoration Projects, which is necessary to ensure that the Restoration Projects fully and permanently provide the ecological values upon which the Trustees base their acceptance in this Consent Decree of the DSAY credits purchased or to be purchased by Settling Defendants from Restoration Credit Sellers; the Trustees accept those DSAY credits in lieu of the payment of damages by Settling Defendants under this Consent Decree.

J.     Plaintiffs and Settling Defendants agree that no further assessment of natural resource damages is required to effectuate the purposes of this Consent Decree.

Restoration Credit Consent Decree          5

K.      Plaintiffs have filed a Complaint in this matter, alleging that Settling Defendants own and/or operate or in the past owned and/or operated real property and/or facilities, identified by tax parcel or other property description for each Settling Defendant in Appendix A, from which storm water, surface water runoff, wastewater, other process discharges, and/or groundwater have flowed into the Portland Harbor Natural Resource Damage Assessment Area.  Plaintiffs also allege that investigations by EPA and others have detected hazardous substances and/or pollutants in soils, groundwater and/or sediments on or in those properties or facilities.  Some of these hazardous substances and/or pollutants are found in the sediments of the Portland Harbor Natural Resource Damage Assessment Area.

L.      Plaintiffs further allege that hazardous substances and/or pollutants have been or are being released into the Portland Harbor Natural Resource Damage Assessment Area from properties and/or facilities owned and/or operated by Settling Defendants through direct discharge, surface water runoff, groundwater and/or seeps, and that those hazardous substances and/or pollutants have caused injury to, destruction of, loss of and/or loss of use of natural resources in the Portland Harbor Natural Resource Damage Assessment Area under Plaintiffs' trusteeship, including sediment, invertebrates, fish, and wildlife, and resources of tribal importance.  Plaintiffs further allege that each of them and the public have suffered the loss of natural resource services (including ecological services as well as direct and passive human use losses) as a consequence of those injuries.

M.      Plaintiffs allege that each Settling Defendant is liable for natural resource damages resulting from releases of hazardous substances or discharges of pollutants into the Portland Harbor Natural Resource Damage Assessment Area pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a); the Oregon Hazardous Waste and Hazardous Materials Act, ORS § 465, and

Restoration Credit Consent Decree                6

ORS § 468B.060; Section 311 of CWA, 33 U.S.C. § 1321; or Section 1002(a) of OPA, 33 U.S.C. § 2702(a).

N.    Although the Trustee Council has initiated but not yet completed a natural resource damage assessment for the Portland Harbor Natural Resource Damage Assessment Area, the Trustee Council has developed and analyzed information sufficient to support a natural resource damages settlement that is fair, reasonable and in the public interest. In addition to natural resource damage assessment costs, the Trustee Council seeks to recover natural resource damages, which consist of three components: ecological service losses, recreational losses, and tribal service losses.

O.    The Trustee Council offered the Phase 2 PRPs an opportunity to pursue a path towards settlement based on the results of the Phase 2 cooperative assessment and the Natural Resource Damage ("NRD") allocation discussed below. These negotiations are referred to as "Path C."

P.    Relying upon the results of the damage-assessment studies, remedial investigations, regulatory standards, and scientific literature, the Trustee Council is seeking to recover from all Portland Harbor PRPs, for purposes of early restoration settlements at this time, funds, property, or in-kind services needed to generate: 1) habitat restoration sufficient to compensate for ecological losses valued for the limited purpose of settlement under the Path C process at 4,130 DSAYs (as defined below); 2) $5,402,400 for recreational losses; and 3) $695,100 for tribal service losses, including tribal service losses related to the tribal use of Pacific Lamprey in Portland Harbor. The tribal service losses in the third item of the preceding sentence are in addition to, and not otherwise accounted for in, the ecological losses and the recreational losses. The total dollar amounts for the recreational losses and tribal service losses were divided

Restoration Credit Consent Decree                    7

by the total number of DSAYs to calculate per-DSAY pro rata shares for recreational losses and tribal service losses. Settling Defendants resolving their liability under this Consent Decree therefore are purchasing DSAY credits from Restoration Credit Sellers and are making separate payments, on a per-DSAY basis, for recreational losses and tribal service losses. In addition, Settling Defendants are paying cash to resolve their liability for the relatively few allocated DSAYs for which they are not purchasing DSAY credits. The per-DSAY cost for those cash payments is $70,500. By comparison, PRPs that are parties to the cash-out consent decree filed concurrently with this Consent Decree are paying a total per-DSAY cost of $70,500 for every DSAY of their allocated responsibility. The $70,500 per-DSAY cost includes compensation for ecological, recreational, and tribal service losses, based on the Trustees' estimates of their per-DSAY cost of compensating for these losses. This total per-DSAY cost takes into account cost estimates developed by the Trustees for restoration of ecological injuries. The Trustees' cost estimates assume that ecological restoration will be a 50/50 blend of the costs of restoration projects both within and outside of the Portland Harbor Natural Resource Damage Assessment Area.[1] The actual price of DSAY credits purchased by Settling Defendants from Restoration

---

[1] In the PEIS, the Trustee Council concluded that all restoration should take place within the Portland Harbor Natural Resource Damage Assessment Area and the Broader Focus Area, the area outside of the Portland Harbor Natural Resource Damage Assessment Area that includes the mainstem Willamette River up to Willamette Falls, the Multnomah Channel, the Oregon side of the lower Columbia River between the east end of Hayden Island and the Multnomah Channel outlet, and portions of Scappoose Bay. The Trustee Council further determined that no more than 50 percent of restoration should take place outside the Portland Harbor Natural Resource Damage Assessment Area. To implement this policy in a manner that treats all Settling Defendants equally, the Trustees have required in this Consent Decree that each Settling Defendant obtain at least 50 percent of its restoration credits from restoration projects within the Portland Harbor Natural Resource Damage Assessment Area.

Restoration Credit Consent Decree                    8

Credit Sellers is privately negotiated between them and may differ from the Trustees' per-DSAY cost estimate.

Q.      Plaintiffs assert that hazardous substance releases and pollutant discharges to the Portland Harbor Natural Resource Damage Assessment Area have become dispersed and commingled to the extent that the effects of one PRP's releases and discharges cannot be readily distinguished from another's.  Plaintiffs further assert that all PRPs who contributed to the contamination are jointly and severally liable for all injuries to natural resources that have resulted from the contamination.  As a consequence, Plaintiffs assert the right to recover all Covered Natural Resource Damages from any Portland Harbor PRP.

R.      Solely for purposes of facilitating settlement, the Trustee Council developed a streamlined process for allocating natural resource ecological damages liability, *i.e.*, the Path C NRD allocation, among the PRPs.  The Trustee Council used readily available data that had been developed to date in the Phase 2 process.  Because Path C was intended to facilitate settlement, participating PRPs agreed to accept the technical bases[2] for the calculation of the 4,130 DSAYs, the recreational losses and the tribal service losses.  The Trustees also considered information submitted by individual PRPs.[3]  The PRP-submitted data provide information related to past

---

[2] For example, the calculation of the 4,130 DSAYs included a number of technical inputs such as a past service loss calculation, a base year of 2011, and surface sediment chemistry point data.

[3] That information included data from the Portland Harbor Remedial Investigation (RI) Report (Lower Willamette Group ("LWG") 2009), the Portland Harbor Remedial Investigation/Feasibility Study (RI/FS) Comprehensive Round 2 Site Characterization Summary and Data Gaps Analysis Report (LWG 2007), the Portland Harbor RI/FS Conceptual Site Model Update including Site Summaries (LWG 2004-2007), the Oregon Department of Environmental Quality ("DEQ") Environmental Cleanup Site Information ("ECSI") Database (DEQ 2013), facility website references, and Google Maps.  Non-public information provided by individual Settling Defendants also was considered by the Trustees.

Restoration Credit Consent Decree                    9

activities, contaminant release and/or pollutant discharge histories, remedial and/or source control histories, and contaminant pathway information.

S.      Using the data and information mentioned above, the Trustee Council assigned a percentage of liability to Portland Harbor Natural Resource Damage Assessment Area properties. The percentage assigned by the Trustee Council reflects the relative contribution of contaminant-related activities on a property to a corresponding contaminant footprint(s) in Portland Harbor Natural Resource Damage Assessment Area sediment, taking into account contributions from upstream and non-site-specific sources.  The Trustee Council established three (3) threshold criteria that had to be met before a Portland Harbor Natural Resource Damage Assessment Area property could be allocated any natural resource damage liability.  Those threshold criteria are as follows: 1) a pathway existed to transport hazardous substances or pollutants from the property to the Willamette River;[4] 2) an activity occurred at the property that was a likely source of a specific hazardous substance or pollutant, or a hazardous substance or pollutant likely to increase the negative effect of a substance of concern ("SOC");[5] and 3) there was sediment contamination (contaminant footprint) in close proximity to the property or a property-related outfall.  The Trustee Council considered the property a source of contamination to the Portland Harbor Natural Resource Damage Assessment Area only if all three criteria were met.

T.      The Trustee Council relied on two methods to allocate each SOC to properties:  1) allocation of unique SOC footprints, wherein individual SOC footprints are allocated only to one

---

[4] Pathways include, but are not limited to surface water, process water and groundwater.

[5] When the Trustee Council calculated natural resource damages, it identified certain contaminants or SOCs likely to cause injuries to natural resources in the Portland Harbor Natural Resource Damage Assessment Area.  Those SOCs are PAHs, PCBs, cadmium, copper, lead, mercury, DDT, DDD, DDE, TBT, 4-methylphenol, and bis (2-ethylhexyl) phthalate.

Restoration Credit Consent Decree                10

property; and 2) allocation of shared SOC footprints potentially associated with several properties. For shared footprints, the Trustee Council considered the relative contribution of an SOC from each property based on the type, intensity, and duration of an activity and its proximity to the Willamette River. This process resulted in an allocation of service losses from relevant contaminant footprints, reflecting the relative contribution of a property's contaminant-related activities to corresponding contaminant footprints.

U.    Under the Path C process, the Trustee Council conducted a party-specific, intra-property allocation by estimating the relative contributions (as percentages) of each PRP associated with contaminant footprints at particular Portland Harbor Natural Resource Damage Assessment Area properties. The Trustee Council estimated PRP contributions based on factors such as activity type, duration, and proximity to the Willamette River. During the Path C process, participating PRPs and the Trustee Council conducted a focused review of more comprehensive, party-specific information to supplement the Path C NRD allocation prior to developing a party-specific allocation. To calculate a party-specific, intra-property allocation, the Trustee Council applied the same three criteria outlined in Paragraph S above to party-specific information. The Trustee Council then converted a party-specific allocation of natural resource damage liability to DSAYs.[6]

V.    Pursuant to the Trustee Council's allocation and Settling Defendants' and the Trustee Council's completion of the Path C process, the Trustee Council allocated a total of 471.389 DSAYs

---

[6] In the case of a small number of PRPs associated with properties initially allocated a low number of DSAYs, the PRPs agreed to forgo the further intra-property allocation and agreed to accept responsibility for the full allocated share of liability for their respective property or properties. A few other PRPs agreed to a streamlined process with focused data submissions and analysis to determine their intra-property allocation.

Restoration Credit Consent Decree                    11

to the Settling Defendants in this Consent Decree and to the settling defendants in the concurrently-filed cash-out consent decree. Those allocations are set forth in Appendix C attached hereto and in Appendix C to the concurrently-filed cash-out consent decree. The Trustee Council determined that this is a fair and reasonable estimate of the equitable responsibility for Covered Natural Resource Damages attributable to each of the settling defendants in both consent decrees. The Trustee Council also allocated a total of $2,921,284.95 in damage assessment costs relating to the Trustee Council's assessment activities for the Portland Harbor Natural Resource Damage Assessment Area to the settling defendants in both consent decrees. The cash damages equivalent of the 373.72 DSAYs allocated to Settling Defendants in this Consent Decree totals $26,347.260.00. When combined with the damage assessment costs allocated to the Settling Defendants in this Consent Decree, the dollar value of Plaintiffs' claims against Settling Defendants resolved in this Consent Decree totals $27,952,073.33 for Covered Natural Resource Damages. When combined with the dollar value of Plaintiffs' claims against settling defendants resolved in the concurrently-filed cash-out consent decree, the combined total dollar value of Plaintiffs' claims resolved in both consent decrees is $36,154,209.45.

W.    The figures in Recital V do not represent the full amount of natural resource damages that Plaintiffs seek to recover from PRPs through the Path C settlement process or otherwise. Plaintiffs are continuing to negotiate with other PRPs within the Path C process. If those negotiations succeed in reaching settlements with other PRPs, Plaintiffs will lodge further consent decrees with this Court embodying those settlements.

X.    The Path C NRD allocation developed by the Trustee Council is distinct from, unrelated to, and has no effect on the total site allocation being conducted by the PRPs to determine liability for EPA's claims for remedial action and response costs under CERCLA or ORS § 465.

Restoration Credit Consent Decree                    12

Y.      PRPs in the Path C process had the option to settle their liability by paying cash as set forth in the concurrently filed cash-out consent decree, purchasing DSAY credits and making other cash payments as set forth in this Consent Decree, or constructing a restoration project. The undersigned Settling Defendants have elected to purchase DSAY credits from Restoration Credit Sellers and make other cash payments in this Consent Decree.

Z.      The Parties agree, and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties at arm's length and in good faith; that settlement of this matter will avoid expensive, prolonged and complicated litigation between the Settling Parties; and that this settlement will allow for earlier restoration of natural resource damages. The Settling Parties agree and this Court finds that this Consent Decree is fair, reasonable, and in the public interest, and consistent with the statutory purposes of CERCLA, the CWA, OPA and the Oregon Hazardous Waste and Hazardous Materials Act.

THEREFORE, with the consent of the Parties to this Consent Decree, it is ORDERED, ADJUDGED, AND DECREED:

### III.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1367, 42 U.S.C. §§ 9607 and 9613(b) and 33 U.S.C. § 2717(b). The Court has personal jurisdiction over the Parties. The Parties waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District, solely for the purposes of this Consent Decree and the underlying Complaint.

### IV. PARTIES BOUND

2.      This Consent Decree is binding upon the Plaintiffs, Settling Defendants, and Restoration Credit Sellers, and their heirs, successors and assigns. Any change in ownership or

Restoration Credit Consent Decree                13

corporate or other legal status, including but not limited to any transfer of assets or real or personal property, will in no way alter the status or responsibilities of Settling Defendants and Restoration Credit Sellers under this Consent Decree.

## V. DEFINITIONS

3.      Unless otherwise expressly provided, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA have the meanings assigned to them in CERCLA or in such regulations.  Whenever the terms listed below are used in this Consent Decree or in any attached Appendix, the following definitions will apply:

a.      "Available DSAY Credits" shall mean the Released DSAY Credits minus the Used DSAY Credits for each Restoration Project.

b.      "Consent Decree" shall mean this consent decree and all appendices attached hereto (listed in Section XXI, "Integration/Appendices").  In the event of conflict between the body of this Consent Decree and any appendix, the body of this Consent Decree shall control.

c.      "Construction Completion Date" shall mean the date of the Trustees' Determination of Completion of Construction Obligations for a Restoration Project as set forth in Paragraphs 18-25.

d.      "Covered Natural Resource Damages" shall mean, for each Settling Defendant, damages, including costs of damage assessment, recoverable by Plaintiffs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a); the Oregon Hazardous Waste and Hazardous Materials Act, ORS § 465, and ORS § 468B.060; Section 311(f)(4) & (5) of the CWA, 33 U.S.C. § 1321(f)(4)&(5); Section 1002(b)(2)(A) of OPA, 33 U.S.C. § 2702(b)(2)(A); any applicable tribal law; and any other statutory or common law, for injury to, destruction of, or loss of and/or loss of use of natural resources and/or resource services resulting from releases of hazardous substances

Restoration Credit Consent Decree                14

or discharges of pollutants at or from the properties identified in Appendix A for each Settling Defendant into the Portland Harbor Natural Resource Damage Assessment Area, where the disposal of hazardous substances or releases of pollutants causing such releases or discharges into the Portland Harbor Natural Resource Damage Assessment Area occurred on or before the Effective Date of this Consent Decree.

e.    "Credit Release Schedules" (individually, "Credit Release Schedule") shall mean:

(1)    for the Alder Creek Restoration Project, the schedule in Appendix D3 showing the number of Released DSAY Credits and the project development milestones determined by the Trustees that will result in additional credit releases in the future;

(2)    for the Linnton Mill Restoration Site, the schedule in Appendix E3 showing the number of Released DSAY Credits and the project development milestones determined by the Trustees that will result in additional credit releases in the future;

(3)    for the Rinearson Natural Area Restoration Project, the schedule in Appendix F3 showing the number of Released DSAY Credits and the project development milestones determined by the Trustees that will result in additional credit releases in the future; and

(4)    for the Harborton Restoration Project, the schedule in Appendix G3 showing the number of Released DSAY Credits and the project development milestones determined by the Trustees that will result in additional credit releases in the future.

f.    "DSAYs" shall mean discounted ecological service acre-years, the metric established by the Trustee Council to determine the scale of Covered Natural Resource Damages liability associated with the Portland Harbor Natural Resource Damage Assessment Area and the

Restoration Credit Consent Decree          15

natural resource restoration value needed to compensate for injury to, destruction of, loss of and/or loss of use of natural resources giving rise to liability.

g.    "Day" shall mean a calendar day unless expressly stated otherwise.

h.    "Effective Date" shall mean the date on which this Consent Decree is entered by the Court, or, if the Court instead issues an order approving the Consent Decree, the date of such order.

i.    "Forecast DSAY Value" shall mean the number of DSAYs, as determined by the Trustees, that represents the total anticipated ecological value of a Restoration Project for restoring injured natural resources.

j.    "Habitat Development Plans" (individually, "Habitat Development Plan") shall mean the plans in Appendices D1, E1, F1, and G1 for implementing the Restoration Projects.

k.    "Habitat Equivalency Analysis," or "HEA," shall mean the methodology used by the Trustees to determine the Forecast DSAY Value of the Restoration Projects, measured in DSAYs, in connection with the Habitat Development Plans.

l.    "Long-Term Stewardship Transition Obligations" shall mean:

(1)    for the Alder Creek Restoration Project, the requirements set forth in the following portions of the Alder Creek Restoration Project Habitat Development Plan: Appendix D5, the Long-Term Management Framework; Appendix D6, the Endowment Fund Information and Analysis (PAR); and Appendix D7, the Endowment Agreement Funding Form.

(2)    for the Linnton Mill Restoration Site, the execution of a Long-Term Stewardship Funding Plan substantially similar to the sample at Appendix 12 to the Habitat Development Plan; and the execution of a Long-Term Stewardship Funding Agreement satisfactory to the Trustees;

Restoration Credit Consent Decree                16

(3)    for the Rinearson Natural Area Restoration Project, the execution of a Long-Term Monitoring and Management Plan substantially similar to the sample in Appendix G-4 to the Habitat Development Plan in Consent Decree Appendix F1; and the execution of a Long-Term Stewardship Funding Plan satisfactory to the Trustees; and

(4)    for the Harborton Restoration Project, the execution of a Long-Term Stewardship Plan, as described in Section 6 of Appendix H to the Habitat Development Plan in Consent Decree Appendix G1, and the execution of a Long-Term Stewardship Funding Plan, both satisfactory to the Trustees.

m.    "Non-NRD Sales" (individually, "Non-NRD Sale") shall mean a sale of, or a non-contingent commitment to sell, credits in Restoration Projects for purposes other than resolving PRPs' liability to the Trustees for natural resource damages.

n.    "Parties" (individually, "Party") shall mean the Plaintiffs, the Settling Defendants, and the Restoration Credit Sellers.

o.    "Performance Guarantees" (individually, "Performance Guarantee") shall mean the surety bonds, letters of credit, and escrow accounts in Appendices D2, E2, F2, and G2 to assure the construction, habitat development, monitoring, general management, adaptive management, and lamprey monitoring of the Restoration Projects.

p.    "Performance Period" shall mean the period beginning with the start of the performance period as described in the Habitat Development Plan for a Restoration Project and ending with the Performance Period Completion Date for that Restoration Project.    The Performance Period is referred to as an "establishment period" in some Habitat Development Plan documents.    References in this Consent Decree to the Performance Period are inclusive of the "establishment period" as used in Habitat Development Plan documents.

Restoration Credit Consent Decree                17

q.      "Performance Period Completion Date" shall mean the date of the Trustees' Determination of Completion of Vegetation and Habitat Development and Monitoring Obligations for a Restoration Project as set forth in Paragraphs 27-30.

r.      "Plaintiffs" (individually, "Plaintiff") shall mean the United States; the State of Oregon; the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe.  The term "Plaintiffs" includes all of the Trustees.

s.      "Portland Harbor Natural Resource Damage Assessment Area" shall mean the waters, including the shoreline, intertidal areas, and bottom sediments, of the Willamette River located in the City of Portland, Multnomah County, Oregon, and encompasses the Willamette River, including Swan Island Lagoon, from approximately River Mile 12.3 to approximately River Mile 0.8 near the confluence with the Columbia River, as well as the upper 1.2 miles of the Multnomah Channel.  *See* PEIS (2017).

t.      "Portland Harbor Restoration Account" shall mean the Department of the Interior Natural Resources Restoration Fund, Account No. 14X5198.

u.      "Released DSAY Credits" shall mean for each Restoration Project the number of DSAY credits authorized by the Trustees for acceptance in the Restoration Project, which shall be no less than the Forecast DSAY Value of the Restoration Project on the date of each DSAY credit release, multiplied by the applicable cumulative credit release percentage in the Credit Release Schedule for the Restoration Project.  The number of Released DSAY Credits for each Restoration Project on March 20, 2023, is shown in Paragraph 42.

Restoration Credit Consent Decree                18

v.     "Restoration Credit Sellers" (individually, "Restoration Credit Seller") shall mean Portland Harbor Holdings II, LLC ("PHH"), Linnton Water Credits LLC ("Linnton"), Rinearson Natural Area, LLC ("Rinearson"), and Portland General Electric Company ("PGE").

(1)     "Portland Harbor Holdings II, LLC," or "PHH," is a business entity that, among other things, designs, constructs, and maintains natural resource restoration and enhancement projects, offering DSAY credits for sale to persons that are liable for natural resource damages at sites that have suffered a loss of natural resources and natural resource services. The terms, conditions, and obligations in this Consent Decree regarding Restoration Credit Sellers apply to Portland Harbor Holdings II, LLC with respect to the Alder Creek Restoration Project.

(2)     "Linnton Water Credits LLC," or "Linnton," is a business entity that, among other things, designs, constructs, and maintains natural resource restoration and enhancement projects, offering DSAY credits for sale to persons that are liable for natural resource damages at sites that have suffered a loss of natural resources and natural resource services. The terms, conditions, and obligations in this Consent Decree regarding Restoration Credit Sellers apply to Linnton Water Credits LLC with respect to the Linnton Mill Restoration Site.

(3)     "Rinearson Natural Area, LLC," or "Rinearson," is a business entity that, among other things, designs, constructs, and maintains natural resource restoration and enhancement projects, offering DSAY credits for sale to persons that are liable for natural resource damages at sites that have suffered a loss of natural resources and natural resource services. The terms, conditions, and obligations in this Consent Decree regarding Restoration Credit Sellers apply to Rinearson Natural Area, LLC with respect to the Rinearson Natural Area Restoration Project.

Restoration Credit Consent Decree          19

(4)    "Portland General Electric Company," or "PGE," is a public utility whose primary business activity is the generation, transmission and distribution of electricity to end use customers. In its business PGE, among other things, also designs, constructs, and maintains natural resource restoration and enhancement projects, offering DSAY credits for sale to persons that are liable for natural resource damages at sites that have suffered a loss of natural resources and natural resource services. The terms, conditions, and obligations in this Consent Decree regarding Restoration Credit Sellers apply to Portland General Electric Company with respect to the Harborton Restoration Project.

w.    "Restoration Projects" (individually, "Restoration Project") shall mean the following restoration projects: Alder Creek Restoration Project, Linnton Mill Restoration Site, Rinearson Natural Area Restoration Project, and Harborton Restoration Project.

(1)    "Alder Creek Restoration Project" shall mean the project described in Appendix D1. Portland Harbor Holdings II, LLC is the Restoration Credit Seller that is developing the Alder Creek Restoration Project.

(2)    "Linnton Mill Restoration Site" shall mean the project described in Appendix E1. Linnton Water Credits LLC is the Restoration Credit Seller that is developing the Linnton Mill Restoration Site.

(3)    "Rinearson Natural Area Restoration Project" shall mean the project described in Appendix F1. Rinearson Natural Area, LLC is the Restoration Credit Seller that is developing the Rinearson Natural Area Restoration Project.

(4)    "Harborton Restoration Project" shall mean the project described in Appendix G1. Portland General Electric Company is the Restoration Credit Seller that is developing the Harborton Restoration Project.

Restoration Credit Consent Decree            20

x.    "Restoration Project Locations" (individually, "Restoration Project Location") shall mean the locations of the Restoration Projects.

(1)    "Alder Creek Restoration Project Location" shall mean the areas shown and described in Appendix D1 and is the property on which the Alder Creek Restoration Project is situated.

(2)    "Linnton Mill Restoration Site Location" shall mean the areas shown and described in Appendix E1 and is the property on which the Linnton Mill Restoration Site is situated.

(3)    "Rinearson Natural Area Restoration Project Location" shall mean the areas shown and described in Appendix F1 and is the property on which the Rinearson Natural Area Restoration Project is situated.

(4)    "Harborton Restoration Project Location" shall mean the areas shown and described in Appendix G1 and is the property on which the Harborton Restoration Project is situated.

y.    "Settling Defendants" (individually, "Settling Defendant") shall mean City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.

z.    "Settling Parties" (individually, "Settling Party") shall mean the Plaintiffs and the Settling Defendants.

aa.    "Trustees" (individually, "Trustee") shall mean those natural resource trustees participating in the Portland Harbor Natural Resource Trustee Council pursuant to the "Natural Resource Trustee Memorandum of Agreement for the Portland Harbor Superfund Site"

Restoration Credit Consent Decree          21

ER-98

at the time of the entry of this Consent Decree – the United States Department of Commerce, acting through NOAA; the United States Department of the Interior; the State of Oregon through the Oregon Department of Fish and Wildlife; the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe.

bb.     "United States" shall mean the United States of America and each department, agency and instrumentality of the United States, including without limitation the National Oceanic and Atmospheric Administration ("NOAA") of the U.S. Department of Commerce and the U.S. Department of the Interior.

cc.     "Used DSAY Credits" shall mean the number of DSAY credits accepted by the Trustees in a Restoration Project plus the DSAY equivalent of Non-NRD Sales in that Restoration Project.  The number of DSAYs in each Non-NRD Sale shall be determined using the conversion table for the applicable Restoration Project, as established pursuant to Paragraph 45, for converting restoration credits from Non-NRD Sales to DSAYs.  DSAY credits accepted by the Trustees include both DSAY credits purchased by the Trustees in a Restoration Project and DSAY credits accepted by the Trustees in settlements with PRPs.

## VI.  GENERAL PROVISIONS

4.     The Complaint states claims against each Settling Defendant upon which relief may be granted.

5.     Nothing in this Consent Decree shall be construed as an admission of liability by Settling Defendants for any claims or allegations made in the Complaint or in this Consent Decree. Settling Defendants deny all or portions of the allegations in the Complaint and this Consent

Restoration Credit Consent Decree                    22

Decree and do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the Complaint or this Consent Decree.

## VII.  TERMS AND CONDITIONS APPLICABLE ONLY TO RESTORATION CREDIT SELLERS

6.      Except as specifically provided in this Section VII, the Terms and Conditions set forth in this Section VII of the Consent Decree are applicable to and enforceable against Restoration Credit Sellers (including Restoration Credit Sellers' successors and assigns), and Restoration Credit Sellers' insurers, sureties, and other Performance Guarantee holders and issuers where specifically provided.  Except as specifically provided in this Section VII of the Consent Decree, the Terms and Conditions set forth in this Section VII are not applicable to or enforceable against Settling Defendants.

### A.      General Consent Decree Provisions For Restoration Credit Sellers

7.      Neither Restoration Credit Sellers' status as parties to this Consent Decree, nor any provision of this Consent Decree, shall impose liability on Restoration Credit Sellers or alter or affect Restoration Credit Sellers' liability (or absence of liability) pursuant to CERCLA, OPA, the Oregon Hazardous Waste and Hazardous Materials Act, or the CWA.  Nothing in this Consent Decree shall shield or relieve Restoration Credit Sellers from liability pursuant to CERCLA, OPA, the Oregon Hazardous Waste and Hazardous Materials Act, or the CWA for Restoration Credit Sellers' acts that otherwise would result in liability under those statutes absent this Consent Decree.

8.      Plaintiffs do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Restoration Credit Sellers' compliance with this Consent Decree will result in compliance with CERCLA or any other law.  Compliance with this Consent Decree does not diminish or affect Restoration Credit Sellers' responsibility to comply with any applicable federal, state or local law or regulation.

Restoration Credit Consent Decree                    23

9.      Restoration Credit Sellers shall be responsible for ensuring that all work required by this Consent Decree is performed in accordance with this Consent Decree. This specifically includes, but is not limited to, work performed by Restoration Credit Sellers' contractors and subcontractors. For purposes of this Consent Decree, all work performed by Restoration Credit Sellers' contractors, subcontractors, and other agents in connection with the Restoration Projects shall be treated as if that work was performed by Restoration Credit Sellers themselves.

10.     All activities undertaken by Restoration Credit Sellers to develop and implement the Restoration Projects shall be performed in accordance with the requirements of all applicable laws and permits.

11.     Where any portion of the activities undertaken pursuant to this Consent Decree requires a federal, state or local permit or approval, Restoration Credit Sellers shall submit timely and complete applications and take all other actions necessary to obtain such permits or approvals. Restoration Credit Sellers may seek relief under the provisions of Section IX (Force Majeure) for any delay in or prevention of the performance of the obligations of this Consent Decree resulting from a failure to obtain, or a delay in obtaining, any federal or state permit or approval required for such performance, provided that they have submitted timely and complete applications and taken all other actions reasonably necessary to obtain all such permits or approvals.

12.     This Consent Decree is not, and shall not be construed to be, a permit issued pursuant to any law.

13.     Each Restoration Credit Seller shall avoid taking any action that is inconsistent with this Consent Decree and/or that would adversely affect the physical or biological condition of its Restoration Project.

Restoration Credit Consent Decree                24

14.     Each Restoration Credit Seller shall undertake all activities required to address potential impacts of its Restoration Project on cultural resources associated with the Restoration Project, including, as applicable, consultation with tribes and the Oregon State Historic Preservation Office, conducting a background and project review by an archaeologist who meets the U.S. Department of the Interior's professional qualification standards at 36 C.F.R. Part 61, and conducting cultural resource surveys or monitoring activities.

15.     The obligations of each Restoration Credit Seller under this Consent Decree are individual in nature.  Any violation by a Restoration Credit Seller of its obligations under this Consent Decree is not attributable to the other Restoration Credit Sellers, and all consequences of such violation, including all responsibilities for remedying such violation, pertain exclusively to the Restoration Credit Seller in violation of its obligations under this Consent Decree.

**B.      Changes to Habitat Development Plans**

16.     A Restoration Credit Seller may propose changes to the Habitat Development Plan for its Restoration Project, so long as any proposed changes comply with all applicable laws.  The Trustees have the sole authority and unreviewable discretion to review and approve any changes to a Habitat Development Plan proposed by its Restoration Credit Seller.  Review and approval by the Trustees of proposed changes to a Habitat Development Plan is not subject to the provisions of Section X (Dispute Resolution).  In conjunction with making any proposed changes to a Habitat Development Plan, the Trustees may revise the Forecast DSAY Value of the applicable Restoration Project as set forth in Paragraphs 47-51.

17.     If the Trustees approve changes to a Habitat Development Plan, those changes shall be documented by the Trustees in a notice to the applicable Restoration Credit Seller.  In that event, the corresponding Habitat Development Plan attached as an appendix to this Consent Decree shall

Restoration Credit Consent Decree              25

be treated as containing the changes approved by the Trustees. Such changes need not be submitted to the Court for approval.

### C.    Restoration Project Construction

18.    Each Restoration Credit Seller shall construct its Restoration Project as described in the applicable Habitat Development Plan. Each Restoration Credit Seller shall provide a written Notice of Completion of Construction Obligations to the Trustees upon the earlier of (a) completion of construction of its Restoration Project, or (b) two years after the Effective Date. Such Notice shall document the Restoration Credit Seller's completion of construction obligations, noting any differences between the project design in the Habitat Development Plan and the as-built project. After receiving the Notice of Completion of Construction Obligations, the Trustees shall provide to that Restoration Credit Seller either (a) a written notice identifying deficiencies in the information submitted in the Notice of Completion of Construction Obligations that prevent the Trustees from determining whether the construction obligations in the applicable Habitat Development Plan have been satisfied (Notice of Information Deficiencies); (b) a written notice identifying specific deficiencies between the as-built Restoration Project and the Habitat Development Plan that the Trustees determine must be corrected for the construction obligations to be completed in accordance with the applicable Habitat Development Plan (Notice of Construction Deficiencies); or (c) a written notice of the Trustees' determination that the construction obligations are completed (Determination of Completion of Construction Obligations) and a revision, if any, to the Forecast DSAY Value of the Restoration Project based on a review of the as-built project. If a Restoration Credit Seller receives a Notice of Information Deficiencies, the Credit Seller shall re-submit an amended Notice of Completion of Construction Obligations pursuant to this Paragraph.

Restoration Credit Consent Decree                26

19. Any Notice of Construction Deficiencies from the Trustees shall set a reasonable date by which the Restoration Credit Seller shall respond to that Notice. Prior to issuing a Notice of Construction Deficiencies, the Trustees and the Restoration Credit Seller shall consult to determine a mutually agreed-upon timeframe for Restoration Credit Seller to correct the identified deficiencies and submit an amended Notice of Completion of Construction Obligations pursuant to Paragraph 20, taking into account seasonal limitations and requirements for conducting the required actions.

20. In the event the Trustees identify, in a Notice of Construction Deficiencies, deficiencies in a Restoration Credit Seller's compliance with its obligations in Paragraph 18 that require correction, the Restoration Credit Seller shall correct the identified deficiencies and complete the Restoration Project in accordance with the Notice of Construction Deficiencies and the applicable Habitat Development Plan. On or before the date specified in the Notice of Construction Deficiencies, the Restoration Credit Seller shall provide to the Trustees an amended Notice of Completion of Construction Obligations for the Trustees' review and response. After receiving such an amended Notice, the Trustees shall provide to the Restoration Credit Seller either (a) a written notice identifying deficiencies in the information submitted in the Notice of Completion of Construction Obligations that prevent the Trustees from determining whether the construction obligations in the applicable Habitat Development Plan have been satisfied (Notice of Information Deficiencies); (b) another Notice of Construction Deficiencies for review and response by the Restoration Credit Seller in accordance with this Paragraph; (c) a written notice of the Trustees' determination that the construction obligations are completed (Determination of Completion of Construction Obligations) with a revision to the Forecast DSAY Value of the Restoration Project based on the review of the as-built project; or (d) a written notice that the

Restoration Credit Consent Decree 27

Trustees are taking other action(s) under this Consent Decree to enforce the applicable Restoration Project construction obligations, including but not limited to a revision to the Forecast DSAY Value of the Restoration Project as set forth in Paragraphs 47-51. A written notice provided pursuant to (d) in the foregoing sentence may include a Determination of Completion of Construction Obligations in conjunction with a revision to the Forecast DSAY Value of the Restoration Project and other actions. If a Restoration Credit Seller receives a Notice of Information Deficiencies, the Credit Seller shall submit an amended Notice of Completion of Construction Obligations pursuant to this Paragraph.

21.    If a Restoration Credit Seller disputes a Notice of Construction Deficiencies or other Trustee response to a Notice of Completion of Construction Obligations, the Restoration Credit Seller may invoke the provisions of Section X (Dispute Resolution) to address that disagreement, excluding disagreements regarding the Forecast DSAY Value of the Restoration Project. If the Trustees do not respond to a Notice of Completion of Construction Obligations as set forth in Paragraphs 18 or 20, as applicable, within ninety (90) days of such Notice, the Restoration Credit Seller may invoke the provisions of Section X (Dispute Resolution) to compel a response from the Trustees.

22.    PHH has completed construction of the Alder Creek Restoration Project. The December 2017 letter received from the Trustees constitutes, for purposes of the Consent Decree, the Trustees' Construction Completion determination. December 1, 2017, is the "Construction Completion Date" for the Alder Creek Restoration Project. PHH need not send the Notice of Completion of Construction Obligations otherwise required by Paragraph 18.

23.    Rinearson has completed construction of the Rinearson Natural Area Restoration Project. For purposes of this Consent Decree, Rinearson has received from the Trustees a

Restoration Credit Consent Decree                28

Determination of Completion of Construction Obligations, and May 22, 2019, is the "Construction Completion Date" for the Rinearson Natural Area Restoration Project. Rinearson need not send the Notice of Completion of Construction Obligations otherwise required by Paragraph 18.

24. Linnton has completed construction of the Linnton Mill Restoration Site. For purposes of this Consent Decree, Linnton has received from the Trustees a Determination of Completion of Construction Obligations, and August 20, 2020, is the "Construction Completion Date" for the Linnton Mill Restoration Site. Linnton need not send the Notice of Completion of Construction Obligations otherwise required by Paragraph 18.

25. PGE has completed construction of the Harborton Restoration Project. For purposes of this Consent Decree, PGE has received from the Trustees a Determination of Completion of Construction Obligations, and August 28, 2020, is the "Construction Completion Date" for the Harborton Restoration Project. PGE need not send the Notice of Completion of Construction Obligations otherwise required by Paragraph 18.

26. Upon completion of construction of a Restoration Project, the Trustees may revise the Forecast DSAY Value of that Restoration Project as set forth in Paragraphs 47-51.

**D. Development of Restoration Project Vegetation and Habitat**

27. Each Restoration Credit Seller shall implement its Restoration Project until the Performance Period Completion Date for each Restoration Project as set forth in the applicable Habitat Development Plan. Upon the earlier of (a) attainment of the 10-year performance standards or final performance standards for the Performance Period in the applicable Habitat Development Plan; (b) 10 years after the applicable Construction Completion Date; or (c) a date mutually agreed-upon by the Trustees and the Restoration Credit Seller, the Restoration Credit Seller responsible for each Restoration Project shall provide a written Notice of Progress on

Restoration Credit Consent Decree                29

Vegetation and Habitat Development and Monitoring Obligations ("Notice of Progress") to the Trustees. This is in addition to any periodic reports that each Restoration Seller is required to provide to the Trustees during the Performance Period under its Habitat Development Plan. As set forth in Paragraph 37, prior to submitting the Notice of Progress, each Restoration Credit Seller must complete the Long-Term Stewardship Transition Obligations for its Restoration Project.

28. The Notice of Progress shall describe the condition of the Restoration Project in relation to all 10-year performance standards or final performance standards in the Performance Period, as set forth in the Habitat Development Plan for that Restoration Project, and shall provide all other information required by the applicable Habitat Development Plan. After receiving the Notice of Progress, the Trustees shall provide to the Restoration Credit Seller either (a) a written notice identifying deficiencies in the information submitted in the Notice of Progress that prevent the Trustees from determining whether the habitat development obligations in the applicable Habitat Development Plan have been satisfied (Notice of Information Deficiencies); (b) a written notice identifying deficiencies the Trustees determine must be corrected, which may include adaptive management actions that must be taken to correct those deficiencies, in order to attain the 10-year performance standards or final performance standards in the Performance Period in accordance with the Habitat Development Plan (Notice of Development Deficiencies); (c) a written notice of the Trustees' determination that the 10-year performance standards or final performance standards in the Performance Period have been attained in accordance with the Habitat Development Plan (Determination of Completion of Vegetation and Habitat Development and Monitoring Obligations); or (d) if the Trustees and the Restoration Credit Seller mutually agree that the 10-year performance standards or final performance standards in the Habitat Development Plan have not been attained, but that further work by the Restoration Credit Seller to attain those

Restoration Credit Consent Decree                30

standards would not be fruitful, the Trustees may provide a Determination of Completion of Vegetation and Habitat Development and Monitoring Obligations in conjunction with a revision to the Forecast DSAY Value of the Restoration Project. If a Restoration Credit Seller receives a Notice of Information Deficiencies, the Credit Seller shall submit an amended Notice of Progress pursuant to this Paragraph. If the Trustees issue a written Determination of Completion of Vegetation and Habitat Development and Monitoring Obligations pursuant to (d) of this Paragraph in conjunction with a revision to the Forecast DSAY Value of the Restoration Project based on partial attainment of 10-year performance standards or final performance standards, the Trustees shall release any remaining DSAY credits under the Credit Release Schedule based on the revised Forecast DSAY Value of the Restoration Project.

29.     Any Notice of Development Deficiencies from the Trustees shall set a date by which the Restoration Credit Seller shall respond to that Notice. Prior to issuing a Notice of Development Deficiencies, the Trustees and the Restoration Credit Seller shall consult regarding the appropriate timeframe for Restoration Credit Seller to correct the identified deficiencies and submit an amended Notice of Progress pursuant to Paragraph 30, taking into account seasonal limitations and requirements for conducting the required actions. The Trustees shall determine the appropriate timeframe, taking into account information provided by the Restoration Credit Seller during the consultation.

30.     In the event the Trustees provide a Notice of Development Deficiencies, the Restoration Credit Seller shall correct the identified deficiencies, and shall take all specified adaptive management actions, to complete the Restoration Project in accordance with the Habitat Development Plan for the Restoration Project. On or before the date specified in the Notice of Development Deficiencies, the Restoration Credit Seller shall provide to the Trustees an amended

Restoration Credit Consent Decree          31

Notice of Progress for review and response by the Trustees. After receiving such an amended Notice of Progress, the Trustees shall provide to the Restoration Credit Seller either (a) a written notice identifying deficiencies in the information submitted in the Notice of Progress that prevent the Trustees from determining whether the habitat development obligations in the applicable Habitat Development Plan have been satisfied (Notice of Information Deficiencies); (b) another Notice of Development Deficiencies for review and response by the Restoration Credit Seller in accordance with this Paragraph; (c) a written notice of the Trustees' determination that the 10-year performance standards or final performance standards have been attained in accordance with the Habitat Development Plan (Determination of Completion of Vegetation and Habitat Development and Monitoring Obligations); or (d) a written notice that the Trustees are taking other action(s) under this Consent Decree to address failure to attain the 10-year performance standards or final performance standards for the Performance Period in the Habitat Development Plan, including but not limited to a revision to the Forecast DSAY Value of the Restoration Project as set forth in Paragraphs 47-51. A written notice provided pursuant to (d) in the foregoing sentence may include a Determination of Completion of Vegetation and Habitat Development and Monitoring Obligations in conjunction with a revision to the Forecast DSAY Value of the Restoration Project and other actions. If the Trustees issue a written Determination of Completion of Vegetation and Habitat Development and Monitoring Obligations pursuant to (c) of this Paragraph in conjunction with a revision to the Forecast DSAY Value of the Restoration Project based on partial attainment of 10-year performance standards or final performance standards, the Trustees shall release any remaining DSAY credits under the Credit Release Schedule based on the revised Forecast DSAY Value of the Restoration Project. If a Restoration Credit Seller receives a Notice of Information

Restoration Credit Consent Decree                32

Deficiencies, the Credit Seller shall submit an amended Notice of Completion of Construction Obligations pursuant to this Paragraph.

31.     If a Restoration Credit Seller disputes a Notice of Development Deficiencies or other Trustee response to a Notice of Progress, the Restoration Credit Seller may invoke the provisions of Section X (Dispute Resolution) to address that disagreement, excluding disagreements regarding the Forecast DSAY Value of the Restoration Project.  If the Trustees do not respond to a Notice of Progress within ninety (90) days of such Notice, the Restoration Credit Seller may invoke the provisions of Section X (Dispute Resolution) to compel a response from the Trustees.  If a dispute regarding a failure by the Trustees to respond to a Notice of Progress is resolved by the Court, the Court may order the Trustees to respond to the Notice by a particular date, but the Trustees shall determine the substance of their response to that Notice.

32.     During the Performance Period, each Restoration Credit Seller shall be responsible for undertaking corrective actions and adaptive management, in consultation with the Trustees, as called for in its Habitat Development Plan, including, but not limited to, adaptive management for any perturbation that affects the ecological integrity or function of its Restoration Project. Perturbations that may require performance of corrective actions or adaptive management include events with a foreseeable probability of occurrence (such as, for example, the beaching of an abandoned barge or unauthorized human access to or occupation of a Restoration Project Location), but such perturbations do not include "force majeure" events as defined in Section IX (Force Majeure).  Corrective actions or adaptive management are not required to address "force majeure" events as defined in Section IX (Force Majeure).

33.     Each Restoration Credit Seller shall provide for continued maintenance and corrective actions of its Restoration Project in accordance with the applicable Habitat Development

Restoration Credit Consent Decree              33

Plan until the Performance Period Completion Date of its Restoration Project, regardless of ownership of the Restoration Project Locations. The Trustees recognize that the Restoration Project Locations may include property that is owned by other entities. Each Restoration Credit Seller recognizes that it is solely responsible for securing the cooperation of other property owners in order to successfully complete, maintain, and provide access to its Restoration Project in accordance with the Habitat Development Plan. Any failure by a Restoration Credit Seller to successfully complete, maintain, or provide access to its Restoration Project in accordance with the Habitat Development Plan resulting from disputes with other property owners shall not constitute a "force majeure" event.

34.     If during the Performance Period of a Restoration Project the Trustees determine that the applicable Restoration Credit Seller is not providing for continued maintenance or is not undertaking corrective actions or adaptive management in accordance with the applicable Habitat Development Plan, the Trustees may provide a written Notice of Ongoing Deficiencies to the Restoration Credit Seller specifying the basis for their determination of noncompliance. A Notice of Ongoing Deficiencies may require a Restoration Credit Seller to take actions, to alter, suspend or cease ongoing activities, or to alter, postpone or refrain from taking proposed actions, as are necessary to ensure compliance with the terms of the applicable Habitat Development Plan and any other Notices for that Restoration Project sent by the Trustees under this Consent Decree. Prior to issuing a Notice of Ongoing Deficiencies, the Trustees and the Restoration Credit Seller shall consult regarding the appropriate timeframe for the Restoration Credit Seller to correct the identified deficiencies. A Notice of Ongoing Deficiencies shall set a reasonable date by which the Restoration Credit Seller shall respond to that Notice. If a Notice of Ongoing Deficiencies includes actions that must be taken by the Restoration Credit Seller, the Notice also shall include a

Restoration Credit Consent Decree          34

reasonable schedule for completion of all actions required by that Notice, taking into account seasonal limitations and requirements for conducting the required actions. The Restoration Credit Seller shall correct the noncompliance as set forth in the Notice or shall invoke the Dispute Resolution procedures set forth in Section X below, excluding any provisions in the Notice regarding the Forecast DSAY Value of the Restoration Project.

35.    After the Performance Period Completion Date for a Restoration Project, the Restoration Credit Seller is no longer responsible for continued maintenance of, or corrective actions to, its Restoration Project. After the Performance Period Completion Date for a Restoration Project, continued maintenance of and corrective actions to that Restoration Project is the responsibility of the long-term steward, as set forth in Section VII.E (Restoration Project Long-Term Stewardship Transition Obligations) and the relevant provisions of the Habitat Development Plans.

### E.    Restoration Project Long-Term Stewardship Transition Obligations

36.    Within thirty (30) days of the Effective Date, each Restoration Credit Seller shall have recorded, or shall arrange to have recorded, the deed restrictions in Appendices D4-a, E4-a, F4-a, and G4-a for its Restoration Project Location. Each Restoration Credit Seller shall ensure that these deed restrictions remain in effect until conservation easement deeds for its Restoration Project referenced in this Paragraph are recorded. Prior to the due date for providing the Notice of Progress on Vegetation and Habitat Development and Monitoring Obligations in Paragraph 27, each Restoration Credit Seller shall record, or arrange to have recorded, conservation easements for its Restoration Project Location substantially similar to the applicable exemplars in Appendices D4-b, E4-b, F4-b, and G4-b, or as otherwise agreed to by the Trustees and the holder(s) of the conservation easement(s).

Restoration Credit Consent Decree                35

37.     Prior to the due date for providing the Notice of Progress on Vegetation and Habitat Development and Monitoring Obligations under Paragraph 27, and no later than ten years after the Construction Completion Date, each Restoration Credit Seller shall complete the Long-Term Stewardship Transition Obligations for its Restoration Project.  The Trustees may grant a request from a Restoration Credit Seller to extend this deadline if the final performance standards for its Restoration Project will not be attained by this deadline and if the Restoration Credit Seller and the Trustees agree that additional time is warranted to work toward final performance standards. The Long-Term Stewardship Transition Obligations include fully funding the long-term Stewardship Fund for each Restoration Project, putting in place the restrictive covenants and conservations easements for each Restoration Project Location, and completing a long-term stewardship plan for each Restoration Project.  In addition, the Trustees, the Restoration Credit Seller for each Restoration Project, and conservation easement holders for each Restoration Project shall consult with each other regarding the selection of a long-term steward for each Restoration Project, after which the Trustees shall appoint a long-term steward for each Restoration Project. The Trustees shall make the final decision regarding long-term steward selection for each Restoration Project in their sole and unreviewable discretion, and this decision is not subject to the provisions of Section X (Dispute Resolution).  A Restoration Credit Seller is never responsible for the duties, obligations, acts or omissions of the long-term steward unless agreed in a writing signed by the Restoration Credit Seller and the Trustees.

38.     Within ninety (90) days of completion of all requirements in Paragraphs 36-37 for a Restoration Project, the Restoration Credit Seller responsible for that Restoration Project shall provide a written Notice of Completion of Long-Term Stewardship Transition Obligations to the Trustees.  Such Notice shall describe the actions taken by the Restoration Credit Seller to comply

Restoration Credit Consent Decree                     36

with the requirements in Paragraphs 36-37.  After receiving a Notice of Completion of Long-Term Stewardship Transition Obligations, the Trustees shall provide to the Restoration Credit Seller either (a) a written notice identifying specific deficiencies the Trustees determine must be corrected (Notice of Long-Term Stewardship Transition Deficiencies); or (b) a written notice of the Trustees' determination that the requirements in Paragraphs 36-37 have been completed (Determination of Completion of Long-Term Stewardship Transition Obligations).

39.     Any Notice of Long-Term Stewardship Transition Deficiencies from the Trustees shall set a reasonable date by which the Restoration Credit Seller shall respond to that Notice. Prior to issuing a Notice of Long-Term Stewardship Transition Deficiencies, the Trustees and the Restoration Credit Seller shall consult regarding the appropriate timeframe for Restoration Credit Seller to correct the identified deficiencies and submit an amended Notice of Completion of Long-Term Stewardship Transition Obligations pursuant to Paragraph 40.  The Trustees shall determine the appropriate timeframe, taking into account information provided by the Restoration Credit Seller during the consultation.

40.     In the event the Trustees identify, in a Notice of Long-Term Stewardship Transition Deficiencies, specific deficiencies with a Restoration Credit Seller's compliance with the requirements in Paragraphs 36-37, the Restoration Credit Seller shall correct the identified deficiencies in accordance with the Notice of Long-Term Stewardship Transition Deficiencies and the applicable Habitat Development Plan.  On or before the date specified in the Notice of Long-Term Stewardship Transition Deficiencies, the Restoration Credit Seller shall provide to the Trustees an amended Notice of Completion of Long-Term Stewardship Transition Obligations for review and response by the Trustees.  After receiving such an amended Notice, the Trustees shall provide either (a) another Notice of Long-Term Stewardship Transition Deficiencies for review

Restoration Credit Consent Decree                37

and response by the Restoration Credit Seller in accordance with this Paragraph, (b) a written notice of the Trustees' determination that the requirements in Paragraphs 36-37 have been completed (Determination of Completion of Long-Term Stewardship Transition Obligations), or (c) a written notice that the Trustees are taking other action(s) under this Consent Decree to enforce the applicable requirements identified in the Notice of Long-Term Stewardship Transition Deficiencies.

41.     If a Restoration Credit Seller disputes a Notice of Long-Term Stewardship Transition Deficiencies or other Trustee response to a Notice of Completion of Long-Term Stewardship Transition Obligations, the Restoration Credit Seller may invoke the provisions of Section X (Dispute Resolution) to address that disagreement, excluding disagreements regarding the Forecast DSAY Value of the Restoration Project.  If the Trustees do not respond to a Notice of Completion of Long-Term Stewardship Transition Obligations within ninety (90) days of such Notice, the Restoration Credit Seller may invoke the provisions of Section X (Dispute Resolution) to compel a response from the Trustees.

Restoration Credit Consent Decree                    38

F.       **Restoration Project DSAY Credits**

Restoration Project Forecast DSAY Value, Released DSAY Credits, and Tracking Used

DSAY Credits and Available DSAY Credits

42.      As of March 20, 2023, pursuant to the Credit Release Schedule for each Restoration Project, the Forecast DSAY Value and the Released DSAY Credits for each Restoration Project are as follows:

| Restoration Project | Forecast DSAY Value | Released DSAY Credits |
|---|---|---|
| Alder Creek Restoration Project | 734.21 | 543.46 |
| Linnton Mill Restoration Site | 502.51 | 252.50 |
| Rinearson Natural Area Restoration Project | 320.70 | 160.35 |
| Harborton Restoration Project | 586.5 | 293.25 |

The Trustees may revise the Forecast DSAY Value of any of the Restoration Projects as set forth in Paragraphs 47-51.  The number of Released DSAY Credits includes both Used DSAY Credits and Available DSAY Credits.  The number of Released DSAY Credits for each Restoration Project will change over time, depending on additional releases of DSAY credits based on determinations by the Trustees that one or more additional milestones in the Credit Release Schedule for a Restoration Project have been met, which may include partial credit for project milestones or performance standards that are partially but not fully met.  The number of Available DSAY Credits will change over time for each Restoration Project, depending on changes to Released DSAY Credits and Used DSAY Credits for each Restoration Project.

43.      Whenever the Forecast DSAY Value or the number of Released DSAY Credits in a Restoration Project changes, the Trustees will send the applicable Restoration Credit Seller a notice of the change, which shall show the change and explain the reason(s) for the change.

Restoration Credit Consent Decree                 39

44.    The Trustees will purchase or accept in settlement no more than the Available DSAY Credits in a Restoration Project as of the time of the purchase or settlement.

45.    Each Restoration Credit Seller may sell credits in its Restoration Project in the form of Non-NRD Sales.  Prior to making any Non-NRD Sales, each Restoration Credit Seller shall coordinate with the Trustees to develop a conversion table for its Restoration Project that shows, at a minimum: (1) the number of DSAYs that each Non-NRD restoration credit is worth, and (2) the maximum number of Non-NRD restoration credits that may be sold for the Restoration Project. Notice of the agreed-upon conversion table shall be sent by the Restoration Credit Seller to the Trustees as set forth in Section XIX (Notices And Submissions), and shall thereby be incorporated herein as an enforceable term of this Consent Decree.  Upon receiving notice from a Restoration Credit Seller of a Non-NRD Sale, the Trustees shall revise the Used DSAY Credits and the Available DSAY Credits for that Restoration Project accordingly.

46.    Appendix C shows the number of DSAY credits that each Settling Defendant has purchased or has signed a legally binding commitment to purchase upon entry of the Consent Decree in each Restoration Project.  Each Restoration Credit Seller shall maintain a Trustee-approved registry that shows all sales of credits in its Restoration Project, including credits for resolving natural resource damages liability to the Trustees and Non-NRD Sales.  Each Restoration Credit Seller shall provide the Trustees with an updated version of the registry for its Restoration Project by February 15 of each calendar year, commencing the year after the Effective Date and continuing until all credits that have been released pursuant to the Credit Release Schedule for each Restoration Project are sold, or until the Restoration Credit Seller informs the Trustee Council that it has terminated credit sales.  In addition, each Restoration Credit Seller shall notify the Trustees within thirty (30) days of each sale of DSAY credits and each Non-NRD Sale.

Restoration Credit Consent Decree                40

Revisions by Trustees of the Forecast DSAY Value of Restoration Projects

47. The Trustees may revise the Forecast DSAY Value of any of the Restoration Projects to account for changes to the planned or actual design or condition of a Restoration Project as compared to the Habitat Development Plan. Revisions to the Forecast DSAY Value of a Restoration Project may be made at any time until and including the Performance Period Completion Date but may not be made after the Performance Period Completion Date. Revisions to the Forecast DSAY Value of a Restoration Project are appropriate when the planned or actual design or condition of the Restoration Project changes the ecological value from the planned or actual design or condition set forth in the Habitat Development Plan previously used to determine the Forecast DSAY Value of that Restoration Project. Examples of such circumstances include, but are not limited to, the following:

- after the Trustees approve changes to a Habitat Development Plan requested by a Restoration Credit Seller pursuant to Paragraph 16;

- after the Trustees receive a Notice of Completion of Construction Obligations or send a Determination of Completion of Construction Obligations for a Restoration Project, if the as-built Restoration Project differs from the design or planned condition of that Restoration Project described in the Habitat Development Plan;

- after the Trustees receive a Notice of Completion of Vegetation and Habitat Development and Monitoring Obligations or send a Determination of Completion of Vegetation and Habitat Development and Monitoring Obligations for a Restoration Project, if the as-developed Restoration Project differs from the planned condition of the Restoration Project previously used by the Trustees to determine the Restoration Project's Forecast DSAY Value; or

Restoration Credit Consent Decree                41

- if the Trustees become aware of events or circumstances, including but not limited to force majeure events and perturbations requiring adaptive management as described in Paragraphs 32 and 75, that have changed the condition of a Restoration Project from the planned or actual condition of the Restoration Project previously used by the Trustees to determine the Restoration Project's Forecast DSAY Value.

48.     In revising the Forecast DSAY Value of a Restoration Project to account for changes in the Project's planned or actual design or condition, the Trustees shall use the same Habitat Equivalency Analysis metrics they previously used to determine the Forecast DSAY Value of that Restoration Project.  The Restoration Credit Seller may participate with the Trustees in the process of reviewing the Forecast DSAY Value of its Restoration Project.  If the Habitat Equivalency Analysis metrics indicate that an upward revision to the Forecast DSAY Value of a Restoration Project could be appropriate, the Trustees may decline to revise the Forecast DSAY Value of a Restoration Project upward if the changed design or conditions that would be the basis of an upward revision in Forecast DSAY Value are inconsistent with, or contrary to, the approved Habitat Development Plan for that Restoration Project.

49.     Any downward revision to the Forecast DSAY Value of a Restoration Project shall not result in a downward revision of Released DSAY Credits for that Restoration Project.  The Trustees' revisions to the Forecast DSAY Value of Restoration Projects shall not affect the efficacy of the DSAY credits accepted by the Plaintiffs in this Consent Decree to resolve Settling Defendants' liability for Covered Natural Resource Damages.

50.     All revisions by the Trustees to the Forecast DSAY Value of Restoration Projects are within the Trustees' sole and unreviewable discretion.  Notwithstanding any other provision of this Consent Decree, the Trustees' revisions to the Forecast DSAY Value of Restoration Projects

Restoration Credit Consent Decree                42

shall not be subject to the provisions of Section X (Dispute Resolution) or to judicial review under any federal or state law or regulation.

51.    A revision of the Forecast DSAY Value of a Restoration Project by the Trustees shall not limit the Trustees' ability to exercise any other rights or authorities under this Consent Decree to address changes in the design or condition of a Restoration Project, including but not limited to rights and authorities to address non-compliance by a Restoration Credit Seller with its obligations under this Consent Decree.

**G.    Restoration Project Performance Guarantees**

52.     Each Restoration Credit Seller shall maintain the Performance Guarantees for its Restoration Project as set forth in Appendices D2, E2, F2, and G2, such that the Performance Guarantees are legally binding and fully effective beginning on or before the Effective Date of this Consent Decree and continuing until released, canceled, or exercised as set forth in this sub-Section VII.G.

53.    <u>Release by Trustees of Performance Guarantees</u>.  Restoration Credit Sellers shall not release, cancel, or discontinue any Performance Guarantee provided for the Restoration Projects except as provided pursuant to this sub-Section and as set forth in Appendices D2, E2, F2, and G2.  Restoration Credit Sellers may release, cancel, or discontinue the Performance Guarantees only as follows:

(a)    If the Trustees provide a Determination of Completion of Construction Obligations for a Restoration Project, or if the Trustees otherwise so notify a Restoration Credit Seller in writing, the Restoration Credit Seller may thereafter release, cancel, or discontinue the applicable Performance Guarantee; PHH, Linnton, Rinearson, and PGE  have completed

Restoration Credit Consent Decree              43

construction of their Restoration Projects and therefore no Performance Guarantees for construction are included in Appendices D2-a, E2-a, F2-a, and G2-a;

(b)    If the Trustees provide a Determination of Completion of Vegetation and Habitat Development And Monitoring Obligations for a Restoration Project, or if the Trustees otherwise so notify a Restoration Credit Seller in writing, the Restoration Credit Seller may thereafter release, cancel, or discontinue the applicable Performance Guarantees set forth in Appendices D2-b, E2-b and E2-c, F2-b and F2-c, or G2-b and G2-d; provided, however, that if a Performance Guarantee includes lamprey monitoring for project years 15 and 20, that Performance Guarantee shall not be released, canceled, or discontinued, although the dollar amount of that Performance Guarantee may be reduced to the amount identified in the Performance Guarantee for lamprey monitoring for project years 15 and 20; and

(c)    Upon payment to the entity specified by the Trustees of the dollar amount required for lamprey monitoring for project years 15 and 20, as stated in the Habitat Development Plan, the Restoration Credit Seller may thereafter release, cancel, or discontinue the applicable Performance Guarantee set forth in Appendix D2-c, E2-c, F2-d, or G2-c.

54.    In the event of a dispute concerning the continuation of a Performance Guarantee, the Restoration Credit Seller may release, cancel, or discontinue the Performance Guarantee(s) required by Paragraph 52 only in accordance with the final administrative or judicial decision resolving such dispute pursuant to Section X (Dispute Resolution) and in accordance with the terms and conditions of the Performance Guarantee(s).

Restoration Credit Consent Decree              44

Cancellation of Performance Guarantees By A Guarantor or Escrow Agent.

55.     If at any time the Trustees are notified by an Escrow Agent appointed pursuant to a Performance Guarantee in Appendices D2, E2, F2, or G2, that the Escrow Agent intends to resign, then, unless the applicable Restoration Credit Seller provides a substitute performance guarantee mechanism that is acceptable to the Trustees no later than thirty (30) days prior to the impending resignation date, the Trustees may draw all funds in the Escrow Account established pursuant to the applicable Performance Guarantee at any time thereafter without any further notice to the applicable Restoration Credit Seller and hold such funds in a separate account or sub-account dedicated solely for holding the withdrawn escrow funds pending the establishment of a new escrow account acceptable to the Trustees.  If the Trustees issue an Exercise of Performance Guarantee pursuant to Paragraph 58 while funds are held in such an account or sub-account dedicated to holding withdrawn escrow funds, the Trustees may expend funds from such an account or sub-account in order to carry out the Exercise of Performance Guarantee until a new escrow account is established.  If a new escrow account acceptable to the Trustees is established, the Trustees shall deposit the then-current funds from the separate account or sub-account into the new escrow account.

56.     If the Trustees are notified by the issuer of a surety bond or letter of credit in Appendices D2, E2, F2, or G2 that the issuer intends to cancel such Performance Guarantee, and the applicable Restoration Credit Seller fails to provide a replacement financial assurance acceptable to the Trustees for that surety bond or letter of credit at least thirty (30) days prior to the cancellation date, the Trustees may demand and draw all funds guaranteed under such surety bond or letter of credit at any time thereafter without any further notice to the applicable Restoration Credit Seller and hold such funds in a separate account or sub-account dedicated solely

Restoration Credit Consent Decree                    45

for holding the withdrawn funds guaranteed under such surety bond or letter of credit pending the establishment of a new surety bond or letter of credit acceptable to the Trustees. If the Trustees issue an Exercise of Performance Guarantee pursuant to Paragraph 58 while funds are held in such an account or sub-account dedicated to holding withdrawn funds guaranteed under such surety bond or letter of credit, the Trustees may expend funds from such an account or sub-account in order to carry out the Exercise of Performance Guarantee until a new surety bond or letter of credit is established. If a new surety bond or letter of credit acceptable to the Trustees is established, the Trustees shall deposit the then-current funds from the separate account or sub-account as directed by the Restoration Credit Seller.

Exercise of Performance Guarantees.

57. In the event the Trustees determine that a Restoration Credit Seller has failed to fulfill any obligation in accordance with the applicable Habitat Development Plan for which there is a Performance Guarantee, then the Trustees may issue a written notice ("Exercise of Performance Guarantee Notice") to the Restoration Credit Seller. Any Exercise of Performance Guarantee Notice issued by the Trustees will specify the grounds upon which such notice was issued and will provide the Restoration Credit Seller an opportunity to remedy the deficiencies specified in the Exercise of Performance Guarantee Notice. That Notice will be provided as set forth in Section XIX (Notices and Submissions) and in the Performance Guarantee(s) corresponding to the obligation(s) identified in the Exercise of Performance Guarantee Notice. Any Exercise of Performance Guarantee Notice shall set a date by which the Restoration Credit Seller shall respond to that Notice, which may be as early as fifteen (15) business days from the Restoration Credit Seller's receipt of that Notice. The Exercise of Performance Guarantee Notice

Restoration Credit Consent Decree          46

shall include a reasonable schedule for completion of all actions required by that Notice, taking into account seasonal limitations and requirements for conducting the required actions.

58.    The Restoration Credit Seller shall remedy, to the Trustees' satisfaction, the deficiencies set forth in any Exercise of Performance Guarantee Notice within the time(s) required by that Notice.  If a Restoration Credit Seller fails to comply with the Exercise of Performance Guarantee Notice, the Trustees may at any time thereafter exercise the corresponding Performance Guarantee(s) as the Trustees deem necessary ("Exercise of Performance Guarantee") to complete the obligation(s) identified in the Exercise of Performance Guarantee Notice.  The Trustees will notify the applicable Restoration Credit Seller in writing if the Trustees determine that an Exercise of Performance Guarantee is warranted under this Paragraph.  Following an Exercise of Performance Guarantee, the Trustees may (a) use any and all funds obtained from such Exercise of Performance Guarantee to complete the obligation(s) identified the Exercise of Performance Guarantee Notice, and (b) in the case of performance bonds, direct the guarantor of the performance bond to complete the obligation(s) identified in the Exercise of Performance Guarantee Notice.  In addition, the Trustees may use their own funds to complete such obligations and may seek reimbursement of any such expended funds pursuant to the provisions of Paragraph 66.  For any and all work conducted by the Trustees and their contractors pursuant to this Paragraph, the applicable Restoration Credit Seller shall provide the Trustees and their contractors with relevant information and access to the applicable Restoration Project Location as requested by the Trustees and their contractors, consistent with the access requirements in Paragraph 64.

59.    Except as specifically provided elsewhere in this Consent Decree, Restoration Credit Sellers may invoke the procedures set forth in Section X (Dispute Resolution), to dispute the Trustees' Exercise of Performance Guarantee under Paragraphs 57-58.    However,

Restoration Credit Consent Decree                47

notwithstanding a Restoration Credit Seller's invocation of such dispute resolution procedures, and during the pendency of any such dispute, the Trustees may in their sole discretion commence and continue an Exercise of Performance Guarantee under Paragraphs 57-58, including performance of associated work, until the earlier of (1) the date that the Restoration Credit Seller remedies, to the Trustees' satisfaction, the deficiencies identified in the Exercise of Performance Guarantee Notice, or (2) a final decision in accordance with Section X (Dispute Resolution) requiring the Trustees to terminate such Exercise of Performance Guarantee. Following either event, the Trustees shall cease obligating any further funds from the Performance Guarantee but shall not be required to repay any funds already obligated or spent by the Trustees.

### H.      Restoration Credit Sellers Indemnification; Insurance

60.      Plaintiffs do not assume any liability by entering into this Consent Decree. Each Restoration Credit Seller shall indemnify and hold harmless each of the Plaintiffs and/or their agents, employees and representatives from any and all damage claims or causes of action arising from negligent or other wrongful acts or omissions of the Restoration Credit Seller and/or its officers, employees, agents, contractors, subcontractors, representatives and any persons acting on their behalf or under their control in carrying out activities pursuant to this Consent Decree. Further, each Restoration Credit Sellers agrees to pay Plaintiffs all reasonable costs Plaintiffs incur, including but not limited to attorneys' fees and other expenses of litigation and settlement, arising from or on account of claims made against  Plaintiffs based on negligent or other wrongful acts or omissions of the Restoration Credit Seller or its officers, employees, agents, contractors, subcontractors, representatives and any persons acting on its behalf or under its control, in carrying out activities pursuant to this Consent Decree. None of the Plaintiffs shall be held out as a party to any contract entered into by or on behalf of a Restoration Credit Seller in carrying out activities

Restoration Credit Consent Decree                    48

pursuant to this Consent Decree. Neither any Restoration Credit Seller nor any contractor or representative of a Restoration Credit Seller shall be considered an agent of any Plaintiff, and each Restoration Credit Seller shall require any contractor hereafter retained by the Restoration Credit Seller to perform work in carrying out activities pursuant to this Consent Decree to affirmatively acknowledge that it is not acting as an agent of any Plaintiff.

61.    Restoration Credit Sellers waive all claims against Plaintiffs for damages or reimbursement of any costs or for set-off of any payments made or to be made to Plaintiffs, arising from or on account of any contract, agreement, or arrangement between a Restoration Credit Seller and any person for performance of activities pursuant to this Consent Decree, including, but not limited to, claims on account of construction delays. In addition, each Restoration Credit Seller shall indemnify and hold harmless Plaintiffs with respect to any and all claims for damages or cost reimbursement arising from or on account of any contract, agreement, or arrangement between the Restoration Credit Seller and any person for performance of activities pursuant to this Consent Decree, including, but not limited to, claims on account of construction delays.

62.    Plaintiffs shall give the applicable Restoration Credit Seller written notice of any claim for which one or more Plaintiffs plans to seek indemnification pursuant to Paragraphs 60 or 61, and shall consult with the Restoration Credit Seller (including, but not limited to, responding to Restoration Credit Seller's reasonable requests for information regarding any proposed settlement of that claim) prior to settling such claim.

63.    No later than fifteen (15) days before commencing any work on a Restoration Project Location and until the Performance Period Completion Date, the applicable Restoration Credit Seller shall cause to be maintained comprehensive general liability insurance and automobile liability insurance with limits of five million dollars ($5,000,000), combined single

Restoration Credit Consent Decree            49

limit. The Trustees shall be named additional insureds on any such policies with respect to all liability arising out of the activities performed by or on behalf of the applicable Restoration Credit Seller pursuant to this Consent Decree. In addition, until the Performance Period Completion Date, each Restoration Credit Seller shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing any work involved in implementing this Consent Decree. No later than fifteen (15) days before commencing any work involved in implementing this Consent Decree, the applicable Restoration Credit Seller shall provide to the Trustees certificates of such insurance and copies of such insurance policies. Restoration Credit Sellers shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date of this Consent Decree until the Performance Period Completion Date. If a Restoration Credit Seller demonstrates by evidence satisfactory to the Trustees that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, the Restoration Credit Seller need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.

### I.    Access to Information and Restoration Project Locations

64.    Commencing upon the date of lodging of this Consent Decree, each Restoration Credit Seller shall take the steps necessary to ensure the Trustees and their representatives have access at all reasonable times to its Restoration Project Location and to any property under the control of Restoration Credit Sellers outside the Site to which access is required for the oversight or implementation of the Restoration Project. Each Trustee shall have the authority to enter any Restoration Project Location at any reasonable time, subject to giving the applicable Restoration

Restoration Credit Consent Decree          50

Credit Seller notice forty-eight (48) hours in advance of entry; provided that advance notice is not required if the Trustees determine that immediate entry is needed to prevent, terminate, or mitigate a violation of this Consent Decree or where immediate action is otherwise required to address conditions on the Restoration Project Location.  Advance notice of entry may be given verbally by the Trustees but must be confirmed in writing by the Trustees prior to entry; such written confirmation may be electronic, including without limitation by text or email.  Trustees and their representatives shall have the authority to move about the Restoration Project Locations in a reasonable manner, including in compliance with all safety requirements, for the purposes of overseeing the implementation of the Restoration Projects, including, but not limited to:

      a.     Monitoring and assessing progress on the planning, development, maintenance and monitoring of any Restoration Project;

      b.     Verifying any data or information submitted to the Trustees;

      c.     Inspecting and copying records, operation logs, contracts or other documents maintained or generated by a Restoration Credit Seller or its contractors retained to perform work pursuant to a Habitat Development Plan;

      d.     Conducting such tests, investigations or sample collections as deemed necessary to monitor compliance with the applicable Habitat Development Plan, investigate or assess contamination at or near the Restoration Project Location, or to assist in further identifying and quantifying natural resource injuries requiring restoration actions and in planning and carrying out further restoration actions; and

      e.     Implementing work on a Restoration Project Location following an Exercise of Performance Guarantee.

Restoration Credit Consent Decree        51

65.    The Trustees may direct any Restoration Credit Seller to use a camera, sound recording device, or other type of equipment already possessed by the Restoration Credit Seller to record the work done on, or conditions at, its Restoration Projects Site and provide copies of any such recordings to the Trustees, provided it is not otherwise privileged.  The Restoration Credit Seller may retain a copy of any such photographs or video recordings.  The Trustees may also use their own camera, sound recording device, or other type of equipment to record the work done on, or conditions at, any Restoration Projects Site, or to record indications of injury to natural resources.

### J.    Prepayment and Reimbursement of Trustees' Restoration Implementation and Oversight Costs

66.    Each Restoration Credit Seller shall pay or reimburse all costs incurred by the Trustees in connection with implementing or overseeing the implementation of its Restoration Project, except for any costs disputed pursuant to Paragraph 68.  The Trustees shall provide Restoration Credit Sellers with an estimate of their expected projected costs for the upcoming year by January 15 of each year.  As set forth in the Habitat Development Plans, each Restoration Credit Seller shall provide forward funding for the Trustees' expected costs relating to implementation and oversight of each Restoration Project for the coming year.

67.    After the Effective Date of this Consent Decree, by April 30 of each year, the Trustees shall provide each Restoration Credit Seller with an invoice setting forth the unreimbursed costs incurred by each Trustee during the prior calendar year relating to the applicable Restoration Project.  The final such invoice for each Restoration Project shall be provided by the Trustees in the year following the Performance Period Completion Date for that Restoration Project.

68.    Within sixty (60) days of receipt of the Trustees' invoice for unreimbursed costs incurred during the prior year, each Restoration Credit Seller shall reimburse each Trustee for its

Restoration Credit Consent Decree                52

costs.  If a Restoration Credit Seller believes that any of the Trustees' invoiced costs were not incurred in implementing and overseeing its Restoration Project or were unreasonable, that Restoration Credit Seller may invoke the Dispute Resolution provisions of Section X within sixty (60) days of receipt of the Trustees' invoice as to the disputed costs only.  Any costs for which the Restoration Credit Seller does not invoke Dispute Resolution shall be paid within sixty (60) days of receipt of the Trustees' invoice.  The Trustees' costs may exceed the budgets in the Habitat Development Plans, but those budgets may be referenced in assessing the reasonableness of the Trustees' costs. The final year for which the Trustees' costs incurred in implementing and overseeing the Project shall be reimbursed by a Restoration Credit Seller shall be the calendar year following the Performance Period Completion Date for its Restoration Project.

69.    All forward funds to be paid to the Trustees pursuant to this Section shall be paid to the Portland Harbor Restoration Account.  All reimbursed funds paid to the Trustees pursuant to this Section shall be paid in accordance with the payment procedure set forth in Paragraph 72. Payments to the Portland Harbor Restoration Account shall be made via EFT pursuant to the current Department of the Interior Natural Resources Restoration Fund deposit and remittance procedures, which shall be provided to the Restoration Credit Seller by the Trustees with the estimate of their expected projected costs for the upcoming year as set forth in Paragraph 66.

## VIII.  COMPENSATION FOR, AND PAYMENT OF, COVERED NATURAL RESOURCE DAMAGES

70.    Within ninety (90) days of the Effective Date of this Consent Decree, each Settling Defendant shall purchase from Restoration Credit Sellers no fewer than the number of DSAY credits in the Restoration Projects identified in Appendix C for that Settling Defendant.  Within one hundred twenty (120) days of the Effective Date, each Settling Defendant and each Restoration Credit Seller shall provide written notice of these DSAY credit sales and purchases to the Trustees,

Restoration Credit Consent Decree                 53

substantially similar to the form in Appendix H, in accordance with Section XIX (Notices and Submittals), referencing Portland Harbor NRDA, DOJ case number 90-11-2-06787/4, and the civil action number. Upon receipt of each such notice, those purchased DSAY credits are hereby accepted by the Plaintiffs to resolve the liabilities of each Settling Defendant as set forth in this Consent Decree.

71.    Within ninety (90) days of the Effective Date, each Settling Defendant shall pay the sum specified for that Settling Defendant in Appendix C. This sum shall be paid by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account in accordance with current EFT procedures. All payments received under this Paragraph shall be deposited in the Portland Harbor Restoration Account and shall be used, as determined jointly by the Trustees, for future assessment activities, for other actions to restore, replace, or acquire the equivalent of the natural resources and resource services injured or lost in the Portland Harbor Natural Resource Damages Assessment Area, and to reimburse costs incurred by the Trustees. Payments shall be made in accordance with instructions provided to Settling Defendants by the Financial Litigation Unit of the U.S. Attorney's Office in the District of Oregon. Any payments received by the Department of Justice after 4:00 p.m. Eastern Standard Time shall be credited on the next business day. Each Settling Defendant shall provide at least five (5) days' notice to the Financial Litigation Unit before making the transfer.

72.    Within 210 days after the Effective Date, the Trustees shall provide each Settling Defendant with a bill requiring payment of general interim Path C costs incurred by the Trustees from April 1, 2020, through the Effective Date of the Consent Decree. In addition, the costs of accounting for the general interim costs after the Effective Date shall be included in the general interim costs. The bills sent to each Settling Defendant shall be accompanied by documentation

Restoration Credit Consent Decree            54

of the Trustees' general interim costs in the same format and level of detail as the documentation previously provided to the Settling Defendants of the Trustees' general past costs through March 31, 2020. The amount of general interim costs billed to each Settling Defendant will be each Settling Defendant's *per capita* share of the general interim costs, which shall be calculated as the total amount of general interim costs divided by the total number of PRPs participating in the Path C settlement process as of March 20, 2023, which is the date this Consent Decree was transmitted to the Settling Defendants for their signatures.

a.      Each Settling Defendant shall pay its share of general interim costs within ninety (90) days of receipt of a bill from the Trustees for those costs. Prior to making this payment, any Settling Defendant may request a meeting with the Trustees if the Settling Defendant believes that the amount of billed costs is in error. Following any such meeting, the Trustees may send corrected bills for general interim costs to the Settling Defendants if they determine, in their sole and unreviewable discretion, that the amounts in the original bills were in error. Any costs incurred by the Trustees in correcting bills shall not be added to the corrected bills.

b.      Payments to NOAA and the U.S. Department of the Interior shall be made by EFT to the U.S. Department of Justice account in accordance with current EFT procedures. Payments shall be made in accordance with instructions provided to each Settling Defendant by the Financial Litigation Unit of the U.S. Attorney's Office in the District of Oregon. Any payments received by the Department of Justice after 4:00 p.m. Eastern Standard Time shall be credited on the next business day. Each Settling Defendant shall provide at least five (5) days-notice to the Financial Litigation Unit before making the transfer.

| | |
|---|---|
| Trustee: | National Oceanic and Atmospheric Administration |
| Interim Cost Amount: | As shown on interim cost bill sent by Trustees |
| | |
| Trustee: | U.S. Department of the Interior |

Restoration Credit Consent Decree                55

Interim Cost Amount:          As shown on interim cost bill sent by Trustees

c.          Payments to the other Trustees shall be made by EFT or certified checks, as indicated in this sub-paragraph for each Trustee, in the amounts indicated for each Trustee. Payments by EFT shall be made in accordance with instructions provided to each Settling Defendant by each Trustee.  Any payments received by a Trustee after 4:00 p.m. Eastern Standard Time shall be credited on the next business day.  Each Settling Defendant shall provide at least five (5) days-notice to a Trustee before making the transfer.  Payments made by certified check shall bear the notation "[Settling Defendant] - Portland Harbor Assessment Costs," and shall be made payable and addressed as indicated below:

| | |
|---|---|
| Trustee: | State of Oregon |
| Payment method: | EFT |
| | |
| Trustee: | Confederated Tribes of the Grand Ronde Community of Oregon |
| Payment method: | EFT |
| | |
| Trustee: | Confederated Tribes of Siletz Indians |
| Payment method: | EFT |
| | |
| Trustee: | Confederated Tribes of the Umatilla Indian Reservation |
| Payment method: | EFT |
| | |
| Trustee: | Confederated Tribes of the Warm Springs Reservation of Oregon |
| Payment method: | Certified check with note "For Portland Harbor" |
| Address: | Attn:  Cash Management<br>PO Box C<br>Warm Springs, OR 97761 |
| | |
| Trustee: | Nez Perce Tribe |
| Payment method: | EFT |

73.          After the Effective Date, and concurrently with issuing the bills described in Paragraph 72, the Trustees shall provide each Settling Defendant with a summary of each Trustee's Path C costs that are specific to that Settling Defendant's participation in the Path C settlement

Restoration Credit Consent Decree                    56

process.  The costs of accounting for these party-specific Path C costs shall be included in each Settling Defendant's party-specific Path C costs.  The total amount of these party-specific costs for each Settling Defendant will be offset by the forward-funding payments that each Settling Defendant has made to the Trustees for these party-specific costs.  Where a Settling Defendant's forward funding payments to the Trustees for these party-specific costs exceeds the Trustees' actual costs, the remaining balance will be refunded to that Settling Defendant.  Where a Settling Defendant's forward funding payments to the Trustees for these party-specific costs are less than the Trustees' actual costs, the Trustees shall send the Settling Defendant a bill for the unpaid balance.  Payment of such unpaid balances shall be made by each Settling Defendant within ninety (90) days of receiving a bill from the Trustees.  Such payments shall be made using the payment instructions in Paragraphs 72(b) and 72(c).

74.    At the time of each payment each Settling Defendant shall send notice in accordance with Section XIX (Notices and Submissions) that payment has been made.    Such notice will reference Portland Harbor NRDA, DOJ case number 90-11-2-06787/4, and the civil action number.

### IX.  FORCE MAJEURE

75.    "Force majeure," for purposes of Restoration Credit Sellers' obligations under this Consent Decree, is defined as any event arising from causes beyond a Restoration Credit Seller's control (including the control of the Restoration Credit Seller's contractors and sub-contractors, and any other entity controlled by that Restoration Credit Seller) that delays or prevents the performance of any obligation under this Consent Decree despite the Restoration Credit Seller's best efforts to fulfill the obligation.  The requirement that Restoration Credit Seller exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure

Restoration Credit Consent Decree                57

event and use best efforts to address the effects of any potential force majeure event (1) as it is occurring and (2) following the potential force majeure event, such that the delay is minimized to the greatest extent possible. "Force majeure" does not include financial inability to fulfill the obligation. The requirement that Restoration Credit Sellers exercise "best efforts to fulfill the obligation" also includes, where necessary, the filing of legal actions to compel contract performance in accordance with the design and schedule approved by the Trustees herein.

a.    If any event occurs or has occurred that may delay the performance of any obligation of a Restoration Credit Seller under this Consent Decree, whether or not caused by a force majeure event, the applicable Restoration Credit Seller shall notify the Trustees within (a) fourteen (14) days from the date when the Restoration Credit Seller first knew that the event might cause a delay, or (b) in the case of a disaster of significant severity and magnitude that causes extensive and widespread damage to the Restoration Project and to infrastructure and communications in the surrounding area, the date on which the Restoration Credit Seller is reasonably able to notify the Trustees. Within thirty (30) days after notifying the Trustees, the Restoration Credit Seller shall provide a written explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; and the rationale for attributing such delay to a force majeure event (if the notifying Restoration Credit Seller intends to assert such a claim). A notifying Restoration Credit Seller shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure event. Failure to comply with the above requirements will preclude a Restoration Credit Seller from asserting any claim of force majeure for that event.

Restoration Credit Consent Decree            58

b.    If the Trustees agree that the delay or anticipated delay is attributable to a force majeure event, the Trustees (or if the extension exceeds one year, the Plaintiffs) will extend the time for performance of the obligations under this Consent Decree that are affected by the force majeure event for such time as is necessary.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  If the Trustees do not agree that the delay or anticipated delay has been or will be caused by a force majeure event, the Trustees will notify the Restoration Credit Seller in writing of their decision.

c.    If a Restoration Credit Seller elects to invoke the Dispute Resolution procedures set forth in Section X regarding a claimed force majeure event, it shall do so no later than thirty (30) days after receipt of the Trustees' notice of disagreement.  In any such proceeding, the Restoration Credit Seller shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will likely be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that the Restoration Credit Seller exercised best efforts to fulfill the obligation in question, that best efforts were exercised to avoid and mitigate the effects of the delay, and that the Restoration Credit Seller complied with the requirements of this Paragraph.  If the Restoration Credit Seller carries this burden, the delay at issue shall be deemed not to be a violation by the Restoration Credit Seller of the affected obligation of this Consent Decree.

## X.  DISPUTE RESOLUTION

76.    Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes between the Trustees and the Restoration Credit Sellers arising under or with respect to this

Consent Decree.  This Dispute Resolution Section does not apply to disputes between the Trustees and Settling Defendants, to disputes between Settling Defendants and Restoration Credit Sellers, or to disputes between the Trustees and Restoration Credit Sellers that are expressly excluded in this Consent Decree from Dispute Resolution.

77.    Any dispute subject to Dispute Resolution which arises under or with respect to this Consent Decree shall in the first instance be the subject of informal negotiations between the Trustees and the applicable Restoration Credit Seller.  The period for informal negotiations shall not exceed thirty (30) days from the time the dispute arises, unless the Trustees and the applicable Restoration Credit Seller agree otherwise in writing.  The dispute shall be considered to have arisen when the Trustees send a Restoration Credit Seller a written notice specifying the nature of the dispute and requested relief ("Notice of Dispute"), or when a Restoration Credit Seller sends the Trustees a written Notice of Dispute if that occurs earlier.

78.    a.    If the Trustees and the Restoration Credit Seller cannot resolve it by informal negotiations within thirty (30) days as set forth under the preceding Paragraph or within such longer period as the Trustees and the Restoration Credit Seller agree in writing, then the position advanced by the Trustees shall be considered binding unless, within thirty (30) days after the conclusion of the  thirty (30) day informal negotiation period (*i.e.*, sixty (60) days after the date of the Notice of Dispute), or some longer period if the Trustees and the Restoration Credit Seller have agreed in writing to extend the period, the Restoration Credit Seller invokes the formal dispute resolution procedures of this Section by providing to the Trustees a written Statement of Position on the matter in dispute, including, but not necessarily limited to, any factual data, analysis or opinion supporting that position and any supporting documentation relied upon by the Restoration Credit Seller.

Restoration Credit Consent Decree            60

b.    Within sixty (60) days after receipt of the Restoration Credit Seller's Statement of Position, the Trustees shall provide to the Restoration Credit Seller their written Statement of Position, including, but not necessarily limited to, any factual data, analysis or opinion supporting that position and all supporting documentation relied upon by the Trustees. Within thirty (30) days after receipt of the Trustees' Statement of Position, the Restoration Credit Seller may submit a Reply.

c.    The Trustees shall exercise best efforts to issue a Final Determination within sixty (60) days of receipt of Restoration Credit Seller's Reply.  If no Reply is submitted, the Trustees may, at their option, adopt their Statement of Position as the Final Determination.

d.    An administrative record of the dispute shall be maintained by the Trustees and shall contain the Final Determination and all Statements of Position and rebuttal(s), including supporting documentation, submitted pursuant to this Section.

e.    The Trustees' Final Determination shall be binding upon the Restoration Credit Seller unless, within thirty (30) days after receipt of the Trustees' Final Determination, the Restoration Credit Seller files with the Court and serves on the parties in accordance with Section XIX (Notices and Submissions) a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the Consent Decree.  The motion shall also include any supporting factual data, analysis, opinion, or documentation. The Trustees may file a response to the Restoration Credit Seller's motion, and the Restoration Credit Seller may file a reply, in accordance with the schedule set forth in the Local Rules for the District of Oregon.  The foregoing sentence notwithstanding, the Trustees and Restoration Credit Sellers acknowledge that disputes may arise that require judicial resolution on

Restoration Credit Consent Decree          61

an expedited basis.  In such cases, the Trustees and the applicable Restoration Credit Seller shall agree on an expedited schedule or, absent prompt agreement, the Trustees or the applicable Restoration Credit Seller may petition the Court for the imposition of an expedited schedule.

f.      The Court may rule based on the administrative record (including the Trustees' Statement of Position), with or without oral argument, and shall uphold the Trustees' Statements of Position or its resolution of the dispute unless it is arbitrary, capricious, or otherwise not in accordance with law.  For disputes consisting of a claim that the Trustees have unreasonably delayed a decision they are required to make, the standard of review shall be whether the Trustees' delay was unreasonable in light of the circumstances in the administrative record.

g.      Except as expressly stated elsewhere in this Consent Decree, any matter subject to dispute resolution shall be reviewable by this Court.

79.     The invocation of Dispute Resolution procedures under this Section shall not extend, postpone, or affect in any way any obligation of Settling Defendants or Restoration Credit Sellers under this Consent Decree, not directly in dispute, unless the Trustees or the Court agree otherwise.  Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment otherwise required under Section XII shall be stayed pending resolution of the dispute. Notwithstanding the stay of payment, stipulated penalties shall continue to accrue from the first day of noncompliance with any applicable provision of this Consent Decree.  In the event that the Restoration Credit Seller does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Sections XII.  In the event that the Restoration Credit Seller does not prevail on the disputed issue, the Trustees may, at their discretion and in lieu of stipulated penalties, request disbursement of the Performance Guarantee relating to the obligation in dispute, provided that the subject dispute relates to Restoration Credit Seller's failure to perform project

Restoration Credit Consent Decree                62

construction, operation and maintenance,  adaptive management, or lamprey monitoring of  its Restoration Project in accordance with the Habitat Development Plan.

## XI.  INTEREST ON LATE PAYMENTS

80.    If a Settling Defendant fails to make any payment required under Paragraphs 70-73 by the due date, interest shall be assessed at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year in accordance with 42 U.S.C. § 9607(a).  The applicable rate of interest is the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1 of each year.  Interest will begin to accrue beginning on the payment due date and shall continue to accrue on the unpaid payment balance through the date that full payment is received.

## XII.  STIPULATED PENALTIES

81.    a.    If a Settling Defendant fails to make a payment or complete any other action required of it under Section VIII (Compensation For, And Payment Of, Covered Natural Resource Damages) by the required date, the Settling Defendant shall be in violation of this Consent Decree and shall be liable for stipulated penalties, in addition to the Interest required by Paragraph 80.

b.    A Restoration Credit Seller shall be liable for stipulated penalties for the following:

- failure to comply with a written notice sent by the Trustees pursuant to Paragraph 34;

- failure to timely record or arrange to have recorded any of the deed restrictions or conservation easements required pursuant to Paragraph 36;

- failure to timely submit a Notice of Completion of Long-Term Stewardship Transition Obligations in accordance with Paragraph 38;

Restoration Credit Consent Decree                63

- failure to comply with a Notice of Long-Term Stewardship Transition Deficiencies sent to it by the Trustees pursuant to Paragraphs 38-40 within the time period(s) specified in such Notice;

- failure to provide timely notice of a Non-NRD Sale, in violation of Paragraph 46;

- failure to maintain, or unauthorized cancellation of, a required Performance Guarantee, except as authorized pursuant to Paragraphs 53-54; and

- failure to pay Trustee costs pursuant to Paragraphs 66 and 68.

c. For the first two weeks that a Settling Defendant or Restoration Credit Seller (for purposes of this Paragraph, "non-compliant Party") fails to comply with any requirement in the Consent Decree referenced in Subparagraph a or b of this Paragraph, the non-compliant Party shall pay a stipulated penalty in the amount of $1,000 per week. Where the delay extends beyond the second week, the non-compliant Party shall pay a stipulated penalty for each additional day of noncompliance in the amount of $750 per day. For purposes of this Subparagraph, a week shall equal a continuous period of seven (7) days. Nothing in this Consent Decree prevents the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

d. All penalties shall begin to accrue on the day after compliance is due or the day after the violation begins, and all penalties shall continue to accrue until compliance with the applicable requirement is achieved. For failures to comply with a notice referenced in Subparagraph b., compliance is due on the dates specified in the notice. Following the Trustees' determination that a non-compliant Party has failed to comply with a requirement of the Consent Decree and is liable for stipulated penalties, the Trustees may send the non-compliant Party written notification of the noncompliance and a written demand for payment of the penalties. However, penalties shall accrue as provided in this Subparagraph

Restoration Credit Consent Decree    64

and Subparagraph c. regardless of whether the Trustees have notified the non-compliant Party of the violation or made a demand for payment.

e.    Payments of stipulated penalties under this Paragraph shall be allocated and made as follows:  25% of the total to the United States; 12.5 % of the total to the State; 12.5% of the total to the Confederated Tribes of the Umatilla Indian Reservation; 12.5% of the total to the Confederated Tribes of the Grand Ronde Community of Oregon; 12.5% of the total to the Confederated Tribes of the Warm Springs Reservation of Oregon; 12.5% of the total to the Nez Perce Tribe; and 12.5% to the Confederated Tribes of Siletz Indians.  Payments under this Paragraph shall be made using the procedures in Paragraph 72.

f.    All penalties accruing under this Paragraph shall be due and payable within thirty (30) days of receipt by the non-compliant Party from the Trustees of a demand for payment of the penalties.

g.    Restoration Credit Sellers may dispute the Trustees' right to the penalties identified under Subparagraph a above by invoking the procedures of Section X (Dispute Resolution).  If a Restoration Credit Seller invokes the procedures of Section X (Dispute Resolution), penalties shall continue to accrue as provided elsewhere in this Paragraph during any dispute resolution period, but need not be paid until the following:

(i).    If the dispute is resolved by agreement or by a decision of the Trustees that is not appealed to this Court, accrued penalties determined to be owing shall be paid to the Trustees within  fifteen (15) days of the agreement or the Restoration Credit Seller's receipt of the Trustees' decision or order;

(ii).    If the dispute is appealed to this Court and the Trustees prevail in whole or in part, the Restoration Credit Seller shall pay all accrued penalties determined by the Court to be owed

Restoration Credit Consent Decree                65

to the Trustees within sixty (60) days of receipt of the Court's decision or order, except as provided in Subparagraph (iii) below;

(iii).    If the District Court's decision is appealed by any Party, the Restoration Credit Seller shall pay all accrued penalties determined by the District Court to be owing to the Trustees into an interest-bearing escrow account within sixty (60) days of receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every sixty (60) days.  Within fifteen (15) days of receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to the Trustees as described in Paragraph 72 or to the Restoration Credit Seller to the extent that they prevail on appeal.  If the final appellate decision awards the Trustees any stipulated penalties not included in the District Court order, the non-compliant Party shall pay those additional amounts within thirty (30) days of receipt of the final decision.

h.    If a non-compliant Party fails to pay stipulated penalties when due, Plaintiffs may institute proceedings in this Court to collect the penalties, as well as interest.  The non-compliant Party shall pay interest on the unpaid balance as provided in Paragraph 80. The payment of penalties shall not alter in any way the non-compliant Party's other obligations under this Consent Decree.

i.    If Plaintiffs bring a motion or a separate action in court to enforce this Consent Decree and prevail, Plaintiffs shall be entitled to recover from the non-compliant Party all costs and expenses of such motion or action, including, but not limited to, costs of attorney time.

j.    Payments made under this Section are in addition to any other remedies or sanctions available to Plaintiffs by virtue of the failure of the non-compliant Party to comply with the requirements of this Consent Decree, except in the event that Trustees elect to exercise a Performance Guarantee pursuant to Section VII.  If the Trustees elect to exercise a Performance Guarantee, the

Restoration Credit Consent Decree                66

Trustees will not enforce the stipulated penalties to the extent the stipulated penalties are assessed on the same basis as the exercise of the Performance Guarantee.

k.      Notwithstanding any other provision of this Section, each Plaintiff may, in its unreviewable discretion, waive payment of any portion of the stipulated penalties payable to that Plaintiff that have accrued pursuant to this Consent Decree.  Payment of stipulated penalties does not excuse the non-compliant Party from complete performance of the obligations in Section VIII (Compensation For, And Payment Of, Covered Natural Resource Damages) or from performance of any other requirement of this Consent Decree.

## XIII.   COVENANT NOT TO SUE BY PLAINTIFFS

82.    Except as specifically provided in Sections XIV (Reservations of Rights) and XV (Additional Reservation For Unknown Conditions Or Information) below, Plaintiffs covenant not to sue or to take administrative action against Settling Defendants to recover Covered Natural Resource Damages as defined in Paragraph 3(d).  This covenant not to sue will take effect for each Settling Defendant upon completion of all of its obligations under Section VIII (Compensation For, And Payment Of, Covered Natural Resource Damages).  This covenant not to sue is conditioned for each Settling Defendant upon the satisfactory performance by each Settling Defendant of its obligations under this Consent Decree.  This covenant not to sue extends only to Settling Defendants and their respective heirs, successors, and assigns and does not extend to any other person.

## XIV.  RESERVATIONS OF RIGHTS

83.    Plaintiffs reserve, and this Consent Decree is without prejudice to, all rights against Settling Defendants with respect to all matters not expressly included within the Covenant Not to Sue by Plaintiffs in Paragraph 82.  Notwithstanding any other provision of this Consent Decree,

Restoration Credit Consent Decree                67

Plaintiffs reserve, and this Consent Decree is without prejudice to, all rights against Settling Defendants with respect to:

    a.    Liability for failure of a Settling Defendant to meet a requirement of this Consent Decree;

    b.    Liability for damages to natural resources (including assessment costs) as defined in 42 U.S.C. §§ 9601(6) & (16) that are not expressly included within the Covenant Not to Sue by Plaintiffs in Section XIII;

    c.    Liability for costs of response incurred or to be incurred by any of the Plaintiffs under Sections 107 or 113 of CERCLA, 42 U.S.C. §§ 9607 or 9613, or any other applicable federal or state law;

    d.    Liability under Section 107(a)(4)(D), 42 U.S.C. § 9607(a)(4)(D), for costs of any health assessment or health effects study carried out under 42 U.S.C. § 9604(i);

    e.    Liability for damages to natural resources (including assessment costs), as defined in 42 U.S.C. §§ 9601(6) & (16), (i) resulting from new releases of hazardous substances or new discharges of pollutants in the Portland Harbor Natural Resource Damage Assessment Area after the Effective Date of this Consent Decree from a Settling Defendant's properties identified in Appendix A, or (ii) resulting from, or arising out of, a Settling Defendant's transportation, treatment, storage, or disposal, or the arrangement for the transportation, treatment, storage, or disposal of hazardous substances at or in connection with the Portland Harbor Natural Resource Damage Assessment Area after the Effective Date of this Consent Decree;

Restoration Credit Consent Decree      68

f.      Liability for injunctive relief or administrative order enforcement, including the performance of removal or remedial actions, under Section 106 of CERCLA, 42 U.S.C. § 9606, or any other applicable federal or state law; and

g.      Criminal liability to the United States or State.

84.      The State's joinder to this Consent Decree is solely in its capacity as a trustee for natural resources and constitutes a limited waiver of the State's Eleventh Amendment immunity for the sole and limited purpose of enforcing the terms of this Consent Decree. This Consent Decree shall not act as a general waiver, and the State does not, by joining in this Consent Decree, waive immunity from private party claims, including contribution claims, in federal court for CERCLA response costs arising from the Portland Harbor Superfund Site.

## XV.  ADDITIONAL RESERVATION FOR UNKNOWN CONDITIONS OR INFORMATION

85.      Notwithstanding any other provision of this Consent Decree, Plaintiffs reserve, and this Consent Decree is without prejudice to, the right to institute proceedings against Settling Defendants in this action or in a new action for: Covered Natural Resource Damages if conditions, factors or information in the Portland Harbor Natural Resource Damage Assessment Area, not known to the Trustees as of the Effective Date of this Consent Decree, are discovered that, together with any other relevant information, indicates that there is injury to, destruction of, loss of and/or loss of use of natural resources of a type unknown, or of a magnitude significantly greater than was known, to the Trustees as of the Effective Date. For purposes of this Paragraph, information known to the Trustees shall consist of any information in the files of, or otherwise in the possession of, any one of the individual Trustees, or their contractors or consultants who worked on the Trustees' natural resource damage assessment, including the Path C liability allocation projects, as of the Effective Date of this Consent Decree. Natural resource damages arising from re-

Restoration Credit Consent Decree                    69

exposure, resuspension or migration of hazardous substances or pollutants by natural causes or as a result of the future implementation of a remedial action performed in accordance with an order by or consent decree with U.S. EPA, in the Portland Harbor Natural Resource Damage Assessment Area shall not create a basis for action by the Trustees under this Paragraph; provided, however, that this limitation shall not apply to any Settling Defendant(s) where the re-exposure, resuspension or migration of hazardous substances or pollutants is the result of negligence occurring after the Effective Date by such Settling Defendant(s) or employees, contractors, or agents of such Settling Defendant(s).

### XVI.  COVENANT NOT TO SUE BY SETTLING DEFENDANTS

86.    Settling Defendants covenant not to sue and agree not to assert any claims or causes of action against the United States, the State, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe or their contractors or employees, relating to Covered Natural Resource Damages and this Consent Decree.

87.    Settling Defendants agree not to sue any other person for Covered Natural Resource Damages.  Settling Defendants retain the right to assert and pursue all such claims and positions against any person in the event such person first asserts, and for so long as such person pursues, any claim or cause of action against Settling Defendants relating to Covered Natural Resource Damages.  Settling Defendants further agree not to challenge, object to, or oppose any other consent decree resolving Covered Natural Resource Damages.  Nothing in this Paragraph shall operate to waive or release any claim by a Settling Defendant under any contract of insurance against any person or entity not a Party to this Consent Decree.  Nothing in this Paragraph shall

Restoration Credit Consent Decree              70

operate to waive or release any claim or action by a Settling Defendant for costs they incurred or will incur that are not within the definition of Covered Natural Resource Damages.

## XVII.  EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION

88.     Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this Consent Decree.  Except as stated in Paragraphs 82, 86, and 87 above, each of the Parties expressly reserves any and all rights, defenses, claims, demands, and causes of action they each may have with respect to any matter, transaction, or occurrence relating in any way to Portland Harbor against any person not a Party hereto.  Nothing in this Consent Decree diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional relief (including response action, response costs, and natural resource damages) and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

89.     The Settling Parties agree, and by entering this Consent Decree this Court finds, that this settlement constitutes a judicially-approved settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and ORS 465.325(6)(b), and  that Settling Defendants are entitled, as of the Effective Date of this Consent Decree, to protection from contribution actions or claims as provided by Section 113(f)(2) and ORS 465.325(6)(b), or as may be otherwise provided by law, for Covered Natural Resource Damages; provided, however, that if Plaintiffs exercise their rights under the reservations in Section XIV or Section XV, other than in Paragraphs 83(a) (failure to satisfy a requirement of this Consent Decree) and 83(g) (criminal liability), the contribution protection afforded by this Consent Decree will no longer include those matters that are within the scope of the exercised reservation.

Restoration Credit Consent Decree                71

90.     In any subsequent administrative or judicial proceeding initiated by Plaintiffs for injunctive relief, recovery of response costs, or other appropriate relief other than Covered Natural Resource Damages, Settling Defendants shall not assert, and shall not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by Plaintiffs in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Paragraphs 82, 86, and 87.

91.     The Settling Parties agree that they will not cite or use this settlement or the Path C NRD allocation results in any forum as evidence of liability for remedial action or response costs.  Nor shall the Settling Parties cite or use this settlement or the Path C NRD allocation results to contend that they are relevant to, or determinative of, their share of remedial action or response costs, including but not limited to in any allocation of liability conducted by or among the Settling Parties or other PRPs or in any judicial or administrative proceeding concerning remedial action or response costs, except in rebuttal to another PRP's use of the Path C NRD allocation results.  The Settling Parties further agree that they will not use this settlement (including the terms of this Consent Decree and the basis for the compromise contained in other documents filed in this action in support of this Consent Decree) in any other forum, whether in litigation, administrative proceedings, formal or informal negotiations, or otherwise, to resolve, attempt to resolve, or in any way influence the resolution of, other claims between Plaintiffs and Settling Defendants; provided, however, that this provision does not limit the Settling Parties from using otherwise available factual information referenced in documents filed in support of this Consent Decree or submitted or used in the Path C Process.  The restriction in the preceding sentence applies to, but is not limited to, claims that the United States (on behalf of the United States Environmental Protection

Restoration Credit Consent Decree                72

Agency) and the State may have against Settling Defendants under CERCLA, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*, CWA, OPA, or Oregon law. The Settling Parties may use this Consent Decree, and other documents filed in this action in support of this Consent Decree, to defend the terms of this Consent Decree, or in any forum as evidence of the settlement reached herein and the basis therefore.

## XVIII. RETENTION OF RECORDS

92.     Until ten (10) years after the entry of this Consent Decree, each Settling Defendant shall preserve and retain all non-identical copies of records, reports, or information, including that in electronic form (hereinafter referred to as "Records"), now in its possession, custody, or control, or that come into its possession, custody, or control, that relate in any manner to the liability of Settling Defendants or any person under CERCLA with respect to the Site, notwithstanding any record retention, or similar, policy of Settling Defendants or Settling Defendants' agents, advisors or consultants providing otherwise. Until ten (10) years after each Restoration Credit Seller's receipt of the Trustees' notification pursuant to Paragraph 28 or 30 (Determination of Completion of Vegetation and Habitat Development and Monitoring Obligations), that Restoration Credit Seller shall preserve and retain all Records now in its possession, custody, or control, or that come into its possession, custody, or control, that relate in any manner to the performance of its Habitat Development Plan; provided, however, that each Restoration Credit Seller (and its contractors and agents) must respectively retain, in addition, copies of all data generated during the performance of the Habitat Development Plans and not contained in the aforementioned documents required to be retained.

93.     After the conclusion of the document retention periods in the preceding Paragraph, Settling Defendants and Restoration Credit Sellers each shall notify the Trustees at least ninety (90) days prior to the destruction of any such Records, and, upon request by the Trustees, Settling Defendants or

Restoration Credit Consent Decree                73

Restoration Credit Sellers shall deliver any such Records to the Trustees. Settling Defendants and Restoration Credit Sellers may assert that certain Records are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Settling Defendants or Restoration Credit Sellers asserts such a privilege, they shall provide Trustees with the following: (1) the title of the Record; (2) the date of the Record; (3) the name, title, affiliation (e.g., company or firm), and address of the author of the Record; (4) the name and title of each addressee and recipient; (5) a description of the subject of the Record; and (6) the privilege asserted. If a claim of privilege applies only to a portion of a Record, the Record shall be provided to Plaintiff(s) in redacted form to mask the privileged information only. Settling Defendants and Restoration Credit Sellers shall retain all Records that they claim to be privileged until the Trustees have had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in the Settling Defendant's or Restoration Credit Seller's favor. However, no Records created or generated pursuant to the requirements of this Consent Decree shall be withheld on the grounds that they are privileged or confidential.

94.    Each Settling Defendant certifies individually that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since the earliest notification of potential liability by any Trustee.

## XIX. NOTICES AND SUBMISSIONS

95.    Whenever notice is required to be given or a document is required to be sent by one Party to another under the terms of this Consent Decree, it will be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Parties in writing; provided, however, that this written notice requirement does not apply where the Consent Decree specifically provides for notice by verbal or electronic means. Written

Restoration Credit Consent Decree            74

notice as specified constitutes complete satisfaction of any written notice requirement of the Consent

Decree for Plaintiffs, Trustees, Settling Defendants, and Restoration Credit Sellers.

As to the United States and as to DOJ:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(DJ # 90-11-2-06787/2)

As to NOAA:

Ericka Hailstocke-Johnson
United States Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel, Natural Resources Section
1410 Neotomas Avenue, Suite 110
Santa Rosa, CA, 95405

Christopher Plaisted
United States Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel, Natural Resources Section
510 W. Ocean Blvd., Suite 4470
Long Beach, CA 90802

As to the United States Department of the Interior:

Deirdre F. Donahue
United States Department of the Interior
Office of the Solicitor
601 SW 2nd Avenue, Suite 1950
Portland, OR 97204

As to the State:

Gary Vrooman
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201

Restoration Credit Consent Decree                    75

As to the Confederated Tribes of the Grand Ronde Community of Oregon:

Tribal Council Chair
9615 Grand Ronde Road
Grand Ronde, OR 97347-9712

Courtesy copies to:

Tribal Attorney's Office
9615 Grand Ronde Road
Grand Ronde, OR 97347-9712

Brandy Humphreys
Lands Department
9615 Grand Ronde Road
Grand Ronde, OR 97347-9712

As to the Confederated Tribes of Siletz Indians:

Confederated Tribes of Siletz Indians
Attn: Tribal Chairman and Natural Resources Manager
P.O. Box 549
Siletz, OR  97380

Courtesy copy to:

Julie Weis
Haglund Kelley LLP
2177 SW Broadway
Portland, OR  97201

As to the Confederated Tribes of the Umatilla Indian Reservation:

Lead Attorney
Office of Legal Counsel
Confederated Tribes of the Umatilla Indian Reservation
46411 Timine Way
Pendleton, OR 97801

As to the Confederated Tribes of the Warm Springs Reservation of Oregon:

General Manager, Branch of Natural Resources
P.O. Box C
Warm Springs, Oregon  97761

Restoration Credit Consent Decree                    76

Legal Counsel of Record for the
Confederated Tribes of the Warm Springs Reservation of Oregon
Karnopp Petersen LLP
360 SW Bond St., Suite 400
Bend, OR 97702

As to the Nez Perce Tribe:

Nez Perce Tribe
Attn: Chairman, Nez Perce Tribal Executive Committee
P.O. Box 305
Lapwai, ID 83540

Courtesy copies to:

Julie Kane
Office of Legal Counsel
Nez Perce Tribe
P.O. Box 305
Lapwai, ID 83540

Courtney Johnson
Executive Director & Staff Attorney
Crag Law Center
3141 E. Burnside St.
Portland, OR 97214

As to Settling Defendants:

For City of Portland

Robert Taylor
City Attorney
Office of the City Attorney, Suite 430
1221 SW 4th Avenue
Portland, Oregon  97204
Robert.Taylor@portlandoregon.gov

With copies to:
Nanci Klinger
Sr. Deputy Attorney
Office of the City Attorney, Suite 430
1221 SW 4th Avenue
Portland, Oregon 97204
Nanci.Klinger@portlandoregon.gov

Restoration Credit Consent Decree                77

For EVRAZ Inc. NA:

Debbie Deetz Silva
EVRAZ Inc. NA
Environmental Manager
14400 North Rivergate Blvd.
Portland, OR  97203
Tel: (503) 978-6044
Email: Debbie.Deetz.Silva@evrazna.com

Loren Dunn
Beveridge & Diamond PC
600 University Street
Suite 1601
Seattle, WA 98101
Tel: (206) 315-4810
Email: ldunn@bdlaw.com

For MMGL LLC:

Richard C. Coffin
President
MMGL LLC
34407 Dupont Boulevard, Suite 6
Frankford, DE  19945

Courtesy copy to:

Greg A. Christianson
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA  94105

For PacifiCorp, an Oregon Corporation:

PacifiCorp, an Oregon Corporation
Jackie Wetzsteon
PacifiCorp
Environmental Policy and Strategy
825 NE Multnomah, LCT 2000
Portland, OR  97232
(503) 813 5036 (work)
(503) 961 3955 (cell)

Restoration Credit Consent Decree            78

Dustin Till
PacifiCorp Office of General Counsel
825 NE Multnomah St., Suite 2000
Portland, OR  97232
Dustin.Till@pacificorp.com
(503) 813-6589

For Port of Portland

Jessica Hamilton, Director, Portland Harbor Environmental
Port of Portland
7200 NE Airport Way
PO Box 3529
Portland, OR 97218

with copies to:

Anzie St. Clair, Assistant General Counsel
Port of Portland
7200 NE Airport Way
PO Box 3529
Portland, OR 97218

and

J. Christopher Baird
Corvid Law PLLC
5209 S. Farrar St.
Seattle, WA 98118
Email: chris@corvidlaw.com

For Schnitzer Steel Industries, Inc.:

General Counsel
Schnitzer Steel Industries, Inc.
299 SW Clay, Suite 350
Portland, OR  97201

Courtesy copy to:

Greg A. Christianson
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA  94105

Restoration Credit Consent Decree              79

For Siltronic Corporation:

Elizabeth K. Bingold
General Counsel
Siltronic Corporation
7200 N.W. Front Ave
Portland, OR 97210-3676

With copy to:

David Rabbino
Jordan Ramis PC
PACWEST, 27th Fl.
1211 SW Fifth Avenue
Portland, OR 97204

As to Restoration Credit Sellers:

For Linnton Water Credits, LLC:

Robert Marinai
President
RestorCap, LLC, its Manager
337 17th Street, Suite 200
Oakland, CA 94612

With copy to:

Aaron Courtney
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205

For PGE

Brendan J. McCarthy
Assistant General Counsel III
121 SW Salmon Street, 1WTC 1301
Portland, OR 97204
Brendan.Mccarthy@pgn.com
503-464-7371

Restoration Credit Consent Decree          80

Chris Bozzini
Director, Environmental Services
Portland General Electric
121 SW Salmon St. 3WTC0403
Portland, OR 97204
Chris.Bozzini@pgn.com
503-464-7853

Kristin Ingram
Assistant General Counsel III
Portland General Electric
121 SW Salmon St. 1WTC1301
Portland, OR 97204
Kristin.Ingram@pgn.com
503-464-7370

Richard George
Senior Assistant General Counsel
Portland General Electric
121 SW Salmon St. 1WTC1301
Richard.George@pgn.com
503-464-7611

Loren Dunn
Beveridge & Diamond PC
600 University Street
Suite 1601
Seattle, WA 98101
Tel: (206) 315-4810
Email: ldunn@bdlaw.com

For Portland Harbor Holdings II, LLC

Portland Harbor Holdings II, LLC
c/o Wildlands
6558 Lonetree Boulevard
Rocklin, CA 95765
Attention:  Sherrie Aland, General Counsel
Telephone:  916-435-3555
Facsimile:  916-435-3556
Email:  saland@heronpacific.com

Restoration Credit Consent Decree          81

For Rinearson Natural Area, LLC

Rinearson Natural Area, LLC
Attn: Evan B. Ocheltree
1100 Boulders Parkway, Suite 101
Richmond, VA 23225

## XX.  RETENTION OF JURISDICTION

96.    This Court retains jurisdiction over both the subject matter of this Consent Decree and the Parties for the purpose of interpreting or enforcing the terms of this Consent Decree.

## XXI.  INTEGRATION/APPENDICES

97.    This Consent Decree, including its appendices, constitutes the final, complete, and exclusive agreement and understanding with respect to the settlement embodied in this Consent Decree.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.  The following appendices are attached to and incorporated into this Consent Decree:

Appendix A identifies the properties for each Settling Defendant that are applicable to the definition of Covered Natural Resource Damages in Paragraph 3.d.

Appendix B is electronic wire transfer payment instructions, "U.S. Department of the Interior, Natural Resources Restoration Fund Assessment and Settlement Deposit Remittance Procedures."

Appendix C sets forth the number of DSAY credits to be purchased by each Settling Defendant, the Restoration Credit Seller from which those DSAY credits are to be purchased, the amounts each Settling Defendant is to pay in compensation for identified types of Covered Natural Resource Damages, and the amounts of natural resource damage assessment past costs each Settling Defendant is to pay.  Appendix C also reflects any prior payments made by each Settling Defendant as part of the Path C process.

Restoration Credit Consent Decree                82

Appendix D consists of documents for the Alder Creek Restoration Project.

- Appendix D1 is the Habitat Development Plan for the Alder Creek Restoration Project, including attachments, exhibits, and appendices to the Habitat Development Plan.

- Appendix D2 consists of the Performance Guarantees for the Alder Creek Restoration Project.

  o Appendix D2-a has been left blank because construction is complete for the Alder Creek Restoration Project.

  o Appendix D2-b is the irrevocable letter of credit for the Interim Management, Contingency and Security and adaptive management for the Alder Creek Restoration Project.

  o Appendix D2-c is the letter of credit for lamprey monitoring events for Years 10, 15 and 20 for the Alder Creek Restoration Project.

- Appendix D3 is the Credit Release Schedule for the Alder Creek Restoration Project.

- Appendix D4 consists of the deed restriction and conservation easement for the Alder Creek Restoration Project Site.

  o Appendix D4-a contains the deed restriction for the Alder Creek Restoration Project.

  o Appendix D4-b contains the conservation easement for the Alder Creek Restoration Project.

- Appendix D5 consists of the Long-Term Management Framework for

Restoration Credit Consent Decree            83

the Alder Creek Restoration Project.

- Appendix D6 is the Endowment Fund Information and Analysis (PAR) for the Alder Creek Restoration Project.

- Appendix D7 is an exemplar Endowment Agreement Funding Form for the Alder Creek Restoration Project.

Appendix E consists of documents for the Linnton Mill Restoration Site.

- Appendix E1 is the Habitat Development Plan for the Linnton Mill Restoration Site, including attachments, exhibits, and appendices to the Habitat Development Plan.

- Appendix E2 consists of the Performance Guarantees for the Linnton Mill Restoration Site.

  - Appendix E2-a has been left blank because construction is complete for the Linnton Mill Restoration Site.

  - Appendix E2-b is the escrow agreement for adaptive management for the Linnton Mill Restoration Site.

  - Appendix E2-c is the Performance Bond for Interim Management, Contingency and Lamprey Monitoring Security (IMCS) for the Linnton Mill Restoration Site.

- Appendix E3 is the Credit Release Schedule for the Linnton Mill Restoration Site.

- Appendix E4 consists of deed restrictions and conservation easements for the Linnton Mill Restoration Site.

- Appendix E4-a contains the deed restrictions for the Linnton Mill Restoration Site.

- Appendix E4-b contains the conservation easements for the Linnton Mill Restoration Site.

Appendix F consists of documents for the Rinearson Natural Area Restoration Project Restoration Site.

- Appendix F1 is the Habitat Development Plan for the Rinearson Natural Area Restoration Project, including attachments, exhibits, and appendices to the Habitat Development Plan.

- Appendix F2 consists of the Performance Guarantees for the Rinearson Natural Area Restoration Project.

  o Appendix F2-a has been left blank because construction is complete for the Rinearson Natural Area Restoration Project.

  o Appendix F2-b is the Letter of Credit for Interim Management, Contingency and Lamprey Monitoring Security in project years 1-10 (IMCS) for the Rinearson Natural Area Restoration Project.

  o Appendix F2-c is the escrow agreement for adaptive management for the Rinearson Natural Area Restoration Project.

  o Appendix F2-d is the letter of credit for lamprey monitoring in project years 15 & 20 for the Rinearson Natural Area Restoration Project.

- Appendix F3 is the Credit Release Schedule for the Rinearson Natural Area Restoration Project.

Restoration Credit Consent Decree                85

- Appendix F4 consists of deed restrictions and conservation easements for the Rinearson Natural Area Restoration Project Location.

  o Appendix F4-a contains the deed restrictions for the Rinearson Natural Area Restoration Project.

  o Appendix F4-b contains the conservation easements for the Rinearson Natural Area Restoration Project.

Appendix G consists of documents for the Harborton Restoration Project.

- Appendix G1 is the Habitat Development Plan for the Harborton Restoration Project, including attachments, exhibits, and appendices to the Habitat Development Plan.

- Appendix G2 consists of the Performance Guarantees for the Harborton Restoration Project.

  o Appendix G2-a has been left blank because construction is complete for the Harborton Restoration Project.

  o Appendix G2-b is the letter of credit for adaptive management for the Harborton Restoration Project.

  o Appendix G2-d is the letter of credit for years 15 and 20 lamprey monitoring for the Harborton Restoration Project.

- Appendix G3 is the credit release schedule for the Harborton Restoration Project.

- Appendix G4 consists of the deed restrictions and conservation easement for the Harborton Restoration Project.

Restoration Credit Consent Decree                86

o   Appendix G4-a is the deed restrictions for the Harborton Restoration Project.

o   Appendix G4-b is the conservation easement for the Harborton Restoration Project.

Appendix H consists of the forms used to report to the Trustees every sale and purchase of DSAY credits by Restoration Credit Sellers and Settling Defendants.

## XXII. MODIFICATION

98.    No material modifications shall be made to any requirement under this Consent Decree without written notification to and written approval of the United States Department of Justice and the Trustees, Settling Defendants, Restoration Credit Sellers, and the Court. Modifications to this Consent Decree exclusive of the appendices incorporated within that do not materially alter the terms of this Consent Decree may be made by written agreement between the United States Department of Justice, the Trustees, and the Settling Defendants and/or Restoration Credit Sellers whose rights or obligations are affected by the modification. Modifications to any of the appendices to this Consent Decree that do not materially alter any of the terms of this Consent Decree may be made by written agreement between the Trustees, and the Settling Defendants and/or Restoration Credit Sellers whose rights or obligations are affected by the modification.

## XXIII. ENFORCEMENT

99.    The requirements of this Consent Decree, including but not limited to deadlines, schedules and project specifications, are independently enforceable.  Any delay or failure of the Plaintiffs, Trustees, or Restoration Credit Sellers to enforce any requirement will not preclude or prejudice the subsequent enforcement of the same or another requirement.

Restoration Credit Consent Decree             87

### XXIV.  26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

100.    For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. §162(f)(2)(A)(ii), performance of Section VIII (Compensation For, And Payment Of, Covered Natural Resource Damages), Paragraphs 70-74; and Section XVIII (Retention Of Records), Paragraphs 92-94, is restitution or required to come into compliance with law.

### XXV.  LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

101.    This Consent Decree will be lodged with the Court for a period of not less than thirty (30) days for public notice and comment.  Plaintiffs each reserve the right to withdraw or withhold their consent if the comments regarding the Consent Decree disclose facts or considerations that indicate this Consent Decree is inappropriate, improper, or inadequate.  Settling Defendants and Restoration Credit Sellers waive all objection to and consent to the entry of this Consent Decree without further notice.

102.    If for any reason this Court declines to approve this Consent Decree in the form presented, this Consent Decree may be voided at the sole discretion of any Party, and if so voided the terms of the agreement shall not be used as evidence in any litigation between the Parties.

### XXVI.   SIGNATORIES/SERVICE

103.    The Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice and each undersigned representative of the State, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, the Nez Perce Tribe, each Settling Defendant, and each Restoration Credit Seller certifies that he or she is authorized to enter into the terms and

Restoration Credit Consent Decree                88

conditions of this Consent Decree and to execute and bind legally the Party that he or she represents to this document.

104.    Settling Defendants and Restoration Credit Sellers agree not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless any Plaintiff has notified Settling Defendants and Restoration Credit Sellers in writing that it no longer supports entry of the Consent Decree.

105.    Each Settling Defendant and Restoration Credit Seller will identify on the attached signature page the name and address of an agent who is authorized to accept service of process by mail on behalf of each of it with respect to all matters relating to this Consent Decree.  Settling Defendants and Restoration Credit Sellers agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including but not limited to service of a summons.

## XXVII.  FINAL JUDGMENT

106.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the United States, the State, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe, Settling Defendants, and Restoration

\\

\\

\\

\\

\\

Restoration Credit Consent Decree                89

Credit Sellers.  The Court finds that there is no just reason for delay and therefore enters this

judgment as a final judgment under Fed. R. Civ. P. 54 and 58.


SO ORDERED THIS __31st__ DAY OF _October_, 2025.



_____

Michael H. Simon
United States District Judge

Restoration Credit Consent Decree                    90

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.*

FOR THE UNITED STATES OF AMERICA

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530

Date: Oct. 30, 2023

MICHAEL J. ZEVENBERGEN
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
c/o NOAA Damage Assessment
7600 Sand Point Way, NE
Seattle, Washington 98115
(206) 276-0037
michael.zevenbergen@usdoj.gov

Date: 10-31-23

FRED PHILLIPS
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
(202) 305-0439
frederick.phillips@usdoj.gov

Restoration Credit Consent Decree                91

THE CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON enters into this Consent Decree

FOR THE CONFEDERATED TRIBES OF GRAND RONDE


_____         Date: _June 6, 2023_
CHERYLE KENNEDY,
Tribal Chairwoman
The Confederated Tribes of Grand Ronde
9615 Grand Ronde Road
Grand Ronde, OR 97338


_____         Date: _6/6/2023_
Holly Partridge
Senior Staff Attorney
The Confederated Tribes of Grand Ronde
9615 Grand Ronde Road
Grand Ronde, OR 97338
(503)879-2335
holly.partridge@grandronde.org

Restoration Credit Consent Decree                ER 169

THE NEZ PERCE TRIBE enters into this Consent Decree in *United States, et al. v. City of Portland, et al.*

NEZ PERCE TRIBE
By:

_Samuel N. Penney_                    Date: _4-24-23_

Samuel N. Penney, Chairman
Nez Perce Tribal Executive Committee
P.O. Box 305
Lapwai, ID 83540


_[signature]_                         Date: _4-24-23_

Shirley J. Allman, Secretary
Nez Perce Tribal Executive Committee
P.O. Box 305
Lapwai, ID 83540


_Julie Kane_                          Date: _4-24-23_

Julie Kane, Managing Attorney
Office of Legal Counsel
P.O. Box 305
Lapwai, ID 83540


_[signature]_                         Date: _4-25-23_

Courtney Johnson
Crag Law Center
3141 E. Burnside St.
Portland, OR 97214
courtney@crag.org


Restoration Credit Consent Decree          93

THE CONFEDERATED TRIBES OF SILETZ INDIANS enters into this Consent Decree in *United States, et al. v. City of Portland, et al.*

CONFEDERATED TRIBES OF SILETZ INDIANS
By

Date: 4/21/23

DELORES PIGSLEY,
Tribal Chairman
Confederated Tribes of Siletz Indians
201 SE Swan Avenue
PO Box 549
Siletz, OR 97380

Date: 4/21/23

JULIE A. WEIS, ESQ.
Haglund Kelley LLP
2177 SW Broadway
Portland, OR 97201
(503) 225-0777
weis@hk-law.com

Restoration Credit Consent Decree                94

THE CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION enters into this Consent Decree in *United States, et al. v. City of Portland, et al.*

CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION
By

Date: 8/18/23

N. KATHRYN BRIGHAM
Board of Trustees Chair
Confederated Tribes of the Umatilla Indian Reservation
46411 Timíne Way
Pendleton, OR 97801

Date: 8/18/2023

JOSEPH R. PITT, ESQ.
OSB #081134
CTUIR Office of Legal Counsel
46411 Timíne Way
Pendleton, OR 97801
(541) 429-7404
joepitt@ctuir.org

Restoration Credit Consent Decree    ER 2172

THE CONFEDERATED TRIBES OF WARM SPRINGS enters into this Consent Decree in *United States, et al. v. City of Portland, et al.*


CONFEDERATED TRIBES OF WARM SPRINGS
By


JONATHAN W. SMITH Sr.,                          Date: May 4, 2023
Tribal Chairman
Confederated Tribes of Warm Springs
1233 Veterans Street
PO Box C
Warm Springs, OR  97761-3001


ELLEN H. GROVER, PARTNER.                       Date: May 4, 2023
Best Best & Krieger LLP
360 SW Bond Street
Bend, OR  97702
(541) 382-3011
Ellen.grover@bbklaw.com


JOSH NEWTON, PARTNER.                           Date: May 4, 2023
Best Best & Krieger LLP
360 SW Bond Street
Bend, OR  97702
(541) 382-3011
Josh.newton@bbklaw.com


Restoration Credit Consent Decree                    96

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.*

FOR THE STATE OF OREGON, DEPARTMENT OF FISH AND WILDLIFE

Date: 7/5/23

Curt Melcher
Director
Oregon Department of Fish and Wildlife
4034 Fairview Industrial Drive SE
Salem, OR 97302

Attorney for the Oregon Department of Fish and Wildlife:

Gary Vrooman, OSB No. 075832
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201

Restoration Credit Consent Decree                97

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation*.

FOR City of Portland

Robert Taylor, City Attorney

Date: 03/22/2023

Agent authorized to receive service of process by mail on behalf of City of Portland with respect to all matters relating to this Consent Decree:

Robert Taylor
City Attorney
Office of the City Attorney, Suite 430
1221 SW 4th Avenue
Portland, Oregon  97204
Robert.Taylor@portlandoregon.gov

With copies to:
Nanci Klinger
Sr. Deputy Attorney
Office of the City Attorney, Suite 430
1221 SW 4th Avenue
Portland, Oregon 97204
Nanci.Klinger@portlandoregon.gov

Restoration Credit Consent Decree                98

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.*

FOR EVRAZ Inc. NA

James Herald
Chief Executive Officer

Date: 4/20/21

Agent authorized to receive service of process by mail on behalf of EVRAZ Inc. NA with

respect to all matters relating to this Consent Decree:

Eileen Tierney
General Counsel and Corporate Secretary
EVRAZ Inc. NA
71 S. Wacker, Suite 1700, Chicago IL 60606
Eileen.Tierney@evrazna.com
(312) 533-3689

and

Debbie Deetz Silva
Environment Manager
EVRAZ Inc. NA
14400 N Rivergate Blvd, Portland, OR 97203
Debbie.Deetz.Silva@evrazna.com
(503) 978-6044

Restoration Credit Consent Decree                    99

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation*.

FOR MMGL LLC

Richard C. Coffin
President

Date:              April 7, 2023

Agent authorized to receive service of process by mail on behalf of MMGL LLC with

respect to all matters relating to this Consent Decree:

Richard C. Coffin
President
MMGL LLC
34407 Dupont Boulevard, Suite 6
Frankford, DE  19945
richard.coffin@mmglllc.com
(510) 913-2628

with copy to:

Greg A. Christianson
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA  94105
greg.christianson@alston.com
(415) 243-1012

Restoration Credit Consent Decree                100

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.*

FOR PACIFICORP, an Oregon Corporation

Ryan Fynn
Senior Vice President and Chief Legal Officer
825 NE Multnomah St., Suite 2000
Portland, OR 97232
ryan.flynn@pacificorp.com
503-813-6321

Date: 04/03/2023

Agent authorized to receive service of process by mail on behalf of PACIFICORP with

respect to all matters relating to this Consent Decree:

PacifiCorp, c/o
CT Corporation System
780 Commercial Street SE, Suite 100
Salem, OR  97301

Restoration Credit Consent Decree                    101

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation*.

FOR Port of Portland

for     Curtis Robinhold

DocuSigned by:

Stan Watters

Curtis Robinhold
Executive Director
Port of Portland
7200 NE Airport Way
Portland, OR 97218

Stan Watters signing on behalf of Curtis
Robinhold per Out of Office delegation

Date:  3/29/2023

Agent authorized to receive service of process by mail on behalf of Port of Portland with

respect to all matters relating to this Consent Decree:

Dan Blaufus
General Counsel
Port of Portland
7200 NE Airport Way
Portland, OR 97218

Restoration Credit Consent Decree       102

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.*


FOR SCHNITZER STEEL INDUSTRIES, INC.


_____
James Matthew Vaughn
Senior Vice President


Date:  7 April 2023
_____


Agent authorized to receive service of process by mail on behalf of Schnitzer Steel

Industries, Inc. with respect to all matters relating to this Consent Decree:

James Matthew Vaughn
Senior Vice President
Schnitzer Steel Industries, Inc.
299 SW Clay, Suite 350
Portland, OR  97201
mvaughn@schn.com
(503) 323-2819

with copy to:

Greg A. Christianson
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA  94105
greg.christianson@alston.com
(415) 243-1012


Restoration Credit Consent Decree                103

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.*

FOR Siltronic Corporation

Elizabeth K. Bingold
General Counsel

Date: 3/21/23

Agent authorized to receive service of process by mail on behalf of Siltronic Corporation

with respect to all matters relating to this Consent Decree:

David A. Rabbino
Jordan Ramis PC,
PACWEST, 27th Fl.
1211 SW Fifth Avenue
Portland, OR 97204
david.rabbino@jordanramis.com
503-598-5536

Restoration Credit Consent Decree              104

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.*

FOR Linnton Water Credits, LLC

By: RestorCap Development, LLC
Its Sole Member

By: RestorCap, LLC
Its Managing Member

By: _____
Name: Robert Marinai
Title: President

Date: ___4/6/23___

Restoration Credit Consent Decree          105

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.*

FOR Portland General Electric Company (Restoration Credit Seller)

Maria Pope (Mar 27, 2023 07:52 PDT)

Maria Pope
President and Chief Executive Officer

Date: ____03/27/2023____

ER1084

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; Pacificorp, an Oregon Corporation; Port of Portland; Schnitzer Still Industries, Inc.; and Siltronic Corporation.*

FOR Portland Harbor Holdings II, LLC (Restoration Credit Seller)

Joe Sanderson
Managing Director

Date:  3/30/2023

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. City of Portland; EVRAZ Inc. NA (fka Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon Corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.*

FOR Rinearson Natural Area, LLC
**By its Sole Member: Rinearson, LLC**, a
Virginia limited liability company

*Evan Ocheltree*

Evan Ocheltree
Manager

Date: 5/25/2023

Restoration Credit Consent Decree              108

[Counsel for Plaintiffs are identified
On Plaintiffs' signature pages]

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| ACF INDUSTRIES, LLC; AIR LIQUIDE AMERICA L.P.; AIRGAS USA LLC; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.; BNSF RAILWAY COMPANY; CALBAG METALS CO.; ESCO GROUP LLC; GOULD ELECTRONICS INC.; HAJ, INC., D/B/A CHRISTENSON OIL COMPANY; HERCULES LLC; KOPPERS INC.; MCCALL OIL & CHEMICAL CORPORATION; MCCALL OIL REAL ESTATE COMPANY LLC; MOREC FRONT LLC; GWC PROPERTIES, LLC; GWC FRONT, LLC; TANKER BASIN LLC; NORTHWEST PIPE COMPANY (FKA NORTHWEST PIPE & CASING COMPANY AND NORTHWEST PIPE AND CASING COMPANY); PORTLAND GENERAL ELECTRIC COMPANY (PGE); PORTLAND TERMINAL RAILROAD COMPANY; SULZER PUMPS (US) INC.; AND VALVOLINE INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 3:23-cv-01603-SI<br><br>**CONSENT DECREE** |
| Defendants. | ) ) | |

ER-186

# TABLE OF CONTENTS

I.      INTRODUCTION.....................................................................................................1

II.     RECITALS...............................................................................................................1

III.    JURISDICTION AND VENUE..............................................................................11

IV.     PARTIES BOUND..................................................................................................11

V.      DEFINITIONS........................................................................................................12

VI.     GENERAL PROVISIONS......................................................................................15

VII.    COMPENSATION FOR, AND PAYMENT OF, COVERED NATURAL RESOURCE
        DAMAGES……………………………………………………………………………15

VIII.   FAILURE TO COMPLY WITH CONSENT DECREE ........................................19

IX.     COVENANT NOT TO SUE BY PLAINTIFFS.....................................................22

X.      RESERVATIONS OF RIGHTS.............................................................................22

XI.     ADDITIONAL RESERVATIONS OF RIGHTS FOR UNKNOWN CONDITIONS AND
NEW INFORMATION.........................................................................................................24

XII.    COVENANT NOT TO SUE BY SETTLING DEFENDANTS..............................25

XIII.   EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION...........................25

XIV.    RETENTION OF RECORDS.................................................................................28

XV.     NOTICES AND SUBMISSIONS..........................................................................29

XVI.    RETENTION OF JURISDICTION.........................................................................39

XVII.   INTEGRATION/APPENDICES.............................................................................39

XVIII.  26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION...................................39

XIX.    LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ...........................40

XX.     SIGNATORIES/SERVICE....................................................................................40

XXI.    FINAL JUDGMENT..............................................................................................41

Cash-out Consent Decree                          ii

## TABLE OF APPENDICES

A     Property description/identification for each Settling Defendant

B     Payment Instructions

C     Amounts of natural resource damages and natural resource damage assessment past costs each Settling Defendant is to pay

Cash-out Consent Decree            iii

## I.  INTRODUCTION

The United States of America ("United States"), on behalf of the National Oceanic and Atmospheric Administration ("NOAA") of the U.S. Department of Commerce and the U.S. Department of the Interior; the State of Oregon (the "State"); the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe (collectively "Plaintiffs" – *see* definition of "Plaintiffs" in Section V) have filed a Complaint in this case against a number of parties pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607; the Oregon Hazardous Waste and Hazardous Materials Act, ORS § 465, and ORS § 468B.060; Section 311 of the Clean Water Act ("CWA"), 33 U.S.C. § 1321; and Section 1002(b)(2)(A) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2702(b)(2)(A).  This Consent Decree addresses the claims asserted in the Complaint against Settling Defendants (as defined below) for Covered Natural Resource Damages (as defined below).

## II.  RECITALS

A.      The U.S. Department of Commerce, acting through NOAA; the U.S. Department of the Interior; the State of Oregon acting through the Oregon Department of Fish and Wildlife; the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe (collectively the "Trustee Council" and each individually a "Trustee" – *see* definition of "Trustees" in Section V), under the authority of Section 107(f) of CERCLA, 42 U.S.C. § 9607(f), Section 1006(b) of OPA,

Cash-out Consent Decree                                    1

33 U.S.C. § 2706(b), and 40 C.F.R. Part 300, subpart G, serve as trustees for natural resources for the assessment and recovery of damages for injury to, destruction of, loss of and/or loss of use of natural resources and/or the services provided by those resources under their trusteeship.

B.      Investigations conducted by the U.S. Environmental Protection Agency ("EPA"), the Trustee Council and others have detected over forty-five (45) hazardous substances in the sediments, soils and groundwater of the Portland Harbor Natural Resource Damage Assessment Area (as defined below), including, but not limited to, polycyclic aromatic hydrocarbons ("PAHs"), polychlorinated biphenyls ("PCBs"), cadmium, copper, lead, mercury, tributyltin ("TBT"), bis 2-ethylhexyl phthalate, dichlorodiphenyltrichloroethane ("DDT"), dichlorodiphenyldichloroethylene ("DDE"), dichlorodiphenyldichloroethane ("DDD"), and 4-methyl phenol.

C.      In January 2007, the Trustee Council conducted a pre-assessment screen and determined that it was reasonable to pursue an assessment of natural resource damages in the Portland Harbor Natural Resource Damage Assessment Area by finding that hazardous substances had been released into the Portland Harbor Natural Resource Damage Assessment Area; that public trust natural resources had likely been injured by the releases; that data sufficient to pursue a natural resource damage assessment were available or could likely be obtained at a reasonable cost; and that, without further action, implemented and planned response actions would not adequately remedy the resource injuries.  See Preassessment Screen for the Portland Harbor Superfund Site (January 2007).   The Trustee Council then notified representatives of known potentially responsible parties ("PRPs") of its intent to conduct a damage assessment.

D.      The Trustee Council began an iterative, phased cooperative natural resource damage assessment with a number of PRPs that elected to participate in the assessment.  Participating PRPs

Cash-out Consent Decree                              2

entered into Funding and Participation Agreements ("FPAs") with the Trustee Council to fund the phased assessment and define the terms of their participation. Phase 1 consisted of the development of an Assessment Plan and settlement-oriented Workplan and was conducted with the cooperation of twenty (20) PRPs. The Trustee Council released the Assessment Plan for public comment on November 23, 2009 and finalized it on June 1, 2010. Subsequently, thirty (30) PRPs entered into FPAs with the Trustee Council for the current assessment phase, Phase 2, which focuses on implementing the Workplan and conducting initial restoration planning with the goal of arriving at realistic early settlements with cooperating parties. The primary studies undertaken to fill identified data gaps include the Pacific Lamprey Toxicity Study (Stratus and Oregon State University 2013); Data Report for Lower Columbia Juvenile Salmon Persistent Organic Pollutant Exposure Assessment (NOAA Undated); and the Analysis of Osprey *(Pandion haliaetus)* Egg Tissue Collected from Portland Harbor and Surrounding Areas: Progress Report (Portland Harbor Natural Resource Trustee Council 2009). The Trustee Council also released the Draft Portland Harbor Programmatic EIS and Restoration Plan (NOAA and Parametrix 2012) for public comment on July 9, 2012 followed by the release of the Final Portland Harbor Programmatic EIS and Restoration Plan ("PEIS") in June 2017. 82 *Fed. Reg.* 28,643 (June 23, 2017). As part of the Phase 2 assessment activities, the Trustee Council (a) conducted a sediment-based Habitat Equivalency Analysis ("HEA") and a qualitative evaluation of losses to other species of concern to determine ecological injury; (b) quantified recreational losses; and (c) completed an evaluation of injured natural resources of tribal importance ("tribal service losses").

E. Plaintiffs and Settling Defendants agree that no further assessment of natural resource damages is required to effectuate the purposes of this Consent Decree.

Cash-out Consent Decree                    3

F.  Plaintiffs have filed a Complaint in this matter, alleging that Settling Defendants own and/or operate or in the past owned and/or operated real property and/or facilities, identified by tax parcel or other property description for each Settling Defendant in Appendix A, from which storm water, surface water runoff, wastewater, other process discharges, and/or groundwater have flowed into the Portland Harbor Natural Resource Damage Assessment Area.  Plaintiffs also allege that investigations by EPA and others have detected hazardous substances and/or pollutants in soils, groundwater and/or sediments on or in those properties or facilities.  Some of these hazardous substances and/or pollutants are found in the sediments of the Portland Harbor Natural Resource Damage Assessment Area.

G.  Plaintiffs further allege that hazardous substances and/or pollutants have been or are being released into the Portland Harbor Natural Resource Damage Assessment Area from properties and/or facilities owned and/or operated by Settling Defendants through direct discharge, surface water runoff, groundwater and/or seeps, and that those hazardous substances and/or pollutants have caused injury to, destruction of, loss of and/or loss of use of natural resources in the Portland Harbor Natural Resource Damage Assessment Area under Plaintiffs' trusteeship, including sediment, invertebrates, fish, and wildlife, and resources of tribal importance.  Plaintiffs further allege that each of them and the public have suffered the loss of natural resource services (including ecological services as well as direct and passive human use losses) as a consequence of those injuries.

H.  Plaintiffs allege that each Settling Defendant is liable for natural resource damages resulting from releases of hazardous substances or discharges of pollutants into the Portland Harbor Natural Resource Damage Assessment Area pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a); the Oregon Hazardous Waste and Hazardous Materials Act, ORS § 465, and ORS §

Cash-out Consent Decree                4

468B.060; Section 311 of CWA, 33 U.S.C. § 1321; or Section 1002(a) of OPA, 33 U.S.C. § 2702(a).

I.      Although the Trustee Council has initiated but not yet completed a natural resource damage assessment for the Portland Harbor Natural Resource Damage Assessment Area, the Trustee Council has developed and analyzed information sufficient to support a natural resource damages settlement that is fair, reasonable and in the public interest.  In addition to natural resource damage assessment costs, the Trustee Council seeks to recover natural resource damages, which consist of three components: ecological service losses, recreational losses, and tribal service losses.

J.      The Trustee Council offered the Phase 2 PRPs an opportunity to pursue a path towards settlement based on the results of the Phase 2 cooperative assessment and the Natural Resource Damage ("NRD") allocation discussed below.  These negotiations are referred to as "Path C."

K.      Relying upon the results of the damage-assessment studies, remedial investigations, regulatory standards, and scientific literature, the Trustee Council is seeking to recover from all Portland Harbor PRPs, for purposes of early restoration settlements at this time, funds, property, or in-kind services needed to generate: 1) habitat restoration sufficient to compensate for ecological losses valued for the limited purpose of settlement under the Path C process at 4,130 DSAYs (as defined below); 2) $5,402,400 for recreational losses; and 3) $695,100 for tribal service losses, including tribal service losses related to the tribal use of Pacific Lamprey in Portland Harbor.  The tribal service losses in the third item of the preceding sentence are in addition to, and not otherwise accounted for in, the ecological losses and the recreational losses.  The total dollar amounts for the ecological losses, recreational losses, and tribal service losses were divided by the total number of DSAYs to calculate per-DSAY pro rata shares for ecological losses, recreational losses, and tribal

Cash-out Consent Decree                    5

service losses. For PRPs that prefer settling on a cash-damages basis, this results in a total per DSAY cost of $70,500. Settling Defendants resolving their liability under this Consent Decree therefore are paying a total per-DSAY cost of $70,500. The total $70,500 per-DSAY cost includes compensation for ecological, recreational, and tribal service losses, based on the Trustees' estimates of their per-DSAY cost of compensating for these losses. This total per-DSAY cost takes into account cost estimates developed by the Trustees for restoration of ecological injuries. The Trustees' cost estimates assume that ecological restoration will be a 50/50 blend of the costs of restoration projects both within and outside of the Portland Harbor Natural Resource Damage Assessment Area.[1] By comparison, PRPs that are parties to the restoration credit consent decree filed concurrently with this Consent Decree are purchasing DSAY credits to compensate for ecological injuries and are making separate payments, on a per-DSAY basis, for recreational losses and tribal service losses.

L.    Plaintiffs assert that hazardous substance releases and pollutant discharges to the Portland Harbor Natural Resource Damage Assessment Area have become dispersed and commingled to the extent that the effects of one PRP's releases and discharges cannot be readily distinguished from another's. Plaintiffs further assert that all PRPs who contributed to the

---

[1] In the PEIS, the Trustee Council concluded that all restoration should take place within the Portland Harbor Natural Resource Damage Assessment Area and the Broader Focus Area, the area outside of the Portland Harbor Natural Resource Damage Assessment Area that includes the mainstem Willamette River up to Willamette Falls, the Multnomah Channel, the Oregon side of the lower Columbia River between the east end of Hayden Island and the Multnomah Channel outlet, and portions of Scappoose Bay. The Trustee Council further determined that no more than 50 percent of restoration should take place outside the Portland Harbor Natural Resource Damage Assessment Area.

Cash-out Consent Decree                6

contamination are jointly and severally liable for all injuries to natural resources that have resulted from the contamination. As a consequence, Plaintiffs assert the right to recover all Covered Natural Resource Damages from any Portland Harbor PRP.

     M.    Solely for purposes of facilitating settlement, the Trustee Council developed a streamlined process for allocating natural resource ecological damages liability, *i.e.,* the Path C NRD allocation, among the PRPs. The Trustee Council used readily available data that had been developed to date in the Phase 2 process. Because Path C was intended to facilitate settlement, participating PRPs agreed to accept the technical bases[2] for the calculation of the 4,130 DSAYs, the recreational losses and the tribal service losses. The Trustees also considered information submitted by individual PRPs.[3] The PRP-submitted data provide information related to past activities, contaminant release and/or pollutant discharge histories, remedial and/or source control histories, and contaminant pathway information.

     N.    Using the data and information mentioned above, the Trustee Council assigned a percentage of liability to Portland Harbor Natural Resource Damage Assessment Area properties. The percentage assigned by the Trustee Council reflects the relative contribution of contaminant-

---

[2] For example, the calculation of the 4,130 DSAYs included a number of technical inputs such as a past service loss calculation, a base year of 2011, and surface sediment chemistry point data.

[3] That information included data from the Portland Harbor Remedial Investigation (RI) Report (Lower Willamette Group ("LWG") 2009), the Portland Harbor Remedial Investigation/Feasibility Study (RI/FS) Comprehensive Round 2 Site Characterization Summary and Data Gaps Analysis Report (LWG 2007), the Portland Harbor RI/FS Conceptual Site Model Update including Site Summaries (LWG 2004-2007), the Oregon Department of Environmental Quality ("DEQ") Environmental Cleanup Site Information ("ECSI") Database (DEQ 2013), facility website references, and Google Maps. Non-public information provided by individual Settling Defendants also was considered by the Trustees.

Cash-out Consent Decree          7

related activities on a property to a corresponding contaminant footprint(s) in Portland Harbor Natural Resource Damage Assessment Area sediment, taking into account contributions from upstream and non-site-specific sources.  The Trustee Council established three (3) threshold criteria that had to be met before a Portland Harbor Natural Resource Damage Assessment Area property could be allocated any natural resource damage liability.  Those threshold criteria are as follows: 1) a pathway existed to transport hazardous substances or pollutants from the property to the Willamette River;[4] 2) an activity occurred at the property that was a likely source of a specific hazardous substance or pollutant, or a hazardous substance or pollutant likely to increase the negative effect of a substance of concern ("SOC");[5] and 3) there was sediment contamination (contaminant footprint) in close proximity to the property or a property-related outfall.  The Trustee Council considered the property a source of contamination to the Portland Harbor Natural Resource Damage Assessment Area only if all three criteria were met.

O.    The Trustee Council relied on two methods to allocate each SOC to properties:  1) allocation of unique SOC footprints, wherein individual SOC footprints are allocated only to one property; and 2) allocation of shared SOC footprints potentially associated with several properties. For shared footprints, the Trustee Council considered the relative contribution of an SOC from each property based on the type, intensity, and duration of an activity and its proximity to the Willamette River.  This process resulted in an allocation of service losses from relevant

---

[4] Pathways include, but are not limited to surface water, process water and groundwater.

[5] When the Trustee Council calculated natural resource damages, it identified certain contaminants or SOCs likely to cause injuries to natural resources in the Portland Harbor Natural Resource Damage Assessment Area.  Those SOCs are PAHs, PCBs, cadmium, copper, lead, mercury, DDT, DDD, DDE, TBT, 4-methylphenol, and bis (2-ethylhexyl) phthalate.

Cash-out Consent Decree                          8

contaminant footprints, reflecting the relative contribution of a property's contaminant-related activities to corresponding contaminant footprints.

P.    Under the Path C process, the Trustee Council conducted a party-specific, intra-property allocation by estimating the relative contributions (as percentages) of each PRP associated with contaminant footprints at particular Portland Harbor Natural Resource Damage Assessment Area properties.    The Trustee Council estimated PRP contributions based on factors such as activity type, duration, and proximity to the Willamette River.    During the Path C process, participating PRPs and the Trustee Council conducted a focused review of more comprehensive, party-specific information to supplement the Path C NRD allocation prior to developing a party-specific allocation.    To calculate a party-specific, intra-property allocation, the Trustee Council applied the same three criteria outlined in Paragraph N above to party-specific information.    The Trustee Council then converted a party-specific allocation of natural resource damage liability to DSAYs.[6]

Q.    Pursuant to the Trustee Council's allocation and Settling Defendants' and the Trustee Council's completion of the Path C process, the Trustee Council allocated a total of 471.389 DSAYs to the Settling Defendants in this Consent Decree and to the settling defendants in the concurrently-filed restoration credit consent decree.    Those allocations are set forth in Appendix C attached hereto and in Appendix C to the concurrently-filed restoration credit consent decree.    The Trustee Council

---

[6] In the case of a small number of PRPs associated with properties initially allocated a low number of DSAYS, the PRPs agreed to forgo the further intra-property allocation and agreed to accept responsibility for the full allocated share of liability for their respective property or properties.  A few other PRPs agreed to a streamlined process with focused data submissions and analysis to determine their intra-property allocation.

Cash-out Consent Decree                    9

determined that this is a fair and reasonable estimate of the equitable responsibility for Covered Natural Resource Damages attributable to each of the settling defendants in both consent decrees. The Trustee Council also allocated a total of $2,921,284.95 in damage assessment costs relating to the Trustee Council's assessment activities for the Portland Harbor Natural Resource Damage Assessment Area to the settling defendants in both consent decrees. The cash value of the damages of the 97.669 DSAYs allocated to Settling Defendants in this Consent Decree totals $6,885,664.50. When combined with the damage assessment costs allocated to the Settling Defendants in this Consent Decree, the dollar value of Plaintiffs' claims against Settling Defendants resolved in this Consent Decree totals $8,202,136.12 for Covered Natural Resource Damages. When combined with the dollar value of Plaintiffs' claims against settling defendants resolved in the concurrently-filed restoration credit consent decree, the combined total dollar value of Plaintiffs' claims resolved in both consent decrees is $36,154,209.45.

R.    The figures in Recital Q do not represent the full amount of natural resource damages that Plaintiffs seek to recover from PRPs through the Path C settlement process or otherwise. Plaintiffs are continuing to negotiate with other PRPs within the Path C process. If those negotiations succeed in reaching settlements with other PRPs, Plaintiffs will lodge further consent decrees with this Court embodying those settlements.

S.    The Path C NRD allocation developed by the Trustee Council is distinct from, unrelated to, and has no effect on the total site allocation being conducted by the PRPs to determine liability for EPA's claims for remedial action and response costs under CERCLA or ORS § 465.

T.    PRPs in the Path C process had the option to settle their liability by paying cash, purchasing DSAY credits and making other cash payments as set forth in the concurrently-filed

Cash-out Consent Decree                    10

restoration credit consent decree, or constructing a restoration project.  The undersigned Settling Defendants have elected to pay cash.

U.    The Settling Parties agree, and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Settling Parties at arm's length and in good faith; that settlement of this matter will avoid expensive, prolonged and complicated litigation between the Settling Parties; and that this settlement will allow for earlier restoration of natural resource damages.  The Settling Parties agree and this Court finds that this Consent Decree is fair, reasonable, and in the public interest, and consistent with the statutory purposes of CERCLA, the CWA, OPA and the Oregon Hazardous Waste and Hazardous Materials Act.

THEREFORE, with the consent of the Settling Parties to this Consent Decree, it is ORDERED, ADJUDGED, AND DECREED:

### III.  JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1367, 42 U.S.C. §§ 9607 and 9613(b) and 33 U.S.C. § 2717(b).  The Court has personal jurisdiction over the Settling Parties. The Settling Parties waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District, solely for the purposes of this Consent Decree and the underlying Complaint.

### IV.  PARTIES BOUND

2.    This Consent Decree is binding upon the Plaintiffs and upon Settling Defendants, and their heirs, successors and assigns.  Any change in ownership or corporate or other legal status, including but not limited to any transfer of assets or real or personal property, will in no way alter the status or responsibilities of Settling Defendants under this Consent Decree.

Cash-out Consent Decree                    11

## V. DEFINITIONS

3.     Unless otherwise expressly provided, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA have the meanings assigned to them in CERCLA or in such regulations.  Whenever the terms listed below are used in this Consent Decree or in any attached Appendix, the following definitions will apply:

a.     "Consent Decree" shall mean this consent decree and all appendices attached hereto (listed in Section XVII, "Integration/Appendices").  In the event of conflict between the body of this Consent Decree and any appendix, the body of this Consent Decree shall control.

b.     "Covered Natural Resource Damages" shall mean, for each Settling Defendant, damages, including costs of damage assessment, recoverable by Plaintiffs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a); the Oregon Hazardous Waste and Hazardous Materials Act, ORS § 465, and ORS § 468B.060; Section 311(f)(4) & (5) of the CWA, 33 U.S.C. § 1321(f)(4)&(5); Section 1002(b)(2)(A) of OPA, 33 U.S.C. § 2702(b)(2)(A); any applicable tribal law; and any other statutory or common law, for injury to, destruction of, or loss of and/or loss of use of natural resources and/or resource services resulting from releases of hazardous substances or discharges of pollutants at or from the properties identified in Appendix A for each Settling Defendant into the Portland Harbor Natural Resource Damage Assessment Area, where the disposal of hazardous substances or releases of pollutants causing such releases or discharges into the Portland Harbor Natural Resource Damage Assessment Area occurred on or before the Effective Date of this Consent Decree.

c.     "Day" shall mean a calendar day unless expressly stated otherwise.

Cash-out Consent Decree                    12

d.      "DSAYs" shall mean discounted ecological service acre-years, the metric established by the Trustee Council to determine the scale of Covered Natural Resource Damages liability associated with the Portland Harbor Natural Resource Damage Assessment Area and the natural resource restoration value needed to compensate for injury to, destruction of, loss of and/or loss of use of natural resources giving rise to liability.

e.      "Effective Date" shall mean the date on which this Consent Decree is entered by the Court, or, if the Court instead issues an order approving the Consent Decree, the date of such order.

f.      "Plaintiffs" (individually, "Plaintiff") shall mean the United States; the State of Oregon; the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe.  The term "Plaintiffs" includes all of the Trustees.

g.      "Portland Harbor Natural Resource Damage Assessment Area" shall mean the waters, including the shoreline, intertidal areas, and bottom sediments, of the Willamette River located in the City of Portland, Multnomah County, Oregon, and encompasses the Willamette River, including Swan Island Lagoon, from approximately River Mile 12.3 to approximately River Mile 0.8 near the confluence with the Columbia River, as well as the upper 1.2 miles of the Multnomah Channel.  *See* PEIS (2017).

h.      "Portland Harbor Restoration Account" shall mean the Department of the Interior Natural Resources Restoration Fund, Account No. 14X5198.

i.      "Settling Defendants" (individually, "Settling Defendant") shall mean ACF Industries, LLC; Air Liquide America L.P.; Airgas USA LLC; Ash Grove Cement Company;

Cash-out Consent Decree                    13

ER-201

Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc. d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline, Inc.

    j.  "Settling Parties" (individually, "Settling Party") shall mean the Plaintiffs and the Settling Defendants.

    k.  "Trustees" (individually, "Trustee") shall mean those natural resource trustees participating in the Portland Harbor Natural Resource Trustee Council pursuant to the "Natural Resource Trustee Memorandum of Agreement for the Portland Harbor Superfund Site" at the time of the entry of this Consent Decree – the United States Department of Commerce, acting through NOAA; the United States Department of the Interior; the State of Oregon through the Oregon Department of Fish and Wildlife; the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe.

    l.  "United States" shall mean the United States of America and each department, agency and instrumentality of the United States, including without limitation the National Oceanic and Atmospheric Administration ("NOAA") of the U.S. Department of Commerce and the U.S. Department of the Interior.

Cash-out Consent Decree      14

## VI.  GENERAL PROVISIONS

4.      The Complaint states claims against each Settling Defendant upon which relief may be granted.

5.      Nothing in this Consent Decree shall be construed as an admission of liability by Settling Defendants for any claims or allegations made in the Complaint or in this Consent Decree. Settling Defendants deny all or portions of the allegations in the Complaint and this Consent Decree and do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the Complaint or this Consent Decree.

## VII.  COMPENSATION FOR, AND PAYMENT OF, COVERED NATURAL RESOURCE DAMAGES

6.      <u>Court Registry</u>.

 a.      Plaintiffs shall file a motion to enable Settling Defendants to deposit certain funds into the registry of the Court ("Registry Account") no later than twenty (20) days after the date of Lodging of this Consent Decree.  Settling Defendants shall not oppose that motion.

 b.      The purpose of the Registry Account is to receive payments from Settling Defendants as provided in Paragraphs 7; to earn interest; and to disburse funds to certain Settling Defendants and to the Trustees as provided in Paragraph 8.  Funds shall be disbursed from the Registry Account as set forth in Paragraphs 6.c and 8.

 c.      Any disbursements from the Registry Account shall be made upon joint motion of Plaintiffs.  Settling Defendants shall not oppose any such motions except on grounds of error in the amount of one or more proposed disbursements.  Motions for disbursements shall state the recipient(s) of funds to be disbursed, the amount of funds to be disbursed to each recipient, the means of disbursement (whether by check, electronic funds transfer ("EFT"), or otherwise), and

Cash-out Consent Decree                    15

account information and any other information necessary to effectuate disbursement to each recipient.

7.    Within ninety (90) days of the Effective Date, each Settling Defendant shall pay to the Registry Account funds in the amounts set forth in Appendix C.  However, no payment is required from any Settling Defendant identified in Appendix C as entitled to a refund.  Instructions for payments to the Registry Account shall be provided by Plaintiffs to each Settling Defendant within twenty (20) days of the Court granting Plaintiffs' motion to establish the Registry Account.

8.    Plaintiffs shall move the Court for disbursements from the Registry Account in the amounts set forth in Appendix C to those identified Settling Defendants identified in Appendix C as entitled to refunds.  Plaintiffs shall file the motion for disbursement no sooner than one hundred twenty (120) days after the Effective Date, and within thirty (30) days after the amount of funds in the Registry Account exceeds the total amount to be refunded to those Settling Defendants identified in Appendix C as entitled to refunds. After all refunds owed to Settling Defendants identified in Appendix C have been disbursed from the Registry Account, Plaintiffs may move the Court from time to time for disbursements of funds (including any accrued interest) from the Registry Account to the Trustees.  Disbursements to the Trustees may be for reimbursement of the Trustees' general past costs, for restoration activities, or for other purposes authorized by law.

9.    Within 210 days after the Effective Date, the Trustees shall provide each Settling Defendant with a bill requiring payment of general interim Path C costs incurred by the Trustees from April 1, 2020, through the Effective Date of the Consent Decree.  In addition, the costs of accounting for the general interim costs after the Effective Date shall be included in the general interim costs.  The bills sent to each Settling Defendant shall be accompanied by documentation of the Trustees' general interim costs in the same format and level of detail as the documentation

Cash-out Consent Decree                                16

previously provided to the Settling Defendants of the Trustees' general past costs through March 31, 2020.  The amount of general interim costs billed to each Settling Defendant will be each Settling Defendant's *per capita* share of the general interim costs, which shall be calculated as the total amount of general interim costs divided by the total number of PRPs participating in the Path C settlement process as of March 20, 2023, which is the date this Consent Decree was transmitted to the Settling Defendants for their signatures.

     a.     Each Settling Defendant shall pay its share of general interim costs within ninety (90) days of receipt of a bill from the Trustees for those costs.  Prior to making this payment, any Settling Defendant may request a meeting with the Trustees if the Settling Defendant believes that the amount of billed costs is in error.  Following any such meeting, the Trustees may send corrected bills for general interim costs to the Settling Defendants if they determine, in their sole and unreviewable discretion, that the amounts in the original bills were in error.  Any costs incurred by the Trustees in correcting bills shall not be added to the corrected bills.

     b.     Payments to NOAA and the U.S. Department of the Interior shall be made by EFT to the U.S. Department of Justice account in accordance with current EFT procedures. Payments shall be made in accordance with instructions provided to each Settling Defendant by the Financial Litigation Unit of the U.S. Attorney's Office in the District of Oregon.  Any payments received by the Department of Justice after 4:00 p.m. Eastern Standard Time shall be credited on the next business day.  Each Settling Defendant shall provide at least five (5) days-notice to the Financial Litigation Unit before making the transfer.

     Trustee:     National Oceanic and Atmospheric Administration
     Interim Cost Amount:  As shown on interim cost bill sent by Trustees

     Trustee:     U.S. Department of the Interior
     Interim Cost Amount:  As shown on interim cost bill sent by Trustees

Cash-out Consent Decree     17

c.      Payments to the other Trustees shall be made by EFT or certified checks, as indicated in this sub-paragraph for each Trustee, in the amounts indicated for each Trustee. Payments by EFT shall be made in accordance with instructions provided to each Settling Defendant by each Trustee. Any payments received by a Trustee after 4:00 p.m. Eastern Standard Time shall be credited on the next business day. Each Settling Defendant shall provide at least five (5) days-notice to a Trustee before making the transfer. Payments made by certified check shall bear the notation "[Settling Defendant] - Portland Harbor Assessment Costs," and shall be made payable and addressed as indicated below:

| | |
|---|---|
| Trustee: | State of Oregon |
| Payment method: | EFT |
| | |
| Trustee: | Confederated Tribes of the Grand Ronde Community of Oregon |
| Payment method: | EFT |
| | |
| Trustee: | Confederated Tribes of Siletz Indians |
| Payment method: | EFT |
| | |
| Trustee: | Confederated Tribes of the Umatilla Indian Reservation |
| Payment method: | EFT |
| | |
| Trustee: | Confederated Tribes of the Warm Springs Reservation of Oregon |
| Payment method: | Certified check with note "For Portland Harbor" |
| Address: | Attn: Cash Management PO Box C Warm Springs, OR 97761 |
| | |
| Trustee: | Nez Perce Tribe |
| Payment method: | EFT |

10.     After the Effective Date, and concurrently with issuing the bills described in Paragraph 9, the Trustees shall provide each Settling Defendant with a summary of each Trustee's Path C costs that are specific to that Settling Defendant's participation in the Path C settlement process. The costs of accounting for these party-specific Path C costs shall be included in each

Cash-out Consent Decree                    18

Settling Defendant's party-specific Path C costs.  The total amount of these party-specific costs for each Settling Defendant will be offset by the forward-funding payments that each Settling Defendant has made to the Trustees for these party-specific costs.  Where a Settling Defendant's forward funding payments to the Trustees for these party-specific costs exceeds the Trustees' actual costs, the remaining balance will be refunded to that Settling Defendant.  Where a Settling Defendant's forward funding payments to the Trustees for these party-specific costs are less than the Trustees' actual costs, the Trustees shall send the Settling Defendant a bill for the unpaid balance.  Payment of such unpaid balances shall be made by each Settling Defendant within ninety (90) days of receiving a bill from the Trustees.  Such payments shall be made using the payment instructions in Paragraphs 9(b) and 9(c).

11.    At the time of each payment each Settling Defendant shall send notice in accordance with Section XV (Notices and Submissions) that payment has been made.    Such notice will reference Portland Harbor NRDA, DOJ case number 90-11-2-06787/4, and the civil action number.

### VIII.  FAILURE TO COMPLY WITH CONSENT DECREE

12.    Interest on Late Payments.

If a Settling Defendant fails to make any payment required under Paragraphs 7, 9, or 10 by the due date, interest shall be assessed at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year in accordance with 42 U.S.C. § 9607(a).  The applicable rate of interest is the rate in effect at the time the interest accrues.  The rate of interest is subject to change on October 1 of each year.  Interest will begin to accrue beginning on the payment due date and shall continue to accrue on the unpaid payment balance through the date that full payment is received.

Cash-out Consent Decree                    19

13.    Stipulated Penalties.

a.    If a Settling Defendant fails to make a payment or complete any other action required of it under Section VII (Compensation For, And Payment Of, Covered Natural Resource Damages) by the required date, the Settling Defendant shall be in violation of this Consent Decree and shall be liable for stipulated penalties, in addition to the interest required by Paragraph 12.

b.    For the first two (2) weeks that a Settling Defendant fails to comply with any requirement in the Consent Decree, the Settling Defendant shall pay a stipulated penalty in the amount of $1,000 per week.  Where the delay extends beyond the second week, the Settling Defendant shall pay a stipulated penalty for each additional day of noncompliance, in the amount of $750 per day.  For purposes of this Subparagraph, a week shall equal a continuous period of seven (7) days.  Nothing in this Consent Decree prevents the simultaneous accrual of separate penalties for separate violations of this Consent Decree.

c.    All penalties shall begin to accrue on the day after compliance is due or the day after the violation begins, and all penalties shall continue to accrue until compliance with the applicable requirement is achieved.  Following the Trustees' determination that a Settling Defendant has failed to comply with a requirement of the Consent Decree and is liable for stipulated penalties, the Trustees may send the Settling Defendant written notification of the noncompliance and a written demand for payment of the penalties.  However, penalties shall accrue as provided in this Subparagraph and Subparagraph b. regardless of whether the Trustees have notified the Settling Defendant of the violation or made a demand for payment.

d.    Payments of stipulated penalties under this Paragraph shall be allocated and made as follows:  25% of the total to the United States; 12.5 % of the total to the State; 12.5% of the total to the Confederated Tribes of the Umatilla Indian Reservation; 12.5% of the total to the Confederated Tribes

Cash-out Consent Decree                              20

of the Grand Ronde Community of Oregon; 12.5% of the total to the Confederated Tribes of the Warm Springs Reservation of Oregon; 12.5% of the total to the Nez Perce Tribe; and 12.5% to the Confederated Tribes of Siletz Indians.  Payments under this Paragraph shall be made using the procedures in Paragraph 9.

e.    All penalties accruing under this Paragraph shall be due and payable within thirty (30) days of a Settling Defendant's receipt from the Trustees of a demand for payment of the penalties.

f.    If a Settling Defendant fails to pay stipulated penalties when due, Plaintiffs may institute proceedings in this Court to collect the penalties, as well as interest.  Settling Defendant shall pay interest on the unpaid balance as provided in Paragraph 12.  The payment of penalties shall not alter in any way the Settling Defendant's other obligations under this Consent Decree.

g.    If Plaintiffs bring a motion or a separate action in court to enforce this Consent Decree and prevail, Plaintiffs shall be entitled to recover from Settling Defendant all costs and expenses of such motion or action, including, but not limited to, costs of attorney time.

h.    Payments made under this Section are in addition to any other remedies or sanctions available to Plaintiffs by virtue of Settling Defendant's failure to comply with the requirements of this Consent Decree.

i.    Notwithstanding any other provision of this Section, each Plaintiff may, in its unreviewable discretion, waive payment of any portion of the stipulated penalties payable to that Plaintiff that have accrued pursuant to this Consent Decree.  Payment of stipulated penalties does not excuse the Settling Defendant from complete performance of the obligations in Section VII (Compensation For, And Payment Of, Covered Natural Resource Damages) or from performance of any other requirement of this Consent Decree.

Cash-out Consent Decree                          21

## IX.  COVENANT NOT TO SUE BY PLAINTIFFS

14.    Except as specifically provided in Sections X (Reservations of Rights) and XI (Additional Reservation For Unknown Conditions Or Information) below, Plaintiffs covenant not to sue or to take administrative action against Settling Defendants to recover Covered Natural Resource Damages as defined in Paragraph 3(b).  This covenant not to sue will take effect for each Settling Defendant upon completion of all of its obligations under Section VII (Compensation For, And Payment Of, Covered Natural Resource Damages).  This covenant not to sue is conditioned for each Settling Defendant upon the satisfactory performance by each Settling Defendant of its obligations under this Consent Decree.  This covenant not to sue extends only to Settling Defendants and their respective heirs, successors, and assigns and does not extend to any other person.

## X.  RESERVATIONS OF RIGHTS

15.    Plaintiffs reserve, and this Consent Decree is without prejudice to, all rights against Settling Defendants with respect to all matters not expressly included within the Covenant Not to Sue by Plaintiffs in Paragraph 14.  Notwithstanding any other provision of this Consent Decree, Plaintiffs reserve, and this Consent Decree is without prejudice to, all rights against Settling Defendants with respect to:

a.    Liability for failure of a Settling Defendant to meet a requirement of this Consent Decree;

b.    Liability for damages to natural resources (including assessment costs) as defined in 42 U.S.C. §§ 9601(6) & (16) that are not expressly included within the Covenant Not to Sue by Plaintiffs in Section IX;

Cash-out Consent Decree                22

c. Liability for costs of response incurred or to be incurred by any of the Plaintiffs under Sections 107 or 113 of CERCLA, 42 U.S.C. §§ 9607 or 9613, or any other applicable federal or state law;

d. liability under Section 107(a)(4)(D), 42 U.S.C. § 9607(a)(4)(D), for costs of any health assessment or health effects study carried out under 42 U.S.C. § 9604(i);

e. Liability for damages to natural resources (including assessment costs), as defined in 42 U.S.C. §§ 9601(6) & (16), (i) resulting from new releases of hazardous substances or new discharges of pollutants in the Portland Harbor Natural Resource Damage Assessment Area after the Effective Date of this Consent Decree from a Settling Defendant's properties identified in Appendix A, or (ii) resulting from, or arising out of, a Settling Defendant's transportation, treatment, storage, or disposal, or the arrangement for the transportation, treatment, storage, or disposal of hazardous substances at or in connection with the Portland Harbor Natural Resource Damage Assessment Area after the Effective Date of this Consent Decree;

f. Liability for injunctive relief or administrative order enforcement, including the performance of removal or remedial actions, under Section 106 of CERCLA, 42 U.S.C. § 9606, or any other applicable federal or state law; and

g. Criminal liability to the United States or State.

16. The State's joinder to this Consent Decree is solely in its capacity as a trustee for natural resources and constitutes a limited waiver of the State's Eleventh Amendment immunity

Cash-out Consent Decree                    23

for the sole and limited purpose of enforcing the terms of this Consent Decree. This Consent Decree shall not act as a general waiver, and the State does not, by joining in this Consent Decree, waive immunity from private party claims, including contribution claims, in federal court for CERCLA response costs arising from the Portland Harbor Superfund Site.

## XI. ADDITIONAL RESERVATION FOR UNKNOWN CONDITIONS OR INFORMATION

17.    Notwithstanding any other provision of this Consent Decree, Plaintiffs reserve, and this Consent Decree is without prejudice to, the right to institute proceedings against Settling Defendants in this action or in a new action for: Covered Natural Resource Damages if conditions, factors or information in the Portland Harbor Natural Resource Damage Assessment Area, not known to the Trustees as of the Effective Date of this Consent Decree, are discovered that, together with any other relevant information, indicates that there is injury to, destruction of, loss of and/or loss of use of natural resources of a type unknown, or of a magnitude significantly greater than was known, to the Trustees as of the Effective Date. For purposes of this Paragraph, information known to the Trustees shall consist of any information in the files of, or otherwise in the possession of, any one of the individual Trustees, or their contractors or consultants who worked on the Trustees' natural resource damage assessment, including the Path C liability allocation projects, as of the Effective Date of this Consent Decree. Natural resource damages arising from re-exposure, resuspension or migration of hazardous substances or pollutants by natural causes or as a result of the future implementation of a remedial action performed in accordance with an order by or consent decree with EPA in the Portland Harbor Natural Resource Damage Assessment Area shall not create a basis for action by the Trustees under this Paragraph; provided, however, that this limitation shall not apply to any Settling Defendant(s) where the re-exposure, resuspension or migration of hazardous substances or pollutants is the result of negligence occurring after the

Cash-out Consent Decree                     24

Effective Date by such Settling Defendant(s) or employees, contractors, or agents of such Settling Defendant(s).

## XII.  COVENANT NOT TO SUE BY SETTLING DEFENDANTS

18.    Settling Defendants covenant not to sue and agree not to assert any claims or causes of action against the United States, the State, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe or their contractors or employees, relating to Covered Natural Resource Damages and this Consent Decree.

19.    Settling Defendants agree not to sue any other person for Covered Natural Resource Damages.  Settling Defendants retain the right to assert and pursue all such claims and positions against any person in the event such person first asserts, and for so long as such person pursues, any claim or cause of action against Settling Defendants relating to Covered Natural Resource Damages.  Settling Defendants further agree not to challenge, object to, or oppose any other consent decree resolving Covered Natural Resource Damages.  Nothing in this Paragraph shall operate to waive or release any claim by a Settling Defendant under any contract of insurance against any person or entity not a Settling Party to this Consent Decree.  Nothing in this Paragraph shall operate to waive or release any claim or action by a Settling Defendant for costs they incurred or will incur that are not within the definition of Covered Natural Resource Damages.

## XIII.  EFFECT OF SETTLEMENT/CONTRIBUTION PROTECTION

20.    Nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a Settling Party to this Consent Decree.  Except as stated in Paragraphs 14, 18, and 19 above, each of the Settling Parties expressly reserves any and all rights,

Cash-out Consent Decree                          25

defenses, claims, demands, and causes of action they each may have with respect to any matter, transaction, or occurrence relating in any way to Portland Harbor against any person not a Settling Party hereto. Nothing in this Consent Decree diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional relief (including response action, response costs, and natural resource damages) and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

21.     The Settling Parties agree, and by entering this Consent Decree this Court finds, that this settlement constitutes a judicially-approved settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and ORS 465.325(6)(b), and that Settling Defendants are entitled, as of the Effective Date of this Consent Decree, to protection from contribution actions or claims as provided by Section 113(f)(2) and ORS 465.325(6)(b), or as may be otherwise provided by law, for Covered Natural Resource Damages; provided, however, that if Plaintiffs exercise their rights under the reservations in Section X or Section XI, other than in Paragraphs 15(a) (failure to satisfy a requirement of this Consent Decree) and 15(g) (criminal liability), the contribution protection afforded by this Consent Decree will no longer include those matters that are within the scope of the exercised reservation.

22.     In any subsequent administrative or judicial proceeding initiated by Plaintiffs for injunctive relief, recovery of response costs, or other appropriate relief other than Covered Natural Resource Damages, Settling Defendants shall not assert, and shall not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by Plaintiffs in the subsequent proceeding were or should have been brought in the instant case; provided, however, that

Cash-out Consent Decree                     26

nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Paragraphs 14, 18, and 19.

23. The Settling Parties agree that they will not cite or use this settlement or the Path C NRD allocation results in any forum as evidence of liability for remedial action or response costs. Nor shall the Settling Parties cite or use this settlement or the Path C NRD allocation results to contend that they are relevant to, or determinative of, their share of remedial action or response costs, including but not limited to in any allocation of liability conducted by or among the Settling Parties or other PRPs or in any judicial or administrative proceeding concerning remedial action or response costs, except in rebuttal to another PRP's use of the Path C NRD allocation results. The Settling Parties further agree that they will not use this settlement (including the terms of this Consent Decree and the basis for the compromise contained in other documents filed in this action in support of this Consent Decree) in any other forum, whether in litigation, administrative proceedings, formal or informal negotiations, or otherwise, to resolve, attempt to resolve, or in any way influence the resolution of, other claims between Plaintiffs and Settling Defendants; provided, however, that this provision does not limit the Settling Parties from using otherwise available factual information referenced in documents filed in support of this Consent Decree or submitted or used in the Path C Process. The restriction in the preceding sentence applies to, but is not limited to, claims that the United States (on behalf of the EPA) and the State may have against Settling Defendants under CERCLA, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*, CWA, OPA, or Oregon law. The Settling Parties may use this Consent Decree, and other documents filed in this action in support of this Consent Decree, to defend the terms of this Consent Decree, or in any forum as evidence of the settlement reached herein and the basis therefore.

Cash-out Consent Decree                                         27

## XIV.  RETENTION OF RECORDS

24.      Until ten (10) years after the entry of this Consent Decree, each Settling Defendant shall preserve and retain all non-identical copies of records, reports, or information, including that in electronic form (hereinafter referred to as "Records"), now in its possession, custody, or control, or that come into its possession, custody, or control, that relate in any manner to the liability of Settling Defendants or any person under CERCLA with respect to the Site, notwithstanding any record retention, or similar, policy of Settling Defendants or Settling Defendants' agents, advisors, or consultants providing otherwise.

25.      After the conclusion of the ten-year document retention period in the preceding Paragraph, Settling Defendants shall notify the Trustees at least ninety (90) days prior to the destruction of any such Records, and, upon request by the Trustees, Settling Defendants shall deliver any such Records to the Trustees.  Settling Defendants may assert that certain Records are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Settling Defendants assert such a privilege, they shall provide Trustees with the following: (1) the title of the Record; (2) the date of the Record; (3) the name, title, affiliation (e.g., company or firm), and address of the author of the Record; (4) the name and title of each addressee and recipient; (5) a description of the subject of the Record; and (6) the privilege asserted.  If a claim of privilege applies only to a portion of a Record, the Record shall be provided to Trustees in redacted form to mask the privileged information only.  Settling Defendants shall retain all Records that they claim to be privileged until the Trustees have had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in the Settling Defendant's favor.  However, no Records created or generated pursuant to the requirements of this Consent Decree shall be withheld on the grounds that they are privileged or confidential.

26.      Each Settling Defendant certifies individually that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any

Cash-out Consent Decree                                28

Records (other than identical copies) relating to its potential liability regarding the Site since the earliest notification of potential liability by any Trustee.

## XV.  NOTICES AND SUBMISSIONS

27.    Whenever  notice is required to be given or a document is required to be sent by one Settling Party to another under the terms of this Consent Decree, it will be directed to the individuals at the addresses specified below, unless those individuals or their successors give notice of a change to the other Settling Parties in writing.    Written notice as specified constitutes complete satisfaction of any written notice requirement of the Consent Decree for Plaintiffs, Trustees, and Settling Defendants.

As to the United States and as to DOJ:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(DJ # 90-11-2-06787/2)

As to NOAA:

Ericka Hailstocke-Johnson
United States Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel, Natural Resources Section
1410 Neotomas Avenue, Suite 110
Santa Rosa, CA, 95405

Christopher Plaisted
United States Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel, Natural Resources Section
510 W. Ocean Blvd., Suite 4470
Long Beach, CA 90802

Cash-out Consent Decree                    29

As to the United States Department of the Interior:

Deirdre F. Donahue
United States Department of the Interior
Office of the Solicitor
601 SW 2nd Avenue, Suite 1950
Portland, OR 97204

As to the State:

Gary Vrooman
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201

As to the Confederated Tribes of the Grand Ronde Community of Oregon:

Tribal Council Chair
9615 Grand Ronde Road
Grand Ronde, OR 97347-9712

Courtesy copies to:

Tribal Attorney's Office
9615 Grand Ronde Road
Grand Ronde, OR 97347-9712

Brandy Humphreys
Lands Department
9615 Grand Ronde Road
Grand Ronde, OR 97347-9712

As to the Confederated Tribes of Siletz Indians:

Confederated Tribes of Siletz Indians
Attn: Tribal Chairman and Natural Resources Manager
P.O. Box 549
Siletz, OR  97380

Courtesy copy to:

Julie Weis
Haglund Kelley LLP
2177 SW Broadway
Portland, OR  97201

Cash-out Consent Decree                    30

As to the Confederated Tribes of the Umatilla Indian Reservation:

Lead Attorney
Office of Legal Counsel
Confederated Tribes of the Umatilla Indian Reservation
46411 Timine Way
Pendleton, OR 97801

As to the Confederated Tribes of the Warm Springs Reservation of Oregon:

General Manager, Branch of Natural Resources
P.O. Box C
Warm Springs, Oregon  97761

Legal Counsel of Record for the
Confederated Tribes of the Warm Springs Reservation of Oregon
Karnopp Petersen LLP
360 SW Bond St., Suite 400
Bend, OR 97702

As to the Nez Perce Tribe:

Nez Perce Tribe
Attn: Chairman, Nez Perce Tribal Executive Committee
P.O. Box 305
Lapwai, ID 83540

Courtesy copies to:

Julie Kane
Office of Legal Counsel
Nez Perce Tribe
P.O. Box 305
Lapwai, ID 83540

Courtney Johnson
Executive Director & Staff Attorney
Crag Law Center
3141 E. Burnside St.
Portland, OR 97214

Cash-out Consent Decree                    31

As to Settling Defendants

For ACF Industries, LLC

Mark A. Crinnion
Vice President and General Counsel
ACF Industries, LLC
PO Box 900
Florissant, MO. 63032-0899
mcrinnion@acfindustries.com

Suzanne Lacampagne
Miller Nash LLP
111 SW Fifth Ave. Suite 3400
Portland, OR  97204
suzanne.lacampagne@millernash.com

Douglas A. Cohen
Brown Rudnick LLP
City Place 1 185 Asylum St
Hartford, CT 06103
dcohen@brownrudnick.com

For Air Liquide America L.P. and Airgas USA LLC

J.W. Ring
Ring Bender LLP
920 SW 6th Ave., Suite 600
Portland, OR. 97204
(503) 964- 6723
jwring@ringbenderlaw.com

Stephanie Payne
Counsel for Airgas, Inc., an Air Liquide Company
1002A Columbus Street
Houston, TX. 77019
(713) 858-4793
Stephanie.payne@airgas.com

Michael Dailey
General Counsel, Airgas, Inc., an Air Liquide Company
259 Radnor Chester Road, Suite 100
Radnor, PA. 19087
(610) 263-2033
Michael.dailey@airgas.com

Cash-out Consent Decree                    32

For Ash Grove Cement Company

David M. Toolan, Vice President & General Counsel
CRH Americas, Inc.
900 Ashwood Parkway, Suite 800
Atlanta, GA  30338

Courtesy copies to:

Brian Ferrasci-O'Malley
Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104

Leslie Nellermoe
Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104

For Ashland Inc. and Valvoline Inc.

Ashland Inc.
500 Hercules Road
Wilmington, DE 19808
Attention: Environmental Counsel

For Beazer East, Inc.

Suzanne Lacampagne
Miller Nash LLP
111 SW Fifth Avenue, Suite 3400
Portland, OR 97204
Suzanne.lacampagne@millernash.com

Charles E. McChesney II, Esq.
Vice President & Secretary, Beazer East, Inc.
600 River Ave., Ste. 200
Pittsburgh, PA 15212
charles.mcchesney@trmi.biz

Cash-out Consent Decree                    33

<u>For BNSF Railway Company</u>

Allen Stegman
General Director Environmental
BNSF Railway Company
2500 Lou Menk Drive, AOB-3
Fort Worth, TX 76131-2828

and

Brooke Kuhl
Senior General Attorney
201 West Railroad Street, STE 300
Missoula, MT 59802

And a copy to:

Robert B. Lowry
Kell, Alterman & Runstein, L.L.P.
520 SW Yamhill Street, Suite 600
Portland, OR 97204

<u>For Calbag Metals Co.</u>

Warren Rosenfeld
Calbag Metals Co.
2495 NW Nicolai St.
Portland, OR 97210

Jennifer Gates
Pearl Legal Group, PC
529 SW Third Ave., Suite 600
Portland, OR 97204
Jgates@pearllegalgroup.com

<u>For ESCO Group LLC</u>

Steve Meck, Esq.
General Counsel, Americas and Global Head of Compliance
The Weir Group PLC
601 Weir Way
Fort Worth, TX 76108
Steve.Meck@mail.weir

Cash-out Consent Decree                34

Wes E. Wadle, Esq.
Litigation & Disputes Counsel, Americas
The Weir Group PLC
601 Weir Way
Fort Worth, TX 76108
Wes.Wadle@mail.weir

Nicholas W. van Aelstyn
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
nvanaelstyn@sheppardmullin.com

For Gould Electronics Inc.

Gould Electronics Inc.
Chief Administrative Officer
Attn.: Dean Hattula
2555 W Fairview St Suite 103
Chandler, AZ 85224
Dhattula@gouldelectronics.com

With a copy to:

John A. Rego
Benesch Friedlander Coplan & Aronoff LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

For HAJ, Inc. d/b/a Christenson Oil Company

Amy Mitchell
Bankruptcy Trustee, Receiver, Disbursing Agent
PO Box 2289
Lake Oswego, OR 97035

With a Copy to -
Katherine Felton
Murphy Armstrong & Felton LLP
719 Second Avenue
Suite 701
Seattle, WA 98104

Cash-out Consent Decree                35

For Hercules LLC

Hercules LLC
c/o Ashland Inc.
500 Hercules Road
Wilmington, DE 19808
Attention: Environmental Counsel

For Koppers Inc.

Koppers Inc.
c/o Stephanie Apostolou, General Counsel and Secretary
436 Seventh Avenue
Pittsburgh, PA 15219
ApostolouSL@koppers.com

With a copy to:

Alan S. Miller
Houston Harbaugh P.C.
Three Gateway Center, 22nd Floor
401 Liberty Avenue
Pittsburgh, PA 15222
milleras@hh-law.com

For McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; and Tanker Basin LLC

McCall Oil & Chemical Corporation
c/o Jeff Miller
Miller Nash LLP
111 SW Fifth Ave. Suite 3400
Portland, OR  97204
jeff.miller@millernash.com

McCall Oil & Chemical Corporation
Ted McCall
McCall Oil & Chemical Corporation
411 NW Park Ave, Suite 202
Portland, OR  97209
Ted@mccallterminals.com

Cash-out Consent Decree                36

<u>For Northwest Pipe Company</u>

Northwest Pipe Company
Ms. Stephanie Heldt-Sheller
Corporate Environmental Manager
201 N.E. Park Plaza Drive, Suite 100
Vancouver, WA 98684-5874

and

Northwest Pipe Company
Michael B. Merchant
Black Helterline LLP
805 SW Broadway, Suite 1900
Portland, OR 97205

<u>For Portland General Electric Company (PGE)</u>

Brendan J. McCarthy
Assistant General Counsel III
121 SW Salmon Street, 1WTC 1301
Portland, OR 97204
Brendan.Mccarthy@pgn.com
503-464-7371

Chris Bozzini
Director, Environmental Services
Portland General Electric
121 SW Salmon St. 3WTC0403
Portland, OR 97204
Chris.Bozzini@pgn.com
503-464-7853

Kristin Ingram
Assistant General Counsel III
Portland General Electric
121 SW Salmon St. 1WTC1301
Portland, OR 97204
Kristin.Ingram@pgn.com
503-464-7370

Cash-out Consent Decree            37

Richard George
Senior Assistant General Counsel
Portland General Electric
121 SW Salmon St. 1WTC1301
Richard.George@pgn.com
503-464-7611

Loren Dunn
Beveridge & Diamond PC
600 University Street
Suite 1601
Seattle, WA 98101
Tel: (206) 315-4810
Email: ldunn@bdlaw.com

For Portland Terminal Railroad Company

Elizabeth C. Knight
Dunn Carney Allen Higgins & Tongue LLP
Suite 1500, 851 SW Sixth Avenue | Portland, OR 97204
Direct (503) 306-5312
Email:  eknight@dunncarney.com

For Sulzer Pumps (US) Inc.

Melissa Peterson
Global Counsel – Clean Fuels and Chemicals Licensing
Sulzer Pumps (US) Inc.
900 Threadneedle, Suite 800
Houston, Texas 77079
Melissa.peterson@sulzer.com

With copy to:

Ira Gottlieb
McCarter & English, LLP
100 Mulberry Street
4 Gateway Center
Newark, NJ 07102
igottlieb@mccarter.com
cbetz@mccarter.com

Cash-out Consent Decree                    38

## XVI.  RETENTION OF JURISDICTION

28.    This Court retains jurisdiction over both the subject matter of this Consent Decree and the Settling Parties for the purpose of interpreting or enforcing the terms of this Consent Decree.

## XVII.  INTEGRATION/APPENDICES

29.    This Consent Decree, including its appendices, constitutes the final, complete, and exclusive agreement and understanding with respect to the settlement embodied in this Consent Decree.  The Settling Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.  The following appendices are attached to and incorporated into this Consent Decree:

Appendix A identifies the properties for each Settling Defendant that are applicable to the definition of Covered Natural Resource Damages in Paragraph 3.b.

Appendix B is electronic wire transfer payment instructions, "U.S. Department of the Interior, Natural Resources Restoration Fund Assessment and Settlement Deposit Remittance Procedures."

Appendix C sets forth the amounts of natural resource damages and natural resource damage assessment past costs each Settling Defendant is to pay and reflects any prior payments made by each Settling Defendant as part of the Path C process.

## XVIII.  26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

30.    For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. §162(f)(2)(A)(ii), performance of Section VII (Payment of Covered Natural Resource Damages), Paragraphs 7, 9, 10, and 11; and Section XIV (Retention Of Records), Paragraphs 24 and 25, is restitution or required to come into compliance with law.

Cash-out Consent Decree                                    39

## XIX.  LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

31.    This Consent Decree will be lodged with the Court for a period of not less than thirty (30) days for public notice and comment.  Plaintiffs each reserve the right to withdraw or withhold their consent if the comments regarding the Consent Decree disclose facts or considerations that indicate this Consent Decree is inappropriate, improper, or inadequate. Settling Defendants waive all objection to, and consent to, the entry of this Consent Decree without further notice.

32.    If for any reason this Court declines to approve this Consent Decree in the form presented, this Consent Decree may be voided at the sole discretion of any Settling Party and, if so voided, the terms of the agreement shall not be used as evidence in any litigation between the Settling Parties.

## XX.  SIGNATORIES/SERVICE

33.    The Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice and each undersigned representative of the State, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe and each Settling Defendant certifies that he or she is authorized to enter into the terms and conditions of this Consent Decree and to execute and bind legally the Settling Party that he or she represents to this document.

34.    Settling Defendants agree not to oppose entry of this Consent Decree by this Court or to challenge any provision of this Consent Decree unless any Plaintiff has notified Settling Defendants in writing that it no longer supports entry of the Consent Decree.

Cash-out Consent Decree                    40

35.    Each Settling Defendant will identify on the attached signature page the name and address of an agent who is authorized to accept service of process by mail on behalf of it with respect to all matters relating to this Consent Decree.  Settling Defendants agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including but not limited to service of a summons.

## XXI.  FINAL JUDGMENT

36.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment between and among the United States, the State, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe, and Settling Defendants.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS 31st    DAY OF October    20 25.

_____
Michael H. Simon, U.S. District Court Judge

Cash-out Consent Decree                        41

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR THE UNITED STATES OF AMERICA

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530

_____    Date: _Oct. 30, 2023_
MICHAEL J. ZEVENBERGEN
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
c/o NOAA Damage Assessment
7600 Sand Point Way, NE
Seattle, Washington 98115
(206) 276-0037
michael.zevenbergen@usdoj.gov

_____    Date: _10-31-23_
FRED PHILLIPS
Senior Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
(202) 305-0439
frederick.phillips@usdoj.gov

Cash-out Consent Decree                42

ER-230

THE CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF
OREGON enters into this Consent Decree

FOR THE CONFEDERATED TRIBES OF GRAND RONDE

_Cheryle A. Kennedy_                              Date: _June 6, 2023_
CHERYLE KENNEDY,
Tribal Chairwoman
The Confederated Tribes of Grand Ronde
9615 Grand Ronde Road
Grand Ronde, OR 97338

_Holly R. Partridge_                              Date: _6/6/2023_
Holly Partridge
Senior Staff Attorney
The Confederated Tribes of Grand Ronde
9615 Grand Ronde Road
Grand Ronde, OR 97338
(503)879-2335
holly.partridge@grandronde.org

ER-232

THE NEZ PERCE TRIBE enters into this Consent Decree in *United States, et al. v. ACF Industries, LLC, et al.*

NEZ PERCE TRIBE
By:

_Samuel N. Penney_                    Date: _4-24-23_
Samuel N. Penney, Chairman
Nez Perce Tribal Executive Committee
P.O. Box 305
Lapwai, ID 83540


                                      Date: _4-24-23_
Shirley J. Allman, Secretary
Nez Perce Tribal Executive Committee
P.O. Box 305
Lapwai, ID 83540


_Julie Kane_                          Date: _4-24-23_
Julie Kane, Managing Attorney
Office of Legal Counsel
P.O. Box 305
Lapwai, ID 83540


                                      Date: _4-25-23_
Courtney Johnson
Crag Law Center
3141 E. Burnside St.
Portland, OR 97214
courtney@crag.org

ER-232

THE CONFEDERATED TRIBES OF SILETZ INDIANS enters into this Consent Decree in *United States, et al. v. ACF Industries, LLC, et al.*

CONFEDERATED TRIBES OF SILETZ INDIANS
By

_____          Date: ___4/21/23___
DELORES PIGSLEY,
Tribal Chairman
Confederated Tribes of Siletz Indians
201 SE Swan Avenue
PO Box 549
Siletz, OR 97380


_____          Date: ___4/21/23___
JULIE A. WEIS, ESQ.
Haglund Kelley LLP
2177 SW Broadway
Portland, OR 97201
(503) 225-0777
weis@hk-law.com

Cash-out Consent Decree                    45

THE CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION
enters into this Consent Decree in *United States, et al. v. ACF Industries, et al.*

CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION
By

Date: 8/18/23

N. KATHRYN BRIGHAM
Chair, Board of Trustees
Confederated Tribes of the Umatilla Indian Reservation
46411 Timíne Way
Pendleton, OR 97801

Date: 8/18/2023

JOSEPH R. PITT, ESQ.
OSB #081134
CTUIR Office of Legal Counsel
46411 Timíne Way
Pendleton, OR 97801
(541) 429-7404
joepitt@ctuir.org

Cash-Out Consent Decree

THE CONFEDERATED TRIBES OF WARM SPRINGS enters into this Consent Decree in *United States, et al. v. ACF Industries, LLC, et al.*

CONFEDERATED TRIBES OF WARM SPRINGS
By

JONATHAN W. SMITH Sr.,
Tribal Chairman
Confederated Tribes of Warm Springs
1233 Veterans Street
PO Box C
Warm Springs, OR  97761-3001

Date: _May 4, 2023_____

ELLEN H. GROVER, PARTNER.
Best Best & Krieger LLP
360 SW Bond Street
Bend, OR  97702
(541) 382-3011
Ellen.grover@bbklaw.com

Date: _May 4, 2023_____

JOSH NEWTON, PARTNER.
Best Best & Krieger LLP
360 SW Bond Street
Bend, OR  97702
(541) 382-3011
Josh.newton@bbklaw.com

Date: _May 4, 2023_____

Cash-out Consent Decree                    47

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR THE STATE OF OREGON, DEPARTMENT OF FISH AND WILDLIFE

Date: 7/5/23

Curt Melcher
Director
Oregon Department of Fish and Wildlife
4034 Fairview Industrial Drive SE
Salem, OR 97302

Attorney for the Oregon Department of Fish and Wildlife:

Gary Vrooman, OSB No. 075832
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201

Cash-out Consent Decree                    48

ER-236

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR ACF Industries, LLC:


**Mark A. Crinnion**
Vice President and General Counsel
ACF Industries, LLC
PO Box 900
Florissant, MO. 63032-0900
mcrinnion@acfindustries.com
(636) 949-2399


Date: March 30, 2023


Agent authorized to receive service of process by mail on behalf of ACF Industries, LLC. with respect to all matters relating to this Consent Decree:

Mark A. Crinnion
Vice President and General Counsel
ACF Industries, LLC
PO Box 900
Florissant, MO. 63032-0900
mcrinnion@acfindustries.com
(636) 949-2399


Cash-out Consent Decree                    49

ER-237

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Air Liquide America L.P.; Airgas USA LLC; Ash Grove Cement Company; Ashland, LLC; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules, LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; and Sulzer Pumps (US) Inc.*

FOR Air Liquide America L.P.

_____

Frederic Bergeret
Treasurer, Air Liquide America L.P.
Date: September 5, 2023
_____

FOR Airgas USA, LLC

_____

Frederic Bergeret
Chief Financial Officer, Airgas USA, LLC
Date: September 5, 2023
_____

Agent authorized to receive service of process by mail on behalf of Air Liquide America L.P. and Airgas USA, LLC with respect to all matters relating to this Consent Decree:

Michael Dailey
General Counsel, Airgas, Inc., an Air Liquide Company
259 Radnor Chester Road, Suite 100
Radnor, PA. 19087
(610) 263-2033
Michael.dailey@airgas.com

Cash-out Consent Decree                              50

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR Ash Grove Cement Company

_____
David M. Toolan
Assistant Secretary

Date: _____March 24, 2023_____

Agent authorized to receive service of process by mail on behalf of Ash Grove Cement Company with respect to all matters relating to this Consent Decree:

Chintan K. Amin
Deputy General Counsel
CRH Americas Law Group
CRH Americas, Inc.
900 Ashwood Parkway, Suite 600
Atlanta, Georgia 30338
**C** +1 (470) 618 1948
**E** chintan.amin@crh.com

Cash-out Consent Decree                                   51

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

**FOR Ashland Inc.**

*Robin E.Lampkin*
By:_____
Name: Robin E. Lampkin
Title: Vice President, Associate General Counsel and Chief Compliance Officer
Date: Mar 23, 2023

**FOR Hercules LLC**

*Robin E.Lampkin*
By:_____
Name: Robin E. Lampkin
Title: Assistant Secretary
Date: Mar 23, 2023

**FOR Valvoline Inc.**

*Julie O'Daniel*
By:_____

Name: Julie M. O'Daniel
Title: Senior Vice President, Chief Legal Officer and Corporate Secretary
Date: Mar 29, 2023

Agent authorized to receive service of process by mail on behalf of Ashland Inc., Hercules LLC and Valvoline Inc. with respect to all matters relating to this Consent Decree:

> Houlihan Law, PC
> Attn: John Houlihan
> 100 N. 35th St.
> Seattle, WA 98103
> Phone: 206-547-5052
> Email: john@houlihan-law.com

Cash-out Consent Decree                    52

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR Beazer East, Inc.

Digitally signed by Charles McChesney
DN: cn=Charles McChesney, o=Lehigh
Hanson, Inc., ou=Three Rivers Management,
Inc, email=Charles.McChesney@TRMI.Biz,
c=US
Date: 2023.03.31 11:13:40 -04'00'

Charles E. McChesney II, Esq.
Vice President & Secretary
Beazer East, Inc.
600 River Ave, Suite 200
Pittsburgh, PA 15212
Email: charles.mcchesney@trmi.biz
(412) 208-8839

Date: March 31, 2023

Agent authorized to receive service of process by mail on behalf of Beazer East, Inc. with respect to all matters relating to this Consent Decree:

Charles E. McChesney II, Esq.
Vice President & Secretary, Beazer East, Inc.
600 River Ave., Ste. 200
Pittsburgh, PA 15212
Email: charles.mcchesney@trmi.biz

Cash-out Consent Decree                    53

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR BNSF Railway Company

John Lovenburg
VP Environment & Sustainability
BNSF Railway Co.

Date: 03-23-2023

Agent authorized to receive service of process by mail on behalf of BNSF Railway Company with respect to all matters relating to this Consent Decree:

CT Corporation System
780 Commercial St. SE, STE 100
Salem, OR 97301

Cash-out Consent Decree                    54

ER-242

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR Calbag Metals Co.

Warren Rosenfeld
President, Calbag Metals Company

Date: 04/10/2023

Agent authorized to receive service of process by mail on behalf of Calbag Metals Co. with respect to all matters relating to this Consent Decree:

Jennifer Gates, Counsel for Calbag Metals Co.
Pearl Legal Group, PC
529 SW Third Ave., Suite 600
Portland, OR 97219
jgates@pearllegalgroup.com

Cash-out Consent Decree                55

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR ESCO Group LLC

Wes E. Wadle, Esq.
Litigation & Disputes Counsel, Americas
The Weir Group

Date: 4/13/23

Agent authorized to receive service of process by mail on behalf of ESCO Group LLC with respect to all matters relating to this Consent Decree:

Nicholas van Aelstyn
Four Embarcadero Center, 17th Floor
San Francisco CA 94111-4019
nvanaelstyn@sheppardmullin.com
(415) 774-2970

Cash-out Consent Decree                    56

ER-244

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR GOULD ELECTRONICS INC.

Dean Hattula
Chief Administrative Officer
Gould Electronics Inc.
2555 W Fairview St Suite 103
Chandler, AZ 85224

Date: 3/22/2023

Agent authorized to receive service of process by mail on behalf of Gould Electronics Inc. with respect to all matters relating to this Consent Decree:

Dean Hattula
Chief Administrative Officer
Gould Electronics Inc.
2555 W Fairview St Suite 103
Chandler, AZ 85224
Email: DHattula@gouldelectronics.com,
Phone: (480) 634-5317

Cash-out Consent Decree                    57

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR HAJ Inc. d/b/a Christenson Oil Company

Amy Mitchell
Bankruptcy Trustee

Date: 3/30/2023

Agent authorized to receive service of process by mail on behalf of HAJ Inc. d/b/a Christenson Oil Company with respect to all matters relating to this Consent Decree:

Amy Mitchell
Bankruptcy Trustee, Receiver, Disbursing Agent
Haj, Inc. d/b/a Christensen Oil Company
P. O. Box 2289
Lake Oswego, OR 97035

Cash-out Consent Decree                58

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR Koppers Inc.

Stephanie Apostolou
General Counsel and Secretary

Date: March 28, 2023

Agent authorized to receive service of process by mail on behalf of Koppers Inc. with respect to all matters relating to this Consent Decree:

Stephanie Apostolou
General Counsel and Secretary
Koppers Inc., 436 Seventh Avenue
Pittsburgh, PA 15219
ApostolouSL@koppers.com

With a copy to:
Alan S. Miller
Houston Harbaugh P.C.
Three Gateway Center, 22nd Floor
401 Liberty Avenue
Pittsburgh, PA 15222
milleras@hh-law.com

Cash-out Consent Decree                              59

ER-247

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LC; GWC Properties, LLC; GWC Front, LLC; and Tanker Basin LLC

Edgar S. McCall
Vice President, Risk Management
McCall Oil & Chemical Corporation
411 NW Park Ave, Suite 202
Portland, OR 97209
ted@mccallterminals.com
(503) 221-5880 x4

Date: _____ *March* 23, 2023 _____

Agent authorized to receive service of process by mail on behalf of McCall Oil & Chemical Corporation, McCall Oil Real Estate Company LLC, Morec Front LC, GWC Properties, LLC, GWC Front, LLC, and Tanker Basin LLC with respect to all matters relating to this Consent Decree:

Suzanne C. Lacampagne
Miller Nash LLP
US Bancorp Tower
111 SW Fifth Ave, Ste 3400
Portland, OR 97204
Email: Suzanne.Lacampagne@MillerNash.com
503.205.2448

Cash-out Consent Decree                    60

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR Northwest Pipe Company
*(fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company)*

_____

Scott J. Montross, President and CEO

Date: ___3/21/23_____

Agent authorized to receive service of process by mail on behalf of Northwest Pipe Company with respect to all matters relating to this Consent Decree:

Michael B. Merchant
Attorney for Northwest Pipe Company
Black Helterline LLP
805 SW Broadway, Suite 1900
Portland, OR 97205
mike.merchant@bhlaw.com
(503) 224-5560

Cash-out Consent Decree                    61

ER-249

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR Portland General Electric Company  *BJM*        *NKes*
                                                           BJM        MAE

_____
Maria Pope (Mar 27, 2023 07:51 PDT)

Maria Pope
President and Chief Executive Officer

Date:  03/27/2023
_____

Agent authorized to receive service of process by mail on behalf of Portland General Electric Company with respect to all matters relating to this Consent Decree:

Carolyn Walker
Managing Assistant General Counsel
121 SW Salmon St. 1 WTC 1301
Portland, OR 97204
Carolyn.Walker@pgn.com
503-464-7903

Cash-out Consent Decree                62

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR Portland Terminal Railroad Company

DocuSigned by:

*David Hughes*

55FBA78DF9ED44A...

_____

David W. Hughes
President, Portland Terminal Railroad Company Board of Directors

3/31/2023

Date: _____

DocuSigned by:

*Tania Bryan*

C4979AB7E4C347E...

_____

Tania Bryan
Director of Finance, Portland Terminal Railroad Company

4/3/2023

Date: _____

Agent authorized to receive service of process by mail on behalf of Portland Terminal Railroad Company with respect to all matters relating to this Consent Decree:

Elizabeth C. Knight
Partner, Dunn Carney Allen Higgins & Tongue LLP
Suite 1500, 851 SW Sixth Avenue | Portland, OR 97204
Direct (503) 306-5312
Email: eknight@dunncarney.com

Cash-out Consent Decree                 63

THE UNDERSIGNED PARTIES enter into this Consent Decree in *United States, et al. v. ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc., d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline Inc.*

FOR Sulzer Pumps (US) Inc.

DocuSigned by:

*Flavio Romero*

C7204C04F8EA431...

Flavio Romero
President, Sulzer Pumps (US) Inc.

Date: Mar-24-2023

Agent authorized to receive service of process by mail on behalf of Sulzer Pumps (US) Inc. with respect to all matters relating to this Consent Decree:

Melissa Peterson
Global Counsel – Clean Fuels and Chemicals Licensing
Sulzer Chemtech
900 Threadneedle, Suite 800
Houston, Texas 77079
Phone +1 346 207 9645
melissa.peterson@sulzer.com

Cash-out Consent Decree                    64

PORTLAND HARBOR CONSENT DECREE

<u>APPENDIX A</u>

Appendix A – ACF Industries LLC

The properties listed below are identified for ACF Industries LLC for purposes of this Consent Decree.  Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation.  Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference.  However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID number | Street Address | Assessor's Parcel Number | Alt Account Number | Notes |
|---|---|---|---|---|
| 68 | 12160 NW St. Helens Road | R325480 | R971340300 | See attached map |
| 68 | 12160 NW St. Helens Road | R325479 | R971340290 | See attached map |
| 68 | 12160 NW St. Helens Road | R325477 | R971340230 | See attached map |

ER-254

## Map Showing Area of Tax Parcels
## ACF Industries, 12160 NW St. Helens Road, Portland, OR



Property outline accessed from Multnomah County Oregon Property Records
website  13 July 2021:

https://www.portlandmaps.com/detail/property/NW-ST-HELENS-RD/R325477_did/

Appendix A – Air Liquide America L.P. and Airgas USA LLC

The properties listed below are identified for Air Liquide America L.P. and Airgas USA LLC for purposes of this Consent Decree.  Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation.  Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference.  However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID | Street Address | County Tax Parcel ID |
|---------|----------------|----------------------|
| 141 | 6529 NW Front Avenue | R961130330 |
| 203 | 3208 NW Yeon Avenue<br>3330 NW Yeon Avenue | R649701500<br>R941291430<br>R649701460<br>R941291710<br>R649701480<br>R941280950<br>R941291700 |
| 608 | 4959 NW Front Street | R941190500 |
| 639 | 2233 NW 23rd Avenue | R215300400<br>R215300420 |

ER-256

Appendix A – Ash Grove Cement Company

        The properties listed below are identified for **Ash Grove Cement Company** for purposes of this Consent Decree.  Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation.  Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference.  However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID number | Street Address | County Tax Parcel ID | Notes |
|---|---|---|---|
| Site 21 | 13939 N. Rivergate Blvd. | R325200 (alternate account no.: R971260190)<br><br>R646099 (alternate account no.: R971260191) | Includes the docks identified in the attached map. |
| Site 275 | 3737 N. Port Center Way | R316054 (alternate account no.: R941210770)<br><br>R237739 (alternate account no.: R649729850)<br><br>R646339 (alternate account no.: R649729801)<br><br>R646340 (alternate account no.: R941210771)<br><br>*Inactive former ID numbers, cancelled into R316054:*<br>R316051 (alternate account no.: R941210750)<br>R316011 (alternate account no.: R941210330)<br>R316000 (alternate account no.: R941210150) | Includes the docks identified in the attached map. |
| Site 275 | 2700 N. Port Center Way | R237733 (alternate account no.: R649729800) | Includes the docks identified in the attached map. |



Site 21 – 13939 N. Rivergate Blvd.



Site 275 – 3737 N. Port Center Way



Site 275 – 2700 N. Port Center Way

Appendix A – Hercules, LLC, Ashland, Inc., and Valvoline, Inc.

The properties listed below are identified for:

- Hercules, LLC, successor in interest to Hercules Incorporated;
- Ashland Inc., successor in interest as of August 1, 2022 to Ashland LLC (which was successor in interest to previous Ashland, Inc.); and
- Valvoline, Inc., the formerly wholly owned subsidiary of Ashland LLC

for purposes of this Consent Decree.  Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation. Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference.  However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID number | Street Address | County Tax Parcel ID | Notes |
|---|---|---|---|
| 123 | 7540 NW Helens Rd. | R961120420 R961121300 R961121120 R961121290 R961121310 R961121130 R961121230 R961130540 R961130410 | NW Natural Gas Co. Property associated with Hercules, LLC short term storage |
| 239 | 6650 N. Basin Avenue | R941171070 R941170970 R941171220 | Ashland Inc. formerly leased property |
| 271 | 6000 N. Cutter Circle | R605600160 | Ashland Inc. / Valvoline, Inc. formerly leased property |
| 279B | 2308 N. Clark Ave. | R009616030 R009616090 | Ashland Inc. / Valvoline, Inc. formerly owned property |
| 508 | 3366 NW Yeon Ave. | R941201260 R941290010 R941292120 | Hercules, LLC property |
| 509 | 3322 NW 35th Ave. | R941291370 | Ashland Inc. formerly leased property |
| 510 | 2800 NW 31st Ave. | R941291160 | Ashland Inc. formerly leased property |

Appendix A – Beazer East, Inc.

The properties listed below are identified for Beazer East, Inc. for purposes of this Consent Decree.  Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation.  Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference.  However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID number | Street Address | Assessor's Parcel Number | Alt Account Number | Notes |
|---|---|---|---|---|
| 123 | 7540 NW St. Helens Road | R502592 | R961130540 | See Figure 1 |
| 123 | 7540 NW St. Helens Road | R324213 | R961130410 | See Figure 1 |
| 123 | 7540 NW St. Helens Road | R324113 | R961120420 | See Figure 1 |
| 123 | 7540 NW St. Helens Road | R324165 | R961121230 | See Figure 1 |
| 123 | 7540 NW St. Helens Road | R324160 | R961121130 | See Figure 1 |
| 123 | 7540 NW St. Helens Road | R324172 | R961121310 | See Figure 1 |
| 123 | 7540 NW St. Helens Road | R324159 | R961121120 | See Figure 1 |
| 123 | 7540 NW St. Helens Road | R324171 | R961121300 | See Figure 1 |
| 123 | 7540 NW St. Helens Road | R324170 | R961121290 | See Figure 1 |

ER-260



**Figure 1
Portland Harbor, Oregon**

Site123

N
W E
S

150    0    150    300
Feet

*Data Source:  PortlandMaps.com
Photo Source:  USDA*

ER-261

Appendix A – Identification of BNSF Railway Company Properties

The locations and extent of BNSF Railway Company (BNSF) properties, including historical and current ownership and/or operations areas, are identified in this Appendix A for purposes of matters addressed in this Consent Decree.  Identification is made by both (1) tax parcel numbers from the Multnomah County Department of County Management Assessment and Taxation to the extent applicable, and (2) as contained within the green defined locations on the referenced attached Maps 1-3 on pages 4-6 below, which also encompass some locations that do not necessarily have tax parcel numbers (for example, the BNSF Railroad Bridge and certain current streets areas).  Where certain property areas have had changes in tax numbers due to transactions or redevelopment, both current and former tax parcel numbers are listed where known for clarity.  The listed Site ID numbers are numbers which were designated by the Trustees and have been included for reference. The boundaries of some Site ID locations contained in Map 3 no longer exactly conform to current tax numbers for reasons noted above regarding changes in applicable tax numbers.

| Trustees' Site ID number | Street Address | Current or Former County Tax Parcel Number |
|---|---|---|
| **BNSF Wye/Railroad Bridge Area[1] (Including Map 1, Appendix A, p.4)** | | |
| 130 | Wye parcel: 6330-6346 NW St. Helens Rd | Wye parcel: R961130020 |
| **BNSF Willbridge Switching Yard (Including Map 1, Appendix A, p. 4)** | | |
| 192 | 5814 NW Doane Ave. | R941190510 |
| 192 | 5814 NW Doane Ave. | R941190520 |
| 192 | 5814 NW Doane Ave. | R941190530 |
| | | |

---

[1] "Wye" is a descriptive term for the area containing segments of BNSF mainlines and part of Doane Lake, and connecting with the west end of BNSF's railroad bridge across the Willamette River.  The tax number for most of the Wye is R961130020.  While no mailing address or any sort of office exists at the Wye, Portland Maps lists address numbers "6330-6346 NW St. Helens Road" for the Wye area.  The mainline segment on the west border of the Wye parcel and the connecting BNSF bridge and its east end embankment, included in Maps 1 and 2, have no tax parcel number or address.

| Trustees' Site ID number | Street Address | Current or Former County Tax Parcel Number |
|---|---|---|
| **Guilds Lake Yard/BNSF Hub Center² Area (Including Maps 1 and 2, Appendix A, pp. 4 and 5)** | | |
| 197 | 3500 NW Yeon Ave. | R941190010 |
| 197 | 3500 NW Yeon Ave. | R941190040 |
| 197 | 3500 NW Yeon Ave. | R941190170 |
| 197 | 3500 NW Yeon Ave. | R941190180 |
| 197 | 3500 NW Yeon Ave. | R941190350 |
| 197 | 3500 NW Yeon Ave. | R941190560 |
| 197 | 3500 NW Yeon Ave. | R941190570 |
| 197 | 3500 NW Yeon Ave. | R941190580 |
| 197 | 3500 NW Yeon Ave. | R941190590 |
| 197 | 3500 NW Yeon Ave. | R941190600 |
| 197 | 3500 NW Yeon Ave. | R941190610 |
| 197 | 3500 NW Yeon Ave. | R941190660 |
| 197 | 3500 NW Yeon Ave. | R941190670 |
| 197 | 3500 NW Yeon Ave. | R941190830 |
| 197 | 3500 NW Yeon Ave. | R941200040 |
| 197 | 3500 NW Yeon Ave. | R941201230 |
| 197 | 3500 NW Yeon Ave. | R941201250 |
| 197 | 3500 NW Yeon Ave. | R941280360 |
| 197 | 3500 NW Yeon Ave. | R941290680 |
| 197 | 3500 NW Yeon Ave. | R941290730 |
| 197 | 3500 NW Yeon Ave. | R941292130 |
| **Former BNSF Hoyt Street Railyard (Including Maps 1 and 3, Appendix A, pp. 4 and 6)** | | |
| 316G | NW 9th Ave. | R001500010 |
| 316G | NW 9th Ave. | R180220350 |
| 316G | NW 9th Ave. | R180220354 |
| 316G | NW 9th Ave. | R180222160 |
| 316G | NW 9th Ave. | R180222190 |
| 316G | NW 9th Ave. | R405841300 |
| 316G | NW 9th Ave. | R883801710 |
| 316G | NW 9th Ave. | R405841350 |
| 316G | NW 9th Ave. | R405841400 |
| 316G | NW 9th Ave. | R405841450 |
| 316G | NW 9th Ave. | R405840750 |
| 316G | NW 9th Ave. | R405841500 |

---

² BNSF's Hub Center has operated and operates on a leased portion of some of or parts of the listed tax parcels within Guilds Lake Yard. The address for the BNSF Hub Center is 3930 NW Yeon Ave.

| Trustees' Site ID number | Street Address | Current or Former County Tax Parcel Number |
|---|---|---|
| **Former BNSF Hoyt Street Railyard (Including Maps 1 and 3, Appendix A, pp. 4 and 6) (continued)** | | |
| 316G | NW 9th Ave. | R405841550 |
| 316G | NW 9th Ave. | R405841600 |
| 316G | NW 9th Ave. | R405841650 |
| 316H | NW 9th Ave. | R405841250 |
| 316H | NW 9th Ave. | R405841700 |
| 316H | NW Overton & NW 11th Ave. | R405840780 |
| 316I | NW 9th Ave. | R179750010 |
| 316I | NW 9th Ave. | R405840900 |
| 316I | NW 9th Ave. | R405840950 |
| 316I | NW 9th Ave. | R405841000 |
| 316I | NW 9th Ave. | R405841050 |
| 318G | NW 9th Ave. | R252050010 |
| 318G | NW 9th Ave. | R405840790 |
| 318G | NW 9th Ave. | R405841200 |
| 333I | NW 9th Ave. | R405840800 |
| 333I | NW 9th Ave. | R405840850 |
| 335I | NW 9th Ave. | R405840350 |
| 335I | NW 9th Ave. | R405840400 |
| 623H | NW 9th Ave. | R405840770 |
| 623H | NW 9th Ave. | R405840764 |
| 623I | NW 9th Ave. | R405840010 |
| 624I | NW 9th Ave. | R564380010 |
| 625I | NW 9th Ave. | R494200010 |
| 626I | NW 9th Ave. | R659520010 |
| 627I | NW 9th Ave. | R102280010 |
| 628F | 900 NW Lovejoy St. | R652720880 |
| 628F | 900 NW Lovejoy St. | R652720910 |
| 637 | 920 NW Kearney St. | R652720940 |
| 637 | 920 NW Kearney St. | R652720970 |
| 638 | 1020 NW 12th Ave. | R801600010 |

ER-264



**BNSF Wye/Railroad Bridge Area (130)**

**BNSF Willbridge Switching Yard (192)**

**Guilds Lake Yard/BNSF Hub Center Area (197) (see Map 2)**

**Former BNSF Hoyt Street Railyard (see Map 3)**

Notes:
Map depicts locations and extent of BNSF properties, including historical and current ownership and/or operations areas covered under the Consent Decree. The Table on pages 1-3 of this Appendix A presents tax parcel numbers to the extent applicable to locations within the green shaded areas. Some locations within the green shaded areas do not have tax parcel numbers and are included by depiction for coverage under the Consent Decree.

BNSF Current and/or Historical Ownership and/or Operations Areas

Basemap Source: Esri World Topographic Map

0    1,500    3,000
Feet

(197) = Trustees' Site ID Number

**BNSF Appendix A, Map 1.**
BNSF Current and/or Historical Ownership and/or Operations Areas

integral
consulting inc.



Notes:
Map more particularly depicts locations and extent of Guilds Lake Yard/BNSF Hub Center area properties, including historical and current BNSF ownership and/or operations areas covered under the Consent Decree. The Table on pages 1-2 of this Appendix A presents tax parcel numbers to the extent applicable to locations within the green shaded areas. To the extent that there may be locations within the green shaded areas that do not have tax parcel numbers, they are included by depiction for coverage under the Consent Decree.

**Guilds Lake Yard/BNSF Hub Center Area (197)**

BNSF Current and Historical Ownership and/or Operations Areas

Basemap Source: Esri World Topographic Map

0    750    1,500
Feet

N

(197) = Trustees' Site ID Number

**BNSF Appendix A, Map 2.**
Guilds Lake Yard/BNSF Hub Center Current and Historical Ownership and/or Operations Areas

integral
consulting inc.

ER-266



Notes:
Map more particularly depicts locations and extent of the former BNSF Hoyt Street Railyard historical ownership and/or operations areas covered under the Consent Decree. The Table on pages 2-3 of this Appendix A presents current and former tax parcel numbers to the extent applicable to locations within the green shaded areas. Some locations within the green shaded areas do not have tax parcel numbers and are included by depiction for coverage under the Consent Decree.

UN = Unnumbered parcel added by Trustees without assignment of a Trustees' Site ID number.

BNSF Historical Ownership and/or Operations Areas

Basemap Source: Esri World Topographic Map

0    175    350    Feet    N

316G = Trustees' Site ID Number

**BNSF Appendix A, Map 3.**
BNSF Former Hoyt Street Railyard Historical Ownership and/or Operations Areas

integral
consulting inc.

Appendix A – Calbag Metals Company

Appendix A identifies the properties for each Settling Defendant that are applicable to the definition of Covered Natural Resource Damages in Paragraph 3.b. of this Consent Decree. Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation. Where available, the current Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference. However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID | County Tax Parcel ID | Street Address | Alternative Account Number |
|---|---|---|---|
| 467 | R490749 R490521 R646107 R286791 R286790 R286793 R286792 | 2495 NW Nicolai St (including NW 25th Ave alley) 2622 NW 25th Place | R941292191 R941292190 R941292192 R829100150 R829100140 R829100190 R829100170 |
| 653 | R295994 | 2500 NW Nicolai Street | R861700530 |
| 652 | R682748 | 2615 NW Industrial Street a/k/a 2530 NW 25th Place | R941292220 |
| 512 | R316519 R650129 R650127 | 2710 NW Industrial Street | R941291940 R941291942 R941291941 |
| 563 | R316353 | 2455 NW Nicolai Street | R941280830 |
| 572 | R174666 R174668 R636480 | 3441 NW Guam Street | R347602940 R347602943 R347602946 R941291910 |
| 61 | R325522 R123693 | 12005 N. Burgard Road | R971350710 R118300200 |
| 194 | R315830 | 4927 NW Front Avenue | R941190450 |

ER-268

Appendix A – ESCO Group LLC

The properties listed below are identified for ESCO Group LLC for purposes of this Consent Decree.  Properties are identified by the Multnomah County property tax ID and assessor map and lot number.    The street address as well as either the Site ID number or, where applicable, the ESCO ID number, are listed for each property in order to provide additional context and reference.  However, the property boundaries are based on the current assessor map and lot number, not the street address, the Site ID number or the ESCO ID number.

| Site ID / ESCO ID | Street Address | Property Tax ID | Alternate Account Number | Assessor Map and Lot Number |
|---|---|---|---|---|
| 138 | 6900 NW Front Ave. | R324216 | R961130440 | 1N1W13A 00500 |
| 203 | 3200 and/or 3208 NW Yeon Ave. | R236763 R236762 R236761 | R649701500 R649701480 R649701460 | 1N1E29AA 01400 1N1E29AA 01500 1N1E29AA 01600 |
| 215 | 2211 NW Brewer St.; 2760 NW Yeon Ave.; 2770 NW Yeon Ave. | R316299 R646139 R316331 R316323 R493040 | R941280050 R941280531 R941280530 R941280410 R941281060 | 1N1E28BC 01500 1N1E28BC 01600A1 1N1E28BC 01600 1N1E28BC 01400 1N1E28BC 01601 |
| 224 | 2245 NW Suffolk St. | R119093 | R094600010 | 1N1E28BC 00700 |
| 304 | 1650 NW Naito Parkway | R699148 | R649911100 | 1N1E28DD 00402 |
| 566 | 2407 NW 28th Ave. | R266228 R266229 | R748500100 R748500150 | 1N1E29DB 00600 1N1E29DB 00700 |
| 572 | 3136 NW 35th Ave. | R174666 R174668 R636480 | R347602940 R347602943 R347602946 | 1N1E29BA 00700 |
| 609 | 2535 NW 28th Ave. | R186833 | R414900490 | 1N1E29DB 00400 |
| 639 | NW Corner 23rd and NW Roosevelt St. | R148111 | R215300420 | 1N1E28CB 03000 |
| ESCO Site A | 2141 NW 25th Ave. | R316317 | R941280370 | 1N1E28C 00100 |
| ESCO Site B | 2141 NW 25th Ave. | R227128 R227136 | R612701390 R612701560 | 1N1E29DD 01600 1N1E29DD 00100 |
| ESCO Site F | 2300 NW 26th Ave.; 2127 NW 26th Ave.; 2635 NW Wilson St. | R316501 R316509 R316491 | R941291680 R941291750 R941291530 | 1N1E29DA 01900 1N1E29DA 01400 1N1E29DA 01300 |
| ESCO Site H | 2404 NW Nicolai St. | R295992 | R861700010 | 1N1E28CB 00700 |
| ESCO Site I | 2414 NW Nicolai St. | R295993 | R861700170 | 1NIE28CB 00800 |

| Site ID / ESCO ID | Street Address | Property Tax ID | Alternate Account Number | Assessor Map and Lot Number |
|---|---|---|---|---|
| ESCO Site K | 2539 NW Vaughn St. | R227129 | R612701410 | 1N1E29DD 00200 |
| ESCO Site L | Part of 2300 NW 26th Ave. | R316445 | R941291050 | 1N1E29DA 01800 |
| ESCO Site M | 2300 NW 26th Ave. | R316380 | R941290100 | 1NIE29DA 01700 |
| ESCO Site O | SW Corner 23rd and NW Roosevelt St. | R148103 | R215300280 | 1N1E28CB 03100 |
| ESCO Site P | 2321 NW Roosevelt St. | R148112 | R215300450 | 1N1E28CB 02900 |
| ESCO Site Q | 2133 NW York St. | R269737 R269738 | R766001590 R766001610 | 1N1E28CA 02900 1N1E28CA 03000 |
| ESCO Site R | 2306 NW Reed St. | R148122 | R215300840 | 1N1E28CB 01900 1N1E28CB 02000 1N1E28CB 02100 |
| ESCO Site T | 2380 NW Roosevelt St. | R148109 | R215300380 | 1N1E28CB 03700 |
| ESCO Site U | NE Corner 24th and NW Roosevelt St. | R148113 | R215300460 | 1N1E28CB 02800 |
| ESCO Site X | 2211 NW York St. | R269746 | R766001970 | 1N1E28CA 04600 |
| ESCO Site Y | 2249 NW York St. | R269745 R649663 R269744 | R766001950 R766001890 | 1N1E28CA 04200 1N1E28CA 04300 |
| ESCO Site AA | 2335 NW 23rd Pl. | R148127 | R215300970 | 1N1E28CB 01500 |
| ESCO Site BB | 2345 NW Nicolai St. | R316333 R316351 R316319 | R941280550 R941280810 R941280390 | 1N1E28BC 01900 1N1E28BC 02000 1N1E28BC 02100 |
| ESCO Site CC | 2400 NW 23rd Pl.; 2425 NW 23rd Ave. | R651952 R651953 | R766002231 R766002232 | 1N1E28CB 00100A1 1N1E28CB 00100A2 |
| ESCO Site DD | 2425 NW 23rd Pl. | R269747 | R766002070 | 1N1E28CB 00300 |

Appendix A – Gould Electronics Inc.

The properties listed below are identified for Gould Electronics Inc for purposes of this Consent Decree.  Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation.  Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference.  However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID number | Street Address | County Tax Parcel ID |
|---|---|---|
| Site 140 | 5909 NW 61st Avenue | R961130350 |

ER-271

Appendix A – HAJ, Inc.

        The properties listed below are identified for HAJ, INC. d/b/a CHRISTENSON OIL COMPANY for purposes of this Consent Decree.  Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation.  Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference.  However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID number | Street Address | Multnomah County Tax Parcel ID | State ID |
|---|---|---|---|
| 503 | 3821 NW St. Helens Road Portland, Oregon 97210 | R253424 (Alt. Acct. #: R697400830) R253423 (Alt. Acct. #: R697400800) R253422 (Alt. Acct. #: R697400770) | 1N1E19DD-01200 1N1E19DD-01300 1N1E19DD-01400 |
| 503 | 3865 NW St. Helens Road Portland, Oregon 97210 | R315874 (Alt. Acct. #: R941190980) | 1N1E19DC-00500 |

**Appendix A – Koppers Inc.**

The properties listed below are identified for Koppers Inc. for purposes of this Consent Decree. Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation. Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference. However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID number | Street Address | County Tax Parcel ID | | Notes |
|---|---|---|---|---|
| 123 | 7540 NW St Helens Road, Portland, OR | R961120420 | (R324113) | [See attached map] |
| | | R961121300 | (R324171) | |
| | | R961121120 | (R324159) | |
| | | R961121290 | (R324170) | |
| | | R961121310 | (R324172) | |
| | | R961121130 | (R324160) | |
| | | R961121230 | (R324165) | |
| | | R961130540 | (R502592) | |
| | | R961130410 | (R324213) | |

Koppers Inc. Released Facilities:

1.    Gasco dock – River Mile 6.3

2.    NPDES Permit No. 100419, replaced by NPDES Permit No. 101003 and then NPDES Permit No. 101642; Outfall No. 001, River Mile 6.5.

      See attached map at ● for 1 and 2.

ER-273





Appendix A – McCall Oil

The properties listed below are identified for McCall Oil and Chemical Corporation, McCall Oil Real Estate Company LLC, Morec Front LLC, GWC Properties, LLC, GWC Front, LLC, and Tanker Basin LLC, for purposes of this Consent Decree. Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation. Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference. However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID number | Street Address | Assessor's Parcel Number | Alt Account Number | Notes |
|---|---|---|---|---|
| 136 | 5480 NW FRONT AVE | R315786 | R941180260 | See Figure 1 |
| 136 | 5540-5740 NW FRONT AVE | R315779 | R941180170 | See Figure 1 |
| 136 | 5700 NW FRONT AVE | R315872 | R941190960 | See Figure 1 |
| 136 | 5480 NW FRONT AVE | R315897 | R941191270 | See Figure 1 |



ER-276

Source: Tax District and Map Image Viewer http://multco.maps.arcgis.com

LEGEND:

▬▬▬▬  Approximate Parcel Boundary

– – – –  Approximate Property Boundary

Figure 1

**PARCEL MAP
McCALL OIL AND
CHEMICAL CORPORATION
PORTLAND, OREGON**

SCALE    FEET
150    0    150    300

Pristine Earth, Inc.
Engineering Solutions for a Cleaner Environment

<u>Appendix A – Northwest Pipe Company</u>

The properties listed below are identified for NORTHWEST PIPE COMPANY fka NORTHWEST PIPE & CASING COMPANY and NORTHWEST PIPE AND CASING COMPANY ("NW Pipe") for purposes of this Consent Decree.  Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation.  Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference.  However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Street Address | County Tax Parcel ID | Notes |
|---|---|---|
| 12005 N Burgard Rd | Alt. Acct Nos. R971350469; R971350460 | Main Site ID Nos. are 62 and #607 See attached map – Areas B through I |
| 9040 N. Burgard Way | Alt. Account No. R971350740 | See attached map – Area R |
| 12005 N Burgard Rd | Alt. Account No. R971350340 | Main Site ID Nos. are 62 and #607 See attached map – Area A |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct. No. R118300100 | See attached map – Area K |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct. No. R118300800 | See attached map – Area L |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct. No. R118300700 | See attached map – Area M |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct No. R118300100 | See attached map – Area N |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct No. R118300200 | See attached map – Area O |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct No. R118300300 | See attached map – Area P |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct No. R118300200 | See attached map – Area Q |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct No. R118300100 | See attached map – Far west portion of Area K |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct No. R118300100 | See attached map – Area J |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct No. R971350710 and R118300200 | See attached map – Area S |
| 12005 N Burgard Rd | Assoc. w/ Alt. Acct No. R118300200 | See attached map – Area T |
| 9125 N Time Oil Rd | Assoc. w/ Alt. Acct Nos. R118300700, R118300800 | See attached map –Portion of southern Areas M and L |

ER-277



**Appendix A: Property of Portland General Electric Company (PGE) and identified spills or releases**

This Appendix A, including Exhibits A-1, A-2 and A-3, contains the descriptions of real and personal property and identified spills and releases and is intended to comprehensively describe all such property and spills or releases included within Appendix A and subject to the Consent Decree through the date of entry of the Consent Decree. PGE's distribution network is found throughout the PGE Distribution Network Area Boundary as delineated by the line on the maps provided in Exhibits A-1 and A-2. The distribution network includes but is not limited to poles, towers, transmission and distribution lines, substations, submerged or underground cables and lines, transformers, capacitors, switches, reclosers and vaults, that together distribute or have distributed power to PGE customers. PGE constructed, installed, or acquired the various portions of the distribution network at various times including portions acquired, constructed, and installed by PGE predecessor companies prior to 1930 and by PGE after 1930; and portions acquired from Pacific Power & Light in a territory swap.

**Part 1: PGE Current and Historically-Owned or Operated Properties**

The following properties and facilities are currently or previously owned or operated by PGE and are included within Appendix A and subject to the Consent Decree. The properties specified include all facilities, equipment and service areas located within the properties, including but not limited to, any poles, towers, transmission and distribution lines, substations, submerged or underground cables and lines, transformers, capacitors, switches, reclosers and vaults, at these locations, that together distribute power to PGE customers.

| Property Description[1] | Portland Harbor Trustee Designated Site ID | Address | Property ID | State ID | Multnomah County Alternate Tax No. |
|---|---|---|---|---|---|
| Harborton Property and Substation | 45 | 12500 NW Marina Way And near 12430 NW St. Helens Rd. | R325467 R325472 R325470 R504043 R325468 R325474 | 2N1W3400100 2N1W3400300 2N1W3401000 2N1W3400800 2N1W3401100 2N1W3401800 | R971340100 R971340180 R971340160 R971340410 R971340130 R971340200 |
| Rivergate Substation and adjacent historic property | 47 | 8920 N. Time Oil Rd. 8849 N. Burgard Way 12299 N. Burgard Rd. | R325485 R325504 R325526 R325506 R325530 | 2N1W35B01700 2N1W35A00800 2N1W35D00200 2N1W35A00900 2N1W35D00100 | R971350100 R971350480 R971350730 R971350520 R971350750 |
| Wacker Substation | 125 | 7200 NW Front Ave. | R324183 R324219 | 1N1W1301200 1N1W13A00100 | R961130010 R961130480 |

---

[1] Properties are described by name, address and other identifying information, if available. Property addresses, lot lines, IDs and tax numbers may have changed over time. Property Id, State ID and Alternate Tax Numbers are provided if associated with the property.

| | | | | | |
|---|---|---|---|---|---|
| Crawford St. Corporation Site (historic property (v)) | 126 | 8524 N. Crawford St. | R263881 R263877 R263876 R263878 R263880 R263874 R263875 | 1N1W12BD05500 1N1W12BD05900 1N1W12BD05800 1N1W12BD05700 1N1W12BD05600 1N1W12CA00200 1N1W12CA00300 | R739101320 R739100920 R739100840 R739101000 R739101160 R739100250 R739100380 |
| Pennwalt Substation (historical ownership) | 131 | 6400 NW Front Ave. | R553604 R553602 R553603 R553605 R553606 R553814 R531501 | 1N1W1300204 1N1W1300207 1N1W1300203 1N1W1300205 1N1W1300206 1N1W1300202 1N1W1300201 | R617400100 R617400010 R617400050 R617400150 R617400200 R961130590 R961130580 |
| Willbridge Substation | 148 | 6215 NW St. Helens Rd. 6333 NW St. Helens Rd. 6411 NW 64th Ave. | R702526 R308300 R308301 R308311 R308310 R308302 R308291 R308303 R308292 R308299 R308295 R308297 R308294 | 1N1W13DB01401 1N1W13DB02200 1N1W13DB02300 1N1W13DB01900 1N1W13DB01800 1N1W13DB02400 1N1W13DB02500 1N1W13DB03200 1N1W13DB02600 1N1W13DB03100 1N1W13DC01500 1N1W13DB02900 1N1W13DB02700 | R64991 R915502150 R915502250 R915502750 R915502710 R915502300 R915501800 R915502310 R915501830 R915502130 R915501890 R915502010 R915501870 |
| Station N (historical ownership) | 155 | 5828 N. Van Houten Pl. | R315775 R248488 | 1N1E1800100 1N1E1800300 | R941180100 R669907720 |
| Zidell/Emery (historic property (ix)) | 181 | 4950, 5034, and 5200 NW Front | R315893 R238223 R315838 R238220 R238218 | 1N1E19A00100 1N1E19A00900 1N1E19A01500 1N1E19A01100 1N1E19A01000 | R941191230 R649741630 R941190540 R649741620 R649741610 |
| Yeon Property (historical ownership) | 193 | Near 4400 Block NW St. Helens Rd. southwest of junction of NW Yeon Ave. and NW St. Helens Rd. | R315857 R315880 | 1N1E19CA00100 1N1E19CA00200 | R941190770 R941191080 |

| | | | | | |
|---|---|---|---|---|---|
| Station E (historical ownership) | 220, 221, 229 | 2700 NW Front Ave. 2635 NW Front Ave. 2101 NW Reed St. | R316362 R316311 R269766 R269767 R269763 R269760 R269761 R269762 | 1N1E28B00600 1N1E28B00800 1N1E28BD00500 1N1E28BD00400 1N1E28CA03100 1N1E28CA03200 1N1E28CA03400 1N1E28CA03500 | R941280900 R941280300 R766003080 R766003120 R766002840 R766002720 R766002750 R766002800 |
| Swan Island Substation | 250 | 5500 N. Basin Rd. | R315598 | 1N1E16CC01900 | R941160200 |
| De Wolf Properties LLC (historical ownership) | 289 | 2303 N. Randolph Ave. | R102681 | 1N1E27CB01500 | R009616580 |
| Summit Properties (historic property (xii)) | 305 | 1462 NW Front Ave. (NW Naito Pkwy) | R298548 | 1N1E27CC00200 | R883803120 |
| Longview City Laundry (historic property (vi)) | 481, 528, 585 | 2801 NW Nela St. 2817 NW Nela St. 2950 NW 29th Ave. 2900 NW 29th Ave. | R316473 R316451 R316449 R316444 R316515 | 1N1E29AC00300 1N1E29AC00400 1N1E29AC00200 1N1E29AC00100 1N1E29AD01000 | R941291260 R941291110 R941291090 R941291040 R941291830 |
| Williams Cindy (historical ownership) | 620 | 3660 NW Front Ave. 3628 NW Front Ave. | R315957 R315944 | 1N1E20DD00300 1N1E20DD00100 | R941201040 R941200870 |
| Linnton Substation (historical ownership) | 629 | Intersection of NW Hoge Ave. and NW St. Helens Rd. | Unknown | Unknown | Unknown |
| Hawthorne Shop (historic ownership) | | 1510 SE Water Ave. | R275770 R275768 R275769 R275767 | 1S1E03DA1300 1S1E03DA1100 1S1E03DA01000 1S1E03DA01200 | R794001000 R794000920 R794000990 R794000900 |
| Station L (historic ownership) | | 1945 SE Water Ave. 1701 SE Water Ave. 211 SE Caruthers St. | R504993 R326765 R326764 R326759 R326766 R326758 R490515 | 1S1E03D00101 1S1E03D00100 1S1E03D00200 1S1E03D00500 1S1E03D00400 1S1E03D00300 1S1E03D00301 | R991030800 R991030760 R991030750 R991030700 R991030770 R991030690 R991030790 |

| | | | | | |
|---|---|---|---|---|---|
| | | 2015 SW Water Ave. 2201 SE 2nd Pl. | R247366 R247367 R247368 R247369 R657640 R657638 R657639 | 1S1E03DD00600 1S1E03DD00500 1S1E03DD00200 1S1E03DD00300 1S1E03DD00301 1S1E03DD00202 1S1E03DD00203 | R668200050 R668200100 R668200150 R668200200 R668200210 R668200170 R668200180 |
| Fulton Substation (historic ownership) | | 0540 SW Nevada St. (540 S. Nevada St.) | R590739 R582379 | 1S1E22BD80000 1S1E22BD00101 | R521900010 R649862490 (historic boundary does not correspond exactly to modern tax lot) |
| Jefferson Substation (historic ownership) | | 1236 SW 1st Ave. | R681278 | 1S1E03BD03500 | R667701394 |
| Riverview Substation and adjacent historic property | | Near 600 SW Taylors Ferry Rd. and 7606 SW Fulton Park Blvd. | R330295 R330286 R167136 R330318 | 1S1E22BD05300 1S1E22BD05400 1S1E22BD05700 1S1E22BD05500 | R991220330 R991220190 R300405510 R991220590 |
| Rose City Core Building | | 3100 NW Industrial St. | R174627 | 1N1E29CA00600 | R347600340 |
| Stephens Substation | | 1830 SE Water Ave. | R326733 | 1S1E03DA04400 | R991030210 |
| World Trade Center | | 121 SW Salmon St. 25 SW Salmon St. 26 SW Salmon St. | R245931 R245917 R245918 | 1S1E03BA02100 1S1E03BA00200 1S1E03BD00200 | R667702030 R667700830 R667700970 |
| Marquam Substation | | 2521 S. Water Ave | R128841 | 1S1E10BA05000 | R140905240 |
| Historic Property (ii) | | 2611 SE 4th Ave. | R197256 | 1S1E10AA00600 | R448700650 |
| Historic Property (iii) | | 101 through 119 SW Main and 1031 through 1037 SW 1st Ave. | R245930 | 1S1E03BD00300 | R667701850 |

| Historic Property (vii) | 189, 205 | 3710 NW Front 3657 NW Front | R315900 R315954 | 1N1E20DD00200 1N1E20DD00400 | R941200060 R941200980 |
|---|---|---|---|---|---|
| Historic Property (viii) | | 7560 and 7568 SW La View Dr. (7560 and 7568 S. La View Dr.) | R166807 R167128 | 1S1E22BD06100 1S1E22BD06000 | R300100540 R300405390 |
| Historic Property (x) | | Near SW Montgomery St. and SW Water Ave | Unknown | Unknown | R77750310 |
| Historic Property (xi) | | Northeast Corner of SW 1st and SW Alder St. | R245899 | 1S1E03BA01000 | R667700010 |
| Historic Property (xiii) | 289 | Near N. Loring and N. Randolph 2303 N. Randolph | R102681 | 1N1E27CB01500 | R009616580 |
| Historic Property (xiv) | | Near SE Main and SE Water St. | R676298 | 1S1E03AD03603 | R649672090 |
| Historic Property (xv) | | Between SW 1st Ave. and 2nd on SW Ash St. | R246026 R246021 R246025 | 1N1E34CD01800 1N1E34DC02400 1N1E34CD01900 | R667704300 R667704220 R667704280 |
| Historic Property (xvi) | | SW Macadam, Fulton District, Near SW Miles Pl. | R330343 | 1S1E22AC04800 | R991220920 |

**Part II: Map of Portland General Electric Company Distribution Network**

In addition to the real properties specified in Part I of this Appendix A where PGE distribution network equipment and property may be or was historically located on properties currently or formerly owned or operated by PGE, maps of the distribution transformers (network, overhead, and underground), cable crossings, and PGE current and historical properties within the PGE Distribution Network Area Boundary that were used in estimating PGE's natural resource damage allocation are provided as Exhibits A-1 and A-2 to this Appendix A.  The equipment indicated in Exhibit A-2, and all poles, towers, transmission and distribution lines, submerged or underground cables and lines, transformers, capacitors, switches, reclosers, vaults and other PGE equipment located within the PGE Distribution Network Area Boundary indicated on the map in Exhibit A-1 but not specifically indicated in Exhibit A-2, are included within this Appendix A and subject to the Consent Decree.  This Appendix A includes all releases of hazardous substances or pollutants from that equipment or activities associated with that equipment (including

but not limited to: installation, use, maintenance, and replacement or removal of equipment; spill response; and periodic removal of water accumulated in vaults).

**Part III: Activities and releases**

In addition to releases of hazardous substances or pollutants from real properties specified in Part I of this Appendix A, and from the distribution network transformers and other equipment identified in Part II of this Appendix A, Part III of this Appendix A is a table of spills and releases covering the period between July 1979 and September 2020 from PGE's distribution network, submerged cables and miscellaneous activities, described as "PGE Total Distribution Network Equipment and Related Spills and Releases within the PGE Distribution Network Area Boundary" in Exhibit A-3 to this Appendix A.  In addition to the spills identified in Exhibit A-3, this Appendix A and the Consent Decree also includes releases of hazardous substances or discharges of pollutants from spills prior to July 1979 within the PGE Distribution Network Area Boundary shown in Exhibit A-1.



Sources: ESRI 2019 − ArcGIS Data Basemaps.pdf; AEGIS 2020 − DC736 FFIDs.pdf; APGIS 2019 − DC1019 Willamette Navigation.pdf.

**Legend**

→ River Flow Direction

— River Mile

▢ PGE Distribution Network
Area Boundary

▢ Navigation Channel

JUNE 2022

**Exhibit A-1**

PGE DISTRIBUTION
NETWORK AREA BOUNDARY
PORTLAND, OREGON

ER-285



Sources: PGE0163453 (RLIS Data, 06/28/2019); River Miles Lines, 2011 (DC 47);
Willamette River Navigation Channel, 5/15/2019 (DC 1019);
TPA RM10W Expert Report at Appendix I (Table A1);
PGE0247893 (Portland Transformer Inventory, 03/2020);

JUNE 2022

**Exhibit A-2**

PGE TRANSFORMERS,
EQUIPMENT AND PROPERTIES
PORTLAND, OREGON



Sources: PGE0163453 (RLIS Data, 06/28/2019); River Miles Lines, 2011 (DC 47);
Willamette River Navigation Channel, 5/15/2019 (DC 1019);
TPA RM10W Expert Report at Appendix I (Table A1);
PGE0247893 (Portland Transformer Inventory, 03/2020);

**Legend**

**PGE Transformers**
- ● Pole-Mounted Transformer
- ■ Pad-Mounted Transformer
- ■ Subsurface Vault Transformer
- — Cable Crossing
- — River Mile
- ■ Current PGE Property
- ■ Historical PGE Property
- ┆ PGE Distribution Network Area Boundary

**Exhibit A-2**

PGE TRANSFORMERS,
EQUIPMENT AND PROPERTIES
PORTLAND, OREGON

JUNE 2022

ER-287



Sources: PGE0163453 (RLIS Data, 06/28/2019); River Miles Lines, 2011 (DC 47);
Willamette River Navigation Channel, 5/15/2019 (DC 1019);
TPA RM10W Expert Report at Appendix 1 (Table A1);
PGE0247893 (Portland Transformer Inventory, 03/2020);

**Exhibit A-2**

JUNE 2022

PGE TRANSFORMERS,
EQUIPMENT AND PROPERTIES
PORTLAND, OREGON

ER-288

**Exhibit A-3: PGE Total Distribution Network Equipment and Related Spills and Releases within the PGE Distribution Network Area Boundary 1979–September 2020**

| Spill Date | Street Address | Spill Equipment Type | Quantity Spilled (gallons)[1] | PCB Content of Spill (ppm)[2] | Spill Description | Overwater Spill | Oil Entered Storm Drain | PCB Content Unknown, Non-PCB, or < 50 ppm | Quantity Spilled Unknown |
|---|---|---|---|---|---|---|---|---|---|
| 1979-07-06 | Linnton Plywood | Transformer | 0.25 | -- | A transformer located on a piling 100 feet into the Willamette River cracked and leaked into the river. PGE called Western Environmental Services to clean up the spill and no oil was found on the water. PGE subsequently relocated the transformer bank to land. | Yes | No | Yes | No |
| 1984-04-10 | NW 109th & St. Helens Road | Transformer | 35 | 53 | A public vehicle hit a power pole causing a pole-mount transformer to spill its contents into the street and most of the oil entered the combined storm/sanitary drain. | No | Yes | No | No |
| 1985-10-04 | NW 25th and Nicolai St | Transformer | 0.125 | Non-PCB | A non-PCB transformer spilled 1 pint of its contents. | No | No | Yes | No |
| 1985-11-25 | Basin St. on Swan Island | Transformer | 10 | 18 | A transformer spilled oil but it did not flow to any storm drains. | No | No | No | No |
| 1986-03-04 | Near 200 SE Spokane (Sellwood Moorage) | Transformer | 5 | 5 | During flooding, 19 houseboats broke from their moorage. Top bushings on transformers located on the dock ruptured and leaked into the river. | Yes | No | No | No |
| 1986-03-15 | 3245 N Willamette Blvd | Transformer | 20 | 40 | A public vehicle hit a power pole causing a pole-mount transformer to spill its contents. All oil went into the storm drain. | No | Yes | No | No |
| 1986-05-05 | 3300 NW Yeon | Transformer | 1 | Non-PCB | A non-PCB pad-mount transformer leaked at Schnitzer Steel. | No | No | Yes | No |
| 1986-05-06 | 12005 N Burgard | Transformer | 1 | Non-PCB | A non-PCB pad-mount transformer leaked at Palmco Oil. | No | No | Yes | No |
| 1986-06-12 | 8200 SW Macadam | Transformer | 5 | 26 | A pole-mount transformer spilled oil onto the sidewalk. | No | No | No | No |
| 1986-06-26 | NW Yeon E of Expressway | Other - Truck | 15 | Non-PCB | A PGE line truck spilled hydraulic oil on new sub-grade. | No | No | No | No |
| 1986-07-23 | 2000 NW Wilson | Transformer | 1 | 11 | A 300 kVa pad-mount transformer leaked. | No | No | No | No |
| 1986-08-09 | 120 SW Columbia St. | Capacitor | 1 | Non-PCB | A non-PCB capacitor spilled oil. | No | No | No | No |
| 1986-08-21 | 2 blocks south of NW 26th and Yeon | Other - Truck | 3 | Non-PCB | A PGE line truck spilled hydraulic oil onto public property. | No | No | No | No |
| 1986-09-04 | 3059 NW Yeon | Other - Truck | 5 | Non-PCB | A PGE bucket truck spilled hydraulic oil onto the roof and exterior wall of a Goodyear Rubber building. | No | No | No | No |
| 1987-04-14 | SW Macadam N of Sellwood Bridge | Other - Truck | 3 | Non-PCB | A PGE line truck spilled hydraulic oil onto public roadway. | No | No | No | No |
| 1987-06-04 | NW 30th Ave and St. Helens Road | Other - Truck | 4 | Non-PCB | A PGE line truck spilled hydraulic oil onto a private driveway. | No | No | No | No |
| 1987-06-24 | 4900 SW Landing Dr | Transformer | 1 | <1 | A pad-mount transformer spilled oil onto soil and pad. | No | No | No | No |
| 1988-08-05 | 2335 NW 29th | Transformer | 0.125 | 12 | A transformer spilled onto public street. | No | No | No | No |
| 1988-12-02 | 5400 N Basin | Transformer | 20 | 30 | A pole-mount transformer leaked from a bullet hole onto gravel and a private vehicle below. | No | No | No | No |
| 1989-01-19 | 12005 North Burgard | Transformer (3) | 20 | <1 | A truck hit a pole causing three pole-mount transformers to spill oil onto the street. Lab analysis of oil reported as less than 1 ppm PCBs. | No | No | No | No |
| 1989-05-16 | 4705 NW Front | Transformer | 0.25 | Non-detect | A transformer spilled oil onto asphalt. Lab analysis of oil did not detect PCBs. | No | No | No | No |
| 1990-04-24 | 5949 N Basin | Transformer | 75 | Non-detect | A transformer malfunctioned and sprayed oil over the surrounding area. Some oil was transported to a drain to pump station and then to treatment plant; not the Willamette River. Lab analysis of oil did not detect PCBs. | No | Yes; not river | No | No |

**Exhibit A-3: PGE Total Distribution Network Equipment and Related Spills and Releases within the PGE Distribution Network Area Boundary 1979–September 2020**

| Spill Date | Street Address | Spill Equipment Type | Quantity Spilled (gallons)[1] | PCB Content of Spill (ppm)[2] | Spill Description | Overwater Spill | Oil Entered Storm Drain | PCB Content Unknown, Non-PCB, or < 50 ppm | Quantity Spilled Unknown |
|---|---|---|---|---|---|---|---|---|---|
| 1990-06-05 | 3325 NW Yeon | Transformer | 2 | 5 | A pole-mount transformer spilled onto the street, a private vehicle, and one person. A pole fire occurred. | No | No | No | No |
| 1990-08-27 | 5617 N Basin | Transformer | 10 | 10 | A pad-mount transformer spilled at Island Leasing Corp. | No | No | No | No |
| 1990-10-24 | Swan Island north of Kittridge/Leverma | Capacitor bank | 3 | Non-PCB | Multiple pole-mount non-PCB capacitors leaked oil onto vegetation. | No | No | No | No |
| 1990-11-24 | 2727 NW 29th | Capacitor | 2 | Non-PCB | Non-PCB capacitor spilled oil onto asphalt and caught on fire. | No | No | No | No |
| 1991-01-30 | 4927 NW Front | Transformer | 1 | <1 | A transformer was dripping oil onto asphalt and soil. Sticker indicated PCB content of less than 1 ppm. | No | No | No | No |
| 1991-04-24 | 110 SE Caruthers | Transformer | 2 | 36 | A pole-mount transformer leaked oil onto pole, soil, and vegetation. | No | No | No | No |
| 1991-07-23 | 290 SE Spokane | Transformer | 5 | <50 | A pad-mount transformer leaked oil onto pad and vegetation. | No | No | Yes | No |
| 1991-10-23 | 9300 N Columbia | Capacitor | 2 | Non-PCB | Non-PCB pole-mount capacitor spilled oil. | No | No | No | No |
| 1991-10-31 | SE Madison and Water | Transformer | 14 | 15 | A transformer leaked oil onto asphalt and two private vehicles. | No | No | No | No |
| 1992-06-23 | 3232 NW Industrial | Transformer (3) | 10 | Non-detect | Three transformers spilled onto soil/bark dust and asphalt. Lab analysis of oil did not detect PCBs. | No | No | No | No |
| 1992-07-30 | Water Ave and Belmont | Other - Truck | 4 | Non-PCB | A PGE line truck spilled hydraulic oil onto the asphalt of a public street. | No | No | No | No |
| 1992-12-17 | 7540 NW St. Helens | Other - Unknown | 22 | Non-PCB | A hydraulic spill from an unknown source contaminated 4,000 square feet of water, soil, and asphalt. | No | No | No | No |
| 1993-02-26 | 2181 NW Nicolai | Transformer | 2 | <1 | One transformer spilled oil onto soil and gravel. Sticker indicated PCB content of less than 1 ppm. | No | No | No | No |
| 1993-02-26 | 2181 NW Nicolai | Transformer | 3 | <1 | One transformer spilled oil onto soil and gravel. Sticker indicated PCB content of less than 1 ppm. | No | No | No | No |
| 1993-06-11 | SW Madison and SW 2nd | Transformer | 5 | 5 | PGE crews cleaned up oil. | No | Yes | No | No |
| 1993-08-11 | NW 6th and Johnson St | Other - Vault cable | 0.0625 | Non-PCB | Spill was contained in vault (V18), no cleanup required. Paper insulated lead covered (PILC) cable paper is saturated with oil, which may or may not contain PCBs. | No | No | Yes | No |
| 1993-09-03 | 2900 NW 29th Ave | Transformer | 0.03125 | 3 | A pole-mount transformer leaked oil on the sidewalk and a car. | No | No | No | No |
| 1993-10-12 | 3900 NW Yeon | Transformer | 2 | 38 | A pole-mount transformer malfunctioned and spilled oil onto asphalt, sidewalk, and railroad tracks. Oil entered a storm drain. | No | Yes | No | No |
| 1994-02-14 | SE Caruthers and 3rd Ave | Transformer | 5 | <1 | A pole-mount transformer leaked oil onto asphalt and private vehicles. Lab analysis of oil reported as less than 1 ppm PCBs. | No | No | No | No |
| 1994-07-06 | 3003 NW 35th | Transformer | 4 | 9 | A transformer spilled oil onto cement. | No | No | No | No |
| 1994-07-12 | NW 31st and Luzon | Transformer | 0.1 | 48 | A pole-mount transformer spilled oil onto asphalt. | No | No | No | No |
| 1994-07-14 | 0225 SW Montgomery | Other - Vault cable | 0.25 | Non-PCB | A cable-splice released a tar-like substance into a vault. | No | No | No | No |
| 1994-12-13 | 3 Spans South of N Ensign | Other - Equipment | 2 | Non-PCB | A PGE hole digger spilled hydraulic oil onto soil. | No | No | No | No |
| 1994-12-21 | E of Ensign Street at Swan Island | Other - Truck | 20 | Non-PCB | A PGE boom truck spilled hydraulic oil onto soil at railroad tracks and puddle of water. | No | No | No | No |

ER-290

**Exhibit A-3: PGE Total Distribution Network Equipment and Related Spills and Releases within the PGE Distribution Network Area Boundary 1979–September 2020**

| Spill Date | Street Address | Spill Equipment Type | Quantity Spilled (gallons)[1] | PCB Content of Spill (ppm)[2] | Spill Description | Overwater Spill | Oil Entered Storm Drain | PCB Content Unknown, Non-PCB, or < 50 ppm | Quantity Spilled Unknown |
|---|---|---|---|---|---|---|---|---|---|
| 1995-04-08 | N Columbia and N Burgard | Transformer (4) | 10 | 43 | A vehicle hit a transformer pole causing it to break and then bring down three other poles. Four transformers ruptured and spilled oil onto asphalt and soil. About 10 gallons flowed into a storm drain and then to a pond. About 25 gallons spilled to the street. Lab analysis of oil in one transformer (15 kVA #3733) had 43 ppm PCBs and the oil other three transformers did not detect PCBs. | No | Yes; not river | No | No |
| 1995-08-06 | NW 21 Ave and Wilson | Other - Truck | 10 | Non-PCB | A PGE line truck spilled hydraulic oil onto asphalt and into storm drain. | No | No | No | No |
| 1995-08-23 | 3200 NW Yeon | Transformer | 1 | -- | A transformer leaked oil onto its concrete pad. PCB content is unknown. | No | No | Yes | No |
| 1995-09-27 | 4315 SE McLoughlin Blvd at railroad tracks | Other - Oil | 20 | Non-PCB | Hydraulic oil spilled onto soil. | No | No | No | No |
| 1995-11-01 | 3200 SE Mcloughlin | Transformer | 0.125 | <1 | A transformer leaked oil on soil. Sticker indicated PCB content of less than 1 ppm. | No | No | No | No |
| 1996-02-01 | 3055 NW 29th Ave | Transformer | 0.0625 | 22 | A transformer spilled oil onto soil, asphalt, bushes, and seven vehicles. | No | No | No | No |
| 1996-02-16 | NW 9th and Front | Other - Train | 20 | Non-PCB | Non-PGE spill. Diesel fuel spilled from train and migrated into a PGE vault. | No | No | No | No |
| 1996-04-30 | 1626 SE Water | Transformer | 1 | 15 | A pad-mount transformer spilled oil onto sand. | No | No | No | No |
| 1996-05-03 | 3930 NW Yeon | Transformer | 0.004 | 15 | A transformer spilled oil onto soil. | No | No | No | No |
| 1996-05-24 | 3319 NW Yeon | Transformer | 2.5 | <1 | A pole-mount transformer spilled oil onto asphalt and ivy. Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 1996-07-01 | 3250 NW St Helens Rd | Transformer | 15 | <1 | While filling a transformer with oil, oil overflowed and spilled onto asphalt. Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 1996-07-23 | 7521 N Edgewater | Transformer | 0.125 | <1 | No description is available. | No | No | No | No |
| 1996-07-26 | 2000 NW Wilson | Transformer | 1.5 | 14 | A transformer spilled oil onto soil and concrete pad. | No | No | No | No |
| 1996-08-01 | 1212 NW 9th Ave | Other - Unknown | 1.5 | Non-PCB | No description is available. | No | No | No | No |
| 1997-04-14 | HWY 30 and Marina Way | Capacitor | 0.25 | Non-PCB | Capacitor malfunctioned and vegetation was impacted by release. Lab analysis of oil did not detect PCBs. | No | No | No | No |
| 1997-12-01 | 5400 N Basin | Transformer | 3 | <1 | A transformer spilled oil onto asphalt. Sticker on transformer and lab analysis indicated PCBs of less than 1 ppm. | No | No | No | No |
| 1998-01-09 | 2279 NW Front | Other - Diesel | -- | Non-PCB | Diesel spilled to soil from an unknown source. | No | No | No | Yes |
| 1998-02-27 | 6941 N Roberts | Transformer | 5 | 260 | A transformer spilled oil onto soil, asphalt, and ten vehicles. | No | No | No | No |
| 1998-03-31 | 2603 SE Grand Ave | Transformer | 2 | <1 | A pole-mount transformer malfunctioned and spilled oil onto the asphalt and sidewalk, and into a storm drain. Sticker indicated PCBs of less than 1 ppm. | No | Yes | No | No |
| 1998-04-30 | N Columbia Blvd. and Lombard | Other - Truck | 14 | Non-PCB | A PGE truck spilled hydraulic oil onto soil outside Rivergate Substation. | No | No | No | No |
| 1999-02-19 | 10400 N Burgard Way | Transformer | 1 | 7 | A transformer spilled oil from its vault (V2736) onto soil and into a ditch. | No | No | No | No |
| 1999-03-09 | 15540 N Lombard | Transformer | 0.5 | 48 | No description is available. | No | No | No | No |

**Exhibit A-3: PGE Total Distribution Network Equipment and Related Spills and Releases within the PGE Distribution Network Area Boundary 1979–September 2020**

| Spill Date | Street Address | Spill Equipment Type | Quantity Spilled (gallons)[1] | PCB Content of Spill (ppm)[2] | Spill Description | Overwater Spill | Oil Entered Storm Drain | PCB Content Unknown, Non-PCB, or < 50 ppm | Quantity Spilled Unknown |
|---|---|---|---|---|---|---|---|---|---|
| 1999-04-09 | 8435 N Crawford | Transformer | 3 | 52 | A pole-mount transformer spilled oil onto soil, cement, and truck parts. | No | No | No | No |
| 1999-05-19 | 11080 NW St. Helens Rd | Transformer (2) | 20 | 14 | Traffic accident caused release of oil from two transformers. | No | Yes; Columbia River or Treatment Plant | No | No |
| 1999-07-22 | 1225 SE Holgate Blvd | Transformer | 30 | Non-PCB | A transformer spilled oil onto asphalt, vegetation, and concrete. | No | No | Yes | No |
| 1999-08-10 | 9420 NW St. Helens Rd | Other - Equipment | 0.125 | Non-PCB | Hydraulic oil spilled onto asphalt. | No | No | No | No |
| 1999-10-04 | 5555 N Channel Ave | Transformer | 0.125 | <1 | A pole-mount transformer spilled oil onto concrete and gravel.  Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 1999-12-14 | 600 NW Naito | Transformer (3) | 21 | No oil spill | A train derailment west of the Steel Bridge caused a fire at three transformers.  The meter base burned but not the transformers.  No spilled oil was observed by PGE. | No | No | No | No |
| 1999-12-15 | 720 NW Front | Transformer | 0.125 | <1 | A transformer leaked oil onto soil.  Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2000-03-16 | 10200 N Lombard | Transformer | 0.5 | 48 | No description is available. | No | No | No | No |
| 2000-10-07 | NW 1 Ave and Flanders | Transformer | 0.5 | <1 | A transformer spilled on soil.  Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2000-12-04 | NW 23 Pl and Nicolai | Other - Truck | 20 | Non-PCB | A PGE boom truck spilled hydraulic oil onto asphalt. | No | No | No | No |
| 2001-12-11 | SW Main St between 1 and 2 Ave | Transformer | 0.0634 | <1 | A pole-mount transformer spilled oil onto asphalt and sidewalk.  Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2002-03-14 | NW 17th and Thurman | Other - Truck | 1 | Non-PCB | A PGE line truck spilled hydraulic oil. | No | No | No | No |
| 2002-05-07 | 2800 NW 29TH Ave | Transformer (6) | 65 | 32 | A Freightliner truck backed into a pole causing six transformers to spill onto asphalt and into a storm drain. | No | Yes | No | No |
| 2003-05-04 | 5688 or 6688 NW St. Helens Road | Transformer (3) | 2 | <1 | A tree fell and hit three transformers causing oil to spill onto asphalt, gravel, and vegetation. The oil was confined to the embankment and did not reach waterways. | No | No | No | No |
| 2003-05-23 | 2701 NW Vaughn (Montgomery Park) | Transformer | 3 | 5 | A transformer released oil into a vault (V5523).  PGE personnel cleaned up spill by surface cleaning and removing 1 yard of soil. | No | No | No | No |
| 2003-07-28 | 3601 NW Yeon | Transformer | 0.25 | <1 | A pole-mount transformer spilled oil onto soil, concrete, and cars.  Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2003-07-31 | 2344 NE 21 Place | Transformer | 0.5 | <1 | A pole-mount transformer spilled oil onto asphalt and a car.  Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2003-09-02 | 2800 NW Front Ave | Transformer | -- | <1 | A transformer spilled oil onto gravel.  Sticker indicated PCBs of less than 1 ppm. | No | No | No | Yes |
| 2003-12-16 | Greeley and Going (on the Hwy Ramp) | Transformer | 20 | <1 | A pole-mount transformer spilled oil onto asphalt. Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2004-01-14 | 1800 NW 16th Ave | Transformer | 5 | 39 | A pole-mount transformer malfunctioned leaking oil onto the asphalt and soil, and into a storm drain. | No | Yes | No | No |

ER-292

**Exhibit A-3: PGE Total Distribution Network Equipment and Related Spills and Releases within the PGE Distribution Network Area Boundary 1979–September 2020**

| Spill Date | Street Address | Spill Equipment Type | Quantity Spilled (gallons)[1] | PCB Content of Spill (ppm)[2] | Spill Description | Overwater Spill | Oil Entered Storm Drain | PCB Content Unknown, Non-PCB, or < 50 ppm | Quantity Spilled Unknown |
|---|---|---|---|---|---|---|---|---|---|
| 2005-04-15 | 6936 Fathom Street | Other - Unknown | -- | Non-PCB | NRC Environmental Services pumped out PGE's vault found to contain diesel and water. The "spill" refers to the fact that diesel was found in vault water, likely related to a leaking diesel UST that was removed on 4/26/2005. The 2,433 gallons of waste water was transported to Cascade General for disposal. | No | No | No | Yes |
| 2005-08-30 | NW 12th Ave & NW Overton St | Other - Paint | -- | Non-PCB | No description is available. | No | No | No | No |
| 2005-10-14 | N Greeley and Going St | Other - Truck | 2 | Non-PCB | A PGE line truck spilled hydraulic oil onto asphalt, soil, and a line truck. | No | No | No | No |
| 2007-01-12 | Corner of McLoughlin & SE Long | Transformer | 37 | 66 | A transformer spilled oil onto soil. | No | No | No | No |
| 2007-03-14 | 8424 N Crawford St | Transformer | 1 | <1 | A pole-mount transformer spilled oil onto soil and concrete curb. Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2007-07-04 | 5828 N Van Houten | Transformer (3) | 30 | <1 | Vandals caused three pole-mount transformers to spill oil onto soil. Lab analysis indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2007-07-11 | 8970 N Bradford St | Transformer (3) | 200 | 30 | Vandals knocked three pole-mount transformers to the ground spilling oil onto asphalt, soil, and vegetation. | No | No | No | No |
| 2007-12-01 | 202 SE Stark St | Transformer | 1 | <1 | A vehicle-strike caused a pole-mount transformer to spill oil onto asphalt, soil, and cement. Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2008-04-04 | 2017 NW Vaughn | Other - Equipment | 15 | Non-PCB | A hole digger spilled hydraulic oil onto asphalt. Heavy rains caused some of the oil (no PCBs) to flow into a storm drain. | No | No | No | No |
| 2008-06-16 | 6707 N Basin | Transformer | 336 | <1 | A transformer fire leaked oil into concrete vaults 33 and 32 (at Pad 47). Transformer oil was not released into the environment. Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2008-08-27 | 2728 NW Nela St | Transformer (2) | 2 | 24 | Two transformers leaked oil onto asphalt and concrete. Lab analysis indicated PCB content of 11 ppm and 24 ppm. | No | No | No | No |
| 2008-12-05 | 6635 N Baltimore Ave | Transformer | 1 | <1 | A transformer leaked oil onto asphalt and soil. Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2009-01-07 | Behind 4750 N. Princeton | Other - Oil | -- | Non-PCB | No description is available. | No | No | No | No |
| 2009-06-17 | SW 2nd & Madison | Other - Truck | 10 | Non-PCB | PGE line truck spilled hydraulic oil to asphalt. | No | No | No | No |
| 2010-03-03 | 3340 NW St Helens | Transformer | 1.5 | Non-detect | A transformer fire leaked oil onto soil, asphalt and railroad track. Lab analysis of oil did not detect PCBs. | No | No | No | No |
| 2010-06-02 | Eastbound off ramp at Greeley and Going Ave | Transformer | 2 | <1 | A fallen tree caused a pole-mount transformer to spill oil. Sticker indicated PCBs of less than 1 ppm. | No | No | No | No |
| 2010-12-11 | 4555 North Channel | Transformer | 1 | 128 | PGE observed a small stain under a pad mount transformer during an equipment change out. | No | No | No | No |

**Exhibit A-3: PGE Total Distribution Network Equipment and Related Spills and Releases within the PGE Distribution Network Area Boundary 1979–September 2020**

| Spill Date | Street Address | Spill Equipment Type | Quantity Spilled (gallons)[1] | PCB Content of Spill (ppm)[2] | Spill Description | Overwater Spill | Oil Entered Storm Drain | PCB Content Unknown, Non-PCB, or < 50 ppm | Quantity Spilled Unknown |
|---|---|---|---|---|---|---|---|---|---|
| 2011-11-02 | 2515 NW Nicolai | Transformer | 50 | 17 | A public vehicle hit a power pole causing three pole-mount transformers to fall (Company numbers 1634, 1635, & 1636). Transformer company number 1636 did not spill oil. This record is for one transformer (Company number 1634) which spilled all of its contents onto asphalt and into filtered catch basin at Calbag Metals. PGE did not observe oil in the downgradient storm drain. | No | No | No | No |
| 2011-11-02 | 2515 NW Nicolai | Transformer | 25 | 13 | A public vehicle hit a power pole causing three pole-mount transformers to fall (Company numbers 1634, 1635, & 1636). Transformer company number 1636 did not spill oil.  This record is for one transformer (Company number 1635) which spilled half of its contents onto asphalt and into filtered catch basin at Calbag Metals. PGE did not observe oil in the downgradient storm drain. | No | No | No | No |
| 2011-11-03 | 7540 NW St Helens Rd | Transformer | 1 | 4 | An equipment malfunction caused a pole-mount transformer to leak onto soil and gravel.  PGE personnel cleaned up spill by removing 2 cubic feet of soil. | No | No | No | No |
| 2012-07-24 | 2420 NW 31ST | Transformer | 30 | 11 | Transformer malfunction spilled oil to soil, gravel, and asphalt. | No | No | No | No |
| 2013-01-14 | 4810 N Lagoon Ave | Transformer | 5 | <1 | Vehicle hit and damaged pad-mount transformer. About 4 square feet of concrete was affected. The spill crew responded and cleanup was completed the same day. Less than 1 ppm. | No | No | No | No |
| 2013-04-18 | 615 NW or SW Naito Pkwy | Transformer | 0.125 | <1 | Release was confined to a concrete vault. Spill response completed cleanup the same day. Less than 1 ppm. | No | No | No | No |
| 2013-04-29 | 5115 N Lagoon | Transformer | 2 | <1 | Transformer malfunction caused a release to soil and asphalt. Approximately 20 square feet of soil and asphalt were affected.  Complete cleanup had to wait until scheduled power down, on 5/11/2013. 3 cubic feet of soil removed, asphalt cleaned. Less than 1 ppm. | No | No | No | No |
| 2013-05-29 | 6834 NW St Helens Rd | Transformer (3) | 44 | <1 | Three pole-mount transformers were damaged by weather/tree fall, which resulted in a release to soil and asphalt. Lab analysis of oil did not detect PCBs. | No | No | No | No |
| 2013-05-31 | 6834 NW St Helens (Hwy 30) | Transformer (3) | 1 | <1 | Vegetation impacted by three pole-mount transformers damaged by weather/tree fall on 5/29/13. | No | No | No | No |
| 2013-09-04 | NW Saltzman Rd & Hwy 30 | Transformer | 3 | Non-detect | Transformer malfunction caused oil spill that reached soil/gravel and asphalt, but not a storm drain. Lab analysis of oil did not detect PCBs. | No | No | No | No |
| 2015-07-06 | 11080 NW St Helens Rd | Transformer (2) | 25 | <1 | Approximately 300 sq. feet of asphalt was affected. Less than 1 ppm. | No | No | No | No |
| 2015-08-07 | 7900 NW Yeon Ave | Transformer (2) | 3 | 29 | Vehicle hit pole during dry weather. Spill response completed cleanup the same day. | No | No | No | No |
| 2015-08-22 | 11820 NW St Helens Rd | Transformer | 1 | <1 | Less than 1 ppm. | No | No | No | No |
| 2016-02-10 | 4800 NW Front Ave | Transformer | 2 | <1 | Less than 1 ppm. | No | No | No | No |
| 2018-06-17 | 6161 NW 61st | Transformer (3) | 80 | <1 | A storm caused a pole to fall and two of three transformers spilled their contents onto asphalt and into a storm drain. | No | Yes | No | No |
| 2018-07-12 | 9442 N Ramsey Blvd | Transformer | 2 | <1 | Less than 1 ppm. | No | No | No | No |
| 2019-02-15 | 3627 N. Anchor Street | Transformer | 0 | <1 | Vehicle hit transformer pad and started a fire. Approximately 2 cubic feet of soot-impacted soil was removed. | No | No | No | No |

ER-294

**Exhibit A-3: PGE Total Distribution Network Equipment and Related Spills and Releases within the PGE Distribution Network Area Boundary 1979–September 2020**

| Spill Date | Street Address | Spill Equipment Type | Quantity Spilled (gallons)[1] | PCB Content of Spill (ppm)[2] | Spill Description | Overwater Spill | Oil Entered Storm Drain | PCB Content Unknown, Non-PCB, or < 50 ppm | Quantity Spilled Unknown |
|---|---|---|---|---|---|---|---|---|---|
| 2019-05-24 | 12005 N. Burgard Way | Transformer (3) | 80 | <1 | Transformer pole fell due to rotten wood, resulting in a fire and a release of 80 gallons of transformer oil from three pole-mounted transformers. | No | No | No | No |
| 2020-01-12 | Not provided | Regulator | 110 | <1 | Electrical fault caused a regulator to rupture and release oil onto soil and gravel. Soil and gravel removal, soil sampling, and backfill was completed on 1/14/2020. | No | No | No | No |
| 2020-02-26 | 9040 N Burgard Way | Transformer | 5 | <1 | Car hit pole causing the attached transformer to spill oil into storm drains. Oil was cleaned and vacuumed from the impacted storm drains. | No | Yes | No | No |
| 2020-05-31 | 4456 NW Yeon Ave | Transformer | 1 | <91 | Transfromer released approxmiately 1 gallon of oil containing < 91 ppm PCB (9/23/2016 oil sample). | No | No | Yes | No |

Appendix A – Portland Terminal Railroad Company

The properties listed below are identified for Portland Terminal Railroad Company for purposes of this Consent Decree.  Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation.  Where available, the Site ID number (Tax Lot number) and street address also are listed for each tax parcel, in order to provide additional context and reference.  However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address. The attached map should be considered part of this Appendix A. The table and figure, combined, provide a comprehensive picture of the released properties.

| Site ID No. | Street Address | County Tax Parcel ID | Assessor Property ID | State ID | Notes |
|---|---|---|---|---|---|
| 197 | 3500 NW Yeon Ave. | R941190180 R941190170 R941190010 R941201230 R941200040 R941201250 R941190580 R941190560 R941190040 R941190600 R941190610 R941190590 R941190570 R941190660 R941190670 R941190830 R941190350 R941290680 R941290730 R941292130 | R315812 R315811 R315800 R315980 R315899 R315982 R315841 R315839 R315801 R315843 R315844 R315842 R315840 R315847 R315848 R315861 R315820 R316412 R316419 R316531 | 1N1E19A-01900 1N1E19DA-00200 1N1E19DA-00100 1N1E20-01300 1N1E20 -01400 1N1E20 -01200 1N1E19B-01300 1N1E19A-02000 1N1E19DA-00300 1N1E19DA-00400 1N1E19DA-00500 1N1E19DA-00600 1N1E19DA-00700 1N1E19DA-00800 1N1E19DA-00900 1N1E19DA-01100 1N1E19DA-01000 1N1E29AA-01700 1N1E29AA-01300 1N1E29AA-01800 | See attached map |
| 306A | 1111 NW Naito Parkway *NW Naito Parkway | R649812740 R649812730 | R508395 R508394 | 1N1E34BB -00502 1N1E34BD -00805 | See attached map |
| 306B | 901 NW Naito Parkway 615 NW NAITO PKWY 945 NW Naito Parkway | R850600300 R850600250 R850600150 | R518301 R291745 R291743 | 1N1E34BD -00806 1N1E34BD -00804 1N1E34BD -00802 | See attached map |
| 306C | 800 NW Sixth Avenue NW COR/ 9TH & NW NAITO NW 2nd Avenue NW 9th Ave 510 NW 3rd NW Station Way 800 WI/ NW 6TH AVE 800 WI/ NW 6TH AVE | R180237200 R180220230 R180236410 R180217550 R180236460 R793100300 R180237360 R180237370 | R141472 R141023 R141444 R140959 R141452 R533588 R141480 R636518 | 1N1E34BD -01200 1N1E34BB-00700 1N1E34BB-00800 1N1E34BB-01100 1N1E34BD-00600 1N1E34BB -01306 1N1E34BD -02300 1N1E34BD -02301 | See attached map |

ER-296

| Site ID No. | Street Address | County Tax Parcel ID | Assessor Property ID | State ID | Notes |
|---|---|---|---|---|---|
| 306D | 1020 – 1300 NW 9th Avenue | R793100100 R793100150 R793100250 R793100350 R793100400 | R533584 R533585 R533587 R533589 R533590 | 1N1E34BB-01302 1N1E34BB-01303 1N1E34BB-01305 1N1E34BB-01307 1N1E34BB-01308 | See attached map |
| 311C | Union Station Track 5 | R180236400 R180217520 R180217530 R180236470 R180236420 R180237210 | R141443 R140955 R140956 R141455 R141447 R140959 | 1N1E34BB-00900 1N1E34BB-01000 1N1E34BB-01200 1N1E34BD-00700 1N1E34BD-01000 1N1E34BD-01100 | See attached map |
| 311G | Union Station Track 5 | R883801700 R180222140 R883801800 R883801900 R180220310 R180222110 | | | |
| 316D | 1020 – 1300 NW 9th Avenue (1150 NW 9th Avenue) | R793100200 | R533586 | 1N1E34BB-01304 | See attached map |
| 334A | 1207 NW Naito Parkway | R649812750 | R508396 | 1N1E34BB 00501 | See attached map |
| 336D | 1020 – 1300 NW 9th Avenue 1020 NW 9th | R793100050 | R533583 | 1N1E34BB-01301 | See attached map |
| 337 | 715 NW Hoyt Street 715 WI/NW Hoyt Street | R180210240 R180210300 | R140726 R140728-INACTIVE[1] | 1N1E34BC-00100 1N1E34BC-00200 | See attached map |
| | NWC/NW Hoyt & NW Broadway | | R709060 | 1N1E34BC-00102 | (Created from -200) |
| | NEC of Hoyt & NW 9th | | R709059 | 1N1E34BC-00101 | (Created from -200) |
| | NW 9th Ave. | | R709062 | 1N1E34BC-00104 | (Created from -200) |
| | NW 9th Ave. | | R709061 | 1N1E34BC-00103 | (Created from -200) |
| | NW Hoyt Street | | R709063 | 1N1E34BC-00105 | (Created from -200) |
| | NW Broadway | | R709064 | 1N1E34BC-00106 | (Created from -200) |
| | NW 9th Ave. | | R709065 | 1N1E34BC-00107 | (Created from -200) |
| | NW Broadway | | R709066 | 1N1E34BC-00108 | (Created from -200) |
| | SEC of Lovejoy & NW 9th | | R709067 | 1N1E34BC-00109 | (Created from -200) |
| | NW Lovejoy Street | | R709068 | 1N1E34BC-00110 | (Created from -200) |
| | SWC/Lovejoy & NW Broadway | | R709069 | 1N1E34BC-00111 | (Created from -200) |
| 348B | 901 NW Naito Parkway 707-729 NW Naito Pkway 731-779 NW Naito Pkway | R850600350 R850600450 R850600400 | R518302 R518304 R518303 | 1N1E34BD-00807 1N1E34BD-00809 1N1E34BD-00808 | See attached map |
| 465A | 1207 NW Naito Parkway | R850600050 | R291740 | 1N1E34BB-00600 | See attached map |

---

[1] In 2020, Tax Lot 1N1E34BC-00200 was merged into R140726. In 2021, new parcels parcels R709060 – R709069 were created by separating out smaller parcels from Lot 200.

APPENDIX A

PORTLAND   TERMINAL
RAILROAD COMPANY,
MAP OF PROPERTIES RELEASED

PORTLAND TERMINAL
RAILROAD SITE PARCELS

LOCATOR MAP

WILLAMETTE RIVER

0  1  2
MILES

WILLAMETTE RIVER

COLUMBIA RIVER HIGHWAY (NORTHWEST YEON AVENUE)

197

FRONT STREET BRIDGE

STADIUM FREEWAY

311G

316D
336D
306D
337

465A
334A

306A
306B
348B

306C

311C

N

0  2,600
SCALE IN FEET

<u>Appendix A – Sulzer Pumps (US) Inc.</u>

The properties listed below are identified for **Sulzer Pumps (US) Inc.** for purposes of this Consent Decree.  Properties are identified by current tax parcel number from the Multnomah County Department of County Management Assessment and Taxation.  Where available, the Site ID number and street address also are listed for each tax parcel, in order to provide additional context and reference.  However, unless otherwise indicated below, the property boundaries are based on the current tax parcel number, not the Site number or the street address.

| Site ID number | Street Address | County Tax Parcel ID |
|---|---|---|
| 220 | 2800 NW Front Ave. | R941280900 |
| 221 | 2700 NW Front Ave. | R941280300 |
| 576 | 2551 NW 30th Ave. | R841080010 |

ER-299

**PORTLAND HARBOR CASH-OUT CONSENT DECREE**

**APPENDIX B**

**PAYMENT INSTRUCTIONS**

In order to ensure that payment instructions reflect the processes and accounts in use at the time payments required by this Consent Decree are to be made, the United States will provide Settling Defendants with current payment instructions before those payments are to be made.

PHNRTC CASH-OUT CD

<u>Portland Harbor Cash-out Consent Decree</u>

<u>Appendix C – Table of Contents</u>

| <u>Description</u> | <u>Page(s)</u> |
|---|---|
| Table of Contents | i |
| Table showing Liabilities, Previous Payments, and Balances Owed for all Settling Defendants | 1 |
| Payments to be made, and Refunds to be received, by each Settling Defendant | 2-17 |

i

PHNRTC CASH-OUT CD

## Appendix C - Cash Out CD

| Settling Defendant Name | NRD Liability | | Assessment Cost Calculations | | | Total Balance[1] | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Final NRD Allocation to Settling Defendant (in DSAYS) | Cash Equivalent of NRD Allocation[2] | Pro-Rata Share of Trustee Council Assessment Costs | Per Capita Share of Path C General Costs | Final Allocated Share of Trustee Council Assessment Costs | Defendant's Total Allocation (NRD Liability + Assessment Costs) | Amount Credited for Payments Received | Net Settlement Balance (or Overpayment) |
| ACF | 0.7 | $ 49,350.00 | $ 2,105.13 | $ 63,096.85 | $ 65,201.98 | $ 114,551.98 | $ 359,512.23 | $ (244,960.25) |
| Airgas USA, LLC | 0.76 | $ 53,580.00 | $ 2,345.39 | $ 63,096.85 | $ 65,442.24 | $ 119,022.24 | $ 295,780.49 | $ (176,758.25) |
| Ash Grove | 16.97 | $ 1,196,385.00 | $ 53,728.88 | $ 63,096.85 | $ 116,825.73 | $ 1,313,210.73 | $ 143,804.89 | $ 1,169,405.84 |
| Ashland / Hercules | 0.2 | $ 14,100.00 | $ 601.47 | $ 63,096.85 | $ 63,698.32 | $ 77,798.32 | $ 404,765.63 | $ (326,967.31) |
| Beazer East | 6.9 | $ 486,450.00 | $ 21,449.35 | $ 63,096.85 | $ 84,546.20 | $ 570,996.20 | $ 359,512.23 | $ 211,483.97 |
| BNSF Railway | 1.16 | $ 81,780.00 | $ 3,579.80 | $ 63,096.85 | $ 66,676.65 | $ 148,456.65 | $ 304,113.83 | $ (155,657.18) |
| Calbag Metals Co. | 0.042 | $ 2,961.00 | $ 132.98 | $ 63,096.85 | $ 63,229.83 | $ 66,190.83 | $ 295,780.49 | $ (229,589.66) |
| ESCO | 0.007 | $ 493.50 | $ 21.65 | $ 65,096.85 | $ 65,118.50 | $ 65,612.00 | $ 284,512.23 | $ (218,900.23) |
| Gould | 0.07 | $ 4,935.00 | $ 221.12 | $ 63,096.85 | $ 63,317.97 | $ 68,252.97 | $ 295,780.49 | $ (227,527.52) |
| HAJ | 0.17 | $ 11,985.00 | $ 538.24 | $ 63,096.85 | $ 63,635.09 | $ 75,620.09 | $ 352,567.79 | $ (276,947.70) |
| Koppers | 3 | $ 211,500.00 | $ 9,258.10 | $ 63,096.85 | $ 72,354.95 | $ 283,854.95 | $ 359,512.23 | $ (75,657.28) |
| McCall Oil | 1.56 | $ 109,980.00 | $ 4,849.42 | $ 63,096.85 | $ 67,946.27 | $ 177,926.27 | $ 215,707.30 | $ (37,781.03) |
| NW Pipe | 2.34 | $ 164,970.00 | $ 7,037.15 | $ 63,096.85 | $ 70,134.00 | $ 235,104.00 | $ 359,512.23 | $ (124,408.23) |
| PGE | 56.46 | $ 3,980,430.00 | $ 176,044.06 | $ 63,096.85 | $ 239,140.91 | $ 4,219,570.91 | $ 295,780.49 | $ 3,923,790.42 |
| PTRR | 1.87 | $ 131,835.00 | $ 5,722.32 | $ 63,096.85 | $ 68,819.17 | $ 200,654.17 | $ 120,253.40 | $ 80,400.77 |
| Sulzer Pumps | 5.46 | $ 384,930.00 | $ 17,286.96 | $ 63,096.85 | $ 80,383.81 | $ 465,313.81 | $ 172,576.44 | $ 292,737.37 |
| Totals: | 97.669 | $ 6,885,664.50 | $ 304,922.02 | $ 1,011,549.60 | $ 1,316,471.62 | $ 8,202,136.12 | $ 4,619,472.39 | $ 3,582,663.73 |

| | | |
| --- | --- | --- |
| Total Amount of Net Settlement Balances Owed by Settling Defendants: | $ | 5,677,818.37 |
| Total Amount of Net Settlement Overpayment Owed to Settling Defendants: | $ | (2,095,154.64) |
| Total Net Settlement Balance: | $ | 3,582,663.73 |

Notes:

1 - As set forth in paragraph 6 of this Consent Decree, Plaintiffs shall move the Court to allow the deposit of funds into and disbursement of funds from a Court Registry Account. Assuming the Court's approval of Plaintiffs' motion, within ninety (90) days of the Effective Date, each Settling Defendant owing a net settlement balance shall pay to the Registry Account funds in the amounts set forth in this Appendix C. However, no payment is required from any Settling Defendant identified in this Appendix C as entitled to a refund. Refunds to Settling Defendants identified in Appendix C as entitled to refunds shall be made as set forth in paragraph 8 of this Consent Decree.

2 - Calculation is based on a $70,500 cash out price per DSAY, which includes $1,742 per DSAY as compensation for recreation service losses and Portland Harbor-wide monitoring and stewardship.

1

ER-303

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Refund to Settling Defendant ACF

1.  DSAYs allocated: 0.7 DSAYs.

2.  Cash Payment/Refund.  ACF shall make no cash payment in accordance with Paragraph 7 of the Consent Decree.  ACF shall receive a refund in the amount of $244,960.25 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| Item | Amount |
|---|---|
| a.  $70,500 for each of the 0.7 DSAYs in the Final NRD Allocation, plus | $49,350.00 |
| b.  Final Allocated Share of Trustee Council Assessment Costs, minus | $65,201.98 |
| c.  Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $359,512.23 |
| **NET CASH PAYMENT:** | **-$244,960.25** |

2

ER-304

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Refund to Settling Defendant Airgas USA, LLC

1. DSAYs allocated: 0.76 DSAYs.

2. Cash Payment/Refund.  Airgas USA, LLC shall make no cash payment in accordance with Paragraph 7 of the Consent Decree. Airgas USA, LLC shall receive a refund in the amount of $176,758.25 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| | Item | Amount |
|---|---|---|
| a. | $70,500 for each of the 0.76 DSAYs in the Final NRD Allocation, plus | $53,580.00 |
| b. | Final Allocated Share of Trustee Council Assessment Costs, minus | $65,442.24 |
| c. | Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $295,780.49 |
| | **NET CASH PAYMENT:** | **-$176,758.25** |

3

ER-305

Portland Harbor Cash-out Consent Decree

Appendix C – Payment by Settling Defendant Ash Grove

1. DSAYs allocated: 16.97 DSAYs.

2. Cash Payment/Refund.  Ash Grove shall make a cash payment in the amount of $1,169,405.84 in accordance with Paragraph 7 of the Consent Decree.  Ash Grove shall receive no refund in accordance with Paragraph 8 of the Consent Decree.  The amount of the cash payment is calculated as follows:

| Item | Amount |
|---|---|
| a. $70,500 for each of the 16.97 DSAYs in the Final NRD Allocation, plus | $1,196,385.00 |
| b. Final Allocated Share of Trustee Council Assessment Costs, minus | $116,825.73 |
| c. Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $143,804.89 |
| **NET CASH PAYMENT:** | **$1,169,405.84** |

4

ER-306

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Refund to Settling Defendant Ashland/Hercules

1. DSAYs allocated: 0.2 DSAYs.

2. Cash Payment/Refund.  Ashland/Hercules shall make no cash payment in accordance with Paragraph 7 of the Consent Decree. Ashland/Hercules shall receive a refund in the amount of $326,967.31 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| | Item | Amount |
|---|---|---|
| a. | $70,500 for each of the 0.2 DSAYs in the Final NRD Allocation, plus | $14,100.00 |
| b. | Final Allocated Share of Trustee Council Assessment Costs, minus | $63,698.32 |
| c. | Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $404,765.63 |
| | **NET CASH PAYMENT:** | **-$326,967.31** |

5

ER-307

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Payment by Settling Defendant Beazer East

1. DSAYs allocated: 6.9 DSAYs.

2. Cash Payment/Refund.  Beazer East shall make a cash payment in the amount of $211,483.97 in accordance with Paragraph 7 of the Consent Decree.  Beazer East shall receive no refund in accordance with Paragraph 8 of the Consent Decree.  The amount of the cash payment is calculated as follows:

| | Item | Amount |
|---|---|---|
| a. | $70,500 for each of the 6.9 DSAYs in the Final NRD Allocation, plus | $486,450.00 |
| b. | Final Allocated Share of Trustee Council Assessment Costs, minus | $84,546.20 |
| c. | Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $359,512.23 |
| | **NET CASH PAYMENT:** | **$211,483.97** |

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Refund to Settling Defendant BNSF Railway

1.  DSAYs allocated: 1.16 DSAYs.

2.  Cash Payment/Refund.  BNSF Railway shall make no cash payment in accordance with Paragraph 7 of the Consent Decree. BNSF Railway shall receive a refund in the amount of $155,657.18 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| Item | Amount |
|---|---|
| a.  $70,500 for each of the 1.16 DSAYs in the Final NRD Allocation, plus | $81,780.00 |
| b.  Final Allocated Share of Trustee Council Assessment Costs, minus | $66,676.65 |
| c.  Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $304,113.83 |
| **NET CASH PAYMENT:** | **-$155,657.18** |

7

ER-309

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Refund to Settling Defendant Calbag Metals Co.

1. DSAYs allocated: 0.042 DSAYs.

2. Cash Payment/Refund. Calbag Metals Co. shall make no cash payment in accordance with Paragraph 7 of the Consent Decree. Calbag Metals Co. shall receive a refund in the amount of $229,589.66 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| | Item | Amount |
|---|---|---|
| a. | $70,500 for each of the 0.042 DSAYs in the Final NRD Allocation, plus | $2,961.00 |
| b. | Final Allocated Share of Trustee Council Assessment Costs, minus | $63,229.83 |
| c. | Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $295,780.49 |
| | **NET CASH PAYMENT:** | **-$229,589.66** |

8

ER-310

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Refund to Settling Defendant ESCO

1. DSAYs allocated: 0.007 DSAYs.

2. Cash Payment/Refund.  ESCO shall make no cash payment in accordance with Paragraph 7 of the Consent Decree. ESCO shall receive a refund in the amount of $218,900.23 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| Item | Amount |
|---|---|
| a.  $70,500 for each of the 0.007 DSAYs in the Final NRD Allocation, plus | $493.50 |
| b.  Final Allocated Share of Trustee Council Assessment Costs, minus | $65,118.50 |
| c.  Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $284,512.23 |
| **NET CASH PAYMENT:** | **-$218,900.23** |

9

ER-311

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Refund to Settling Defendant Gould

1.  DSAYs allocated: 0.07 DSAYs.

2.  Cash Payment/Refund.  Gould shall make no cash payment in accordance with Paragraph 7 of the Consent Decree. Gould shall receive a refund in the amount of $227,527.52 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| | Item | Amount |
|---|---|---|
| a. | $70,500 for each of the 0.07 DSAYs in the Final NRD Allocation, plus | $4,935.00 |
| b. | Final Allocated Share of Trustee Council Assessment Costs, minus | $63,317.97 |
| c. | Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $295,780.49 |
| | **NET CASH PAYMENT:** | **-$227,527.52** |

10

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Refund to Settling Defendant HAJ

1.  DSAYs allocated: 0.17 DSAYs.

2.  Cash Payment/Refund.  HAJ shall make no cash payment in accordance with Paragraph 7 of the Consent Decree. HAJ shall receive a refund in the amount of $276,947.70 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| | Item | Amount |
|---|---|---|
| a. | $70,500 for each of the 0.17 DSAYs in the Final NRD Allocation, plus | $11,985.00 |
| b. | Final Allocated Share of Trustee Council Assessment Costs, minus | $63,635.09 |
| c. | Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $352,567.79 |
| | **NET CASH PAYMENT:** | **-$276,947.70** |

11

ER-313

PHNRTC CASH-OUT CD

<u>Portland Harbor Cash-out Consent Decree</u>

<u>Appendix C –Refund to Settling Defendant Koppers</u>

1. DSAYs allocated: 3 DSAYs.

2. Cash Payment/Refund.  Koppers shall make no cash payment in accordance with Paragraph 7 of the Consent Decree. Koppers shall receive a refund in the amount of $75,657.28 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| | Item | Amount |
|---|---|---|
| a. | $70,500 for each of the 3 DSAYs in the Final NRD Allocation, plus | $211,500.00 |
| b. | Final Allocated Share of Trustee Council Assessment Costs, minus | $72,354.95 |
| c. | Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $359,512.23 |
| | **NET CASH PAYMENT:** | **-$75,657.28** |

12

ER-314

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Refund to Settling Defendant McCall Oil

1. DSAYs allocated: 1.56 DSAYs.

2. Cash Payment/Refund.  McCall Oil shall make no cash payment in accordance with Paragraph 7 of the Consent Decree. McCall Oil shall receive a refund in the amount of $37,781.03 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| Item | Amount |
|------|--------|
| a. $70,500 for each of the 1.56 DSAYs in the Final NRD Allocation, plus | $109,980.00 |
| b. Final Allocated Share of Trustee Council Assessment Costs, minus | $67,946.27 |
| c. Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $215,707.30 |
| **NET CASH PAYMENT:** | **-$37,781.03** |

13

ER-315

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Refund to Settling Defendant NW Pipe

1. DSAYs allocated: 2.34 DSAYs.

2. Cash Payment/Refund.  NW Pipe shall make no cash payment in accordance with Paragraph 7 of the Consent Decree. NW Pipe shall receive a refund in the amount of $124,408.23 in accordance with Paragraph 8 of the Consent Decree.  The amount of the refund is calculated as follows:

| | Item | Amount |
|---|---|---|
| a. | $70,500 for each of the 2.34 DSAYs in the Final NRD Allocation, plus | $164,970.00 |
| b. | Final Allocated Share of Trustee Council Assessment Costs, minus | $70,134.00 |
| c. | Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $359,512.23 |
| | **NET CASH PAYMENT:** | **-$124,408.23** |

14

ER-316

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Payment by Settling Defendant PGE

1. DSAYs allocated: 56.46 DSAYs.

2. Cash Payment/Refund.  PGE shall make a cash payment in the amount of $3,923,790.42 in accordance with Paragraph 7 of the Consent Decree.  PGE shall receive no refund in accordance with Paragraph 8 of the Consent Decree.  The amount of the cash payment is calculated as follows:

| Item | Amount |
|------|--------|
| a. $70,500 for each of the 56.46 DSAYs in the Final NRD Allocation, plus | $3,980,430.00 |
| b. Final Allocated Share of Trustee Council Assessment Costs, minus | $239,140.91 |
| c. Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $295,780.49 |
| **NET CASH PAYMENT:** | **$3,923,790.42** |

15

ER-317

PHNRTC CASH-OUT CD

<u>Portland Harbor Cash-out Consent Decree</u>

<u>Appendix C –Payment by Settling Defendant PTRR</u>

1. DSAYs allocated: 1.87 DSAYs.

2. Cash Payment/Refund.  PTRR shall make a cash payment in the amount of $80,400.77 in accordance with Paragraph 7 of the Consent Decree.  PTRR shall receive no refund in accordance with Paragraph 8 of the Consent Decree.  The amount of the cash payment is calculated as follows:

| | Item | Amount |
|---|---|---|
| a. | $70,500 for each of the 1.87 DSAYs in the Final NRD Allocation, plus | $131,835.00 |
| b. | Final Allocated Share of Trustee Council Assessment Costs, minus | $68,819.17 |
| c. | Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $120,253.40 |
| | **NET CASH PAYMENT:** | **$80,400.77** |

16

ER-318

PHNRTC CASH-OUT CD

Portland Harbor Cash-out Consent Decree

Appendix C –Payment by Settling Defendant Sulzer Pumps

1. DSAYs allocated: 5.46 DSAYs.

2. Cash Payment/Refund.  Sulzer Pumps shall make a cash payment in the amount of $292,737.37 in accordance with Paragraph 7 of the Consent Decree.  Sulzer Pumps shall receive no refund in accordance with Paragraph 8 of the Consent Decree.  The amount of the cash payment is calculated as follows:

| | Item | Amount |
|---|---|---|
| a. | $70,500 for each of the 5.46 DSAYs in the Final NRD Allocation, plus | $384,930.00 |
| b. | Final Allocated Share of Trustee Council Assessment Costs, minus | $80,383.81 |
| c. | Total Funding Received from Settling Defendant by the Trustee Council under FPAs | $172,576.44 |
| | **NET CASH PAYMENT:** | **$292,737.37** |

17

ER-319

**U.S. District Court**
**District of Oregon**

**Notice of Electronic Filing**

The following transaction was entered on 9/19/2025 at 1:54 PM PDT and filed on 9/19/2025
**Case Name:**   United States of America et al v. ACF Industries, LLC et al
**Case Number:**   3:23-cv-01603-SI
**Filer:**
**Document Number:**   139(No document attached)

**Docket Text:**

ORDER - Arkema Inc., FMC Corporation, Gunderson LLC, and NW Natural (together, the "Proposed Intervenors") have each filed unopposed motions to intervene. ECF [106] (Arkema), ECF [108] (FMC), ECF [117] (Gunderson), and ECF [118] (NW Natural). The Proposed Intervenors are non-settling, potentially responsible parties for natural resource damages under § 107(a) of CERCLA, 42 U.S.C. § 9607(a). Non-settling, potentially responsible parties may intervene as a matter of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure and § 113(i) of CERCLA to oppose a consent decree incorporating a settlement that, if approved, would bar contribution from settling potentially responsible parties. *U.S. v. Aerojet Gen. Corp.*, I606 F.3d 1142, 1146 (9th Cir. 2010).  Because the consent decree here would bar contribution and because the Proposed Intervenors meet the requirements of Rule 24(a)(2), the Court GRANTS the Unopposed Motions to Intervene, ECF [106], [108], [117], and [118]. In addition, FMC Corporation has filed unopposed requests for judicial notice in support of its motion to intervene and its opposition to Plaintiffs' motion to enter consent decrees. ECF [109]; ECF [114]. Because the subject of FMC's requests for judicial notice-court filings, government websites, and administrative records-are all public records not subject to reasonable dispute, see Fed. R. Evid. 201, the Court GRANTS FMC's two requests for judicial notice, ECF [109] and ECF [114]. Ordered by Judge Michael H. Simon. (mja)