No. 25-8129

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA; et al.,

*Plaintiffs-Appellees*,

v.

ARKEMA INC., by and through its agent, Legacy Site Services LLC,

*Intervenor-Appellant,*

v.

ACF INDUSTRIES, LLC; et al.,

*Defendants-Appellees,*

GUNDERSON, LLC; et al.,

*Intervenors.*

On Appeal from the U.S. District Court for the District of Oregon
Case No. 3:23-cv-1603-SI
Hon. Michael H. Simon

**APPELLANT'S EXCERPTS OF RECORD**
**VOLUME 3 OF 6**

Matthew J. Stock
Jessica C. Kerr
HILLIS CLARK MARTIN &
PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
(206) 623-1745
Email: matthew.stock@hcmp.com
Email: jessica.kerr@hcmp.com
*Attorneys for Legacy Site Services LLC,*
*agent for Appellant Arkema Inc.*

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

THE UNITED STATES OF AMERICA; the ) 
STATE OF OREGON; the CONFEDERATED ) 
TRIBES OF THE GRAND RONDE ) No. 3:23-cv-1603-SI
COMMUNITY OF OREGON; the ) 
CONFEDERATED TRIBES OF SILETZ ) September 29, 2025
INDIANS; the CONFEDERATED TRIBES ) 
OF THE UMATILLA INDIAN ) Portland, Oregon
RESERVATION; the CONFEDERATED ) 
TRIBES OF THE WARM SPRINGS ) 
RESERVATION OF OREGON; and the ) 
NEZ PERCE TRIBE, ) 
                                  ) 
                       Plaintiffs, ) 
                                  ) 
             v.                    ) 
                                  ) 
ACF INDUSTRIES LLC, et al.,        ) 
                                  ) 
                      Defendants.  ) 

**TRANSCRIPT OF PROCEEDINGS**

(Oral Argument)

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

**COURT REPORTER:**
Kellie M. Humiston, RMR, CRR
(503) 326-8186
Kellie_Humiston@ord.uscourts.gov

ER-322

**A P P E A R A N C E S - i**

FOR THE PLAINTIFF USA:

    U.S. DEPARTMENT OF JUSTICE
    By: Michael James Zevenbergen
    7600 Sand Point Way NE
    Seattle, WA 98155


FOR THE PLAINTIFF STATE OF OREGON:

    OREGON DEPARTMENT OF JUSTICE
    By: Gary Lee Vrooman
    100 SW Market Street
    Portland, OR 97201

FOR THE PLAINTIFF CONFEDERATED TRIBES OF THE GRAND RONDE:

    CONFEDERATED TRIBES OF GRAND RONDE
    By: Holly Ray Partridge
    9615 Grand Ronde Road
    Grand Ronde, OR 97347


FOR THE PLAINTIFF CONFEDERATED TRIBES OF THE SILETZ INDIANS:

    HAGLUND KELLEY
    By: Julie A. Weis
    2177 SW Broadway
    Portland, OR 97201


FOR THE PLAINTIFF CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON:

    BEST BEST & KRIEGER
    By: Josh Newton
    360 SW Bond Street
    Suite 400
    Bend, OR 97702

FOR THE PLAINTIFF NEZ PERCE TRIBE:

    CRAG LAW CENTER
    By: Courtney B. Johnson
    3141 E. Burnside Street
    Portland, OR 97214

**A P P E A R A N C E S - ii**

FOR THE DEFENDANT PORT OF PORTLAND:
CORVID LAW PLLC dba HEADWATERS LAW GROUP
By: Gregory L. Baird
92 Lenora Street
Seattle, WA 98121

FOR THE DEFENDANT PORT OF PORTLAND:
PORT OF PORTLAND
By: Crystal S. Chase
7200 NE Airport Way
Portland, OR 97218

FOR THE DEFENDANT BEAZER EAST, INC.:
MILLER NASH
By: C. Marie Eckert
1140 SW Washington Street
Suite 700
Portland, OR 97205

FOR THE INTERVENOR ARKEMA INC.:
HILLIS CLARK MARTIN & PETERSON
By: Matthew J. Stock
999 3rd Avenue
Suite 4600
Seattle, WA 98104

FOR THE INTERVENOR FMC CORPORATION:
FARELLA BRAUN & MARTEL
By: James H. Colopy
One Bush Street
Suite 900
San Francisco, CA 94104

FOR THE INTERVENOR GUNDERSON:
TONKON TORP
By: Maureen Bayer
1300 SW Fifth Avenue
Suite 2400
Portland, OR 97201

4

**A P P E A R A N C E S - iii**

FOR THE INTERVENOR GUNDERSON:
                        TONKON TORP
                        By:  Maureen Bayer
                        1300 SW Fifth Avenue
                        Suite 2400
                        Portland, OR 97201

FOR THE INTERVENOR NW NATURAL:
                        PEARL LEGAL GROUP
                        By:  Patricia M. Dost
                        529 SW Third Avenue
                        Suite 600
                        Portland, OR 97204


FOR THE INTERVENOR NW NATURAL:
                        PEARL LEGAL GROUP
                        By:  Heather Tourgee
                        529 SW Third Avenue
                        Suite 600
                        Portland, OR 97204

ER-325

(September 29, 2025, 10:06 a.m.)

**P R O C E E D I N G S**

THE COURT:  Good morning, everyone.  We are here in the case of United States, et al. vs. ACF Industries LLC, et al., and it is Case Number 3:23-cv-1603.  This is the place and time set for review of plaintiffs' motion to enter consent decrees, Docket 85.  We are holding a fairness hearing pursuant to the CERCLA statute.

And at this time, I will begin by inviting counsel for plaintiffs to enter appearances.  And why don't we first hear who is representing the United States.  We'll then move to State of Oregon and then Confederated Tribes of Grande Ronde, Confederated Tribes of Siletz, Confederated Tribes of Umatilla, Confederated Tribes of Warm Springs, the Nez Perce Tribe, and then we'll move on to defendants' appearances.

MR. ZEVENBERGEN:  Good morning, Your Honor.  Mike Zevenbergen with the U.S. Department of Justice for the United States.

THE COURT:  Welcome.

MR. VROOMAN:  Good morning, Your Honor.  Gary Vrooman, Oregon Department of Justice, for the State of Oregon.

THE COURT:  Welcome.

MS. PARTRIDGE:  Holly Partridge for Confederated Tribes of Grand Ronde.

ER-326

6

THE COURT:  Welcome.

MS. WEIS:  Good morning, Your Honor.  Julie Weis with Haglund Kelley for the Siletz Tribe.

THE COURT:  Welcome.

Do we have anyone appearing for the Confederated Tribes of Umatilla?  Do we have anyone appearing for Warm Springs?

MS. NEWTON:  Your Honor, Josh Newton is appearing remotely on behalf of the Confederated Tribes of Warm Springs.

THE COURT:  Thank you, Mr. Newton.

Anyone appearing for Nez Perce?

MS. JOHNSON:  Good morning, Your Honor.  Courtney Johnson on behalf of the Nez Perce Tribe.

THE COURT:  Good morning.  All right.  I think that is everyone for plaintiffs.  Am I correct?  Have I left anyone out?

All right.  Now I think I'd like to hear from -- appearances from first ACF Industries, followed by -- well, you know, I think I'm just going to go to the objectors first.  Who's representing Arkema Inc.?

MR. STOCK:  Good morning, Your Honor.  Matt Stock, Hillis Clark, on behalf of Legacy Site Services, agent for Arkema Inc.

THE COURT:  Very good.  Welcome.

And who's representing FMC, please?

MR. COLOPY:  Good morning, Your Honor.  Jim Colopy from Farella Braun & Martel for FMC Corporation.

THE COURT: Good morning. Welcome.

Who's representing Gunderson, please?

MS. BAYER: Good morning, Your Honor. Maureen Bayer, Tonkon Torp, for Gunderson, as well as with me is Zach Wright, also Tonkon Torp, for Gunderson.

THE COURT: Good morning to both of you.

MS. BAYER: Thank you.

THE COURT: Anyone representing here NW Natural?

MS. DOST: Good morning, Your Honor. Patty Dost for NW Natural, and my colleague Heather Tourgee.

THE COURT: Good morning. Welcome.

And then we had some other appearances by defendants. Is anyone here representing Defendant Port of Portland, who I know filed in support of the motion?

MR. BAIRD: Yes, Your Honor. Chris Baird from Headwaters Law Group. And with me is Crystal Chase from the Port of Portland.

THE COURT: Welcome.

MR. BAIRD: Thank you.

THE COURT: On behalf the di minimus defendants, which there's got to be a better name than that. On behalf of the di minimus defendants, appearance, please.

MS. ECKERT: Well, that's the best we could do, Your Honor. Marie Eckert from Miller Nash. I'm here representing Beazer East, Inc., and those other de minimus defendants who have

8

joined in the de minimus defendants' supporting brief.

THE COURT: Thank you. Welcome, Ms. Eckert.

And now an appearance by the entity titled the settling defendants, who are also in support.

MR. BAIRD: Your Honor, I think -- this is Chris Baird again, Headwaters Law Group. I'll be answering questions on behalf of the settling defendants, although many of them are also on the phone, so they might pipe in if you have questions for specific defendants.

THE COURT: And is there anyone else who would like now to enter an oral appearance? Hearing none.

All right. Then as I proposed in an e-mail that I sent -- or I guess it was a minute order we sent out recently, I'd like to -- I've really got a lot of things going on today, so I'd like to see if we can keep this hearing to about an hour beginning now. I will invite plaintiffs to use 12 minutes for their opening statements in support of the motion, you can divide it up however you wish, followed by eight minutes to be shared by the Defendants Port of Portland, de minimus settling defendants, followed by 30 minutes to be shared however you wish to allocate it among the four objecting defendants, followed by ten minutes for plaintiffs' rebuttal.

I will tell you I have read the briefs that you all have provided. I believe I understand the issues. I don't think I need too much sort of basic background or introductory

material, if any.

What I'm most interested in really would be a clearer understanding of the objectors' arguments and the plaintiffs' responses to those arguments. That said, the time is yours, and plaintiffs may proceed.

MR. ZEVENBERGEN: Good morning, Your Honor. Mike Zevenbergen speaking for plaintiffs. May it please the Court.

The settlement that is before the Court is the product of years of cooperation and negotiation at one of the largest Superfund sites in the nation involving more than 100 parties. Three groups of parties collaborated to reach this result. First, the settling trustees are five tribes, the State of Oregon, and two federal agencies. Second, the settling defendants are 23 of the responsible parties that stepped forward early to resolve their liability through restoration rather than later through litigation. And, finally, there are four restoration project developers that are parties to this site. They risked their capital years ago so that their restoration projects would be sufficiently developed, that by the time the parties were prepared to resolve their liability, there would be restoration credits available for sale.

That collaboration among the three groups was time-consuming, it was costly, and it was also groundbreaking, but in the end, the result was the first round of early settlements that will begin to restore the natural resources at

Portland Harbor that were damaged by toxic contamination. This is regarded as a significant milestone by all the sovereigns here, the Tribes, the State, and the United States.

We understand that the Court's review will evaluate whether these settlements are fair, reasonable, consistent with the statute, and in the public interest, taking into account the wide latitude the trustees have in reaching these settlements.

Under that standard, the consent decree should be entered for the following reasons. First, the consent decrees advance CERCLA's primary objective of achieving restoration, and they do so sooner rather than later. Second, the consent decrees were negotiated at arm's length using a process that was both appropriate technically, but also applied uniformly as between the settling defendants. Third, and related to the first point, the settlements result in a resolution of liability without litigation, which is one of the key objectives of CERCLA. And last but not least, and this is -- may be where Your Honor was signaling you'd like to have some discussion, the public record supports the trustees' methods and judgments in reaching these settlements.

So I'll begin by highlighting three aspects of the public record. The first is with respect to total damages. The trustees' estimate of total damages here was based on a widely accepted and technically sound method, what's called habitat equivalency analysis, or HEA. The trustees documented their use

11

of HEA extensively in the administrative record. In the initial application of HEA, they documented why it was applied from the Commencement Bay site to the Portland Harbor site. And while intervenors don't like the outcome, they raise no specific technical flaw in what the trustees did.

Second, I would -- with respect to total damages still, it is true that using a different method may well have yielded a different result. That is always the case when you're choosing between one method or another, no two will produce the same result, but the fact that a different method might achieve a different result does nothing to undermine the technical soundness of the method that the trustees chose using their discretion.

THE COURT: That's my understanding, that neither the Ninth Circuit nor the Supreme Court has dictated or directed a specific method.

MR. ZEVENBERGEN: That is our understanding as well, Your Honor. The cases we cited discuss deference to trustees' technical judgments in selecting an appropriate method.

The second point that I'll talk about, again, in the administrative record, is allocation. Here, the settling defendants were collectively allocated 11.4 percent of the harm. That allocation is supported in the public record by a very long list of information, beginning with information about the contamination that is in the sediments at the site, a great deal

of information about the industrial history and activities that took place at Portland Harbor not just by settling defendants, but by all of the industrial participants in Portland Harbor's history.

On top of that, with respect to settling defendants, the trustees prepared detailed descriptions for each settling defendant of the operations that took place on every property identified in the consent decrees, on the activities that were associated with those operations, and then, finally, which contaminants of concern, and there were 12 that the trustees looked at, but which of those 12 for each activity was associated with that activity.

All of that information collectively paints a detailed picture of what these 23 settling defendants collectively did at Portland Harbor, and in relation to the relevant case law, provides more than enough detail to satisfy the standards for entry of the consent decree.

The last point I'll make is with respect to consent decree provisions, because the intervenors are claiming, among other things, that the covenants not to sue and the contribution protection granted to settling defendants are too broad, and they particularly make that argument with respect to the geography involved here. In the trustees' view, that is entirely appropriate both for legal and technical reasons.

Technically speaking, the trustees found, using EPA and

Oregon DEQ data, that the contamination in the area they studied was substantially more significant than contamination downstream of that area. And the trustees, therefore, concluded that the contamination within their study area reflected the large majority of natural resource damages. Based on that, the trustees determined to focus their analysis on that area, but given the differences in contamination, the trustees felt it was appropriate to give covenants not to sue for the entirety of that contamination, because, like any other settling party or group of settling parties, settling defendants required repose. That is the inducement for settlement, that the claims would be resolved.

In sum, Your Honor -- and I know I'm wrapping up before my 12 minutes, but I thought you might have a question or two.

THE COURT: That's okay, too.

MR. ZEVENBERGEN: All right. In sum, the proposed settlement is in the public interest and the consent decrees should be entered so that the public can enjoy the benefits of restoration now rather than waiting till much later in the process.

With that, I know I'm ending early, I would request that the remainder of my time, if it's possible, be added to my time for rebuttal.

THE COURT: That sounds quite reasonable. Thank you very much, Mr. Zevenbergen.

All right. Who is going to be speaking next for the

14

other parties in support of the settlement, that would be Port of Portland, de minimus defendants, settling defendants?  Yes.

MR. BAIRD:  Your Honor, I will be for the Port of Portland and the settling defendants.

THE COURT:  Thank you.

MR. BAIRD:  Good morning again, Your Honor.  Once again, my name is Chris Baird.  May it please the Court.  I have very little to add here today.

The one thing I want to pick up that was not in the trustees' opening was that there really is no risk of this consent decree disturbing at all the allocation proceeding that is currently ongoing.  Although they both involve CERCLA, that is really where it ends.  Some of the same facilities in and around the Portland Harbor area, that is really where the similarities end.  Natural resources damages are different than response costs.  They involve different technical issues, they involve different legal claims, and so there really is no risk that the allocation will be undermined by this at all.

Beyond that, if you have questions, I'm happy to address them.  I know -- I understand that Mr. Loren Dunn may want to say a few words on behalf of PGE, one of the restoration project developers.  And if he is on the line, I'd invite him to speak.  And if not, we have Ms. Eckert who can talk on behalf of the de minimus parties.

THE COURT:  Mr. Dunn, are you with us?  I don't see you

15

and I don't hear anyone.  If you're speaking, you may be on mute.

All right.  Let's proceed to Ms. Eckert.  And I've known Ms. Eckert for a long time, and I have never before used her name, Ms. Eckert, in the same phrase as "de minimus," but you may proceed.

MS. ECKERT:  Well, we considered "the teeny tiny defendants," Your Honor.  That was too long to say.

I will be brief as well.  We join in the arguments made by the trustees and the larger group of settling defendants.  I represent Beazer East, Inc., which is both a de minimus defendant and also has joined in the larger settling group, but I'm also authorized to speak today on behalf of those other de minimus defendants that joined in our brief supporting the entry of the consent decrees.

And I simply want to focus on the unique harm that is suffered by the small parties in the event that long negotiated consent decrees are not entered at the end of the day.  There will be harm to all of the settling defendants if this process -- if the consent decrees aren't entered and we are back at the starting gate, but for those very small parties, it's a very difficult decision to decide to enter into the process of negotiation and funding.

And in CERCLA, the goal of encouraging early settlements is for a reason.  You need people to step up, you need people to fund, you want to avoid litigation, you want to

avoid standing in a courtroom like we are today with a host of lawyers representing their clients, and get things done.  And so for this group, as reflected in the briefs, for many of them, the cost of funding this process at the end of the day was larger than their actual liability.

So in keeping with the goals of CERCLA, that conduct should be rewarded.  There is an extensive record here to show that the consent decrees are both substantively and procedurally fair.  And for parties that have stepped up with very limited liability, it would really be -- cause extreme harm, and from a public policy standpoint, have broader implications if the consent decrees are not upheld.

Thank you, Your Honor.

THE COURT:  Thank you, Ms. Eckert.

All right.  Now let's turn to the reasons why I shouldn't approve the consent decrees.  Let me hear from counsel for Arkema, FMC, Gunderson, and/or NW Natural.

MS. BAYER:  Good morning, Your Honor.  May it please the Court.  My name is Maureen Bayer.  I'm representing Gunderson.

Just to lay out a roadmap for you, I will be speaking about the legal standard very briefly, followed by a presentation by Mr. Stock for Legacy Site Services, Arkema, followed by an argument by James Colopy representing FMC, and then Patty Dost will speak on behalf of NW Natural.

In advocating for the entry of the proposed CDs, settling defendants and plaintiffs lean very heavily on CERCLA'S policy favoring early settlement. They also use this argument to bolster the amount of deference that the CDs should be afforded.

We acknowledge that the statutory framework of CERCLA promotes early settlement by providing contribution protection for settling parties, and this may also result in a disproportionate share of liability to non-settling parties; however, CERCLA's policy of early settlement cannot and should not be at all costs, and must be balanced against the competing Polluter Pays Principle; that is, in passing CERCLA, Congress's intent to make responsible parties pay for the pollution and the problems that it has caused.

It is against this backdrop that the plaintiffs argue that since settlement is encouraged under CERCLA, they have wide latitude to discount the amount the settling parties are responsible for. Plaintiffs cite for this proposition two district court cases ruling that liability discount afforded settling parties were justified by CERCLA's policy of encouraging settlement, but that wasn't the only metric in those cases. The courts also considered in depth whether the decrees were substantively and procedurally fair, reasonable, and protective of the public interest. In order for Your Honor to make such a determination, plaintiffs must provide this Court with adequate information.

As my fellow intervenors will discuss shortly, the picture that plaintiffs have painted is not detailed enough. Plaintiffs acknowledge that the Court must consider the effect of settlement on the non-settlers.  To be clear, we are not asking the Court to ensure that the settlement is perfectly calibrated, nor that the best deal possible has been struck; however, the settlements before Your Honor are presented with inadequate information for you to conclude that they are generally fair and reasonable, as required by the relevant standards.

THE COURT:  Is it fair for me to ask what specifically is the most important missing information?

MS. BAYER:  I'm so glad you're asking for that.  I'm going to pass the mic on to Mr. Stock.

THE COURT:  Thank you, Ms. Bayer.

MR. STOCK:  We didn't coordinate that hand-off, but it worked pretty well.

THE COURT:  And it's Mr. Stock, right?

MR. STOCK:  It is.  Matt Stock, Hillis Clark, on behalf of Legacy Site Services, agent for Arkema, Inc.

So I guess I'll just jump right in and dispatch with some of the introductory comments, but I do want to say, you know, what this Court needs to do and what the intervenors have looked at in terms of trying to determine whether the consent decrees are substantively fair is it's -- we're trying to gauge the adequacy of the settlement payments, right?  And the *Montrose*

court in the Ninth Circuit laid out the test for this back in 1995, and it said: The proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of the total projected costs to be paid, the settlement payment, by the settlers with the proportion of liability attributable to them.

We don't have that second piece of information. What we have is the liability that has been assigned to the settling parties following the negotiations. We don't know what types of discounts were made. We don't know what the ultimate allocation was prior to the negotiations that took place that resulted in the 11.4 percent of aggregate liability that you've heard a lot about in the briefing, right? That is an essential piece of information.

In fact, if you look at the *Arizona v. City of Tucson* case, which was 2014, that reaffirmed this test. Again, this was the Ninth Circuit. And in that case, the Ninth Circuit rejected consent decrees that the district court had upheld on the grounds that the district court didn't do that comparative analysis. It didn't know what the liability was for the settling parties.

THE COURT: Well, but it's one thing to not know what the liability is, but are you telling me that *Arizona* -- the *City of Tucson* case requires that the discounts that have been given be made public or at least made available to defendants? Is that a holding in that case?

MR. STOCK: Well, I'll read you what the court said. This was the Ninth Circuit, again, critiquing the district court's decision. It said: But nowhere in the district court's opinion is there an analysis comparing each parties' estimated liability with its settlement amount.

So there again, I think what the Ninth Circuit is instructing the district court to do is look at the assignment of liability. It then looks at the discounts for litigation purposes, and that's discussed by *Montrose*, that ultimately compares that against the settlement payment.

THE COURT: Just remind me the pincite for that quote, please.

MR. STOCK: Yes. So *Arizona* was 761 F.3d 1005. And the quote in question is on page 1012. And then *Montrose*, if you need it, is --

THE COURT: No, no. I've got that. I've read that one.

MR. STOCK: Okay. So, again, without the assignments of liability that were given the settling defendants, we think that alone is grounds to deny the plaintiffs' motion, but, and this is the issue that we focus a lot on in our briefing, the other problem that the settling -- I'm sorry, that the intervenors have identified is the fact that the total quantum of natural resource damages upon which the settling defendants are settling is likely to increase. And that is certainly our

concern, right?

We don't take issue per se with the trustees' use of the habitat equivalency analysis, nor do we necessarily take issue with the calculation of damages, the 4,130 DSAYs that came out of that habitat equivalency analysis.

The problem that we've identified in the briefing, and we stand by here, is that that analysis will not be carried through in the forthcoming formal damage assessment, which will then be used to determine the quantum of damages that the plaintiffs will use when pursuing claims against the non-settling parties.  To use very colloquial terms, right, it's not uncommon for non-settling parties to be left holding the bag following proceedings like this.  Our concern is that bag is going to get a lot bigger, because the method by which the damages are being calculated is going to change.  We're going to go from a habitat equivalency analysis to a resource equivalency analysis, right?  The scope and the suite of resources to be evaluated is going to increase.

Beyond that, when you look at the trustees' Phase III damage assessment plan, they indicate that they may look at additional contaminants, may look at additional geographic areas, and may look at additional natural resource damages that are attributable to the implementation of the remedy.  Any one of those things standing alone is likely to lead to an increase in the amount of natural resource damages.

Trustees have chided us, claiming that these claims are speculative, that we don't know how much bigger the damages calculation could be. That's true. The trustees also acknowledged in their opening brief that the damages assessment is likely to lead -- well, not likely; could lead to a greater calculation of damages.

That -- that potential is animating our concern that the contribution protection that's being afforded to the settling defendants here is inappropriate, because, again, we just don't know what the ultimate calculation of damages may be.

THE COURT: Is there any solution to that problem other than to deny them contribution protection, deny them finality?

MR. STOCK: That's certainly one solution.

THE COURT: Okay. Is there any other solution?

MR. STOCK: I think another solution would be to utilize similar, perhaps identical, methodologies in terms of assessing damages so that the settling defendants and the non-settling defendants are being measured by the same device.

THE COURT: But I thought we don't know yet. And you're telling me, and I'm telling you the plaintiffs agree, that we don't know ultimately what the full magnitude of the damage will be. So how can we do that now, given the consequence of your argument that you can't settle now with anybody?

MR. STOCK: Yes. The consequence of the argument is that you can't settle now.

ER-343

THE COURT: That's not the world's most appealing argument.

MR. STOCK: I think had -- had we not been told that the methods by which the trustees were going to assess damages is going to change going forward, you know, I think that that argument may carry a little more weight, but the fact is they have telegraphed that there will be changes in the methodologies that are going to lead to potentially greater quantums of damages that my client, the other intervenors here, other non-settling defendants may ultimately be held responsible for.

THE COURT: Okay.

MR. STOCK: And with that, I will turn the lectern over to Mr. Colopy. Thank you, Your Honor.

THE COURT: Very good. Thank you.

Good morning, Mr. Colopy.

MR. COLOPY: Good morning, Your Honor. I'd like to try to answer the Court's questions about the practicalities here and provide more detail about the concerns that the intervenors have as we laid out in our papers.

As the Court knows, as laid out in our papers, and particularly on page 12 of FMC's opposition brief, we know that plaintiffs have performed party-specific and property-specific allocations. We know that because they say so in their CDs. They are simply refusing to produce it. They're refusing to produce it to us, they're refusing to produce it to the Court,

and are asserting as confidential and as not necessary for the Court to be able to approve the consent decrees that in the report.

We disagree, one, because the law set forth by the Ninth Circuit, as you know, which I won't repeat because you've already hear it, in our view requires it to be put forward.

THE COURT: So what specifically are you asking for that they're not producing?

MR. COLOPY: Well, what I'm specifically asking for is what they referenced in recitals F, T, and U of the restoration CD, which refers to the specific -- party-specific allocations and property -- well, I'll reverse that order; the property-specific allocations that they did and the party-specific one.

And let me give an example of why that matters. One of the settling defendants here is Schnitzer Steel, now known as Radius Recycling. They operated at a site that my client, FMC Corporation, also operated at. Now, unlike Schnitzer, which operated up and down the river at various locations, my client only operate -- only owned this one site, we call it the Front Avenue property. It's Site Number 157 in plaintiffs' recitation of sites. As it happens, Intervenor Gunderson LLC also owned that site at a different point in time, and at only that site and nowhere else.

Now, we are two of the non-settling defendants. At

that site, I would say there are a total of five PRPs associated with it. There's Radius and an affiliated entity that are two of the settling defendants, there's my clients, there's Gunderson LLC, then there's a fifth older entity that is an orphan, long defunct.

Let's assume for the moment that plaintiffs continue with FMC and with Gunderson LLC and -- with their NRD claim, and at some point proceed either to trial or to settlement, and they have -- they say, "This is the amount that FMC owes for your contribution associated with this one property, your only property, your only nexus to the river." And they'll have the same conversation with Gunderson LLC, or they'll ask the Court -- this would be a bench trial. They would ask the Court, they will say, "Your Honor, we believe the dollar amount is X and the dollar amount is Y."

What is the amount that's going to be attributed to the extensive operations that Schnitzer had at this property? Schnitzer operated for 30 years a vessel dismantling operation, a scrap yard, they shredded automobiles, they did a lot of things that are very obvious contributors to environmental contamination. There is nothing in the record at all that provides any illumination for us or for the Court about how that has been quantified and addressed as part of this settlement. And that future day, whether it's in court or whether it's in a conference room in settlement, we won't know that number. And

they can come and they could say, "We assigned zero for Schnitzer. We disregarded those 30 years of vessel dismantling and shredding and scrap yard operations." They could come in and say it's 50 percent, they could come in and say it's 35 percent.

There needs to be, as part of this approval, some determination on a property basis and a per party associated with that basis in order to have future resolution of the claims that will remain pending. And that is not limited to this one site.

And I misspoke earlier. It's Site 186 is the Front Avenue property.

That will be true at many, many sites up and down the river where there are multiple PRPs associated with the property, some of which are settling, some of which are not. Right now, the record has nothing in it on that information.

THE COURT: Does any case law expressly require party or property-specific allocations be disclosed as part of a court fairness hearing?

MR. COLOPY: Your Honor, there is not an abundance of case law on this issue. So we have not located something that is exactly on point as you describe; however, I believe the court's -- the Ninth Circuit in *Montrose* and *Aerojet* by referring to comparative liability and due diligence the court needs to provide and how the level of deference that a court may accord to the government is depending upon the persuasive power of its proposal and rationale. All of those, in our view, requires the

27

production of that information that exists, because they've told us it exists and they've included in their CD, which they're asking this Court to approve, but without making it available for anyone else to see.

And given the large monetary implications here, they have very real consequences, which gets to the second point I'd like to address, Your Honor, which is the scope of the contribution protection that's being sought here.  It is not only for the NRD study area.  It is going far beyond that.  And, again, we have no calculation of what the party -- or excuse me, property contributions were or the party contributions were as part of this consent decree.

And these settling defendants, if granted as currently written, would be entitled to protection from any claims for this very broad area for which there is much that's unknown, as plaintiffs admit, as everyone admits.

And going back to your earlier question, I believe the Court has discretion to limit the scope of the contribution protection to the NRD study area at best and not to include the area outside of it, given the unknown nature of any claims that may exist as to there.

THE COURT:  Let me follow up on that.  Are you saying that I can unilaterally modify the settlement agreement in that fashion?  I thought all I could do is either approve or disapprove, and I thought you were arguing that I should

ER-348

disapprove because that contribution limitation exists.

MR. COLOPY: As one of the grounds, not the only ground. You have the authority to deny and state that you believe that provision is over --

THE COURT: So you're not saying that I can modify the agreement and then force it on the settling parties?

MR. COLOPY: I'm not saying you have the line item veto. That's right.

THE COURT: Okay.

MR. COLOPY: I'd like to have that one with me, yes.

THE COURT: Okay.

MR. COLOPY: The third point, Your Honor, I would like to address is there are prior cases that this court has held in abeyance, as addressed in the papers. One of them is an NRD case brought by Yakima Nation. That is also a natural resource damages case. And we quoted to you the filings by the federal government in that case where they vigorously argue that the facts and the legal claims being asserted by Yakima Nation involve a significant overlap -- their words, not mine -- a significant overlap in facts and issues, and that the equities of the ongoing private allocation process justified a court-ordered stay of that Yakima litigation pending the outcome of the private allocation. And that's exactly what this court did. Not Your Honor, but a different judge entered into a long-term stay that is still in place and has been in place for many years.

This court -- again, another judge -- also did the same thing in a parallel cost recovery case, not natural resource damages, but also under CERCLA, brought against a number of parties who were not participating in the private allocations. That is also subject to a long-term stay. But the statements that the United States said in the prior -- in the briefing -- in the prior briefing in the Yakima case, also an NRD case just like this one, equally apply here. The private allocation is -- it has its own schedule. We are moving promptly towards it.

This -- these settlements, these CDs, if you look at the signature pages, were executed in March and April of 2023. The motion that is before you today, Your Honor, was filed in June of 2025, two years and two months later, not exhibiting a great deal of time urgency to move this forward.

Given where we are with the pace of the settlement and the timeline that the federal government has given the participants in that private allocation for a comprehensive settlement, which is less than that period, we believe that for the same reasons as the federal government advocated in the Yakima case and this court granted, that this matter should be deferred.

And that gets to the nature -- and I know, Your Honor, you said you didn't need background, but just to -- just in case there's any question on this, the natural resource damages by definition are a residual claim by definition. The measure of

natural resource damages is a depletion of a cleanup.

The cleanup hasn't started anywhere in the river, and it won't start for years to come, because the design of that cleanup is still ongoing. We have addressed that in detail in our papers, I won't repeat it, but for those same reasons, Your Honor, we ask that this be deferred.

THE COURT: Thank you, Mr. Colopy.

MR. COLOPY: Thank you, Your Honor.

THE COURT: Ms. Tourgee. Am I pronouncing that correctly?

MR. COLOPY: I'm sorry?

MS. TOURGEE: Yes.

THE COURT: I'm sorry. Your name?

MS. TOURGEE: Dost.

THE COURT: Pardon me? Oh. Sorry. Ms. Dost. Thank you.

MS. DOST: I'm so sorry about that. I'm, again, Patty Dost from Pearl Legal Group on behalf of NW Natural.

I want to say at the outset that the trustees note in their motion that settlement negotiations are ongoing with other parties in this process, and I want to identify that NW Natural is one of these -- of those parties with whom settlement negotiations are ongoing.

We generally support the settlement process, but we also believe it must have some baseline level of fairness and

31

transparency.

I'm not going to repeat what my colleagues have said about the law requiring some level of comparative analysis of fault here, but I did want to point to a couple of other issues that I think are sort of relevant there. One is that the standard for causation for natural resource damages is by statute a little different than other sorts of claims. It requires that the trustees establish that a -- that the injury for which they seek to recover damages results from a hazardous substance by a named defendant. That's the CERCLA case.

So in evaluating a settlement of natural resource damages, the Court should pay special attention to whether the settlement fairly ties the damages settled to the identified release of a specific hazardous substance at a specific facility.

And then, finally, I think it's also important to note that the 2023 allocation methodology report, which was cited in the FMC briefing, provides by the trustees that -- or provides the trustees' acknowledgment that relevant regulations and legal precedent suggests that the approach chosen for a particular case should be equitable, clearly defined, systematically applied, and make reasonable use of available data.

So NW Natural is concerned that with respect to the settlements proposed today, the Court simply does not have the information it needs to evaluate the comparative fault of the settling parties and/or to determine that the application -- the

allocation approach was equitable, clearly defined, and systematically applied.

I'd like to, as Mr. Colopy did, give a specific example here to talk about it. NW Natural's the owner of the property that is known as Site 123 in this proceeding. Two of the settling defendants, Beazer and Koppers, are former tenants of Site 123. The trustees have advised, as Mr. Colopy identified, that the first step of the allocation, which was to estimate the amount of damages, that being the number of DSAYs that are attributable to each property that allegedly contributed contaminants to the river, and then those properties were given site numbers, and thereafter the trustees allocated the DSAYs among the various parties associated with the site.

And according to the 2023 Allocation Summary Report, it's important to note that the -- as the allocation proceeded, the trustees occasionally updated the harbor-wide allocation to numbered sites, and from there to the parties associated with those sites. So as the allocation went along, the numbers were changing in that allocation.

So to perform any degree of comparative analysis with respect to Site 123, the Court would need to have at least the number of DSAYs assigned to Site 123 and the number of DSAYs to be settled. And here, the Court has only the number of DSAYs to be settled, 6.9 to Beazer and 3 to Koppers. This single number does not allow the Court to determine whether the settlement with

Koppers and Beazer represents 1 percent of the damages associated with Site 123 or 10 percent or 90 percent.

And I want to be clear in raising this that NW Natural is not necessarily objecting to the settlements to Beazer and Koppers. It's just that the Court and the parties do not have the information available to evaluate what the comparable -- what the comparative liability of those parties has been determined to be.

So just having that one number does not allow for comparison of the relative responsibility of the parties. It doesn't allow the Court to determine whether the allocation was updated equitably and systematically to determine -- as the allocation was changing harbor-wide. It doesn't allow the Court to evaluate whether the public will be adequately compensated for the damages associated with Site 123.

And it's important that the trustees acknowledge that they calculated the number of DSAYs associated with Site 123, but they have declined to provide that number to the Court. And as Mr. Colopy's saying --

THE COURT: What response did they give you for the reason why they declined to provide that?

MS. DOST: I have not heard a response from the government about that other than there are confidentiality agreements in place.

THE COURT: Is that common or uncommon in these sort of

34

CERCLA settlements?

MS. DOST: I think that it is common for settlement discussions to be confidential; however, the ability of the Court to determine whether the allocation was applied systematically is really impaired by the -- the failure of the government to be able to come up with that number.

It's important to think about this case in the context of other sorts of allocations that have been litigated, right? In cases that are based upon a volume metric allocation, the court has an understanding of the amount of waste that came from one defendant versus the amount of waste that was totally there.

Here, because the -- the settlement is just described in DSAYs, which are basically fungible entities like dollars, all that the Court knows is the amount of the total fungible DSAYs that are being settled by these certain defendants, and that does not give the Court any ability to evaluate the comparative liability of those parties for those DSAYs.

I wanted to just talk about this on a little bit more of a global scale within the harbor as a whole. The trustees have also declined to provide the chemical-specific DSAY footprints that they prepared to assign the DSAYs to each of the sites. So they mapped it all out and then they segregated it back to each site that they thought it came from.

The trustees, again, acknowledge that this information exists, but they provided only the total number of DSAYs per

ER-355

COC -- or per, sorry, CERCLA lawyer, per contaminant harbor-wide, and that does not allow the Court to go through that exercise of tracing back what damages in what footprints are being assigned to which site and then how those are being divided among the parties. There's absolutely no way for the Court to evaluate that information within the comparative fault associated with the information that the trustees have provided here.

So you were asking earlier what is it that we would like to see done here. What NW Natural would like to see the Court ask the trustees to provide would be for each site in which there's a settlement the DSAYs allocated to that site, the contaminants contributed to each site and which of those are being settled by each defendant, which footprints of damages are being settled or partially settled, and which DSAYs are attributable to those footprints, which footprints are attributable to which sites being settled, and whether the settling defendants' allocated DSAYs were adjusted as the trustees reallocated the footprints from time to time through the allocation.

According to the description provided by the trustees, all of this information exists and should be readily available in existing tables or could be compiled by the plaintiff without much trouble. We're just asking really what our eighth grade algebra teachers asked all of us, that we show -- that we showed our work.

I'll just close by saying that NW Natural very much wants to settle this case. We've been engaged with the trustees for a long time. And we acknowledge we have liability of the site, and we'd like to resolve it. We're simply just asking the Court to require the trustees to provide enough information, information that the trustees acknowledge already exists, for the Court to ensure a level playing field here. Thank you.

THE COURT: Thank you very much.

All right. I think it's time to go back to you, Mr. Zevenbergen. And let me share with you what I really would hope that you'd now address. And to the extent that I'm misstating these concerns, by all means please correct me. To the extent that I'm correctly stating these concerns, please tell me why I shouldn't be concerned. But as I understand it, the primary thrust of the objection is that there's not enough information for the Court to be able to compare each settling parties' liability with -- or each potentially responsible parties' liability to the settlement amount, to the overall settlement amount, that that's caused in part because the quantum of damages are likely to increase.

I understand your response is that that's to some extent speculative, but their response is, "Well, but you've already indicated you're going to apply a different methodology in Phase III, and so why shouldn't we be comparing apples to apples now."

And then relatedly, part of the argument I'm hearing is that we need to have comparative liability, that comparative liability depend -- does deserve a fair amount of deference to the government, but it depends upon the persuasive power of that evidence, and that you just haven't given enough evidence to be persuasive on that point, because we don't have party-specific allocations, we don't have property-specific allocations, and we don't have some of the other details that Ms. Dost was just referring to.

That's what I'm hearing as the thrust of the objectors' main concerns. If I've misheard that, by all means correct me. If I've heard that correctly, why should I not be concerned?

MR. ZEVENBERGEN: Thank you, Your Honor. I think you have heard their concerns correctly. I will -- as I address each concern, I'm going to take issue with the way they've framed it, because in many cases, I think that legally they're barking up the wrong tree.

So if I may, I'll begin with the quantum issue just so we can understand that -- the whole thing that's at stake. So I think argument was helpful in clarifying that the intervenors don't so much object to the quantum that was determined by the HEA process. They're afraid that it's going to grow in the future. So I'll speak to that both generally and then with respect to some specific concerns they raised in their brief, and then I'll even look ahead and talk a little bit about risks at

trial that aren't faced here in settlement.

So generally, just beginning with the general point, the analysis that is being done for the formal damage assessment, which the trustees announced publicly in 2018, that's the document that intervenors point to, that analysis is ongoing. Anyone who's worked in environmental sciences generally knows that when you do a study, you don't know the outcome until the study is completed.

So the intervenors are correct that we're using a different method, but that doesn't mean the numbers go up. That means there's a very good chance the number's different, that the likelihood the number would be the same as what was reached in the HEA is pretty small given the range of outcomes. So the number will be different, but we don't know whether the number will be bigger or smaller.

Let me say a little bit about the difference in methodologies so that the Court has an appreciation of what's at stake. So HEA is basically taking information about the amount -- the concentrations of identified toxic contamination and translating those into a percentage of ill effects. So basically for any given contaminant, the higher the concentration, the greater the reduction in the habitat value to the contaminated habitat. That's what HEA does. So if you know the concentrations, then you take scientific literature and you basically can see what your outcome is.

39

The formal damages assessment, by contrast, is taking those contaminant concentrations and then doing studies either in the field or the lab to determine the actual effect on the natural resources that are out there, fish, birds, mammals, things like that. That's a very complicated undertaking. And even if you know exactly what your contaminant concentrations are, things happen at one site that don't necessarily happen at the other, and so you just can't know in advance what the outcome will be. It could be that these studies are done and they show harm to natural resources that are significantly greater than were estimated by the HEA. That is absolutely a possibility, but the converse is true as well, that these studies could be done and they could show harm that is significantly less. We just don't know until the studies are done. So that's the first point.

The second point with respect to specific concerns that were raised, one concern is geography. So when you look at the 2018 -- the 2018 announcement, you will see that the trustees have stated their intention to use the same study area. The language the intervenors point to is the part where they say, "And we could go further. It depends," but what we know right now about the trustees' geographic decisions is first they have said very publicly, pointing to available data, that they stopped where they did in the study area because downstream, that concentrations dropped off noticeably and, therefore, they

40

thought there was less harm. So that indicates an intention not to proceed.

The trustees here have also been very public about their disagreement with the Yakima Nation, a fellow trustee, about whether they should have looked downstream. The Yakima Nation felt very strongly that they should, the remaining trustees felt strongly that that was not appropriate, and so the Yakima Nation ended up leaving the trustee council. That was a big deal for all parties involved. And it wasn't over lack of respect, because I want to say there is -- there's respect all around among the trustees, but the trust -- the settling trustees here stuck to their guns on their determination that it was appropriate to stop where they did, geographically speaking. And so what you see in the 2018 document is a placeholder, that it's always possible that new information could come along that tells them to go downstream, but at present, they don't intend to do that.

The same thing with contaminants of concern. Again, if you look at that document, what it actually says is that the trustees intend to examine three of the 12 contaminants that were examined here, so fewer contaminants than were examined here. And the three contaminants they highlight are the DDT and breakdown contaminants, what are called DDXs, polycyclic aromatic hydrocarbon, PAHs; petroleum and carbon-related contaminants, that's the second one; and the third one is PCBs.

As we showed the Court, those three contaminants collectively make up more than 80 percent of the harm estimated by the trustees in the habitat equivalency analysis that was done.  So those are significant contaminants.

What the trustees said in their 2018 document is for this formal assessment, we might not do more than just those three.  And the reason they said it is it costs money to include more contaminants.  So it would be pretty expensive to do all 12.  The intervenors framed the argument as if the trustees are thinking about doing more than 12.  The trustees have said, "We might do more than three."  That's a very, very different situation.

I think I'll leave the specific claims that they make there, because the rest are in the brief.

The last point I want to make here is about problems of proof at trial.  In the settlement, the trustees are getting 100 percent of the allocations that they made to settling defendants, because that's what settlement is.  The trustees make the allocation in the settlement document.  That's what settling defendants pay.  And there's certainty all around for the trustees in terms of what they receive, the settling defendants in terms of what they pay.

Even accepting intervenors' hypothetical that the formal damage assessment is -- produces a larger injury than the settlement damage assessment with the HEA model, let's say that

happens, we still have to go to trial, Your Honor. And natural resource damage assessment trials are very, very sciencey, they're intensive, they're complicated, and the problems of proof are difficult. So there's a lot that trustees have to do with a lot of science, and we have to keep the fact finder awake at the same time. And as I'm --

THE COURT: Unfortunately, it's not a jury, is it?

MR. ZEVENBERGEN: Well, actually, Your Honor, I could dive down that rabbit hole. There's a lot of case law suggesting that it is a jury case.

THE COURT: We'll talk about that down the road.

MR. ZEVENBERGEN: So -- and which increases the complexity. So the fact that the trust -- even if the trustees were to come up with a larger formal assessment, that doesn't mean they recover that much. So there are uncertainties upon uncertainties. And CERCLA's scheme, as with many other schemes, allows for parties to reach settlements that account in part for the uncertainties.

THE COURT: Let me go back and drill down one more piece. And I think what you've just said answers this, but I'd like to just drill down and make sure I understand your answer.

What is the specific response to why the trustees do not need, as part of this fairness process, to provide to the non-settling parties party-specific and property-specific allocations?

MR. ZEVENBERGEN: Yes. Okay. So I -- the place where I'll start is that the intervenors are looking at the wrong metric. What the settling defendants -- excuse me. What the trustees needed to provide and did provide was the aggregate amount that was allocated to settling defendants, which is 11.4 percent. And in -- to jump to -- we reached that by allocating specific amounts to each settling defendant and had specific information that we developed as to each settling defendant, but as we explained in our response to comments on this point and then again in our briefs, the piece of the settlement that directly affects intervenors and other non-settlers here is the aggregate amount of the settlement, because under CERCLA Section 113(f)(2), the non-settling party's liability is reduced by the amount of the settlement in the aggregate.

THE COURT: But -- and here's where I'm still confused, among many other places where I'm still confused, but if one of the non-settling, or objecting, defendants is concerned about a specific site, whether it be Site 186, 123, whatever, if they're concerned about a specific site for their potential future responsibility, if all they get is the aggregate of multiple sites from all the settling defendants, they say that they've got some concerns, why is that not a legitimate concern for the Court to consider in a fairness hearing with some settling defendants?

MR. ZEVENBERGEN: They said that's their concern because the way they framed it was to try to paint for you a

44

picture of the liability they would be facing at that site. And that's where I -- and this relates to CERCLA's overall liability scheme of joint and several liability.

So let's suppose that we are a number of years in the future and the trustees are now bringing a claim for any non-settlers for natural resource damages. Hopefully these intervenors would have settled out somewhere along the way if that's possible, but maybe they'd be part of that at trial.

THE COURT: Sure.

MR. ZEVENBERGEN: We would not be proceeding site by site through more than 200 sites at the Portland Harbor site. We would show the industrial history of the Portland Harbor site. Again, I'm --

THE COURT: Right. Would you show the entire natural resource damage at the --

MR. ZEVENBERGEN: Yes.

THE COURT: -- entire Superfund site --

MR. ZEVENBERGEN: And the fact that these parties contributed to it.

THE COURT: And then any individual party that's remaining for trial would be jointly and severally liable for the entirety --

MR. ZEVENBERGEN: Yes.

THE COURT: -- of the remaining damages minus the settlement amounts already received --

ER-365

MR. ZEVENBERGEN: Exactly.

THE COURT: -- regardless of whether their specific site did or did not cause a large amount of damage, regardless whether or not a prior owner of their specific site did or did not pay a particularly large amount in settlement.

MR. ZEVENBERGEN: Exactly, Your Honor. And the place where these defendant -- where the defendants' individual liabilities would be determined would be at the allocation portion of the trial, which usually follows liability and determination of damages so you know how big the pot is that you're dividing up. And that would -- is where the defendants would all gather together and basically point fingers at each other and say, "They were more responsible than I was." And the fact finder would have to determine who was responsible for how much --

THE COURT: But they couldn't --

MR. ZEVENBERGEN: -- as between those defendants.

THE COURT: But they couldn't point the finger at a settling defendant.

MR. ZEVENBERGEN: That is correct.

THE COURT: And so why aren't -- I mean, they're saying right now, "If we get to this allocation phase, I would at least like to know now," they say, "what is the amount that's going to be allocated to prior owners or even later owners of this specific site." And why are they not entitled to that?

MR. ZEVENBERGEN:  Because the benefit they get from this settlement is that, as Your Honor just said, their pie effectively shrinks, because whatever the total damages that are approved, there's a slice or two slices if there's a later settlement, and we hope -- we hope there will be, but there are slices taken out of that pie, and the non-settlers that are found liable in this hypothetical at trial are only allocated shares as between themselves.

THE COURT:  And your response essentially is, well, that may have some pros and cons in some type of objective sense, but that's the way CERCLA works.

MR. ZEVENBERGEN:  Yes.  Yes.  Now, on top of that, Your Honor, we did -- the trustees developed and provided to the public very detailed information as to each settling defendant.  Courts commonly want to know if something important has been overlooked by the governments that are involved.

THE COURT:  Sure.

MR. ZEVENBERGEN:  And so we provided information on operations, activities, associated contaminants.  There is absolutely no objection by intervenors as to any of those specific documents to say you overlooked this operation or that activity or you assigned the wrong contaminants.  There's nothing here as to that.

THE COURT:  The only thing that you're not providing is what is the specific share of the overall settlement that is

coming from this particular settling defendant from that particular settling defendant?

MR. ZEVENBERGEN: No. We are providing that for each settling defendant. What we're not doing is where the settling defendants have more than one facility, we're not breaking it down for the facility and we're not providing all of the detailed inner workings that went into the calculation for each facility. If I can --

THE COURT: You may.

MR. ZEVENBERGEN: -- grab my co-counsel's analogy and use it a little bit, I agree that you have to show your homework in eighth grade algebra, you have to show your work, but if you're required to show your work in coming out of settlement discussions in cases like this that are this complex, then settlements often don't happen. And the cases we cite recognize that, I think, very well known reality in the legal world. And in the intervenors' briefs, I don't think there are any citations to the contrary.

The last point I'd like to make going on the three issues that you flagged, Your Honor, is -- well, you talked -- let me talk about two more. I said one more, but if I may --

THE COURT: You may.

MR. ZEVENBERGEN: -- introduce two more.

THE COURT: You may.

MR. ZEVENBERGEN: One of the issues that you raised was

the idea of deference and the fact that the degree of deference depends on the persuasive power of what the trustees here have submitted.

We have tried to be very candid with the Court, with non-settlers, with the public about the information that we are not providing. We're -- you know, we're not trying to be opaque about that. We want to be upfront. We calculated this information, we're withholding it, but as to the information we have provided, we believe that it does entitle us to substantial deference because of the long list of information that is in the public record, some of it developed by others like EPA and DEQ that was used by the trustees, other information developed by the trustees and put into the public record both with respect to their -- the outcomes of the allocation and the methodologies that they used. So here, the transparent -- the trustees have done their best to be transparent about all of that.

And I would -- I would say there were -- one of my co-counsel referenced the case law on this and two cases that talk about allocation. I think it was Ms. Bayer. I think the two cases she's talking about, and they're in the trustees' briefs, are the *Acushna* (phonetic) case and the case at -- at the Fox River site. Those two cases both gave trustees a substantial degree of difference -- of difference in allocations -- in discounts that were built into allocations, that the discounts were on the order of a factor of 3.

Here, the public record is so extensive, that we -- we feel like if we needed to, we would be entitled to discount our claims by at least that amount, but we have not. As we explained in the brief, the discount that we built in was not a party-by-party give and take. It was much more of a structural discount where we said: All right. We're -- we just passed 2011. We've done some -- the year 2011. We've done some substantial homework on the amount of damages at the site. We're going to set the amount of damages at 4,130 DSAYs, which is our calculation for 2011.

If that calculation were made using the same model in 2023, as we explained, the amount would be about 30 percent higher. And while that is a significant discount to induce settlement, it's far less than has been found to be allowable in the case law. So that was my second to the last point.

My last point, Your Honor, goes to --

THE COURT: I've got one moderately trivial question, but serious.

MR. ZEVENBERGEN: Yes.

THE COURT: Let me do that now, and then I'll let you do your last point.

MR. ZEVENBERGEN: Please.

THE COURT: Is there something I should make of this, and if not, why not, to the fact that there were some signatures that's been pointed out by Mr. Colopy on the consent decrees in

2023 but the motion wasn't filed till 2025?  Is there anything I should make of that, and if not, why not?

MR. ZEVENBERGEN:  I think my response is going to go under the heading Fun and Games With the Federal Government.

So -- so the signatures --

THE COURT:  I'm not sure what that means.

MR. ZEVENBERGEN:  Well, I'll tell you --

THE COURT:  My imagination is running wild.

MR. ZEVENBERGEN:  So I'll try to explain, Your Honor. So, yes, the final documents were -- were reached and were sent out for signature, and then -- and then the trustees went through their formal approval processes.  As anyone who has worked --

THE COURT:  Okay.

MR. ZEVENBERGEN:  -- in the federal government or even in tribal and state governments knows, that can take a long time, especially in big settlements like this where you have to go up to the Associate Attorney General of the United States.  It's a long climb.  So that whole process takes a while.

Following -- following that process, we did lodge the consent decrees in November of 2023 and then the -- and then we filed our motion to enter in June of 2025.  We had -- if Your Honor looks at the Response to Comment document, that largely answers why it takes so long.  And then there was the small matter of this election in November of 2024 and the change in administrations.

THE COURT:  I got you.

MR. ZEVENBERGEN:  Right.  Every administration takes a fresh look.  So all of that adds to the time, Your Honor.

THE COURT:  Okay.  I'm satisfied.  You wanted to make one final point, and you may.

MR. ZEVENBERGEN:  The final point was on the scope of contribution protection.  So the statute is structured to give parties that are resolving their liability finality, and that -- the statute is designed first for early cleanup and restoration, but as part of that, to allow for early settlement.

Well, if early settlement means settlement now and then some litigation later, so that for any settling party, settlement really doesn't mean settlement, it's not an effective tool.  That's the first point I would make.

The second point I would make is that the scope of contribution protection generally tracks, and needs to track, the same scope of the covenant not to sue.  So here the trustees say, "We're not going to sue you for these items."  And that covenant, again, we were very upfront about this is geographically broad, it extends beyond the areas where we assessed damages, for the reasons I've said.

In order to be effective, the covenant -- the contribution protection needs to have an equivalent geographic footprint, otherwise, the settling defendants are in a position where the trustees can't sue them, but all of the non-settlers

can.  So the covenant is, practically speaking, ineffective.

THE COURT:  Understood.

MR. ZEVENBERGEN:  So, Your Honor, we believe that the consent decrees need to be effected as the settling defendants, but that is what brought us to settlement and is allowing us to achieve the results here, and we hope the next rounds of settlements, which with luck we will bring to this Court as soon as possible.  Thank you.

THE COURT:  Thank you.

All right.  I believe I've already ruled on all of the pending motions to intervene, which I've all granted without opposition.  There were a couple of requests for judicial notice from FMC that I've granted without opposition.

So all that remains is plaintiff's motion to enter consent decrees, Docket 85.  I'll take that under advisement, and I'll do my best to get out a written opinion and order within a couple of weeks.

So thank you all.  I appreciate everybody's outstanding briefing and outstanding oral advocacy.  Have a good day.

I have a criminal matter starting any minute now.

MR. COLOPY:  Thank you, Your Honor.

MR. STOCK:  Thank you, Your Honor.

(Proceedings adjourned at 11:18 a.m.)

**C E R T I F I C A T E**

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

DATED this 9th day of October 2025.

/s/ Kellie M. Humiston

Kellie M. Humiston, RMR, CRR
Official Court Reporter
Certificates Expire:  9/2027

**/**

**/s** [1] - 53:12

**1**

**1** [1] - 33:1
**10** [1] - 33:2
**100** [3] - 2:8, 9:10, 41:17
**1005** [1] - 20:13
**1012** [1] - 20:14
**10:06** [1] - 5:1
**11.4** [3] - 11:22, 19:12, 43:5
**113(f)(2** [1] - 43:13
**1140** [1] - 3:11
**11:18** [1] - 52:23
**12** [8] - 8:16, 12:10, 12:11, 13:13, 23:21, 40:20, 41:8, 41:10
**123** [8] - 32:5, 32:7, 32:21, 32:22, 33:2, 33:15, 33:17, 43:18
**1300** [2] - 3:23, 4:4
**157** [1] - 24:21
**186** [2] - 26:9, 43:18
**1995** [1] - 19:2

**2**

**200** [1] - 44:11
**2011** [3] - 49:7, 49:10
**2014** [1] - 19:16
**2018** [5] - 38:4, 39:18, 40:14, 41:5
**2023** [6] - 29:11, 31:16, 32:14, 49:12, 50:1, 50:20
**2024** [1] - 50:24
**2025** [6] - 1:7, 5:1, 29:13, 50:1, 50:21, 53:9
**2177** [1] - 2:16
**23** [2] - 9:14, 12:14
**2400** [2] - 3:23, 4:5
**29** [2] - 1:7, 5:1

**3**

**3** [2] - 32:24, 48:25
**30** [4] - 8:20, 25:18, 26:2, 49:12
**3141** [1] - 2:23
**326-8186** [1] - 1:24
**35** [1] - 26:4
**360** [1] - 2:20
**3:23-cv-1603** [1] - 5:6
**3:23-cv-1603-SI** [1] - 1:6

**3rd** [1] - 3:15

**4**

**4,130** [2] - 21:4, 49:9
**400** [1] - 2:20
**4600** [1] - 3:15

**5**

**50** [1] - 26:4
**503** [1] - 1:24
**529** [2] - 4:8, 4:12

**6**

**6.9** [1] - 32:24
**600** [2] - 4:8, 4:12

**7**

**700** [1] - 3:12
**7200** [1] - 3:8
**7600** [1] - 2:4
**761** [1] - 20:13

**8**

**80** [1] - 41:2
**85** [2] - 5:8, 52:15

**9**

**9/2027** [1] - 53:14
**90** [1] - 33:2
**900** [1] - 3:19
**92** [1] - 3:5
**94104** [1] - 3:20
**9615** [1] - 2:11
**97201** [4] - 2:9, 2:16, 3:24, 4:5
**97204** [2] - 4:9, 4:13
**97205** [1] - 3:12
**97214** [1] - 2:24
**97218** [1] - 3:9
**97347** [1] - 2:12
**97702** [1] - 2:21
**98104** [1] - 3:16
**98121** [1] - 3:5
**98155** [1] - 2:5
**999** [1] - 3:15
**9th** [1] - 53:9

**A**

**a.m** [2] - 5:1, 52:23
**abeyance** [1] - 28:14
**ability** [2] - 34:3, 34:16
**able** [3] - 24:2, 34:6, 36:16

**above-entitled** [1] - 53:5
**absolutely** [3] - 35:5, 39:11, 46:20
**abundance** [1] - 26:18
**accepted** [1] - 10:24
**accepting** [1] - 41:23
**accord** [1] - 26:23
**according** [2] - 32:14, 35:20
**account** [2] - 10:6, 42:17
**ACF** [3] - 1:13, 5:5, 6:16
**achieve** [2] - 11:10, 52:6
**achieving** [1] - 10:10
**acknowledge** [6] - 17:5, 18:3, 33:16, 34:24, 36:3, 36:6
**acknowledged** [1] - 22:4
**acknowledgment** [1] - 31:18
**activities** [3] - 12:1, 12:8, 46:19
**activity** [3] - 12:11, 12:12, 46:22
**actual** [2] - 16:5, 39:3
**Acushna** [1] - 48:21
**add** [1] - 14:8
**added** [1] - 13:21
**additional** [3] - 21:21, 21:22
**address** [5] - 14:20, 27:7, 28:13, 36:11, 37:14
**addressed** [3] - 25:23, 28:14, 30:4
**adds** [1] - 51:3
**adequacy** [2] - 18:25, 19:2
**adequate** [1] - 17:24
**adequately** [1] - 33:14
**adjourned** [1] - 52:23
**adjusted** [1] - 35:17
**administration** [1] - 51:2
**administrations** [1] - 50:25
**administrative** [2] - 11:1, 11:21
**admit** [1] - 27:16
**admits** [1] - 27:16
**advance** [2] - 10:10, 39:8
**advised** [1] - 32:7
**advisement** [1] - 52:15
**advocacy** [1] - 52:19

**advocated** [1] - 29:19
**advocating** [1] - 17:1
**Aerojet** [1] - 26:21
**affects** [1] - 43:11
**affiliated** [1] - 25:2
**afforded** [3] - 17:4, 17:18, 22:8
**afraid** [1] - 37:22
**agencies** [1] - 9:13
**agent** [2] - 6:20, 18:19
**aggregate** [5] - 19:12, 43:4, 43:12, 43:14, 43:20
**ago** [1] - 9:18
**agree** [2] - 22:20, 47:11
**agreement** [2] - 27:23, 28:6
**agreements** [1] - 33:24
**ahead** [1] - 37:25
**Airport** [1] - 3:8
**al** [3] - 1:13, 5:5
**algebra** [2] - 35:24, 47:12
**allegedly** [1] - 32:10
**allocate** [1] - 8:20
**allocated** [7] - 11:22, 32:12, 35:11, 35:17, 43:5, 45:24, 46:7
**allocating** [1] - 43:6
**Allocation** [1] - 32:14
**allocation** [26] - 11:21, 11:23, 14:11, 14:18, 19:10, 28:21, 28:23, 29:8, 29:17, 31:16, 32:1, 32:8, 32:15, 32:16, 32:18, 32:19, 33:11, 33:13, 34:4, 34:9, 35:19, 41:19, 45:8, 45:22, 48:14, 48:19
**allocations** [12] - 23:23, 24:11, 24:13, 26:16, 29:4, 34:8, 37:7, 41:17, 42:25, 48:23, 48:24
**allow** [6] - 32:25, 33:9, 33:11, 33:13, 35:2, 51:10
**allowable** [1] - 49:14
**allowing** [1] - 52:5
**allows** [1] - 42:17
**alone** [2] - 20:20, 21:24
**AMERICA** [1] - 1:5
**amount** [26] - 17:4, 17:16, 20:5, 21:25, 25:9, 25:14, 25:15, 25:16, 32:9, 34:10,

34:11, 34:14, 36:18, 36:19, 37:3, 38:19, 43:5, 43:12, 43:14, 45:3, 45:5, 45:23, 49:3, 49:8, 49:9, 49:12
**amounts** [3] - 19:3, 43:7, 44:25
**analogy** [1] - 47:10
**analysis** [14] - 10:25, 13:6, 19:19, 20:4, 21:3, 21:5, 21:7, 21:16, 31:3, 32:20, 38:3, 38:5, 41:3
**animating** [1] - 22:7
**announced** [1] - 38:4
**announcement** [1] - 39:18
**answer** [2] - 23:17, 42:21
**answering** [1] - 8:6
**answers** [2] - 42:20, 50:23
**appealing** [1] - 23:1
**appearance** [3] - 7:22, 8:3, 8:11
**appearances** [4] - 5:11, 5:16, 6:16, 7:12
**appearing** [4] - 6:5, 6:6, 6:7, 6:10
**apples** [2] - 36:24, 36:25
**application** [2] - 11:2, 31:25
**applied** [5] - 10:13, 11:2, 31:20, 32:2, 34:4
**apply** [2] - 29:8, 36:23
**appreciate** [1] - 52:18
**appreciation** [1] - 38:17
**approach** [2] - 31:19, 32:1
**appropriate** [6] - 10:13, 11:19, 12:24, 13:8, 40:7, 40:13
**approval** [2] - 26:5, 50:12
**approve** [4] - 16:16, 24:2, 27:3, 27:24
**approved** [1] - 46:4
**April** [1] - 29:11
**area** [11] - 13:1, 13:3, 13:4, 13:6, 14:14, 27:9, 27:15, 27:19, 27:20, 39:19, 39:24
**areas** [2] - 21:21, 51:20
**argue** [2] - 17:14,

28:17
**arguing** [1] - 27:25
**Argument** [1] - 1:18
**argument** [10] - 12:22, 16:24, 17:3, 22:23, 22:24, 23:2, 23:6, 37:1, 37:20, 41:9
**arguments** [3] - 9:3, 9:4, 15:8
**Arizona** [3] - 19:15, 19:22, 20:13
**ARKEMA** [1] - 3:13
**Arkema** [5] - 6:18, 6:20, 16:17, 16:23, 18:19
**arm's** [1] - 10:12
**aromatic** [1] - 40:23
**aspects** [1] - 10:21
**asserted** [1] - 28:18
**asserting** [1] - 24:1
**assess** [1] - 23:4
**assessed** [1] - 51:20
**assessing** [1] - 22:17
**assessment** [10] - 21:8, 21:20, 22:4, 38:3, 39:1, 41:6, 41:24, 41:25, 42:2, 42:14
**assign** [1] - 34:21
**assigned** [5] - 19:8, 26:1, 32:22, 35:3, 46:22
**assignment** [1] - 20:7
**assignments** [1] - 20:18
**Associate** [1] - 50:17
**associated** [13] - 12:9, 12:11, 25:1, 25:10, 26:6, 26:12, 32:13, 32:17, 33:1, 33:15, 33:17, 35:6, 46:19
**assume** [1] - 25:6
**attention** [1] - 31:12
**Attorney** [1] - 50:17
**attributable** [5] - 19:6, 21:23, 32:10, 35:15, 35:16
**attributed** [1] - 25:16
**authority** [1] - 28:3
**authorized** [1] - 15:12
**automobiles** [1] - 25:19
**available** [7] - 9:21, 19:24, 27:3, 31:21, 33:6, 35:21, 39:23
**Avenue** [7] - 3:15, 3:23, 4:4, 4:8, 4:12, 24:21, 26:10
**avoid** [2] - 15:25, 16:1
**awake** [1] - 42:5

**B**

**backdrop** [1] - 17:14
**background** [2] - 8:25, 29:23
**bag** [2] - 21:12, 21:13
**Baird** [4] - 3:4, 7:15, 8:5, 14:7
**BAIRD** [5] - 7:15, 7:19, 8:5, 14:3, 14:6
**balanced** [1] - 17:10
**barking** [1] - 37:16
**based** [3] - 10:23, 13:5, 34:9
**baseline** [1] - 30:25
**basic** [1] - 8:25
**basis** [2] - 26:6, 26:7
**Bay** [1] - 11:3
**Bayer** [6] - 3:22, 4:4, 7:3, 16:19, 18:14, 48:19
**BAYER** [4] - 7:3, 7:7, 16:18, 18:12
**BEAZER** [1] - 3:10
**Beazer** [6] - 7:25, 15:10, 32:6, 32:24, 33:1, 33:4
**BEFORE** [1] - 1:20
**begin** [4] - 5:10, 9:25, 10:21, 37:18
**beginning** [3] - 8:16, 11:24, 38:2
**behalf** [12] - 6:8, 6:12, 6:20, 7:20, 7:21, 8:7, 14:21, 14:23, 15:12, 16:25, 18:18, 30:18
**below** [1] - 53:3
**bench** [1] - 25:13
**Bend** [1] - 2:21
**benefit** [1] - 46:1
**benefits** [1] - 13:17
**best** [5] - 7:23, 18:6, 27:19, 48:16, 52:16
**BEST** [2] - 2:19
**better** [1] - 7:21
**between** [4] - 10:13, 11:9, 45:17, 46:8
**beyond** [4] - 14:19, 21:19, 27:9, 51:20
**big** [3] - 40:9, 45:10, 50:16
**bigger** [3] - 21:14, 22:2, 38:15
**birds** [1] - 39:4
**bit** [4] - 34:18, 37:25, 38:16, 47:11
**bolster** [1] - 17:4
**Bond** [1] - 2:20
**Braun** [1] - 6:25

**BRAUN** [1] - 3:18
**breakdown** [1] - 40:23
**breaking** [1] - 47:5
**brief** [8] - 8:1, 15:8, 15:13, 22:4, 23:21, 37:24, 41:14, 49:4
**briefing** [7] - 19:13, 20:21, 21:6, 29:6, 29:7, 31:17, 52:19
**briefly** [1] - 16:22
**briefs** [5] - 8:23, 16:3, 43:10, 47:17, 48:21
**bring** [1] - 52:7
**bringing** [1] - 44:5
**broad** [3] - 12:21, 27:15, 51:19
**broader** [1] - 16:11
**Broadway** [1] - 2:16
**brought** [3] - 28:15, 29:3, 52:5
**built** [2] - 48:24, 49:4
**Burnside** [1] - 2:23
**Bush** [1] - 3:19

**C**

**CA** [1] - 3:20
**calculated** [3] - 21:15, 33:17, 48:7
**calculation** [8] - 21:4, 22:3, 22:6, 22:10, 27:10, 47:7, 49:10, 49:11
**calibrated** [1] - 18:5
**candid** [1] - 48:4
**cannot** [1] - 17:9
**capital** [1] - 9:18
**carbon** [1] - 40:24
**carbon-related** [1] - 40:24
**carried** [1] - 21:7
**carry** [1] - 23:6
**case** [27] - 5:5, 11:8, 12:15, 19:16, 19:17, 19:23, 19:25, 26:15, 26:19, 28:14, 28:16, 28:17, 29:2, 29:7, 29:20, 29:23, 31:10, 31:19, 34:7, 36:2, 42:9, 42:10, 48:18, 48:21, 49:15
**Case** [1] - 5:6
**cases** [11] - 11:18, 17:18, 17:20, 28:13, 34:9, 37:16, 47:14, 47:15, 48:18, 48:20, 48:22
**causation** [1] - 31:6
**caused** [2] - 17:13, 36:19

**CD** [2] - 24:11, 27:2
**CDs** [4] - 17:1, 17:4, 23:23, 29:10
**CENTER** [1] - 2:22
**CERCLA** [14] - 5:8, 10:16, 14:12, 15:23, 16:6, 17:5, 17:11, 17:15, 29:3, 31:10, 34:1, 35:1, 43:12, 46:11
**CERCLA'S** [1] - 17:2
**CERCLA's** [5] - 10:10, 17:9, 17:19, 42:16, 44:2
**certain** [1] - 34:15
**certainly** [2] - 20:25, 22:13
**certainty** [1] - 41:20
**Certificates** [1] - 53:14
**certified** [1] - 53:7
**certify** [1] - 53:3
**chance** [1] - 38:11
**change** [3] - 21:15, 23:5, 50:24
**changes** [1] - 23:7
**changing** [2] - 32:19, 33:13
**Chase** [2] - 3:8, 7:16
**chemical** [1] - 34:20
**chemical-specific** [1] - 34:20
**chided** [1] - 22:1
**choosing** [1] - 11:8
**chose** [1] - 11:12
**chosen** [1] - 31:19
**Chris** [3] - 7:15, 8:5, 14:7
**Circuit** [8] - 11:15, 19:1, 19:17, 20:2, 20:6, 24:5, 26:21
**citations** [1] - 47:17
**cite** [2] - 17:17, 47:15
**cited** [2] - 11:18, 31:16
**City** [1] - 19:22
**city** [1] - 19:15
**claim** [3] - 25:7, 29:25, 44:5
**claiming** [2] - 12:19, 22:1
**claims** [11] - 13:11, 14:17, 21:10, 22:1, 26:7, 27:14, 27:20, 28:18, 31:7, 41:13, 49:3
**clarifying** [1] - 37:20
**CLARK** [1] - 3:14
**Clark** [2] - 6:20, 18:18
**cleanup** [4] - 30:1, 30:2, 30:4, 51:9
**clear** [2] - 18:4, 33:3

**clearer** [1] - 9:2
**clearly** [2] - 31:20, 32:1
**client** [3] - 23:9, 24:17, 24:19
**clients** [2] - 16:2, 25:3
**climb** [1] - 50:18
**close** [1] - 36:1
**co** [2] - 47:10, 48:18
**co-counsel** [1] - 48:18
**co-counsel's** [1] - 47:10
**COC** [1] - 35:1
**collaborated** [1] - 9:11
**collaboration** [1] - 9:22
**colleague** [1] - 7:10
**colleagues** [1] - 31:2
**collectively** [4] - 11:22, 12:13, 12:14, 41:2
**colloquial** [1] - 21:11
**Colopy** [9] - 3:18, 6:24, 16:24, 23:13, 23:15, 30:7, 32:3, 32:7, 49:25
**COLOPY** [11] - 6:24, 23:16, 24:9, 26:18, 28:2, 28:7, 28:10, 28:12, 30:8, 30:11, 52:21
**Colopy's** [1] - 33:19
**coming** [2] - 47:1, 47:13
**Commencement** [1] - 11:3
**Comment** [1] - 50:22
**comments** [2] - 18:21, 43:9
**common** [2] - 33:25, 34:2
**commonly** [1] - 46:15
**COMMUNITY** [1] - 1:7
**comparable** [1] - 33:6
**comparative** [10] - 19:19, 26:22, 31:3, 31:24, 32:20, 33:7, 34:16, 35:6, 37:2
**compare** [2] - 19:3, 36:16
**compares** [1] - 20:10
**comparing** [2] - 20:4, 36:24
**comparison** [1] - 33:10
**compensated** [1] - 33:14
**competing** [1] - 17:10
**compiled** [1] - 35:22
**completed** [1] - 38:8

complex [1] - 47:14
complexity [1] - 42:13
complicated [2] - 39:5, 42:3
comprehensive [1] - 29:17
concentration [1] - 38:22
concentrations [5] - 38:19, 38:24, 39:2, 39:6, 39:25
concern [9] - 12:10, 21:1, 21:13, 22:7, 37:15, 39:17, 40:18, 43:22, 43:24
concerned [5] - 31:22, 36:14, 37:12, 43:17, 43:19
concerns [8] - 23:18, 36:12, 36:13, 37:11, 37:14, 37:24, 39:16, 43:22
conclude [1] - 18:8
concluded [1] - 13:3
conduct [1] - 16:6
Confederated [7] - 5:13, 5:14, 5:24, 6:5, 6:8
CONFEDERATED [8] - 1:6, 1:7, 1:8, 1:9, 2:10, 2:10, 2:14, 2:18
conference [1] - 25:25
confidential [2] - 24:1, 34:3
confidentiality [1] - 33:23
conformed [1] - 53:6
confused [2] - 43:15, 43:16
Congress's [1] - 17:11
cons [1] - 46:10
consent [23] - 5:7, 10:8, 10:9, 10:11, 12:8, 12:17, 12:18, 13:16, 14:11, 15:14, 15:17, 15:19, 16:8, 16:12, 16:16, 18:23, 19:18, 24:2, 27:12, 49:25, 50:20, 52:4, 52:15
consequence [2] - 22:22, 22:24
consequences [1] - 27:6
consider [2] - 18:3, 43:23
considered [2] - 15:6, 17:21
consistent [1] - 10:5

consuming [1] - 9:23
contaminant [4] - 35:1, 38:21, 39:2, 39:6
contaminants [15] - 12:10, 21:21, 32:11, 35:12, 40:18, 40:20, 40:21, 40:22, 40:23, 40:24, 41:1, 41:4, 41:8, 46:19, 46:22
contaminated [1] - 38:23
contamination [9] - 10:1, 11:25, 13:1, 13:2, 13:4, 13:7, 13:9, 25:21, 38:19
context [1] - 34:7
continue [1] - 25:6
contrary [1] - 47:18
contrast [1] - 39:1
contributed [3] - 32:10, 35:12, 44:19
contribution [11] - 12:20, 17:6, 22:8, 22:12, 25:10, 27:8, 27:18, 28:1, 51:7, 51:16, 51:23
contributions [2] - 27:11
contributors [1] - 25:20
conversation [1] - 25:12
converse [1] - 39:12
cooperation [1] - 9:9
coordinate [1] - 18:15
Corporation [2] - 6:25, 24:18
CORPORATION [1] - 3:17
correct [6] - 6:14, 36:12, 37:11, 38:9, 45:20, 53:4
correctly [4] - 30:10, 36:13, 37:12, 37:14
CORVID [1] - 3:3
cost [2] - 16:4, 29:2
costly [1] - 9:23
costs [4] - 14:16, 17:10, 19:4, 41:7
council [1] - 40:8
counsel [3] - 5:10, 16:16, 48:18
counsel's [1] - 47:10
couple [3] - 31:4, 52:12, 52:17
court [16] - 17:18, 19:1, 19:18, 19:19, 20:1, 20:7, 25:24, 26:16, 26:22, 26:23,

28:13, 28:21, 28:23, 29:1, 29:20, 34:10
COURT [79] - 1:1, 1:21, 1:23, 5:4, 5:20, 5:23, 6:1, 6:4, 6:9, 6:13, 6:22, 7:1, 7:6, 7:8, 7:11, 7:18, 7:20, 8:2, 8:10, 11:14, 13:14, 13:23, 14:5, 14:25, 16:14, 18:10, 18:14, 18:17, 19:21, 20:11, 20:16, 22:11, 22:14, 22:19, 23:1, 23:11, 23:14, 24:7, 26:15, 27:22, 28:5, 28:9, 28:11, 30:7, 30:9, 30:13, 30:15, 33:20, 33:25, 36:8, 42:7, 42:11, 42:19, 43:15, 44:9, 44:14, 44:17, 44:20, 44:24, 45:2, 45:16, 45:18, 45:21, 46:9, 46:17, 46:24, 47:9, 47:22, 47:24, 49:17, 49:20, 49:23, 50:6, 50:8, 50:13, 51:1, 51:4, 52:2, 52:9
Court [41] - 9:7, 9:8, 11:15, 14:7, 16:19, 17:24, 18:3, 18:5, 18:22, 23:20, 23:25, 24:2, 25:12, 25:13, 25:22, 27:3, 27:18, 31:12, 31:23, 32:21, 32:23, 32:25, 33:5, 33:11, 33:13, 33:18, 34:3, 34:14, 34:16, 35:2, 35:5, 35:10, 36:5, 36:7, 36:16, 38:17, 41:1, 43:22, 48:4, 52:7, 53:13
court's [3] - 20:3, 26:21
Court's [2] - 10:4, 23:17
court-ordered [1] - 28:21
Courtney [2] - 2:23, 6:11
courtroom [1] - 16:1
courts [2] - 17:21, 46:15
covenant [4] - 51:17, 51:18, 51:22, 52:1
covenants [2] - 12:20, 13:8
CRAG [1] - 2:22
credits [1] - 9:21
criminal [1] - 52:20

critiquing [1] - 20:2
CRR [2] - 1:24, 53:13
Crystal [2] - 3:8, 7:16

## D

damage [9] - 21:8, 21:20, 22:21, 38:3, 41:24, 41:25, 42:2, 44:15, 45:3
damaged [1] - 10:1
damages [40] - 10:22, 10:23, 11:6, 13:5, 14:15, 20:24, 21:4, 21:9, 21:14, 21:22, 21:25, 22:2, 22:4, 22:6, 22:10, 22:17, 23:4, 23:8, 28:16, 29:3, 29:24, 30:1, 31:6, 31:9, 31:12, 31:13, 32:9, 33:1, 33:15, 35:3, 35:13, 36:20, 39:1, 44:6, 44:24, 45:10, 46:3, 49:8, 49:9, 51:20
data [3] - 13:1, 31:21, 39:23
DATED [1] - 53:9
dba [1] - 3:3
DDT [1] - 40:22
DDXs [1] - 40:23
de [8] - 7:25, 8:1, 8:19, 14:2, 14:24, 15:4, 15:10, 15:12
deal [4] - 11:25, 18:6, 29:14, 40:9
decide [1] - 15:21
decision [2] - 15:21, 20:3
decisions [1] - 39:22
declined [3] - 33:18, 33:21, 34:20
decree [5] - 10:8, 12:17, 12:19, 14:11, 27:12
decrees [19] - 5:7, 10:9, 10:11, 12:8, 13:16, 15:14, 15:17, 15:19, 16:8, 16:12, 16:16, 17:21, 18:24, 19:18, 24:2, 49:25, 50:20, 52:4, 52:15
DEFENDANT [3] - 3:3, 3:7, 3:10
defendant [13] - 12:7, 15:10, 31:10, 34:11, 35:13, 43:7, 43:8, 45:7, 45:19, 46:14, 47:1, 47:2, 47:4
Defendant [1] - 7:13

Defendants [2] - 1:14, 8:19
defendants [51] - 7:12, 7:20, 7:22, 7:25, 8:4, 8:7, 8:9, 8:19, 8:21, 9:14, 10:14, 11:22, 12:2, 12:5, 12:14, 12:21, 13:10, 14:2, 14:4, 15:7, 15:9, 15:13, 15:18, 17:2, 19:24, 20:19, 20:24, 22:9, 22:17, 22:18, 23:10, 24:16, 24:25, 25:3, 27:13, 32:6, 34:15, 41:18, 41:20, 41:21, 43:3, 43:5, 43:17, 43:21, 43:23, 45:11, 45:17, 47:5, 51:24, 52:4
defendants' [4] - 5:16, 8:1, 35:17, 45:7
deference [7] - 11:18, 17:4, 26:23, 37:3, 48:1, 48:10
deferred [2] - 29:21, 30:6
defined [2] - 31:20, 32:1
definition [2] - 29:25
defunct [1] - 25:5
degree [3] - 32:20, 48:1, 48:23
deny [4] - 20:20, 22:12, 28:3
DEPARTMENT [2] - 2:3, 2:7
Department [2] - 5:18, 5:22
depletion [1] - 30:1
depth [1] - 17:21
DEQ [2] - 13:1, 48:11
describe [1] - 26:20
described [1] - 34:12
description [1] - 35:20
descriptions [1] - 12:6
deserve [1] - 37:3
design [1] - 30:3
designed [1] - 51:9
detail [3] - 12:16, 23:18, 30:4
detailed [5] - 12:6, 12:13, 18:2, 46:14, 47:6
details [1] - 37:8
determination [4] - 17:24, 26:6, 40:12, 45:10
determine [9] - 18:23, 21:9, 31:25, 32:25,

4

33:11, 33:12, 34:4, 39:3, 45:14
**determined** [4] - 13:6, 33:7, 37:21, 45:8
**developed** [5] - 9:19, 43:8, 46:13, 48:11, 48:12
**developers** [2] - 9:17, 14:22
**device** [1] - 22:18
**di** [2] - 7:20, 7:22
**dictated** [1] - 11:15
**difference** [3] - 38:16, 48:23
**differences** [1] - 13:7
**different** [15] - 11:7, 11:8, 11:10, 11:11, 14:15, 14:16, 14:17, 24:23, 28:24, 31:7, 36:23, 38:10, 38:11, 38:14, 41:11
**difficult** [2] - 15:21, 42:4
**digitally** [1] - 53:7
**diligence** [1] - 26:22
**directed** [1] - 11:15
**directly** [1] - 43:11
**disagree** [1] - 24:4
**disagreement** [1] - 40:4
**disapprove** [2] - 27:25, 28:1
**disclosed** [1] - 26:16
**discount** [6] - 17:16, 17:18, 49:2, 49:4, 49:6, 49:13
**discounts** [5] - 19:10, 19:23, 20:8, 48:24
**discretion** [2] - 11:13, 27:18
**discuss** [2] - 11:18, 18:1
**discussed** [1] - 20:9
**discussion** [1] - 10:18
**discussions** [2] - 34:3, 47:14
**dismantling** [2] - 25:18, 26:2
**dispatch** [1] - 18:20
**disproportionate** [1] - 17:8
**disregarded** [1] - 26:2
**district** [6] - 17:18, 19:18, 19:19, 20:2, 20:3, 20:7
**DISTRICT** [3] - 1:1, 1:2, 1:21
**disturbing** [1] - 14:11
**dive** [1] - 42:9
**divide** [1] - 8:17

**divided** [1] - 35:4
**dividing** [1] - 45:11
**DIVISION** [1] - 1:3
**Docket** [2] - 5:7, 52:15
**document** [6] - 38:5, 40:14, 40:19, 41:5, 41:19, 50:22
**documented** [2] - 10:25, 11:2
**documents** [2] - 46:21, 50:10
**dollar** [2] - 25:14, 25:15
**dollars** [1] - 34:13
**done** [10] - 16:2, 35:9, 38:3, 39:9, 39:12, 39:14, 41:4, 48:16, 49:7
**DOST** [4] - 7:9, 30:17, 33:22, 34:2
**Dost** [7] - 4:7, 7:9, 16:24, 30:14, 30:15, 30:18, 37:8
**down** [7] - 24:19, 26:11, 42:9, 42:11, 42:19, 42:21, 47:6
**downstream** [4] - 13:2, 39:24, 40:5, 40:16
**drill** [2] - 42:19, 42:21
**dropped** [1] - 39:25
**DSAY** [1] - 34:20
**DSAYs** [16] - 21:4, 32:9, 32:12, 32:22, 32:23, 33:17, 34:13, 34:14, 34:17, 34:21, 34:25, 35:11, 35:14, 35:17, 49:9
**due** [1] - 26:22
**Dunn** [2] - 14:20, 14:25

## E

**e-mail** [1] - 8:12
**early** [10] - 9:15, 9:24, 13:20, 15:23, 17:3, 17:6, 17:9, 51:9, 51:10, 51:11
**East** [2] - 7:25, 15:10
**EAST** [1] - 3:10
**ECKERT** [2] - 7:23, 15:6
**Eckert** [8] - 3:11, 7:24, 8:2, 14:23, 15:2, 15:3, 15:4, 16:14
**effect** [2] - 18:3, 39:3
**effected** [1] - 52:4
**effective** [2] - 51:13, 51:22

**effectively** [1] - 46:3
**effects** [1] - 38:20
**eight** [1] - 8:18
**eighth** [2] - 35:23, 47:12
**either** [3] - 25:8, 27:24, 39:2
**election** [1] - 50:24
**encouraged** [1] - 17:15
**encouraging** [2] - 15:23, 17:19
**end** [4] - 9:24, 14:15, 15:17, 16:4
**ended** [1] - 40:8
**ending** [1] - 13:20
**ends** [1] - 14:13
**engaged** [1] - 36:2
**enjoy** [1] - 13:17
**ensure** [2] - 18:5, 36:7
**enter** [6] - 5:7, 5:11, 8:11, 15:21, 50:21, 52:14
**entered** [5] - 10:9, 13:17, 15:17, 15:19, 28:24
**entire** [2] - 44:14, 44:17
**entirely** [1] - 12:23
**entirety** [2] - 13:8, 44:22
**entities** [1] - 34:13
**entitle** [1] - 48:9
**entitled** [4] - 27:14, 45:25, 49:2, 53:5
**entity** [3] - 8:3, 25:2, 25:4
**entry** [3] - 12:17, 15:13, 17:1
**environmental** [2] - 25:20, 38:6
**EPA** [2] - 12:25, 48:11
**equally** [1] - 29:8
**equitable** [2] - 31:20, 32:1
**equitably** [1] - 33:12
**equities** [1] - 28:20
**equivalency** [6] - 10:25, 21:3, 21:5, 21:16, 41:3
**equivalent** [1] - 51:23
**especially** [1] - 50:16
**essential** [1] - 19:13
**essentially** [1] - 46:9
**establish** [1] - 31:8
**estimate** [2] - 10:23, 32:8
**estimated** [3] - 20:4, 39:11, 41:2
**et** [3] - 1:13, 5:5

**evaluate** [6] - 10:4, 31:24, 33:6, 33:14, 34:16, 35:5
**evaluated** [1] - 21:17
**evaluating** [1] - 31:11
**event** [1] - 15:16
**evidence** [2] - 37:5
**exactly** [5] - 26:20, 28:23, 39:6, 45:1, 45:6
**examine** [1] - 40:20
**examined** [2] - 40:21
**example** [2] - 24:15, 32:3
**excuse** [2] - 27:10, 43:3
**executed** [1] - 29:11
**exercise** [1] - 35:2
**exhibiting** [1] - 29:13
**exist** [1] - 27:21
**existing** [1] - 35:22
**exists** [6] - 27:1, 27:2, 28:1, 34:25, 35:21, 36:6
**expensive** [1] - 41:8
**Expire** [1] - 53:14
**explain** [1] - 50:9
**explained** [3] - 43:9, 49:3, 49:12
**expressly** [1] - 26:15
**extends** [1] - 51:20
**extensive** [3] - 16:7, 25:17, 49:1
**extensively** [1] - 11:1
**extent** [3] - 36:11, 36:13, 36:22
**extreme** [1] - 16:10

## F

**F.3d** [1] - 20:13
**faced** [1] - 38:1
**facilities** [1] - 14:13
**facility** [4] - 31:14, 47:5, 47:6, 47:7
**facing** [1] - 44:1
**fact** [10] - 11:10, 19:15, 20:23, 23:6, 42:5, 42:13, 44:18, 45:14, 48:1, 49:24
**factor** [1] - 48:25
**facts** [2] - 28:18, 28:20
**failure** [1] - 34:5
**fair** [7] - 10:5, 16:9, 17:22, 18:8, 18:10, 18:24, 37:3
**fairly** [1] - 31:13
**fairness** [5] - 5:8, 26:17, 30:25, 42:23, 43:23

**far** [2] - 27:9, 49:14
**FARELLA** [1] - 3:18
**Farella** [1] - 6:25
**fashion** [1] - 27:24
**fault** [3] - 31:4, 31:24, 35:6
**favoring** [1] - 17:3
**federal** [5] - 9:13, 28:16, 29:16, 29:19, 50:14
**Federal** [1] - 50:4
**fellow** [2] - 18:1, 40:4
**felt** [3] - 13:7, 40:6, 40:7
**few** [1] - 14:21
**fewer** [1] - 40:21
**field** [2] - 36:7, 39:3
**Fifth** [2] - 3:23, 4:4
**fifth** [1] - 25:4
**filed** [4] - 7:14, 29:12, 50:1, 50:21
**filings** [1] - 28:16
**final** [3] - 50:10, 51:5, 51:6
**finality** [2] - 22:12, 51:8
**finally** [3] - 9:16, 12:9, 31:15
**finder** [2] - 42:5, 45:14
**finger** [1] - 45:18
**fingers** [1] - 45:12
**first** [13] - 5:11, 6:16, 6:17, 9:12, 9:24, 10:9, 10:14, 10:22, 32:8, 39:14, 39:22, 51:9, 51:14
**fish** [1] - 39:4
**five** [2] - 9:12, 25:1
**flagged** [1] - 47:20
**flaw** [1] - 11:5
**FMC** [10] - 3:17, 6:23, 6:25, 16:17, 16:24, 24:17, 25:7, 25:9, 31:17, 52:13
**FMC's** [1] - 23:21
**focus** [3] - 13:6, 15:15, 20:21
**follow** [1] - 27:22
**followed** [6] - 6:16, 8:18, 8:20, 8:21, 16:22, 16:23
**following** [5] - 10:9, 19:9, 21:12, 50:19
**follows** [1] - 45:9
**footprint** [1] - 51:24
**footprints** [6] - 34:21, 35:3, 35:13, 35:15, 35:18
**FOR** [16] - 1:2, 2:3, 2:7, 2:10, 2:14, 2:18,

2:22, 3:3, 3:7, 3:10, 3:13, 3:17, 3:21, 4:3, 4:6, 4:10
**force** [1] - 28:6
**foregoing** [1] - 53:3
**formal** [7] - 21:8, 38:3, 39:1, 41:6, 41:24, 42:14, 50:12
**former** [1] - 32:6
**forth** [1] - 24:4
**forthcoming** [1] - 21:8
**forward** [4] - 9:14, 23:5, 24:6, 29:14
**four** [2] - 8:21, 9:16
**Fox** [1] - 48:22
**framed** [3] - 37:15, 41:9, 43:25
**framework** [1] - 17:5
**Francisco** [1] - 3:20
**fresh** [1] - 51:3
**Front** [2] - 24:20, 26:9
**full** [1] - 22:21
**Fun** [1] - 50:4
**fund** [1] - 15:25
**funding** [2] - 15:22, 16:4
**fungible** [2] - 34:13, 34:14
**future** [5] - 25:24, 26:7, 37:23, 43:19, 44:5

**G**

**Games** [1] - 50:4
**Gary** [2] - 2:8, 5:21
**gate** [1] - 15:20
**gather** [1] - 45:12
**gauge** [2] - 18:24, 19:2
**general** [1] - 38:2
**General** [1] - 50:17
**generally** [6] - 18:8, 30:24, 37:23, 38:2, 38:6, 51:16
**geographic** [3] - 21:21, 39:22, 51:23
**geographically** [2] - 40:13, 51:19
**geography** [2] - 12:22, 39:17
**given** [12] - 13:7, 19:23, 20:19, 22:22, 27:5, 27:20, 29:15, 29:16, 32:11, 37:5, 38:13, 38:21
**glad** [1] - 18:12
**global** [1] - 34:19
**goal** [1] - 15:23
**goals** [1] - 16:6

**Government** [1] - 50:4
**government** [8] - 26:24, 28:17, 29:16, 29:19, 33:23, 34:5, 37:4, 50:14
**governments** [2] - 46:16, 50:15
**grab** [1] - 47:10
**grade** [2] - 35:23, 47:12
**Grand** [3] - 2:11, 2:12, 5:25
**GRAND** [3] - 1:6, 2:10, 2:10
**Grande** [1] - 5:13
**granted** [5] - 12:21, 27:13, 29:20, 52:11, 52:13
**great** [2] - 11:25, 29:14
**greater** [4] - 22:5, 23:8, 38:22, 39:10
**Gregory** [1] - 3:4
**ground** [1] - 28:3
**groundbreaking** [1] - 9:23
**grounds** [3] - 19:18, 20:20, 28:2
**GROUP** [3] - 3:4, 4:7, 4:11
**Group** [3] - 7:16, 8:6, 30:18
**group** [4] - 13:9, 15:9, 15:11, 16:3
**groups** [2] - 9:11, 9:22
**grow** [1] - 37:22
**guess** [2] - 8:13, 18:20
**GUNDERSON** [2] - 3:21, 4:3
**Gunderson** [9] - 7:2, 7:4, 7:5, 16:17, 16:20, 24:22, 25:3, 25:7, 25:12
**guns** [1] - 40:12

**H**

**habitat** [7] - 10:24, 21:3, 21:5, 21:15, 38:22, 38:23, 41:3
**Haglund** [1] - 6:3
**HAGLUND** [1] - 2:15
**hand** [1] - 18:15
**hand-off** [1] - 18:15
**happy** [1] - 14:19
**Harbor** [7] - 10:1, 11:3, 12:2, 12:15, 14:14, 44:11, 44:12
**harbor** [4] - 32:16, 33:13, 34:19, 35:1

**Harbor's** [1] - 12:3
**harbor-wide** [3] - 32:16, 33:13, 35:1
**harm** [8] - 11:22, 15:15, 15:18, 16:10, 39:10, 39:13, 40:1, 41:2
**hazardous** [2] - 31:9, 31:14
**HEA** [9] - 10:25, 11:1, 11:2, 37:22, 38:13, 38:18, 38:23, 39:11, 41:25
**heading** [1] - 50:4
**HEADWATERS** [1] - 3:3
**Headwaters** [2] - 7:16, 8:6
**hear** [5] - 5:11, 6:15, 15:1, 16:16, 24:6
**heard** [4] - 19:12, 33:22, 37:12, 37:14
**hearing** [7] - 5:8, 8:11, 8:15, 26:17, 37:1, 37:10, 43:23
**Heather** [2] - 4:11, 7:10
**heavily** [1] - 17:2
**held** [2] - 23:10, 28:13
**helpful** [1] - 37:20
**higher** [2] - 38:21, 49:13
**highlight** [1] - 40:22
**highlighting** [1] - 10:21
**HILLIS** [1] - 3:14
**Hillis** [2] - 6:20, 18:18
**history** [3] - 12:1, 12:4, 44:12
**holding** [3] - 5:8, 19:25, 21:12
**hole** [1] - 42:9
**Holly** [2] - 2:11, 5:24
**homework** [2] - 47:11, 49:8
**Honor** [48] - 5:17, 5:21, 6:2, 6:7, 6:11, 6:19, 6:24, 7:3, 7:9, 7:15, 7:24, 8:5, 9:6, 10:17, 11:18, 13:12, 14:3, 14:6, 15:7, 16:13, 16:18, 17:23, 18:7, 23:13, 23:16, 25:14, 26:18, 27:7, 28:12, 28:24, 29:12, 29:22, 30:6, 30:8, 37:13, 42:1, 42:8, 45:6, 46:2, 46:13, 47:20, 49:16, 50:9, 50:22, 51:3, 52:3,

52:21, 52:22
**HONORABLE** [1] - 1:20
**hope** [4] - 36:11, 46:5, 52:6
**hopefully** [1] - 44:6
**host** [1] - 16:1
**hour** [1] - 8:15
**Humiston** [3] - 1:24, 53:12, 53:13
**hydrocarbon** [1] - 40:24
**hypothetical** [2] - 41:23, 46:7

**I**

**idea** [1] - 48:1
**identical** [1] - 22:16
**identified** [6] - 12:8, 20:23, 21:6, 31:13, 32:7, 38:19
**identify** [1] - 30:21
**ii** [1] - 3:1
**III** [2] - 21:19, 36:24
**iii** [1] - 4:1
**ill** [1] - 38:20
**illumination** [1] - 25:22
**imagination** [1] - 50:8
**impaired** [1] - 34:5
**implementation** [1] - 21:23
**implications** [2] - 16:11, 27:5
**important** [6] - 18:11, 31:15, 32:15, 33:16, 34:7, 46:15
**IN** [1] - 1:1
**inadequate** [1] - 18:7
**inappropriate** [1] - 22:9
**INC** [2] - 3:10, 3:13
**Inc** [5] - 6:18, 6:21, 7:25, 15:10, 18:19
**include** [2] - 27:19, 41:7
**included** [1] - 27:2
**increase** [4] - 20:25, 21:18, 21:24, 36:20
**increases** [1] - 42:12
**INDIAN** [1] - 1:8
**INDIANS** [2] - 1:8, 2:14
**indicate** [1] - 21:20
**indicated** [1] - 36:23
**indicates** [1] - 40:1
**individual** [2] - 44:20, 45:7
**induce** [1] - 49:13

**inducement** [1] - 13:11
**industrial** [3] - 12:1, 12:3, 44:12
**INDUSTRIES** [1] - 1:13
**Industries** [2] - 5:5, 6:16
**ineffective** [1] - 52:1
**information** [30] - 11:24, 12:1, 12:13, 17:25, 18:8, 18:11, 19:7, 19:14, 26:14, 27:1, 31:24, 33:6, 34:24, 35:6, 35:7, 35:21, 36:5, 36:6, 36:16, 38:18, 40:15, 43:8, 46:14, 46:18, 48:5, 48:8, 48:10, 48:12
**initial** [1] - 11:1
**injury** [2] - 31:8, 41:24
**inner** [1] - 47:7
**instructing** [1] - 20:7
**intend** [2] - 40:16, 40:20
**intensive** [1] - 42:3
**intent** [1] - 17:12
**intention** [2] - 39:19, 40:1
**interest** [3] - 10:6, 13:16, 17:23
**interested** [1] - 9:2
**intervene** [1] - 52:11
**Intervenor** [1] - 24:22
**INTERVENOR** [6] - 3:13, 3:17, 3:21, 4:3, 4:6, 4:10
**intervenors** [16] - 11:4, 12:19, 18:1, 18:22, 20:23, 23:9, 23:18, 37:20, 38:5, 38:9, 39:20, 41:9, 43:2, 43:11, 44:7, 46:20
**intervenors'** [2] - 41:23, 47:17
**introduce** [1] - 47:23
**introductory** [2] - 8:25, 18:21
**invite** [2] - 8:16, 14:22
**inviting** [1] - 5:10
**involve** [4] - 14:12, 14:16, 28:19
**involved** [3] - 12:23, 40:9, 46:16
**involving** [1] - 9:10
**issue** [6] - 20:21, 21:2, 21:4, 26:19, 37:15, 37:18

**issues** [6] - 8:24, 14:16, 28:20, 31:4, 47:20, 47:25
**item** [1] - 28:7
**items** [1] - 51:18

## J

**James** [3] - 2:4, 3:18, 16:24
**Jim** [1] - 6:24
**Johnson** [2] - 2:23, 6:12
**JOHNSON** [1] - 6:11
**join** [1] - 15:8
**joined** [3] - 8:1, 15:11, 15:13
**joint** [1] - 44:3
**jointly** [1] - 44:21
**Josh** [2] - 2:19, 6:7
**judge** [2] - 28:24, 29:1
**JUDGE** [1] - 1:21
**judgments** [2] - 10:19, 11:19
**judicial** [1] - 52:12
**Julie** [2] - 2:15, 6:2
**jump** [2] - 18:20, 43:6
**June** [2] - 29:13, 50:21
**jury** [2] - 42:7, 42:10
**JUSTICE** [2] - 2:3, 2:7
**Justice** [2] - 5:18, 5:22
**justified** [2] - 17:19, 28:21

## K

**keep** [2] - 8:15, 42:5
**keeping** [1] - 16:6
**KELLEY** [1] - 2:15
**Kelley** [1] - 6:3
**Kellie** [3] - 1:24, 53:12, 53:13
**Kellie_Humiston@ ord.uscourts.gov** [1] - 1:25
**key** [1] - 10:16
**known** [4] - 15:3, 24:16, 32:5, 47:16
**knows** [4] - 23:20, 34:14, 38:6, 50:15
**Koppers** [4] - 32:6, 32:24, 33:1, 33:5
**KRIEGER** [1] - 2:19

## L

**lab** [1] - 39:3
**lack** [1] - 40:9
**laid** [3] - 19:1, 23:19, 23:20

**language** [1] - 39:20
**large** [4] - 13:4, 27:5, 45:3, 45:5
**largely** [1] - 50:22
**larger** [5] - 15:9, 15:11, 16:4, 41:24, 42:14
**largest** [1] - 9:9
**last** [7] - 10:17, 12:18, 41:15, 47:19, 49:15, 49:16, 49:21
**latitude** [2] - 10:7, 17:16
**Law** [2] - 7:16, 8:6
**law** [8] - 12:15, 24:4, 26:15, 26:19, 31:3, 42:9, 48:18, 49:15
**LAW** [3] - 2:22, 3:3, 3:4
**lawyer** [1] - 35:1
**lawyers** [1] - 16:2
**lay** [1] - 16:21
**lead** [4] - 21:24, 22:5, 23:8
**lean** [1] - 17:2
**least** [5] - 10:17, 19:24, 32:21, 45:22, 49:3
**leave** [1] - 41:13
**leaving** [1] - 40:8
**lectern** [1] - 23:12
**Lee** [1] - 2:8
**left** [2] - 6:14, 21:12
**Legacy** [3] - 6:20, 16:23, 18:19
**Legal** [1] - 30:18
**LEGAL** [2] - 4:7, 4:11
**legal** [6] - 12:24, 14:17, 16:22, 28:18, 31:18, 47:16
**legally** [1] - 37:16
**legitimate** [1] - 43:22
**length** [1] - 10:12
**Lenora** [1] - 3:5
**less** [4] - 29:18, 39:13, 40:1, 49:14
**level** [4] - 26:23, 30:25, 31:3, 36:7
**liabilities** [1] - 45:8
**liability** [29] - 9:15, 9:20, 10:15, 16:5, 16:10, 17:8, 17:18, 19:6, 19:8, 19:12, 19:20, 19:22, 20:5, 20:8, 20:19, 26:22, 33:7, 34:17, 36:3, 36:17, 36:18, 37:2, 37:3, 43:13, 44:1, 44:2, 44:3, 45:9, 51:8

**liable** [2] - 44:21, 46:7
**likelihood** [1] - 38:12
**likely** [5] - 20:25, 21:24, 22:5, 36:20
**limit** [1] - 27:18
**limitation** [1] - 28:1
**limited** [2] - 16:9, 26:8
**line** [2] - 14:22, 28:7
**list** [2] - 11:24, 48:10
**literature** [1] - 38:24
**litigated** [1] - 34:8
**litigation** [6] - 9:16, 10:16, 15:25, 20:8, 28:22, 51:12
**LLC** [6] - 1:13, 5:5, 24:22, 25:4, 25:7, 25:12
**located** [1] - 26:19
**locations** [1] - 24:19
**lodge** [1] - 50:19
**long-term** [2] - 28:24, 29:5
**look** [11] - 19:15, 20:7, 21:19, 21:20, 21:21, 21:22, 29:10, 37:25, 39:17, 40:19, 51:3
**looked** [3] - 12:11, 18:23, 40:5
**looking** [1] - 43:2
**looks** [2] - 20:8, 50:22
**Loren** [1] - 14:20
**luck** [1] - 52:7

## M

**magnitude** [1] - 22:21
**mail** [1] - 8:12
**main** [1] - 37:11
**majority** [1] - 13:5
**mammals** [1] - 39:4
**mapped** [1] - 34:22
**March** [1] - 29:11
**Marie** [2] - 3:11, 7:24
**Market** [1] - 2:8
**Martel** [1] - 6:25
**MARTEL** [1] - 3:18
**MARTIN** [1] - 3:14
**material** [1] - 9:1
**Matt** [2] - 6:19, 18:18
**matter** [3] - 29:20, 50:24, 52:20
**matters** [1] - 24:15
**Matthew** [1] - 3:14
**Maureen** [4] - 3:22, 4:4, 7:3, 16:19
**mean** [4] - 38:10, 42:15, 45:21, 51:13
**means** [6] - 36:12, 37:11, 38:11, 50:6, 51:11, 53:5

**measure** [1] - 29:25
**measured** [1] - 22:18
**method** [9] - 10:24, 11:7, 11:9, 11:10, 11:12, 11:16, 11:19, 21:14, 38:10
**methodologies** [4] - 22:16, 23:7, 38:17, 48:14
**methodology** [2] - 31:16, 36:23
**methods** [2] - 10:19, 23:4
**metric** [3] - 17:20, 34:9, 43:3
**mic** [1] - 18:13
**MICHAEL** [1] - 1:20
**Michael** [1] - 2:4
**might** [5] - 8:8, 11:10, 13:13, 41:6, 41:11
**Mike** [2] - 5:17, 9:6
**milestone** [1] - 10:2
**MILLER** [1] - 3:10
**Miller** [1] - 7:24
**mine** [1] - 28:19
**minimus** [10] - 7:20, 7:22, 7:25, 8:1, 8:19, 14:2, 14:24, 15:4, 15:10, 15:12
**minus** [1] - 44:24
**minute** [2] - 8:13, 52:20
**minutes** [5] - 8:16, 8:18, 8:20, 8:21, 13:13
**misheard** [1] - 37:11
**missing** [1] - 18:11
**misspoke** [1] - 26:9
**misstating** [1] - 36:12
**model** [2] - 41:25, 49:11
**moderately** [1] - 49:17
**modify** [2] - 27:23, 28:5
**moment** [1] - 25:6
**monetary** [1] - 27:5
**money** [1] - 41:7
**months** [1] - 29:13
**Montrose** [4] - 18:25, 20:9, 20:14, 26:21
**morning** [18] - 5:4, 5:17, 5:21, 6:2, 6:11, 6:13, 6:19, 6:24, 7:1, 7:3, 7:6, 7:9, 7:11, 9:6, 14:6, 16:18, 23:15, 23:16
**most** [3] - 9:2, 18:11, 23:1
**motion** [9] - 5:7, 7:14, 8:17, 20:20, 29:12,

30:20, 50:1, 50:21, 52:14
**motions** [1] - 52:11
**move** [3] - 5:12, 5:15, 29:14
**moving** [1] - 29:9
**MR** [62] - 5:17, 5:21, 6:19, 6:24, 7:15, 7:19, 8:5, 9:6, 11:17, 13:15, 14:3, 14:6, 18:15, 18:18, 20:1, 20:13, 20:18, 22:13, 22:15, 22:24, 23:3, 23:12, 23:16, 24:9, 26:18, 28:2, 28:7, 28:10, 28:12, 30:8, 30:11, 37:13, 42:8, 42:12, 43:1, 43:24, 44:10, 44:16, 44:18, 44:23, 45:1, 45:6, 45:17, 45:20, 46:1, 46:12, 46:18, 47:3, 47:10, 47:23, 47:25, 49:19, 49:22, 50:3, 50:7, 50:9, 50:14, 51:2, 51:6, 52:3, 52:21, 52:22
**MS** [16] - 5:24, 6:2, 6:7, 6:11, 7:3, 7:7, 7:9, 7:23, 15:6, 16:18, 18:12, 30:12, 30:14, 30:17, 33:22, 34:2
**multiple** [2] - 26:12, 43:20
**must** [4] - 17:10, 17:24, 18:3, 30:25
**mute** [1] - 15:1

## N

**name** [5] - 7:21, 14:7, 15:4, 16:19, 30:13
**named** [1] - 31:10
**NASH** [1] - 3:10
**Nash** [1] - 7:24
**nation** [1] - 9:10
**Nation** [5] - 28:15, 28:18, 40:4, 40:6, 40:8
**natural** [17] - 9:25, 13:5, 14:15, 20:24, 21:22, 21:25, 28:15, 29:2, 29:24, 30:1, 31:6, 31:11, 39:4, 39:10, 42:1, 44:6, 44:14
**Natural** [10] - 7:8, 7:10, 16:17, 16:25, 30:18, 30:21, 31:22,

7

33:3, 35:9, 36:1
**NATURAL** [2] - 4:6, 4:10
**Natural's** [1] - 32:4
**nature** [2] - 27:20, 29:22
**NE** [2] - 2:4, 3:8
**necessarily** [3] - 21:3, 33:4, 39:7
**necessary** [1] - 24:1
**need** [9] - 8:25, 15:24, 15:25, 20:15, 29:23, 32:21, 37:2, 42:23, 52:4
**needed** [2] - 43:4, 49:2
**needs** [6] - 18:22, 26:5, 26:22, 31:24, 51:16, 51:23
**negotiated** [2] - 10:12, 15:16
**negotiation** [2] - 9:9, 15:22
**negotiations** [4] - 19:9, 19:11, 30:20, 30:23
**never** [1] - 15:3
**new** [1] - 40:15
**NEWTON** [1] - 6:7
**Newton** [2] - 2:19, 6:7
**newton** [1] - 6:9
**next** [2] - 13:25, 52:6
**nexus** [1] - 25:11
**NEZ** [2] - 1:10, 2:22
**Nez** [3] - 5:15, 6:10, 6:12
**Ninth** [8] - 11:15, 19:1, 19:17, 20:2, 20:6, 24:5, 26:21
**non** [15] - 17:8, 18:4, 21:10, 21:12, 22:18, 23:9, 24:25, 42:24, 43:11, 43:13, 43:17, 44:6, 46:6, 48:5, 51:25
**non-settlers** [6] - 18:4, 43:11, 44:6, 46:6, 48:5, 51:25
**non-settling** [9] - 17:8, 21:10, 21:12, 22:18, 23:9, 24:25, 42:24, 43:13, 43:17
**none** [1] - 8:11
**note** [3] - 30:19, 31:15, 32:15
**nothing** [4] - 11:11, 25:21, 26:14, 46:22
**notice** [1] - 52:12
**noticeably** [1] - 39:25
**November** [2] - 50:20,

50:24
**nowhere** [2] - 20:3, 24:24
**NRD** [5] - 25:7, 27:9, 27:19, 28:14, 29:7
**Number** [2] - 5:6, 24:21
**number** [16] - 25:25, 29:3, 32:9, 32:22, 32:23, 32:24, 33:9, 33:17, 33:18, 34:6, 34:25, 38:12, 38:14, 44:4
**number's** [1] - 38:11
**numbered** [1] - 32:17
**numbers** [3] - 32:12, 32:18, 38:10
**NW** [13] - 4:6, 4:10, 7:8, 7:10, 16:17, 16:25, 30:18, 30:21, 31:22, 32:4, 33:3, 35:9, 36:1

## O

**object** [1] - 37:21
**objecting** [3] - 8:21, 33:4, 43:17
**objection** [2] - 36:15, 46:20
**objective** [2] - 10:10, 46:10
**objectives** [1] - 10:16
**objectors** [1] - 6:17
**objectors'** [2] - 9:3, 37:10
**obvious** [1] - 25:20
**occasionally** [1] - 32:16
**October** [1] - 53:9
**OF** [21] - 1:2, 1:5, 1:6, 1:6, 1:7, 1:7, 1:8, 1:9, 1:10, 1:17, 2:3, 2:7, 2:7, 2:10, 2:10, 2:14, 2:18, 2:18, 3:3, 3:7, 3:7
**Official** [1] - 53:13
**often** [1] - 47:15
**older** [1] - 25:4
**once** [1] - 14:6
**one** [35] - 9:9, 10:16, 11:9, 14:9, 14:21, 19:21, 20:17, 21:23, 22:13, 24:4, 24:14, 24:15, 24:20, 25:10, 26:8, 28:2, 28:10, 28:14, 29:8, 30:22, 31:5, 33:9, 34:11, 39:7, 39:17, 40:25, 42:19, 43:16, 47:5,

47:21, 47:25, 48:17, 49:17, 51:5
**One** [1] - 3:19
**ongoing** [6] - 14:12, 28:21, 30:4, 30:20, 30:23, 38:5
**opaque** [1] - 48:6
**opening** [3] - 8:17, 14:10, 22:4
**operate** [1] - 24:20
**operated** [4] - 24:17, 24:18, 24:19, 25:18
**operation** [2] - 25:18, 46:21
**operations** [5] - 12:7, 12:9, 25:17, 26:3, 46:19
**opinion** [2] - 20:4, 52:16
**opposition** [3] - 23:21, 52:12, 52:13
**OR** [11] - 2:9, 2:12, 2:16, 2:21, 2:24, 3:9, 3:12, 3:24, 4:5, 4:9, 4:13
**oral** [2] - 8:11, 52:19
**Oral** [1] - 1:18
**order** [7] - 8:13, 17:23, 24:12, 26:7, 48:25, 51:22, 52:16
**ordered** [1] - 28:21
**OREGON** [7] - 1:2, 1:6, 1:7, 1:10, 2:7, 2:7, 2:18
**Oregon** [6] - 1:8, 5:13, 5:22, 9:13, 13:1
**original** [1] - 53:6
**orphan** [1] - 25:4
**otherwise** [1] - 51:24
**outcome** [5] - 11:4, 28:22, 38:7, 38:25, 39:8
**outcomes** [2] - 38:13, 48:14
**outset** [1] - 30:19
**outside** [1] - 27:20
**outstanding** [2] - 52:18, 52:19
**overall** [3] - 36:18, 44:2, 46:25
**overlap** [2] - 28:19, 28:20
**overlooked** [2] - 46:16, 46:21
**owes** [1] - 25:9
**own** [1] - 29:9
**owned** [2] - 24:20, 24:22
**owner** [2] - 32:4, 45:4
**owners** [2] - 45:24

## P

**pace** [1] - 29:15
**page** [2] - 20:14, 23:21
**pages** [1] - 29:11
**PAHs** [1] - 40:24
**paid** [2] - 19:3, 19:4
**paint** [1] - 43:25
**painted** [1] - 18:2
**paints** [1] - 12:13
**papers** [4] - 23:19, 23:20, 28:14, 30:5
**parallel** [1] - 29:2
**pardon** [1] - 30:15
**part** [11] - 25:23, 26:5, 26:16, 27:12, 36:19, 37:1, 39:20, 42:17, 42:23, 44:8, 51:10
**partially** [1] - 35:14
**participants** [2] - 12:3, 29:17
**participating** [1] - 29:4
**particular** [3] - 31:19, 47:1, 47:2
**particularly** [3] - 12:22, 23:21, 45:5
**parties** [37] - 9:10, 9:11, 9:14, 9:17, 9:20, 13:10, 14:1, 14:24, 15:16, 15:20, 16:9, 17:7, 17:8, 17:12, 17:16, 17:19, 19:9, 19:20, 21:11, 21:12, 28:6, 29:4, 30:21, 30:22, 31:25, 32:13, 32:17, 33:5, 33:7, 33:10, 34:17, 35:5, 40:9, 42:17, 42:24, 44:18, 51:8
**parties'** [3] - 20:4, 36:17, 36:18
**Partridge** [2] - 2:11, 5:24
**PARTRIDGE** [1] - 5:24
**party** [14] - 13:9, 23:22, 24:11, 24:14, 26:6, 26:15, 27:10, 27:11, 37:6, 42:24, 44:20, 49:5, 51:12
**party's** [1] - 43:13
**party-by-party** [1] - 49:5
**party-specific** [5] - 23:22, 24:11, 24:14, 37:6, 42:24
**pass** [1] - 18:13
**passed** [1] - 49:6
**passing** [1] - 17:11
**Patricia** [1] - 4:7

**Patty** [3] - 7:9, 16:24, 30:17
**pay** [5] - 17:12, 31:12, 41:20, 41:22, 45:5
**payment** [2] - 19:5, 20:10
**payments** [1] - 18:25
**Pays** [1] - 17:11
**PCBs** [1] - 40:25
**Pearl** [1] - 30:18
**PEARL** [2] - 4:7, 4:11
**pending** [3] - 26:8, 28:22, 52:11
**people** [2] - 15:24, 15:25
**per** [5] - 21:2, 26:6, 34:25, 35:1
**Perce** [3] - 5:15, 6:10, 6:12
**PERCE** [2] - 1:10, 2:22
**percent** [11] - 11:22, 19:12, 26:4, 33:1, 33:2, 41:2, 41:17, 43:6, 49:12
**percentage** [1] - 38:20
**perfectly** [1] - 18:5
**perform** [1] - 32:20
**performed** [1] - 23:22
**perhaps** [1] - 22:16
**period** [1] - 29:18
**persuasive** [4] - 26:24, 37:4, 37:6, 48:2
**PETERSON** [1] - 3:14
**petroleum** [1] - 40:24
**PGE** [1] - 14:21
**Phase** [2] - 21:19, 36:24
**phase** [1] - 45:22
**phone** [1] - 8:8
**phonetic** [1] - 48:21
**phrase** [1] - 15:4
**pick** [1] - 14:9
**picture** [3] - 12:14, 18:2, 44:1
**pie** [2] - 46:2, 46:6
**piece** [4] - 19:7, 19:13, 42:20, 43:10
**pincite** [1] - 20:11
**pipe** [1] - 8:8
**place** [9] - 5:6, 12:2, 12:7, 19:11, 28:25, 33:24, 43:1, 45:6
**placeholder** [1] - 40:14
**places** [1] - 43:16
**plaintiff** [1] - 35:22
**PLAINTIFF** [6] - 2:3, 2:7, 2:10, 2:14, 2:18, 2:22

**plaintiff's** [1] - 52:14
**plaintiffs** [16] - 5:11, 6:14, 8:16, 9:5, 9:7, 17:2, 17:14, 17:17, 17:24, 18:2, 18:3, 21:10, 22:20, 23:22, 25:6, 27:16
**Plaintiffs** [1] - 1:11
**plaintiffs'** [5] - 5:7, 8:22, 9:3, 20:20, 24:21
**plan** [1] - 21:20
**playing** [1] - 36:7
**PLLC** [1] - 3:3
**point** [27] - 10:14, 11:20, 12:18, 24:23, 25:8, 26:20, 27:6, 28:12, 31:4, 37:6, 38:2, 38:5, 39:15, 39:16, 39:20, 41:15, 43:9, 45:12, 45:18, 47:19, 49:15, 49:16, 49:21, 51:5, 51:6, 51:14, 51:15
**Point** [1] - 2:4
**pointed** [1] - 49:25
**pointing** [1] - 39:23
**policy** [4] - 16:11, 17:3, 17:9, 17:19
**Polluter** [1] - 17:11
**pollution** [1] - 17:12
**polycyclic** [1] - 40:23
**Port** [5] - 7:13, 7:16, 8:19, 14:1, 14:3
**PORT** [3] - 3:3, 3:7, 3:7
**portion** [1] - 45:9
**PORTLAND** [4] - 1:3, 3:3, 3:7, 3:7
**Portland** [23] - 1:8, 2:9, 2:16, 2:24, 3:9, 3:12, 3:24, 4:5, 4:9, 4:13, 7:13, 7:17, 8:19, 10:1, 11:3, 12:2, 12:3, 12:15, 14:2, 14:4, 14:14, 44:11, 44:12
**position** [1] - 51:24
**possibility** [1] - 39:11
**possible** [5] - 13:21, 18:6, 40:15, 44:8, 52:8
**pot** [1] - 45:10
**potential** [2] - 22:7, 43:19
**potentially** [2] - 23:8, 36:17
**power** [3] - 26:24, 37:4, 48:2
**practicalities** [1] -

23:17
**practically** [1] - 52:1
**precedent** [1] - 31:19
**prepared** [3] - 9:20, 12:6, 34:21
**present** [1] - 40:16
**presentation** [1] - 16:22
**presented** [1] - 18:7
**pretty** [3] - 18:16, 38:13, 41:8
**primary** [2] - 10:10, 36:15
**Principle** [1] - 17:11
**private** [5] - 28:21, 28:22, 29:4, 29:8, 29:17
**problem** [3] - 20:22, 21:6, 22:11
**problems** [3] - 17:13, 41:15, 42:3
**procedurally** [2] - 16:8, 17:22
**proceed** [5] - 9:5, 15:2, 15:5, 25:8, 40:2
**proceeded** [1] - 32:15
**proceeding** [3] - 14:11, 32:5, 44:10
**PROCEEDINGS** [1] - 1:17
**Proceedings** [1] - 52:23
**proceedings** [2] - 21:13, 53:5
**process** [12] - 10:12, 13:19, 15:18, 15:21, 16:4, 28:21, 30:21, 30:24, 37:22, 42:23, 50:18, 50:19
**processes** [1] - 50:12
**produce** [4] - 11:9, 23:24, 23:25
**produces** [1] - 41:24
**producing** [1] - 24:8
**product** [1] - 9:8
**production** [1] - 27:1
**project** [2] - 9:17, 14:22
**projected** [1] - 19:4
**projects** [1] - 9:19
**promotes** [1] - 17:6
**promptly** [1] - 29:9
**pronouncing** [1] - 30:9
**proof** [2] - 41:16, 42:3
**proper** [1] - 19:2
**properties** [1] - 32:11
**property** [17] - 12:7, 23:22, 24:12, 24:13,

24:21, 25:10, 25:11, 25:17, 26:6, 26:10, 26:12, 26:16, 27:11, 32:4, 32:10, 37:7, 42:24
**property-specific** [5] - 23:22, 24:13, 26:16, 37:7, 42:24
**proportion** [2] - 19:4, 19:5
**proposal** [1] - 26:25
**proposed** [4] - 8:12, 13:15, 17:1, 31:23
**proposition** [1] - 17:17
**pros** [1] - 46:10
**protection** [10] - 12:21, 17:6, 22:8, 22:12, 27:8, 27:14, 27:19, 51:7, 51:16, 51:23
**protective** [1] - 17:22
**provide** [11] - 17:24, 23:18, 26:23, 33:18, 33:21, 34:20, 35:10, 36:5, 42:23, 43:4
**provided** [7] - 8:24, 34:25, 35:7, 35:20, 46:13, 46:18, 48:9
**provides** [4] - 12:16, 25:22, 31:17
**providing** [5] - 17:6, 46:24, 47:3, 47:6, 48:6
**provision** [1] - 28:4
**provisions** [1] - 12:19
**PRPs** [3] - 19:3, 25:1, 26:12
**public** [16] - 10:6, 10:18, 10:22, 11:23, 13:16, 13:17, 16:11, 17:23, 19:24, 33:14, 40:3, 46:14, 48:5, 48:11, 48:13, 49:1
**publicly** [2] - 38:4, 39:23
**purposes** [1] - 20:9
**pursuant** [1] - 5:8
**pursuing** [1] - 21:10
**put** [2] - 24:6, 48:13

### Q

**quantified** [1] - 25:23
**quantum** [5] - 20:23, 21:9, 36:19, 37:18, 37:21
**quantums** [1] - 23:8
**questions** [4] - 8:6, 8:8, 14:19, 23:17

**quite** [1] - 13:23
**quote** [2] - 20:11, 20:14
**quoted** [1] - 28:16

### R

**rabbit** [1] - 42:9
**Radius** [2] - 24:17, 25:2
**raise** [1] - 11:4
**raised** [3] - 37:24, 39:17, 47:25
**raising** [1] - 33:3
**range** [1] - 38:13
**rather** [3] - 9:15, 10:11, 13:18
**rationale** [1] - 26:25
**Ray** [1] - 2:11
**reach** [2] - 9:11, 42:17
**reached** [3] - 38:12, 43:6, 50:10
**reaching** [2] - 10:7, 10:19
**read** [3] - 8:23, 20:1, 20:16
**readily** [1] - 35:21
**reaffirmed** [1] - 19:16
**real** [1] - 27:6
**reality** [1] - 47:16
**reallocated** [1] - 35:18
**really** [11] - 8:14, 9:2, 14:10, 14:13, 14:14, 14:17, 16:10, 34:5, 35:23, 36:10, 51:13
**reason** [3] - 15:24, 33:21, 41:7
**reasonable** [5] - 10:5, 13:23, 17:22, 18:9, 31:21
**reasons** [6] - 10:9, 12:24, 16:15, 29:19, 30:5, 51:21
**rebuttal** [2] - 8:22, 13:22
**receive** [1] - 41:21
**received** [1] - 44:25
**recently** [1] - 8:13
**recitals** [1] - 24:10
**recitation** [1] - 24:21
**recognize** [1] - 47:15
**record** [12] - 10:18, 10:22, 11:1, 11:21, 11:23, 16:7, 25:21, 26:14, 48:11, 48:13, 49:1, 53:4
**recover** [2] - 31:9, 42:15
**recovery** [1] - 29:2
**Recycling** [1] - 24:17

**reduced** [1] - 43:13
**reduction** [1] - 38:22
**referenced** [2] - 24:10, 48:18
**referring** [2] - 26:21, 37:9
**refers** [1] - 24:11
**reflected** [2] - 13:4, 16:3
**refusing** [3] - 23:24, 23:25
**regarded** [1] - 10:2
**regardless** [2] - 45:2, 45:3
**regulations** [1] - 31:18
**rejected** [1] - 19:17
**related** [2] - 10:14, 40:24
**relatedly** [1] - 37:1
**relates** [1] - 44:2
**relation** [1] - 12:15
**relative** [1] - 33:10
**release** [1] - 31:14
**relevant** [4] - 12:15, 18:9, 31:5, 31:18
**remain** [1] - 26:8
**remainder** [1] - 13:21
**remaining** [3] - 40:6, 44:21, 44:24
**remains** [1] - 52:14
**remedy** [1] - 21:23
**remind** [1] - 20:11
**remotely** [1] - 6:8
**repeat** [3] - 24:5, 30:5, 31:2
**Report** [1] - 32:14
**report** [2] - 24:3, 31:16
**Reporter** [1] - 53:13
**REPORTER** [1] - 1:23
**repose** [1] - 13:10
**represent** [1] - 15:10
**representing** [10] - 5:12, 6:18, 6:23, 7:2, 7:8, 7:13, 7:24, 16:2, 16:19, 16:24
**represents** [1] - 33:1
**request** [1] - 13:20
**requests** [1] - 52:12
**require** [2] - 26:15, 36:5
**required** [3] - 13:10, 18:9, 47:13
**requires** [4] - 19:23, 24:6, 26:25, 31:7
**requiring** [1] - 31:3
**RESERVATION** [3] - 1:9, 1:10, 2:18
**residual** [1] - 29:25
**resolution** [2] - 10:15,

26:7

**resolve** [3] - 9:15, 9:20, 36:4
**resolved** [1] - 13:11
**resolving** [1] - 51:8
**resource** [14] - 13:5, 20:24, 21:16, 21:22, 21:25, 28:15, 29:2, 29:24, 30:1, 31:6, 31:11, 42:2, 44:6, 44:15
**resources** [5] - 9:25, 14:15, 21:17, 39:4, 39:10
**respect** [12] - 10:22, 11:6, 12:5, 12:18, 12:22, 31:22, 32:21, 37:24, 39:16, 40:10, 48:13
**response** [9] - 14:15, 33:20, 33:22, 36:21, 36:22, 42:22, 43:9, 46:9, 50:3
**Response** [1] - 50:22
**responses** [1] - 9:4
**responsibility** [2] - 33:10, 43:20
**responsible** [7] - 9:14, 17:12, 17:17, 23:10, 36:17, 45:13, 45:14
**rest** [1] - 41:14
**restoration** [9] - 9:15, 9:17, 9:18, 9:21, 10:10, 13:18, 14:21, 24:10, 51:9
**restore** [1] - 9:25
**result** [7] - 9:11, 9:24, 10:15, 11:8, 11:10, 11:11, 17:7
**resulted** [1] - 19:11
**results** [2] - 31:9, 52:6
**reverse** [1] - 24:12
**review** [2] - 5:7, 10:4
**rewarded** [1] - 16:7
**risk** [2] - 14:10, 14:17
**risked** [1] - 9:18
**risks** [1] - 37:25
**river** [5] - 24:19, 25:11, 26:12, 30:2, 32:11
**River** [1] - 48:22
**RMR** [2] - 1:24, 53:13
**Road** [1] - 2:11
**road** [1] - 42:11
**roadmap** [1] - 16:21
**RONDE** [3] - 1:6, 2:10, 2:10
**Ronde** [4] - 2:11, 2:12, 5:13, 5:25
**room** [1] - 25:25

**round** [1] - 9:24
**rounds** [1] - 52:6
**ruled** [1] - 52:10
**ruling** [1] - 17:18
**running** [1] - 50:8

## S

**sale** [1] - 9:21
**San** [1] - 3:20
**Sand** [1] - 2:4
**satisfied** [1] - 51:4
**satisfy** [1] - 12:16
**scale** [1] - 34:19
**schedule** [1] - 29:9
**scheme** [2] - 42:16, 44:3
**schemes** [1] - 42:16
**Schnitzer** [5] - 24:16, 24:18, 25:17, 25:18, 26:2
**science** [1] - 42:5
**sciences** [1] - 38:6
**sciencey** [1] - 42:2
**scientific** [1] - 38:24
**scope** [6] - 21:17, 27:7, 27:18, 51:6, 51:15, 51:17
**scrap** [2] - 25:19, 26:3
**se** [1] - 21:2
**Seattle** [3] - 2:5, 3:5, 3:16
**second** [10] - 9:13, 10:11, 11:6, 11:20, 19:7, 27:6, 39:16, 40:25, 49:15, 51:15
**Section** [1] - 43:12
**sediments** [1] - 11:25
**see** [8] - 8:15, 14:25, 27:4, 35:9, 38:25, 39:18, 40:14
**seek** [1] - 31:9
**segregated** [1] - 34:22
**selecting** [1] - 11:19
**sense** [1] - 46:10
**sent** [3] - 8:13, 50:10
**September** [2] - 1:7, 5:1
**serious** [1] - 49:18
**Services** [3] - 6:20, 16:23, 18:19
**set** [3] - 5:6, 24:4, 49:9
**settle** [3] - 22:23, 22:25, 36:2
**settled** [9] - 31:13, 32:23, 32:24, 34:15, 35:13, 35:14, 35:16, 44:7
**settlement** [54] - 9:8, 13:11, 13:16, 14:1,

17:3, 17:6, 17:9, 17:15, 17:20, 18:4, 18:5, 18:25, 19:3, 19:5, 20:5, 20:10, 25:8, 25:23, 25:25, 27:23, 29:15, 29:18, 30:20, 30:22, 30:24, 31:11, 31:13, 32:25, 34:2, 34:12, 35:11, 36:18, 36:19, 38:1, 41:16, 41:18, 41:19, 41:25, 43:10, 43:12, 43:14, 44:25, 45:5, 46:2, 46:5, 46:25, 47:13, 49:14, 51:10, 51:11, 51:12, 51:13, 52:5
**settlements** [15] - 9:25, 10:5, 10:7, 10:15, 10:20, 15:24, 18:7, 29:10, 31:23, 33:4, 34:1, 42:17, 47:15, 50:16, 52:7
**settlers** [7] - 18:4, 19:5, 43:11, 44:6, 46:6, 48:5, 51:25
**settling** [70] - 8:3, 8:7, 8:19, 9:12, 9:13, 10:14, 11:21, 12:2, 12:5, 12:6, 12:14, 12:21, 13:9, 13:10, 14:2, 14:4, 15:9, 15:11, 15:18, 17:2, 17:7, 17:8, 17:16, 17:19, 19:3, 19:8, 19:20, 20:19, 20:22, 20:24, 20:25, 21:10, 21:12, 22:8, 22:17, 22:18, 23:9, 24:16, 24:25, 25:3, 26:13, 27:13, 28:6, 31:25, 32:6, 35:17, 36:16, 40:11, 41:17, 41:19, 41:21, 42:24, 43:3, 43:5, 43:7, 43:8, 43:13, 43:17, 43:21, 43:23, 45:19, 46:14, 47:1, 47:2, 47:4, 51:12, 51:24, 52:4
**several** [1] - 44:3
**severally** [1] - 44:21
**share** [3] - 17:8, 36:10, 46:25
**shared** [2] - 8:18, 8:20
**shares** [1] - 46:7
**shortly** [1] - 18:1
**show** [9] - 16:7, 35:24, 39:9, 39:13, 44:12, 44:14, 47:11, 47:12, 47:13

**showed** [2] - 35:24, 41:1
**shredded** [1] - 25:19
**shredding** [1] - 26:3
**shrinks** [1] - 46:3
**signaling** [1] - 10:18
**signature** [5] - 29:11, 50:11, 53:6, 53:7
**signatures** [2] - 49:24, 50:5
**signed** [1] - 53:7
**significant** [6] - 10:2, 13:2, 28:19, 28:20, 41:4, 49:13
**significantly** [2] - 39:10, 39:13
**signing** [1] - 53:3
**Siletz** [2] - 5:14, 6:3
**SILETZ** [2] - 1:7, 2:14
**similar** [1] - 22:16
**similarities** [1] - 14:14
**SIMON** [1] - 1:20
**simply** [4] - 15:15, 23:24, 31:23, 36:4
**single** [1] - 32:24
**site** [32] - 9:17, 11:3, 11:25, 24:17, 24:20, 24:23, 25:1, 26:8, 32:12, 32:13, 34:23, 35:4, 35:10, 35:11, 35:12, 36:4, 39:7, 43:18, 43:19, 44:1, 44:10, 44:11, 44:12, 44:17, 45:3, 45:4, 45:25, 48:22, 49:8
**Site** [13] - 6:20, 16:23, 18:19, 24:21, 26:9, 32:5, 32:7, 32:21, 32:22, 33:2, 33:15, 33:17, 43:18
**sites** [9] - 9:10, 24:22, 26:11, 32:17, 32:18, 34:22, 35:16, 43:21, 44:11
**situation** [1] - 41:12
**slice** [1] - 46:4
**slices** [2] - 46:4, 46:6
**small** [4] - 15:16, 15:20, 38:13, 50:23
**smaller** [1] - 38:15
**solution** [4] - 22:11, 22:13, 22:14, 22:15
**somewhere** [1] - 44:7
**soon** [1] - 52:7
**sooner** [1] - 10:11
**sorry** [6] - 20:22, 30:11, 30:13, 30:15, 30:17, 35:1
**sort** [3] - 8:25, 31:5, 33:25

**sorts** [2] - 31:7, 34:8
**sought** [1] - 27:8
**sound** [1] - 10:24
**soundness** [1] - 11:12
**sounds** [1] - 13:23
**sovereigns** [1] - 10:2
**speaking** [7] - 9:7, 12:25, 13:25, 15:1, 16:21, 40:13, 52:1
**special** [1] - 31:12
**specific** [31] - 8:9, 11:4, 11:16, 23:22, 24:11, 24:13, 24:14, 26:16, 31:14, 32:3, 34:20, 37:6, 37:7, 37:24, 39:16, 41:13, 42:22, 42:24, 43:7, 43:18, 43:19, 45:2, 45:4, 45:25, 46:21, 46:25
**specifically** [3] - 18:10, 24:7, 24:9
**speculative** [2] - 22:2, 36:22
**SPRINGS** [2] - 1:9, 2:18
**Springs** [3] - 5:15, 6:6, 6:8
**stake** [2] - 37:19, 38:18
**stand** [1] - 21:7
**standard** [3] - 10:8, 16:22, 31:6
**standards** [2] - 12:16, 18:9
**standing** [2] - 16:1, 21:24
**standpoint** [1] - 16:11
**start** [2] - 30:3, 43:2
**started** [1] - 30:2
**starting** [2] - 15:20, 52:20
**state** [2] - 28:3, 50:15
**STATE** [2] - 1:6, 2:7
**State** [4] - 5:12, 5:22, 9:12, 10:3
**statements** [2] - 8:17, 29:5
**States** [6] - 5:5, 5:12, 5:19, 10:3, 29:6, 50:17
**STATES** [3] - 1:1, 1:5, 1:21
**stating** [1] - 36:13
**statute** [5] - 5:9, 10:6, 31:6, 51:7, 51:9
**statutory** [1] - 17:5
**stay** [3] - 28:22, 28:24, 29:5
**Steel** [1] - 24:16

**stenographic** [1] - 53:4

**step** [2] - 15:24, 32:8

**stepped** [2] - 9:14, 16:9

**still** [6] - 11:6, 28:25, 30:4, 42:1, 43:15, 43:16

**stock** [1] - 16:23

**STOCK** [12] - 6:19, 18:15, 18:18, 20:1, 20:13, 20:18, 22:13, 22:15, 22:24, 23:3, 23:12, 52:22

**Stock** [5] - 3:14, 6:19, 18:13, 18:17, 18:18

**stop** [1] - 40:13

**stopped** [1] - 39:23

**Street** [6] - 2:8, 2:20, 2:23, 3:5, 3:11, 3:19

**strongly** [2] - 40:6, 40:7

**struck** [1] - 18:6

**structural** [1] - 49:5

**structured** [1] - 51:7

**stuck** [1] - 40:12

**studied** [1] - 13:1

**studies** [4] - 39:2, 39:9, 39:12, 39:14

**study** [7] - 13:4, 27:9, 27:19, 38:7, 38:8, 39:19, 39:24

**subject** [1] - 29:5

**submitted** [1] - 48:3

**substance** [2] - 31:9, 31:14

**substantial** [3] - 48:9, 48:22, 49:8

**substantially** [1] - 13:2

**substantively** [3] - 16:8, 17:22, 18:24

**sue** [5] - 12:20, 13:8, 51:17, 51:18, 51:25

**suffered** [1] - 15:16

**sufficiently** [1] - 9:19

**suggesting** [1] - 42:9

**suggests** [1] - 31:19

**suite** [8] - 3:12, 3:15, 3:19, 3:23, 4:5, 4:8, 4:12, 21:17

**Suite** [1] - 2:20

**sum** [2] - 13:12, 13:15

**Summary** [1] - 32:14

**Superfund** [2] - 9:10, 44:17

**support** [5] - 7:14, 8:4, 8:17, 14:1, 30:24

**supported** [1] - 11:23

**supporting** [2] - 8:1,

15:13

**supports** [1] - 10:19

**suppose** [1] - 44:4

**Supreme** [1] - 11:15

**SW** [8] - 2:8, 2:16, 2:20, 3:11, 3:23, 4:4, 4:8, 4:12

**systematically** [4] - 31:20, 32:2, 33:12, 34:4

**T**

**tables** [1] - 35:22

**teachers** [1] - 35:24

**technical** [5] - 11:5, 11:11, 11:19, 12:24, 14:16

**technically** [3] - 10:13, 10:24, 12:25

**teeny** [1] - 15:6

**telegraphed** [1] - 23:7

**ten** [1] - 8:21

**tenants** [1] - 32:6

**term** [2] - 28:24, 29:5

**terms** [5] - 18:23, 21:11, 22:16, 41:21, 41:22

**test** [2] - 19:1, 19:16

**THE** [101] - 1:1, 1:2, 1:5, 1:6, 1:8, 1:9, 1:20, 2:3, 2:7, 2:10, 2:14, 2:18, 2:22, 3:3, 3:7, 3:10, 3:13, 3:17, 3:21, 4:3, 4:6, 4:10, 5:4, 5:20, 5:23, 6:1, 6:4, 6:9, 6:13, 6:22, 7:1, 7:6, 7:8, 7:11, 7:18, 7:20, 8:2, 8:10, 11:14, 13:14, 13:23, 14:5, 14:25, 16:14, 18:10, 18:14, 18:17, 19:21, 20:11, 20:16, 22:11, 22:14, 22:19, 23:1, 23:11, 23:14, 24:7, 26:15, 27:22, 28:5, 28:9, 28:11, 30:7, 30:9, 30:13, 30:15, 33:20, 33:25, 36:8, 42:7, 42:11, 42:19, 43:15, 44:9, 44:14, 44:17, 44:20, 44:24, 45:2, 45:16, 45:18, 45:21, 46:9, 46:17, 46:24, 47:9, 47:22, 47:24, 49:17, 49:20, 49:23, 50:6, 50:8, 50:13, 51:1, 51:4, 52:2, 52:9

**themselves** [1] - 46:8

**thereafter** [1] - 32:12

**therefore** [2] - 13:3, 39:25

**they've** [4] - 27:1, 27:2, 37:15, 43:21

**thinking** [1] - 41:10

**Third** [2] - 4:8, 4:12

**third** [3] - 10:14, 28:12, 40:25

**three** [9] - 9:11, 9:22, 10:21, 40:20, 40:22, 41:1, 41:7, 41:11, 47:19

**thrust** [2] - 36:15, 37:10

**ties** [1] - 31:13

**time-consuming** [1] - 9:23

**timeline** [1] - 29:16

**tiny** [1] - 15:6

**titled** [1] - 8:3

**today** [6] - 8:14, 14:8, 15:12, 16:1, 29:12, 31:23

**together** [1] - 45:12

**TONKON** [2] - 3:22, 4:3

**Tonkon** [2] - 7:4, 7:5

**took** [3] - 12:2, 12:7, 19:11

**tool** [1] - 51:13

**top** [2] - 12:5, 46:12

**TORP** [2] - 3:22, 4:3

**Torp** [2] - 7:4, 7:5

**total** [9] - 10:22, 10:23, 11:6, 19:4, 20:23, 25:1, 34:14, 34:25, 46:3

**totally** [1] - 34:11

**TOURGEE** [2] - 30:12, 30:14

**Tourgee** [3] - 4:11, 7:10, 30:9

**towards** [1] - 29:9

**toxic** [2] - 10:1, 38:19

**tracing** [1] - 35:3

**track** [1] - 51:16

**tracks** [1] - 51:16

**transcript** [2] - 53:4, 53:6

**TRANSCRIPT** [1] - 1:17

**translating** [1] - 38:20

**transparency** [1] - 31:1

**transparent** [2] - 48:15, 48:16

**tree** [1] - 37:17

**trial** [9] - 25:8, 25:13, 38:1, 41:16, 42:1,

44:8, 44:21, 45:9, 46:7

**trials** [1] - 42:2

**tribal** [1] - 50:15

**Tribe** [3] - 5:15, 6:3, 6:12

**TRIBE** [2] - 1:10, 2:22

**tribes** [1] - 9:12

**Tribes** [8] - 5:13, 5:14, 5:15, 5:24, 6:5, 6:8, 10:3

**TRIBES** [8] - 1:6, 1:7, 1:8, 1:9, 2:10, 2:10, 2:14, 2:18

**tried** [1] - 48:4

**trivial** [1] - 49:17

**trouble** [1] - 35:23

**true** [5] - 11:7, 22:3, 26:11, 39:12, 53:4

**trust** [2] - 40:11, 42:13

**trustee** [2] - 40:4, 40:8

**trustees** [59] - 9:12, 10:7, 10:25, 11:5, 11:12, 12:6, 12:10, 12:25, 13:3, 13:6, 13:7, 15:9, 22:1, 22:3, 23:4, 30:19, 31:8, 31:17, 32:7, 32:12, 32:16, 33:16, 34:19, 34:24, 35:7, 35:10, 35:18, 35:20, 36:2, 36:5, 36:6, 38:4, 39:18, 40:3, 40:7, 40:11, 40:20, 41:3, 41:5, 41:9, 41:10, 41:16, 41:18, 41:21, 42:4, 42:13, 42:22, 43:4, 44:5, 46:13, 48:2, 48:12, 48:13, 48:15, 48:22, 50:11, 51:17, 51:25

**trustees'** [10] - 10:19, 10:23, 11:18, 12:23, 14:10, 21:2, 21:19, 31:18, 39:22, 48:20

**try** [3] - 23:16, 43:25, 50:9

**trying** [3] - 18:23, 18:24, 48:6

**Tucson** [2] - 19:15, 19:23

**turn** [2] - 16:15, 23:12

**two** [15] - 9:13, 11:9, 13:13, 17:17, 24:25, 25:2, 29:13, 32:5, 46:4, 47:21, 47:23, 48:18, 48:20, 48:22

**type** [1] - 46:10

**types** [1] - 19:9

**U**

**U.S** [2] - 2:3, 5:18

**ultimate** [2] - 19:10, 22:10

**ultimately** [3] - 20:9, 22:21, 23:10

**Umatilla** [2] - 5:14, 6:6

**UMATILLA** [1] - 1:8

**uncertainties** [3] - 42:15, 42:16, 42:18

**uncommon** [2] - 21:11, 33:25

**under** [6] - 10:8, 17:15, 29:3, 43:12, 50:4, 52:15

**undermine** [1] - 11:11

**undermined** [1] - 14:18

**understood** [1] - 52:2

**undertaking** [1] - 39:5

**unfortunately** [1] - 42:7

**uniformly** [1] - 10:13

**unilaterally** [1] - 27:23

**unique** [1] - 15:15

**UNITED** [3] - 1:1, 1:5, 1:21

**United** [6] - 5:5, 5:12, 5:18, 10:3, 29:6, 50:17

**unknown** [2] - 27:15, 27:20

**unlike** [1] - 24:18

**up** [16] - 8:18, 13:12, 14:9, 15:24, 16:9, 24:19, 26:11, 27:22, 34:6, 37:16, 38:10, 40:8, 41:2, 42:14, 45:11, 50:16

**updated** [2] - 32:16, 33:12

**upfront** [2] - 48:7, 51:19

**upheld** [2] - 16:12, 19:18

**urgency** [1] - 29:14

**USA** [1] - 2:3

**utilize** [1] - 22:16

**V**

**value** [1] - 38:22

**various** [2] - 24:19, 32:13

**versus** [1] - 34:11

**vessel** [2] - 25:18, 26:2

**veto** [1] - 28:8

**view** [3] - 12:23, 24:6,

26:25
**vigorously** [1] - 28:17
**volume** [1] - 34:9
**VROOMAN** [1] - 5:21
**Vrooman** [2] - 2:8, 5:21
**vs** [1] - 5:5

## W

**WA** [3] - 2:5, 3:5, 3:16
**waiting** [1] - 13:18
**wants** [1] - 36:2
**WARM** [2] - 1:9, 2:18
**Warm** [3] - 5:15, 6:6, 6:8
**Washington** [1] - 3:11
**waste** [2] - 34:10, 34:11
**weeks** [1] - 52:17
**weight** [1] - 23:6
**Weis** [2] - 2:15, 6:2
**WEIS** [1] - 6:2
**welcome** [9] - 5:20, 5:23, 6:1, 6:4, 6:22, 7:1, 7:11, 7:18, 8:2
**whole** [3] - 34:19, 37:19, 50:18
**wide** [5] - 10:7, 17:15, 32:16, 33:13, 35:1
**widely** [1] - 10:23
**wild** [1] - 50:8
**wish** [2] - 8:18, 8:20
**withholding** [1] - 48:8
**words** [2] - 14:21, 28:19
**workings** [1] - 47:7
**works** [1] - 46:11
**world** [1] - 47:16
**world's** [1] - 23:1
**wrapping** [1] - 13:12
**Wright** [1] - 7:4
**written** [2] - 27:14, 52:16

## Y

**Yakima** [8] - 28:15, 28:18, 28:22, 29:7, 29:20, 40:4, 40:5, 40:8
**yard** [2] - 25:19, 26:3
**year** [1] - 49:7
**years** [8] - 9:9, 9:18, 25:18, 26:2, 28:25, 29:13, 30:3, 44:4
**yielded** [1] - 11:7

## Z

**Zach** [1] - 7:4
**zero** [1] - 26:1
**ZEVENBERGEN** [33] - 5:17, 9:6, 11:17, 13:15, 37:13, 42:8, 42:12, 43:1, 43:24, 44:10, 44:16, 44:18, 44:23, 45:1, 45:6, 45:17, 45:20, 46:1, 46:12, 46:18, 47:3, 47:10, 47:23, 47:25, 49:19, 49:22, 50:3, 50:7, 50:9, 50:14, 51:2, 51:6, 52:3
**Zevenbergen** [5] - 2:4, 5:18, 9:7, 13:24, 36:10

ER-385

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE, <br><br> Plaintiffs, <br><br> v. <br><br> ACF INDUSTRIES, LLC; AIRGAS USA LLC; AIR LIQUIDE AMERICA L.P.; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.; BNSF RAILWAY COMPANY; CALBAG METALS CO.; CITY OF PORTLAND; ESCO GROUP LLC; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); GOULD ELECTRONICS INC.; HAJ, INC., D/B/A CHRISTENSON OIL COMPANY; HERCULES LLC; KOPPERS INC.; MCCALL OIL & CHEMICAL CORPORATION; MCCALL OIL REAL ESTATE COMPANY LLC; MOREC FRONT LLC; GWC PROPERTIES, LLC; GWC FRONT, LLC; TANKER BASIN LLC; MMGL LLC; NORTHWEST PIPE COMPANY (FKA NORTHWEST PIPE & CASING COMPANY AND NORTHWEST PIPE AND CASING COMPANY); PACIFICORP, AN OREGON CORPORATION; PORT OF PORTLAND; PORTLAND GENERAL ELECTRIC COMPANY (PGE); PORTLAND TERMINAL RAILROAD COMPANY; SCHNITZER STEEL INDUSTRIES, INC.; SILTRONIC CORPORATION; SULZER PUMPS (US) INC.; and VALVOLINE INC., <br><br> Defendants. | No. 3:23-cv-01603-SI <br><br> **DECLARATION OF JENNIFER HUGHES IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREES** |

ER-386

1.      I am Jennifer Hughes, and I make this Declaration in support of Plaintiffs' Motion to Enter Consent Decrees in the matter of United States of America, et al., v. ACF Industries, LLC, et al.  This declaration furnishes the Court with documents in the public record maintained by the Portland Harbor Natural Resource Trustee Council (the "Trustees") that have been cited in Plaintiffs' opening and reply memoranda in support of their Motion To Enter Consent Decrees.

2.      I hold a Bachelor of Science in Physical Geography and a Master of Urban and Regional Planning and have worked for Parametrix, Inc.as a land use and environmental planner for 22 years.  I conduct technical analysis, project management, document production, and document control for a variety of projects in compliance with local, state, and federal regulations.  Since 2010 I have worked as the Case Administrator for the Trustees as part of my position with Parametrix.  As Case Administrator, I provide support services to the Trustees relating to their work at the Portland Harbor Superfund Site, part of which includes maintaining documents on websites so that they are available to the public.  My work requires me to verify that the documents I post to those websites are true and correct copies of those documents.

3.      I have reviewed Plaintiffs' Motion To Enter Consent Decrees (Dkt. No. 85) and Plaintiffs' Reply In Support Of Their Motion To Enter Consent Decrees (filed September 2, 2025), for the purpose of making available in this declaration true and correct copies of documents in the Trustees' public record that are cited in those two filings.  The following documents, which are identified by name and date, are true and correct copies of publicly available documents on websites that I help maintain on behalf of the Trustees.

A.      Exhibit 1 is a true and correct copy of the Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement.  Portland Harbor Natural

Hughes Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      1

Resource Trustee Council, May 2015.  Available at: https://pub-data.diver.orr.noaa.gov/portland-harbor/20230401_PH%20Ph2%20PthC%20SummaryPreface_5383.pdf

       B.     Exhibit 2 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment: Phase 2 Allocation Methodology Report.  Prepared by Industrial Economics, Incorporated for the Portland Harbor Natural Resource Trustee Council, April 2023. Available at: https://pub-data.diver.orr.noaa.gov/portland-harbor/20230101_PHAllctnMthdlgyRprt_5231.pdf

       C.     Exhibit 3 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for American Car Foundry (ACF) Industries. Portland Harbor Natural Resource Trustee Council, 2022. Available at: https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_ACFInd_AllocationSumMemo_5233.pdf

       D.     Exhibit 4 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for AirGas and Air Liquide. Portland Harbor Natural Resource Trustee Council, 2023. Available at: https://pub-data.diver.orr.noaa.gov/portland-harbor/20230626_Air_Liquide_AllocationSumMemo_5255.pdf

       E.     Exhibit 5 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Ash Grove Cement, Inc. Portland Harbor Natural Resource Trustee Council, 2022. Available at: https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_AshGrove_AllocationSumMemo_5254.pdf

Hughes Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees     2

F.      Exhibit 6 is a true and correct copy of the Portland Harbor Natural

Resource Damage Assessment. Phase 2: Allocation Summary Memo for Ashland, Inc., Hercules,

LLC, and Valvoline, Inc. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-

harbor/20221118_AshlandHercules_AllocationSumMemo_5253.pdf

G.      Exhibit 7 is a true and correct copy of the Portland Harbor Natural

Resource Damage Assessment. Phase 2: Allocation Summary Memo for Beazer East, Inc.

Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-

harbor/20221118_Beazer_AllocationSumMemo_5252.pdf

H.      Exhibit 8 is a true and correct copy of the Portland Harbor Natural

Resource Damage Assessment. Phase 2: Allocation Summary Memo for BNSF Railway

Company. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-

harbor/20221118_BNSF_AllocationSumMemo_5251.pdf

I.      Exhibit 9 is a true and correct copy of the Portland Harbor Natural

Resource Damage Assessment. Phase 2: Allocation Summary Memo for Calbag Metals Co.

Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-

harbor/20221118_Calbag_AllocationSumMemo_5250.pdf

J.      Exhibit 10 is a true and correct copy of the Portland Harbor Natural

Resource Damage Assessment. Phase 2: Allocation Summary Memo for City of Portland.

Portland Harbor Natural Resource Trustee Council, 2023. Available at:

Hughes Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      3

https://pub-data.diver.orr.noaa.gov/portland-harbor/20230920_CityOfPortland_AllocationSumMemo_5249.pdf

K.      Exhibit 11 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for ESCO Inc. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_ESCO_AllocationSumMemo_5248.pdf

L.      Exhibit 12 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Evraz Inc. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_EVRAZ_AllocationSumMemo_5247.pdf

M.      Exhibit 13 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Gould Electronics, Inc. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_Gould_AllocationSumMemo_5246.pdf

N.      Exhibit 14 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for HAJ Inc. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_HAJ_AllocationSumMemo_5245.pdf

Hughes Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees       4

O.      Exhibit 15 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Koppers, Inc. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_Koppers_AllocationSumMemo_5244.pdf

P.      Exhibit 16 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for McCall Oil and Chemical. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_McCall_AllocationSumMemo_5243.pdf

Q.      Exhibit 17 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for MMGL. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_MMGL_AllocationSumMemo_5242.pdf

R.      Exhibit 18 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Northwest Pipe. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_NWPipe_AllocationSumMemo_5241.pdf

S.      Exhibit 19 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for PacifiCorp. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

Hughes Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      5

https://pub-data.diver.orr.noaa.gov/portland-

harbor/20221118_PacifiCorp_AllocationSumMemo_5240.pdf

      T.     Exhibit 20 is a true and correct copy of the Portland Harbor Natural

Resource Damage Assessment. Phase 2: Allocation Summary Memo for Port of Portland.

Portland Harbor Natural Resource Trustee Council, 2023. Available at:

https://pub-data.diver.orr.noaa.gov/portland-

harbor/20230920_PortOfPortland_AllocationSumMemo_5238.pdf

      U.     Exhibit 21 is a true and correct copy of the Portland Harbor Natural

Resource Damage Assessment. Phase 2: Allocation Summary Memo for Portland General

Electric. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-

harbor/20221118_PGE_AllocationSumMemo_5239.pdf

      V.     Exhibit 22 is a true and correct copy of the Portland Harbor Natural

Resource Damage Assessment. Phase 2: Allocation Summary Memo for Portland Terminal

Railroad Company. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-

harbor/20221118_PTRR_AllocationSumMemo_5237.pdf

      W.     Exhibit 23 is a true and correct copy of the Portland Harbor Natural

Resource Damage Assessment. Phase 2: Allocation Summary Memo for Schnitzer Steel

Industries. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-

harbor/20221118_Schnitzer_AllocationSumMemo_5236.pdf

Hughes Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees    6

X.      Exhibit 24 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Siltronic Corporation. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_Siltronic_AllocationSumMemo_5235.pdf

Y.      Exhibit 25 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Sulzer Pumps. Portland Harbor Natural Resource Trustee Council, 2022. Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_Sulzer%20Pumps_AllocationSumMemo_5234.pdf

Z.      Exhibit 26 is a true and correct copy of the Portland Harbor Superfund Site Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan.  Industrial Economics, Incorporated, 2018.  Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final_4076.pdf

AA.    Exhibit 27 is a true and correct copy of the Contaminant Concentrations in Osprey (*Pandion haliaetus*) Eggs from Portland Harbor and Surrounding Areas: Data Summary Report. Buck, Jeremy and Kaiser, James L. for the Portland Harbor Natural Resource Trustee Council, 2011.  Available at:

https://pub-data.diver.orr.noaa.gov/portland-harbor/20110307_OspreyFinalDataSumRpt_1219.pdf

BB.    Exhibit 28 is a true and correct copy of the Portland Harbor Natural Resource Damage Assessment: Summary of Phase 2 DSAYs Allocated to Settling Parties, July

Hughes Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      7

2023.  Portland Harbor Natural Resource Trustee Council, 2023.  Available at: https://pub-

data.diver.orr.noaa.gov/portland-

harbor/20230711_FinalSummaryPh2DSAYsAllctdSttlingParties_5232.pdf


Signed under penalty of perjury on _____9/2_____, 2025.


_____
Jennifer Hughes

Hughes Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      8

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 2, 2025, a copy of the foregoing was served on all counsel of record using the Court's CM/ECF system.


  s/ Michael J. Zevenbergen
MICHAEL J. ZEVENBERGEN

Hughes Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees    9

# Exhibit 5

# Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Ash Grove Cement, Inc.

# Portland Harbor Natural Resource Damage Assessment Phase 2: Allocation Summary Memo for Ash Grove Cement, Inc.

## 1.0    INTRODUCTION

Ash Grove Cement, Inc. (Ash Grove), an owner and operator of sites in Portland Harbor, has engaged in activities resulting in releases of substances of concern. As part of the Portland Harbor natural resource damage assessment (NRDA) Phase 2 process, and for settlement purposes only, the Trustee Council developed a party-specific allocation of natural resource damages liability for two sites with which Ash Grove Cement is associated, Sites 21 and 275.[1] That liability is determined in units of discounted service acre-years (DSAYs). Based on the information gathered throughout the Phase 2 process, methods described in the Trustee Council's allocation methodology report, and data and assumptions described below, Ash Grove's liability is calculated to be 16.97 DSAYs.

This memorandum provides a summary of the information reviewed and resulting DSAY allocation for Ash Grove and is organized as follows:

- ❖ Section 2 provides background information.
- ❖ Section 3 describes general operations at Ash Grove's sites.
- ❖ Section 4 outlines Ash Grove's activities at their sites.
- ❖ Section 5 is a list of references.

---

[1] The allocation presented in this memorandum is limited to an allocation of natural resource damages liability by the Trustee Council and does not inform or have any application relative to other environmental liabilities associated with the Portland Harbor Superfund Site, including but not limited to remedial liability. The use of "allocation" or "liability" in this memorandum refers only to the Trustee Council's settlement-oriented allocation of natural resource damages liability.

PAGE 1

## 2.0    OVERVIEW OF ASH GROVE SITES

Exhibit 2-1 is a map of the Ash Grove sites included in their party-specific allocation, and Exhibit 2-2 outlines background information for each of these sites. The relevant tax lot parcels are described in Appendix A of the Consent Decree associated with the settlement of natural resource damages for these parcels.

**EXHIBIT 2-1    MAP OF ASH GROVE SITES**



**EXHIBIT 2-2    ASH GROVE SITE BACKGROUND INFORMATION**

| SITE ID | ADDRESS[1] | CURRENT OWNER | ASH GROVE DATES OF OWNERSHIP | ASH GROVE DATES OF OPERATION | SITE ACREAGE |
|---|---|---|---|---|---|
| 21 | 13939 N Rivergate Blvd | Ash Grove | April 2, 1963-Present | June 1, 1964-Present | 29.61 |
| 275 | North:  3737 N Port Center Way | Ash Grove | North: Dec 22, 2005-Present | North: Dec 22, 2005-Present | North: 7.7 |
| 275 | South: 2600 N River St | Ash Grove | South: Dec 22, 1992-Present | South: Dec 22, 1992-Present | South:  6.94 |

Note.

1. All addresses located in Portland, Oregon.

PAGE 3

ER-399

## 3.0    ASH GROVE OWNERSHIP AND OPERATIONS

The following section briefly describes Ash Grove's ownership of and operations at the sites listed in Exhibit 2-2.

**SITE 21 (Ash Grove Cement Co. #1-Rivergate)**

Ash Grove purchased the property in 1963 from the Port of Portland, and lime manufacturing operations began in 1964. At that time, the facility consisted of a barge mooring structure for receiving raw materials (e.g., limestone), material conveyance and stockpiling systems, two calcimatic kilns, one hydrator, bulk storage silos, a warehouse, and an office. A third calcimatic kiln was put into production in 1977, and a replacement hydrator was installed in 2001. The calcimatic kilns and hydrator produced quicklime and hydrated lime for Ash Grove until June 1, 2006 when Ash Grove discontinued lime production and leased a portion of its product handling facilities (e.g., storage silos, conveyors, and hydrating facilities) to an unaffiliated third party, Graymont Western US, Inc. (Graymont). Graymont continues to use those facilities to deliver lime products to its customers today under a lease agreement with Ash Grove. Ash Grove continues to operate and sell the products from the grinding mills at the Rivergate Plant to produce powdered limestone and dolomite.

**Site 275 (Ash Grove Cement Co. #2-Terminal)**

The Ash Grove Terminal Facility consists of two contiguous parcels of land purchased independently. On December 22, 1992, Ash Grove acquired the first parcel (the "South Terminal Facility") from Union Pacific Railroad (UPRR). Cement storage and distribution facilities were subsequently installed, and the South Terminal Facility was operational starting in December 1994. Currently, cement is received at the South Terminal Facility via railcars from Ash Grove plants located more than 100 miles outside of the Portland area. Upon arrival, the rail cars are unloaded into concrete storage silos and the stored cement is subsequently loaded into customer and independent carrier tanker trucks for regional distribution. On December 22, 2005, Ash Grove acquired the second parcel of property (the "North Terminal Facility") from NSC Smelter LLC. Cement storage silos and distribution facilities were subsequently installed, and the North Terminal Facility was operational starting in April 2007. Cement and occasionally ground granulated blast furnace slag (a cement additive) are imported from overseas sources via ships. The material is unloaded from the ship using a vacuum system and then subsequently transferred to bulk storage silos. Stored material is then either loaded into railcars for distribution to Ash Grove's customers or transferred using rail cars or an enclosed pipe conveyor to the South Terminal Facility for distribution. The Ash Grove Terminal facility is surrounded on three sides by a UPRR rail yard.

## 4.0    ASH GROVE ACTIVITIES

Exhibit 4-1 identifies, for each of Ash Grove's properties in Appendix A of the Consent Decree, the activities that had the potential to result in the release of one or more of the substances of concern included in the Trustee Council's evaluation of natural resource damages. These types of activities are further described in the Trustee Council's allocation methodology report.

### EXHIBIT 4-1    ASH GROVE-RELATED ACTIVITIES

| Ash Grove Activities – Site 21 |
| --- |
| Aboveground storage tank (AST) - diesel |
| AST hydraulic fluid |
| AST lubrication oil |
| AST other petroleum/unknown petroleum |
| AST waste oil |
| Boat moorage or marina operations |
| Cement/limestone manufacturing |
| Creosote treated railroad ties |
| Creosote treated wood pilings |
| Extensive vehicle operations or washing facilities |
| Landfill of dredged sediments-Willamette prior to 1980 |
| PCB capacitor use |
| PCB contaminated oil spill |
| PCB transformer use/spills/storage |
| Petroleum leaks/spills |
| Scrap metal yard operation |
| Underground storage tank - gasoline |
| Ash Grove Activities – Site 275 |
| AST diesel |
| AST hydraulic fluid |
| AST lubrication oil |
| AST other petroleum/unknown petroleum |
| AST waste oil |
| Cement manufacturing/distribution |
| Creosote treated railroad ties |
| Creosote treated wood pilings |
| Extensive vehicle operations or washing facilities |
| Fueling operations |
| Hydraulic oil leaks/spills |
| Landfill of dredged sediments-Willamette prior to 1980 |
| Ship maintenance and/or construction |

ER-401

## 5.0    REFERENCES

Lower Willamette Group. 2009. Portland Harbor Draft Remedial Investigation Report. Prepared by Integral Consulting, Inc., Windward Environmental LLC, Kennedy/Jenks Consultants, and Anchor QEA, LLC.

Oregon Department of Environmental Quality. 2013. Environmental Cleanup Site Information Database. https://www.deq.state.or.us/lq/ECSI/ecsiquery.asp?listtype=lis&listtitle=Environmental+Cleanup+Site%20Information+Database

Portland Harbor Natural Resource Trustee Council. 2022. Portland Harbor Natural Resource Damage Assessment: Allocation Methodology Report. Prepared by Industrial Economics, Incorporated.

The Trustee Council also reviewed 19 additional documents submitted by Phase 2 parties that are settlement confidential and therefore not identified.

# Exhibit 10

# Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for City of Portland

# Portland Harbor Natural Resource Damage Assessment
# Phase 2: Allocation Summary Memo for the City of Portland

## 1.0   INTRODUCTION

The City of Portland, both an owner and operator of sites in Portland Harbor, has engaged in activities resulting in releases of substances of concern. As part of the Portland Harbor natural resource damage assessment (NRDA) Phase 2 process, and for settlement purposes only, the Trustee Council developed a party-specific allocation of natural resource damages liability for 34 sites with which the City of Portland is associated: 61, 62, 72, 112, 126, 127, 176, 190, 213, 222, 278, 279A, 279B, 279C, 306A, 306B, 306C, 306D, 306E, 311C, 316D, 316H, 334A, 336D, 348B, 414, 465A, 528, 607, 611, 619, 622, 623H, and 652.[1] That liability is determined in units of discounted service acre-years (DSAYs). Based on the information gathered throughout the Phase 2 process, methods described in the Trustee Council's allocation methodology report, and data and assumptions described below, the City of Portland's liability is calculated to be 61.03 DSAYs.

This memorandum summarizes the information the Trustee Council utilized to develop the allocation, and is organized as follows:

❖   Section 2 provides background information.

❖   Section 3 describes general operations at the City of Portland's sites.

❖   Section 4 outlines the City of Portland's activities at their sites.

❖   Section 5 is a list of references.

---

[1] The allocation presented in this memorandum is limited to an allocation of natural resource damages liability by the Trustee Council and does not inform or have any application relative to other environmental liabilities associated with the Portland Harbor Superfund Site, including but not limited to remedial liability. The use of "allocation" or "liability" in this memorandum refers only to the Trustee Council's settlement-oriented allocation of natural resource damages liability.

PAGE 1

## 2.0    OVERVIEW OF CITY OF PORTLAND SITES

Exhibit 2-1 is a map of the City of Portland sites included in their party-specific allocation, and Exhibit 2-2 outlines background information for each of these sites. The relevant tax lot parcels are described in Appendix A of the Consent Decree associated with the settlement of natural resource damages for these parcels.

**EXHIBIT 2-1    MAP OF CITY OF PORTLAND SITES**



**EXHIBIT 2-2    CITY OF PORTLAND SITE BACKGROUND INFORMATION**

| SITE ID | ADDRESS[1] | CURRENT OWNER(S) | CITY OF PORTLAND DATES OF OWNERSHIP | CITY OF PORTLAND DATES OF OPERATION | SITE ACREAGE |
|---|---|---|---|---|---|
| 61, 62, 607 | 12005 N. Burgard Street | Schnitzer Steel Industries, Inc. Burgard Equities, LLC. Northwest Pipe Co. | 1917-1949 | 1917-1949 | 133 |
| 72 | 11040 N Lombard St | City of Portland | 1917-Present | 1965-1985 | 0.85 |
| 112 | 8706 N Bradford St | City of Portland | 1915-Present | 1915-Present | 1.84 |
| 112 | 6543 N Burlington | City of Portland | 1979-Present | 1993-Present | 8.06 |
| 126 | 8424 N. Crawford Street | Steel Hammer Properties, LLC | 1979-1997 | 1979-1997 | 14.8 |
| 127 | N Edgewater St | Metro | 1979-1996 | 1979-1996 | 24.3 |
| 176 | N Basin Ave 97217 | City of Portland | 1996-Present | 1996-Present | 14 |
| 190 | 3660 NW Front Ave | City of Portland | 1959-Present | 1959-Present | 0.55 |
| 213, 528, 619, 652 | 2615-2619 NW Industrial St, 2530 NW 25TH Pl | City of Portland | 1896-1946, 1993-Present | 1897-1946, 1993-Present | 11.78 |
| 222 | 2400 NW Front Ave | City of Portland | 2004-Present | 2004-Present | 22 |
| 278 | 1402 N. River St | Sakrete | 1928-1990 | 1928-1990 | 3.05 |
| 279A | 2110 N Lewis Ave | City of Portland | 2000-Present | 2000-Present | 0.92 |
| 279B | 2308 N. Clark Ave | City of Portland | 2002-Present | 2002-Present | 0.66 |
| 279C | 1405 N. River St | City of Portland | 1938-Present | 1938-Present | 0.38 |

| SITE ID | ADDRESS[1] | CURRENT OWNER(S) | CITY OF PORTLAND DATES OF OWNERSHIP | CITY OF PORTLAND DATES OF OPERATION | SITE ACREAGE |
|---|---|---|---|---|---|
| 306A, 334A, 465A | 1207 NW Naito Pkwy | City of Portland | 1987-Present | 1987-Present | 4.8 |
| 306B, 348B | 901 NW Naito Pkwy | City of Portland | 1987-Present | 1987-Present | 19.8 |
| 306C, 311C | 800 NW 6TH Ave | City of Portland | 1987-Present | 1987-Present | 13.54 |
| 306D, 316D, 336D | 1020 – 1300 NW 9TH Ave | City of Portland | 1987-Present | 1987-Present | 7.1 |
| 306E | 1362 NW Front Ave | City of Portland | 2000-Present | 2000-Present | 4.0 |
| 316H, 623H | NW 11TH Ave & Overton St | City of Portland | 2004-Present | 2004-Present | 2.07 |
| 414 | 1 N Center Ct St | City of Portland | 1924-Present | 1924-Present | 38 |
| 611 | NW Marina Way | Bonneville Power Administration | n/a | 1951-1988 | 1.5 |
| 622 | 614 N Tillamook St | City of Portland | 1996-Present | 1996-Present | 0.99 |

Note.

1. All addresses are located in Portland, Oregon.

## 3.0   CITY OF PORTLAND OWNERSHIP AND OPERATIONS

The following section briefly describes the City of Portland's ownership of and operations at the sites listed in Exhibit 2-2.

### Site 61, 62, and 607 (Burgard Sites)

The City acquired this Property, originally comprised of two tax lots, between 1917 and 1925 (historical tax lot boundaries have changed over time).  The City acquired the areas described as lot 38 (Sites 61 and 607) in 1917 and lot 6 (Sites 61, 62 and 607) in 1925. In 1941, the Oregon Shipbuilding Corporation entered into a Government-Owner Facilities Contract with the United States to construct shipbuilding facilities for World War II in the area of Terminal 4. The Oregon Shipbuilding Corporation leased the Property from multiple entities, including portions of the City of Portland's tax lots, in 1941.  In 1949 and 1950, the City conveyed its portions of the Property to the federal government and the State of Oregon. Currently, Sites 61, 62 and 607 are owned by Schnitzer Steel Industries, Inc., Northwest Pipe Co., and Burgard Equities, LLC respectively. Current operations include metals recycling and fabrication, pipe manufacturing, and pipe storage.

### Site 72 (Wheeler Bay Fire Boat Facility)

The City obtained this Property in 1917. It was formerly part of Terminal 4 and was retained by the City when the Dock Commission merged with the Port of Portland in 1971. The Fire Bureau kept Fire Boat 3 at Pier 2 at Wheeler Bay from 1965 until 1985. Although still owned by the City, the Property is currently vacant and unused.

### SITE 112 (Cathedral Park)

Cathedral Park is located on the east side of the Willamette River. Local residents wanted to create a park on the land beneath the St. Johns Bridge in the early 1970s, and the City of Portland supported the development as a way to address the lack of public access to the waterfront for recreational use. The land was vacant and largely unused except for river access. The City acquired the land for development of the park in 1974, and the park was completed and opened to the public in 1980.  The City is the current owner of the Property, which is still being used as a public park.

### SITE 112 (Water Pollution Control Laboratory)

The City purchased the Property from Brand-S Corporation in 1979 and opened the City's Water Pollution Control Laboratory (WPCL) on this Property in February 1997. Half of the facility consists of staff offices; the other half is laboratory space. Laboratory activities primarily include analysis of wastewater from treatment plants and permitted industrial waste. During the City's ownership through the Portland Development Commission (PDC), from 1979 to 1993 the land was vacant and the City did not conduct activities on the Property. The Property was used for a short time in the late 1980s by Lampros Steel to store new steel.  Since 1993, the City has owned and operated the WPCL through its Bureau of Environmental Services (BES).

### SITE 126 (Crawford Street Corporation Site)

The City owned this Property from 1979 until 1997. Historical operations included lumber, chain, and steel manufacturing; various mills; machine shops; auto repair; and metal forging, cleaning, machining, shaping, cutting, and painting. The Property is currently owned by Steel Hammer Properties, LLC. Lampros Steel is currently leasing the property and uses it for steel distribution.

**SITE 127 (Willamette Cove)**

Willamette Cove was formed in 1908 when BNSF constructed an embankment for the railroad bridge. From the 1930s to the 1960s, the Property was used by various industries, including a wood barrel manufacturer and lumber mill on the east end of the site, Port of Portland dry docks in the central and eastern portions and a plywood mill at the west end.  The City, represented by the PDC, acquired the Property as part of an urban renewal project in 1979 and transferred it to The Trust for Public Lands to be used for open space and recreational purposes in 1996.  No City operations or facilities were located on the Property during PDC's ownership.  The Trust for Public Lands transferred the Property to Metro Greenspace in 1996.  Metro is the current owner of all tax lots comprising Site 127, which is currently undeveloped.

**SITE 176 (Swan Island Boat Ramp)**

The Port owned the Property from 1984 until 1996 and used it as a boat ramp and public parking lot. The City, represented by the Bureau of Environmental Services, purchased the property in 1996 with the intent to construct a combined sewage treatment facility that was eventually located elsewhere. From 2009 to 2011, the Property was used for temporary staging during sewer construction. The City continues to maintain the parking lot and boat ramp for public use while other portions of the Property remain undeveloped.

**Site 190 (Station 6)**

The Property was vacant until the City, represented by the Fire Bureau, began using the Property for a fire station in 1959 through an agreement with the Portland Commission of Public Docks. The Station is used to support both land and water-based emergency response efforts. The Fire Bureau constructed a fire station with a gangway and dock for fireboat access in 1960. Two fireboats are currently docked in an area accessed using a pier extending from the property to the boat moorage area. A boathouse is also located in the fireboat moorage area.  The City is the current owner of the Property.

**SITE 213, 528, 619, and 652 (Guilds Lake Industrial Center)**

The Property was part of an approximately 22-acre Property that the City owned and operated as a municipal landfill from the 1910s through 1946. Municipal wastes and incinerator ash were placed in the landfill during operation of an incinerator on the Property to the southeast of the property.  The West Coast Freight Terminal building occupied the site from approximately 1950 until 1978. The terminal building extended northwest of the incinerator building and housed terminal docking and repair facilities for several companies. The City repurchased the Property from Marathon U.S. Realties in 1993. The Property is now occupied by two warehouses and parking areas that were constructed in late 1979 and early 1980. The City currently owns the Property and leases certain facilities on site to third parties for warehousing activities.

**SITE 222 (Terminal 1 North)**

The City's Commission of Public Docks purchased the Property in 1945 from Eastern and Western Lumber Company and subsequently operated the Property as a lumber terminal.  In 1971, the Port of Portland acquired the Property as a result of a merger with the Dock Commission.  The City leased the Property from the Port of Portland beginning in 2002 and acquired the Property in 2004 to support the West Side combined sewer overflow (CSO) project.  The City constructed a tunnel shaft on the Property to support construction of the tunnel and for long-term operation and maintenance access. The City has also used the Property as storage for other activities supporting the construction of the tunnel shaft.

ER-409

One of the warehouses on the Property is used for fabricating concrete tunnel sections.  The City is the current owner of the Property and continues to provide tunnel maintenance.

**SITE 278 (Municipal Paving Plant)**

In 1928, the City built a municipal paving plant at the foot of SE Essex Street, which it operated intermittently until 1966. The building was sold shortly after its closure, and in 1969 the City leased approximately two-thirds of the Property where concrete materials were delivered via rail and barge, stored onsite and distributed via truck.  In 1990, the City sold the Property to Sakrete of Pacific Northwest, Inc., which almost immediately assigned its rights under the sale agreement to 4M Investments.  Sakrete is the current owner of the Property.

**SITE 279A (Former Tucker Property)**

The Property has been developed since at least 1889 and has been used by the electrical supply and service industry, with onsite activities including operation of electrical substations, transformer storage, and transformer repair.  The City purchased the Property in 2000 from Thomas Tucker through the exercise of its eminent domain authority for the Lower Albina Overcrossing Project. Upon acquiring the Property, the City demolished the onsite building, conducted a remedial action under the oversight of the Oregon Department of Environmental Quality (DEQ) and the U.S. Environmental Protection Agency (EPA), and constructed an overpass ramp to alleviate traffic congestion in the area. The City is the current owner of the Property and continues to use the Property for right-of-way access (an overpass ramp), with remnant portions used for surface parking.

**SITE 279B (Valvoline Portland Packaging Plant)**

The City purchased the Property in 2002 from Valvoline Company, a division of Ashland, Inc. The Property was originally purchased for an on-ramp to North Interstate Avenue but the ramp was located elsewhere. The City's Bureau of Maintenance currently uses the Property for storage of de-icing solution and for vehicle parking. The City also leases a portion of the Property to Widmer Brothers for parking. The City is the current owner of the property.

**SITE 279C (Materials Testing Laboratory)**

The City acquired this Property in 1938 from Montgomery Estate Company and used it for offices and materials testing from 1938 to present. The Property is currently served by the City's municipal water and sanitary sewer systems. Approximately one half of the building is used for offices and the other half is used for materials testing. The Materials Testing Laboratory, an operation of the City's Bureau of Environmental Service's Engineering division, provides physical testing of soils, aggregates, cement, concrete, and other construction materials for purposes of design, material evaluation, material acceptance, and quality assurance for the City's public works construction.  The City is the current owner of the property and continues to operate the laboratory.

**SITE 306A, 334A, 465A (One Waterfront Place)**

The Property is located in the former Union Station rail yards and is known as Parcel A North. Union Station and its associated rail yards were built when the former Couch Lake was filled in the 1890s. According to historical information, use of the area for railroad purposes began in the 1880s and continued until the mid-1980s. The City of Portland represented by PDC acquired One Waterfront Place Property from the Portland Terminal Railroad Company in 1987 as part of its acquisition of Union Station and associated railroad properties. All of the tracks were removed from the Property before PDC's purchase of the Property.  Following acquisition of the Union Station assemblage in 1987, the portion of

PAGE 7

ER-410

the overall Property north of the Broadway Bridge and east of the mainline tracks was divided into smaller parcels. The remainder of this portion of the Property is still owned by PDC.

**SITE 306B, 348B (The Yards at Union Station)**

The Yards at Union Station is a multi-phase housing project south of the Broadway Bridge (and also known as Lots 3, 4 and 5 of Parcel B South) constructed on former rail yards. The City of Portland, represented by PDC, acquired The Yards at Union Station properties from the Portland Terminal Railroad Company in 1987 as part of its acquisition of Union Station and associated railroad properties. When PDC acquired the Property, the rail yards were used for active rail movement, storage of rail cars on any of the numerous yard tracks on site, and storage of rail materials including ties and ballasts. In 1988, PDC hired a salvage contractor who removed all of the unused track, ties and other equipment except for the 7 operating tracks serving the station and located nearest the depot. Currently, these discontinued yards remain vacant except for occasional temporary permitted uses, such as special event parking. The City is the current owner of the property.

**SITE 306C, 311C (Union Station Block Y Parking Area)**

The Property was residentially developed by 1889. Commercial development appeared on the Property in the early 1900s. By the mid-1920s the Property had been converted to its present use as a parking lot for the Union Station Terminal.  The City of Portland, represented by PDC, acquired the Property from Portland Terminal Railroad Company (PTRR) in 1987. Block Y was historically and continues presently to operate as a surface parking lot.  In 2003, the entire block was reconfigured to extend NW 6th Avenue through the Property, eventually connecting to NW 9th and Johnson.  The City is the current owner of the property.

**SITE 306D, 316D, 336D (Station Place)**

PDC acquired most of the Station Place Property from PTRR in 1987 as part of its acquisition of Union Station and associated railroad properties.  In 1989, portions of what became Station Place Lots 2 and 5 were acquired from Union Pacific Railroad Company and Glacier Park Company. Station Place consists of the former railroad parcels northwest of Union Station (and is also known as Union Station North B and the Horse barn Site).  The Portland Mounted Police Department occupied the Station Place Property from 1990 to 2001. The corral and modular building were removed and demolition of the horse barn was completed as part of an infrastructure improvement construction plan.  Currently the site is owned by the City and has mixed use as a parking lot, commercial and residential buildings as well as vacant land.

**SITE 306E (Centennial Mills)**

Historically, the Property was used for a flour mill from 1910 to 2000.  The City, represented by PDC, acquired the Centennial Mills property on July 19, 2000 in furtherance of PDC's statutory mandate of acquiring blighted properties for rehabilitation and inclusion into the River District Urban Renewal Area. In 2002, a portion of the Property was redeveloped for a horse paddock that is used by the City's Mounted Patrol Unit that continues to operate today.  The rest of the property is currently vacant.  The City is the current owner of the property.

**SITE 414 (Rose Garden Arena and Memorial Coliseum)**

The City, acting through its Exposition-Recreation Commission, began acquiring land for a coliseum complex in 1954. The Memorial Coliseum was opened in 1960 and is currently operating today.  The Memorial Coliseum is used for hosting spectator sports and entertainment events and is currently

PAGE 8

ER-411

owned by the City. Before acquisition for the Rose Garden Arena, the area was primarily residential. Operations on the property included a truck facility from 1950 to 1964 and a gas station from 1963 to 1983.  The City purchased the former gas station property in 1984. In 1995, the Rose Garden Sports Arena was opened. The Rose Garden, which continues to operate to this day, is a multi-purpose spectator facility that hosts sports, concerts, conventions and trade shows. The City is the current owner of the property.

### SITE 611 (Linnton Oil Fire Training Ground)

The City operated the Linnton Oil Fire Training Ground (LOFTG) from 1952 to 1988, located on the west side of the Willamette River at river mile 3.5. LOFTG was used by public and private firefighting crews to learn methods of extinguishing petroleum fires. Liquid fuels for the training fires were donated by the cooperating industries. After operations ended, the City investigated and remediated the Property under DEQ oversight. Remediation activities included soil removal, capping, groundwater monitoring and institutional controls.  The site is currently owned by Bonneville Power Administration and is vacant except for an existing power line.

### SITE 622 (Former Westinghouse Property)

Historical operations at the Property prior to City ownership included an electrical transformer repair facility, which the Westinghouse Electric Manufacturing Company owned and operated between 1943 and 1978. From 1985 to 1996, the building was leased to Pac West Glass, which manufactured stone, clay, and glass.  Owners of the property during that time include William Gilmore, Tillamook Industrial Investors, and Thomas Tucker. The City acquired the Property in 1996 for expansion of the adjacent Water Bureau Interstate Facility.  Following acquisition of the Property, the City investigated the nature and extent of legacy contamination at the site, made parking lot improvements, constructed storm water treatment facilities, removed underground storage tanks, demolished existing buildings and storm water conveyance systems, removed contaminated soil, and capped the Property with new asphalt.  The Property is currently owned by the City and is being used for parking and storage for the Water Bureau Interstate Facility.

### SITE 623H, 316H (River District Property)

The Property is part of the former Hoyt Street Rail Yard that was operated by Burlington Northern Santa Fe Railway Company (BNSF) and its predecessors from about 1911 through 1998.  Hoyt Street Properties, L.L.C. (HSP) acquired the Hoyt Street Rail Yard in 1994 and leased the site to BNSF through the end of 1998. In October 1997, BNSF ceased all rail operations at the Property with the exception of some rail car storage in the western portion of the site. Since 1998, HSP has been developing the former rail yard for residential, commercial and other related uses. The City as PDC acquired the Property (Tracts C and D) from HSP in 2004, transferring it to the City's Bureau of Parks and Recreation in 2005. The City currently owns the Property, operating it as a neighborhood park.

### City-Owned Outfalls

Outfalls are owned by either public or private entities. For City-owned outfalls, the City, as an owner, has benefitted by having that infrastructure in place (e.g., drainage to limit flooding), and may have gained additional economic benefits through its rate payers from the discharge of contaminants from site-specific activities into its outfall system.

## 4.0    CITY OF PORTLAND ACTIVITIES

Exhibit 4-1 identifies, for each of the City of Portland's properties in Appendix A of the Consent Decree, the activities that had the potential to result in the release of one or more of the substances of concern included in the Trustee Council's evaluation of natural resource damages. These types of activities are further described in the Trustee Council's allocation methodology report.

**EXHIBIT 4-1    CITY OF PORTLAND-RELATED ACTIVITIES**

| City of Portland Activities - Site 61 |
| --- |
| creosote treated railroad ties |
| landfill of dredged sediments-Willamette prior to 1980 |
| ship berthing |
| ship/boat maintenance and/or construction |
| **City of Portland Activities - Site 62** |
| ship/boat maintenance and/or construction |
| **City of Portland Activities - Site 72** |
| creosote treated wood pilings |
| landfill of construction and demolition debris |
| **City of Portland Activities - Site 112** |
| aboveground storage tank (AST) heating oil |
| creosote treated railroad ties |
| creosote treated wood pilings |
| landfill of construction and demolition debris |
| landfill of dredged sediments-Willamette prior to 1980 |
| ship berthing |
| **City of Portland Activities - Site 126** |
| creosote treated railroad ties |
| creosote treated wood pilings |
| underground storage tank (UST) other petroleum/unknown petroleum |
| **City of Portland Activities - Site 127** |
| creosote treated wood pilings |
| landfill of dredged sediments-Willamette prior to 1980 |
| UST other petroleum/unknown petroleum |
| **City of Portland Activities - Site 176** |
| creosote treated wood pilings |
| landfill of dredged sediments-Willamette prior to 1980 |

ER-413

| City of Portland Activities - Site 190 |
| --- |
| boat moorage |
| creosote treated wood pilings |
| fueling operations |
| landfill of dredged sediments-Willamette prior to 1980 |
| UST diesel |
| UST gasoline |
| **City of Portland Activities - Site 213** |
| landfill of dredged sediments-Willamette prior to 1980 |
| municipal landfill operation |
| waste transfer station |
| **City of Portland Activities - Site 222** |
| creosote treated wood pilings |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 278** |
| asphalt batch plant/asphalt production |
| AST other petroleum/unknown petroleum |
| creosote treated wood pilings |
| UST bunker c |
| UST gasoline |
| **City of Portland Activities - Site 279A** |
| extensive vehicle operations or washing facilities |
| landfill of construction and demolition debris |
| **City of Portland Activities - Site 279B** |
| none |
| **City of Portland Activities - Site 279C** |
| UST diesel |
| UST heating oil |
| UST other petroleum/unknown petroleum |
| **City of Portland Activities - Site 306A** |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 306B** |
| creosote treated railroad ties |
| landfill of dredged sediments-Willamette prior to 1980 |

| **City of Portland Activities - Site 306C** |
| --- |
| creosote treated railroad ties |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 306D** |
| creosote treated railroad ties |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 306E** |
| creosote treated wood pilings |
| landfill of dredged sediments-Willamette prior to 1980 |
| unprotected storage of petroleum contaminated soil |
| UST heating oil |
| **City of Portland Activities - Site 311C** |
| creosote treated railroad ties |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 316D** |
| creosote treated railroad ties |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 316H** |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 334A** |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 336D** |
| creosote treated railroad ties |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 348B** |
| creosote treated railroad ties |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 414** |
| mechanical/electric motor repair and maintenance |
| UST waste oil |
| **City of Portland Activities - Site 465A** |
| landfill of dredged sediments-Willamette prior to 1980 |

| City of Portland Activities - Site 528 |
| --- |
| landfill of dredged sediments-Willamette prior to 1980 |
| municipal landfill operation |
| **City of Portland Activities - Site 607** |
| none |
| **City of Portland Activities - Site 611** |
| AST other petroleum/unknown petroleum |
| petroleum leaks/spills |
| unprotected storage of petroleum contaminated soil |
| UST diesel |
| UST other petroleum/unknown petroleum |
| **City of Portland Activities - Site 619** |
| landfill of dredged sediments-Willamette prior to 1980 |
| municipal landfill operation |
| **City of Portland Activities - Site 622** |
| none |
| **City of Portland Activities - Site 623H** |
| landfill of dredged sediments-Willamette prior to 1980 |
| **City of Portland Activities - Site 652** |
| none |
| **City of Portland Activities – Non-Site-Specific** |
| City-owned outfalls |
| Land zoned as residential/commercial and parks/open space (non-site-specific stormwater) |

## 5.0 REFERENCES

Lower Willamette Group. 2009. Portland Harbor Draft Remedial Investigation Report. Prepared by Integral Consulting, Inc., Windward Environmental LLC, Kennedy/Jenks Consultants, and Anchor QEA, LLC.

Oregon Department of Environmental Quality. 2013. Environmental Cleanup Site Information Database. https://www.deq.state.or.us/lq/ECSI/ecsiquery.asp?listtype=lis&listtitle=Environmental+Cleanup+Site%20Information+Database

Portland Harbor Natural Resource Trustee Council. 2022. Portland Harbor Natural Resource Damage Assessment: Allocation Methodology Report. Prepared by Industrial Economics, Incorporated.

The Trustee Council also reviewed 190 additional documents submitted by Phase 2 parties that are settlement confidential and therefore not identified.

# Exhibit 11

# Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for ESCO Inc.

# Portland Harbor Natural Resource Damage Assessment Phase 2: Allocation Summary Memo for ESCO Inc.

## 1.0     INTRODUCTION

ESCO Inc. (ESCO), an owner and operator of sites in Portland Harbor, has engaged in activities resulting in releases of substances of concern. As part of the Portland Harbor natural resource damage assessment (NRDA) Phase 2 process, and for settlement purposes only, the Trustee Council developed a party-specific allocation of natural resource damages liability for 29 properties with which ESCO Inc. is associated: Sites 138, 203, 215, 224, 304, 539, 566, 572, 609, 639, the ESCO Main Plant, and 18 additional properties.[1][2] That liability is determined in units of discounted service acre-years (DSAYs). Based on the information gathered throughout the Phase 2 process, methods described in the Trustee Council's allocation methodology report, and data and assumptions described below, ESCO's liability is calculated to be 0.007 DSAYs.

This memorandum summarizes the information the Trustee Council utilized to develop the allocation, and is organized as follows:

- ❖  Section 2 provides background information.
- ❖  Section 3 describes general operations at ESCO's sites.
- ❖  Section 4 outlines ESCO's activities at their sites.
- ❖  Section 5 is a list of references.

---

[1] ESCO Main Plant and the 18 additional properties were not assigned an allocation site number.

[2] The allocation presented in this memorandum is limited to an allocation of natural resource damages liability by the Trustee Council and does not inform or have any application relative to other environmental liabilities associated with the Portland Harbor Superfund Site, including but not limited to remedial liability. The use of "allocation" or "liability" in this memorandum refers only to the Trustee Council's settlement-oriented allocation of natural resource damages liability.

## 2.0    OVERVIEW OF ESCO SITES

Exhibit 2-1 is a map of the ESCO sites included in their party-specific allocation, and Exhibit 2-2 outlines background information for each of these sites. The relevant tax lot parcels are described in Appendix A of the Consent Decree associated with the settlement of natural resource damages for these parcels.

**EXHIBIT 2-1    MAP OF ESCO SITES**



**EXHIBIT 2-2    ESCO SITE BACKGROUND INFORMATION**

| SITE ID | SITE ADDRESS[1] | CURRENT OWNER | ESCO DATES OF OWNERSHIP | ESCO DATES OF OPERATION | SITE ACREAGE |
|---|---|---|---|---|---|
| 138 | 6900 NW Front Ave | ESCO Corporation | 1966-Present | 1957-1983 | 10.5 |
| 203 | 3200-3250 NW Yeon Ave<br><br>3342 NW 26th Ave | IPC Property Owner Pool 3 West, Yeon Industrial Park Condominium, Wendland Properties LLC, McDonald's USA LLC, Spire-Yeon LLC | None | 1947-1963 | <0.50 |
| 215 | 2211 NW Brewer St | ESCO Corporation | 1984-Present | 1984-Present | 0.5 |
| 215 | 2760 NW Yeon Ave | ESCO Corporation | 1998-Present | 1998-Present | 1.48 |
| 215 | 2770 NW Yeon Ave | ESCO Corporation | 1952-Present | 1954-Present | 3.23 |
| 224 | 2245 NW Suffolk St | Henry P Oseran & Associates | None | 1998-Present | 1.26 |
| 304 | 1650 NW Naito Pkwy | Fremont Place LP | None | 1998-2013 | 0.07 |
| 539 | 2345 NW Nicolai St | Francis Development LLC | None | 1995-1996 | 1.39 |
| 566 | 2407 NW 28th Ave | BWG LLC | None | 1996-2002 | 1.33 |
| 572 | 3136 NW 35th Ave | Standard Steel Property LLC | None | 2008-Present | 3.69 |
| 609 | 2535 NW 28th Ave | DB & EB LLC | None | 1981-1989 | 0.25 |
| 639 | NW Corner 23rd and NW Roosevelt St | ESCO Corporation | 1965-Present | 1965-Present | 0.23 |
| ESCO Main Plant | 2141 NW 25th Ave | ESCO Corporation | 1913-Present | 1913-Present | 15.57 |

PAGE 3

| ESCO Site B | 2141 NW 25th Ave | ESCO Corporation | 1943-Present | 1943-Present | 0.50 |
|---|---|---|---|---|---|
| ESCO Site F | 2300 NW 26th Ave, 2127 NW 26th Ave, 2635 NW Wilson St | 1535-A1 LLC, UPG American Can Property Owner LLC | None | 1976-Present | 4.54 |
| ESCO Site H | 2404 NW Nicolai St | ESCO Corporation | 1980-Present | None | 0.23 |
| ESCO Site I | 2414 NW Nicolai St | ESCO Corporation | 1977-Present | 1977-Present | 0.15 |
| ESCO Site K | 2539 NW Vaughn St | ESCO Corporation | 1985-Present | None | 0.53 |
| ESCO Site L | Part of 2300 NW 26th Ave | 1535-A1 LLC | None | 1974-Present | 1.00 |
| ESCO Site M | 2300 NW 26th Ave | ESCO Corporation | 1980-Present | 1980-Present | 2.36 |
| ESCO Site O | SW Corner 23rd and NW Roosevelt St | ESCO Corporation | 1967, 1969-Present | 1967, 1969-Present | 0.38 |
| ESCO Site P | 2321 NW Roosevelt St | ESCO Corporation | 2004-Present | 2004-Present | 0.05 |
| ESCO Site Q | 2133 NW York St | Portland Y 222 LLC ET AL | None | 1989-1997 | 0.69 |
| ESCO Site R | 2306 NW Reed St | SP Property Investments LLC | None | 1982-1987 | 0.46 |
| ESCO Site T | 2380 NW Roosevelt St | Spears Roosevelt LLC | None | 1968-1999 | 0.27 |
| ESCO Site U | NE Corner 24th and NW Roosevelt St | ESCO Corporation | 1962-Present | 1962-Present | 0.66 |
| ESCO Site X | 2311 NW York St | ESS-GS York LLC | None | 1968-1985 | 0.53 |
| ESCO Site Y | 2249 NW York St | PLB Investments LLC & Bacchus Investors LLC | 1968-2005 | 1968-2005 | 0.73 |
| ESCO Site AA | 2335 NW 23rd Pl | 2329 NW 23rd Place LLC | None | 1978-early 1980s | 0.23 |
| ESCO Site CC | 2400 NW 23rd Pl, 2425 NW 23rd Ave | Nams Inc | None | 1969-1989 | 0.56 |
| ESCO Site DD | 2425 NW 23rd Pl | Green Transfer & Storage Co | None | 1978-1981 | 0.11 |

Note.

1. All addresses are located in Portland, Oregon.

PAGE 4

ER-422

## 3.0    ESCO OWNERSHIP AND OPERATIONS

The following section briefly describes ESCO's ownership of and operations at the sites listed in Exhibit 2-2.

### SITE 138 (Willbridge Landfill)

ESCO operated Willbridge Landfill from 1957 to 1979. Operations consisted of placing used foundry-related waste materials such as spent sand cores, molds, slag, and refractory materials from its Portland operations (Main Plant and Plant 3) into the remnant of Doane Lake. Estimates of used foundry materials in the landfill range from approximately 323,000 to 436,000 cubic yards. From 1957 until 1966, ESCO's filling took place with the consent of the Property owner at that time. ESCO acquired the Willbridge Landfill property in 1966 and still retains ownership. ESCO operated Willbridge Landfill until 1979. Then, in 1983 the landfill was closed, graded and contoured, and finally capped with soil and re-vegetated. The property remains vacant land.

### SITE 215 (Plant 3) and the ESCO Main Plant

ESCO currently operates two steel foundries in northwest Portland that manufacture steel parts used primarily in mining, dredging, and construction applications. The size of the parts manufactured at the plants ranges from 40 pounds to many thousands of pounds each. The Main Plant has been in operation since 1913 and historically has manufactured larger parts, typically over 50 pounds each. ESCO purchased this property in 1952 and began steel foundry operations and manufacturing in 1954. Operating since 1954, Plant 3 makes smaller parts, typically less than 50 pounds each. Other than product size, the basic operations at the two plants are similar. The manufacturing process involves mold and core making, refining clean scrap steel (melting); pouring the steel into a mold (pouring); allowing the steel to cool and harden (cooling); removing the cast metal part from the mold (shakeout); and finishing operations such as cutting, grinding, welding, sandblasting and heat treating, and painting.

### Sites 203, 224, 304, 539, 566, 572, 609, 639, and additional ESCO properties B, F, H, I, K, L, M, O, P, Q, R, T, U, X, Y, AA, CC, and DD

ESCO leased these sites for storage space or office administrative use from as early as 1947 until present. For example, Sites 539 and 572 were used for non-manufacturing pattern storage.

ER-423

## 4.0    ESCO ACTIVITIES

Exhibit 4-1 identifies, for each of ESCO's properties in Appendix A of the Consent Decree, the activities that had the potential to result in the release of one or more of the substances of concern included in the Trustee Council's evaluation of natural resource damages. These types of activities are further described in the Trustee Council's allocation methodology report.

**EXHIBIT 4-1    ESCO-RELATED ACTIVITIES[1]**

| ESCO Activities - Site 138 |
|---|
| industrial landfilling of ESCO steel foundry waste |
| landfilling of Doane Lake by surrounding properties |
| **ESCO Activities - Site 215** |
| Above-ground storage tank (AST) hydraulic fluid |
| Underground storage tank (UST) diesel |
| AST waste oil |
| fueling operations |
| steel fabrication |
| **ESCO Activities - ESCO Main Plant** |
| UST waste oil |
| UST diesel |
| UST gasoline |
| AST diesel |
| AST hydraulic fluid |
| AST waste oil |
| fueling operations |
| steel fabrication |

Note.

1. ESCO did not conduct relevant activities on Sites 203, 224, 304, 539, 566, 572, 609, 639, and the 18 additional ESCO properties.

PAGE 6

ER-424

ER-425

## 5.0    REFERENCES

Lower Willamette Group. 2009. Portland Harbor Draft Remedial Investigation Report. Prepared by Integral Consulting, Inc., Windward Environmental LLC, Kennedy/Jenks Consultants, and Anchor QEA, LLC.

Oregon Department of Environmental Quality. 2013. Environmental Cleanup Site Information Database. https://www.deq.state.or.us/lq/ECSI/ecsiquery.asp?listtype=lis&listtitle=Environmental+Cleanup+Site%20Information+Database

Portland Harbor Natural Resource Trustee Council. 2022. Portland Harbor Natural Resource Damage Assessment: Allocation Methodology Report. Prepared by Industrial Economics, Incorporated.

The Trustee Council also reviewed six additional documents submitted by Phase 2 parties that are settlement confidential and therefore not identified.

ER-425

# Exhibit 12

# Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Evraz Inc.

Case 3:23-cv-01603-SI    Document 130-12    Filed 09/02/25    Page 2 of 9

# 5247

# Portland Harbor Natural Resource Damage Assessment Phase 2: Allocation Summary Memo for Evraz Inc. North America

## 1.0    INTRODUCTION

Evraz Inc. North America (Evraz), both an owner and operator of sites in Portland Harbor, has engaged in activities resulting in releases of substances of concern. As part of the Portland Harbor natural resource damage assessment (NRDA) Phase 2 process, and for settlement purposes only, the Trustee Council developed a party-specific allocation of natural resource damages liability for 9 sites with which Evraz is associated: 13, 60, 64, 73, 142, 157, 158, 160, and 182.[1] That liability is determined in units of discounted service acre-years (DSAYs). Based on the information gathered throughout the Phase 2 process, methods described in the Trustee Council's allocation methodology report, and data and assumptions described below, Evraz's liability is calculated to be 45.5 DSAYs.

This memorandum summarizes the information the Trustee Council utilized to develop the allocation, and is organized as follows:

- ❖ Section 2 provides background information.
- ❖ Section 3 describes general operations at the EVRAZ sites.
- ❖ Section 4 outlines EVRAZ's activities at their sites.
- ❖ Section 5 is a list of references.

---

[1] The allocation presented in this memorandum is limited to an allocation of natural resource damages liability by the Trustee Council and does not inform or have any application relative to other environmental liabilities associated with the Portland Harbor Superfund Site, including but not limited to remedial liability. The use of "allocation" or "liability" in this memorandum refers only to the Trustee Council's settlement-oriented allocation of natural resource damages liability.

PAGE 1

ER-427

## 2.0    OVERVIEW OF EVRAZ SITES

Exhibit 2-1 is a map of the EVRAZ sites included in their party-specific allocation, and Exhibit 2-2 outlines background information for each of these sites. The relevant tax lot parcels are described in Appendix A of the Consent Decree associated with the settlement of natural resource damages for these parcels.

**EXHIBIT 2-1    MAP OF EVRAZ SITES**



**EXHIBIT 2-2    EVRAZ SITE BACKGROUND INFORMATION**

| SITE ID | ADDRESS[1] | CURRENT OWNER | EVRAZ DATES OF OWNERSHIP | EVRAZ DATES OF OPERATION | SITE ACREAGE |
|---|---|---|---|---|---|
| 13 | 14400 N Rivergate Blvd | Evraz Inc. | 1967 – Present | 1969 – Present | 145 |
| 60 | 9040 N Burgard Way | Evraz Inc. (50%) Lampros (50%) | 2004 – Present | 2004 – Present | 25.2 |
| 64 | 11920 N Burgard Street | WMR LLC | 1983 – 1997 | No operations | 84.5 |
| 73 | 10400 North Lombard Street | Port of Portland | NA | 1999 – 2001 | 104 |
| 142 | 6161 NW 61st Avenue | Metropolitan Service District of Portland, Oregon | 1959 – 1980 | 1959 – 1980 | 10.4 |
| 157 | 5555 N Channel Avenue | Cascade General/ Vigor Industrial | NA | 1947 – 1950 | 57 |
| 158 | 5815 & 5851 N Lagoon Avenue | Service Steel Inc. | NA | 2000 – 2002 | 14.5 |
| 160 | N Channel Avenue (various) | Port of Portland | NA | 1947 – 1951 | 93.0 |
| 182 | 4950, 5034, & 5200 NW Front Avenue | Front Ave LP, Tube Forgings of America, CMI Northwest | 1955 – 1978 | 1955 – 1978 | 44.0 |

Note.

1. All addresses are located in Portland, Oregon.

### 3.0    EVRAZ OWNERSHIP AND OPERATIONS

Gilmore Iron and Steel Co., Gilmore Steel Corporation, Gilmore Steel and Supply Co. Inc., Camrose Pipe Corporation dba Columbia Structural Tubing, Oregon Steel Mills, Inc., Evraz Oregon Steel Mills, Inc., and Evraz Inc. North America were allocated as one entity. The following section briefly describes EVRAZ's ownership of and operations at the sites listed in Exhibit 2-2.

**SITE 13 (Oregon Steel Mills)**: The Oregon Steel Mills site, also known as Rivergate, is located adjacent to the Willamette River at river mile 2.4 east. Rivergate was a swampy lowland area that was filled with Willamette River dredged sediments in the 1940s to create the current land. Oil sump operations, steel manufacturing, smelting, recycling, and storage are all past uses. A dock was in use until the late 1970s when iron ore shipments ceased. Evraz's predecessor, Gilmore Steel, purchased the Rivergate property in 1967, and Evraz still owns the site. Current site uses include steel and steel pipe manufacturing, pipe coating, and transportation of steel product. Two landfills are also located on the property. The West Landfill consists of mullite, ceramic refractory, furnace slag, mill scale, and dredged Willamette sediment. The East Landfill consists primarily of spent refractory material. Fueling activities occur on-site and enable the rail and vehicle transportation.

**Site 60 (Lampros Properties LLC)**: The Lampros site is located upland near river mile 4 east. The site has primarily been used by steel manufacturing companies for production and storage of steel products, including recycling, dating back to 1980. During World War II, the property housed the shipyard administration building and parking lot and later was the temporary site for Vanport College. Since 2004, Evraz's subsidiary, Camrose Pipe Corporation dba Columbia Structural Tubing, has had a 50% ownership co-tenancy agreement with Lampros Properties, LLC. The site currently consists of a large warehouse and nearly 20 acres of paved area. Portions of the warehouse space and paved area are used for storage of steel products, parts, and equipment.

**Site 64 (WMR LLC)**: The WMR LLC site is an upland property near river mile 4 east. The site was formerly owned by Union Carbide, whose operations involved calcium carbide and ferroalloy processing from 1941 to 1981 that resulted in substantial wastes. Evraz's predecessor, Gilmore Steel, owned the former Union Carbide site from 1983 to 1997 where the land was leased to tenants. Evraz acquired the property to secure a power contract with the Bonneville Power Administration due to Evraz's high electricity use on nearby sites. WMR LLC has owned the property since 1997 and leases to Northwest Container Services, which stores and repairs seagoing containers and equipment.

**Site 73 (Port of Portland Terminal 4 Auto)**: The Port of Portland Terminal 4 Auto property is located adjacent to the Willamette River at river miles 4.8 – 5.6 east. The Port of Portland has owned the site since 1971. The land was undeveloped until 1973, when Toyota constructed a large auto storage facility and steel dock/yard. The terminal is adjacent to the waterway and is used by Toyota as an automobile unloading, storage, and processing facility. Evraz's predecessor, Oregon Steel Mills, Inc., leased a 20-acre portion of the site for 28 months (1999 – 2001) for steel slab import, handling, and storage.

**Site 142 (METRO Central Transfer Station)**: The METRO Central Transfer Station is an upland site at river mile 7.2 west. Bethlehem Steel used the site as a steel distribution warehouse from 1924 to 1959 and was an owner from 1945 to 1959. Evraz's predecessor, Gilmore Steel, owned the property from 1959 to

PAGE 4

ER-430

1980 and operated a warehouse for steel products and a service center for cutting steel to customer specifications and shipping via truck and rail. The property is currently owned and operated by Metropolitan Service District of Portland, Oregon (METRO) for use as the central waste transfer station.

**Site 157 (Portland Shipyard)**: The Portland Shipyard is located adjacent to the Willamette River, on Swan Island at river mile 8.5 east. Historically, the site has seen heavy industrial use and river contamination from multiple sources. The Port of Portland owned the site from 1922 to 2000. Between 1926 and 1931, the Port constructed an airport on the island. From 1942 to 1949, the U.S. Maritime Commission constructed a shipyard under a lease with the Port. In 1950, the Port converted the shipyard to a public, common-user ship repair yard. Ship repair contractors contracted with vessel owners and operators to perform ship repair work. Evraz's predecessor, Gilmore Steel, leased Bays 10 and 11 (approximately 1.1 acres) in the Assembly Building at the Portland Shipyard from 1947 to 1950 for the storage of steel. Oregon Steel Mills, Inc. leased Bay 1 (approximately 0.61 acres) from July 1995 to January 1996 for storage and assembly of a rolling steel mill for the Rivergate property. In 2000, the Port of Portland sold the ship repair yard to Cascade General. It is currently used for metal fabrication and maintenance of ships as well as land and water transportation.

**Site 158 (The Marine Group)**: The Marine Group Property is an upland site on Swan Island at river mile 8.6 east. Maintenance and warehouse facilities in support of local industrial operations including the Portland Shipyard are conducted on this site. Evraz's predecessor, Oregon Steel Mills, Inc., leased Bay 12 (approximately 1.5 acres) from 2000 to 2002 for fabrication, cutting, storage, and distribution of steel products. The site is currently owned by Service Steel, Inc.

**Site 160 (Port of Portland-N Channel Ave.)**: This Port of Portland site is located adjacent to the Willamette River on Swan Island at river miles 8.5 – 9.5 east. The Port of Portland has owned the property since 1922. Activities that support the Portland shipyard, including ship maintenance, sandblasting of ships, fuel storage, concrete batching, and material storage, are performed on the property. Evraz's predecessors, Gilmore Steel and Oregon Steel Mills, Inc., leased Swan Island "Machine Shop" Building 9 (approximately 1.1 acres) from 1947 to 1951 for cutting, processing, and storage of metal and steel.

**Site 182 (Front Ave LP)**: The Front Avenue LP property is located adjacent to the Willamette River at river miles 8.0 – 8.6 west. Evraz's predecessor, Gilmore Steel and Supply, owned the property from 1955 to 1978 and operated a secondary (scrap metal recycling) steel mill. Electric arc furnace slag from the mill was used partly as fill to expand the site. A settling pond was used for 8 years to separate solids before discharging to the Willamette. Two 20,000 gallon USTs containing bunker C fuel were used to power the mill. Electrical transformers were also used on-site. Currently, Glacier Northwest (Parcel #1) operates a concrete batch plant, and Tube Forgings of America (Parcel #2) operates a carbon steel pipe fitting factory. CMI Northwest (Parcel #3) uses the site for lumber storage. Front Avenue LP, Tube Forgings of America, and CMI Northwest are listed as current owners of the site.

## 4.0    EVRAZ ACTIVITIES

Exhibit 4-1 identifies, for each of EVRAZ's properties in Appendix A of the Consent Decree, the activities that had the potential to result in the release of one or more of the substances of concern included in the Trustee Council's evaluation of natural resource damages. These types of activities are further described in the Trustee Council's allocation methodology report.

### EXHIBIT 4-1    EVRAZ-RELATED ACTIVITIES[1]

| Evraz Activities – Site 13 |
| --- |
| above-ground storage tank (AST) diesel |
| AST gasoline |
| AST hydraulic fluid |
| AST kerosene |
| AST other petroleum/unknown petroleum |
| Creosote treated railroad ties |
| Creosote treated wood pilings |
| Extensive vehicle operations |
| Fueling operations |
| Hydraulic fluid use |
| Hydraulic oil leakage/spills |
| Landfill of dredged sediments-Willamette prior to 1980 |
| Oil/water separation/filtration use |
| PCB containing capacitor use |
| PCB transformer use/spills/storage |
| Petroleum leaks/spills |
| underground storage tank (UST) diesel |
| UST gasoline |
| UST other petroleum/unknown petroleum |
| **Evraz Activities – Site 60** |
| Landfill of dredged sediments-Willamette prior to 1980 |
| **Evraz Activities – Site 64** |
| Creosote treated railroad ties |
| Landfill of dredged sediments-Willamette prior to 1980 |
| **Evraz Activities – Site 158** |
| Steel Fabrication |

PAGE 6

ER-432

| Evraz Activities – Site 182 |
|---|
| Creosote treated railroad ties |
| Creosote treated wood pilings |
| Extensive vehicle operations |
| Landfill of construction and demolition debris |
| Lubricating oil used in manufacturing |
| Sandblasting for other than boats or vessels |
| Scrap metal yard operation |
| Slag storage or landfilling |
| Steel manufacturing |
| Sump discharge at Site 182 |
| UST bunker c |

Note.
1. Evraz did not conduct any relevant activities on Sites 73, 142, 157, and 160.

PAGE 7

## 5.0    REFERENCES

Lower Willamette Group. 2009. Portland Harbor Draft Remedial Investigation Report. Prepared by Integral Consulting, Inc., Windward Environmental LLC, Kennedy/Jenks Consultants, and Anchor QEA, LLC.

Oregon Department of Environmental Quality. 2013. Environmental Cleanup Site Information Database. https://www.deq.state.or.us/lq/ECSI/ecsiquery.asp?listtype=lis&listtitle=Environmental+Cleanup+Site%20Information+Database

Portland Harbor Natural Resource Trustee Council. 2022. Portland Harbor Natural Resource Damage Assessment: Allocation Methodology Report. Prepared by Industrial Economics, Incorporated.

The Trustee Council also reviewed 25 additional documents submitted by Phase 2 parties that are settlement confidential and therefore not identified.

# Exhibit 13

# Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Gould Electronics, Inc.

Case 3:23-cv-01603-SI    Document 130-13    Filed 09/02/25    Page 2 of 6

# 5246

# Portland Harbor Natural Resource Damage Assessment
# Phase 2: Allocation Summary Memo for Gould Electronics, Inc.

## 1.0    INTRODUCTION

Gould Electronics, Inc. (Gould), an owner and operator of one site in Portland Harbor, has engaged in activities resulting in releases of substances of concern. As part of the Portland Harbor natural resource damage assessment (NRDA) Phase 2 process, and for settlement purposes only, the Trustee Council developed a party-specific allocation of natural resource damages liability for one site with which Gould is associated, Site 140.[1] That liability is determined in units of discounted service acre-years (DSAYs). Based on the information gathered throughout the Phase 2 process, methods described in the Trustee Council's allocation methodology report, and data and assumptions described below, Gould's liability is calculated to be 0.07 DSAYs.

This memorandum summarizes the information the Trustee Council utilized to develop the allocation, and is organized as follows:

- ❖ Section 2 provides background information.
- ❖ Section 3 describes general operations at Gould's site.
- ❖ Section 4 outlines Gould's activities at their site.
- ❖ Section 5 is a list of references.

---

[1] The allocation presented in this memorandum is limited to an allocation of natural resource damages liability by the Trustee Council and does not inform or have any application relative to other environmental liabilities associated with the Portland Harbor Superfund Site, including but not limited to remedial liability. The use of "allocation" or "liability" in this memorandum refers only to the Trustee Council's settlement-oriented allocation of natural resource damages liability.

PAGE 1

## 2.0    OVERVIEW OF GOULD SITE

Exhibit 2-1 is a map of the Gould site included in their party-specific allocation, and Exhibit 2-2 outlines background information for the site. The relevant tax lot parcel is described in Appendix A of the Consent Decree associated with the settlement of natural resource damages for this parcel.

### EXHIBIT 2-1    MAP OF GOULD SITE



**EXHIBIT 2-2    GOULD SITE BACKGROUND INFORMATION**

| SITE ID | ADDRESS | CURRENT OWNER | GOULD DATES OF OWNERSHIP | GOULD DATES OF OPERATION | SITE ACREAGE |
|---|---|---|---|---|---|
| 140 | 5909 NW 61st Avenue, Portland, Oregon | Gould Electronics Inc. | 1979 – Present | 1979 – 1981 | 9.2 acres |

## 3.0    GOULD OWNERSHIP AND OPERATIONS

The following section briefly describes Gould's ownership of and operations at Site 140.

**Site 140**
NL Industries operated on the property from 1949 to 1979 (Exhibit 1-1). During that 30-year time period, NL Industries operated a lead smelter and produced lead oxide at the Site, discharging approximately 6.5 million gallons of untreated battery acid to Doane Lake and burying approximately 80,000 tons of lead-bearing material on the property. Gould acquired the property in 1979 and is the current owner. From 1979 to 1981, Gould began closing operations, which included cable sweating, lead refining, battery breaking, and lead oxide production. As a result of the discharges and burial of hazardous wastes at the Site, in 1983 the U.S. EPA listed the Site on the National Priorities List. A remedial investigation was conducted, and site cleanup was completed in 2002. Currently, there are no operations.

Case: 25-8129, 04/13/2026, DktEntry: 77.4, Page 119 of 204

Case 3:23-cv-01603-SI    Document 130-13    Filed 09/02/25    Page 5 of 6

## 4.0 GOULD ACTIVITIES

Exhibit 4-1 identifies, for Gould's property in Appendix A of the Consent Decree, the activities that had the potential to result in the release of one or more of the substances of concern included in the Trustee Council's evaluation of natural resource damages. These types of activities are further described in the Trustee Council's allocation methodology report.

## EXHIBIT 4-1    GOULD-RELATED ACTIVITIES

| Gould Activities - Site 140 |
| --- |
| Battery breaking |
| Hydraulic fluid use |
| Landfill of dredged sediments-Willamette prior to 1980 |
| Landfill of shredded battery casings |
| Lead smelting/refining |
| PCB transformer use |

PAGE 4

ER-439

## 5.0    REFERENCES

Lower Willamette Group. 2009. Portland Harbor Draft Remedial Investigation Report. Prepared by Integral Consulting, Inc., Windward Environmental LLC, Kennedy/Jenks Consultants, and Anchor QEA, LLC.

Oregon Department of Environmental Quality. 2013. Environmental Cleanup Site Information Database. https://www.deq.state.or.us/lq/ECSI/ecsiquery.asp?listtype=lis&listtitle=Environmental+Cleanup+Site%20Information+Database

Portland Harbor Natural Resource Trustee Council. 2022. Portland Harbor Natural Resource Damage Assessment: Allocation Methodology Report. Prepared by Industrial Economics, Incorporated.

The Trustee Council also reviewed six additional documents submitted by Phase 2 parties that are settlement confidential and therefore not identified.

# Exhibit 14

# Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for HAJ Inc.

# 5245

# Portland Harbor Natural Resource Damage Assessment
# Phase 2: Allocation Summary Memo for HAJ Inc.

## 1.0    INTRODUCTION

HAJ Inc. (HAJ), an owner and operator of one site in Portland Harbor, has engaged in activities resulting in releases of substances of concern. As part of the Portland Harbor natural resource damage assessment (NRDA) Phase 2 process, and for settlement purposes only, the Trustee Council developed a site-specific allocation of natural resource damages liability for one site with which HAJ is associated, Site 503.[1] That liability is determined in units of discounted service acre-years (DSAYs). Based on the information gathered throughout the Phase 2 process, methods described in the Trustee Council's allocation methodology report, and data and assumptions described below, HAJ's liability is calculated to be 0.17 DSAYs.

This memorandum summarizes the information the Trustee Council utilized to develop the allocation, and is organized as follows:

- ❖ Section 2 provides background information.
- ❖ Section 3 describes general operations at HAJ's site.
- ❖ Section 4 outlines HAJ's activities at their site.
- ❖ Section 5 is a list of references.

---

[1] The allocation presented in this memorandum is limited to an allocation of natural resource damages liability by the Trustee Council and does not inform or have any application relative to other environmental liabilities associated with the Portland Harbor Superfund Site, including but not limited to remedial liability. The use of "allocation" or "liability" in this memorandum refers only to the Trustee Council's settlement-oriented allocation of natural resource damages liability.

PAGE 1

ER-442

## 2.0    OVERVIEW OF HAJ SITE

Exhibit 2-1 is a map of the HAJ site included in their site-specific allocation, and Exhibit 2-2 outlines background information for the site. The relevant tax lot parcel is described in Appendix A of the Consent Decree associated with the settlement of natural resource damages for this parcel.

**EXHIBIT 2-1    MAP OF HAJ SITE**



**EXHIBIT 2-2    HAJ SITE BACKGROUND INFORMATION**

| SITE ID | ADDRESS | CURRENT OWNER | HAJ YEARS OF OWNERSHIP | HAJ YEARS OF OPERATION | SITE ACREAGE |
|---------|---------|---------------|------------------------|------------------------|--------------|
| 503 | 3821 NW St Helens Rd (East Plant) | HAJ, Inc | 1984 – Present | Late 1940's – Present | 2.97 |
| 503 | 3865 NW St Helens Rd (West Plant) | BCS Properties LLC | None | 2000 - Present | 2.08 |

## 3.0    HAJ OWNERSHIP AND OPERATIONS

The following section briefly describes HAJ's ownership of and operations at Site 503.

**Site 503**

Christenson Oil is a bulk petroleum storage and distribution facility specializing in lubricating and other specialty oils. The facility handles small quantities of cresols, isobutanol, and phenolic and zinc containing lubricant additives. Christenson Oil has occupied the property since at least 1952 and may have built petroleum storage facilities on the property as early as the 1940s. There are two outdoor aboveground storage tank (AST) farms (including 14 ASTs) and three indoor tank farms (including 32 ASTs) located in the East Plant portion of the property. Four of the tank farms are used for bulk petroleum storage with a capacity of 290,400 gallons. The fifth tank farm is used for product mixing and blending and has a capacity of 23,000 gallons. The ASTs are enclosed in secondary containment structures. The West Plant includes warehouses, offices, loading/unloading facilities, and storage areas. Three spills have been documented on this property since 1975.

## 4.0    HAJ ACTIVITIES

Exhibit 4-1 identifies, for HAJ's property in Appendix A of the Consent Decree, the activities that had the potential to result in the release of one or more of the substances of concern included in the Trustee Council's evaluation of natural resource damages. These types of activities are further described in the Trustee Council's allocation methodology report.

**EXHIBIT 4-1    HAJ-RELATED ACTIVITIES**

| HAJ Activities - Site 503 |
| --- |
| Aboveground storage tank (AST) - Kerosene |
| AST lubrication oil |
| AST other petroleum/unknown petroleum |
| Extensive vehicle operations or washing facilities |
| Hydraulic oil leakage/spills |
| Petroleum leaks/spills |
| Unprotected storage of petroleum contaminated soil |
| Underground storage tank (UST) - diesel |
| UST other petroleum/unknown petroleum |

PAGE 4

## 5.0    REFERENCES

Lower Willamette Group. 2009. Portland Harbor Draft Remedial Investigation Report. Prepared by Integral Consulting, Inc., Windward Environmental LLC, Kennedy/Jenks Consultants, and Anchor QEA, LLC.

Oregon Department of Environmental Quality. 2013. Environmental Cleanup Site Information Database. https://www.deq.state.or.us/lq/ECSI/ecsiquery.asp?listtype=lis&listtitle=Environmental+Cleanup+Site%20Information+Database

Portland Harbor Natural Resource Trustee Council. 2022. Portland Harbor Natural Resource Damage Assessment: Allocation Methodology Report. Prepared by Industrial Economics, Incorporated.

The Trustee Council also reviewed six additional documents submitted by Phase 2 parties that are settlement confidential and therefore not identified.

# Exhibit 15

# Portland Harbor Natural Resource Damage Assessment. Phase 2: Allocation Summary Memo for Koppers, Inc.

# Portland Harbor Natural Resource Damage Assessment Phase 2: Allocation Summary Memo for Koppers, Inc.

## 1.0    INTRODUCTION

Koppers, Inc. (Koppers), an operator of one site in Portland Harbor, has engaged in activities resulting in releases of substances of concern. As part of the Portland Harbor natural resource damage assessment (NRDA) Phase 2 process, and for settlement purposes only, the Trustee Council developed a party-specific allocation of natural resource damages liability for one site with which Koppers is associated, Site 123.[1] That liability is determined in units of discounted service acre-years (DSAYs). Based on the information gathered throughout the Phase 2 process, methods described in the Trustee Council's allocation methodology report, and data and assumptions described below, Koppers' liability is calculated to be 3.00 DSAYs.

This memorandum summarizes the information the Trustee Council utilized to develop the allocation, and is organized as follows:

- ❖ Section 2 provides background information.
- ❖ Section 3 describes general operations at Koppers' site.
- ❖ Section 4 outlines Koppers' activities at their site.
- ❖ Section 5 is a list of references.

---

[1] The allocation presented in this memorandum is limited to an allocation of natural resource damages liability by the Trustee Council and does not inform or have any application relative to other environmental liabilities associated with the Portland Harbor Superfund Site, including but not limited to remedial liability. The use of "allocation" or "liability" in this memorandum refers only to the Trustee Council's settlement-oriented allocation of natural resource damages liability.

PAGE 1

## 2.0    OVERVIEW OF KOPPERS SITE

Exhibit 2-1 is a map of the Koppers site included in their party-specific allocation, and Exhibit 2-2 outlines background information for the site. The relevant tax lot parcel is described in Appendix A of the Consent Decree associated with the settlement of natural resource damages for this parcel.

**EXHIBIT 2-1    MAP OF KOPPERS SITE**



ER-449

**EXHIBIT 2-2    KOPPERS SITE BACKGROUND INFORMATION**

| SITE ID | ADDRESS | CURRENT OWNER | KOPPERS DATES OF OWNERSHIP | KOPPERS DATES OF OPERATION | SITE ACREAGE |
|---|---|---|---|---|---|
| 123 | 7540 NW St Helens Rd Portland, OR | Northwest Natural (1958 - Present) | None | 12/29/1988 - present | 6.4 of 44.65 total site acres |

PAGE 3

**3.0    KOPPERS OPERATIONS**

The following section briefly describes Koppers' operations at the site listed in Exhibit 2-2.

**SITE 123 (NW Natural)**

Koppers, Inc. has leased a 6.4 acre parcel of property from Northwest Natural since December 29, 1988. Historically, Beazer leased the substantially same parcel for coal tar distillation, storage and distribution from 1965 until 1988. In 1988, Koppers, Inc. resumed storage and distribution operations of coal tar pitch and other related products into the terminal via railroad tank cars or bulk cargo ships. Prior to 1999, only solid coal tar pitch was being stored and distributed. In 1999, liquid coal tar pitch storage and distribution began. In 2005, most of the solid pencil pitch at the site had been primarily phased out.

## 4.0    KOPPERS ACTIVITIES

Exhibit 4-1 identifies, for Koppers' property in Appendix A of the Consent Decree, the activities that had the potential to result in the release of one or more of the substances of concern included in the Trustee Council's evaluation of natural resource damages. These types of activities are further described in the Trustee Council's allocation methodology report.

**EXHIBIT 4-1    KOPPERS-RELATED ACTIVITIES**

| Koppers Activities – Site 123 |
| --- |
| Aboveground storage tank - other petroleum/unknown petroleum |
| Coal tar pitch distribution/storage |
| Petroleum leaks/spills |
| Ship berthing |
| Extensive vehicle operations or washing facilities |

PAGE 5

ER-452

## 5.0   REFERENCES

Lower Willamette Group. 2009. Portland Harbor Draft Remedial Investigation Report. Prepared by Integral Consulting, Inc., Windward Environmental LLC, Kennedy/Jenks Consultants, and Anchor QEA, LLC.

Oregon Department of Environmental Quality. 2013. Environmental Cleanup Site Information Database. https://www.deq.state.or.us/lq/ECSI/ecsiquery.asp?listtype=lis&listtitle=Environmental+Cleanup+Site%20Information+Database

Portland Harbor Natural Resource Trustee Council. 2022. Portland Harbor Natural Resource Damage Assessment: Allocation Methodology Report. Prepared by Industrial Economics, Incorporated.

The Trustee Council also reviewed 15 additional documents submitted by Phase 2 parties that are settlement confidential and therefore not identified.

[Counsel for Plaintiffs are identified
in Plaintiffs' signature blocks]

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE,<br><br>    Plaintiffs,<br><br>        v.<br><br>ACF INDUSTRIES, LLC; AIRGAS USA LLC; AIR LIQUIDE AMERICA L.P.; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.; BNSF RAILWAY COMPANY; CALBAG METALS CO.; CITY OF PORTLAND; ESCO GROUP LLC; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); GOULD ELECTRONICS INC.; HAJ, INC., D/B/A CHRISTENSON OIL COMPANY; HERCULES LLC; KOPPERS INC.; MCCALL OIL & CHEMICAL CORPORATION; MCCALL OIL REAL ESTATE COMPANY LLC; MOREC FRONT LLC; GWC PROPERTIES, LLC; GWC FRONT, LLC; TANKER BASIN LLC; MMGL LLC; NORTHWEST PIPE COMPANY (FKA NORTHWEST PIPE & CASING COMPANY AND NORTHWEST PIPE AND CASING COMPANY); PACIFICORP, AN OREGON CORPORATION; PORT OF PORTLAND; PORTLAND GENERAL ELECTRIC COMPANY (PGE); PORTLAND TERMINAL RAILROAD COMPANY; SCHNITZER STEEL INDUSTRIES, INC.; SILTRONIC CORPORATION; SULZER PUMPS (US) INC.; and VALVOLINE INC.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 3:23-cv-01603-SI<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO ENTER CONSENT DECREES** |

ER-454

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ......................................................................................1

ARGUMENT...........................................................................................2

    I.    The Trustees' "Initial Estimate" of Total Natural Resources Damages Is Sound and Fully Appropriate For Use In This Settlement ....................................2

        A.    The Trustees Properly Adapted The HEA model from Commencement Bay To Portland Harbor ......................................................3

        B.    The Trustees' Use Of A Different Formal Damage Assessment Methodology Does Not Alter The Suitability Of The HEA Model For Settlement ....................................................5

        C.    Arkema's "Expectation" That The Formal Assessment Injury Estimate Will Be Bigger Than The Estimate In The Consent Decrees Is Pure Speculation...........................................8

            1.    Neither Arkema Nor the Trustees Can Know Today The Outcome Of Studies To Be Conducted In The Formal Injury Assessment ....................................................8

            2.    The Specific Items Arkema Highlights In the 2018 Injury Assessment Plan Do Not Signal A Bias Toward Greater Injury ....................................................11

        D.    The Consent Decrees' Reopener Provision Protect The Public And Non-Settlors If New Information Shows Significantly Greater Harm To Natural Resources Than Is Presently Known ....................................................16

    II.    These Consent Decrees for Natural Resource Damages Are Not Premature In Relation To the Status of Site Cleanup ..................................................17

        A.    Legally And Practically, The Consent Decrees Are Not Premature .........17

        B.    The Consent Decrees Do Not Require Source Control Provisions...........19

    III.    The Public Record Supports The Amount Of Damages Allocated To Settling Defendants In The Consent Decrees........................................22

        A.    The Public Record Provides Information That Intervenors Could Have Used To Assess The Fairness (Or Unfairness) Of The Consent Decree Allocations ....................................................24

Plaintiffs' Reply Supporting Mot. To Enter      i

B.      The Applicable Caselaw Affords The Trustees More Deference For
Settlements Than Intervenors Acknowledge And Supports The
Allocations In the Consent Decrees ........................................................33

IV.     The Consent Decrees Will Not Disrupt the Ongoing Response Cost
Allocation ...........................................................................................39

A.      Entry Of The Consent Decrees Will Not Create Evidence That Can
Be Used In The Related Cases ...............................................................39

B.      The Consent Decrees' Additional Protection Against Settling
Defendants' Use Of The Allocations In Other Forums Are Lawful ........41

C.      Entry Of the Consent Decrees Is Consistent With The United States'
Motion To Stay Litigation Of Related Claims In The *Yakama Nation*
Lawsuit ................................................................................................45

V.      The Covenants And Other Terms Of The Consent Decrees Are Appropriate
And Do Not Warrant Revision ............................................................47

VI.     NW Natural's Erroneous Understanding of Joint and Several Liability
Under CERCLA Also Colors Its Understanding Of The Consent Decrees'
Resolution Of Claims Against Settling Defendants.............................49

VII.    The Public Interest Favors Entry Of The Decrees..............................51

**TABLE OF AUTHORITIES**

**Cases**

*Arizona v. City of Tucson*,

761 F.3d 1005 (9th Cir. 2014) ...................................................................................passim

*Atlantic Richfield Co. v. Christian*,

590 U.S. 1 (2020) ...............................................................................................................33

*California v. Montrose Chem. Corp.*,

104 F.3d 1507 (9th Cir. 1997) ...........................................................................................50

*City of New York v. Exxon Corp.*,

697 F. Supp. 677 (S.D.N.Y. 1988)......................................................................................44

*Commissioner of Dep't of Planning & Natural Res. v. Century Alumina Co.*,

Nos. CIV. 2005/0062, 2007/114, 2008 WL 4693550 (D.V.I. Oct. 22, 2008).........................22

*Confederated Tribes & Bands of the Yakama Nation v. Airgas USA LLC*,

435 F. Supp. 3d 1103 (D. Or. 2019).......................................................................... 13, 14, 45

*In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution*,

712 F. Supp. 1019 (D. Mass. 1989) ...............................................................................passim

*Lifescan, Inc. v. Smith*,

Civ. No. 17-5552, 2023 WL 7088249 (D.N.J. Feb. 6, 2023) ................................................ 23

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,

767 F. Supp. 1220 (S.D.N.Y. 1991)....................................................................................33

*New Mexico v. General Elec. Co.*,

467 F.3d 1223 (10th Cir. 2006) ..........................................................................................50

*Ohio v. U.S. Dep't of Interior*,

880 F.2d 432 (D.C. Cir. 1989)............................................................................................49

*Pacific Railroad v. Ketchum*,

101 U.S. 289 (1879)..........................................................................................................43

*Pakootas v. Teck Cominco Metals, Ltd.*,

905 F.3d 565 (9th Cir. 2018) ...............................................................................................5

*Preservation Aviation, Inc. v. United States*,

NO. SA CV 07-01219 SJO, 2009 WL 10673755 (C.D.Cal. Nov. 19, 2009)....................18, 19

*San Luis & Delta-Mendota Water Auth. v. Jewell*,

747 F.3d 581 (9th Cir. 2014) ...................................................................................7

*Silver Mountain Dev., Inc. v. City of Silverton*,

No. 6:21-CV-00809-MK, 2022 WL 17751700 (D. Or. Dec. 19, 2022) ..................33

*State of Utah By & Through Utah State Dep't of Health v. Kennecott Corp.*,

801 F. Supp. 553 (D. Utah 1992) ........................................................................ 19, 20

*Tribe v. ASARCO, Inc.*,

280 F. Supp. 2d 1094 (D. Idaho 2003) ..................................................................50

*United States v. Akzo Coatings of America, Inc.*,

949 F.2d 1408 (6th Cir. 1991) ..............................................................................5

*United States v. Cannons Eng'g*,

899 F.2d 79 (1st Cir. 1990) ...................................................................................7

*United States v. Chapman*,

146 F.3d 1166 (9th Cir. 1998) ..............................................................................5

*United States v. Charles George Trucking, Inc.*,

34 F.3d 1081 (1st Cir. 1994) ................................................................................19

*United States v. City of Akron*,

No. 5:09CV272, 2023 WL 8236814 (N.D. Ohio Nov. 28, 2023) ..........................5

*United States v. Fort James Operating Co.*,

313 F. Supp. 2d 902 (E.D. Wis. 2004) ............................................................. 35, 36

*United States v. Montrose Chem. Corp. of Cal.*,

50 F.3d 741 (9th Cir. 1995) ............................................................................. 22, 37

*United States v. Taibi*,

No. 10-CV-2250 JLS, 2012 WL 553143 (S.D. Cal. Feb. 21, 2012) ......................33

*United States v. W.R. Grace & Co.*,

429 F.3d 1224 (9th Cir. 2005) ..............................................................................5

*United States v. Wallace*,

893 F. Supp. 627 (N.D. Tex. 1995) .......................................................................7

*Washington v. United States*,

No. CIV. 06-05225, 2007 WL 3025843 (W.D. Wash. Oct. 15, 2007) ............... 42, 43

**Statutes**

Plaintiffs' Reply Supporting Mot. To Enter       iv

42 U.S.C. § 9607(a)(4)(C).................................................................................................49

42 U.S.C. § 9607(f)(1) ..............................................................................................48, 51

42 U.S.C. § 9613(a)(4)(C)................................................................................................48

42 U.S.C. § 9613(f)(1) ....................................................................................................48

42 U.S.C. § 9613(f)(2) ....................................................................................................34

42 U.S.C. § 9613(g)(1)...............................................................................................13, 18

42 U.S.C. § 9613(g)(2)....................................................................................................13

**Rules**

Fed.R.Civ. P. 24(c)..........................................................................................................50

Fed.R.Evid. 408 ................................................................................................39, 40, 41

**Regulations**

43 C.F.R. § 11.15(a)(1) ....................................................................................................15

43 C.F.R. § 11.14(v)..........................................................................................................6

**Other Authorities**

*NOAA, Portland Harbor Superfund Site Natural Resource Damage Assessment Plan Addendum
   2: Phase 3 Damage Assessment Plan (October 3, 2018)* ...................................................6, 12

*Natural Resource Damages Under CERCLA And OPA,*
   53 ELR 10569 (2024)....................................................................................................22, 50

Oregon Department of Environmental Quality, *Environmental Cleanup Information Database,*
   https://www.oregon.gov/deq/hazards-and-cleanup/env-cleanup/pages/ecsi.aspx.......................9

Portland Harbor Natural Resource Trustee Council, *Contaminant Concentrations in Osprey
   (Pandion haliaetus) Eggs from Portland Harbor and Surrounding Areas: Data Summary
   Report* (May 7, 2011), https://pub-data.diver.orr.noaa.gov/portland-
   harbor/20110307_OspreyFinalDataSumRpt_1219.pdf………..…………………………..8

Portland Harbor Trustees Natural Resource Trustee Council, *Summary of Portland Harbor
   Natural Resource Damage Assessment for Purposes of Settlement*
   (May 14, 2015), https://pub-data.diver.orr.noaa.gov/portland-
   harbor/20230401_PH%20Ph2%20PthC%20SummaryPreface_5383.pdf……………………8

Plaintiffs' Reply Supporting Mot. To Enter        v

*Restoration Scaling Approaches to Addressing Ecological Injury: The Habitat-Based Resource Equivalency Method, Environmental Management*, 65 Env't Mgmt. 161 (2020) ......................6

## **INTRODUCTION**

Plaintiffs' opening brief explains the terms of the proposed Consent Decrees, the Habitat Equivalency Analysis ("HEA") model used to estimate the total natural resource injuries and allocate those injuries to the Settling Defendants, and the information in the public record used by the Trustees in their negotiations with Settling Defendants. Pl. Op. Br. at 1–12. The majority of the opening brief discusses the Trustees' responses to the public comments that objected to various consent decree provisions as well as the early settlement process, including the Trustees' HEA model, used to reach settlement with the Settling Defendants. *Id*. at 14–32.

Three of the seven public commenters have moved to intervene to oppose entry of the Consent Decrees. In addition, Northwest Natural—a potentially liable party at the Portland Harbor Superfund Site ("Site") that did not submit any public comments—also now opposes entry of the Consent Decrees. In this brief, Plaintiffs collectively reply to the Intervenors, grouping their arguments by topic.

Intervenors advance two primary arguments in opposition to entry of the Consent Decrees. First, they argue that the basis of the Trustees' damage assessment is defective by criticizing the HEA model and asserting that that the public record does not contain enough information to justify the allocations to Settling Defendants. Second, Intervenors argue that a natural resource damages ("NRD") settlement is premature in relation to the cleanup status at Portland Harbor, that it threatens the ongoing non-judicial response cost allocation involving many responsible parties, and that uncertainty relating to a later formal NRD assessment means that the Consent Decrees provide Settling Defendants with too much protection against contribution claims that might be asserted against Settling Defendants by non-settlors such as Intervenors.

Plaintiffs' Reply Supporting Mot. To Enter        1

Several common flaws underlie Intervenors' arguments.  Their arguments mis-state or simply ignore important information in the public record—including highly visible information in Plaintiffs' opening brief and the attached response to public comments—that supports the estimate of total natural resource damages and the allocation of damages to Settling Defendants. Intervenors also incorrectly describe the caselaw on the applicable standard of review in a way that would substantially eliminate the deference accorded to the Trustees' expertise in natural resource damage assessments, and that allows trustees to offer substantial incentives for settlements.  Finally, these inaccuracies also extend to Intervenors' arguments relating to other Portland Harbor cleanup activities, especially the response cost allocation (including the United States' arguments in prior cases aimed at safeguarding that allocation) and the relationship between the Consent Decrees' estimate of total natural resource damages and the ongoing cleanup overseen by the U.S. Environmental Protection Agency ("EPA").

## ARGUMENT

**I.      The Trustees' "Initial Estimate" Of Total Natural Resources Damages Is Sound And Fully Appropriate For Use In This Settlement**.

Arkema[1] criticizes the Trustees' HEA model on three grounds: that it is not properly adapted to Portland Harbor, that it should not be used for settlement because the Trustees are using a different method for their formal damage assessment, and that the formal assessment will demonstrate larger total damages than the HEA model.  Dkt. No. 111, Arkema Br. at 12–18.

Before addressing these specific arguments, it is important to emphasize that no Intervenor challenges the use of HEA models *per se*, nor does any Intervenor dispute the fact

---

[1] These issues are similarly addressed by FMC and Gunderson.  Dkt. No. 112 at 24–27; Dkt. No. 115 at 14–17.  Section I of this reply brief tracks Arkema's argument because it is the most detailed of the three briefs on this subject.

Plaintiffs' Reply Supporting Mot. To Enter         2

that HEA models are the most commonly used tool for calculating habitat injuries and

corresponding restoration in natural resource damage assessment.  The appropriateness of and

wide use of HEA models in NRDA was documented extensively in the Trustees' response to

public comments.  Dkt. No. 85-3, Plaintiffs' Response to Comments ("Pl. RTC") at 9–11.

> **A.      The Trustees Properly Adapted The HEA Model From Commencement Bay To Portland Harbor.**

Arkema's public comments questioned whether the HEA model was properly used at

Portland Harbor because that model was originally developed for the Commencement Bay site.

Dkt. No. 85-3, Pl. RTC at 23.  However, Arkema did not argue that HEA models cannot be

adapted from one site to another, nor did it explain why this was not properly done for the

Portland Harbor model.  Rather, Arkema selectively quoted from a lengthy memo in which the

Trustees explained why the Commencement Bay model was appropriate for use and how it was

adapted to the Portland Harbor Site.  *See id.*

The 2015 Trustee memo cited by Arkema sets out the precise toxicity relationships for all

12 contaminants as applied to Portland Harbor:

**EXHIBIT 2-1    PORTLAND HARBOR PHASE 2 SERVICE LOSS THRESHOLDS**

| CONTAMINANT | UNITS | 5% | 10% | 15% | 20% | 30% | 40% | 60% | 80% |
|---|---|---|---|---|---|---|---|---|---|
| PAHs, total | ppb | 1,000 | 5,000 | -- | 10,000 | -- | 22,800 | 69,000 | 100,000 |
| PCBs, total | ppb | 130 | -- | -- | 173 | -- | 1,500 | 4,000 | 20,600 |
| p,p' DDT | ppb | -- | 16 | -- | 70 | 1,500 | 3,600 | -- | -- |
| p,p' DDE | ppb | -- | 9 | -- | 65 | 7,000 | 21,500 | -- | -- |
| p,p' DDD | ppb | -- | 12 | -- | 45 | 456 | 2,100 | -- | -- |
| TBT | ppb | 138 | -- | -- | 1,000 | -- | -- | -- | -- |
| bis (2-ethylhexyl) phthalate | ppb | 1,300 | 1,900 | -- | 2,000 | -- | -- | -- | -- |
| Cadmium | ppm | 2.7 | 5.1 | 9.6 | 14 | -- | -- | -- | -- |
| Copper | ppm | 270 | 390 | 530 | 1,300 | -- | -- | -- | -- |
| Lead | ppm | 360 | 450 | 530 | 1,200 | -- | -- | -- | -- |
| Mercury | ppm | 0.41 | 1.3 | 1.4 | 2.3 | -- | -- | -- | -- |
| 4-Methylphenol | ppb | 110 | 670 | 1,800 | 3,600 | -- | -- | -- | -- |

Plaintiffs' Reply Supporting Mot. To Enter       3

> **Notes:**
> Service loss thresholds based primarily on those applied for the Commencement Bay / Hylebos Waterway NRDA. Service loss thresholds for total PAHs were modified based on an evaluation of the literature and site-specific information.
> **--** indicates "not applicable".

Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement (May 14, 2015) ("Trustees' 2015 NRDA Summary") at A-5, *Declaration Of Jennifer Hughes* ("*Hughes Decl.*") Ex. 1. If any commenter or Intervenor believed these loss thresholds were inappropriate for calculating the total injury at the Site, they had nearly a decade—culminating in the public comment period for the Consent Decrees—to submit a basis for that view to the Trustees.[2]

The Trustees' response to Arkema's comment specifically addresses Arkema's arguments, including the fact that Commencement Bay includes a species of flatfish not found at Portland Harbor. Dkt. No. 85-3, Pl. RTC at 25. The response explains that the toxic effects of all 12 Portland Harbor contaminants of concern ("COCs") were considered for both Commencement Bay and Portland Harbor. Because those service loss relationships are based on information including scientific literature and studies "relevant to the Pacific Northwest," it was reasonable to use those loss relationships at Portland Harbor. *Id*. Moreover, where differences in species between Commencement Bay and Portland Harbor warranted a service loss adjustment for one contaminant (polycyclic aromatic hydrocarbons, or PAHs), the Trustees used additional scientific data to make the adjustment. *Id*.

---

[2] Arkema's complaint that it does not have the "detailed calculations for the HEA" is somewhat cynical in this context, because this portion of Arkema's brief does not pertain to those "detailed calculations," but rather to the service loss relationships explicitly set out in Exhibit 2-1 of the Trustees' 2015 NRDA Summary, *Hughes Decl.* Ex. 1. *Cf.* Arkema Br. at 13 n.12. Arkema has both the relationships themselves and the Trustees' explanation for their appropriateness.

Plaintiffs' Reply Supporting Mot. To Enter        4

Arkema's brief does not directly engage with the Trustees' response to its comment or the Trustees' technical judgment. Instead, Arkema insinuates that the Trustees' analysis for the other 11 contaminants may not have been sufficient, pointing to the Trustees' statement that it was not only "unnecessary" to conduct additional studies for those contaminants, but that it also would be "costly" and "time-consuming." Arkema Br. at 12. But this does not disprove—or even challenge—the Trustees' technical determination that additional studies on those 11 contaminants was "unnecessary."[3] Arkema's indignation that the Portland Harbor HEA model was originally developed at the Commencement Bay site is no substitute for a showing that the Trustees' adaptation of the model to Portland Harbor is scientifically problematic. Such unsupported insinuations cannot overcome the deference due to the Trustees' exercise of their technical expertise. *See*, *e.g.*, *United States v. City of Akron*, No. 5:09CV272, 2023 WL 8236814 *1 (N.D. Ohio Nov. 28, 2023) (in reviewing proposed consent decree amendment involving technical judgment, court defers to agency's expertise) (*citing United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1408, 1426 (6th Cir. 1991)).

**B.    The Trustees' Use Of A Different Formal Damage Assessment Methodology Does Not Alter The Suitability Of The HEA Model For Settlement.**

Having failed to demonstrate any substantive technical flaw in the HEA model's service loss thresholds used to calculate total natural resource injuries at the Site, Arkema next argues that the HEA's estimate of total injury cannot be used in settlement because the Trustees are

---

[3] Indeed, responsible parties often argue that agency costs incurred under CERCLA were unnecessary and therefore are not recoverable. *See, e.g., Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565 (9th Cir. 2018) (appeal of response costs award related to plaintiff's investigation to establish defendant's CERCLA liability); *United States v. W.R. Grace & Co.*, 429 F.3d 1224 (9th Cir. 2005) (unsuccessful challenge to reimbursement of cleanup costs alleging agency's data and conclusions were an unfounded basis for response actions); *United States v. Chapman*, 146 F.3d 1166 (9th Cir. 1998) (ruling upholding partial award to plaintiff of response action costs consistent with National Contingency Plan).

Plaintiffs' Reply Supporting Mot. To Enter        5

using a different injury methodology for the formal damage assessment under development for potential litigation. Arkema Br. 13–16. As with the prior argument, Arkema relies on the Trustees' own statements about their actions and intentions in their Response To Comments, then layers on unsupported speculation about the meaning of those statements to reach its conclusions.[4]

Arkema first argues that the Trustees' use of a different formal assessment methodology constitutes an "abandonment" of its HEA model and an acknowledgement that the HEA model "is not accurate or reliable enough" for the formal assessment. Arkema Br. at 13–15. Arkema's argument relies on assumptions and inferences not supported by the record; its argument might have weight if the Trustees had said anything to that effect, but they did not. Instead, the Trustees said that the formal assessment methodology

> will, in this case, *best* measure adverse changes in the viability of natural resources resulting from exposure to contaminants (see 43 CFR § 11.14(v)) and *best* determine the quantity and type of appropriate habitat needed to fully address the measured losses.

October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan at A-1–A-2 (emphasis added), *Hughes Decl*. Ex. 26.[5] This decision was further explained in response to Arkema's comment on this issue, which stated that

---

[4] FMC makes a shorter version of this same argument. FMC Br. at 25–27. Because Arkema's argument is more detailed, Plaintiffs focus on Arkema's brief in addressing the argument.

[5] Arkema describes the Trustees' formal assessment methodology as a "resource equivalency analysis ("REA")." Arkema Br. at 13. This is not quite accurate, but it is close enough for purposes of this motion to enter the Consent Decrees. The formal assessment method and the HEA both evaluate a habitat injury, but the basic difference between methods is this: the HEA calculated injuries to the Site habitat based on concentrations of specified contaminants, whereas the formal assessment methodology will calculate habitat injury by measuring injuries to particular species that live in, and are supported by, that habitat. *See generally* Mary Baker et al., *Restoration Scaling Approaches to Addressing Ecological Injury: The Habitat-Based Resource Equivalency Method, Environmental Management*, 65 Env't Mgmt. 161 (2020).

Plaintiffs' Reply Supporting Mot. To Enter    6

"[t]he Settling Trustees' decision to conduct those [formal assessment] studies is primarily for the purpose of adding more scientific support to their injury claims as litigation approaches." Dkt. No. 85-3, Pl. RTC at 19.

While settlements of CERCLA NRD claims are common, litigation of those claims is not. It therefore is not surprising that the Trustees chose the "best" method, in their view, for litigation. However, using a "best" methodology for litigation does not make HEA an inadequate method for settlement – at this Site or any other throughout the country. Given the significant differences in cost, resources, and time between a HEA methodology and the formal injury assessment announced by the Trustees, and given limited budgets, it should be no surprise that Trustees conduct formal injury assessments only in those instances where "litigation approaches." Dkt. No. 85-3, Pl. RTC at 19.

This straightforward explanation is hardly an abandonment of the HEA model, nor is it a failure to "address this issue head-on," as Arkema claims *Cf.* Arkema Br. at 13-15. To the contrary, as the governmental entities charged with restoring injured natural resources, the Trustees' choice of methodologies to do just that is entitled to significant deference. *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014) ("Our deference to agency determinations is at its greatest when that agency is choosing between various scientific models."); *United States v. Wallace*, 893 F. Supp. 627, 633 (N.D. Tex. 1995) (explaining that "the EPA is not required to show that it has chosen the best or even the fairest method of apportioning liability, but that it is reasonable. Further, '[t]he choice of the yardstick to be used for allocating liability must be left primarily to the expert discretion of the EPA, particularly when the PRPs involved are numerous and the situation is complex'") (quoting *United States v. Cannons Eng'g*, 899 F.2d 79, 88 (1st Cir. 1990)).

Plaintiffs' Reply Supporting Mot. To Enter        7

> **C.**    **Arkema's Expectation That The Formal Assessment Injury Estimate Will Be Bigger Than The Estimate In The Consent Decrees Is Pure Speculation.**

Arkema intertwines its argument that the HEA methodology must be invalid because it is different than the formal assessment methodology with an argument that the formal assessment methodology, by its nature, will demonstrate a bigger total injury than the HEA estimate used in the Consent Decrees. Arkema Br. at 15–18. However, Arkema's separate contentions in support of its argument are as uncertain as its conclusion.

> **1.**    **Neither Arkema Nor The Trustees Can Know Today The Outcome Of Studies To Be Conducted In The Formal Injury Assessment.**

Arkema begins by claiming that there are "inherent" differences between the approaches that make the formal assessment injury more likely to be bigger. First, Arkema claims that the formal assessment will consider injuries to more species, such as mink and birds, than the HEA model. Arkema Br. at 15-16. This is not so. The Trustees did consider injuries to piscivorous birds and mammals, which are qualitatively incorporated into the injury on a habitat basis and are represented in restoration project design.[6] Moreover, even assuming that the Trustees do conduct studies on all of the possible species they identified in 2018 NRD Assessment Plan, which has not yet been determined and is by no means certain, the question of which species will be shown to require the most restoration, and at what scale, is entirely uncertain. This was explained in the Trustees' response to Arkema's comment:

> The formal damage assessment will be substantially informed by additional studies now being conducted, which pertain to the extent of injury of natural resources at Portland Harbor. As with any studies like those now underway, it is impossible to predict the results in advance. The Settling Trustees' decision to conduct those

---

[6] *See* Trustees' 2015 NRDA Summary at A-3, A-11, and A-12 (2015), *Hughes Decl*. Ex. 1; Jeremy Buck and James L. Kaiser, Contaminant Concentrations in Osprey (Pandion haliaetus) Eggs from Portland Harbor and Surrounding Areas: Data Summary Report (The Portland Harbor Natural Resource Trustee Council, 2011), *Hughes Decl*. Ex. 27.

Plaintiffs' Reply Supporting Mot. To Enter        8

> studies is primarily for the purpose of adding more scientific support to their injury claims as litigation approaches. Whether the quantum of the Settling Trustees' injury claim would increase or decrease as a result of these studies is unknown.
>
> Thus, compared to the HEA, the quantum of non-settling defendants' potential liability for damages under the formal damage assessment could also increase or decrease, depending on the outcome of those studies.

Dkt. No. 85-3, Pl. RTC at 19.

Arkema offers no basis for forecasting that the Trustees—or anyone—could know the outcome of these studies in advance. Studies of this nature, involving complex field assessments of contaminant-related injuries to multiple species, are by definition unpredictable. That uncertainty is a foundational principle of the scientific process, well understood by anyone familiar with how such studies are conducted.

To put a finer point on this, the habitat injury produced by the HEA model and the associated underlying data and assumptions are all known at this time. The HEA model calculated an injury of 4,130 discounted service acre years (DSAYs), and the underlying data and assumptions used in that calculation include the publicly available Site contaminant data used by the Trustees,[7] the service loss relationships in Table 2.1 of the Trustees' 2015 memo that quantify habitat service for each contaminant of concern based on contaminant concentrations, *supra* at 3-4, and the baseline habitat value assignments (from 0%–100%) for each type of

---

[7] Much of the Trustees' publicly available information on operations conducted by non-participants in the early settlement process was gathered from the Oregon Department of Environmental Quality's Environmental Cleanup Database (https://www.oregon.gov/deq/hazards-and-cleanup/env-cleanup/pages/ecsi.aspx), site summaries released by the Lower Willamette Group (https://semspub.epa.gov/work/10/100003899.pdf), and other public information searches conducted during the allocation process (e.g., Multnomah County tax parcel records, party-specific websites, historical aerial photographs).

Plaintiffs' Reply Supporting Mot. To Enter        9

contaminated habitat in the Assessment Area.  This last item also is contained in the Trustees'

2015 NRDA Summary cited by Intervenors:

**EXHIBIT 2-2    PORTLAND HARBOR BASELINE-ADJUSTED HABITAT VALUES WITHIN THE ASSESSMENT AREA**

| HABITAT | SLOPE | CLASSIFICATION | SCALING FACTOR |
|---|---|---|---|
| Active Channel Margin/Shoreline (Between Ordinary High Water and Ordinary Low Water, or 20.1ft. to 5.1ft. NAVD88) | Slope < 5:1 (low angle) | Vegetated: native | 1.00 |
| | | Vegetated: invasive | 0.75 |
| | | Unvegetated | 0.80 |
| | | Bioengineered | 0.40 |
| | | Riprap | 0.10 |
| | | Pilings not allowing light | 0.05 |
| | | Sheetpile | 0.00 |
| | | Covered (suspended structure) | 0.10 |
| | | Covered (floating) | 0.00 |
| Active Channel Margin/Shoreline (Between OHW and OLW, or 20.1 ft. to 5.1 ft. NAVD88) | Slope > 5:1 (steep angle) | Vegetated: native | 0.20 |
| | | Vegetated: invasive | 0.09 |
| | | Unvegetated | 0.10 |
| | | Bioengineered | 0.20 |
| | | Riprap | 0.10 |
| | | Pilings not allowing light | 0.05 |
| | | Sheetpile | 0.00 |
| | | Covered (suspended structure) | 0.10 |
| | | Covered (floating) | 0.00 |
| Shallow Water (Between OLW and 15 ft. below OLW, or 5.1 ft. to -9.9 ft. NAVD88) | NA | Gravel or natural rock | 1.0 |
| | | Riprap or concrete | 0.10 |
| | | Covered (suspended structure) | 0.10 |
| | | Covered (floating) | 0.00 |
| Deep Water (Below -9.9 ft. NAVD88) | NA | Natural substrate | 0.10 |
| | | Artificial substrate | 0.05 |

Trustees' 2015 NRDA Summary at A-7, *Hughes Decl*. Ex. 1.

In contrast to the HEA's results and key inputs, the studies that will determine the amount

of injury calculated by the formal assessment are "inherently" unknown.  As the Trustees'

response to comment *supra* indicates, the quantum of that injury depends entirely on the future

outcomes of studies.  Unlike the key assumptions and outcome of the HEA in the above

Plaintiffs' Reply Supporting Mot. To Enter      10

paragraph, the outcomes of the formal assessment studies, by their nature, cannot be known today. In particular, the fact that the HEA here estimated a service loss percentage due to a certain concentration of a contaminant *does not foreordain* that studies of whether, and how much, that same contaminant has actually affected selected species at the Site will show a greater injury than the HEA. Thus, far from being an "anything's possible" excuse, *cf.* Arkema Br. at 18, this uncertainty is fundamental to the fairness of the proposed Consent Decree, because neither the Settling Defendants nor non-settlors can know today whether the total injury estimated in the Consent Decrees is more or less than the future outcome of the formal assessment.

### 2. The Specific Items Arkema Highlights In The 2018 NRD Assessment Plan Do Not Signal A Bias Toward Greater Injury.

This same uncertainty applies equally to the rest of Arkema's argument on this point. For example, Arkema notes that the formal assessment may evaluate certain types of impacts to natural resources that were not considered by the HEA model. Dkt. No. 111, Arkema Br. at 16. This is theoretically correct, although some of the types Arkema mentions—injuries to recreation such as fishing and boating, and certain tribal service losses—were, in fact, included in the total damages allocated by the Consent Decrees.[8] Studies of those same types of impacts in the formal assessment may not show a greater injury than estimated in the Consent Decrees. Similarly, whether other types of impacts are studied, and what those studies might show, remains unknown. Given these unknowns, the formal assessment could find larger injuries than

---

[8] In their responses to public comments, the Trustees note that they assessed recreational fishing and boating damages as well as damages related to losses of tribally significant resources and that Settling Defendants are liable for a portion of those damages. Dkt No. 85-3, Pl. RTC at 26, n.52. The Trustees also describe the basis for their lost recreational damages estimate for early settlements. *Id*. at 116.

Plaintiffs' Reply Supporting Mot. To Enter        11

ER-471

the Consent Decrees' estimate for some types of impacts and smaller injuries for other types of impacts, with a smaller overall injury estimate. *See supra* at 10-11.

Nor does Arkema gain any traction for its assertion that the formal assessment's total injury will be larger than the initial estimate in the Consent Decrees due to (1) the possibility of other contaminants of concern being studied beyond the 12 COCs used in the HEA; (2) the inclusion of "injury caused by remedial actions" in the formal assessment; and (3) the possibility that the geographic area studied in the formal assessment will be larger than the Assessment Area used by the HEA. Dkt. No. 111, Arkema Br. at 17-18. The first and third items – regarding COCs and geography – are placeholders to allow the Trustees to make those determinations at the time the studies are conducted rather than in 2018. It is sensible for the Trustees to preserve their flexibility when making these decisions. As to COCs, there is always the possibility of new information being discovered. That can take many forms, including finding contaminants at the Portland Harbor site that previously were thought not to be present, or a discovery that contaminants previously thought relatively benign are in fact quite toxic. Nothing in the 2018 NRD Assessment Plan suggests that the language quoted in Arkema's brief is anything other than the type of language governments use to keep their options open to new information. Indeed, the notion of remaining open to new information is so fundamental to the scientific process that it could be problematic for the Trustees to state that they would *not consider* such information.[9]

---

[9] While the Trustees appropriately have not foreclosed any options, the 2018 Addendum to the Damage Assessment Plan clearly states the intention to focus on three COCs: PAHs, PCBs, and DDx. October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan, *Hughes Decl.* Ex. 26 at Section 3.1 (Hazardous Substances). As discussed *infra* at 31-33, these same COCs also account for the large majority of injury in the HEA model used for this settlement.

Plaintiffs' Reply Supporting Mot. To Enter    12

The same is true regarding geography. Prior to the Trustees' 2018 NRD Assessment Plan, as Intervenors themselves discuss, the Yakama Nation sued a number of potentially responsible parties (including the United States) at the Portland Harbor Superfund Site for both response costs and natural resource damages. *See Confederated Tribes & Bands of the Yakama Nation v. Airgas USA LLC*, 435 F. Supp. 3d 1103 (D. Or. 2019). The Yakama Nation's NRD claim specifically included alleged injuries *outside* of the Trustees' Assessment Area. *Id.* at 1112-13. Thus, as Intervenors note, it is possible to imagine NRD claims being asserted for injuries to natural resources beyond the Assessment Area. Dkt. No. 111, Arkema Br. at 17-18; Dkt. No. 112, FMC Br. at 24-25.

However, Arkema neglects to mention that a number of defendants in the *Yakama Nation* litigation, including all Intervenors, filed or joined motions asserting that any NRD claim based on injuries *outside of an area of the Site even smaller than the Assessment Area* was barred on statute of limitations grounds. Case No. 3:17-cv-00164-SB (D.Or.), Dkt. No. 255 (brief filed by Exxon, which Arkema, FMC, and Gunderson joined) and Dkt. No. 263 (brief filed by NW Natural). The basis of those briefs is that NRD claims at a Superfund site have a statute of limitations that typically is much longer than CERCLA's statute of limitations at non-Superfund sites. 42 U.S.C. § 9613(g)(1) & (2). Intervenors and other defendants in the *Yakama Nation* case argued that the boundaries of the Portland Harbor Superfund Site are defined by the areas of active remediation in EPA's 2017 Record of Decision ("ROD"), which selected the cleanup remedy for the Site. Active remediation in EPA's ROD runs from river mile 11.8 to river mile 1.9 of the Willamette River. As FMC correctly states, the Trustees' NRD Assessment Area begins at river mile 12.3 and ends at river mile 0.8, and it also includes the upper 1.2 miles of the Multnomah Channel and thus is larger than the EPA active remediation area set in the ROD.

Plaintiffs' Reply Supporting Mot. To Enter    13

Dkt. No. 112, FMC Br. at 9.  In the *Yakama Nation* litigation, the Court denied the defendants'

motion to dismiss on the grounds that the final boundaries of the Portland Harbor Superfund Site

have not yet been set by EPA.  *Yakama Nation*, 435 F. Supp. 3d at 1109, 1122.  Nonetheless,

there is at least some litigation risk that the scope of any NRD claim, whether by the Trustees

here or by the Yakama Nation, would be limited to an area smaller than the NRD Assessment

Area.

The response to comments also directly addresses Arkema's geography argument.

Arkema brushes aside the possibility that "the relevant geographic area could decrease,"

seemingly forgetful of the very risk articulated in a brief it previously joined.  *Cf.* Arkema Br. at

18.  However, the Trustees to date have very intentionally not assessed injuries beyond the NRD

Assessment Area, not just due to the potential legal risk described above, but also because

"contaminant concentrations in sediment downstream of the Portland Harbor Assessment Area . .

. are substantially lower than the concentrations within the Assessment Area."  Dkt. No. 85-3, Pl.

RTC at 101.  In response, Arkema offers no substantive basis to disregard the Trustees'

"technical judgment that the large majority of the natural resource damages from contaminants

released or discharged into the Portland Harbor Assessment Area have occurred and are

occurring within the Assessment Area."  *Id.* at 36–37.

Despite these express statements, Arkema insists on reading the geography placeholder in

the Trustees' 2018 NRD Assessment Plan to "expressly reference the likely expansion of the

relevant assessment area," deeming the Trustees' present concerns and past determinations to the

contrary as "simply not credible."  Arkema Br. at 18.  In light of all of the above litigation risks

and explanations regarding the NRD Assessment Area boundaries, not to mention the fact that

the Trustees' insistence on limiting their injury analysis to the NRD Assessment Area was

Plaintiffs' Reply Supporting Mot. To Enter        14

significant enough to cause the Yakama Nation to withdraw from the Trustee Council in 2009, Plaintiffs respectfully submit that if any party's argument on this issue is not credible, it is Arkema's.

Finally, Arkema flags harm from EPA's remediation as an additional item to be considered in the formal injury assessment. Dkt. No. 111, Arkema Br. at 17. (*See also* Dkt. No. 112, FMC Br. at 27-29; Dkt. No. 115, Gunderson Br. at at 16). Notably, the Trustees' language in the 2018 NRD Assessment Plan on this one point is much more definitive than for COCs or geography: the latter two use the word "may," but the Trustees state that injury from remedial actions "will" be evaluated. This is entirely appropriate: the CERCLA NRD regulations expressly provide for this. 43 C.F.R. §11.15(a)(1). The difficulty with Arkema's argument, however, is that such consideration is not an "expansion[] to the overall scope of the assessment" used in the Consent Decrees. *Cf.* Arkema Br. at 18.

To the contrary, the injury estimate in the Consent Decrees relating to remediation is more conservative (*i.e.*, it assumes more injury) than the formal injury assessment will be, because the Consent Decrees assumed that EPA's remedy would include *no* active remediation. Trustees' 2015 NRDA Summary at A-8 to A-9, *Hughes Decl.* Ex. 1. As a result, contaminant concentrations are expected to decrease much more slowly under the Consent Decrees' assumptions than under the active remediation scenario selected by EPA in 2017. Thus, the estimated ongoing harm from contaminants is *larger* in the Consent Decrees' total injury estimate than would be the case in the formal injury assessment. As explained in response to Arkema's comment on this point, "Active remediation to remove or cap contaminated sediments in some locations may re-release contaminants to some extent, but, even if this occurs, overall exposure of natural resources to contaminants will decrease." Dkt. No. 85-3, Pl. RTC at 19–20.

Plaintiffs' Reply Supporting Mot. To Enter        15

**D.    The Consent Decrees' Reopener Provision Protects The Public And Non-Settlors If New Information Shows Significantly Greater Harm To Natural Resources Than Presently Is Known.**

If, after the Consent Decrees are entered, information develops through the formal injury assessment process or otherwise showing significantly greater harm to natural resources than is presently known, Plaintiffs may assert additional NRD claims against Settling Defendants. Plaintiffs' right to do so is explicitly reserved in the "Additional Reservation For Unknown Conditions Or Information" section of the Consent Decrees.  That provision reads:

> Notwithstanding any other provision of this Consent Decree, Plaintiffs reserve, and this Consent Decree is without prejudice to, the right to institute proceedings against Settling Defendants in this action or in a new action for: Covered Natural Resource Damages if conditions, factors or information in the Portland Harbor Natural Resource Damage Assessment Area, not known to the Trustees as of the Effective Date of this Consent Decree, are discovered that, together with any other relevant information, indicates that there is injury to, destruction of, loss of and/or loss of use of natural resources of a type unknown, or of a magnitude significantly greater than was known, to the Trustees as of the Effective Date.

Dkt. No. 4-1 ¶ 85; Dkt. No. 11-1 ¶ 17.

In response to comments raising the possibility that the formal injury assessment would find total injuries greater than the total injury estimate used in the Consent Decrees, the Trustees gave the following explanation:

> [T]he Consent Decrees contain reopener provisions. These provisions allow us to assert additional natural resource damage claims against Settling Defendants if "conditions, factors or information" are discovered indicating additional damages "of a type unknown, or of a magnitude significantly greater than was known, to the Trustees as of the Effective Date."[10] Therefore, after entry of the Consent Decrees, if the Settling Trustees discover in the formal damage assessment that the HEA estimate overlooked damages "of a type unknown, or of a magnitude significantly greater than" what was known at the time the Consent Decrees

---

[10] *Cash-Out Decree*, Dkt. No. 11-1, ¶ 17; *Restoration Credit Decree*, Dkt. No. 4-1, ¶ 85.

Plaintiffs' Reply Supporting Mot. To Enter        16

were entered, the Consent Decrees provide a mechanism for recovery of those damages against Settling Defendants, and no contribution protection would apply to that additional quantum of damages.

Dkt. No. 85-3, Pl. RTC at 37.  Intervenors' briefs do not contest the efficacy of this safeguard; tellingly, they do not mention it at all.

In sum, Arkema's prediction about the outcome of the formal injury assessment is self-serving guesswork with little if any support in the Trustees' 2018 NRD Assessment Plan. Arkema's speculation in no way undermines the Trustees' appropriate use of the HEA model's estimate of total injury for the Consent Decrees.

**II.    These Consent Decrees For Natural Resource Damages Are Not Premature In Relation To The Status Of Site Cleanup.**

Two Intervenors—FMC and Gunderson—raise without merit the ongoing cleanup efforts overseen by EPA as a basis of uncertainty that argues against resolution of NRD claims at this time.  As they correctly note, EPA's cleanup decision is set forth in its 2017 Record of Decision, and responsible parties at the Site are now engaged in developing the detailed engineering designs (the "Remedial Design" phase, or "RD") to implement EPA's selected remedy.  FMC Br. at 2-5, 27-30; Gunderson Br. at 16.  Intervenors use EPA's ongoing remedial process to argue that the Consent Decrees are premature and/or that they should include "source control" protections.  These arguments are potentially confusing, as they invite the Court down a rabbit hole involving a process that is both complex and separate from the Trustees' NRD injury assessments and restoration decisions.  The legal and practical defects of Intervenors' arguments are addressed in order.

**A.    Legally And Practically, The Consent Decrees Are Not Premature.**

As a matter of law, Plaintiffs' NRD claims in their Complaint, and therefore the Consent Decrees setting those claims, are timely.  For sites on CERCLA's National Priorities List ("NPL

Plaintiffs' Reply Supporting Mot. To Enter        17

ER-477

sites") such as Portland Harbor, Congress expressly authorized NRD claims to be brought after EPA issues its record of decision. 42 U.S.C. § 9613(g)(1). *See also* H.R. Rep. No. 253, at 21 (1985) ("[D]amages assessment at NPL sites should, whenever possible, take place while the [remedial investigation and feasibility study] is underway."). As explained in detail in the response to comments, this statutory framework "necessarily means that at least some areas of contamination will not yet be fully controlled when trustees assert their claims." Dkt. No. 85-3, Pl. RTC at 57; *see generally id*. at 56–57.

Not only are Plaintiffs' claims legally timely, but the ongoing remedial activities described by Intervenors, Dkt. No. 112, FMC Br. at 28, did not prevent the Trustees from using conservative assumptions in the injury estimate. The reasons for this are again set out in response to the FMC and Gunderson comments on this issue. Dkt. No. 85-3, Pl. RTC at 57. One of the Trustees' points is that while contaminant levels may be temporarily raised at certain times and locations during the cleanup, the overall future contaminant loads at the Site will be much lower with EPA's selected remedy than they would be if EPA had chosen to let the entire Site recover naturally. FMC contests the Trustees' judgment on this point, FMC Br. at 29, but it does not explain how releases of contaminants during cleanup – which will of course be subject to an array of control measures and best management practices – should be expected to cause, *in the aggregate*, more harm to natural resources than leaving all of the contaminants in place indefinitely. Without any compelling showing by Intervenors on this point, the Trustees' technical judgment is entitled to substantial deference.[11] *Preservation Aviation, Inc. v. United*

---

[11] The argument *supra* in Section I.D. regarding the Consent Decrees' reopener applies here with equal force. In the exceptionally unlikely event that contaminant concentrations due to remedial activities rose so greatly that they caused the actual total injury to significantly exceed the total injury estimate in the Consent Decrees, the reopener section in those Consent Decrees could be invoked.

Plaintiffs' Reply Supporting Mot. To Enter      18

*States*, No. SA CV 07-01219 SJO, 2009 WL 10673755, at *2 (C.D.Cal. Nov. 19, 2009) (when

reviewing a proposed CERCLA settlement, "[c]ourts should defer to the technical expertise of an

administrative agency on whose behalf the Justice Department negotiated the consent decree.")

(*citing United States v. Charles George Trucking, Inc.,* 34 F.3d 1081, 1085 (1st Cir. 1994)).

> **B.      The Consent Decrees Do Not Require Source Control Provisions.**

Intervenors' insistence that the Consent Decrees must include measures to control future

releases of hazardous substances combines two errors: a fundamental misunderstanding of the

divisions of responsibility under CERCLA between EPA and natural resource trustees, and a

misguided effort to shoehorn the Consent Decrees into the opinion in *State of Utah By &*

*Through Utah State Dep't of Health v. Kennecott Corp.,* 801 F. Supp. 553 (D. Utah 1992), which

involved an NRD settlement where no remedial measures had been selected by EPA or its

corresponding state regulator.

First, FMC's suggestion that the Trustees seek to control releases of sources within

EPA's active remediation area fundamentally misunderstands the division of responsibility under

CERCLA between regulators such as EPA and its state counterparts and natural resource

trustees.  This basic division of responsibility was explained by the Plaintiffs at length in

response to FMC's and Gunderson's public comments as follows:

> These suggestions are contrary to the fundamental division of
> responsibility under CERCLA for cleanup of hazardous substances
> and restoration of the natural resources they injure. CERCLA
> identifies EPA as the lead federal agency responsible for
> addressing hazardous substance contamination and provides States
> with remedial authority.  At Portland Harbor, EPA and ODEQ
> agreed that ODEQ would oversee remediation of upland facilities
> that are sources of contamination to the Portland Harbor Superfund
> Site, and EPA would direct the cleanup of contaminants in the
> banks and bottom sediments of the Willamette River itself within
> the Superfund Site. CERCLA does not give this remedial authority
> to natural resource trustees.

Plaintiffs' Reply Supporting Mot. To Enter       19

Dkt. No. 85-3, Pl. RTC at 58.  This point was further emphasized in the Plaintiffs'

response to another commenter that made the same error:

> The Settling Trustees also note that the ROD and ESD are
> specifically related to the cleanup led by EPA, not the NRDA
> process led by the Settling Trustees that produced the Consent
> Decrees. The Settling Trustees have no authority to make remedial
> decisions, including determining "risk levels" or issuing a ROD for
> remedial action. The above examples reflect a basic
> misunderstanding of EPA's role in the cleanup of the Portland
> Harbor Superfund Site versus the Settling Trustees' role in
> restoring natural resources injured by the hazardous substances and
> pollutants being cleaned up.

*Id*. at 72.  Rather than contest the merits of the above detailed explanation about the differing

authorities and roles of cleanup regulators and natural resource trustees, FMC doubles down with

a generalized one-liner about the authority of "the federal government and the State of Oregon."

FMC Br. at 30.  That is no basis for requiring source control provisions in the Consent Decrees.

Second, both the remedial process and restoration planning are far more advanced at

Portland Harbor than in *Kennecott Corp.,* 801 F. Supp. 553.  That case involved a contaminated

aquifer at a site where EPA had not yet decided on a remedy and was still in the process of its

remedial investigation and feasibility study, which is a precursor to remedy decisions.  *Id*. at 564.

In that context, the court found substantial uncertainty about whether the aquifer could be

restored or protected.  This precluded a reliable estimate of the damages, including the

appropriate method for measuring damages.  *Id*. at 568.  In addition, in the absence of definitive

source control measures by either EPA or the State, *id*. at 559, 564, 569, the consent decree itself

did not ensure that the aquifer would be protected from further contamination.  *Id*. at 570.

None of the above factors are present at Portland Harbor.  EPA issued its cleanup

decision in 2017.  As explained *supra*, in estimating total injury, the Trustees made assumptions

Plaintiffs' Reply Supporting Mot. To Enter        20

about future contaminant exposure to natural resources that conservatively overstate that exposure when compared against expected future contaminant concentrations under EPA's ROD. Nor is there uncertainty about the viability of the restoration projects in the Restoration Credit Consent Decree. All four restoration projects in the Restoration Credit Consent Decree have been constructed and are in various stages of habitat development. Dkt. No. 4-1, Restoration Credit Consent Decree ¶¶ 22–25. In addition, of the three restoration projects within the Assessment Area, there are no active remedial measures planned in accordance with EPA's ROD (*i.e.*, no capping or dredging). *See* map at https://www.fws.gov/portlandharbor/Ecological-Restoration-Projects. Moreover, the Restoration Credit Consent Decree contains measures to ensure that the Trustees obtain the full value of restoration credits they accept in settlement. These include well-defined criteria for accepting restoration credits and restoration credit release schedules that ensure restoration credits are only released after verifying achievement of required milestones for each restoration project.[12] Dkt. No. 4-1, Restoration Credit Consent Decree ¶¶ 42 (release of DSAY credits dependant on achievement of project milestones under Credit Release

---

[12] During restoration planning, the Trustee Council was well aware that restoration projects, particularly those located in the Assessment Area, may occur in areas that contain contamination. To assess the potential exposure to and adverse effects of that potential contamination on natural resources, the Trustee Council reviewed project-specific information and in multiple cases required sediment characterization and sampling. In some cases, the Trustee Council concluded that contamination anticipated to remain on soil or sediment surfaces (sometimes called "leave surfaces" or "surface elevations") following restoration would exceed levels that cause injury to natural resources and must be removed. In other cases, the Trustee Council concluded that post-restoration residual contamination represented a less substantial level of risk to target resources, and that contamination resulted in reduced restoration credits for the project. How this issue was managed during design, construction, and crediting of the Linnton, PGE, and Rinearson restoration projects is detailed in their respective habitat development plans. Dkt. No. 6-1, Linnton Mill Restoration Site Habitat Development Plan, Credit-based Consent Decree Appendix E1 at 18; Dkt. No. 8-1, PGE Harborton Habitat Development Plan, Credit-based Consent Decree Appendix G1 at 25; Dkt. No. 7-1, Rinearson Natural Area Restoration Project Habitat Development Plan, Credit-based Consent Decree Appendix F1 at 19.

Plaintiffs' Reply Supporting Mot. To Enter        21

Schedules), 47-51 (revisions to DSAY credits authorized for restoration projects).  Against this backdrop, Intervenors have made no concrete showing that implementation of EPA's remedy will adversely affect those restoration projects or that the existing Restoration Credit Consent Decree provisions are inadequate.

The special circumstances in *Kennecott Corp.* help explain why that case is something of an outlier, both with respect to requiring source control measures in a restoration plan, and for its significantly less deferential review of trustee settlements compared to other cases.  Dkt. No. 85-3, Pl. RTC at 58 & n.147; *Natural Resource Damages Under CERCLA And OPA*, 53 ELR 10569, 10599 & n.298 (2024).  None of those special circumstances are present at Portland Harbor, and such provisions are therefore unnecessary in the restoration plans.[13]

### III.    The Public Record Supports The Amount Of Damages Allocated To Settling Defendants In The Consent Decrees.

FMC, Gunderson, and NW Natural all argue that Plaintiffs have failed to provide sufficient information about how Settling Defendants' liability allocations (measured in DSAYs)

---

[13] Arkema's reliance on *Commissioner of Dep't of Planning & Natural Res. v. Century Alumina Co.*, Nos. CIV. 2005/0062, 2007/114, 2008 WL 4693550 (D.V.I. Oct. 22, 2008) is similarly misplaced.  *Cf.* Dkt. No. 111, Arkema Br. at 21.  The proposed consent decree in that case addressed both natural resource damages and response costs.  Regarding natural resource damages, the trustee had submitted a preliminary estimate of damages for one portion of the site, but there was no damages estimate of another portion of the site, which included an aquifer, wetlands, mudflats, and mangrove near the Caribbean Sea.  *Id*. at *4-5.  Without an estimate of damages for those latter areas, the Court could not determine if the natural resource damages portion of the settlement was fair.  *Id.* *5.  Plaintiffs in that case also failed to provide "any estimations of the past or projected response costs," leaving the court "at a complete loss" to evaluate the fairness of the settlement.  *Id.*  Thus, unlike the proposed Consent Decrees, which include a reasonable estimate of the total harm, the *Century Alumina* case is much more akin to *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995), where no natural resource damages estimate was provided.  *See infra* at 36-37.

Plaintiffs' Reply Supporting Mot. To Enter        22

were determined.  FMC Br. at 18-24; Gunderson Br. at 10-14; NW Natural Br. at 7-13.  While their arguments differ slightly, they all contain two critical defects.[14]

First and foremost, Intervenors assume that the public record must show exactly *how* the allocations were determined.  *E.g., Gunderson Br.* at 10.  This is in error.  If Intervenors were correct, natural resource trustees (and other governmental bodies) could not reach settlements without disclosing their confidential deliberations and discussions with defendants in those settlements.  However, courts have guarded the confidentiality of negotiations that are essential to reaching settlement.  *See*, *e.g.*, *infra* at 38 n.30 and *Lifescan, Inc. v. Smith,* Civ. No. 17-5552, 2023 WL 7088249 at *4 and *8 (D.N.J. Feb. 6, 2023) (denying production of documents and communications concerning Plaintiffs' settlement negotiations with individual defendants to preserve settlement participants' willingness to communicate, especially where revealing communications would chill future settlement negotiations involving other claims or parties in the same complex litigation).  Instead of revealing the inner workings of *how* settlements are reached, the public record must contain enough information to support the *outcome* of the negotiations.

The difference is critical here, because while Intervenors have made much of the information they do not have – chiefly, the detailed calculations used by the Trustees to estimate each Settling Defendant's contribution to the total harm – Intervenors have largely ignored the information in the public record that details Settling Defendants' activities and associated waste

---

[14] This section focuses on the arguments of FMC and Gunderson, which address more of the public record and Plaintiffs' Response To Comments than NW Natural.  NW Natural's knowledge of the public record materials discussed in this Section is limited to the Complaint, the Consent Decrees, and the *Declaration of Troy Baker*.  Dkt. No. 119, NW Natural Br. at 2, 8. NW Natural acknowledges references to the public record in Plaintiffs' opening brief but apparently is unfamiliar with them.  *Id*. at 8.  This may be because NW Natural was not involved in the public comment process.

Plaintiffs' Reply Supporting Mot. To Enter        23

streams.  By largely failing to engage with this information and make meaningful comparisons to the many other responsible parties – and their associated activities and wastes – they have declined to test the allocations in the Consent Decrees against the available public information.

Second, while Intervenors correctly state that the Court's review on this point must be "independent," they give little more than lip service to the deference due the Trustees as the governmental bodies authorized under CERCLA to assess and redress natural resource damages. This deference, combined with CERCLA structural favoritism toward settlements – which the Supreme Court recently noted, as discussed below – allows the Trustees much wider latitude in reaching settlements with willing parties than Intervenors acknowledge.

As a result, although the particulars of the negotiations between the Trustees and Intervenors are appropriately shielded from public view, the Trustees have explained the relative proportionality of the allocations in the public record as follows:

> the allocations to Settling Defendants vary widely in magnitude but correspond roughly to the magnitude and duration of activities—and associated contamination—released from the identified properties for each Settling Defendant. Generally speaking, Settling Defendants with larger allocations conducted relevant operations larger in scope, for longer periods of time, or in locations more susceptible to releasing hazardous substances into the Portland Harbor Assessment Area than Settling Defendants with much lesser shares of liability.

Dkt. No. 85-3, Pl. RTC at 50.

> **A.**    **The Public Record Provides Information That Intervenors Could Have Used To Assess The Fairness (Or Unfairness) Of The Consent Decree Allocations.**

Intervenors directly contest almost none of the public record information cited in our opening brief to support the allocations to Settling Defendants.  That information is of two kinds. The first is factual information used by the Trustees regarding the contamination throughout the

Plaintiffs' Reply Supporting Mot. To Enter        24

Site, such as the contaminant datasets[15] and the 12 contaminants used in the HEA model to estimate total injury.  For each Settling Defendant, the Trustees provided detailed information in an allocation memo,[16] including:

- general background, including an identification of all of the properties examined in the allocation process for that Settling Defendant (Section 2.0 of each memo),

- the total acreage associated with those properties (Section 2.0 of each memo),

- the nature of the Settling Defendant's connection to those properties (i.e., ownership and/or operations), the relevant time frame of the ownership and/or operations, and available information about other historical and current owners and operators on the property (Section 2.0 of each memo),

- a description of the operations conducted at those properties and the time periods during which those operations were conducted, in a narrative that includes available information about other historical and current operations (Section 3.0 of each memo), and

- an identification of the relevant activities identified within the allocation model that are associated with one or more of the 12 COCs that took place during the operations, including a note if no relevant activities were identified at a particular property (Section 4.0 of each memo).

Dkt. No. 85-3, Pl. RTC at 49.  In addition, for each type of activity conducted by any owner or operator, the Trustees also developed a comprehensive list of COCs that are associated with those activities, which is a 5-page table in the 2023 Phase 2 Allocation Methodology Report. Phase 2 Allocation Methodology Report (April 2023) at 10–14, *Hughes Decl*. Ex. 2.

The second type of information is a description of the methods used by the HEA model and the actual values used in that model on key factors such as habitat type values and service loss thresholds.  Plaintiffs Op. Br. at 4-8, 24-26; *supra* at 3-4, 9-10.  Although the detailed HEA

---

[15] These datasets are voluminous.  *See* Trustees' 2015 NRDA Summary at A-4, *Hughes Decl*. Ex. 1.  The datasets referenced as available on Query Manager are now available on NOAA's DIVER database.

[16] *See Hughes Decl*. Exs. 3-25.

Plaintiffs' Reply Supporting Mot. To Enter        25

calculations for each Settling Defendant were withheld as confidential, the information in the public record "provides a guide for evaluating those calculations." Dkt. No. 85-3, Pl. RTC at 49.

One important use of this information is to allow the public (including Intervenors) to check that the Trustees did not overlook any polluting operations on the properties they evaluated for each Settling Defendant, and that evaluation of those operations identified all relevant activities and associated COCs. None of the Intervenors assert such an omission here, however.[17]

This information also is important to demonstrate that the Trustees selected and used appropriate methods in their allocation. Here, although Intervenors argue that HEA should not be used at this Site, *supra* Section I, they do not point to *any* specific error in the detailed memo in the public record that describes how the Trustees allocated the share of the harm to Settling Defendants. *See, e.g.,* Dkt. No. 112, FMC Br. at 19 (referencing the 2023 Phase 2 Allocation Methodology Report but identifying no error or omission in it).

---

[17] On this point, FMC questions why Site 157 is "unallocated" for Evraz. Dkt. No. 112, FMC Br. at 24. FMC's terminology is incorrect and is not used within the document FMC cites (*i.e.*, the Allocation Summary Memo for Evraz). All properties identified by each Settling Defendant as potential sources of COCs were evaluated. For each such property, if examination found that no pathway to the river existed, no activities were conducted relevant to any COC, or no sediment contamination for any relevant COC was documented proximate to the property or associated outfall, the Settling Party received no allocation of DSAYs for that property. The Trustees' evaluation of Evraz's properties illustrates this process. The Evraz allocation evaluated Evraz as an owner and/or operator at nine "sites" in the assessment area. At four of those sites, including the Portland Shipyard (Site 157), Evraz did not conduct activities that resulted in an allocation. Supporting information for this is available in the Allocation Summary Memo for Evraz at 5, *Hughes Decl.* Ex. 12: "Evraz's predecessor, Gilmore Steel, leased Bays 10 and 11 (approximately 1.1 acres) in the Assembly Building at the Portland Shipyard from 1947 to 1950 for the storage of steel. Oregon Steel Mills, Inc. leased Bay 1 (approximately 0.61 acres) from July 1995 to January 1996 for storage and assembly of a rolling steel mill for the Rivergate property." *See also id.* at footnote 1 in Table 4-1, "Evraz did not conduct any relevant activities on Sites 73, 142, 157, and 160."

Plaintiffs' Reply Supporting Mot. To Enter      26

The Trustees have shown that the methods they used to allocate the total injury were appropriate, and they have provided the information they used about both the contamination throughout the Site and the locations, activities, and related contaminants of Settling Defendants that contributed to that contamination. Again, Intervenors have identified no inaccuracies in that information, nor have they argued that the information identifying the operations, activities, and associated contaminants of Settling Defendants is incomplete. In short, the record before the Court demonstrates that the Trustees considered all of Settling Defendants' relevant actions when determining allocations.

Intervenors' public comments on the Consent Decrees largely ignored this information. Gunderson's comments raised questions about only two facilities included in the entire settlement: Schnitzer's steel mill operations on the Site 186 property, and the City of Portland's stormwater outfall OF-18.[18] Dkt. No. 85-3, Pl. RTC at 41–43. Regarding the Schnitzer mill, the Trustees' response explains that Settling Defendants' allocations in the Consent Decrees do not break out the allocations for each property in order to preserve the confidentiality of negotiations, and that the Trustees did not have sufficient information to allocate responsibility to specific non-participants.[19] *Id.* at 50-51 Regarding the City's outfall OF-18, the Trustees

---

[18] The only public comments submitted by Intervenors on this issue are Gunderson's. FMC incorporated Gunderson's comments by reference.

[19] FMC takes part of this response entirely out of context to argue that the Trustees' have "admitted" that their allocation method was unreliable because they did not assign responsibility to *individual* non-participants in the negotiations. Dkt. No. 112, FMC Br. at 20-21. This misreads the context of the comment and response. In its comment, Gunderson suggested that two related additional types of information should have been made *public*: intra-site allocations for properties where more than one entity operated, and individual allocations to non-participants. Dkt. No. 85-3, Pl. RTC at 41-42. The Trustees' response explains that allocations to individual non-participants were not made because non-participants had no opportunity (by their own choice) to submit information about their own operations to the Trustees. *Id.* at 50-51. This response was not intended to suggest that the Trustees had no information about non-

Plaintiffs' Reply Supporting Mot. To Enter        27

explained that they "estimated the City's share of liability by outfall type rather than by individual outfall." *Id.* at 51.

Significantly, neither the public comments of Gunderson nor any other Intervenor attempted to assess the Consent Decrees' assignment of 11.4% of total injury to the Settling Defendants. Rather, they effectively refused to do so, arguing that unless they were privy to the Trustees' confidential calculations using the HEA model, the fairness of the Consent Decree's effect on non-settlors could not be assessed. *See* Dkt. No. 85-3, Pl. RTC at 41-43. As explained in the Trustees' response to comments, this is the metric that affects non-settling parties such as Intervenors, because pursuant to CERCLA Section 113(f)(2), the amount of natural resources damages that may be recovered against non-settlors is reduced by the total settlement amount in the Consent Decrees. *Id.* at 52-53.

In their briefs, Intervenors partially repeat the positions in their public comments. However, perhaps in response to Plaintiffs' statement in the Response To Comments that the principal effect on non-settlors is the Consent Decrees' aggregate allocation to Settling Defendants of 11.4%, FMC now argues for the first time that the aggregate allocation given to Settling Defendants is too small. FMC Br. at 21–24. While the Plaintiffs disagree with FMC's argument for the reasons below, FMC's use of materials in the public domain to make its argument strongly supports Plaintiffs' argument that the basic fairness of the allocation can be assessed using available information. *Cf.* Pl. Op. Br. at 24–27. FMC uses this information to identify properties operated by Settling Defendants that FMC deems significant, to specify the

participants' operations or that the Trustees could not make allocations to non-participants as a whole with that information. In fact, the Trustees used publicly available information about non-participants' operations to make internal allocations as between Settling Defendants and the non-participants as a whole. Dkt. No. 85-1, *Declaration of Troy Baker* ¶¶ 11 & 13. Using this approach, the Trustees did not need to make allocations to individual non-participants.

Plaintiffs' Reply Supporting Mot. To Enter       28

types of operations that took place at those properties, and to emphasize the significance of operations at those properties.[20]  FMC Br. at 21-23.  To emphasize the significance of the Settling Defendants' operations, FMC points to the fact that six of the Settling Defendants are among the parties performing remedial design under EPA administrative orders.  FMC Br. at 22.

If FMC – or any other Intervenor – had raised this argument in their public comments, Plaintiffs could have addressed it in the response to comments.  In any event, the first problem with FMC's argument is that it stops short.  Instead of comparing these six Settling Defendants' operations to the other operations conducted by parties also performing remedial design under EPA orders, FMC abruptly concludes that "only 11.4% is not plausible under any calculation." FMC Br. at 24.  But FMC's brief contains no support for that conclusion.  Nonetheless, if one were to accept FMC's metric of parties performing remedial design under EPA orders, FMC Br. at 22, one could compare the number of Settling Defendants performing or funding remedial design against non-settling parties in that role.[21]  For the 16 different areas under remedial design orders, the breakdown is presented in Table 1:

---

[20] The operations referenced by FMC include activities at Site 157 and the City's Outfall 18. With respect to Site 157, *see supra* at 26 n.17.  Regarding Outfall 18, FMC asserts it has contributed, and continues to contribute, significant contaminants to the Willamette River.  FMC Br. at 23.  FMC's argument that the City of Portland's allocation for these releases is insufficient misses two points.  First, as FMC itself notes, contaminants released through Outfall 18 come from numerous upland properties with many types of operations.  While the Consent Decree resolves the City's liability for past releases of contaminants, the owners/operators responsible for those contaminants remain liable.  Second, as to future releases of contaminants from Outfall 18 – or any other property owned or operated by Settling Defendants – the Consent Decree does not resolve Settling Defendants' liability and contains an express reservation of rights.  Dkt. Nos. 4-1 ¶ 3.d and 11-1 ¶ 3.b (Definition of "Covered Natural Resource Damages") & Dkt. Nos. 4-1 ¶ 83.e and 11-1 ¶ 15.e (Reservation of rights for releases after the "Effective Date").
[21] Intervenors' briefs demonstrate that they are well aware of the parties performing remedial design.  All Intervenors are industrial concerns represented by sophisticated counsel, and Arkema, FMC, and NW Natural are performing remedial design under EPA orders.

Plaintiffs' Reply Supporting Mot. To Enter        29

**Table 1. Settling and Non-Settling Defendants per Remedial Project Area.**

| Remedial Project Area | Settling Defendants | Non-Settlors |
|---|---|---|
| B1a | | - Atlantic Richfield Company<br>- BP Products North America, Inc.<br>- Brix Maritime Company.<br>- Exxon Mobil Corporation<br>- Kinder Morgan Liquids Terminals, LLC |
| Gasco | | - Northwest Natural |
| US Moorings | | - Northwest Natural |
| Navigation Channel | | - Northwest Natural |
| River Mile 7 West, Bayer | | - Bayer Crop Science, Inc. |
| River Mile 7 West, Arkema | | - Arkema, Inc. |
| Willbridge Cove | - McCall Oil and Chemical Corporation | - Chevron USA Inc.<br>- Kinder Morgan Liquids Terminals, LLC<br>- Phillips 66 Company<br>- Shell Oil Company |
| River Mile 9 West | | - FMC Corporation |
| River Mile 10 West | | - General Electric Company |
| River Mile 11 East | - City of Portland<br>- PacifiCorp | - Cargill, Inc.<br>- CBS Corporation<br>- DIL Trust<br>- Glacier Northwest, Inc. |
| River Mile 10 East | | - Union Pacific Railroad Company |
| Swan Island Basin | - City of Portland<br>- Port of Portland | - Daimler Trucks North America, LLC<br>- Vigor Industrial LLC<br>- Cascade General, Inc.<br>- Shipyard Commerce Center, LLC<br>- State of Oregon<br>- Federal agencies |
| Willamette Cove | - City of Portland<br>- Port of Portland | - State of Oregon<br>- Federal agencies |
| Terminal 4 | - Port of Portland | |
| River Mile 3.5 East | - Schnitzer Steel Inc. dba Radius Recycling<br>- MMGL, LLC | |
| River Mile 2 East | - EVRAZ, Inc., NA, dba Oregon Steel Mills | |

The tally in Table 1 includes six Settling Defendants and 24 non-settlors; Settling Defendants represent 20% of the total. As discussed *infra* Section III.B, compared to the aggregate allocation here of 11.4%, this comparison is well within the flexibility courts have given trustees to settle CERCLA natural resource damage claims.

Plaintiffs' Reply Supporting Mot. To Enter        30

The second defect in FMC's argument is that the metric FMC uses to dispute the fairness of the 11.4% aggregate allocation to Settling Defendants pertains to implementation of EPA's Portland Harbor cleanup remedy, not to natural resource damages caused by the contaminants being cleaned up.[22]  In view of FMC's new assertion regarding the aggregate allocation to Settling Defendants, the Trustees have added a previously internal table to the public record showing the relative contribution to natural resource damages for each of the 12 COCs used in the HEA model.  Attachment A, *Second Declaration of Troy Baker In Support Of Plaintiffs' Motion To Enter Consent Decrees* ("*Second Baker Decl.*") ¶¶ 4–5 & Exhibit 1.

The information in that table strongly supports the Consent Decrees' aggregate allocation of 11.4% of natural resource damages to Settling Defendants.  For each of the 12 COCs used in the HEA model, the table shows the damages (in DSAYs) for the site as a whole and the damages (also in DSAYs) collectively allocated to Settling Defendants in the Consent Decrees.  *Second Baker Decl*. ¶ 4 & Exhibit 1.  Exhibit 1 shows that some COCs contributed much more to the harm to natural resources than other COCs, and that Settling Defendants have relatively little responsibility for the COCs most responsible for the total harm.  *Id.*

Specifically, 70.4% of the harm in the HEA model (2,909 of 4,130 total DSAYs) was caused by four COCs: dichloro-diphenyl-trichloroethane ("DDT"), its breakdown products dichloro-diphenyl-dichloroethane ("DDD") and dichloro-diphenyl-dichloroethylene ("DDE") (collectively, "DDx" compounds), and polycyclic aromatic hydrocarbons ("PAHs").  *Second Baker Decl*. ¶ 5 & Ex. 1.  Settling Defendants were allocated only 12.8 DSAYs for DDx COCs,

---

[22] In addition to the fact that 20% parties performing remedial design are Settling Defendants does not show the 11.4% aggregate allocation to be impermissible, it also is an unreliable metric because, as explained *infra* at 41, the key drivers of natural resource damages can be very different than the key drivers of cleanup costs.

Plaintiffs' Reply Supporting Mot. To Enter        31

or 1.0% of the harm caused by those COCs. *Id.* ¶ 6 & Ex. 1. This allocation aligns with the activities identified for each Settling Defendant and their associated COCs, because only two Settling Defendants conducted industrial activities associated with DDx COCs, such as application or disposal of pesticides (Port of Portland) and municipal landfill operation and waste transfer station operation (City of Portland). [23] More significantly, none of the Settling Defendants conducted industrial activities that involved manufacture, distribution, or storage of DDx COCs (*e.g.*, pesticide storage, pesticide formulation, or pesticide manufacturing). *See* Table 2-3 of the Phase 2 Allocation Methodology Report at 12, *Hughes Decl.* Ex. 2. For PAHs, Settling Defendants were allocated 151 DSAYs, which is 9.3% of the harm caused by PAHs. *Second Baker Decl.* ¶ 7 & Ex. 1. This allocation also aligns with the higher number of Settling Defendants that conducted activities associated with PAHs (all 23). While all Settling Defendants were associated with at least one PAH-related activity, only two were associated with a heavy industrial source such as coal oil/gasification plant/refinery operations or disposal of liquid manufactured gas plant waste (Portland Terminal Railroad), or coal tar distillation plant operations (Beazer East). Hughes Decl. Exs. 7 & 22.

Combining the results for PAH and DDx COCs, Settling Defendants were allocated 163.8 of the 2,909 DSAYs, or 5.6% of the harm, caused by those contaminants. *Second Baker Decl.* ¶ 8 & Ex. 1. By contrast, Settling Defendants were allocated 25.2% of the harm (308 of 1,221 DSAYs) from the eight COCs other than PAHs or DDx compounds. *Id.* ¶ 9 & Ex. 1. The differences in the percentage of the total allocated to Settling Defendants for each COC are not surprising, as Settling Defendants include few of the industrial operators at Portland Harbor

---

[23] *See* descriptions in Table 2-3 of the Phase 2 Allocation Methodology Report, *Hughes Decl.* Ex. 2, and party-specific allocation summary memoranda for the Port of Portland and City of Portland. *Hughes Decl.* Exs. 10 & 20.

Plaintiffs' Reply Supporting Mot. To Enter        32

typically associated with heavy DDx or PAH contamination, such as DDT manufacturers and processors, coal gas plant operators, and oil companies involved in large-scale storage and transportation of petroleum-based products.  Given that the large majority of total damages were caused by PAHs and DDx COCs, it stands to reason that a group of settling parties with relatively little responsibility for those COCs would be assigned a relatively small share of the total damages.[24]

> ### B. The Applicable Caselaw Affords The Trustees More Deference For Settlements Than Intervenors Acknowledge And Supports The Allocations In the Consent Decrees.

Both Plaintiffs and Intervenors recognize that the Trustees' settlement determinations are entitled to deference, citing largely the same body of caselaw.  But in addition to the usual deference accorded agency expertise, CERCLA is explicitly structured to favor settlement rather than litigation.  As the Supreme Court recently observed, "Settlements are the heart of the Superfund statute." *Atlantic Richfield Co. v. Christian,* 590 U.S. 1, 22 (2020) (citing provisions). One of the sections cited in *Christian* contains two related provisions that promote early settlements.  First, "a party who has resolved its CERCLA liability through a judicially approved consent decree 'shall not be liable [to other responsible parties] for claims for contribution

---

[24] FMC argues that no new information should be allowed into the record or cited in Plaintiffs' reply.  Dkt. No. 112, FMC Br. at 36.  However, none of Intervenors' public comments argued that the aggregate allocation to Settling Defendants was too low. *See* Dkt No. 85-3, Pl. RTC at 47, 52-53.  Now, FMC is the only Intervenor to challenge the aggregate allocation of 11.4% to Settling Defendants.  In similar circumstances, courts have properly considered evidence and argument submitted with a reply that is responsive to points raised in the non-moving party's opposition. *See, e.g*, *United States v. Taibi*, No. 10-CV-2250 JLS, 2012 WL 553143, at *4 (S.D. Cal. Feb. 21, 2012); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F. Supp. 1220, 1235 (S.D.N.Y. 1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir. 1992).  This Court also has recognized exceptions allowing new information in a reply, including when the issue not raised by the party's opening brief is "raised in the [response] brief," or if "failure to do so would result in manifest injustice." *Silver Mountain Dev., Inc. v. City of Silverton*, No. 6:21-CV-00809-MK, 2022 WL 17751700, at *5 (D. Or. Dec. 19, 2022).

Plaintiffs' Reply Supporting Mot. To Enter        33

regarding matters addressed in the settlement.'" *Arizona v. City of Tucson*, 761 F.3d 1005, 1011 (9th Cir. 2014) (*quoting* 42 U.S.C. § 9613(f)(2)).  Second, Section 113(f)(2) also provides that settlements reduce the potential liability of non-settlors by the amount of the settlement.  42 U.S.C. § 9613(f)(2).  As a result, "[t]his statutory framework contemplates that potentially responsible parties who do not enter into early settlement agreements may ultimately bear a disproportionate share of the CERCLA liability."  *City of Tucson*, 761 F.3d at 1011.

In the context of this statutory framework promoting settlements, despite the potential risk of imposing disproportionate liability on non-settlors, courts have given natural resource trustees wide latitude to discount their claims in pursuit of this objective.  For example, in *In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution ("Acushnet IV")*, 712 F. Supp. 1019 (D. Mass. 1989), the court approved a $2 million early settlement of a CERCLA natural resource damages claim with one of six defendants where the total amount sought was $50-70 million and the settling defendant's responsibility was comparable to (and arguably greater than) that of the non-settlors.  In doing so, the court approved multiple levels of discounting applied by the trustees.  First, although the government's claim was $50–70 million when the consent decree was entered, it had been $34 million when the settlement was negotiated.  *Id*. at 1031.  Next, the court allowed the government to discount the $34 million estimated claim to a $12 million total settlement goal.  *Id.*  Finally, although the government estimated the settling defendant's share of $12 million to be $2.3 million, the final negotiated settlement was $2 million.  *Id.*  All together, the settlement approved by the court reflected a discount of at least a *factor* of 3 when measured against the $34 total damage figure, or an even larger discount if measured against the current total damage estimate.

Plaintiffs' Reply Supporting Mot. To Enter        34

The court found that these discounts were justified by the value to the trustees and the public of early settlement, a number of technical and legal litigation risk factors common to NRD cases (including Portland Harbor), and CERCLA's encouragement of settlements versus litigation. 712 F. Supp. at 1029–32. In approving the consent decree in light of these factors, the court explained that a reviewing court "is not required to ensure that the sovereigns have struck the best deal possible. Nor must the court ensure that the settlement is perfectly calibrated in terms of share of liability so long as it is generally fair and reasonable." 712 F.Supp. at 1032.[25] Considering the possibility of disproportionate liability for non-settlors, the court noted that the sovereigns were entitled to reward early settlors, that the non-settlors in that case (as here) could have availed themselves of the same opportunities,[26] and that any resulting disproportionate liability reflected Congress's choice to structure the statute to favor early settlors. *Id.*

Another case squarely addressing the range of allowable discounts to early settling parties reached a very similar result. *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902 (E.D. Wis. 2004). Federal, state, and tribal trustees in that case pursued paper mill operators for natural resource damages caused by PCB discharges from their operations. The trustees estimated total damages of $176 million - $333 million. *Id.* at 906. The settling defendant's responsibility was estimated to be 15%–20% of the total, or a range of $26.4 million to $66.6 million, using the low and high ends of the total damage estimate range and the low and high ends of the percentage of responsibility range. *Id.* at 908–09. The trustees settled the claim for

---

[25] *See also* 712 F.Supp. at 1028 (stating that the legal standard for entry of a settlement is not "whether this is the best possible settlement that could have been obtained but rather . . . 'whether the settlement is within the reaches of the public interest'") (*citation omitted*).

[26] Three Intervenors acknowledge participating in the early settlement process that produced the Consent Decrees. Dkt No. 111 at 12 (Arkema); Dkt No. 119 at 3 (NW Natural); Dkt No. 115 at 9-10 (Gunderson).

Plaintiffs' Reply Supporting Mot. To Enter        35

just under $11 million—discounting their claim by a factor somewhere between 2.5 and 6.  *Id*. at 909.  As in *Acushnet IV*, the *Fort James* court found a discount of this magnitude to be allowable in light of litigation risks and the value of early settlement.  *Id*. at 909–10.

Compared to the settlement discounts in the above cases, the discount in the Consent Decrees is modest.  In calculating the total injury of 4,130 DSAYs, the Trustees set the "current year" at 2011 rather than a later date, using a yearly discount rate of 3%.  Trustees' 2015 NRDA Summary at A-8 ¶¶ 6 & 9, *Hughes Decl*. Ex. 1.  Some Intervenors wondered in their briefs about this structural discount but apparently did not recognize it in the Trustees' 2015 NRDA Summary.  *See* Dkt. No. 115, Gunderson Br. at 13-14; Dkt. No. 119, NW Natural Br. at 10.  The Second Declaration of Troy Baker explains that the "current year" was set at 2011 because that was the approximate time by which the Trustees had developed the 4,130 DSAYS damages estimate for settlement purposes, in collaboration with the potentially responsible parties participating in Phase 2.  *Second Baker Decl*. ¶ 12.  When the Path C settlement process began in 2013, the Trustees incentivized settlements by allowing any party participating in the Path C process to resolve their liability using that total injury calculation as of 2011.  *Id.*  To illustrate the maximum magnitude of the incentive, the total injury estimate of 4,130 DSAYs used here for settlement would reflect a modest discount of 29.9% if one were to set the "current year" at 2023 – the year the Consent Decrees were signed and lodged with the Court.  *Id.* ¶ 13.

In opposition to the above cases authorizing early settlement discounts measured in multiples of a settling party's full share of liability, Intervenors cite no contrary cases setting lower thresholds.  Indeed, the Ninth Circuit cases rejecting NRD consent decrees did so not because the proposed discounts were too large, but because there was nothing in the record to gauge the total estimate of damages and hence no way to even roughly gauge the reasonableness

Plaintiffs' Reply Supporting Mot. To Enter        36

of the settlement amount. In *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741 (9th Cir. 1995), the Ninth Circuit rejected a proposed $45.7 million settlement of NRD claims because there was "no evidence of the governments' estimate – preliminary or otherwise – of total natural resource damages." 50 F.3d at 747. In such an "information vacuum," the court found it could not compare the settlement value against the settling parties' potential responsibility. *Id*. But where such information is provided, *Montrose* articulates a highly deferential standard of review of settlements—especially for early settlements—between responsible parties and government agencies charged with enforcing CERCLA.[27] 50 F.3d at 746–48.

The Ninth Circuit's decision in *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014) is in the same vein. That case involved a settlement of response cost claims between Arizona and *de minimis* settling parties. The total cleanup costs were estimated at $75 million, but the district court's approval of the settlement was remanded because "the court declined to even discuss the parties' individual or aggregate settlement amounts, and merely deferred to the ADEQ's judgment that 'the public interest is best served through entry of th[e] agreement[s].'" *Id.* at 1009. In the district court proceeding below, "the State did not provide *any* evidence supporting [the settling parties'] estimated liability." *Id.* at 1013 (emphasis added). As in *Montrose*, the defect was not the settlement amounts or discounts, it was the absence of *any* information to assess them. However, where such information is provided, *City of Tuscon*

---

[27] Plaintiffs and Intervenors read *Montrose* very differently, regarding both the degree of deference given to settlements with government agencies and whether "initial" estimates of total damages may be a basis of those settlements. *Compare* Dkt. No. 85-1, Pl. Op. Br. at 13, 21, 26–27 & Dkt. No. 85-3, Pl. RTC at 18 *with* Dkt. No. 111, Arkema Br. at 8–10, 19. Respectfully, Plaintiffs stand by their reading of *Montrose*.

Plaintiffs' Reply Supporting Mot. To Enter        37

restated the reasons in *Montrose* and other cases for which agencies may discount claims in reaching settlements.[28]  *Id.* at 1012.

Applying the above cases to the record before the Court, the Trustees have provided both a well-documented estimate of total injury and detailed information about each Settling Defendants' activities and the contaminants associated with those activities.  Moreover, by any metric suggested by Intervenors or Plaintiffs, the early settlement discount given to Settling Defendants is far less than the discounts approved in other cases.  This is so whether one compares the number of Settling Defendants performing remedial design to the total number of parties doing so (where the discount comparison would be 20% vs. 11.4%),[29] or whether one compares the aggregate allocation given to the Settling Defendants against the relative contributions of their COCs to the Trustees' estimate of total injury, as discussed *supra* Section III.A.  By either of these metrics, the Consent Decrees are fair and reasonable.  The Consent Decrees further CERCLA's goals of addressing harm to natural resources as soon as possible and of avoiding litigation.  Intervenors' demands for detailed explanations about the particulars of each allocation – which were permissibly withheld as settlement confidential materials – should not stand in the way of entry of the Consent Decrees.[30]

---

[28] *City of Tucson* indicated that CERCLA settlements involving only state agencies can be accorded a lesser degree of deference than similar settlements with federal agencies.  761 F.3d at 1013–15.  This is inapplicable here, because Plaintiffs include federal, state, and tribal trustees.

[29] Plaintiffs do not endorse this metric.  *Supra* at 31 n.22 and *infra* at 41.

[30] Regarding settlement confidentiality, *see supra* at 23 and cases cited in Plaintiffs' Response to Comments, Dkt. No. 85-3 at 52 & n.118, 112 & n.238.  By contrast, Intervenors give a lukewarm nod toward the concept of confidentiality but cite no authority suggesting that the Trustees are required to disclose the detailed calculations underlying the settlement discussions with each Settling Defendant.

Plaintiffs' Reply Supporting Mot. To Enter        38

**IV.    The Consent Decrees Will Not Disrupt the Ongoing Response Cost Allocation.**

Intervenors Arkema and FMC make a two-prong argument that entering the Consent Decrees will disrupt the important non-judicial allocation of response costs that has been progressing for over a decade in the shadow of litigation stayed by this Court.  Dkt. No. 111 Arkema Br. at 26–31; Dkt. No. 112, FMC Br. at 31–35.  One prong of their argument brushes aside the fundamental difference between litigating a related case versus settling that same related case.  The other prong speculates about possible use by *non-settlors* of the Consent Decrees' allocations in the response cost allocation.  Both omit one critical point: they fail to explain why a *settlement* of this case would disrupt the response cost allocation settlement process in the same way that litigating the A*rkema* case would have done.  This latter deficiency is addressed first.

**A.    Entry Of The Consent Decrees Will Not Create Evidence That Can Be Used In The Related Cases.**

Intervenors' notion that a settlement here somehow will be used improperly by unnamed parties in the ongoing response cost allocation is both speculative and contrary to Federal Rule of Evidence 408, which reads in relevant part:

> **Rule 408. Compromise Offers and Negotiations**
>
> **(a) Prohibited Uses.** Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
> **(1)** furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim; and
> **(2)** conduct or a statement made during compromise negotiations about the claim [. . .]

Plaintiffs' Reply Supporting Mot. To Enter       39

Fed.R.Evid. 408. The Advisory Committee made clear that this rule bars the admissibility not only of settlement discussions, but also attempts by third parties to use settlements themselves against the settling parties:

> While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken *with respect to completed compromises* when offered against a party thereto. This latter situation will not, of course, ordinarily occur *except when a party to the present litigation has compromised with a third person*.

Fed. R. Evid. 408, advisory committee notes to 1972 proposed rules (emphasis added).

The Consent Decrees themselves also include commonly used terms barring their use to prove either Settling Defendants' liability or allegations of fact in the Complaint and Consent Decrees:

> Nothing in this Consent Decree shall be construed as an admission of liability by Settling Defendants for any claims or allegations made in the Complaint or in this Consent Decree. Settling Defendants deny all or portions of the allegations in the Complaint and this Consent Decree and do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the Complaint or this Consent Decree.

Dkt. No. 4-1 ¶ 5; Dkt. No. 11-1 ¶ 5.

Thus, both Rule 408 and the Consent Decrees themselves will bar their usage as evidence in further proceedings. Arkema wonders about "those instances where another party introduced [the Consent Decrees] as evidence," Dkt. No. 111, Arkema Br. at 27, while FMC speculates that some party on the response cost allocation might "cite Plaintiffs' allocation as evidence supporting a low allocation." Dkt. No. 112, FMC Br. at 35. Neither brief contains any reason as to why the Consent Decrees could be used as "evidence" in light of the above limitations, nor do

Plaintiffs' Reply Supporting Mot. To Enter     40

they give indications of how or why an inadmissible settlement document would carry weight in negotiations with sophisticated counsel in a separate matter. [31]

A second void in Intervenors' argument is their assumption that the allocations to Settling Defendants for *natural resource damages* would be meaningful in the *response cost* allocation. Intervenors are sophisticated parties and surely know that parties' relative responsibility for response costs and natural resource damages at the same site can vary substantially, for many reasons. For example, the hazardous substances driving cleanup costs may differ from the hazardous substances causing the most harm to natural resources. Additionally, the location of a party's released hazardous substances may make their cleanup expensive but cause relatively little harm to natural resources, or *vice versa*. Combinations of factors can exacerbate these differences. All participants in the response cost allocation are aware of these differences. When combined with the fact that the Consent Decrees cannot be used as "evidence" of the allocations in them, Intervenors' expressions of concern should be given little weight.

**B.      The Consent Decrees' Additional Protection Against Settling Defendants' Use Of The Allocations In Other Forums Are Lawful.**

In addition to the limitations on the use of the Consent Decrees as evidence in Fed.R.Evid. 408 or as admissions in Paragraph 5 of the Consent Decrees, the Decrees further preclude Settling Defendants from using the allocations in any other forum:

> Nor shall the Settling Parties cite or use this settlement or the Path C NRD allocation results to contend that they are relevant to, or determinative of, their share of remedial action or response costs, including but not limited to in any allocation of liability conducted by or among the Settling Parties or other PRPs or in any judicial or

---

[31] FMC's argument includes the bare suggestion that the allocations in those decrees have been "put at issue" by Intervenors themselves, and thus the Court's approval of the Consent Decrees somehow would give the allocations more weight. Dkt. No. 112, FMC Br. at 33. This makes no legal sense, as the Court's final judgments in this matter would be the Consent Decrees themselves, which contain the limitations *supra* on their use and are subject to FRE 408.

Plaintiffs' Reply Supporting Mot. To Enter        41

> administrative proceeding concerning remedial action or response costs, except in rebuttal to another PRP's use of the Path C NRD allocation results.

Dkt. No. 4-1 ¶ 91; Dkt. No. 11-1 ¶ 23. The above language specifically precludes use of the Consent Decrees by Settling Defendants in the ongoing response cost allocation to further protect the participants in that allocation that are not Settling Defendants here. Dkt. No. 85-3, Pl. RTC at 30.

Intervenors raise two concerns with this language. First, they claim that the above language may not be an enforceable, citing the opinion in a motion to enter a consent decree regarding natural resource damages claims in *Washington v. United States*, No. CIV. 06-05225, 2007 WL 3025843 (W.D. Wash. Oct. 15, 2007). In that case, however, the language at issue was: "This Consent Decree shall not be used against any Party in any action or proceeding other [than] to enforce the terms of this Consent Decree." *Id.* at *10 (internal citations omitted). The court explained its objection to that language as follows:

> The Court cannot and should not prohibit the use of the Consent Decree in future actions. The Consent Decree is part of the record accessible by the public, and the Court is aware of no legal authority, or for that matter any sensible public policy, that supports preventing the use of the Consent Decree by parties in future actions. The rules and laws of evidence will guide any court hearing any future case.

*Id.* As explained in Plaintiffs Response to Comments, by contrast, the provision in the Consent Decrees here binds only Settling Defendants, not outside parties. Dkt. No. 85-3, Pl. RTC at 30.

To this, Arkema responds that Judge Bryan's language is "sweeping," by which it apparently means that Judge Bryan necessarily ruled that no limitations on prospective uses of a consent decree are allowable, even if they apply only against the parties to the decree. But that is not what the opinion says. The opinion notes with approval two other limitations on future uses

Plaintiffs' Reply Supporting Mot. To Enter        42

of that consent decree. First, it takes note of "a provision precluding the use of the Consent Decree as evidence of an admission of liability on the part of the United States." 2007 WL 3025843, *10. This is much like the provision in Paragraph 5 of the Consent Decrees precluding their use as admissions. Second, the opinion notes that in "any future case," use of the consent decree will be subject to "[t]he rules and laws of evidence." *Id.* Thus, the *Washington* case agrees that limitations to future uses of a consent decree discussed *supra* in Section IV.A. are allowable.

In this context of allowable limitations on the prospective uses of consent decrees, the specific defect with the provision in *Washington* was that it sought to impose limitations on the future use of the consent decree beyond the parties that had negotiated the consent decree. This is evident in the court's reference to the "public" and to "parties in future actions," by which the court clearly was referring to persons that were not parties to the agreement in the consent decree. 2007 WL 3025843, *10. By contrast, the provision questioned by Intervenors does not apply to the public or "parties" beyond Settling Defendants. *See, e.g., Pacific Railroad v. Ketchum*, 101 U.S. 289, 297 (1879) ("Parties to a suit have the right to agree to anything they please in reference to the subject-matter of their litigation, and the court, when applied to, will ordinarily give effect to their agreement, if it comes within the general scope of the case made by the pleadings."). Intervenors are purely speculating when they argue that the *Washington* court would have found this much narrower provision unenforceable. As Plaintiffs' Response To Comments points out, subsequent to the *Washington* opinion, several consent decrees have been entered in the Western District of Washington with language very similar to the provision at issue in the Consent Decrees. Dkt. No. 85-3, Pl. RTC at 30–31 & n.71.

Plaintiffs' Reply Supporting Mot. To Enter    43

Intervenors' second concern is that the provision, which does not bind parties (other than Settling Defendants) to the response cost allocation, would not prevent Consent Decrees from being used by those parties.[32] FMC Br. at 35.  This hypothetical seems strained.  Settling Defendants have committed not to use the Consent Decrees in such a fashion.  Dkt. No. 4-1 ¶ 91; Dkt. No. 11-1 ¶ 23.  Intervenors say they oppose such usage.  Which parties would seek to do so?  And even if this were to happen, why would the Consent Decrees have any weight?  As explained above, they are not evidence, they are not admissions, they contain allocations of liability for natural resource damages but not response costs, and as settlements, they are not treated as determinations regarding the underlying facts.  *See In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution*, 712 F. Supp. 1019, 1028 (D. Mass. 1989) ("Settlements are to be encouraged and the court does not 'have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute.'" (*quoting City of New York v. Exxon Corp.,* 697 F. Supp. 677, 692 (S.D.N.Y. 1988))).

In short, the Federal Rules of Evidence, the terms of the Consent Decrees, general legal practice, and the differences between response costs and natural resource damages all would weigh against any party in the response cost allocation making any meaningful use of the Consent Decrees.  Beyond variations on the truism that one never knows what might happen, Intervenors' briefs demonstrate nothing to the contrary.

---

[32] Arkema suggests that even Settling Defendants might do this because "the non-settling defendants have no independent ability to enforce the provisions of those decrees."  Dkt. No. 111, Arkema Br. at 28 n.2.  This is far-fetched.  An attempt by Settling Defendants to make affirmative use of the Consent Decrees in the response cost allocation, in direct violation the terms of those same Consent Decrees which the Settling Defendant had negotiated and agreed to, would only invite a loss of their own credibility in the response cost allocation.

Plaintiffs' Reply Supporting Mot. To Enter       44

**C.    Entry Of The Consent Decrees Is Consistent With The United States' Motion To Stay Litigation Of Related Claims In The *Yakama Nation* Lawsuit.**

Having failed to affirmatively articulate how the Consent Decrees might be used to disrupt the response cost allocation, Arkema and FMC argue that the United States has made their case for them in its motion to stay the related litigation in *Confederated Tribes & Bands of the Yakama Nation v. Airgas USA LLC*, 435 F. Supp. 3d 1103 (D. Or. 2019).  Dkt. No. 111, Arkema Br. at 28–32; Dkt. No. 112, FMC Br. at 31-33.  They argue that the United States' briefs, which sought a stay to avoid the disruption that litigation of that case would cause to the response cost allocation, should be read to mean that a settlement of this related case would be equally disruptive to the response cost allocation.  This, despite the fact that the quoted portions of the brief specifically refer to "litigation" and not "settlement."

To begin, Plaintiffs and Intervenors agree that there is a significant overlap of both parties and issues in the *Arkema* litigation, the *Yakama Nation* litigation, and this case.  Dkt. No. 86, Plaintiffs' Notice of Related Cases; *Yakama Nation*, 435 F. Supp. 3d at 1128.  "Common issues include determining which potentially responsible parties released which particular hazardous substances; when the releases occurred; the nature and frequency of the releases; and the eventual fate of the hazardous substances contained in the releases."  435 F. Supp. 3d at 1128.  As the Court then explained, litigating those common issues in the *Yakama Nation* case could well "disrupt or even derail" the response cost allocation through "cascading litigation" among potentially hundreds of parties, leading to judicial determinations of common issues that were inconsistent with the negotiations in the response cost allocation.  *Id*.  The Court found that these risks, and the interest of judicial economy to allow settlement, strongly favored a stay.  *Id*.

The United States' briefs in that case track this view.  The opening brief noted that the claims for response costs and natural resource damages in the *Arkema* and *Yakama Nation* cases

Plaintiffs' Reply Supporting Mot. To Enter        45

"arise out of the same releases or threated [sic] releases of hazardous substances" and "are based on some of the same information, *e.g.*, historical documentation."  Case No. 3:17-cv-00164, Dtk. No. 235, U.S. Opening Br. at 17.  The opening brief also emphasized the "significant hardship" to the United States and other parties if the case were litigated, which would require splitting resources between litigation and the response cost allocation.  The United States' reply brief was along the same lines.  It argued, "Given the significant overlap in facts and issues between this case and the response cost allocation process, *the progression of this litigation and any decision on the liability or allocation issues* would interfere with the consideration and resolution of those very issues in that allocation process, which was initiated well before this litigation."  Dkt. No. 280, U.S. Reply Br. at 8 (emphasis added).  Such interference argued in favor of a stay.  *Id.*

In response to Arkema's and FMC's comments on this issue, Plaintiffs' Response To Comments explained that settlement of claims in this case does not raise the same concerns as did litigating the claims in the *Yakama Nation* case, and that the United States' briefs in the *Yakama Nation* case were not to the contrary.  Dkt. No. 85-3, Pl. RTC at 30–31.  Arkema calls this explanation "revisionist history" and "not a fair characterization" of the United States' arguments, stating that "the United States took the broad view and focused on the overlap of parties and issues and not the mere fact of litigation."  Dkt. No. 111, Arkema Br. at 30–31.  FMC is similarly unflattering.  Dkt. No. 112, FMC Br. at 31-33.  These characterizations are long on entertaining pejoratives but short on substance.  The *Yakama Nation* opinion articulated, in granting the parties' motions to stay, why *litigating* that case would make the overlap of parties and issues problematic for the response cost allocation in the related *Arkema* case.  For the reasons *supra* in Sections IV.A and IV.B, Arkema and FMC have not made nearly the same

Plaintiffs' Reply Supporting Mot. To Enter        46

showing with respect to *settlement* of this case, and the United States' motion to stay briefs in the

*Yakama Nation* case certainly do not make that showing for them.

**V.      The Covenants And Other Terms Of The Consent Decrees Are Appropriate And Do Not Warrant Revision.**

Several Intervenors argue that the Consent Decrees' contribution protection afforded to

Settling Defendants should be scaled back.  Dkt. No. 111, Arkema Br. at 22–25; Dkt. No. 112,

FMC Br. at 24–25, 29–31; Dkt. No. 115, Gunderson Br. at 19–20.  Most of these requests to

modify the Consent Decrees are explicitly based on arguments addressed *supra*: whether it can

be known today if the quantum of damages in the formal damage assessment will be greater than

the estimate used for settlement; whether there are significant natural resource damages

downstream of the Assessment Area, and if the Trustees can or will include those damages in the

formal damage assessment; and whether harm to natural resources that occurs during remedial

action was accounted for in the Trustees' estimate of damages for this settlement.  *Supra* Section

I.C.  As explained above*,* examination of these arguments shows the estimate of total damages in

the HEA model is appropriate.  *Id.*   Therefore, Plaintiffs declined Intervenors' requests in their

public comments to modify the contribution protection provision in the Consent Decree in

response to the above arguments.  Dkt. No. 85-3, Pl. RTC at 36–38.

No further discussion of these arguments is needed beyond Section I.C. and the Response

To Comments, with one exception.  The thrust of Intervenors' arguments is that the above

concerns all threaten to produce natural resource damage claims significantly larger than the

HEA estimate used for settlement.  However, none of their briefs on this topic so much as

mentions the Consent Decrees' reopener provision, which allows the Trustees to assert additional

claims against Settling Defendants in such circumstances.  *Supra* Section I.D.  Given that the

reopener provision is discussed in response to the above concerns, Dkt. No. 85-3, Pl. RTC at 36–

Plaintiffs' Reply Supporting Mot. To Enter       47

38, Intervenors' failure to address that point in their briefs undercuts their argument that the provisions of the Consent Decrees, as written, are insufficient to address this concern.

The last contribution protection issue is raised by Arkema, regarding the effect of contribution protection in the Consent Decrees on NRD claims pursued by the Yakama Nation. Dkt. No. 111, Arkema Br. at 24–25.  Referencing Plaintiff's Response To Comments on this issue, Arkema argues that the broad grant of contribution protection is inconsistent with Plaintiffs' explanation that Settling Defendants could, in certain circumstances, be subject to contribution claims stemming from the Yakama Nations' claim for natural resource damages. Arkema Br. at 24.

Arkema's discussion of this possibility misses two key points.  First, because the Consent Decrees resolve Plaintiffs' claims for natural resource damages, but not the Yakama Nation's claims, Settling Defendants are subject to suit directly by the Yakama Nation for natural resource damages.  Such claims would not be contribution claims brought under Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1).  Rather, they would be direct claims for natural resource damages brought under Section 107(a)(4)(C), 42 U.S.C. § 9613(a)(4)(C), and therefore the contribution protection provision in the Consent Decrees would not apply at all.  Instead, Settling Defendants could raise CERCLA's bar on double recovery of natural resource damages by different trustees in Section 107(f)(1), 42 U.S.C. § 9607(f)(1).  Plaintiffs' Response To Comments excerpt quoted in Arkema's brief is part of a fuller explanation on this topic.  *See* Dkt. No. 85-3, Pl. RTC at 38–39.

Second, if a Settling Defendant here was not sued directly by the Yakama Nation for natural resource damages but was brought into the case as a third-party defendant via a contribution claim, the same double recovery provisions would apply, albeit indirectly.  Dkt. No.

Plaintiffs' Reply Supporting Mot. To Enter        48

85-3, Pl. RTC at 38–39.  But because the fundamental limitation on any potential recovery in such a suit is driven by CERCLA's double recovery prohibition and not the contribution protection provision in the Consent Decrees, modification of that provision is not warranted.  *Id.*

**VI.    NW Natural's Erroneous Understanding of Joint and Several Liability Under CERCLA Also Colors Its Understanding Of The Consent Decrees' Resolution Of Claims Against Settling Defendants.**

Much of NW Natural's brief is directed at the issues in Section III regarding the public record's support for the allocations in the Consent Decrees.  Dkt. No. 119, NW Natural Br. at 1-2, 7-13.  As explained *supra*, NW Natural's arguments on this issue are addressed in conjunction with the arguments asserted by FMC and Gunderson.  *Supra* at 23 n.14.

This section addresses an argument raised only by NW Natural: that liability under CERCLA for natural resource damages is several only, rather than joint and several.  Dkt. No. 119, NW Natural Br. at 4, 13-15.  This apparently necessitates, in NW Natural's view, the Court's review of the minutiae of the Trustees' allocations to determine, in fine detail, each Settling Defendant's precise responsibility for each identified footprint of contamination.  *See id*. at 12-13.

NW Natural's argument that liability for natural resource damages under CERCLA is several only is simply in error.  It is based only on two authorities: a citation to Section 107(a)(4)(C), which is CERLCA's provision imposing liability for natural resource damages, 42 U.S.C. § 9607(a)(4)(C), and a citation to *Ohio v. U.S. Dep't of Interior*, 880 F.2d 432 (D.C. Cir. 1989).  However, the discussion cited in *Ohio* pertains to the standard for proving the causation element on liability.  *Id*. at 472; *cf*. NW Natural Br. at 14.  This is different than whether liability under CERCLA for natural resource damages is several only or joint and several.

For trustees' CERCLA natural resource damage claims, every court addressing this issue – including the Ninth Circuit – has ruled that liability is joint and several, subject to the potential

Plaintiffs' Reply Supporting Mot. To Enter        49

showing that the harm is divisible or that there is a reasonable basis for apportioning the harm.[33]

*New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1234 (10th Cir. 2006); *California v. Montrose Chem. Corp.*, 104 F.3d 1507, 1518 n.9 (9th Cir. 1997); *Coeur d'Alene Tribe v. ASARCO, Inc. (ASARCO I)*, 280 F. Supp. 2d 1094, 1119–20 (D. Idaho 2003).

NW Natural's request that the Court "find that liability for NRD is only several," rather than joint and several, NW Natural Br. at 15, is not well taken for yet another reason.  NW Natural's request mirrors that found to be without merit in *Arizona v. City of Tucson*, 761 F.3d 1005, 1009 (9th Cir. 2014), where intervenors had requested a judicial declaration "that the State could not, in the future, hold [them] jointly and severally liable" for CERCLA remediation costs. In upholding the district court's rejection of that request, the Ninth Circuit observed that requests for such declarations "are not properly before the court if raised only in passing," such as in a "brief opposing the State's motion to enter the consent decrees."  *Id.* at 1010 (stating that the proper way to have raised such a request would have been through a "separate action seeking such relief" or by including the request for relief in the pleading supporting intervenors' motion to intervene, for which there was a complaint).[34]  Thus, the *City of Tucson* intervenors' request that the district court order that NRD liability is only several "was not properly before the district court."  *Id.*  Likewise, NW Natural's request is not properly before this Court and should not be entertained.

---

[33] NW Natural is correct that the legal standard for causation is not clearly established.  *See Natural Resource Damages Under CERCLA And OPA*, 53 ELR 10569, 10578 (2024).  But whatever the standard for causation, liability, once established, is presumptively joint and several.  *Id.* at 10579.

[34] NW Natural, along with FMC, Gunderson and Arkema, did not file a Fed.R.Civ. P. 24(c) "pleading" in support of their motions to intervene.  Fed.R.Civ.P. 24(c) (stating that an intervention motion "must . . . be accompanied by a pleading that sets out the claim or defense for which intervention is sought").

Plaintiffs' Reply Supporting Mot. To Enter       50

NW Natural's mistaken view on joint and several liability under CERCLA seems to explain, at least in part, its insistence that any NRD settlement specify precisely the liability of each settling party. *See* Dkt. No. 119, NW Natural Br. at 12–13. Its theory seems to be that, if liability always is several, there must be a precise understanding of the scope and basis of each potentially responsible party's liability in order to avoid CERCLA's bar on double recovery of natural resource damages in 42 U.S.C. § 9607(f)(1). *See id.* But contrary to this view, courts have noted that, in conjunction with the provisions regarding the effect of settlement on non-settlors in 42 U.S.C. § 9607(f)(1), contribution claims function effectively because liability is joint and several. *Acushnet IV*, 712 F. Supp. at 1027 & n.11.

## VII.    The Public Interest Favors Entry Of The Decrees.

Putting all of Intervenors' arguments together would set an impossible standard for settling natural resource damage claims to achieve early restoration at Superfund sites, especially large and complex sites. Early restoration could not occur unless there were no plans for a later formal assessment (despite the fact that the most appropriate sites for formal assessments are large and complex), the EPA remedy was almost fully implemented, and the allocation negotiations were fully disclosed (which would discourage candid discussions needed for settlement). In effect, Intervenors ask the Court not just to consider the effects of settlements on non-settlors, but to prioritize them above all other considerations. This is contrary to the intent of Congress, which the caselaw explains is to favor and prioritize settlements to achieve cleanup and restoration as soon as possible. While courts must consider the effect of settlements on non-settlors, those effects may include, within very wide limits, allocations under which "potentially responsible parties who do not enter into early settlement agreements may ultimately bear a disproportionate share of the CERCLA liability." *City of Tucson*, 761 F.3d at 1011. *See also*

Plaintiffs' Reply Supporting Mot. To Enter        51

*Acushnet IV*, 712 F. Supp. at 1027 (Congress's intention was to encourage settlements and reduce litigation that diverts resources from cleanup and restoration).

The Consent Decrees negotiated by the Trustees have all the hallmarks of a desirable early settlement. All potentially responsible parties were invited to join the early settlement process, and although most did not, many did. The process included jointly agreed-upon activities, including some early site-specific injury studies. The Trustees created a technical injury and allocation model that they applied to maintain consistency. Concurrent with the negotiations with responsible parties, the Trustees engaged interested restoration project developers and the public, with the result that all restoration projects in the Consent Decrees already are providing public benefits. *See* Dkt. No. 85-3, Pl. RTC at 84, 109, and 112-114 (describing the Trustees' restoration planning process and the role played by the public). The Consent Decrees therefore significantly advance the public interest, and any adverse effects on non-settlors are not so "disproportionate" that they should block this Court's approval of the proposed settlement.

Respectfully submitted,

UNITED STATES OF AMERICA

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
Washington, D.C.  20530

Plaintiffs' Reply Supporting Mot. To Enter        52

s/ Michael J. Zevenbergen
MICHAEL J. ZEVENBERGEN
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice, c/o NOAA
7600 Sand Point Way, NE
Seattle, Washington 98115
(202) 276-0037
Michael.Zevenbergen@usdoj.gov


STATE OF OREGON

DAN RAYFIELD
Attorney General
State of Oregon Department of Justice


s/ Christina L. Beatty-Walters
CHRISTINA L. BEATTY-WALTERS #981634
SADIE FORZLEY #151025
Senior Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, Oregon 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov
Sadie.Forzley@doj.oregon.gov


CONFEDERATED TRIBES OF THE GRAND RONDE
COMMUNITY OF OREGON


s/ Holly Partridge
HOLLY PARTRIDGE
Senior Staff Attorney
The Confederated Tribes of Grand Ronde
9615 Grand Ronde Road
Grand Ronde, OR 97338
(503) 879-2335


Plaintiffs' Reply Supporting Mot. To Enter        53

CONFEDERATED TRIBES OF THE SILETZ INDIANS


 s/ Julie A. Weis
JULIE A. WEIS
Haglund Kelley LLP
2177 SW Broadway
Portland, OR  97201
(503) 225-0777


CONFEDERATED TRIBES OF THE UMATILLA
INDIAN RESERVATION


 s/ Joseph R. Pitt
JOSEPH R. PITT
CTUIR Office of Legal Counsel
46411 Timíne Way
Pendleton, OR  97801
(541) 429-7404


CONFEDERATED TRIBES OF THE WARM SPRINGS
RESERVATION OF OREGON


 s/ Josh Newton
JOSH NEWTON
Best Best & Krieger LLP
360 SW Bond Street
Bend, OR  97702
(541) 318-9817

NEZ PERCE TRIBE


 s/ Courtney Johnson
COURTNEY JOHNSON
Crag Law Center
3141 E. Burnside St.
Portland, OR 97214
(503) 525-2728

OF COUNSEL:

Ericka Hailstocke-Johnson
Attorney-Advisor
Office of General Counsel
Natural Resources Section
National Oceanic & Atmospheric Administration
501 W. Ocean Boulevard, Long Beach, CA 90802
Telephone: (562) 980-4070
E-mail: Ericka.Hailstocke-Johnson@noaa.gov

Date: September 2, 2025

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 2, 2025, a copy of the foregoing was served on all counsel of record using the Court's CM/ECF system.


   s/ Michael J. Zevenbergen          
MICHAEL J. ZEVENBERGEN

# Attachment A
# Second Declaration of Troy Baker

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE,<br><br>     Plaintiffs,<br><br>         v.<br><br>ACF INDUSTRIES, LLC; AIRGAS USA LLC; AIR LIQUIDE AMERICA L.P.; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.; BNSF RAILWAY COMPANY; CALBAG METALS CO.; CITY OF PORTLAND; ESCO GROUP LLC; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); GOULD ELECTRONICS INC.; HAJ, INC., D/B/A CHRISTENSON OIL COMPANY; HERCULES LLC; KOPPERS INC.; MCCALL OIL & CHEMICAL CORPORATION; MCCALL OIL REAL ESTATE COMPANY LLC; MOREC FRONT LLC; GWC PROPERTIES, LLC; GWC FRONT, LLC; TANKER BASIN LLC; MMGL LLC; NORTHWEST PIPE COMPANY (FKA NORTHWEST PIPE & CASING COMPANY AND NORTHWEST PIPE AND CASING COMPANY); PACIFICORP, AN OREGON CORPORATION; PORT OF PORTLAND; PORTLAND GENERAL ELECTRIC COMPANY (PGE); PORTLAND TERMINAL RAILROAD COMPANY; SCHNITZER STEEL INDUSTRIES, INC.; SILTRONIC CORPORATION; SULZER PUMPS (US) INC.; and VALVOLINE INC.,<br><br>     Defendants. | ))))))))))))))))))))))))))))))))))))))) | No. 3:23-cv-01603-SI<br><br>**SECOND DECLARATION OF TRO    A ER IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREES** |

Second Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees        1

1.      I am Troy Baker, and I make this Second Declaration in support of Plaintiffs'

Motion to Enter Consent Decrees in the matter of <u>United States of America, et al., v. ACF</u>

<u>Industries, LLC, et al.</u>  By this Declaration I explain additional information placed into the public

record for this matter that identifies the percentage of harm to natural resources caused by each

of the 12 contaminants of concern ("COCs") used in the Trustees' Habitat Equivalency Analysis

("HEA") model.  I also further explain the incentive for early settlement adopted by the Trustees

by setting certain injury assumptions in the HEA model, which is described in the Trustees'

Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement

(May 14, 2015).

<u>Information regarding the percentage contribution to total harm for each COC</u>

2.      My first declaration explained that the Trustees' HEA model estimated the total

ecological injury to Portland Harbor natural resources by calculating the injury caused by each of

12 COCs to those resources.  Dkt. No. 85-1, Declaration Of Troy Baker In Support Of Plaintiffs'

Motion To Enter Consent Decrees ("First Baker Decl.")   8.  As explained in Plaintiff's Motion

To Enter Consent Decrees ("Pl. Mot.), Dkt. No. 85, information in the public record for the

Consent Decrees allows the public to see which of the 12 COCs are associated with each Settling

Defendant's operations and activities on the properties identified in the Consent Decrees'

Appendix A for each Settling Defendant.  Dkt. No. 85, Pl. Mot. at 24  26.

3.      The Trustees placed this information in the public record to allow the public to

assess the allocations to Settling Defendants, but they refrained from making public more

detailed information about each Settling Defendant's allocation in order to preserve the

confidentiality of negotiations.  That more detailed information withheld from public disclosure

includes the amount of harm (measured by the HEA model in Discounted Service Acre Years, or

Second Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      2

"DSAYs,") caused by each COC for each Settling Defendant. Withheld information also includes, for Settling Defendants with more than one site assigned DSAYs, a breakdown of the number of DSAYs assigned to each site for that Settling Defendant. For properties owned or operated by a Settling Defendant that also were owned or operated by other parties, the breakdown of DSAYs assigned to a Settling Defendant versus other parties also was withheld as confidential.

4.      In the process of completing the public record for the Consent Decrees, the Trustees prepared in July 2023 a table showing the amount of harm (in DSAYs) to natural resources caused by each of the 12 COCs. That table also includes the number of DSAYs and the percentage of the total collectively allocated to the Settling Defendants for each COC. At the time the Consent Decrees were lodged with the Court for public comment, the Trustees decided not to include this table in the public record for two reasons. First, detailed information about Settling Defendants' operations, activities, and associated COCs already were included in the public record. Second, although the table does not directly identify any specific non-settling parties that contributed to the total harm to natural resources, it does identify the COCs most responsible for harm to natural resources at Portland Harbor    and by implication the associated non-settling parties in the industries that are likely the primary sources of those COCs.

5.      In view of the concerns and arguments raised by the non-settling parties seeking to intervene in the Motion To Enter Consent Decrees, the Trustees have added this July 2023 table to the public record.   *ee* Exhibit 1. Exhibit 1 shows that some COCs contributed much more to the harm to natural resources than other COCs, and that Settling Defendants have relatively little responsibility for the COCs most responsible for the total harm. Specifically, 70.4% of the harm in the HEA model (2,909 of 4,130 total DSAYs) was caused by four COCs:

Second Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees        3

dichloro-diphenyl-trichloroethane ("DDT"), its breakdown products dichloro-diphenyl-dichloroethane and dichloro-diphenyl-dichloroethylene (collectively called "DDx" chemicals), and polycyclic aromatic hydrocarbons ("PAHs").

6.    The allocations to Settling Defendants include 12.8 DSAYs for DDx COCs, or 1.0% of the harm caused by DDx COCs.

7.    For PAHs, Settling Defendants were allocated 151 DSAYs, which is 9.3% of the harm caused by PAHs.

8.    Combining the results for PAH and DDx COCs, Settling Defendants were allocated 163.8 of the 2,909 DSAYs, or 5.6% of the harm, caused by those contaminants.

9.    With respect to the harm attributable to the eight COCs other than PAHs or DDx contaminants, Settling Defendants were allocated 308 out of 1,221 DSAYs for those eight COCs, or 25.2% of the total harm from that group of COCs.

Early settlement incentive used by the Trustees

10.    A settlement incentive adopted by the Trustees was to pause the annual compounding of damages as of the year 2011.  That incentive is identified in the Trustees' Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement (May 14, 2015) ("Trustees' 2015 Summary") on page A-8.  As depicted on the graph on page A-9, losses to natural resources were calculated over time, beginning in 1981, and ending in 2100. *ee also id*. at A-6, A-8  8.  The "current year" for the calculation of total losses was set at 2011, and the HEA model calculated total losses of 4,130 DSAYs for that year.  *d*. at A-8,    6, 9.

11.    Setting the "current year" at 2011 reduces the total losses calculated by the model when compared to later years.  The HEA model used a 3% annual discount rate.  Trustees' 2015

Second Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees    4

Summary at A-8 ¶ 9. This is because, as explained in more detail in Plaintiffs' Response To Comments, the longer an injury to natural resources occurs, the longer the harm compounds. Dkt. No. 85-3 at 8–9, 12–14. Therefore, the total injury as of 2011 has a lower value (in DSAYs) than in later years.

12. The Trustees chose 2011 as the "current year" because that was the approximate time by which the Trustees, working collaboratively with the Phase 2 parties, had developed a technically sound estimate of 4,130 DSAYs for settlement purposes. As an incentive to reach settlements, the Trustees allowed any party participating in the subsequent settlement process (which came to be called "Path C" and commenced in 2013) to resolve their liability using a total injury calculation as of 2011.

13. By way of comparison, if the "current year" were set to 2021 (the year in which the Trustees and the last Settling Defendant reached an agreement in principle on the number of DSAYs allocated to that Settling Defendant), the total harm would be compounded (by 3% per year) for an additional ten years. Thus, the HEA model would calculate the total injury to be 5,550 DSAYs. The 2011 calculation of 4,130 would reflect a 25.6% discount versus the 2021 calculation. As a further example, if the "current year" were set to 2023 (the year the Consent Decrees were signed and lodged), the HEA model would calculate the total injury to be 5,888 DSAYs. The 2011 calculation of 4,130 DSAYs would reflect a discount of 29.9% versus the 2023 calculation.

Signed under penalty of perjury on ___09/02___, 2025.

_____
Troy Baker

Second Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees        5

# Exhibit 1

# To Second Declaration Of Troy Baker

Second Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees     6

**Portland Harbor Natural Resource Damage Assessment**

Summary of Phase 2 DSAYs Allocated to Settling Parties, July 2023

| Substance of Concern[1] | Portland Harbor Assessment Area Phase 2 Discounted Service Acre-Years (DSAYs) | DSAYs Allocated to Settling Parties (2022)[2] | Total Percentage Allocated to Settling Parties |
|---|---|---|---|
| BEPH | 199 | 46.29 | 23% |
| CD | 9 | 4.92 | 57% |
| CU | 39 | 6.03 | 15% |
| DDD | 362 | 2.41 | 1% |
| DDE | 274 | 0.58 | 0.2% |
| DDT | 653 | 9.83 | 2% |
| HG | 52 | 3.16 | 6% |
| MP4 | 168 | 34.63 | 21% |
| PAH | 1620 | 151.02 | 9% |
| PB | 20 | 2.23 | 11% |
| PCB | 557 | 172.27 | 31% |
| TBT | 177 | 38.00 | 21% |
| **Grand Total** | **4,130** | **471.39** | **11.4%** |

1. Substances of concern include the following: bis(2-ethylhexyl) phthalate (BEPH), cadmium (Cd), copper (Cu), pesticides including dichloro-diphenyl-trichloroethane and its breakdown products dichloro-diphenyl-dichloroethane and dichloro-diphenyl-dichloroethylene (DDx), mercury (Hg), 4-methyl phenol (MP4), polycyclic aromatic hydrocarbons (PAHs), lead (Pb), polychlorinated biphenyls (PCBs), and tributyltin (TBT).

2. Settling parties include the following: Airgas USA, LLC; Air Liquide America L.P., also known as Air Liquide America Limited Partnership; ACF Industries LLC; Ash Grove Cement Company; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Company; City of Portland; ESCO Group LLC; EVRAZ Inc. NA; Gould Electronics Inc.; HAJ, INC. d/b/a Christenson Oil Company; Hercules, LLC and related entites Ashland, LLC and Valvoline, LLC; Koppers Inc.; McCall Oil and Chemical Corporation and related entities McCall Oil Real Estate Company LLC, Morec Front LLC, GWC Properties LLC, GWC Front LLC, and Tanker Basin LLC; MMGL, LLC; Northwest Pipe Company; PacifiCorp; Port of Portland; Portland General Electric Company; Portland Terminal Railroad Company; Schnitzer Steel Industries, Inc.; Siltronic Corporation; and Sulzer Pumps (US) Inc.