No. 25-8129

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA; et al.,

*Plaintiffs-Appellees*,

v.

ARKEMA INC., by and through its agent, Legacy Site Services LLC,

*Intervenor-Appellant,*

v.

ACF INDUSTRIES, LLC; et al.,

*Defendants-Appellees,*

GUNDERSON, LLC; et al.,

*Intervenors.*

On Appeal from the U.S. District Court for the District of Oregon
Case No. 3:23-cv-1603-SI
Hon. Michael H. Simon

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 4 OF 6

Matthew J. Stock
Jessica C. Kerr
HILLIS CLARK MARTIN &
PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
(206) 623-1745
Email: matthew.stock@hcmp.com
Email: jessica.kerr@hcmp.com
*Attorneys for Legacy Site Services LLC,*
*agent for Appellant Arkema Inc.*

Patricia M. Dost, OSB No. 902530
pdost@pearllegalgroup.com
Heather Tourgee, OSB No. 244304
htourgee@pearllegalgroup.com
Pearl Legal Group PC
529 SW Third Avenue, Suite 600
Portland, OR  97204
Telephone: (503) 467-4675
**Counsel for Intervenor NW Natural**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE,<br><br>          Plaintiffs,<br><br>     v.<br><br>ACF INDUSTRIES LLC; AIRGAS USA LLC; AIR LIQUIDE AMERICA L.P.; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.: BNSF RAILWAY COMPANY; CALBAG METALS CO.; CITY OF PORTLAND; ESCO GROUP LLC; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); GOULD ELECTRONICS INC.; HAJ, INC., D/B/A | Case No. 3:23-cv-1603-SI<br><br>**INTERVENOR NW NATURAL'S OPPOSITION TO MOTION TO ENTER CONSENT DECREES** |

PAGE 1 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

CHRISTENSON OIL COMPANY;
HERCULES LLC; KOPPERS INC.;
McCALL OIL & CHEMICAL
CORPORATION; McCALL OIL REAL
ESTATE COMPANY LLC; MOREC
FRONT LLC; GWC PROPERTIES, LLC;
GWC FRONT, LLC; TANKER BASIN LLC;
MMGL LLC; NORTHWEST PIPE
COMPANY (fka NORTHWEST PIPE &
CASING COMPANY AND NORTHWEST
PIPE AND CASING COMPANY);
PACIFICORP., an Oregon Corporation;
PORT OF PORTLAND; PORTLAND
GENERAL ELECTRIC COMPANY (PGE);
PORTLAND TERMINAL RAILROAD
COMPANY; SCHNITZER STEEL
INDUSTRIES, INC.; SILTRONIC
CORPORATION; SULZER PUMPS (US)
INC.; and VALVOLINE INC.,

        Defendants.

Intervenor NW Natural hereby opposes Plaintiffs' Motion to Enter Consent Decrees on the following grounds.

## I.    <u>INTRODUCTION</u>

Plaintiffs, trustees of natural resources associated with the Portland Harbor Superfund Site ("Site"), seek entry of two proposed CERCLA natural resource damage ("NRD") consent decrees memorializing settlements of Defendants' NRD liability. Judicial review of consent decree settlement requires "independent scrutiny" which necessitates sufficient information to allow that scrutiny. *See, e.g., Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014).

In the absence of any record to support a determination that settlements memorialized in those decrees are fair, reasonable and adequate to compensate the public for lost and damaged resources. Plaintiffs offer the Court only crumbs of information: a declaration describing the

PAGE 2 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR 97209
TELEPHONE 503-467-4675

process and model used to estimate NRD and reach settlement, and two appendices to the consent decrees that identify locations where each Defendant owned or operated property or a facility that allegedly released hazardous substances that caused NRD. Unfortunately, these crumbs are insufficient to create a path the Court can follow in undertaking the scrutiny required when reviewing settlements memorialized in consent decrees.

NW Natural is a non-settling potentially responsible party ("PRP") at the Site. NW Natural's connection to the Site stems from its operation of a manufactured gas plant at approximately river mile 6.1 on the west side of the river from 1913 to 1956. Over the 25 years since the identification of Portland Harbor as a Superfund site, NW Natural has worked consistently and cooperatively with EPA and other PRPs, taking a major role in the investigation of contamination and drafting of a feasibility study identifying possible remedial actions. NW Natural currently is completing remedial design for three project areas within the Site and is negotiating with EPA and the United States Department of Justice toward a remedial action consent decree.

Concurrent with its involvement in the response work at Portland Harbor, NW Natural also worked cooperatively with the Plaintiffs to evaluate potential NRD at the Site. In January 2007, Plaintiffs began a natural resource damage assessment ("Assessment"), conducting it in phases and in cooperation with certain PRPs. Restoration Credit Consent Decree at 8, ECF No. 4-1; Cash-Out Consent Decree at 5, ECF No. 11-1. NW Natural provided funding for and participated in the phased NRD assessment in cooperation with Plaintiffs and began settlement negotiations in Phase 2. Those negotiations had not concluded at the time Plaintiffs commenced this action, nor by the time Plaintiffs filed their Motion to Enter.

PAGE 3 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR  97209
TELEPHONE 503-467-4675

ER-528

NW Natural cites this background to establish its long-term cooperation in the Portland Harbor remedial and NRD processes. NW Natural did not take the decision to oppose the Motion to Enter lightly. However, due to the lack of evidence provided by Plaintiffs, NW Natural cannot discern what liability for NRD remains unsettled, or whether the settlements memorialized in the Consent Decrees are fair, reasonable and adequate. If they are not, then entry of the Consent Decrees grants contribution protection to each Settling Defendant based on unidentified damage to natural resources caused by unidentified hazardous substances released by each Defendant at undefined locations, leaving NW Natural with no remedy in contribution against the numerous settling Defendants as well as no understanding of what NRD they actually settled.

Moreover, Plaintiffs allege joint and several liability for all NRD in the Assessment Area, and offer as support for their settlements the suggestion that if the settlements amounts do not correspond to the Defendants' actual liability, joint and several liability will allow Plaintiffs to recover the unaccounted-for damages. Complaint ¶¶ 27, 34 and 42 (ECF No. 1); Response to Public Comments at 51 (ECF No. 85-3). The Court should find that joint and several liability does not apply in the NRD context and not allow Plaintiffs to justify their settlements, or evade review of the evidence supporting those settlements, under that theory.

The information provided with the Motion for Entry does not justify a conclusion that the proposed Consent Decrees are fair, reasonable and consistent with CERCLA. As the Court cannot undertake the analysis required of it without this information, the Motion to Enter must be denied.

PAGE 4 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR  97209
TELEPHONE 503-467-4675

ER-529

## II.    STANDARD OF REVIEW FOR CONSENT DECREE ENTRY

This Court's duty in reviewing the two NRD Consent Decrees is to ensure, based on a thorough and independent evaluation of the evidence, that the settlements are fair, reasonable, and consistent with CERCLA. *See City of Tucson*, 761 F.3d at 1012 (citing *United States v. Montrose Chem. Corp. of California*, 50 F.3d 741, 746-47 (9th Cir. 1995)) (holding that the district court abused its discretion in entering consent decree without necessary "independent scrutiny" and in the absence of sufficient information to support the settlement's terms). In evaluating a consent decree's fairness, both substantive and procedural fairness must be considered. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 (1st Cir. 1990). Procedural fairness requires a court "attempt to gauge [the] candor, openness, and bargaining balance" of the negotiating process. *Id*. "Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Id*.

Settlements reached by government entities are typically afforded deference. *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir 1990). This deference does not mean that a court may simply "rubberstamp" the settlement; rather, reviewing courts must weigh the advantages of early settlement against the risks of approving a deficient consent decree. *Cannons*, 899 F.2d 79, 84 (1st Cir. 1990). That is no less true where a court is tasked with reviewing scientific or technical evidence to ensure that it forms a rational basis for settlement. *See, e.g.*, *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409 (6th Cir. 1991) (judicial review of a CERCLA consent decree must, notwithstanding the deference due to government agency settlements, be "thorough and penetrating"). Indeed, even when employing a deferential standard of review, "'the more technical the case, the more intensive must be the court's efforts to understand the

PAGE 5 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR  97209
TELEPHONE 503-467-4675

ER-530

evidence….'" *Id.* (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1975)).

The Ninth Circuit has adopted the requirement that district courts have enough information to view a CERCLA consent decree in its full evidentiary context; that is, a court must be able review the settlement and supporting evidence with the requisite scrutiny to determine that the settlement is fair, reasonable, and consistent with CERCLA itself. *See, e.g.*, *City of Tucson*, 761 F.3d at 1012 ("The district court must actually engage with that information and explain in a reasoned disposition why the evidence indicates that the consent decrees are substantively fair, reasonable, and consistent with CERCLA's objectives.") (internal citations omitted); *Montrose*, 50 F.3d at 746 (noting that the appropriate measure of deference due "'depends on the persuasive power of the agency's proposal and rationale'") (quoting *Cannons*, 899 F.2d at 84).

In particular, the settlement must also be fair to the non-settling PRPs. *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142 (9th Cir. 2010) (quoting *Cannons*, 899 F.2d at 87). This fairness to the non-settling parties can only be evaluated if liability has been apportioned in light of "some acceptable measure of comparative fault." *Id.* The same is true for a court's evaluation of the reasonableness of the settlement. Reasonableness speaks to (1) the settlement's efficiency in effectuating a cleanup, (2) the compensation of the public for the actual and anticipated costs of cleanup, and (3) the relative strength of the parties' litigation positions. *Cannons*, 899 F.2d at 89-90. These factors are impossible to evaluate without a rational explanation of, among other things, the fault of the settling parties, and the harm for which each PRP is responsible. *See City of Tucson*, 761 F.3d at 1012-14 (where the district court's opinion lacked a thorough analysis of each party's comparative liability, essentially deferring to the State's representation that the settlement had basis in sound facts and methodologies, the court failed to "fulfill its

PAGE 6 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR  97209
TELEPHONE 503-467-4675

ER-531

responsibilities to independently assess the adequacy of the agreements and provide a reasoned explanation for its decision.").

### III.    ARGUMENT

**A.    The Absence of Key Pieces of Information About the Settlements Renders Judicial Scrutiny Impossible.**

NW Natural does not take a position and reserves its rights regarding the procedural fairness of the settlements embodied in the Consent Decrees.[1] This argument focuses on Plaintiffs' failure to provide sufficient information to allow the Court to deem the settlements substantively fair.

To prove liability for natural resource damages, CERCLA requires that trustees show not just that a defendant released hazardous substances, but that an injury resulted from the defendant's release. 42 U.S.C. 9607(a)(4)(C). In order to make a case for liability of and settlement with PRPs, Plaintiffs explain that they identified hazardous substance "footprints" in river sediments and each Defendants' release from its operations or property of a hazardous substance present in these footprints. Baker Decl. ¶¶ 8-14, ECF No. 85-1. Given Plaintiffs' choice to substitute a Defendant's connection to a footprint (*i.e.,* that a Defendant released a hazardous substance that also is present at a specific footprint) for more explicit proof of causation of damages, it is important to understand which footprints and which hazardous substances in which quantities are covered by each Defendant's settlements in order to evaluate

---

[1] Plaintiffs' description in the Baker Declaration (ECF No. 85-1) of their process for determining natural resource damages and reaching settlements with the defendants has the air of fairness, but in the absence of the information discussed below that is needed to review substantive fairness, it is impossible to discern if this is true. For example, as discussed below, if Plaintiffs have no information to provide about which footprints are being settled (as opposed to merely omitting that information from evidence in support of their Motion), then the settlements also may be procedurally unfair.

PAGE 7 – NW NATURAL'S OPPOSITION TO MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR  97209
TELEPHONE 503-467-4675

the fairness and adequacy of the settlements.

Plaintiffs provided no evidence to allow the Court to do so, however. The information provided by Plaintiffs, which consists only of allegations of the Complaint and statements in the proposed Consent Decrees, merely identifies (1) where a Defendant operated a facility or owned property near or in the Assessment Area, (2) the commercial activities the Defendant conducted at the facility/property, and (3) the amount of a settlement. Plaintiffs suggest their Administrative Record contains information that supports the settlements, but they do not provide it to the Court and note that the Record does not contain information demonstrating how Plaintiffs determined the Defendants' liability. Motion to Enter at 24-25, ECF No. 85. Thus, it is not clear where the hazardous substances released by each Defendant have caused damage (*i.e. which footprints are being settled for each Defendant*), which resource(s) was/were damaged by that Defendant's hazardous substances, and how much damage occurred within each "footprint."

To appreciate the import of this informational void, it is helpful to understand the contrast between this Site and a typical land-based Superfund site. Plaintiffs identified a geographic area associated with the Portland Harbor Superfund Site in which to evaluate damage to or loss of and pursue recovery of natural resource damage, referred to by Plaintiffs as the Portland Harbor Natural Resource Damage Assessment Area ("Assessment Area"). Baker Decl. ¶ 8, ECF No. 85-1. The Assessment Area "includes the waters, shoreline, intertidal areas, and bottom sediments, of the Willamette River, including Swan Island Lagoon, from approximately River Mile 12.3 to approximately River Mile 0.8, as well as the upper 1.2 miles of the Multnomah Channel." Compl. ¶ 17, ECF No. 1. Plaintiffs are seeking to settle, via the proposed Consent Decrees, all of Defendants' liability for natural resource damages in the entire Assessment Area. Cash-Out Consent Decree at 15, ECF No. 11-1; Restoration Credit Consent Decree at 20-21 ECF No. 4-1.

PAGE 8 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR 97209
TELEPHONE 503-467-4675

In other words, Plaintiffs seek Court approval to settle claims covering approximately a 12-mile-long area that includes a river that carries some of the hazardous substances far from where they were released without providing information about the core subject matter of the settlement: for each Defendant, which footprints are being settled and which hazardous substances and damages are correlated with them.[2] These are basic and fundamental components that must be known in order to determine whether the settlements are fair, reasonable and consistent with CERCLA.

Plaintiffs also note that a few hazardous substances were treated differently in their settlements with Defendants. Baker Decl. ¶ 13, ECF No. 85-1. For these few COCs that Plaintiffs deemed "ubiquitous and diffuse," settlements were based on multiple Defendants' contributions of those COCs to a single footprint. NW Natural presumes that, within the context of Plaintiffs' procedures, "ubiquitous and diffuse" refers to hazardous substances that are (i) found in a large majority of footprints, and (ii) were present at the property or facility of a large majority of the Defendants, but the phrase is undefined. Other than polycyclic aromatic hydrocarbons ("PAHs"), Plaintiffs do not identify which hazardous substances received this treatment. They also do not identify which footprints were treated in this manner, or whether the settlements, by dividing causation and liability *within* individual footprints in this manner, actually resolve *all* liability associated with a given footprint. No information is available to the Court to allow it to make these observations or to determine whether the liability associated with

---

[2] In their Response to Public Comments, Plaintiffs indicate documents in the Administrative Record that one could use to identify which hazardous substances Plaintiffs correlated with different types of industrial activities, and separate documents that identify each Defendants industrial activities, but the documentation does not appear to indicate that any given Defendant is settling its liability for *all* hazardous substances given that information is not provided about the associated footprints to which hazardous substances are connected. Pls.' Responses to Public Comments, at 64, ECF No. 85-3.

PAGE 9 – NW NATURAL'S OPPOSITION TO MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR 97209
TELEPHONE 503-467-4675

a footprint is fairly apportioned among the Defendants who were deemed jointly liable at these footprints.

**B.      The Court Cannot Assess Comparative Fault**

Central to the required fairness and reasonableness evaluations is whether the terms of a CERCLA consent decree are justified—even in imprecise terms—by a rational connection between the settling party's liability at the site and the amount for which that party is settling. *City of Tucson*, 761 F.3d at 1012 (9th Cir. 2014) (quoting *United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996)). This analysis necessarily requires a court reviewing an NRD settlement to consider the relationship between the comparative fault of the settling party and the proportionate shares of the settling PRPs. The Plaintiffs have not identified information that allows the Court to compare the estimated damage caused by each Defendant's hazardous substances to the settlement amount the Court is asked to approve. Rather, Plaintiffs state that any discounts to liability were included in the assessment but provide no explanation of that effect. Pls.' Responses to Public Comments,  51, ECF No. 85-3.

Without such information, the Court cannot determine if the settlements are substantively fair. *See Washington v. United States*, No. 06-05225RJB, 2007 WL 3025843 at *7 (W.D. Wash. Oct 15, 2007) (writing that agencies must supply a plausible explanation for measuring comparative fault and allocating liability; in other words, an agency must "weld[] some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs") (quoting *Cannons*, 899 F.2d at 87); *United States v. Fort James Operating Co.*, 313 F. Supp.2d 902, 908 (E.D. Wisc. 2004) ("The terms of a consent decree are substantively fair if they are based on the comparative fault and if liability is apportioned in relation to rational estimates of the harm each party has caused.").

PAGE 10 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR  97209
TELEPHONE 503-467-4675

C.      **Deference Accorded to Governmental Consent Decrees Does Not Override the Obligation to Scrutinize Them**

Plaintiffs may argue that their decision to enter these settlements is entitled to deference, but they cannot rely on the deference accorded to CERCLA settlements to overcome an absence of evidence – that is not a benefit of deference. The Sixth Circuit helpfully explains the relationship between deference and the requirement to scrutinize a settlement:

> There is no inconsistency between the deferential standard of review and the requirement that the reviewing court involve itself in even the most complex evidentiary matters.... The close scrutiny of the evidence is intended to educate the court. It must understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made. The more technical the case, the more intensive must be the court's efforts to understand the evidence, for without an appropriate understanding of the case before it the court cannot properly perform its appellate function.

*Akzo Coatings*, 949 F.2d at 426 (reviewing a CERCLA consent decree; quoting *Ethyl Corp. v. EPA,* 541 F.2d 1, 36 (D.C. Cir.1975) (en banc)). A court must understand before it can defer. It need not review and approve every choice made along the way or even every detail that culminated in the agreed settlement amount, but it must understand the primary components of the settlement, something that cannot be accomplished based on the materials submitted to the Court. *Montrose*, 50 F.3d at 748 ("Deference, however, does not mean turning a blind eye to an empty record on a critical aspect of settlement evaluation.").

It is reasonable for Plaintiffs to provide the information that would allow the Court to undertake this evaluation - courts scrutinizing consent decrees in similar circumstances explicitly rely on it. For example, in *United States v. NCR Corp.*, No. 10-C-910,, 2017 WL 3668771 (E.D. Wisc. Aug. 23, 2017), the court, evaluating the river-based NRD consent decree at issue there, had full access to the governments' calculations for allocating shares. This included geographic

PAGE 11 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR 97209
TELEPHONE 503-467-4675

ER-536

considerations (*i.e.*, where in the river the defendant released hazardous substances, with upstream locations receiving a greater share), and the amount of hazardous substances discharged, among other metrics. There, the Trustees used a point scoring system for each metric and the court was provided with the number of points attributed to each Defendant for each metric, such that the court was able to examine how the Trustees arrived at the allocation of liability to each defendant. Though the court acknowledged that the point system was not necessarily reproducible and in some instances reflected qualitative rather than quantitative determinations, it was able to determine that the settlements in the proposed consent decrees were fair and reasonable. *Id*.

The requisite scrutiny, and the articulation by the Court of the basis for its determinations after that scrutiny, is valuable for another reason: future settlements, and possibly litigation with respect to the remaining NRD in the Assessment Area, may implicate these Consent Decrees and the liability they settled. Given the low percentage of NRD being settled in the Consent Decrees (11%), future settlements and litigation are expected. *See, e.g.,* Cash-Out Consent Decree ¶ II.R. (recognizing potential for future consent decrees). Review of those future settlements and litigation arguments likely will invoke and consider the settlements at issue in this case to confirm, for example, that there is no double-counting of damages or attempt to hold a PRP responsible for already-settled NRD. *See* 42 U.S.C. 9607(f)(1) (double recovery of NRD prohibited). If the current Consent Decrees provide no basis for linking the settlements to any given footprints, hazardous substances or damages, then review of future settlements (or review of litigation arguments about the scope of available damages) will be difficult and require significant speculation.

PAGE 12 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR 97209
TELEPHONE 503-467-4675

ER-537

As the lack of information on core components of the settlements prevents the required scrutiny, the Court should deny the Motion to Enter and instruct that any renewed motion should include:

- Which footprints are subject to the settlements and which are not;

- Which footprints are associated with each Defendant

- Which hazardous substance is associated with each footprint with which a Defendant is associated;

- As to each Defendant, information indicating whether any of its facilities, properties or operations in or near the Assessment Area are not associated with any footprints but are included in the settlements;

- If more than one Defendant or any non-settling PRPs are associated with the same footprint, how the DSAYs for that footprint are allocated between them;

- The natural resource(s) damaged by each Defendant's hazardous substance(s); and

- The number of PRPs (both settling and non-settling) believed to be responsible for natural resource damages.

**D.    <u>Plaintiffs' Reliance on Joint and Several Liability is Misplaced.</u>**

Plaintiffs may argue that any discrepancies between any Defendant's individual liability and their settlements, or the absence of information supporting the settlements, does not matter because liability for NRD is joint and several and they ultimately will recover the full amount of NRD from non-settling PRPs. *See* Plaintiffs' Responses to Public Comments at p. 52, ECF No. 85-3 ("Once the combined relief from all settlements is deducted from the total quantum of

PAGE 13 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR  97209
TELEPHONE 503-467-4675

natural resource damages, non-settling potentially responsible parties would face joint and several liability for the remaining unresolved natural resource damages.").

Under Section 107(a)(4)(C) of CERCLA, PRPs are liable for damages for injury to natural resources "resulting from" a release of hazardous substances, indicating that the PRP's hazardous substances must cause injury to natural resources in order for the PRP to be found liable and thus liability is only several. 42 U.S.C. § 9607(a)(4)(C). Congress did not adopt joint and several liability for natural resource damages in CERCLA and courts have found the legislative history does not indicate that joint and several liability was Congress' intention. *See, e.g., Ohio v. U.S. Dep't of Interior*, 880 F.2d 432 (D.C. Cir. 1989) (examining text and legislative history and finding in NRD case that, "The statutory text of CERCLA provides no clues as to whether proof of causation-of-injury should be less strict than that required by the common law. …The legislative history is ambiguous, as well."). In *Ohio v. U.S. Department of Interior*, the court found there was "little evidence" that Congress specifically intended for a lesser standard than traditional causation for showing that a particular spill caused a particular biological injury. *Id.* at 472.

The Ninth Circuit Court of Appeals has not ruled on the issue. In light of the ambiguity of the legislative history and the statute, lower courts have acknowledged the need for a causation standard closer to traditional proximate cause. *See Coeur D'Alene Tribe v. Asarco Inc.*, No. CV91-0342NEJL, 2001 WL 34139603, at *5 (D. Idaho Mar. 30, 2001) (adopting proximate causation standard where a single PRP's release of hazardous substances is alleged to have caused injury and, where multiple PRPs' releases contribute to the same injury, the "contributing factor" test); *see also Confederated Tribes and Bands of Yakama Nation v. Airgas USA, LLC*, 435 F. Supp. 3d 1103, 1120 (D. Or. 2019) (recognizing contributing factor test in multi-party

PAGE 14 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR 97209
TELEPHONE 503-467-4675

PRP case); *Coeur d' Alene Tribe*, 280 F. Supp. 2d at 1124 (D. Idaho 2003) (reiterating causation standards). Under the "contributing factor" causation test, a PRP is liable for natural resource damages in a case where hazardous substances from multiple PRPs are commingled only where the injury to natural resources caused by the subject PRP's release of hazardous substances would have occurred in the absence of any other PRP's releases of hazardous substances. *See, e.g., Coeur D'Alene Tribe v. Asarco Inc.*, *supra* at \*5 (Mar. 30, 2001).

The Court should not adopt, by explicit or implicit language, Plaintiffs' suggestion that joint and several liability will allow Plaintiffs to recover NRD from non-settling PRPs to offset any discrepancy between the current settlements and the actual liability of the Defendants. Based on the most reasonable reading of the statute and congressional intent, the causation requirements for NRD prevent joint and several liability. If the Court were to find that liability for NRD is only several, non-settling PRPs, like NW Natural, would have no cause for concern about exactly which footprints, which COCs, and which injuries are subject to the settlements here. In that event, the Court's only concern would be whether these settlements are fair to the public and will allow recovery of natural resources as Plaintiffs represent they will. In a circumstance in which non-settlors' liability is not joint and several, the court must take an even closer look at the fairness and reasonableness factors described above. *See Montrose*, 50 F.3d at 747 ("[I]f joint and several liability does not apply to the natural resources damages, the governments' ability to collect the totality of remaining damages from the non-settling defendants certainly would have an impact on the settlement's merits.").

## IV.    CONCLUSION

Plaintiffs' Motion to Enter warrants rigorous engagement with the evidence that serves as the basis of the settlement terms. Because that type of engagement cannot occur here due to the

PAGE 15 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR  97209
TELEPHONE 503-467-4675

ER-540

lack of information available, the Court should deny the Motion to Enter.

Dated this 28th day of July 2025.

PEARL LEGAL GROUP, PC

s/ Patricia M. Dost
Patricia M. Dost, OSB No. 902530
pdost@pearllegalgroup.com
Heather Tourgee, OSB No. 244304
htourgee@pearllegalgroup.com
529 SW Third Avenue, Suite 600
Portland, OR 97204
Phone: 503-467-4675
Counsel for Intervenor NW Natural

PAGE 16 – NW NATURAL'S OPPOSITION TO
MOTION TO ENTER CONSENT DECREES

PEARL LEGAL GROUP PC
529 SW THIRD AVENUE, SUITE 600
PORTLAND, OR  97209
TELEPHONE 503-467-4675

Zachary W.L. Wright, OSB No. 941615
  Direct:  503.802.2041
  Email:  zach.wright@tonkon.com
Maureen S. Bayer, OSB No. 214905
  Direct:  503.802.2115
  Email:  maureen.bayer@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779

*Attorneys for Proposed Intervenor Gunderson LLC*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
(PORTLAND DIVISION)

| | |
|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE, <br><br> Plaintiffs, <br><br> v. <br><br> ACF INDUSTRIES LLC; AIRGAS USA LLC; AIR LIQUIDE AMERICA L.P.; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.: BNSF RAILWAY COMPANY; CALBAG METALS CO.; CITY OF PORTLAND; ESCO GROUP LLC; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); GOULD ELECTRONICS INC.; HAJ, INC., D/B/A | Civil No. 3:23-cv-1603 <br><br> **PROPOSED INTERVENOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES** <br><br> **ORAL ARGUMENT REQUESTED** |

**PAGE i –  PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

CHRISTENSON OIL COMPANY;
HERCULES LLC; KOPPERS INC.;
McCALL OIL & CHEMICAL
CORPORATION; McCALL OIL REAL
ESTATE COMPANY LLC; MOREC
FRONT LLC; GWC PROPERTIES, LLC;
GWC FRONT, LLC; TANKER BASIN LLC;
MMGL LLC; NORTHWEST PIPE
COMPANY (fka NORTHWEST PIPE &
CASING COMPANY AND NORTHWEST
PIPE AND CASING COMPANY);
PACIFICORP., an Oregon Corporation;
PORT OF PORTLAND; PORTLAND
GENERAL ELECTRIC COMPANY (PGE);
PORTLAND TERMINAL RAILROAD
COMPANY; SCHNITZER STEEL
INDUSTRIES, INC.; SILTRONIC
CORPORATION; SULZER PUMPS (US)
INC.; and VALVOLINE INC.,

Defendants.

///

///

///

///

//

///

///

///

///

///

///

///

**PAGE ii –  PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF
LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT
DECREES**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION..................................................................................................1

II.    BACKGROUND ..................................................................................................4

    A.    Portland Harbor Superfund Site and the NRD Process.....................................4

    B.    Lodging of the Proposed Consent Decrees ..........................................................7

    C.    Gunderson's Efforts to Oppose the Proposed Consent Decrees........................8

III.   ARGUMENT........................................................................................................9

    A.    The Trustees Did Not Provide Sufficient Information to Evaluate the Fairness of the Allocation...................................................................................10

    B.    The Trustees Provide No Explanation or Justification for Any Discount Afforded Settling Defendants ...............................................................13

    C.    The Proposed Consent Decrees are Based on an Incomplete Record and Are Therefore Premature .................................................................14

    D.    CERCLA Does Not Require Early Settlement at All Costs.............................17

    E.    The Release of Liability and Related Contribution Bar Are Broader Than Necessary ..........................................................................................19

IV.    CONCLUSION .................................................................................................21

**PAGE iii –   PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

ER-544

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Aerojet Gen. Corp.*,
  606 F.3d at 1152 ...................................................................................................9

*United States v. Cannons Eng'g Corp.*,
  899 F.2d 79 (1st Cir. 1990)..........................................................................9, 13, 17

*United States v. Charter Int'l Oil Co.*,
  83 F.3d 510 (1st Cir. 1996).....................................................................................9

*United States v. Montrose Chem. Corp. of California*,
  50 F.3d 741 (9th Cir. 1995) ........................................................................... *passim*

**Statutes**

33 U.S.C. § 1321.....................................................................................................1

33 U.S.C. § 2702.....................................................................................................1

42 U.S.C. § 9607.....................................................................................................1

42 U.S.C. § 9613...................................................................................................17

ORS § 465...........................................................................................................1, 5

ORS § 468B.060......................................................................................................1

**Other Authorities**

65 Fed. Reg. 75179, 75181 (Dec. 1, 2000) ..............................................................4

88 Fed. Reg. 78063 (Nov. 14, 2023)........................................................................8

88 Fed. Reg. 88417 (Dec. 21, 2023) ........................................................................8

Industrial Economics, Incorporated, *Portland Harbor Natural Resource Damage
  Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan* .......................15

*Arkema Inc. v. Anderson Roofing Co.*,
  Case No. 3:09-cv-00453-JR (D. Or.) ...............................................................18, 19

*Confederated Tribes & Bands of the Yakama Nation v. Air Liquide Am. Corp.*,
  No. 3:17-cv-00164-SB (D. Or. July 31, 2017), ECF No. 218 ...........................5, 18

**PAGE iv –    PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF
              LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT
              DECREES**

ER-545

Proposed Intervenor Gunderson LLC ("Gunderson") respectfully submits this Opposition to Plaintiffs' Motion to Enter Consent Decrees ("Opposition").[1]

## I.    INTRODUCTION

On November 1, 2023, Plaintiffs United States of America ("United States"), by authority of the Attorney General, on behalf of the National Oceanic and Atmospheric Administration of the U.S. Department of Commerce and the U.S. Department of the Interior; the State of Oregon, on behalf of the Oregon Department of Fish and Wildlife; the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe (collectively "Trustees") filed this action under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a); Section 311 of the Clean Water Act, 33 U.S.C. § 1321; Section 1002(b) of the Oil Pollution Act, 33 U.S.C. § 2702(b); the Oregon Hazardous Waste and Hazardous Materials Act, ORS § 465; and ORS § 468B.060 alleging damages for injury to, destruction of, or loss of natural resources resulting from the release of hazardous substances and discharges of oil into the Willamette River in and near Portland, Oregon.  The suit was brought against parties alleged to own or operate, or to have historically owned or operated, real properties or facilities that released hazardous substances or oil into the "Portland Harbor Natural Resource Damage Assessment Area."  ECF No. 2-1 at 7. The Portland Harbor Natural Resource Damage Assessment Area includes the waters, shoreline,

---

[1]    To the extent not inconsistent with the arguments raise below, Gunderson also joins the arguments raised by Legacy Site Services LLC on behalf of Arkema, Inc. ("Arkema") and FMC Corporation ("FMC") in their respective oppositions to Plaintiffs' motion.

**PAGE 1 –    PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

intertidal areas, and bottom sediments of the Willamette River from approximately river mile 12.3 to approximately river mile 0.8, as well as the upper 1.2 miles of the Multnomah Channel, portions of which are part of the Portland Harbor Superfund Site ("Site"). *Id*. at 16.

Concurrently with the filing of the Complaint, the Trustees lodged two consent decrees pursuant to which the Trustees seek to settle the claims asserted in the Complaint for covered natural resource damages ("NRD") with 23 of the Defendants ("Settling Defendants"). One consent decree allows a subset of the Settling Defendants[2] to resolve their NRD liability through a one-time cash payment ("Cash-out Consent Decree"), and the other consent decree allows a subset of the Settling Defendants[3] to resolve their NRD liability through the purchase of restoration credits from certain approved restoration-credit sellers ("Restoration Credit Consent Decree"). ECF No. 11-1 at 9; ECF No. 4-1 at 14. The two consent decrees are collectively referred to herein as the "Proposed Consent Decrees." The Proposed Consent Decrees provide that ecological losses the Trustees seek to recover from all PRPs measured as 4,130 discounted service acre-years ("DSAYs") valued at $70,500 per allocated DSAY. ECF No. 11-1 at 9. The total amount that Trustees seek to recover in NRD amounts to $27,952,073.33, while the

---

[2]    ACF Industries, LLC; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc. d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (formerly Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline, Inc.

NA (formerly Oregon Steel Mills and Gilmore Steel); MMGL LLC; PacifiCorp, an Oregon corporation; Port of Portland; Schnitzer Steel Industries, Inc.; and Siltronic Corporation.

**PAGE 2 – PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

Proposed Consent Decrees settle claims against the Settling Defendants in the amount of $36,154,209.45, representing approximately 12% of the total liability.  ECF No. 4-1 at 18.

The Trustees notified Gunderson that it is a potentially responsible party ("PRP") for NRD at the Site.  Declaration of Maureen S. Bayer ("Bayer Decl.") ¶ 5.  Although the Trustees did not name Gunderson as a defendant, the Trustees have asserted a right to hold any PRP jointly and severally liable for all NRD at the Site.  ECF No. 4-1 at 15; *see also* ECF No. 4-1 at 13, 18.  Gunderson first learned of the terms of the Proposed Consent Decrees on November 2, 2023, when the Department of Justice issued a press release regarding the Proposed Consent Decrees lodged with the Court.  The Proposed Consent Decrees were published for public comment on November 14, 2023.  Gunderson timely submitted public comments to the Department of Justice.  *See* ECF No. 85-2 at 20-28.  Plaintiffs moved to enter the Proposed Consent Decrees on June 9, 2025.  ECF No. 85.  For the reasons set forth herein, Gunderson opposes the Trustees' Motion that this Court approve and enter the Proposed Consent Decrees.

Gunderson opposes the Trustees' Motion to enter the Proposed Consent Decrees on the grounds that the Proposed Consent Decrees: (1) cannot be found to be based on a fair and reasonable allocation of liability among the PRPs; and (2) extinguish Gunderson's right to NRD contribution claims against the Settling Defendants.

The Proposed Consent Decrees lack sufficient information necessary for the Court to determine if they are fair and reasonable.  Specifically, of the total liability for NRD determined by the Trustees (4,130 DSAYs), the two Proposed Consent Decrees combined account for just over ten percent of the total DSAYs allocated to the Site.  However, Plaintiffs have provided no explanation, formula, or data for how the amount of NRD allocated to each Settling Defendant was determined.  Plaintiffs have provided insufficient information to the Court necessary for its

**PAGE 3 –    PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

evaluation of whether the percentage of liability allocated to the Settling Defendants is fair and reasonable.  If the Proposed Consent Decrees are approved, the Trustees have indicated that they may seek to hold Gunderson jointly and severally liable for the remaining NRD liability at the Site.  Because the Proposed Consent Decrees only account for just over ten percent of the total DSAYs, the remaining NRD liability is significant.  By the Trustees' own admission, Trustees have not even yet completed a full NRD assessment for the Site and, because NRD are the measure of the residual damage remaining after cleanup is completed, the Trustees cannot conduct a full assessment until the ongoing remediation at the Site is complete.  Nor is it clear that the Trustees have evaluated the significant data being generated as part of the ongoing remedial design process.  Trustees cannot claim that the Proposed Consent Decrees represent fair and reasonable settlements for damages that have not even been established.

Additionally, the Proposed Consent Decrees unfairly extinguish Gunderson's right to NRD contribution claims against the Settling Defendants.  The Proposed Consent Decrees expressly protect the Settling Defendants from contribution claims (ECF No. 4-1 at 77; ECF No. 11-1 at 28-30), leaving Gunderson potentially holding the bag for a share of the NRD costs that would vastly exceed a fair measure of its liability.

## II.    BACKGROUND

**A.    Portland Harbor Superfund Site and the NRD Process.**

As a result of historical industrial activities in the Portland Harbor, in 2000 the United States Environmental Protection Agency ("EPA") listed the Site on the National Priorities List ("NPL").  ECF No. 114 ¶ 31, 65 Fed. Reg. 75179, 75181 (Dec. 1, 2000).  From 1985 until 2023, Gunderson owned and operated a railcar- and barge-manufacturing facility ("Gunderson Facility") on the west side of the Willamette River around River Mile 8.5.  (Bayer Decl. ¶ 2).

**PAGE 4 –    PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

ER-549

Shortly after the Site was listed on the NPL, on December 8, 2000, EPA sent a general notice letter to Gunderson and about 70 other parties. *Id.* at ¶ 5 and Exhibit 1. This letter informed each recipient that it had been identified as a PRP at the Site. *Id.* Shortly after the listing of the Portland Harbor as a Superfund site, Gunderson joined the Lower Willamette Group to conduct a remedial investigation and feasibility study. Gunderson is currently participating in a private, non-judicial allocation process ("Allocation") to settle claims for past and future response costs at the Site. Although the Trustees assert that the allocation of NRD "developed by the Trustee[s] is distinct from, unrelated to, and has no effect on the total site Allocation being conducted by the PRPs to determine liability for EPA's claims for remedial action and response costs under CERCLA or ORS § 465" (ECF No. 4-1 at 18), the United States has previously recognized in separate but related litigation pending before this Court that a claim for NRD "addresses many of the same contamination releases as those that are at issue . . . in the non-judicial response cost allocation process." *See* United States' Opposed Mot. to Dismiss at 19, *Confederated Tribes & Bands of the Yakama Nation v. Air Liquide Am. Corp.,* No. 3:17-cv-00164-SB (D. Or. July 31, 2017), ECF No. 218.

In January 2007, Trustees began conducting pre-assessment work to determine the extent of NRD at the Site. ECF No. 4-1 at 8-9. Shortly thereafter, Trustees notified PRPs of their intent to conduct a natural resource damage assessment ("NRDA"). *Id.* The NRDA was an iterative process conducted in multiple phases. Under so-called "Phase 1," the Trustees developed an assessment plan and a settlement-oriented workplan. *Id.* Twenty PRPs, including Gunderson, participated in that process, entering into funding and participation agreements ("FPAs") with Trustees to fund that portion of the Trustees' work. (Bayer Decl. ¶ 3.) Following the Phase 1 process, 30 PRPs, including Gunderson, entered into FPAs with Trustees for

**PAGE 5 –   PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

"Phase 2." ECF No. 4-1 at 9. Phase 2 focused on implementing the workplan developed in Phase I and conducting initial restoration planning. *Id.* Additionally, in Phase 2, the Trustees decided to quantify NRD using a habitat equivalency analysis ("HEA"), developed for the Commencement Bay site in Tacoma, Washington. The HEA aims to quantify "ecological functions lost due to contamination (in terms of ecological services provided by an area of habitat), and informs how much restoration is required to generate an equivalent amount of similar services," essentially determining the ecological losses due to PRPs' alleged activities at the Site. ECF No. 114 ¶ 27; Bayer Decl. ¶ 9 and Exhibit 5 at A-3, *Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement*. The losses and restoration metrics quantified by the HEA are expressed in terms of present-value units of the diminished resource as reflected in the number of DSAYs. *Id.* at A-4. The HEA resulted in an initial damage assessment of 4,130 DSAYs. ECF No. 4-1 at 13.

During Phase 2, the Trustees asked the PRPs whether they would participate in settlement negotiations based on the results of the Phase 2 assessment, referred to as "Path C." ECF No. 4-1 at 13. PRPs in the Path C process had the option to settle their liability by paying cash (as set forth in the Cash-out Consent Decree), purchasing DSAY credits and making other cash payments (as set forth in the Restoration Credit Consent Decree), or constructing a restoration project. *Id.* at 14.

The Path C process led to the allocation of DSAYs underlying the Proposed Consent Decrees. The amount allocated to each Settling Defendant was based on first assigning a percentage of liability to the Portland Harbor Natural Resource Damage Assessment Area Properties. ECF No. 4-1 at 16. The Trustees then calculated a "party-specific, intraproperty allocation by estimating the relative contributions (as percentages) of each PRP associated with

PAGE 6 –    **PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

contaminant footprints at particular . . . properties." *Id*. at 17.  The Trustees then "converted a party-specific allocation of natural resource damage liability to DSAYs." *Id.*  The Trustees have not identified the estimated intra-property percentage contributions of each PRP, the basis for that estimation, or the allocation of DSAYs on a site-specific basis.   Omitting this information prevents a sufficient understanding of the DSAYs allocated and remaining for particular facilities.

DSAYs have different monetary values, depending on whether the settlement is based on cash or on a restoration credit.  For the Cash-out Consent Decree, each DSAY has a value of $70,500 and includes the "compensation for ecological, recreational, and tribal service losses, based on the Trustees' estimates of their per-DSAY cost of compensating for these losses." ECF No. 11- at 9.  Parties to the Cash-out Consent Decree pay for the number of DSAYs allocated to them in addition to the assessment costs owed.  *Id*.; ECF 4-4 at 1.  For parties to the Restoration Credit Consent Decree, the actual price of DSAY restoration credits purchased by Settling Defendants "from Restoration Credit Sellers is privately negotiated between them and may differ from the Trustees' per-DSAY cost estimate."  ECF No. 4-1 at 14-16.  Parties to the Restoration Consent Decree also pay for assessment costs owed and $1,742 per DSAY for the cost for compensation of recreational losses, tribal service losses, and Portland Harbor-wide monitoring and stewardship.  ECF No. 4-4 at 2.  PRPs purchasing restoration credits effectively finance compensatory restoration projects, which they do not develop or maintain themselves. ECF 4-1 at 11.

///

///

**B.    Lodging of the Proposed Consent Decrees.**

**PAGE 7 –    PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

In November of 2023, Trustees filed their Complaint and concurrently lodged the two Proposed Consent Decrees—the Cash-out Consent Decree and the Restoration Credit Consent Decree. Per the terms of the Proposed Consent Decrees, in exchange for their payments, Settling Defendants would resolve their NRD liability to the Trustees and receive protection from contribution claims from other Settling Defendants and others not party to the Proposed Consent Decrees. ECF No. 4-1 at 73, 77. Plaintiffs moved to enter the Proposed Consent Decrees on June 9, 2025. ECF No. 85.

The Proposed Consent Decrees allocate 471.389 DSAYs of the 4,130 estimated total DSAYs calculated in Path C, (*i.e.*, only 11.4 percent) among the Settling Defendants. ECF No. 85 at 13.

## C.    Gunderson's Efforts to Oppose the Proposed Consent Decrees.

Gunderson did not learn of the terms of the Proposed Consent Decrees until the Department of Justice's press release in November 2023. Soon after, Proposed Consent Decrees were published for public comment on the Department of Justice's Environment and Natural Resources Division Proposed Consent Decree website and in the Federal Register on November 14, 2023 ("Notice"). ECF No. 114 ¶ 32, 88 Fed. Reg. 78063 (Nov. 14, 2023). The Notice provided for a 30-day comment period.[4] Gunderson timely filed public comments with the Department of Justice in response to the Proposed Consent Decrees, raising several key legal issues and voicing support for the public comments filed by other similarly situated PRPs. ECF

---

[4]    The deadline to submit comments was subsequently extended to January 28, 2024, after Trustees received a request to extend the comment period by an additional 45 days. 88 Fed. Reg. 88417 (Dec. 21, 2023).

**PAGE 8 –    PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

No. 85.2 at 20. *See also* the public comments submitted by other similarly situated PRPs, namely Arkema, Inc. and FMC Corporation, as incorporated into Gunderson's public comments. ECF No. 85-2 at 10 and 30.

## III.    ARGUMENT

Plaintiffs argue that the Proposed Consent Decrees should be approved because they are fair, reasonable, and consistent with CERCLA, the Clean Water Act, the Oil Pollution Act ,and the Oregon Hazardous Waste and Materials Act. ECF 85 at 19. However, because the Proposed Consent Decrees are premature, based on incomplete information, and contain releases far broader than the area assessed, the Trustees have failed to meet their burden to show that the Proposed Consent Decrees should be approved.

In evaluating a consent decree's fairness, both substantive and procedural fairness must be considered. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990). Procedural fairness requires the court to "look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Id*. "Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Id*. at 87. Gunderson does not challenge the procedural fairness of the Proposed Consent Decrees' negotiations, but rather, focuses the Court's attention on the substantive fairness issues with the Proposed Consent Decrees.

A determination of substantive fairness must be supported by assessing whether liability has been roughly apportioned based upon "some acceptable measure of comparative fault." *United States v. Aerojet Gen. Corp*., 606 F.3d at 1152 (citing *Cannons Eng'g Corp*., 899 F.2d at 87); *see also United States v. Charter Int'l Oil Co.,* 83 F.3d 510, 521 (1st Cir. 1996) ("This amounts to asking whether the terms of the settlement are roughly proportional to [a party's]

**PAGE 9 –    PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

responsibility and whether they serve the public interest."). In other words, there must be some benchmark by which to evaluate consent decrees, such as the estimate of the projected total natural resource damages at issue. *United States v. Montrose Chem. Corp. of California*, 50 F.3d 741, 746 (9th Cir. 1995). Furthermore, it is the District Court's obligation to "independently scrutinize the terms" of a consent decree to ensure that they are fair and reasonable. *Id.* at 747 (internal quotations omitted). In doing so, the Court must base its decision on sufficient evidence. *Id.* at 746-47. When there is insufficient evidence on the record to make a reasonable determination "with respect to estimates of responsibility and damage," the consent decree should not be approved. *Id*. at 747. The Trustees have failed to provide sufficient evidence to support a finding that the Proposed Consent Decree is either fair or reasonable.

### A.   The Trustees Did Not Provide Sufficient Information to Evaluate the Fairness of the Allocation.

The Proposed Consent Decrees' lack of transparency concerning the allocation of the DSAYs for each of the Settling Defendants' sites makes it impossible to assess whether the Proposed Consent Decrees are reasonable or fair. Because the settlement of liability in these Proposed Consent Decrees is not supported by a factual record allowing sufficient insight into each Settling Defendants' liability and the magnitude of the discount from the originally allocated site-specific DSAYs, it would be improper for the Court to approve the Proposed Consent Decrees. Plaintiffs have failed to provide any explanation, formula, or data for how the amount of NRD allocated to each Settling Defendant was determined. ECF 85 at 29-30. ("[T]he public record does not contain settlement confidential information, such as the Trustees' detailed calculations of each Defendant's liability.") Plaintiffs' conclusory statement that the information it has provided is sufficient is unconvincing, particularly where the Court lacks information

**PAGE 10 – PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

necessary for its evaluation of whether the percentage of liability allocated to the Settling Defendants is fair and reasonable.

Neither the Trustees' Motion nor the Proposed Consent Decrees explain how the NRD liability initially allocated to a Settling Defendant during Phase 2 resulted in the allocation of NRD liability under the Proposed Consent Decrees. The Proposed Consent Decrees discuss the process leading up to Path C, but the basis for the settlements is simply stated as "a fair and reasonable estimate of the equitable responsibility for Covered Natural Resource Damages." ECF No. 4-1 at 18; ECF No. 11-1 at 13. The Plaintiffs describe the process in vague terms, at best: "The amount of assigned liability (in DSAYs) depended on the estimated injury to natural resources (in DSAYs) caused by contaminants in the sediment footprint and whether other properties and facilities also contributed to contaminants in that footprint." ECF 85 at 12-13. There is no explanation, formula, or data provided for how the amount allocated was arrived at other than to say that the "Trustees developed a proposed liability allocation, in DSAYs, for that Defendant." *Id*. at 13. As admitted by Plaintiffs, "the Trustees' detailed calculations of each Defendant's liability" has not been provided. ECF No. 85 at 31.

Troy Baker, whose declaration was filed to support the Trustee's Motion, is an environmental scientist for the National Oceanic and Atmospheric Administration. ECF No. 85-1 at 3. Mr. Baker did not develop the methodologies used for the settlement; he merely reviewed them and concluded that the methodologies and calculation are reasonable and appropriate. *Id*. at 5-6. Most importantly, Mr. Baker's declaration provides only vague information about the process the Trustees used to make the determinations critical to the Proposed Consent Decrees. By way of example:

**PAGE 11 – PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

ER-556

- Although contaminant footprint maps were constructed using sediment contamination data for 12 contaminants of concern (*id*. at 6), the contaminants are not listed, the source of the data is not listed, and the data itself is not provided.

- Although a contaminant footprint map was developed for each (unspecified) contaminant reflecting the degree of contamination relative to threshold concentrations for injury to aquatic resources, *id*., the thresholds and injuries are not provided, but rather are referred to only as "established in the scientific literature." *Id*.

- "The Trustees considered the injuries resulting from the range of hazardous substances in sediments and calculated the total combined losses to natural resources over time from those contaminants." *Id*. at 7. But there is no information provided as to how those calculations were made, other than listing what categories of information the Trustees reviewed.

- "[T]he Trustees and the PRPs … conducted site-specific studies at Portland Harbor to help quantify the natural resource injuries." *Id*. But there is no information provided as to the extent, detail, or depth of these "studies," what types of resources they involved, whether they involved any sampling, or any helpful information whatsoever.

- "To reach settlements with individual PRPs, the Trustees first developed estimates of the share of the total injuries attributable to hazardous substances released from each property along the Assessment Area." *Id*. at 8. However, no information is provided as to how these estimates were arrived at, what hazardous substances were considered, what resources were considered, or what injuries were considered.

Finally, Mr. Baker cautions that the process the Trustees used is not definitive, that the development of new information could change the estimates, that attributing responsibility at the Site inherently involves uncertainty, and that the methodology the Trustees used is not the only reasonable means of measuring total injury and individual responsibility. *Id*. at 10. These caveats are extremely concerning and indicate the lack of trustworthiness of the initial estimate of damages.

Mr. Baker then concludes,

the Trustees devoted substantial effort and resources to the development of this HEA model and the allocation methods used in the settlement process and believe that they are appropriate tools for the early resolution of PRPs' liability for natural

**PAGE 12 –  PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

resource damages at Portland Harbor. Indeed, the financial and technical resources employed for the HEA process used at Portland Harbor substantially exceed the resources typically available at CERCLA sites to develop and apply HEA models.

*Id.* at 10-11. But the cost of the allocation process and the quantity of technical resources expended are not factors that indicate whether the settlement is fair and reasonable, nor is it evidence indicating that the Proposed Consent Decrees are substantively "fair, reasonable, and consistent with CERCLA's objectives." *Montrose,* 50 F.3d at 748. As such, these factors should not be given weight in such a determination.

**B.    The Trustees Provide No Explanation or Justification for Any Discount Afforded Settling Defendants.**

The Proposed Consent Decrees leave nearly 90 percent of NRD liability of the total NRD estimated to date to be shifted to the non-settling PRPs. While some reasonable discounts of liability to entice settlement are permitted where a PRP assumes open-ended risks, obtaining a complete release from uncertain future liability should require a *premium* rather than a discount. *Cannons*, 899 F.2d at 88. Mr. Baker's declaration provides that the Trustees factored "the value of early settlement." ECF No. 85-1 at 12.

> In order to encourage PRPs to address the impact of releases of contaminants on natural resources sooner than later, the Trustees believe it is appropriate to use the value of early restoration as a factor in evaluating settlements, and the Trustees have done so for these settlements.

*Id.* As with the other information provided about the Potential Settlements, this statement is vague and does not illuminate how "the value of early restoration" was factored into the Potential Settlements. It is reasonable to conclude that the liability of the Settling PRPs was substantially discounted. The concept of discounting liability to entice entry into settlement

///

**PAGE 13 –  PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

should not be misused to let serious polluters off the hook without paying for the damage they have caused.

The Proposed Consent Decrees do not explain what discounts the Trustees applied to Settling Defendants' previously allocated DSAYs. *See* ECF No. 4-1 at 13-14 (explaining the Path C process, total DSAYs quantified and then jumping to the allocation of 471.389 DSAYs with no explanation on the discount that occurred between the party-specific, intra-property allocation and the Proposed Consent Decrees' allocation). The significant difference in allocated versus total DSAYs leaves nearly 90 percent of the liability on the table to be allocated to the non-settling PRPs. In fact, this percentage is likely to be higher because, as the Proposed Consent Decrees note, the full assessment quantifying NRD liability has not been completed. ECF No. 4-1 at 13. With this lack of information regarding the process of allocation of liability, the Court cannot evaluate if the amount of liability allocated to the Settling Defendants was appropriately fair or reasonable.

**C.      The Proposed Consent Decrees Are Based on an Incomplete Record and Are Therefore Premature.**

Approval of the Proposed Consent Decrees would be premature given that the extent of NRD in the Site are not yet close to being quantified. As Plaintiffs admit:

> While the formal damage assessment will be based on more site-specific injury studies than the HEA model, the outcome of those studies is not yet known (and was not known when the settlements with Defendants were negotiated). Therefore, the total damage estimate in the formal damage assessment could be higher or lower than the estimate produced by the HEA model used for the Decrees.

ECF 85 at 26-27. Far from reassuring, Plaintiffs statements make it clear that insufficient information has been collected to make any estimate reasonable. Any NRD settlements based on an incomplete record are premature. *See United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d

**PAGE 14 – PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

at 747–48 (holding that it was an abuse of discretion for the trial court to approve individual natural resource damage settlements where there was no evidence of the total natural resource damages at issue). The Court must know the total extent of NRD to understand the proportion of liability allocated to the Settling Defendants.

> [T]he court . . . should determine the proportional relationship between the [amount] to be paid by the settling defendants and the governments' current estimate of total potential damages. The court should evaluate the fairness of that proportional relationship in light of the degree of liability attributable to the settling defendants.

*Id.* at 747. The Trustees are prematurely allocating liability when they have not yet quantified the full extent of NRD at the Site.

Parties to the Proposed Consent Decree believe that "no further assessment of natural resource damages is required" for approval of the Proposed Consent Decrees, despite the fact that the Trustees "have not yet completed a natural resource damage assessment for the Portland Harbor Resource Damage Assessment Area." ECF No. 4-1 at 11, 13. But based on the breadth of the studies that the Trustees have proposed to conduct as part of their forthcoming full assessment (*i.e.*, the Phase 3 Damage Assessment), the initial estimate of damages associated with the Site Assessment Area are likely to increase significantly. *See* Bayer Decl. ¶ 10 and Exhibit 6 at A-1 to A-2; Industrial Economics, Incorporated*, Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan*, (stating that a change in approach going forward will increase the geographic extent and evaluate injury caused by remedial actions that have not yet been implemented).

The Proposed Consent Decrees are not informed by a current or full understanding of Site conditions. Key information is lacking on a site-specific basis. For example, Schnitzer was a major historical operator at the Gunderson Facility, where it conducted "military ship

**PAGE 15 –  PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

dismantling . . . shredding automobiles, appliances, and other metal components, without any significant control of contaminated discharges or soil erosion into the Willamette River." ECF 85-2 at 23.  Schnitzer nonetheless "settled its liability at the Gunderson Facility, in addition to ten other sites, including two major industrial sites, IT slip and Burgard Way, for a total 37.49 DSAYs, which amounts to an average of only 3.4 DSAYs per site."  *Id*. at 25.  As provided in Gunderson's public comments to the CDs:

> Because the DSAYs allocated to Schnitzer in the Restoration Credit Consent Decree are not provided on a site-specific basis, it is not possible to determine how many DSAYs were allocated to Schnitzer for the Gunderson Facility or how many unsettled DSAYs remain to be allocated to other potential responsible parties at the Gunderson Facility.  Consequently, it is not possible to determine if Schnitzer is even close to paying its fair share for the deplorable conditions it caused.

*Id*.

Excluding partial upland remedies and source control actions, no remedial action has been conducted in-water or on the riverbanks at the Site.  In fact, the remedial design process is years away from being complete, and data is still being collected now.  As such, a full picture of the nature and scope of the required cleanup is unknown.  Any NRD settlements based on an incomplete record are premature.  *See Montrose*, 50 F.3d at 748 (holding that it was an abuse of discretion for the trial court to approve individual natural resource damage settlements where there was no evidence of the total natural resource damages at issue).

The Trustees state that the formal damage assessment could be lower than the estimate produced by the HEA model.  ECF No. 85 at 27.  Given that cleanup costs at the Site have ballooned to over a billion dollars, that prediction is both unlikely and unsupported.  ECF No. 114 ¶ 15, the PHSS Record of Decision issued by the EPA in January 2017, at 86.  Moreover, the Trustees intend to use a better and more expansive model to estimate damages related to

**PAGE 16 – PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

implementation of the remedy and have suggested that they may expand the geographic scope. ECF No. 85-2 at 12 fn8. Not only does this planned course of action bring into question the basis for the initial estimates of damages, but it also reveals that a prediction that the damage estimate could be lower is disingenuous.

**D.    CERCLA Does Not Require Early Settlement at All Costs.**

In addition to procedural and substantive fairness, the Proposed Consent Decrees must be faithful to the purposes of CERCLA. Plaintiffs rely heavily on the Court's statement in *Montrose* that "CERCLA's primary goal is encouraging early settlement," ECF No. 85 at 26, citing *Montrose, supra*, at 748. While CERCLA is designed to encourage early settlements, such settlements must be balanced by the competing principle that those responsible for the contamination bear the costs and responsibility for remediation. *See Canons*, 899 F.2d at 90-91. Neither *Montrose* nor any other case provides that early settlement eclipses all other purposes of CERCLA, including accountability for contamination.

Moreover, the underlying principle behind encouraging early settlement is to avoid litigation. Where an early settlement significantly discounts liability of major contributors, the Proposed Consent Decrees must be questioned because reducing the liability of the settling parties necessarily increases the liability of non-settling parties. 42 U.S.C. § 9613(f)(2). If those contributing significantly to the contamination are not assigned sufficient liability in the Proposed Consent Decrees, the result is that a disproportionate share will remain to be paid by non-settling parties. Ultimately, approval of a settlement involving such a small share of the overall damage could defeat the early settlement goal of avoiding inefficient expenditure of public funds on lengthy litigation by actually inviting litigation, as we discuss further.

**PAGE 17 –    PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

The Proposed Consent Decrees have the potential to derail the private allocation ongoing at the Site and are drafted in such a way that reveals the Trustees' awareness of this issue. ECF No. 11-1 at 30. ("The Settling Parties agree that they will not cite or use this settlement or the Path C NRD allocation results in any forum as evidence of liability for remedial action or response costs.") Approximately 100 parties, including state and federal parties and the City of Portland, have been engaged in ongoing private allocation of liability for the response costs at the Site for over 15 years. The Allocation has been extremely data-driven and costly, but the process is designed to facilitate settlements between the parties and determine shares of liability for performance of the remedial action. If the Proposed Consent Decrees are approved, they would become public record, and the allocation team hired to make determinations in the Allocation would have access to the information they contain. While the Proposed Consent Decrees prohibit settling parties from citing or using them, there is nothing to preclude the allocators from relying on the Proposed Consent Decrees.

Plaintiffs filed a Notice of Related Cases regarding *Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp*. et al., Case No. 3:17-cv-00164-SB (D. Or.) (the "*Yakama* Litigation") and *Arkema Inc. v. Anderson Roofing* Co., Case No. 3:09-cv-00453-JR (D. Or.) (the "*Arkema* Litigation"). In that Notice of Related cases, the Plaintiff noted "a very similar overlap of both parties and potential legal and factual issues exists as between this case and [the Yakima Litigation and the Arkema Litigation.]." ECF No. 86 at 2. The United States successfully moved to stay both the Yakima Litigation and Arkema Litigation on grounds that they had significant potential to affect the Allocation on similar grounds. In 2017, the Confederated Tribes and Bands of the Yakama Nation filed a complaint against many of the defendants in this case and parties to the Allocation seeking NRD associated with the Site.

**PAGE 18 – PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

*Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp. et al.*, Case No. 3:17-cv-00164-SB (D. Or.) (the "*Yakama* Litigation"). ECF No. 114 ¶ 6. The United States brought a motion to stay the lawsuit to allow the allocation to continue, which this Court granted. ECF No. 356. In seeking the stay, the United States argued that there is "significant overlap of the parties and issues" between the *Yakima* Litigation and the *Arkema* Litigation, "and the non-judicial response costs allocation process." ECF No. 114 ¶ 9 and Exhibit 9 at 18–19. Moreover, the United States argued that "the liability claims in both cases and the allocation issues that are being addressed through the [Allocation] are based on some of the same information, e.g., historical documentation, the RI/FS, etc." *Id*. at 19.

In sum, there is a very real risk that the Proposed Consent Decrees will undo years of work and tens of millions of dollars of effort to allocate responsibility among PRPs the Court should not approve the Proposed Consent Decrees at this juncture. To the extent that CERCLA encourages early settlement, it does not do so "at all costs," but only in those instances where it would preserve resources. This is not one of those instances.

**E.    The Release of Liability and Related Contribution Bar Are Broader Than Necessary.**

The covenants not to sue the Settling Defendants contained in the Proposed Consent Decrees extend "to natural resource damages outside of the Portland Harbor Assessment Area, even if those damages were caused by releases of hazardous substances or discharges of pollutants from Settling Defendants' identified facilities *into* the Portland Harbor Assessment Area." ECF No. 85-3 at 41, emphasis in original. However, in developing its initial estimate of damages, Plaintiffs only assessed damages and estimated DSAYs within the Portland Harbor Natural Resource Damage Assessment Area. As such, the release and related contribution bar

**PAGE 19 –  PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

covers a geographic area far broader than that preliminarily assessed by the Plaintiffs, and releases Settling Defendants for damages <u>anywhere</u> releases of hazardous substances from their properties have come to be located, despite the fact that such injuries have not yet been assessed, let alone quantified. Because the Trustees plan on using a more expansive method to estimate damages and may very well expand the geographic scope of the assessment area, ECF No. 85-2 at 12 fn8 and 31 fn3, the breadth of the release and related contribution bar contained in the Proposed Consent Decrees is inappropriate.

The expansiveness of the releases and related contribution bar contained in the Proposed Consent Decrees has not been adequately justified. The Trustees acknowledge that "contaminants originating in the Portland Harbor Assessment Area have migrated downstream," to areas that that the Trustees will likely assess in Phase 3. ECF No. 85-3 at 41. As such, the Trustees' "technical judgment that the large majority of the [NRD] from contaminants released or discharged . . . have occurred and are accruing within the Assessment Area" is unfounded. *Id*. at 41-42.

The only other justification provided by the Trustees for this breadth is "closure," arguing that if contribution protection were geographically limited, then Settling Defendants would not be properly induced to settle. ECF No. 85-3 at 42. However, this is the Trustees simply ignoring the fact that the Proposed Settlements are premature and should not be finalized until the assessment of NRD is complete.

///

///

///

///

**PAGE 20 – PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

ER-565

## IV.    CONCLUSION

For the reasons set forth in this Motion, Gunderson respectfully requests that this Court

DENY Plaintiffs' Motion to enter the Proposed Consent Decrees.

DATED:  July 28, 2025.

TONKON TORP LLP

By:    /s/ Zachary W.L. Wright
      Zachary W.L. Wright, OSB No. 941615
        Direct:  503.802.2041
        Email:  zach.wright@tonkon.com
      Mauren Bayer, OSB No. 214905
        Direct:  503.805.2115
        Email:  Maureen.bayer @tonkon.com

*Attorneys for Proposed Intervenor Gunderson LLC*

**PAGE 21 – PROPOSED INTERVNEOR GUNDERSON LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES**

ER-566

Matthew J. Stock, OSB No. 065205
HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Tel: (206) 623-1745
Fax: (206) 623-7789
Email: matthew.stock@hcmp.com
*Attorneys for Legacy Site Services LLC,*
*agent for Arkema Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE, | Case No. 3:23-cv-01603-YY |
| Plaintiffs, | DECLARATION OF MATTHEW STOCK IN SUPPORT OF ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES |
| v. | |
| ACF INDUSTRIES, LLC; AIRGAS USA LLC; AIR LIQUIDE AMERICA L.P.; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.; BNSF RAILWAY COMPANY; CALBAG METALS CO.; CITY OF PORTLAND; ESCO GROUP LLC; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); GOULD ELECTRONICS INC.; HAJ, INC., D/B/A CHRISTENSON OIL COMPANY; HERCULES LLC; KOPPERS INC.; MCCALL OIL & CHEMICAL CORPORATION; MCCALL OIL REAL ESTATE COMPANY LLC; MOREC FRONT | |

*DECLARATION OF MATTHEW STOCK IN SUPPORT OF ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES - 1 (CASE NO. 3:23-CV-01603-YY)*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-567

LLC; GWC PROPERTIES, LLC; GWC FRONT, LLC; TANKER BASIN LLC; MMGL LLC; NORTHWEST PIPE COMPANY (FKA NORTHWEST PIPE & CASING COMPANY AND NORTHWEST PIPE AND CASING COMPANY); PACIFICORP, AN OREGON CORPORATION; PORT OF PORTLAND; PORTLAND GENERAL ELECTRIC COMPANY (PGE); PORTLAND TERMINAL RAILROAD COMPANY; SCHNITZER STEEL INDUSTRIES, INC.; SILTRONIC CORPORATION; SULZER PUMPS (US) INC.; and VALVOLINE INC.,

Defendants.

I, Matthew Stock, declare as follows:

1.      I am a principal with the law firm of Hillis Clark Martin & Peterson P.S. and counsel of record for Legacy Site Services LLC, agent for Arkema Inc. ("Arkema") in the above-captioned matter. I am over the age of 18 and competent to testify as to the facts stated below. I make the following declaration from my personal knowledge.

2.      For more than 20 years, Arkema has been actively involved in the CERCLA response actions that have taken place in relation to the Portland Harbor Superfund Site (the "Site"). Among other things, Arkema was a founding member of the "Lower Willamette Group"— a collection of parties that conducted a remedial investigation and feasibility study of the Site pursuant to Administrative Order on Consent for Remedial Investigation/Feasibility Study, CERCLA Docket No. 10-2001-0240. Arkema was also a member of the "Pre-RD Group"—a separate group of parties that conducted site-wide sampling to update the dataset following the completion of the feasibility study pursuant to Administrative Settlement Agreement and Order on Consent for Pre-Remedial Design Investigation and Baseline Sampling, CERCLA Docket No. 10-

*DECLARATION OF MATTHEW STOCK IN SUPPORT OF ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES - 2* (CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-568

2018-0236. Arkema is currently performing remedial design work at River Mile 7W pursuant to Administrative Settlement Agreement and Order on Consent for River Mile 7 West Project Area, CERCLA Docket No. 10-2020-0054.

3. Arkema is also actively involved in the ongoing private allocation of liability for the response costs that have been and will be incurred in relation to the Site (the "Response Cost Allocation"). Arkema has been involved in that allocation process since 2008 and has invested significant time and money into that process. Currently, there are more than 100 parties participating in the Response Cost Allocation, which aims to resolve several billion dollars in past and future response costs associated with the Site.

4. Separately, Arkema has asserted cost recovery and contribution claims against those potentially responsible parties that refused to take part in the Response Cost Allocation and also refused to enter tolling agreements. Those claims have been filed in the matter of *Arkema Inc. v. Anderson Roofing Co., Inc., et al.*, Case No. 3:09-CV-453-PK (D. Or.), which is currently stayed pending the outcome of the Response Cost Allocation.

5. Arkema is currently defending against natural resource damage claims asserted by the Confederated Tribes and Bands of the Yakama Nation in the matter of *Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp., et al.*, Case No. 3:17-cv-00164-SB (D. Or). That matter is also currently stayed pending the outcome of the Response Cost Allocation.

6. Arkema was actively involved in the Trustees' early natural resource damages settlement process, funding and participating in both the Phase I and Phase II assessment efforts.

7. Attached as **Exhibit A** is a true and correct copy of the Trustees' October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage

*DECLARATION OF MATTHEW STOCK IN SUPPORT OF ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES - 3*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-569

Assessment Plan, *available at* https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final%20%282%29.pdf. This document is part of the United States' Portland Harbor NRDA Administrative Record. The highlighting on Exhibit A is mine.

8.      Attached as **Exhibit B** is a true and correct copy of a May 1, 2018 document titled "Portland Harbor List of Potentially Responsible Parties who are Liability Letter Recipients (based on EPA's notification list," available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20180501_PRPs-LiabilityListRecipients_4263.pdf. This document is part of the United States' Portland Harbor NRDA Administrative Record. The highlighting on Exhibit B, which shows that Arkema has been identified as being potentially responsible for natural resource damages at the Portland Harbor Natural Resource Damage Assessment Area, is mine.

9.      Attached as **Exhibit C** is a true and correct copy of the Trustees' May 14, 2015 Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement, *available at* https://pub-data.diver.orr.noaa.gov/portland-harbor/20230401_PH%20Ph2%20PthC%20SummaryPreface_5383.pdf. This document is part of the United States' Portland Harbor NRDA Administrative Record. The highlighting on Exhibit C is mine.

10.     Attached as **Exhibit D** is a true and correct copy of *Commissioner of Department of Planning & Natural Resources v. Century Alumina Co.*, CIV. 2005/0062, 2008 WL 4693550 (D.V.I. Oct. 22, 2008).

//

//

//

//

*DECLARATION OF MATTHEW STOCK IN SUPPORT OF ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES - 4*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-570

I declare, under penalty of perjury, that the foregoing is true and correct.

DATED: July 28, 2025.

_____

Matthew Stock

*DECLARATION OF MATTHEW STOCK IN SUPPORT OF*
*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION*
*TO ENTER CONSENT DECREES - 5*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-571

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Declaration of Matthew Stock in Support of Arkema Inc.'s Motion to Intervene and Memorandum of Law in Support with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties registered in the CM/ECF system for this matter.

DATED: July 28, 2025.

/s/ Maggie Bassetti
Maggie Bassetti, Paralegal

*DECLARATION OF MATTHEW STOCK IN SUPPORT OF*
*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION*
*TO ENTER CONSENT DECREES - 6*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-572

# EXHIBIT A



# Portland Harbor Superfund Site
# Natural Resource Damage Assessment Plan
# Addendum 2: Phase 3 Damage Assessment Plan

Final  |  3 October 2018

prepared for:

National Oceanic and Atmospheric Administration

prepared by:

Industrial Economics, Incorporated

2067 Massachusetts Avenue

Cambridge, MA 02140

IEc

*This page intentionally left blank.*

INDUSTRIAL ECONOMICS, INCORPORATED

**IEc**

## TABLE OF CONTENTS

**LIST OF EXHIBITS**

**LIST OF ACRONYMS**

**CHAPTER 1 | INTRODUCTION**

| | |
|---|---|
| 1.0 Background and Purpose | 1-1 |
| 1.1 Status of NRDA phases | 1-2 |
| 1.2 Comparison of Remedy and NRDA | 1-4 |
| 1.3 Use of Existing Information | 1-5 |
| 1.4 Coordination with Other Parties | 1-5 |
| 1.5 Coordination with the Public | 1-5 |

**CHAPTER 2 | UPDATE TO PORTLAND HARBOR ASSESSMENT AREA BACKGROUND AND CONFIRMATION OF EXPOSURE**

| | |
|---|---|
| 2.0 Assessment Area | 2-1 |
| 2.1 Portland Harbor Superfund Site History and Portland Harbor Remediation | 2-3 |
| 2.2 Sources of Hazardous Substances and Pathways | 2-6 |
| 2.3 Natural Resources and Resource Services | 2-7 |
| 2.4 Confirmation of Exposure | 2-8 |

**CHAPTER 3 | UPDATE TO INJURY ASSESSMENT AND QUANTIFICATION AND DAMAGE DETERMINATION**

| | |
|---|---|
| 3.0 Assessment Approach | 3-1 |
| 3.1 Hazardous Substances | 3-1 |
| 3.2 Natural Resources | 3-1 |
| 3.3 Injury Determination | 3-2 |
| 3.4 Injury Quantification and Damage Determination | 3-6 |
| 3.5 Baseline | 3-10 |

ER-576

IEc

## CHAPTER 4  |  PROPOSED STUDIES

| | |
|---|---|
| 4.0 Introduction | *4-1* |
| 4.1 Study Prioritization | *4-3* |
| 4.2 Injury Assessment Study Descriptions | *4-3* |
| 4.3 Sharing Data, Split Samples, and Analytical Results | *4-16* |
| 4.4 Quality Assurance | *4-16* |
| 4.5 Study Management | *4-18* |
| 4.6 Data Generation and Acquisition | *4-19* |
| 4.7 Assessment and Oversight | *4-20* |
| 4.8 Data Validation and Usability | *4-20* |

## REFERENCES

## APPENDIX A: RESPONSE TO PUBLIC COMMENTS

IEc

**LIST OF EXHIBITS**

Exhibit 2-1     Phase 3 Assessment Area                                           2-2

Exhibit 2-2     Summary of Selected Remedy Technologies (EPA 2017)               2-4

Exhibit 2-3     Sites Associated with Substantial In-river Remedial              2-5
                Actions (EPA 2017)

Exhibit 3-1     Preliminary Phase 3 Conceptual Site Model                        3-3

Exhibit 4-1     Ongoing and Planned Studies                                      4-4

Exhibit 4-2     Personnel Plan                                                   4-18

# IEc

## LIST OF ACRONYMS

| | |
|---|---|
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| COC | contaminant of concern |
| DDT | dichlorodiphenyltrichloroethane |
| DEQ | Oregon Department of Environmental Quality |
| DIVER | NOAA's Data Integration Visualization Exploration and Reporting database |
| DOI | United States Department of the Interior |
| ECSI | Oregon DEQ's Environmental Cleanup Site Information database |
| EPA | United States Environmental Protection Agency |
| FCA | Fish Consumption Advisory |
| HEA | Habitat Equivalency Analysis |
| MGP | Manufactured Gas Production |
| NOAA | National Oceanic and Atmospheric Administration |
| NCP | National Oil and Hazardous Substances Pollution Contingency Plan |
| NPL | National Priorities List |
| NRDA | Natural Resource Damage Assessment |
| PAH | polycyclic aromatic hydrocarbon |
| PCB | polychlorinated biphenyl |
| Site | Portland Harbor Superfund Site |
| PI | Principal Investigator |
| PRP | Potentially Responsible Party |
| QA | Quality Assurance |
| QAP | Quality Assurance Plan |
| QC | Quality Control |
| REA | Resource Equivalency Analysis |

IEc

| | |
|---|---|
| RI/FS | Remedial Investigation / Feasibility Study |
| PEIS/RP | Programmatic Environmental Impact Statement and Restoration Plan |
| RM | River Mile |
| ROD | Record of Decision |
| U.S. | United States |

ER-580

**IEc**

## CHAPTER 1 | INTRODUCTION

### 1.0 BACKGROUND AND PURPOSE

For decades, the Willamette River near Portland, Oregon, including the Portland Harbor Superfund Site (Site), has been contaminated by oil and hazardous substances.[1,2,3] To address injuries to natural resources resulting from exposure to these contaminants, and identify the scale and scope of restoration sufficient to compensate for natural resource service losses, the Portland Harbor Natural Resource Trustee Council (Trustee Council) is conducting a Natural Resource Damage Assessment (NRDA). The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 et seq.; the Clean Water Act, 33 U.S.C. § 1251; the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 C.F.R. 300, Subpart G; Executive Orders 12580 and 12777; and other applicable Federal and state laws and regulations provide a legal framework for the Trustee Council's actions.

The Trustee Council is comprised of representatives from the Confederated Tribes of the Grand Ronde Community of Oregon, Confederated Tribes of Siletz Indians, Confederated Tribes of the Umatilla Indian Reservation, Confederated Tribes of the Warm Springs Reservation of Oregon, Nez Perce Tribe, United States Department of the Interior (DOI), acting through the U.S. Fish and Wildlife Service, U.S. Department of Commerce, acting through the National Oceanic and Atmospheric Administration (NOAA), and State of Oregon. The trustees are authorized under both Federal and state regulations to conduct a NRDA (NCP 40 Code of Federal Regulations (CFR) Subpart G, §300.600, 300.605, 300.610).

In 2010, the Trustee Council released to the public the Portland Harbor Superfund Site Natural Resource Damage Assessment Plan (2010 Plan; Stratus 2010).[4] The 2010 Plan was developed to guide the Trustee Council in performing the NRDA in a systematic

---

[1] Oil, for purposes of this document means "oil" as defined in 33 U.S.C. § 2701(23): "oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil…".

[2] For purposes of this document, the term "Hazardous Substances" is defined in 42 U.S.C. § 9601(14).

[3] See 65 Fed. Reg. 232, 75,179 et seq. (Dec. 1, 2000) for description of the Site.

[4] The Trustee Council released a draft of the Plan for public review and comment in November 2009. The final version of the Plan, released in 2010, addressed the comments received during the comment period (2010 Plan Appendix D) and included Addendum 1 Inclusion of Navigational Services in the Portland Harbor Superfund Site Natural Resource Damage Assessment (Appendix E).

## IEc

manner at reasonable cost. It lays out an iterative, four-phased approach to encourage participation by parties potentially responsible for releases of contamination and discharges of oil (potentially responsible parties; PRPs) to the lower Willamette River. Each assessment phase outlined in the 2010 Plan builds upon preceding phases (2010 Plan Section 1.5).

The purpose of this Addendum is to provide an update on the current status of the NRDA, as well as more detailed information regarding the Trustee Council's proposed focus for conducting the remaining phases. This includes the Trustee Council's emphasis on specific natural resources and hazardous substances; methods and metrics for quantifying contaminant-related injuries; and the specific studies that the Trustee Council has identified to-date to support injury determination and quantification and damage determination. Phase 3 efforts will build upon the substantial volume of information and data that have been generated through Phase 2, the remedial process, and other studies.

### 1.1    STATUS OF NRDA PHASES

As mentioned above and described in Section 1.5 of the 2010 Plan, the Portland Harbor NRDA consists of four Phases, which may overlap in their implementation.

*Phase 1 – Development of the Assessment Plan*. This phase of the Portland Harbor NRDA process is complete, and included:

- Development of the 2010 Plan with an Addendum (Addendum 1) regarding navigational services in Appendix E of the 2010 Plan.

- Implementation of scientific studies to fill data gaps related to salmon and osprey (NOAA 2009, Buck and Kaiser 2011).

- Initiation of public outreach efforts (e.g., comment period on the draft 2010 Plan and a Trustee Council website: https://www.fws.gov/oregonfwo/Contaminants/PortlandHarbor/).

- Review of data collected as part of the remedial process as well as other relevant data and literature to determine preliminary injury and damages and evaluate data gaps.

- Development of an outline for the scope of Phase 2 (Phase 2 Framework). This is included as Appendix B of the 2010 Plan.

*Phase 2 – Implementation of the Settlement-Oriented Work Plan*. The goal of Phase 2 is to conduct a settlement-oriented assessment, including restoration planning, to enable the Trustee Council to settle PRPs' natural resource liability near the time that the United States Environmental Protection Agency (EPA) issues the Record of Decision (ROD) for the Site. To support these efforts, the Trustee Council is using the extensive breadth of existing information, including the results of studies conducted under Phase 1; the results of additional studies conducted under Phase 2; reasonably conservative, simplifying assumptions to the extent practicable; and guidance in the Federal regulations. The Trustee Council quantified or qualitatively characterized natural resource injuries and lost

ER-582

IEc

services using methods typically applied in the context of NRDA, and identified the type, scale, and cost of restoration sufficient to compensate the public for these losses.

Some efforts have been completed, while others are ongoing. Specifically, during the Phase 2 assessment:

- The Trustee Council defined the Phase 2 Assessment Area (i.e., the area within which natural resource exposure to and injury from contaminant releases are being assessed) as the Willamette River from approximately river mile (RM) 12 to RM 1, and the upper one mile of Multnomah Channel.

- Efforts to assess key resources, including juvenile salmon, Pacific lamprey, white sturgeon, sediment, benthos, piscivorous birds (i.e., osprey and bald eagle), piscivorous mammals (i.e., otter and mink), and other fishes covered by advisories or having recreational value were completed (e.g., Buck and Kaiser 2011, Stratus 2011, Stratus et al. 2013), along with evaluations of pathway and confirmation of exposure of resources to Site-related contaminants.

- The Trustee Council conducted a settlement-oriented assessment of contaminant-related injury to natural resources and corresponding ecological and recreational losses. This assessment used existing information and habitat and resource equivalency analyses (HEA/REA) and benefit transfer to quantify ecological and recreational losses, respectively (methods are described in Chapter 5 of the 2010 Plan).

- The Trustee Council confirmed the importance of specific natural resources such as salmon, lamprey, and sturgeon to the tribal Trustees and evaluated potential compensatory restoration projects to address losses of such natural resources.

- Cooperatively with PRPs, the Trustee Council is engaging in settlement discussions and assessment efforts.

- The Trustee Council completed the Phase 2 restoration planning process, culminating with the release of the Final Programmatic Environmental Impact Statement and Restoration Plan (PEIS/RP) in 2017. The PEIS/RP identifies Integrated Habitat Restoration Planning as the Trustee Council's preferred alternative and lists a suite of potential restoration projects both within the Study Area and the Broader Focus Area (see the PEIS/RP (NOAA 2017) and the 2010 Plan Chapter 5).

The Trustee Council continues to work towards completion of the Phase 2 process. Once Phase 2 is concluded, the Trustee Council will develop a Phase 2 Assessment Report, which describes the Phase 2 process in more detail and will be released to the public for review.

*Phase 3 – Completion of the NRDA.* Phase 3 will fill remaining data gaps, as needed, to refine injury determination and quantification, damage determination, and restoration planning sufficient for the Trustee Council to pursue litigation-based natural resource damage claims against PRPs who do not settle during Phase 2. This Addendum is the first

ER-583

IEc

step in the Phase 3 planning process, and lays out a framework that the Trustee Council intends to pursue when implementing Phase 3.

The Trustee Council does not yet have a firm timeline for the completion of Phase 3 of this NRDA. A timeline may be accelerated or slowed depending on variables such as further refinement of remedial design by EPA, public comment on this Addendum, and environmental conditions (e.g., weather and flooding) that could restrict ancillary study plan implementation. Even with these areas of uncertainty, the Trustee Council believes that the bulk of the injury assessment work could be completed within the next five years.

*Phase 4 – Recovery of damages from non-settling potentially responsible parties*. The purpose of Phase 4 is to recover from non-settling Portland Harbor PRPs, jointly and severally, natural resource damages including the costs of assessment, resulting from the release of hazardous substances in the Assessment Area. This phase will include litigation, if appropriate.

Information regarding the NRDA process in general, the legal authority of trusteeship, and the Trustee Council's decision to perform a Type B assessment can be found in the 2010 Plan (Sections 1.2, 1.3, and 1.4, respectively).

### 1.2 COMPARISON OF REMEDY AND NRDA

With oversight from EPA and the Oregon Department of Environmental Quality (DEQ), a variety of remedial efforts have occurred and are planned for the Site (see Section 2.1 for current status of the Site remedy). The distinction between remedial activities and NRDA is an important one, particularly since both sets of activities often operate concurrently and overlap in geographic scope. Remedial actions aim to remove and/or reduce to acceptable levels the human health and ecological risks associated with hazardous substances at a site. This process is described in CERCLA (42 USC §9601(24)). These efforts are typically funded by the PRPs, the Superfund program, or a combination of both. Remedial activities range from dredging and capping contaminants in place to removal and disposal of contaminated materials in landfills, all of which can, for a short time period re-expose natural resources to the hazardous substances of concern and can physically impact habitat. It is an anticipated risk that is tempered by the knowledge that long-term benefits will be obtained through reduction of human and natural resource exposure to the hazardous substances.

Also under CERCLA, NRDA is a process by which natural resource trustees can determine compensation (i.e., restoration, replacement, or acquisition of equivalent lost resources or resource services) for injuries to natural resources (43 CFR Part 11; see Section 1.1 for current status of the Portland Harbor NRDA). NRDA can take into account the interim losses that the public has incurred due to the release of hazardous substances as well as the release of hazardous substances and physical injuries resulting from remedial activities. The assessment aims to compensate the public for ecological losses as well as potential lost human services including, but not limited to, foregone or diminished recreational fishing and boating trips and lost tribal services. The damages recovered through the NRDA process are then translated into actions in order to restore

the resources and/or services that have been lost, including those resources injured or lost as a result of remedial actions (43 CFR §11.15(a)(1)).

Despite the different goals and timeframes, the Trustee Council and their remedial counterparts are coordinating efforts to the extent practicable in accordance with the CERCLA NRDA regulations (43 CFR §11.31(a)(3)) to avoid situations where natural resources are unnecessarily injured by the remedy and to maximize potential efficiencies (e.g., sampling).

## 1.3    USE OF EXISTING INFORMATION

The CERCLA NRDA regulations require that the assessment be conducted in a planned, systematic manner and at a reasonable cost (43 CFR §11.13(c)). The Trustee Council prioritizes cost effectiveness. As such, the Trustee Council will review existing data prior to undertaking any new data collection, including data collected as part of remedial and restoration efforts. Where existing data do not allow for the determination of the nature or extent of injuries, the Trustee Council will implement studies that will focus on filling those data gaps. These studies will be designed and implemented in phases to allow for subsequent adjustments in study design based on initial findings.

## 1.4    COORDINATION WITH OTHER PARTIES

As stated in the 2010 Plan, the Trustee Council will coordinate NRDA activities with ongoing remedial actions to conduct the NRDA efficiently, cost effectively, and with minimal duplication of effort (43 CFR §11.31(a)(3)). Therefore, the Trustee Council will continue to work with EPA, DEQ, and PRPs.

In addition, under CERCLA the parties responsible for releases of hazardous substances were invited to participate in a cooperative NRDA effort (43 CFR §11.32(a)(2) & (d)). For example, the Trustee Council has signed Phase 2 Funding and Participation Agreements with dozens of PRPs, with the goal of relying on existing information for the purpose of early (i.e., prior to litigation) settlement of the cooperating PRPs' natural resource damages liability.

## 1.5    COORDINATION WITH THE PUBLIC

The Trustee Council will continue to actively encourage public participation and considers such participation to be an important component of the NRDA process. This process will include an opportunity for review and comment by PRPs as well as affected Federal, state, or tribal entities in addition to any interested members of the public (43 CFR §11.32(e)(2)(i)). For example, the Trustee Council made the draft of this Addendum available for review for a period of thirty days in accordance with 43 CFR §11.32(e)(2)(i). Two sets of comments were received. Those comments and the Trustee Council's responses are provided in Appendix A.

A copy of this document is available for review online at:

https://www.fws.gov/oregonfwo/Contaminants/PortlandHarbor/

IEc

and

https://darrp.noaa.gov/hazardous-waste/portland-harbor

Other previously prepared Trustee Council documents, some of which are referenced in this Addendum, are also available on these websites.

Interested parties may obtain a hard copy of this Addendum from the Trustee Council by submitting a written request to the address listed above.

As the Trustee Council moves forward with this NRDA, there will be additional opportunities for public participation. Examples include review of additional substantial changes to the 2010 Plan, future restoration plans, and proposed settlements. The Trustee Council will provide sufficient notification to the public in advance of these opportunities.

### 1.5.1 ADMINISTRATIVE RECORD

Pursuant to 43 CFR §11.91(c), the Trustee Council maintains a publicly available Administrative Record for the Portland Harbor NRDA, which includes documents relied upon for the NRDA as well as this Final Addendum and subsequent restoration planning documents. The Administrative Record will soon be available electronically at: https://www.fws.gov/oregonfwo/Contaminants/PortlandHarbor/#arec. It is currently available in hard copy at the Portland Harbor NRDA Reading Room, located at the U.S. Fish and Wildlife Service Office (2600 SE 98th Avenue, Suite 100, Portland, Oregon). Visitors may access the Reading Room by appointment. To schedule an appointment, please contact Ted Buerger at ted_buerger@fws.gov.

IEc

# CHAPTER 2  |  UPDATE TO PORTLAND HARBOR ASSESSMENT AREA BACKGROUND AND CONFIRMATION OF EXPOSURE

This chapter defines the assessment area for Phase 3 and summarizes the Site history, including the remedial process and current status. It also reviews the sources of hazardous substances and oil, pathways, and natural resources and resource services within that geographic scope. Lastly, this chapter summarizes information indicating that natural resources have been exposed to contamination within the Assessment Area.

## 2.0    ASSESSMENT AREA

Based on the industrial history of the Portland Harbor area, the 2010 Plan, the geographic scope defined under Phase 2 (NOAA 2017), remedial actions (ongoing and planned), and the CERCLA NRDA regulatory definition of an assessment area ("the area or areas within which natural resources have been affected directly or indirectly by the discharge of oil or release of a hazardous substance" (43 CFR §11.14(c)), the Trustee Council identified the assessment area for Phase 3 of the Portland Harbor NRDA as the Willamette River, including Swan Island Lagoon, from approximately RM 12 to RM 1 near the confluence with the Columbia River, as well as the upper one mile of Multnomah Channel (Assessment Area; Exhibit 2-1). A detailed description of the physical, biological, tribal, and economic characteristics of the Assessment Area is provided in Chapter 2 of the 2010 Plan.

ER-587

**IEc**

EXHIBIT 2-1    PHASE 3 ASSESSMENT AREA



IEc

## 2.1 PORTLAND HARBOR SUPERFUND SITE HISTORY AND PORTLAND HARBOR REMEDIATION

The Willamette River drains 11.7 percent of the area in the State of Oregon during its meandering 309-mile route, which terminates at the confluence with the Columbia River (EPA 2017). Since the late 1800s, the Portland Harbor section of the lower Willamette River has been widely modified to allow for shipping, manufacturing, and other industries.[5] This includes the creation of a Federally authorized navigation channel and other maintenance dredging areas.[6] Wharves, piers, floating docks, and pilings are commonly observed throughout this reach and support shipping activities in addition to stabilizing riverbanks for development (EPA 2017). Hazardous substances entered, and continue to enter, the Willamette River through a variety of historic and current activities, including ship building and repair; ship dismantling; wood treatment and lumber milling; storage of bulk fuels; manufactured gas production (MGP); chemical manufacturing and storage; metal recycling, production, and fabrication; steel mills, smelters, and foundries; and electrical production and distribution (EPA 2017). More detail is provided in Section 2.2 of the 2010 Plan.

In May 1998, the EPA conducted a Preliminary Assessment and Site Investigation, which resulted in the addition of the Site to the National Priorities List (NPL) in December 2000 (EPA 2017). On September 28, 2001, a subset of the approximately 150 PRPs, called the Lower Willamette Group, entered into an Administrative Settlement and Order on Consent with EPA to conduct the Remedial Investigation and Feasibility Study, which collected a substantial amount of data to characterize the physical and chemical characteristics of the lower Willamette River (EPA 2016a, 2016b).

In January 2017, EPA issued the ROD for the Site, which presents the Selected Remedy for clean-up of the in-river portion of the Site from approximately RM 1.9 to RM 11.8. A combination of technologies will be used to address areas where contaminant concentrations in sediment exceed cleanup levels, including capping, dredging/excavation, enhanced natural recovery, and monitored natural recovery (Exhibit 2-2). EPA estimates that construction of the selected remedy will be complete approximately 13 years after the initiation of cleanup. Concurrently, the upland areas adjacent to the Willamette River are undergoing site-by-site cleanup under the authority of DEQ, following the Portland Harbor Joint Source Control Strategy (DEQ and EPA 2005). Remediation of source control locations (e.g., contaminated riverbanks) that are adjacent to in-water cleanup areas may be coordinated with EPA as part of the Site

---

[5] See Chapter 2 of the 2010 Plan for more information.

[6] The Federal navigation channel extends from the confluence of the Willamette and Columbia Rivers to Willamette River RM 11.6 and is authorized to a depth of -40 feet Columbia River datum (U.S. Army Corps of Engineers 2018).

remedy. All other upland source control efforts are expected to be completed prior to in-water remedy implementation.[7]

EXHIBIT 2-2    SUMMARY OF SELECTED REMEDY TECHNOLOGIES (EPA 2017)

| TECHNOLOGY | NEARSHORE HABITAT* | NAVIGATION CHANNEL | TOTAL | UNITS |
|---|---|---|---|---|
| Capping and dredging of in-water contaminated sediment | 326 | 38 | 365 | acres |
| Monitored natural recovery | 675 | 1,100 | 1,775 | acres |
| Enhanced natural recovery (Swan Island Lagoon) | 28 | | 28 | acres |
| Note: | | | | |
| * Nearshore habitat includes active channel margin and other shallow water habitats. | | | | |

Ongoing remedial work at the Site includes baseline and pre-remedial design sampling as well as DEQ's upland source control efforts, which are being conducted through agreements between EPA and several PRPs. Baseline sampling will provide a point of reference for assessing the long-term success of the remedy, while remedial design sampling will provide information sufficient for drafting engineering designs to implement the remedy (e.g., dredge prisms and cap designs). To the extent practicable, the Trustee Council plans to utilize information gathered during the remedial process in assessing injury.

In addition to this work, a number of enforcement and cleanup actions have occurred or were initiated throughout the Site (Exhibit 2-3; EPA 2017), including at:

- Terminal 4 (RM 4.5 East) – Work completed in 2008 included dredging and off-site disposal of contaminated sediment, capping contaminated sediment in-river, and riverbank capping and stabilizing. Additional cleanup actions are ongoing.

- Triangle Park (RM 5 East) – This remedial action consisted of institutional controls, groundwater monitoring and in-river sediment excavation and capping.

- Gould NPL Site (RM 5 West) – An upland remedy addressed soils at this site in 2000 and the site was removed from the NPL in 2002. Five year reviews of the remedy are ongoing.

---

[7] Additional details regarding upland source control work can be found in the Portland Harbor Upland Source Control Summary Report (DEQ 2016).

IEc

**EXHIBIT 2-3    SITES ASSOCIATED WITH SUBSTANTIAL IN-RIVER REMEDIAL ACTIONS (EPA 2017)**



IEc

- U.S. Moorings (near RM 6 West) – In June 2007, EPA issued a Resource Conservation and Recovery Act order to the United States Army Corps of Engineers to conduct an upland source investigation. The U.S. Moorings Remedial Investigation/Feasibility Study (RI/FS) for upland sources identified where potentially erodible, contaminated soils were located; these soils were remediated in 2013.

- NW Natural (RM 6 West) – In 2005, tar-like material and tar-like contaminated sediment were dredged from the riverbank and nearshore areas adjacent to the Gasco facility. These materials were disposed of off-site and a cap was constructed over the dredged area.

- Gasco (RM 6.5 West) – NW Natural and Siltronic are conducting site characterization and design evaluations in-water, adjacent to their two facilities. The information collected through these efforts was incorporated into the Site RI/FS, and the remedy will be implemented as prescribed in the ROD.

- Arkema (near RM 7 West) – Site characterization and preliminary design evaluations were conducted, but no cleanup actions were taken.

- River Mile 11E Project Area (RM 11 East) – Characterization efforts for this area were conducted from 2013 to 2015, and the remedy will be implemented as prescribed in the ROD.

- McCormick and Baxter NPL Site (RM 7 East) – Completed in 2005, the selected remedy addressed in-river and upland areas of this site. It included a 23-acre cap on nearshore and submerged lands adjacent to the facility. The most recent five-year review indicated that the remedies for soil, sediment, and groundwater are functioning as intended.

## 2.2 SOURCES OF HAZARDOUS SUBSTANCES AND PATHWAYS

As described above and in Sections 2.2-2.4 of the 2010 Plan, industrial and municipal activities have resulted in the discharge and release of hazardous substances (e.g., polychlorinated biphenyls (PCBs), polycyclic aromatic hydrocarbons (PAHs), dioxins and furans, metals, pesticides) to the lower Willamette River. Such releases have occurred through spills, permitted and non-permitted discharges, stormwater runoff from contaminated upland facilities, and movement of contaminated groundwater to Willamette River surface water and sediment. Once contamination reaches the river, it may remain in surface water and be transported away from the location of entry, or adsorb to sediment particles. Organisms are then exposed to these contaminants through direct contact or ingestion of contaminated water, sediment, and prey, moving the contaminants through the food web.

Extensive information regarding contaminant pathways to and movement within the Willamette River has been collected through the remedial and upland source control processes (e.g., as cited in the 2010 Plan Sections 2.3.1 and 2.4).[8] This includes documentation of facility-specific hazardous substance and oil releases, area-related parameters (e.g., groundwater flow patterns), physical transport mechanisms (e.g., in-river sediment movement, transition zone water characteristics), and contaminant concentrations in various media. For example, Site-related contaminants have been measured in surface water, groundwater, sediment, soil, invertebrates, fishes, birds, and mammals collected from the Willamette River. The Trustee Council will utilize this information to help document the connections between releases, natural resource exposure, and injuries.

## 2.3   NATURAL RESOURCES AND RESOURCE SERVICES

The Assessment Area is comprised of interconnected and interdependent structures, organisms, and processes, and supports a suite of aquatic-related habitats such as wetlands, shoreline, active channel margin, and other nearshore and shallow water habitat (together, aquatic habitat complex). This aquatic habitat complex includes surface water resources (shallow, pelagic, and benthic waters and sediments); geologic resources, such as soil; and biological resources. Substrates vary from natural rock, silt, and sand to artificial riprap and sheet piling, and may be unvegetated, or vegetated with either native or non-native species.[9] Biological resources include, but are not limited to, aquatic invertebrates, aquatic and terrestrial plants, reptiles and amphibians, anadromous and resident fish, birds (e.g., osprey, bald eagle, spotted sandpiper), and mammals (e.g., mink, river otter). Some of these species are listed by state and/or Federal agencies as threatened, endangered, or species of concern.

The aquatic habitat complex provides physical structure to the Assessment Area; offers wildlife access to food, water, and shelter; and enables services such as sediment and pollution control, localized microclimate and shading, and provision of wintering and breeding services for waterfowl, shorebirds, and migrating birds. Though parts of the Assessment Area have been modified to accommodate industrial activities (e.g., armored riverbanks), the majority of the Willamette River shoreline within the City of Portland is part of the Greenway overlay, whose purpose is to protect, conserve, enhance, and maintain lands within the aquatic habitat complex, increase public access to the river, and protect and improve water quality (NOAA 2017). The aquatic habitat complex provides structure and vegetation that supply important services to the biological resources in the Assessment Area. For example, because beaches accumulate large woody debris, the

---

[8] The CERCLA NRDA regulations define a pathway as: "[t]he route or medium through which oil or a hazardous substance is or was transported from the source of the discharge or release to the injured resource" (43 CFR §11.14(dd)).

[9] This NRDA will focus on biological species and other natural resources that may have been injured by hazardous substance releases. The dredged navigation channel, rip-rap, sheet piling, and other anthropogenically-altered areas (e.g., parking lots or mowed lawns) are not being considered.

adjacent in-water areas are used by species such as salmon, shad, and white sturgeon. Man-made construction, including pilings and overwater structures (e.g., floating or permanent docks), also influences the quality of the aquatic habitat complex and may provide points of attachment for invertebrate communities and nesting sites for birds (e.g., osprey, cliff swallows; Adolfson Associates 2009, NOAA 2017).

Together, the components of a habitat support both ecological and human use services. The CERCLA NRDA regulations define services as, "the physical and biological functions performed by the resource including the human uses of those functions," which can be used as, "a metric for measuring resource conditions and resource restoration" (43 CFR §11.14(nn); 73 Fed. Reg. 57,259 at 57,263-57,264). Some examples of services include, but are not limited to:

- Ecological functions such as nutrient cycling and predator-prey interactions;

- Recreational activities such as hunting, fishing, swimming, boating, and wildlife viewing;

- Cultural, spiritual, and religious purposes; and

- Subsistence and general food sources.

The resources that comprise and utilize the aquatic habitat complex are essential for the sustainable provision of services. Because of the interrelatedness and interdependence of resources within a given habitat, impacts to one component (e.g., individual species or species group) may cause cascading impacts to the natural resource services provided by other resources and the habitat as a whole. Additional descriptions of resources and resource services are provided in Sections 2.5 and 2.6 of the 2010 Plan and Chapter 3 of the PEIS/RP (NOAA 2017).

## 2.4    CONFIRMATION OF EXPOSURE

As stated in the CERCLA NRDA regulations, "whenever possible, exposure shall be confirmed using existing data," (43 CFR §11.37(b)) where exposure "means that all or part of a natural resource is, or has been, in physical contact with oil or a hazardous substance, or with media containing oil or a hazardous substance" (43 CFR §11.14(q)). Pursuant to these regulations, in the 2010 Plan the Trustee Council confirmed exposure for a suite of natural resources within the Assessment Area, including surface water (and transition zone water), sediment, groundwater, soil, and biota (e.g., benthic invertebrates, fishes, birds, and mammals; see Chapter 3 of the 2010 Plan for more details).[10]

When the 2010 Plan was developed, data sources included key remedial documents and initial NRDA reports (e.g., Integral Consulting 2006a, 2006b; Integral Consulting et al. 2007; PHNRTC 2007). DEQ upland contaminant source investigations also supported the

---

[10] The analysis was conducted to meet the objectives for confirmation of exposure and does not present the universe of data associated with natural resource exposure to contaminants.

IEc

confirmation of exposure for groundwater and geologic resources (DEQ 2016). Since that time, additional data related to the cleanup of the Site have been collected by PRPs (with and without EPA oversight) and DEQ, and independent scientific investigations have been conducted, which may help refine the Trustee Council's understanding of natural resource exposure and injury (e.g., Buck and Kaiser 2011, Stratus et al. 2013, McIntyre 2016, Spromberg et al. 2016). The Trustee Council will determine the relevance and quality of these data and information before relying upon them for the purposes of the NRDA.

**IEc**

# CHAPTER 3  |  UPDATE TO INJURY ASSESSMENT AND QUANTIFICATION AND DAMAGE DETERMINATION

## 3.0    ASSESSMENT APPROACH

The CERCLA NRDA regulations require that the assessment be conducted in a planned, systematic manner and at a reasonable cost (43 CFR §11.13(c)). Consistent with these regulations and the approach presented in the 2010 Plan (Section 4.1), the Trustee Council identified a set of contaminants, natural resources, and pathways on which to focus assessment efforts. This assessment will emphasize the use of existing information, identify data gaps, and evaluate potential methods for addressing those data gaps. Studies will be designed and implemented in phases to allow for subsequent adjustments in study design based on initial findings. In addition, the Trustee Council will consider the relationship between injury and restoration to ensure that the metrics used to assess each of these components are comparable and that restoration will provide resources of a type and quality that are consistent with what was lost.

This chapter identifies the hazardous substances and natural resources on which the Trustee Council plans to focus this assessment, discusses injury determination for biological resources, including pathways, summarizes how the Trustee Council will evaluate remedial-related impacts, and describes injury quantification and damage determination methods.

## 3.1    HAZARDOUS SUBSTANCES

As described in Section 2.2, dozens of hazardous substances and oil have been measured in natural resources from the Assessment Area (more information is available in the 2010 Plan, Section 2.3.2, and remedial documents such as the RI/FS (EPA 2016a, 2016b)). In order to conduct Phase 3 of this NRDA at a reasonable cost, the Trustee Council plans to select a subset of these contaminants on which to focus. At this time, the contaminants of concern (COCs) warranting immediate action by the Trustee Council include PAHs, PCBs, and dichlorodiphenyltrichloroethane (DDT) and its metabolites due to their elevated concentrations, widespread presence in sediments throughout the Assessment Area, and connection to industrial sources. Other COCs may warrant further examination as additional information becomes available.

## 3.2    NATURAL RESOURCES

For this NRDA, the Trustee Council is prioritizing the assessment of impacts to the aquatic habitat complex within the Assessment Area (including shoreline, active channel margin, and shallow water areas). As described in Section 2.3, the aquatic habitat

ER-596

IEc

complex is comprised of a combination of interdependent natural resources, including surface water, groundwater, sediment, soils, and biological resources. Changes in habitat functionality, or services, can be informed by the health of those resources and/or the measured levels of contaminants in a particular resource. Changes to the condition of individual organisms or the health and survival of populations that utilize a habitat reflect the services provided by that habitat as a whole. Thus, habitat services and biological resources are linked, and impacts to one will influence the other. Specifically for Phase 3, the Trustee Council is initially focusing their assessment of COC-related injury on organisms mostly likely to use the aquatic habitat complex, including benthic invertebrates (e.g., amphipods, midges), forage fish (e.g., sculpin), and Chinook salmon. These resources are key elements of the aquatic ecosystem, have been exposed to Site-related contaminants (as detailed in the 2010 Plan, Sections 3.3 and 3.6), are representative of impacts to habitat within the Assessment Area, and may also be resources of particular significance to both the general public and tribal members. The Trustee Council is also evaluating potential injuries to birds and mammals that utilize the Assessment Area to determine if additional assessment is warranted.

### 3.3   INJURY DETERMINATION

Determination of injury to natural resources under the CERCLA NRDA regulations consists of documentation that: (1) there is a pathway for the released hazardous substance from the point of release to a point at which natural resources are exposed to the released substance (43 CFR §11.61(a) & (b)), and (2) injury of a natural resource of interest (in this case, biological resources) has occurred, as defined in 43 CFR §11.62. Exposure pathways and injury categories are described below.

#### 3.3.1   PATHWAY

An important step in determining injury to natural resources is to establish a pathway from a known release of a hazardous substance or oil to exposure of a natural resource. At this time, the Trustee Council is focusing on sediment and biological pathways. Direct contact with sediment may expose resources to contaminants. Food web transfer is also important due to the potential of some Site-related contaminants to biomagnify (e.g., PCBs). As noted in Section 2.2, there is an extensive body of available information regarding contaminant fate and transport, both generally in aquatic systems and accounting for Assessment Area-specific characteristics. The conceptual site model in Exhibit 3-1 summarizes the Trustee Council's current focus on specific pathways, biological receptors, and endpoints of injury for the Portland Harbor NRDA. As the NRDA proceeds, the Trustee Council may identify additional pathways of concern.

ER-597

IEc

**EXHIBIT 3-1    PRELIMINARY PHASE 3 CONCEPTUAL SITE MODEL**



IEc

### 3.3.2  INJURY TO BIOLOGICAL RESOURCES

Because the Trustee Council is focusing on biological resources, injury will be determined based on the CERCLA NRDA regulations as, "a measurable adverse change, either long- or short-term, in the chemical or physical quality or the viability of a natural resource resulting either directly or indirectly from exposure to a discharge or oil or release of a hazardous substance" (43 CFR §11.14 (v)). Specifically, injury to biological resources has occurred if exposure to Assessment Area-related contaminants:

1) *"Cause[s] the biological resource or its offspring to have undergone at least one of the following adverse changes in viability: death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction), or physical deformations"* (43 CFR §11.62(f)(i)). The Trustee Council will focus on metrics that are relevant for a particular ecosystem, habitat, or resource. For example, site-specific toxicity tests could indicate a significant reduction in survival or growth of a species, constituting an injury under this definition.

2) *"Exceed[s] levels for which an appropriate State health agency has issued directives to limit or ban consumption of such organism"* (43 CFR §11.62(f)(iii)). Fish consumption advisories are currently in place for the Portland Harbor stretch of the lower Willamette River due to PCBs.[11] The Oregon Department of Health advises people to avoid eating carp, bass, and catfish, and to limit consumption of other resident fishes to one meal per month. Vulnerable populations, which include young children, women of childbearing age, and people with compromised immune systems, are advised not to consume any fish from the area (OHA 2018).

The Trustee Council will prioritize the use of existing data and information to the fullest extent possible, including to establish metrics of injury. Additionally, the Trustee Council will consider a phased approach for developing studies or analyses, as necessary, to address data gaps in the assessment. These are cost effective strategies that are expected to satisfy the standard of reasonable cost described in 43 CFR §11.13(c).

### 3.3.3  INJURY CAUSED BY REMEDIAL ACTIONS

Remedial actions often do not fully return natural resources and/or lost services to baseline conditions (i.e., the conditions that would have existed had the release of the hazardous substances not occurred) because remedial actions are designed to manage unacceptable risks to human health and the environment. Further, remedial actions that involve, for example, dredging and other physical alterations of the environment, may also result in unavoidable, additional injury that is compensable under 43 CFR § 11.15(a)(1). The Trustee Council may identify and quantify the extent to which

---

[11] There is also a fish consumption advisory (FCA) for the Willamette River from the confluence with the Columbia River southward to Eugene for mercury.

remediation affects natural resources by assessing both physical injuries and injuries resulting from residual contamination throughout the documented or expected timeframe of those injuries. This evaluation would be based on a review of remedial documents, when available, including documents that describe where remediation has been completed, or that reasonably estimate the result of the remedy (i.e., habitat condition and level of contamination) (See 43 CFR § 11.15(a)(1)).

In 2017, the EPA issued the ROD for remedial actions in the Site. Consistent with Section 1.2, The Trustee Council will look for opportunities to coordinate remedial actions and NRDA assessment and restoration efforts. This coordination will both increase efficiencies (i.e., cost and time) as well as benefit the natural resources within the Assessment Area. Restoration work conducted in conjunction with the remedy and proposed as compensation for natural resource injuries will be reviewed for approval by the Trustee Council before compensation is accepted, and may also be reviewed by the public as part of restoration planning.[12]

### 3.3.4  SUMMARY OF INJURY DETERMINATION

Currently available data and information demonstrate that natural resources in the Assessment Area have been exposed to and injured by the release of Site-related hazardous substances (e.g., studies and analyses conducted under Phase 2). The Trustee Council has identified specific categories of injury and corresponding habitat and resources that will be the focus of Phase 3 efforts to refine the determination of injury in the Assessment Area. Studies will build on Phase 1, Phase 2, remedial, and other studies, and potentially include, but are not limited to:

- Comprehensive review of existing exposure and effects data;
- Documentation of the pathways from the Site-related source(s) of the COCs to the point at which biota are exposed to those contaminants;
- Documentation of the exposure of natural resources to COCs and corresponding injury, including through sample collection and analysis and laboratory tests;
- Determination of the type and extent of the public's use of Assessment Area resources.

As part of the injury determination process, study efforts will include the data collection and analyses necessary to further characterize baseline conditions (i.e., natural resource conditions but for the contamination; see Section 3.5). These studies and any considerations to be implemented within each study work plan are further discussed in Chapter 4.

---

[12] Interested PRPs must obtain the approval of the Trustee Council prior to project implementation in order to receive credit against potential liability.

IEc

### 3.4    INJURY QUANTIFICATION AND DAMAGE DETERMINATION

Once injury to natural resources has been documented, the CERCLA NRDA regulations state that:

> *...the authorized official shall quantify for each resource determined to be injured and for which damages will be sought, the effect of the discharge or release in terms of the reduction from the baseline condition in the quantity and quality of services...provided by the injured resource* (43 CFR §11.70(a)(1)).

The purpose of the injury quantification step is to define the scope of natural resource injuries and lost services, and to allow for selection and scaling of restoration projects that will adequately and appropriately compensate the public for those injured resources and lost services. The Trustee Council may quantify and value injuries through time, utilizing metrics and units that will depend on how the injury is characterized (see also 2010 Plan Section 4.9). For example, the units could be a quantity of resource (e.g., number or biomass of fish lost); quantity or quality of habitat (e.g., acres of wetland injured); quantity of services (e.g., number of fishing days lost or impaired); or a value (e.g., in dollars) for losses in natural resource services.

An additional parameter in the injury quantification, per the CERCLA NRDA regulations, is a preliminary determination of the recovery period for the resources and habitat within the relevant geographical area (43 CFR §11.31(a)(2)). Recovery period, as defined in 43 CFR §11.14(gg), "means either the longest length of time required to return the services of the injured resource to their baseline condition, or a lesser period of time selected by the authorized official and documented in the Assessment Plan." The Trustee Council will consider factors such as proposed or implemented remedial and restoration activities, natural attenuation, and species' habitat use and sensitivity to contaminants when estimating the recovery period in the Assessment Area. Due to the nature of the contaminants in the Assessment Area (e.g., chemicals with bioaccumulative properties), at this time the Trustee Council anticipates that it will take many decades for some natural resources and resource services in the Assessment Area to reach baseline conditions. Other natural resource services may never return to baseline. The Trustee Council will refine these estimates based on the results of relevant assessment studies.

Once injury is quantified, the Trustee Council will determine the damages required to compensate the public for losses to natural resources and resource services. Damages can be measured as the cost to restore, replace, or acquire the equivalent of lost resources, or the lost value associated with the reduction in resource services (43 CFR §11.80). The CERCLA NRDA regulations identify a list of relevant cost- and value-estimating methodologies for determining natural resource damages (43 CFR §11. 83).

Based on current knowledge and understanding of the Assessment Area and the CERCLA NRDA regulations, the Trustee Council anticipates utilizing the following approaches for injury quantification and damage determination. The Trustee Council may consider different approaches if new information becomes available as the assessment proceeds.

ER-601

**IEc**

- **Ecological:** Exposure to contamination can cause toxic effects on biota, resulting in a loss of resources and resource services. The Trustee Council anticipates using resource equivalency methods (described in more detail in 2010 Plan Section 5.1) to refine the Phase 2 assessment of ecological injuries. As such, the Trustee Council will quantify ecological injury in terms of the loss of specific resources of concern (e.g., threatened or endangered species, species of cultural importance), and will determine damages as the cost of implementing sufficient habitat restoration to generate resources equivalent to those lost.

- **Recreational (human use):** Contamination and associated fish consumption advisories can cause adverse changes to available services in terms of recreational quality, public access, or recreation demand. The Trustee Council will rely on existing information, as well as interviews with key informants and focus groups with recreationists, to determine if implementing survey-based methods for quantifying recreational losses due to contamination is warranted. The Trustee Council may base damages either on the lost value of recreational use services (value-to-cost) or the cost of implementing sufficient restoration such that the amount of recreational use value created is equivalent to the value lost (value-to-value).

- **Tribal lost services:** The Trustee Council expects to quantify the change in services provided by natural resources and corresponding impacts to tribal communities due to contamination of Assessment Area resources through a cultural assessment. The Trustee Council will evaluate methods to refine their determination of tribal-related damages when more information on the types and scale of losses is available. For example, REAs that support the safe continuation of traditional uses by tribal members may be utilized to support tribal service loss assessments.

These anticipated approaches to injury quantification are discussed in greater detail in the following sections.

### 3.4.1 ECOLOGICAL INJURY QUANTIFICATION AND DAMAGE DETERMINATION APPROACH

The Trustee Council anticipates quantifying injury to natural resources that utilize the aquatic habitat complex within the Assessment Area. Ecological losses may result from the direct (e.g., toxic) or indirect (e.g., remedial) effects of hazardous substances and oil on natural resources, including biological organisms. The Trustee Council will apply a variant of resource equivalency analysis for Portland Harbor. This method is identified in the CERCLA NRDA regulations (43 CFR §11.83(c)(2)) and is commonly applied in the context of NRDA, as it not only provides quantitative measures of lost natural resources, but also can be used to scale restoration projects to compensate for natural resource service losses.

The Assessment Area's aquatic habitat complex supports key resources that are essential to habitat health, viability, and sustainability and are of specific concern for this assessment (Section 2.3). For each resource of focus (e.g., salmon), the Trustee Council

IEc

will identify an appropriate metric(s) to assess the degree of contaminant-related injury (e.g., percent reduction in growth or survival), and will identify the locations within which the injury has occurred in the past and/or is expected to occur in the future. Existing data (e.g., developed under Phase 2 and related efforts), in combination with the studies described in Chapter 4, will generate data appropriate for application in a REA, and injury will be quantified for each species and metric over time. Each species/metric combination will be considered an independent indicator of the quality of the aquatic habitat complex. Studies will include field-based studies (e.g., to confirm exposure to Site-related contaminants and assess the type and magnitude of effect resulting from that exposure), laboratory studies to confirm that Site-related contaminants cause the field-based observations on relevant endpoints, and studies to verify the completeness of contaminant pathways.

To determine the damages required to compensate for ecological injuries, the Trustee Council will use REA to calculate the quantity of habitat, of a certain type and quality, expected to create additional resources equivalent to the quantity of injured resource(s). The benefits of habitat restoration projects (consistent with the Integrated Habitat Restoration Alternative in the PEIS/RP (NOAA 2017)) to each of the indicator species will be quantified using the same metrics as those used to quantify injury. This comparison will inform the scale of required compensatory restoration. For all species that utilize or benefit from the same habitat type, the total quantity of required restoration will be based on the species requiring the most restoration. This approach assumes restoration will also fully compensate for the service losses associated with an indicator species requiring less restoration. By calculating restoration in this manner, the Trustee Council accounts for lesser quantities of damages and avoids double counting. Damages will be calculated as the cost to implement that restoration.

### 3.4.2 RECREATIONAL USE INJURY QUANTIFICATION AND DAMAGE DETERMINATION APPROACH

There is a broad range of services that humans derive from natural resources. Recreational use loss is a common category of human use losses associated with releases of hazardous substances for which trustees typically seek compensation. With parks and access points along the Willamette River, there are many recreational opportunities for millions of users within a short distance from the Assessment Area. Fishing is a popular activity in this region, both by boat and from the bank. Species targeted include spring Chinook salmon, steelhead trout, coho salmon, shad, white sturgeon, and bass. Members of the public also use the lower Willamette River for motor boating, sailing, jet skiing, kayaking, rowing, paddle boarding, and windsurfing. Waterskiing, tubing, and swimming are also common, and beaches are found both upriver of downtown Portland and below Portland at the confluence of the Willamette and Columbia Rivers.

Contamination may affect recreationists in a number of ways. Some recreationists may forgo visits due to the presence of hazardous substances. Others may proceed with a visit, but the visit may have a diminished value due to the presence of contaminants. Preliminary investigation of potential recreational losses by the Trustee Council indicates

ER-603

**IEc**

that recreational use losses have likely occurred as a result of hazardous substances releases to the Assessment Area (e.g., fish consumption advisories have been in place for the Willamette River since 2001; OHA 2017). During Phase 2, the Trustee Council developed an estimate of recreational use damages for impacts to fishing and pleasure boating, and identified potential impacts to other activities from Site-related contamination.

Under the CERCLA NRDA regulations, to the extent that the release of hazardous substances causes changes to available services in terms of recreational quality, public access, or recreation demand, these changes are compensable (43 CFR §11.71(e)). To assess the magnitude of this potential loss, the Trustee Council plans to implement a phased approach, with the scope and implementation of each phase dependent on the results of the previous phase. Part 1 will consist of a comprehensive review of existing information, building on Phase 2 efforts. Part 2 would involve interviews with key informants and focus groups with recreationists, for which the Trustee Council will develop specific questions and elicit feedback regarding recreational use and preferences in the Assessment Area. Based on the results of Parts 1 and 2, the Trustee Council will determine whether further evaluation of recreational loss is appropriate. If so, they will likely implement a primary study of recreational activity using one of the survey-based methods listed in the CERCLA NRDA regulations (e.g., revealed preference or stated preference; 43 CFR §11.83).

### 3.4.3  TRIBAL LOSS QUANTIFICATION APPROACH

Tribal loss refers to a loss in natural resource services of importance to the governments or members of tribal communities, for which separate natural resource restoration actions may be needed. Due to the differences in the nature and extent of services tribal members derive from the environment and the corresponding impacts of those changes, it may be necessary to describe and quantify service losses to tribal communities separately from service losses to the non-tribal general public. For example, the cultural significance of a particular natural resource, its traditional collection, and/or use may differ from that of the non-tribal general public. Thus, specific restoration actions may be required to fully compensate for losses in tribal services.

Examples of methods that trustees have applied to measure service losses to tribal communities in the context of NRDA include, but are not limited to:

- Assessment of changes in tribal services. This includes assessment and analysis of changes in levels of traditional knowledge, cultural practices, and relationships resulting from shifts in the use of natural resources caused by the presence of hazardous substances. Such an analysis is generally based on applied anthropological and ethnographic approaches (e.g., community-based research).

- Direct assessment of lost resource use. This can involve application of revealed preference techniques, user surveys, and existing data. Data can include the number of individuals who previously used a site, the nature and frequency of that

ER-604

IEc

use, substitution or alternative behaviors, and the expected recovery period for the activity.

- REA. This involves the use of resource-based measures to quantify the level of resource-specific losses given the assumption that ecological service losses are a proxy measure of tribal service losses. For example, REA can be applied to estimate losses due to decreasing/eliminating collection of culturally important species due to consumption guidelines (43 CFR §11.62(f)(1)(iii)).

- Stated preference and other survey-based techniques. This involves the use of surveys to elicit tribal attitudes and preferences toward an injured resource.

The Trustee Council may use a combination of these approaches to assess changes in services resulting from the release of hazardous substances and oil to the environment.

## 3.5 BASELINE

Baseline, as defined in 43 CFR §11.14(e), is;

> ...the condition or conditions that would have existed at the assessment area had the discharge of oil or release of the hazardous substance under investigation not occurred.

Baseline data should reflect expected conditions in the Assessment Area had the discharge of oil or release of hazardous substances not occurred, taking into account natural processes and changes that result from human activities (e.g., structural alterations). The Trustee Council evaluated baseline conditions in the Assessment Area under Phase 2, using information on contaminant concentrations and other physical conditions in reference areas, data from study controls, and reasonable assumptions.

Under Phase 3, the Trustee Council plans to further refine their understanding of baseline conditions. Their approach to establishing baseline conditions may vary by natural resource or the service being assessed. In general, the characterization of baseline conditions will occur within the specific injury studies that are proposed (Chapter 4). In the context of ecological injury, the Trustee Council will define resource-specific baseline conditions by selecting appropriate reference locations that differ as little as possible from the Assessment Area, except for the presence of contamination (43 CFR §11.72(d)). Additional studies and evaluations will likely be needed to understand whether other factors could be contributing to adverse effects observed in the Assessment Area. Baseline is also a consideration when quantifying the recreational and tribal services that natural resources would provide but for the release of hazardous substances.

IEc

## CHAPTER 4 | PROPOSED STUDIES

### 4.0    INTRODUCTION

The preceding chapters describe some of the key components of the Portland Harbor NRDA and discuss the framework and general approaches the Trustee Council plans to apply. The NRDA itself will be comprised of a series of iterative analyses aimed at assessing the severity and magnitude of natural resource injury resulting from hazardous substance releases to the Assessment Area. Efforts will focus on natural resources that are commonly found in the lower Willamette River and have likely been injured by the release of Site-related contaminants. These resources include, but are not limited to, benthic invertebrates (e.g., amphipods, midges), forage fishes (e.g., sculpin), Chinook salmon, birds, and mammals. In order to advance the injury assessment process outlined in Chapter 3, the Trustee Council plans to undertake studies that will: 1) determine and quantify injury to natural resources and lost services resulting from Site-related contamination, and 2) assist in identifying and scaling restoration projects that will compensate for natural resource injuries (including the cost of such restoration).

This work will build on previous studies investigating the effects of contaminants on Assessment Area resources and associated recreational uses and tribal services. Previous research has documented the toxic effects of COCs in relevant natural resources, such as juvenile salmonids (e.g., Meador et al. 2002a, 2002b; Meador et al. 2006; Johnson et al. 2014; O'Neill et al. 2015) and forage fishes (e.g., Kuzyk et al. 2005, Khan 2011). For instance, O'Neill et al. (2015) found that juvenile Chinook salmon residing and feeding in more urbanized and industrialized environments are exposed to higher concentrations of contaminants than salmon in less developed habitats, and Arkoosh et al. (1998) reported that chemical contaminants in a polluted estuary in the Pacific Northwest, with historical contamination of COCs, was linked to reduced immune response and subsequent survival of juvenile Chinook salmon. Meador (2013) also found that survival rates for juvenile Chinook out-migrating through contaminated estuaries were significantly lower than those utilizing relatively clean estuaries. Adverse effects, such as reduced growth, immunological impacts, and biochemical changes, have been reported in salmonids exposed to PCBs, DDTs, and PAHs (Johnson et al. 2014), including wild juvenile Chinook salmon exposed to COCs in a contaminated estuary (Varanasi et al. 1993, Arkoosh et al. 1998).  A synthesis of published scientific studies associated exposure to DDT with adverse biological effects in juveniles and adult fish species, including salmonids (Beckvar et al. 2005); similarly, exposure to PCBs has been associated with adverse physiological effects in juvenile and adults salmonids (Meador et al. 2002a). The Ecological Risk Assessment portion of the Remedial Investigation for the Site also identified the potential for adverse effects (i.e., reduced survival, reduced growth, or

ER-606

impaired reproduction) on benthic invertebrates, fishes, and wildlife resulting from exposure to PCBs, PAHs, and DDT compounds through multiple lines of evidence (Windward 2013 in EPA 2016a).

As described in Section 2.3, natural resources that utilize habitat within the Assessment Area not only provide ecological services, but also provide human use services to both the general public and tribal members. For example, recreational fishing has been affected by the fish consumption advisories in place for the lower Willamette River. The importance of Assessment Area resources to tribal members, their connection to and use of those resources, and the impacts of contamination on tribal practices has also been documented. For example, in 2005 the Lower Willamette Group funded a Cultural Resources Analysis as part of the RI/FS process. The report uses oral histories, interviews, and other anecdotal evidence to show that the lower Willamette River has historically been an important area for tribal fishing, gathering, trade and other traditional practices (Ellis et al. 2005). Personal Use Permit data from the Oregon Department of Fish and Wildlife also report lamprey harvest occurring at Willamette Falls. Therefore, the ongoing, planned, and potential studies summarized below focus on these natural resources.

Future efforts based on the results of initial studies may include: 1) determining that exposure of, and injury to, natural resources have occurred due to the release of hazardous substances to the Assessment Area; 2) quantifying injury to natural resources in terms of lost ecological, recreational, and tribal use services; and 3) determining damages (i.e., the amount of money sought by the natural resource trustees as compensation for injury) associated with the quantified losses. Damages collected by the Trustee Council from the PRPs will then be used by the Trustee Council to plan and implement restoration projects consistent with the PEIS/RP (as described in Section 1.1).

This chapter describes the studies that the Trustee Council is presently undertaking or considering at this time. These selected efforts represent the Trustee Council's best understanding the information that may be needed to further refine the determination and quantification of injury to Assessment Area natural resources and resource services. This Addendum is not intended to limit other studies that may be undertaken in the course of the assessment, as the Trustee Council recognizes that other studies may become necessary or advisable as the assessment proceeds and new information becomes available, or new data gaps are identified. To the extent possible, study development will be coordinated with ongoing efforts initiated by other entities (e.g., EPA and DEQ). In addition, the inclusion of a study within this Addendum does not guarantee that it will be undertaken. For example, the Trustee Council may decide that some studies may not be needed if reasonable assumptions supported by expert opinion can be made, considering the cost of additional research or sampling against the expected gain in information from a particular study. As such, this Addendum provides a starting point from which the Trustee Council will prioritize study efforts and implement the Phase 3 injury assessment process. As these efforts progress and additional information is generated, the Trustee Council may provide amendments to this Addendum or additional addendums to the 2010 Plan for public review.

IEc

### 4.1    STUDY PRIORITIZATION

The Trustee Council identified and prioritized a list of discrete assessment activities that are expected to assist in identifying and quantifying the scale of natural resource injury stemming from releases of hazardous substances to the Assessment Area. Study prioritization is based on:

- The review and use of existing information specific to the Assessment Area;

- Likely cost–effectiveness;

- Technical sequencing (e.g., an assessment activity may have a nearer-term priority if the analysis generates data or results upon which subsequent assessment efforts are based);

- Efforts that may be more likely to clarify the existence or extent of injury; and,

- Efforts most likely to contribute to the understanding of the appropriate scale and scope of required restoration.

Based on this prioritization, assessment activities are grouped into one of three categories:

1. Nearer-Term Priorities (Level 1). Ongoing efforts by the Trustee Council and studies that provide prerequisite data for future studies.

2. Middle-Term Priorities (Level 2). Studies that build upon the data collected in Level 1 studies with the intent of more effectively determining injury, addressing principal concerns of the public, and/or directly assisting in scaling restoration alternatives.

3. Longer-Term Priorities (Level 3). Studies that will be needed for later stages of the assessment process, depend largely on the completion of previous efforts, are expected to be subject to more difficult technical challenges, or, at this time, are less certain of satisfying the CERCLA NRDA regulatory requirement for cost effectiveness.

### 4.2    INJURY ASSESSMENT STUDY DESCRIPTIONS

The Trustee Council's proposed studies are summarized in Exhibit 4-1 and presented in detail in this section. Each study description discusses the study objectives, the need/rationale for each study, and the general approach to conducting the study, which will be developed further in collaboration with principal investigators (PIs). These studies will build on previous efforts, including Phase 1, Phase 2, remedial studies, and other relevant investigations.

ER-608

**IEc**

**EXHIBIT 4-1          ONGOING AND PLANNED STUDIES**

| CATEGORY | STUDY NUMBER | PRIORITY | STUDY | OBJECTIVE | STATUS |
|---|---|---|---|---|---|
| Data Management | 1 | 1 | Development of database and data analysis protocols | Review and integrate data from available sources (e.g., DEQ's Environmental Cleanup Site Information Database (ECSI), remedial databases, relevant literature) into NOAA's Data Integration Visualization Exploration and Reporting database (DIVER). Work with the Trustee Council to finalize methods for handling sample results that report non-detects, lab replicates, field duplicates, and data qualifiers; and develop methodology to define and apply protocols for processing and use of the data to meet goals of the assessment. | Ongoing |
| Pathway | 2 | 1 | Review of existing pathway-related data | Review existing information on physical and chemical transport mechanisms within the Assessment Area to document contaminant pathways. Include spill histories and data on surface water, groundwater, flow-through infrastructure (e.g., outfalls), soil, and sediment. | Potential |
| Pathway | 3 | 3 | Analysis of media to support pathway analyses | Collection of Site-related soil, overland surface water runoff, outfall discharge, and/or groundwater. Analysis of COCs in these media and physical characteristics to assess connections between sources and Assessment Area resources. | Potential |
| Sediment | 4 | 1 | Review of existing sediment data | Based on the database (see "Data Management"), evaluate the extent, quality, and appropriateness of available sediment chemistry data, information on physical parameters, and timing of relevant remedial actions to inform benthic invertebrate and fish injury assessment and assist in study design. | Ongoing |
| Sediment | 5 | 2 | Analysis of Assessment Area sediment | Collection of sediments, as needed, to complement studies of benthic invertebrate and fish exposure and toxicity, and pathway. Analysis of COCs in Assessment Area sediments, and corresponding physical parameters, as compared to reference site sediments. | Potential |
| Benthic Invertebrates | 6 | 1 | Review of existing invertebrate data | Evaluate the extent, quality, and appropriateness of available contaminant chemistry and toxicity data associated with relevant benthic invertebrate species to inform the potential severity and magnitude of injury. | Ongoing |
| Benthic Invertebrates | 7 | 2 | Benthic invertebrate baseline parameters | Compile and review existing information to determine baseline benthic invertebrate community characteristics (e.g., abundance of target species) and habitat extent within the Assessment Area. | Potential |

ER-609

**IEc**

| CATEGORY | STUDY NUMBER | PRIORITY | STUDY | OBJECTIVE | STATUS |
|---|---|---|---|---|---|
| Fish | 8 | 1 | Review of existing fish data | Based on the database (see "Data Management"), review the extent of available contaminant chemistry data measured in fish tissues and data related to fish toxicity studies to inform historic exposure and effects as well as the need for and design of subsequent primary studies. | Ongoing |
| | 9 | 1 | Juvenile salmonid field-based exposure and toxicity assessment | *In situ* collection of juvenile salmonids and assessment of the toxicity of Assessment Area-specific contaminant exposure. Analysis of COCs in field-collected juvenile salmonid tissues, stomach contents, and/or whole organisms to assess exposure to Site-specific contaminants. | Potential |
| | 10 | 2 | Juvenile salmonid laboratory toxicity testing | Laboratory study exposing juvenile salmonids to relevant COCs to confirm causality between contaminant exposure and effects on relevant endpoints. | Potential |
| | 11 | 1 | Forage fish field-based exposure and toxicity assessment | *In situ* collection of bottom-dwelling resident fish (e.g., sculpin) and assessment of the toxicity of Assessment Area-specific contaminant exposure. Analysis of COCs in field-collected bottom-dwelling resident fish tissues, stomach contents, and/or whole organisms to assess exposure to Site-specific contaminants. | Potential |
| | 12 | 2 | Forage fish laboratory-based toxicity testing | Laboratory study exposing bottom-dwelling resident fish (e.g., sculpin) to relevant COCs to confirm causality between contaminant exposure and effects on relevant endpoints. | Potential |
| | 13 | 3 | Baseline migratory and forage fish characteristics | Determine baseline characteristics of migratory salmonids and resident forage fish (e.g., abundance, community age structure, habitat use) within the Assessment Area. | Potential |
| Birds | 14 | 1 | Review of existing avian exposure, toxicity, life history, and habitat use data | Review existing data on avian exposure and toxicity (for chemical analyses and/or toxicity studies; see "Data Management"), life history information, and habitat use data to determine if additional assessment is warranted. | Ongoing |
| Mammals | 15 | 1 | Review of existing mammalian exposure, toxicity, life history, and habitat use data | Review existing data on mammalian exposure and toxicity (for chemical analyses and/or toxicity studies; see "Data Management"), life history information, and habitat use data to determine if additional assessment is warranted. | Ongoing |
| Remedial Activities | 16 | 2 | Impacts of remedial activities | Compile information on remedial activities and evaluate the severity of impacts on the aquatic habitat complex. This includes the timing, location, spatial extent, and type of remedial activities. | Potential |

ER-610

IEc

| CATEGORY | STUDY NUMBER | PRIORITY | STUDY | OBJECTIVE | STATUS |
|---|---|---|---|---|---|
| Recreation | 17 | 1 | Review existing outdoor recreational use data and information | Review existing data and information on the types and levels of potentially affected recreational activities in the lower Willamette River through time. Review public information on and awareness of the contamination in the lower Willamette River, including via fish and shellfish consumption advisories and guidelines, news reports, and community information sources. | Ongoing |
| | 18 | 2 | Outdoor recreational use interviews and focus groups | Organize and implement interviews and focus groups with recreationists to gain information and insights into outdoor recreational use, including fishing, boating, and swimming in the lower Willamette River. Consider results along with previously collected information to determine if a primary recreational use study is needed. | Potential |
| | 19 | 3 | Outdoor recreational use survey | If necessary based on results of Study 18, implement one or more surveys to quantify lost recreational use on the lower Willamette River potentially affected by the contamination. | Potential |
| Tribal Loss | 20 | 1 | Assess changes in the tribal services provided by natural resources as a result of COCs | Further document the relationship between the affected Tribes and resources that utilize the Assessment Area. Identify natural resources and habitat of importance to these communities for which tribal members hold a different value than the general public, and assess changes in resource use as a result of contamination. | Potential |

### DATA MANAGEMENT: DEVELOPMENT OF DATABASE AND DATA ANALYSIS PROTOCOLS (STUDY #1, PRIORITY 1)

**Objectives:** (1) Review and integrate relevant Assessment Area-related data (e.g., sediment, fish tissue) from available sources (e.g., DEQ's Environmental Cleanup Site Information Database (ECSI), remedial database, literature) into NOAA's Data Integration Visualization Exploration and Reporting (DIVER) database. (2) Finalize methods for handling sample results that report non-detects, lab replicates, field duplicates, and data qualifiers, and develop an analytical methodology to determine protocols for processing and use of the data to meet assessment goals.

**Need/Rationale:** A substantial amount of Assessment Area contaminant chemistry and bioassay data are available in a variety of media collected under a range of efforts. Compiling and standardizing the data into one database will enable more efficient analysis of existing data to inform gaps and structure targeted studies that fill those gaps and clearly allow other researchers to understand quality of the data.

**Approach:** The Trustee Council will identify data repositories containing relevant data for the injury assessment (e.g., sediment, fish tissue). Qualifier codes, analytes, units, methods, sampling dates, depths, species, and other pertinent parameters will be standardized to be consistent with the DIVER format. Any metadata related to the

original sources will be retained for reference, including available documents that explain field and analytical methodologies. Data will be incorporated into DIVER such that queries are transparent, reproducible, and downloadable into analytical software (e.g., Microsoft Access or Excel). Protocols and methods for processing and use of the data to meet goals of the assessment will be developed.

### PATHWAY: REVIEW OF EXISTING PATHWAY-RELATED DATA (STUDY #2, PRIORITY 1)

**Objective:** Review existing information on physical and chemical transport mechanisms within the Assessment Area to document contaminant pathways. Include spill histories and data on surface water, groundwater, flow-through infrastructure (e.g., outfalls), soil, and sediment.

**Need/Rationale:** A cost-effective assessment utilizes existing data to the extent possible prior to undertaking primary studies. As such, it is prudent and necessary to identify and review existing pathway-related information. Documentation of a complete pathway is a requirement under the CERCLA NRDA regulations for natural resource injury determination (43 CFR §11.61(c)(3) and §11.63).

**Approach:** The Trustee Council will review existing data sources that include, but are not limited to, information collected under EPA's remedial process (e.g., EPA 2016a, 2016b) and DEQ's upland source control process (e.g., DEQ 2016), outfall and other runoff-related information, and site-specific hydrology, geology, topography, and bathymetry data. The Trustee Council will assess the availability, quality, and comprehensiveness of existing pathway information to refine their current understanding of Assessment Area pathways. This effort will enable the Trustee Council to identify complete pathways as well as any data gaps that could inform additional data collection or studies.

### PATHWAY: ANALYSIS OF MEDIA TO SUPPORT PATHWAY ANALYSES (STUDY #3, PRIORITY 3)

**Objective**: Collection of Site-related soil, overland surface water runoff, outfall discharge, groundwater, and other physical media, and analysis of COCs in and physical characteristics of these media to assess connections between sources and Assessment Area resources.

**Need/Rationale:** To the extent possible, existing contaminant chemistry data in soil, surface water, groundwater, and other matrices/media, as well as physical information (e.g., groundwater flow, soil type) will be utilized to inform planning of primary studies, as well as the determination and quantification of natural resource injuries. However, additional sampling of these media may be necessary to link pathways of exposure to natural resource injuries in the Assessment Area. Documentation of a complete pathway is a requirement under the CERCLA NRDA regulations for natural resource injury determination (43 CFR §11.61(c)(3) and §11.63).

**Approach:** The Trustee Council will query DIVER (Study #1) for available contaminant chemistry data in soil, surface water, groundwater, and other media, and assess whether

ER-612

additional collection and subsequent chemical analysis of samples is necessary to characterize pathways of exposure from sources of contamination to natural resources in the Assessment Area. If sufficient high quality data do not exist with the appropriate characteristics and in the locations of interest (e.g., near known sources of a specific contaminant or proximate to proposed field collection sites for fish), then the Trustee Council will consider a primary study to collect and analyze these media.

### SEDIMENT: REVIEW OF EXISTING SEDIMENT DATA (STUDY #4, PRIORITY 1)

**Objective:** Evaluate the extent, quality, and appropriateness of available sediment chemistry data, information on physical parameters, and timing of relevant remediation actions to inform benthic invertebrate and fish injury assessment and assist in study design. Based on this review, identify data gaps and uncertainties upon which the Trustee Council may choose to focus future primary studies.

**Need/Rationale:** A cost-effective assessment utilizes existing data to the extent possible prior to undertaking primary studies. As such, it is prudent and necessary to identify and review existing sediment chemistry data.

**Approach:** The Trustee Council will query the DIVER database (Study #1) for sediment chemistry data. This study will involve a detailed and rigorous review of available information, specifically evaluating the use of these data in a NRDA context. For example, data will be reviewed for relevance to COCs, quality, spatial and temporal extent, and availability of associated physical parameters by which to evaluate potential toxicity, fate, and transport of various contaminants (e.g., total organic carbon). If sufficient high quality data with the appropriate characteristics and in the locations of interest (in the case of *in situ* work) do not exist, then the Trustee Council will consider whether a primary study is warranted.

### SEDIMENT: CHEMICAL ANALYSIS OF ASSESSMENT AREA SEDIMENT (STUDY #5, PRIORITY 2)

**Objective:** Collection of sediments, as needed, to complement studies of benthic invertebrate and fish exposure and toxicity, and pathway. Analysis of COCs in Assessment Area sediments, and corresponding physical parameters, as compared to reference site sediments.

**Need/Rationale:** Sediment is both a primary sink for and source of contaminants in the Assessment Area, and is one of the main pathways through which natural resources are exposed to contaminants. To the extent possible, existing sediment data will be utilized to inform planning of primary studies. However, additional sediment sampling may be necessary to link pathways of exposure to natural resource injuries in the Assessment Area, document the magnitude of exposure, and focus the design of other studies.

**Approach:** The Trustee Council will query the DIVER database (Study #1) for sediment chemistry data (Study #4), and assess whether additional collection and subsequent chemical analysis of Assessment Area sediments is necessary, particularly in the context of the benthic invertebrate, fishery, and pathway studies outlined within this Addendum.

ER-613

IEc

If sufficient high quality data do not exist with the appropriate characteristics and in the areas of interest (i.e., near proposed field collection sites for fish), then the Trustee Council will consider a primary study to collect and analyze sediment for COCs. This study would be undertaken in tandem with the proposed field sampling efforts of studies listed below, to ensure the most relevant data are collected as efficiently as possible.

### BENTHIC INVERTEBRATES: REVIEW OF EXISTING INVERTEBRATE DATA (STUDY #6, PRIORITY 1)

**Objective:** Evaluate the extent, quality, and appropriateness of available contaminant chemistry and toxicity data associated with relevant benthic invertebrate species (e.g., midges, amphipods) to inform the potential severity and magnitude of injury.

**Need/Rationale:** A cost-effective assessment utilizes existing data to the extent possible prior to undertaking primary studies. As such, it is prudent and necessary to identify and review existing data related to benthic invertebrates in the Assessment Area. These data, including sediment contaminant concentrations, benthic invertebrate toxicity studies, and other benthic parameters, can directly inform injury determination and quantification.

**Approach:** The Trustee Council will query the DIVER database (Study #1), remedial process documents, and other supplemental reports/studies for contaminant chemistry and toxicity data associated with relevant benthic invertebrate species (e.g., midges, amphipods) and endpoints. This study will involve a detailed and rigorous review of available information, specifically evaluating the use of these data in a NRDA context. For example, the Trustee Council will review data for species relevance, quality, spatial and temporal extent, contaminants of interest, and endpoints. The Trustee Council will use relevant data to determine and quantify injury to benthic invertebrates within the Assessment Area.

### BENTHIC INVERTEBRATES: BENTHIC INVERTEBRATE BASELINE PARAMETERS (STUDY #7, PRIORITY 2)

**Objective:** Compile and review existing information to determine baseline benthic invertebrate community characteristics (e.g., abundance of target species) and habitat extent and quality within the Assessment Area.

**Need/Rationale:** Baseline data will inform the conditions and metric(s) against which the Trustee Council will measure both injury (i.e., adverse effects resulting from exposure to Assessment Area contamination) and restoration (i.e., the benefits to a species or species group resulting from habitat improvements). Understanding the baseline condition of injured natural resources is a component of the injury quantification process under the CERCLA NRDA regulations (43 CFR §11.70(a)(1)).

**Approach:** This study will be executed in two phases. (1) The Trustee Council will utilize existing data, publicly available documents, and site-specific and/or generic literature to establish characteristics such as benthic invertebrate abundance, community structure, and relevant habitat within the Assessment Area. (2) If the first phase reveals

IEc

substantial data gaps, the Trustee Council may consider a primary study that will fill those data gaps.

### FISH: REVIEW OF EXISTING FISH DATA (STUDY #8, PRIORITY 1)

**Objective:** Based on the DIVER database (Study #1), review the extent of available contaminant chemistry data measured in fish tissues and data related to fish toxicity studies to inform historic exposure and effects as well as the need for and design of subsequent primary studies. Focus on salmon and forage fishes.

**Need/Rationale:** Understanding the extent and magnitude of contaminant exposure to trust natural resources is an essential component of injury determination and quantification. A cost-effective assessment utilizes existing data to the extent possible prior to undertaking primary studies. As such, it is prudent and necessary to review existing, available data to enable efficient analysis, identification of data gaps, and determination of direction for potential future studies.

**Approach:** The Trustee Council will query the NRDA database (Study #1) for contaminant chemistry and toxicity data associated with relevant species and locations within the Assessment Area, with a focus on salmon and forage fishes. This study will involve a detailed and rigorous review of available information, specifically evaluating the use of these data in a NRDA context. For example, data will be reviewed for species relevance, quality, spatial and temporal extent, contaminants of interest, and endpoints.

### FISH: JUVENILE SALMONID TOXICITY ASSESSMENT (STUDY #9, PRIORITY 1; STUDY #10, PRIORITY 2)

**Objective:** Assess the toxicity of COCs to juvenile salmonids (e.g., Chinook) through field assessments and laboratory testing.

**Need/Rationale:** Salmon are anadromous, meaning they are born in freshwater, migrate to the ocean to mature, then return to their natal freshwater stream to spawn and die. Specifically within the Assessment Area, salmon (e.g., Chinook) use the aquatic habitat complex for salinity adjustments as juveniles, as a foraging area, and as a place of refuge from predation. Some salmonid species are also threatened or candidate species under the Oregon State Department of Fish and Wildlife or the Federal Endangered Species Act, including Chinook salmon, coho salmon, chum salmon, and steelhead.

Salmon can have profound differences in susceptibility to chemicals at different life stages (e.g., juveniles, spawners); as such, salmonid life history is an important determinant of chemical exposure and acute toxicity. Their extended residency in freshwater streams, particularly during a critical time of growth and development, make juvenile Chinook salmon particularly vulnerable to the effects of contaminants. In addition to direct, short-term impacts, contaminant exposure during the juvenile stage may also have long-term effects on the viability of that organism as an adult.

These studies will generate data to inform both injury determination and quantification. Field studies enable a direct measurement of the effects on salmon associated with exposure to contaminated media within the Assessment Area as compared to a reference

ER-615

**IEc**

site. Analysis of field-collected salmon tissues and stomach contents documents exposure to the COCs. In addition, because laboratory studies are conducted in a controlled environment where many variables can be specifically defined and monitored, the proposed laboratory tests are intended to support field observations of the impact of relevant contaminants on the test organisms.

**Approach:** Toxicity testing of juvenile salmonids involves two interrelated studies, as well as review and analysis of the results of Study #1 (database of contaminant and toxicity data) and Study #8 (review of existing fish data). For Study #9, the Trustee Council will collaborate with a PI to design and implement a field-based study of juvenile salmonid health in the Assessment Area as compared to a reference site. Juvenile salmon will be collected from various locations throughout the Assessment Area and evaluated for growth patterns (e.g., as indicated by otolith accretion and insulin-like growth factor measurements). COCs in field-collected juvenile salmonid tissue and stomach contents will be measured, as well as sediment, to assess salmonid exposure to COCs within the Assessment Area. Concentrations of COCs in fish tissues, stomach contents, and sediment will be compared to concentrations collected at an appropriate reference location. These data will be analyzed to evaluate the statistical association between exposure and injury. Study #10 will be a laboratory exposure study in which juvenile salmonids are exposed to individual or mixtures of COCs to assess the effects on selected endpoints, such as growth and survival. This study will confirm that exposure to COCs at concentrations relevant to the Assessment Area is responsible for any observed adverse effects on chosen endpoints. Appropriate control organisms and laboratory control conditions will be used. The data obtained in these studies will be used to quantify contaminant-related losses to salmon by using organism-based metrics that reflect an impact to the overall aquatic habitat complex (e.g., lost biomass).

### FISH: FORAGE FISH TOXICITY ASSESSMENT (STUDY #11, PRIORITY 1; STUDY #12, PRIORITY 2)

**Objective:** Assess the toxicity of COCs to bottom-dwelling fish species (e.g., sculpin) through field assessments and laboratory testing.

**Need/Rationale:** Forage fishes are an essential component of the aquatic food web. They link primary producers (e.g., algae) and upper trophic level species (e.g., salmon), and, in the case of species such as sculpin, are closely tied to sediment (a primary sink for and source of contaminants in the Assessment Area). Exposure and toxicity testing of forage fish species will complement the salmon studies proposed by the Trustee Council and assist in determining whether forage fish species in the Assessment Area have been injured due to exposure of Site-related contaminants. These studies will generate data to inform both injury determination and quantification. Field studies enable a direct measurement of the effects to forage fishes as a result of exposure to contaminated media within the Assessment Area as compared to a reference site. Analysis of COCs in field-collected fish tissues and stomach contents documents exposure to the COCs. In addition, because laboratory studies are conducted in a controlled environment where many

IEc

variables can be specifically defined and monitored, these laboratory tests are intended to support field observations of the impact of relevant contaminants on the test organisms.

**Approach:** Toxicity testing of forage fishes involves two interrelated studies, as well as review and analysis of the results of Study #1 (database of contaminant and toxicity data) and Study #8 (review of existing fish data). As part of Study #11, the Trustee Council will collaborate with a PI to design and implement a field-based study of sculpin health in the Assessment Area as compared to a reference site. Sculpin will be collected from various locations throughout the Assessment Area and evaluated for growth patterns (e.g., as indicated by otolith accretion). COCs in field-collected sculpin tissues, stomach contents, and/or whole organisms, as well as sediment, will be analyzed to assess sculpin exposure to COCs within the Assessment Area. Concentrations of COCs in fish tissues, stomach contents, and sediment will be compared to concentrations collected at an appropriate reference location. These data will be correlated to link exposure and injury. Study #12 will be a laboratory exposure study in which sculpin are exposed to individual or mixtures of COCs to assess the effects on selected endpoints, such as growth and survival. This study will confirm that exposure to COCs is responsible for any observed adverse effects on chosen endpoints. Appropriate control organisms and laboratory control conditions will be used. The Trustee Council will use data obtained in these studies to quantify contaminant-related losses to forage fishes, using organism-based metrics that reflect an impact to the overall aquatic habitat complex (e.g., lost biomass).

### FISH: BASELINE MIGRATORY AND FORAGE FISHES CHARACTERISTICS (STUDY #13, PRIORITY 3)

**Objective:** Determine the baseline characteristics of migratory salmonids and resident forage fishes (e.g., abundance, community age structure, habitat use) within the Assessment Area.

**Need/Rationale:** Baseline data will inform the conditions and metric(s) against which the Trustee Council will measure both injury (i.e., adverse effects resulting from exposure to Assessment Area contamination) and restoration (i.e., the benefits to a species or species group resulting from habitat improvements). Understanding the baseline condition of injured natural resources is a component of the injury quantification process under the CERCLA NRDA regulations (43 CFR §11.70(a)(1)).

**Approach:** The Trustee Council will utilize existing data, publicly available documents, and site-specific and/or generic literature to establish life history characteristics such as abundance and community age structure of salmon and sculpin within the Assessment Area, as well as ecological characteristics such as habitat use by these species. If substantial data gaps are identified, the Trustee Council may consider a primary study that will fill those data gaps.

### BIRDS: REVIEW OF EXISTING AVIAN EXPOSURE, TOXICITY, LIFE HISTORY, AND HABITAT USE DATA (STUDY #14, PRIORITY 1)

**Objective:** Review existing data on avian exposure and toxicity using the DIVER database (for chemical analyses and/or toxicity studies; Study #1), life history

information, and habitat use data. This will inform historic exposure and effects as well as the need for and design of subsequent primary studies.

**Need/Rationale:** Birds utilize habitats within and adjacent to the Assessment Area and are key ecological receptors in those ecosystems. Understanding the extent and magnitude of contaminant exposure to natural resources is an essential component of injury determination and quantification. A cost-effective assessment utilizes existing data to the extent possible prior to undertaking primary studies. As such, it is prudent and necessary to review existing, available data. This review will allow for more efficient analysis of existing data to identify gaps and inform potential primary studies.

**Approach:** This study will involve a detailed and rigorous review of available data and information relevant to bird species within the Assessment Area, specifically evaluating the use of these data in a NRDA context. Sources of information will include, but not be limited to, the DIVER database (for chemical analyses and/or toxicity studies; Study #1), life history information, and habitat use data. The Trustee Council will review information for species relevance, quality, spatial and temporal extent, contaminants of interest, and endpoints. If sufficient high quality data do not exist with the appropriate characteristics and in the areas of interest, then the Trustee Council will consider whether a primary study is warranted.

### MAMMALS: REVIEW OF EXISTING MAMMALIAN EXPOSURE, TOXICITY, LIFE HISTORY, AND HABITAT USE DATA (STUDY #15, PRIORITY 1)

**Objective:** Review existing data on mammalian exposure and toxicity using the DIVER database (for chemical analyses and/or toxicity studies; Study #1), life history information, and habitat use data. This will inform historic exposure and effects as well as the need for and design of subsequent primary studies.

**Need/Rationale:** Mammals utilize habitats within and adjacent to the Assessment Area and are key ecological receptors in those ecosystems. Understanding the extent and magnitude of contaminant exposure to natural resources is an essential component of injury determination and quantification. A cost-effective assessment utilizes existing data to the extent possible prior to undertaking primary studies. As such, it is prudent and necessary to review existing, available data. This review will allow for more efficient analysis of existing data to identify gaps and inform potential primary studies.

**Approach:** This study will involve a detailed and rigorous review of available data and information relevant to mammalian species within the Assessment Area, specifically evaluating the use of these data in a NRDA context. Sources of information will include, but not be limited to, the DIVER database (for chemical analyses and/or toxicity studies; Study #1), life history information, and habitat use data. The Trustee Council will review information for species relevance, quality, spatial and temporal extent, contaminants of interest, and endpoints. If sufficient high quality data do not exist with the appropriate characteristics and in the areas of interest, then the Trustee Council will consider whether a primary study is warranted.

ER-618

IEc

### REMEDIAL ACTIVITIES: IMPACTS OF REMEDIAL ACTIVITIES (STUDY #16, PRIORITY 2)

**Objective:** Compile information on remedial activities and evaluate the severity of impacts on the aquatic habitat complex. This will include timing, location, spatial extent, and type of remedial activities.[13]

**Need/Rationale:** Impacts due to remedial activities are compensatory under the CERCLA NRDA regulations (43 CFR §11.15(a)(1)). As such, understanding the extent, duration, and magnitude of these activities allows for a complete quantification of injury.

**Approach:** A timeline of remediation activities will be developed based on existing information. Location, duration, spatial extent, and type of remedial activity will be documented to the extent possible. While some remedial actions in the Site have been completed, the overarching Site-wide ROD has not yet been implemented. Therefore, the Trustee Council will review previously conducted and anticipated remedial actions and any information related to those actions (e.g., timing, duration, area, type of remediation). This information may be used to spatially and temporally quantify injury to relevant natural resources using geospatial and desktop modeling software (e.g., ArcGIS, Microsoft Excel, and Microsoft Access).

### RECREATION: REVIEW EXISTING OUTDOOR RECREATION USE DATA AND INFORMATION (STUDY #17, PRIORITY 1)

**Objective:** Review existing data and information on the types and levels of potentially affected recreational activities in the lower Willamette River through time. Review public information on and awareness of the contamination in the lower Willamette River, including via fish and shellfish consumption advisories and guidelines, news reports, and community information sources.

**Need/Rationale:** In order to understand the potential magnitude, extent, and duration of outdoor recreational use losses, it is necessary to review existing data and information on the types and levels of potentially affected recreational activity on the Assessment Area through time. A cost-effective assessment utilizes existing data to the extent possible prior to undertaking primary studies. As such, it is prudent and necessary to review existing, available data. This review will allow for more efficient analysis of existing data to identify gaps and inform potential primary studies.

**Approach:** Building on efforts conducted during Phase 2 of the NRDA, the Trustee Council will use existing information to identify the level and type of recreational activities conducted within the Assessment Area and how it may be affected by public awareness of the contamination. The Trustee Council will review fish and shellfish consumption advisories and guidelines, news reports, community information resources, and other information sources to establish the geographic extent, nature, and duration of

---

[13] This study focuses on the physical impacts of remedial actions. The potential injury resulting from residual contamination or physical injury post-remedy will be incorporated into the injury assessments for individual resources.

ER-619

IEc

any human use advisories that have been applied to the lower Willamette River and corresponding changes in recreational behavior. Depending on the results of this study, and/or if this effort reveals substantial data gaps, the Trustee Council may consider one or more primary studies.

### RECREATION: PRIMARY STUDIES OF OUTDOOR RECREATIONAL USE THROUGH INTERVIEWS, FOCUS GROUPS, AND SURVEYS (STUDY #18, PRIORITY 2; STUDY #19, PRIORITY 3)

**Objective:** Refine the Trustee Council's understanding of and quantify the effects of Site-related contamination on outdoor recreational use of the Assessment Area and the role of consumption advisories and contamination on recreationist site choice and behavior.

**Need/Rationale:** Based on the results of Study #17, the Trustee Council may determine that additional primary data collection regarding the potential extent of outdoor recreational use losses is appropriate. Information on outdoor recreation site choice and use/avoidance in the presence of contamination can be necessary to quantify injury and assess lost recreational use damages.

**Approach:** Should the results of Study #17 indicate that sufficient losses may have occurred and that information can feasibly be collected for a reasonable cost, a phased effort will be initiated. The first phase will involve organization and implementation of focus groups to gain specific feedback on outdoor recreational use on the lower Willamette River. Interviews with key informants (e.g., heads of fishing clubs or paddling organizations) and focus groups with recreationists will be conducted to collect information about current patterns of recreational use and potential behavioral impacts (e.g., substituting to alternative locations) due to contamination. The focus groups will be moderated, and brief surveys will be distributed to participants to provide a standardized framework for eliciting responses. The results of these interviews and focus groups would be considered along with similar information collected during earlier phases of the NRDA and other existing data to determine if the Trustee Council should implement one or more comprehensive use surveys (e.g., revealed or stated preference). The Trustee Council will identify in a detailed study plan the specific approach to be followed, including selection of sample frame and sample mode. The Trustee Council will need to address several challenges, including: 1) unwillingness of some recreationists to be interviewed (e.g., some recreationists may refuse to participate in surveys); 2) the need for a multilingual survey given the diverse user population; and 3) the challenge of identifying and sampling recreational users (and potential users) of the lower Willamette River.

### TRIBAL LOSS: ASSESS CHANGES IN THE TRIBAL SERVICES PROVIDED BY NATURAL RESOURCES AS A RESULT OF COCS (STUDY #20, PRIORITY 1)

**Objective:** Further document the relationship between the affected Tribes and resources that utilize the Assessment Area. This evaluation would identify natural resources of

ER-620

**IEc**

cultural significance that are not in common with the non-tribal general public, and assess changes in resource use as a result of contamination.

**Need/Rationale:** The cultural significance of certain natural resources may be uniquely tied to tribal members' way of life in a manner that is distinctly separate from the non-tribal general public. Therefore, it is necessary to further understand the changes in tribal services provided by Assessment Area resources, including resource use (e.g., changes in frequency and/or location), due to Site-related contaminants. Natural resources provide a range of services to tribal communities. These services may have been diminished in quality, or interrupted, by the presence of contaminants released into the Assessment Area. This evaluation would ensure that the Trustee Council is able to account for tribal lost services and tribal resources of concern in both the injury assessment and subsequent restoration planning process.

**Approach:** The Trustee Council will first compile and review existing information that describes tribal services, uses, and values associated with Assessment Area resources. This includes reports (e.g., Ellis et al. 2005), previous interviews with tribal members and natural resource managers, and other information (e.g., history, culture). Building on this information review and efforts conducted under Phase 2, the Trustee Council will identify additional information sources to fill data gaps. For example, additional interviews could be conducted with a variety of tribal members to ascertain the historical and current uses (or desired uses) of Assessment Area resources. These interviews would identify the nature and extent of services provided by natural resources that are important to the health, welfare, economy, tradition, and culture of tribal members, in terms of both use and non-use services. The Trustee Council would then develop narratives that describe tribal members' relationship to natural resources found within the Assessment Area, providing a more complete picture of the natural resources important to tribal communities. This information ultimately will be used to support decision-making regarding the scale and scope of potential primary and compensatory restoration for lost tribal services.

## 4.3  SHARING DATA, SPLIT SAMPLES, AND ANALYTICAL RESULTS

Section 11.31(a)(4) of 43 CFR states that, "The Assessment Plan shall contain procedures and schedules for sharing data, split samples, and results of analyses, when requested, with any identified potentially responsible parties and other natural resource trustees."

If the Trustee Council determines that a study should be implemented, that study will be developed into a full work plan in collaboration with a PI and be made available to the public. These work plans will include study objectives, approaches for sharing and publishing data and analytical results with relevant parties and the public, and conditions and procedures for sharing split samples with PRPs.

## 4.4  QUALITY ASSURANCE

The CERCLA NRDA regulations require trustees to develop a Quality Assurance Plan (QAP) that "satisfies the requirements listed in the National Contingency Plan and

applicable EPA guidance for quality control and quality assurance plans" (43 CFR §11.31(c)(2)). The Trustee Council recognizes the importance of data quality, given the many management decisions involved in accomplishing the NRDA that ultimately require the use of environmental data. The collection, compilation, evaluation, and reporting of environmental data are necessary to perform the assessment. The Trustee Council must therefore properly document the origin and quality of the data used to make decisions so that data limitations may be identified; and assessments of the severity, location and extent of injury are accurate. This assists the Trustee Council in making appropriate decisions regarding the type and scale of restoration actions necessary to compensate for natural resource injuries. Also relevant to this effort are the NOAA and FWS guidelines established under the Information Quality Act of 2001. All information developed and used in this NRDA will comply with these guidelines.

This Addendum includes studies that evaluate existing datasets as well as studies that generate new information. With respect to the evaluation of existing data, each study's PI will carefully document the source(s) of all data, available information about quality assurance (QA)/quality control (QC) procedures used by the original investigator, and any data qualifiers or other information restricting application of the data. This approach will also be applied to new data and analyses developed by Federal and state agencies, tribes, academics, and information developed under the auspices of other activities or programs. For new studies that are specifically undertaken to support the NRDA process, the Trustee Council will develop appropriate study-specific QAPs according to the general principles described below.

As stated by EPA (2001), QAPs will "vary according to the nature of the work being performed and the intended use of the data" and as such, need to be tailored to match the specific data-gathering needs of a particular project (40 C.F.R. § 300.5). The NRDA will entail a variety of widely different data-gathering efforts; therefore, it is not appropriate to develop a single, detailed QAP to cover all these activities. Instead, the Trustee Council will ensure that individual study plans adequately address project-specific QA issues. The discussion in this document therefore focuses on the required elements of an acceptable study plan.

In general, a study plan must provide sufficient detail to demonstrate that:

- The study's technical and quality objectives are identified and agreed upon;
- The intended measurements, data generation, or data acquisition methods are appropriate for achieving study objectives;
- Assessment procedures are sufficient for confirming that data of the type and quality needed and expected are obtained; and
- Any limitations on the use of the data can be identified and documented (EPA 2001).

Accordingly, specific study plans developed for this assessment will include the four elements called for by EPA:

IEc

- Project Management – documents that the study has a defined goal(s), that the participants understand the goal(s) and the approach to be used, and that the planning outputs have been documented;

- Data Generation and Acquisition – ensures that all aspects of study design and implementation including methods for sampling, measurement and analysis, data collection or generation, data compiling/handling, and QC activities are documented and employed;

- Assessment and Oversight – assesses the effectiveness of the implementation of the study and associated QA and QC activities; and,

- Data Validation and Usability – addresses the QA activities that occur after the data collection or generation phase of the study is completed.

### 4.5    STUDY MANAGEMENT

Effective implementation of study objectives requires clear study organization, which includes carefully defining the roles and responsibilities of each study participant. Unambiguous personnel structures help ensure that each individual is aware of his or her specific areas of responsibility, as well as clarifying internal lines of communication and authority, which is important for decision-making purposes as studies progress. Individuals' and organizations' roles and responsibilities may vary by study or task, but each person's role and responsibility should be clearly described in the NRDA study plan. Exhibit 4-2 presents a generic personnel plan for a NRDA study.

**EXHIBIT 4-2    PERSONNEL PLAN**



The Assessment Manager is the designated Trustee Council representative with responsibility for the review and acceptance of the study-specific plan. This individual is also responsible for ensuring that the study's goals and design will meet the broader

ER-623

**IEc**

requirements of this NRDA. The Assessment Manager coordinates efforts with the Quality Assurance Coordinator and oversees the Study PI.

The QA Coordinator oversees the overall conduct of the quality system. Appointed in consultation with the Trustee Council, this individual's responsibilities include, but are not limited to: reviewing and assisting the PI with the development of study-specific study plans; conducting audits and ensuring implementation of both study-specific and overall plans; archiving samples, data, and all documentation supporting the data in a secure and accessible form; and reporting to the Trustee Council. To ensure independence, the person serving as QA Coordinator will not serve either as the Assessment Manager or as a PI for any NRDA study.

Study-specific PIs oversee the design and implementation of particular NRDA studies. Each PI has the responsibility to ensure that all health, safety, and relevant QA requirements are met. If deviations from the study plan occur, the PI (or his/her designee) will document these deviations and report them to the Assessment Manager and the QA Coordinator.

The Field Team Leader supervises day-to-day field investigations, including sample collection, field observations, and field measurements. The Field Team Leader generally is responsible for ensuring compliance with all field QA procedures defined in the study plan. Similarly, the Laboratory Project Manager is responsible for monitoring and documenting the quality of laboratory work. The Health and Safety Officer (who may also be the Field Team Leader) is responsible for ensuring adherence to specified safety protocols in the field.

### 4.6 DATA GENERATION AND ACQUISITION

All studies under the direction of the Trustee Council that are specifically undertaken in support of the NRDA will have a prepared study plan that will be completed prior to the initiation of any work. These study plans will be submitted to, and approved by, the QA Coordinator or designee. Each study plan should describe and/or include, at a minimum:

- Study objectives;
- Rationale for generating or acquiring the data;
- Proposed method(s) for generating or acquiring the data, including descriptions of (or references to) standard operating procedures for all sampling or data-generating methods and analytical methods;
- Types and numbers of samples required;
- Analyses to be performed;
- Sampling locations and frequencies;
- Sample handling and storage procedures;
- Chain-of-custody procedures;

ER-624

• Data quality requirements (for instance, with respect to precision, accuracy, completeness, representativeness, comparability, and sensitivity);

• Description of the procedures to be used in determining if the data meet these requirements; and

• Description of the interpretation techniques to be used, including statistical analyses.

• Split sample protocols and procedures for archiving samples and management of residuals.

In addition, to the extent practicable, laboratories will be required to comply with good laboratory practices. This includes descriptions and documentation of maintenance, inspections of instruments, and acceptance testing of instruments, equipment, and their components, as well as the calibration of such equipment and the maintenance of all records relating to these exercises. Documentation to be included with the final report(s) from each study will include field logs for the collection or generation of the samples, chain of custody records, and other QA/QC documentation as applicable.

### 4.7    ASSESSMENT AND OVERSIGHT

To ensure that the study plan for each project is implemented effectively, the QA Coordinator will review QAPs for all Trustee Council studies that generate data. The QA Coordinator or designee will also audit all such studies. Audits will include technical system audits (e.g., evaluations of operations) as well as scrutinizing data and reports (e.g., evaluations of data quality and adequacy of documentation).

If, in the professional opinion of the QA Coordinator, the results of an audit indicate a compromise in the quality of the collection, generation, analysis, or interpretation of the data, the QA Coordinator has the authority to stop work by oral direction. Within two working days of this direction, the QA Coordinator will submit to the Trustee Council a written report describing the necessity for this direction. The Assessment Manager will consult with the Trustee Council regarding measures to be taken in response to the QA Coordinator's report.

### 4.8    DATA VALIDATION AND USABILITY

In addition to the assessment and oversight activities described previously, analytical data will be considered for validation by an independent third party. Prompt validation of analytical data can assist the analyst or analytical facility in developing data that meet the requirements for precision and accuracy. If undertaken, it is expected that data validation will use the study-specific plans and EPA Guidance on Environmental Verification and Validation (EPA 2002).

ER-625

IEc

## REFERENCES

Adolfson Associates. 2009. The River Plan North Reach Volume 3A: Natural resources inventory: Riparian corridors and wildlife habitat. City of Portland Bureau of Planning and Sustainability. Recommended Draft. November.

Arkoosh M.R., E. Casillas, P. Huffman, E. Clemons, J. Evered, J.E. Stein, and U. Varanasi. 1998. Increased susceptibility of juvenile Chinook salmon (*Oncorhynchus tshawytscha*) from a contaminated estuary to the pathogen *Vibrio anguillarum*. *Transactions of the American Fisheries Society* 127:360-374.

Beckvar, N., T.M. Dillon, and L.B. Read. 2005. Approaches for linking whole-body fish tissue residues of mercury or DDT to biological effects thresholds. *Environmental Toxicology and Chemistry* 24:2094-105.

Buck, J. and J.L. Kaiser. 2011. Contaminant concentrations in osprey (*Pandion haliaetus*) eggs from Portland Harbor and surrounding areas: Data summary report. Prepared by: Jeremy Buck, U.S. Fish and Wildlife Service, Oregon Fish and Wildlife Office, Portland, Oregon, and James L. Kaiser, Kaiser and Associates Environmental Consulting, LLC, Seattle, Washington. For the Portland Harbor Natural Resource Trustee Council. March 7.

DEQ and EPA (Oregon Department of Environmental Quality and United States Environmental Protection Agency). 2005. Portland Harbor Joint Source Control Strategy. Final. December.

DEQ. 2016. Portland Harbor Upland Source Control Summary Report. Northwest Region Cleanup Program. November 21, 2014 – Updated March 25, 2016.

Ellis, D.V., J.M. Allen, and Y. Hajda. 2005. Cultural Resource Analysis Report for the Portland Harbor Superfund Site, Portland Oregon. Prepared for the Lower Willamette Group Portland, Oregon. Report No. 1461. April 25.

EPA (United States Environmental Protection Agency). 2017. Record of Decision Portland Harbor Superfund Site Portland, Oregon. U.S. Environmental Protection Agency, Region 10, Seattle, Washington. January.

EPA. 2016a. Final Remedial Investigation Report, Portland Harbor RI/FS, U.S. Environmental Protection Agency, Region 10, Seattle, Washington. February 8.

EPA. 2016b. Draft Final Portland Harbor Feasibility Study. U.S. Environmental Protection Agency, Region 10, Seattle, Washington. June.

IEc

EPA. 2002. EPA Guidance on Environmental Data Verification and Data Validation (EPA QA/G-8), November.

EPA. 2001. EPA Requirements for Quality Assurance Project Plans (EPA QA/R-5), March.

Integral Consulting. 2006a. Portland Harbor RI/FS Round 3A January 2006 High-Flow Surface Water Data Report. Draft Prepared by Integral Consulting Inc. for the lower Willamette Group. October 20.

Integral Consulting. 2006b. Portland Harbor RI/FS Round 3A Summer 2006 Low-Flow Surface Water Event Field Sampling Report. Draft prepared by Integral Consulting Inc. for the Lower Willamette Group.

Integral Consulting, Windward Environmental, Kennedy/Jenks Consultants, and Anchor Environmental LLC. 2007. Portland Harbor RI/FS: Comprehensive Round 2 Site Characterization Summary and Data Gaps Analysis Report, Volumes I–VII. Prepared for the Lower Willamette Group, Portland, Oregon.

Johnson, L.L., B.F. Anulacion, M.R. Arkoosh, D.G. Burrows, D.A. da Silva, J.P. Dietrich, M.S. Myers, J.A. Spromberg, and G.M. Ylitalo. 2014. Effects of legacy persistent organic pollutants (POPs) in fish. In K. B. Tierney (ed.). *Organic Chemical Toxicology of Fishes* (Elsevier: London).

Khan, R.A. 2011. Chronic exposure and decontamination of a marine sculpin (*Myoxocephalus scorpius*) to polychlorinated biphenyls using selected body indices, blood values, histopathology, and parasites as bioindicators. *Archives of Environmental Contamination and Toxicology* 60(3):479-485.

Kuzyk, Z.A., P.V. Hodson, S.M. Solomon, and K.J. Reimer. 2005. Biological responses to PCB exposure in shorthorn sculpin from Saglak Bay, Labrador. *Science of the Total Environment* 351-353:285-300.

McIntyre, J. 2016. Testing the effectiveness of bioretention at reducing the toxicity of urban storm water to coho salmon. U.S. Fish and Wildlife Service (lead entity); NOAA-Fisheries, Washington State University, and Suquamish Tribe (partners); Jay Davis (USFWS, project manager); Jenifer McIntyre (WSU-Puyallup), report preparer).

Meador, J.P. 2013. Do chemically contaminated river estuaries in Puget Sound (WA, USA) affect the survival rate of hatchery-reared Chinook salmon? *Canadian Journal of Fisheries and Aquatic Sciences* 71:162-80.

Meador, J.P., F.C. Sommers, G.M. Ylitalo, and C.A. Sloan. 2006. Altered growth and related physiological responses in juvenile Chinook salmon (*Oncorhynchus tshawytscha*) from dietary exposure to polycyclic aromatic hydrocarbons (PAHs). *Canadian Journal of Fisheries and Aquatic Sciences* 63(10):2364-2376.

IEc

Meador, J.P., T.K. Collier, and J.E. Stein. 2002a. Use of tissue and sediment-based threshold concentrations of polychlorinated biphenyls (PCBs) to protect juvenile salmonids listed under the US Endangered Species Act. *Aquatic Conservation: Marine and Freshwater Ecosystems* 12:493-516.

Meador, J.P., T.K. Collier, and J.E. Stein. 2002b. Determination of a tissue and sediment threshold for TBT to protect prey species of juvenile salmonids listed under the U.S. Endangered Species Act. *Aquatic Conservation: Marine and Freshwater Ecosystems* 12:539-551.

NOAA (National Oceanic and Atmospheric Administration). 2017. Final Portland Harbor Programmatic Environmental Impact Statement and Restoration Plan. May.

NOAA. 2009. Data Report for Lower Columbia Juvenile Salmon Persistent Organic Pollutant Exposure Assessment. Prepared by Environmental Conservation Division, Northwest Fisheries Science Center, National Marine Fisheries Service, National Oceanic and Atmospheric Administration. Prepared for NOAA Damage Assessment Center and Portland Harbor Natural Resource Trustees. August 19.

OHA (Oregon Health Authority). 2017. Fish Advisories and Consumption Guidelines. http://www.oregon.gov/oha/PH/HEALTHYENVIRONMENTS/RECREATION/FIS HCONSUMPTION/Pages/fishadvisories.aspx#willamette

O'Neill, S.M., A.J. Carey, J.A.Lanksbury, L.A. Niewolny, G. Ylitalo, L. Johnson, and J.E. West. 2015. Toxic contaminants in juvenile Chinook salmon (*Oncorhynchus tshawytscha*) migrating through estuary, nearshore, and offshore habitats of Puget Sound. Washington Department of Fish and Wildlife. October.

PHNRTC (Portland Harbor Natural Resource Trustee Council). 2007. Preassessment Screen for the Portland Harbor Superfund Site. January 7.

Spromberg, J.A., D.H. Baldwin, S.E. Damm, J.K. McIntyre, M. Huff, C.A. Sloan, B.F. Anulacion, J.W. Davis, and N.L. Scholz. 2016. Coho salmon spawner mortality in western U.S. urban watersheds: bioinfiltration prevents lethal storm water impacts. *Journal of Applied Ecology* 53:398-407.

Stratus (Stratus Consulting). 2011. Sampling Report: Field Collection of Sediments for Pacific Lamprey Toxicity Study. Prepared for Portland Harbor Natural Resource Trustee Council. January 28.

Stratus. 2010. Portland Harbor Superfund Site Natural Resource Damage Assessment Plan. Prepared for the Portland Harbor Natural Resource Trustee Council. June 1.

Stratus, Oregon State University, and United States Geological Survey, Oregon Cooperative Fish and Wildlife Research Unit. 2013. Pacific lamprey toxicity study. Prepared for the Portland Harbor Natural Resource Trustee Council. Revised July 15.

IEc

U.S. Army Corps of Engineers. 2018. Columbia – Lower Willamette channel – Portland District. Available at: http://www.nwp.usace.army.mil/Missions/Navigation/Channels/Columbia-L-Willamette/ (Accessed February 21, 2018).

Varanasi, U., E. Casillas, M.R. Arkoosh, T. Hom, D.A. Misitano, D.W. Brown, S. Chan, T.K. Collier, B.B. McCain, and J.E. Stein. 1993. Contaminant exposure and associated biological effects in juvenile chinook salmon (*Oncorhynchus tshawytscha*) from urban and nonurban estuaries of Puget Sound. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Northwest Fisheries Science Center, Environmental Conservation Division.

Windward (Windward Environmental LLC). 2013. Portland Harbor RI/FS Final Remedial Investigation Report. Appendix G Baseline Ecological Risk Assessment. Final. Volume 1. Prepared for The Lower Willamette Group and United States Environmental Protection Agency. December 16.

IEc

# APPENDIX A: RESPONSE TO PUBLIC COMMENTS

The Trustee Council received two sets of comments on the Portland Harbor Superfund Site Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan Draft for Public Review dated March 9, 2018. Responses to those comments are included in this Appendix.

## PORTLAND GENERAL ELECTRIC

**Comment 1.** Addendum 2 pertains to PRPs that chose not to participate in Path C (participation in which is intended [to] facilitate a timely, negotiated settlement) and Path C participants that do not settle under Phase 2 of the NRDA. Those that settle under Phase 2 will not be liable for any costs associated with Phase 3. However, Addendum 2 does not establish a timeline for when negotiated settlements for Path C participants must be completed to avoid becoming party to Phase 3. In accordance with 43 C.F.R. § 11.31(a)(4), the Trustee Council should provide additional detail regarding the status of on-going Phase 2 settlement negotiations and clearly identify milestone dates to preclude participation in Phase 3. What is the Trustee Council's Phase 2 timeline or plan for addressing the Phase 2 timeline?

> **Response 1.** The Trustee Council is currently involved in settlement negotiations with multiple parties. The substance, course and progress of those negotiations are confidential by agreement of the parties.

**Comment 2**. The approach put forth in Addendum 2 makes use of Resource Equivalency Analysis (REA) to quantify ecological service losses. The 2010 Assessment Plan noted that Habitat Equivalency Analysis (HEA) was being used in Phase 2: Implementation of the Settlement-Oriented Work Plan.

**Comment 2a.** What is the rationale for changing to [a] REA? The REA can require potentially costly and time-intensive studies. Is this approach in keeping with the reasonable cost provisions outlined in 43 C.F.R. § 11.14(ee)?

> **Response 2a.** Natural resource trustees have discretion as to the methods used to quantify injuries. The approach to quantifying injury outlined in the Plan Addendum is consistent with 43 C.F.R. Part 11. To determine the damages required to compensate for ecological injuries to the aquatic habitat complex, the Trustee Council intends to determine the types and quantity of habitat needed to generate in the future an equivalent quantity of the injured natural resources. The

IEc

benefits of habitat restoration projects to each of a series of indicator species over time will be quantified using the same metrics as those used to quantify injury (e.g., productivity of fish per area over time). This comparison will inform the scale of required compensatory restoration. Because many of the potentially injured indicator species utilize or benefit from the same habitat type, the total quantity of required restoration will be determined by the species requiring the largest area of restoration of the ideal habitat type. Damages will be calculated as the cost to implement that restoration. The Trustee Council will ensure that there is no "double-counting" of losses in the quantification process, as set forth in the CERCLA regulations (43 CFR §11.83(c)(2). The rationale for making this change from Phase 2 to Phase 3 is based on the Trustees' judgment that the proposed approach will, in this case, best measure adverse changes in the viability of natural resources resulting from exposure to contaminants (see 43 CFR §11.14(v)) and best determine the quantity and type of appropriate habitat needed to fully address the measured losses.

**Comment 2b.** Will the HEA analysis (and assessments) conducted during Phase 2 change for Path C participants who settle under Phase 2?

> **Response 2b.** The Plan Addendum does not change the way the Trustee Council is intending to calculate liability for parties who settle during Phase 2.

**Comment 2c.** Will the ecological service losses calculated using the REA be converted to DSAYs [discount service acre-years] so that damages assessed to all PRPs (and potential payments) will be conducted using the same unit of measure, regardless of when/how a settlement is reached? How will this conversion be made? If this is not the case, then what happens to DSAYs created from existing Portland Harbor NRD restoration projects?

> **Response 2c.** A claim for damages to compensate for injury to natural resources will account for resolution of partial liability for injury that has been addressed through earlier settlements. A final determination of the "unit of measure" used to make this adjustment has not been made, but the Trustee Council intends to develop a means to address recoveries from settlements negotiated during Phase 2 to prevent double counting and to allow for DSAYs created from existing Portland Harbor NRD restoration projects and not otherwise retired to be used to satisfy subsequent settlements or recoveries.

**Comment 3.** A wide variety of studies with a broad range of level of effort are proposed (e.g., database evaluation to field-based studies). Can the Trustees clarify what studies will be implemented and how those studies will fill specific data gaps, given the magnitude of information that has already been collected and documented? How will baseline conditions be updated (what types of information will be collected and why) and how will the updated baseline conditions be incorporated into the HEA/REA process?

IEc

**Response 3.** The first step in characterizing injuries will be compiling and updating existing relevant information. The Trustee Council has identified some important data gaps that will be filled through study implementation (for example, injury to salmonids and resident fish). Other studies may be completed if the initial analysis indicates data gaps are significant. The characterization of baseline conditions will occur within the specific injury studies that are proposed by selecting appropriate reference locations that differ as little as possible from the Assessment Area, except for the presence of contamination (43 CFR §11.72(d)). Additional studies and evaluations may be needed to understand whether other factors could be contributing to adverse effects observed in the Assessment Area. This information will be used (for example) when calculating the number of fish affected by contamination. To quantify how much restoration is needed to compensate for injuries, information on specific benefits provided by uncontaminated, contaminated, and restored habitat will be needed.

**Comment 4.** How will Addendum 2 address allocation of damages between potentially responsible parties (PRPs)? This information was included, at least in a cursory fashion, in the 2010 Assessment Plan and should also be included in this addendum.

**Response 4.** A claim for damages to compensate for injury to natural resources will account for resolution of partial liability for injury that has been addressed through earlier settlements. Parties that have not resolved liability for injury to natural resources at the time of completion of the NRDA claim will be potentially jointly and severally liable for all damages included in the claim.

**Comment 5.** Section 3.3.3 of Addendum 2 discusses assessing damages for remediation activities; it is also discussed in the original NRDA Plan which applies to Phase 2 as well. When will the Trustee Council calculate damages for remediation and what will be the timeframe? If a Party settled during Path C, are they responsible for damages during remediation?

**Response 5.** The Trustee Council will estimate injury from previous and planned remedial actions concurrently with evaluating other ecological injuries. The Record of Decision for remedial actions at the site was issued in 2017 and EPA is currently designing and planning implementation of those actions. As more information and final plans become available, the Trustee Council will use information regarding past and future expected remediation to quantify injuries to habitat, and will include that information to assist in determining recovery time for natural resources injured by existing contamination, and will use it in determining restoration needed to fully compensate for injuries. The Trustee Council expects that the NRDA will take approximately 5 years to complete. The terms of specific Phase 2 settlement agreements are still being negotiated with individual parties. Those negotiations are confidential, and therefore we do

INDUSTRIAL ECONOMICS, INCORPORATED

A-3

**IEc**

not address here the question of settling parties' liability for damages during remediation.

<span style="color:#800000">**YAKAMA NATION**</span>

**Comments.** The Confederated Tribes and Bands of the Yakama Nation (Yakama Nation) is a federally recognized Indian tribe and the legal successor in interest to the Indian signatories to the Treaty with the Yakamas of June 9, 1855. The Yakama Nation is a trustee for natural resources that have been, and continue to be, injured due to the releases of hazardous substances from Portland Harbor. We submit the following comments on the March 9, 2018 Portland Harbor Superfund Site, Natural Resource Damage Assessment Plan, Addendum 2: Phase 3 Damage Assessment Plan for your consideration.

- A Trustee Council decision was made in 2009 to truncate the damage assessment at River Mile 2 of the Willamette River, despite general agreement that then-existing data showed that natural resources in the Lower Columbia River were being exposed to contaminants released at and from Portland Harbor. At that time the Trustee Council indicated that they would pursue an assessment downstream of the site during Phase 3.

- In 2009, as a result of the Trustee Council's decision, the Yakama Nation withdrew from the Trustee Council. The Tribe's withdrawal was primarily due to the Trustee Council's unwillingness to commit to assessing injury to juvenile salmon, other fish, and natural resources in the Columbia River.

- The June 1, 2010 Portland Harbor Superfund Site Natural Resource Damage Assessment Plan indicates that Columbia River fish and prey data would be considered in Phase 1 of NRDA. Plan, p. 4-10. In addition, Multnomah Channel data was to be considered in Phase 2 (Plan, p.2-1) and "... Based on their analysis of the data, the Trustees determined that they would defer consideration of assessment work in the Lower Columbia River until Phase 3 (Plan, Appendix D. p.14)". https://www.fws.gov/oregonfwo/Contaminants/PortlandHarbor/Documents/Final AssessmentPlan060110.pdf.

Based on the above information and other data referenced in the Trustee Council's assessment documents, [text formatting added] we request that the March 9, 2018 draft Addendum 2 include consideration of injuries to natural resources in the Lower Columbia River resulting from the releases of hazardous substances at and from the Portland Harbor Superfund Site. We remain hopeful that the Trustee Council will fulfill its responsibilities – as expressly noted in Section 2 of the Addendum – to address injuries in "'the area or areas within which natural resources have been affected directly or indirectly by the discharge of oil or release of a hazardous substance" (43 CFR §11.14(c)'. However, it appears that the Trustee Council remains committed to addressing only a portion of the injuries to natural resources within their trusteeship. Thus, we request that Addendum 2 acknowledge the full range of exposure and natural resource injuries that may be

INDUSTRIAL ECONOMICS, INCORPORATED                                    A-4

**IEc**

associated with the site, and address how the Assessment's limited approach is appropriate for restoration of all injured trust resources.

**Response.** The lower Columbia River and downstream portions of the Multnomah Channel are not included at this time in order to focus a cost-effective assessment, taking into account a number of factors, including existing information about relative contaminant loads in these water bodies. Sediment contaminant concentrations in the lower Willamette River near the confluence with the Columbia River are lower than those within the Portland Harbor Assessment Area. Concentrations of PCBs and DDT in sediment are lower in the lower Columbia River than in Portland Harbor. This apparent pattern of decreasing contamination provides a rationale for bounding the Phase 3 assessment process, helping to ensure that the assessment is reasonable in scope and cost. However, the Trustee Council may expand the geographic scope of their studies in the future as the assessment progresses and further information is developed, including information indicating a likelihood of injury to Columbia River resources resulting from contaminants attributable to Portland Harbor sources.

INDUSTRIAL ECONOMICS, INCORPORATED

# EXHIBIT B

**Portland Harbor
List of Potentially Responsible Parties
who are Liability Letter Recipients
(based on EPA's notification list)
May 1, 2018**

ACF Industries, Inc. / ACF Industries, LLC

Acme Trading & Supply

Air Liquide America Specialty Gases LLC

Alder Creek Lumber Company, Inc.

Anderson Brothers, Inc./Specialty Truck Parts

Arkema Inc.,(FKA Atofina Chemicals, Inc., Elf Atochem North America, Inc, Atochem North America,Inc., Pennwalt Corporation, Pennsalt Chemicals Corporation)

Ashland, Inc.

ATKN Company (Willamette Iron and Steel Company) (DBA: WISCO)

Babcock Land Company, LLC

BAE Systems San Diego Ship Repair, Inc.

Basin Street Associates

Bay Valley Foods, LLC

BBD&R, Inc.(AKA Fred Devine Diving and Salvage)

Beazer East, Inc.

BP West Coast Products LLC (FKA Atlantic Richfield Company (ARCO)

Brand-S Corporation (Portland Lumber Mills)

Brix Maritime Co., d/b/a Foss Maritime Co.

Peter Brix (Twin City Barge, Inc., The Siegfried Company, Knappton Corporation, Knappton Towboat Company, Brix Rafting & Sorting Company, Sun Dial Booming Company, Brix

1

Maritime Towing, Inc., Lafferty Transportation Company, Brix Investment Company, Marine Ways Corporation, and Marine Equipment Leasing Company)

Burgard 789 LLC

Burlington Northern and Santa Fe Railway Company

Calbag Metals Co.

CanAm Minerals, Inc. d.b.a Kleen Blast

Cargill, Inc.

104(e) (EPA Information Gathering Authority) Recipient List

0-9

12005 Burgard Equities LLC
528 Investors LLC

A

Abex Corp (American Brake Shoe Co)
ACF Industries, Inc. / ACF Industries, LLC
Advanced American Construction Properties LLC
A.G.G. Enterprises, Inc.
Air Liquide America Corporation
Albers Mill Building Partnership
Alder Creek Lumber Company, Inc.
Alcatel Submarine Networks, Inc.
Aleris International
American Seafoods Company
American Ship Dismantlers
American Tokyo Kasei, Inc.
Anchor Park LLC
Anderson Brothers Property

2

Anderson Portland Properties LLC
ANRFS Holdings, Inc.
Arkema Inc. (Formerly Atofina Chemicals, Inc.)
Armstrong Disposal Company
Ash Grove Cement Co.
Ashland, Inc.
ATC Leasing Co. LLC
ATKN Company
Automotive Electric Distributors Inc.
Automatic Vending

B

B D C Properties LLC
Babcock Land Company, LLC
BAE Systems San Diego Ship Repair, Inc.
Barton, Richard M. (c/o Metro Presort, Inc.)
Basin Street Assoc
Bay Valley Foods
BBD&R, Inc. (Fred Devine Diving and Salvage)
Beazer East, Inc./Beazer Materials & Services, Inc.
Bell Oil Terminal Co.
Berry Transport, Inc.
Bird Incorporated
Borden Chemical, Inc.
Borden Packaging and Industial Products
Boydstun Metal Works, inc.
BP West Coast Products LLC (aka: Atlantic Richfield Company (ARCO)
Brand-S Corporation
Brenntag Pacific
Brazil & Co. (a.k.a. Brazil Electric)
Brazil Motor & Controls, Inc.
Brix Dearmond, LLC
Brix Maritime Co. (DBA: Foss Maritime Co.)
Burgard 789
Burlington Northern and Santa Fe Railway Company

C

3

C&T Quincy Foods
Calbag Metals Company
CanAm Minerals, Inc.
Cargrill Inc.
Carson Oil Co. Inc.
Cascade Brake Products
Cascade General, Inc.
Cenex Ag Inc.
CENVEO Corporation
Certain Teed Corporation
Chapel Steel
Chase Bag
Chevron U.S.A., Inc.
Chipman Chemical Co.
Christenson Oil (aka: Haj, Inc.)
City of Portland
CHS, Inc.
Columbia Forge and Machine Works
Columbia Grain, Inc.
Columbia River Sand & Gravel
ConocoPhillips Co.
consolidated Metco Inc.
Container Recovery, Inc.
Container Management Services, LLC
Cornerstone Property Investments LLC
Crosby & Overton
Crawford Street Corporation
Crowly Marine Services, Inc.
Crown Beverage Packaging Inc


D


D.S.U.-Peterbilt & GMC, Inc.
Dasic International Corp.
DIL Trust
Douglas Oil Co. of California
Dulien Steel
Dura Industries

4

E

East Side Plating, Inc.
Eastman Chemical Company
EC Company (Marine Electric Co.)
Edward Hostmann, Inc.
Elkem Metals
Equilon Enterprises, LLC
ESCO Corporation
Estey, John R.
Evergreen Chemical and Soap Company
Evraz Oregon Steel Mills, Inc.
ExxonMobil Oil Corporation

F

Fletcher Construction Company North America
Flint Ink Corp.
FLRF LLC
FMC Corp
Fort James Corp.
Fort James NW LLC
Foster Poultry Farms
Frank Fink Company
Freightliner Corporation
Front Avenue Corporation
Front Avenue III Limited Partnership
Front Avenue Limited Partnership
Front Avenue MP, LLC

G

G A C Acquisition Corp
Galvanizers Company
GATX Tank Storage Terminals Corporation
GATX Terminals Corporation

5

General Electric Co.
General Services Administration-
General Construction Company (subsidiary of: Peter Kiewit Sons, Inc.)
Georgia-Pacific West, Inc.
G.I. Trucking Company a Corporation Of California
Glacier Northwest, Inc.
Greenway Properties LLC
Goldendale Aluminum Co.
Golden Northwest Aluminum Holding Co.
Gould Electronics, Inc. (fka: GA-TEK, Inc.)
Great Western Chemical Co. (aka: GWC Front LLC)
Grundfos Pumps Corporation
GS Roofing----
Guilds Lake Properties LLC
Gunderson Brothers Engineering Corporation
Gunderson, Inc.


H

HAL North America, Inc. (Pacific Northern Oil Co.)
Harsch Investment Properties LLC
Hendren Tow-Boat Co., Inc.
Henry P Oseran & Associates
Hercules Inc.
Herman, Stan
Hexion Specialty Chemicals, Inc.
Hill Investment Co.
Howard S. Wright Construction Co.

I

Ifco Systems Inc.
Industrial Battery Company, Inc.
Industry 30 LLC
International Raw Materials LTD
Island Holdings Inc.

J

Jefferson Smurfit Corporation
John Day Logging Company
Jones Stevedoring
Joseph T. Ryerson & Son, Inc.
JR Simplot Company

6

K

Kaiser----
K F Jacobsen & Co
Kinder Morgan
Kinder Morgan Liquids Terminals LLC
Kinder Morgan Bulk Terminals, Inc.
King-Ries LLC
Kingsley Lumber Co.
KLIX Corp.
Koppers Company, Inc.
Koppers Inc.
KSC Recovery Inc.

L

L&S Marine
Lakea Corporation (ABN: Columbia American Plating)
Lakeside Industries
Lampros Properties LLC / Camrose Pipe Corporation
Langley - St. Johns Partnership
Linde Gas LLC
Linnton Plywood Association
Lockheed Martin Corp.
Lone Star NW
Longview City Laundry & Cleaners Inc.
Lynden Farms

M

M&F Worldwide
Macro Manufacturing
Madden Family LLC
Mar Com Holding, LLC
Mar Com Marine
Mar Com, Inc.
Marine Finance Corporation
Marine Propulsion Services Inc.
Marine Salvage Consortium, Inc.

7

Maritime Administration
Martin Marietta Materials Inc.-
McCall Oil and Chemical Corporation (and affiliated)
McCall Oil Real Estate Co. LLC
McCloskey Corp (Oregon)
McCown de Leeuw & Co (aka: BMC Northwest Holdings inc.)
McEachern Corp.
McMorgan Institutional Real Estate Fund I LLC
McWhorter, Inc.
Medite Corporation (fka Medford Corporation)
Mept Rivergate LLC
Metco Inc.
Metra Steel
"Metro Regional Government"
MFI Inc (MetroFueling Inc)
Morse Bros., Inc.
Mt. Hood Chemical Corp.
Multnomah Land and Equipment
Myers Container LLC


N


Niblick, Inc.
Nichols Marine Ways
Nikko Materials USA, Inc.
NL Industries, Inc.
NMT Diesel, Inc.
North Basin Watumull LLC
North Pacific Group, Inc. (dba North Pacific Lumber)
Northern Pacific Railway Co.
Northwest Container Services
Northwest Industrial and Foundry Supply Co.
Northwest Marine, Inc.
Northwest Marine Iron Works
Northwest Natural Gas Company (a.k.a. NW Natural/Gasco)
Northwest Oil
Northwest Pipe Company
NRC Environmental Services
Nudelman & Sons, Inc.

8

O

Olympic Pipe Line Company
Oregon Power Lending Institution Inc.
Oregon Sustainable Agriculture Land Trust
Oregon Terminal Co.
Oregon Washington Railroad
Oregon Woodworking Limited
Owens Corning (Corp.)

P

Pacific Terminal Services, Inc.
PacifiCorp (Pacific Power)
Paco Pumps (f/k/a Pacific Pumping Company)
Paramount of Oregon LLC
PCC Flow Technologies LP
Peanut Butter Properties LLC
Petrina Properties V LLC
PetroCard Systems Inc.
Phillips Oil Co.
Pope & Talbot, Inc.
Port of Portland
Portland Bulk Terminals, LLC
Portland Container Repair Corp.
Portland General Electric Company
Portland Shipyard LLC
Portland Terminal Railroad Co.
Premier Edible Oils
Pride of Oregon Holdings Inc (Pacific Pride Services Inc)

Q

Quadra Chemicals Inc.

9

R

R. E. McElroy LLC
R K Storage and Warehousing, Inc.
Riedel (Zidell - Triangle Park)
Riedel Environmental Technologies
Riverside Industrial Lumber
Ro-Mar Realty of Oregon, Inc.
RoMar Transportation Systems
Rose City Moving & Storage
Rudie Wilhelm Warehouse Co.

S

S N Properties Partnership (aka N. Warehousing, Inc.)
Sakrete of Pacific Northwest Inc.
Samuelson Properties LP
Sause Bros., Inc.
Schnitzer Steel Industries Inc (Metra Steel)
Schnitzer Investment Corp.
Schnitzer Steel Industries, Inc.
Shaver Transportation Company
Shell Oil Co.
Shipyard Commerce Center LLC
Shore Terminals LLC
SIC Processing USA Management Corp.
Siltronic Corporation
Simpson Lumber Company
Smith Environmental Technologies
Southern Pacific Pipelines PA
SPC Properties LLC
Special Asphalt Products
Specialty Truck Parts, Inc.
Standard Oil Co.
Standard Steel Property LLC
StarLink Logistics, Inc. (fka: Bayer Cropscience Limited Partnership/ Rhone Poulenc)
State of Oregon (ODOT)
State of Oregon (ODSL)--
Steel Hammer Properties, LLC

10

Steelmill Warehouse, Inc.
Sulzer Pumps (US) Inc.
Summit Properties Inc.
Sutter, David (owner property of KLIX)
Swan Island Watamull LLC
Swift Transportation

T

Taiwan Navigation Co., Ltd.
Tanker Basin LLC
Tenex Management Limited
The Marine Group, LLC
The Marine Salvage Consortium, Inc.
Texaco Inc.
Tice Properties
Tidewater Oil Co.
Time Oil Co.
Tosco Corporation
Toyota Logistics Services, Inc.
Toyota Motor Sales USA
Transloader International Co LLC
Tri-County Metropolitan (Tri-Met)
Tube Forgings of America, Inc.

U

U. S. Army Corps of Engineers (USACE)
U. S. Navy
Union Carbide Corporation
Union Pacific Corp
Union Pacific Railroad Company
United States (BPA)
United States Coast Guard
Univar (Van Waters & Rogers)
Unocal Corporation

11

V


V&K Service, Inc.
Valero LP (aka Shore Terminals LLC)
Valspar Corp., The
VWR International, Inc.


W



Watamull Properties Corp.
West Coast Adhesives Co.
Western Homes Incorporated
Western Pacific Piledriving
Westinghouse Electric
Wilhelm Trucking Co. (dba Wilhelm Trucking Acquisition)
Willamette-Western Corporation
Willamette Hi Grade Concrete (Riedel)
Wirfs, Don
WMR LLC
Work Zone LLC



XYZ



Young Mechanical Services, Inc.
YRC, Inc.
Z Exploration Inc.
Zehrung Corp.
Zidell Marine Corporation
Zidell, Emery N.
ZRZ Realty Co.

12

# EXHIBIT C

# PORTLAND HARBOR
## Natural Resource Trustee Council

**Preface to the document entitled, "Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement"**

The Portland Harbor Natural Resource Trustee Council documented the Phase 2 Path C settlement process in the attached document, dated May 14, 2015. This document summarized key inputs to the Phase 2 ecological and recreational injury assessments and estimates of Tribal-specific losses, including the approach to restoration, and described the process of allocating liability among potentially responsible parties that participated in Phase 2 Path C. The document was updated in April 2023 to remove references to confidential documents but otherwise has been left unchanged.

ER-649

## Attachment: Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement

May 14, 2015

### 1.0    INTRODUCTION

The Portland Harbor Natural Resource Trustee Council (Trustee Council) is conducting a Natural Resource Damage Assessment (NRDA) of injuries caused by hazardous substance releases and discharges of oil in the lower Willamette River in Portland, Oregon. The Trustee Council is comprised of representatives from the Confederated Tribes of the Grand Ronde Community of Oregon, Confederated Tribes of Siletz Indians, Confederated Tribes of the Umatilla Indian Reservation, Confederated Tribes of the Warm Springs Reservation of Oregon, Nez Perce Tribe, U.S. Department of the Interior (DOI), National Oceanic and Atmospheric Administration (NOAA), and State of Oregon. The Trustees are authorized under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.* (CERCLA); the Oregon Hazardous Waste and Hazardous Materials Act, ORS § Chapter 465, and ORS 468B.060; Section 311 of the Clean Water Act (CWA), 33 U.S.C. § 1321; Section 1002(b)(2)(A) of the Oil Pollution Act of 1990 (OPA), 33 U.S.C. § 2702(b)(2)(A); and other authorities to conduct a NRDA, the purpose of which is to restore, replace, or acquire the equivalent of natural resources injured and resource services lost as a result of the release of hazardous substances and discharge of oil.

The assessment area for the Portland Harbor NRDA encompasses the Willamette River, including Swan Island Lagoon, from approximately river mile 12.2 to approximately river mile 1.0 near the confluence with the Columbia River, as well as the upper one mile of Multnomah Channel (Exhibit 1-1). Contaminant levels in assessment area resources are sufficient to cause injury to trust resources as defined by the DOI NRDA regulations (43 C.F.R. Part 11). For example, contaminant concentrations in sediments exceed thresholds for injury to sediment and biological resources, and a contaminant-related fish consumption advisory (FCA) was issued for resident species and sturgeon caught in Portland Harbor. These injuries have resulted in a loss of ecological, recreational, and tribal services.

To encourage cooperation with potentially responsible parties (PRPs) during the NRDA process, the Trustee Council is following an iterative, phased approach. Phase 1 focused on the development and completion of the Assessment Plan and associated, settlement-oriented Work Plan. Phase 2 – the current phase – is focused on the implementation of the settlement-oriented Work Plan and restoration planning. Phase 3 will complete the NRDA and provide an opportunity for settlements with PRPs. Finally, Phase 4 will focus on recovery of damages from non-settling PRPs.

As part of Phase 2, the Trustee Council quantified or qualitatively characterized natural resource injuries and lost services using methods typically applied in the context of NRDA, and identified the type, scale, and cost of restoration sufficient to compensate the public for these losses. Efforts were undertaken pursuant to a cooperative NRDA process with the goal of achieving timely habitat restoration projects and resolving natural resource damage liability through settlements with as many PRPs as possible. To date, 30

A-1

ER-650

PRPs have joined the Phase 2 cooperative assessment process and signed funding and participation agreements. The Trustee Council subsequently offered these Phase 2 PRPs an opportunity to engage in settlement negotiations based on the initial results of the Phase 2 cooperative assessment. These negotiations are referred to as "Phase 2, Path C," or simply "Path C" and the Phase 2 PRPs that elect to engage in Path C settlement negotiations are referred to as "Path C parties."

**EXHIBIT 1-1     ASSESSMENT AREA FOR THE PORTLAND HARBOR NRDA**



This document summarizes the methods and results of the Trustee Council's assessment of ecological, recreational fishing, and tribal service losses, as well as the process by which those losses were allocated to a PRP. Finally, an overview of the costs associated with a PRP's liability is presented. Sections are as follows:

- Section 2: Ecological Losses

A-2

- Section 3: Allocation of Discounted Service-Acre Years

- Section 4: Restoration

- Section 5: Recreational Fishing and Boating Losses

- Section 6: Tribal Losses

- Section 7: Cost per Discounted Service-Acre Year

- Section 8: References

## 2.0 ECOLOGICAL LOSSES

Concentrations of a suite of contaminants in Portland Harbor resources are sufficient to cause injury to trust resources. For settlement purposes, the Trustee Council focused on the following contaminants (substances of concern, or SOCs): polycyclic aromatic hydrocarbons (PAHs), polychlorinated biphenyls (PCBs), cadmium, copper, lead, mercury, dichlorodiphenyltrichloroethane (DDT), dichlorodiphenyldichloroethane (DDD), dichlorodiphenyldichloroethylene (DDE), tributyltin (TBT), 4-methylphenol, and bis (2-ethylhexyl) phthalate. These SOCs were selected because they each satisfy at least one of the following Trustee Council criteria for inclusion in Phase 2 analyses: 1) identified as a risk driver in the draft Ecological Risk Assessment for Portland Harbor (LWG 2009), 2) concentrations exceeded Trustee Council Phase 2 service loss thresholds (described below), 3) representative of classes of contaminants of concern identified in the draft Portland Harbor Remedial Investigation (RI) Report (LWG 2009), and/or 4) data of sufficient reliability and density are available.

For this NRDA, the Trustee Council quantified injuries in the assessment area based on lost resource services to establish a basis for scaling restoration (*i.e.*, damages). Services are "*the physical and biological functions performed by the resource including the human uses of those functions*" (43 C.F.R. § 11.14 (nn)). A reduction in the ability of a resource to provide these services, as compared to the baseline level of services (Section 2.3), is considered a service loss. Because evaluating lost services for every natural resource that uses Portland Harbor habitat is not reasonable, the Trustee Council identified sediment to be representative of the aquatic habitat. The essential functions of sediment (*e.g.*, base of the food web, critical role in nutrient and energy cycling) and the breadth of available contaminant concentration and effects data for sediment, led the Trustee Council to conclude that sediment is an appropriate proxy for quantifying overall lost habitat services.

To calculate contaminant-related ecological losses, the Trustee Council used Habitat Equivalency Analysis (HEA), a method commonly applied in NRDA and an accepted methodology under 43 C.F.R. Part 11. The premise of HEA is that the public can be compensated for past and expected future losses in ecological services through the provision of additional ecological services in the future. Therefore, HEA quantifies ecological functions lost due to contamination (in terms of ecological services provided by an area of habitat), and informs how much restoration is required to generate an equivalent amount of similar services.

A-3

ER-652

Because environmental losses and gains are not experienced at a single point in time, HEA accounts for changes in contaminant concentrations over time (*e.g.*, through remedy or natural recovery), as well as the social discount rate (*i.e.*, change in value the public holds for a good or service over time). The public typically holds a greater value for services in the past and a lesser value for those same services in the future (Freeman 1993). In NRDA, a discount rate of three percent is applied (NOAA 1999). To compare losses and gains that occur over different time periods, the present value (*i.e.*, value in a single, common year) of services is calculated. That is, past losses are compounded annually at three percent and future losses (or restoration gains) are discounted annually at three percent. Losses and gains are then expressed in terms of present value units of the diminished resource itself – discounted service acre-years (DSAYs) – rather than economic value (Unsworth and Bishop 1994). Dollar damages are calculated as the cost of compensatory restoration projects.

Section 2 focuses specifically on the methods and assumptions used to quantify ecological losses. This includes contaminant data, service losses, baseline, and the temporal scope of the assessment. Ecological gains from restoration are discussed in Section 4.

## 2.1    CONTAMINANT DATA

The contaminant data used for this assessment were extracted from the NOAA Query Manager database – a compilation of publicly available data from multiple sources in a standard format. The Trustee Council focused on surface sediment data (assumed to be the biologically active zone) from within the Portland Harbor assessment area of sufficient quality (*e.g.*, appropriately validated by an analytical laboratory). Samples with concentrations below method detection limits were set at half the detection limit.[1] To further increase reliability and reduce uncertainty associated with sediment chemistry data, samples collected before 2000 or data with questionable reliability were excluded from the Trustee Council's analysis.

Because data were not available for every point within the assessment area, the Trustee Council spatially interpolated sediment concentration data for each contaminant to estimate concentrations throughout the assessment area. The interpolation was conducted using inverse distance weighting, which is a standard tool in the Environmental Systems Research Institute (ESRI) ArcGIS (Geographic Information System) – a specialized software that enables the transparent, reproducible, spatial analysis of contaminant data.

## 2.2    SERVICE LOSSES

Ecological service losses are calculated by comparing surface sediment chemistry concentrations for the 12 SOCs to literature-based thresholds that inform the severity and magnitude of adverse effects at a range of contaminant concentrations. Consistent with injury definitions in the DOI NRDA regulations, endpoints include but are not limited to,

---

[1] A sample reported as non-detect indicates that the contaminant concentration is between zero and the detection limit, but that the analytical method cannot measure the concentration more precisely. Assigning that sample a concentration equal to half the detection limit is a way to account for this uncertainty, assuming that the true concentration has an equal probability of being more than or less than the midpoint between zero and the detection limit. This is consistent with standard practice in NRDA.

A-4

changes in biochemistry, reproduction, growth, and/or survival (43 C.F.R. § 11.62). In general, adverse effects and corresponding ecological service losses increase with increasing contaminant concentrations (expressed as a percentage of services lost). For this assessment, the Trustee Council primarily used service loss relationships developed for the Commencement Bay Superfund Site in Puget Sound, Washington[2] (Wolotira 2002). Service loss thresholds for total PAHs were modified based on an additional evaluation of the literature and site-specific information (Exhibit 2-1).

**EXHIBIT 2-1    PORTLAND HARBOR PHASE 2 SERVICE LOSS THRESHOLDS**

| CONTAMINANT | UNITS | 5% | 10% | 15% | 20% | 30% | 40% | 60% | 80% |
|---|---|---|---|---|---|---|---|---|---|
| PAHs, total | ppb | 1,000 | 5,000 | -- | 10,000 | -- | 22,800 | 69,000 | 100,000 |
| PCBs, total | ppb | 130 | -- | -- | 173 | -- | 1,500 | 4,000 | 20,600 |
| p,p' DDT | ppb | -- | 16 | -- | 70 | 1,500 | 3,600 | -- | -- |
| p,p' DDE | ppb | -- | 9 | -- | 65 | 7,000 | 21,500 | -- | -- |
| p,p' DDD | ppb | -- | 12 | -- | 45 | 456 | 2,100 | -- | -- |
| TBT | ppb | 138 | -- | -- | 1,000 | -- | -- | -- | -- |
| bis (2-ethylhexyl) phthalate | ppb | 1,300 | 1,900 | -- | 2,000 | -- | -- | -- | -- |
| Cadmium | ppm | 2.7 | 5.1 | 9.6 | 14 | -- | -- | -- | -- |
| Copper | ppm | 270 | 390 | 530 | 1,300 | -- | -- | -- | -- |
| Lead | ppm | 360 | 450 | 530 | 1,200 | -- | -- | -- | -- |
| Mercury | ppm | 0.41 | 1.3 | 1.4 | 2.3 | -- | -- | -- | -- |
| 4-Methylphenol | ppb | 110 | 670 | 1,800 | 3,600 | -- | -- | -- | -- |

*Notes:*
Service loss thresholds based primarily on those applied for the Commencement Bay / Hylebos Waterway NRDA. Service loss thresholds for total PAHs were modified based on an evaluation of the literature and site-specific information.
-- indicates "not applicable".

### 2.3    BASELINE

In order to quantify injuries, and therefore calculate damages and scale restoration activities, the baseline condition (*i.e.*, physical, chemical, and biological condition) of the affected resources and associated services must be established. Baseline is "the condition or conditions that would have existed at the assessment area had the…release of the hazardous substance…not occurred" (43 C.F.R. § 11.14 (e)). Degradation caused by permitted releases of hazardous substances or permitted physical modifications of habitat is not compensable under CERCLA (43 C.F.R. § 11.24 (b)). For the purpose of evaluating injury from contamination, baseline habitat condition within the assessment

---

[2] The Portland Harbor Trustee Council elected to rely on Commencement Bay service loss relationships because: 1) they are suitable for use at other locations in the Pacific Northwest with similar ecological attributes; and 2) the development of site-specific Portland Harbor service loss relationships would have been costly, time-consuming, and unnecessary for a settlement-oriented, cooperative NRDA process.

A-5

area is based on chemical, physical and biological characteristics, including non-contaminant-related development impacts.

Baseline contaminant levels – that is, contaminant levels that would have existed but for the releases from the PRPs – are accounted for during the allocation of liability for losses (Section 3.1). For example, baseline contamination from non-PRP upstream sources and non-site-specific sources and any corresponding losses in ecological services are identified as such in the allocation and are not allocated to a specific PRP.

To account for non-contaminant baseline conditions within the assessment area, the Trustee Council used a habitat value rating to describe the level of habitat services provided by a one-acre area. The Trustee Council developed and adopted habitat value ratings that rank the relative importance of habitat types in the lower Willamette River for juvenile Chinook salmon using technical information received from a group of scientists knowledgeable about juvenile salmon and juvenile salmon habitat. The Trustee Council identified salmon as an appropriate species to represent habitat quality for the following reasons: 1) based on existing information it is likely that injury to salmon in the assessment area has occurred; 2) the habitat preferences and needs of salmon are similar to or overlap with those of other potentially injured trust resources; 3) upper Willamette River Chinook salmon are listed as threatened under the Federal Endangered Species Act (ESA), 16 U.S.C. § 1531, *et seq*; and 4) Chinook salmon critical habitat is located within the Portland Harbor area.

Habitat values were assigned on a scale of 0.00 to 1.00, with 1.00 being the highest quality habitat for juvenile Chinook salmon. For example, a value of 1.00 is provided by a gently sloped, naturally vegetated active channel margin or a shallow, off-channel area with gravel substrate. In contrast, areas of substrate beneath over-water, man-made structures are assigned a low habitat value for juvenile Chinook salmon.

Injury caused by baseline contamination is quantified as a portion of the baseline habitat service value. Exhibit 2-2 presents all habitat types and associated values used in the assessment of ecological service losses for Portland Harbor.

## 2.4    TEMPORAL SCOPE

The temporal scope of the ecological portion of the assessment is based on the determination of injury to natural resources and corresponding losses in ecological services. Discharges and releases of hazardous substances into the lower Willamette River at Portland Harbor have resulted from current and historical industrial and municipal activities and processes since the early 1900s. Therefore, injury to ecological resources due to contamination has likely occurred since that time. Damages are defined as "the amount of money sought by the natural resource trustee as compensation for injury, destruction, or loss of natural resources" (43 C.F.R. § 11.14(1)), and are calculated beginning in 1981 (in accordance with the promulgation of CERCLA and the divisibility of injury using HEA) and continuing through the reasonable expected recovery of resource services, in this case estimated to be the year 2100. This decades-long recovery period is reasonable because of the uncertainty of the scale, type, and ultimate success of remedial actions, which for purposes of settlement is assumed to be monitored natural recovery rather than active removal or capping; the chemical stability of the contaminants

A-6

of concern (*i.e.*, many of them are not expected to substantially degrade); the continued recycling of contaminants in the ecosystem; and the effects of discounting (future losses are discounted at three percent annually).

EXHIBIT 2-2    PORTLAND HARBOR BASELINE-ADJUSTED HABITAT VALUES WITHIN THE ASSESSMENT AREA

| HABITAT | SLOPE | CLASSIFICATION | SCALING FACTOR |
|---|---|---|---|
| Active Channel Margin/Shoreline<br><br>(Between Ordinary High Water and Ordinary Low Water, or 20.1ft. to 5.1ft. NAVD88) | Slope < 5:1 (low angle) | Vegetated: native | 1.00 |
| | | Vegetated: invasive | 0.75 |
| | | Unvegetated | 0.80 |
| | | Bioengineered | 0.40 |
| | | Riprap | 0.10 |
| | | Pilings not allowing light | 0.05 |
| | | Sheetpile | 0.00 |
| | | Covered (suspended structure) | 0.10 |
| | | Covered (floating) | 0.00 |
| Active Channel Margin/Shoreline<br><br>(Between OHW and OLW, or 20.1 ft. to 5.1 ft. NAVD88) | Slope > 5:1 (steep angle) | Vegetated: native | 0.20 |
| | | Vegetated: invasive | 0.09 |
| | | Unvegetated | 0.10 |
| | | Bioengineered | 0.20 |
| | | Riprap | 0.10 |
| | | Pilings not allowing light | 0.05 |
| | | Sheetpile | 0.00 |
| | | Covered (suspended structure) | 0.10 |
| | | Covered (floating) | 0.00 |
| Shallow Water (Between OLW and 15 ft. below OLW, or 5.1 ft. to -9.9 ft. NAVD88) | NA | Gravel or natural rock | 1.0 |
| | | Riprap or concrete | 0.10 |
| | | Covered (suspended structure) | 0.10 |
| | | Covered (floating) | 0.00 |
| Deep Water (Below -9.9 ft. NAVD88) | NA | Natural substrate | 0.10 |
| | | Artificial substrate | 0.05 |

## 2.5    SUMMARY OF STEPS FOR CONDUCTING THE PORTLAND HARBOR HEA

The following is a general description of the steps the Trustee Council undertook to prepare and run the Phase 2 HEA.

1.  Define the assessment area. Within the Portland Harbor assessment area described in Section 1.0, the Trustee Council further delineated the exact boundaries of the assessment area based on the level of ordinary high water

A-7

ER-656

(OHW), defined as 14 feet NAVD 88.[3] OHW locations were identified using a digital elevation model based on high resolution topographic and bathymetric surveys. The delineated assessment area contains 2,675 acres.

2. Compile surface sediment SOC chemistry point data from NOAA's Query Manager database and import to GIS (Section 2.1).

3. In GIS, interpolate surface sediment chemistry point data using inverse-distance weighting (a standard spatial analysis technique) to create a service loss grid for each contaminant throughout the assessment area (Section 2.2).

4. Assemble data on habitat types within the assessment area and import to GIS (Section 2.3).

5. Assemble information on habitat areas where anthropogenic activities (other than contaminant releases) have resulted in a degraded ecological baseline and import to GIS (Section 2.3).

6. Calculate the area and amount of service loss associated with each habitat type in the year 2011 (the "current year" of the analysis), using the geo-processed data inputs described in the preceding steps. The areas within which a service loss is identified are referred to as "footprints." [4]

7. Input areas and service losses into a Microsoft Excel-based HEA spreadsheet.

8. Estimate change in service loss over time using a combination of two asymptotic functions (Exhibit 2-3). This estimate was based on the following reasonable assumptions:

   - Losses in 1981 were twice those in 2011.

   - Remedial actions begin in 2021, but will rely primarily on monitored natural recovery.

   - Ecological recovery is complete in 2100 (*i.e.*, service losses are zero).

   - Service losses change asymptotically (*i.e.*, not linearly), consistent with other ecological patterns such as toxicological effects, growth, and community succession.

9. Calculate DSAYs. Multiply service loss by the corresponding number of affected acres for each contaminant of concern for each year of the analysis. Apply the three percent discount rate to calculate present value losses. Losses summed across time total approximately 4,130 DSAYs. HEA input assumptions, parameters, and results are summarized in Exhibit 2-4.

---

[3] NAVD 88 is the North American Vertical Datum of 1988 which established the height of the primary tidal benchmark from which all elevations are measured.

[4] "Footprints" are defined as areas of sediment with contaminant concentrations in exceedence of adverse effects thresholds and sufficient to cause a loss in ecological services.

A-8

EXHIBIT 2-3    GRAPHICAL EXAMPLE OF PHASE 2 HEA ASSUMPTIONS

*Note:* Light green area represents the sum of losses over time.

EXHIBIT 2-4    HEA INPUT PARAMETERS AND RESULTS

| | |
|---|---:|
| HEA Start Year | 1981 |
| HEA Current Year | 2011 |
| Remediation Start Year | 2021 |
| HEA Years of Recovery | 89 |
| HEA End Year | 2100 |
| Discount Rate | 3% |
| Assessment Area (Acres) | 2,675 |
| **Result (DSAYs)** | **4,130** |

### 3.0    ALLOCATION OF DISCOUNTED SERVICE ACRE-YEARS

As noted above, there are numerous parties with potential natural resource damage liability associated with releases of hazardous substances to Portland Harbor. For example, the U.S. Environmental Protection Agency delivered Superfund General Notices of Liability to over 140 PRPs. To enable settlements with any of these PRPs, the Trustee Council must be able to assign, or allocate, a relative share of the Portland Harbor-wide liability of 4,130 DSAYs to a specific party based on information pertaining to parameters such as, but not limited to, past activities, contaminant release histories, remedial and/or source control histories, and contaminant pathway information. The Trustee Council established a two-phase process for establishing a party-specific allocation: 1) develop a preliminary "site" or tax parcel-based allocation using readily available public information, and 2) develop an "intra-party" allocation based on

A-9

ER-658

information reviewed during the site allocation, supplemented by additional information provided by Path C parties as needed.

### 3.1 SITE ALLOCATION

The Trustee Council prepared an initial allocation in April 2014 that represents a starting point for settlement discussions between Path C parties and the Trustee Council. The Trustee Council's allocation method assigns a percentage of observed sediment contamination and estimated ecological losses to each "site." A site is defined as a tax parcel or a group of contiguous tax parcels (*i.e.*, land) associated by ownership and/or related activities with the potential to contribute chemicals responsible for natural resource injuries in the assessment area.

The results of the Allocation Report are based solely on readily available data obtained from the Portland Harbor Remedial Investigation Report (LWG 2009), the Portland Harbor Remedial Investigation/Feasibility Study (RI/FS) Conceptual Site Model Update including Site Summaries (LWG 2004-2007), the Portland Harbor RI/FS Comprehensive Round 2 Site Characterization Summary and Data Gaps Analysis Report (LWG 2007), the Oregon Department of Environmental Quality Environmental Cleanup Site Information (ECSI) Database (DEQ 2013), facility website references, and Google Maps.

Based on review of these documents, the Trustee Council developed a database of site-related information. This includes, but is not limited to:

- Portland Harbor NRDA site identification numbers, tax parcel information, addresses, ECSI numbers, and site locations;

- Current and historical tenant names and years of operation identified in the references;

- Activity descriptions, activity types, associated SOCs, and references to supporting information; and

- Activities with supporting references that occurred on each site.

The allocation process necessarily involves the application of professional judgment, largely to address variability in the amount, type, and quality of data available for each site. To ensure equity in the allocation process, the Trustee Council explicitly identified assumptions used in the allocation methodology and systematically applied the same standards to all available data for the sites considered in the allocation analysis.

Using the information in the allocation database, the Trustee Council identified and documented which sites have the potential to have released any of the 12 SOCs. Sites are allocated responsibility for their relative contribution to ecological losses only if there is a link (nexus) between the site and contamination found in the assessment area. For each site and SOC, three threshold questions were posed:

1. Is there a pathway for process water, surface water, groundwater, or sediment to travel from the site to the Willamette River?

A-10

2. Was an activity conducted at the site that is a likely source of a specific SOC or that resulted in the release of a chemical likely to exacerbate the impact of a relevant contaminant?

3. Is there evidence of sediment contamination and corresponding ecological service loss in close proximity (within 100 feet) to the site or site-related outfall?

If the answer to all three questions above is "yes," then the site is considered to be a source of the contaminant(s) to the assessment area, and is allocated a percentage of the losses in relevant SOC footprints. Percentages reflect the relative contribution of a site's contaminant-related activities to corresponding contaminant footprints. Relative contribution is based on parameters such as the type, intensity, and duration of site-related activities and the site's proximity to the Willamette River, and is calculated using Portland Harbor-specific ranking factors for each parameter.[5]

However, SOC concentrations in assessment area sediment may not be attributable solely to site-specific activities. The draft RI modeled PAHs, PCBs, DDx,[6] copper, TBT and BEPH to identify potential sources of non-site specific (NSS) contamination to the Willamette River (LWG 2009). Based on loadings data (*i.e.*, kilograms of each SOC), the Trustee Council determined that the two main non-site-specific sources of SOCs to the assessment area are the Willamette River upstream of Portland Harbor and non-industrial stormwater. Each of these sources therefore is also allocated a percentage of the losses in relevant SOC footprints.

Site DSAYs are calculated as the site's allocation percentage of each SOC footprint times the total DSAYs in that footprint, summed across all relevant footprints.[7]

### 3.2    PARTY ALLOCATION

The second phase of the allocation estimates the relative contribution of SOC-related contamination among historical and current owners, tenants, operators, generators or transporters – that is, an intra-party allocation of liability. For all sites with which a particular Path C party is associated, the Trustee Council reviewed relevant information compiled during the site allocation process, as well as additional materials submitted by that party. Materials include, but are not limited to, an overview presentation of party-specific operations and activities at the site(s), photographs, log books, and Superfund 104(e) responses.[8] Using this more comprehensive dataset, the Trustee Council applied the same methods and ranking system described above (Section 3.1) to allocate site DSAYs among parties associated with that site.

### 4.0    RESTORATION

Consistent with CERCLA, the Trustee Council will use recovered natural resource damages to restore, replace, or acquire the equivalent of those natural resources and

---

[5] Ranking factors were defined prior to the review of any Portland Harbor industry-specific information.

[6] DDx includes DDT, DDD, and DDE.

[7] To determine the DSAYs for each individual contaminant footprint as defined by the Trustee Council, the Trustee Council developed a GIS-based methodology based in part on a model designed by GeoSyntec, with modifications to account for changes in service loss over time.

[8] Under CERCLA, EPA is authorized to seek information involving sites containing hazardous substances.

A-11

resource services that have been lost over time due to the release of hazardous substances in the assessment area. In this case, the Trustee Council used a species guild approach to focus on restoration that is expected to benefit the species most likely to have been injured (using surrogate species and top predators), with an emphasis on juvenile salmon, Pacific lamprey, mink, bald eagle and the habitats and food webs upon which these species rely. These species were selected because they represent species guilds common in Pacific Northwest river systems that share similar types of habitats, and because these species may have been injured by releases of hazardous substances or oil in Portland Harbor (NOAA 2012).

The Trustee Council has proposed an integrated habitat restoration approach that focuses on the habitat needs shared by these species, with a particular focus on juvenile Chinook salmon. The resulting integrated restoration is also expected to benefit other natural resources in Portland Harbor. For example, as described in the draft Programmatic Environmental Impact Statement and Restoration Plan for Portland Harbor (DPEIS; NOAA 2012):

- Lack of shallow water and wetland habitat is a primary factor limiting both salmonid success and foraging opportunities for bald eagles and other piscivorous predators in the Portland Harbor area. Restoration of these habitat types would benefit both fish and wildlife.

- Riparian buffers of sufficient width provide habitat suitable for perching, nesting, foraging, and territory defense for birds such as bald eagle and osprey; support habitat for mammals that use riparian areas for feeding such as mink and river otter; and protect stream corridors from human disturbance. Restoration of this habitat type will benefit all Trustee Council target species as well as other aquatic-dependent wildlife.

Because the Trustee Council is interested in restoring habitats that substantially benefit natural resources impacted by contamination of the lower Willamette River, restoration of off-channel habitats and the river's active channel margin[9] are top priorities. In addition, shorelines and riparian zones, especially those adjoining off-channel habitat and contiguous upland habitats, are targeted habitat priorities because of their ability to support fish and wildlife and their ecological connections to aquatic habitats, such as filtering runoff and providing sources of organic material.

To ensure that restoration is strongly linked to injury and that it will benefit potentially injured species, the Trustee Council established a geographic boundary to guide the location of restoration projects (Exhibit 4-1). Informed by technical information provided to the Trustee Council by a group of scientists with knowledge of juvenile salmon and juvenile salmon habitat, the Trustee Council determined restoration within the Portland Harbor Superfund Study Area is the highest priority. For example, as stated in the DPEIS, "Chinook salmon critical habitat located within the Portland Harbor area is used by juvenile Chinook salmon to rest and rear in preparation for entry into the lower Columbia River estuary. Thus, this critical habitat provides unique functions and features for a

---

[9] Active channel margin is defined as the portion of the river's edge that is located at the interface of unwetted shoreline and shallow water and occurs from the ordinary high water mark to ordinary low water.

A-12

particular life stage of an ESA-listed species and cannot be replaced by habitats that support other life stages." (p.ES-6). However, technical information reviewed by the Trustee Council also identified the Portland Harbor area as the most altered, habitat-limited portion of the lower Willamette River for ESA-listed juvenile Chinook salmon. Therefore, at least 50 percent of the restoration necessary to compensate the public for ecological losses will be undertaken within the Portland Harbor Superfund Study Area. The Trustee Council further determined that the remaining 50 percent of restoration can be implemented in the broader focus area, which includes the main stem of the Willamette River upstream to Willamette Falls, Multnomah Channel, and the Oregon side of the lower Columbia River between the east end of Hayden Island and the Multnomah Channel outlet (DPEIS p. 5-5; Exhibit 4-1).

**EXHIBIT 4-1    BROADER FOCUS AREA FOR ECOLOGICAL RESTORATION**



A-13

ER-662

With the integrated habitat restoration approach, the Trustee Council seeks projects that will achieve the following:

- Move toward more natural hydrology for the river.

- Restore floodplain function.

- Reestablish floodplain and riparian plant communities.

- Improve aquatic and riparian habitat conditions.

- Increase habitat complexity.

- Restore habitat that provides ecological value in the landscape context (*e.g.*, connectivity, patch size, shape and distance between different patches of habitat).

- Restore recreational services along the river while avoiding negative impacts to ecological restoration.

A suite of restoration projects is identified in the DPEIS as potentially satisfying the project priorities described above and benefiting injured resources. To select specific projects, the Trustee Council will follow a standard process (Exhibit 4-2). Initial screening will assess the proposed project site and its suitability for restoration. A specific project may be proposed by the Trustee Council or by another entity (*e.g.*, a project developer). The project proponent will then develop a project-specific restoration concept, which will determine what restoration is possible at the site and how it can be carried out, and include site-specific goals. Based on these goals, the project proponent will design specific restoration techniques and prepare preliminary cost estimates to compare with available funding. During project design and implementation, the Trustee Council will take advantage of opportunities to partner with other agencies or use economies of scale to reduce costs or improve project benefits where feasible.

The Trustee Council will review potential restoration projects and estimate the amount of ecological benefit each project will provide beyond the project's baseline (*i.e.*, initial) condition. Baseline and restored habitat will be assigned a habitat value consistent with the habitat values used in the evaluation of ecological injury (Exhibit 2-2), and the difference between the two conditions will be estimated in DSAYs to provide the total ecological value provided by the restoration project. The Trustee Council's goal is to ensure implementation of a suite of projects that together will provide sufficient value, calculated and expressed in terms of DSAYs, to fully compensate for injuries to trust resources.

A-14

ER-663

**EXHIBIT 4-2    RESTORATION PROJECT PLANNING, IMPLEMENTATION AND STEWARDSHIP (NOAA 2012)**

Restoration Project Planning, Implementation and Stewardship

**Site Investigation and Selection**

Includes:
- Site selection
- Identification of project implementer
- Development of formal agreement
- Development of project vision and goals

**Project Planning, Design and Implementation**

Includes:
- Development of cost estimates
- Securing property access
- Compliance and permitting
- Development of stewardship plan
- Final design
- Gathering pre-project baseline data
- Construction and as-built surveys

**Project Stewardship**

Includes:
- Monitoring
- Maintenance
- Adaptive management

A-15

ER-664

### 4.1    MONITORING AND STEWARDSHIP

As part of the DPEIS, the Trustee Council developed a Monitoring and Stewardship Plan for restoration projects implemented as part of the Portland Harbor NRDA. As depicted in Exhibit 4-3, monitoring and stewardship of restoration sites in Portland Harbor will be divided into four phases. The first three phases comprise the performance period, during which each site will be thoroughly monitored to ensure that it is on a trajectory towards full habitat function. The performance period will include baseline, implementation, and effectiveness monitoring. Once a project has met its performance criteria and the performance period is over, the long-term stewardship phase will begin. Long-term stewardship will involve activities like regular site visits, maintenance, ongoing effectiveness monitoring, and other tasks required to maintain project effectiveness and full functionality in perpetuity.

### EXHIBIT 4-3    MONITORING AND STEWARDSHIP PHASES (NOAA 2012)



The Trustee Council will oversee monitoring of all restoration projects implemented through settlements or by third-party (non-Trustee Council, non-PRP) developers in the Portland Harbor NRDA case. Project developers, with input from the Trustee Council, will develop a site-specific monitoring plan for the performance period and the long-term stewardship period. During the performance period, the Trustee Council will review monitoring results and validate that projects are meeting their performance standards.

During the long-term stewardship phase of the project, a conservation steward will work with the Trustee Council or its designee to develop site-specific, long-term stewardship plans, maintenance plans, and methods for clear and consistent documentation of their activities. Regular reporting of effectiveness monitoring results, site visits, maintenance activities, qualitative monitoring results (observational and photographic), enforcement

A-16

issues, financial management, adaptive management activities, and descriptions of community involvement will be provided to the Trustee Council or its designee by the site steward.

## 5.0    RECREATIONAL FISHING AND BOATING LOSSES

A PCB-related FCA was issued in 2004 for resident species and sturgeon caught in Portland Harbor. In concert with this FCA, Portland Harbor contamination has affected perceptions about the quality of the fishery and boating opportunities for the past several decades, resulting in a loss of recreation services that would have been provided by Portland Harbor natural resources but for the contamination.

Recreation services (*i.e.*, uses and associated values) have been affected in three primary ways:

1.  People may continue to recreate at contaminated sites but enjoy it less.

2.  People may choose to forego certain types of recreation activities.

3.  People may choose to change the location or types of recreation in which they participate.

This section summarizes the methods and results for the recreation damages portion of the Portland Harbor Superfund Site Phase 2 NRDA. Allocation of these damages is described in Section 7.

## 5.1    RECREATION DAMAGES METHODS AND RESULTS

The Trustee Council used the benefit transfer (BT) method to estimate recreation damages. BT is an accepted methodology under 43 C.F.R. Part 11 and government agency guidelines for economic analyses (OMB 2003, USEPA 2010). In this case, BT is characterized by the application of literature-based values that reflect the extent of lost and reduced-quality use at comparative sites to site-specific changes in recreational behavior/perception (*e.g.*, with versus without contamination). Recreation damages were estimated for four types of recreation: resident species fishing, sturgeon fishing, anadromous species fishing (including salmon and excluding sturgeon), and boating. Other recreation uses (*e.g.*, non-motorized boating, wildlife viewing, hiking, etc.) impacted by Portland Harbor contamination were considered but not quantified, primarily because existing data for those activities are limited. Up to two additive damage calculations were made for each category: one for trips that occur with reduced quality (item 1 above) and another for trips that are taken elsewhere or not at all (items 2 and 3 above). Based on the available economics literature and information collected in September 2011 from focus groups with regional anglers and boaters, the reduced-quality calculation was carried out for all four recreation categories, while the lost trips calculation was only carried out for the resident species and sturgeon fishing categories (Exhibit 5-1).

A-17

**EXHIBIT 5-1    SUMMARY OF RECREATIONAL LOSS CATEGORIES**

| CATEGORY | REDUCED TRIP QUALITY | LOST TRIPS |
|---|---|---|
| Resident species fishing | Yes | Yes |
| Sturgeon fishing | Yes | Yes |
| Anadromous species fishing (including salmon, excluding sturgeon) | Yes | No |
| Recreational boating | Yes | No |

Recreation damages associated with reduced-quality and lost trips were calculated annually from 1981 (in accordance with the promulgation of CERCLA and the divisibility of damages), to the time when impacts to the specific recreation trip category were expected to end. Damages for a given year were calculated by multiplying the following inputs: 1) annual recreation trips, 2) percentage of total trips affected or lost, 3) annual total potential loss factor, 4) estimate of per-trip lost value or per-trip value, and 5) annual discount rate. Each input is discussed in more detail below.

1. *Annual recreation trips*. Portland Harbor fishing and boating use data came from the Oregon Department of Fish and Wildlife's annual creel survey and the Oregon State Marine Board's triennial survey of motorboating and sailing use. Data were available back to 1981 or earlier. Linear interpolation was used to fill data gaps between years with available data, and future trips were forecasted using the most recent 10 years of use data available. Summary statistics for the use data applied in the BT are presented in Exhibit 5-2.

**EXHIBIT 5-2    RECREATION USE DATA SUMMARY STATISTICS (ANNUAL TRIPS)**

| CATEGORY | LOW | HIGH | MEAN |
|---|---|---|---|
| Resident species fishing | 500 | 5,100 | 2,600 |
| Sturgeon fishing | 500 | 8,000 | 4,200 |
| Anadromous species fishing, excluding sturgeon | 3,800 | 55,600 | 23,700 |
| Recreational boating | 6,300 | 42,200 | 14,400 |

2. *Percentage of total trips affected: Reduced trip quality*. This input was based on information in the economics literature and from the September 2011 focus groups. There is a clear link in the economics literature between the presence of FCAs and the reduced quality of recreational fishing. Since contamination has led to FCAs for resident species and sturgeon, the Trustee Council concluded that 100 percent of trips in these categories are affected. However, only some anglers and boaters in the focus groups expressed concern for themselves and/or others

A-18

ER-667

about consuming anadromous fish and/or engaging in in-water activities. Based on those findings, the Trustee Council estimated 15 percent and 20 percent of trips are affected for anadromous species fishing and boating, respectively.

*Percentage of total trips lost.* This estimate was also based on information from the economics literature. The Trustee Council relied on Connelly *et al.* (1990, 1992), Silverman (1990), and Vena (1992) to determine that four percent of total resident species and sturgeon fishing trips are lost due to contamination.

3. *Annual total potential loss factor.* This factor was used to scale the loss for a given year, since impacts are not uniform across time.[10] The Trustee Council used best professional judgment in estimating the extent of losses over time. A factor of 1 was used for all fishing categories from 2004, when the Portland Harbor FCA was issued, through the end of EPA remediation work, forecasted to conclude in 2025 for this analysis. For boating, a factor of 1 was used starting in 2000 when the site was listed on the National Priorities List (NPL). Because contamination levels in fish will take additional time to decline after remediation ends, the Portland Harbor FCA is expected to remain in place beyond remediation. For this analysis, the FCAs for resident species and sturgeon were forecasted to be removed in 2035 and 2050 and a factor of 1 was applied up until the removal of the FCA for these categories.[11]

For time periods leading up to 2004 (or 2000 for boating) and following remediation (or lifting of the FCA for resident species and sturgeon fishing), a concave exponential function was used to ramp up and down the total potential loss factor. This approach reflects the buildup of concern over time about recreating in Portland Harbor and the decline in concern that is anticipated after remediation and lifting of the FCA. Since public concern and awareness about Portland Harbor contamination dates back several decades, even before the site was listed on the NPL or the Portland Harbor FCA was issued, a loss factor of 0.25 is used for 1981 to reflect a lower level of damages in the past.[12] Exhibit 5-3 presents the potential loss factor in select years for each damage category.

---

[10] A total potential loss factor of 1 does not imply that all trips are lost or affected. The reduced-quality and lost trips calculations have separate inputs for the percentage of total trips affected and the percentage of total trips lost.

[11] This adjustment is not necessary for the other categories because the FCA only applies to resident species and sturgeon and there is no boating health advisory in place.

[12] The Trustee Council identified numerous news articles and other media sources that document past public concern about Portland Harbor contamination, including Tom McCall's 1962 documentary, *Pollution in Paradise*.

A-19

**EXHIBIT 5-3     POTENTIAL LOSS FACTOR IN KEY YEARS**

| CATEGORY | POTENTIAL LOSS FACTOR | | | |
|---|---|---|---|---|
| | 1981 | 2000 NPL LISTING | 2004 FCA | END OF IMPACT (YEAR) |
| Resident species fishing | 0.25 | 0.8 | 1 | 0 (2055) |
| Sturgeon fishing | 0.25 | 0.8 | 1 | 0 (2070) |
| Anadromous species fishing, excluding sturgeon | 0.25 | 0.8 | 1 | 0 (2045) |
| Recreational boating | 0.25 | 1 | 1 | 0 (2045) |

4.  *Estimate of per-trip lost value.* These estimates were based on information in the economics literature. The Trustee Council conducted a comprehensive literature search of peer-reviewed studies, reports, and unpublished literature to find applicable studies for use in the BT. All identified studies were reviewed and scored for quality and applicability using a common set of criteria. These criteria were developed using government agency guidelines and peer-reviewed publications for conducting economic analyses with BT.[13]

To be considered for application in the BT, a study had to use adequate data and apply accepted research methods in the field of natural resource economics. Studies passing this initial filter were scored based on a geographic criterion (*i.e.*, is the affected population in the candidate study similar to the affected population around Portland Harbor?), an injury scenario criterion (*i.e.*, is the type and scope of contamination similar, along with the affected recreational uses?) and an applicable estimate criterion (*i.e.*, does the study contain an estimate that directly supports the reduced-quality and/or lost trips calculation?). These three criteria were weighted on a 100-point scoring scale to reflect the Trustee Council's relative preference for inclusion in the BT (20 percent, 40 percent, and 40 percent, respectively).

Reduced Quality Trips. The Trustee Council relied on MacNair and Desvousges (2007) and USFWS and Stratus (1999) to develop per-trip lost value estimates for the fishing categories and on Carson and Mitchell (1993), Desvousges *et al.* (1983), Huber *et al.* (2006), and Van Houtven (2007) for the boating category (Exhibit 5-4).[14]

Trip Value. The Trustee Council relied on Bergstrom *et al.* (1996), Boyle *et al.* (1999), Loomis (2005), and Walsh *et al.* (1992) to develop per-trip value estimates for the resident species and sturgeon fishing categories (Exhibit 5-4).[15]

---

[13] *See* Unsworth and Petersen (1995), OMB (2003), U.S. EPA (2010), Boyle and Bergstrom (1992), Desvousges *et al.* (1992), Rosenberger and Loomis (2001), Loomis (2005), and Boyle *et al.* (2010)

[14] All estimates have been converted to 2011 dollars using the Consumer Price Index (CPI) for Portland, OR. CPI information from 1981 to 2011 for Portland was downloaded from http://www.bls.gov/cpi/#tables.

[15] *See* previous footnote.

A-20

**EXHIBIT 5-4    VALUE ESTIMATES USED IN BT**

| CATEGORY | REDUCED QUALITY LOSS ESTIMATE PER TRIP (2011$) | LOST TRIP VALUE ESTIMATE (2011$) |
|---|---|---|
| Resident species fishing | $5.71 | $45 |
| Sturgeon fishing | $10.28 | $81 |
| Anadromous species fishing, excluding sturgeon | $5.14 | -- |
| Recreational boating | $9.60 | -- |
| *Notes:* Sources are noted in text. -- indicates "not applicable". | | |

5. *Annual discount factor*. A discount rate was used to address the gap in time between when losses occurred and when compensatory restoration actions are expected to provide benefits. Annual losses were discounted to 2012 equivalent losses.[16] Consistent with the ecological loss calculations (Section 2) and standard practice in NRDA, a rate of three percent was applied.

The Trustee Council used the inputs described above to calculate damages associated with reduced-quality and lost trips for each recreation category (recall, damages associated with lost trips were only estimated for the resident species and sturgeon fishing categories). Exhibit 5-5 summarizes the recreation damage estimates developed using the BT approach described above.

**EXHIBIT 5-5    SUMMARY OF RECREATION DAMAGE ESTIMATES**

| LOSS CATEGORY | ESTIMATE (2011$) |
|---|---|
| Total fishing losses, resident species | $853,700 |
| Total fishing losses, sturgeon | $2,738,800 |
| Total fishing losses, other anadromous species | $705,300 |
| Total losses, recreational boating | $1,104,600 |
| **Total losses** | **$5,402,400** |

---

[16] At the time this analysis was done in 2012, the latest CPI data available were from 2011. Therefore, 2011 was used as the baseline year for calculating inflation-adjusted economic values and 2012 was used for resource service discounting.

A-21

## 6.0    TRIBAL LOSSES

As described above, the Confederated Tribes of the Grand Ronde Community of Oregon, Confederated Tribes of Siletz Indians, Confederated Tribes of the Umatilla Indian Reservation, Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe (together, Tribes) are members of the Portland Harbor Natural Resource Trustee Council. Releases of contaminants at Portland Harbor have injured natural resources of tribal importance, resulting in the lost use of those resources. In an effort to identify Tribal-specific losses due to contamination, the Tribes conducted interviews with Tribal members and natural resources staff to evaluate: 1) species of primary importance to the Tribes, and 2) whether compensatory restoration actions, above and beyond the ecological and recreational restoration efforts, were necessary to address Tribal-specific lost use.

Fish species in the lower Willamette River of primary importance to the Tribes for Portland Harbor NRDA purposes are salmon, sturgeon, and lamprey. Tribal representatives conducted focus group interviews with Tribal members and staff between November 2010 and May 2012. These interviews focused on the impact of contamination on Tribal salmon and sturgeon fishing and lamprey gathering in the Portland Harbor area. Results were similar across Tribes, and indicated that Tribal members experience some level of loss associated with salmon, sturgeon, and lamprey contamination.

### 6.1    SALMON AND STURGEON

Regarding salmon and sturgeon, some Tribal members avoid eating salmon or sturgeon from the lower Willamette River and/or avoid fishing for these species due to contamination. In addition, many Tribal members fish for these species in areas other than Portland Harbor, for reasons that include lack of contamination.

In the context of assessing the ecological benefits of potential restoration actions, the Trustees developed specific criteria to identify benefits to salmon as target fish species for habitat restoration, with the understanding that other target species also would benefit from such restoration (Section 4.0). For example, information indicates that both salmon and sturgeon will benefit from habitat characteristics such as in-stream habitat structures and high water quality. This metric allows the Trustees to scale a restoration project (*i.e.*, calculate sufficient project size and scope) to generate benefits for the particular species of concern.

Given these factors, the Tribes believe that general ecological restoration as a result of the NRDA will provide sufficient benefit to salmon and sturgeon to compensate for Tribal losses associated with contamination of these species.

### 6.2    LAMPREY

### 6.2.1    INJURY

Unlike salmon and sturgeon, lamprey gathered at Willamette Falls, approximately 15 miles upstream from the Portland Harbor assessment area, are a sole-source fishery for Tribal members due to plummeting lamprey populations at other sites where Tribal members also traditionally collected these fish. As part of their life cycle, lamprey migrate through the Willamette River and the Portland Harbor assessment area en route

A-22

ER-671

to Willamette Falls, and are exposed to contamination during that journey. Due to this exposure, lamprey harvested at Willamette Falls do not provide the full suite of services they would provide absent the contamination. Specifically, due to the association of lamprey at Willamette Falls with contamination, Tribal members either do not eat lamprey or do not enjoy their meals as much, and also are worried about lamprey meals they provide to others, including their children. This reduced quality results in a lost connection to and use of the lamprey resource. These losses have occurred in the past and will continue into the future until contamination in the assessment area, and its associated impact on Tribal members' perception and consumption of lamprey, is removed.

To evaluate another line of evidence of injury to lamprey, the Tribes, in cooperation with Oregon State University, conducted a pilot study assessing the toxicity of Portland Harbor sediment, as compared to relatively uncontaminated Siletz River sediment, to lamprey ammocoetes (larvae). Results of these preliminary experiments suggest that the presence of contaminants adversely affects ammocoete burrowing behavior. For example, ammocoetes exposed to contaminated sediment took longer to initiate and complete burrowing than ammocoetes exposed to reference/control sediment. This could have negative implications for ammocoetes in Portland Harbor, as burrowing is an essential behavior that allows ammocoetes to feed and gain protection from predators.

### 6.2.2 RESTORATION

The Tribal Trustees conducted a literature review to assess whether the Trustee Council criteria that were developed to determine the relative benefit of habitat restoration projects for salmon were also relevant for lamprey. While some habitat characteristics may be used by both salmon and adult lamprey (*e.g.*, shallow in-water habitat, in-stream habitat structures), the review indicated that data are insufficient to specifically identify lamprey habitat needs and preferences, particularly for ammocoetes and juvenile lamprey, and that the benefits of restoration projects to lamprey are uncertain.

Therefore, Tribal representatives developed a compensatory restoration claim for losses related to Tribal use of lamprey in Portland Harbor. Based on the results of the pilot study, the literature review, and interviews with Tribal members and staff, restoration actions focus on compilation and evaluation of existing data regarding risks to human health resulting from consumption of contaminated lamprey and monitoring of restoration efforts to assess ecological benefits to lamprey.

#### Compilation and Evaluation of Data Regarding Health Risks Resulting from Consumption of Contaminated Lamprey

As noted above, Tribal members expressed concerns about consumption of contaminated lamprey. Many of these concerns specifically relate to health risks. A number of studies on the human health effects associated with consumption of contaminated lamprey have been conducted by various tribes and trustee agencies (not limited to the Tribes and Trustees of the Portland Harbor NRDA). To date, a comprehensive review of this information has not been conducted. Therefore, the Tribes will compile and evaluate data from existing studies, which will help guide Tribal members' perceptions and decisions regarding lamprey consumption by adults and children. The cost of this effort is estimated to be $50,000.

### Monitoring

In addition to consumption-related losses, Tribal interviews revealed that Tribal members have overarching concerns about lamprey – questions regarding basic characteristics such as sensitivity to stressors (including contamination), migration, and population. The pilot study indicates that contamination adversely affects lamprey ammocoetes, but in the interest of cost-effective settlement efforts, a comprehensive follow-on study has not been conducted. In addition, the literature review revealed a paucity of information regarding lamprey characteristics such as sensitivity to contaminants, migration, population, and habitat preferences. The Trustee Council has an opportunity to fill this gap through lamprey ammocoete monitoring as part of the Portland Harbor NRDA restoration effort. Based on the limited information available, the Trustee Council concluded that monitoring methods for salmonids and other fish species are not effective for lamprey ammocoetes. For example, salmonids and lamprey ammocoetes have different physiologies and life cycles, and therefore potentially have different habitat preferences.

The Tribes developed two separate but related lamprey ammocoete monitoring plans. One is a harbor-wide restoration monitoring plan that builds on previous work conducted by the U.S. Fish and Wildlife Service (USFWS). The second is a restoration project-specific monitoring effort that will be conducted at each restoration site and a corresponding reference site. The goal of both efforts is to simultaneously monitor the impact of restoration actions on ammocoete populations and health in Portland Harbor, and gather information about lamprey life history, biology, and habitat requirements that may be used by the Tribes and/or the Trustee Council in the future to design and evaluate lamprey restoration projects.

Where possible, data will be collected to satisfy the following objectives:

1. Determine whether lamprey occupy restoration and reference sites.

2. Determine the types of habitat available and in which habitat types lamprey are detected.

3. Characterize species and life history stage of lamprey that occupy a site.

4. Evaluate the health of lamprey detected at each site.

The harbor-wide monitoring has three additional objectives:

1. Evaluate colonization between sites.

2. Evaluate harbor-wide trends.

3. Describe changes in ecosystem health (*e.g.*, ecosystem diversity index).

Harbor-wide monitoring efforts will occur in multiple habitat types throughout the 20 years following the start of project implementation. Lamprey-related data collection efforts will include direct sampling for lamprey, as well as characterization of co-located substrate through the analysis of parameters such as sediment total organic carbon and grain size. Data collection is planned for years 9 through 11 and 18 through 20 after

A-24

ER-673

restoration efforts begin. Harbor-wide monitoring costs are based on USFWS effort for similar, previous work, and are approximately $645,100.[17]

Project-specific monitoring efforts will occur in multiple habitat types associated with each restoration project over a 20-year span post-restoration, and will include one year of pre-restoration baseline monitoring. Results will be compiled into a series of data reports provided to the Tribes. The cost of project-specific monitoring will be paid for by restoration project developers and is therefore not included as a component of the cash-out per DSAY cost (see Section 7.0).

## 7.0    COST PER DSAY

PRPs for this site may resolve their portion of natural resource damage liability either through a complete cash-out settlement or through a combination of restoration project implementation and funding for losses not compensated for by the project. In this case, a PRP's liability is expressed as their share of DSAYs. Therefore, the Trustees developed an estimate of the cost per DSAY that incorporates the cost of compensation for ecological, recreational fishing and boating, and Tribal losses.

### 7.1    ECOLOGICAL RESTORATION

If a PRP settlement is a complete cash-out, the Trustee Council plans to purchase ecological restoration credits from third-party developers rather than implement the projects themselves. This means that in addition to project implementation, the estimated dollars per DSAY ($/DSAY) paid to the Trustee Council by the PRP must include funds for relevant transactions (*e.g.*, land transfers) and project contingency.

#### Base Restoration Cost

Currently, the price the Trustee Council will have to pay project implementers for DSAY credits is uncertain. Some project implementers provided estimates of the price at which they expect to sell credits; other developers indicated that credit prices will increase as remedial actions are completed. In addition, a number of potential project developers are waiting for initial transactions to occur before proposing a price. Therefore, based on available information provided by restoration project implementers, the Trustee Council currently estimates that credits within Portland Harbor will cost approximately $85,000 (range of $50,000-$125,000),[18] and credits within the broader focus area will cost approximately $40,000 (range of $15,000-$60,000). Because the Trustee Council needs to ensure that funds are sufficient to satisfy the purchase of half of the compensatory ecological credits within Portland Harbor and half within the broader focus area (Section 4.0), the base cost per DSAY is estimated to be $62,500 (the average of $85,000 and $40,000).

---

[17] Cost includes personnel, supplies/equipment, overhead, travel, sample analysis, data compilation, and contingency, and also accounts for a two percent escalation factor (BLS 2012).

[18] This cost is comparable to the Duwamish River NRDA restoration costs. Duwamish River NRDA restoration projects have focused on restoring habitat types similar to those habitat types that the Trustee Council has prioritized for restoration.

A-25

### Transaction Cost

Based on restoration efforts for other cases, the Trustee Council assumes that the Trustee Council will incur transaction costs in the amount of approximately $10,000 per project. Assuming that four restoration projects implemented as part of the Portland Harbor NRDA will require transaction costs, and that the transactions are completed at varying times throughout restoration efforts, the Trustee Council projected total transaction costs of approximately $35,670. This is the sum of the present value of four $10,000 project costs assuming a two percent escalation factor and a four percent return on monies retained in the DOI Natural Resource Damage Assessment and Restoration Program fund.[19]  Distributed across the 4,130 DSAYs, this is approximately $9 per DSAY.

### Contingency

The Trustee Council added a contingency to account for project issues that are likely to arise during project implementation. A contingency is typically applied for any project that involves components such as construction, engineering, and/or adaptive management associated with performance metrics. Sufficient contingency funding ensures that monies are available to address unforeseen issues related to restoration actions so that performance standards can be achieved and maintained. For example, restoration actions that will improve the quantity or quality of priority habitat types may include levee removal and modification; dam removal; culvert removal or replacement; and/or restoration or creation of off-channel, active channel margin, and shallow water habitats. Revegetation and invasive plant removal will also be a component of most project types. Contingencies in the context of these types of restoration actions often range from 10 to 20 percent. For purposes of settlement, the Trustees applied a 10 percent contingency to the per-DSAY base restoration cost plus transaction cost, resulting in approximately $6,251 per DSAY ([$62,500 + $9] * 10%).

### 7.2    LONG-TERM STEWARDSHIP

Stewardship is essential to ensure the long-term viability of a restoration project. As described in Section 4.0, the Trustee Council's Monitoring and Stewardship Plan summarizes activities related to monitoring and stewardship (*e.g.*, site visits, effectiveness monitoring, maintaining relationships with landowners and community members). The Trustee Council estimated the level of effort and associated cost for a sub-set of Trustee Council members to engage in and oversee stewardship activities for an initial period of time to be at least $1.1 million, or $265 per DSAY.

### Lamprey-Specific Data Collection and Reporting (Tribal)

As described in Section 6.0, available data on lamprey in Portland Harbor are sparse. The Tribes identified two lamprey-specific efforts to supplement the general harbor-wide monitoring: 1) compilation and evaluation of data regarding the health risks of consumption of contaminated lamprey, and 2) sampling of lamprey ammocoetes to determine habitat use and collection and analysis of co-located data on substrate

---

[19] The two percent escalation factor is the 10-year average (2002-2011) of the consumer price index for the Portland-Salem, Oregon-Washington area (BLS 2012).

A-26

characteristics to inform lamprey ammocoete habitat preferences. The cost of these combined efforts is approximately $695,100, or $168 per DSAY.

### 7.3 RECREATIONAL FISHING AND BOATING

At this time the Trustee Council has not identified specific projects that would provide compensation to the public for the approximately $5.4 million of lost recreational fishing and boating value. Therefore, for purposes of settlement, the Trustee Council distributed the lost value across the 4,130 DSAYs, for a cost of approximately $1,308 per DSAY.

The Trustee Council will use recovered damages for lost recreational fishing and boating to implement projects that connect people with the Willamette River for recreational opportunities. As stated in the DPEIS, "[t]he Trustee Council will focus on improving access for local communities to the banks of the Willamette River where it is limited, specifically within Portland Harbor. Restoration projects will be designed to provide a quality fishing opportunity along natural shorelines with features desired by anglers. Restoration projects will also be designed to provide safe access to users, with particular consideration for disabled persons and families. Projects will also be designed to limit the impacts of human use on sensitive ecological restoration areas." (NOAA 2012 p.5-9)

### 7.4 TOTAL COST PER DSAY

In the context of settlement with Path C parties who desire a cash-out settlement, the Trustees compiled costs associated with ecological restoration and monitoring and stewardship, as well as lost recreational value, and estimated an overall cost per DSAY of approximately $70,500 (Exhibit 7-1). For Path C parties that prefer to implement ecological restoration projects, the settlement would still require payment of $1,742 per DSAY for monitoring and stewardship (which includes funding for lamprey monitoring as compensation for Tribal-specific losses), and recreational fishing losses.

### EXHIBIT 7-1   TOTAL COST PER DISCOUNT SERVICE ACRE-YEAR

| COMPENSATORY NRDA COMPONENT | | COST PER DSAY |
|---|---|---|
| Ecological | Base Restoration | $62,500 |
| | Transaction | $9 |
| | Contingency | $6,251 |
| Monitoring and Stewardship[1] | Trustee Council oversight | $265 |
| | Lamprey-specific Harbor-wide monitoring (Tribal) | $168 |
| Recreational Fishing[1] | | $1,308 |
| Total[2] | | **$70,500** |
| Notes: 1. Monitoring and stewardship and recreational fishing costs per DSAY would still be a cash component of a settlement in which the PRP implemented the ecological restoration projects. 2. Total does not sum due to rounding. | | |

A-27

ER-676

## 8.0    REFERENCES

Bergstrom, J.C., J.M. Bowker, H.K. Cordell, G. Bhat, B.K. Donald, R.J. Teasley, and P. Villegas. 1996. Ecoregional Estimates of the Net Economic Value of Outdoor Recreational Activities in the United States: Individual Model Results. Final Results. USDA Forest Service Resource Program and Assessment Staff. September.

BLS (United States Department of Labor Bureau of Labor Statistics). 2012. Consumer Price Index. Detailed Report Tables. Series ID: CUURA425SA0,CUUSA425SA0. Area: Portland-Salem, OR-WA. Item: All items. Not seasonally adjusted. Accessed April 5.

Boyle, K., R. Bishop, J. Caudill, J. Charbonneau, D. Larson, M.A. Markowski, R.E. Unsworth, and R.W. Paterson. 1999. A Meta Analysis of Sport Fishing Values. Prepared for the U.S. Fish and Wildlife Service. April.

Boyle, K.J. and J.C. Bergstrom. 1992. Benefit transfer studies: Myths, pragmatism, and idealism. *Water Resources Research* 28(3):657–663.

Boyle, K.J., N.V. Kuminoff, C. Parmeter, and J.C. Pope. 2010. The benefit-transfer challenges. *Annual Review of Resource Economics* 2:161–182.

Carson, R.T. and R.C. Mitchell. 1993. The value of clean water: The public's willingness to pay for boatable, fishable, swimmable quality water. *Water Resources Research* 29(7):2445–2454.

Connelly, N.A., T.L. Brown, and B.A. Knuth. 1990. New York Statewide Angler Survey 1988. Prepared by the New York State Department of Environmental Conservation, Division of Fish and Wildlife, Albany, NY. April.

Connelly, N.A., B.A. Knuth, and C.A. Bisogni. 1992. Effects of the Health Advisory and Advisory Changes on Fishing Habits and Fish Consumption in New York Sport Fisheries. Report for the New York Sea Grant Institute Project No. R/FHD-2-PD. Human Dimensions Research Unit, New York DNR. Series No 92-9. September.

DEQ (Oregon Department of Environmental Quality). 2013. Environmental Cleanup Site Information Database. http://www.deq.state.or.us/lq/ecsi/ecsiquery.asp?listtype=lis&listtitle=Environmental +Cleanup+Site%20Information+Database

Desvousges, W.H., M.C. Naughton, and G.R. Parsons. 1992. Benefit transfer: Conceptual problems in estimating water quality benefits using existing studies. *Water Resources Research* 28(3):675–683.

Desvousges, W.H., V.K. Smith, and M.P. McGivney. 1983. A Comparison of Alternative Approaches for Estimating Recreation and Related Benefits of Water Quality Improvements. Prepared for the U.S. Environmental Protection Agency, Economic Analysis Division, Washington, DC.

Freeman, A.M. 1993. The Measurement of Environmental and Resource Values, Theory and Methods. Resources for the Future, Washington, D.C.

A-28

Huber, J., W.K. Viscusi, and J. Bell. 2006. Economics of Environmental Improvement. Prepared for U.S. Environmental Protection Agency, National Center for Environmental Economics. September 1.

Loomis, J. 2005. *Updated Outdoor Recreation Use Values on National Forests and Other Public Lands*. PNW-GTR-658. USDA Forest Service Pacific Northwest Research Station.

LWG (Lower Willamette Group). 2009. Portland Harbor Superfund Site Draft Remedial Investigation Report. October.

LWG. 2007. Portland Harbor RI/FS Comprehensive Round 2 Site Characterization Summary and Data Gaps Analysis Report. Prepared by Integral Consulting, Windward Environmental LLC, Kennedy/Jenks Consultants, Anchor Environmental L.L.C. February 21.

LWG. 2004-2007. Portland Harbor RI/FS Conceptual Site Model Update. Prepared for the Lower Willamette Group. Integral Consulting, Inc. and Groundwater Solutions, Inc. September 17, 2004. Appendix A. Site Summaries. September 2004, March 2005, and February 2007.

MacNair, D.J. and W.H. Desvousges. 2007. The economics of fish consumption advisories: Insights from revealed and stated preference data. *Land Economics* 83(4):600–616.

NOAA (National Oceanic and Atmospheric Administration). 2012. Draft Portland Harbor Programmatic Environmental Impact Statement and Restoration Plan. July 9. http://www.fws.gov/oregonfwo/Contaminants/PortlandHarbor/Documents/20120627_PEIS_DraftforRelease.pdf.

NOAA. 1999. Discounting and the Treatment of Uncertainty in Natural Resource Damage Assessment. Technical Paper 99-1. February 19.

OMB (Office of Management and Budget). 2003. Circular A-4: To the Heads of Executive Agencies and Establishments. Office of Management and Budget. September 17.

Rosenberger, R.S. and J.B. Loomis. 2001. *Benefit Transfer of Outdoor Recreation Use Values: A Technical Document Supporting the Forest Service Strategic Plan (2000 Revision)*. Gen. Tech. Rep. RMRS-GTR-72. U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. Fort Collins, CO.

Silverman, W.M. 1990. Michigan's Sport Fish Consumption Advisory: A Study in Risk Communication. Master of Science, University of Michigan.

Unsworth, R.E. and T.B. Petersen. 1995. Secondary methods for natural resource valuation: Benefits transfer. In *A Manual for Conducting Natural Resource Damage Assessment: The Role of Economics*. U.S. Fish and Wildlife Service Division of Economics, pp. 69–95.

A-29

USEPA (United States Environmental Protection Agency). 2010. *Guidelines for Preparing Economic Analyses*. EPA 240-R-10-001. U.S. Environmental Protection Agency. December.

USFWS and Stratus (United States Fish and Wildlife Service and Stratus Consulting). 1999. Recreational Fishing Damages from Fish Consumption Advisories in the Waters of Green Bay. Prepared for U.S. Fish and Wildlife Service, U.S. Department of Justice, and U.S. Department of Interior. Stratus Consulting Inc., Boulder, CO. November 1.

Van Houtven, G., J. Power, and S.K. Pattanayak. 2007. Valuing water quality improvements in the United States using meta-analysis: Is the glass half-full or half-empty for national policy analysis? *Resource and Energy Economics* 29:206–228.

Vena, J.E. 1992. Risk Perception, Reproductive Health Risk and Consumption of Contaminated Fish in a Cohort of New York State Anglers. Cover Letter with Report sent by Dr. Vena of the University at Buffalo to Jim Colquhoun and Robert Lange at the Department of Environmental Conservation.

Walsh, R.G., D.M. Johnson, and J.R. McKean. 1992. Benefit transfer of outdoor recreation demand studies, 1968–1988. *Water Resources Research* 28(3):707–713.

# EXHIBIT D

Case: 25-8129, 04/13/2026, DktEntry: 77.5, Page 157 of 244

Case 3:23-cv-01603-SI    Document 113-4    Filed 07/28/25    Page 2 of 7

Commissioner of Dept. of Planning and Natural Resources..., Not Reported in...

2008 WL 4693550
Only the Westlaw citation is currently available.
NOT PRECEDENTIAL—NOT FOR PUBLICATION
District Court of the Virgin Islands, Division of St. Croix.

COMMISSIONER OF the DEPARTMENT OF
PLANNING AND NATURAL RESOURCES,
Robert S. Mathes, In His Capacity as Trustee
for Natural Resources of the Territory of
the United States Virgin Islands, Plaintiff,
v.
CENTURY ALUMINA COMPANY, Virgin
Islands Alumina Company, St. Croix Alumina,
L.L.C., Lockheed Martin Corporation, Alcoa
World Alumina, L .L.C., Hovensa, L.L.C.,
Hess Oil Virgin Islands Corporation, St. Croix
Renaissance Group, L.L.L.P., Defendants.
United States Virgin Islands, Department of
Planning and Natural Resources, Plaintiff,
v.
St. Croix Renaissance
Group, L.L.L.P., Defendant.

Civil Nos. 2005/0062, 2007/114.
|
Oct. 22, 2008.

**Attorneys and Law Firms**

John K. Dema, Law Offices of John K. Dema, P.C., St. Croix, VI, for Plaintiffs.

David J. Cattie, Simone D. Francis, Ogletree, Deakins, Nash, Smoak & Steward, LLC, Henry L. Feuerzeig, Dudley Topper & Feuerzeig, St. Thomas, VI, Elizabeth Bartlett Partlow, Ogletree, Deakis, Nash, Smoak & Stewart, P.C., Columbus, SC, Eric C. Schweitzer, Ogletree Deakins, Christiansted, VI, Bablu David Naidu, Donald Stever, Kirkpatrick & Lockhart Preston Gates Ellis LLP, New York, NY, Todd H. Newman, Joshua Evan Tate, Nichols Newman Logan & Grey, PC, St. Croix, VI, for Defendants.

**MEMORANDUM OPINION**

FINCH, J.

**\*1** THIS MATTER comes before the Court on the Joint Motion to Approve and Enter Agreement and Consent Decree. Such Consent Decree concerns two environmental actions relating to contamination allegedly emanating from the HOVENSA Refinery [hereinafter "the Refinery"] and the Alumina Facility sites in an area known as the South Coast Industrial Area of St. Croix, United States Virgin Islands. After reviewing the substantial written submissions in support of and in objection to the entering of the Consent Decree, the Court does not approve the Consent Decree.

**I. Natural Resource Damages and Response Cost Suits**
In Civil No.2005–62, the Commissioner of the Department of Planning and Natural Resources, Robert S. Mathes, in his capacity as Trustee for the Natural Resources of the Territory of the United States Virgin Islands [hereinafter "the Trustee"] brings federal claims against St. Croix Renaissance Group, L.L.L.P [hereinafter "Renaissance"], and seven other entities under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., as well as territorial common law and statutory claims. In Civil No.2007–114, United States Virgin Islands Department of Planning and Natural Resources (DPNR), on behalf of the United States Virgin Islands, sues Renaissance alone to recover past and future response costs pursuant to CERCLA and for a declaratory judgment that Renaissance is jointly, severally, and strictly liable to DPNR for such costs.

**II. The Proposed Consent Decree and Responses Thereto**
In the proposed Consent Decree, Renaissance, current owner of the Alumina Facility, agrees with the Trustee and DPNR to make a payment of $300,000. Of this $300,000, $180,000 would be paid for damages and natural resources damages and $120,000 would go toward response costs, oversight costs, health assessment costs, attorney's fees and litigation costs. The Trustee and DPNR agree to release their present claims, as well as all future claims, except those reserved, against Renaissance as well as all subsequent transferees, for damages, natural resource damages, response costs, health assessment costs, attorney's fees and litigation costs. The Consent Decree would also provide Renaissance with protection from contribution claims under section 113(f)(2) of

ER-681

Case: 25-8129, 04/13/2026, DktEntry: 77.5, Page 158 of 244
Case 3:23-cv-01603-SI    Document 113-4    Filed 07/28/25    Page 3 of 7
Commissioner of Dept. of Planning and Natural Resources..., Not Reported in...

the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9613(f)(2).

St. Croix Alumina, L.L.C. and ALCOA World Alumina, L.L.C. [hereinafter "SCA/ALCOA"] who are two of Renaissance's Codefendants in Civil No.2005–62 and former owners of the Alumina Facility, oppose the Joint Motion as unfair, unreasonable and inconsistent with CERCLA's goals. SCA/ALCOA principal concerns are that the Consent Decree (1) does not contain any estimate of total damages or response costs to resolve potential claims associated with the Alumina Facility, or of Renaissance's fair share of such damages or costs; (2) gives Renaissance unlawfully broad protection from contribution claims; and (3) releases future owners of the Alumina Facility.

**\*2** Century Alumina Company [hereinafter "Century"], together with Virgin Islands Alumina Company, and Lockheed Martin Corporation, three other Renaissance Codefendants, request that, if the Court approves the Consent Decree, the Court explicitly confirm that the Consent Decree does not affect any contractual indemnification obligations between or among the Defendants and that those rights and obligations remain valid and enforceable pursuant to both territorial and federal law, including CERCLA. *See, e.g., Washington v. United States,* 2007 WL 3025843, at \*9 (W.D.Wash. Oct. 15, 2007) (approving a Consent Decree upon condition that Consent Decree expressly permit other PRPs to bring any contractual indemnity claims). These three Codefendants also asks that the Court only approve the Consent Decree after explicitly stating that such approval in no way indicates acceptance of the methodology, factual findings, or conclusions of a report prepared in 2004 for DPNR which was submitted in support of the Consent Decree, and explicitly stating that any such methodologies, factual findings, or conclusions have no preclusive effect in the pending litigation on the non-settling parties, including Century, Virgin Islands Alumina Company and Lockheed Martin Corporation.

Renaissance Codefendants HOVENSA, LLC and Hess Oil Virgin Islands Corp. [collectively, hereinafter "the Refinery Defendants"], also request that the Court, if it approves the Consent Decree, explicitly acknowledge the right of all non-settling Defendants to challenge any of the factual findings or legal conclusions in subsequent proceedings in the pending litigation or in related litigation between the non-settling Defendants and the Trustee. The Refinery Defendants also agree with SCA/ALCOA's contention that the releases and

covenants not to sue "subsequent transferees of the Alumina Facility" are unfair. They ask the Court to narrowly tailor the release and covenant not to sue provisions so that they are not applicable to "subsequent transferees."

In their Joint Reply to Responses to Joint Motion to Approve and Enter Agreement and Consent Decree, the Trustee, DPNR, and Renaissance, propose that the Court, in its Order approving the Consent Decree, state "that the Consent Decree shall not change the contractual indemnifications entered into by any of the parties to these proceedings; and ... that the Releases and Covenants Not to Sue contained ... as to 'subsequent transferees' do not apply to future contaminant releases at the Alumina Facility."

SCA/ALCOA rejects this proposal on the grounds previously stated as well as that the clarification concerning the viability of pre-existing contractual obligations among the parties is unduly narrow, and that the Consent Decree is unfair and inconsistent with the purposes of CERCLA to the extent that it includes any release or covenant not to sue subsequent transferees; the proposed limited release does not cure such defect.

### III. The Role of the District Court

**\*3** The Court must undertake an independent assessment of the Consent Decree and determine whether its proponents have carried their burden of proving that "it is fair, reasonable, and consistent with CERCLA's goals." *In re Tutu Water Wells CERCLA Litigation,* 326 F.3d 201, 207 (3d Cir.2003). "Fairness" in the context of an environmental consent decree has both procedural and substantive components. *Id.* To measure procedural fairness, the Court "look [s] to the negotiation process and attempt[s] to gauge its candor, openness and bargaining balance." *Id.* Procedural fairness requires arm's length negotiations between balanced parties. *Id.*

A Consent Decree is substantively fair if its terms "are based on comparative fault and apportion liability according to rational estimates of the harm each party has caused." *Id.* (quotation omitted). Settlement terms must roughly correlate with comparative fault so that each party bears the costs of the harm for which it is legally responsible. *See United States v. Cannons Engineering Corp.,* 899 F.2d 79, 87 (1st Cir.1990). Although the Court need not "review the allocated shares with mathematical exactitude," *United States v. Kramer,* 19 F.Supp.2d 273, 281 (D.N.J.1998), the measure of comparative fault on which the settlement terms are based cannot be

ER-682

Case: 25-8129, 04/13/2026, DktEntry: 77.5, Page 159 of 244
Case 3:23-cv-01603-SI    Document 113-4    Filed 07/28/25    Page 4 of 7
Commissioner of Dept. of Planning and Natural Resources..., Not Reported in...

"arbitrary, capricious, [or] devoid of a rational basis." *Tutu Wells,* 326 F.3d at 207 (quotation omitted).

"A district court's reasonableness inquiry, like that of fairness, is a pragmatic one, not requiring precise calculations." *United States v. Charter Intern. Oil Co.,* 83 F.3d 510, 521 (1st Cir.1996). In evaluating reasonableness, the Court's consideration is multifaceted. *Cannons Engineering Corp.,* 899 F.2d at 89. The Court examines "the probable effectiveness of proposed remedial responses," "whether the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures," and "the relative strength of the parties' litigation positions." *Id.* at 89–90. "The Court's task ... is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference of such resolution." *Kramer,* 19 F.Supp.2d at 281 (quotation omitted).

"The 'consistency' required under CERCLA is one of fidelity to CERCLA's broad policies-it means only that the decree must further the larger purposes that Congress intended CERCLA to serve." *United States v. Atlas Minerals and Chemicals, Inc.,* 851 F.Supp. 639, 655 (E.D.Pa.1994). "Congress sought through CERCLA to encourage prompt and effective responses to hazardous waste releases and to impose liability on responsible parties, and also aimed to encourage settlements that would reduce the inefficient expenditure of public funds on lengthy litigation." *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 119 (2d Cir.1992) (citations omitted).

## IV. Whether the Consent Decree is Fair, Reasonable, and Consistent with CERCLA's Purposes

**\*4** As the court remarked in *New York v. Panex Indus., Inc.,* 2000 WL 743966, at \*1 (W.D.N.Y. June 6, 2000), "[t]he standards for determining whether to approve a CERCLA consent decree are now well-established, even though application of those standards to the facts of a particular case has oftentimes vexed district courts in their analyses of prospective settlements." The proposed Consent Decree in this case is no exception to this norm.

### A. *Fairness*

#### 1. Procedural Fairness

Renaissance's Codefendants do not object to the Consent Decree as procedurally unfair. However, in determining overall fairness, when the settlement negotiations have taken place openly and all parties have been encouraged to join in such discussions and attempts have been made to enter global settlements, the Court is more willing to look upon a proposed Consent Decree favorably, even when it has had misgivings as to the substantive fairness of the Consent Decree. *See United States v. Charles George Trucking, Inc.,* 34 F.3d 1081, 1089 (1st. Cir.1994) (promoting idea "that one type of fairness serves to assure the other"). For example, in *Panex Indus., Inc.,* 2000 WL 743966, at \*3, the court faced as its "most troublesome issue" whether substantive fairness could be found "where the record [was] seriously lacking in factual data by which a precise measurement of relative culpability [might] be calculated." The court considered such lack of proof not to be fatal, since it could "infer substantive fairness through a 'finding of procedural fairness together with other circumstantial indicia of fairness.' " *Id.* (quoting *Charles George Trucking, Inc.,* 34 F.3d at 1089); *see also United States v. Davis,* 261 F.3d 1, 23 (1st Cir.2001) ("A finding of procedural fairness may also be an acceptable proxy for substantive fairness, when other circumstantial indicia of fairness are present.").

According to the movants, the negotiations in this case were lengthy and were conducted in good faith at arm's length. While the Court does not question such representations, evidently none of the other potentially responsible parties (PRPs) were privy to the negotiations, or the preliminary economic damage assessment quantifying the natural resource damages to the Fairplains Well Field, one of the contaminated areas. Thus, although the Court has no basis for finding that the negotiations were procedurally unfair, the Court will not consider such procedural fairness as counterbalancing its concerns about the substantive fairness of the Consent Decree.

#### 2. Substantive Fairness

The Trustee has preliminarily quantified the damages and natural resource damages associated with the use and non-use losses due to the contamination of the Fairplains Well Field, one of the areas allegedly contaminated by Defendants at between $15.5 million to $17 .7 million. Because there is no evidence of record, that the Trustee's assessment of damages was performed in accordance with the pertinent federal regulations, the Court does not presume the validity or correctness of this assessment. *Utah v. Kennecott Corp.,* 801 F.Supp. 553, 567–68 & nn. 15–16 (D.Utah 1992); 42 U.S.C. § 9607(f)(2)(C); 43 C.F.R. § 11.10 ("The assessment procedures set forth in this part are not mandatory. However,

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 25-8129, 04/13/2026, DktEntry: 77.5, Page 160 of 244

Case 3:23-cv-01603-SI    Document 113-4    Filed 07/28/25    Page 5 of 7

Commissioner of Dept. of Planning and Natural Resources..., Not Reported in...

they must be used by Federal or State natural resource trustees in order to obtain the rebuttable presumption contained in section 107(f)(2)(C) of CERCLA.").

**\*5** The $180,000 that Renaissance would pay would compensate the Trustee for only about 1% of the damages to the Fairplains Well Field. Because the Trustee seeks compensation for natural resource damages to areas in addition to the Fairplains Well Field, including the Kingshill Aquifer, wetlands, mud flats, mangroves and the near shore Caribbean Sea, the $180,000 represents even less than 1% of the total compensation sought. Without further quantifying of the total damages and natural resources damages, the Court has no means of assessing whether Renaissance's payment of only $180,000 is substantively fair.

The Court is at a complete loss as to where to begin in its determination of whether the $120,000 allotted in the Consent Decree for response costs, oversight costs, health assessment costs, attorney's fees and litigation costs is substantively fair. Although the Trustee presents a natural resources damages figure for at least a portion of the natural resources that were harmed, DPNR has not provided the Court with any estimations of the past or projected response costs.

What complicates the Court's task even further is that the movants have suggested no apportionment methodology or presented even any imprecise estimates of the comparative fault of the various parties or groups of parties. The movants merely contend that Renaissance's apportionment is minimal because Renaissance came into possession of the Alumina Facility after the majority of the conduct occurred that caused the contamination, Renaissance has cooperated with DPNR and already paid $55,000 for investigation costs, oversight and response costs, and Renaissance has a limited ability to pay.

Renaissance acknowledges that as a current owner of the Alumina Facility it is liable for response costs. *See* 42 U.S.C. § 9607(a). That Renaissance's activities may not have caused any portion of the contamination is just one relevant consideration in reaching an equitable apportionment. "[A]llocation is a highly fact-intensive process that depends upon the particular circumstances of each case." *United States v. Davis,* 31 F.Supp.2d 45, 63 (D.R.I.1998).

Another factor pertinent to the inquiry is whether Renaissance obtained the Alumina Facility at a discounted price to allow for future environmental clean-up claims. *See Smith*

*Land & Imp. Corp. v. Celotex Corp.,* 851 F.2d 86, 90 (3d Cir.1988); *see also Equitable Considerations in Allocating Response Costs to Owners or Occupant of Previously Contaminated Facility in Action Pursuant to § 133(f) of Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA),* 148 A.L.R. Fed 203 (discussing additional factors in apportioning liability). Moreover, since the commencement of Renaissance's ownership, red mud spills have occurred and contaminants have allegedly continued to leach into the ground water. These circumstances increase Renaissance's measure of liability.

Renaissance's cooperation with DPNR and contributions thus far are laudable. However, without an estimation of the total response costs, the Court cannot evaluate whether the $55,000 Renaissance has paid fairly limits Renaissance's additional liability to only $120,000.

**\*6** Renaissance's purported limited ability to pay is not a compelling reason to reduce its apportionment. As SCA/ALCOA point out, Renaissance has not presented any data that would substantiate its argument that it has insufficient financial resources to pay its fair share, whatever that may be. Moreover, "[a]lthough ability to pay is one of the factors to be considered in equitably allocating CERCLA liability among contribution defendants, a defendant's share of liability is not increased or decreased simply because that defendant's net worth is more or less than the net worth of other defendants." *United States v. Davis,* 31 F.Supp.2d 45, 66 (D.R.I.1998), *aff'd* 261 F.3d 1 (1st Cir.2001). "As is true of any assessment of compensatory damages, the liable party's ability to pay should not influence the amount of the assessment." *Charles George Trucking, Inc.,* 34 F.3d 1081 at 1087.

Thus, the movants have provided the Court with neither a calculated apportionment of liability, nor any other substantive qualitative methodology, that it used in determining the amount that Renaissance would pay in exchange for its discharge from liability. With the record before it, the Court cannot perform its role of assessing whether the proposed Consent Decree is based on a rational determination of comparative fault. Because the Court can find the Consent Decree neither substantively fair (nor substantively unfair), it cannot approve it.

### B. *Reasonableness*

Pending before the Court are motions to dismiss in the Trustee's natural resource damages action. Presently, there has been no motion practice in DPNR's suit for response costs.

Case: 25-8129, 04/13/2026, DktEntry: 77.5, Page 161 of 244

Case 3:23-cv-01603-SI    Document 113-4    Filed 07/28/25    Page 6 of 7

Commissioner of Dept. of Planning and Natural Resources..., Not Reported in...

However, the Court presumes that if it withholds approval of the Consent Decree, dispositive motions will likely ensue.

If the Court does not approve the proposed Consent Decree, there is a risk that the $300,000 Renaissance has agreed to pay will never be recovered by the Trustee and DPNR. In comparison to the estimate of the damages to the Fairplains Well Field alone at $15.5 to $17.7 million, Renaissance's contribution is not substantial enough to force the Court's hand.

Furthermore, the Court is not convinced that entering the Consent Decree will significantly reduce any litigation costs beyond what Renaissance would have paid its attorneys. Approval of the Consent Decree would not remove any issues raised in the pending motions from the Court's consideration. Even with Renaissance's dismissal from the case, discovery and further motion practice are inevitable. Ultimately, if the remaining parties were not to settle, the matter would still have to be tried. The Court also anticipates contribution litigation as well among the remaining PRPs, as well as litigation regarding any indemnification or hold harmless agreements.

In *New York v. SCA Services, Inc.,* 1993 WL 59407, at *5 (S.D.N.Y Mar. 1, 1993) the court rejected the proposed Consent Decree in part because no significant reduction in litigation costs would be realized:

> **\*7** Since entry of the proposed Consent Judgment will not eliminate the need to apportion responsibility among all parties to the litigation with respect to the remedial costs and response costs not covered by the settlement, the litigation will continue unabated with attorneys fees mounting monthly as the parties or their attorneys, depending on who is in control of the situation, endeavor to show their share or responsibility as less than others maintain.... Thus, no significant reduction in the inefficient expenditures of funds in lengthy litigation would be obtained by approval of the proposed Consent Judgment.

As in *SCA Services, Inc.,* the entering of the proposed Consent Decree will not eliminate the need to apportion responsibility among the parties, which, no doubt, will be a highly litigious process. Approval of this Consent Decree, involving the Trustee, DPNR, and only one PRP will due little to reduce litigation costs or to expedite resolution of theses matters.

### C. Fidelity to CERCLA

One of CERCLA's goals is to encourage early settlement, with a focus on cleaning up the environment. The $300,000 that Renaissance will contribute will do little to meet this objective, given the substantial estimated natural resource damages alone, not to mention the response costs. Moreover, the bulk of the $300,000 is slated for natural resource damages compensation, which will not lead to any responsive or remedial action. *See SCA Services, Inc.,* 1993 WL 59407, at *5 (rejecting Consent Decree because payment merely constituted assessment of a monetary amount sufficient to account for damage, and would not result in effective response). Thus, approving the Consent Decree will not further this CERCLA objective.

Another CERCLA policy is to encourage voluntary cleanups. By barring further claims for contribution against Renaissance for costs voluntarily incurred by a private party, the Consent Decree deters private parties from undertaking any cleanup "for fear of being 'stuck' with the full bill." *Kelley v. Wagner,* 930 F.Supp. 293, 299 (E.D.Mich.1996). Thus, entering the Consent Decree before determining the response costs and an appropriate apportionment of liability actually counters CERCLA's intent.

The parties focus on whether the release of a subsequent transferee from liability is consistent with CERCLA's aims. However, the questions of whether such a discharge comports with CERCLA, is within the Court's jurisdictional power, and is precedented, have not been fully explored by the parties. Because the Court rejects the Consent Decree on other grounds, it does not reach the issues surrounding the discharge of subsequent transferees.

### V. Conclusion

"[T]he proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them, and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified." *Charles George Trucking, Inc.,* 34 F.3d at 1087. The Court has before it neither the total natural resource damages assessment nor the total project costs. The movants have made no attempts to apportion liability. Neither the litigation risks nor time savings outweigh the concerns for substantive fairness. No other considerations, including the desirability of re-developing the Alumina Facility, justify approving this proposed Consent Decree. The proponents have failed to meet their burden of producing evidence which

enables the court to determine independently whether the proposed Consent Decree is fair, reasonable, and consistent with the goals of CERCLA.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4693550

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Brian D. Chenoweth, OSB #944991
Bradley T. Crittenden, OSB #173274
Chenoweth Law Group
510 S.W. Fifth Avenue, Fourth Floor
Portland, OR 97204
Telephone:  503-446-6261
Facsimile:  503-221-2182
Email:  bdc@chenowethlaw.com
bcrittenden@chenowethlaw.com

James H. Colopy, CASB #172806, *pro hac vice*
Christopher Rendall-Jackson, CASB #288933, *pro hac vice*
Hayleigh Shobar, CASB #355748, *pro hac vice*
Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480
Email:  jcolopy@fbm.com
crendall-jackson@fbm.com
hshobar@fbm.com

Attorneys for Proposed Intervenor
FMC CORPORATION

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE, <br><br> Plaintiffs, | Case No. 3:23-cv-01603-SI <br><br> **INTERVENOR FMC CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES** <br><br> **Request for Oral Argument** |

Page 1 –    INTERVENOR FMC CORPORATION'S OPPOSITION
            TO MOTION TO ENTER CONSENT DECREES

ER-687

vs.

ACF INDUSTRIES, LLC; ACF
INDUSTRIES, LLC; AIRGAS USA LLC;
AIR LIQUIDE AMERICA L.P.; ASH
GROVE CEMENT COMPANY; ASHLAND
INC.; BEAZER EAST, INC.; BNSF
RAILWAY COMPANY; CALBAG METALS
CO.; CITY OF PORTLAND; ESCO GROUP
LLC; EVRAZ INC. NA (FKA OREGON
STEEL MILLS AND GILMORE STEEL);
GOULD ELECTRONICS INC.; HAJ, INC.,
D/B/A CHRISTENSON OIL COMPANY;
HERCULES LLC; KOPPERS INC.;
MCCALL OIL & CHEMICAL
CORPORATION; MCCALL OIL REAL
ESTATE COMPANY LLC; MOREC FRONT
LLC; GWC PROPERTIES, LLC; GWC
FRONT, LLC; TANKER BASIN LLC;
MMGL LLC; NORTHWEST PIPE
COMPANY (FKA NORTHWEST PIPE &
CASING COMPANY AND NORTHWEST
PIPE AND CASING COMPANY);
PACIFICORP, AN OREGON
CORPORATION; PORT OF PORTLAND;
PORTLAND GENERAL ELECTRIC
COMPANY (PGE); PORTLAND
TERMINAL RAILROAD COMPANY;
SCHNITZER STEEL INDUSTRIES, INC.;
SILTRONIC CORPORATION; SULZER
PUMPS (US) INC.; and VALVOLINE INC.,

Defendants.

Page 2 –    INTERVENOR FMC CORPORATION'S OPPOSITION
TO MOTION TO ENTER CONSENT DECREES

ER-688

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ...................................................................................................2

     A.      The Portland Harbor Superfund Site.........................................................2

     B.      The PHSS Allocation.................................................................................5

     C.      The PHSS Natural Resource Damage Assessment....................................8

          1.      Scope of Plaintiffs' "Path C" settlement process.........................8

          2.      Methodology used for the Path C assessment.............................11

     D.      The Two Proposed Consent Decree Settlements .....................................13

     E.      Plaintiffs' Current Motion to Enter Consent Decree Settlements...........14

III.    STANDARD OF REVIEW .................................................................................16

IV.     ARGUMENT.......................................................................................................18

     A.      Plaintiffs Fail to Sustain Their Burden to Demonstrate to the Court that the Proposed CDs Are Substantively Fair. ..............................................................18

          1.      Plaintiffs admit that their determination of the Settling Defendants' proportional liability for the NRD Assessment Area is unreliable. ...........18

          2.      Plaintiffs' process for allocating Settling Defendants' liability is fundamentally biased. ...................................................................................21

          3.      The proposed CDs seek to resolve all NRD liability for vast areas beyond the NRD Assessment Area, which Plaintiffs cannot even identify. .......................................................................................................24

          4.      Plaintiffs' NRD determination in the NRD Assessment Area is fundamentally flawed and unreliable.............................................................25

     B.      Publicly Available Information Demonstrates that the Proposed CDs Are Premature. ..............................................................................................27

          1.      Given remedial design is not complete at any project area, and remedial action has not begun anywhere, NRD cannot be reliably estimated or quantified at this time.......................................................27

          2.      The proposed CDs provide covenants not to sue without accounting for significant ongoing source-control issues throughout the PHSS.....................................................................29

     C.      The Proposed CDs Are Based on a Fundamentally Flawed Allocation that Would Undermine the Ongoing PHSS Allocation. .................................31

          1.      Plaintiffs' Motion is inconsistent with their other filings in this Court, and Plaintiffs are inappropriately seeking to have their NRD claims treated differently than those of another PHSS Trustee. ................31

2.     Plaintiffs' proposed CDs openly acknowledge the risk to the PHSS Allocation, but are unable to mitigate that risk...........................33

D.    New Arguments and Evidence Cannot Be Introduced on Reply...........................36

V.    CONCLUSION.................................................................................................36

CERTIFICATE OF COMPLIANCE.................................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Arizona v. City of Tucson*,
  761 F.3d 1005 (9th Cir. 2014) ................................................................17, 20

*Cal. Expanded Metal Prods. Co. v. Klein*,
  426 F. Supp. 3d 730 (W.D. Wash. 2019)..............................................................36

*Clinton v. Jones*,
  520 U.S. 681 (1997)..............................................................................................2

*CMAX, Inc. v. Hall*,
  300 F.2d 265 (9th Cir. 1962) ................................................................................2

*Docusign, Inc. v. Sertifi, Inc.*,
  468 F. Supp. 2d 1305 (W.D. Wash. 2006)...........................................................36

*In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution*,
  712 F. Supp 1019 (D. Mass. 1989) ............................................................27, 28, 30

*Quapaw Tribe of Okla.*,
  No. 03-CV-0846-CVE-PJC, 2008 WL 2704482 (N.D. Okla. July 7, 2008) ...........................28

*State of Utah by & through Utah State Dep't of Health v. Kennecott Corp.*,
  801 F. Supp. 553 (D. Utah 1992)..........................................................................30

*United States v. Aerojet Gen. Corp.*,
  606 F.3d 1142 (9th Cir. 2010) ..........................................................1, 17, 18, 22

*United States v. Montrose Chem. Corp. of Cal.*,
  50 F.3d 741 (9th Cir. 1995) ........................................................................16, 17, 18

*United States v. Pioneer Nat. Res. Co.*,
  452 F. Supp. 3d 1005 (D. Colo. 2020)....................................................17, 18, 20

*Washington v. United States*,
  No. CIV. 06-05225RJB, 2007 WL 3025843 (W.D. Wash. Oct. 15, 2007). ......................34, 35

## FEDERAL STATUTES

42 U.S.C.
  § 9607(f)(2)(C)........................................................................................................18, 36
  § 9622(j)(2) ...................................................................................................................30

## FEDERAL RULES AND REGULATIONS

43 C.F.R. § 11.10 ............................................................................................................18, 36

65 Fed. Reg. 75179 (Dec. 1, 2000) ......................................................................................3

## OTHER AUTHORITIES

EPA, *NRD: A Primer* (Oct. 7, 2024), https://www.epa.gov/superfund/natural-
  resource-damages-primer..............................................................................................8, 28

EPA, *NRD: Frequently Asked Questions* (Oct. 8, 2024),
  https://www.epa.gov/superfund/natural-resource-damages-frequently-asked-
  questions ...........................................................................................................................8

EPA, *NRD: Trustees* (Oct. 8, 2024), https://www.epa.gov/superfund/natural-
  resource-damages-trustees ...............................................................................................8

EPA, *PHSS Record of Decision* (Jan. 2017),
  https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.
  docdata&id=1002155........................................................................................................2

EPA, *PHSS Updates Fact Sheet* (June 2025),
  https://semspub.epa.gov/work/10/100636181.pdf............................................3, 4, 5, 22, 28

EPA, *Portland Harbor Cleanup Progress*,
  https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.s
  chedule&id=1002155....................................................................................................5, 22

Foth, *Sufficiency Assessment Report, River Mile 9 West - PHSS* (July 2020),
  https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.s
  cs&id=1002155&doc=Y&colid=39800&region=10&type=SC) ................................5, 23, 24

IEc, *PHSS NRD Asessment Plan Addendum 2: Phase 3 Damage Assessment Plan*
  (Oct. 3, 2018), https://pub-data.diver.orr.noaa.gov/portland-
  harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final
  %20%282%29.pdf .....................................................................................10, 12, 25, 26

IEc, *Portland Harbor NRD Assessment, Phase 2 Allocation Methodology Report*
  (Jan. 2023), https://pub-data.diver.orr.noaa.gov/portland-
  harbor/20230101_PHAllctnMthdlgyRprt_5231.pdf.......................................................12, 20

Parametrix, *Final Portland Harbor Programmatic EIS and Restoration Plan*
(May 2017), https://pub-data.diver.orr.noaa.gov/portland-
harbor/20170501_FINAL_PEIS_3953.pdf.................................................................................9

Portland Harbor Natural Resource Trustee Council, *Summary of Portland Harbor
NRD Assessment for Purposes of Settlement* (May 14, 2015), https://pub-
data.diver.orr.noaa.gov/portland-
harbor/20230401_PH%20Ph2%20PthC%20SummaryPreface_5383.pdf.........................13, 26

*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Evraz
Inc. North America* (Nov. 18, 2022), https://pub-
data.diver.orr.noaa.gov/portland-
harbor/20221118_EVRAZ_AllocationSumMemo_5247.pdf...............................12, 19, 23, 24

*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for
MMGL* (Nov. 18, 2022), https://pub-data.diver.orr.noaa.gov/portland-
harbor/20221118_MMGL_AllocationSumMemo_5242.pdf.......................................12, 19, 23

*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for the
Port of Portland* (Sept. 20, 2023), https://pub-
data.diver.orr.noaa.gov/portland-
harbor/20230920_PortOfPortland_AllocationSumMemo_5238.pdf.....................12, 19, 23, 24

*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for
Schnitzer Steel Industries* (Nov. 18, 2022), https://pub-
data.diver.orr.noaa.gov/portland-
harbor/20221118_Schnitzer_AllocationSumMemo_5236.pdf........................11, 12, 19, 23, 24

## I.    INTRODUCTION

Plaintiffs' Motion to Enter Consent Decrees (the "Motion") should be denied.  After asserting a right to hold the non-settling potentially responsible parties ("PRPs") responsible for any remaining liability, Plaintiffs fail—and adamantly refuse—to provide critical information, making it impossible for this Court to fulfill its obligation to "consider the substantive fairness of the consent decree[s] to non-settling PRPs by assessing whether liability has been roughly apportioned based upon 'some acceptable measure of comparative fault.'"  *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1152 (9th Cir. 2010).

Despite proposing a settlement for these Settling Defendants that is far below their proportion of liability, Plaintiffs insist on hiding how they calculated that liability for settlement purposes at the numerous properties of Settling Defendants at issue, and contend this Court and non-settlors must be satisfied with a conclusory general statement of their purported methodology.  Moreover, the record here demonstrates admissions by Plaintiffs that they did not follow their purported methodology and, regardless, that they are unable to make a reliable determination of the Settling Defendants' proportional liability or even identify the relevant geographic area in which to assess that liability.  This attempt to circumvent a meaningful—and mandated—review by this Court should not be condoned.

Moreover, the proposed Consent Decree settlements ("CDs") are premature and threaten to undermine the confidential non-judicial allocation process for the Portland Harbor Superfund Site ("PHSS") that has been ongoing for more than fifteen years (the "PHSS Allocation").  The proposed CDs attempt to settle natural resources damages ("NRD")—which are typically determined based on the conditions after the cleanup—well before NRD can reasonably be calculated, when the anticipated cleanup is not yet designed and has not yet begun, and will last for at least fifteen years.  As part of this, given the significant unresolved source-control issues

Page 1 –    INTERVENOR FMC CORPORATION'S OPPOSITION
          TO MOTION TO ENTER CONSENT DECREES

threatening any cleanup, Plaintiffs have violated their statutory mandates by prematurely agreeing to covenants not to sue without making necessary provisions to protect the natural resources from that threat. This Court has already stayed two related lawsuits—the *Arkema* and *Yakama* lawsuits—to protect the PHSS Allocation, and Plaintiffs' Motion is inconsistent with the United States' representations to this Court to obtain a long-term stay of the *Yakama* lawsuit.

For these reasons, the Motion should be denied or, in the alternative, the Court should hold the Motion in abeyance until the conclusion of the PHSS Allocation.[1]

## II.    BACKGROUND[2]

### A.    The Portland Harbor Superfund Site

The PHSS encompasses an approximately ten-mile reach of the Lower Willamette River in Portland, Oregon, from approximately river mile ("RM") 1.9 to RM 11.8. Environmental contamination in the river sediment and riverbanks of the PHSS reflects over a century of industrial, marine, commercial, defense, and municipal operations by hundreds of private and governmental entities with upland and shoreline operations.[3] Contaminants continue to enter the river from various sources, particularly from discharges through the numerous City of Portland outfalls across the PHSS.

---

[1] *E.g.*, *Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."); *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) ("A district court has inherent power to control the disposition of the causes on its docket in a manner which will promote economy of time and effort for itself, for counsel, and for litigants.").

[2] Except where otherwise indicated, this Section is based on publicly available information, including from the proposed CDs, and from public records that are the subject of FMC's concurrently filed Request for Judicial Notice in Support of this Opposition ("RJN").

[3] RJN ¶ 15 at Part 2 §§ 1 & 2 (EPA, *PHSS Record of Decision* (Jan. 2017), currently available at https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.docdata&id=1002155).

Page 2 –    INTERVENOR FMC CORPORATION'S OPPOSITION
            TO MOTION TO ENTER CONSENT DECREES

On December 1, 2000, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA," aka "Superfund"), the United States Environmental Protection Agency ("USEPA" or "EPA") added the PHSS to CERCLA's National Priorities List.[4] Sixteen years later, on January 3, 2017, USEPA issued its 3,012-page Record of Decision ("ROD"), which identified sixty-four separate contaminants of concern ("COCs") at the PHSS and the selected remedy for the comprehensive cleanup. The selected remedy is a combination of active remediation in certain areas of PHSS, and monitored natural recovery for the remainder of the PHSS whereby natural processes decrease contaminant concentrations.

Cleanup has not begun at any location within the PHSS, as the remedy is still being designed at the numerous "project areas" where active remediation is required, as depicted in the following recent USEPA Fact Sheet for the PHSS ("USEPA Fact Sheet"):[5]



---

[4] RJN ¶ 31, 65 Fed. Reg. 75179, 75182 (Dec. 1, 2000).

[5] *See* RJN ¶ 18, Ex. 16 (EPA, *PHSS Updates Fact Sheet* (June 2025), currently available at https://semspub.epa.gov/work/10/100636181.pdf).

Page 3 –    INTERVENOR FMC CORPORATION'S OPPOSITION
            TO MOTION TO ENTER CONSENT DECREES

As listed in the USEPA Fact Sheet, thirty-one public and private parties (many of which are Settling Defendants here) are currently performing remedial design at sixteen separate project areas across the PHSS, and USEPA is performing remedial design at certain additional "fund-led" project areas.[6] Certain parties are performing remedial design at more than one project area. For example, the City of Portland and the Port of Portland (both Settling Defendants) each are performing remedial design at three separate project areas.

Remedial design is not complete at any project area and remains incomplete at the majority of the project areas. Specifically, the USEPA Fact Sheet and the EPA PHSS website indicate that, of the sixteen project areas where parties other than USEPA are conducting the remedial design, only half of those areas have completed a Remedial Design Work Plan; only two areas have completed Preliminary Remedial Design (which is only 30% complete); five areas have no estimated date specified for completion of remedial design; and, of the areas that do have an estimated completion date, only three include date ranges indicating completion of remedial design before 2027.[7]

Implementation of the active remediation remedy, known as "remedial action," will require at least fifteen years to complete at all project areas, and post-implementation monitoring of the PHSS will be required for an extended period of time.[8] Numerous sources of

---

[6] *Id.*

[7] RJN ¶ 18, Ex. 16, *supra*, n.5 (EPA, *PHSS Updates Fact Sheet*); RJN ¶ 17, Ex. 15 (EPA, *Portland Harbor Cleanup Progress*, currently available at https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.schedule&id=1002155).

[8] Decl. of James H. Colopy in Supp. of this Opp'n ("Colopy Decl.") ¶ 8.

Page 4 –    INTERVENOR FMC CORPORATION'S OPPOSITION
              TO MOTION TO ENTER CONSENT DECREES

contamination to the PHSS remain insufficiently controlled, and threaten to re-contaminate the cleanup.[9]

## B.    The PHSS Allocation

Hundreds of potentially responsible parties (PRPs) have contributed to the PHSS contamination over an extended period.[10]  Of those, approximately 100 PRPs have been participating for more than fifteen years in a confidential non-judicial allocation process ("PHSS Allocation") as members of the USEPA-initiated Portland Harbor Participation and Common Interest Group ("PCI Group").[11]  The PHSS Allocation seeks a comprehensive settlement of PRPs to fund and implement the investigation and cleanup of the PHSS, which if successful will advance and facilitate the cleanup by avoiding litigation between PRPs or with USEPA.[12]

The PHSS Allocation process remains ongoing and is not complete.  It has required substantial investments by its participants, and is complicated by the long history of contaminant releases to the site, the numerous sources and pathways of contamination (including multiple PRPs associated with individual properties over time), and the dynamic and complicated fate and transport of contaminants in the river system.[13]  The PHSS Allocation continues to make meaningful progress, and is on a schedule in general alignment with the progress of remedial

---

[9] *E.g.*, Colopy Decl. ¶¶ 3-4, Ex. 1, Table 3-1, RM9W Source Control Sufficiency Assessment Matrix (Foth, *Sufficiency Assessment Report*, *River Mile 9 West - PHSS* (July 2020) ("SAR"), currently available at
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=1002155&doc=Y&colid=39800&region=10&type=SC).

[10] *See* RJN ¶ 15 at Part 2 §§ 1 & 2, *supra*, n.3 (ROD).

[11] Colopy Decl. ¶ 11.

[12] Colopy Decl. ¶ 13.

[13] Colopy Decl. ¶ 12.

Page 5 –    INTERVENOR FMC CORPORATION'S OPPOSITION
            TO MOTION TO ENTER CONSENT DECREES

design work.[14]  Concurrently, settlement discussions are ongoing between the PRPs and USEPA for the terms of a consent decree to govern the cleanup.  Those PRPs and USEPA seek to have the settlement discussions synchronized with expected finalization of remedial action consent decrees and a comprehensive settlement.[15]

This Court has stayed two lawsuits to protect the PHSS Allocation.  First, on April 23, 2009, Arkema, Inc., and certain other PRPs filed a complaint in this Court to obtain contribution from numerous PRPs for investigation and remediation costs under CERCLA and Oregon law (the "*Arkema* lawsuit").[16]  This Court granted the motion by the *Arkema* plaintiffs for a long-term stay to allow the PHSS Allocation to progress, and to develop a comprehensive allocation for settlement discussions with those defendants that refused to join the PCI Group.[17]  This Court's stay of the *Arkema* lawsuit has been repeatedly extended, most recently until January 2028.[18]

Second, on January 30, 2017, Yakama Nation filed a complaint seeking to recover NRD assessment costs, and declaratory relief as to future NRD liability for a broad geographic area, against FMC and numerous other PRPs (the "*Yakama* lawsuit").[19]  Although the current value of

---

[14] RJN Decl. ¶ 5, Ex. 5 (Pls.' Thirtieth Status Report (July 14, 2025), Dkt. No. 594 in *Arkema Inc. v. Anderson Roofing Co.*, No. 3:09-cv-00453-JR (D. Or. Apr. 24, 2009) ("*Arkema* lawsuit")); RJN Decl. ¶ 13, Ex. 13 (Tenth Joint Status Report (Feb. 28, 2025), Dkt. No. 469 in *Confederated Tribes & Bands of the Yakama Nation v. Air Liquide Am. Corp.*, No. 3:17-cv-00164-SB (D. Or. Jan. 30, 2017) ("*Yakama* lawsuit")).

[15] *Id.*

[16] *See* RJN Decl. ¶ 1, Ex. 1 (Compl. (Apr. 24, 2009), Dkt. No. 1 in *Arkema* lawsuit).

[17] RJN Decl. ¶ 2, Ex. 2 (Mot. for Referral to Alternative Dispute Resolution (Sept. 24, 2009), Dkt. No. 169 in *Arkema* lawsuit).

[18] RJN Decl. ¶ 3, Ex. 3 (Order (May 18, 2010), Dkt. No. 337 in *Arkema* lawsuit); RJN Decl. ¶ 4, Ex. 4 (Order (Jan. 14. 2025), Dkt. No. 589 in *Arkema* lawsuit).

[19] *See* RJN Decl. ¶ 6, Ex. 6 (Compl. (Jan. 30, 2017), Dkt. Nos. 1 & 1-1 in *Yakama* lawsuit).

Page 6 –    INTERVENOR FMC CORPORATION'S OPPOSITION
            TO MOTION TO ENTER CONSENT DECREES

Yakama Nation's NRD claims is not known, in a 2016 bankruptcy proceeding against a Settling Defendant, Yakama Nation valued its NRD claim at approximately $962 million.[20]

The United States promptly brought a motion for a long-term stay of the *Yakama* lawsuit, as in the *Arkema* lawsuit, to allow the PHSS Allocation to continue, which was granted by this Court and continues to be in place with regular extensions.[21] Citing several reasons, the United States argued a comprehensive stay was necessary for an "orderly and efficient" resolution of overall PHSS liability and to avoid interference with the PHSS Allocation:

> there is significant overlap of the parties and issues in [the *Yakama*] case, the *Arkema* case, and the non-judicial response cost allocation process. . . . [T]he liability claims in both cases and the allocation issues that are being addressed through the non-judicial response cost allocation process are based on some of the same information, *e.g.*, historical documentation, the RI/FS, etc. . . . A stay of these proceedings therefore would support the orderly and efficient course of these proceedings.[22]
>
> . . .
>
> Given the significant overlap in facts and issues between this case and the response cost allocation process, the progression of this litigation and any decision on the liability or allocation issues would interfere with the consideration and resolution of those very issues in that allocation process, which was initiated well before this litigation. Those equities weigh heavily in favor of a stay.[23]

These reasons equally apply here.

---

[20] RJN Decl. ¶ 14, Ex. 14 (Yakama Nation Proof of Claim, *in re HAJ, Inc. dba Christenson Oil*, No. 16-32787-pcm7 (D. Or. Bankr. Ct. Nov. 14, 2016), Claim 29-1).

[21] RJN Decl. ¶ 11, Ex. 11 (Findings & Recommendation (Jan. 22, 2019), Dkt. No. 321 in *Yakama* lawsuit); RJN ¶ 12, Ex. 12 (Op. & Order (Aug. 8, 2019), Dkt. No. 356 in *Yakama* lawsuit).

[22] RJN ¶ 9, Ex. 9 at 17-18 (United States Mot. to Dismiss & Stay (Sept. 22, 2017), Dkt. No. 253 in *Yakama* lawsuit).

[23] RJN ¶ 10, Ex. 10 at 8 (United States Reply in Supp. of Mot. to Dismiss & Stay (Oct. 25, 2017), Dkt. No. 280 in *Yakama* lawsuit).

Page 7 –    INTERVENOR FMC CORPORATION'S OPPOSITION
            TO MOTION TO ENTER CONSENT DECREES

### C.      The PHSS Natural Resource Damage Assessment

Natural resource damages (NRD) constitute the injury to natural resources as a result of contamination, and include compensation for interim loss of use and cost of assessment and restoration.[24]  Distinct from cleanup costs, NRD are typically assessed following cleanup.  Only the federal government, individual states, and Native American tribal governments may act as NRD trustees. "[A]ssessment of [NRD] takes place following cleanup because cleanups sometimes also effectively restore habitat" and, "[b]ecause the choices made in cleanup decisions can affect the amount of NRD, EPA coordinates with Trustee agencies on cleanup decisions."[25]

Here, the Portland Harbor Natural Resource Trustee Council (the "Trustee Council") is comprised of the United States of America ("United States"), on behalf of the National Oceanic and Atmospheric Administration ("NOAA") of the United States Department of Commerce and the United States Department of the Interior; the State of Oregon (the "State"); the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe.

### 1.      Scope of Plaintiffs' "Path C" settlement process

Plaintiffs' "Path C" settlement process with the Settling Defendants here was limited in geographic scope to the Portland Harbor Natural Resource Damage Assessment Area ("NRD

---

[24] *E.g.*, RJN ¶ 19 (EPA, *NRD: A Primer* (Oct. 7, 2024), currently available at https://www.epa.gov/superfund/natural-resource-damages-primer); RJN ¶ 20 (EPA, *NRD: Frequently Asked Questions* (Oct. 8, 2024), currently available at https://www.epa.gov/superfund/natural-resource-damages-frequently-asked-questions); RJN ¶ 21 (EPA, *NRD: Trustees* (Oct. 8, 2024), currently available at https://www.epa.gov/superfund/natural-resource-damages-trustees).

[25] RJN ¶ 19 *supra*, n.24 (EPA, *NRD: A Primer*).

Page 8 –     INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

Assessment Area"), consisting of the Lower Willamette River from approximately RM 12.3 to RM 0.8, as well as the upper 1.2 miles of the Multnomah Channel.

However, Plaintiffs also assert that up to 50% of restoration could occur outside of the NRD Assessment Area, in the vast "Broader Focus Area" that includes the mainstem Willamette River up to Willamette Falls, the Multnomah Channel, the Oregon side of the lower Columbia River between the east end of Hayden Island and the Multnomah Channel outlet, and portions of Scappoose Bay.[26]  In the following figure,[27] NRD Assessment Area is outlined in yellow and the Broader Focus Area is outlined in red:



_____

[26] Restoration CD ¶ P, fn.1 (Nov. 1, 2023), Dkt. No. 4 ("Restoration CD"); Cash-Out CD ¶ K, fn.1 (Nov. 6, 2023), Dkt. No. 11-1 ("Cash-Out CD").

[27] RJN ¶ 28, Figure 1-1 (Parametrix, *Final Portland Harbor Programmatic EIS and Restoration Plan* (May 2017), currently available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20170501_FINAL_PEIS_3953.pdf).

Page 9 –     INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

Significantly, in 2009, the Confederated Tribes and Bands of the Yakama Nation (the "Yakama Nation") withdrew from the Trustee Council due to its concerns that Plaintiffs would not assess NRD in the Lower Columbia River.  Yakama Nation is not a party to the proposed CDs and, as an NRD trustee for the PHSS, is continuing to independently prosecute NRD claims against PRPs, including against the Settling Defendants and against non-settling PRPs.

Yakama Nation asserts Plaintiffs' NRD Assessment Area is too narrow:

> A Trustee Council decision was made in 2009 to truncate the damage assessment at River Mile 2 of the Willamette River, despite general agreement that then existing data showed that natural resources in the Lower Columbia River were being exposed to contaminants released at and from Portland Harbor. At that time the Trustee Council indicated that they would pursue an assessment downstream of the site during Phase 3.[28]

Notwithstanding the exclusion of the Lower Columbia River from its NRD Assessment Area, Plaintiffs do assert that "contaminants originating in the Portland Harbor Assessment Area have migrated downstream" into the Columbia River.[29]  Plaintiffs further acknowledge that, in the future, they may expand the geographic scope of the NRD assessment to include the Columbia River, and that they have not identified all of the relevant COCs and may be adding COCs in the future.[30]

---

[28] RJN ¶ 30 at A-4 (IEc, *PHSS NRD Asessment Plan Addendum 2: Phase 3 Damage Assessment Plan* (Oct. 3, 2018), currently available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final%20%282%29.pdf).

[29] Mot., Attach. C at 36 (June 9, 2025), Dkt. No. 85 ("Mot.").

[30] RJN ¶ 30, *supra*, n.28 at A-5 (IEc, *Phase 3 Damage Assessment Plan* ("Trustee Council may expand the geographic scope of their studies in the future as the assessment progresses and further information is developed, including information indicating a likelihood of injury to Columbia River resources resulting from contaminants attributable to Portland Harbor sources"); *Id.* at 3-1 (for the Phase 3 assessment, "[o]ther COCs may warrant further examination as additional information becomes available")).

Page 10 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

## 2. Methodology used for the Path C assessment

For purposes of these CD settlements, Plaintiffs allocated each Settling Defendants' liability in terms of calculated discounted service acre-years ("DSAYs"), and based on their determinations and allocation of the relative liability for each Settling Defendant at its properties in the NRD Assessment Area.

Numerous properties at issue in the proposed CDs involve more than one PRP, including properties with settling and non-settling PRPs. For example, for what Plaintiffs identify as Site 186 (4250, 4350, & 4700 Front Avenue or the "Gunderson Property"), at least four PRPs are identified as past or present owners or operators: two Settling Defendants (Schnitzer Steel Industries, Inc. ("Schnitzer") and MMGL LLC ("MMGL")); and two non-settling PRPs (FMC and Gunderson LLC ("Gunderson")).[31] A further example is Site 157 (Swan Island Shipyard/Portland Ship Repair Yard), which is associated with at least three Settling Defendants (Schnitzer, Oregon Steel Mills/Evraz Inc. NA ("Evraz"), and Port of Portland) and one non-settling PRP (Cascade General), which has owned the property for twenty-five years.[32]

---

[31] RJN ¶ 22 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Schnitzer Steel Industries* (Nov. 18, 2022), currently available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_Schnitzer_AllocationSumMemo_5236.pdf); RJN ¶ 23 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for MMGL* (Nov. 18, 2022), currently available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_MMGL_AllocationSumMemo_5242.pdf).

[32] RJN ¶ 22, *supra*, n.31 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Schnitzer Steel Industries*); RJN ¶ 24 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Evraz Inc. North America* (Nov. 18, 2022), currently available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_EVRAZ_AllocationSumMemo_5247.pdf); RJN ¶ 26 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for the Port of Portland* (Sept. 20, 2023), currently available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20230920_PortOfPortland_AllocationSumMemo_5238.pdf).

Page 11 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

The Trustee Council "assigned" a liability percentage to each property within the NRD Assessment Area, and then, at each property, conducted a party-specific, intra-property allocation by **estimating the relative contributions (as percentages) of each PRP** associated with contaminant footprints" at that property, and then "converted a party-specific allocation of natural resource damage liability to DSAYs.[33] Each Settling Defendant was able "to review its proposed allocation and to provide additional information if it disagreed with the factual basis for the Trustees' proposed allocation."[34] FMC and other non-settling parties were not.

To quantify the amounts of NRD for purposes of the Path C settlement process, Plaintiffs decided to use a habitat equivalency analysis ("HEA") model that was developed specifically for another unrelated site, the Commencement Bay Superfund Site located in Puget Sound, Washington (the "Commencement Bay HEA Model"), and that is unique to the conditions at that unrelated site.[35] The Motion fails to demonstrate why the Commencement Bay HEA Model is an accurate measure for the PHSS. Moreover, Plaintiffs will be abandoning the Commencement Bay HEA Model for their Phase 3 NRD damage assessment, and instead will use a resource equivalency analysis ("REA").[36] Plaintiffs admit that, at PHSS, "the proposed [REA] approach

---

[33] Restoration CD ¶¶ S, U (emphasis added); Cash-Out CD ¶ P; *see* RJN ¶ 25 at vii (IEc, *Portland Harbor NRD Assessment, Phase 2 Allocation Methodology Report* (Jan. 2023), currently available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20230101_PHAllctnMthdlgyRprt_5231.pdf).

[34] Mot., Attach. A ¶ 14 (Baker Decl. (June 6, 2025), Dkt. No. 85-1).

[35] RJN ¶ 27 at A-5 (Portland Harbor Natural Resource Trustee Council, *Summary of Portland Harbor NRD Assessment for Purposes of Settlement* (May 14, 2015), currently available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20230401_PH%20Ph2%20PthC%20SummaryPreface_5383.pdf.

[36] RJN ¶ 30, *supra*, n.28 at A-1–A-2 (IEc, *Phase 3 Damage Assessment Plan*).

Page 12 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

will, in this case, best measure adverse changes in the viability of natural resources resulting from exposure to contaminants."[37]

### D.    The Two Proposed Consent Decree Settlements

This Motion concerns two proposed CDs between Plaintiffs and twenty-three Settling Defendants which, if approved, would resolve all of Settling Defendants' NRD liability over a broad geographic area.  Seven Settling Defendants signed the CD requiring purchase of DSAYs through four restoration projects (the "Restoration CD"), and the remaining sixteen Settling Defendants signed the CD requiring cash payments (the "Cash-Out CD").[38]  This is a small fraction of the total NRD of $297,262,500 sought by Plaintiffs from all PRPs with NRD liability,[39] for which Plaintiffs assert that all PRPs are jointly and severally liable.[40]  These CDs, however, purport to settle the entirety of these twenty-three Settling Defendants' NRD liability at an amount that Plaintiffs assert to be **only 11.4% of the total NRD**.

The proposed CDs would grant covenants not to sue and contribution protection to Settling Defendants for an exceptionally large geographic area far beyond the NRD Assessment Area.  "Covered Natural Resource Damages," as defined in the CDs, include NRD <u>at any location</u> caused by contaminants from a Settling Defendant's property, irrespective of where that NRD occurs.[41]  In their responses to public comments, Plaintiffs readily admit the settlements

---

[37] *Id.*

[38] Restoration CD, App. C; Cash-Out, App. C.

[39] Per the proposed CDs, the amount of $297,262,500 is comprised the total of the following values assigned by Plaintiffs:  $291,165,000 in ecological losses calculated at 4,130 DSAYs valued at $70,500 each; $5,402,400 for recreational losses; and $695,100 for tribal service losses. Restoration CD ¶ P; Cash-Out CD ¶ K.

[40] Restoration CD ¶ Q; Cash-Out CD ¶ L.

[41] Restoration CD ¶ 85; Cash-Out CD ¶ 17.

Page 13 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

resolve liability for this broad geographic scope beyond the NRD Assessment Area.[42]  Similarly, absent negligence, Settling Defendants are protected from liability for "re-exposure, resuspension or migration of hazardous substances or pollutants by natural causes or as a result of the future implementation of a remedial action performed in accordance with an order by or consent decree with U.S. EPA."[43]  Plaintiffs openly admit that they intentionally agreed to the exceptionally broad scope of the covenants not to sue and contribution protection, asserting that it was an "appropriate compromise."[44]

**E.      Plaintiffs' Current Motion to Enter Consent Decree Settlements**

The two CDs were for the most part executed in March and April 2023 by the Settling Defendants.  Seven months later, on November 1, 2023, Plaintiffs lodged the CDs with this Court and circulated them for public comment.

In January 2024, a number of parties filed public comments on the proposed CDs, including FMC, Legacy Site Services LLC, agent for Arkema Inc. ("Arkema"), and Gunderson. Those public comments pointed out that Plaintiffs did not provide information sufficient to determine whether the proposed CDs are substantively fair, and that the proposed CDs are premature and put the ongoing PHSS Allocation at risk.  They requested that Plaintiffs withdraw the proposed CDs or, alternatively, make specified revisions to address their concerns.  Prior to filing the Motion, Plaintiffs did not respond to FMC's comments or contact FMC to discuss its comments and, to FMC's knowledge, Plaintiffs did not contact any of the parties that submitted public comments.[45]

---

[42] Mot., Attach. C at 36 (emphasis in original).

[43] Restoration CD ¶ 85; Cash-Out CD ¶ 17.

[44] Mot., Attach. C at 19.

[45] Colopy Decl. ¶¶ 14-16.

Page 14 –    INTERVENOR FMC CORPORATION'S OPPOSITION
                  TO MOTION TO ENTER CONSENT DECREES

Approximately a year and a half after receiving the public comments, on June 9, 2025, Plaintiffs filed this Motion requesting that the CDs be approved without change, irrespective of the public comments. The Motion asserts the twenty-three Settling Defendants are responsible for approximately 11.4% of the NRD for the NRD Assessment Area—the CDs (and Motion) provide no determinations, calculations or allocation as to the much broader geographic area covered by the CDs, or the current and future recontamination at PHSS.

The Motion fails to provide critical evidence. Plaintiffs merely assert Settling Defendants' allocated liability and the total NRD in the assessment area, but hide the critical underlying information because "the detailed calculations for the HEA and party-specific allocations are part of the confidential settlement process."[46] Plaintiffs' Motion offers only a single declaration of less than ten pages in support of the proposed CDs. That declaration provides only vague and general descriptions of Plaintiffs' allocation process and determination of NRD in the assessment area, and it is completely devoid of any detail that would allow meaningful scrutiny of those calculations. The sole declarant admits he was not involved in the PHSS Natural Resources Damage Assessment prior to January 2023, by which time the CD settlements were being circulated for signature, and thus he was not involved in the NRD settlement negotiations and allocations.

Despite many properties involving both settling and non-settling PRPs, and Plaintiffs asserting that their allocation of liability is based on relative allocations to all PRPs at each property, in response to comments about their failure to provide property-specific allocations, Plaintiffs asserted that they "had no duty to any non-settling responsible party to make particularized allocations as to those parties" and that, "indeed, making allocations to parties

---

[46] Mot., Attach. C at 49.

Page 15 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

outside of the early settlement process would be too uncertain to calculate without a submittal of technical information from that party with sufficient detail to prepare an intra-site allocation at locations with multiple owners and operators."[47]

In this action, Plaintiffs filed a Notice of Related Cases (the "Notice") acknowledging that these CD settlements have "a very similar overlap of both parties and potential legal and factual issues" with both the *Yakama* and *Arkema* lawsuits.[48]

## III.    STANDARD OF REVIEW

Upon review of a consent decree settlement, as directed by the Ninth Circuit in *Montrose*, a reviewing court has an "obligation to 'scrutinize' the settlement process to determine whether the decree was both (1) the product of a procedurally fair process, and (2) substantively fair to the parties in light of a reasonable reading of the facts." *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 746 (9th Cir. 1995) (vacating entry of NRD consent decree, and finding district court lacked sufficient information to determine whether fair and reasonable).

"A court must consider the substantive fairness of the consent decree to non-settling PRPs by assessing whether liability has been roughly apportioned based upon 'some acceptable measure of comparative fault.'" *Aerojet Gen. Corp.*, 606 F.3d at 1152 (citation omitted); *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014) (vacating entry of CERCLA consent decrees where district court "deferred completely" to the government).

> [T]he proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is *to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them,* and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified.

---

[47] Mot., Attach. C at 51.

[48] Notice of Related Cases at 2 (June 9, 2025), Dkt. No. 86.

Page 16 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

*Montrose*, 50 F.3d at 747 (emphasis in original); *Arizona*, 761 F.3d at 1008.  In other words, the reviewing court must compare the percentage of costs being paid by settling defendants against the percentage of those defendants' relative fault.  *Montrose*, 50 F.3d at 747.  The court cannot scrutinize this correlation in an "informational vacuum," such as "where there is no evidence at all on an important point."  *Id.*; *Arizona*, 761 F.3d at 1012.

To meet its burden to make this showing, the government is required to provide "a clear explication or evidentiary support for its conclusion," such as "indication of whether there are other PRPs and their potential relative liability."  *United States v. Pioneer Nat. Res. Co.*, 452 F. Supp. 3d 1005, 1015 (D. Colo. 2020) (denying motion to enter CERCLA consent decree to recover cleanup costs where insufficient factual basis for liability allocation).  "[T]he mere fact that evidence sufficient to evaluate the terms of an agreement is either before the court or purportedly in the parties' possession is not alone sufficient," because "[t]he district court must actually engage with that information and explain in a reasoned disposition why the evidence indicates that the consent decrees are procedurally and substantively 'fair, reasonable, and consistent with CERCLA's objectives.'"  *Arizona*, 761 F.3d at 1012 (citation omitted).

Although the government is accorded some deference, "the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale."  *Montrose*, 50 F.3d at 746 (citation and internal quotation marks omitted).  "[T]he Court need only defer when there is a reasonable, good faith basis for the apportioned liability," which requires "a sufficient factual basis to defer to [the government's] expertise on apportionment of liability."  *Pioneer Nat. Res. Co.*, 452 F. Supp. 3d at 1015 (citation and internal quotation marks omitted).

Page 17 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

IV.    **ARGUMENT**

A.    **Plaintiffs Fail to Sustain Their Burden to Demonstrate to the Court that the Proposed CDs Are Substantively Fair.**

The Motion must be denied, due to a complete absence of credible evidence critical to the Court's determination of whether Settling Defendants' settlement contribution is roughly correlated with their relative liability. *Montrose*, 50 F.3d at 747. The Court thus lacks critical information to determine "the substantive fairness of the consent decree to non-settling PRPs by assessing whether liability has been roughly apportioned based upon 'some acceptable measure of comparative fault.'" *Aerojet Gen. Corp.*, 606 F.3d at 1152 (citation omitted).

As an initial matter, in their Motion, Plaintiffs have not asserted or provided any evidence that their assessment complied with 43 Code of Federal Regulations Part 11, and are thus not entitled to a rebuttable presumption in their favor. *See* 42 U.S.C. § 9607(f)(2)(C); 43 C.F.R. § 11.10. In their Motion, Plaintiffs have the burden to demonstrate that the proposed CDs are substantively fair to the non-settling PRPs, and they have failed to carry that burden. Plaintiffs assert that "the detailed calculations for the HEA and party-specific allocations are part of the confidential settlement process"[49] and provide only a single declaration consisting of vague general descriptions of their process, and devoid of details critical to an evaluation of whether the proposed CDs are substantively fair to the non-settling PRPs.

1.    **Plaintiffs admit that their determination of the Settling Defendants' proportional liability for the NRD Assessment Area is unreliable.**

By their own admission, Plaintiffs' calculation of Settling Defendants' proportional liability for the NRD Assessment Area is unreliable. Plaintiffs assert that their allocation of liability to the Settling Defendants is based on a calculation of the relative liability of each PRP

_____

[49] Mot., Attach. C at 49.

Page 18 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

at the relevant properties.  The relevant properties include numerous properties involving more than one PRP, typically both settling and non-settling PRPs.  For example, at least four PRPs are identified as past or present owners or operators of Site 186 (the Gunderson Property):  two Settling Defendants (Schnitzer and MMGL); and two non-settling PRPs (FMC and Gunderson).[50]  And at least four PRPs are identified at Site 157 (Swan Island Shipyard/Portland Ship Repair Yard):  three Settling Defendants (Schnitzer, Evraz, and Port of Portland) and one non-settling PRP (Cascade General), which has owned the property for twenty-five years.[51]  In the proposed CDs, Plaintiffs assert that the Trustee Council "assigned" a liability percentage to each property within the NRD Assessment Area, and then, at each property, "conducted a party-specific, intra-property allocation by *estimating the relative contributions (as percentages) of each PRP* associated with contaminant footprints" at that property, and then "converted a party-specific allocation of natural resource damage liability to DSAYs."[52]  This same process is described in the 2023 Phase 2 Allocation Methodology Report.[53]

Plaintiffs adamantly refuse to provide their property-specific calculations, and the Court cannot rely on their admittedly unreliable and unsupported calculation of Settling Defendants' overall proportional liability as about 11.4%.[54]  Plaintiffs must provide "a clear explication or

---

[50] RJN ¶ 22, *supra*, n.31 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Schnitzer Steel Industries*); RJN ¶ 23, *supra*, n.31 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for MMGL*).

[51] RJN ¶ 22, *supra*, n.31 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Schnitzer Steel Industries*); RJN ¶ 24, *supra*, n.32 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Evraz Inc. North America*); RJN ¶ 26, *supra*, n.32 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for the Port of Portland*).

[52] Restoration CD ¶¶ S, U (emphasis added).

[53] RJN ¶ 25 at vii, *supra*, n. 33 (IEc, PH NRD Assessment).

[54] *E.g.*, Mot. at 2; Mot., Attach. C at 47.

Page 19 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

evidentiary support for its conclusion," such as "indication of whether there are other PRPs and their potential relative liability," *Pioneer Nat. Res. Co.*, 452 F. Supp. 3d at 1015, and "the mere fact that evidence sufficient to evaluate the terms of an agreement is either before the court or purportedly in the parties' possession is not alone sufficient," *Arizona*, 761 F.3d at 1012.

Further, in their responses to public comments on the Proposed CDs, Plaintiffs make two damning admissions, each of which independently demonstrates that Plaintiffs' calculation of the Settling Defendants' proportion of liability is unreliable.

First, Plaintiffs admit that, although they said that they did as part of their methodology, they did not actually calculate the relative liability of all PRPs, whether settling or non-settling, associated with each property. On the one hand, Plaintiffs assert in the proposed CDs that they have calculated "the relative contributions (as percentages) of each PRP" at the relevant properties, including properties such as Site 186 and Site 157 with numerous settling and non-settling PRPs, and based the allocation to the Settling Defendants on that calculation of relative contributions. On the other hand, in their responses to comments, Plaintiffs admit they made no determinations of contributions by non-settling PRPs: "the Settling Trustees had no duty to any non-settling responsible party to make particularized allocations as to those parties."[55] Calculation of the relative liability of all PRPs, both settling and non-settling, at each property is the foundation of Plaintiffs' asserted allocation of comparative liability, and Plaintiffs' admission that they have not done so demonstrates their allocation is incomplete and unreliable.

Second, Plaintiffs admit that they cannot make a reliable estimation of relative liability for properties that include non-settling PRPs:

> indeed, making allocations to parties outside of the early settlement process
> ***would be too uncertain to calculate without a submittal of technical***

---

[55] Mot., Attach. C at 51.

Page 20 –   INTERVENOR FMC CORPORATION'S OPPOSITION
TO MOTION TO ENTER CONSENT DECREES

*information from that party with sufficient detail to prepare an intra-site allocation at locations with multiple owners and operators*.[56]

Without being able to calculate the relative liability of non-settling PRPs, Plaintiffs also cannot reliably calculate "the relative contributions (as percentages) of each PRP" at the relevant properties.[57]  By their own admission, the fundamental building block for their calculation of Settling Defendants' proportion of liability—the calculation of each PRPs' relative liability at each relevant property—is unreliable where there are multiple owners or operators.

### 2.  Plaintiffs' process for allocating Settling Defendants' liability is fundamentally biased.

Plaintiffs' allocation process is heavily biased in favor of reducing the Settling Defendants' proportional liability, because it only considered evidence from those PRPs participating in the Path C settlement process and excluded any other evidence from more than one hundred other PRPs that have been alleged to have contributed to PHSS contamination. Plaintiffs' process does not provide a reliable determination of Settling Defendants' proportional liability, depriving the Court of information necessary to determine "the substantive fairness of the consent decree to non-settling PRPs by assessing whether liability has been roughly apportioned based upon 'some acceptable measure of comparative fault.'"  *Aerojet Gen. Corp.*, 606 F.3d at 1152.

Plaintiffs admit that technical submissions from each PRP are critical to a reliable calculation of relative liability, and admit that they considered such submissions from only Path C participants.[58]  In particular, Settling Defendants were given the opportunity to submit

---

[56] Mot., Attach. C at 51 (emphasis added).

[57] Restoration CD ¶ U; Cash-Out CD ¶ P.

[58] "During the Path C process, participating PRPs and the Trustee Council conducted a focused review of more comprehensive, party-specific information to supplement the Path C NRD

Page 21 –   INTERVENOR FMC CORPORATION'S OPPOSITION
          TO MOTION TO ENTER CONSENT DECREES

evidence to rebut its proposed relative allocation for a property, as they were each "given an opportunity to review its proposed allocation and to provide additional information if it disagreed with the factual basis for the Trustees' proposed allocation."[59]  FMC and other non-settling parties were not.  At properties involving multiple PRPs—such as Site 186 and Site 157 that each involve settling and non-settling PRPs—allowing only the settling PRPs to rebut their relative liability allocation is fundamentally biased in favor of those settling PRPs.

Here, six of the seven Settling Defendants to the Restoration Credit CD are remedial design performing parties at the PHSS.[60]  Two of those Settling Defendants—the City of Portland and the Port of Portland—are each performing the remedial design at three separate project areas.  Three others—Schnitzer MMGL, and Evraz ("UAO Parties")—are the only parties at the PHSS performing the remedial design pursuant to unilateral administrative orders ("UAOs"), indicating that they did not voluntarily agree to perform the work and are being compelled to do so.  Through this settlement, those three UAO Parties alone are resolving all of their NRD liability for about forty properties, with ship dismantling, auto shredding, metal recycling, and steel manufacturing operations spanning decades.[61]

Another Settling Defendant, the City of Portland, is settling for thirty-four properties, with operations including ship building operations during World War II and decades-long

---

allocation prior to developing a party-specific allocation."  Restoration CD ¶ U; Cash-Out CD ¶ P.

[59] Mot., Attach. A ¶ 14 (Baker Decl. (June 6, 2025), Dkt. No. 85-1).

[60] *See* RJN ¶ 18, Ex. 16, *supra*, n. 5 (EPA, *PHSS Updates Fact Sheet*); RJN ¶ 17, Ex. 15, *supra*, n.7 (EPA, *Portland Harbor Cleanup Progress*).

[61] RJN ¶ 24, *supra*, n.32 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Evraz Inc. North America*); RJN ¶ 23, *supra*, n.31 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for MMGL*); RJN ¶ 22, *supra*, n.31 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Schnitzer Steel Industries*).

Page 22 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

landfill operations, as well as all of the City-owned outfalls that discharged stormwater and, for many decades prior to modern environmental controls, discharged industrial releases from facilities in the drainage area of each outfall.[62]  Plaintiffs provide a map depicting over forty active City-owned outfalls, and twelve abandoned City-owned outfalls, that are being settled by these CDs, and admit that they did not do even one outfall-specific allocation.[63]  One of the depicted active outfalls is City Outfall 18, which has funneled to the RM9W Project Area decades of discharges from a massive upland industrial area spanning over 200 acres, where operations included varnish and roof-coating manufacturing, paint mixing, drum cleaning, and blending of motor oil.[64]  Pursuant to recent environmental investigations of this area, City Outfall 18 continues to be an active ongoing source of contaminants discharging into the river – many of the upland sites discharging into City Outfall 18 are determined to be insufficiently assessed or controlled, or need further investigation.[65]

A different Settling Defendant, the Port of Portland, is settling for forty-nine properties. At just one of those Port properties, Site 157, which the Port owned for seventy-eight years, operations included a municipal airport, shipbuilding during World War II, and subsequent operations related to steel manufacturing by Settling Defendants Schnitzer and Evraz.[66]  Despite

---

[62] RJN ¶ 26, *supra*, n.32 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for the Port of Portland*).

[63] Mot., Attach. C at 51; Restoration CD, App. A at 5.

[64] *e.g.*, Colopy Decl. ¶ 3, *supra*, n.9 at §§ 3.2.4.1 to 3.2.4.7, 4.3.2.1.1 (pp. 41-44 and 76-77) (Foth, SAR); Colopy Decl. ¶ 5, Ex. 2, Fig. 4.3-1 (Foth, SAR).

[65] *E.g.*, Colopy Decl. ¶ 3, *supra*, n.9 at § 4.3.2.1.1 (pp. 76-77) (Foth, SAR).

[66] RJN ¶ 22, *supra*, n.31 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Schnitzer Steel Industries*); RJN ¶ 24, *supra*, n.32 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Evraz Inc. North America*); RJN ¶ 26, *supra*, n.32 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for the Port of Portland*).

Page 23 –   INTERVENOR FMC CORPORATION'S OPPOSITION
            TO MOTION TO ENTER CONSENT DECREES

its significant operations, of the nine properties that Settling Defendant Evraz is settling for, Plaintiffs' summary allocation memo indicates that Site 157 and three other properties—namely, almost half of the properties being settled for Evraz—are "Unallocated."[67]  Plaintiffs fail to provide any explanation for why those properties are included as part of Evraz's settlement, despite being "Unallocated."

Plaintiffs' assertion that the collective liability of all twenty-three Settling Defendants is only 11.4% is not plausible under any calculation.

> **3.     The proposed CDs seek to resolve all NRD liability for vast areas beyond the NRD Assessment Area, which Plaintiffs cannot even identify.**

The expansive covenants not to sue and contribution protection would shield Settling Defendants from NRD outside the NRD Assessment Area, including for any NRD liability due to the resuspension and migration of contaminants that may occur during the remedial action, which is expected to last for at least fifteen years.  The proposed covenants and contribution protection apply to the full extent of "Covered Natural Resource Damages," regardless of where the damage occurs,[68] and Plaintiffs admit that "these provisions extend our covenants not to sue and contribution protection to natural resource damages outside of the Portland Harbor Assessment Area."[69]  Moreover, the proposed CDs explicitly exclude NRD "arising from re-exposure, resuspension or migration of hazardous substances or pollutants by natural causes or as a result of the future implementation of a remedial action" in the NRD Assessment Area.[70]

---

[67] RJN ¶ 24, *supra*, n.32 (*Portland Harbor NRD Assessment Phase 2: Allocation Summary Memo for Evraz Inc. North America*); Restoration CD, App. A at 6-12.

[68] Restoration CD ¶¶ 3(d), 82, 89; Cash-Out CD ¶¶ 3(b), 14, 21.

[69] Mot., Attach. C at 36.

[70] Restoration CD ¶ 85; Cash-Out CD ¶ 17.

Page 24 –   INTERVENOR FMC CORPORATION'S OPPOSITION
            TO MOTION TO ENTER CONSENT DECREES

Given that the Willamette River is a dynamic river system, such resuspension and migration makes NRD beyond the NRD Assessment Area significantly more likely.

Despite this, Plaintiffs are unable to identify the relevant geographic area, or Settling Defendants' proportional liability beyond the NRD Assessment Area, or whether that area will increase or decrease upon further evaluation or even all of the relevant COCs.[71]  Yakama Nation withdrew from the Trustee Council due to its contention NRD originating from PHSS extends into the Lower Columbia River,[72] and assert evidence of PHSS contamination throughout such downstream areas.[73]  Plaintiffs offer no estimation of the Yakama Nation's NRD claims. Whereas Plaintiffs seek $297 million in NRD,[74] at one point the Yakama Nation valued its NRD claim at almost a billion dollars.[75]

> **4.    Plaintiffs' NRD determination in the NRD Assessment Area is fundamentally flawed and unreliable.**

Plaintiffs rely on a habitat equivalency analysis ("HEA") model developed specifically for the conditions at a different Superfund site in a different state, the Commencement Bay Superfund Site located in Puget Sound, Washington (the "Commencement Bay HEA Model"), and provide only conclusory assertions that it is appropriately applied to the PHSS, without

---

[71] Mot., Attach. C at 19; RJN ¶ 30 at 3-1, *supra*, n.28 (IEc, *Phase 3 Damage Assessment Plan*) (for the Phase 3 assessment, "[o]ther COCs may warrant further examination as additional information becomes available").

[72] Mot., Attach. B at 51 (Yakama Nation comments on CDs).

[73] Mot., Attach. C at 36; RJN ¶ 30, *supra*, n.28 (IEc, *Phase 3 Damage Assessment Plan*).

[74] Per the proposed CDs, the amount of $297,262,500 is comprised the total of the following values assigned by Plaintiffs:  $291,165,000 in ecological losses calculated at 4,130 DSAYs valued at $70,500 each; $5,402,400 for recreational losses; and $695,100 for tribal service losses. Restoration CD ¶ P; Cash-Out CD ¶ K.

[75] RJN Decl. ¶ 14, Ex. 14, *supra*, n.20 (Yakama Nation Proof of Claim).

Page 25 –    INTERVENOR FMC CORPORATION'S OPPOSITION
TO MOTION TO ENTER CONSENT DECREES

factual or expert support.[76] Plaintiffs generically assert with no supporting evidence that they thoroughly reviewed the technical basis for the Commencement Bay HEA Model, and that only the service loss from the chemical PAHs (polycyclic aromatic hydrocarbons) required adjustment.[77] Plaintiffs' actions speak louder, however. In their Phase 3 damage assessment to proceed against non-settling parties, Plaintiffs intend to abandon the Commencement Bay HEA Model and instead use a resource equivalency analysis ("REA"), demonstrating the inapplicability here of the Commencement Bay HEA Model.[78]

Plaintiffs' rationale for making this change is citing the "Trustees' judgment" that the REA approach is the "best measure" at PHSS to measure adverse changes in the viability of natural resources resulting from exposure to contaminants.[79] This is damning, and significantly undermines any credible argument that the Commencement Bay HEA Model provides a reliable basis for determining service loss in the NRD Assessment Area.

Plaintiffs' repeated insistence that they can rely on "preliminary" or "current" estimates is unavailing.[80] A preliminary or current calculation of a reliable model is different from a calculation based on a model developed for the specific conditions at a different Superfund site that Plaintiffs have decided to abandon in future assessments. Using different models for parties at the same site is fundamentally unfair, as it holds the parties to different standards. Here, Plaintiffs propose holding Settling Defendants to a different standard, based on the HEA model,

---

[76] RJN ¶ 27 at A-5, *supra*, n.35 (Portland Harbor Natural Resource Trustee Council, *Summary of Portland Harbor NRD Assessment for Purposes of Settlement*).

[77] Mot., Attach. C at 25.

[78] *See* RJN ¶ 30 at A-1–A-2, *supra*, n.28 (IEc, *Phase 3 Damage Assessment Plan*).

[79] *Id.*

[80] *E.g.*, Mot. at 21; Mot., Attach. C at 18, 56.

Page 26 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

without any evidence that doing so could be considered substantively fair to the non-settling PRPs.

In sum, each of the flaws in Plaintiffs' asserted calculations identified above is fatal and independently prevent the Court from determining whether the proposed CDs are substantively fair and reasonable.  Taken together, these fatal flaws leave no question that Court lacks the information necessary to scrutinize the proposed CDs.

**B.      Publicly Available Information Demonstrates that the Proposed CDs Are Premature.**

**1.      Given remedial design is not complete at any project area, and remedial action has not begun anywhere, NRD cannot be reliably estimated or quantified at this time.**

Natural resource damages are generally considered "a residue of the cleanup action," and are "viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup."  *In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution*, 712 F. Supp 1019, 1035 (D. Mass. 1989).  "An NRD claim, including a claim for interim and lost use damages, is a residual claim and the full measure of damage can not [sic] be determined until a remedial action is completed."  *Quapaw Tribe of Okla.*, No. 03-CV-0846-CVE-PJC, 2008 WL 2704482, at *18 (N.D. Okla. July 7, 2008).  USEPA recognizes this sequencing of NRD, and explains that "[t]he assessment of [NRD] takes place following cleanup because cleanups sometimes also effectively restore habitat" and, "[b]ecause the choices made in cleanup decisions can affect the amount of NRD, EPA coordinates with Trustee agencies on cleanup decisions."[81]

---

[81] RJN ¶ 19 *supra*, n.24 (EPA, *NRD: A Primer*).

Page 27 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

At this time, Plaintiffs cannot reasonably estimate the residual NRD or Settling Defendants' proportional liability for that NRD, because remedial design—let alone remedial action—is far from complete and its scope remains in significant flux. Completion of remedial design at the majority of the project areas is either not anticipated until 2027 or no estimated completion date is specified.[82] At the sixteen project areas where parties other than EPA are conducting the remedial design: only half of those areas have completed a Remedial Design Work Plan; only two areas have completed Preliminary Remedial Design (which is only 30% complete); five areas have no estimated date specified for completion of remedial design; and, of the areas that do have an estimated completion date, only three include dates ranges indicating completion of remedial design before 2027.[83]

Plaintiffs fail to provide a complete accounting of the data used, or when the HEA model was run, to determine their asserted initial estimate of damages. Of the limited number of datasets identified by Plaintiffs, none were collected after 2013.[84] Extensive data at PHSS has been collected since 2013, however. In fact, data are still being collected and analyzed across the PHSS project areas, and those data have already significantly changed the extent of contamination footprints, remediation of riverbanks, technology assignments, and the scope of contaminants to be addressed by active remedies.[85] There is no indication that Plaintiffs have accounted for these data, or the associated changes in the understanding in the extent of contamination and remedial actions.

---

[82] *See* RJN ¶ 18, Ex. 16, *supra*, n. 5 (EPA, *PHSS Updates Fact Sheet*); RJN ¶ 17, Ex. 15, *supra*, n.7 (EPA Portland Harbor Cleanup Progress website).

[83] *See id.*

[84] Restoration CD ¶ R, n.3; Cash-Out CD ¶ M, n.2.

[85] Colopy Decl. ¶ 7.

Page 28 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

Plaintiffs assert that they "conservatively assumed that the cleanup would not include any active remediation," and that "this provides more certainty, not less" that Plaintiffs' estimate "sufficiently captures future harm to natural resources from current contamination."[86]  Not so. First, by failing to consider resuspension and migration of contaminants during active remediation that would be covered by the covenants and contribution protection in the proposed CDs and any habitat or other mitigation that may be a part of active remediation measures, Plaintiffs have omitted a potentially significant influence on total liability and the Settling Defendants' relative responsibility for that liability.  Plaintiffs have essentially admitted that they have not even attempted to determine the residual NRD after the completion of remedial action. Second, if this assumption will not be carried forward to future assessments, it further undermines the Court's ability to determine whether the proposed CDs are substantively fair to the non-settling PRPs.

> **2.** **The proposed CDs provide covenants not to sue without accounting for significant ongoing source-control issues throughout the PHSS.**

By statute, NRD trustees may provide a covenant not to sue for NRD only "if the potentially responsible party agrees to undertake appropriate actions necessary to protect and restore the natural resources damaged by such release or threatened release of hazardous substances."  42 U.S.C. § 9622(j)(2).  This provision was adopted because "Congress was concerned with and condemned past sweetheart deals that EPA negotiated with [potentially responsible parties]," and thus requires the United States to "drive the hardest bargain it can."  *In re Acushnet River*, 712 F. Supp. at 1034, 1036 (internal quotation marks omitted).

---

[86] Mot. at 23; *see* Mot., Attach. C at 56.

Page 29 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

Accordingly, "natural resources damages settlements which do not require clean up but which contain a covenant not to sue (on the part of the government)—must include provisions assuring that the responsible party will take actions necessary to 'protect and restore' the injured natural resources."  *State of Utah by & through Utah State Dep't of Health v. Kennecott Corp.*, 801 F. Supp. 553, 569 (D. Utah 1992).  For example, where additional source control is needed, a consent decree will not meet the requirement that it "protect" the damaged natural resources nor "be just and fair without a covenant to perform necessary additional source control and [providing] for containment and management of the existing contamination."  *Id.* at 570.

The proposed CDs fail to account for ongoing source-control issues across the PHSS. The proposed CDs' covenants not to sue shield Settling Defendants from liability for releases on or before the effective date of the proposed CDs, but neither the covenants nor the reservations of rights by Plaintiffs clearly address ongoing releases.[87]  Despite evidence of ongoing source-control issues throughout the PHSS, including at some of the properties at issue in the proposed CDs,[88] the proposed CDs make no provision for protection of natural resources from this ongoing source of contamination.

Plaintiffs' assertion that they lack the authority to provide any protection for source control is not credible and, if anything, further confirms the proposed CDs are premature.  Both the federal government and the State of Oregon are members of the Trustee Council and are responsible for regulating uncontrolled sources at and into the PHSS.  The failure to exclude contamination from ongoing source-control issues is overbroad and not substantively fair.

---

[87] Restoration CD ¶¶ 3(d), 82-83; Cash-Out CD ¶¶ 3(b), 14-15.

[88] *E.g.*, Colopy Decl. ¶ 4, Ex. 1, Table 3-1, RM9W Source Control Sufficiency Assessment Matrix (Foth, SAR).

Page 30 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

ER-723

C.      **The Proposed CDs Are Based on a Fundamentally Flawed Allocation that Would Undermine the Ongoing PHSS Allocation.**

For more than fifteen years, approximately 100 PRPs have been engaging in the PHSS Allocation.[89]  As the United States represented to this Court when obtaining a stay of the *Yakama* lawsuit, "[t]his long-term intensive process [of the PHSS Allocation] has required a substantial amount of resources by the United States—not to mention dozens of other parties—to address the technical and historically complex response cost liability and allocation issues concerning contamination from the Portland Harbor Site."[90]

Plaintiffs are risking the PHSS Allocation by insisting the Court enter the proposed CDs based on a biased and fundamentally flawed determination of the Settling Defendants' allocation of liability for the NRD Assessment Area, which is generally co-extensive with the PHSS. Entering the proposed CDs could undermine the determination and allocation of comparable fault that has been under development in the PHSS Allocation for more than fifteen years.

1.      **Plaintiffs' Motion is inconsistent with their other filings in this Court, and Plaintiffs are inappropriately seeking to have their NRD claims treated differently than those of another PHSS Trustee.**

Plaintiffs' Motion contradicts their other filings with this Court, including filings arguing that NRD claims asserted by another Portland Harbor Trustee should be treated differently. Plaintiffs' contradictory positions are illustrated by the filings summarized below, and provide an independent basis for denying the Motion.  Both the proposed CDs and the *Yakama* lawsuit address alleged NRD at the PHSS, and Plaintiffs have offered no credible justification for

---

[89] *E.g.*, RJN ¶ 9, Ex. 9 at 3 (United States Mot. to Dismiss & Stay (Sept. 22, 2017), Dkt. No. 253 in *Yakama* lawsuit).

[90] *Id.* at 18.

Page 31 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

treating their claims differently than those of another PHSS trustee. Plaintiffs should not be allowed to speak out of both sides of their mouth to get different treatment for their NRD claims.

First, by their Notice of Related Cases (the "Notice") in this action, Plaintiffs have conceded that there is material overlap between the above-captioned action and the PHSS Allocation, *Yakama* lawsuit, and *Arkema* lawsuit.[91] Plaintiffs state that, for the reasons articulated in the Court's decision staying the *Yakama* lawsuit, "a very similar overlap of both parties and potential legal and factual issues exists as between this case and the [*Yakama* and *Arkema* lawsuits]."[92]

Second, the United States obtained a court-ordered stay of the *Yakama* lawsuit by asserting the stay was necessary to promote the orderly and efficient resolution of the PHSS Allocation. The *Yakama* lawsuit, like these proposed CDs, involve NRD Trustee(s) seeking to prosecute NRD claims and to render liability determinations for NRD—all at the same site. The United States argued that long-term stay of the *Yakama* and *Arkema* lawsuits would lead to an orderly and efficient resolution of the PHSS Allocation as well as those lawsuits:

> there is significant overlap of the parties and issues in [the *Yakama*] case, the *Arkema* case, and the non-judicial response cost allocation process. . . . [T]he liability claims in both cases and the allocation issues that are being addressed through the non-judicial response cost allocation process are based on some of the same information, *e.g.*, historical documentation, the RI/FS, etc. . . . A stay of these proceedings therefore would support the orderly and efficient course of these proceedings.[93]

And the United States further argued in the *Yakama* lawsuit that:

> Given the significant overlap in facts and issues between this case and the response cost allocation process, the progression of this litigation and any

---

[91] Mot. at 16, n.6.

[92] Notice of Related Cases Pursuant to LR 42-2 at 2 (June 9, 2025), Dkt. No. 86.

[93] RJN ¶ 9, Ex. 9 at 17-18 (United States Mot. to Dismiss & Stay (Sept. 22, 2017), Dkt. No. 253 in *Yakama* lawsuit).

Page 32 –   INTERVENOR FMC CORPORATION'S OPPOSITION
            TO MOTION TO ENTER CONSENT DECREES

decision on the liability or allocation issues would interfere with the consideration and resolution of those very issues in that allocation process, which was initiated well before this litigation. Those equities weigh heavily in favor of a stay.[94]

The United States now directly contradicts its own position, given the current Motion seeks to provide an allocation that will threaten the PHSS Allocation.

Plaintiffs attempt to explain this inconsistency by asserting a false distinction. Plaintiffs assert that approval of the CDs is distinguishable because "our natural resource damage claims would be *settled*, not *litigated*," and thereby "*avoid* disrupting the ongoing non-judicial allocation of response costs"[95] and thus "*avoids* putting at issue those same topics."[96] Not so. Most obviously, Plaintiffs' asserted allocation of liability to the Settling Defendants has already been put at issue by the proposed CDs, and is currently being opposed and litigated. If anything, the biased and unreliable allocation underlying these proposed CDs creates a greater risk to the PHSS Allocation than the *Arkema* and *Yakama* lawsuits did at the time they were stayed.

Plaintiffs' inconsistent and self-serving attempt to partially settle their claims for NRD puts the PHSS Allocation at risk, similar to the risk this Court recognized when staying the *Yakama* and *Arkema* lawsuits, and Plaintiffs' Motion should thus be denied.

> **2.      Plaintiffs' proposed CDs openly acknowledge the risk to the PHSS Allocation, but are unable to mitigate that risk.**

Plaintiffs acknowledge the risk the proposed CDs pose to the PHSS Allocation, given Plaintiffs included language in both proposed CDs in an attempt to explicitly prohibit use of the

---

[94] RJN ¶ 10, Ex. 10 at 8 (United States, Reply in Supp. of Mot. to Dismiss and Stay (Oct. 25, 2017), Dkt. No. 280 in *Yakama* lawsuit).

[95] Mot., Attach. C at 31 (emphasis in original).

[96] Mot. at 16 (emphasis in original).

Page 33 –    INTERVENOR FMC CORPORATION'S OPPOSITION
TO MOTION TO ENTER CONSENT DECREES

"Path C NRD allocation results" underlying the CDs "in any allocation of liability conducted by or among the Settling Parties or other PRPs":

> The Settling Parties agree that they will not cite or use this settlement or the Path C NRD allocation results in any forum as evidence of liability for remedial action or response costs. Nor shall the Settling Parties cite or use this settlement or the Path C NRD allocation results to contend that they are relevant to, or determinative of, their share of remedial action or response costs, including but not limited to in any allocation of liability conducted by or among the Settling Parties or other PRPs or in any judicial or administrative proceeding concerning remedial action or response costs, except in rebuttal to another PRP's use of the Path C NRD allocation results.[97]

This language is ineffective for two reasons. First, such provisions are not necessarily enforceable as Plaintiffs hypothesize. In *Washington v. United States,* a district court considered a similar provision in a consent decree stating that "[t]his Consent Decree shall not be used against any Party in any action or proceeding other to enforce the terms of this Consent Decree." No. CIV. 06-05225RJB, 2007 WL 3025843, at *10 (W.D. Wash. Oct. 15, 2007). The court was unequivocal in finding that language unenforceable:

> The Court cannot and should not prohibit the use of the Consent Decree in future actions. The Consent Decree is part of the record accessible by the public, and the Court is aware of no legal authority, or for that matter any sensible public policy, that supports preventing the use of the Consent Decree by parties in future actions. The rules and laws of evidence will guide any court hearing any future case.

*Id.* Plaintiffs fail to cite any contrary legal authority. Instead, they assert these proposed CDs are distinguishable because the provision is limited to the parties to the CDs—a distinction not made

---

[97] Restoration CD ¶ 91; Cash-Out CD ¶ 23.

Page 34 – INTERVENOR FMC CORPORATION'S OPPOSITION
TO MOTION TO ENTER CONSENT DECREES

by the court above—and merely point to two other consent decrees with similar language in their recitals that were not opposed or accompanied by any judicial analysis.[98]

Second, this language only binds the parties to the proposed CDs, not to other third parties, and there is a significant risk that Plaintiffs' allocation will be given undue weight and undermine the PHSS Allocation. Given how biased and unfairly favorable Plaintiffs' allocations are in favor of the Settling Defendants, a party to the PHSS Allocation may find it advantageous to draw an analogy to Settling Defendants' operations and to then cite Plaintiffs' allocation as evidence supporting a low allocation. In addition, Plaintiffs' allocation could be given undue weight in the PHSS Allocation. It would be a court-approved allocation that was supported by at least two Plaintiffs that would also likely be plaintiffs in an action regarding the response costs at issue in the PHSS Allocation, the United States and the State.

Given these dynamics, there is a significant risk that the biased and unreliable allocation by Plaintiffs undermines the PHSS Allocation, and it is insufficient for Plaintiffs to merely assert, as they have, that it is "highly unlikely" that non-parties would rely on proposed CDs in disputes with one another and "highly uncertain" what weight the proposed CDs would be given by a decision-maker. Plaintiffs' assertions are unfounded and should be disregarded.

In sum, the proposed CDs threaten the PHSS Allocation and, on that basis alone, should be denied. Plaintiffs' attempts to justify the proposed CDs despite this risk are both inconsistent and self-serving, and should thus be disregarded.

---

[98] Mot., Attach. C at 30-31 n.71 (citing "*United States v. The Boeing Co.*, No. CV-10-758-RSM (W.D. Wa. 2010), Docket # 8, paragraph N; *United States v. Vigor Indus., LLC*, No. CV-21-44-RSM (W.D. Wa. 2021), Docket # 7, paragraph L").

Page 35 –   INTERVENOR FMC CORPORATION'S OPPOSITION
              TO MOTION TO ENTER CONSENT DECREES

**D.** **New Arguments and Evidence Cannot Be Introduced on Reply.**

Plaintiffs' Motion is devoid of information necessary to determine whether the proposed CDs are substantively fair to non-settling PRPs, and it should be denied due to Plaintiffs' failure to meet their burden. This includes Plaintiffs not asserting or providing any evidence that their assessment of NRD is entitled to a rebuttable presumption because they have complied with 43 Code of Federal Regulations Part 11. *See* 42 U.S.C. § 9607(f)(2)(C); 43 C.F.R. § 11.10.

On reply to this Motion, new arguments or evidence cannot be introduced in an effort to rescue the deficient showing. *Docusign, Inc. v. Sertifi, Inc.*, 468 F. Supp. 2d 1305, 1307 (W.D. Wash. 2006) ("It is well established that new arguments and evidence presented for the first time in [r]eply are waived," including where "declarations address issues which should have been addressed in the opening brief"); *Cal. Expanded Metal Prods. Co. v. Klein*, 426 F. Supp. 3d 730, 743 (W.D. Wash. 2019) (declining to give "a second bite at the apple on reply" and striking a supplemental declaration and all portions of the reply relying on it).

**V.** **CONCLUSION**

For the reasons stated above, Plaintiffs' Motion should be denied. Plaintiffs fail to sustain their burden to provide information necessary and critical for the Court to evaluate and determine whether the proposed CDs are substantively fair to the non-settling PRPs. Moreover, consistent with this Court's findings in the related *Arkema* and *Yakama* actions concerning PHSS, the proposed CDs are premature and threaten to undermine the ongoing non-judicial allocation process for the PHSS. If the Motion is not denied, the Court should hold the Motion in abeyance until the conclusion of the PHSS Allocation.

Through this Opposition, FMC also joins the factual and legal positions separately

Page 36 – INTERVENOR FMC CORPORATION'S OPPOSITION
TO MOTION TO ENTER CONSENT DECREES

concurrently submitted by Legacy Site Services LLC, agent for Arkema Inc., Gunderson LLC, and NW Natural in opposition to this same Motion.


DATED this 28th day of July, 2025

FARELLA BRAUN + MARTEL LLP


By:   /s/ James H. Colopy
      James H. Colopy, CASB #172806, *pro hac vice*

      *Attorneys for Proposed Intervenor FMC*
      *CORPORATION*

Page 37 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,610 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/ James H. Colopy
James H. Colopy

38614\20491332.13

Page 38 –    INTERVENOR FMC CORPORATION'S OPPOSITION
             TO MOTION TO ENTER CONSENT DECREES

Matthew J. Stock, OSB No. 065205
HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Tel: (206) 623-1745
Fax: (206) 623-7789
Email: matthew.stock@hcmp.com
*Attorneys for Legacy Site Services LLC,*
*agent for Arkema Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE, | Case No. 3:23-cv-01603-YY |
| | ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES |
| Plaintiffs, | **Request for Oral Argument** |
| v. | |
| ACF INDUSTRIES, LLC; AIRGAS USA LLC; AIR LIQUIDE AMERICA L.P.; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.; BNSF RAILWAY COMPANY; CALBAG METALS CO.; CITY OF PORTLAND; ESCO GROUP LLC; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); GOULD ELECTRONICS INC.; HAJ, INC., D/B/A CHRISTENSON OIL COMPANY; HERCULES LLC; KOPPERS INC.; MCCALL OIL & CHEMICAL CORPORATION; MCCALL OIL REAL ESTATE COMPANY LLC; MOREC FRONT | |

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES*
(CASE NO. 3:23-CV-01603-YY)

ER-732

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

LLC; GWC PROPERTIES, LLC; GWC FRONT, LLC; TANKER BASIN LLC; MMGL LLC; NORTHWEST PIPE COMPANY (FKA NORTHWEST PIPE & CASING COMPANY AND NORTHWEST PIPE AND CASING COMPANY); PACIFICORP, AN OREGON CORPORATION; PORT OF PORTLAND; PORTLAND GENERAL ELECTRIC COMPANY (PGE); PORTLAND TERMINAL RAILROAD COMPANY; SCHNITZER STEEL INDUSTRIES, INC.; SILTRONIC CORPORATION; SULZER PUMPS (US) INC.; and VALVOLINE INC.,

Defendants.

---

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES (CASE NO. 3:23-CV-01603-YY)*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-733

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................... 1

II.  BACKGROUND ............................................................................................ 2

III. STANDARD OF REVIEW .......................................................................... 8

IV.  ARGUMENT ................................................................................................. 9

    A.  Without a reliable estimate of natural resource damages, it is impossible for this Court to assess the fairness and reasonableness of the settlements embodied in the Proposed Consent Decrees. ..................................................................................... 9

    B.  The Trustees have not yet determined the total quantum of natural resource damages associated with the Site, and their "initial" estimate is incomplete and unreliable...... 10

        1.  The HEA model that the Trustees used to generate their "initial" estimate of natural resource damages has never been validated for the Site and will be abandoned as part of the forthcoming formal damage assessment. ........................................... 12

        2.  The Trustees' forthcoming formal damage assessment is also likely to account for damages that may be attributable to additional contaminants, remedial actions not yet performed, and geographical areas not yet evaluated. .................................... 17

    C.  As a result of the deficiencies inherent in the Trustees' "initial" estimate of damages and the uncertainties in the scope of the formal assessment of damages, it is impossible to determine whether the settlements embodied in the Proposed Consent Decrees are fair or reasonable............................................................................................... 18

    D.  The contribution protection afforded by the Proposed Consent Decrees is overly broad and prejudices non-settling defendants. ....................................................... 22

    E.  CERCLA's emphasis on early settlements does not absolve the Trustees' of their responsibility to demonstrate the fairness and reasonableness of the Proposed Consent Decrees. ....................................................................................................... 25

    F.  Finally, the settlements embodied in the Proposed Consent Decrees run the risk of undermining the ongoing private allocation of liability for response costs at the Portland Harbor Superfund Site............................................................................... 26

V.   CONCLUSION........................................................................................... 31

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - i*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-734

# TABLE OF AUTHORITIES

**Cases**

*Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*,
712 F. Supp. 1019 (D. Mass. 1989) ................................................................... 20

*Arizona v. City of Tucson*,
761 F.3d 1005 (9th Cir. 2014) ............................................................................. 8

*Coeur d'Alene Tribe v. Asarco Inc.*,
280 F. Supp. 2d 1094 (D. Idaho 2003) ............................................................... 3

*Commissioner of Department of Planning & Natural Resources v. Century Alumina Co.*,
CIV. 2005/0062, 2008 WL 4693550 (D.V.I. Oct. 22, 2008) .......................... 21

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*,
88 F.3d 1191 (D.C. Cir. 1996) .......................................................................... 11

*Starbuck v. City & Cty. of S.F.*,
556 F.2d 450 (9th Cir. 1977) ............................................................................ 21

*State of Utah By & Through Utah State Dep't of Health v. Kennecott Corp.*,
801 F. Supp. 553 (D. Utah 1992) ...................................................................... 19

*United States v. Aerojet Gen. Corp.*,
606 F.3d 1142 (9th Cir. 2010) ............................................................................ 9

*United States v. Cannons Eng'g Corp.*,
720 F. Supp. 1027 (D. Mass. 1989) .................................................................... 9

*United States v. Montrose Chem. Corp. of California*,
50 F.3d 741 (9th Cir. 1995) ...................................................................... *passim*

*United States v. Pioneer Nat. Res. Co.*,
452 F. Supp. 3d 1005 (D. Colo. 2020) ................................................................ 9

*Washington v. United States*,
No. CIV. 06-05225RJB, 2007 WL 3025843 (W.D. Wash. Oct. 15, 2007) .... 27, 28

**Statutes**

42 U.S.C. 9607(f)(2)(C) ......................................................................................... 11

**Other Authorities**

65 Fed. Reg. 75179, 75181 (Dec. 1, 2000) ............................................................. 6

**Regulations**

43 C.F.R. § 11.38 ................................................................................................... 11

43 C.F.R. Part 11 ................................................................................................... 11

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - ii*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-735

# I.    INTRODUCTION

Plaintiffs have moved for the entry of two separate consent decrees that seek to resolve the liabilities of the named defendants for natural resource damages associated with Portland Harbor Natural Resource Damage Assessment Area (the "Assessment Area"). The Trustees, however, have not yet completed a natural resource damage assessment that could provide this Court with the information that it needs to evaluate the fairness and reasonableness of the settlements embodied in those proposed consent decrees. Instead, they have merely conducted a "streamlined" assessment that resulted in an "initial" estimate of damages. Furthermore, the Trustees have indicated that the natural resource damage assessment that they will eventually perform (the "Phase 3 Damage Assessment") will be based on a model and on additional inputs that were not used for purposes of the "initial" damage estimate upon which the proposed consent decrees are based.

These changes call into question the methods by which the "initial" estimate was generated and undercut the Trustees' assertion that this Court has been presented with the evidence that it needs to meaningfully review and evaluate the proposed consent decrees. They also suggest that the total quantum of natural resource damages that will be generated by the Phase 3 Damage Assessment will be greater than the amount generated by the "initial" estimate. Given the broad contribution protection that would be afforded to the settling parties under the proposed consent decrees, as well as the Trustees' stated intention of pursuing non-settling parties for those natural resource damages that are not resolved by means of the proposed consent decrees on a joint and several basis, this likely increase in the total quantum of natural resource damages renders the settlements unfair and unreasonable to the non-settling parties. For all of these reasons, which are

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 1*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-736

discussed more fully below, Legacy Site Services LLC, agent for Arkema Inc. ("Arkema"), opposes the requested entry of these proposed consent decrees.

## II.    BACKGROUND

This lawsuit relates to natural resource damages that are allegedly attributable to releases of contaminants to the Portland Harbor Natural Resource Damage Assessment Area—a stretch of the lower Willamette River that runs from approximately River Mile 0.8 (near the confluence with the Columbia River) to approximately River Mile 12.3, and also includes the upper 1.2 miles of the Multnomah Channel. *See* Complaint at ¶¶ 1, 17 (ECF No. 1) . The Assessment Area is depicted in the following figure, which is taken from the Trustees' May 14, 2015 Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement.[1]



---

[1] This document, which is from the United States' Portland Harbor NRDA Administrative Record, is available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20230401_PH%20Ph2%20 PthC%20SummaryPreface_5383.pdf. It is also the subject of Intervenor FMC Corporation's Requests For Judicial Notice, filed concurrently, which Arkema joins.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 2*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-737

Plaintiffs the United States (on behalf of the National Oceanic and Atmospheric Administration of the Department of Commerce and the Department of the Interior), the State of Oregon (on behalf of the Oregon Department of Fish and Wildlife), the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe (collectively, the "Trustees") have asserted claims against a subset of the parties that they allege are responsible for those natural resource damages at the Assessment Area (the "Settling Defendants"). The Trustees are now seeking entry of two separate consent decrees (the "Proposed Consent Decrees") that would resolve the natural resource damages liabilities of those Settling Defendant. *See* Plaintiffs' Motion to Enter Consent Decrees ("Plaintiffs' Motion") (ECF No. 85); Cash-Out Consent Decree (ECF No. 11-1); Restoration Credit Consent Decree (ECF No. 4-1). The Trustees have separately indicated that they intend to pursue those additional parties that they believe are also responsible for natural resource damages on a joint and several basis. *See* Plaintiffs' Responses to Public Comments at 52 ("Once the combined relief from all settlements is deducted from the total quantum of natural resource damages, non-settling potentially responsible parties would face joint and several liability for the remaining unresolved natural resource damages.") (ECF No. 85-3); *see also* Complaint at ¶ 27 (ECF No. 1).[2]

---

[2] Arkema does not agree with, and reserves the right to challenge, the Trustees' assertion that natural resource damages give rise to joint and several liability under the applicable statutes. *See, e.g.*, *Coeur d'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094, 1124 (D. Idaho 2003) (describing the causation standard applicable to natural resource damage claims (citing *Boeing v. Cascade Corp.*, 207 F.3d 1177 (9th Cir. 2000)).

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 3*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-738

The Proposed Consent Decrees assign shares of liability to each of the Settling Defendants. The Trustees have apparently calculated these shares as a ratio of each Settling Defendant's individual responsibility for the natural resource damages that the Trustees have calculated to date relative to the total amount of natural resource damages that the Trustees have calculated at the Assessment Area.[3] The Trustees, however, have not yet completed their natural resource damage assessment. *See* Cash-Out Consent Decree, Recital N ("[T]he Trustee Council has initiated but not yet completed a natural resource damage assessment of the Portland Harbor Assessment Area[.]") (ECF No. 11-1); Restoration Credit Consent Decree, Recital I (same) (ECF No. 4-1). Instead, they have simply performed a "streamlined" assessment for purposes of settlement that resulted in an "initial" estimate of damages. *See* Declaration of Troy Baker In Support of Plaintiffs' Motion to Enter Consent Decrees, ¶ 7 (ECF No. 85-1); Plaintiffs' Responses to Public Comments at 17 ("[Arkema] is correct that this settlement is based upon an initial estimate of damages.") (ECF No. 85-3).

The Trustees' "initial" estimate of natural resource damages—which was largely based on the results of a habitat equivalence analysis ("HEA") model that was developed for a different site altogether—resulted in a calculation of natural resource damages equivalent to 4,130 discounted service acre-years (or "DSAYs"). (DSAYs are the units of measurement by which the Trustees are currently measuring natural resource damages at the Assessment Area.) That HEA model, however, was never validated for the Assessment Area. Indeed, the Trustees have indicated that they will be using a different model altogether to calculate natural resource damages as part of

---

[3] The Trustees have not disclosed the calculations used to generate each Settling Defendant's purported individual share of responsibility. *See* Plaintiffs' Response to Public Comments at 49 ("the detailed calculations for the HEA and party-specific allocations are part of the confidential settlement process") (ECF No. 85-3).

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 4*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

their forthcoming Phase 3 Damage Assessment. *See* Plaintiffs' Response to Public Comments at 17 ("HEA will not be the basis of the formal damage assessment now under development.") (ECF No. 85-3). Beyond that, the Trustees have also indicated that the upcoming Phase 3 Damage Assessment may account for (1) contaminants not considered for purposes of the "initial" estimate, (2) additional geographic areas not considered for purposes of the "initial" estimate, and (3) remedial actions that have not yet been performed and were not considered for purposes of the "initial" estimate. *See generally* October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan.[4]

The changes that the Trustees intend to implement as part of the Phase 3 Damage Assessment—which will expand the scope of that assessment relative the "streamlined" assessment performed to date—are likely to result in a larger total calculation of natural resource damages. The Trustees contend that the Proposed Consent Decrees resolve 11.4% of the natural resource damage liability at issue. *See* Plaintiffs' Motion at 8 (ECF No. 85). However, an increase in the calculation of total natural resource damages will dilute that percentage. A higher calculation of natural resource damages will also increase the exposure of those potentially responsible parties that are not among the Settling Defendants. This is especially true as the Proposed Consent Decrees include contribution protection provisions that would bar third party contribution claims against Settling Defendants for their share of the total natural resource damages that are ultimately

---

[4] This document, which is taken from the Portland Harbor NRDA Administrative Record, is available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20 Addendum_1004_2018_Public%20Final%20%282%29.pdf. It is also the subject of Intervenor FMC Corporation's Requests For Judicial Notice, filed concurrently, which Arkema joins. Finally, an annotated version of this document is included as Exhibit A to the Declaration of Matthew Stock in Support of Arkema Inc.'s Opposition to Plaintiffs' Motion to Enter Consent Decrees.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 5*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

calculated by the Phase 3 Damage Assessment. *See* Cash-Out Consent Decree at ¶ 21 (ECF No. 11-1); Restoration Credit Consent Decree at ¶ 89 (ECF No. 4-1).

Arkema is one of the additional parties that the Trustees are likely to pursue for the natural resource damages that are not addressed by the Proposed Consent Decrees. *See* May 1, 2018 Portland Harbor List of Potentially Responsible Parties who are Liability Letter Recipients (based on EPA's notification list).[5] Arkema and its predecessors historically operated an industrial facility at 6400 NW Front Street in Portland. The Trustees have identified this facility as one of the alleged sources of contaminants that have led to natural resource damages at the Assessment Area. *See id.*

For more than 20 years, Arkema has been actively involved in the CERCLA response actions that have taken place in relation to the Portland Harbor Superfund Site (the "Site"), which is generally co-located with the Assessment Area and was placed on the National Priorities List by the United States Environmental Protection Agency ("EPA") in 2000. *See* 65 Fed. Reg. 75179, 75181 (Dec. 1, 2000). Among other things, Arkema was a founding member of the "Lower Willamette Group"—a collection of parties that conducted a comprehensive remedial investigation and feasibility study of the Site. *See* Declaration of Matthew Stock in Support of Arkema Inc.'s Opposition to Plaintiffs' Motion to Enter Consent Decrees ("Stock Decl."), ¶ 2. Arkema was also a member of the "Pre-RD Group"—a separate group of parties that undertook site-wide sampling to update the dataset following the completion of the feasibility study. *See id.* Arkema's work at

---

[5] This document, which is taken from the Portland Harbor NRDA Administrative Record, is available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20180501_PRPs-LiabilityList Recipients_4263.pdf. It is also the subject of Intervenor FMC Corporation's Requests For Judicial Notice, filed concurrently, which Arkema joins. Finally, an annotated version of this document is included as Exhibit B to the Declaration of Matthew Stock in Support of Arkema Inc.'s Opposition to Plaintiffs' Motion to Enter Consent Decrees.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 6*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

the Site continues to this day. It is currently performing remedial design work at River Mile 7W. *See id.*

Arkema is also actively involved in the ongoing private allocation of liability for the response costs that have been and will be incurred in relation to the Site (the "Response Cost Allocation").[6] Arkema has been involved in that allocation process since 2008 and has invested significant resources along the way. Currently, there are more than 100 parties participating in the Response Cost Allocation, which aims to resolve several billion dollars in past and future response costs, thereby paving the way for the eventual cleanup of the Site. *See id.*, ¶ 3.[7]

Arkema is currently defending against similar natural resource damage claims asserted by the Confederated Tribes and Bands of the Yakama Nation (the "Yakama Nation") in the matter of *Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp., et al.*, Case No. 3:17-cv-00164-SB (D. Or) (the "Yakama Nation NRD Litigation"). *See* Stock Decl., ¶ 5; Second Amended Complaint for Recovery of Costs Under CERCLA § 107, Case No. 3:17-cv-00164-SB (D. Or.) (ECF No. 225). Several of the Settling Defendants have also been named as defendants in that lawsuit, which, like this action, concerns liability for natural resource damages allegedly attributable to releases of contaminants to the Willamette River. At the urging of many of the defendants, including the United States, the Yakama Nation NRD Litigation is currently stayed pending the outcome of the Response Cost Allocation. *See* Stock Decl., ¶ 5; Opinion and

---

[6] Separately, Arkema has asserted cost recovery and contribution claims against those potentially responsible parties that refused to take part in the Response Cost Allocation and also refused to enter tolling agreements. Those claims were filed in the matter of *Arkema Inc. v. Anderson Roofing Co., Inc., et al.*, Case No. 3:09-CV-453-PK (D. Or.) (the "Arkema Litigation"), which is currently pending before this court. *See* Stock Decl., ¶ 4.

[7] To date, the remedy for the Site that was selected by EPA and set forth in the January 2017 Record of Decision has not been implemented.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 7*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

Order, Case No. 3:17-cv-00164-SB (D. Or.) (ECF No. 356). This stay was sought, in part, to ensure that the Yakama Nation NRD Litigation did not upend that ongoing allocation process.

Finally, Arkema was also actively involved in the Trustees' early natural resource damages settlement process, funding and participating in both the Phase I and Phase II assessment efforts. *See* Stock Decl., ¶ 6. For the reasons that are discussed in this opposition, however, Arkema grew increasingly disenchanted with, and leery of, the manner in which the Trustees insisted on generating their initial estimate of natural resource damages at the Assessment Area.

### III.   STANDARD OF REVIEW

Plaintiffs have moved for the entry of two Proposed Consent Decrees, which would resolve the Settling Defendants' NRD liabilities arising from releases of hazardous substances to the Assessment Area. Before the Proposed Consent Decrees may be entered, this Court "has an obligation to independently scrutinize" their terms to ensure that they are fair (both procedurally and substantively), reasonable, and consistent with the purposes of the applicable statutes. *See Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014); *United States v. Montrose Chem. Corp. of California*, 50 F.3d 741, 743 (9th Cir. 1995). District courts are cautioned against rubberstamping consent decrees put forward by the government, and are instead expected to conduct an "independent evaluation" of the decrees' terms. *Montrose*, 50 F.3d at 747 (courts "must eschew any rubber stamp approval in favor of an independent evaluation" of the proposed consent decrees (citations omitted)). To that end, "[t]he district court must actually engage with that information and explain in a reasoned disposition why the evidence indicates that the consent decrees are procedurally and substantively fair, reasonable, and consistent with CERCLA's objectives." *City of Tucson*, 761 F.3d at 1012 (internal citations and quotations omitted).

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 8*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-743

Importantly, the district court's independent evaluation must account for the interests of both the signatories to the proposed consent decrees as well as non-settling defendants. *United States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1040 (D. Mass. 1989), *aff'd*, 899 F.2d 79 (1st Cir. 1990) ("Fairness should be examined from the standpoint of signatories and non-parties to the decree." (citations omitted)); *see also United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1152 (9th Cir. 2010).

Proposed consent decrees are accorded some deference, but "the true measure of the deference due depends on the persuasive power of the [government's] proposal and rationale." *Montrose*, 50 F.3d at 746 (internal quotation marks omitted). Furthermore, "the Court need only defer when there is a reasonable, good faith basis for the apportioned liability," which requires "a sufficient factual basis to defer to [the government's] expertise on apportionment of liability." *United States v. Pioneer Nat. Res. Co.*, 452 F. Supp. 3d 1005, 1015 (D. Colo. 2020) (citations and internal quotations omitted); *see also Montrose*, 50 F.3d at 748 ("Deference, however, does not mean turning a blind eye to an empty record on a critical aspect of settlement evaluation.").

## IV.    ARGUMENT

**A.    Without a reliable estimate of natural resource damages, it is impossible for this Court to assess the fairness and reasonableness of the settlements embodied in the Proposed Consent Decrees.**

Before this Court can approve and enter the Proposed Consent Decrees, it must "gauge the adequacy of the settlement amounts to be paid" by Settling Defendants. *Montrose*, 50 F.3d at 747. To do this, the Court must "compare the proportion of total projected costs to be paid by the [Settling Defendants] with the proportion of liability attributable to them." *Id.* (citations omitted). And in order "to determine the proportion of total projected costs to be paid by the [Settling Defendants], the court must know the total projected costs themselves." *Id.* Where there is no

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES - 9 (CASE NO. 3:23-CV-01603-YY)*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-744

evidence of the total projected costs at issue, it is an abuse of discretion to approve a proposed settlement. *Id.* at 746–47 (reversing the district court's approval of a consent decree that purported to resolve natural resource damage liabilities where there was "no evidence on this record from which the district court could have made any determination with respect to estimates of responsibility and damage").

In the context of the Proposed Consent Decrees pending before this Court, "total projected costs" are measured in reference to total natural resource damages, which are currently quantified in terms of DSAYs. Therefore, in order for this Court to assess the fairness and reasonableness of the Proposed Consent Decrees, as it is required to do under *Montrose*, it must know the total quantum of natural resource damages associated with the Site.

**B.      The Trustees have not yet determined the total quantum of natural resource damages associated with the Site, and their "initial" estimate is incomplete and unreliable.**

In this case, the Trustees have not yet completed a full natural resource damage assessment for the Site. *See, e.g.*, Cash-Out Consent Decree, Recital I ("the Trustee Council has initiated but not yet completed a natural resource damage assessment for the Portland Harbor Natural Resource Damage Assessment Area") (ECF No. 11-1). Instead, they have—by their own admission—simply completed an "initial" estimate of those damages based on a "streamlined" assessment. *See* Declaration of Troy Baker In Support of Plaintiffs' Motion To Enter Consent Decrees, ¶ 7 (ECF No. 85-1); Plaintiffs' Response to Public Comments at 17 (noting that "this settlement is based upon an initial estimate of damages") (ECF No. 85-3); *see also* Motion at 20, n.7 ("The Trustees' HEA model was developed specifically for the early settlement process and thus is a 'preliminary' estimate of damages.") (ECF No. 85). This initial estimate was not performed in accordance with the natural resource damage assessment regulations promulgated by the United States Department

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 10*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

of the Interior, 43 C.F.R. Part 11.[8] Rather, they were assessed through a "streamlined" process that was utilized for purposes of early settlement. Therefore, the Trustees' initial estimate is not entitled to the rebuttable presumption established by Section 107(f)(2)(C) of CERCLA. *See* 42 U.S.C. 9607(f)(2)(C) ("Any determination or assessment of damages to natural resources for the purposes of this chapter and section 1321 of Title 33 made by a Federal or State trustee in accordance with the regulations promulgated under section 9651(c) of this title shall have the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding under this chapter or section 1321 of Title 33.").[9] In the absence of that rebuttable presumption, the burden is on the Trustees to show that the Proposed Consent Decrees are fair and reasonable. Given the deficiencies and uncertainties described below, the Trustees cannot make that showing.

---

[8] The Trustees cite a provision of these regulations, stating that "CERCLA regulations also provide for a 'preliminary estimate of damages." *See* Plaintiffs' Motion at 20 n.7 (ECF No. 85). While true, the regulation at issue—43 C.F.R. § 11.38—makes clear that the purpose of such preliminary estimates is to inform the nature and scope of the subsequent formal damage assessment. *See* 43 C.F.R. § 11.38(b) ("The purpose of the preliminary estimate of damages is for reference in the scoping of the Assessment Plan to ensure that the choice of the scientific, cost estimating, and valuation methodologies expected to be used in the damage assessment fulfills the requirements of reasonable cost, as that term is used in this part. The authorized official will also use the preliminary estimate of damages in the review of the Assessment Plan, as required in § 11.32(f) of this part, to ensure the requirements of reasonable cost are still met."); *see also Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1225 (D.C. Cir. 1996) ("The preliminary estimate is a rough estimate, based on existing data, of the ultimate amount of damages. The purpose of the preliminary estimate is to determine the proper scope of the assessment."). This regulation provides no support whatsoever for the notion that preliminary estimates should be used for, or are otherwise sufficient to support, settlements with responsible parties.

[9] Generally speaking, natural resource damage assessments that are performed pursuant to the regulations promulgated by the United States Department of the Interior, 43 C.F.R. Part 11, may be entitled to a rebuttable presumption under Section 107(f)(2)(C) of CERCLA. That, however, is not the case here.

---

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 11*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-746

**1.** **The HEA model that the Trustees used to generate their "initial" estimate of natural resource damages has never been validated for the Assessment Area and will be abandoned as part of the Phase 3 Damage Assessment.**

In generating their "initial" estimate of natural resource damages, the Trustees chose to rely upon a HEA model originally developed for Commencement Bay, a contaminated marine site in Tacoma, Washington. The Trustees' have conceded that their decision to use the HEA model was based on expediency rather than accuracy:

> The Portland Harbor Trustee Council elected to rely on Commencement Bay service loss relationships because: 1) they are suitable for use at other locations in the Pacific Northwest with similar ecological attributes; and 2) *the development of site-specific Portland Harbor service loss relationships would have been costly, time-consuming, and unnecessary* for a settlement-oriented, cooperative NRDA process.

*See* May 14, 2015 Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement at A-5 (fn. 2) (emphasis added).[10]

The HEA model, which purports to estimate ecological service losses based on, among other things, the relationship between concentrations of certain contaminants and impacts to certain benthic invertebrate and fish species present in Commencement Bay (including a marine flatfish species that does not exist within the Willamette River), has never been validated for the Assessment Area.[11] Indeed, the Trustees' declarant, Troy Baker, admits that this model is not

---

[10] This document, which is taken from the Portland Harbor NRDA Administrative Record, is available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20230401_PH%20Ph2%20PthC %20SummaryPreface_5383.pdf. It is also the subject of Intervenor FMC Corporation's Requests For Judicial Notice, filed concurrently, which Arkema joins. Finally, an annotated version of this document is included as Exhibit C to the Declaration of Matthew Stock in Support of Arkema Inc.'s Opposition to Plaintiffs' Motion to Enter Consent Decrees.

[11] Arkema, which was a funding party throughout the Trustees' settlement-oriented natural resource damage assessment process, repeatedly raised these concerns but never received a satisfactory response from the Trustees. Meanwhile, of the 12 contaminants evaluated, the Trustees only developed a site-specific service loss relationship for one. *See, e.g.*, Plaintiffs' Response to Public Comments at 25–26 ("The Settling Trustees therefore developed a revised PAH service loss

---

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 12*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-747

"definitive." Declaration of Troy Baker In Support of Plaintiffs' Motion To Enter Consent Decrees, ¶ 16 (ECF No. 85-1). As such, the accuracy and applicability of the damages that the model predicted are uncertain.[12]

Tellingly, the Trustees intend to abandon the HEA model in favor of a more robust resource equivalency analysis ("REA") model for purposes of the Phase 3 Damage Assessment. *See* Plaintiffs' Response to Public Comments at 17 ("HEA will not be the basis of the formal damage assessment now under development.") (ECF No. 85-3). The Trustees have explained the rationale for this methodological change in their Phase 3 Damage Assessment Plan, where they reference inadequacies in the HEA model:

> **Comment 2a.** What is the rationale for changing to [a] REA? . . .
>
> **Response 2a.** . . . The rationale for making this change from Phase 2 to Phase 3 is based on the Trustees' judgment that the proposed approach [*i.e.*, the REA] will, in this case, best measure adverse changes in the viability of natural resources resulting from exposure to contaminants (see 43 CFR § 11.14(v)) and best determine the quantity and type of appropriate habitat needed to fully address the measured losses.

---

relationship specifically for use in the Portland Harbor HEA that incorporated additional available data from fish toxicity studies, Portland Harbor site-specific benthic toxicity studies, freshwater literature-based sediment effect concentrations, and the State of Oregon freshwater water sediment guidelines.") (ECF No. 85-3).

[12] In their responses to Arkema's public comments, the Trustees' state that they "determined that the Commencement Bay service loss relationships reflect relevant endpoints, species, and species groups." *See* Plaintiffs' Response to Public Comments at 25 (ECF No. 85-3). The Trustees, however, have withheld the "detailed calculations for the HEA" as confidential information. *See id.* at 49 ("the detailed calculations for the HEA and party-specific allocations are part of the confidential settlement process"). It is therefore impossible to vet the accuracy of their assertion. Beyond that, it is also undermined by the Trustees' abandonment of the HEA model for purposes of the Phase 3 Damage Assessment.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 13*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

*See* October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan at A-1 – A-2.[13]

In light of this acknowledgment, it strains credibility for the Trustees to contend that the HEA model is sufficient to support the settlements that are embodied in the Proposed Consent Decrees.[14] Stated differently, if the HEA model that was used to generate the initial estimate of natural resource damages is not accurate or reliable enough to carry over to the formal Phase 3

---

[13] This document, which is taken from the Portland Harbor NRDA Administrative Record, is available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20 Addendum_1004_2018_Public%20Final%20%282%29.pdf. It is also the subject of Intervenor FMC Corporation's Requests For Judicial Notice, filed concurrently, which Arkema joins. Finally, an annotated version of this document is included as Exhibit A to the Declaration of Matthew Stock in Support of Arkema Inc.'s Opposition to Plaintiffs' Motion to Enter Consent Decrees.

[14] In their response to public comments, the Trustees also suggest that the magnitude of the restoration projects demonstrates the reasonableness of the initial estimate of damages generated by the HEA model, stating:

> While the detailed calculations for the HEA and party-specific allocations are part of the confidential settlement process, information in the public record provides a guide for evaluating those calculations. Regarding the estimate of site-wide damages and restoration necessary for compensation, the Settling Trustees' calculations established a total of 4,130 DSAYs. One can understand this more concretely by comparing it to the value of the four large restoration projects represented in the Restoration Credit Decree. The total value of those projects, if and when fully developed to Settling Trustee standards and used wholly to resolve natural resource damages liability (rather than for mitigation or other legal frameworks) would be 2,143.92 DSAYs. This amount is roughly half of the quantum of restoration needed to address the total damages the Settling Trustees estimated. This provides an on-the-ground sense of how much restoration would be necessary to fully address all natural resource injuries for the Portland Harbor Assessment Area, as assessed by the Settling Trustees in their settlement process, not just the approximately 11% of total injuries captured in the Consent Decrees.

Plaintiffs' Response to Public Comments at 49–50 (ECF No. 85-3). Similar logic was rejected by the *Montrose* court. *See Montrose*, 50 F.3d at 745 ("Notably absent from the Special Master's report, however, is any reference to the governments' estimates—preliminary or otherwise—of the potential total natural resource damages. Rather, the Special Master's report simply notes that one of the factors reflective of the consent decree's reasonableness is its relationship to the estimates of restoration and response costs." (internal quotations omitted)).

---

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 14*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

Damage Assessment—as the Trustees have determine and expressly acknowledged—then it should not be used by the Trustees or this Court as the basis for the proposed settlements.

Rather than address this issue head-on, the Trustees' seek to deflect. In their responses to Arkema's public comments, they state that "nobody can predict the outcome of studies that will inform the damage assessment." *See* Plaintiffs' Response to Public Comments at 18 (ECF No. 85-3). In their Motion, the Trustees take things one step further, casting this alleged uncertainty to the side and stating that it is, in fact, unreasonable for Arkema to conclude that the total damages calculation will increase as a result of the forthcoming Phase 3 Damage Assessment:

> Arkema's assumption that a formal damage assessment necessarily will produce a larger estimate of total damages is not well-grounded: while the formal damage assessment will be based on more site-specific injury studies than the HEA model, the outcome of those studies is not yet known (and was not known when the settlements with Defendants were negotiated).

Motion at 21 (ECF No. 85).

The Trustees provide no evidentiary support for the implicit suggestion that the Phase 3 Damage Assessment could result in a smaller quantum of total natural resource damages. Meanwhile, Arkema's expectation that the Phase 3 Damage Assessment will result in a larger calculation of total natural resource damages is based, in part, on the inherent differences in the HEA model that the Trustees used to generate the "initial" estimate and the REA model that will be used for purposes of the formal damage assessment. Notably, the REA model will analyze impacts to a greater number of species and a greater number of categories of natural resource services than the HEA model did. The HEA model focused on the relationship between certain contaminants and the ecological services provided by benthic invertebrates and fish. *See, e.g.*, Plaintiffs' Response to Public Comments at 25 ("Most of these [service loss] relationships were based on data on benthic invertebrates; however, the service loss estimates for PCBs and PAHs

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 15*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-750

also included data on salmonids and flatfish, respectively.") (ECF No. 85-3). In contrast, the REA model will analyze ecological service losses associated with benthic invertebrates and fish, as well as mammals (e.g., mink) and piscivorous birds (e.g., osprey, bald eagle). *See* October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan at Exhibit 3-1 and Section 4.2 (summarizing the Trustees' proposed additional natural resource damage studies). [15]

The REA model will also evaluate impacts to categories of natural resources that were not considered by the HEA model, including recreational resources (e.g., fishing, boating) and tribal resources (e.g., changes in levels of traditional knowledge, cultural practices, and relationships resulting from shifts in the use of natural resources caused by the presence of hazardous substances). *See id.* In light of the REA model's more expansive scope—which will account for both additional receptors (*i.e.*, species not considered by the HEA model) and additional resource categories—it stands to reason that the resulting calculation of natural resource damages will be materially larger than the damages set forth in the Trustees' "initial" estimate. While it is impossible to predict just how much larger the calculation of natural resource damages could be, the likelihood of an increase makes it impossible for this Court to assess the fairness or reasonableness of the Proposed Consent Decrees.

---

[15] This document, which is taken from the Portland Harbor NRDA Administrative Record, is available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20 Addendum_1004_2018_Public%20Final%20%282%29.pdf. It is also the subject of Intervenor FMC Corporation's Requests For Judicial Notice, filed concurrently, which Arkema joins. Finally, an annotated version of this document is included as Exhibit A to the Declaration of Matthew Stock in Support of Arkema Inc.'s Opposition to Plaintiffs' Motion to Enter Consent Decrees.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 16*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-751

**2.    The Trustees' forthcoming Phase 3 Damage Assessment is also likely to account for damages that may be attributable to additional contaminants, remedial actions not yet performed, and geographical areas not yet evaluated.**

Arkema's expectation that the total quantum of natural resource damages will increase when the Phase 3 Damage Assessment is completed is also based on the Trustees' representations that that assessment may account for damages that could be associated with additional contaminants, remedial actions not yet completed, and geographic areas not yet evaluated. This is all documented in their Phase 3 Damage Assessment Plan:

- On page 3-1, the Trustees state that "[o]ther COCs [*i.e.*, contaminants of concern] may warrant further examination as additional information becomes available." *See* October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan at 3-1.[16]

- On pages 3-4 and 3-5, the Trustees indicate that the Phase 3 Damage Assessment will evaluate "injury caused by remedial actions" that have not yet been implemented at the Site. *See id.* at 3-4 – 3-5.

- On page A-5, the Trustees suggest that the geographic scope of the formal assessment may expand beyond the boundaries of the current assessment area and extend as far as the Columbia River, stating:

> [T]he Trustee Council may expand the geographic scope of their studies in the future as the assessment progresses and further information is developed, including

---

[16] This document, which is taken from the Portland Harbor NRDA Administrative Record, is available at https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final%20%282%29.pdf. It is also the subject of Intervenor FMC Corporation's Requests For Judicial Notice, filed concurrently, which Arkema joins. Finally, an annotated version of this document is included as Exhibit A to the Declaration of Matthew Stock in Support of Arkema Inc.'s Opposition to Plaintiffs' Motion to Enter Consent Decrees.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 17*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

> information indicating a likelihood of injury to Columbia River resources resulting from contaminants attributable to Portland Harbor sources.

*See id.* at A-5. Any of these expansions to the overall scope of the assessment, standing alone, would almost certainly result in a larger calculation of natural resource damages.

In their responses to Arkema's public comments, the Trustees try to brush these concerns aside, employing the same "anything's possible" logic that was deployed to try to downplay the shift from the HEA model to the REA model. For instance, rather than addressing the likelihood that a larger assessment area will result in a larger estimate of damages, the Trustees claim that Arkema "ignores that the relevant geographic area could also decrease." *See* Plaintiffs' Response to Public Comments at 19 (ECF No. 85-3). In light of the Trustees' own statements in the Phase 3 Damage Assessment Plan—which expressly reference the likely expansion of the relevant assessment area—the Trustees' unsubstantiated assertion to the contrary is simply not credible.

**C.**      **As a result of the deficiencies inherent in the Trustees' "initial" estimate of damages and the uncertainties in the scope of the formal assessment of damages, it is impossible to determine whether the settlements embodied in the Proposed Consent Decrees are fair or reasonable.**

As discussed above, the Trustees' "initial" estimate of natural resource damages—the estimate on which the settlements embodied in the Proposed Consent Decrees are based—(1) was generated using a model that has been deemed insufficient by the Trustees and will not be carried over to the Phase 3 Damage Assessment, (2) likely resulted in a smaller quantum of natural resource damages compared to what the REA model will generate, and (3) fails to account for additional contaminants, additional geographic areas, and additional damage that may arise as a result of remedy implementation at the Site—any of which would likely further increase the total quantum of damages calculated as part of the Phase 3 Damage Assessment.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 18*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-753

Nonetheless, the Trustees contend that their "initial" estimate is good enough in the eyes of the law. They cite to *Montrose*, claiming that that decision "makes clear that, where trustees have developed an estimate of total damages, 'preliminary or otherwise,' that estimate may be the basis of settlement." *See* Motion at 21 (ECF No. 85). The Trustees, however, are attempting to convert the court's dicta to law. The *Montrose* court did not hold that preliminary or initial estimates of damages are, in every instance, all that is required to support proposed settlements. Rather, the *Montrose* court simply held that where there is *no* evidence of such damages, it is an abuse of discretion for a district court to approve of the resulting settlement. *Montrose*, 50 F.3d at 746–47.

Indeed, several district court opinions make clear that where initial or preliminary estimates of natural resource damages fail to provide the court with sufficient evidence to gauge the fairness and reasonableness of the proposed settlements, those proposed settlements should be rejected. For instance, in *State of Utah By & Through Utah State Dep't of Health v. Kennecott Corp.*, 801 F. Supp. 553 (D. Utah 1992), the district court was asked to approve a consent decree that would have resolved the State of Utah's natural resource damage claims against the Kennecott Corporation, which arose from the impacts of Kennecott's historic mining activities on groundwater. *Id.* at 555. The trustee in that case had not yet prepared a formal natural resource damage assessment. Instead, it had prepared a "preliminary" estimate of damages but then negotiated a settlement with Kennecott based on further revisions to that estimate. *Id.* at 557–61. The district court refused to approve the consent decree in response to the trustee's motion and instead ordered an evidentiary hearing on the fairness and reasonableness of the proposed settlement. *Id.* at 561. In its resulting written decision, the court started with the following observation, which is equally relevant to the instant proceedings:

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 19*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-754

> In this case the State chose not to follow the existing federal regulations in making its determinations. It was not required to do so, but failure to do so eliminates the presumption of validity and correctness which otherwise the State would enjoy. This is important in a case such as this where the State has chosen to settle its damage claim *before* the remediation process. This "cart before the horse" approach is unusual as noted by the court in *In re Acushnet River and New Bedford Harbor: Proceedings re Alleged PCB Pollution,* 712 F. Supp. 1019, 1035 (D. Mass. 1989).

*Id.* at 567–68 (emphasis in original; footnotes omitted).[17] The court then rejected the trustee's proposed consent decree on several grounds, including the trustee's failure to properly assess damages. *Id.* at 568 ("The court has determined from a preponderance of the evidence at the hearing that the settlement contained within the proposed [c]onsent decree is deficient in at least three major respects. . . . Third, failure to apply the proper measure of damages, which resulted in failure adequately to take into account the extent of the damages the State has suffered and will suffer as a result of the contamination. . . . Inadequate consideration of damages requires that the proposed Consent Decree be rejected for failure to satisfy substantive fairness under CERCLA."). In particular, the court was troubled by the possibility of additional natural resource damages that had not been accounted for in the proposed settlement. *See id.* at 571 ("It appears to the court that significant additional possible damages such as loss of the aquifer are not provided for in the proposed Consent Decree, even assuming that loss of value ultimately is determined to be the

---

[17] The passage from the *Acushnet* decision that the *Kennecott* court referenced is this:

> [C]ustomarily, natural resource damages settlements follow or are contemporaneous with cleanup settlements. This is so because, customarily, natural resource damages are viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup, together with the lost use value and the costs of assessment. As a residue of the cleanup action, in effect, they are thus not generally settled prior to a cleanup settlement.

*In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution*, 712 F. Supp. 1019, 1035 (D. Mass. 1989). As mentioned above, the remedy for the Portland Harbor Superfund Site has not yet been implemented.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES - 20 (CASE NO. 3:23-CV-01603-YY)*

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

proper standard."). The court concluded "that inadequate consideration of damages requires that the proposed Consent Decree be rejected for failure to demonstrate to the court the existence of substantive fairness under CERCLA." *Id.*

Similarly, in *Commissioner of Department of Planning & Natural Resources v. Century Alumina Co.*, CIV. 2005/0062, 2008 WL 4693550 (D.V.I. Oct. 22, 2008), the district court was asked to approve a consent decree that would resolve, among other things, defendant St. Croix Renaissance Group, L.L.L.P.'s natural resource damage liabilities arising from contamination at the South Coast Industrial Area in St. Croix. *Id.* at *1.[18] In support of the motion to enter the decree, the trustee had offered a "preliminary" quantification of natural resource damages. *Id.* at *4. However, because that preliminary quantification was based on only a portion of the area impacted by contaminants, the Court could not ascertain whether the total payment amount—relative to the *total* natural resource damages, an amount that had not yet been calculated—was fair. *Id.* at *4–5 ("Without further quantifying of the total damages and natural resources damages, the Court has no means of assessing whether Renaissance's payment of only $180,000 is substantively fair."). Accordingly, the court concluded that it lacked the evidence necessary for it to independently determine whether the proposed decree was fair, reasonable, and consistent with the goals of CERCLA and, thus, refused to enter the decree. *Id.* at *7.

---

[18] This case, a copy of which is attached as an exhibit to the Stock Declaration for the court's reference, is unpublished and has been flagged as "not precedential." *See* Stock Decl., Ex. D. That said, Arkema is not relying on it as binding precedent. In fact, it could not. *See Starbuck v. City & Cty. of S.F.*, 556 F.2d 450, 457 n.13 (9th Cir. 1977) ("The doctrine of stare decisis does not compel one district court judge to follow the decision of another."). Rather, Arkema simply cites this case as an example of a district court rejecting a proposed natural resource damage consent decree despite the preparation of a preliminary quantification of natural resource damages.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 21*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

As *Kennecott* and *Century Alumina* make clear, where preliminary or initial estimates of natural resource damages do not offer reasonable and reliable calculations of the total damages at issue, those preliminary or initial estimates of damages do not provide the district courts with sufficient evidence to establish the fairness and reasonableness of the proposed settlements. *See also Montrose*, 50 F.3d at 747 ("[T]he proper way to gauge the adequacy of settlement amounts to be paid by settling PRPs is to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them*,* and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified. Of course, to determine the proportion of total projected costs to be paid by the settlors, the court must know the total projected costs themselves." (citations and internal quotations omitted)).

Here, the Trustees' "initial" estimate of damages does not provide this Court with a reasonable and reliable estimate of the total quantum of natural resource damages likely to be calculated for the Site. In fact, similar to the preliminary assessments in both *Kennecott* and *Century Alumina*, the Trustees' "initial" estimate likely underreports the total damages that will be generated through the forthcoming Phase 3 Damage Assessment. Accordingly, this Court should reject the Trustees' motion and decline to approve the Proposed Consent Decrees.

**D.      The contribution protection afforded by the Proposed Consent Decrees is overly broad and prejudicial to non-settling defendants.**

The Proposed Consent Decrees provide broad contribution protection to the Settling Defendants, insulating them from third party contribution claims relating to "Covered Natural Resource Damages":

> The Settling Parties agree, and by entering this Consent Decree this Court finds, that this settlement constitutes a judicially-approved settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and ORS 465.325(6)(b), and that Settling Defendants are entitled, as of the Effective Date of this Consent

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'
MOTION TO ENTER CONSENT DECREES - 22*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-757

Decree, to protection from contribution actions or claims as provided by Section 113(f)(2) and ORS 465.325(6)(b), or as may be otherwise provided by law, for Covered Natural Resource Damages[.]

*See* Cash-Out Consent Decree, ¶ 21(ECF No. 11-1); Restoration Credit Consent Decree, ¶ 89 (ECF No. 4-1).

"Covered Natural Resource Damages" encompass any natural resource damages resulting from the Settling Defendants' historic releases of contaminants into the Assessment Area, regardless of where those contaminants have come to be located:

> [D]amages, including costs of damage assessment, recoverable by Plaintiffs . . . for injury to, destruction of, or loss of and/or loss of use of natural resources and/or resource services resulting from releases of hazardous substances or discharges of pollutants at or from the properties identified in Appendix A for each Settling Defendant into the Portland Harbor Natural Resource Damage Assessment Area, where the disposal of hazardous substances or releases of pollutants causing such releases or discharges into the Portland Harbor Natural Resource Damage Assessment Area occurred on or before the Effective Date of this Consent Decree.

*See* Cash-Out Consent Decree, ¶ 3(b) (ECF No. 11-1); Restoration Credit Consent Decree, ¶ 3(d) (ECF No. 4-1); *see also* Plaintiffs' Response to Public Comments at 36 (emphasis in original) (ECF No. 85-3) ("these provisions extend our covenants not to sue and contribution protection to natural resource damages outside of the Portland Harbor Assessment Area, even if those damages were caused by releases of hazardous substances or discharges of pollutants from Settling Defendants' identified facilities *into* the Portland Harbor Assessment Area.") (ECF No. 85-3).

Given the deficiencies in the Trustees' "initial" estimate of damages, and the uncertainty over the ultimate extent and quantum of natural resource damages that the Trustees may use as the basis of future claims against non-settling defendants, both of which are discussed at length above, this level of contribution protection is neither reasonable nor fair. In the likely event that the Trustees ultimately conclude that there is an additional quantum of natural resource damages

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 23*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-758

associated with the Site, the non-settling defendants—each of whom will face allegations of joint and several liability for such damages—will have no recourse against any Settling Defendant for its share of those additional damages.[19]

Moreover, the contribution protection provisions may also bar non-settling defendants from asserting contribution claims against Settling Defendants in the ongoing Yakama Nation NRD Litigation, in which the Yakama Nation has asserted its own claims for natural resource damages arising in relation to the Assessment Area.[20] Arkema raised this concern in its public comments. *See* Public Comments Received on Consent Decrees at 17 n.20 (ECF No. 85-2). In response, the Trustees suggest the contribution protection provided by the Proposed Consent Decrees may not extend to the Yakama Nation's claims, stating:

> "[R]ecovery of natural resources by the Yakama Nation would require a showing that the total amount of the damages being sought exceeds the amount of the settlement in the Consent Decrees. If such a showing were made, defendants in that case who are not Settling Defendants under the Consent Decrees [e.g., Arkema] could bring contribution claims against Settling Defendants if Settling Defendants' share of the additional quantum of damages established in the Yakama Nation suit exceeded the amount of the settlement with Settling Defendants in the Consent Decrees.

*Id.* at 38 (ECF No. 85-3). The problem with this response is that it is inconsistent with the broad contribution protection provisions set forth in the Proposed Consent Decrees, which provides no

---

[19] *See, e.g.*, Plaintiffs' Response to Public Comments at 52 ("Once the combined relief from all settlements is deducted from the total quantum of natural resource damages, non-settling potentially responsible parties would face joint and several liability for the remaining unresolved natural resource damages.") (ECF No. 85-3); Cash-Out Consent Decree, Recital L ("Plaintiffs further assert that all PRPs who contributed to the contamination are jointly and severally liable for all injuries to natural resources that have resulted from the contamination.") (ECF No. 11-1 ).

[20] The Yakama Nation has, in a separate bankruptcy proceeding, indicated that its claim for natural resource damages is $962,030,000. *See* Yakama Nation Proof of Claim (Claim 29-1), filed in the matter of *In re HAJ, Inc. dba Christenson Oil*, No. 16-32787-pcm7 (D. Or. Bankr. Ct.). This notice of claim is subject to FMC Corporation's Requests for Judicial Notice, which Arkema joins.

---

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 24*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-759

exception or carve-out for claims asserted by the Yakama Nation. It is also inconsistent with the Trustees' own sweeping interpretation of that language. *See id.* at 36 (quoted above) (ECF No. 85-3).

In its public comments, Arkema suggested that if the Trustees were to seek entry of the Proposed Consent Decrees despite the fundamental problems with the initial damage estimate on which they are based, that the Trustees should at least modify the contribution protection provisions so as to (1) exclude those damages that are assessed beyond the current boundaries of the Assessment Area, (2) exclude any additional damages identified and quantified as part of the Phase 3 Damage Assessment, and (3) exclude any damages sought by the Yakama Nation in the Yakama Nation NRD Litigation. *See* Public Comments at 17. The Trustees, however, rejected those recommendations. While Arkema believes that the Trustees have failed to provide this Court with the evidence it needs to approve the Proposed Consent Decrees, Arkema would ask, in the alternative, that the Court condition the entry of the Proposed Consent Decrees on such modifications to mitigate the unfairness inherent in the current contribution protection provisions.

E.   **CERCLA's emphasis on early settlements does not absolve the Trustees' of their responsibility to demonstrate the fairness and reasonableness of the Proposed Consent Decrees.**

The Trustees contend that the Proposed Consent Decrees should be entered because "[e]arly settlements are encouraged and appropriate." *See* Plaintiffs' Response to Public Comments at 17 (ECF No. 85-3); *see also* Motion at 20 ("The statute is structured to encourage early settlements . . . .") (ECF No. 85). The Trustees also insist that if they "could only use formal damages assessments . . . as the basis for settlements, then early settlements of natural resource damage claims would be exceptionally rare, if not impossible." *See* Plaintiffs' Response to Public Comments at 18 (ECF No. 85-3). These arguments are red herrings. Arkema does not dispute that

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 25*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-760

one of CERCLA's general goals is to facilitate early settlements, but that goal does not absolve the Trustees from putting forth sufficient evidence to justify their proposed settlements. *See, e.g.*, *Montrose*, 50 F.3d at 748 (reversing the district court's approval of a consent decree despite "CERCLA's primary goal of encouraging early settlement"). Furthermore, Arkema is not arguing that natural resource damage settlements are only appropriate where formal damage assessments have been completed. Arkema is simply arguing that the incomplete and unreliable "initial" estimate of damages that the Trustees have conducted to date at the Assessment Area does not support the settlements currently before this Court.

**F.      Finally, the settlements embodied in the Proposed Consent Decrees run the risk of undermining the ongoing private allocation of liability for response costs at the Portland Harbor Superfund Site.**

Arkema has been engaged in the ongoing Response Cost Allocation since that allocation's inception in 2008. *See* Stock Decl., ¶ 3. It has invested significant time and money in that process, as have the nearly 100 other parties that are currently involved. *See id*. It is Arkema's hope and expectation that a successful Response Cost Allocation will facilitate settlements and the eventual performance of remedial action at the Site. The Proposed Consent Decrees, which are predicated on the development and implementation of a competing (but far less robust and inclusive) allocation process, may undermine that ongoing allocation process.

The Trustees appropriately acknowledge that "this would be an adverse result." *See* Plaintiffs' Response to Public Comments at 30 (ECF No. 85-3). But they contend that the following language, which appears in both Proposed Consent Decrees, ameliorates this concern:

> The Settling Parties agree that they will not cite or use this settlement or the Path C NRD allocation results in any forum as evidence of liability for remedial action or response costs. Nor shall the Settling Parties cite or use this settlement or the Path C NRD allocation results to contend that they are relevant to, or determinative of, their share of remedial action or response costs, including but not limited to in any

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES - 26 (CASE NO. 3:23-CV-01603-YY)*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-761

allocation of liability conducted by or among the Settling Parties or other PRPs or in any judicial or administrative proceeding concerning remedial action or response costs, except in rebuttal to another PRP's use of the Path C NRD allocation results.

*See* Cash-Out Consent Decree, ¶ 23 (ECF No. 11-1); Restoration Credit Consent Decree, ¶ 91 (ECF No. 4-1).

By its terms, this provision only precludes the Settling Defendants from citing the allocations reflected in the Proposed Consent Decrees, and even then, includes a potentially expansive carve-out for those instances where another party introduces them as evidence. This provision does not preclude decisionmakers (e.g., allocators responsible for the Response Cost Allocation) or those third parties that may believe that they are similarly situated to the Settling Defendants from relying on those allocations. Indeed, in their response to Arkema's comments, the Trustees concede that there is a possibility that the Proposed Consent Decrees could impact the Response Cost Allocation. *See* Plaintiffs' Response to Public Comments at 30, n.70 ("Although non-settling parties (including judges and other decision-makers in other forums) are not expressly prohibited from using those documents, *we assume any such usage would be quite limited*." (emphasis added)) (ECF No. 85-3). Given the stakes involved in that allocation process, even "limited" interference would be too much.

Furthermore, the limitation set forth in the language quoted above may not be legally enforceable. In *Washington v. United States*, No. CIV. 06-05225RJB, 2007 WL 3025843 (W.D. Wash. Oct. 15, 2007), the District Court for the Western District of Washington specifically rejected the inclusion of similar language in a proposed consent decree that would have resolved

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 27*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-762

the United States' liability for natural resource damages at Commencement Bay.[21] As Judge Bryan stated:

> The Court cannot and should not prohibit the use of the Consent Decree in future actions. The Consent Decree is part of the record accessible by the public, and the Court is aware of no legal authority, or for that matter any sensible public policy, that supports preventing the use of the Consent Decree by parties in future actions.

*See id.* at *10.

In the event that the Settling Defendants were able to cite to or rely on the allocations set forth in the Proposed Consent Decrees as evidence of their responsibility for response costs, that could have a profound impact on the ongoing Response Cost Allocation.

In their response to comments, Trustees contend that Arkema's concerns are unfounded. They distinguish the language at issue in *Washington* (which precluded the use of the consent decree *against* the settling parties) from the language set forth in the Proposed Consent Decrees (which purports to preclude the use of the Proposed Consent Decrees *by* the settling parties) and conclude that *Washington* is inapposite. That distinction, however, fails to account for the sweeping language used in the *Washington* decision, which makes clear that there is no legal authority or public policy that supports a prohibition on any party's use of a consent decree in any future action.[22]

Notably, the United States has previously moved to stay related proceedings that could have upended the Response Cost Allocation. In 2017, the Yakama Nation filed its own complaint

---

[21] In that case, the language at issue was: "This Consent Decree shall not be used against any Party in any action or proceeding other to enforce the terms of this Consent Decree." *See Washington*, 2007 WL 3025843 at *10.

[22] Even if one were to assume that the language in the Proposed Consent Decrees is legally valid and enforceable as between the signatories, the non-settling defendants have no independent ability to enforce the provisions of those decrees.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 28*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-763

against a number of parties, include several Settling Defendants and non-settling parties, seeking natural resource damages associated with Portland Harbor. *See generally Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp. et al.*, Case No. 3:17-cv-00164-SB (D. Or.) (the "Yakama Nation NRD Litigation"). In that matter, the United States sought a stay on account of the extensive overlap between the Yakama Nation's natural resource damage claims and the Response Cost Allocation, arguing as follows:

> For any claims remaining after the Court's consideration of all motions to dismiss, the Court should exercise its discretion to stay this case pending the outcome of the Portland Harbor non-judicial allocation process [*i.e.*, the Response Cost Allocation] that has been underway in connection with the *Arkema* litigation. Consideration of the factors articulated by the Ninth Circuit . . . support a stay here.

> First, a stay is supported to achieve the orderly and efficient course of proceedings in this case, the *Arkema* litigation, and the non-judicial response cost allocation process. As explained in the United States' Notice of Related Cases . . . , there is significant overlap of the parties and issues in this case, the *Arkema* case, and the non-judicial response cost allocation process. The Yakama Nation's claim here for CERCLA response costs relating to releases or threatened releases of hazardous substances from the Site, overlaps with the claims for response costs by the *Arkema* plaintiffs arising out of the contamination at the Site, and with the issues that are being addressed by the numerous parties in the non-judicial allocation response cost process concerning liability for and allocation of response costs arising from contamination at the Site. Moreover, the liability claims in both cases and the allocation issues that are being addressed through the non-judicial response cost allocation process are based on some of the same information, e.g., historical documentation, the RI/FS, etc.

> Finally, the Yakama Nation's claim here for a declaratory judgment on liability for future natural resource assessment costs also arises out of the same releases or threated releases of hazardous substances from the Site. Although it appears that the Yakama Nation's assessment cost claim is different in geographic scope from the current natural resource damage assessment being conducted by Federal and State Trustee agencies and the other five Tribal Governments, *i.e.*, the Yakama Nation's claim covers assessment costs outside the area covered by the other Trustees' assessment, . . . the Yakama Nation's assessment cost claim addresses many of the same contamination releases as those that are at issue in the *Arkema* litigation (as evidenced by the parties they have sued) and in the non-judicial response cost allocation process. A stay of these proceedings therefore would support the orderly and efficient course of these proceedings.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CONSENT DECREES - 29 (CASE NO. 3:23-CV-01603-YY)*

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-764

*See* United States' Opposed Motion and Memorandum in Support to Dismiss a Portion of Claim 2 and Stay the Remaining Claims of Plaintiff's Second Amended Complaint, Case No. 3:17-cv-00164-SB, at 16–18 (citations omitted) (ECF No. 253); *see also* United States' Amended Notice of Related Cases Pursuant to LR 42-2, Case No. 3:17-cv-00164-SB, at 6 ("Given the overlap between this current litigation and the *Arkema* litigation, as well as the overlap between the non-judicial allocation process that prompted the stay of the *Arkema* litigation, these two cases should be designated as related and treated accordingly.") (ECF No. 146). The court granted the stay. *See* August 8, 2019 Opinion and Order, Case No. 3:17-cv-00164-SB (ECF No. 356).[23]

The Yakama Nation's natural resource damage claims are, for all intents and purposes, indistinguishable from the Trustees' natural resource damage claims. Both share substantial overlap with issues being addressed and resolved through the Response Cost Allocation, which, by the government's own logic, should be allowed to conclude before any natural resource damages claims are resolved.

Arkema raised this point in its public comments. In response, the Trustees engage in revisionist history and claim that the real concern with the Yakama Nation's claims was that they would lead to litigation, not that they could result in a competing allocation of liability. *See* Plaintiffs' Response to Public Comments at 31 ("Most of the remainder of the comments points to the concern articulated by the United States in the Yakama Nation action that litigating liability in that case would undermine the ongoing non-judicial allocation of response costs being conducted while the Arkema case is stayed. However, that concern is not applicable here because, once the Court enters the Consent Decrees, our natural resource damage claims would be *settled*, not

---

[23] The cited pleadings from the Yakama Nation NRD Litigation are the subject of Intervenor FMC Corporation's Requests For Judicial Notice, filed concurrently, which Arkema joins.

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 30*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-765

*litigated*." (emphasis in original; footnote omitted)) (ECF No. 85-3); *see also* Motion at 15–16 (ECF No. 85). This is not a fair characterization of the arguments advanced by the government in the Yakama Nation NRD Litigation, where the United States took the broad view and focused on the overlap of parties and issues and not the mere act of litigation. And one of the key issues to be resolved in the Yakama Nation NRD Litigation (as with the Response Cost Allocation) is the allocation of liability as between the parties. By assigning percentages of liability to the Settling Defendants, Arkema's reasonable concern—similar to the concern raised by the United States in response to the Yakama Nation's NRD claims—is that the Proposed Consent Decrees could inadvertently interfere with the outcome of the Response Cost Allocation. The consequences of such interference could be substantial.

## V.    CONCLUSION

The Trustees have asked this Court to enter the Proposed Consent Decrees, arguing that they are supported by their "streamlined" assessment and "initial" estimate of natural resource damages at the Portland Harbor Natural Resource Damage Assessment Area. The Trustees, however, intend to abandon the model that they used to generate their "initial" estimate when they conduct their Phase 3 Damage Assessment. Moreover, the model that they intend to use for the Phase 3 Damage Assessment is likely to account for additional resources not considered for purposes of the "initial" estimate, additional contaminants not considered for purposes of the "initial" estimate, additional geographic areas not considered for purposes of the "initial" estimate, and the effects of remedial actions that have not yet been implemented and that were not considered for purposes of the "initial" estimate. These additional inputs—each of which broaden the scope of the natural resource damage assessment relative to the "initial" estimate—are more likely than not going to lead to a larger calculation of natural resource damages at the Portland Harbor Natural

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 31*
(CASE NO. 3:23-CV-01603-YY)

HILLIS CLARK MARTIN & PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

Resource Damage Assessment Area than the initial estimate upon which the Proposed Consent Decrees are based. This calls into serious question the reasonableness of the settlements that are embodied in those Proposed Consent Decrees. Moreover, subjecting non-settling parties to a more rigorous damage assessment than the Settling Defendants is the very definition of unfairness, especially given the broad contribution protection that will be afforded to the Settling Defendants by virtue of the Proposed Consent Decrees. For all of these reasons, Arkema respectfully requests that this Court deny the Trustees' Motion to Enter Consent Decrees.

DATED: July 28, 2025.

HILLIS CLARK MARTIN & PETERSON P.S.

/s/ Matthew J. Stock
Matthew J. Stock, OSB No. 065205
999 Third Avenue, Suite 4600
Seattle, Washington 98104
Tel: (206) 623-1745
Fax: (206) 623-7789
Email: matthew.stock@hcmp.com
*Attorneys for Legacy Site Services LLC,*
*agent for Arkema Inc.*

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 32*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA 98104
Tel: (206) 623-1745
Fax: (206) 623-7789

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Opposition to Plaintiffs' Motion to Enter Consent Decrees with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties registered in the CM/ECF system for this matter.

DATED: July 28, 2025.


/s/ Maggie Bassetti
Maggie Bassetti, Paralegal

*ARKEMA INC.'S OPPOSITION TO PLAINTIFFS'*
*MOTION TO ENTER CONSENT DECREES - 33*
(CASE NO. 3:23-CV-01603-YY)

**HILLIS CLARK MARTIN & PETERSON P.S.**
999 Third Avenue, Suite 4600
Seattle, WA  98104
Tel: (206) 623-1745
Fax: (206) 623-7789

ER-768