No. 25-8129

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA; et al.,

*Plaintiffs-Appellees*,

v.

ARKEMA INC., by and through its agent, Legacy Site Services LLC,

*Intervenor-Appellant,*

v.

ACF INDUSTRIES, LLC; et al.,

*Defendants-Appellees,*

GUNDERSON, LLC; et al.,

*Intervenors.*

On Appeal from the U.S. District Court for the District of Oregon
Case No. 3:23-cv-1603-SI
Hon. Michael H. Simon

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 5 OF 6

Matthew J. Stock
Jessica C. Kerr
HILLIS CLARK MARTIN &
PETERSON P.S.
999 Third Avenue, Suite 4600
Seattle, Washington 98104
(206) 623-1745
Email: matthew.stock@hcmp.com
Email: jessica.kerr@hcmp.com
*Attorneys for Legacy Site Services LLC,*
*agent for Appellant Arkema Inc.*

[Counsel for Plaintiffs are identified
in Plaintiffs' signature blocks]

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE, <br><br> Plaintiffs, <br><br> v. <br><br> ACF INDUSTRIES, LLC; AIRGAS USA LLC; AIR LIQUIDE AMERICA L.P.; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.; BNSF RAILWAY COMPANY; CALBAG METALS CO.; CITY OF PORTLAND; ESCO GROUP LLC; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); GOULD ELECTRONICS INC.; HAJ, INC., D/B/A CHRISTENSON OIL COMPANY; HERCULES LLC; KOPPERS INC.; MCCALL OIL & CHEMICAL CORPORATION; MCCALL OIL REAL ESTATE COMPANY LLC; MOREC FRONT LLC; GWC PROPERTIES, LLC; GWC FRONT, LLC; TANKER BASIN LLC; MMGL LLC; NORTHWEST PIPE COMPANY (FKA NORTHWEST PIPE & CASING COMPANY AND NORTHWEST PIPE AND CASING COMPANY); PACIFICORP, AN OREGON CORPORATION; PORT OF PORTLAND; PORTLAND GENERAL ELECTRIC COMPANY (PGE); PORTLAND TERMINAL RAILROAD COMPANY; SCHNITZER STEEL INDUSTRIES, INC.; SILTRONIC CORPORATION; SULZER PUMPS (US) INC.; and VALVOLINE INC., <br><br> Defendants. | No. 3:23-cv-01603-YY <br><br> **PLAINTIFFS' MOTION TO ENTER CONSENT DECREES** |

ER-770

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................ 1

    I.      BACKGROUND ................................................................................... 4

           A.     Portland Harbor Natural Resource Damages ................................ 4

           B.     The Early Settlement Process Injury Assessment ......................... 4

           C.     Defendants' Shares of Natural Resource Damages ...................... 6

           D.     Restoration and the Early Settlement Process ............................. 9

           E.     Terms of the Proposed Decrees ................................................ 10

           F.     Public Comment on the Proposed Consent Decrees .................. 12

    II.     STANDARD OF REVIEW ................................................................ 13

    III.    ARGUMENT: THE COURT SHOULD APPROVE THE DECREES BECAUSE THEY ARE FAIR, REASONABLE, AND CONSISTENT WITH APPLICABLE STATUTES ................................................... 14

           A.     The Decrees are Procedurally Fair ............................................ 14

           B.     The Decrees are Substantively Fair .......................................... 18

                 1.     The Trustees Constructed an Effective and Technically Sound HEA Model To Estimate Total Injury To Natural Resources and Total Required Restoration ................................. 19

                2.     The Settlement, Which Uses the Total Injury Estimate Developed By the Trustees' HEA Model, Is Not Premature ........ 20

                       a.     Early Settlements May Be Based Upon A "Preliminary" Estimate of Damages Before a Formal Damage Assessment Has Been Conducted ...................... 21

                       b.     The Trustees' HEA Model Is Reliable and Reasonable ........................................................................ 22

                       c.     Complete Knowledge of Current or Future Contaminant Loads Is Unnecessary Because the Trustees Used Conservative Assumptions ...................... 22

                       d.     The Estimate of Recreational Losses Is Reasonable ......... 24

Plaintiffs' Motion to Enter Consent Decrees    i

3. The Decrees and the Public Record Sufficiently Support The Shares Allocated To Defendants....................................................... 24

C. The Decrees Are Reasonable ................................................................. 27

D. The Decrees Are Consistent with the Applicable Statutes ........................ 30

IV. REQUEST TO ENTER THE CONSENT DECREE............................................. 32

## TABLE OF AUTHORITIES

### Cases

*Arizona v. City of Tucson*,
    761 F.3d 1005 (9th Cir. 2014) ...................................................................... 18

*Bragg v. Robertson*,
    83 F. Supp. 2d 713 (S.D.W. Va. 2000) ........................................................ 27

*Mausolf v. Babbitt*,
    85 F.3d 1295 (8th Cir. 1996) ....................................................................... 16

*Officers for Just. v. Civil Serv. Comm'n of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ....................................................................... 13

*Speed Shore Corp. v. Denda*,
    605 F.2d 469 (9th Cir. 1979) ....................................................................... 13

*United States v. Bd. of Trustees of Univ. of Ill.*,
    No. 07-2188, 2008 WL 345542 (C.D. Ill. Feb. 7, 2008) .............................. 13

*United States v. Bliss*,
    133 F.R.D. 559 (E.D. Mo. 1990) ................................................................. 16

*United States v. BP Expl. & Oil Co.*,
    167 F. Supp. 2d 1045 (N.D. Ind. 2001) ....................................................... 17

*United States v. BP Prods. N. Am. Inc.*,
    No. 2:12-CV-207, 2012 WL 5411713 (N.D. Ind. Nov. 6, 2012) .................. 28

*United States v. Cannons Eng'g Corp.*,
    899 F.2d 79 (1st Cir. 1990)........................................... 13, 14, 17, 18, 27, 30

*United States v. Charles George Trucking, Inc.*,
    34 F.3d 1081 (1st Cir. 1994)........................................................................ 18

*United States v. Charter Int'l Oil Co.*,
    83 F.3d 510 (1st Cir.1996)........................................................................... 18

*United States v. Comunidades Unidas Contra La Contaminacion*,
    204 F.3d 275 (1st Cir. 2000)........................................................................ 17

*United States v. Fort James Operating Co.*,
    313 F. Supp. 2d 902 (E.D. Wis. 2004)......................................................... 27

*United States v. McInnes*,
    556 F.2d 436 (9th Cir. 1977) ....................................................................... 13

*United States v. Metro. St. Louis Sewer Dist.*,
    569 F.3d 829 (8th Cir. 2009) ....................................................................... 16

*United States v. Montrose Chem. Corp. of Cal.*,
    50 F.3d 741 (9th Cir. 1995) ........................................... 13, 14, 18, 21, 26

Plaintiffs' Motion to Enter Consent Decrees    iii

*United States v. Oregon*,
913 F.2d 576 (9th Cir. 1990) .............................................................................. 13

*United States v. Town of Moreau, New York*,
979 F. Supp. 129 (N.D.N.Y. 1997) .................................................................... 17

*Washington v. United States*,
No. CIV. 06-05225RJB, 2007 WL 3025843 (W.D. Wash. Oct. 15, 2007) ............ 13, 14, 18, 27

## Statutes

16 U.S.C. § 1531 ................................................................................................... 28

33 U.S.C. § 1321 .............................................................................................. 1, 31

33 U.S.C. § 2702(a) ............................................................................................. 30

33 U.S.C. § 2702(b) ............................................................................................... 1

33 U.S.C. § 2702(b)(2)(A) .................................................................................... 30

42 U.S.C. § 9607(a) .......................................................................................... 1, 30

42 U.S.C. § 9607(f)(1) ....................................................................................... 4, 27

42 U.S.C. § 9613(f)(2) .......................................................................................... 27

ORS § 465 .............................................................................................................. 1

ORS § 465.255(1) ................................................................................................. 31

ORS § 468B.060 .................................................................................................... 1

## Rules

Fed. R. Civ. P. 54 & 58 ........................................................................................ 32

## Regulations

43 C.F.R. § 11.38 ................................................................................................. 20

## Other Authorities

88 Fed. Reg. 78063 (Nov. 14, 2023) .................................................................... 12

88 Fed. Reg. 88417 (Dec. 21, 2023) .................................................................... 12

LR 7-1(a)(4) ........................................................................................................... 1

Plaintiffs' Motion to Enter Consent Decrees       iv

**INTRODUCTION**

Plaintiffs the United States (on behalf of the National Oceanic and Atmospheric Administration of the Department of Commerce ("NOAA") and the Department of the Interior), the State of Oregon (on behalf of the Oregon Department of Fish and Wildlife), the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe (collectively, the "Trustees") move for entry of the Consent Decrees ("Decrees") lodged in this action on November 1, 2023.  Dkt. Nos. 4-1 through 9-1 (Restoration Credit Consent Decree) and 11-1 (Cash-out Consent Decree). [1]  The purpose of the Decrees is to resolve Defendants' liability for Plaintiffs' claims under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a); Section 311 of the Clean Water Act, 33 U.S.C. § 1321; Section 1002(b) of the Oil Pollution Act, 33 U.S.C. § 2702(b); and the Oregon Hazardous Waste and Hazardous Materials Act, ORS § 465, and ORS § 468B.060, for certain natural resource damages resulting from releases of hazardous substances and oil into the Willamette River from the facilities owned and/or operated by Defendants and identified in Appendix A to the Decrees. *See* Dkt. Nos. 4-1 ¶ 3.d and 11-1 ¶ 3.b (Definition of "Covered Natural Resource Damages"); *see also* Dkt. No. 1 ¶ 1 (Complaint).

To resolve liability for natural resource damages, the Decrees require Defendants to: (1) provide compensation for Defendants' equitable shares of natural resource damages through a combination of cash payments to the Trustees and purchases of credits in restoration projects

---

[1] With respect to LR 7-1(a)(4), Defendants in this action have consented not to oppose entry of the Decrees.  Dkt. Nos. 4-1 ¶ 104 and 11-1 ¶ 34.

Plaintiffs' Motion to Enter Consent Decrees       1

described in detail in the Restoration Credit Consent Decree; and (2) pay their proportionate shares of the costs incurred by the Trustees during the early settlement process, including for the assessment of natural resource damages. *Cash-out Consent Decree*, Dkt. No. 11-1 § VII; *Restoration Credit Consent Decree,* Dkt. No. 4-1 § VIII. The Restoration Credit Consent Decree also contains extensive requirements for the restoration project developers selling restoration credits under the terms of that Decree, to ensure that the ecological values represented by the restoration credits have been fully developed and will be permanently maintained. *Restoration Credit Consent Decree,* Dkt. No. 4-1 § VII.

The Defendants in the Decrees (16 Defendants in the Cash-Out Consent Decree and 7 Defendants in the Restoration Credit Consent Decree)[2] collectively represent about 11.4% of the estimated total natural resource damages. *Infra* at 8. The total value of the claims resolved in both Decrees is approximately $36.2 million. Dkt. Nos. 4-1 ¶ V, 11-1 ¶ Q. This includes restoration project credits valued by the Trustees at approximately $23.3 million, with the remaining approximately $12.9 million consisting of cash payments (including Defendants' pre-payments and approximately $2.9 million of Trustees' past damage assessment costs). *See id.*

The proposed Decrees were subject to a seventy-five day public comment period. Plaintiffs received comments from public interest groups, an individual member of the public, other parties who are potentially liable for natural resource damages at the Portland Harbor Superfund Site, and the Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation").[3] The comments address issues such as the adequacy of the Trustees' Habitat

---

[2] Some Defendants consist of multiple legal entities.

[3] The Yakama Nation is the only natural resource trustee at the Portland Harbor Superfund Site that is not a plaintiff in this action. As explained in the Response to Comments, the Yakama

Plaintiffs' Motion to Enter Consent Decrees    2

Equivalency Analysis model, which was used to estimate natural resources damages and to allocate Defendants' equitable shares of those damages, the appropriateness of early settlements prior to completion by natural resource trustees of a formal damage assessment, and whether the restoration projects in the Restoration Credit Consent Decree are appropriate. All comments received from the public are attached to this Motion as Attachment B. Specific responses to the complete set of public comments are provided in the Response to Comments, which is attached to this Motion as Attachment C.

In the proposed Consent Decrees, Plaintiffs reserved the right to withdraw or withhold their consent if the comments regarding the Consent Decree disclosed facts or circumstances indicating that the Consent Decree is inappropriate, improper, or inadequate. *Cash-out Consent Decree*, Dkt. No. 11-1, ¶ 31; *Restoration Credit Consent Decree,* Dkt. No. 4-1 ¶ 101. Defendants have signed and fully approved the Consent Decrees and have consented to their entry without further notice. *Id*. ¶¶ 34, 104. After carefully reviewing and considering each comment received, Plaintiffs concluded that none of the comments provides a basis to withdraw their consent to these settlements or for this Court to disapprove of the settlements.

This motion to enter summarizes Plaintiffs' responses to the public comments. As explained below, the proposed settlement with Defendants embodied in the Consent Decrees is fair, reasonable, and consistent with the applicable statutes, and accordingly, the Decrees should be entered as final orders of this Court.

---

Nation left the Portland Harbor Natural Resource Trustee Council in 2009 due to a disagreement with the other Trustees over the early restoration settlement approach pursued by the Trustees who are Plaintiffs in this action.

Plaintiffs' Motion to Enter Consent Decrees    3

## I.    BACKGROUND

### A.  Portland Harbor Natural Resource Damages

The Willamette River has been subject to considerable levels of industrial and other uses by numerous parties throughout its history and into the present. *Declaration of Troy Baker* ("Baker Decl."), Attachment A, ¶ 6. Plaintiffs, who are trustees for the natural resources of the Portland Harbor Superfund Site pursuant to 42 U.S.C. § 9607(f)(1), are working to restore the natural resources injured by releases of hazardous substances and oil into the Willamette River and its adjoining shorelines. These contaminants have had serious impacts on the aquatic organisms and other natural resources that inhabit, or come into contact with, contaminated sediments or eat contaminated prey items. The injured resources include fish and wildlife species and their habitat. *Id.* ¶ 6.

### B.  The Early Settlement Process Injury Assessment

For the purpose of negotiating early settlements, including the settlement represented by the proposed Decrees, the Trustees developed a streamlined process for estimating natural resource injuries and the restoration required to compensate for those injuries. *Baker Decl.* ¶ 7. Plaintiffs analyzed the impacts from hazardous substances and oil to natural resources, developed restoration strategies, and selected restoration projects to address these impacts. *Id*.

The streamlined process uses a model called Habitat Equivalency Analysis ("HEA"), which is a tool for evaluation of natural resource injuries and required restoration. *Baker Decl.* ¶ 7. The HEA is designed to account for the injuries resulting from the range of contaminants in river sediments and calculate the total combined loss to natural resources over time from those contaminants. *Id*. Because the injuries to natural resources evaluated by the HEA are caused principally by contaminated river sediments, the HEA measured the injuries in terms of losses of

Plaintiffs' Motion to Enter Consent Decrees    4

ER-778

ecological services provided per acre of affected habitat. *Id*. The HEA model incorporated information from a variety of sources to estimate the extent of injury to natural resources, including information regarding the natural resources historically and currently found in the Portland Harbor Natural Resource Assessment Area ("Assessment Area"), information on contaminant levels in the Assessment Area, environmental studies of impacts to similar resources in similar marine and estuarine environments, state regulatory standards, and scientific literature. *Id.* ¶ 9. In addition, the Trustees and the potentially responsible parties participating in the early restoration process also conducted site-specific studies at Portland Harbor to help quantify the natural resource injuries. *Id*. Relying upon all of this information, the Trustees' HEA model determined the percentage loss of ecological services resulting from increasing sediment concentrations of hazardous substances and oil in the Assessment Area. *Id*.

The HEA also is used to determine the amount of habitat restoration needed to compensate for ecological service losses over time. *Baker Decl.* ¶ 10. The HEA calculated the amount of habitat restoration needed to compensate for a given level of injuries by the gain in ecological services per acre provided by different restoration techniques in different habitats. *Id*. To equate losses from contamination and gains from restoration occurring at different times, the losses and gains were converted to a common, present value. *Id*. The resulting measure of natural resource damages is discounted service acre-years, or "DSAYs." *Id.* ¶¶ 9–10. Sufficient restoration is determined to be the number of acres of a particular type of restoration that generates the same amount of DSAYs as were lost due to the injury. *Id.* ¶ 10. For the purposes of early settlements, the Trustees estimated the damages for the Assessment Area as a whole— and thus the quantum required for restoration—to be 4,130 DSAYs. *Id*; *Cash-out Consent Decree*, Dkt. No. 11-1 ¶ K; *Restoration Credit Consent Decree,* Dkt. No. 4-1 ¶ P.

Plaintiffs' Motion to Enter Consent Decrees     5

The HEA was then used to assign ecological losses to individual facilities. *Baker Decl.* ¶¶ 11–12. The Trustees used two basic approaches in the Assessment Area. First, for most hazardous substances, there was a "footprint" of contamination in the sediments that was attributed to particular facilities or properties. Second, for more ubiquitous and diffuse contaminants, such as polycyclic aromatic hydrocarbons ("PAHs"), multiple facilities or properties often contributed to a contamination footprint, in which case a relative index approach was used, where liability was divided among the facilities and properties that were known to have released the ubiquitous and diffuse contaminants. *Id.* ¶ 13. This division among facilities and properties was based on the nature of the waste-producing activities located at the facility or property, the area involved and the time period during which these activities occurred. Using this methodology, responsibility for virtually all contaminated sediment footprints in the Assessment Area were assigned to properties and facilities near or adjacent to the Assessment Area.[4] *Id.* ¶ 13. Once the HEA assigned ecological losses (measured in DSAYs) to each Defendant's properties and/or facilities, the total number of DSAYs for that Settling Defendant was then calculated by adding the DSAYs attributed to each such property and/or facility. *Id.* ¶ 14.

## C. Defendants' Shares of Natural Resource Damages

As alleged in the Complaint, Defendants own and/or operate, or in the past owned and/or operated, real property and/or facilities, at or from which there have been releases of hazardous substances and/or discharges of oil to the Assessment Area. *Compl.*, Dkt. No. 1 ¶¶

---

[4] In rare cases, it was not possible to assign contaminant footprints to properties near or adjacent to the Assessment Area, primarily where a contaminant footprint was not in sufficient proximity to any known source of that contaminant. These instances represent less than 3% of the HEA's total injury estimate. *Baker Decl.* ¶ 13.

Plaintiffs' Motion to Enter Consent Decrees    6

16, 18. These facilities and properties are identified for each Defendant in Appendix A of the Complaint and Appendix A of the Decrees. Dkt. No. 1, App. A; Dkt. No. 4-1, App. A; Dkt. No. 11-1, App. A.

The early settlement allocation process for each Defendant began with an identification by each Defendant of its currently or formerly owned and/or operated facilities and properties. *Baker Decl.* ¶ 12. The Decrees resolve Defendants' natural resource damages liabilities only for facilities and properties identified in the Decrees. *See* Dkt. Nos. 4-1 ¶ 3.d and 11-1 ¶ 3.b (Definition of "Covered Natural Resource Damages"). Each Defendant submitted information regarding its activities and operations for these identified properties, which the Trustees reviewed for accuracy. *Baker Decl.* ¶ 12. Based on this information, the Trustees determined the contaminants likely associated with these activities. *Id.*

Contaminants associated with activities at Defendants' properties and facilities were then compared with contaminant footprints in Willamette River sediments in the Assessment Area. *Baker Decl.* ¶ 12. Properties and facilities were allocated liability (in DSAYs) where each of the following criteria was met: there was a pathway for contaminants to travel from the property or facility to the Willamette River; contaminants associated with activities on Defendant's property or facility were found in contaminated sediment footprints; and those footprints were in sufficiently close proximity to the property or facility, or a site-related outfall to the Willamette River. *Baker Decl.* ¶ 12; *see also* Dkt. Nos. 4-1 ¶ S and 11-1 ¶ N. If a connection existed between contaminated sediments and a Defendant's property or facility, then that property or facility was assigned natural resource damages liability for the contaminated footprint. The amount of assigned liability (in DSAYs) depended on the estimated injury to natural resources

Plaintiffs' Motion to Enter Consent Decrees      7

(in DSAYs) caused by contaminants in the sediment footprint and whether other properties and facilities also contributed contaminants to that footprint. *Baker Decl.* ¶ 12.

Using the above process at each property or facility identified by a Defendant, the Trustees developed a proposed liability allocation, in DSAYs, for that Defendant. *Baker Decl.* ¶ 14. The Trustees then shared their proposed allocation with that Defendant, including the factual basis for that allocation. Each Defendant was given an opportunity to review its proposed allocation and to provide additional information if it disagreed with the factual basis for the Trustees' proposed allocation. *Id.* If the Trustees agreed that the additional information warranted revisions to the factual basis of their initial allocation, revisions to the factual basis and associated DSAY allocations were made. No significant revisions were made to allocations without a supporting factual basis, such as information establishing that a Defendant did not use a particular type of process or chemical; only modest equitable downward revisions based on "litigation risk" or other forms of "uncertainty" were made in negotiations with individual Defendants. *Id.*

The shares in Appendix C of the Decrees reflect the results of the negotiations between the Trustees and each Defendant. Together, Defendants were assigned a total of 471.389 DSAYs, which represents about 11.4% of the estimated total natural resource damages for the Assessment Area.[5] *Baker Decl.* ¶ 15. Negotiations with additional potentially responsible parties ("PRPs") in the early settlement process are ongoing, and if further settlements are

---

[5] Plaintiffs believe that the allocation process here goes far beyond what is required under applicable law and should not be regarded as a minimum for other settlements in other cases. The financial and technical resources required for the HEA process used here may not be available at other sites. *Baker Decl.* ¶ 16.

Plaintiffs' Motion to Enter Consent Decrees    8

reached, the Trustees anticipate lodging additional consent decrees embodying those settlements. *Id.*; Dkt. Nos. 4-1 ¶ W, 11-1 ¶ R.

### D. Restoration and the Early Settlement Process

In addition to assessing injuries to natural resources, the early settlement process also developed a restoration strategy and selected restoration projects that could be included in settlements with PRPs. *Baker Decl.* ¶ 17. A draft Programmatic Restoration Plan and Environmental Impact Statement (PEIS) was released for public comment in 2012, and the Trustees published the final document and response to comments in 2017. *Id.* The PEIS included the Trustees' integrated restoration approach as the preferred alternative and provided details on the Trustees' goals and objectives for ecological restoration, target species, and monitoring and stewardship expectations. *Id.* The PEIS also identified 44 projects as examples of the types of ecological restoration projects that might ultimately be implemented (including all four of the restoration projects the Trustees included in the Restoration Credit Consent Decree in 2023). *Id.*

Following the PEIS, the Trustees developed a Supplemental Restoration Plan and Environmental Assessment ("SRP"), in which the Trustees identified the purchase of credits from restoration banks as the preferred alternative for ecological restoration during this phase of the NRDA and identified and evaluated the four restoration projects included in the Restoration Credit Consent Decree. *Baker Decl.* ¶ 18. The Trustees published the draft SRP for public comment in 2020 and published the final document, including a response to public comments, in 2021. *Id.*

Plaintiffs' Motion to Enter Consent Decrees     9

### E.  Terms of the Proposed Decrees

The proposed settlement between Plaintiffs and Defendants is embodied in two separate consent decrees.  The Defendants in the Cash-out Consent Decree are resolving their liabilities for Covered Natural Resource Damages on an all-cash basis.  Defendants' payments under this Decree fully fund their allocated shares for injuries to natural resources in the amount of $70,500 per allocated DSAY.  Dkt. No. 11-1 ¶¶ K, 7 & App. C.  In addition, Defendants participating in the Cash-out Consent Decree will make payments for the Trustees' past costs (through April 1, 2020) and the Trustees' interim costs (between April 1, 2020, and the Effective Date of the Cash-out Consent Decree).  *Id.* ¶¶ 8–10.

Defendants participating in the Restoration Credit Consent Decree will address their responsibilities for ecological injury by purchasing restoration credits in one or more of the four restoration projects identified in that Decree.  Dkt. No. 4-1 ¶¶ H, P, 70; Dkt. No. 4-4 (App. C). In addition, Defendants in the Restoration Credit Consent Decree pay $1,742 per allocated DSAY (which covers recreational service losses, tribal service losses, and Portland Harbor-wide monitoring and stewardship) for each restoration credit they purchase in one of the four restoration projects.  Dkt. No. 4-4 (App. C) at 1 n.2.  Like the Defendants in the Cash-out Consent Decree, Defendants in the Restoration Credit Consent Decree are paying their proportionate share of the Trustees' past and interim costs.  Dkt. No. 4-1  ¶¶ 71–73.

The developers of the four restoration projects in the Restoration Credit Consent Decree are parties to that Decree.  That Decree contains a number of commitments by the project developers to ensure that the restoration projects in which restoration credits are purchased continue to maintain their ecological values.  Dkt. No. 4-1 § VII.  Each project developer must construct its restoration project and develop and maintain the habitat and vegetation as set forth

Plaintiffs' Motion to Enter Consent Decrees      10

in the Habitat Development Plan for each project. *Id*. ¶¶ 18, 27. The project developers also must ensure that the restoration projects are permanently dedicated to the projects' ecological purpose, which includes both legal protections for the project sites and funding long-term stewardship to manage the projects after they are fully developed. *Id*. § VII.E. All of these commitments by project developers are secured by liquid performance guarantees in the forms of bonds, irrevocable letters of credits, and/or escrow accounts. *Id*. § VII.G. The Decree also requires project developers to reimburse the Trustees for their costs of overseeing implementation of the projects. *Id.* § VII.J.

The Restoration Credit Consent Decree also contains mechanisms to ensure that restoration credits accepted by the Trustees from each project represent on-the-ground ecological value. Dkt. No. 4-1 § VII.F. Those mechanisms include identifying the number of restoration credits in each project that the Trustees have authorized to date, a Credit Release Schedule for each project that ties additional releases of restoration credits to achievement of success criteria, and Trustee authority to re-assess, if needed, the value of a project. *Id*. ¶¶ 42–43, 47–51. In addition, the Decree requires the restoration project developers to disclose to the Trustees all sales of credits in their restoration projects and to maintain a Trustee-approved registry of all such sales. *Id*. ¶¶ 45–46. The Trustees will accept restoration credits from a restoration project in a settlement only if the project has sufficient remaining credits, taking into consideration credits that the Trustees have previously approved and credits that already have been sold. *Id*. ¶ 44.

In consideration of Defendants' commitments in the Decrees, Plaintiffs covenant not to sue Defendants for natural resource damages resulting from releases of hazardous substances or discharges of oil prior to the Effective Date from the properties and facilities identified in the

Plaintiffs' Motion to Enter Consent Decrees    11

Decree into the Assessment Area. Dkt. Nos. 4-1 ¶ 3.d and 11-1 ¶ 3.b (Definition of "Covered Natural Resource Damages"); Dkt. Nos. 4-1 § XIII and 11-1 § IX (Covenant Not to Sue by Plaintiffs). Plaintiffs' covenant is subject to reservations of rights, Dkt. Nos. 4-1 § XIV and 11-1 § X, as well as "the right to institute proceedings against Settling Defendants [. . .] for: Covered Natural Resource Damages if conditions, factors or information in the Portland Harbor Natural Resource Damage Assessment Area, not known to the Trustees as of the Effective Date of this Consent Decree, are discovered that, together with any other relevant information, indicates that there is injury to, destruction of, loss of and/or loss of use of natural resources of a type unknown, or of a magnitude significantly greater than was known, to the Trustees as of the Effective Date." Dkt. Nos. 4-1 § XV and 11-1 § XI. The Decrees also provide Defendants with protection from contribution actions or claims by other liable parties for Covered Natural Resource Damages. Dkt. Nos. 4-1 ¶ 89 and 11-1 ¶ 21.

**F. Public Comment on the Proposed Consent Decrees**

Public comments on the Consent Decrees were accepted for a total of seventy-five days following publication of notice of the Decrees in the Federal Register. A notice of lodging of the Decrees was published in the Federal Register, which provided a 45-day public comment period. 88 Fed. Reg. 78063 (Nov. 14, 2023). In response to a request to extend the public comment period, the comment period was extended for 30 days. 88 Fed. Reg. 88417 (Dec. 21, 2023). Plaintiffs received seven lengthy public comments, including from an individual, public interest groups, potentially responsible parties who are not Defendants in the Decrees, and the Yakama Nation. Those public comments, and Plaintiffs' responses to those comments, are set out in full in attachments to this motion to enter the Decrees. Attachments B & C, respectively.

Plaintiffs' Motion to Enter Consent Decrees     12

## II.    STANDARD OF REVIEW

The standard of review for the proposed Consent Decrees is whether they are fair, reasonable, and consistent with the objectives of the relevant statutes.  *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 743 (9th Cir. 1995) (discussing natural resource damages under CERCLA); *see also United States v. Bd. of Trustees of Univ. of Ill.*, No. 07-2188, 2008 WL 345542, at *2 (C.D. Ill. Feb. 7, 2008) (discussing natural resources consent decree under Clean Water Act).

The decision to approve a proposed consent decree is committed to the informed discretion of the district court, *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990), and the court's review is informed by the "overriding public interest in settling and quieting litigation." *United States v. McInnes*, 556 F.2d 436, 441 (9th Cir. 1977); *see also Speed Shore Corp. v. Denda*, 605 F.2d 469, 473 (9th Cir. 1979) ("Settlement agreements conserve judicial time and limit expensive litigation.").  Proposed consent decrees in CERCLA cases are entitled to deference from the court reviewing the decree.  *Montrose Chem. Corp.*, 50 F.3d at 746; *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990).  The judicial policy favoring settlements "is strengthened when a government agency charged with protecting the public interest 'has pulled the laboring oar in constructing the proposed settlement.'" *Montrose Chem. Corp.*, 50 F.3d at 746 (quoting *Cannons Eng'g Corp.*, 899 F.2d 79 at 84).  "[T]he reviewing court's role is to 'scrutinize' the settlement, but the acting governmental units are entitled to some deference." *Washington v. United States*, No. CIV. 06-05225RJB, 2007 WL 3025843, at *5 (W.D. Wash. Oct. 15, 2007) (citing *Montrose Chem. Corp.*, 50 F.3d at 747); *see also Officers for Just. v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982) (a court is

Plaintiffs' Motion to Enter Consent Decrees     13

not "empowered to rewrite the settlement agreed upon by the parties," or to "delete, modify, or substitute certain provisions of the consent decree").

**III.    ARGUMENT: THE COURT SHOULD APPROVE THE DECREES BECAUSE THEY ARE FAIR, REASONABLE, AND CONSISTENT WITH APPLICABLE STATUTES**

The proposed Consent Decrees satisfy the three-part test for district court approval of a settlement: The Decrees are fair, reasonable, and consistent with CERCLA, CWA, OPA, and Oregon Hazardous Waste and Hazardous Materials Act.  Accordingly, the Court should enter the Decrees.  This part of the motion addresses the most common or otherwise significant public comments received on the proposed Decrees as part of the analysis of whether the proposed Decrees meet the three-part test.  A more extensive summary of the public comments and responses to the specific issues raised in the comments are set forth in the Response to Comments ("RC"), Attachment C.

**A.  The Decrees are Procedurally Fair**

The determination of whether a consent decree is "fair" requires the reviewing court to conduct a two-pronged inquiry, assessing "whether the decree was both (1) the product of a procedurally fair process, and (2) substantively fair to the parties in light of a reasonable reading of the facts." *Montrose Chem. Corp.*, 50 F.3d at 746.

The Decrees are the result of a procedurally fair process.  "In measuring procedural fairness, 'a court should ordinarily look to the negotiation process and attempt to engage its candor, openness, and bargaining balance.'" *Washington v. United States*, 2007 WL 3025843, at *6 (citing *Cannons Eng'g Corp.*, 899 F.2d at 86).  Courts find procedural fairness where the settlement was negotiated at arm's length among experienced counsel.  *See, e.g., Cannons Eng'g Corp.*, 899 F.2d at 84; *Washington v. United States*, 2007 WL 3025843, at *6.  Here, the

Plaintiffs' Motion to Enter Consent Decrees    14

Trustees invited potentially responsible parties to participate in early settlement discussions. The Trustees have negotiated, and continue to negotiate, with PRPs that joined that early settlement process. *Baker Decl.* ¶ 15. Defendants elected to participate in this early settlement process. Both Plaintiffs and Defendants were represented by experienced counsel in the negotiation process, which involved agreement to fund studies of injuries to natural resources in the Assessment Area and many technical and legal exchanges over a number of years, to reach agreement on the terms of the proposed Decrees and each Defendant's share of responsibility. *See id.* ¶¶ 7, 11–12, 14–15.

Two comments questioned the Trustees' early settlement process from a procedural standpoint. First, Arkema asserted that the early settlement process for the Trustees' natural resource damage claims could undermine the separate non-judicial allocation for Portland Harbor that has been ongoing since approximately 2011 to address the costs of clean-up being overseen by the Environmental Protection Agency ("EPA"). RC, Arkema Section C, Attachment C at 27–29. To address this concern, the Consent Decrees contain provisions that expressly prohibit Defendants in those Decrees from using the Decrees (presumably against other parties who are not Defendants in the Decrees) in any other forum. The prohibition is broadly worded to include the ongoing non-judicial allocation of response costs as well as any future lawsuits. Dkt. Nos. 4-1 ¶ 90 and 11-1 ¶ 22; RC at 30. Moreover, the expressed concern that non-parties (including judges) would use the settlements against other non-parties seems both speculative and highly unlikely. RC at 30–31 & n.70.

Arkema's comment also questions why the United States sought a stay in the natural resource damages suit filed in 2017 by the Yakama Nation but is proceeding to settle natural resource damage claims in the Decrees. This comment ignores the fact that litigating the

Plaintiffs' Motion to Enter Consent Decrees    15

Yakama Nation natural resource damages case, which names many of the same parties to the non-judicial allocation, could have upset the remedial settlement process by putting at issue the same liability and allocation topics addressed in the non-judicial allocation. By contrast, settling natural resource damage claims—as the Decrees do—*avoids* putting at issue those same topics. RC at 31.[6]

Willamette Riverkeeper asserted that the NRDA process should be more inclusive and transparent to the public, and that public outreach by the Trustees has been too infrequent. RC, Riverkeeper Section 2 at 102. In response, Plaintiffs acknowledge that the negotiations in this case were complex, highly technical, sensitive, and took a number of years. There was no cloak of secrecy but, like virtually all negotiations, they were not held in the public arena. "[A] federal case is a limited affair, and not everyone with an opinion is invited to attend." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 841 (8th Cir. 2009) (quoting *Mausolf v. Babbitt*, 85 F.3d 1295, 1301 (8th Cir. 1996). "The confidentiality of the negotiations does not have any bearing on the candor, openness, and bargaining balance as between the parties to the negotiation . . .." *United States v. Bliss*, 133 F.R.D. 559, 569 (E.D. Mo. 1990). Had the negotiations taken place in public, reaching an agreement may well have been impossible, and certainly would have taken much longer.

There is no requirement under CERCLA, the CWA, OPA, and the Oregon Hazardous Waste and Hazardous Materials Act, or by the Trustees or the United States in general, to conduct settlement negotiations in public. "[T]he government is under no obligation to telegraph

---

[6] Plaintiffs agree with comments by Arkema and others that this case is related to both the ongoing non-judicial response cost allocation and the natural resource litigation filed by the Yakama Nation in 2017. A Notice of Related Cases is filed concurrently with this motion. *See also* RC at 39–40.

Plaintiffs' Motion to Enter Consent Decrees    16

its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes." *Cannons Eng'g Corp.*, 899 F.2d at 93; *see also United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 277 (1st Cir. 2000) (court rejected objections to a settlement based upon lack of participation by intervener in negotiations); *United States v. Town of Moreau, New York*, 979 F. Supp. 129, 135–36 (N.D.N.Y. 1997) ("it is doubtful that a public settlement conference would ever permit the type of give and take that would lead to an agreed resolution of the dispute"). Likewise, there is no requirement that the Government allow third parties to participate in the settlement negotiations. *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1052 (N.D. Ind. 2001).

Within the limits of confidential settlement discussions, the Trustees have engaged in public outreach and coordination, providing detailed information about the injury investigations being conducted, the restoration process generally, and specific restoration projects. RC, Riverkeeper Section 2 at 103–105. To support their public outreach and engagement efforts, the Trustees maintain a consistently growing public record that, as of this writing, contains over 700 documents, ranging from detailed technical reports to simple fact sheets. Where the Trustees felt more easily-digestible information would be useful to the public, they provided materials such as newsletters and YouTube videos. RC, Riverkeeper Section 2 at 103. They also periodically attended public meetings held by community groups to provide in-person outreach. RC, Riverkeeper Section 2 at 104–105. Arguably the Trustees' most important public engagement has been the thorough and concerted outreach conducted at various points in the NRDA process where public engagement is encouraged in the CERCLA regulations. One such example is their development of the PEIS. The Trustees held a three-month long public comment period after

Plaintiffs' Motion to Enter Consent Decrees     17

they released their Draft PEIS, which they advertised to the public using multiple forms of outreach.  During this comment period, the Trustees also held two public meetings.  The Trustees considered and addressed comments received from the public during this review process before the Trustees issued a final PEIS.  *Id.*  In sum, the early settlement process appropriately balanced the rights of Defendants, parties in other processes such as the ongoing non-judicial allocation of clean-up costs, and the public.

### B.  The Decrees are Substantively Fair

The proposed Decrees are substantively fair.  Substantive fairness derives from "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible."  *Cannons Eng'g Corp.*, 899 F.2d at 87.  Because these concepts are not easily quantified in environmental cases, the government's expertise and conclusions receive "the benefit of the doubt when weighing substantive fairness."  *Id.* at 88.  As the Ninth Circuit has explained, in the context of a consent decree for natural resource damages "the proper way to gauge the adequacy of settlement amounts to be paid by settling [parties] is *to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them,* and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified."  *Montrose Chem. Corp.*, 50 F.3d at 747 (emphasis in original) (citing *United States v. Charles George Trucking, Inc.,* 34 F.3d 1081, 1087 (1st Cir. 1994)); *see also Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014) ("in order to approve a CERCLA consent decree, a district court must find that the agreement is 'based upon, and roughly correlated with, some acceptable measure of comparative fault'" (quoting *United States v. Charter Int'l Oil Co.,* 83 F.3d 510, 521 (1st Cir.1996)); *Washington v. United States*, 2007 WL 3025843, at *7.

Plaintiffs' Motion to Enter Consent Decrees     18

Some of the public comments questioned the fairness or appropriateness of the Decrees, both with respect to the estimate of total injury and the allocations to Defendants. As described below and in more detail in the responses to public comments, the Trustees conducted a thorough process for estimating total injuries to natural resources in the Assessment Area, for measuring restoration to compensate for those injuries, and for allocating liability to Defendants.

1. **The Trustees Constructed an Effective and Technically Sound HEA Model To Estimate Total Injury To Natural Resources and Total Required Restoration**

One commenter stated that the Trustees erroneously used the HEA methodology by over-counting the amount of restoration (as measured in DSAYs) that each acre of restored habitat in the four restoration projects provides. RC at 1–7. The comment appears to be based on the erroneous belief that the maximum value of a restoration project (in DSAYs) would be the project's acreage. Based on this assumption, the comment then includes a number of calculations that produce DSAY values for each restoration project far below the DSAY values determined by the Trustees. *Id* at 2, 5–7. The commenter's DSAY value calculations are much closer to the *annual* DSAY value of each restoration project than to the DSAY values for the *entire life* of those projects. RC at 2–3, 5–7.

The comment misunderstands the fact that DSAYs are discounted service acre *years*, which means that the total number of DSAYs credited to a restoration project is calculated by adding up the amount of increased habitat value produced by the project *each year*. DSAYs are not measured in acres (a static spatial measure) but instead are measured in service-acre-years, which have not only a spatial component but also a time and quality component. *See* RC at 8–9. The fact that HEA models measure both injury and restoration year-by-year, with discount factors to adjust for the year when the injury or restoration occurs, is what allows HEA models to

Plaintiffs' Motion to Enter Consent Decrees      19

calibrate restoration (which occurs later in time) to injury (which occurs earlier in time).  RC at 9.  In practice, this means that habitat restoration addressing injuries to natural resources that is developed sooner will be worth more (in DSAYs) than the same habitat restoration if it is developed later.  *Id.* at 11–12.

In sum, the HEA developed by the Trustees for Portland Harbor correctly applies the standard HEA methodology that is used nation-wide (by federal, state, and private practitioners).  The ability of that methodology to calculate the quantum of restoration required to compensate for injuries that occur earlier in time is a key reason why the HEA model, using DSAYs as a measure of value, is an appropriate tool for natural resource damage settlements.  RC at 9–10, 12–14.

### 2. The Settlement, Which Uses the Total Injury Estimate Developed By the Trustees' HEA Model, Is Not Premature

Several comments argue in various ways that the Trustees must wait until their ongoing formal damage assessment is complete and/or EPA's cleanup is largely complete before reaching any settlements of natural resource damages claims.  The crux of these comments—that natural resource trustees generally may not reach early settlements of NRD claims and that the Portland Harbor Trustees should not do so here—is simply incorrect.  The statute is structured to encourage early settlements, and the relevant case law recognizes that "preliminary" estimates of damages may be the basis of those settlements.  The HEA model's estimate of damages here is a reasonable basis for the settlement embodied in the Decrees.[7]

---

[7] The Trustees' HEA model was developed specifically for the early settlement process and thus is a "preliminary" estimate of damages.  CERCLA's regulations also provide for a "preliminary estimate of damages," which is a different, optional step in the formal damage assessment process.  *See* 43 C.F.R. § 11.38.

Plaintiffs' Motion to Enter Consent Decrees    20

      **a.**      **Early Settlements May Be Based Upon A "Preliminary" Estimate of Damages Before a Formal Damage Assessment Has Been Conducted**

Arkema commented that the fairness of settlements cannot be evaluated until the Trustees have completed a formal damage assessment. Arkema Comment Section A, RC at 15–16. This argument is not supported by the applicable case law, including the cases cited in Arkema's comment. The leading case on this issue is *Montrose Chem. Corp.,* 50 F.3d 741, which evaluated the adequacy of a settlement of natural resource damage claims. *Montrose* concludes its discussion of early settlements by noting with approval "CERCLA's primary goal of encouraging early settlement." 50 F.3d at 748. Thus, not only are early settlements permissible under CERCLA, early settlements are "encouraged."

In addition, *Montrose* specifically notes that "preliminary" or "current" estimates of damages may be the basis of early settlements. *Id.* at 745, 747. The difficulty with the proposed consent decree in *Montrose* was that there was no estimate of total damages *at all*—"preliminary or otherwise"—for the reviewing court to compare with the commitments by defendants under the consent decree. The discussion in *Montrose* makes clear that, where trustees have developed an estimate of total damages, "preliminary or otherwise," that estimate may be the basis of settlement. *Id*. at 746–47.

In this case, the HEA model employed by the Trustees is the most common type of methodology used for natural resource damage settlements, and the Trustees expended significant effort to build a HEA model that would produce a reasonable estimate of total damages for Portland Harbor. RC at 18. Moreover, Arkema's assumption that a formal damage assessment necessarily will produce a larger estimate of total damages is not well-grounded: while the formal damage assessment will be based on more site-specific injury studies than the

Plaintiffs' Motion to Enter Consent Decrees     21

HEA model, the outcome of those studies is not yet known (and was not known when the settlements with Defendants were negotiated). Therefore, the total damage estimate in the formal damage assessment could be higher or lower than the estimate produced by the HEA model used for the Decrees.[8] RC at 18–19.

### b. The Trustees' HEA Model Is Reliable and Reasonable

Arkema's second comment is closely related to the comment above: that because the Trustees are not using their HEA model for their formal damage assessment, it necessarily must be inadequate for use in settlement. Arkema Comment Section B, RC at 23–24. However, the Trustees carefully considered whether it was appropriate to adapt the HEA model originally used for Commencement Bay in Tacoma, Washington, to the Portland Harbor environment. RC at 25–26. In doing so, the Trustees considered, among other factors, the different natural resources and different regulatory criteria at Portland Harbor. *Id*. The fact that the Trustees' formal damage assessment methodology will be different from the HEA model used for early settlements and will include additional studies not included in the HEA model, does not mean that the HEA methodology itself is unreasonable or that it should not be used as a basis for settlement. *Id*. at 17–19.

### c. Complete Knowledge of Current or Future Contaminant Loads Is Unnecessary Because the Trustees Used Conservative Assumptions

Commenters Gunderson and FMC assert that uncertainty about when contaminant loads will be remediated renders the Trustees' estimate of total damages too uncertain to be used in

---

[8] The comment also contains a criticism of the estimated total dollar value of the relief obtained under the Consent Decrees that fails to properly account for payments previously made by Defendants and the value of the restoration credits purchased by Defendants under the Restoration Credit Consent Decree. RC at 20–22.

Plaintiffs' Motion to Enter Consent Decrees    22

settlement. RC at 54–55. These comments argue that the total extent of contaminant exposure to natural resources cannot be known until contamination at Portland Harbor is more fully addressed and that the Decrees are deficient because they contain no requirements that the Defendants address their contamination. *Id*.

In part, these comments echo Arkema's comments above that early settlements of natural resource damages claims are inappropriate, but that suggestion is contrary to both CERCLA's purposes and the caselaw. *Supra* at 20–21. With respect to the specific points regarding clean-up of contaminants, the comments overlook two key points. First, although the precise pace of EPA's cleanup—and thus, the time period over which natural resources will be exposed to harmful levels of contaminants—is unknown, the Trustees' HEA model conservatively assumed that the cleanup would not include any active remediation. This assumption meant that contaminant loads declined very gradually over time in the HEA model, when in fact, EPA's remedy includes a significant amount of active remediation of contaminants. Therefore, even if the particulars of future contaminant remediation in various parts of the Assessment Area are unknown, it can be said today that the HEA model *overestimates* future contaminant exposure to natural resources. Contrary to the comments, this provides more certainty, not less, that the HEA model sufficiently captures future harm to natural resources from current contamination. RC at 56–57.

Second, the fact that natural resources will continue to be exposed to contamination after this settlement does not mean that it is the Trustees' role within CERCLA's statutory framework to address this contamination. Rather, CERCLA places clean up responsibility on regulatory agencies—principally, EPA and its state counterparts. RC at 57–58. Courts generally have recognized that trustees may conclude natural resource damage settlements with liable parties

Plaintiffs' Motion to Enter Consent Decrees    23

before EPA's cleanup activities are concluded, and that they may do so without seeking to step into EPA's role of regulating the scope and extent of cleanup. *Id.* at 58.

### d.   The Estimate of Recreational Losses Is Reasonable

A relatively small fraction of the Trustees' total damage estimate is the lost recreational use, in dollar terms, resulting from releases of contaminants into the Assessment Area. The Decrees estimate harbor-wide recreational losses at $5,402,400. Dkt. Nos. 4-1 ¶ P, 11-1 ¶ K. Willamette Riverkeeper expressed concern that this amount underestimated the extent of recreational losses due to the types of limitations on recreational activities resulting from the contamination and the long period of those limitations. Riverkeeper Section 5, RC at 110.

The Trustees agree that the contamination has diminished both the extent and the quality of recreational experiences in the Willamette River Assessment Area. In quantifying the recreational loss for settlement, the Trustees followed both the applicable CERCLA regulations and the Portland Harbor Superfund Site Natural Resource Damage Assessment Plan. RC at 111. The Trustees' estimate of losses is based on data from the State of Oregon on the number of fishing and boating trips and on the economic values of those trips taken from applicable literature. *Id.*

### 3.   The Decrees and the Public Record Sufficiently Support The Shares Allocated To Defendants

Several commenters asserted that there is not enough information in the settlement to evaluate whether the Defendants are paying their fair share of the total damages. Gunderson Section 1, Yakama Nation Section 3, Willamette Riverkeeper Section 1, RC at 41–46. These comments each describe the information in the Decrees themselves, but they contain little if any discussion of the accompanying information in the Trustees' public record. While the public record does not contain settlement confidential information, such as the Trustees' detailed

Plaintiffs' Motion to Enter Consent Decrees      24

calculations of each Defendant's liability, it does contain substantial information about the following: the Trustees' HEA methodology; the contaminant datasets used by the Trustees in the HEA model; and each Defendant's activities and the Trustees' conclusions about the contamination associated with those activities. RC at 47. This information, coupled with the shares allocated to each Defendant, is sufficient to assess whether the allocations to Defendants are fair.

Two documents in the public record provide significant information about the data and methodologies used to construct the Trustees' HEA model. The first document includes discussion of contaminant sampling used to estimate the extent and concentrations of contaminant footprints, the ecological service loss percentages associated with levels of those contaminants, the ecological values assigned to habitat types, and the methodology for allocating injuries from injured habitat to nearby properties. RC at 48. The second document provides more detail about allocating injuries from river sediment footprints to adjacent properties, methods for allocating injuries attributed to a property to the various operations and associated parties that operated over time on that property, and an appendix that describes the contaminants associated with each different type of activity considered by the HEA model that took place on the properties identified in Appendix A of the Decrees. *Id.*

The above descriptions of the HEA methodology relate to additional information that is provided for each Defendant. Appendix A to the Decrees contains property identifications by parcel number and/or maps showing each Defendant's properties and facilities that were considered by the Trustees in the allocation process. Dkt. Nos. 4-2 (Restoration Credit Consent Decree App. A), 11-1 at 68–114 (Cash-Out Consent Decree App. A). For each Defendant, the Trustees developed a report that describes the properties considered, a description of the

Plaintiffs' Motion to Enter Consent Decrees    25

operations on those properties and the time periods when they took place, and the activities associated with those properties (from which the contaminants associated with those activities were determined using the appendix described above).  RC at 49.

All of this information allows commenters and others to verify that the Trustees fully reviewed the operations and activities conducted by Defendants, including associated contaminants, and that no operations or activities conducted by Defendants were overlooked by the Trustees.  Commenters did not identify any instances, including for any Defendant specifically mentioned in the comments such as the City of Portland and Schnitzer Steel, RC at 50–51, in which an operation or activity conducted by a Defendant was overlooked by the Trustees.

In short, the Trustees' HEA model used relevant information about sediment contaminants and the operations and activities on Defendants' properties that contributed to those contaminants, and it used appropriate factors and analysis to develop allocations to account for the relationship between contaminants from Defendants' activities and the harm to natural resources resulting from contaminated sediments.  The Decrees assess Defendants' combined allocated share at 11.4% of the total of estimated natural resource damages for the Assessment Area.  While the detailed calculations used for each Defendant remain settlement confidential, operations, activities, associated contaminants, and contaminant data all are in the public record, and no comment raises serious doubt that important information or factors were overlooked.  RC at 49–52.  Under the generous standard of review applicable here, the Trustees have more than demonstrated that their allocation methodology is fair.[9] *Montrose Chem. Corp.*, 50 F.3d at 746

---

[9] In any future Portland Harbor natural resource damages litigation, the effect of the Decrees on that litigation would derive from the total amount recovered from Defendants under the Decrees,

Plaintiffs' Motion to Enter Consent Decrees     26

(noting that deference is appropriate to consent decrees negotiated by public agencies); *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902, 908–909 (E.D. Wis. 2004) (acknowledging that even substantial discounts are allowable to achieve early settlements in CERLCA cases).

## C.  The Decrees Are Reasonable

Factors relevant in the Court's evaluation of the "reasonableness" of a consent decree are (1) "the decree's likely efficaciousness as a vehicle for cleansing the environment" and (2) "whether the settlement satisfactorily compensates the public." *Cannons Eng'g Corp.*, 899 F.2d at 89–90; *see also Washington v. United States*, 2007 WL 3025843, at *7 (listing additional factors).  The Decrees are effective vehicles for addressing injuries to the environment because they require Defendants to make payments or purchase credits in habitat restoration projects designed to restore natural resources injured by Defendants' releases in the Assessment Area. The Decrees also include provisions to ensure that the restoration projects are fully developed, including permanent stewardship of the projects after full development has been achieved.  The proposed settlement embodied in the Decrees therefore provides appropriate compensation to the public for Defendants' proportionate share of total natural resource injuries, including Defendants' proportionate share of the Trustees' costs.  Accordingly, the proposed Decrees are reasonable and not an arbitrary and capricious act.  *See Fort James Operating Co.*, 313 F. Supp. 2d at 910 (natural resource damages consent decree was reasonable where the "only imaginable alternative to settlement would be complex and probably lengthy litigation"); *Bragg v.*

---

not the allocations to any individual Defendant.  RC at 52–53.  In any future litigation, the Trustees would not seek the amounts recovered under the Decrees from non-settlors.  *See* 42 U.S.C. § 9613(f)(2) (settlements reduce the potential liability of non-settlors by the amount of the settlement) & 42 U.S.C. § 9607(f)(1) (bar on double recovery of natural resource damages).

Plaintiffs' Motion to Enter Consent Decrees     27

*Robertson*, 83 F. Supp. 2d 713, 717 (S.D.W. Va. 2000) ("[I]t is precisely the desire to avoid a protracted examination of the parties' legal rights that underlies entry of consent decrees. Both the parties and the general public benefit from the saving of time and money that results from the voluntary settlement of litigation.").

Moreover, the Trustees place a high value on early settlements such as those embodied in the Decrees because they address injuries to natural resources on a quicker timeframe than having to wait years for complex and lengthy litigation. *See*, *e.g.*, *United States v. BP Prods. N. Am. Inc.*, No. 2:12-CV-207, 2012 WL 5411713, at *4 (N.D. Ind. Nov. 6, 2012) (consent decree "serves the public interest by providing these environmental benefits more quickly and at less cost than could be achieved through litigation. . . . [A] risky proposition with uncertain results"). The earlier restoration is implemented, the sooner natural resources injured by releases of contaminants can begin to recover. The benefits of early restoration are especially important for species at Portland Harbor listed under the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq.*; *Baker Decl.* ¶ 20; RC at 17 & n.30.

The Yakama Nation and Willamette Riverkeeper questioned whether the restoration projects in the Restoration Credit Decree are appropriate or effective means of restoring injured natural resources.[10] The Yakama Nation critiqued the four restoration projects in the Restoration Credit Decree as relatively small and isolated, not fully mature, and not integrated into a coordinated restoration strategy. RC at 76–77. Willamette Riverkeeper expressed concern about

---

[10] Commenter Northwest Environmental Defense Center ("NEDC") makes many of the same arguments raised by the Yakama Nation and Willamette Riverkeeper. The response to the comments from Yakama Nation and Willamette Riverkeeper therefore references the NEDC comments as well. RC at 79. There is also a separate response to the NEDC comments, in part because NEDC misconstrues the authority and mandate under CERCLA of natural resource trustees. *See* RC at 60–75.

Plaintiffs' Motion to Enter Consent Decrees     28

ER-802

what they described as the absence of a coherent restoration vision and about high sedimentation levels in a restored aquatic area at one of the restoration projects. *Id*. at 106, 78.

On the contrary, the four restoration projects in the Restoration Credit Consent Decree were selected as part of an overall restoration strategy that already has been presented to the public. The Trustees published their draft Programmatic Restoration Plan and Environmental Impact Statement (PEIS) for public review in 2012 and published the final document in 2017. The PEIS identified 44 projects as examples of the types of ecological restoration projects that might ultimately be implemented, including all four restoration projects included in the Restoration Credit Decree. In their 2021 SRP, the Trustees identified the purchase of credits from those four projects as their preferred restoration alternative for early settlements after additional public review. RC at 79–80, 107–109. Through the public comment process for both the PEIS and the SRP, the Trustees considered all comments received, addressed them, and, in light of the comments, selected preferred alternatives that meet CERCLA restoration requirements as well as the Trustees' restoration objectives.

Nor are the projects small or isolated. The projects range in size from 27–54 acres, and each project has a sufficient variety of habitat types to provide desired habitat "connectivity" from one type of habitat to another. In addition, three of the four projects are in close enough proximity to each other to provide habitat connectivity between them, and the fourth project (Rinearson) is located within Meldrum Bar Park, which provides additional connecting habitat outside of the boundaries of the project itself. RC at 80–81. This means that the habitat provided by the projects does not function in isolation; instead, the projects are mutually beneficial as fish, birds, and other animals move between from one project to another or to other nearby high-quality habitat. *Id*.

Plaintiffs' Motion to Enter Consent Decrees    29

As to project maturity, the Trustees are fully aware that mature habitat is more desirable, and they have structured the project development process to achieve that goal. Unlike many natural resource damages settlements, in which restoration project construction does not begin until *after* the settlement is final, all four of these restoration projects already are constructed, with habitat development underway. Dkt. No. 4-1 ¶¶ 22–25; RC at 82. Additionally, each project includes a 10-year performance period for habitat development, followed by permanent stewardship requirements. *Id*. at 82–83. Restoration credits in the projects are only released by the Trustees as ecological milestones are reached, which ensures that the settlement in the Decrees and future settlements are based on actual restoration.[11] *Id*. at 82; *Restoration Credit Consent Decree,* Dkt. No. 4-1, ¶¶ 42, 44.

## D. The Decrees Are Consistent with the Applicable Statutes

Finally, the Court must consider "the extent to which consent decrees are consistent with Congress' discerned intent" in the statutes at issue. *Cannons Eng'g Corp.*, 899 F.2d at 90. CERCLA, 42 U.S.C. § 9607(a), provides,

> any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, . . . shall be liable for, . . . damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

The Oil Pollution Act establishes that parties responsible for discharges of oil are liable for "[d]amages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage." 33 U.S.C. § 2702(a), (b)(2)(A). The Clean Water

---

[11] For example, the Trustees are fully aware of the high sedimentation levels at one of the restoration projects and are working with the project developer to address that issue before releasing restoration credits for the full expected value of that project. RC at 85–86.

Plaintiffs' Motion to Enter Consent Decrees    30

Act provides that an owner or operator of a facility from which oil or a hazardous substance is discharged "into or upon the navigable waters of the United States, [or] adjoining shorelines" shall be liable for the costs of removal of such oil or substance, which shall include "any costs or expenses incurred by the Federal Government or any State government in the restoration or replacement of natural resources damaged or destroyed as a result of a discharge of oil or a hazardous substance." 33 U.S.C. § 1321. Similarly, the Oregon Hazardous Waste and Hazardous Materials Act imposes strict liability "for damages for injury to or destruction of any natural resources caused by a release." ORS § 465.255(1).

The terms of the Decree are consistent with these objectives. The Decrees address past releases of hazardous substances and discharges of oil that injured natural resources in the Assessment Area. The Decrees address those releases and discharges by requiring Defendants to pay cash or purchase restoration credits that will provide habitat to restore injured natural resources, and to reimburse the Trustees for their costs. Because the Decrees provide effective compensation to restore natural resources, based on Defendants' proportionate share of liability for total natural resource injuries, they are consistent with the purposes of CERCLA, the Clean Water Act, the Oil Pollution Act, and the Oregon Hazardous Waste and Hazardous Materials Act.

Two commenters—NEDC and Willamette Riverkeeper—suggest that the absence of a Biological Opinion from NOAA Fisheries (a/k/a the "National Marine Fisheries Service") frustrates the overarching statutory framework from being fully implemented. RC at 67, 78. These commenters seemingly were unaware that the Trustees did initiate consultations with NOAA Fisheries under Section 7 of the Endangered Species Act, and that Biological Opinions were issued both for the Trustees' overall restoration strategy in their PEIS and for the four

Plaintiffs' Motion to Enter Consent Decrees     31

individual projects in the Decrees.  RC at 89–91.  The Biological Opinion for the PEIS

concluded that "[t]he long-term beneficial effects of the proposed action on listed species,

primarily improved habitat conditions in the action area, are likely to far outweigh any of the

short-term adverse effects."  RC at 90.  The Biological Opinions for the specific projects

reached conclusions similar to, and consistent with, that of the Biological Opinion for the PEIS.

*Id.* at 90–91.

## IV.    REQUEST TO ENTER THE CONSENT DECREE

The settlement embodied in the Decrees substantially advances the public interest by

implementing restoration of injured natural resources at Portland Harbor substantially earlier

than would occur if restoration waited until this matter were fully litigated to judgment.

Moreover, the Trustees have allocated responsibility among Defendants using a settlement

methodology that is fair to Defendants and non-settlors.  The actions taken by the Settling

Trustees in the Decrees represent a lawful exercise of their authorities under the relevant

statutes.

For the reasons set forth above, Plaintiffs respectfully request that this Court enter each

Decree as a final judgment in this action pursuant to Fed. R. Civ. P. 54 & 58.  As set forth in the

Decrees, Defendants have consented to entry.  Dkt Nos. 4-1 ¶ 104 and 11-1 ¶ 34.

> Respectfully submitted,
>
> UNITED STATES OF AMERICA
>
> ADAM R.F. GUSTAFSON
> Acting Assistant Attorney General
> Environment & Natural Resources Division
> U.S. Department of Justice
> Washington, D.C.  20530

Plaintiffs' Motion to Enter Consent Decrees     32

s/ Michael J. Zevenbergen
MICHAEL J. ZEVENBERGEN
Senior Counsel
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice, c/o NOAA
7600 Sand Point Way, NE
Seattle, Washington 98115
(202) 276-0037
Michael.Zevenbergen@usdoj.gov

STATE OF OREGON

DAN RAYFIELD
Attorney General
State of Oregon Department of Justice

s/ Sadie Forzley
SADIE FORZLEY #151025
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, Oregon 97201
(971) 673-1880
Sadie.Forzley@doj.oregon.gov

CONFEDERATED TRIBES OF THE GRAND RONDE
COMMUNITY OF OREGON

s/ Holly Partridge
HOLLY PARTRIDGE
Senior Staff Attorney
The Confederated Tribes of Grand Ronde
9615 Grand Ronde Road
Grand Ronde, OR 97338
(503) 879-2335

Plaintiffs' Motion to Enter Consent Decrees    33

CONFEDERATED TRIBES OF THE SILETZ INDIANS


 s/ Julie A. Weis
JULIE A. WEIS
Haglund Kelley LLP
2177 SW Broadway
Portland, OR  97201
(503) 225-0777


CONFEDERATED TRIBES OF THE UMATILLA
INDIAN RESERVATION


 s/ Joseph R. Pitt
JOSEPH R. PITT
CTUIR Office of Legal Counsel
46411 Timíne Way
Pendleton, OR  97801
(541) 429-7404


CONFEDERATED TRIBES OF THE WARM SPRINGS
RESERVATION OF OREGON


 s/ Josh Newton
JOSH NEWTON
Best Best & Krieger LLP
360 SW Bond Street
Bend, OR  97702
(541) 318-9817


Plaintiffs' Motion to Enter Consent Decrees    34

NEZ PERCE TRIBE


 s/ Courtney Johnson
COURTNEY JOHNSON
Crag Law Center
3141 E. Burnside St.
Portland, OR 97214
(503) 525-2728

OF COUNSEL:

Ericka Hailstocke-Johnson
Attorney-Advisor
Office of General Counsel
Natural Resources Section
National Oceanic & Atmospheric Administration
501 W. Ocean Boulevard, Long Beach, CA 90802
Telephone: (562) 980-4070
E-mail: Ericka.Hailstocke-Johnson@noaa.gov

Date: June 9, 2025

Plaintiffs' Motion to Enter Consent Decrees    35

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 9, 2025, a copy of the foregoing was served on all counsel of record using the Court's CM/ECF system.


 /s Michael J. Zevenbergen
MICHAEL J. ZEVENBERGEN


Plaintiffs' Motion to Enter Consent Decrees     36

# Attachment A
# Declaration of Troy Baker

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA; the STATE OF OREGON; the CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON; the CONFEDERATED TRIBES OF SILETZ INDIANS; the CONFEDERATED TRIBES OF THE UMATILLA INDIAN RESERVATION; the CONFEDERATED TRIBES OF THE WARM SPRINGS RESERVATION OF OREGON; and the NEZ PERCE TRIBE, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| ACF INDUSTRIES, LLC; AIRGAS USA LLC; AIR LIQUIDE AMERICA L.P.; ASH GROVE CEMENT COMPANY; ASHLAND INC.; BEAZER EAST, INC.; BNSF RAILWAY COMPANY; CALBAG METALS CO.; CITY OF PORTLAND; ESCO GROUP LLC; EVRAZ INC. NA (FKA OREGON STEEL MILLS AND GILMORE STEEL); GOULD ELECTRONICS INC.; HAJ, INC., D/B/A CHRISTENSON OIL COMPANY; HERCULES LLC; KOPPERS INC.; MCCALL OIL & CHEMICAL CORPORATION; MCCALL OIL REAL ESTATE COMPANY LLC; MOREC FRONT LLC; GWC PROPERTIES, LLC; GWC FRONT, LLC; TANKER BASIN LLC; MMGL LLC; NORTHWEST PIPE COMPANY (FKA NORTHWEST PIPE & CASING COMPANY AND NORTHWEST PIPE AND CASING COMPANY); PACIFICORP, AN OREGON CORPORATION; PORT OF PORTLAND; PORTLAND GENERAL ELECTRIC COMPANY (PGE); PORTLAND TERMINAL RAILROAD COMPANY; SCHNITZER STEEL INDUSTRIES, INC.; SILTRONIC CORPORATION; SULZER PUMPS (US) INC.; and VALVOLINE INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 3:23-cv-01603-YY<br><br>**DECLARATION OF TROY BAKER IN SUPPORT OF PLAINTIFFS' MOTION TO ENTER CONSENT DECREES** |
| Defendants. | ) | |

ER-812

1.      I am Troy Baker, and I make this Declaration in support of Plaintiffs' Motion to Enter Consent Decrees in the matter of <u>United States of America, et al., v. ACF Industries, LLC, et al</u>.  By this Declaration I explain the early settlement process used to estimate the extent of injuries to natural resources in the Willamette River within the Portland Harbor Superfund Site, the contributions of Defendants to those injuries, and the ecological values of the restoration projects identified in the proposed Restoration Credit Consent Decree previously lodged in this matter.

2.      I received a Bachelor of Science degree from Texas A&M University in 1998 and a Master of Science degree from the University of Georgia in 2000.

3.      I am an environmental scientist for the National Oceanic and Atmospheric Administration ("NOAA") of the United States Department of Commerce in the Assessment and Restoration Division ("ARD").  I have been involved for a number of years on behalf of NOAA in assessing damages to and restoring natural resources injured by contaminants in the Willamette River in Portland, Oregon.  ARD assesses natural resource damages resulting from hazardous substance releases and oil spills that injure publicly owned, managed, or controlled natural resources and for which NOAA has been designated as a trustee on behalf of the public. NOAA typically carries out CERCLA natural resource damage assessments in conjunction with federal, state, and tribal co-trustees.  I am experienced in the use of Habitat Equivalency Analysis ("HEA"), a habitat valuation approach used to quantify natural resource injuries and determine compensation for natural resource damages.

4.      I have 25 years of experience in the environmental field and have been involved in natural resource damage assessments ("NRDA") related to sediments contaminated by hazardous substances, oil, and other petroleum products that affected aquatic resources.  From

Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      1

December 2006 to the present as an ARD employee, I have worked with interdisciplinary teams to detect, measure, and quantify environmental and human use impacts from pollution and plan for restoration that addresses those injuries. Earlier in my NOAA career, I was based in Baton Rouge, LA, and Silver Spring, MD, including acting as a Branch Chief for the Southeastern Branch of ARD during 2010–2013. In each of these locations, I have been involved in pollution cases with contaminated sediments and injured natural resources. My duty location has been Seattle, WA, since 2013. In addition to pollution casework in the West Coast region, or other areas as necessary, I also have been designated the NOAA Co-Director of the Coastal Response Research Center at the University of New Hampshire since November 2020. In that role, I participate in and help coordinate all-hazards incident preparedness activities for the NOAA Office of Response and Restoration.

5.    Since January 2023 through the present, I have been NOAA's case team coordinator for the Portland Harbor NRDA, responsible for managing the evaluation of information used by the Portland Harbor natural resource trustees participating in the Portland Harbor Natural Resource Trustee Council ("Trustees") to develop and review settlement proposals for natural resource damages claims relating to Portland Harbor. As part of my current position, I reviewed work led by my predecessor in this position, Robert Neely, in his efforts with contractors, fellow case team members, and co-Trustees to develop the information used in the HEA model the Trustees used to estimate injuries to natural resources in Portland Harbor. Mr. Neely also helped develop and manage the efforts that allocated shares of harbor-wide liability for natural resource injuries to individual parcels identified as sources of contamination into the Willamette River. I have thoroughly reviewed the methodologies utilized for this

Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      2

settlement with the Defendants at Portland Harbor.  It is my opinion that both the methodologies and calculation of natural resource damages are reasonable and appropriate.

6.      The Willamette River has been subject to considerable levels of industrial and other uses by numerous parties throughout its history and into the present.  Investigations as part of the EPA-led cleanup process and by the Trustees as part of the NRDA documented that large quantities of hazardous substances have contaminated extensive areas of Willamette River sediments.  The contamination was deposited in the sediments by various pathways, including, but not limited to, surface water or groundwater flows or migration of free product that carried the contaminants from areas of adjacent upland facilities where they have been spilled or dumped.  Sediment contamination also resulted from direct releases to the water of hazardous substances from facilities near and adjacent to the Willamette River, discharges from sewer and rainwater systems, or from bank sloughing of contaminated soils.  These contaminants have had serious impacts on the aquatic organisms and other natural resources that inhabit, or come into contact with, contaminated sediments or eat contaminated prey items.  The Trustees have determined that the contamination has harmed not only the organisms that inhabit the sediments, but fish and wildlife that come into contact with the pollution or that eat contaminated prey. Because of the central role that the community of organisms living in and on the sediments plays in the Willamette River food web, the Trustees' natural resource damage analysis for settlement is based upon the areal extent of sediment contamination, the severity of that contamination, and the length of time over which the contamination has been injuring natural resources.

7.      For the purpose of negotiating early settlements with PRPs that accepted the Trustees' invitation to join the early settlement process, including the settlement represented by the proposed Decrees, the Trustees developed a streamlined process for estimating natural

Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      3

resource injuries and the restoration required to compensate for those injuries. Plaintiffs analyzed the impacts from hazardous substances and oil to natural resources, developed restoration strategies, and selected restoration projects to address these impacts. The streamlined process uses a model called Habitat Equivalency Analysis ("HEA"), which is a tool for evaluation of natural resource injuries and required restoration. The HEA is designed to account for the injuries resulting from the range of contaminants in river sediments and calculate the total combined loss to natural resources over time from those contaminants. Because the injuries to natural resources evaluated by the HEA are caused principally by contaminated river sediments, the HEA measured the injuries in terms of losses of ecological services provided per acre of affected habitat.

8.      Contaminant footprint maps within the Portland Harbor Natural Resource Damage Assessment Area ("Assessment Area") were constructed using sediment contamination data for 12 contaminants of concern. A contaminant footprint map was developed for each contaminant, reflecting the degree of contamination relative to threshold concentrations for injury to aquatic resources. Each footprint delineates sediment contaminant concentrations that exceed these threshold levels. The thresholds for determining injury reflect Oregon and Washington State sediment standards and effects thresholds established in the scientific literature.

9.      The Trustees' HEA model quantified natural resource damages liability for the Assessment Area in terms of discounted ecological service acre years ("DSAYs"). A DSAY reflects the amount of ecological services one acre of a given habitat provides over one year and can be used to measure a "debit" when habitat is injured (*e.g.*, by contamination) or a "credit" when habitat is restored. The Trustees used DSAYs as an ecological "currency" to facilitate

Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      4

negotiating settlements.  DSAYs are a metric that allow the Trustees to value damages and to allow potentially responsible parties ("PRPs") to develop restoration projects that generate ecological services instead of paying monetary damages.  The Trustees considered the injuries resulting from the range of hazardous substances in sediments and calculated the total combined losses to natural resources over time from those contaminants.  In making these determinations, the Trustees reviewed information regarding the natural resources historically and currently found in the Willamette River, information on contaminant levels in the Assessment Area, environmental studies of impacts to similar resources in similar environments, state regulatory standards, and scientific literature in order to determine the percentage loss of ecological services resulting from increasing sediment concentrations of hazardous substances.  In addition, the Trustees and the PRPs participating in the early restoration process also conducted site-specific studies at Portland Harbor to help quantify the natural resource injuries.  Relying upon all of this information, the Trustees' HEA model determined the percentage loss of ecological services resulting from increasing sediment concentrations of hazardous substances and oil in the Assessment Area.

10.    The HEA also is used to determine the amount of habitat restoration needed to compensate for ecological service losses over time.  The HEA calculated, in DSAYs, the amount of habitat restoration needed to compensate for a given level of injuries by the gain in ecological services per acre provided by different restoration techniques in different habitats.  To equate losses from contamination and gains from restoration occurring at different times, the losses and gains were converted to a common, present value.  Sufficient restoration is determined to be the number of acres of a particular type of restoration that generates the same amount of DSAYs as were lost due to the injury.  For the purposes of early settlements, the Trustees estimated the

Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      5

damages for the Assessment Area as a whole – and thus the quantum required for restoration – to be 4,130 DSAYs.

11. To reach settlements with individual PRPs, the Trustees first developed estimates of the share of the total injuries attributable to hazardous substances released from each property along the Assessment Area. The Trustees reviewed publicly available documents obtained from EPA and the Oregon Department of Environmental Quality, and summary documents published by federal, state, and/or local authorities to evaluate activities that took place at those facilities that resulted in the release or likely release of hazardous substances and discharges of oil to the Assessment Area.

12. Each PRP in the early settlement process identified the properties and facilities it owns or operates, and/or formerly owned or operated. Each Defendant submitted information regarding its activities and operations for these identified properties, which the Trustees reviewed for accuracy. Based on this information, the Trustees determined the contaminants likely associated with these activities. Contaminants associated with activities at Defendants' properties and facilities were then compared with contaminant footprints in Willamette River sediments in the Assessment Area. A three-step process was used to determine whether a property would be potentially subject to allocation for a particular contaminant. First, a pathway must exist for the contaminant to travel from the property or facility to the Assessment Area. Second, contaminants associated with activities on the property or facility were found in contaminated sediment footprints. Finally, those footprints were in sufficiently close proximity to the property or facility, or a site-related outfall to the Willamette River. If a connection existed between contaminated sediments and a Defendant's property or facility, then that property or facility was assigned natural resource damages liability for the contaminated

Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees    6

ER-818

footprint. The amount of assigned liability (in DSAYs) depended on the estimated injury to natural resources (in DSAYs) caused by contaminants in the sediment footprint and whether other properties and facilities also contributed contaminants to that footprint.

13.    The Trustees used two basic approaches to assigning contaminants to properties and facilities in the Assessment Area. First, for most hazardous substances, there was a "footprint" of contamination in the sediments that was attributed to particular facilities or properties. Second, for more ubiquitous and diffuse contaminants, such as polycyclic aromatic hydrocarbons ("PAHs"), multiple facilities or properties often contributed to a contamination footprint, in which case a relative index approach was used, where liability was divided among the facilities and properties that were known to have released the ubiquitous and diffuse contaminants. This division among facilities and properties was based on the nature of the waste-producing activities located at the facility or property, the area involved and the time period during which these activities occurred. Using this methodology, responsibility for virtually all contaminated sediment footprints in the Assessment Area were assigned to properties and facilities near or adjacent to the Assessment Area. In rare cases, it was not possible to assign contaminant footprints to properties near or adjacent to the Assessment Area, primarily where a contaminant footprint was not in sufficient proximity to any known source of that contaminant. These instances represent less than 3% of the HEA's total injury estimate.

14.    Using the above process at each property or facility identified by a PRP, the Trustees developed a proposed liability allocation, in DSAYs, for that PRP. The Trustees then shared their proposed allocation with that PRP, including the factual basis for that allocation. Each PRP was given an opportunity to review its proposed allocation and to provide additional information if it disagreed with the factual basis for the Trustees' proposed allocation. For

Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees        7

example, a PRP might provide information that it did not use a particular type of process or chemical at the site in question. If the Trustees agreed that the additional information warranted revisions to the factual basis of their initial allocation, revisions to the factual basis and associated DSAY allocations were made. No significant revisions were made to allocations without a supporting factual basis, such as information establishing that a Defendant did not use a particular type of process or chemical. Only modest equitable downward revisions based on "litigation risk" or other forms of "uncertainty" were made in negotiations with individual PRPs.

15. Together, Defendants in the proposed Consent Decrees were assigned a total of 471.389 DSAYs, which represents about 11.4% of the estimated total natural resource damages for the Assessment Area. Negotiations with additional PRPs in the early settlement process are ongoing, and if further settlements are reached, the Trustees anticipate lodging additional consent decrees embodying those settlements.

16. It is important to note that the Trustees' assessment of injuries to natural resources in the HEA model used to calculate DSAY losses for the Assessment Area, and the process the Trustees used to allocate those losses to individual facilities and properties, are not held out as definitive. The Trustees performed assessments using information available at the time to the Trustees, and the development of new information could change those estimates. In addition, attributing responsibility in a multi-user environment as complex as the Willamette River inherently involves uncertainty. As such, the methodology used by the Trustees, and the results of that methodology, are not necessarily the only reasonable means of measuring total injury and individual responsibility. However, the Trustees devoted substantial effort and resources to the development of this HEA model and the allocation methods used in the settlement process and believe that they are appropriate tools for the early resolution of PRPs' liability for natural

Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees    8

resource damages at Portland Harbor. Indeed, the financial and technical resources employed for the HEA process used at Portland Harbor substantially exceed the resources typically available at CERLCA sites to develop and apply HEA models.

17. In addition to assessing injuries to natural resources, the Trustees included in their early settlement process a restoration strategy and selected restoration projects that could be included in settlements with PRPs. A draft Programmatic Restoration Plan and Environmental Impact Statement ("PEIS") was released for public comment in 2012, and the Trustees published the final document and response to comments in 2017. The PEIS included the Trustees' integrated restoration approach as the preferred alternative and provided details on the Trustees' goals and objectives for ecological restoration, target species, and monitoring and stewardship expectations. The PEIS also identified 44 projects as examples of the types of ecological restoration projects that might ultimately be implemented (including all four of the restoration projects the Trustees included in the Restoration Credit Consent Decree).

18. Following the PEIS, the Trustees developed a Supplemental Restoration Plan and Environmental Assessment ("SRP"), in which the Trustees identified the purchase of credits from restoration banks as the preferred alternative for ecological restoration during this phase of the NRDA and identified and evaluated the four restoration projects included in the Restoration Credit Consent Decree. The Trustees published the draft SRP for public comment in 2020 and published the final document, including a response to public comments, in 2021.

19. In evaluating the adequacy of the restoration value required of Defendants in the Consent Decrees in relation to their share of responsibility, the key measure employed by the Trustees was the HEA methodology described above. Based on the releases of hazardous substances and discharges of oil from the Defendants' identified facilities and properties in the

Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees    9

Consent Decrees, the purchased restoration credits and cash payments will provide sufficient restoration value to compensate for the share of injury attributed to Defendants' properties and facilities in the Consent Decrees. This determination was the primary factor in the Trustees' acceptance of the Consent Decrees.

20.    Another factor considered by the Trustees is the value of early settlement. In order to encourage PRPs to address the impact of releases of contaminants on natural resources sooner rather than later, the Trustees believe it is appropriate to use the value of early restoration as a factor in evaluating settlements, and the Trustees have done so for these settlements. The Trustees particularly value early restoration where, as in the Willamette River, several affected species are identified as threatened or candidate species under federal or state law. Such species particularly need timely action to increase their survival, and early settlements help achieve this objective.

21.    Taking the above factors together, the Trustees have concluded that the Consent Decrees appropriately compensate for injuries to natural resources in Portland Harbor resulting from release of contaminants from Defendants' properties. I fully concur with this conclusion.

Signed under penalty of perjury on ____June 06 th____, 2025.

_____
Troy Baker

Baker Declaration in Support of
Plaintiffs' Motion to Enter Consent Decrees      10

# Attachment B
# Public Comments
# Received on Consent Decrees

Public Comment
Received 01/02/2024 from
John Lee Marshall, Citizen Activist

To:    Assistant Attorney General,
       U.S. DOJ—ENRD
       P.O. Box 7611
       Washington, DC 20044–7611

From:  John Lee Marshall
       Citizen Activist
       2215 SE Miller Street, Apt 11
       Portland, Oregon 97202

Re:    U.S. Department of Justice
       Environment and Natural Resources Division
       CONSENT DECREE U.S. et al. v. ACF Industries, LLC. et al.[1]

Assistant Attorney General, Environment and Natural Resources Division, United States of America et al. v. ACF Industries LLC, et al., D.J. Ref. No. 90– 11–2–06787/2.

**Delta HEA vs Annual Return Dividend for Calculating DSAYs**

I strongly suspect the method used by Portland Harbor mitigation banks (banks) and the Trustee Council to calculate debits and credits (DSAYs) may have a fundamental logic error and subsequently the number of DSAYs may be significantly overestimated. The logic error is in the dividend variable used for their DSAY formula (see Figure 1 for definitions and Figure 2 for formula comparison):

$$\text{Bank's DSAY Formula: DSAYs} = (RS - DS) / DR \times A$$

The dividend highlighted in yellow above in the bank's formula is termed Delta HEA. Alternatively, I suspect that the dividend that should have been used is the Annual Recovery highlighted in yellow in my interpretation of the correct DSAY formula below:

$$\text{My Interpretation of the Correct DSAY Formula: DSAYs} = AR / DR \times A$$

Under the assumption DSAYs are intended to represent the present values of Portland Harbor

| DSAYs - Discounted-Service-Acre-Years |
|---|
| A – Habitat Acres |
| RS – Recovered Services Value Score |
| DS – Damaged Services Value Score |
| AR – Annual Recovery |
| DR – Discount Rate |

Figure 1. DSAY Formula Term Variable Definitions.

---

[1] Comment period: *Updated December 22, 2023*
11/14/2023 - 1/28/2024

credits and debits, I employed an Excel spreadsheet (Figure 3) using data extracted from the Linnton Mill Mitigation Bank Prospectus (Prospectus). This allowed me to reproduce the same DSAY numbers for the bank as displayed in the Prospectus. The results using the bank's formula yielded ~ 318-DSAYs (Figures 3 and 5). This number of DSAYs is significantly greater than the ~ 12-DSAYs yielded by my interpretation of the correct formula (Figures 3 and 4).



Figure 2. Comparison of Dividends (Delta HEA vs Annual Return) to Calculate DSAYs.

Logic suggests that:

1. if the range of DSAY value is between 0 and 1,
2. if all 12 acres had 0-value post impact (debit) or pre-recovery (credit),

3. and if the mitigation bank subsequently reached full functional value (1.0),
4. then the most the present value (DSAYs) could possibly be is: 12-acres x $(1.0 - 0)$ x 1-year = 12-DSAYs.

The problem lies in the fact that Delta HEA currently used in the dividend does not reflect the habitat function annual recovery, but rather the entire functional recovery over the entire life of the bank. The arithmetic used by the Portland Harbor mitigation banks and the Trustee Council may treat this much larger figure as the additive annual accrual of function at their respective locations, thereby erroneously magnifying their true overall functional value.

For example, if the bank reached its full credit value from 0 to 1 in 1-year, then the annual accrual would be 100% or 1.00. The annual accrual total (1) would be divided by the percent annual accrual (1) to derive a present value of 1. Likewise if it took 30 years for the bank to reach full value then the annual accrual total (0.033) [*Not say 0.875*] would be divided by the percent annual accrual (0.033) to derive a present value of 1. In both cases the value 1.0 is multiplied by acres (12) multiplied by 1-year to derive 12-DSAYs, much lower than 318-DSAYs derived in the Prospectus. This suggests a serious flaw in the logic used to calculate DSAYs at the banks. The Trustee Council should look into this further and the results of their investigation should be reported to the Portland Harbor stakeholders as well as the general public. For a more in-depth analysis of this potential problem, including a series of investigative amortization tests, go to:

Logic Testing for Portland Harbor Mitigation and Conservation Bank Credits and Debits (DSAYs)

**Why are the Dividends Used in the DSAY Calculation Formula Important?**

In order to meet the natural resource recovery goals established during the CERCLA and CWA related Natural Resources Damage Assessment (NRDA) negotiations it is necessary to:

1. Maintain competitive mitigation bank credit and debit values in the region,
2. Maintain affordable credits for the regulated public (polluters), and
3. Maintain reasonably profitable credits for the mitigation bank sponsors.
4. Verify the banks are meeting their recovery targets.

A balance should assure adequate mitigation bank sponsor profit in a competitive credit market while the regulated public (polluters) can meet their regulatory obligations and still remain solvent. All the while the regulatory agencies need assurances the region's overall mitigation banking program is adequately meeting the public trust requirements.

The foundation for balance is contingent on the credit/debit evaluation methods being logically defensible as verified by transparent accounting. Illogical methods that significantly overvalue credits can lead to an amelioration strategy that underserves and possibly even subjugates its intended purpose. In other words, the ecological recovery of the Portland Harbor superfund site, in terms of both acreage and function, may be severely compromised. The credit/debit evaluation methods are not the only elements affecting Portland Harbor recovery goals, but they are nevertheless extremely important and therefore deserve careful consideration.

**3 |** P a g e

| Proposed Cowardin Class | Habitat HEA Category | Pre-construction Condition | Acres | Existing Functional Value | Proposed Functional Value * | Delta Value (DV) | Incremental Annual Value (AV) | HEA DISCOUNT Rate ** (DR) | DV/DR | (DV/DR) * Acres | (DV/DR) * Ac by Cowardin Class | DV * A | Incremental Annual Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Shallow Water riprap/concrete adjacent | 3.75 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 27.5 | 103.1 | | 3.375 | 30x = 1 |
| Riverine | Shallow Water | Shallow Water covered | 0.22 | 0.5 | 1 | 0.5 | 0.033 | 0.032727 | 15.3 | 3.4 | | 0.11 | 30x/30 = 1/30 |
| | | Shallow Water Gravel/rock, degraded | 0.84 | 0.5 | 1 | 0.5 | 0.033 | 0.032727 | 15.3 | 12.8 | | 0.42 | x = 1/30 |
| | | ACM piles | 0.56 | 0.05 | 0.8 | 0.75 | 0.033 | 0.032727 | 22.9 | 12.8 | | 0.42 | x = 0.033 |
| | | ACM covered | 0.14 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 21.4 | 3.0 | | 0.098 | |
| | | ACM riprap | 0.38 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 21.4 | 8.1 | | 0.266 | |
| | ACM | ACM unvegetated/steep | 0.41 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 21.4 | 8.8 | 188.3 | 0.287 | |
| | Unvegetated | Riparian unvegetated | 0.14 | 0 | 0.8 | 0.8 | 0.033 | 0.032727 | 24.4 | 3.4 | | 0.112 | Alternative A |
| | | Riparian invasive | 0.32 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 21.4 | 6.8 | | 0.224 | |
| | | Riparian native forested | 0.09 | 0.5 | 0.8 | 0.3 | 0.033 | 0.032727 | 9.2 | 0.8 | | 0.027 | This alternative divides |
| | | Riparian invasive | 0.16 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 27.5 | 4.4 | | 0.144 | Delta V by HEA Discount |
| | Off-Channel | Riparian unvegetated | 0.68 | 0 | 1 | 1 | 0.033 | 0.032727 | 30.6 | 20.8 | | 0.68 | Rate |
| | | Riparian unvegetated | 1.12 | 0 | 1 | 1 | 0.033 | 0.032727 | 30.6 | 34.2 | | 1.12 | |
| | | Upland unvegetated | 2.38 | 0 | 1 | 1 | 0.033 | 0.032727 | 30.6 | 72.7 | | 2.38 | |
| Palustrine | | ACM piles | 0.21 | 0.05 | 1 | 0.95 | 0.033 | 0.032727 | 29.0 | 6.1 | 132.3 | 0.1995 | |
| | ACM | ACM riprap | 0.11 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 27.5 | 3.0 | | 0.099 | |
| | Vegetated | Riparian unvegetated | 0.08 | 0 | 1 | 1 | 0.033 | 0.032727 | 30.6 | 2.4 | | 0.08 | |
| | | Riparian invasive vegetated | 0.5 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 27.5 | 13.8 | | 0.45 | Mitigation Ratio (C/A) |
| | | Sum Acres | 12.09 | | | | | | | Sum Credits aka DSAYs | 321 | 10 | 26.51582155 |
| | | | | | | | | | | | | 317.9242 | |

| Proposed Cowardin Class | Habitat HEA Category | Pre-construction Condition | Acres | Existing Functional Value | Proposed Functional Value * | Delta Value (DV) | Incremental Annual Value (AV) | HEA DISCOUNT Rate ** (DR) | AV/DR | (AV/DR) * Acres | (AV/DR) * Ac by Cowardin Class | DV * A | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Shallow Water riprap/concrete adjacent | 3.75 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 1.0 | 3.8 | | 3.375 | |
| Riverine | Shallow Water | Shallow Water covered | 0.22 | 0.5 | 1 | 0.5 | 0.033 | 0.032727 | 1.0 | 0.2 | | 0.11 | |
| | | Shallow Water Gravel/rock, degraded | 0.84 | 0.5 | 1 | 0.5 | 0.033 | 0.032727 | 1.0 | 0.8 | | 0.42 | |
| | | ACM piles | 0.56 | 0.05 | 0.8 | 0.75 | 0.033 | 0.032727 | 1.0 | 0.6 | | 0.42 | |
| | | ACM covered | 0.14 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 1.0 | 0.1 | | 0.098 | |
| | | ACM riprap | 0.38 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 1.0 | 0.4 | | 0.266 | |
| | ACM | ACM unvegetated/steep | 0.41 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 1.0 | 0.4 | 7.8 | 0.287 | Alternative B |
| | Unvegetated | Riparian unvegetated | 0.14 | 0 | 0.8 | 0.8 | 0.033 | 0.032727 | 1.0 | 0.1 | | 0.112 | This alternative divides |
| | | Riparian invasive | 0.32 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 1.0 | 0.3 | | 0.224 | Incremental Annual V |
| | | Riparian native forested | 0.09 | 0.5 | 0.8 | 0.3 | 0.033 | 0.032727 | 1.0 | 0.1 | | 0.027 | by HEA Discount Rate |
| | | Riparian invasive | 0.16 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 1.0 | 0.2 | | 0.144 | |
| | Off-Channel | Riparian unvegetated | 0.68 | 0 | 1 | 1 | 0.033 | 0.032727 | 1.0 | 0.7 | | 0.68 | |
| | | Riparian unvegetated | 1.12 | 0 | 1 | 1 | 0.033 | 0.032727 | 1.0 | 1.1 | | 1.12 | |
| | | Upland unvegetated | 2.38 | 0 | 1 | 1 | 0.033 | 0.032727 | 1.0 | 2.4 | | 2.38 | |
| Palustrine | | ACM piles | 0.21 | 0.05 | 1 | 0.95 | 0.033 | 0.032727 | 1.0 | 0.2 | 4.4 | 0.1995 | |
| | ACM | ACM riprap | 0.11 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 1.0 | 0.1 | | 0.099 | |
| | Vegetated | Riparian unvegetated | 0.08 | 0 | 1 | 1 | 0.033 | 0.032727 | 1.0 | 0.1 | | 0.08 | |
| | | Riparian invasive vegetated | 0.5 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 1.0 | 0.5 | | 0.45 | Alt A/ Alt B |
| | | Sum Acres | 12.09 | | | | | | | Sum Credits aka DSAYs | 12 | 10 | 26.29646339 |

Worksheet tabs: ALT_DSAYs | HEA_B | HEA_E | HEA_G | HEA_F | HEA_N | HEA_O | HEA_I | HEA_J | HEA_L | HEA_M | HEA_K | HEA_H | HEA_C

Figure 3. Delta HEA vs Annual Return HEA Derived DSAYs.

https://www.mitigationcreditdebit.com/HEA_ALT_DSAYS.xlsx



Figure 4. DSAYs Calculator Results Using Annual Return / Rate of Annual Return

https://www.mitigationcreditdebit.com/EcoServCalculator.html



Figure 5. DSAYs Calculator Results Using Delta HEA / Rate of Annual Return

https://www.mitigationcreditdebit.com/EcoServCalculator.html

ER-830

Public Comment
Received 01/23/2024 from
Arkema Inc.



January 23, 2024

*Via Email (pubcomment-ees.enrd@usdoj.gov),*
*Original to Follow by U.S. Mail*

Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611

Re:    ***United States of America et al. v. ACF Industries LLC, et al.***
       **D.J. Ref. No. 90-11-2-06787/2**

To whom it may concern:

This firm represents Legacy Site Services LLC ("LSS"), agent for Arkema Inc. ("Arkema"), in relation to the Portland Harbor Superfund Site in Portland, Oregon (the "Site"). As a founding member of the Lower Willamette Group and the Pre-RD Group, as well as the signatory to an individual Administrative Order on Consent for Removal Action, Arkema has been actively involved in the investigation and ongoing remediation at the Site for more than 20 years.[1] Currently, Arkema is performing remedial design work at a portion of the Site pursuant to an Administrative Settlement Agreement and Order on Consent with the United States Environmental Protection Agency.[2]

On November 1, 2023, the Department of Justice filed a friendly complaint, accompanied by two proposed consent decrees—a Cash-Out Consent Decree (Dkt. 2-1) and a Restoration Credit Consent Decree (Dkt. 4-1)—in the matter of *United States of America et al. v. ACF Industries LLC, et al.*, Case No. 3:23-cv-01603 (D. Or.). The complaint, which was filed on behalf of the United States (on behalf of the National Oceanic and Atmospheric Administration and the Department of the Interior), the State of Oregon, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs

---

[1] *See* Administrative Order on Consent for Remedial Investigation/Feasibility Study, CERCLA Docket No. 10-2001-0240; Administrative Order on Consent for Removal Action, CERCLA Docket No. 10-2005-0191; Administrative Settlement Agreement and Order on Consent for Pre-Remedial Design Investigation and Baseline Sampling, CERCLA Docket No. 10-2018-0236.

[2] *See* Administrative Settlement Agreement and Order on Consent for River Mile 7 West Project Area, CERCLA Docket No. 10-2020-0054.

999 Third Avenue, Suite 4600 | Seattle, WA 98104 | 206.623.1745 | f: 206.623.7789 | hcmp.com

Assistant Attorney General
January 23, 2024
Page 2 of 9

Reservation of Oregon, and the Nez Perce Tribe (collectively, the "Trustees"), alleges claims against a number of parties for natural resource damages within the Portland Harbor Natural Resource Damage Assessment Area (the "Assessment Area"), which is generally co-located with the Site. The consent decrees, if entered by the court, would resolve those claims and afford the settling defendants protection against future natural resource damage claims, including contribution claims by non-settling parties.[3] The consent decrees are currently subject to a public comment period. This letter sets forth Arkema's comments on those proposed consent decrees.

A.    **It is impossible to assess the fairness of the settlements embodied in the proposed consent decrees because those settlements precede a full assessment of natural resource damages at the Assessment Area.**

The proposed consent decrees purport to resolve the natural resource damage liability of the settling defendants through an allocation of liability (measured in discounted service acre-years or "DSAYs") to each settling party.[4] Many of these settling defendants have been allocated nominal shares of liability.[5] In order to assess the fairness and adequacy of these individual allocations (which purport to represent each settling party's share of total natural resource damages within the Assessment Area), there needs to be a full assessment and accounting of the total natural resource damages associated with that area.[6] That full assessment and accounting has not yet been completed. Instead, the Trustees have simply conducted a "preliminary"

---

[3] Based on the information set forth in the recitals of the consent decrees, it appears that non-settling parties may ultimately face claims by the Trustees alleging that they are jointly and severally liable for upwards of $260 million in unresolved natural resource damage liability (estimated as the monetary value of those DSAYs that are not accounted for in the proposed settlements), plus additional assessment costs.

[4] As described in the consent decrees, DSAYs are the units of measurement that the Trustees have used to quantify the natural resource damages allegedly associated with the Assessment Area.

[5] Notably, many of the settling defendants that are party to the proposed Cash-Out Consent Decree (11 of 16) are receiving *refunds* from the Trustees. *See* Dkt. 2-1 at 118. Furthermore, while the Justice Department's press release accompanying the lodging of the consent decrees strongly suggests (but does not explicitly state) that the settlements will result in the recovery of "more than $33 million to restore natural resources," the net amounts to be paid under the two consent decrees come out to a mere $4.7 million. That press release may have been artfully worded, but at least one local news outlet has reported as fact what was suggested by the Justice Department, *i.e.*, that the settlements have been offered in exchange for the payment of $33 million. *See* "Alleged Willamette River Polluters Agree to Pay $33 Million to Restore Habitat, *Willamette Week*, November 2, 2023 ("Nearly two dozen organizations . . . *have agreed to pay* $33.2 million to settle federal litigation alleging that they polluted the Willamette River." (emphasis added)), *available at* www.wweek.com/news/courts/2023/11/02/alleged-willamette-river-polluters-agree-to-pay-33-million-to-restore-habitat/.

[6] *See, e.g., United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747–49 (9th Cir. 1995) (holding that it was an abuse of discretion for the trial court to approve individual natural resource damage settlements where there was no evidence of the total natural resource damages at issue).

Hillis Clark Martin & Peterson P.S.

Assistant Attorney General
January 23, 2024
Page 3 of 9

damage assessment, which was done "for the limited purpose of settlement under the Path C process."[7]

The Trustees' preliminary assessment resulted in an initial damage estimate equivalent to 4,130 DSAYs. However, based on the breadth of the studies that the Trustees have proposed to conduct as part of their forthcoming full assessment (*i.e.*, the Phase 3 Damage Assessment), the total damages associated with the Assessment Area are likely to significantly increase. Among other things, the Trustees plan to utilize a more expansive method for estimating damages, to assess damages associated with the eventual implementation of the remedy at the Site (which may be performed, in part, by one or more of the settling defendants), and may expand the geographic scope of the Assessment Area to include areas not yet assessed.[8]

Until the full Phase 3 Damage Assessment is complete and the ultimate accounting of natural resource damages is made, it is impossible to assess the fairness and adequacy of the settlements embodied in the consent decrees, each of which is purportedly based on an allocated share of those damages. Beyond that, settlements, such as those embodied in the consent decrees, that afford contribution protection before the full amount of natural resource damages have been quantified, are inherently prejudicial to non-settling parties. This is especially true where the contribution protection extends to "[n]atural resource damages arising from re-exposure, resuspension or migration of hazardous substances or pollutants . . . as a result of the future implementation of a remedial action," as one or more of the settling defendants may conduct future remedial actions at the Site that could give rise to claims for additional natural resource damages.[9]

---

[7] *See* Cash-Out Consent Decree, Dkt. 2-1 at 8 (Recital K); Restoration Credit Consent Decree, Dkt. 4-1 at 13 (Recital P).

[8] These differences are explicitly documented in the Trustees' assessment plan for the Phase 3 Damages Assessment. *See* October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan at A-2 (noting that ecological service losses will be quantified using a REA, rather than a HEA, because "that approach will, in this case, best measure adverse changes in the viability of natural resources resulting from exposure to contaminants . . . and best determine the quantity and type of appropriate habitat needed to fully address the measured losses"), at 3-4 (indicating that the Type B assessment will evaluate "injury caused by remedial actions" that have not yet been implemented), and at A-5 ("However, the Trustee Council may expand the geographic scope of their studies in the future as the assessment progresses and further information is developed, including information indicating a likelihood of injury to Columbia River resources resulting from contaminants attributable to Portland Harbor sources."), *available at* https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final%20%282%29.pdf.

[9] *See* Cash-Out Consent Decree, Dkt. 2-1 at 27 (Paragraph 17); Restoration Credit Consent Decree, Dkt. 4-1 at 69–70 (Paragraph 87).

Hillis Clark Martin & Peterson P.S.

Assistant Attorney General
January 23, 2024
Page 4 of 9

**B.** **Additionally, the settlements embodied in the proposed consent decrees are based on a technically deficient assessment of ecological service losses.**

In conducting their preliminary damage assessment for the Assessment Area, the Trustees chose to rely upon the habitat equivalence analysis ("HEA") model previously developed for a different Site altogether—the Commencement Bay Site in Tacoma, Washington. That HEA model, which estimates ecological service losses based on, among other things, the relationship between concentrations of certain contaminants and impacts to certain species present in Commencement Bay (including a marine flatfish species that does not exist within the Assessment Area), has never been validated for the Assessment Area.[10] The Trustees' decision to use the Commencement Bay model was based on expediency rather than accuracy. The Trustees have admitted as much, stating:

> The Portland Harbor Trustee Council elected to rely on Commencement Bay service loss relationships because: 1) they are suitable for use at other locations in the Pacific Northwest with similar ecological attributes; and 2) *the development of site-specific Portland Harbor service loss relationships would have been costly, time-consuming, and unnecessary* for a settlement-oriented, cooperative NRDA process.[11]

As part of the Phase 3 Damage Assessment, the Trustees evidently intend to abandon the Commencement Bay model in favor of a resource equivalency analysis ("REA") model, citing inadequacies in the Commencement Bay model as the rationale for the change. The following question and answer, which is taken from the Trustees' own Phase 3 Damage Assessment Plan, makes this clear:

> **Comment 2a.** What is the rationale for changing to [a] REA? . . .

> **Response 2a.** . . . The rationale for making this change from Phase 2 to Phase 3 is based on the Trustees' judgment that the proposed approach [*i.e.*, the REA] will, in this case, best measure adverse changes in the viability of natural resources resulting from exposure to contaminants (see 43 CFR §11.14(v)) and

---

[10] Arkema, which has been a funding party throughout the Trustees' ongoing natural resource damage assessment process at Portland Harbor, has repeatedly raised these concerns and has never received a satisfactory response from the Trustees.

[11] *See* May 14, 2015 Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement at A-5 (fn. 1) (emphasis added), *available at* https://pub-data.diver.orr.noaa.gov/portland-harbor/20230401_PH%20Ph2%20PthC%20SummaryPreface_5383.pdf. Notably, the Trustees made attempts to establish site-specific injury thresholds for a single contaminant (PAHs) but no others.

Hillis Clark Martin & Peterson P.S.

Assistant Attorney General
January 23, 2024
Page 5 of 9

best determine the quantity and type of appropriate habitat needed to fully address the measured losses.[12]

If the model that that the Trustees used to estimate ecological service losses in Phase 2 is not accurate or reliable enough to carry over to Phase 3 (as the Trustees have expressly acknowledged), then it should not be used as the basis for the proposed settlements.[13]

Additionally, it bears noting that Stratus Consulting, Inc. ("Stratus")—the Trustees' lead consultant throughout the Phase 2 preliminary assessment process—stepped away from this matter after becoming embroiled in an international scandal arising from its involvement in an environmental case between Ecuadorean Amazon villagers and Chevron. In that case, Stratus was alleged to have produced a fraudulent damage assessment in order to artificially inflate the value of the plaintiffs' claims. Years of extensive litigation ensued, with Stratus forced to defend itself against RICO claims and ultimately disavowing its work.[14] The *Denver Post*, Stratus' hometown newspaper, summarized the fall-out in an editorial that concluded with following cautionary remarks:

> As Bloomberg BusinessWeek reporter Paul M. Barrett, whose "Law of the Jungle" is the definitive account of the fiasco in Ecuador, told The Washington Free Beacon: "Any thoughtful spectator has to be skeptical about the role of Stratus Consulting in any major pollution dispute."[15]

**C.** **The settlements embodied in the proposed consent decrees run the risk of undermining the ongoing private allocation of liability for response costs at the Portland Harbor Superfund Site.**

Arkema has been engaged in the ongoing private allocation of liability for the response costs that have been and will be incurred at the Site (the "Response Cost Allocation") since that allocation's inception in 2008, investing significant resources along the way. Currently, there are

---

[12] *See* October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan at A-1 – A-2, *available at* https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final%20%282%29.pdf.

[13] It also calls into question the purported precision of the allocations of liability to the settling defendants, two of which are shown to the thousandth of a DSAY. *See* Cash-Out Consent Decree, Dkt. 2-1 at 118.

[14] This is detailed in Judge Kaplan's 497-page Opinion entered in the matter of *Chevron Corporation v. Steven Donziger, et al.*, Case No. 1:11-cv-00691-LAK-JCF (S.D.N.Y.), Dkt. 1874; *see also* "Consultant Recants in Chevron Pollution Case in Ecuador," *New York Times*, April 12, 2013, *available at* www.nytimes.com/2013/04/13/business/research-recanted-in-oil-pollution-case-in-ecuador.html.

[15] "Boulder's Stratus Consulting and the jungle crooks," *The Denver Post*, July 24, 2015, *available at* www.denverpost.com/2015/07/24/carroll-boulders-stratus-consulting-and-the-jungle-crooks/.

Hillis Clark Martin & Peterson P.S.

Assistant Attorney General
January 23, 2024
Page 6 of 9

nearly 100 parties that are participating in the Response Cost Allocation. It is Arkema's hope and expectation that a successful Response Cost Allocation will facilitate settlements and the eventual performance of remedial action at the Site. The consent decrees, which are predicated on the development and implementation of a competing (but far less robust) allocation process and which include allocations of liability to several parties that are also participating in the Response Cost Allocation, may undermine the allocation of response costs.

The Trustees appear to have anticipated this issue, including the following provision in the two consent decrees:

> The Settling Parties agree that they will not cite or use this settlement or the Path C NRD allocation results in any forum as evidence of liability for remedial action or response costs. Nor shall the Settling Parties cite or use this settlement or the Path C NRD allocation results to contend that they are relevant to, or determinative of, their share of remedial action or response costs, including but not limited to in any allocation of liability conducted by or among the Settling Parties or other PRPs or in any judicial or administrative proceeding concerning remedial action or response costs, except in rebuttal to another PRP's use of the Path C NRD allocation results.[16]

By its terms, this provision only precludes *settling parties* from citing the allocations reflected in the consent decrees, and even then, includes a potentially expansive carve-out for those instances where another party introduces them as evidence. It does *not* preclude decisionmakers from relying on those allocations. Beyond that, the limitation set forth above may not be legally enforceable. In *Washington v. United States*, the District Court for the Western District of Washington specifically rejected the inclusion of similar language in a proposed consent decree that would have resolved the United States' liability for natural resource damages at Commencement Bay.[17] As Judge Bryan stated:

> The Court cannot and should not prohibit the use of the Consent Decree in future actions. The Consent Decree is part of the record accessible by the public, and the Court is aware of no legal authority, or for that matter any sensible public policy, that supports preventing the use of the Consent Decree by parties in future actions.[18]

---

[16] *See* Cash-Out Consent Decree, Dkt. 2-1 at 30 (Paragraph 23); Restoration Credit Consent Decree, Dkt. 4-1 at 72 (Paragraph 91).

[17] *See Washington v. United States*, No. CIV. 06-05225RJB, 2007 WL 3025843 (W.D. Wash. Oct. 15, 2007). In that case, the language at issue was: "This Consent Decree shall not be used against any Party in any action or proceeding other to enforce the terms of this Consent Decree." *Id.* at *10.

[18] *See id.* at *10.

Hillis Clark Martin & Peterson P.S.

Assistant Attorney General
January 23, 2024
Page 7 of 9

In the event that the settling defendants were able to cite to or rely on the allocations set forth in the consent decrees as evidence of their responsibility for response costs, that could have a profound impact on the ongoing Response Cost Allocation.

Notably, the United States has moved to stay other proceedings that could have upended the Response Cost Allocation. In 2017, the Confederated Tribes and Bands of the Yakama Nation filed its own complaint against a number of parties seeking natural resource damages associated with Portland Harbor. *See generally Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp. et al.*, Case No. 3:17-cv-00164-SB (D. Or.) (the "Yakama Nation NRD Litigation"). In that matter, the United States sought (and was granted) a stay on account of the extensive overlap between the Yakama Nation's natural resource damage claims and the Response Cost Allocation:

> For any claims remaining after the Court's consideration of all motions to dismiss, the Court should exercise its discretion to stay this case pending the outcome of the *Arkema* litigation and the non-judicial allocation process [*i.e.*, the Response Cost Allocation]. Consideration of the factors articulated by the Ninth Circuit . . . support a stay here.

> First, a stay is supported to achieve the orderly and efficient course of proceedings in this case, the *Arkema* litigation, and the non-judicial response cost allocation process. As explained in the United States' Notice of Related Cases, there is significant overlap of the parties and issues in this case, the *Arkema* case, and the non-judicial response cost allocation process. The Yakama Nation's claim here for CERCLA response costs relating to releases or threatened releases of hazardous substances from the Site, overlaps with the claims for response costs by the *Arkema* plaintiffs arising out of the contamination at the Site, and with the issues that are being addressed by the numerous parties in the non-judicial allocation response cost process concerning liability for and allocation of response costs arising from contamination at the Site. Moreover, the liability claims in both cases and the allocation issues that are being addressed through the non-judicial response cost allocation process are based on some of the same information, e.g., historical documentation, the RI/FS, etc.[19]

---

[19] *See* United States' Opposed Motion and Memorandum in Support: (1) To Dismiss a Portion of Claim 2; and (2) Stay Any Remaining Claims, Case No. 3:17-cv-00164-SB, Dkt. 218 at 18–19 (citations omitted); *see also* United States' Amended Notice of Related Cases Pursuant to LR 42-2, Case No. 3:17-cv-00164-SB, Dkt. 146 at 6 ("Given the overlap between this current litigation and the *Arkema* litigation, as well as the overlap between the non-judicial allocation process that prompted the stay of the *Arkema* litigation, these two cases should be designated as related and treated accordingly.").

Hillis Clark Martin & Peterson P.S.

ER-838

Assistant Attorney General
January 23, 2024
Page 8 of 9

The Yakama Nation's natural resource damage claims are, for all intents and purposes, indistinguishable from the Trustees' natural resource damage claims.[20] Both share substantial overlap with issues being addressed and resolved through the Response Cost Allocation, which, by the United States' own logic, should be allowed to conclude before any natural resource damages claims are resolved.

**D.    Conclusion**

The settlements proposed by the Trustees precede a full assessment and accounting of the natural resource damages associated with the Assessment Area and are therefore impossible to assess for reasonableness and fairness. Furthermore, the preliminary assessment that has been conducted to date suffers from serious technical flaws. Finally, the settlements also run the very real risk of undermining the ongoing Response Cost Allocation and the substantial resources that have been devoted to that effort. Accordingly, Arkema respectfully requests that the Trustees withdraw the proposed consent decrees pending the outcome of the Phase 3 Damage Assessment and the completion of the Response Cost Allocation.

If the Trustees are unwilling to withdraw the consent decrees, then Arkema requests that the Trustees take the following steps before moving for entry of the proposed consent decrees:

- Revise the language of the consent decrees to clearly state that the contribution protection does not apply to any natural resource damages that are assessed beyond the boundaries of the "Portland Harbor Natural Resource Damage Assessment Area," as that phrase is currently defined by the consent decrees (e.g., natural resource damages assessed within the Columbia River).

- Revise the language of the consent decrees to clearly state that the contribution protection does not apply to any additional natural resource damages identified during the Phase 3 Damages Assessment, including without limitation damages attributable to the implementation of the remedy at the Site or damages attributable to hazardous substances that have not yet been investigated.

- Revise the language of the consent decrees to clearly state that the contribution protection does not apply to the natural resource damages claims asserted by the Yakama Nation in the matter of *Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp. et al.*, Case No. 3:17-cv-00164-SB (D. Or.).

- Revise the language of the consent decrees to clearly state that the entry of the consent decrees does not indicate judicial acceptance of the Trustees'

---

[20] For this reason, Arkema is also concerned that the contribution protection afforded by the proposed consent decrees may apply to the Yakama Nation's natural resource damage claims, and any cross-claims for contribution that the defendants in that action may ultimately assert against one another.

Hillis Clark Martin & Peterson P.S.

Assistant Attorney General
January 23, 2024
Page 9 of 9

> methodology, factual findings, or conclusions, and that any such methodologies, factual findings, and conclusions have no preclusive effect in any future natural resource damages litigation against or among any non-settling parties, or any other proceedings against or among any non-settling parties.

- Issue an updated press release with an accurate statement regarding the payments to be made by the settling parties in exchange for entry of the consent decrees so as to eliminate any public misperceptions created by the original press release.

- Notify the Court, pursuant to LR 42-2 (and consistent with the position taken by the United States in the Yakama Nation NRD Litigation), that this matter is related to both *Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp. et al.*, Case No. 3:17-cv-00164-SB (D. Or.) and *Arkema Inc. v. Anderson Roofing Co., Inc.*, et al., Case No. 3:09-cv-00453-JR (D. Or.).[21]

Thank you in advance for your consideration of these comments. If you have any questions, please contact me.

Sincerely,

Matthew J. Stock

MJS:jlt
*E-Mail:* matthew.stock@hcmp.com
*Direct Dial:* (206) 470-7647

ND: 24232.005 4894-2356-1620v2

---

[21] LR 42-2 provides that "[i]t is the responsibility of counsel to identify complex or related cases and to bring the matter promptly to the attention of the Court."

Public Comment
Received 01/26/2024 from
Gunderson LLC



Jeanette Schuster
jeanette.schuster@tonkon.com

503.802.2114    direct
503.221.1440    main

January 26, 2024

VIA EMAIL AND U.S. MAIL

Assistant Attorney General
U.S. DOJ-ENRD
P.O. Box 7611
Washington, DC  20044-7611
E-Mail: pubcomment-ees.enrd@usdoj.gov

Re:    Public Comments—Gunderson LLC
       *United States of America, et al. v. ACF Industries LLC, et al.*
       D.J. Ref. No. 90-11-2-06787/2

Dear Assistant Attorney General:

This firm represents Gunderson LLC ("Gunderson").  The purpose of this letter is to provide comments on behalf of Gunderson regarding two consent decrees ("CDs") lodged on November 1, 2023, with the United States District Court for the District of Oregon, *United States of America, et al. v. ACF Industries LLC, et al.*, Case No. 3:23-cv-01603 ("Cash-Out CD", Dkt. 11-1) and No. 3:23-cv-01603-YY ("Restoration Credit CD", Dkt. 4-1).  If approved by the court, the CDs will settle claims for natural resource damages ("NRD") by the natural resource trustees currently participating in the Portland Harbor Natural Resource Trustee Council ("Trustee Council")[1] against a number of defendants who are alleged to have owned or operated facilities at the Portland Harbor Superfund Site in Portland, Oregon ("Site").

---

[1] The United States (on behalf of the National Oceanic and Atmospheric Administration and the Department of the Interior), the State of Oregon, the Confederated Tribes of the Grand Ronde Community of Oregon, the Confederated Tribes of Siletz Indians, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Nez Perce Tribe.  The Confederated Tribes and Bands of the Yakama Nation ("Yakama") are not participating in the Trustee Council, and is not a party to the proposed CDs.  On January 30, 2017, the Yakama sued 33 parties, including Gunderson, the federal government, and the State of Oregon, for costs the Yakama incurred in assessing natural resource damages to the Columbia River from contaminants deposited at Portland Harbor.  *Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp. et al.*, Case No. 3:17-cv-00164 (D. Or.), ECF Nos. 1 & 1-1.  This case has been stayed.

Tonkon Torp LLP  |  Advocates & Advisors  |  888 SW Fifth Ave.  |  Suite 1600  |  Portland OR 97204  |  tonkon.com

Assistant Attorney General
January 26, 2024
Page 2 of 9

## Gunderson Facility Background

Long after the ban of key Site contaminants, including polychlorinated biphenyls ("PCBs"), Gunderson owned and operated a railcar- and barge-manufacturing facility ("Gunderson Facility") at the Site, from 1985 until 2023. A 72-inch pipe ("OF-18") owned by the City of Portland ("City") that drains stormwater from approximately 200 acres of industrial lands discharges in the middle of the Gunderson Facility. In addition to stormwater, this outfall historically also drained process wastewater and spilled hazardous materials, as well as sanitary sewage, directly to the Willamette River.[2] The City has acknowledged the impacts of this outfall on the river, stating the following in a December 2013 Completion Summary:

> "The City and DEQ selected Basin 18 as an early focus area for the Portland Harbor Outfalls Project and used the basin to pilot different approaches to a conveyance system source investigation. Basin 18 contains many DEQ Cleanup Program sites, as well as a U.S. Environmental Protection Agency (EPA) site, and is one of the more complex basins within the study area. The City focused its source investigation activities on industrial areas in the basin identified as most likely to be major sources to the conveyance system."[3]

Prior operators in the OF-18 basin included Reimann & McKenney, Inc. ("Reimann"), a barrel refurbishing company, which conducted sloppy operations on bare ground. Reimann was found criminally liable in connection with its barrel-refurbishing operations.[4]

---

[2] *See* City of Portland, *Completion Summary for City of Portland Outfall Basin 18* (Dec. 2013) at 5–7 (available at: https://www.portlandoregon.gov/bes/article/500576) (identifying a range of upland sources to the basin contributing to OF-18).

[3] *Id.* at 1.

[4] *See United States v. Reimann and McKenney, Inc.,* CR 70-179 (Dis. Ct. Or).

Assistant Attorney General
January 26, 2024
Page 3 of 9





Assistant Attorney General
January 26, 2024
Page 4 of 9

The impacts of the discharges through this City outfall are readily visible in historical photographs, including the photograph from 1970 shown below.



Prior to Gunderson's operations, a portion of the Gunderson Facility (so-called "Area 3"), was operated by multiple Schnitzer Steel Industries, Inc. ("Schnitzer") (now d/b/a Radius Recycling) entities for military ship dismantling and for shredding automobiles, appliances, and other metal components, without any significant control of contaminated stormwater discharges or soil erosion into the Willamette River.  The deplorable conditions that resulted from these operations are readily apparent from historical photographs, including the photograph from 1971 below.



Assistant Attorney General
January 26, 2024
Page 5 of 9

Shortly after the listing of the Portland Harbor as a Superfund site, Gunderson joined the Lower Willamette Group to conduct a remedial investigation and feasibility study.[5]  EPA sent Gunderson a notice of potential liability for the Gunderson Facility on December 8, 2000.  FMC is currently performing the remedial design ("RD") work for the River Mile 9 West Project Area ("RM9W") at the Site, pursuant to an Administrative Settlement and Order on Consent for Remedial Design at RM9W entered into with EPA (CERCLA Docket No. 10-2020-0038).  Gunderson is also participating in a non-judicial allocation process to settle claims for past and future response costs at the Site ("Allocation").

The Trustee Council's final Phase 2 injury evaluation determined service loss at 4,130 discounted service acre-years ("DSAYs") across the Site.[6]  Gunderson funded and participated in the Phase 1 and 2 settlement processes and provided the Trustee Council with additional historical and technical information related to the Gunderson Facility.

**2023 NRD Settlements**

Appendix A of both CDs contains a list of each Settling Defendant along with a list of all sites to which each Settling Defendant's settlement applies.  Appendix C of both CDs contains a table listing the liabilities, previous payments, and balances owed for each Settling Defendant.  Nothing in the complaint, CDs, or attached appendices, nor documents in the public record describes each Settling Defendant's discounts received in the settlements, their liability at each settled site, nor site-specific DSAY allocation.

**Gunderson Comments**

By this letter, Gunderson joins the public comments provided by Legacy Site Services LLC on behalf of Arkema, Inc. ("Arkema") and FMC Corporation ("FMC"). Gunderson objects to the proposed settlements because they are not fair, reasonable, consistent with the goals of CERCLA, or in the public interest.

***The Proposed Settlements Lack Key Information***

The CDs lack key information necessary to determine if the settlements are fair and reasonable.  The Restoration Credit CD states that, "[u]nder the Path C process, the Trustee Council conducted a party-specific, intra-property allocation by estimating relative contributions (as percentages) of each PRP [potentially responsible party]

---

[5] *See In Re Portland Harbor Superfund Site, ATOFINA Chemicals, Inc., Gunderson, Inc., et al., Administrative Order on Consent for Remedial Investigation/Feasibility Study*, U.S. EPA Docket Number CERCLA-10-2001-0240 (Sept. 28, 2001).
[6] Portland Harbor Natural Resource Trustee Council, *Summary of Portland Harbor Natural* Resource *Damage Assessment for Purposes of Settlement* (May 2015, updated April. 2023) at A-9.

ER-846

Assistant Attorney General
January 26, 2024
Page 6 of 9

associated with contaminant footprints using factors such as activity type, duration, and proximity to the Willamette River."[7]  Using this process, the Trustee Council settled 471.389 DSAYs in the two CDs, which represents about 11 percent of the total DSAYs allocated to the Site.  The CDs discuss the process leading up to Path C but the basis for the settlements is simply stated as "a fair and reasonable estimate of the equitable responsibility for Covered Natural Resource Damages."[8]  There is no explanation, formula, or data provided for how the amount allocated was arrived at.

When evaluating a settlement's reasonableness, a court should "compare the proportion of total projected costs to be paid by the settlors, with the proportion of liability attributable to them, and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified."[9]  This issue has not been met because the necessary information has not been provided.  Furthermore, to compare the proportion of total projected costs, "the court must know the total projected costs themselves."[10]  Because the Trustee Council has not yet completed an NRD assessment for the entire NRD assessment area, this information is currently unknown.[11]

The proposed CDs do not provide the information necessary to determine any site-specific allocation or the relative proportion of the settlements as compared to other sites or parties.  For example, Schnitzer, the major historical operator at the Gunderson Facility, settled its liability at the Gunderson Facility, in addition to ten other sites, including two major industrial sites, IT slip and Burgard Way, for a total 37.49 DSAYs, which amounts to an average of only 3.4 DSAYs per site.[12]  Because the DSAYs allocated to Schnitzer in the Restoration Credit CD are not provided on a site-specific basis, it is impossible to determine how many DSAYs were allocated to Schnitzer for the Gunderson Facility or how many unsettled DSAYs remain to be allocated to other potential responsible parties at the Gunderson Facility. Consequently, it is not possible to determine if Schnitzer is even close to paying its fair share for the deplorable conditions it caused.

In addition, even though the Trustee Council acknowledges that the City has benefitted from having the outfall structures in place and may have gained additional economic benefits from rate payers,[13] based on the information in the record, the

---

[7] Restoration Credit CD, Dkt. 4-1 at 11.
[8] Restoration Credit CD, Dkt. 4-1 at 12; Cash-Out CD, Dkt. 11-1 at 10.
[9] *New Jersey Dep't of Env't Prot. v. Exxon Mobil Corp.*, 453 N.J. Super.  588, 640(Law.  Div. 2015), aff'd, 453 N.J. Super. 272 (App. Div. 2018) (quoting *United States v. Montrose Chem. Corp. of California*, 50 F.3d 741, 747 (9th Cir. 1995)).
[10] *United States v. Montrose Chem. Corp. of California*, 50 F.3d at 747.
[11] Restoration Credit CD, Dkt. 4-1 at 7.
[12] *Portland Harbor Natural Resource Damage Assessment Phase 2: Allocation Summary Memo for Schnitzer Steel Industries*,      at      1      (available      at:      https://pub-data.diver.orr.noaa.gov/portland-harbor/20221118_Schnitzer_AllocationSumMemo_5236.pdf); Restoration Credit CD, Dkt. 4-4 at 8.
[13] *Id*. at 9.

ER-847

Assistant Attorney General
January 26, 2024
Page 7 of 9

settlements appear to dismiss the impacts of City outfalls to the Willamette River and natural resources.  There is no mention in the CDs of the significant contribution of polluters like Reimann to the City's outfalls and the City's liability for them, or the fact that healthy fish used to die within minutes of being placed in river water[14] because the City turned the river into an open sewer.[15]  The City settled its total NRD liability for 34 sites, along with all of the City-owned outfalls and non-site-specific stormwater, for a total of 61.03 DSAYs, which amounts to an average of only 1.795 DSAYs per site, inclusive of all City the outfalls and stormwater.

A court must consider the substantive fairness of each consent decree to non-settling PRPs.[16]  This determination must be supported by assessing whether liability has been roughly apportioned based upon "some acceptable measure of comparative fault."[17]  In other words, there must be some benchmark by which to evaluate consent decrees, such as the estimate of the projected total natural resource damages at issue.[18]

The lack of transparency in the Cash-Out CD and the Restoration Credit CD into the allocation of the DSAYs for each of the settling defendants' sites makes it impossible to assess whether the settlements are reasonable or fair.[19]  While some discounts of liability to entice settlement are permitted,[20] this concept should not be misused to let serious polluters off the hook without paying for the damage they have caused. In interpreting NRD settlements, courts have held that even though NRD-settling consent decrees should be given deference to encourage settlements and to give deference to the agency's expertise, courts should not just "rubber-stamp" each proposed consent decree.[21]  Because the settlement of liability in these CDs do not appear to be supported by a complete factual record allowing sufficient insight into each Settling Defendant's liability and the magnitude of the discount from the originally allocated site-specific DSAYs or how DSAYs were allocated to each settling party on a site-specific basis, the court would be improperly approving the CDs.

---

[14] Hillegas, James.  *Working for the "working river" : Willamette River water pollution, 1926 to 1962* (June 9, 2009) at 75 (available at: https://search.worldcat.org/title/551797587) ("Men were shown immersing hatchery fingerlings in river water where, in most cases, the fingerlings died within forty-five seconds because of extremely low levels of dissolved oxygen.").

[15] Sears, Alfred. *Report Upon a System of Sewerage for the City of Portland, Oregon* (Dec. 1883) at 38.

[16] *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 (1st Cir. 1990) ("Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible.").

[17] *Id.* at 87.  *See also United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996) ("This amounts to asking whether the terms of the settlement are roughly proportional to [a party's] responsibility and whether they serve the public interest.").

[18] *United States v. Montrose Chem. Corp. of California*, 50 F.3d at 746.

[19] *United States v. Cannons Eng'g Corp.*, 899 F.2d at 90 (holding that courts should defer to an agency's expertise if settlement figures are derived in a sensible way from a plausible interpretation of the record).

[20] *United States v. Davis*, 261 F.3d 1, 26 (1st Cir. 2001) ("discounts on maximum potential liability as an incentive to settle are considered fair and reasonable under Congress's statutory scheme.").

[21] *United States v. Cannons Eng'g Corp.,* 899 F.2d at 84.

Assistant Attorney General
January 26, 2024
Page 8 of 9

### The Proposed Settlements Are Premature

The CDs are also not informed by a current understanding of Site conditions. With limited exception, no remedial action has been conducted at the Site. In fact, the remedial design process is not even finished yet. This means that a full picture of the nature and scope of the required cleanup is not even known. Any NRD settlements based on an incomplete record are premature.[22]

Moreover, at the RM9W project area where the Gunderson Facility is located, FMC has concluded that upland sources are not sufficiently controlled.[23] Thus, any NRD settlement that fails to implement source control measures for known sources leaves open the potential for future NRD damages, thereby failing to meet the statutory directive that NRD settlements must "protect and restore" damaged natural resources.[24]

For the above reasons, the settlements will not fully address the extent of NRD. By allowing a handful of parties to underpay their share of damages, the Trustee Council invites future litigation. Rushing settlements through prematurely without adequate data and an understanding of all parties' liabilities for contamination in the river does not promote CERCLA's purposes.

### Conclusion

In light of the significant inadequacies of the CDs identified above and presented in Arkema's and FMC's public comments, Gunderson requests that the Trustee Council withdraw the proposed CDs pending the outcome of the Trustee Council's Phase 3 Damage Assessment and the completion of the Allocation.

Alternatively, if the Trustee Council will not withdraw the proposed CDs, Gunderson requests that the Trustee Council take the steps enumerated in Arkema's and FMC's comments. In addition, Gunderson requests the Trustee Council provide a listing of the number of DSAYs that were settled with the Settling Defendants on a site-specific basis and the discounts each Settling Defendant received, as well as the facts upon which each Settling Defendant's liability determinations were made.

---

[22] *See United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d at 747–49 (holding that it was an abuse of discretion for the trial court to approve individual natural resource damage settlements where there was no evidence of the total natural resource damages at issue).

[23] *See* Foth, *Sufficiency Assessment Report, River Mile 9 West - Portland Harbor Superfund Site* (July 2020) at section 3.2.3.

[24] 42 USC § 9622.

Assistant Attorney General
January 26, 2024
Page 9 of 9


Thank you for your consideration.

Regards,

Jeanette Schuster

JCS/sp


002402\00214\16784160v5

Public Comment
Received 01/26/2024 from
FMC Corporation



CHRISTOPHER I. RENDALL-JACKSON
crendall-jackson@fbm.com
D 415.954.4417

January 26, 2024

*Via E-Mail and U.S. Mail*

Assistant Attorney General
U.S. DOJ-ENRD
P.O. Box 7611
Washington, DC  20044-7611
E-Mail: pubcomment-ees.enrd@usdoj.gov

        **Re:**    ***United States of America, et al. v. ACF Industries LLC, et al.***
                **D.J. Ref. No. 90-11-2-06787/2.**

Dear Assistant Attorney General:

       We are providing public comments on behalf of FMC Corporation ("FMC") regarding the two consent decrees ("CDs") lodged in November 2023 in *United States of America v. ACF Industries, LLC*, No. 3:23-cv-01603-YY (D. Or.).  If approved by the Court, the CDs would settle claims for natural resource damages by the natural resource trustees currently participating in the Portland Harbor Natural Resource Trustee Council ("Trustee Council")[1] against a number of defendants who are alleged to have owned or operated facilities at the Portland Harbor Superfund Site in Portland, Oregon (the "Site").  (*See* ECF Nos. 4-1 & 11-1.)

       FMC previously owned and operated a facility at the Site and, on April 28, 2006, received a Notice of Potential Liability for the Site from the United States Environmental Protection Agency ("USEPA").  FMC is currently performing the remedial design work for the River Mile 9 West Project Area ("RM9W") at the Site, pursuant to an Administrative Settlement and Order on Consent for Remedial Design at RM9W entered into with USEPA (CERCLA Docket No. 10-2020-0038).

       By this letter, FMC joins the public comments provided by Legacy Site Services LLC, agent for Arkema, Inc. ("Arkema"), and by Gunderson LLC ("Gunderson"), and incorporates those comments by reference, as if set forth herein.  As discussed in detail in the Arkema comments, the fairness and reasonableness of the proposed CDs cannot be determined because

---

[1]  Yakama Nation is not participating in the Trustee Council, and is not a party to the proposed CDs.  On November 1, 2016, FMC received a 60 Day Notice of Intent, indicating that the Yakama Nation would seek recovery of natural resource damages from FMC, and the Yakama Nation subsequently commenced litigation to recover costs from FMC and other parties under CERCLA.  *See* Compl., *Confederated Tribes & Bands of the Yakama Nation v. Air Liquide Am. Corp.*, No. 3:17-cv-00164-SB (D. Or. Feb. 17, 2017), ECF Nos. 1 & 1-1.



Assistant Attorney General
January 26, 2024
Page 2

the Trustee Council has not evaluated the totality of the natural resource damages.[2]  For example, the Trustee Council has indicated that the Phase 3 damage assessment, which is ongoing, may include additional areas and damages caused by future remedial action.[3]  Furthermore, for those natural resource damages that have been evaluated to date, the Trustee Council has admitted that it relied on a model that does not provide the best measure of natural resource damages.[4]

In advancing its incomplete and technically flawed allocation as the basis for the proposed CDs, the Trustee Council is placing the ongoing non-judicial allocation of response costs for the Site at risk.[5]  Notably, the United States asserted to the Court, in separate but related litigation, that a stay of a related natural resource damages claim (by Yakama Nation) was appropriate, because the claim "addresses many of the same contamination releases as those that are at issue . . . in the non-judicial response cost allocation process" and that "[a] stay of these proceedings therefore would support the orderly and efficient course of these proceedings."[6]

Importantly, completion of remedial design – let alone completion of remedial action – has not yet occurred at any portion of the Site.  Natural resource damages are generally considered "a residue of the cleanup action," and are "viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup."[7]  As courts have recognized, natural resource damages, "even interim and lost use damages, can not [sic] be fully measured until the EPA's remedial work is completed,"[8] and should "be addressed at the conclusion of the EPA-ordered remediation" because "[o]nly then will we know the effectiveness of the cleanup and the precise extent of residual damage."[9]  Accordingly, claims for

---

[2]  *See, e.g.*, *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995).

[3]  Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan at 3-4 to 3-5 (Oct. 3, 2018) ("The Trustee Council may identify and quantify the extent to which remediation affects natural resources . . . ."), and at A-5 ("[T]he Trustee Council may expand the geographic scope of their studies in the future as the assessment progresses and further information is developed, including information indicating a likelihood of injury to Columbia River resources resulting from contaminants attributable to Portland Harbor sources."), *available at* https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final%20%282%29.pdf.

[4]  *See Id.* at A-1 to A-2 (recognizing that a different model will "best measure adverse changes in the viability of natural resources resulting from exposure to contaminants . . . and best determine the quantity and type of appropriate habitat needed to fully address the measured losses.").

[5]  Numerous Potentially Responsible Parties are participating in a voluntary, non-judicial allocation process to settle claims for past and future response costs at the Site.  *See* United States' Opposed Mot. to Dismiss at 8, *Confederated Tribes & Bands of the Yakama Nation v. Air Liquide Am. Corp.*, No. 3:17-cv-00164-SB (D. Or. July 31, 2017), ECF No. 218.

[6]  *Id.* at 17.

[7]  *In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution*, 712 F. Supp. 1019, 1035 (D. Mass. 1989).

[8]  *Quapaw Tribe of OK v. Blue Tee Corp.*, No. 03-CV-0846-CVE-PJC, 2008 WL 2704482, at *13 (N.D. Okla. July 7, 2008).

[9]  *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1250 (10th Cir. 2006).



natural resource damages are generally not settled before remediation is complete.[10]  Here, the Trustee Council has taken the unusual step of attempting to enter settlements prematurely, further exacerbating concerns with its incomplete and technically flawed assessment of natural resource damages at the Site.

At the very least, a settlement for natural resource damages, which provides settling parties with a covenant not to sue without also requiring remedial action, "must include provisions assuring that the responsible party will take actions necessary to 'protect and restore' the injured natural resource."[11]  Remedial design efforts at the Site have identified numerous ongoing upland source-control issues,[12] and the CDs must protect against further contamination by requiring additional source control by current owners and operators who are settling parties.[13]  However, as currently drafted, the CDs fail to provide such necessary protections.

In light of the significant inadequacies identified above, and in Arkema's and Gunderson's public comments, FMC requests that the Trustee Council withdraw the proposed CDs pending the outcome of the Trustee Council's Phase 3 Damage Assessment and the completion of the ongoing non-judicial allocation of response costs for the Site.

Alternatively, if the Trustee Council will not withdraw the pending CDs, FMC requests that the Trustee Council take the steps enumerated below before moving for entry of the proposed CDs.

1. Revise the CDs to clearly state that contribution protection does not apply to any natural resource damages that are assessed beyond the boundaries of the "Portland Harbor Natural Resource Damage Assessment Area," as that phrase is currently defined by the CDs (e.g., natural resource damages assessed within the Columbia River).

2. Revise the CDs to clearly state that contribution protection does not apply to any additional natural resource damages identified during the Phase 3 Damages Assessment. This includes, but is not limited to, natural resource damages attributable to the implementation of the remedy at the Site and/or damages attributable to hazardous substances that have not yet been investigated.

3. Revise the CDs to clearly state that contribution protection does not apply to the natural resource damages claims asserted by the Yakama Nation in the matter of *Confederated*

---

[10] *Acushnet River*, 712 F. Supp. at 1035 ("As a residue of the cleanup action, in effect, [natural resource damages] are thus not generally settled prior to a cleanup settlement.").

[11] *State of Utah By & Through Utah State Dep't of Health v. Kennecott Corp.*, 801 F. Supp. 553, 569 (D. Utah 1992) (citation omitted).

[12] *See, e.g.*, Foth, Sufficiency Assessment Report, River Mile 9 West – Portland Harbor Superfund Site (July 2020), Table 3-1 (RM9W Source Control Sufficiency Assessment Matrix).

[13] *See Kennecott Corp.*, 801 F. Supp. at 569 (finding that the "proposed Consent Decree fails to require protection against further contamination by way of source control").



Assistant Attorney General
January 26, 2024
Page 4

*Tribes & Bands of the Yakama Nation v. Air Liquide America Corp.*, No. 3:17-cv-00164-SB (D. Or.).

4.  Revise the CDs to clearly state that the entry of the CDs does not indicate judicial acceptance of the Trustee Council's methodology, factual findings, or conclusions, and that any such methodologies, factual findings, and conclusions have no preclusive effect in any future natural resource damages litigation.

5.  Revise the CDs to require settling defendants who still own or operate facilities at the Site to perform further source control at those facilities.

6.  To reduce the risk of any public misperceptions regarding the import of these settlements, issue an updated press release with an accurate statement regarding the payments to be made by the settling defendants in exchange for entry of the CDs. It is misleading to suggest that the settlements are worth over $33 million, based on the value of the Discounted Service Acre Years ("DSAYs") allocated to the settling defendants, without also disclosing that the total dollar amount allocated to settling defendants in the CDs is less than half the value of those DSAYs.[14]

7.  Pursuant to United States District Court for the District of Oregon Local Rule 42-2, notify the Court that this matter is related to both *Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp..*, No. 3:17-cv-00164-SB (D. Or.) and *Arkema Inc. v. Anderson Roofing Co., Inc.*, No. 3:09-cv-00453-JR (D. Or.).[15]

Sincerely,

Christopher I. Rendall-Jackson

cc:  Victoria W. Hollinger, FMC Corporation
     James H. Colopy, Farella Braun ⏐ Martel LLP

38614\16533856.11

---

[14]  *E.g.*, https://www.justice.gov/opa/pr/responsible-parties-reach-settlement-more-33-million-restore-natural-resources-portland; https://www.fws.gov/portlandharbor/news/two-consent-decrees-lodged.

[15]  D. Or. R. 42-2 states that "[i]t is the responsibility of counsel to identify complex or related cases and to bring the matter promptly to the attention of the Court."

Public Comment
Received 01/26/2024 from
Northwest Environmental Defense Center

**NORTHWEST ENVIRONMENTAL DEFENSE CENTER**
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

Written Comment RE: Portland Harbor Superfund Site: Comment on NRDA Consent Decrees for *U.S. et al. v. ACF Industries, LLC. et al.* (D.J. Ref. No. 90–11–2–06787/2.)

January 26, 2024,

United States Department of Justice

Kathryn C. Macdonald,

Assistant Section Chief, Environmental Enforcement Section

Submitted to: pubcomment-ees.enrd@usdoj.gov

**Parties:**

Dear Mx. Macdonald,

The Northwest Environmental Defense Center ("NEDC") respectfully submits the following comments on the Updated Cash-Out Consent Decree and Restoration Credit Consent Decrees lodged as a settlement to the Natural Resource Damages Assessment ("NRDA") process of CERCLA.[1] NEDC fully endorses these comments, and urges the Department of Justice to consider the following issues in determining whether the Consent Decrees ("CDs") present an appropriate restoration response for the Lower Willamette River's Natural Resources. The Portland Harbor Superfund site has only been used for industrial purposes within the last 100 years of its long history. The exploitation of the River for industrial use has led to widespread contamination of the sediments, water, and air in and around the River with hazardous substances,

---

[1] 42 U.S.C. § 9607 (2006).



NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

including PCBs, Dioxin, PAHs, and many more.[2] The NRDA response set forth by the CDs is purportedly aimed at restoring the ecological health and long-term viability of the River and its natural resources.[3]  But as the Yakama Nation noted in the comments it issued for the Record of Decision (ROD), the restoration as it was planned in 2017 was inadequate to reduce the concentrations of aquatic hazardous substances to levels where uses of the river, such as subsistence fishing, could proceed unimpaired without the use of continued fishing advisories.[4]  The CDs fail to remedy the gaping holes in the overarching plan for the Portland Harbor Superfund Site. Several implications of that failure are touched on below.

## I.    Introduction

The Updated Cash-Out Consent Decree and Restoration Credit Consent Decree ("the CDs" or "the Decrees") lodged in U.S. et al. v. ACF Industries, LLC. et al., No. 3:23-cv-1603-YY, 3-4 (D. Or., Nov. 1, 2023) are insufficient to restore or compensate for the damages to the Lower Willamette River's natural resources, specifically as they pertain to Endangered Species Act (ESA) listed Lower Columbia River (LCR) Chinook and Steelhead Trout. Furthemore, the Decrees present a piecemeal and scattered image of what this restoration will lead to.  Due to the lack of an overarching explanation or reasoning for how the four proposed sites will be effective in isolation,

---

[2] *Portland Harbor Superfund Site: Connecting to the Willamette River (Storymap)*, US EPA Region 10, https://storymaps.arcgis.com/stories/ab89faf239624854a5b9c7723f1c43da (2022).

[3] See U.S. et al. v. ACF Industries, LLC. et al., No. 3:23-cv-1603-YY, Appendix D at 1 (D. Or., Nov. 1, 2023). Retrieved from: https://www.justice.gov/enrd/media/1322711/dl?inline. See also *Id*., Appendix E at 1.  See also *Id*., Appendix F at 7 ("Restoration projects developed under the Portland Harbor Natural Resource Damage Assessment (NRDA) process must meet certain habitat criteria conducive to supporting the life histories of the selected species. The Project is being developed to primarily target the federally threatened upper Willamette River (UWR) spring-run Chinook salmon (Oncorhynchus tshawytscha) evolutionarily significant unit (ESU), the federally threatened lower Columbia River (LCR) Chinook salmon ESU, the federally threatened LCR steelhead (O. mykiss) distinct population segment (DPS), the federally threatened UWR steelhead DPS, and the LCR coho salmon (O. kisutch) ESU, hereafter referred to as the "target salmonids." Once complete, this Project will also benefit a diverse array of aquatic, avian, and terrestrial species that reside either permanently or temporarily within the Willamette and Columbia Rivers."). See also *Id*. Appendix G at 9.

[4] US EPA, *Portland Harbor Superfund Site: Record of Decision Responsiveness Summary Report* §3.2.1, 2,707 (2017). (FIND CITE– continued fishing advisories after the cleanup)



let alone in cumulation, it is difficult to understand *why* the Trustee Council, the U.S. Department of Justice (DOJ), the U.S. Department of the Interior (DOI), the National Oceanic and Atmospheric Administration (NOAA), and the Oregon Department of Fish and Wildlife (ODFW) (hereinafter, the "Action Agencies") selected these four remediation sites.  It is even harder to understand *how* these sites will ensure the complete restoration of viable Salmonid habitat in the Willamette River. The Action Agencies' unfortunately fragmented approach to ecological repair is discussed in the first several sections of this comment.

Furthermore, the CDs are arguably insufficient insofar as they were privately negotiated and decided upon without the solicitation of meaningful input from the Yakama Nation, nor from the communities affected by the degradation of the Portland Harbor. That insufficiency is articulated in the final section of this comment.

II.    **The Proposed Consent Decrees do not adequately restore damages to natural resources, including Salmonid Habitat and species health.**

According to the U.S. Department of the Interior (DOI), Natural Resources Damages Assessment and Restoration (NRDAR) Projects, like the plan embodied by the two CDs and their Appendices, are supposed to: "...establish the amount of money to be sought in compensation for injuries to natural resources resulting from a discharge of oil or release of a hazardous substance. The measure of damages is the cost of restoration, rehabilitation, replacement, and/or acquisition of the equivalent of the injured natural resources to their baseline level of services."[5]

However, the funds sought to be recovered by the settlement presented in the CDs are grossly inadequate to meet this standard. Discounted service-acre years, or "DSAYs" are the measure that define the full scope of the Portland harbor clean-up, and the Trustee Council and Action Agencies intend to hold the relevant PRPs responsible for a total of 4,130 DSAYs, of which the combined sum of the DSAYs collected by the Restoration and Cash Out decrees at issue here

---

[5] U.S. Department of the Interior, *How NRDAR Differs from Remedial Actions under CERCLA* (N.D.). Retrieved from: https://www.doi.gov/restoration/primer/remedial.



NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

accounts for only 476.[6] Each DSAY has a cash equivalent of $70,500.[7] Thus, the total dollar amount of this settlement is $33,558,000, of which only $600,000 will be afforded to Natural Resources Damages.[8]  And while this initial settlement presents a total of $33 million, that number pales in comparison to the immense historic, ecologic, spiritual, and cultural values of the Willamette River alone. The CDs are simply insufficient to attain the goals of the NRDAR process.

The reasons for the settlement's final, inadequate form may in part be explained through the concept of Shifting Baseline Syndrome. Shifting Baseline Syndrome described the process by which human understanding of the environment is heavily shaped by the "gradual change in accepted norms for the condition of the natural environment due to lack of past information or lack of experience of past conditions."[9]  Though a shifting baseline allows individuals to slowly acclimate to their surroundings, it can (and often does) lead to a sense of complacency surrounding environmental quality.  Shifting Baseline Syndrome leads to an increased tolerance for environmental degradation, alterations in individual understandings of what a "desirable" environment consists of, and creates a false "baseline" against which environmental improvement can be judged.[10]

For the Portland Harbor Superfund Site, the manifestation of this syndrome is clear in the disparate understandings displayed by the Action Agencies and Potentially Responsible Parties (PRP's) through the Consent Decrees, versus those of the Trustees to the site (including the

---

[6] Restoration Decree ("RD") II.P (stating that the total amount of DSAYs to be collected is 4,130); *see also* RD II.V (discussing the fact that the combined sum of the DSAYs across both Consent Decrees is 471).

[7] RD II.K.

[8] *See Two Consent Decrees Lodged*, Fish and Wildlife Serv., https://www.fws.gov/portlandharbor/news/two-consent-decrees-lodged (Nov. 2, 2023).

[9] Soga, M., Gaston, K. J., & Halsey, O. (2018). Shifting baseline syndrome: causes, consequences, and implications. Frontiers in Ecology and the Environment, 16(4), 222–230, 222. https://doi.org/10.1002/fee.1794

[10] *Id.*

NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

Yakama Nation) and affected communities in their commenting and advocacy.[11]  From the perspective of the proposed Consent Decrees, "…restoration projects [are] a means of both compensating for injured natural resources *in the Portland Harbor Natural Resource Damage Assessment Area* and resolving liabilities of PRP's that contributed to those injuries."[12]  However, according to the Yakama Nation, the curtailed extent of the cleanup (that of the Natural Resources Damage Assessment Area, alone) led to its resignation in protest from the Trustee Council in 2009, as these plans do not restore the damages to the natural resources at issue.[13]

Since its withdrawal from the Trustee Council, the Yakama Nation has remained heavily invested in the outcomes of the cleanup (but unconsulted by the relevant Action Agencies), and displayed that investment in part through its commissioning of independent studies of the impacts of contaminants from the Portland Harbor upon Lower Columbia Chinook.[14]  The independent reviews found that "not only are these toxic chemicals present in dangerous levels in the sediment, surface water of the Lower Columbia, but they are present at levels that exceed acceptable risk for human health."[15]

The stark difference in acceptable post-restoration risk levels between the stance codified in the CDs at issue here, and the views of the Yakama Nation, is clearly shown through the various comments submitted previously, especially in response to the 2017 Record of Decision and 2019

---

[11] See US EPA, *Portland Harbor Superfund Site: Record of Decision Responsiveness Summary Report*, Pg. 1 (2017). Retrieved from:
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.docdata&id=1002155#AR. See also *id.* at §3.2.11, Pg. 2,712.  See also US EPA, *Portland Harbor Superfund Site: Explanation of Significant Differences– ESD Responsiveness Summary Report*, §2, 172 (2019).

[12] U.S. et al. v. ACF Industries, LLC. et al., No. 3:23-cv-1603-YY, 3-4 (D. Or., Nov. 1, 2023). Retrieved from:
https://www.justice.gov/enrd/media/1322711/dl?inline.

[13] *See* Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

[14] *Id.*

[15] *Id.*



Explanation of Significant Differences (ESD).  In response to the proposed ROD for the Portland Harbor Superfund Site Remedial Action, the Yakama Nation called out such issues as: recognizing issues with capping sediment; requesting explanation about long-term management of sediment caps; not changing clean-up measures based on convenience and cost savings alone; not waiving ARARs; and allowing long-term efficacy to drive the decision-making process.[16]  Critically, however, the Yakama Nation specifically requested: (1) that the clean-up produce a result in which fish caught from the Harbor would be fit for consumption, rather than one in which there is a continued reliance on fishing advisories (such a result would be consistent with their treaty right to fish within their "usual and accustomed fishing grounds");[17] and by extension, (2) a respect for the Federal Trust Responsibility in regard to Trust duty to restore the natural resources at issue here: ESA listed LCR Chinook Salmon and Steelhead Trout.[18]

Ultimately, the Yakama Nation and community comments to the same effect, as compared to the responses given by the Action Agencies, and ultimately to the Natural Resources Damages Assessment set forth by the two CDs, display the environmental dissociation that can be caused by a shifted baseline.  To the Yakama Nation and the community at large, this cleanup is *the* opportunity to rectify the damage done to the Portland Harbor, which has impinged on Tribal

---

[16] US EPA, *Portland Harbor Superfund Site: Record of Decision Responsiveness Summary Report*,  Pg. 2671 - 707 (2017).

[17] Yakama Nation Treaty of 1855, June 9, 1855 12 Stat., 951. Ratified Mar. 8, 1859. Proclaimed Apr. 18, 1859.

[18] "The right of taking fish at all usual and accustomed places in common with the citizens of the Territory of Washington and the right of erecting temporary buildings for curing them, reserved to the Yakima Indians in the Treaty of 1859, was not a grant of right to the Indians, but a reservation by the Indians of rights already possessed and not granted away by them. The rights so reserved imposed a servitude on the entire land relinquished to the United States under the treaty and which, as was intended to be, was continuing against the United States and its grantees, as well as against the state and its grantees." United States v. Winnans, 198 U.S. 371 (1905), Syllabus, https://supreme.justia.com/cases/federal/us/198/371/.



Treaty fishing rights for well over 100 years.[19] It is time for the responsible parties to pay their fair share, as is the thrust and purpose of CERCLA.[20]

The extension of this underlying inadequacy will not be rectified by the proposed remedy set forth in the Consent Decrees. The piecemeal nature of the Natural Resource Damages Plans (contained in Appendices D, E, F, an G) shows concern for sites of crucial significance to species, but fails to acknowledge the fact that in a living ecosystem, an isolated, site-based approach is unworkable. Furthermore, at each of the four selected remediation sites, there are individual inadequacies (addressed in turn below). Finally, the lack of a cohesive, final Biological Assessment or Biological Opinion (as required by §7 of the Endangered Species Act for such major federal projects) severely hampers the ability of the Tribes and the community in review of the selected actions.

## III.    The Piecemeal Nature of the Consent Decrees' Plans

The Portland Harbor Superfund site has for years had a detrimental impact on LCR Chinook and Steelhead habitat, as the polluted sediments and water affect the health of fish, disrupt their migration patterns, and lead to long-term ecological damage.[21]

As they are presented, the CDs form a concerning image for the future of the Portland Harbor. The four CD Appendices, D, E, F, and G, individually correspond to one of four proposed restoration sites throughout the Portland Harbor Natural Resources Damages Assessment Area. While the plans are individually designed to *support* Salmonid habitat, their isolated, disjointed nature will not suffice to *restore or repair* Salmonid health or abundance, as

---

[19] Yakama Nation Treaty of 1855, June 9, 1855 12 Stat., 951. Ratified Mar. 8, 1859. Proclaimed Apr. 18, 1859.

[20] 42 U.S.C. §§ 9604 and 9607(a)(4).

[21] Michael Kjelland, et. al, *A Review of the Potential Effects of Suspended Sediment on Fishes: Potential Dredging-Related Physiological, Behavioral, and Transgenerational Implications*, 35 Env. Systems and Decisions 334, https://link.springer.com/article/10.1007/s10669-015-9557-2 (Jul. 23, 2015).



NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

Salmonid success hinges largely upon habitat connectivity and cleanliness.[22] In combination with the drawn out timeline of the Portland Harbor clean-up, the four plans leave community members (like all of us) wondering how these sites will lead to a healthy and thriving ecosystem for ESA-listed LCR Chinook and Steelhead. With no set start date for the clean-up,[23] little to no transparency as to what is being discussed when making these cleanup decisions, and with the relevant species concurrently facing multiple other stressors,[24] the plans central to these CDs seem, at best, a start to repairing the conditions necessary to rehabilitating Salmonid habitat.

The segmenting of each "discernable" project into its own Appendix creates the impression that each individual site, on its own, might be sufficient to rehabilitate ESA Listed LCR Chinook and Steelhead within its area of focus.[25] But that impression is misleading, as studies confirm that isolated projects are no substitution for connected habitat.[26] "[While] criteria favored large restoration projects located near the mainstem river... they were insufficient for assessing a project's

---

[22] See Bilby, Robert E., Ken P. Currens, Kurt L. Fresh, Derek B. Booth, Robert R. Fuerstenberg, and Gino L. Lucchetti. "Why Aren't Salmon Responding to Habitat Restoration in the Pacific Northwest?." *Fisheries* (2023). See also Hood, W. Gregory, Katie Blauvelt, Daniel L. Bottom, Janine M. Castro, Gary E. Johnson, Kim K. Jones, Kirk L. Krueger, Ronald M. Thom, and Andy Wilson. "Using landscape ecology principles to prioritize habitat restoration projects across the Columbia River Estuary." *Restoration Ecology* 30, no. 3 (2022): e13519.

[23] Under the Portland Harbor Record of Decision, "[c]onstruction time for the Selected Remedy is currently estimated to be 13 years, consistent with Alternative F..." US EPA, *Portland Harbor Superfund Site: Record of Decision Responsiveness Summary Report*, Pg. 119 (2017). Though this number remains constant in the 2019 ESD, because there is no set start date, the community is left to wonder how long the efforts will take. When will the clock start?

[24] The Nature Conservancy, *What Threatens Our Salmon?*, Stories in Washington, https://www.nature.org/en-us/about-us/where-we-work/united-states/washington/stories-in-washington/protecting-northwest-salmon/ (Aug. 30, 2021).

[25] See U.S. et al. v. ACF Industries, LLC. et al., No. 3:23-cv-1603-YY, Appendix D at 1 (D. Or., Nov. 1, 2023). Retrieved from: https://www.justice.gov/enrd/media/1322711/dl?inline. See also *Id*., Appendix E at 1. See also *Id*., Appendix F at 7. See also *Id*. Appendix G at 9.

[26] Hood, W. G., Blauvelt, K., Bottom, D. L., Castro, J. M., Johnson, G. E., Jones, K. K., Krueger, K. L., Thom, R. M., & Wilson, A. (2022). Using landscape ecology principles to prioritize habitat restoration projects across the Columbia River Estuary. Restoration Ecology : The Journal of the Society for Ecological Restoration., 30(3). https://doi.org/10.1111/rec.13519



NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

benefits due to geographic location relative to existing habitat."[27] Furthermore, the amount of "upland work" presented between the four Appendices creates the impression that most of the work that will be done to restore these natural resources will be performed not in the water, but *on dry land*.  It remains unclear how such upland work will be sufficient to restore Salmon habitat without an equivalent amount of in-water work. The emphasis on upland work, and the disjointed nature of the isolated, site-based approach to clean-up, are cause for concern regarding the true extent of the clean-up and its efficacy in restoring salmonid habitat. There must be a holistic vision of how all four of sites will work together in order to gain community support for the planned actions.

**IV.    The Perceived Inadequacies of Selected Sites**

While on paper the four sites offer a net gain for listed salmonids and anadromous fish, in practice these benefits are not clearly apparent, nor even clearly likely. Appendix D discusses the proposed Alder Creek Restoration Plan, located at the divergence of the Willamette River and Multnomah Channels, and covers roughly 52.3 acres of contaminated area.[28] The stated goals of this restoration include a "move towards normative hydrology, the restoration of floodplain functions, including off channel habitat for multiple species, re-establishing floodplain and riparian plants," etc.[29]  However, the list of proposed activities following these goals seem more focussed on the upland sections of Alder Creek than on in-water work. Of the 11 items listed as pieces of the proposed action, roughly half focus on in-water activities (including invasive species control and native re-vegetation; side channel habitat restoration; habitat complexity improvements; hydrologic reconnection; and removal of in-water structures).[30] The rest focus on

---

[27] *Id.*

[28] CD Appendix D at 2.

[29] *Id.*

[30] *Id* at 3.

NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

uplands activities, including the removal of the industrial saw mill currently on site.[31] Even where there *is* a focus on in-water remediation, however, the presented goals are squishy and vague as to how they will create a cohesive and thriving ecosystem.[32]  Furthermore, due to uncertain time-lines concerning when restoration will actually begin, as well as uncertainties about future oversight of the project as it pertains to listed salmonids specifically, it is unclear how the Alder Mill Project will do more than provide one refuge for salmon along a degraded corridor.

Unfortunately, the other three Appendices (E, F, and G) fair no better.  Each appendix suffers from the same general deficiencies as Appendix D, including their focuses on uplands work, and their lack of a comprehensively presented vision of how the sites will work together to create strong riparian habitat. It is challenging to understand how these Appendices will live up to their stated purpose of habitat restoration in the Willamette River. The Restoration Credit Consent Decree appears to lack detailed strategies that would be crucial for salmon spawning and rearing habitats. Salmon necessitate specific substrates for spawning, especially clean gravel beds with appropriate water flow for egg oxygenation.[33] The Decrees should explicitly outline continuous monitoring and management strategies for these habitats, including regular evaluations of gravel quality and depth.[34] Additionally, the Decrees' plan should focus on creating and maintaining nursery areas for juvenile salmon, which require sheltered environments with adequate vegetation and protection from predators.[35] The current plan does not provide sufficient detail on the

---

[31] *Id.*

[32] *Id.* ("Habitat Complexity Improvement[:] Provide habitat structure and complexity by installing large woody debris, snags, debris piles, rock piles, and downed wood where possible and appropriate..."

[33] King County, Washington, *Chapter 2: Salmon Habitat Needs*, Habitat-limiting Factors and Reconnaissance Report Part I (N.D.). Retrieved from: https://your.kingcounty.gov/dnrp/library/2000/kcr728/vol1/partI/no2.pdf

[34] *Id.*

[35] *Id.*



NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

creation and upkeep of such habitats, such as undercut banks, vegetated shallows, and side channels, all of which are vital for the developmental stages of the salmonid life cycle.[36]

## V.    Review of this project is limited by the absence of a comprehensive Biological Opinion

While this comment has addressed a number of defects in the CDs concerning their questionable potential to repair Natural Resources, this review is heavily hampered by the lack of a comprehensive Biological Opinion from the National Oceanic and Atmospheric Administration (NOAA), in line with the mandates of Endangered Species Act §7(a)(2). Although it seems that EPA has initiated consultation under the ESA §7(a)(2) mandate for discrete actions within the clean-up,[37] the lack of an overarching analytical documents produced by the relevant  Action Agencies for these CDs constricts review of the project by members of the public. Without expert agency opinion here, reviewing this proposal is highly speculative in regard to the project's ultimate impacts on listed salmonid species. Such an agency report would also establish, on the record, how the project will work as a comprehensive whole. The lack of any Action Agency explanation for how these restoration sites are expected to create holistic habitat, combined with the lack of a Biological Opinion, creates an opaque situation, leaving community commenters with only the ability to speculate.

## VI.    Crucial Trustees and community voices were not sufficiently consulted in the drafting of the Portland Harbor Superfund site Consent Decrees.

Under the NRDA Process, according to NOAA, the voices of impacted communities are one of the leading factors driving NRDA decisions, weighed among other factors including relevant laws, current science, and economics.[38]  Various groups, however, including the Yakama

---

[36] *Id.*

[37] Kim W. Kratz, *Endangered Species Act Section 7 Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the River Mile 11 East Sheet Pile Test in the Willamette River at RM 10.9 to 11.6*, NMFS No. WCRO-2020-00970 (July 13, 2020).

[38] NOAA, *Damage Assessment, Remediation, and Restoration Program: Natural Resource Damage Assessment* (10/24/2017). Retrieved from: https://darrp.noaa.gov/what-we-do/natural-resource-damage-assessment



NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

Nation, Portland Harbor Community Coalition, and Northwest Environmental Defense Center continue to call for the full restoration of salmon habitat such that the endangered species can recover. Their voices must be considered in this process.

Salmon are also culturally, spiritually, societally, and economically significant to many Indigenous Tribes in the Pacific Northwest, including the Yakama Nation.[39] In particular, Lower Columbia River (LCR) Chinook and Steelhead populations remain a critical resource for traditional practices, sustenance, and tribal economies.[40] Thus, the health of the Columbia River and its tributaries, such as the Yakima River, is vital for LCR Chinook and Steelhead habitat, as well as for the overall well-being of the ecosystem at large. Despite the Yakama Nation's Continued Trustee status in regard to the Portland Harbor site [41], and their reliance on and respect for the river's salmon populations, the tribe's treaty rights were not properly considered in the development of the CDs, nor were they included in the broader discussions related to their creation (as shown through the failure to heed the recommendations of the public in related decisions made for the Portland Harbor).[42]

According to the Yakama Nation fisheries website,[43] after the Yakama Nation chose to step down from its role as an appointed Trustee for the Portland Harbor Superfund site,[44] the tribe

---

[39] *See* Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

[40] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7882363/.

[41] *See* Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

[42] See US EPA, *Portland Harbor Superfund Site: Explanation of Significant Differences– ESD Responsiveness Summary Report*, §2, 172 (2019). (Noting that the overwhelming majority of comments received disfavored EPA's proposed weakening of clean up standards for PAHs throughout the cleanup site, which EPA ignored and changed the plan anyway.)

[43] *See* Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

[44] Scott Learn, *Yakama Nation Leaves Portland Harbor Superfund Panel*, The Oregonian, https://www.oregonlive.com/environment/2009/06/yakama_nation_leaves_portland.html (Jun. 10, 2009).

financed independent analyses of existing scientific studies on the effects of contaminants in the Portland Harbor, with the prevailing consensus of those studies demonstrating that the high concentrations of PCBs, DDTs, and PAHs in the sediment and surface water surpass acceptable risk levels for human health.[45] As it currently stands, the opportunity for the Trustee Council and Action Agencies to begin rectifying this injury is largely being ignored, as the scheme of the plans set forth by the CDs does not attempt to fully restore or reimburse the harms to either the ESA Listed LCR Chinook Salmon or LCR Steelhead Trout. In response to the Yakama Nation's 2017 comments on the ROD, requesting the removal of contaminants to levels which would alleviate the need for Fishing Advisories in the Portland Harbor, EPA replied: "EPA recognizes that the remedy likely will not reduce the concentrations of PCBs and other contaminants to levels low enough to allow for consumption at the higher consumption rates associated with subsistence fishing."[46] Thus, this Natural Resources Damages Assessment is the only portion of the project with an intent to truly address damages to the salmon and their habitat.

The decision to limit the restoration activities for Natural Resource Damages to only certain areas of the river harms common rights to engage with the Willamette River as a navigable body of water. Only after the Port of Portland came into existence in 1891 did heavy industry begin polluting the pristine waters of the Willamette River, resulting in the Portland Harbor Superfund Site.[47] The act of industrialization, and its negative byproducts, have impinged on the treaty rights held by the Yakama Nation and other tribes in and around the Willamette river Basin, as well as on the use and enjoyment of the river and its resources by local communities. The

---

[45] *See* Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

[46] R.O.D. 3-37.

[47] US EPA, *Portland Harbor Superfund Site: Connecting to the Willamette River (Storymap)*, US EPA Region 10 (2022).



**NORTHWEST ENVIRONMENTAL DEFENSE CENTER**
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

opportunity to rectify the harms done, which is currently presented under the CERCLA NRDAR process, should be seized and acted upon to the fullest extent possible.

Given the importance of salmon to the Yakama Nation, it is crucial for federal agencies and other interest groups with stakes in the Portland Harbor site to engage in considerate and meaningful consultation with the Tribe, and to take their comments seriously.[48] Likewise, we must remember that environmental justice is always a key concern in the context of hazardous waste removal and restoration.[49] Historically, minority and low-income communities, including Indigenous tribes, have borne a disproportionate burden of environmental hazards.[50] In particular, the severe health implications associated with environmental contaminants are a serious environmental justice issue, especially as they pertain to individuals fishing for subsistence.[51] The restoration of the Portland Harbor Natural Resources is a step towards rectifying the injury done to affected communities of the Willamette Valley.

## VII. Conclusion

The Updated Cash-Out Consent Decree and Restoration Credit Consent Decrees lodged in response to the Natural Resources Damages to the Portland Harbor are in many ways insufficient.  The CDs fail to pay attention to community needs and input, as seen in the ESD process, during which that input was ignored in favor of monetary interests. Furthermore, the CDs do not uphold the Federal Government's trustee relationship to the tribes, and they do not reflect meaningful restoration or compensation for the damages done to the natural resources of the Portland Harbor. In that same vein, the CDs fail to provide meaningful restoration to ESA listed

---

[48] The Action Agencies may wish to consider the principles of EO 13175 as a baseline for meaningful involvement. *See* Exec. Order No. 13715, *Consultation and Coordination with Indian Tribes*, 65 F.R. 67249 (2000).

[49] Supporting Environmental Justice at Superfund Sites, Env't Prot. Agency, https://www.epa.gov/superfund/supporting-environmental-justice-superfund-sites (last visited Jan. 23, 2024).

[50] *Id.*; "Environmental Racism with a Faint Green Glow" by Eric Jantz, New Mexico Environmental Law Center.

[51] Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S Terwilliger Blvd., Portland, OR 97219
Phone: 503.768.6673 | Web: nedc.org

anadromous fish (like the LCR Chinook Salmon and Steelhead Trout), as they set forth only a loose and disjointed framework, with no associated timeline to gauge its progress. Because the Action Agencies have continued to frame the rhetoric concerning the CDs by casting it in the light of the Willamette River's industrial history, as opposed to its ancient history as pristine habitat, the clean-up plan seems to reflect a shifted baseline, and as such offers only nominal consideration regarding the species and communities impacted by those very same industrial processes.

Editors & Coordinators:

Mario Batki  // Cameron Quackenbush

*Mario Batki*

Contributors:

Moriah Daniels  // Antonia Langowski  // Victoria Reiners

ER-871

Public Comment
Received 01/26/2024 from
the Yakama Nation



Confederated Tribes and Bands
of the Yakama Nation

Established by the
Treaty of June 9, 1855

January 26, 2024

Todd S. Kim
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

**Re:    Comments on Consent Decrees lodged in *United States of America et al. v. ACF Industries LLC, et al.*, D.J. Ref. No. 90–11–2–06787/2.**

Dear Assistant Attorney General Kim:

I write on behalf of the Confederated Tribes and Bands of the Yakama Nation (the "Yakama Nation" or "Tribe") to provide comments on two proposed Consent Decrees (collectively "the Decrees") lodged in the United States District Court for the District of Oregon on November 1, 2023. *United States, et al., v. ACF Industries, LLC, et al.*, No. 3:23-cv-01603-YY. The first Consent Decree seeks to settle the natural resource damages liability of twenty-three responsible parties for cash payments (the "Cash Out Decree"). The second seeks to settle the liability of an additional six responsible parties, and requires the settling parties to purchase restoration "credits" that may be provided by four restoration projects described in the decree (the "Restoration Credit Consent Decree"). Each is discussed in the comments below.

In the 1855 Treaty with the Yakamas, the Yakama Nation conditionally ceded 10 million acres of land and reserved for our People, among other things, the right to fish at all usual and accustomed places within the Columbia Basin. See *Sohappy v. Smith,* 529 F.2d 570 (9th Cir. 1976). Those rights, specifically reserved to the Yakama Nation by the Treaty, are the very essence of what defines us as a People. Fishing on the Columbia River has sustained our People since time immemorial, and we honor the fish with songs and stories that define our culture. The United States should take into account the Yakama Nation's significant treaty rights, and meaningfully involving the Yakama Nation in all decisions affecting its natural resources.

The federal Trustees (NMFS, USFWS) are well aware of Yakama Nation's interests. The Tribe was a member of the Portland Harbor Natural Resource Council until 2009, and withdrew only when it became clear that the Trustees would not commit to assessing the extent of natural resource injury in the Lower Columbia River – a fear that is now being realized with the very limited geographic scope of the assessment areas addressed by the Consent Decrees. At that time, the Tribe informed the United States and other trustees that it would remain active in matters concerning Portland Harbor, and that it would continue its work on natural resources damage claims both at the Portland Harbor Superfund Site, and in other areas where releases of hazardous substances have come to be located. *See*, Letter from Ralph Sampson, Jr., Chairman,

to Authorized Officials of the Natural Resource Trustee Council (June 5, 2009). Yakama Nation has done both. EPA has continued to recognize Yakama Nation's status as a natural resource trustee. In August 2010, EPA's Director of the Office of Environmental Cleanup informed the Tribe that it was aware of its role in the NRDA process under CERCLA, and that it would continue to coordinate with the Tribe on matters related to the Portland Harbor Superfund Site. Nevertheless, in a circumstance in April 2015 starkly similar to the present, Yakama Nation noted in comments to the proposed settlement in *U.S. v. Linnton Plywood Assn.* that the United States "has made no effort to consult with or to include the Yakama Nation in any of its negotiations leading up to, or in implementing, the settlement…" Against this backdrop, it can come as no surprise to the United States that Yakama Nation has significant, and federally-recognized, rights and interests in the natural resources at issue in the instant settlements. The federal Trustees have simply ignored them throughout their negotiations and deliberations.

Yakama Nation is a trustee for natural resources under CERLA Section 107(f) and the National Contingency Plan, 40 C.F.R. § 300.610, and as such is entitled to seek damages for injuries to natural resources under its trusteeship under CERCLA, 42 U.S.C. § 9607(a)(4)(C), and the Oil Pollution Act, 30 U.S.C. § 2702. Natural resource have suffered, and continue to suffer, injuries from releases at the Portland Harbor Superfund Site.  Those injuries are not limited to the arbitrarily-designated Portland Harbor Natural Resource Damage Assessment Area, but extend throughout the Lower Willamette River, Multnomah Channel, and Lower Columbia River. It is Yakama Nation's goal to fulfill its obligations as trustee by fully assessing all natural resource injuries, and seeking damages to make the public whole. Information that has been, and will be, developed regarding cleanup timelines, implementation of source control measures, and habitat mitigation measures, are greatly affecting the assessment of natural resources, and the quantification of damages resulting therefrom. It is our hope that together with these settlements, any further Trustee Council settlements, and Yakama Nation's recoveries for ecological and Tribal lost services, that we can achieve a fully functioning, clean, and thriving ecosystem.

These comments are offered based on Yakama Nation's review of the Consent Decrees and supporting materials, though a more thorough review, and comprehensive understanding, will be required for a thorough analysis. Given the limited amount of time, and the extraordinary amount of material (both included as Appendices and referenced in the Consent Decrees themselves), these comments are necessarily limited. Yakama Nation nonetheless appreciates the opportunity to provide feedback, and we encourage further dialogue with the Trustees and consultation with NMFS and USFWS to ensure a comprehensive and accurate assessment is completed, and full recovery of losses to the sovereigns and the public will be made. When additional assessment work, projects, and data become available, we will be happy to address each of the points below.

1. The Consent Decrees do not settle any of Yakama Nation's existing or potential claims for Natural Resource Damages.

The Consent Decrees do not and cannot affect Yakama Nation's status as a natural resource trustee under the law. Nor does it foreclose Yakama Nation from pursuing claims against any or all of the Settling Defendants, and for any damages that are not fully recovered by the other Trustees. The measure of damages under CERCLA includes the costs of restoration, rehabilitation, replacement, and/or acquisition of the equivalent of injured natural resources, the

2
ER-874

value services provided by those resources over time, and the reasonable costs of assessing natural resource injuries. This settlement falls far short of recovering the full amount of damages resulting from releases at and from the Portland Harbor Superfund Site, and Yakama Nation is entitled to seek those in a subsequent action.

2. <u>The Consent Decrees settle significantly less than the total amount of damages thus far calculated</u>.

The Trustees' Damage Assessment is not yet complete. Nonetheless, the Trustees use certain, admittedly limited technical information, and several agreed-upon "assumptions" to calculate an amount of DSAYs to compensate for injured and lost natural resources. For purposes of the proposed settlements, 4130 DSAYs were calculated for full compensation within the Portland Harbor Natural Resource Damage Assessment Area. That total does not include additional damages for recreational losses and tribal lost services.

Unless all of the properties within the Damage Assessment Area have been analyzed to determine the relative contribution of substances of concern from each property, it would not be possible to assign percentages to individual properties. Those calculations should be provided so that we can determine whether the total number of DSAYs is supportable, and whether the settlements are fair, reasonable, and adequate.

A total of 471.389 DSAYs (373.72 from the Restoration Credits Consent Decree), or 11.4% of the total calculated DSAYs, have been allocated to all parties in the two Consent Decrees. Despite recovering only a small percentage of the total amount of damages, twenty three responsible parties are being given a cash-out settlement, and an additional six responsible parties are purchasing restoration credits.

Given the large number of responsible parties included in the settlement, the high probability of significant injury to resources being caused by their respective facilities, and the comparatively small percentage of recovery, the Trustees should clarify their intent to recover the full amount of damages owed to the public and the sovereigns, and to implement projects for the full restoration, replacement, or acquisition of the equivalent of the natural resources injured and/or lost.

3. <u>The Consent Decrees do not provide enough information to determine whether the allocation of liability is fair, adequate, reasonable, or consistent with the objectives of the law</u>.

Both of the proposed Consent Decrees must, at a minimum, be demonstrably fair, adequate, reasonable, and consistent with the objectives of CERCLA. *United States v. Montrose Chem. Corp. of Cal.,* 50 F.3d 741, 743 (9th Cir. 1995). The Consent Decrees must be both procedurally and substantively fair. *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 877 (9th Cir. 2014).

We have reviewed the information provided in the Consent Decrees regarding the apportionment of liability, guided by the legal requirements set forth in the Ninth Circuit in instances where liability is apportioned. A settlement is substantively fair when it "is 'based upon, and roughly

correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done.'" *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014) (internal citations omitted). The Trustees' justification for the allocation of liability to each of the settling parties, at least as set forth in the Consent Decrees and the Appendices, does not meet these criteria.

The declared justification for the individual settlements is deficient in two respects. First, the basis for calculating the total DSAYs for the Assessment Area is not apparent. The Consent Decrees and decade‑long NRDA process (that is not yet complete) have resulted in thousands – if not tens of thousands – of pages of information and analyses spread out across many agencies, organizations and websites. Not surprisingly, this makes it impossible to evaluate and assess much of the information that was used to develop the Consent Decree settlements, unless that information is consolidated, explained, and presented to Yakama Nation.  In particular, the Habitat and Resource Equivalency Analyses methods, data, and analysis are not readily available for review. Appendix B of the 2010 Portland Harbor NRDA Plan provides:

> Once service loss thresholds and habitat value factors are established, habitat will be mapped and characterized using existing sediment contamination data. The areas of habitat with different service levels (based on contaminant concentrations and/or predicted toxicity) become inputs to the HEA model, along with assumptions about recovery times under various clean-up scenarios. The Trustee Council will use conservative assumptions regarding natural resource recovery times based on information developed as part of the FS and remedial process.

However, the document does not provide the maps for review, let alone any work that may have gone into developing the HEA models for the overall Portland Harbor Superfund site or the HEA documentation itself. It is unclear where all of this information resides, or if it is available to anyone other than the Trustee Council. At one point, a document presenting NOAAs HEA/REA methodology was available for download, but all links now appear to be broken. Without that information, it is impossible to determine whether the total amount of DSAYs presented in the Consent Decrees is fair, reasonable, or consistent with CERCLA.

Second, the Trustees should provide the allocation used to determine each Settling Defendants' assigned percentage of liability, and the data considered, rather than simply a general description of the allocation methodology. Instead, the Consent Decrees describe the "Path C" process the parties followed and provide a table of the final percentages. Neither the data nor calculations to support the final percentages are provided. The Consent Decrees describe – generally – the process undertaken to allocate liability for the Settling Defendants' properties, *see*, *e.g.,* Cash Out Decree, ¶ P, and the results of that allocation process. *See,* Cash Out Decree, Appx C. But none of the supporting information has been provided. Rather, references to large documents or document collections, databases, and generic categories are listed. *Id.*, n. 3. Moreover, "non-public information" was used by the Trustees. Without that information, the public comment process is superfluous, as any review of the adequacy of the settlements is based purely on conjecture.

None of the "readily available data," the "technical inputs," or "PRP‑submitted" data that were used by the Trustees are provided.  Justifying the bases for the percentages of liability, even in an

4
ER-876

imprecise way, is essential to determine whether the determination of DSAYs, and the allocation of those to individual responsible parties, is in any way fair.

On their face, the Consent Decrees cannot be deemed fair, reasonable, adequate, or consistent with the purposes of CERCLA.

4. <u>The releases of liability in the Consent Decrees are unjustifiably broad</u>.

Section IX of the Cash Out Decree, and Section XIII of the Restoration Credit Consent Decree, set forth covenants not to sue the Settling Defendants. Each provides releases for "Covered Natural Resource Damages." That term is defined to include all recoverable damages, under the law, resulting from releases of hazardous substances at and from the Settling Defendants' properties. The Trustees' damage assessment, however, has been limited to an area much smaller than where the Settling Defendants' releases have come to be located, referred to as the "Portland Harbor Natural Resource Damage Assessment Area." And the estimated DSAYs on which the settlements are based have been calculated only within that limited area. Natural resource injuries outside the Portland Harbor Natural Resource Damage Assessment Area undoubtedly exist but have not yet been fully assessed. And those injuries are undoubtedly compensable under the law. Thus, the Consent Decrees release the Settling Defendants from liability for these, as‑yet unquantified injuries, and for the resulting damages. The Consent Decree should provide justification for such an extraordinarily broad release. The six Settling Defendants in the Restoration Credit Consent Decree in particular have some of the most extensive and harmful releases of hazardous substances within their facilities. It is not clear at all why the federal Trustees are releasing these responsible parties from further liability for any injuries to aquatic resources either in the Willamette or Lower Columbia Rivers.

5. <u>The Restoration/Mitigation Bank projects chosen for the Consent Decrees are relatively insignificant, compared to the large Restoration Focus Area and number of originally identified sites for potential restoration.</u>

The Trustees' Restoration Portfolio includes 44 project sites within Portland Harbor NRDA Superfund Assessment Area and Broader Focus Area. The Preferred Alternative and approach identified in the Trustees' Restoration Plan is the Restoration Bank Credit Alternative which originally included five restoration banks covering 178 acres. The Portland Harbor NRDA Consent Decrees have reduced the chosen restoration banks from five to four restoration sites ranging from 26 to 52 acres covering approximately 163 acres total, which is about one quarter of a square mile. These acre amounts are the total area of the sites including upland and aquatic habitats. While the injury studies set forth in the Consent Decrees have focused primarily on aquatic and/or riparian species and habitats, the vast majority of the acreage at each of these sites is in terrestrial or upland habitat types. The four project sites chosen are not fully connected to each other or other restored habitat, cover a miniscule part of the area where contamination occurs, and are not equal to the injury and damages that have accrued as a result of the Portland Harbor Superfund site.

6. <u>The four chosen restoration banks are not fully mature and are not yet providing the types, or projected values, of functioning habitats listed in the Trustees' objectives</u>.

Given the lack of functioning aquatic and floodplain habitat at these sites (particularly the Linnton site), including lack of hydraulic connectivity at low flows, small volumes of water moving slowly downstream over relatively wide shallow stream channels devoid of cover and instream complexity, inadequate water quality for temperature with potential for fish stranding and supporting warm water predators, and lack of large wood and mature riparian vegetation, it is unclear whether the restoration sites can provide fish credits (for ESA-listed salmonids and other tribally important species) until many years from now, even if they ultimately mature into the habitat they were designed to be.

Moreover, the design and monitoring of the restoration plans places heavy emphasis on lamprey, frogs, and riparian and/or terrestrial species. While focus on lamprey is appropriate, the focus on designing and developing functioning habitat for juvenile Chinook and steelhead is lacking. Because salmonids are critical to the Tribe, and the fishery has suffered significant injury, the restoration projects should be designed to address that injury.

Despite the lack of maturity and functionality, the Trustees have assigned higher values to the three projects within the Assessment Area, resulting in elevated credits and DSAY values. Placing a higher value on these projects, when the projects provide little habitat related to ESA-listed Chinook, steelhead and other tribally important species, should be justified by the Trustees.

7. <u>In future restoration planning efforts, the Trustees should develop additional and larger projects to promote restoration and protection of natural, physical and biological processes for the Willamette River</u>.

To provide habitat connectivity through the urbanized shoreline, additional projects on both sides of the river (and within close proximity to each other) must be identified and included in future restoration planning. The current projects do not, and cannot, achieve habitat connectivity. The Trustees should identify and implement restoration and protection projects in the Broader Focus Area of the Lower Columbia River where benefits to ESA-listed and tribally important salmonids would be greatest.

The Trustee Council also acknowledges that restoration actions at the confluences of the Multnomah Channel and Lower Columbia River would have the greatest benefit for juvenile Chinook salmon. The Damage Assessment Plan discussed the results of its consultation with a panel of experts to develop

> an approach to guide the geographic location of compensatory restoration actions. The expert panel noted that potentially injured juvenile Chinook salmon utilize an area that extends from Willamette Falls to the mouth of the Willamette, Multnomah Channel (inclusive of Scappoose Bay) and the southern shore of the Lower Columbia River between the confluence of the Sandy River and the mouth of Multnomah Channel, and restoration actions within this area would have the greatest benefit for juvenile Chinook salmon."

2010 Portland Harbor NRDA Plan, Appendix B, at B-12.

Because the four projects set forth in Restoration Credit Consent Decree have limited ability to benefit ESA-listed and tribally important salmonids, the Trustees should explore additional restoration projects that provide those endpoints. The Consent Decree should allow the Settling Defendants to purchase credits from those additional projects if the opportunities are available.

The foregoing comments concern the lack of transparency of the process, and potential inadequacies of the compensatory restoration received from the Settling Defendants. But Yakama Nation is also concerned by the continued lack of a more meaningful role in the process that led to the proposed settlements. As recently as December 23, 2023, President Biden stated that his "Administration is committed to protecting and supporting Tribal sovereignty and self-determination, and to honoring our trust and treaty obligations to Tribal Nations." Executive Order 14112 (December 6, 2023). And in a Memorandum on January 26, 2021, the President emphasized that "[i]t is a priority of my Administration to make respect for Tribal sovereignty and self-governance, commitment to fulfilling Federal trust and treaty responsibilities to Tribal Nations, and regular, meaningful, and robust consultation with Tribal Nations cornerstones of Federal Indian policy." Presidential Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships (January 26, 2021). While we understand that the Justice Department has exempted the *content* of settlement negotiations from the full Executive Order requirements, Yakama Nation was never advised of the ongoing negotiations, and only learned of the proposed Consent Decrees through publication. Despite Yakama Nation's clear and obvious interests in the subject matter of the Consent Decrees, we are being treated as any other member of the public, not a Tribal sovereign to whom the United States owes significant trust and treaty obligations. This treatment falls far short of exercising the United States' responsibility to the Tribe in the coordinated and effective manner required by the President. Consultation or, at a minimum, notification on a government-to-government basis would not affect the ability of the Attorney General to settle cases on behalf of the United States.

Yakama Nation offers these comments in the hopes of achieving full compensation for natural resources lost due to releases from the Portland Harbor Superfund Site, and is fully committed to achieving that goal. We hope the Trustees share our vision. But the lack of transparency and disregard for a more inclusive processes raises significant concerns about both the implementation of the plans set forth in the Consent Decrees, and the future recovery and use of funds adequate to fully compensate the public for its losses.

Sincerely,

Phil Rigdon, Superintendent
Department of Natural Resources
Yakama Nation


cc:     Michael J. Zevenbergen (Senior Counsel NOAA Environmental Enforcement Section)
        Julie Weis (Chair, Portland Harbor Natural Resource Trustee Council)

7

ER-879

Public Comment
Received 01/28/2024 from
Willamette Riverkeeper



Date: January 28, 2024

From: Willamette Riverkeeper

    1210 Center St.

    Oregon City, OR 97045

To:    pubcomment-ees.enrd@usdoj.gov

    Todd S. Kim

    Assistant Attorney General

    Environment & Natural Resources Division

    U.S. Department of Justice

    950 Pennsylvania Avenue, NW

    Washington, DC 20530-0001

Re: Comments on Consent Decrees lodged in *United States of America et al. v. ACF Industries LLC, et al.*, D.J. Ref. No. 90–11–2–06787/2.

Dear Assistant Attorney General Kim.,

Please accept the following comments from Willamette Riverkeeper regarding the two consent decrees lodged in *United States of America et al. v. ACF Industries LLC, et al.*, D.J. Ref. No. 90–11–2–06787/2.  Willamette Riverkeeper is a 501(c)(3) nonprofit environmental organization whose mission is to protect and restore the Willamette River's water quality and habitat. Willamette Riverkeeper has been engaged in the Portland Harbor Superfund process since its inception.

The first Consent Decree seeks to settle the natural resource damages liability of twenty-three responsible parties for cash payments ("Cash Out Decree"). The second

seeks to settle the liability of an additional six responsible parties, and requires the settling parties to purchase restoration "credits" that may be provided by four restoration projects described in the decree ("Restoration Credit Consent Decree"). The settlements are part of the Natural Resources Damage Assessment process ("NRDA"). The purpose of the NRDA is to restore the natural resources – and the services they provide – that were injured and lost over time (past, present, and future) due to releases of hazardous substances and discharges of oil into Portland Harbor. Restoration as part of the NRDA is in addition to cleanup. These are the first consent degrees proposed in this process and they come 22 years after the NRDA process was initiated in 2002.

Settling Defendants Include ACF Industries, LLC; Air Liquide America L.P.; Airgas USA LLC; Ash Grove Cement Company; Ashland Inc.; Beazer East, Inc.; BNSF Railway Company; Calbag Metals Co.; ESCO Group LLC; Gould Electronics Inc.; HAJ, Inc. d/b/a Christenson Oil Company; Hercules LLC; Koppers Inc.; McCall Oil & Chemical Corporation; McCall Oil Real Estate Company LLC; Morec Front LLC; GWC Properties, LLC; GWC Front, LLC; Tanker Basin LLC; Northwest Pipe Company (fka Northwest Pipe & Casing Company and Northwest Pipe and Casing Company); Portland General Electric Company (PGE); Portland Terminal Railroad Company; Sulzer Pumps (US) Inc.; and Valvoline, Inc.

Restoration Defendants include the City of Portland, Evraz, Inc. (FKA Oregon Steel Mills and Gilmore Steel, MMGL LLC, Pacificorp, Port of Portland, Schnitzer Steel Industries, Inc. and Siltronic Corporation.

We appreciate the opportunity to comment on the consent decrees as well as the work of the Natural Resource Damage  Assessment Trustee Council. However, we have several significant concerns about these proposed settlements:

1) **The Settlement Agreements seem far too small given the number, financial capacity and liability of the parties involved**: The Trustee Council places a very heavy emphasis on the size of the settlements ($36,154,209.45). However, the critical factor is not the size of the settlement but rather the overall size of the assessment and what portion of the assessment these settlements cover. In fact, these settlement agreements represent only approximately  11% of the overall liability in the natural resource damage assessment.

> *This process converts these losses into a common metric of DSAYs, which represent how much ecological services one acre of habitat provides for one year. The Trustee Council calculated ecological service losses for the entire Portland Harbor Assessment Area to be 4,130 DSAYs*

*(as noted above, the current settlements address about 11% of this total).[1]*
*The Trustee Council determined the amount of money it would cost to*
*acquire DSAYs of ecological benefit to offset ecological losses. This*
*yielded a cost of approximately $69,025 per DSAY.*

We are deeply concerned that the Trustee Council may be settling far too low
with these responsible parties and may be unable. through either future
settlements or legal action against remaining responsible parties, to achieve its
overall damage assessment goals. We understand that parties sometimes
receive a financial benefit for settling early. We also understand that there is joint
and several liability. However, settlements still should be reasonably proportional
in order to ensure that overall NRDA goals can be achieved. The information
provided in no way gives us confidence that this standard has been met.

2) **The NRDA process needs to be more inclusive and more transparent:**
Although the NRDA process involves significant public interests (natural
resources, recreation. etc.) it has occurred  largely behind closed doors with
minimal public engagement. What little public engagement that has occurred has
been episodic, often with years of virtual silence in between. In a complex
process that has spanned more than two decades, and which intersects with
other complex processes (e.g. the in water cleanup program administered by
EPA and the upland cleanup program administered by DEQ) it is extremely
difficult for the public to track and understand the NRDA process, based on such
limited information. It is fair to say that much of the public that is currently
engaged in the Superfund process is not even aware that the NRDA process is
running in parallel. Given the timeframe of this process, many people have both
entered and exited the process since the Trustee Council last engaged in
significant outreach. It is absolutely critical that the Trustee Council begin
engaging with the public in a regular and ongoing manner similar to what is
occurring through the cleanup programs.

 It is important that the public have the opportunity to interact with the different
representatives on the Trustee Council, gain a high level understanding of the
overall NRDA process, and have  adequate time to develop a deeper
understanding of specific issues well in advance of formal opportunities for public
input. It is not acceptable or realistic to expect the public to be able to effectively
weigh-in on complex legal and scientific decisions without this kind of ongoing
outreach and engagement. We urge the Trustee Council to begin engaging with

---

[1] Consent Decrees

the public on an ongoing basis via the public engagement structures established through the cleanup programs.

Our organization is familiar with this process, and has been engaged with Trustee representatives over the years. Even so, meaningful interaction in regard to the valuation of Willamette River habitat, and the function and value of the four mitigation sites has not occurred in the last four years. It seems to us that additional engagement should have occurred, even if *specifics* related to the proposed settlement could not be discussed.

3) **There is a lack of coherent vision or structure in terms of what NRDA anticipates achieving or how these settlements will advance those goals**: The Portland Harbor Superfund Site is the most degraded and polluted stretch of river in the State of Oregon. Decades of pollution have harmed fish and wildlife, restricted recreational opportunities and violated treaty rights of Native American Tribes.  Portland Harbor has been listed as a Superfund site since 2000. The NRDA Trustee Council was established in 2002. Despite the fact that more than two decades have elapsed since these processes were initiated, it is not clear what the Trustee Council hopes to achieve in the Portland Harbor Study Area in terms of restoring fish and wildlife habitat, mitigating for lost recreational activities, or addressing lost opportunities for tribes. The settlement agreements and related documents do not provide the reader with any understanding of what the public can expect at the end of this process in terms of tangible outcomes: How many acres of in-water, riparian and upland habitat will be restored? How will this restoration be distributed within the study area? What species will benefit and how? What specific recreational opportunities will be provided? The reader is provided with information regarding  monetary obligations of a subset of responsible parties, but a virtually no understanding of how those funds will actually compensate for the real damages that have occured. We question whether it makes sense to settle before the Trustee Council is able to fully describe what it is actually expecting to achieve on the river.

4) **We question the overall design and ecological function of sites such as Linnton where sedimentation seems to be a potential ongoing issue**.  In particular, this site is composed of a backchannel that is affected by natural deposition, with the potential to block the off-chanel habitat. Further, the large pile created by excavated sediments is not a natural occurrence along the Willamette, especially with large woody debris being placed many meters above normal high winter and spring flows. Sites that require ongoing management seem problematic at best when these areas have questionable long-term

functionality, yet are said to contain a significant percentage of the needed ecological uplift. We do recognize that the Trustee Council has spent significant time evaluating each of these sites, but even so we feel it is important to recognize that such sites have the potential to change significantly over time. Even with adaptive management, significant uncertainty exists.

5) **Recreational Damages**: The amount of funds dedicated to recreational damages strikes us as exceedingly low. The public has suffered through decades of restricted activity along Portland's premier natural resource, the Willamette River. This restricted activity has manifested itself in myriad ways including restricted access to significant portions of the river. Public beaches have been affected for decades. The opportunity to catch and consume fish has been affected (with significant health advisories posted for decades), and the overall recreational opportunity has been diminished by the reality of a river with contaminated sediments that span miles. The general public has taken home the message that Portland Harbor is not a place to spend time, nor are there many places to easily access the river. The amount of funding anticipated through NRDA to compensate for lost recreational activities is likely not enough to do more than one or two small projects along the entire 10+ mile Portland Harbor Superfund Site.

6) **Lack of Biological Opinion**: A fundamental missing piece of this process is the lack of a Biological Opinion ("BiOP") from the National Marine Fisheries Service evaluating the impacts of the consent decrees on listed salmonids. We believe a BiOp from the expert agency responsible for salmon recovery is essential to truly evaluate the impacts of these actions on listed salmonids.

7) **Climate Change -** How has climate change figured into the NRDA process for Portland Harbor? Has the process changed or adapted over the years to reflect the increased value of lost habitat, and the need to accurately reflect the impact of habitat loss? Given this process by itself has taken many years, has the Trustee Council adapted new data in regard to climate change and the value of habitat for providing resiliency into account?

We very much appreciate the work of the Trustee Council, and understand that this has been a long process with a significant amount of technical and ecological work. We also understand that this is a very significant potential settlement, and that the vast amount of habitat the Willamette has lost since the inception of NRDA, and the increased need for increased healthy habitat due to climate change, is exceedingly important.

We hope that you take our comments in the spirit in which they were intended. Our organization works only to protect and restore the Willamette River's water quality and habitat, and any settlement that falls shy of the needed mark is problematic in our view.


Respectfully,


Travis Williams
Executive Director


Bob Sallinger
Conservation Director

# Attachment C
# Plaintiffs' Responses to Public Comments

## Plaintiffs' Responses to Public Comments Received on the Consent Decrees Lodged on November 1, 2023, In *United States of America et al. v. ACF Industries LLC et al.,* No. 3:23-cv-01603-YY (D. Or.)

On November 1, 2023, Plaintiffs (the United States of America; the State of Oregon; the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe) filed this action for natural resource damages at the Portland Harbor Superfund Site and concurrently lodged two consent decrees resolving those claims against the Defendants named in Plaintiffs' Complaint.

Plaintiffs took public comments on the proposed consent decrees from November 14, 2023, to January 28, 2024, and received seven comments.[1]

This document contains our[2] responses to the written public comments on the proposed Consent Decrees received during the comment period. We have reproduced the comments in full, without our responses, in a separate document. In this document, we have broken the comments into segments by topic so that our responses directly follow each topic raised. Where different commenters have raised the same topic, we grouped these segments from different commenters on the same topic in order to provide a single, non-duplicative response to comments on that topic.

---

[1] 88 Fed. Reg. 78063 (Nov. 14, 2023); 88 Fed. Reg. 88417 (Dec. 21, 2023).

[2] This document uses the terms "we" and "our" to refer to the Plaintiffs in this case. The term "Settling Trustees" is used to refer to the natural resource trustees that are members of the Portland Harbor Natural Resource Trustee Council ("PHNRTC"). The Yakama Nation also is a natural resource trustee at the Portland Harbor Superfund Site but is not a Plaintiff or a member of the PHNRTC.

# Table of Contents

List of Acronyms ................................................................................................................... iv

Public Comment Received 01/02/2024 from John Lee Marshall, Citizen Activist ....................1

    **Response to Comment from John Marshall** ................................................................8

Public Comment Received 01/23/2024 from Arkema Inc., Section A (Arkema A) ..................15

    **Response to Arkema A** ............................................................................................17

Public Comment Received 01/23/2024 from Arkema Inc., Section B (Arkema B)........................23

    **Response to Arkema B** ............................................................................................25

Public Comment Received 1/23/2024 from Arkema Inc., Section C (Arkema C)...........................27

    **Response to Arkema C** ............................................................................................30

Public Comment Received 01/23/2024 from Arkema Inc., Section D (Arkema D) ........................32

Public Comment Received 01/26/2024 from FMC Corporation (FMC1)........................................34

    **Response to Arkema D and FMC1** ..........................................................................36

Public Comment Received 01/26/2024 from Gunderson LLC, Part 1 (Gunderson 1)...................41

Public Comment Received 01/26/2024 from the Yakama Nation, Section 3 (YN3) ....................44

Public Comment  Received 01/28/2024 from Willamette Riverkeeper, Section 1 (WR1)............46

    **Response to Gunderson 1, YN3, and WR1** .................................................................47

Public Comment Received 01/26/2024 from Gunderson LLC, Part 2 (Gunderson 2)...................54

Public Comment Received 01/26/2024 from FMC Corp. (FMC2) .................................................55

    **Response to Gunderson 2 and FMC2**.........................................................................56

Public Comment Received 01/26/2024 from Northwest Environmental Defense Center
    (NEDC) ..................................................................................................................60

    Response to NEDC ...................................................................................................71

Public Comment Received 01/26/2024 from the Yakama Nation, Sections 5, 6, and 7
    (YN5, YN6, YN7)..................................................................................................76

Public Comment  Received 01/28/2024 from Willamette Riverkeeper, Sections 4 and 6
    (WR4, WR6)..........................................................................................................78

    **Response to NEDC, YN5, YN6, YN7, WR4, and WR6** ..............................................79

Public Comment Received 01/26/2024 from the Yakama Nation, Introduction (YNA)..............93

Public Comment Received 01/26/2024 from the Yakama Nation, Closing (YNB) .....................95

    **Response to YNA, YNB** ....................................................................................................96

Public Comment Received 01/26/2024 from the Yakama Nation, Section 1 (YN1) .....................98

    **Response to YN1** ...............................................................................................................99

Public Comment Received 01/26/2024 from the Yakama Nation, Section 4 (YN4) ..................100

    **Response to YN4** .............................................................................................................101

Public Comment  Received 01/28/2024 from Willamette Riverkeeper, Section 2 (WR2)..........102

    **Response to WR2**............................................................................................................103

Public Comment  Received 01/28/2024 from Willamette Riverkeeper, Section 3 (WR3)..........106

    **Response to WR3**............................................................................................................107

Public Comment  Received 01/28/2024 from Willamette Riverkeeper, Section 5 (WR5)..........110

    **Response to WR5**............................................................................................................111

Public Comment  Received 01/28/2024 from Willamette Riverkeeper, Section 7 (WR7)..........112

    **Response to WR7**............................................................................................................113

# List of Acronyms

BO – Biological Opinion

CERCLA – Comprehensive Environmental Response, Compensation, and Liability Act

DOI – U.S. Department of the Interior

DSAY – Discounted Service Acre Year

EPA – Environmental Protection Agency

ESA – Endangered Species Act

HEA – Habitat Equivalency Analysis

IRT – Interagency Review Team

Justice Department – U.S. Department of Justice

NOAA – National Oceanic and Atmospheric Administration

NPL – National Priority List

NRDA – Natural Resource Damage Assessment

ODEQ – Oregon Department of Environmental Quality

OPA – Oil Pollution Act

PEIS – Programmatic Restoration Plan and Environmental Impact Statement

ROD – Record of Decision

SRP – Supplemental Restoration Plan and Environmental Assessment

iv

# Public Comment Received 01/02/2024 from
## John Lee Marshall, Citizen Activist

To:    Assistant Attorney General,
U.S. DOJ—ENRD
P.O. Box 7611
Washington, DC 20044–7611

From:  John Lee Marshall Citizen Activist
2215 SE Miller Street, Apt 11
Portland, Oregon 97202

Re:    U.S. Department of Justice

Environment and Natural Resources Division

CONSENT DECREE U.S. et al. v. ACF Industries, LLC. et al.[3]

Assistant Attorney General, Environment and Natural Resources Division, United States of America et al. v. ACF Industries LLC, et al., D.J. Ref. No. 90– 11–2–06787/2.

**Delta HEA vs. Annual Return Dividend for Calculating DSAYs**

I strongly suspect the method used by Portland Harbor mitigation banks (banks) and the Trustee Council to calculate debits and credits (DSAYs) may have a fundamental logic error and subsequently the number of DSAYs may be significantly overestimated. The logic error is in the dividend variable used for their DSAY formula (see Figure 1 for definitions and Figure 2 for formula comparison):

Bank's DSAY Formula: $DSAYs = (RS - DS) / DR \times A$

The dividend highlighted in yellow above in the bank's formula is termed Delta HEA. Alternatively, I suspect that the dividend that should have been used is the Annual Recovery highlighted in yellow in my interpretation of the correct DSAY formula below:

My Interpretation of the Correct DSAY Formula: $DSAYs = AR / DR \times A$

| DSAYs - Discounted-Service-Acre-Years |
|---|
| A – Habitat Acres |
| RS – Recovered Services Value Score |
| DS – Damaged Services Value Score |
| AR – Annual Recovery |
| DR – Discount Rate |

---

[3] **[This is footnote 1 in the comment Plaintiffs received from John Marshall.]**  Comment period: *Updated December 22, 2023.* 11/14/2023 - 1/28/2024.

1

Public Comment Received 01/02/2024 from
John Lee Marshall, Citizen Activist

**Figure 1. DSAY Formula Term Variable Definitions**

Under the assumption DSAYs are intended to represent the present values of Portland Harbor credits and debits, I employed an Excel spreadsheet (Figure 3) using data extracted from the Linnton Mill Mitigation Bank Prospectus (Prospectus). This allowed me to reproduce the same DSAY numbers for the bank as displayed in the Prospectus. The results using the bank's formula yielded ~ 318-DSAYs (Figures 3 and 5). This number of DSAYs is significantly greater than the 12-DSAYs yielded by my interpretation of the correct formula (Figures 3 and 4).



**Figure 2. Comparison of Dividends (Delta HEA vs Annual Return) to Calculate DSAYs. Logic suggests that:**

1.  if the range of DSAY value is between 0 and 1,

2

Public Comment Received 01/02/2024 from
John Lee Marshall, Citizen Activist

2. if all 12 acres had 0-value post impact (debit) or pre-recovery (credit),

3. and if the mitigation bank subsequently reached full functional value (1.0),

4. then the most the present value (DSAYs) could possibly be is: 12-acres x (1.0 – 0) x 1-year = 12-DSAYs.

The problem lies in the fact that Delta HEA currently used in the dividend does not reflect the habitat function annual recovery, but rather the entire functional recovery over the entire life of the bank. The arithmetic used by the Portland Harbor mitigation banks and the Trustee Council may treat this much larger figure as the additive annual accrual of function at their respective locations, thereby erroneously magnifying their true overall functional value.

For example, if the bank reached its full credit value from 0 to 1 in 1-year, then the annual accrual would be 100% or 1.00. The annual accrual total (1) would be divided by the percent annual accrual (1) to derive a present value of 1. Likewise if it took 30 years for the bank to reach full value then the annual accrual total (0.033) [*Not say 0.875*] would be divided by the percent annual accrual (0.033) to derive a present value of 1. In both cases the value 1.0 is multiplied by acres (12) multiplied by 1-year to derive 12-DSAYs, much lower than 318-DSAYs derived in the Prospectus. This suggests a serious flaw in the logic used to calculate DSAYs at the banks. The Trustee Council should look into this further and the results of their investigation should be reported to the Portland Harbor stakeholders as well as the general public. For a more in-depth analysis of this potential problem, including a series of investigative amortization tests, go to: Logic Testing for Portland Harbor Mitigation and Conservation Bank Credits and Debits (DSAYs)

**Why are the Dividends Used in the DSAY Calculation Formula Important?**

In order to meet the natural resource recovery goals established during the CERCLA and CWA related Natural Resources Damage Assessment (NRDA) negotiations it is necessary to:

1. Maintain competitive mitigation bank credit and debit values in the region,

2. Maintain affordable credits for the regulated public (polluters), and

3. Maintain reasonably profitable credits for the mitigation bank sponsors.

4. Verify the banks are meeting their recovery targets.

A balance should assure adequate mitigation bank sponsor profit in a competitive credit market while the regulated public (polluters) can meet their regulatory obligations and still remain solvent. All the while the regulatory agencies need assurances the region's overall mitigation banking program is adequately meeting the public trust requirements.

The foundation for balance is contingent on the credit/debit evaluation methods being logically defensible as verified by transparent accounting. Illogical methods that significantly overvalue credits can lead to an amelioration strategy that underserves and possibly even subjugates its intended purpose. In other words, the ecological recovery of the Portland Harbor superfund site, in terms of both acreage and function, may be severely compromised. The credit/debit

3

Public Comment Received 01/02/2024 from
John Lee Marshall, Citizen Activist

evaluation methods are not the only elements affecting Portland Harbor recovery goals, but they are nevertheless extremely important and therefore deserve careful consideration.

4

Public Comment Received 01/02/2024 from
John Lee Marshall, Citizen Activist

| Proposed Cowardin Class | Habitat HEA Category | Pre-construction Condition | Acres | Existing Functional Value | Proposed Functional Value * | Delta Value (DV) | Incremental Annual Value (AV) | HEA DISCOUNT Rate ** (DR) | DV/DR | (DV/DR) * Acres | (DV/DR) * Ac by Cowardin Class | DV * A | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Shallow Water riprap/concrete adjacent | 3.75 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 27.5 | 103.1 | | 3.375 | 30x = 1 |
| Riverine | Shallow Water | Shallow Water covered | 0.22 | 0.5 | 1 | 0.5 | 0.033 | 0.032727 | 15.3 | 3.4 | | 0.11 | 30x/30 = 1/30 |
| | | Shallow Water Gravel/rock, degraded | 0.84 | 0.5 | 1 | 0.5 | 0.033 | 0.032727 | 15.3 | 12.8 | | 0.42 | x = 1/30 |
| | | ACM piles | 0.56 | 0.05 | 0.8 | 0.75 | 0.033 | 0.032727 | 22.9 | 12.8 | | 0.42 | x = 0.033 |
| | | ACM covered | 0.14 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 21.4 | 3.0 | | 0.098 | |
| | | ACM riprap | 0.38 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 21.4 | 8.1 | | 0.266 | |
| | ACM | ACM unvegetated/steep | 0.41 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 21.4 | 8.8 | 188.3 | 0.287 | |
| | Unvegetated | Riparian unvegetated | 0.14 | 0 | 0.8 | 0.8 | 0.033 | 0.032727 | 24.4 | 3.4 | | 0.112 | Alternative A |
| | | Riparian invasive | 0.32 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 21.4 | 6.8 | | 0.224 | |
| | | Riparian native forested | 0.09 | 0.5 | 0.8 | 0.3 | 0.033 | 0.032727 | 9.2 | 0.8 | | 0.027 | This alternative divides |
| | | Riparian invasive | 0.16 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 27.5 | 4.4 | | 0.144 | Delta V by HEA Discount |
| | Off-Channel | Riparian unvegetated | 0.68 | 0 | 1 | 1 | 0.033 | 0.032727 | 30.6 | 20.8 | | 0.68 | Rate |
| | | Riparian unvegetated | 1.12 | 0 | 1 | 1 | 0.033 | 0.032727 | 30.6 | 34.2 | | 1.12 | |
| | | Upland unvegetated | 2.38 | 0 | 1 | 1 | 0.033 | 0.032727 | 30.6 | 72.7 | | 2.38 | |
| Palustrine | ACM | ACM piles | 0.21 | 0.05 | 1 | 0.95 | 0.033 | 0.032727 | 29.0 | 6.1 | 132.3 | 0.1995 | |
| | Vegetated | ACM riprap | 0.11 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 27.5 | 3.0 | | 0.099 | |
| | | Riparian unvegetated | 0.08 | 0 | 1 | 1 | 0.033 | 0.032727 | 30.6 | 2.4 | | 0.08 | |
| | | Riparian invasive vegetated | 0.5 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 27.5 | 13.8 | | 0.45 | Mitigation Ratio (C/A) |
| | | Sum Acres | 12.09 | | | | | | Sum Credits aka DSAYs | | 321 | 10 | 26.51582155 |
| | | | | | | | | | | | | 317.9242 | |

| Proposed Cowardin Class | Habitat HEA Category | Pre-construction Condition | Acres | Existing Functional Value | Proposed Functional Value * | Delta Value (DV) | Incremental Annual Value (AV) | HEA DISCOUNT Rate ** (DR) | AV/DR | (AV/DR) * Acres | (AV/DR) * Ac by Cowardin Class | DV * A | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Shallow Water riprap/concrete adjacent | 3.75 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 1.0 | 3.8 | | 3.375 | |
| Riverine | Shallow Water | Shallow Water covered | 0.22 | 0.5 | 1 | 0.5 | 0.033 | 0.032727 | 1.0 | 0.2 | | 0.11 | |
| | | Shallow Water Gravel/rock, degraded | 0.84 | 0.5 | 1 | 0.5 | 0.033 | 0.032727 | 1.0 | 0.8 | | 0.42 | |
| | | ACM piles | 0.56 | 0.05 | 0.8 | 0.75 | 0.033 | 0.032727 | 1.0 | 0.6 | | 0.42 | |
| | | ACM covered | 0.14 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 1.0 | 0.1 | | 0.098 | |
| | | ACM riprap | 0.38 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 1.0 | 0.4 | | 0.266 | Alternative B |
| | ACM | ACM unvegetated/steep | 0.41 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 1.0 | 0.4 | 7.8 | 0.287 | |
| | Unvegetated | Riparian unvegetated | 0.14 | 0 | 0.8 | 0.8 | 0.033 | 0.032727 | 1.0 | 0.1 | | 0.112 | This alternative divides |
| | | Riparian invasive | 0.32 | 0.1 | 0.8 | 0.7 | 0.033 | 0.032727 | 1.0 | 0.3 | | 0.224 | Incremental Annual V |
| | | Riparian native forested | 0.09 | 0.5 | 0.8 | 0.3 | 0.033 | 0.032727 | 1.0 | 0.1 | | 0.027 | by HEA Discount Rate |
| | | Riparian invasive | 0.16 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 1.0 | 0.2 | | 0.144 | |
| | Off-Channel | Riparian unvegetated | 0.68 | 0 | 1 | 1 | 0.033 | 0.032727 | 1.0 | 0.7 | | 0.68 | |
| | | Riparian unvegetated | 1.12 | 0 | 1 | 1 | 0.033 | 0.032727 | 1.0 | 1.1 | | 1.12 | |
| | | Upland unvegetated | 2.38 | 0 | 1 | 1 | 0.033 | 0.032727 | 1.0 | 2.4 | | 2.38 | |
| Palustrine | ACM | ACM piles | 0.21 | 0.05 | 1 | 0.95 | 0.033 | 0.032727 | 1.0 | 0.2 | 4.4 | 0.1995 | |
| | Vegetated | ACM riprap | 0.11 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 1.0 | 0.1 | | 0.099 | |
| | | Riparian unvegetated | 0.08 | 0 | 1 | 1 | 0.033 | 0.032727 | 1.0 | 0.1 | | 0.08 | |
| | | Riparian invasive vegetated | 0.5 | 0.1 | 1 | 0.9 | 0.033 | 0.032727 | 1.0 | 0.5 | | 0.45 | Alt A/ Alt B |
| | | Sum Acres | 12.09 | | | | | | Sum Credits aka DSAYs | | 12 | 10 | 26.29646339 |

Tabs: ALT_DSAYs | HEA_B | HEA_E | HEA_G | HEA_F | HEA_N | HEA_O | HEA_I | HEA_J | HEA_L | HEA_M | HEA_K | HEA_H | HEA_C

**Figure 3. Delta HEA vs Annual Return HEA Derived DSAYs.** https://www.mitigationcreditdebit.com/HEA_ALT_DSAYS.xlsx

**Public Comment Received 01/02/2024 from**
**John Lee Marshall, Citizen Activist**



**Figure 4. DSAYs Calculator Results Using Annual Return / Rate of Annual Return**
**https://www.mitigationcreditdebit.com/EcoServCalculator.html**

Public Comment Received 01/02/2024 from
John Lee Marshall, Citizen Activist



**Figure 5. DSAYs Calculator Results Using Delta HEA / Rate of Annual Return**
https://www.mitigationcreditdebit.com/EcoServCalculator.html

7

ER-898

# Response to Comment from John Marshall

– The commenter's general thesis appears to be that the Settling Trustees should not have used habitat equivalency analysis (HEA) to quantify the ecological service gains provided by the restoration banks included in these Consent Decrees.[4] However, as discussed below, commenter's conclusion is based on a misunderstanding of how HEA works and how the Settling Trustees used HEA in the Portland Harbor natural resource damage assessment (NRDA).

HEA is a method of converting the diverse flow of ecological services provided by a habitat, for example, food and shelter for animals, into a common currency. This currency is known as a discounted service acre year (DSAY), which represents the total amount of ecological services provided by an acre of a given habitat (*e.g.*, marsh, mudflat, forested uplands) over the course of one year. The methodology assumes that equivalent habitats will provide equivalent ecological services. Thus, for example, a party could provide compensation for lost wetland ecological services by creating additional wetland ecological services through restoration of existing wetland habitat or creation of new wetland habitat. HEA allows natural resource trustees engaged in the NRDA process to quantify both the ecological service losses (injuries) to habitat caused by contamination, as well as the amount of restoration necessary to generate ecological services that will compensate the public for those losses. The ability to draw this type of equivalency is critical, as the natural resource damages provisions of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and the Oil Pollution Act (OPA) are not punitive; rather, they are intended to compensate the public. Accordingly, the Settling Trustees must be able to balance losses and gains.

As their name suggests, DSAYs contain a time element, which is necessary to determine equivalency between lost ecological services from injury and gained ecological services from restoration. First, the flow of ecological services can change over time. HEA incorporates the concept that injuries may get worse or better (*i.e.*, recover) over time, and that restored habitat is expected to improve over time. Second, injury and restoration may not occur wholly during the same time period. Restoration does not begin until sometime after the injury began (in this case, decades). Third, HEA accounts for the fact that the public would rather have ecological services today than tomorrow, and also would rather have had them yesterday than today. As a result, the public (and the Settling Trustees) values ecological services, and the losses of those ecological services from contamination, that occurred in the past or present more highly than restored

---

[4] The commenter does not explicitly state an objection to the use of HEA and couches his evaluation in HEA-like terminology, such as suggesting an undervaluation rather than a completely different currency. However, the effect of implementing the calculations the commenter supports would create a valuation process that is different from HEA, at least as HEA is used in NRDA cases. HEA began as a NRDA tool but has since been adapted for various ecological crediting regimes, such as mitigation and conservation banking. Those different crediting regimes apply HEA (or something similar) in different ways than HEA is applied in the NRDA context, which may explain some of the commenter's misunderstandings discussed herein.

8

ecological services that occur in the future. NRDA practitioners refer to the process of accounting for the change in value over time as "discounting." This generally means that the Settling Trustees require more restoration when restoration implementation is delayed, because ecological services generated later in time have less value. Accounting for each of these time factors can result in a different number of acres of restoration needed for compensation than were injured.[5]

Natural resource trustees commonly use equivalency analyses such as HEA to quantify injury and scale compensatory restoration, and these methods have been used in the vast majority of NRDA settlements since the 1990s. Various sources and authorities explicitly document HEA as a relevant, objective, cost-effective method for quantifying compensatory damages in NRDA:

- In federal regulations;[6]

- In federal NRDA guidance documents issued by agencies such as the National Oceanic and Atmospheric Administration (NOAA),[7] United States Fish and Wildlife Service (USFWS),[8] and the National Park Service (NPS);[9]

- In the peer-reviewed literature;[10] and

---

[5] DAMAGE ASSESSMENT AND RESTORATION PROGRAM, NAT'L OCEANIC AND ATMOSPHERIC ADMIN., HABITAT EQUIVALENCY ANALYSIS: AN OVERVIEW (2000), https://repository.library.noaa.gov/view/noaa/47184.

[6] *See e.g.,* 43 C.F.R. § 11.83(c)(2) (CERCLA); 15 C.F.R. § 990.53(d)(2) (OPA).

[7] DAMAGE ASSESSMENT AND RESTORATION PROGRAM, NAT'L OCEANIC AND ATMOSPHERIC ADMIN., SCALING COMPENSATORY RESTORATION ACTIONS: GUIDANCE DOCUMENT FOR NATURAL RESOURCE DAMAGE ASSESSMENT UNDER THE OIL POLLUTION ACT OF 1990 (1997), https://permanent.fdlp.gov/gpo9953/scaling.pdf; COASTAL OCEAN OFF., NAT'L OCEANIC AND ATMOSPHERIC ADMIN., GUIDELINES FOR THE CONSERVATION AND RESTORATION OF SEAGRASSES IN THE UNITED STATES AND ADJACENT WATERS (1998), https://repository.library.noaa.gov/view/noaa/1672; DAMAGE ASSESSMENT AND RESTORATION PROGRAM, NAT'L OCEANIC AND ATMOSPHERIC ADMIN., HABITAT EQUIVALENCY ANALYSIS: AN OVERVIEW (2000), https://repository.library.noaa.gov/view/noaa/47184.

[8] ROBERT E. UNSWORTH & TIMOTHY B. PETERSEN, A MANUAL FOR CONDUCTING NATURAL RESOURCE DAMAGE ASSESSMENT: THE ROLE OF ECONOMICS (1995).

[9] NAT'L PARK SERV., U.S. DEP'T OF THE INTERIOR, DAMAGE ASSESSMENT AND RESTORATION HANDBOOK: GUIDANCE FOR DAMAGE ASSESSMENT AND RESTORATION ACTIVITIES IN THE NATIONAL PARK SERVICE (2003), https://www.doi.gov/sites/default/files/migrated/restoration/library/upload/NPS_Handbook.pdf.

[10] Mary Baker et al., *Restoration Scaling Approaches to Addressing Ecological Injury: The Habitat-Based Resource Equivalency Method*, 65 ENV'T MGMT. 161–77 (2020), https://doi.org/10.1007/s00267-019-01245-9; William H. Desvousges et al., *Habitat and Resource Equivalency Analysis: A Critical Assessment*, 143 ECOLOGICAL ECON. 74–89 (2018), https://doi.org/10.1016/j.ecolecon.2017.07.003; Richard W. Dunford et al., *The Use of Habitat Equivalency Analysis in Natural Resource Damage Assessments*, 48 ECOLOGICAL ECON. 49–70

9

- As the basis for the ecological portion of NRDA settlements, such as for the Hylebos Waterway,[11] Watts Bar Reservoir,[12] St Lawrence River Environment Natural Resource Damage Assessment,[13] Tennessee Valley Authority Kingston Coal Ash Spill,[14] and Oak Ridge Reservation.[15]

Further, in cases where natural resource trustees have used HEA in contested natural resource damages litigation, courts have upheld its use. For example, in *United States v. Great Lakes Dredge and Dock Company*, the court upheld the use of HEA to scale the loss of ecological services from injury to sea bottom habitat in the Florida Keys National Marine Sanctuary to ecological service gains from restoration projects proposed as compensation.[16] And in *United States v. Fisher*, the court concluded that HEA is "the most technically appropriate and cost-

---

(2004), https://doi.org/10.1016/j.ecolecon.2003.07.011; Carol Adaire Jones & Lisa DiPinto, *The Role of Ecosystem Services in the USA Natural Resource Liability Litigation*, 29 ECOSYSTEM SERVICES 333–51 (2018), https://doi.org/10.1016/j.ecoser.2017.03.015; Elizabeth Strange et al., *Determining Ecological Equivalence in Service-to-Service Scaling of Salt Marsh Restoration*, 29 ENV'T MGMT. 290–300 (2002), https://doi.org/10.1007/s00267-001-0019-X.; J. Walter Milon & Richard E. Dodge, *Applying Habitat Equivalency Analysis for Coral Reef Damage Assessment and Restoration*, 69 BULL. OF MARINE SCI. 975–88 (2001); Deborah P. French McCay et al., *Restoration that Targets Function as Opposed to Structure: Replacing Lost Bivalve Production and Filtration*, 264 MARINE ECOLOGY PROGRESS SERIES 197–212 (2003), http://www.jstor.org/stable/24867511.

[11] COMMENCEMENT BAY NAT. RES. TR., HYLEBOS WATERWAY NATURAL RESOURCE DAMAGE SETTLEMENT PROPOSAL REPORT: A HABITAT RESTORATION-BASED APPROACH FOR RESOLVING NATURAL RESOURCE DAMAGE CLAIMS RELATING TO THE HYLEBOS WATERWAY OF THE COMMENCEMENT BAY NEARSHORE/TIDEFLATS SUPERFUND SITE COMBINED WITH A PROPOSAL FOR ALLOCATING LIABILITY FOR SETTLEMENT PURPOSES (2002), https://www.cerc.usgs.gov/orda_docs/DocHandler.ashx?task=get&ID=1284.

[12] WATTS BAR RESERVOIR TR. COUNCIL, OAK RIDGE RESERVATION NATURAL RESOURCE DAMAGE ASSESSMENT: EVALUATION OF CONTAMINANT-RELATED LOSSES AND WATTS BAR RESERVOIR AND GAINS FROM THE BLACK OAK RIDGE CONSERVATION EASEMENT (2009), https://www.cerc.usgs.gov/orda_docs/DocHandler.ashx?ID=469.

[13] NAT. RES. TR. OF THE ST. LAWRENCE RIVER ENV'T, ST. LAWRENCE RIVER ENVIRONMENT NATURAL RESOURCE DAMAGE ASSESSMENT: RESTORATION AND COMPENSATION DETERMINATION PLAN AND ENVIRONMENTAL ASSESSMENT (2013), https://www.fws.gov/sites/default/files/documents/508_St.%20Lawrence%20Restoration%20Plan%20and%20Appendices.pdf.

[14] NAT. RES. TR. OF THE TENN. VALLEY AUTH. KINGSTON FOSSIL PLANT COAL ASH RELEASE NAT. RES. DAMAGE ASSESSMENT, TENNESSEE VALLEY AUTHORITY KINGSTON FOSSIL PLAN COAL ASH RELEASE NATURAL RESOURCE DAMAGE ASSESSMENT RESTORATION AND COMPENSATION DETERMINATION PLAN (2015).

[15] OAK RIDGE RSRV. NAT. RES. TR., OAK RIDGE RESERVATION NATURAL RESOURCE DAMAGE ASSESSMENT: RESTORATION AND COMPENSATION DETERMINATION PLAN/ENVIRONMENTAL ASSESSMENT (2022), https://doeic.science.energy.gov/uploads/A.0106.037.0027.pdf.

[16] *United States v. Great Lakes Dredge & Dock Co.,* 259 F.3d 1300 (11th Cir. 2001).

10

effective method to quantify the natural resource damage" that resulted from injury to seagrass habitat.[17]

The Settling Trustees determined that HEA was an appropriate tool to calculate ecological service losses and gains for the Portland Harbor Assessment Area for the reasons described above. To support the proposed settlements in this case, the Settling Trustees took the following steps to apply HEA to the Portland Harbor Assessment Area:

1.  The Settling Trustees used HEA to identify the ecological services lost as a result of contamination in the Portland Harbor Assessment Area. This is based on the size (in acres) of the injured area, the severity of the injury (in percent ecological service loss), and duration of the injury (from the time when the injury began, or, in this case, 1981, when CERCLA was enacted, until the ecological services are expected to recover), and the timing of the injury (the Settling Trustees valued service losses farther in the past higher than losses in the present or future). When the Settling Trustees applied these parameters into the HEA model, it yielded the habitat injury "debit," *i.e.*, the size of the ecological service losses caused by contamination that require compensation through ecological restoration. The HEA expresses this in lost DSAYs. For Portland Harbor, the Settling Trustees calculated a harbor-wide ecological injury totaling 4,130 DSAYs for the purposes of Phase 2 early settlements.

2.  The Settling Trustees identified the ecological services that they expect compensatory restoration to provide over the full life of the projects. To address injuries caused by contamination in the Portland Harbor Assessment Area, the Settling Trustees identified four restoration banks that provide suitable habitat to compensate for losses of ecological services. Not all ecological services created by a restoration project accrue immediately; some will take months or years to come to fruition. Each restoration bank thus has a quantified number of DSAY "credits" which are "released" over time as the banks reach various performance milestones. The Settling Trustees quantified these credits by first identifying the ecological services that restoration implementation would create over time. The Settling Trustees considered the level of ecological service uplift, spatial extent of the restoration bank, and timing of the benefits, with ecological services provided in the future being valued lower than ecological services in the near term. Ultimately, the Settling Trustees' HEA expressed the restoration benefits of each project as a number of DSAYs gained.

3.  For each Settling Defendant, the Settling Trustees quantified in DSAYs the ecological service losses, *i.e.*, injury, caused by that Settling Defendant's activities. The Settling Defendants could then resolve their liability for ecological service losses by purchasing DSAY restoration credits or entering a monetary settlement with the Settling Trustees at the per-DSAY "cash-out" price, as outlined in the Cash-Out Decree.

The current proposed settlements reflect the process described above.

---

[17] *United States v. Fisher*, 977 F. Supp. 1193, 1198 (S.D. Fla. 1997), *aff'd*, 174 F.3d 201 (11th Cir. 1999).

11

The commenter presents a number of specific arguments regarding why the Settling Trustees should not have used HEA or used it incorrectly, but the overarching argument is that the HEA, as applied by the Settling Trustees, overestimates the credits generated by the restoration banks. This conclusion stems from a misunderstanding of the DSAY currency and how it is used in NRDA. Specifically, the commenter seems to assume that a DSAY "credit" applied to the ecological values of a restoration project constitutes a kind of multiplier, *i.e.*, when the Settling Trustees credit a restored acre as providing, for example, 10 DSAYs, they are concluding that a restored acre is worth 10 lost or injured acres.[18] This assumption is incorrect. As noted above, a DSAY is the amount of ecological services provided by an acre of habitat over one year. Per the inclusion of "discounted" as a qualifier in the very name of the metric, a year's worth of ecological services in the future is worth less than a year's worth of ecological services in the present or past.

As a simple hypothetical example, if exactly one acre of pristine habitat dropped from 100% to 0% ecological services for exactly one year in the present, this would cause a single DSAY of injury. To compensate for that single DSAY of injury, a restoration project built 10 years later that turned a parking lot into pristine habitat (*i.e.*, 0% ecological services to 100% ecological services) for exactly one year would need to be 1.34 acres. This like-for-like replacement assumes a fully-new and equivalent habitat (from a parking lot, zero services, initial condition) and leads to an acreage requirement more than a third larger than the acreage injured in the present. The conditions in this hypothetical are highly unrealistic—among other things, habitat does not change in an instant—but this is a concrete example of the way that HEA explicitly accounts for delays in compensation.

Various statements in the comment reflect the commenter's misunderstanding regarding the role of time in the value of ecological services. In particular, the commenter either disregards or objects to the necessary time component contained within the HEA and the resulting DSAYs.[19]

---

[18] The commenter states, "It appears that the arithmetic used by the banks may treat this much larger figure as the annual accrual of function at their respective locations, thereby effectively artificially magnifying their true overall functional values about 30 times (Figure 28)." The commenter thus appears to conclude that 30 DSAYs from an acre of restored habitat means that the habitat in the restored acre is considered 30 times as valuable as the injured acre. This is not accurate. The Settling Trustees do not use HEA results to magnify anything. In fact, the ecological service gains from a single acre of restoration generate fewer DSAYs of credit than might be expected simply due to discounting. Because HEA "packages" ecological benefits in units of one year, the only way to identify the full value of a project is to add up all of its years of benefits. Far from "artificially magnifying" the ecological values of a project, this is an effective way to capture the full value of a project over time.

[19] The commenter states, "The problem lies in the fact that delta HEA does not reflect the habitat function annual recovery, but rather the entire functional recovery over the entire life of the bank." Although the meaning of the commenter's phrase "habitat function annual recovery" is unclear, the Settling Trustees assume it refers to the time-path of maturity of restoration projects and how the annual flow of ecosystem services changes during the maturation process. This

12

However, this time component is what makes HEA a useful tool and DSAYs an important metric to evaluate ecological service losses and gains. DSAYs are the common metric that allowed the Settling Trustees to directly compare the ecological services lost due to contamination and the ecological services gained through habitat restoration. Measuring ecological services lost over time (past and/or future) also ensures that the public is compensated for those losses; conversely, this time component is also a way to avoid overvaluing restoration by discounting the ecological services gained from that restoration the farther those gains occur into the future.

Beyond the specific points addressed above, the methodologies the commenter relies on to critique the Settling Trustees' use of HEA are not in general NRDA use because they are tailored toward other crediting procedures or seem to have been created by the commenter.[20] The commenter also attempts to analogize the unique circumstances surrounding NRDA to non-NRDA calculations, such as capitalization operations or real estate appraisals, which are not relevant to the present circumstances.[21]

It would be inappropriate for the Settling Trustees to supplant a standard and widely-accepted NRDA methodology with one not applicable to the present circumstances. Further, doing so would create an intractable problem: the Settling Trustees calculated the Settling Defendants' liability in DSAYs generated through a HEA, which necessarily includes the important economic concept of ecological values in the past, present, and future. Without the Settling Trustees calculating the ecological service gains provided by habitat restoration using a methodology that

---

concept is precisely what HEA is designed to and does account for. HEA anticipates the habitat values that a project will provide each year, then adds up the discounted ecological services in acres provided by restored habitat on an annual basis. It thus captures the ecological services provided by habitat functions over time.

[20] In materials linked to his formal comments, the commenter uses two methodologies, referred to as Habitat Equivalency Procedure (HEP) and Habitat Suitability Index (HSI). The Settling Trustees are unfamiliar with HEP; however, from the commenter's description, it appears unusable in the NRDA context as it does not have a straightforward way to aggregate losses over time. A key strength of HEA is that it takes annual flows of services and converts them to a stock variable, *i.e.*, a quantity measured at a specific point in time, DSAYs. Without this time-value conversion from flow variables to a stock variable, there is no clear way to scale restoration. The Settling Trustees are aware of HSI, and the fact that it has been cited at least once for potential use in NRDA as an input to an equivalency analysis calculation (Daniel Hayes et al., *Predicting Response of Migratory Fish Populations to Dam Removal*, AQUATIC ECOSYSTEM HEALTH AND MGMT., Jan.–Mar. 2023, at 79–88, https://doi.org/10.14321/aehm.026.01.79); however, it has never been, to our knowledge, used for NRDA scaling nor is it clear how it could be applied in place of HEA. HSI is a measure of the suitability of a given habitat for a particular species, not a holistic measure of services provided by a habitat, as is HEA.

[21] For example, commenter points to the arithmetic used in "capitalization operations that divide annual rates of return by the accepted discount rates to find present values," and the "operations real estate appraisers use to calculate the present value of real property," which are inapt comparisons.

13

also captures this critical time element, the Settling Trustees could not readily match the restoration needed to provide ecological service gains sufficient to offset those ecological service losses attributable to the Settling Defendants' activities. It is the comparability of the injury DSAYs and the restoration DSAYs that made the proposed settlements possible and appropriate for the circumstances of this case.

## Public Comment Received 01/23/2024 from
## Arkema Inc., Section A (Arkema A)

**A. It is impossible to assess the fairness of the settlements embodied in the proposed consent decrees because those settlements precede a full assessment of natural resource damages at the Assessment Area.**

The proposed consent decrees purport to resolve the natural resource damage liability of the settling defendants through an allocation of liability (measured in discounted service acre- years or "DSAYs") to each settling party.[22] Many of these settling defendants have been allocated nominal shares of liability.[23] In order to assess the fairness and adequacy of these individual allocations (which purport to represent each settling party's share of total natural resource damages within the Assessment Area), there needs to be a full assessment and accounting of the total natural resource damages associated with that area.[24] That full assessment and accounting has not yet been completed. Instead, the Trustees have simply conducted a "preliminary" damage assessment, which was done "for the limited purpose of settlement under the Path C process."[25]

The Trustees' preliminary assessment resulted in an initial damage estimate equivalent to 4,130 DSAYs. However, based on the breadth of the studies that the Trustees have proposed to

---

[22] **[This is footnote 4 in Arkema A.]** As described in the consent decrees, DSAYs are the units of measurement that the Trustees have used to quantify the natural resource damages allegedly associated with the Assessment Area.

[23] **[This is footnote 5 in Arkema A.]** Notably, many of the settling defendants that are party to the proposed Cash-Out Consent Decree (11 of 16) are receiving *refunds* from the Trustees. *See* Dkt. 2-1 at 118. Furthermore, while the Justice Department's press release accompanying the lodging of the consent decrees strongly suggests (but does not explicitly state) that the settlements will result in the recovery of "more than $33 million to restore natural resources," the net amounts to be paid under the two consent decrees come out to a mere $4.7 million. That press release may have been artfully worded, but at least one local news outlet has reported as fact what was suggested by the Justice Department, *i.e.*, that the settlements have been offered in exchange for the payment of $33 million. *See* "Alleged Willamette River Polluters Agree to Pay $33 Million to Restore Habitat, *Willamette Week*, November 2, 2023 ("Nearly two dozen organizations . . . *have agreed to pay* $33.2 million to settle federal litigation alleging that they polluted the Willamette River." (emphasis added)), *available at* www.wweek.com/news/courts/2023/11/02/alleged-willamette-river-polluters-agree-to-pay-33-million-to-restore-habitat.

[24] **[This is footnote 6 in Arkema A.]** *See, e.g.*, *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747–49 (9th Cir. 1995) (holding that it was an abuse of discretion for the trial court to approve individual natural resource damage settlements where there was no evidence of the total natural resource damages at issue).

[25] **[This is footnote 7 in Arkema A.]** *See* Cash-Out Consent Decree, Dkt. 2-1 at 8 (Recital K); Restoration Credit Consent Decree, Dkt. 4-1 at 13 (Recital P).

15

conduct as part of their forthcoming full assessment (*i.e.*, the Phase 3 Damage Assessment), the total damages associated with the Assessment Area are likely to significantly increase. Among other things, the Trustees plan to utilize a more expansive method for estimating damages, to assess damages associated with the eventual implementation of the remedy at the Site (which may be performed, in part, by one or more of the settling defendants), and may expand the geographic scope of the Assessment Area to include areas not yet assessed.[26]

Until the full Phase 3 Damage Assessment is complete and the ultimate accounting of natural resource damages is made, it is impossible to assess the fairness and adequacy of the settlements embodied in the consent decrees, each of which is purportedly based on an allocated share of those damages. Beyond that, settlements, such as those embodied in the consent decrees, that afford contribution protection before the full amount of natural resource damages have been quantified, are inherently prejudicial to non-settling parties. This is especially true where the contribution protection extends to "[n]atural resource damages arising from re-exposure, resuspension or migration of hazardous substances or pollutants . . . as a result of the future implementation of a remedial action," as one or more of the settling defendants may conduct future remedial actions at the Site that could give rise to claims for additional natural resource damages.[27]

---

[26] **[This is footnote 8 in Arkema A.]** These differences are explicitly documented in the Trustees' assessment plan for the Phase 3 Damages Assessment. *See* October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan at A-2 (noting that ecological service losses will be quantified using a REA, rather than a HEA, because "that approach will, in this case, best measure adverse changes in the viability of natural resources resulting from exposure to contaminants . . . and best determine the quantity and type of appropriate habitat needed to fully address the measured losses"), at 3-4 (indicating that the Type B assessment will evaluate "injury caused by remedial actions" that have not yet been implemented), and at A-5 ("However, the Trustee Council may expand the geographic scope of their studies in the future as the assessment progresses and further information is developed, including information indicating a likelihood of injury to Columbia River resources resulting from contaminants attributable to Portland Harbor sources."), *available at* https://pub-data.diver.orr. noaa.gov/portlandharbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final%20%282%29.pdf.

[27] **[This is footnote 9 in Arkema A.]** *See* Cash-Out Consent Decree, Dkt. 2-1 at 27 (Paragraph 17); Restoration Credit Consent Decree, Dkt. 4-1 at 69–70 (Paragraph 87).

16

# Response to Arkema A

The commenter is correct that this settlement is based upon an initial estimate of damages. The Settling Trustees are using HEA to estimate damages for purposes of settlement. HEA will not be the basis of the formal damage assessment now under development. However, the comment ignores that nearly all natural resource damages settlements are based on initial estimates of damages and that formal damage assessments are the exception rather than the rule. Early settlements are encouraged and appropriate, and early settlement and restoration initiatives by natural resource trustees at sites such as Portland Harbor typically begin long before the U.S. Environmental Protection Agency (EPA) has issued a Record of Decision (ROD) for the site (hence the characterization as "early") and involve only the potentially responsible parties interested in funding early restoration of damaged resources in exchange for early resolution of their liability (which is often, as here, a subset of the potentially responsible parties). Such early settlement initiatives, by their nature, often use methods and/or data sets that are different from those used in any subsequent formal NRDAs for those sites. Thus, this comment challenges not only the settlement approach at the Portland Harbor site but also natural resource trustees' settlement practices nationwide. The Settling Trustees explain below why using the HEA methodology here for purposes of settlement is sound practice, even though they are using a different methodology in the formal damage assessment now under development.

## Early Settlements are Encouraged and Appropriate

The Settling Trustees place a high value on early settlements because they provide funding to address injuries to natural resources more quickly than if restoration did not occur until after a complex and lengthy (often years-long) litigation process.[28] The earlier restoration occurs, the sooner it provides compensation to the public for natural resources injuries caused by releases of contaminants. The benefits of early restoration are especially important where there are species listed under the Endangered Species Act (ESA),[29] as is the case at Portland Harbor.[30]

For the following reasons, the Settling Trustees' decision to use the HEA methodology for early settlement is appropriate here even though they are not using HEA in the formal damage assessment:

---

[28] *See, e.g., United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 748 (9th Cir. 1995) (noting "CERCLA's primary goal of encouraging early settlement"); *United States v. BP Prods. N. Am. Inc.*, No. 2:12-CV-207, 2012 WL 5411713, at *4 (N.D. Ind. Nov. 6, 2012) (consent decree "serves the public interest by providing these environmental benefits more quickly and at less cost than could be achieved through litigation . . . a risky proposition with uncertain results").

[29] 16 U.S.C. §§ 1531 *et seq.*

[30] For a full discussion of the various listed species that may be found in and around Portland Harbor, see NAT'L OCEANIC AND ATMOSPHERIC ADMIN., FINAL PORTLAND HARBOR PROGRAMMATIC EIS AND RESTORATION PLAN § 3.10.1 (2017), https://pub-data.diver.orr.noaa.gov/portland-harbor/20170501_FINAL_PEIS_3953.pdf.

17

- The HEA methodology was developed a number of years ago and now is the most commonly used methodology in settlements of natural resource damage cases. (*See* explanation of HEA methodology in response to John Marshall comment above.) As the commenter notes, the Portland Harbor HEA estimated the total injury to be 4,130 DSAYs. As a result, the current settlements are based on a reasonable estimate of the total injury, which courts have stated is necessary for such settlements.[31]

- Settling Trustees further stress that so long as the total estimate of damages they use for settlement is reasonable, it need not be the "final" estimate. The discussion in *Montrose* supports this view, requiring an estimate of the total natural resource damages, "preliminary or otherwise," to support a settlement.[32] The commenter's footnote 6 cites *Montrose* for the proposition that trustees may not use preliminary methodologies for settlements, but the context and wording of *Montrose*, including the discussion of total cost estimates in *United States v. Charles George Trucking, Inc.*[33], indicate otherwise.[34]

- The Settling Trustees explain, in two lengthy memos in their public record, how they went to considerable effort and expense to construct a detailed HEA model for this site. In the Settling Trustees' professional judgment, the estimate of total damages they produced with this model is reasonable because the HEA is based on extensive information and is consistent with standard practice. The simple fact that the formal damage assessment may produce a different estimate of total damages – which could be lower or higher than the HEA estimate, as explained below, does not make the HEA estimate inappropriate for settlement purposes.

- If trustees could only use formal damage assessments (which are even more time-consuming and expensive) as the basis of settlements, then early settlements of natural resource damage claims would be exceptionally rare, if not impossible. Reading CERCLA this way is contrary to the many cases (including those cited above) explaining that CERCLA encourages, not precludes, early cleanup and early natural resource restoration.[35]

**Early Settlement Damages Estimate Versus Formal Damage Assessment Estimate**

The commenter criticizes the settlement based on a presumption that the methodology the Settling Trustees are using in the formal damage assessment will necessarily produce a larger total damage estimate than the HEA that Settling Trustees developed for settlement purposes. The Settling Trustees disagree with this presumption because nobody can predict the outcome of studies that will inform the damage assessment.

---

[31] *See Montrose*, 50 F.3d at 746-47.

[32] *Id.* at 745, 747.

[33] 34 F.3d 1081, 1087 (1st Cir. 1994).

[34] *See Montrose*, 50 F.3d at 747.

[35] Early settlors also avoid paying the costs of the formal damage assessments.

18

The formal damage assessment will be substantially informed by additional studies now being conducted, which pertain to the extent of injury of natural resources at Portland Harbor. As with any studies like those now underway, it is impossible to predict the results in advance. The Settling Trustees' decision to conduct those studies is primarily for the purpose of adding more scientific support to their injury claims as litigation approaches. Whether the quantum of the Settling Trustees' injury claim would increase or decrease as a result of these studies is unknown.

Thus, compared to the HEA, the quantum of non-settling defendants' potential liability for damages under the formal damage assessment could also increase or decrease, depending on the outcome of those studies.

The commenter also criticizes the Settling Trustees' notice to the potentially responsible parties and the public that the relevant geographic area could increase over that used by the HEA. The commenter ignores that the relevant geographic area also could decrease. Neither possibility is reason to conclude that the settlement is not reasonable.

In summary, the HEA that Settling Trustees used as the basis of the proposed settlements is not certain to generate a lower estimate of total natural resource damages than the formal damage assessment now being developed. Coupled with the validity of HEA as a reasonable methodology for settlements here and across the country, Settling Trustees' decision to use HEA as the basis of early settlement at Portland Harbor is a reasonable choice.[36]

**Other Criticisms of the Sufficiency of the Settlement Amounts are Incorrect**

The commenter also asserts that the total damages are not fully accounted for because the Consent Decrees shield Settling Defendants from further liability for damages "arising from re-exposure, resuspension or migration of hazardous substances or pollutants . . . as a result of the future implementation of a remedial action."[37] This was an appropriate compromise on the Settling Trustees' part because the overall effect of EPA's remedy will be to substantially *reduce* the level of harmful contamination in the Portland Harbor Assessment Area, thus substantially reducing the ongoing injury to natural resources.[38] Active remediation to remove or cap

---

[36] *See, e.g., San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014) ("Our deference to agency determinations is at its greatest when that agency is choosing between various scientific models."); *United States v. Wallace*, 893 F. Supp. 627, 633 (N.D. Tex. 1995) (upholding EPA's choice of a volumetric model for calculating relevant fault for settlement, explaining that "the EPA is not required to show that it has chosen the best or even the fairest method of apportioning liability, but that it is reasonable. Further, '[t]he choice of the yardstick to be used for allocating liability must be left primarily to the expert discretion of the EPA, particularly when the PRP's involved are numerous and the situation is complex'").

[37] *Cash-Out Decree*, Dkt. #11-1, paragraph 17; *Restoration Credit Decree*, Dkt. #4-1, paragraph 87.

[38] U.S. ENV'T PROT. AGENCY, RECORD OF DECISION FOR THE PORTLAND HARBOR SUPERFUND SITE at 56 (2017), https://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/(Filings)/84473AAEE282B06E8525815B00

contaminated sediments in some locations may re-release contaminants to some extent, but, even if this occurs, overall exposure of natural resources to contaminants will decrease. Moreover, if Settling Defendants' negligence, or that of their contractors, causes contamination to be re-released, the Consent Decrees preserve claims for those damages.[39]

Finally, in their footnote 5, commenter asserts that "the net amounts to be paid under the two Consent Decrees come out to a mere $4.7 million," and that "artfully worded" statements in the U.S. Department of Justice's (Justice Department's) press release suggesting a recovery value under the Consent Decrees of more than $33 million is misleading or inaccurate.

In fact, the $33 million figure in the Justice Department's press release slightly *understates* the value of the claims resolved by the Consent Decrees, because it includes only the value of recoveries for restoration but does not include reimbursements for some of the Settling Trustees' costs.

As the Consent Decrees show, the total value of the claims we resolve against Settling Defendants exceeds $36 million.[40] Of this amount, just under $3 million is for the Settling Trustees' past costs.[41] Past damage assessment costs allocated to each Settling Defendant are shown in Appendix C of each Consent Decree.[42] The past assessment costs are approximately $1.3 million for the Cash-Out Decree and approximately $1.6 million for the Restoration Credit Decree[43] for a total of approximately $2.9 million in past assessment costs. The remainder of the $36 million in total value is the cash value of the Settling Defendants' allocations for damages to natural resources (apart from past assessment costs), measured in DSAYs, at a value of $70,500 per DSAY.[44] Settling Defendants in the Cash-Out Decree were allocated 97.669 DSAYs valued at $6,885,664.50.[45] Settling Defendants in the Restoration Credit Decree were allocated 373.72 DSAYs valued at $26,347,260.00.[46] Together, the value of these restoration recoveries total just over $33 million. The Justice Department's press release focused only on the value of recoveries for restoration (excluding the approximately $2.9 million in past assessment costs) and therefore

---

6393D7/$File/Portland%20Harbor%20ROD...12.pdf.

[39] *Cash-Out Decree*, Dkt. #11-1, paragraph 17; *Restoration Credit Decree*, Dkt. #4-1, paragraph 87. For these reasons, Plaintiffs do not agree with the commenter's suggestion in its "Conclusion" that the Consent Decrees should be revised to "state that the contribution protection . . . damages attributable to the implementation of the remedy at the Site."

[40] *Cash-Out Decree*, Dkt. #11-1, paragraph Q; *Restoration Credit Decree*, Dkt. #4-1, paragraph V.

[41] *Id.*

[42] *Cash-Out Decree Appendix C*, Dkt. #11-1, page 118; *Restoration Credit Decree Appendix C*, Dkt. #4-4, page 2.

[43] *Id.*

[44] *Cash-Out Decree*, Dkt. #11-1, paragraph K; *Restoration Credit Decree*, Dkt. #4-1, paragraph P.

[45] *Cash-Out Decree*, Dkt. #11-1, paragraph Q.

[46] *Restoration Credit Decree*, Dkt. #4-1, paragraph V.

20

used the lower figure of approximately $33 million rather than the higher figure of approximately $36 million.

Of the approximately $36 million owed by Settling Defendants, approximately $4.6 million will be in additional net cash payments by Settling Defendants, primarily for two reasons. First, Settling Defendants already have paid almost $9.3 million to Settling Trustees in the course of their participation in, and funding of, the early restoration process.[47] The fact that Settling Defendants made these payments long before they were due under the Consent Decrees significantly benefitted the Settling Trustees financially by providing necessary funding for the early settlement process. At the time each Settling Defendant made its financial contributions, liability allocations had not yet been developed.[48] Once the Settling Trustees made final allocations for each Settling Defendant, those who had paid more than their final shares (including their shares of past assessment costs) necessarily were owed refunds, while those Settling Defendants who had paid less than their final shares were assessed the remainder of amounts owed. All Settling Defendants receiving refunds are participating in the Cash-Out Decree. That agreement includes both general provisions for payment by some Settling Defendants and refunds to others, as well as a specific accounting for each Settling Defendant of dollar amounts owed to Plaintiffs, prior payments made, and the net amounts owed or to be refunded.[49] While this arrangement results in a lower cash payment to the Settling Trustees than would have been the case without any advance funding, this funding arrangement is preferable because the advance funding made this early restoration process possible.

Beyond the above cash payments, most of the value the Settling Trustees recover under the Consent Decrees is in the form of restoration credits, not dollars. The Restoration Credit Decree assesses a total of 373.72 DSAYs to the Settling Defendants in that Decree, with a total cash equivalent value of $26,347,260.00.[50] Settling Defendants in that Decree are purchasing 338.61 DSAYs in restoration credits to resolve their liability for damages due to ecological injury.[51] The cash equivalent value of each DSAY credit is $68,758,[52] which puts the total cash equivalent

---

[47] *Cash-Out Decree Appendix C*, Dkt. #11-1, page 118 ($4,619,472.39); *Restoration Credit Decree Appendix C*, Dkt. #4-4, page 2 ($4,669,925.95).

[48] *See Cash-Out Decree*, Dkt. #11-1, paragraph D; *Restoration Credit Decree*, Dkt. #4-1, paragraph D (explaining that Funding and Participation Agreements were executed at the beginning of the early restoration process).

[49] *Cash-Out Decree*, Dkt. #11-1, paragraphs 6–8 and Appendix C, pp. 18–19, 118–134.

[50] *Restoration Credit Decree*, Dkt. #4-1, paragraph V.

[51] *Restoration Credit Decree Appendix C*, Dkt. #4-4, page 2.

[52] While the Consent Decrees set the total cash value of each DSAY at $70,500, the non-ecological damages portion of each DSAY (*i.e.*, the compensation for recreational fishing and boating damages, damages resulting from losses of tribally important resources, and Portland Harbor-wide monitoring and stewardship) is $1,742. *Restoration Credit Decree Appendix C*, Dkt #4-4, page 2 footnote 2. When Settling Defendants purchase DSAY credits in restoration projects, these credits cover only the ecological portion of the DSAYs assigned to Settling Defendants. This is why Settling Defendants in the Restoration Credit Decree must pay an

21

value of the purchased DSAY credits at $23,282,146.38. Therefore, when one accounts for the value of the purchased DSAY credits and the prior payments by Settling Defendants, the value Settling Trustees receive under the Consent Decrees is reasonably estimated at over $36 million.[53]

---

additional $1,742 per DSAY of their assessed liability.

[53] The Consent Decrees also provide for recovery by the Settling Trustees of "general interim Path C costs," which run from April 1, 2020, through the Effective Date of the Consent Decrees. *Cash-Out Decree*, Dkt. #11-1, paragraph 9; *Restoration Credit Decree*, Dkt. #4-1, paragraph 72. They also provide for reconciliation of the party-specific costs of each Settling Defendant's participation in the Path C settlement process. *Id.* paragraphs 10 and 73, respectively. Because Settling Trustees will not determine the amounts of these costs until after the Consent Decrees are effective, these amounts are in addition to the approximately $36 million noted in the prefatory paragraphs of the Consent Decrees.

22

# Public Comment Received 01/23/2024 from
# Arkema Inc., Section B (Arkema B)

**B. Additionally, the settlements embodied in the proposed consent decrees are based on a technically deficient assessment of ecological service losses.**

In conducting their preliminary damage assessment for the Assessment Area, the Trustees chose to rely upon the habitat equivalence analysis ("HEA") model previously developed for a different Site altogether—the Commencement Bay Site in Tacoma, Washington. That HEA model, which estimates ecological service losses based on, among other things, the relationship between concentrations of certain contaminants and impacts to certain species present in Commencement Bay (including a marine flatfish species that does not exist within the Assessment Area), has never been validated for the Assessment Area.[54] The Trustees' decision to use the Commencement Bay model was based on expediency rather than accuracy. The Trustees have admitted as much, stating:

> The Portland Harbor Trustee Council elected to rely on Commencement Bay service loss relationships because: 1) they are suitable for use at other locations in the Pacific Northwest with similar ecological attributes; and 2) *the development of site-specific Portland Harbor service loss relationships would have been costly, time- consuming, and unnecessary* for a settlement-oriented, cooperative NRDA process.[55]

As part of the Phase 3 Damage Assessment, the Trustees evidently intend to abandon the Commencement Bay model in favor of a resource equivalency analysis ("REA") model, citing inadequacies in the Commencement Bay model as the rationale for the change. The following question and answer, which is taken from the Trustees' own Phase 3 Damage Assessment Plan, makes this clear:

**Comment 2a.** What is the rationale for changing to [a] REA? . . .

**Response 2a.** The rationale for making this change from Phase 2 to Phase 3 is based on the Trustees' judgment that the proposed approach [*i.e.*, the REA] will, in this case, best measure adverse changes in the viability of natural resources resulting from exposure to contaminants

---

[54] **[This is footnote 10 in Arkema B.]** Arkema, which has been a funding party throughout the Trustees' ongoing natural resource damage assessment process at Portland Harbor, has repeatedly raised these concerns and has never received a satisfactory response from the Trustees.

[55] **[This is footnote 11 in Arkema B.]** *See* May 14, 2015 Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement at A-5 (fn. 1) (emphasis added), *available at* https://pub-data.diver.orr.noaa.gov/portlandharbor/20230401_PH%20Ph2%20PthC%20SummaryPreface_5383.pdf. Notably, the Trustees made attempts to establish site-specific injury thresholds for a single contaminant (PAHs) but no others.

(see 43 CFR §11.14(v)) and best determine the quantity and type of appropriate habitat needed to fully address the measured losses.[56]

If the model that that the Trustees used to estimate ecological service losses in Phase 2 is not accurate or reliable enough to carry over to Phase 3 (as the Trustees have expressly acknowledged), then it should not be used as the basis for the proposed settlements.[57]

Additionally, it bears noting that Stratus Consulting, Inc. ("Stratus")—the Trustees' lead consultant throughout the Phase 2 preliminary assessment process—stepped away from this matter after becoming embroiled in an international scandal arising from its involvement in an environmental case between Ecuadorean Amazon villagers and Chevron. In that case, Stratus was alleged to have produced a fraudulent damage assessment in order to artificially inflate the value of the plaintiffs' claims. Years of extensive litigation ensued, with Stratus forced to defend itself against RICO claims and ultimately disavowing its work.[58] The *Denver Post*, Stratus' hometown newspaper, summarized the fall-out in an editorial that concluded with following cautionary remarks:

> As Bloomberg BusinessWeek reporter Paul M. Barrett, whose "Law of the Jungle" is the definitive account of the fiasco in Ecuador, told The Washington Free Beacon: "Any thoughtful spectator has to be skeptical about the role of Stratus Consulting in any major pollution dispute."[59]

---

[56] **[This is footnote 12 in Arkema B.]** *See* October 3, 2018 Portland Harbor Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan at A-1 – A-2, *available at* https://pubdata.diver.orr.noaa.gov/portlandharbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20 Final%20%282%29.pdf.

[57] **[This is footnote 13 in Arkema B.]** It also calls into question the purported precision of the allocations of liability to the settling defendants, two of which are shown to the thousandth of a DSAY. *See* Cash-Out Consent Decree, Dkt. 2-1 at 118.

[58] **[This is footnote 14 in Arkema B.]** This is detailed in Judge Kaplan's 497-page Opinion entered in the matter of *Chevron Corporation v. Steven Donziger, et al.*, Case No. 1:11-cv-00691-LAK-JCF (S.D.N.Y.), Dkt. 1874; *see also* "Consultant Recants in Chevron Pollution Case in Ecuador," *New York Times*, April 12, 2013, *available at* www.nytimes.com/2013/04/13/business/research-recanted-in-oil-pollution-case-in-ecuador.html.

[59] **[This is footnote 15 in Arkema B.]** "Boulder's Stratus Consulting and the jungle crooks," *The Denver Post*, July 24, 2015, *available at* www.denverpost.com/2015/07/24/ carroll-boulders-stratus-consulting-and-the-jungle-crooks/.

24

## Response to Arkema B

The Settling Trustees designed the early settlement phase of the Portland Harbor NRDA to maximize the use of existing information.[60] The Settling Trustees selected this strategy because it combines available information with reasonable assumptions, and therefore enables the Settling Trustees to cost-effectively support a robust, defensible settlement with Settling Defendants. In contrast, primary studies often are expensive, require substantial time and effort, and are more typically implemented in the context of a formal assessment to bring claims against non-settling parties.

In particular, toxicity data from studies conducted outside of an assessment area are often used to support NRDA settlements. For this reason and the reasons discussed below, using the Commencement Bay Site information was also reasonable:

- The Commencement Bay service loss relationships are based on scientific literature, technical data, regulatory standards, and the results of other studies relevant to the Pacific Northwest to identify concentrations above which hazardous substances have effects on aquatic organisms.[61] Most of these relationships were based on data on benthic invertebrates; however, the service loss estimates for PCBs and PAHs also included data on salmonids and flatfish, respectively.

- The Settling Trustees thoroughly reviewed the technical basis for the Commencement Bay service loss relationships for each of the 12 Portland Harbor substances of concern and concluded that they could reasonably apply all those service loss relationships except for PAHs to Portland Harbor. The Settling Trustees determined that the Commencement Bay service loss relationships reflect relevant endpoints, species, and species groups.

- As the commenter notes, the Commencement Bay PAH service losses were based mainly on English sole, a marine flatfish that is not found in the Portland Harbor Assessment Area. The Settling Trustees therefore developed a revised PAH service loss relationship specifically for use in the Portland Harbor HEA that incorporated additional available data from fish toxicity studies, Portland Harbor site-specific benthic toxicity studies,

---

[60] NAT'L OCEANIC AND ATMOSPHERIC ADMIN., FINAL PORTLAND HARBOR SUPERFUND SITE NATURAL RESOURCE DAMAGE ASSESSMENT PLAN ADDENDUM 2: PHASE 3 DAMAGE ASSESSMENT PLAN (2018), https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final%20%282%29.pdf; PORTLAND HARBOR NAT. RES. TR. COUNCIL, PORTLAND HARBOR SUPERFUND SITE: NATURAL RESOURCE DAMAGE ASSESSMENT PLAN (2010), https://pub-data.diver.orr.noaa.gov/portland-harbor/20100601_FNLAssessmentPlan_0930.pdf.

[61] ROBERT WOLOTIRA, HYLEBOS WATERWAY NATURAL RESOURCE DAMAGE SETTLEMENT PROPOSAL REPORT APPENDIX D: DEFINING INJURIES TO NATURAL RESOURCES IN HYLEBOS WATERWAY (2002), https://pub-data.diver.orr.noaa.gov/admin-record/6605/Hylebos%20Waterway%20NRDA%20Settlement%20Proposal%20Report-%20%20Defining%20Injuries%20to%20Natural%20Resources%20in%20Hylebos%20Waterway.pdf.

25

freshwater literature-based sediment effect concentrations, and the State of Oregon freshwater sediment guidelines.[62]

•   Identification of existing service loss relationships and subsequent modifications to account for Portland Harbor-specific considerations is consistent with the Trustee Council's Phase 2 strategy.

Regarding the portion of the comment about Stratus Consulting (Stratus), the Settling Trustees hired Industrial Economics, Incorporated (IEc) in 2013 to provide consulting support. One of IEc's tasks was to conduct an independent, comprehensive review of Stratus' work on the Portland Harbor NRDA HEA. IEc evaluated all data and supporting documentation for each parameter, assumption, and method in the HEA (*e.g.*, sediment contaminant concentrations, service loss thresholds, remedial assumptions, discount rate). IEc then re-ran the HEA and conducted quality checks on all associated data queries, data processing, spatial and temporal interpolation, and present value loss calculations. This included sediment contaminant interpolation, service loss determination, footprint derivation, and hindcasting and forecasting models. Based on the results of this review, IEc agreed with the inputs that Stratus had applied in the HEA, determined that the technical incorporation of these parameters into the analysis was sound, and shared their assessment and conclusions with the Settling Trustees. For these reasons, the Settling Trustees have continued to use the work performed by Stratus at Portland Harbor.

---

[62] ENV'T CLEANUP PROGRAM, STATE OF OR. DEP'T OF ENV'T QUALITY, GUIDANCE FOR ASSESSING BIOACCUMULATIVE CHEMICALS OF CONCERN IN SEDIMENT (2020), https://www.oregon.gov/deq/FilterDocs/GuidanceforAssessingBioaccumulative.pdf.

## Public Comment Received 1/23/2024 from
## Arkema Inc., Section C (Arkema C)

**C. The settlements embodied in the proposed consent decrees run the risk of undermining the ongoing private allocation of liability for response costs at the Portland Harbor Superfund Site.**

Arkema has been engaged in the ongoing private allocation of liability for the response costs that have been and will be incurred at the Site (the "Response Cost Allocation") since that allocation's inception in 2008, investing significant resources along the way. Currently, there are nearly 100 parties that are participating in the Response Cost Allocation. It is Arkema's hope and expectation that a successful Response Cost Allocation will facilitate settlements and the eventual performance of remedial action at the Site. The consent decrees, which are predicated on the development and implementation of a competing (but far less robust) allocation process and which include allocations of liability to several parties that are also participating in the Response Cost Allocation, may undermine the allocation of response costs.

The Trustees appear to have anticipated this issue, including the following provision in the two consent decrees:

> The Settling Parties agree that they will not cite or use this settlement or the Path C NRD allocation results in any forum as evidence of liability for remedial action or response costs. Nor shall the Settling Parties cite or use this settlement or the Path C NRD allocation results to contend that they are relevant to, or determinative of, their share of remedial action or response costs, including but not limited to in any allocation of liability conducted by or among the Settling Parties or other PRPs or in any judicial or administrative proceeding concerning remedial action or response costs, except in rebuttal to another PRP's use of the Path C NRD allocation results.[63]

By its terms, this provision only precludes *settling parties* from citing the allocations reflected in the consent decrees, and even then, includes a potentially expansive carve-out for those instances where another party introduces them as evidence. It does *not* preclude decisionmakers from relying on those allocations. Beyond that, the limitation set forth above may not be legally enforceable. In *Washington v. United States*, the District Court for the Western District of Washington specifically rejected the inclusion of similar language in a proposed consent decree that would have resolved the United States' liability for natural resource damages at Commencement Bay.[64] As Judge Bryan stated:

---

[63]  **[This is footnote 16 in Arkema C.]** *See* Cash-Out Consent Decree, Dkt. 2-1 at 30 (Paragraph 23); Restoration Credit Consent Decree, Dkt. 4-1 at 72 (Paragraph 91).

[64]  **[This is footnote 17 in Arkema C.]** *See Washington v. United States*, No. CIV. 06-05225RJB, 2007 WL 3025843 (W.D. Wash. Oct. 15, 2007). In that case, the language at issue was: "This Consent Decree shall not be used against any Party in any action or proceeding other to enforce the terms of this Consent Decree." *Id.* at *10.

27

The Court cannot and should not prohibit the use of the Consent Decree in future actions. The Consent Decree is part of the record accessible by the public, and the Court is aware of no legal authority, or for that matter any sensible public policy, that supports preventing the use of the Consent Decree by parties in future actions.[65]

In the event that the settling defendants were able to cite to or rely on the allocations set forth in the consent decrees as evidence of their responsibility for response costs, that could have a profound impact on the ongoing Response Cost Allocation.

Notably, the United States has moved to stay other proceedings that could have upended the Response Cost Allocation. In 2017, the Confederated Tribes and Bands of the Yakama Nation filed its own complaint against a number of parties seeking natural resource damages associated with Portland Harbor. *See generally Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp. et al.*, Case No. 3:17-cv-00164-SB (D. Or.) (the "Yakama Nation NRD Litigation"). In that matter, the United States sought (and was granted) a stay on account of the extensive overlap between the Yakama Nation's natural resource damage claims and the Response Cost Allocation:

> For any claims remaining after the Court's consideration of all motions to dismiss, the Court should exercise its discretion to stay this case pending the outcome of the *Arkema* litigation and the non-judicial allocation process [*i.e.*, the Response Cost Allocation]. Consideration of the factors articulated by the Ninth Circuit . . . support a stay here.

> First, a stay is supported to achieve the orderly and efficient course of proceedings in this case, the *Arkema* litigation, and the non-judicial response cost allocation process. As explained in the United States' Notice of Related Cases, there is significant overlap of the parties and issues in this case, the *Arkema* case, and the non-judicial response cost allocation process. The Yakama Nation's claim here for CERCLA response costs relating to releases or threatened releases of hazardous substances from the Site, overlaps with the claims for response costs by the *Arkema* plaintiffs arising out of the contamination at the Site, and with the issues that are being addressed by the numerous parties in the non-judicial allocation response cost process concerning liability for and allocation of response costs arising from contamination at the Site. Moreover, the liability claims in both cases and the allocation issues that are being addressed through the non-judicial response cost allocation process are based on some of the same information, *e.g.*, historical documentation, the RI/FS, etc.[66]

---

[65] **[This is footnote 18 in Arkema C.]** *See id.* at *10.

[66] **[This is footnote 19 in Arkema C.]** *See* United States' Opposed Motion and Memorandum in Support: (1) To Dismiss a Portion of Claim 2; and (2) Stay Any Remaining Claims, Case No. 3:17-cv-00164-SB, Dkt. 218 at 18–19 (citations omitted); *see also* United States' Amended Notice of Related Cases Pursuant to LR 42-2, Case No. 3:17-cv-00164- SB, Dkt. 146 at 6 ("Given the overlap between this current litigation and the *Arkema* litigation, as well as the overlap between the non-judicial allocation process that prompted the stay of the *Arkema* litigation, these two cases should be designated as related and treated accordingly.").

28

Public Comment Received 1/23/2024 from
Arkema Inc., Section C (Arkema C)

The Yakama Nation's natural resource damage claims are, for all intents and purposes, indistinguishable from the Trustees' natural resource damage claims.[67] Both share substantial overlap with issues being addressed and resolved through the Response Cost Allocation, which, by the United States' own logic, should be allowed to conclude before any natural resource damages claims are resolved.

---

[67] **[This is footnote 20 in Arkema C.]** For this reason, Arkema is also concerned that the contribution protection afforded by the proposed consent decrees may apply to the Yakama Nation's natural resource damage claims, and any cross-claims for contribution that the defendants in that action may ultimately assert against one another.

29

# Response to Arkema C

The first portion of the comment states a concern that that the Consent Decrees could somehow undermine the ongoing non-judicial allocation of response costs among Portland Harbor potentially responsible parties being conducted in the long-stayed *Arkema* litigation. We agree that this would be an adverse result; therefore, we drafted the Consent Decrees so that they prohibit the parties to the Consent Decrees from using these settlements in allocations of Portland Harbor response costs. This includes the non-judicial allocation that the commenter referenced.[68] The commenter raises two concerns about these provisions: that persons who are not parties to the Consent Decrees (and thus not precluded by the referenced provision) might seek to use those provisions; and that decisionmakers (presumably including judges) might use those provisions even if the parties to the Consent Decrees do not raise them.

These Consent Decree provisions appropriately protect non-parties from having the Consent Decrees used against them in forums such as the non-judicial response cost allocation. First and foremost, Settling Defendants are prohibited from doing so by the terms of the Consent Decrees. This addresses the major concern that non-settling parties might have in other contexts: that Settling Defendants might use this settlement of claims for natural resource damages against them in other forums or negotiations, such as the non-judicial response cost allocation.

Conversely, non-settlors can hardly complain that the Consent Decrees do not bind *them* from citing to the document, as they are not limited in this regard by the terms of the referenced provisions. In this respect, the comment is incorrect that the provisions in the Consent Decrees are "similar" to one rejected by Judge Bryan in a natural resource damages settlement in the Western District of Washington. The settlement rejected by Judge Bryan stated that it "could not be used *against* any Party in any action or proceeding . . . ."[69] By contrast, the provision in the present Consent Decrees prevents their use in other actions or proceedings *by* parties to the Consent Decrees, not *against* them.[70] Subsequent to Judge Bryan's critique of the provision cited

---

[68] *Cash-Out Decree*, Dkt. #11-1, paragraph 23; *Restoration Credit Decree*, Dkt. #4-1, paragraph 91.

[69] See Arkema C, fn. 17 (emphasis added).

[70] Although non-settling parties (including judges and other decision-makers in other forums) are not expressly prohibited from using those documents, we assume any such usage would be quite limited. This is in part because the Consent Decrees expressly disavow any admission of either liability or the allegations in the Complaint. *Cash-Out Decree*, Dkt. #11-1, paragraph 5; *Restoration Credit Decree*, Dkt. #4-1, paragraph 5. In addition, as explained below, under CERCLA section 113(f)(2), the effect of this settlement will be to reduce the potential liability of non-settling parties by *the amount of the settlement*. 42 U.S.C. § 113(f)(2) (emphasis added). Other than applying this statutory requirement to natural resource damages claims asserted against other potentially responsible parties, judges and other decision-makers typically treat negotiated settlements as having much less precedential import than adjudicated resolutions, so the "precedential value" of these settlements is highly uncertain, even if non-parties raise them in some other context. *See In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB*

30

in the comment, natural resource trustees have addressed this criticism by negotiating consent decrees that limit the *parties* to those decrees from using them affirmatively in other forums, using language very similar to the provision in the Consent Decrees highlighted by the commenter. Those consent decrees have been entered by several judges in the same judicial district as Judge Bryan.[71]

The second portion of the comment begins with the hypothetical that "settling defendants [are] able to rely on the allocations set forth in the consent decrees" in the ongoing non-judicial allocation of response costs. However, this is explicitly prohibited by the above-referenced provisions of the Consent Decrees. If the Court enters the proposed Consent Decrees, the concern articulated by the commenter will be expressly forbidden, and we presume that Settling Defendants will abide by it.

Most of the remainder of the comment points to the concern articulated by the United States in the *Yakama Nation* action that litigating liability in that case would undermine the ongoing non-judicial allocation of response costs being conducted while the *Arkema* case is stayed.[72] However, that concern is not applicable here because, once the Court enters the Consent Decrees, our natural resource damage claims would be *settled*, not *litigated*. By resolving the claims in our Complaint without any litigation, the Consent Decrees *avoid* disrupting the ongoing non-judicial allocation of response costs, because Settling Defendants have consented to entry of the Consent Decrees without further adjudication.[73] Moreover, because Settling Defendants would be precluded by the Consent Decrees from using that settlement in any way in the non-judicial response cost allocation, that wholly separate, parallel process would not be adversely affected.

The final paragraph of this comment states that the Yakama Nation's natural resource damage claims are essentially the same as the claims of the Settling Trustees. This apparent reference to joint trusteeship among all natural resource trustees at the Portland Harbor Assessment Area relates to at least one of the commenter's requests in the "Conclusion" section of its comments, and we therefore address this issue below.

---

*Pollution*, 712 F. Supp. 1019, 1028 (D. Mass. 1989) ("Settlements are to be encouraged and the court does not 'have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute.'" (*quoting City of New York,* 697 F. Supp. 677, 692 (S.D.N.Y. 1988)).

[71] *See, e.g., United States v. The Boeing Co.*, No. CV-10-758-RSM (W.D. Wa. 2010), Docket # 8, paragraph N; *United States v. Vigor Indus., LLC*, No. CV-21-44-RSM (W.D. Wa. 2021), Docket # 7, paragraph L.

[72] FMC raises the same argument in the first full paragraph of page 2 of its comments.

[73] *Cash-Out Decree*, Dkt. #11-1, paragraph 31; *Restoration Credit Decree*, Dkt. #4-1, paragraph 101.

31

## Public Comment Received 01/23/2024 from
## Arkema Inc., Section D (Arkema D)

### D. Conclusion

The settlements proposed by the Trustees precede a full assessment and accounting of the natural resource damages associated with the Assessment Area and are therefore impossible to assess for reasonableness and fairness. Furthermore, the preliminary assessment that has been conducted to date suffers from serious technical flaws. Finally, the settlements also run the very real risk of undermining the ongoing Response Cost Allocation and the substantial resources that have been devoted to that effort. Accordingly, Arkema respectfully requests that the Trustees withdraw the proposed consent decrees pending the outcome of the Phase 3 Damage Assessment and the completion of the Response Cost Allocation.

If the Trustees are unwilling to withdraw the consent decrees, then Arkema requests that the Trustees take the following steps before moving for entry of the proposed consent decrees:

- Revise the language of the consent decrees to clearly state that the contribution protection does not apply to any natural resource damages that are assessed beyond the boundaries of the "Portland Harbor Natural Resource Damage Assessment Area," as that phrase is currently defined by the consent decrees (*e.g.*, natural resource damages assessed within the Columbia River).

- Revise the language of the consent decrees to clearly state that the contribution protection does not apply to any additional natural resource damages identified during the Phase 3 Damages Assessment, including without limitation damages attributable to the implementation of the remedy at the Site or damages attributable to hazardous substances that have not yet been investigated.

- Revise the language of the consent decrees to clearly state that the contribution protection does not apply to the natural resource damages claims asserted by the Yakama Nation in the matter of *Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp. et al.*, Case No. 3:17-cv-00164-SB (D. Or.).

- Revise the language of the consent decrees to clearly state that the entry of the consent decrees does not indicate judicial acceptance of the Trustees' methodology, factual findings, or conclusions, and that any such methodologies, factual findings, and conclusions have no preclusive effect in any future natural resource damages litigation against or among any non-settling parties, or any other proceedings against or among any non-settling parties.

- Issue an updated press release with an accurate statement regarding the payments to be made by the settling parties in exchange for entry of the consent decrees so as to eliminate any public misperceptions created by the original press release.

32

ER-923

- Notify the Court, pursuant to LR 42-2 (and consistent with the position taken by the United States in the Yakama Nation NRD Litigation), that this matter is related to both *Confederated Tribes and Bands of the Yakama Nation v. Air Liquide America Corp. et al.*, Case No. 3:17-cv-00164-SB (D. Or.) and *Arkema Inc. v. Anderson Roofing Co., Inc.*, et al., Case No. 3:09-cv-00453-JR (D. Or.).[74]

---

[74] **[This is footnote 21 in Arkema D.]** LR 42-2 provides that "[i]t is the responsibility of counsel to identify complex or related cases and to bring the matter promptly to the attention of the Court."

33

## Public Comment Received 01/26/2024 from FMC Corporation (FMC1)

Alternatively, if the Trustee Council will not withdraw the pending CDs, FMC requests that the Trustee Council take the steps enumerated below before moving for entry of the proposed CDs.

1.  Revise the CDs to clearly state that contribution protection does not apply to any natural resource damages that are assessed beyond the boundaries of the "Portland Harbor Natural Resource Damage Assessment Area," as that phrase is currently defined by the CDs (*e.g.*, natural resource damages assessed within the Columbia River).

2.  Revise the CDs to clearly state that contribution protection does not apply to any additional natural resource damages identified during the Phase 3 Damages Assessment. This includes, but is not limited to, natural resource damages attributable to the implementation of the remedy at the Site and/or damages attributable to hazardous substances that have not yet been investigated.

3.  Revise the CDs to clearly state that contribution protection does not apply to the natural resource damages claims asserted by the Yakama Nation in the matter of *Confederate Tribes & Bands of the Yakama Nation v. Air Liquide America Corp.,* No. 3:17-cv-00164- SB (D. Or.).

4.  Revise the CDs to clearly state that the entry of the CDs does not indicate judicial acceptance of the Trustee Council's methodology, factual findings, or conclusions, and that any such methodologies, factual findings, and conclusions have no preclusive effect in any future natural resource damages litigation.

5.  Revise the CDs to require settling defendants who still own or operate facilities at the Site to perform further source control at those facilities.

6.  To reduce the risk of any public misperceptions regarding the import of these settlements, issue an updated press release with an accurate statement regarding the payments to be made by the settling defendants in exchange for entry of the CDs. It is misleading to suggest that the settlements are worth over $33 million, based on the value of the Discounted Service Acre Years ("DSAYs") allocated to the settling defendants, without also disclosing that the total dollar amount allocated to settling defendants in the CDs is less than half the value of those DSAYs.[75]

7.  Pursuant to United States District Court for the District of Oregon Local Rule 42-2, notify the Court that this matter is related to both *Confederated Tribes and Bands of*

---

[75] **[This is footnote 14 in FMC1.]** *E.g.,* https://www.justice.gov/opa/pr/responsible-parties-reach-settlement-more-33-million-restore-natural-resources-portland; https://www.fws.gov/portlandharbor/news/two-consent-decrees-lodged.

Public Comment Received 01/26/2024 from FMC Corporation (FMC1)

*the Yakama Nation v. Air Liquide America Corp..,* No. 3:17-cv-00164-SB (D. Or.) and *Arkema Inc. v. Anderson Roofing Co., Inc.,* No. 3:09-cv-00453-JR (D. Or.).[76]

---

[76] **[This is footnote 15 in FMC1.]** D. Or. R. 42-2 states that "[i]t is the responsibility of counsel to identify complex or related cases and to bring the matter promptly to the attention of the Court."

35

ER-926

# Response to Arkema D and FMC1

Some of the requests in the bullet points in Arkema D relate to responses provided above, while other requests raise issues that this document has not yet addressed. The response below seeks to address those portions of the bullet points not yet addressed and also responds to nearly identical comments in FMC1. The responses below are organized in order of the Arkema D comments. Where FMC1 makes additional, different comments addressed in this section, those differences are noted and addressed separately.

**First Arkema D Bullet**

The first bullet seeks to create a geographic limitation on the contribution protection we grant to Settling Defendants in the Consent Decrees. We do not agree that such a limitation would be appropriate or workable for purposes of settlement.

The Consent Decrees provide Settling Defendants with covenants not to sue from Plaintiffs, including associated contribution protection, for natural resource damages "resulting from releases of hazardous substances or discharges of pollutants at or from the properties identified in Appendix A for each Settling Defendant into the Portland Harbor Natural Resource Damage Assessment Area."[77] As written, these provisions extend our covenants not to sue and contribution protection to natural resource damages outside of the Portland Harbor Assessment Area, even if those damages were caused by releases of hazardous substances or discharges of pollutants from Settling Defendants' identified facilities *into* the Portland Harbor Assessment Area. The scope of the covenants and associated contribution protection are appropriate for three reasons.

First, the Settling Trustees carefully considered the boundaries of the Portland Harbor Assessment Area that were used to determine the magnitude of natural resource damages at Portland Harbor. While both the Settling Trustees and regulatory agencies (the EPA and the Oregon Department of Environmental Quality (ODEQ)) are aware that some contaminants originating in the Portland Harbor Assessment Area have migrated downstream of the Assessment Area, the extent and level of contamination in river sediments drops substantially downstream of the Assessment Area (sediments downstream of river mile 1.9 were determined to have a much lower risk than the upstream areas that the EPA identified for further cleanup and feasibility study analysis.).[78] It is therefore the Settling Trustees' technical judgment that the large majority of the natural resource damages from contaminants released or discharged into the

---

[77] *Cash-Out Decree*, Dkt. #11-1, paragraphs 3.b (Definition of "Covered Natural Resource Damages), 14 (Plaintiffs' Covenant Not to Sue), & 21 (Contribution Protection); *Restoration Credit Decree*, Dkt. #4-1, paragraphs 3.d (Definition of "Covered Natural Resource Damages), 82 (Plaintiffs' Covenant Not to Sue), & 89 (Contribution Protection).

[78] *See, e.g.,* U.S. ENV'T PROT. AGENCY, RECORD OF DECISION FOR THE PORTLAND HARBOR SUPERFUND SITE §§ 2.2.10, 3.2.12 (2017), https://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/(Filings)/84473AAEE282B06E8525815B006393D7/$File/Portland%20Harbor%20ROD...12.pdf.

36

ER-927

Portland Harbor Assessment Area have occurred and are occurring within the Assessment Area.[79] It is thus appropriate that our covenants not to sue and the associated contribution protection apply to all damages from releases of hazardous substances into the Portland Harbor Assessment Area from Settling Defendants' identified facilities.

Additionally, the suggestion in the first bullet to geographically limit contribution protection would undermine a critical attribute of the settlement in the Consent Decrees: closure. If we adopted the suggestion to geographically limit contribution protection (and presumably our covenants not to sue, as they are intended to be equivalent in scope to the contribution protection), Settling Defendants could not be certain—assuming that grounds for the reopener provisions do not materialize—that they had resolved their liabilities to Settling Trustees[80] for natural resource damages regarding their facilities listed in Appendix A of the Consent Decrees. Providing such closure is a key inducement for Settling Defendants to make the commitments in the Consent Decrees. For these reasons, our terms regarding the geographic scope of the covenants and contribution protection are a reasonable (and modest) compromise.

**Second Arkema D Bullet**

The second bullet suggests revisions to the Consent Decrees to limit contribution protection so that it does not include damages in the ongoing formal damage assessment, including damages caused by remediation of existing contamination, that exceed the total damage estimate in the HEA. We disagree with this suggestion, mainly for reasons explained above: such a change is unnecessary because the Settling Trustees believe the quantum of total damages estimated by the HEA is a reasonable estimate; implementing the suggested change would likely lead to contribution actions by non-settling parties against Settling Defendants, and even if the magnitude of such claims were small, this would obviate the substantial closure provided by the Consent Decrees to Settling Defendants; and the overall effect of remedial actions will be to substantially lower the level of contamination to which natural resources are exposed, even if some contaminants are re-released in the process of that removal.

Furthermore, these revisions are unnecessary because the Consent Decrees contain reopener provisions. These provisions allow us to assert additional natural resource damage claims against Settling Defendants if "conditions, factors or information" are discovered indicating additional damages "of a type unknown, or of a magnitude significantly greater than was known, to the Trustees as of the Effective Date."[81] Therefore, after entry of the Consent Decrees, if the Settling Trustees discover in the formal damage assessment that the HEA estimate overlooked damages "of a type unknown, or of a magnitude significantly greater than" what was known at the time

---

[79] *See* NAT'L OCEANIC AND ATMOSPHERIC ADMIN., FINAL PORTLAND HARBOR SUPERFUND SITE NATURAL RESOURCE DAMAGE ASSESSMENT PLAN ADDENDUM 2: PHASE 3 DAMAGE ASSESSMENT PLAN at A-5 (2018), https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final%20%282%29.pdf.

[80] As explained below, Settling Defendants remain potentially liable to the Yakama Nation for further natural resource damages at the Portland Harbor Superfund Site.

[81] *Cash-Out Decree*, Dkt. #11-1, paragraph 17; *Restoration Credit Decree*, Dkt. #4-1, paragraph 85.

37

the Consent Decrees were entered, the Consent Decrees provide a mechanism for recovery of those damages against Settling Defendants, and no contribution protection would apply to that additional quantum of damages.[82]

**Third Arkema D Bullet**

The third bullet appears to misapprehend the relationship between natural resource damages claims brought by the Yakama Nation in *Confederated Tribes & Bands of the Yakama Nation v. Air Liquide America Corp.*,[83] and our natural resource damages claims resolved in the Consent Decrees.  As the opinion in that case indicates, there is "substantial overlap" between the resources for which the Yakama Nation and the Settling Trustees are trustees, and "joint trusteeship" of these resources is a well-recognized feature of natural resource law.[84] The opinion then recognized that CERCLA's prohibition in Section 107(f)(1) on double recoveries by different trustees for damages to shared natural resources allows one or more trustees to recover for these damages, even if (as in the Consent Decrees) not all trustees are parties to that action. Trustees who are not parties to the first action may bring a later suit for additional damages.

The language of the statute dictates that a co-trustee acting individually or collectively with the other co-trustees may seek recovery from a potentially responsible party or parties for the full amount of the damages, less any amount that has already been paid as a result of a settlement to another trustee by a potentially responsible party.[85]

Therefore, recovery of natural resource damages by the Yakama Nation would require a showing that the total amount of the damages being sought exceeds the amount of the settlement in the Consent Decrees. If such a showing were made, defendants in that case who are not Settling Defendants under the Consent Decrees could bring contribution claims against Settling Defendants if Settling Defendants' share of the additional quantum of damages established in the Yakama Nation suit exceeded the amount of the settlement with Settling Defendants in the Consent Decrees.

This is consistent with CERCLA Section 113(f)(2), which governs the effect of settlements with some parties on the remaining claims against non-settling parties.

Such a judicially approved settlement does not discharge any of the other potential liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.[86]

As this discussion shows, whether the contribution protection in the Consent Decrees might shield Settling Defendants from contribution claims in *Confederated Tribes & Bands of the*

---

[82] *Id.* paragraphs 21 (*Cash-Out Decree)* & 89 (*Restoration Credit Decree*).

[83] Case No. 3:17-cv-00164-SB (D. Or.)

[84] *Confederated Tribes & Bands of the Yakama Nation v. Airgas USA LLC*, 435 F. Supp. 3d 1103, 1125 (D. Or. 2019).

[85] *Id.* at 1126 (quoting *United States v. Asarco Inc.*, 471 F. Supp. 2d 1063, 1068 (D. Idaho 2005).

[86] 42 U.S.C. § 9613(f)(2).

*Yakama Nation v. Air Liquide America Corp.*[87] would depend on a number of contingencies; it is not a simple question of contribution protection either applying, or not applying, to claims in that case. For all of these reasons, we believe that the scope of contribution protection in the Consent Decrees is fair and consistent with applicable law.

**Fourth Arkema D Bullet**

The fourth bullet demonstrates a misunderstanding of the effect of the Consent Decrees' entry on non-settling parties. Nothing in the Consent Decrees suggests that by entering those documents as final judgments on the claims asserted in the Complaint, the Court is adopting or giving preclusive effect to any "methodology, factual findings, and conclusions" used by us or Settling Defendants in our negotiations. To the contrary, the Consent Decrees expressly disavow any admission of either liability or the allegations in the Complaint.[88] As discussed above, the Consent Decrees prohibit Settling Defendants from using the Consent Decrees against non-settling parties in any other forum.

Moreover, the Court's review of the Consent Decrees is not a *de novo* fact-finding exercise, but rather a review of the settlement's reasonableness, "swaddled" in substantial deference to Plaintiffs' judgments, as reflected in the settlements.[89] Thus, the Court need not "adopt" the approaches or findings described in the Consent Decrees or the associated public record documents in order to enter the Consent Decrees as final judgments. As stated above, the fundamental effect of the settlement on non-settling parties is provided by Section 113(f)(2): entry of the Consent Decrees "does not discharge any of the other potential liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement."[90]

**Fifth Arkema D Bullet**

As explained above, the Consent Decrees and the Justice Department's press release describing the Consent Decrees accurately state (or slightly understate) the value of our recoveries from Settling Defendants in the Consent Decrees. No revisions are warranted.

**Last Arkema D Bullet**

We agree with the commenter's suggestion to notify the Court that the case is related to both *Confederated Tribes & Bands of the Yakama Nation v. Air Liquide America Corp.*[91] and *Arkema Inc. v. Anderson Roofing Co.*[92] Our failure to make this notification upon filing the Complaint

---

[87] Case No. 3:17-cv-00164-SB (D. Or.)

[88] *Cash- Out Decree*, Dkt. #11-1, paragraph 5; *Restoration Credit Decree*, Dkt. #4-1, paragraph 5.

[89] *Montrose*, 50 F.3d at 746.

[90] 42 U.S.C. § 9613(f)(2)

[91] Case No. 3:17-cv-00164-SB (D. Or.).

[92] Case No. 3:09-cv-00453-JR (D. Or.).

39

and lodging the Consent Decrees was an oversight and does not reflect a position that the cases are unrelated.

**FMC1 Comment 5**

We disagree with this comment because, as explained more fully below in response to a comment by Gunderson, the commenter confuses the authority of the Settling Trustees—to recover damages or their equivalent to be used for restoration of injured natural resources—with the authority of regulators, such as EPA and ODEQ, who have authority to order cleanup actions or implement cleanup actions themselves and then sue to recover cleanup costs.

# Public Comment Received 01/26/2024 from Gunderson LLC, Part 1 (Gunderson 1)

## The Proposed Settlements Lack Key Information

The CDs lack key information necessary to determine if the settlements are fair and reasonable. The Restoration Credit CD states that, "[u]nder the Path C process, the Trustee Council conducted a party-specific, intra-property allocation by estimating relative contributions (as percentages) of each PRP [potentially responsible party] associated with contaminant footprints using factors such as activity type, duration, and proximity to the Willamette River."[93]  Using this process, the Trustee Council settled 471.389 DSAYs in the two CDs, which represents about 11 percent of the total DSAYs allocated to the Site.  The CDs discuss the process leading up to Path C but the basis for the settlements is simply stated as "a fair and reasonable estimate of the equitable responsibility for Covered Natural Resource Damages."[94] There is no explanation, formula, or data provided for how the amount allocated was arrived at.

When evaluating a settlement's reasonableness, a court should "compare the proportion of total projected costs to be paid by the settlors, with the proportion of liability attributable to them, and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified."[95]  This issue has not been met because the necessary information has not been provided. Furthermore, to compare the proportion of total projected costs, "the court must know the total projected costs themselves."[96]  Because the Trustee Council has not yet completed an NRD assessment for the entire NRD assessment area, this information is currently unknown.[97]

The proposed CDs do not provide the information necessary to determine any site-specific allocation or the relative proportion of the settlements as compared to other sites or parties. For example, Schnitzer, the major historical operator at the Gunderson Facility, settled its liability at the Gunderson Facility, in addition to ten other sites, including two major industrial sites, IT slip and Burgard Way, for a total 37.49 DSAYs, which amounts to an average of only 3.4 DSAYs per site.[98]  Because the DSAYs allocated to Schnitzer in the Restoration Credit CD are not provided

---

[93] **[This is footnote 7 in Gunderson 1.]** Restoration Credit CD, Dkt. 4-1 at 11.

[94] **[This is footnote 8 in Gunderson 1.]** Restoration Credit CD, Dkt. 4-1 at 12; Cash-Out CD, Dkt. 11-1 at 10.

[95] **[This is footnote 9 in Gunderson 1.]** *New Jersey Dep't of Env't Prot. v. Exxon Mobil Corp.*, 453 N.J. Super. 588, 640(Law. Div. 2015), aff'd, 453 N.J. Super. 272 (App. Div. 2018) (quoting *United States v. Montrose Chem. Corp. of California*, 50 F.3d 741, 747 (9th Cir. 1995)).

[96] **[This is footnote 10 in Gunderson 1.]** *United States v. Montrose Chem. Corp. of California*, 50 F.3d at 747.

[97] **[This is footnote 11 in Gunderson 1.]** Restoration Credit CD, Dkt. 4-1 at 7.

[98] **[This is footnote 12 in Gunderson 1.]** *Portland Harbor Natural Resource Damage Assessment Phase 2: Allocation Summary Memo for Schnitzer Steel Industries*, at 1 (available at: https://pub-data.diver.orr.noaa.gov/portland-

41

on a site-specific basis, it is impossible to determine how many DSAYs were allocated to Schnitzer for the Gunderson Facility or how many unsettled DSAYs remain to be allocated to other potential responsible parties at the Gunderson Facility. Consequently, it is not possible to determine if Schnitzer is even close to paying its fair share for the deplorable conditions it caused.

In addition, even though the Trustee Council acknowledges that the City has benefitted from having the outfall structures in place and may have gained additional economic benefits from rate payers,[99] based on the information in the record, the settlements appear to dismiss the impacts of City outfalls to the Willamette River and natural resources. There is no mention in the CDs of the significant contribution of polluters like Reimann to the City's outfalls and the City's liability for them, or the fact that healthy fish used to die within minutes of being placed in river water[100] because the City turned the river into an open sewer.[101] The City settled its total NRD liability for 34 sites, along with all of the City-owned outfalls and non-site- specific stormwater, for a total of 61.03 DSAYs, which amounts to an average of only 1.795 DSAYs per site, inclusive of all City the outfalls and stormwater.

A court must consider the substantive fairness of each consent decree to non-settling PRPs.[102] This determination must be supported by assessing whether liability has been roughly apportioned based upon "some acceptable measure of comparative fault."[103] In other words, there must be some benchmark by which to evaluate consent decrees, such as the estimate of the projected total natural resource damages at issue.[104]

---

harbor/20221118_Schnitzer_AllocationSumMemo_5236.pdf); Restoration Credit CD, Dkt. 4-4 at 8.

[99] **[This is footnote 13 in Gunderson 1.]** *Id.* at 9.

[100] **[This is footnote 14 in Gunderson 1.]** Hillegas, James. *Working for the "working river" : Willamette River water pollution, 1926 to 1962* (June 9, 2009) at 75 (available at: https://search.worldcat.org/title/551797587) ("Men were shown immersing hatchery fingerlings in river water where, in most cases, the fingerlings died within forty-five seconds because of extremely low levels of dissolved oxygen.").

[101] **[This is footnote 15 in Gunderson 1.]** Sears, Alfred. *Report Upon a System of Sewerage for the City of Portland, Oregon* (Dec. 1883) at 38.

[102] **[This is footnote 16 in Gunderson 1.]** *See United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 87 (1st Cir. 1990) ("Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible.").

[103] **[This is footnote 17 in Gunderson 1.]** *Id.* at 87. *See also United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 521 (1st Cir. 1996) ("This amounts to asking whether the terms of the settlement are roughly proportional to [a party's] responsibility and whether they serve the public interest.").

[104] **[This is footnote 18 in Gunderson 1.]** *United States v. Montrose Chem. Corp. of California*, 50 F.3d at 746.

The lack of transparency in the Cash-Out CD and the Restoration Credit CD into the allocation of the DSAYs for each of the settling defendants' sites makes it impossible to assess whether the settlements are reasonable or fair.[105] While some discounts of liability to entice settlement are permitted,[106] this concept should not be misused to let serious polluters off the hook without paying for the damage they have caused. In interpreting NRD settlements, courts have held that even though NRD-settling consent decrees should be given deference to encourage settlements and to give deference to the agency's expertise, courts should not just "rubber-stamp" each proposed consent decree.[107] Because the settlement of liability in these CDs do not appear to be supported by a complete factual record allowing sufficient insight into each Settling Defendant's liability and the magnitude of the discount from the originally allocated site-specific DSAYs or how DSAYs were allocated to each settling party on a site-specific basis, the court would be improperly approving the CDs.

---

[105] **[This is footnote 19 in Gunderson 1.]** *United States v. Cannons Eng'g Corp.,* 899 F.2d at 90 (holding that courts should defer to an agency's expertise if settlement figures are derived in a sensible way from a plausible interpretation of the record).

[106] **[This is footnote 20 in Gunderson 1.]** *United States v. Davis*, 261 F.3d 1, 26 (1st Cir. 2001) ("discounts on maximum potential liability as an incentive to settle are considered fair and reasonable under Congress's statutory scheme.").

[107] **[This is footnote 21 in Gunderson 1.]** *United States v. Cannons Eng'g Corp.,* 899 F.2d at 84.

43

# Public Comment Received 01/26/2024
## from the Yakama Nation, Section 3 (YN3)

3. The Consent Decrees do not provide enough information to determine whether the allocation of liability is fair, adequate, reasonable, or consistent with the objectives of the law.

Both of the proposed Consent Decrees must, at a minimum, be demonstrably fair, adequate, reasonable, and consistent with the objectives of CERCLA. *United States v. Montrose Chem. Corp. of Cal.,* 50 F.3d 741, 743 (9th Cir. 1995). The Consent Decrees must be both procedurally and substantively fair. *United States v. Coeur d'Alenes Co.*, 767 F.3d 873, 877 (9th Cir. 2014).

We have reviewed the information provided in the Consent Decrees regarding the apportionment of liability, guided by the legal requirements set forth in the Ninth Circuit in instances where liability is apportioned. A settlement is substantively fair when it "is 'based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done.'" *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014) (internal citations omitted). The Trustees' justification for the allocation of liability to each of the settling parties, at least as set forth in the Consent Decrees and the Appendices, does not meet these criteria.

The declared justification for the individual settlements is deficient in two respects. First, the basis for calculating the total DSAYs for the Assessment Area is not apparent. The Consent Decrees and decade-long NRDA process (that is not yet complete) have resulted in thousands – if not tens of thousands – of pages of information and analyses spread out across many agencies, organizations and websites. Not surprisingly, this makes it impossible to evaluate and assess much of the information that was used to develop the Consent Decree settlements, unless that information is consolidated, explained, and presented to Yakama Nation. In particular, the Habitat and Resource Equivalency Analyses methods, data, and analysis are not readily available for review. Appendix B of the 2010 Portland Harbor NRDA Plan provides:

> Once service loss thresholds and habitat value factors are established, habitat will be mapped and characterized using existing sediment contamination data. The areas of habitat with different service levels (based on contaminant concentrations and/or predicted toxicity) become inputs to the HEA model, along with assumptions about recovery times under various clean-up scenarios. The Trustee Council will use conservative assumptions regarding natural resource recovery times based on information developed as part of the FS and remedial process.

However, the document does not provide the maps for review, let alone any work that may have gone into developing the HEA models for the overall Portland Harbor Superfund site or the HEA documentation itself. It is unclear where all of this information resides, or if it is available to anyone other than the Trustee Council. At one point, a document presenting NOAAs HEA/REA methodology was available for download, but all links now appear to be broken. Without that information, it is impossible to determine whether the total amount of DSAYs presented in the Consent Decrees is fair, reasonable, or consistent with CERCLA.

44

ER-935

Second, the Trustees should provide the allocation used to determine each Settling Defendants' assigned percentage of liability, and the data considered, rather than simply a general description of the allocation methodology. Instead, the Consent Decrees describe the "Path C" process the parties followed and provide a table of the final percentages. Neither the data nor calculations to support the final percentages are provided. The Consent Decrees describe – generally – the process undertaken to allocate liability for the Settling Defendants' properties, *see*, *e.g.,* Cash Out Decree, ¶ P, and the results of that allocation process. *See,* Cash Out Decree, Appx C. But none of the supporting information has been provided. Rather, references to large documents or document collections, databases, and generic categories are listed. *Id.*, n. 3. Moreover, "non-public information" was used by the Trustees. Without that information, the public comment process is superfluous, as any review of the adequacy of the settlements is based purely on conjecture.

None of the "readily available data," the "technical inputs," or "PRP-submitted" data that were used by the Trustees are provided. Justifying the bases for the percentages of liability, even in an imprecise way, is essential to determine whether the determination of DSAYs, and the allocation of those to individual responsible parties, is in any way fair.

On their face, the Consent Decrees cannot be deemed fair, reasonable, adequate, or consistent with the purposes of CERCLA.

45

## Public Comment  Received 01/28/2024 from
## Willamette Riverkeeper, Section 1 (WR1)

**1. The Settlement Agreements seem far too small given the number, financial capacity and liability of the parties involved**: The Trustee Council places a very heavy emphasis on the size of the settlements ($36,154,209.45). However, the critical factor is not the size of the settlement but rather the overall size of the assessment and what portion of the assessment these settlements cover. In fact, these settlement agreements represent only approximately 11% of the overall liability in the natural resource damage assessment.

This process converts these losses into a common metric of DSAYs, which represent how much ecological services one acre of habitat provides for one year. The Trustee Council calculated ecological service losses for the entire Portland Harbor Assessment Area to be 4,130 DSAYs (as noted above, the current settlements address about 11% of this total).[108] The Trustee Council determined the amount of money it would cost to acquire DSAYs of ecological benefit to offset ecological losses. This yielded a cost of approximately $69,025 per DSAY.

We are deeply concerned that the Trustee Council may be settling far too low with these responsible parties and may be unable, through either future settlements or legal action against remaining responsible parties, to achieve its overall damage assessment goals. We understand that parties sometimes receive a financial benefit for settling early. We also understand that there is joint and several liability. However, settlements still should be reasonably proportional in order to ensure that overall NRDA goals can be achieved. The information provided in no way gives us confidence that this standard has been  met.

---

[108] **[This is footnote 1 in WR1.]** Consent Decrees.

# Response to Gunderson 1, YN3, and WR1

The thrust of these comments is that we have not provided enough information about Settling Defendants' allocations to determine whether the Consent Decrees are fair, reasonable, and in the public interest. We disagree for the following reasons:

Documents in the public record provide substantial information about:

- o the Settling Trustees' HEA methodology,

- o the contaminant data sets that the Settling Trustees used to generate allocations, and

- o the activities that the Settling Trustees analyzed for each Settling Defendant's identified properties and facilities and the presumed contaminants associated with those activities.

The Consent Decrees provide both an estimate of the total damages and the Settling Defendants' share of those damages, which is what the leading case cited by the commenters calls for.[109]

While the Settling Trustees have not made public the detailed injury, restoration, and allocation calculations used in the HEA, the deference afforded by the governing caselaw allows the Settling Trustees to withhold these details so that the settlement process has sufficient confidentiality to allow the negotiation of final agreements.

The Settling Trustees' more detailed response to these comments is set forth below.

## Public Record Regarding Total Injury Calculations and Allocations to Settling Defendants

The documents in the Settling Trustees' public record contain information that allows for meaningful technical review. NRDA methodologies—including HEA—require specialized scientific and technical expertise to assess, among other things, the range of habitats and species that constitute the injured natural resources, the relevant contaminants of concern; the magnitude of the effects of those contaminants of concern at varying concentrations on the natural resources of concern; the likely extent of exposure of natural resources to these contaminants in the concentrations likely in the environment over time; the injury likely caused by each contaminant footprint and the expected total injury caused by all observed contaminant footprints; the value of various habitats to natural resources, which is needed both to estimate damages and to estimate the corresponding amount of restoration required to compensate for those damages; and calculating the estimated quantum of required restoration. All of these topics must be (and have been) addressed in a technically competent fashion by the Settling Trustees when developing a HEA. By publicly describing the methods, assumptions, and values that were used in the Portland Harbor HEA, the Settling Trustees have provided for a meaningful review of their assessment process.

---

[109] *Montrose*, 50 F.3d 741.

Examples of technical documents developed and used by the Settling Trustees to quantify losses and damages include the following:

- *Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement*, which provides the following:[110]

  o a description of the data and methodology used to estimate the extent and concentrations of contaminant footprints,

  o a table showing, for each contaminant of concern, the contaminant concentrations for each service loss threshold (*i.e.*, what percentage of habitat injury [between 5%-80%] corresponds to a stated concentration of that contaminant in a sediment footprint,

  o a table showing the ecological value of each affected habitat type, adjusted downward for the baseline quality of the habitat (*e.g.*, factors other than contamination), and

  o a high-level overview of the methodology for allocating estimated injury from the contaminant footprints to onshore "sites," which typically were defined based on tax parcels.

- *Phase 2 Allocation Methodology Report*, which provides the following:[111]

  o a detailed description of the methodology for allocating estimated injury from the contaminant footprints to onshore "sites," which typically were defined based on tax parcels,

  o a detailed description of the methodology for allocating injury attributed to a "site" to the different parties that owned and/or operated that site,

  o an appendix containing the definition of each activity and the associated substances of concern, and

  o an appendix describing how liability related to non-site-specific sources and public outfalls was allocated.

---

[110] PORTLAND HARBOR NAT. RES. TR. COUNCIL, SUMMARY OF PORTLAND HARBOR NATURAL RESOURCE DAMAGE ASSESSMENT FOR PURPOSES OF SETTLEMENT (2015), https://pub-data.diver.orr.noaa.gov/portland-harbor/20230401_PH%20Ph2%20PthC%20SummaryPreface_5383.pdf.

[111] PORTLAND HARBOR NAT. RES. TR. COUNCIL, PORTLAND HARBOR NATURAL RESOURCE DAMAGE ASSESSMENT: PHASE 2 ALLOCATION METHODOLOGY REPORT (2023), https://pub-data.diver.orr.noaa.gov/portland-harbor/20230101_PHAllctnMthdlgyRprt_5231.pdf.

48

- *Relative Chinook Salmon Lower Willamette Habitat Values*, a table assigning the relative ecological value of various habitat types in both the Portland Harbor Assessment Area and within restoration project areas.[112]

These are examples of technical documents included in the public record that provide information on key technical inputs and methods used by Settling Trustees in the HEA model used to estimate and allocate natural resource damages.

The Settling Trustees' public record also contains a report produced by the Settling Trustees with factual information supporting the allocation for each Settling Defendant, which provides information on the operations, activities, and associated contaminants of concern for that Settling Defendant. These reports are located here https://www.diver.orr.noaa.gov/web/guest/portland-harbor-admin-record under Settlements>2023 Phase 2 Settlements>Party Specific Information. Each report includes the following information:

- general background, including an identification of all of the properties examined in the allocation process for that Settling Defendant,

- a description of the operations conducted at those properties and the time periods during which those operations were conducted, and

- an identification of the activities that took place during the operations. The Settling Trustees could then cross-reference these activities by the Settling Defendants against a list of contaminants of concern that are associated with those activities, found in the *Phase 2 Allocation Methodology Report*.[113]

The information the Settling Trustees have provided regarding each Settling Defendant's share of liability is consistent with the applicable requirements. The Settling Trustees have provided an overall estimate of damages, an explanation for how that estimate was made, an allocation for each Settling Defendant that represents each Settling Defendant's share of liability, and information about the operations and related contaminants of concern for each Settling Defendant.

While the detailed calculations for the HEA and party-specific allocations are part of the confidential settlement process, information in the public record provides a guide for evaluating those calculations. Regarding the estimate of site-wide damages and restoration necessary for compensation, the Settling Trustees' calculations established a total of 4,130 DSAYs. One can understand this more concretely by comparing it to the value of the four large restoration projects represented in the Restoration Credit Decree. The total value of those projects, if and when fully developed to Settling Trustee standards and used wholly to resolve natural resource damages

---

[112] PORTLAND HARBOR NAT. RES. TR. COUNCIL, RELATIVE CHINOOK SALMON LOWER WILLAMETTE HABITAT VALUES (2012), https://pub-data.diver.orr.noaa.gov/portland-harbor/20120802_REV_HabitatValuesTable_1764.pdf.

[113] PORTLAND HARBOR NAT. RES. TR. COUNCIL, PORTLAND HARBOR NATURAL RESOURCE DAMAGE ASSESSMENT: PHASE 2 ALLOCATION METHODOLOGY REPORT (2023), https://pub-data.diver.orr.noaa.gov/portland-harbor/20230101_PHAllctnMthdlgyRprt_5231.pdf.

liability (rather than for mitigation or other legal frameworks) would be 2,143.92 DSAYs. This amount is roughly half of the quantum of restoration needed to address the total damages the Settling Trustees estimated. This provides an on-the-ground sense of how much restoration would be necessary to fully address all natural resource injuries for the Portland Harbor Assessment Area, as assessed by the Settling Trustees in their settlement process, not just the approximately 11% of total injuries captured in the Consent Decrees.

Similarly, the allocations to Settling Defendants vary widely in magnitude but correspond roughly to the magnitude and duration of activities—and associated contamination—released from the identified properties for each Settling Defendant. Generally speaking, Settling Defendants with larger allocations conducted relevant operations larger in scope, for longer periods of time, or in locations more susceptible to releasing hazardous substances into the Portland Harbor Assessment Area than Settling Defendants with much lesser shares of liability. These differences are reflected in the properties identified for each Settling Defendant in Appendix A of the two Consent Decrees, in the party-specific reports describing each Settling Defendant's activities on those properties, and in the list of contaminants corresponding to each identified activity. As with the estimate of total harm, the actual calculations of each Settling Defendant's share of liability as set out in Appendix C of the Consent Decrees were part of the confidential settlement process and addressed specifics of contaminant usage, release, and pathways to the Portland Harbor Assessment Area. Those calculations and associated settlement discussions, therefore, are not part of the public record. However, the descriptions of properties, activities, and associated contaminants for each Settling Defendant provide the public factual background for those confidential calculations.

The commenters also inquire about the extent of compromises for litigation risk. As with any settlement, the Trustee Council made adjustments to account for the lost time, high costs, and risks associated with litigation. Here, the Settling Trustees incorporated these adjustments primarily into the design of the Phase 2 assessment that yielded the total harbor-wide calculation of 4,130 DSAYs. By factoring litigation risk into the technical basis of the total injury estimate of the Phase 2 assessment, the Settling Trustees followed this procedural approach to litigation risk with each settling party. The technical adjustments are reflected in the Settling Trustees' record, particularly in those documents that describe the technical underpinnings of the settlement-based assessment. This allowed the Settling Trustees to focus discussions with individual Settling Defendants on corrections to the factual record used to calculate those parties' liability, including some modest adjustments for equitable considerations.

**Comments Regarding Particular Settling Defendants and Particular Locations**

The commenters also inquire about Settling Trustees' allocations to parties at certain locations, including Settling Defendant Schnitzer's allocation for its activities at the Gunderson Facility and the allocations to Settling Defendant City of Portland for its various outfalls to the Portland Harbor Assessment Area. Regarding the allocation to Schnitzer, Settling Trustees did not publicly disclose the contributions of each facility to that Settling Defendant's total share of liability, because Settling Trustees determined not to do so for any Settling Defendant. The Settling Trustees made this decision in order to keep the underlying calculations confidential. Gunderson 1 suggests an expectation that, if the commenter had resolved its liability with Settling

Trustees in the Consent Decrees, its share of liability should have been less than Schnitzer's allocated share, because (according to Gunderson 1) Schnitzer bears greater responsibility for the contamination at that location. That may be, and if the commenter had participated in the early settlement process, the Consent Decrees might reflect that supposition. However, the Settling Trustees had no duty to any non-settling responsible party to make particularized allocations as to those parties; indeed, making allocations to parties outside of the early settlement process would be too uncertain to calculate without a submittal of technical information from that party with sufficient detail to prepare an intra-site allocation at locations with multiple owners and operators. Moreover, the covenants not to sue in the Consent Decrees are for releases of hazardous substances from all of the identified properties for each Settling Defendant; therefore, Settling Trustees were not required to sub-divide the allocation to each Settling Defendant for each property or other contaminant source identified in the Consent Decrees' Appendix A for each Settling Defendant.

With respect to the City of Portland's outfalls to the Portland Harbor Assessment Area, Settling Trustees estimated the City's share of liability by outfall type rather than by individual outfall. For all publicly owned outfalls (*i.e.*, City-owned outfalls), Settling Trustees estimated the percentage of industrial inputs (*i.e.*, drainage from land zoned for industrial purposes), then evaluated the type and amount of substances of concern associated with industrial drainage, and determined the total liability across the assessment area that could be attributed to discharge of industrial drainage. As a public outfall owner, the City received an ownership portion of this liability. The City's allocation, therefore, reflects the sum of its responsibility for all City-owned outfalls. No allocations were developed for any individual outfall, including OF-18, identified in Gunderson 1.[114] The Settling Trustees also allocated the City a portion of non-site-specific contamination from stormwater runoff that occurred on land that was not zoned as "industrial," including parks, open space, and commercial/residential areas.[115]

**Applicable Requirements and the Sufficiency of the Consent Decrees and Supporting Record**

The above information in the Consent Decrees and the accompanying public record satisfies the applicable requirements for substantive fairness for non-settling responsible parties. First and foremost, the Consent Decrees provide the "proportion of total projected costs to be paid by the settlors,"[116] by including both the share of liability of each Settling Defendant and the total

---

[114] Gunderson's comment references Willamette River conditions between the 1880s and the early 1960s in which fingerlings suffered significant mortality, sometimes from low oxygen conditions caused by sewage. These injuries to fish were not included in the Settling Trustees' injury calculations, which only considered injuries caused by hazardous substances and petroleum beginning in 1981, after the passage of CERCLA. *See also* the discussion about baseline in the response to the NEDC on that topic below.

[115] PORTLAND HARBOR NAT. RES. TR. COUNCIL, PORTLAND HARBOR NATURAL RESOURCE DAMAGE ASSESSMENT: PHASE 2 ALLOCATION METHODOLOGY REPORT at B-1 to B-5 (2023), https://pub-data.diver.orr.noaa.gov/portland-harbor/20230101_PHAllctnMthdlgyRprt_5231.pdf.

[116] *Montrose*, 50 F.3d at 747.

estimated damages of 4,130 DSAYs. Second, because the Consent Decrees account for litigation risks primarily in the harbor-wide assessment, the amounts paid by the Settling Defendants is the same as "the proportion of liability attributable to them."[117] The specific calculations Settling Trustees used to develop and negotiate each Settling Defendant's liability remain settlement confidential, but, as explained above, Settling Trustees have provided detailed information regarding each Settling Defendant's properties, operations, activities, and hazardous substances associated with those activities.[118] Settling Trustees have also made available a detailed description of their HEA, allocation methodologies, and key assumptions used to estimate the total damages they allocated. In our view, nothing in these comments indicates that Settling Trustees have omitted critical information or have otherwise clearly erred.[119]

When one reviews the allocations that Settling Trustees made to each Settling Defendant, it is fundamental to understand that the effect of a settlement on non-settlors' liability under CERCLA section 113(f)(2) is based on the total amount of the settlement, not the share assessed to any individual Settling Defendant.[120] We emphasize this point because the commenters raise concerns about the number of DSAYs allocated to Settling Defendant Schnitzer for its operations at Site 186, a location at which Gunderson, FMC, and Schnitzer all operated. The commenters appear to be concerned that DSAYs at Site 186 not allocated to Schnitzer would become their responsibility in future litigation.

Rather, in future litigation, the Settling Trustees would deduct from the total damages the relief obtained under this settlement (cash and restoration credit purchases comprising 471.389 DSAYs in total restoration value), plus the relief obtained under any additional settlements with other potentially responsible parties, whether within the Path C process or otherwise. Once the combined relief from all settlements is deducted from the total quantum of natural resource damages, non-settling potentially responsible parties would face joint and several liability for the remaining unresolved natural resource damages. This was explained in *United States v. Fort*

---

[117] *Id.* (citing *Charles George Trucking*, 34 F.3d at 1087).

[118] *See United States v. Town of Moreau*, 979 F. Supp. 129, 135 (N.D.N.Y. 1997) ("At a minimum, [] parties would be reticent to make any concessions at a settlement conference if they could expect that their statements would be published to the public at large."); *City of Colton v. Am. Promotional Events, Inc.*, No. 09-01864, 2014 WL 12740639, at *3 (C.D. Cal. 2014) ("In most cases, as here, an agreement of secrecy and confidentiality forms the bedrock of the mediation process."); *Ford Motor Co. v. Edgewood Props., Inc.*, 257 F.R.D. 418, 424 (D.N.J. 2009) ("[T]he disclosure of such negotiations in cases such as this that are brought under the environmental recovery statutes—CERLCA and the [Oil Pollution] Act—could tend to have a chilling effect on negotiations between government entities, be they federal or state, and potentially responsible parties.").

[119] *Cf. Montrose*, 50 F.3d at 747 (court unable to determine fairness of amount paid by settlors where there was no information to determine the fraction of total responsibility that amount represented).

[120] 42 U.S.C. § 9613(f)(2); *See, e.g.*, *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 92 (1st Cir. 1990) (effect of settlement is "a dollar-for-dollar reduction of the aggregate liability"); *Acushnet River,* 712 F. Supp. at 1026–29.

52

Case: 25-8129, 04/13/2026, DktEntry: 77.6, Page 176 of 237
Case 3:23-cv-01603-YY    Document 85-3    Filed 06/09/25    Page 58 of 119

Response to Gunderson 1,YN3, and WR1

*James Operating Co.*,[121] when the court approved a consent decree resolving natural resources damages claims against one potentially responsible party:

> Given CERCLA's joint and several liability scheme, the government may find it appropriate to offer relatively favorable terms to early settlers, thereby encouraging other parties to settle based on the possibility that late settlers and non-settlers bear the risk that they might ultimately be responsible for *an enhanced share of the total claim. See, e.g., United States v. Charter Int'l Oil Co.*, 83 F.3d 510, 515 (1st Cir. 1996) ("[CERCLA's] statutory framework contemplates that [responsible parties] who do not join in a first-round settlement will be left with the risk of bearing a disproportionate share of liability.") (emphasis added).

This same concept was similarly formulated in *Cannons Eng'g Corp.* as follows: "Disproportionate liability, a technique which promotes early settlements and deters litigation for litigation's sake, is an integral part of [CERCLA's] plan."[122] Thus, so long as the proportion of liability allocated to Settling Defendants as a whole—here, about 11.4% of the total estimated natural resource damages—roughly corresponds to their aggregate share of liability, but allowing for discounts for litigation risks, the benefits of early settlements and early restoration, and similar factors, whether any given Settling Defendant was allocated too much or too little responsibility for any given operation does not affect the fairness of the settlement as to non-settlors.[123]

---

[121] 313 F. Supp. 2d 902, 909 (E.D. Wis. 2004)

[122] 899 F.2d at 92.

[123] *See, e.g.*, *Charles George Trucking*, 34 F.3d at 1085–89 (finding consent decree substantially fair based on the total amount of the settlement despite the complete absence of specific allocations to individual generators and transporters of hazardous substances).

53

## Public Comment Received 01/26/2024 from Gunderson LLC, Part 2 (Gunderson 2)

**The Proposed Settlements Are Premature.**

The CDs are also not informed by a current understanding of Site conditions. With limited exception, no remedial action has been conducted at the Site. In fact, the remedial design process is not even finished yet. This means that a full picture of the nature and scope of the required cleanup is not even known. Any NRD settlements based on an incomplete record are premature.[124]

Moreover, at the RM9W project area where the Gunderson Facility is located, FMC has concluded that upland sources are not sufficiently controlled.[125] Thus, any NRD settlement that fails to implement source control measures for known sources leaves open the potential for future NRD damages, thereby failing to meet the statutory directive that NRD settlements must "protect and restore" damaged natural resources.[126]

For the above reasons, the settlements will not fully address the extent of NRD. By allowing a handful of parties to underpay their share of damages, the Trustee Council invites future litigation. Rushing settlements through prematurely without adequate data and an understanding of all parties' liabilities for contamination in the river does not promote CERCLA's purposes.

---

[124] **[This is footnote 22 in Gunderson 2.]**
[125] **[This is footnote 23 in Gunderson 2.]**
[126] **[This is footnote 24 in Gunderson 2.]**

54

Case: 25-8129, 04/13/2026, DktEntry: 77.6, Page 178 of 237

Case 3:23-cv-01603-YY    Document 85-3    Filed 06/09/25    Page 60 of 119

Public Comment Received 01/26/2024 from FMC Corp. (FMC2)

# Public Comment Received 01/26/2024 from FMC Corp. (FMC2)

Importantly, completion of remedial design – let alone completion of remedial action – has not yet occurred at any portion of the Site. Natural resource damages are generally considered "a residue of the cleanup action," and are "viewed as the difference between the natural resource in its pristine condition and the natural resource after the cleanup."[127] As courts have recognized, natural resource damages, "even interim and lost use damages, can not [sic] be fully measured until the EPA's remedial work is completed,"[128] and should "be addressed at the conclusion of the EPA-ordered remediation" because "[o]nly then will we know the effectiveness of the cleanup and the precise extent of residual damage."[129] Accordingly, claims for natural resource damages are generally not settled before remediation is complete.[130] Here, the Trustee Council has taken the unusual step of attempting to enter settlements prematurely, further exacerbating concerns with its incomplete and technically flawed assessment of natural resource damages at the Site.

At the very least, a settlement for natural resource damages, which provides settling parties with a covenant not to sue without also requiring remedial action, "must include provisions assuring that the responsible party will take actions necessary to 'protect and restore' the injured natural resource."[131] Remedial design efforts at the Site have identified numerous ongoing upland source-control issues,[132] and the CDs must protect against further contamination by requiring additional source control by current owners and operators who are settling parties.[133] However, as currently drafted, the CDs fail to provide such necessary protections.

---

[127] **[This is footnote 7 in FMC2.]** In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution, 712 F. Supp. 1019, 1035 (D. Mass. 1989).

[128] **[This is footnote 8 in FMC2.]** *Quapaw Tribe of OK v. Blue Tee Corp.*, No. 03-CV-0846-CVE-PJC, 2008 WL 2704482, at *13 (N.D. Okla. July 7, 2008).

[129] **[This is footnote 9 in FMC2.]** *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1250 (10th Cir. 2006).

[130] **[This is footnote 10 in FMC2.]** *Acushnet River*, 712 F. Supp. at 1035 ("As a residue of the cleanup action, in effect, [natural resource damages] are thus not generally settled prior to a cleanup settlement.").

[131] **[This is footnote 11 in FMC2.]** *State of Utah By & Through Utah State Dep't of Health v. Kennecott Corp.,* 801 F. Supp. 553, 569 (D. Utah 1992) (citation omitted).

[132] **[This is footnote 12 in FMC2.]** *See, e.g.*, Foth, Sufficiency Assessment Report, River Mile 9 West - Portland Harbor Superfund Site (July 2020), Table 3-1 (RM9W Source Control Sufficiency Assessment Matrix).

[133] **[This is footnote 13 in FMC2.]** *See Kennecott Corp.*, 801 F. Supp. at 569 (finding that the "proposed Consent Decree fails to require protection against further contamination by way of source control").

55

# Response to Gunderson 2 and FMC2

The comments that the Consent Decrees are premature are largely based on an apparent misunderstanding of applicable law regarding litigation and resolution of natural resource damages claims. For sites on the National Priorities List (NPL) such as Portland Harbor, CERCLA generally precludes trustees from commencing natural resource damages litigation "before selection of the remedial action" for the Site.[134] As the commenters correctly note, this limitation reflects the fact that natural resource damages claims are "residual" in the sense that the magnitude of damages depends, in part, on the amount of ongoing harm to natural resources from "residual" contamination that cleanup agencies expect to remain after a cleanup is concluded.[135] But once a remedy has been selected, the statute authorizes trustees to pursue natural resource damages claims in litigation.[136] Notwithstanding 42 U.S.C. § 9613(g)(1), trustees and potentially responsible parties may resolve natural resource damages claims via negotiated settlements at any time.

At Portland Harbor, EPA issued the ROD in 2017. The estimate of total natural resource damages at the site that the Settling Trustees used to negotiate the present settlements conservatively estimates future sediment contamination levels—the primary source of known contaminant exposure of an injury to natural resources at Portland Harbor—by assuming that EPA's remedy would be monitored natural recovery throughout the Portland Harbor Assessment Area. However, EPA's ROD includes both dredging and capping of contaminated sediments, which can be expected to lower sediment contaminant concentrations more rapidly than the assumptions in the Settling Trustees' HEA.[137] This allowed the Settling Trustees to develop an estimate of total damages, which includes the likely ongoing damages from sediment contaminant levels after EPA's remedy is implemented. This is entirely consistent with the plain language of the CERCLA and the Ninth Circuit's acknowledgment that an estimate of total damages, "preliminary or otherwise," can support a settlement of natural resource damages

---

[134] 42 U.S.C. § 9613(g)(1). While this limitation precludes litigation before a record of decision ("ROD") has been issued for a site, potentially responsible parties may choose not to assert this defense and instead settle their liability before issuance of a ROD. *See, e.g.*, *United States v. The Boeing Co.* (W.D. Wa. 2010), No. CV-10-758-RSM, Docket #8 (consent decree resolving natural resource damages claims for contaminants released from identified properties at the Lower Duwamish Waterway Superfund Site prior to EPA's issuance of the ROD for that site).

[135] *See, e.g.*, *Quapaw Tribe of Okla. v. Blue Tee Corp.*, No. 03-CV-0846-CVE-PJC, 2008 WL 2704482, at *16 (N.D. Okla. July 7, 2008) (citing CERLCA's legislative history to explain that natural resource damage claims may depend on the remedy at a site, and therefore "an action for natural resource damages for a site on the [NPL] should not take place *before the remedy has been selected*") (emphasis added).

[136] 42 U.S.C. § 9613(g)(1).

[137] *See* Portland Harbor Nat. Res. Tr. Council, Summary of Portland Harbor Natural Resource Damage Assessment for Purposes of Settlement at A-7 to A-9 (2015), https://pub-data.diver.orr.noaa.gov/portland-harbor/20230401_PH%20Ph2%20PthC%20SummaryPreface_5383.pdf.

claims.[138] The discussion in *New Mexico v. General Electric Co.*[139] is consistent with this view as well. The Tenth Circuit based its dismissal of New Mexico's natural resource damages claims on the fact that they were effectively a challenge to EPA's selected remedy and that New Mexico was thus barred under CERCLA section 113(h) from bringing the claim until after EPA fully implemented its remedy.[140] However, at Portland Harbor, there has been no suggestion that Settling Trustees' claims represent an implicit challenge to EPA's remedy, and, therefore, the applicable time limitations derive from Section 113(g)(1), not Section 113(h).[141]

A statutory framework that allows trustees to assert natural resource damages claims before cleanup is complete—which CERCLA section 113(g)(1) expressly allows—necessarily means that at least some areas of contamination will not yet be fully controlled when trustees assert their claims. That clearly is the case at Portland Harbor. The commenters are correct that some sources of upland contamination into the Portland Harbor Assessment Area remain to be addressed, and that the precise actions to address contaminated sediments will not be known until they are implemented. The Settling Trustees are well aware of this, but it has not prevented development of a reasonable estimate of total injury (including conservative assumptions explained above about the pace of reducing contaminant concentrations). In part, this is because injuries to natural resources were much greater at the beginning of the relevant period the Settling Trustees assessed than at the end of that period. Contamination in the Portland Harbor Assessment Area was highest at the beginning of the relevant period of injury (1981) and has been gradually declining (albeit at levels today that continue to injure natural resources). In addition, the earlier the injury, the longer the period during which the public has gone uncompensated, and the greater the weight assigned by the HEA here (and HEAs generally at other sites). An inverse dynamic applies to future injuries. While the Settling Trustees do not know the precise contaminant levels at any given location after cleanup is complete, that information is not essential for them to develop a reasonable estimate of injury. What *is* important is the fact that the future contaminant levels that EPA's ROD contemplates represent a dramatic reduction compared to contaminant levels today. Estimating future harm to natural resources depends on contaminant levels generally, not the precise future contaminant level at any given location. Accordingly, the Settling Trustees are confident that ongoing post-remedial harm to natural resources will be vastly lower than past harm and has been conservatively estimated in the HEA.

The commenters also suggest that the Consent Decrees should "implement source control measures for known sources" to protect natural resources, per Gunderson 2, and do so "by

---

[138] *Montrose,* 50 F.3d at 745, 747.

[139] 467 F.3d 1223 (10th Cir. 2006).

[140] *Id.* at 1249–50.

[141] Statements in *Quapaw Tribe* that natural resource damages claims cannot be brought until remedial work is complete are dicta, because EPA had not completed its ROD for that site. *Quapaw Tribe* at *4, *8. In any event, those statements are contrary to the plain language of the statute, the legislative history cited in that decision, and other authorities including the Ninth Circuit's *Montrose* decision.

requiring additional source control by current owners and operators who are settling parties," per FMC2. These suggestions are contrary to the fundamental division of responsibility under CERCLA for cleanup of hazardous substances and restoration of the natural resources they injure. CERCLA identifies EPA as the lead federal agency responsible for addressing hazardous substance contamination and provides States with remedial authority.[142] At Portland Harbor, EPA and ODEQ agreed that ODEQ would oversee remediation of upland facilities that are sources of contamination to the Portland Harbor Superfund Site, and EPA would direct the cleanup of contaminants in the banks and bottom sediments of the Willamette River itself within the Superfund Site. CERCLA does not give this remedial authority to natural resource trustees.

The case law generally acknowledges the fact that natural resource trustees may settle claims prior to the completion of cleanup and without stepping into EPA's role as the lead federal regulator of CERCLA cleanups. One of the most complete discussions of such "early" settlement is found in *In re Acushnet River & New Bedford Harbor Proc. re Alleged PCB Pollution.*[143] The opinion notes that natural resource damages settlements "customarily" accompany or follow cleanup agreements rather than preceding them,[144] but the opinion nonetheless concluded that such a settlement could be approved if two other unrelated issues were addressed.[145] In addition, the opinion found that Section 122(j) allowed the trustees to reach a settlement that was far below the settlor's share of the full amount of damages the trustees estimated at that site, reasoning that "few settlements would ever be possible where the United States' bottom line is 100% of damages."[146] Courts have entered numerous other "early" natural resource damages settlements without "source control measures" that the commenters assert here are required by Section 122(j).[147]

---

[142] Many States (including Oregon), also enacted their own complementary statutes, which authorize state agencies to direct cleanup of contaminated facilities.

[143] 712 F. Supp. 1019 (D. Mass. 1989).

[144] *Id.* at 1035.

[145] *Id.* at 1038. The *Acushnet* court sought clearer assurances that the natural resource trustees had approved the covenants not to sue in the consent decree, and the court required that the consent decree be modified to include a "reopener" provision for later-discovered injuries. Here, the Consent Decrees have been signed by the Settling Trustees' decisionmakers, and the Consent Decrees include "reopeners" if significant additional harm to natural resources is later discovered. *Cash-Out Decree*, Dkt. #11-1, paragraph 17; *Restoration Credit Decree*, Dkt. #4-1, paragraph 85.

[146] *Id.* at 1036.

[147] On this point, the contrary opinion in *Utah v. Kennecott Corp.*, 801 F. Supp. 553 (D. Utah 1992), is an outlier. Ironically, that opinion cites to *Acushnet* for the proposition that Section 122(j) that "natural resources damages settlements which do not require clean up . . . must include provisions assuring that the responsible party will take actions necessary to 'protect and restore' the injured natural resources." *Id.* at 569. But in *Acushnet,* as here, "actions necessary to 'protect and restore' the injured resource" meant no more than payments by settlors to the trustees for a negotiated portion of settlors' alleged responsibility for the contamination. *See,*

Finally, we do not agree that the settlement was rushed or that the Settling Defendants are underpaying their share of total damages. The Settling Trustees began this early settlement initiative in collaboration with interested potentially responsible parties roughly 15 years ago. Throughout the process, the Settling Trustees have kept the public informed of their general progress. The Settling Trustees' process has been thorough and deliberate. Nor are Settling Defendants underpaying their fair shares of liability. As indicated above, the Settling Trustees have not discounted Settling Defendants' individual shares for litigation risk (which the Settling Trustees largely took into account in the harbor-wide assessment), other than modest equitable adjustments, even though such discounts are both common and often significant in other cases.[148] Not offering Settling Defendants such discounts of this type in the Consent Decrees makes the Portland Harbor allocation process more conservative and thus more protective of non-settlors.

---

*e.g.*, *Fort James Operating Co.*, 313 F. Supp. 2d at 907 (approving consent decree resolving defendant's site-wide natural resource damages liability where settlement was lodged before EPA had completed three of five final RODs for the site); *United States v. The Boeing Co.*, No. CV-10-758-RSM (W.D. Wa. 2010), Docket #8 (consent decree resolving natural resource damages claims for contaminants released from identified properties at the Lower Duwamish Waterway Superfund Site prior to EPA's issuance of the ROD for that site); *United States v. Vigor Indus., LLC*, No. CV-21-44-RSM (W.D. Wa. 2021), Docket # 7 (consent decree resolving natural resource damages claims for contaminants released from identified properties at the Lower Duwamish Waterway Superfund Site after EPA's issuance of the ROD for that site but prior to the start of remedial action).

[148] *See, e.g.*, *Fort James Operating Co.*, 313 F. Supp. 2d at 908–10 (approving settlement for 3%–6% of total estimated damages where settling defendant's proportionate share of liability apparently was 15%–20% of the total); *Acushnet River*, 712 F. Supp. at 1026–32 (approving $2 million early settlement of natural resource damages claims with one of six defendants where total estimated damages were at least $34 million, and settling defendant may have caused more pollution than any non-settlor).

59

# Public Comment Received 01/26/2024 from
# Northwest Environmental Defense Center (NEDC)

The Northwest Environmental Defense Center ("NEDC") respectfully submits the following comments on the Updated Cash-Out Consent Decree and Restoration Credit Consent Decrees lodged as a settlement to the Natural Resource Damages Assessment ("NRDA") process of CERCLA.[149] NEDC fully endorses these comments, and urges the Department of Justice to consider the following issues in determining whether the Consent Decrees ("CDs") present an appropriate restoration response for the Lower Willamette River's Natural Resources. The Portland Harbor Superfund site has only been used for industrial purposes within the last 100 years of its long history. The exploitation of the River for industrial use has led to widespread contamination of the sediments, water, and air in and around the River with hazardous substances, including PCBs, Dioxin, PAHs, and many more.[150] The NRDA response set forth by the CDs is purportedly aimed at restoring the ecological health and long-term viability of the River and its natural resources.[151] But as the Yakama Nation noted in the comments it issued for the Record of Decision (ROD), the restoration as it was planned in 2017 was inadequate to reduce the concentrations of aquatic hazardous substances to levels where uses of the river, such as subsistence fishing, could proceed unimpaired without the use of continued fishing advisories.[152] The CDs fail to remedy the gaping holes in the overarching plan for the Portland Harbor Superfund Site.

---

[149] **[This is footnote 1 in NEDC.]** 42 U.S.C. § 9607 (2006)

[150] **[This is footnote 2 in NEDC.]** *Portland Harbor Superfund Site: Connecting to the Willamette River (Storymap)*, US EPA Region 10, https://storymaps.arcgis.com/ stories/ab89faf239624854a5b9c7723f1c43da (2022).

[151] **[This is footnote 3 in NEDC.]** See U.S. et al. v. ACF Industries, LLC. et al., No. 3:23-cv-1603-YY, Appendix D at 1 (D. Or., Nov. 1, 2023). Retrieved from: https://www.justice.gov/enrd/media/1322711/dl?inline. See also *Id*., Appendix E at 1. See also *Id*., Appendix F at 7 ("Restoration projects developed under the Portland Harbor Natural Resource Damage Assessment (NRDA) process must meet certain habitat criteria conducive to supporting the life histories of the selected species. The Project is being developed to primarily target the federally threatened upper Willamette River (UWR) spring-run Chinook salmon (Oncorhynchus tshawytscha) evolutionarily significant unit (ESU), the federally threatened lower Columbia River (LCR) Chinook salmon ESU, the federally threatened LCR steelhead (O. mykiss) distinct population segment (DPS), the federally threatened UWR steelhead DPS, and the LCR coho salmon (O. kisutch) ESU, hereafter referred to as the "target salmonids." Once complete, this Project will also benefit a diverse array of aquatic, avian, and terrestrial species that reside either permanently or temporarily within the Willamette and Columbia Rivers."). See also *Id*. Appendix G at 9.

[152] **[This is footnote 4 in NEDC.]** US EPA, *Portland Harbor Superfund Site: Record of Decision Responsiveness Summary Report* § 3.2.1, 2,707 (2017). (FIND CITE– continued fishing advisories after the cleanup)

Several implications of that failure are touched on below.

## I.      Introduction

The Updated Cash-Out Consent Decree and Restoration Credit Consent Decree ("the CDs" or "the Decrees") lodged in U.S. et al. v. ACF Industries, LLC. et al., No. 3:23-cv-1603-YY, 3-4 (D. Or., Nov. 1, 2023) are insufficient to restore or compensate for the damages to the Lower Willamette River's natural resources, specifically as they pertain to Endangered Species Act (ESA) listed Lower Columbia River (LCR) Chinook and Steelhead Trout. Furthermore, the Decrees present a piecemeal and scattered image of what this restoration will lead to. Due to the lack of an overarching explanation or reasoning for how the four proposed sites will be effective in isolation, let alone in cumulation, it is difficult to understand *why* the Trustee Council, the U.S. Department of Justice (DOJ), the U.S. Department of the Interior (DOI), the National Oceanic and Atmospheric Administration (NOAA), and the Oregon Department of Fish and Wildlife (ODFW) (hereinafter, the "Action Agencies") selected these four remediation sites. It is even harder to understand *how* these sites will ensure the complete restoration of viable Salmonid habitat in the Willamette River. The Action Agencies' unfortunately fragmented approach to ecological repair is discussed in the first several sections of this comment.

Furthermore, the CDs are arguably insufficient insofar as they were privately negotiated and decided upon without the solicitation of meaningful input from the Yakama Nation, nor from the communities affected by the degradation of the Portland Harbor. That insufficiency is articulated in the final section of this comment.

## II.     The Proposed Consent Decrees do not Adequately Restore Damages to Natural Resources, Including Salmonid Habitat and Species Health

According to the U.S. Department of the Interior (DOI), Natural Resources Damages Assessment and Restoration (NRDAR) Projects, like the plan embodied by the two CDs and their Appendices, are supposed to: "…establish the amount of money to be sought in compensation for injuries to natural resources resulting from a discharge of oil or release of a hazardous substance.

The measure of damages is the cost of restoration, rehabilitation, replacement, and/or acquisition of the equivalent of the injured natural resources to their baseline level of services."[153]

However, the funds sought to be recovered by the settlement presented in the CDs are grossly inadequate to meet this standard. Discounted service-acre years, or "DSAYs" are the measure that define the full scope of the Portland harbor clean-up, and the Trustee Council and Action Agencies intend to hold the relevant PRPs responsible for a total of 4,130 DSAYs, of which the combined sum of the DSAYs collected by the Restoration and Cash Out decrees at issue here

---

[153] **[This is footnote 5 in NEDC.]** U.S. Department of the Interior, *How NRDAR Differs from Remedial Actions under CERCLA* (N.D.). Retrieved from: https://www.doi.gov/restoration/primer/remedial.

61

Public Comment Received 01/26/2024 from
Northwest Environmental Defense Center (NEDC)

accounts for only 476.[154] Each DSAY has a cash equivalent of $70,500.[155] Thus, the total dollar amount of this settlement is $33,558,000, of which only $600,000 will be afforded to Natural Resources Damages.[156] And while this initial settlement presents a total of $33 million, that number pales in comparison to the immense historic, ecologic, spiritual, and cultural values of the Willamette River alone. The CDs are simply insufficient to attain the goals of the NRDAR process.

The reasons for the settlement's final, inadequate form may in part be explained through the concept of Shifting Baseline Syndrome. Shifting Baseline Syndrome described the process by which human understanding of the environment is heavily shaped by the "gradual change in accepted norms for the condition of the natural environment due to lack of past information or lack of experience of past conditions."[157] Though a shifting baseline allows individuals to slowly acclimate to their surroundings, it can (and often does) lead to a sense of complacency surrounding environmental quality.  Shifting Baseline Syndrome leads to an increased tolerance for environmental degradation, alterations in individual understandings of what a "desirable" environment consists of, and creates a false "baseline" against which environmental improvement can be judged.[158]

For the Portland Harbor Superfund Site, the manifestation of this syndrome is clear in the disparate understandings displayed by the Action Agencies and Potentially Responsible Parties (PRP's) through the Consent Decrees, versus those of the Trustees to the site (including the Yakama Nation) and affected communities in their commenting and advocacy.[159] From the perspective of the proposed Consent Decrees, "...restoration projects [are] a means of both compensating for injured natural resources *in the Portland Harbor Natural Resource Damage Assessment Area* and resolving liabilities of PRP's that contributed to those injuries."[160] However, according to the Yakama Nation, the curtailed

---

[154] **[This is footnote 6 in NEDC.]** Restoration Decree ("RD") II.P (stating that the total amount of DSAYs to be collected is 4,130); *see also* RD II.V (discussing the fact that the combined sum of the DSAYs across both Consent Decrees is 471).

[155] **[This is footnote 7 in NEDC.]** RD II.K.

[156] **[This is footnote 8 in NEDC.]** *See Two Consent Decrees Lodged*, Fish and Wildlife Serv., https://www.fws.gov/portlandharbor/news/two-consent-decrees-lodged (Nov. 2, 2023).

[157] **[This is footnote 9 in NEDC.]** Soga, M., Gaston, K. J., & Halsey, O. (2018). Shifting baseline syndrome: causes, consequences, and implications. Frontiers in Ecology and the Environment, 16(4), 222–230, 222. https://doi.org/10.1002/fee.1794

[158] **[This is footnote 10 in NEDC.]** *Id.*

[159] **[This is footnote 11 in NEDC.]** See US EPA, *Portland Harbor Superfund Site: Record of Decision Responsiveness Summary Report*, Pg. 1 (2017). Retrieved from: https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.docdata&id=1002155#AR. See also *id.* at §3.2.11, Pg. 2,712. See also US EPA, *Portland Harbor Superfund Site: Explanation of Significant Differences– ESD Responsiveness Summary Report*, §2, 172 (2019).

[160] **[This is footnote 12 in NEDC.]** U.S. et al. v. ACF Industries, LLC. et al., No. 3:23-cv-1603-

extent of the cleanup (that of the Natural Resources Damage Assessment Area, alone) led to its resignation in protest from the Trustee Council in 2009, as these plans do not restore the damages to the natural resources at issue.[161]

Since its withdrawal from the Trustee Council, the Yakama Nation has remained heavily invested in the outcomes of the cleanup (but unconsulted by the relevant Action Agencies), and displayed that investment in part through its commissioning of independent studies of the impacts of contaminants from the Portland Harbor upon Lower Columbia Chinook.[162] The independent reviews found that "not only are these toxic chemicals present in dangerous levels in the sediment, surface water of the Lower Columbia, but they are present at levels that exceed acceptable risk for human health."[163]

The stark difference in acceptable post-restoration risk levels between the stance codified in the CDs at issue here, and the views of the Yakama Nation, is clearly shown through the various comments submitted previously, especially in response to the 2017 Record of Decision and 2019 Explanation of Significant Differences (ESD). In response to the proposed ROD for the Portland Harbor Superfund Site Remedial Action, the Yakama Nation called out such issues as: recognizing issues with capping sediment; requesting explanation about long-term management of sediment caps; not changing clean-up measures based on convenience and cost savings alone; not waiving ARARs; and allowing long-term efficacy to drive the decision-making process.[164] Critically, however, the Yakama Nation specifically requested: (1) that the clean-up produce a result in which fish caught from the Harbor would be fit for consumption, rather than one in which there is a continued reliance on fishing advisories (such a result would be consistent with their treaty right to fish within their "usual and accustomed fishing grounds");[165] and by extension, (2) a respect for the Federal Trust Responsibility in regard to Trust duty to restore the natural resources at issue here: ESA listed LCR Chinook Salmon and Steelhead Trout.[166]

---

YY, 3-4 (D. Or., Nov. 1, 2023). Retrieved from:
https://www.justice.gov/enrd/media/1322711/dl?inline.

[161] **[This is footnote 13 in NEDC.]** *See* Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

[162] **[This is footnote 14 in NEDC.]** *Id.*

[163] **[This is footnote 15 in NEDC.]** *Id.*

[164] **[This is footnote 16 in NEDC.]** US EPA, *Portland Harbor Superfund Site: Record of Decision Responsiveness Summary Report*, Pg. 2671 - 707 (2017).

[165] **[This is footnote 17 in NEDC.]** Yakama Nation Treaty of 1855, June 9, 1855 12 Stat., 951. Ratified Mar. 8, 1859. Proclaimed Apr. 18, 1859.

[166] **[This is footnote 18 in NEDC.]** "The right of taking fish at all usual and accustomed places in common with the citizens of the Territory of Washington and the right of erecting temporary buildings for curing them, reserved to the Yakima Indians in the Treaty of 1859, was not a grant of right to the Indians, but a reservation by the Indians of rights already possessed and not granted away by them. The rights so reserved imposed a servitude on the entire land relinquished

63

Ultimately, the Yakama Nation and community comments to the same effect, as compared to the responses given by the Action Agencies, and ultimately to the Natural Resources Damages Assessment set forth by the two CDs, display the environmental dissociation that can be caused by a shifted baseline.  To the Yakama Nation and the community at large, this cleanup is *the* opportunity to rectify the damage done to the Portland Harbor, which has impinged on Tribal Treaty fishing rights for well over 100 years.[167] It is time for the responsible parties to pay their fair share, as is the thrust and purpose of CERCLA.[168]

The extension of this underlying inadequacy will not be rectified by the proposed remedy set forth in the Consent Decrees. The piecemeal nature of the Natural Resource Damages Plans (contained in Appendices D, E, F, an G) shows concern for sites of crucial significance to species, but fails to acknowledge the fact that in a living ecosystem, an isolated, site-based approach is unworkable. Furthermore, at each of the four selected remediation sites, there are individual inadequacies (addressed in turn below).  Finally, the lack of a cohesive, final Biological Assessment or Biological Opinion (as required by §7 of the Endangered Species Act for such major federal projects) severely hampers the ability of the Tribes and the community in review of the selected actions.

### III.    The Piecemeal Nature of the Consent Decrees' Plans

The Portland Harbor Superfund site has for years had a detrimental impact on LCR Chinook and Steelhead habitat, as the polluted sediments and water affect the health of fish, disrupt their migration patterns, and lead to long-term ecological damage.[169]

As they are presented, the CDs form a concerning image for the future of the Portland Harbor. The four CD Appendices, D, E, F, and G, individually correspond to one of four proposed restoration sites throughout the Portland Harbor Natural Resources Damages Assessment Area. While the plans are individually designed to *support* Salmonid habitat, their isolated, disjointed nature will not suffice to *restore or repair* Salmonid health or abundance, as Salmonid success hinges largely upon habitat connectivity and cleanliness.[170] In combination

---

to the United States under the treaty and which, as was intended to be, was continuing against the United States and its grantees, as well as against the state and its grantees." United States v. Winnans, 198 U.S. 371 (1905), Syllabus, https://supreme.justia.com/cases/federal/ us/198/371/

[167] **[This is footnote 19 in NEDC.]** Yakama Nation Treaty of 1855, June 9, 1855 12 Stat., 951. Ratified Mar. 8, 1859. Proclaimed Apr. 18, 1859.

[168] **[This is footnote 20 in NEDC.]** 42 U.S.C. §§ 9604 and 9607(a)(4).

[169] **[This is footnote 21 in NEDC.]** Michael Kjelland, et. al, *A Review of the Potential Effects of Suspended Sediment on Fishes: Potential Dredging- Related Physiological, Behavioral, and Transgenerational Implications*, 35 Env. Systems and Decisions 334, https://link.springer.com/article/10.1007/s10669-015-9557-2 (Jul. 23, 2015).

[170] **[This is footnote 22 in NEDC.]**  See Bilby, Robert E., Ken P. Currens, Kurt L. Fresh, Derek B. Booth, Robert R. Fuerstenberg, and Gino L. Lucchetti. "Why Aren't Salmon Responding to Habitat Restoration in the Pacific Northwest?." *Fisheries* (2023). See also Hood, W. Gregory,

with the drawn out timeline of the Portland Harbor clean-up, the four plans leave community members (like all of us) wondering how these sites will lead to a healthy and thriving ecosystem for ESA- listed LCR Chinook and Steelhead.  With no set start date for the clean-up,[171] little to no transparency as to what is being discussed when making these cleanup decisions, and with the relevant species concurrently facing multiple other stressors,[172] the plans central to these CDs seem, at best, a start to repairing the conditions necessary to rehabilitating Salmonid habitat.

The segmenting of each "discernable" project into its own Appendix creates the impression that each individual site, on its own, might be sufficient to rehabilitate ESA Listed LCR Chinook and Steelhead within its area of focus.[173] But that impression is misleading, as studies confirm that isolated projects are no substitution for connected habitat.[174] "[While] criteria favored large restoration projects located near the mainstem river… they were insufficient for assessing a project's benefits due to geographic location relative to existing habitat."[175] Furthermore, the amount of "upland work" presented between the four Appendices creates the impression that most of the  work that will be done to restore these natural resources will be performed not in the water, but *on dry land*.  It remains unclear how such upland work will be sufficient to restore Salmon habitat  without an equivalent amount of in-water work. The emphasis on upland work, and the disjointed nature of the isolated, site-based approach to clean-up, are cause for concern regarding the true extent of the clean-up and its efficacy in restoring salmonid habitat. There

---

Katie Blauvelt, Daniel L. Bottom, Janine M. Castro, Gary E. Johnson, Kim K. Jones, Kirk L. Krueger, Ronald M. Thom, and Andy Wilson. "Using landscape ecology principles to prioritize habitat restoration projects across the Columbia River Estuary." *Restoration Ecology* 30, no. 3 (2022): e13519.

[171] **[This is footnote 23 in NEDC.]** Under the Portland Harbor Record of Decision, "[c]onstruction time for the Selected Remedy is currently estimated to be 13 years, consistent with Alternative F…" US EPA, *Portland Harbor Superfund Site: Record of Decision Responsiveness Summary Report*, Pg. 119 (2017). Though this number remains constant in the 2019 ESD, because there is no set start date, the community is left to wonder how long the efforts will take. When will the clock start?

[172] **[This is footnote 24 in NEDC.]** The Nature Conservancy, *What Threatens Our Salmon?*, Stories in Washington, https://www.nature.org/en-us/about-us/where-we-work/united-states/washington/stories-in-washington/protecting-northwest-salmon/ (Aug. 30, 2021).

[173] **[This is footnote 25 in NEDC.]** See U.S. et al. v. ACF Industries, LLC. et al., No. 3:23-cv-1603-YY, Appendix D at 1 (D. Or., Nov. 1, 2023). Retrieved from: https://www.justice.gov/enrd/media/1322711/dl?inline. See also *Id*., Appendix E at 1. See also *Id*., Appendix F at 7. See also *Id*. Appendix G at 9.

[174] **[This is footnote 26 in NEDC.]** Hood, W. G., Blauvelt, K., Bottom, D. L., Castro, J. M., Johnson, G. E., Jones, K. K., Krueger, K. L., Thom, R. M., & Wilson, A. (2022). Using landscape ecology principles to prioritize habitat restoration projects across the Columbia River Estuary. Restoration Ecology the Journal of the Society for Ecological Restoration., 30(3). https://doi.org/10.1111/rec.13519

[175] **[This is footnote 27 in NEDC.]** *Id*.

must be a holistic vision of how all four of sites will work together in order to gain community support for the planned actions.

## IV.    The Perceived Inadequacies of Selected Sites

While on paper the four sites offer a net gain for listed salmonids and anadromous fish, in practice these benefits are not clearly apparent, nor even clearly likely. Appendix D discusses the proposed Alder Creek Restoration Plan, located at the divergence of the Willamette River and Multnomah Channels, and covers roughly 52.3 acres of contaminated area.[176] The stated goals of this restoration include a "move towards normative hydrology, the restoration of floodplain functions, including off channel habitat for multiple species, re-establishing floodplain and riparian plants," etc.[177] However, the list of proposed activities following these goals seem more focused on the upland sections of Alder Creek than on in-water work. Of the 11 items listed as pieces of the proposed action, roughly half focus on in-water activities (including invasive species control and native re-vegetation; side channel habitat restoration; habitat complexity improvements; hydrologic reconnection; and removal of in-water structures).[178] The rest focus on uplands activities, including the removal of the industrial saw mill currently on site.[179] Even where there *is* a focus on in-water remediation, however, the presented goals are squishy and vague as to how they will create a cohesive and thriving ecosystem.[180] Furthermore, due to uncertain time-lines concerning when restoration will actually begin, as well as uncertainties about future oversight of the project as it pertains to listed salmonids specifically, it is unclear how the Alder Mill Project will do more than provide one refuge for salmon along a degraded corridor.

Unfortunately, the other three Appendices (E, F, and G) fair no better.  Each appendix suffers from the same general deficiencies as Appendix D, including their focuses on uplands work, and their lack of a comprehensively presented vision of how the sites will work together to create strong riparian habitat. It is challenging to understand how these Appendices will live up to their stated purpose of habitat restoration in the Willamette River. The Restoration Credit Consent Decree appears to lack detailed strategies that would be crucial for salmon spawning and rearing habitats. Salmon necessitate specific substrates for spawning, especially clean gravel beds with appropriate water flow for egg oxygenation.[181] The Decrees should explicitly outline continuous monitoring and management strategies for these habitats, including regular evaluations of gravel

---

[176] **[This is footnote 28 in NEDC.]** CD Appendix D at 2.

[177] **[This is footnote 29 in NEDC.]** *Id.*

[178] **[This is footnote 30 in NEDC.]** *Id* at 3.

[179] **[This is footnote 31 in NEDC.]** *Id.*

[180] **[This is footnote 32 in NEDC.]** *Id.* ("Habitat Complexity Improvement [:] Provide habitat structure and complexity by installing large woody debris, snags, debris piles, rock piles, and downed wood where possible and appropriate…"

[181] **[This is footnote 33 in NEDC.]** King County, Washington, *Chapter 2: Salmon Habitat Needs*, Habitat-limiting Factors and Reconnaissance Report Part I (N.D.). Retrieved from: https://your.kingcounty.gov/dnrp/library/2000/kcr728/vol1/partI/no2.pdf

66

quality and depth.[182] Additionally, the Decrees' plan should focus on creating and maintaining nursery areas for juvenile salmon, which require sheltered environments with adequate vegetation and protection from predators.[183] The current plan does not provide sufficient detail on the creation and upkeep of such habitats, such as undercut banks, vegetated shallows, and side channels, all of which are vital for the developmental stages of the salmonid life cycle.[184]

## V.      Review of this Project is Limited by the Absence of a Comprehensive Biological Opinion

While this comment has addressed a number of defects in the CDs concerning their questionable potential to repair Natural Resources, this review is heavily hampered by the lack of a comprehensive Biological Opinion from the National Oceanic and Atmospheric Administration (NOAA), in line with the mandates of Endangered Species Act §7(a)(2). Although it seems that EPA has initiated consultation under the ESA §7(a)(2) mandate for discrete actions within the clean-up,[185] the lack of an overarching analytical documents produced by the relevant  Action Agencies for these CDs constricts review of the project by members of the public. Without expert agency opinion here, reviewing this proposal is highly speculative in regard to the project's ultimate impacts on listed salmonid species. Such an agency report would also establish, on the record, how the project will work as a comprehensive whole. The lack of any Action Agency explanation for how these restoration sites are expected to create holistic habitat, combined with the lack of a Biological Opinion, creates an opaque situation, leaving community commenters with only the ability to speculate.

## VI.     Crucial Trustees and Community Voices were not Sufficiently Consulted in the Drafting of the Portland Harbor Superfund Site Consent Decrees.

Under the NRDA Process, according to NOAA, the voices of impacted communities are one of the leading factors driving NRDA decisions, weighed among other factors including relevant laws, current science, and economics.[186] Various groups, however, including the Yakama Nation, Portland Harbor Community Coalition, and Northwest Environmental Defense Center continue to call for the full restoration of salmon habitat such that the endangered species can recover. Their voices must be considered in this process.

---

[182] **[This is footnote 34 in NEDC.]** *Id.*

[183] **[This is footnote 35 in NEDC.]** *Id.*

[184] **[This is footnote 36 in NEDC.]** *Id.*

[185]  **[This is footnote 37 in NEDC.]** Kim W. Kratz, Endangered Species Act Section 7 Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the River Mile 11 East Sheet Pile Test in the Willamette River at RM 10.9 to 11.6, NMFS No. WCRO-2020-00970 (July 13, 2020).

[186] **[This is footnote 38 in NEDC.]** NOAA, *Damage Assessment, Remediation, and Restoration Program: Natural Resource Damage Assessment* (10/24/2017). Retrieved from: https://darrp.noaa.gov/what-we-do/natural-resource-damage-assessment

67

Public Comment Received 01/26/2024 from
Northwest Environmental Defense Center (NEDC)

Salmon are also culturally, spiritually, societally, and economically significant to many Indigenous Tribes in the Pacific Northwest, including the Yakama Nation.[187] In particular, Lower Columbia River (LCR) Chinook and Steelhead populations remain a critical resource for traditional practices, sustenance, and tribal economies.[188] Thus, the health of the Columbia River and its tributaries, such as the Yakima River, is vital for LCR Chinook and Steelhead habitat, as well as for the overall well-being of the ecosystem at large. Despite the Yakama Nation's Continued Trustee status in regard to the Portland Harbor site,[189] and their reliance on and respect for the river's salmon populations, the tribe's treaty rights were not properly considered in the  development of the CDs, nor were they included in the broader discussions related to their creation (as shown through the failure to heed the recommendations of the public in related decisions made for the Portland Harbor).[190]

According to the Yakama Nation fisheries website,[191] after the Yakama Nation chose to step down from its role as an appointed Trustee for the Portland Harbor Superfund site,[192] the tribe financed independent analyses of existing scientific studies on the effects of contaminants in the Portland Harbor, with the prevailing consensus of those studies demonstrating that the high concentrations of PCBs, DDTs, and PAHs in the sediment and surface water surpass acceptable risk levels for human health.[193] As it currently stands, the opportunity for the Trustee Council and Action Agencies to begin rectifying this injury is largely being ignored, as the scheme of the plans set forth by the CDs does not attempt to fully restore or reimburse the harms to either the ESA Listed LCR Chinook Salmon or LCR Steelhead Trout. In response to the Yakama Nation's 2017 comments on the ROD, requesting the removal of contaminants to levels which would alleviate the need for Fishing Advisories in the Portland Harbor, EPA replied: "EPA recognizes that the remedy likely will not reduce the concentrations of PCBs and other contaminants to levels low enough to allow for consumption at the higher consumption rates

---

[187] **[This is footnote 39 in NEDC.]** *See* Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

[188] **[This is footnote 40 in NEDC.]** https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7882363/.

[189] **[This is footnote 41 in NEDC.]** *See* Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

[190] **[This is footnote 42 in NEDC.]** See US EPA, *Portland Harbor Superfund Site: Explanation of Significant Differences– ESD Responsiveness Summary Report*, §2, 172 (2019). (Noting that the overwhelming majority of comments received disfavored EPA's proposed weakening of clean up standards for PAHs throughout the cleanup site, which EPA ignored and changed the plan anyway.)

[191] **[This is footnote 43 in NEDC.]** *See* Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

[192] **[This is footnote 44 in NEDC.]** Scott Learn, *Yakama Nation Leaves Portland Harbor Superfund Panel*, The Oregonian, https://www.oregonlive.com/environment/2009/06/yakama_nation_leaves_portland.html (Jun. 10, 2009).

[193] **[This is footnote 45 in NEDC.]** *See* Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

68

associated with subsistence fishing."[194] Thus, this Natural Resources Damages Assessment is the only portion of the project with an intent to truly address damages to the salmon and their habitat.

The decision to limit the restoration activities for Natural Resource Damages to only certain areas of the river harms common rights to engage with the Willamette River as a navigable body of water. Only after the Port of Portland came into existence in 1891 did heavy industry begin polluting the pristine waters of the Willamette River, resulting in the Portland Harbor Superfund Site.[195] The act of industrialization, and its negative byproducts, have impinged on the treaty rights held by the Yakama Nation and other tribes in and around the Willamette river Basin, as well as on the use and enjoyment of the river and its resources by local communities. The opportunity to rectify the harms done, which is currently presented under the CERCLA NRDAR process, should be seized and acted upon to the fullest extent possible.

Given the importance of salmon to the Yakama Nation, it is crucial for federal agencies and other interest groups with stakes in the Portland Harbor site to engage in considerate and meaningful consultation with the Tribe, and to take their comments seriously.[196] Likewise, we must remember that environmental justice is always a key concern in the context of hazardous waste removal and restoration.[197] Historically, minority and low-income communities, including Indigenous tribes, have borne a disproportionate burden of environmental hazards.[198] In particular, the severe health implications associated with environmental contaminants are a serious environmental justice issue, especially as they pertain to individuals fishing for subsistence.[199] The restoration of the Portland Harbor Natural Resources is a step towards rectifying the injury done to affected communities of the Willamette Valley.

## VII.    Conclusion

The Updated Cash-Out Consent Decree and Restoration Credit Consent Decrees lodged in response to the Natural Resources Damages to the Portland Harbor are in many ways insufficient. The CDs fail to pay attention to community needs and input, as seen in the ESD process, during which that input was ignored in favor of monetary interests. Furthermore, the

---

[194] **[This is footnote 46 in NEDC.]** R.O.D. 3-37.

[195] **[This is footnote 47 in NEDC.]** US EPA, *Portland Harbor Superfund Site: Connecting to the Willamette River (Storymap)*, US EPA Region 10 (2022).

[196] **[This is footnote 48 in NEDC.]** The Action Agencies may wish to consider the principles of EO 13175 as a baseline for meaningful involvement. *See* Exec. Order No. 13715, Consultation and Coordination with Indian Tribes, 65 F.R. 67249 (2000).

[197] **[This is footnote 49 in NEDC.]** Supporting Environmental Justice at Superfund Sites, Env't Prot. Agency, https://www.epa.gov/superfund/supporting-environmental-justice-superfund-sites (last visited Jan. 23, 2024).

[198] **[This is footnote 50 in NEDC.]** *Id.*; "Environmental Racism with a Faint Green Glow" by Eric Jantz, New Mexico Environmental Law Center.

[199] **[This is footnote 51 in NEDC.]** Superfund Sites, Yakama Nation, https://yakamafish-nsn.gov/protect/superfund-sites (last visited Jan. 24, 2024).

Public Comment Received 01/26/2024 from
Northwest Environmental Defense Center (NEDC)

CDs do not uphold the Federal Government's trustee relationship to the tribes, and they do not reflect meaningful restoration or compensation for the damages done to the natural resources of the Portland Harbor. In that same vein, the CDs fail to provide meaningful restoration to ESA listed anadromous fish (like the LCR Chinook Salmon and Steelhead Trout), as they set forth only a loose and disjointed framework, with no associated timeline to gauge its progress. Because the Action Agencies have continued to frame the rhetoric concerning the CDs by casting it in the light of the Willamette River's industrial history, as opposed to its ancient history as pristine habitat, the clean-up plan seems to reflect a shifted baseline, and as such offers only nominal consideration regarding the species and communities impacted by those very same industrial processes.

70

# Response to NEDC

This commenter covers a wide range of topics. A number of these topics—but by no means all of them—also are addressed by other commenters. Therefore, we set out NEDC above in full, but we respond to these comments in two different groups: (1) specific comments or topics raised by NEDC that generally are not raised by other commenters, or at least not raised in the way they are presented by NEDC, and (2) other comments or topics raised by NEDC that also are raised by Willamette Riverkeeper or the Yakama Nation, or both.

Multiple points in the commenter's letter (1) conflate the scope of the NRDA process and its relation to the remedial action and (2) misunderstand the goals of the present Consent Decrees. It is difficult to respond substantively to many points due to the pervasive reliance on faulty premises or on premises that are not directly relevant to the goals of the Consent Decrees. To help clarify, we first reiterate the difference between the NRDA and remedial processes under CERCLA and other relevant authorities.

Conducting cleanup activities or removing contaminants from the environment is not a core goal of the NRDA process, but is instead the goal of the cleanup process. As the Settling Trustees have noted in their Frequently Asked Questions related to this site:

> Natural resources at Portland Harbor, including water, fish, and wildlife, are held in trust for all people. Responsibility for protecting these resources is shared among the Trustee Council. When natural resources are injured by releases of hazardous substances or oil, federal laws empower the Trustee Council to obtain compensation and restore the injured resources and their habitats. This process is called natural resource damage assessment and is separate from the cleanup process at the Portland Harbor Superfund Site. …

> The NRDA is not part of the cleanup, which is also called the remedy; they are related but separate processes. The purpose of the NRDA is to restore the natural resources – and the services they provide – that were injured and lost over time (past, present, and future) due to releases of hazardous substances and discharges of oil into Portland Harbor. Restoration as part of the NRDA is in addition to cleanup, and accounts for both positive and negative impacts to natural resources caused by remedial actions. Unlike the NRDA, the purpose of the remedial process is to protect human health and the environment from further harm by reducing risks of adverse impacts from contaminants. Remedial actions in Portland Harbor will not fully address past natural resource injuries and may leave some residual contamination in the environment.[200]

---

[200] PORTLAND HARBOR NAT. RES. TR. COUNCIL, PORTLAND HARBOR NATURAL RESOURCE DAMAGE ASSESSMENT: FREQUENTLY ASKED QUESTIONS (FAQ) TO ACCOMPANY THE 2023 CONSENT DECREES at 1, 3 (2023), https://www.fws.gov/portlandharbor/sites/portland/files/resources/Portland%20Harbor%20FAQ%20Sheet.pdf.

71

In several places, the commenter conflates the NRDA process reflected in the Consent Decrees with the entirely separate remedial (or cleanup) process led by EPA and ODEQ, neither of which is a Settling Trustee. For example, the commenter refers to the NRDA restoration banks included in the Restoration Credit Decree as "remediation sites." Subsequently, they state that "Discounted service-acre years, or 'DSAYs' are the measure that define the full scope of the Portland harbor clean-up." This is incorrect. DSAYs are the metric the Settling Trustees used to measure (1) ecological injury from contamination and (2) ecological benefits provided by the aforementioned restoration banks. Contrary to the commenter's assertion, the DSAY concept is not relevant to the cleanup process.

Similarly, in another place, the commenter seems to confuse who the relevant parties are to the Consent Decrees: "For the Portland Harbor Superfund Site, the manifestation of this [shifting baseline] syndrome is clear in the disparate understandings displayed by the Action Agencies and Potentially Responsible Parties (PRP's) through the Consent Decrees, versus those of the Trustees to the site (including the Yakama Nation) and affected communities in their commenting and advocacy." Contrary to commenters' suggestion, with the exception of the Yakama Nation, which resigned from the Trustee Council in 2009, the "Action Agencies" here are the Settling Trustees identified in the Consent Decrees and at the beginning of this document.

Finally, in several places, the commenter references comments, including several from the Yakama Nation, on remedial documents that are not directly relevant to the Consent Decrees or the NRDA process. For example, the commenter states, "But as the Yakama Nation noted in the comments it issued for the Record of Decision (ROD), the restoration as it was planned in 2017 was inadequate to reduce the concentrations of aquatic hazardous substances to levels where uses of the river, such as subsistence fishing, could proceed unimpaired without the use of continued fishing advisories." The ROD does not address the NRDA habitat restoration that is the subject of these Consent Decrees, nor is NRDA restoration intended to "reduce concentrations of aquatic hazardous substances." The commenter also notes "The stark difference in acceptable post-restoration risk levels between the stance codified in the CDs at issue here, and the views of the Yakama Nation, is clearly shown through the various comments submitted previously, especially in response to the 2017 Record of Decision and 2019 Explanation of Significant Differences (ESD)." In discussing post-action "risk levels," the commenter appears to address post-cleanup standards rather than post restoration standards. The Settling Trustees also note that the ROD and ESD are specifically related to the cleanup led by EPA, not the NRDA process led by the Settling Trustees that produced the Consent Decrees. The Settling Trustees have no authority to make remedial decisions, including determining "risk levels" or issuing a ROD for remedial action. The above examples reflect a basic misunderstanding of EPA's role in the cleanup of the Portland Harbor Superfund Site versus the Settling Trustees' role in restoring natural resources injured by the hazardous substances and pollutants being cleaned up.

Even where the commenter addresses matters within the jurisdiction of natural resource trustees rather than EPA, they seem to misunderstand the limitations on the Settling Trustees' authorities and mission to address injured natural resources. For example, the commenter states, "It is even harder to understand *how* these [restoration banks] will ensure the complete restoration of viable Salmonid habitat in the Willamette River." This dramatically overstates the goals of the NRDA

process and the authority of the Settling Trustees. Under CERCLA, OPA, the Clean Water Act, and state law, natural resource trustees are empowered to restore natural resources commensurate with the harm caused by releases of hazardous substances and discharges of oil, not to "ensure complete restoration of viable [] habitat in the Willamette River." Because such a goal is far beyond the authority Congress or the Oregon legislature gave to natural resource trustees, we disagree that the Consent Decrees should be faulted for failing to accomplish such a goal.

The commenter also misstates the quantum of restoration resulting from the Consent Decrees. For example, the commenter states, "Thus, the total dollar amount of this settlement is $33,558,000, of which only $600,000 will be afforded to Natural Resources Damages." This is incorrect. The Trustee Council is unclear what led the commenter to draw this conclusion. As explained above in the response to Arkema A, the total value of relief the Settling Trustees obtain under the Consent Decrees exceeds $36 million, with over $33 million of that amount, in the form of cash or restoration credits, for restoration of injured natural resources and resource services like recreation.

The commenter also addresses the topic of the appropriate baseline for the Settling Trustees to use when measuring injuries to natural resources. These comments mischaracterize the proposed settlements based on an apparent misunderstanding of the NRDA process and its objectives, and how the concept of "baseline" relates to that process and those objectives. While the commenter correctly states that natural resource trustees measure damages based on the cost to restore natural resources injured by releases of hazardous substances and discharges of oil to baseline, the commenter then ignores that "baseline" in the context of NRDA has a precise meaning. Per 43 C.F.R. § 11.14(e), for the purposes of calculating natural resource damages, baseline is "the condition or conditions that would have existed at the assessment area had the discharge of oil or release of the hazardous substance under investigation not occurred." Because the commenter disregards the specific meaning of baseline for NRDA and replaces it with a different concept of baseline related to humans' shifting perceptions of the environment, the commenter's criticisms of the Settling Trustees' damages calculations are unfounded. Specifically, contrary to the commenter's assertions, the Settling Trustees' damages calculations cannot include the cost to address the full range of insults to natural resources in the Portland Harbor Assessment Area.

The CERCLA NRDA regulations, at 43 C.F.R. § 11.72, direct natural resource trustees to determine the baseline conditions of the injured natural resources. Rather than relying on "human understanding," the regulations provide that natural resource trustees should, among other considerations, select data to calculate baseline that "reflect conditions that would have been expected at the assessment area had the discharge of oil or release of hazardous substances not occurred, taking into account both natural processes and those that are the result of human activities."[201] Accordingly, natural resource trustees may then only select those restoration actions that "return injured resources to their baseline condition, as measured in terms of the physical, chemical, or biological properties that the injured resources would have exhibited or the services that would have been provided by those resources *had the discharge of oil or release*

---

[201] 43 C.F.R. § 11.72(b)(1).

*of the hazardous substance under investigation not occurred.*"[202] Highlighting the constraints of the NRDA process while revising the CERCLA NRDA regulations, the U.S. Department of the Interior (DOI) stated that the NRDA process only measures damages for which potentially responsible parties are liable and "[the regulations] are not intended as a general method for quantifying and resolving other forms of natural resource degradation."[203] By law, natural resource trustees are bound to calculate damages for a decline in natural resources and resource services from their baseline conditions, a calculation which encompasses only natural resource injuries caused by hazardous substance releases and oil discharges, not the full suite of anthropogenic and other impacts seen in an industrialized waterway like the Portland Harbor Assessment Area.

Section 2.3 of the "Summary of Portland Harbor Natural Resource Damage Assessment for the Purposes of Settlement" (Summary), which is part of the Settling Trustees' public record, details the Settling Trustees' approach to calculating baseline conditions.[204] The Settling Trustees provide an overview of that information here. For purposes of the proposed settlements, the Settling Trustees calculated baseline resource conditions by identifying chemical and physical impacts to natural resources in the Portland Harbor Assessment Area that were caused by activities other than the potentially responsible parties' discharges of oil and releases of hazardous substances. Consistent with 43 C.F.R. § 11.72(b)(1), the Settling Trustees identified baseline contaminant levels for the Portland Harbor Assessment Area. Baseline contamination levels are the levels of contamination that would have existed in the Portland Harbor Assessment Area from sources other than the potentially responsible parties' releases and discharges, such as contamination from upstream, non-potentially responsible party facilities.[205] The Settling Trustees quantified injuries to resources caused by baseline contamination as a reduction in ecological services. The Settling Trustees then subtracted that baseline service reduction from the total Portland Harbor Assessment Area habitat service losses to calculate only those damages that stem from potentially responsible parties' releases of hazardous substances and discharges of oil.[206]

The Settling Trustees also identified non-contaminant impacts to habitat in the Portland Harbor Assessment Area, that is, degradation by anthropogenic activities other than potentially responsible parties' contaminant releases and discharges. Using information about habitat types and juvenile salmonids' uses of those habitat types in the Portland Harbor Assessment Area in

---

[202] 43 C.F.R. § 11.82(b)(1)(i) (emphasis added).

[203] Natural Resource Damage Assessments, 58 Fed. Reg. 39328, 39341 (July 22, 1993) (to be codified at 43 C.F.R. pt. 11).

[204] PORTLAND HARBOR NAT. RES. TR. COUNCIL, SUMMARY OF PORTLAND HARBOR NATURAL RESOURCE DAMAGE ASSESSMENT FOR PURPOSES OF SETTLEMENT § 2.3 (2015), https://pub-data.diver.orr.noaa.gov/portland-harbor/20230401_PH%20Ph2%20PthC%20SummaryPreface_5383.pdf.

[205] *Id.* at A-6.

[206] *Id.*

particular, the Settling Trustees assessed and ranked each habitat type.[207] The habitat rankings account for physical habitat alterations, such as pilings, overwater structures, riprap, and riverbank slopes, with beneficial habitat characteristics ranking higher than characteristics that impair juvenile salmonids' use of the Portland Harbor Assessment Area.[208] These rankings reflect the physical baseline of the Assessment Area. For all of these reasons, the Settling Trustees appropriately determined baseline conditions consistent with NRDA regulations.

---

[207] *Id.*

[208] *Id.*

# Public Comment Received 01/26/2024 from the Yakama Nation, Sections 5, 6, and 7 (YN5, YN6, YN7)

5. The Restoration/Mitigation Bank projects chosen for the Consent Decrees are relatively insignificant, compared to the large Restoration Focus Area and number of originally identified sites for potential restoration.

The Trustees' Restoration Portfolio includes 44 project sites within Portland Harbor NRDA Superfund Assessment Area and Broader Focus Area. The Preferred Alternative and approach identified in the Trustees' Restoration Plan is the Restoration Bank Credit Alternative which originally included five restoration banks covering 178 acres. The Portland Harbor NRDA Consent Decrees have reduced the chosen restoration banks from five to four restoration sites ranging from 26 to 52 acres covering approximately 163 acres total, which is about one quarter of a square mile. These acre amounts are the total area of the sites including upland and aquatic habitats. While the injury studies set forth in the Consent Decrees have focused primarily on aquatic and/or riparian species and habitats, the vast majority of the acreage at each of these sites is in terrestrial or upland habitat types. The four project sites chosen are not fully connected to each other or other restored habitat, cover a miniscule part of the area where contamination occurs, and are not equal to the injury and damages that have accrued as a result of the Portland Harbor Superfund site.

6. The four chosen restoration banks are not fully mature and are not yet providing the types, or projected values, of functioning habitats listed in the Trustees' objectives.

Given the lack of functioning aquatic and floodplain habitat at these sites (particularly the Linnton site), including lack of hydraulic connectivity at low flows, small volumes of water moving slowly downstream over relatively wide shallow stream channels devoid of cover and instream complexity, inadequate water quality for temperature with potential for fish stranding and supporting warm water predators, and lack of large wood and mature riparian vegetation, it is unclear whether the restoration sites can provide fish credits (for ESA-listed salmonids and other tribally important species) until many years from now, even if they ultimately mature into the habitat they were designed to be.

Moreover, the design and monitoring of the restoration plans places heavy emphasis on lamprey, frogs, and riparian and/or terrestrial species. While focus on lamprey is appropriate, the focus on designing and developing functioning habitat for juvenile Chinook and steelhead is lacking.

Because salmonids are critical to the Tribe, and the fishery has suffered significant injury, the restoration projects should be designed to address that injury.

Despite the lack of maturity and functionality, the Trustees have assigned higher values to the three projects within the Assessment Area, resulting in elevated credits and DSAY values.

Placing a higher value on these projects, when the projects provide little habitat related to ESA-listed Chinook, steelhead and other tribally important species, should be justified by the Trustees.

7. In future restoration planning efforts, the Trustees should develop additional and larger projects to promote restoration and protection of natural, physical and biological processes for the Willamette River.

To provide habitat connectivity through the urbanized shoreline, additional projects on both sides of the river (and within close proximity to each other) must be identified and included in future restoration planning. The current projects do not, and cannot, achieve habitat connectivity. The Trustees should identify and implement restoration and protection projects in the Broader Focus Area of the Lower Columbia River where benefits to ESA-listed and tribally important salmonids would be greatest.

The Trustee Council also acknowledges that restoration actions at the confluences of the Multnomah Channel and Lower Columbia River would have the greatest benefit for juvenile Chinook salmon. The Damage Assessment Plan discussed the results of its consultation with a panel of experts to develop an approach to guide the geographic location of compensatory restoration actions. The expert panel noted that potentially injured juvenile Chinook salmon utilize an area that extends from Willamette Falls to the mouth of the Willamette, Multnomah Channel (inclusive of Scappoose Bay) and the southern shore of the Lower Columbia River between the confluence of the Sandy River and the mouth of Multnomah Channel, and restoration actions within this area would have the greatest benefit for juvenile Chinook salmon." 2010 Portland Harbor NRDA Plan, Appendix B, at B-12.

Because the four projects set forth in Restoration Credit Consent Decree have limited ability to benefit BSA-listed and tribally important salmonids, the Trustees should explore additional restoration projects that provide those endpoints. The Consent Decree should allow the Settling Defendants to purchase credits from those additional projects if the opportunities are available.

77

ER-968

## Public Comment  Received 01/28/2024 from
## Willamette Riverkeeper, Sections 4 and 6 (WR4, WR6)

**4. We question the overall design and ecological function of sites such as Linnton where sedimentation seems to be a potential ongoing issue.**  In particular, this site is composed of a backchannel that is affected by natural deposition, with the potential to block the off-channel habitat. Further, the large pile created by excavated sediments is not a natural occurrence along the  Willamette, especially with large woody debris being placed many meters above normal high winter and spring flows. Sites that require ongoing management seem problematic at best when these areas have questionable long-term functionality, yet are said to contain a significant percentage of the needed ecological uplift. We do recognize that the Trustee Council has spent significant time evaluating each of these sites, but even so we feel it is important to recognize that such sites have the potential to change significantly over time.  Even with adaptive management, significant uncertainty exists.

**6. Lack of Biological Opinion**: A fundamental missing piece of this process is the lack of a Biological Opinion ("BiOP") from the National Marine Fisheries Service evaluating the impacts of the consent decrees on listed salmonids. We believe a BiOp from the expert agency responsible for salmon recovery is essential to truly evaluate the impacts of these actions on listed salmonids.

78

ER-969

# Response to NEDC, YN5, YN6, YN7, WR4, and WR6

This response addresses topics mutually raised by multiple commenters that we have not otherwise addressed in responses to those entities individually. We organized this response to cover the main points of the comments collectively, rather than responding to individual comments by each commenter, because there is substantial overlap in the topics they raise. The general critique these comments raise is that the ecological restoration projects are inadequate to compensate the public or resolve the liability of the potentially responsible parties for injuries caused to natural resources by the long-term contamination in the Portland Harbor Assessment Area. The commenters make specific assertions about the ecological restoration projects that fall into six main themes, as follows:

- There is a lack of connectivity between restoration sites. The ecological restoration projects are isolated from one another and do not provide habitat connectivity.

- Projects are not mature. The ecological restoration projects are not mature or are not yet providing the benefits the Settling Trustees are crediting them with providing.

- There is a lack of focus on salmon. The ecological restoration projects do not focus on salmon, an endangered species and one of particular significance to the tribes.

- Sedimentation is occurring at the Linnton Mill restoration project. The Linnton Mill restoration project is experiencing sedimentation, bringing into question its long-term value and viability.

- There is too much upland habitat. The ecological restoration projects place too much emphasis on upland, rather than aquatic or riparian, habitats.

- More restoration is needed. More ecological restoration projects should be implemented.

Before addressing each of these topics, the Settling Trustees summarize a few broad points about their restoration approach to address and clarify misunderstandings or inaccuracies reflected in the comments on the restoration projects.

The public has previously had the opportunity to review and comment on the Settling Trustees' selected restoration alternatives. The Settling Trustees released their Programmatic Restoration Plan and Environmental Impact Statement (PEIS) in draft form for public comment in 2012 and published the final document and response to comments in 2017. The PEIS included the Settling Trustees' integrated restoration approach as the preferred alternative and provided details on the Settling Trustees' goals and objectives for ecological restoration, target species, and monitoring and stewardship expectations. The PEIS also identified 44 projects as examples of the types of ecological restoration projects that might ultimately be implemented (including all four of the restoration projects the Settling Trustees included in the Restoration Credit Decree). The public later had the opportunity to review and comment on the Settling Trustees' Supplemental Restoration Plan and Environmental Assessment (SRP), where the Settling Trustees identified the purchase of credits from restoration banks as the preferred alternative for ecological restoration during this phase of the NRDA and identified and evaluated the four restoration

79

projects they included in the Restoration Credit Decree. The Settling Trustees published the draft SRP for public comment in 2020 and published the final document, including a response to public comments, in 2021.

The circumstances surrounding the restoration banks in these Consent Decrees have created a considerable benefit to the public. Third party restoration bankers constructed these projects early and prospectively in anticipation of settlements or credit purchases from potentially responsible parties. As a result, the projects have been providing ecological benefits to the public for several years prior to the lodging of the Consent Decrees. This "early" restoration approach is distinct from other restoration approaches in which potentially responsible parties or trustees propose a restoration concept at the time of settlement or later. The fact that developers constructed these projects early, and the Settling Trustees have made substantial information about them public in their record prior to settlements, means that a much finer level of detail and post-construction information is available to the public than would typically be the case. It also means that the public and natural resources have already been receiving the benefits of these projects, which would not be the case if they were only proposed project concepts at this time.

**Lack of Site Connectivity**

The commenters suggest that the ecological restoration projects are isolated from one another and from other restoration projects and that they do not provide habitat connectivity. Habitat connectivity is a goal the Settling Trustees have articulated throughout their restoration planning efforts, as described in the PEIS. The four projects contained in these Consent Decrees meet this goal in a number of ways.

Each of the ecological restoration projects included in the Restoration Credit Decree is relatively large, given the heavily urbanized and industrial setting of Portland Harbor (projects range in size from 27–54 acres each). Accordingly, these projects provide habitat connectivity *within* the projects themselves. Each site contains a mosaic of habitats that are connected to one another. The habitats present within each project include shallow water, off channel or side channel habitats, tributaries, riparian habitat, and uplands. Connectivity of multiple habitats within one project allows fish and wildlife to benefit and access multiple habitats at a given site, such as a juvenile Chinook salmon utilizing the shallow water habitat along the mainstem of the Willamette River then entering into a restoration project and seeking cover or feeding opportunities within slower moving waters in the off channel or side channel habitat within the project. Aquatic habitats like these benefit when they are surrounded by riparian and upland areas that are protected, as those areas provide food sources, shade, and serve as a buffer from more developed areas outside the project. Smaller projects would not have the same level of intra-project habitat connectivity.

In addition, the restoration projects do provide some connectivity between each other and with other natural or restored areas nearby, including the following:

- The Harborton and Alder Creek restoration projects are both located at the confluence of the Willamette River with Multnomah Channel and sit directly across the Multnomah Channel from one another. Observers have seen bald eagles flying from

perches on one site to the other. These two sites are separated by approximately 200 meters of open water.

- Both the Harborton and Linnton Mill projects are located just downstream of Forest Park, one of the largest urban forests in the United States. Streams from Forest Park provide cold, clean water to the aquatic habitats at the Harborton and Linnton Mill projects. Despite a major transportation corridor separating Forest Park from the Willamette River and these two project areas, wildlife including elk, deer, and beaver have all been observed at the restoration projects.

- The Rinearson Creek project sits within Meldrum Bar Park, which includes several acres of riparian and forest habitats and linear feet of shoreline along the Willamette River that are accessible to fish and wildlife. Rinearson Creek also sits across the Willamette River from Mary S. Young Park, which provides off channel, riparian, and upland habitats.

When considered across the span of the approximately 11-mile Portland Harbor Assessment Area and even larger Broader Focus Area[209], the four restoration projects serve as additional resting areas where outmigrating juvenile Chinook salmon and many other fish and wildlife species can stop, rest, and feed in the densely populated and developed Portland Metro area. These four sites are also hydrologically connected to many other parks, natural areas, and existing habitat features.

Though habitat connectivity is one of the Settling Trustees' restoration goals, restoration opportunities within the Portland Harbor Assessment Area and Broader Focus Area are limited, as evidenced by the relative lack of other recent habitat restoration efforts in the reach. Land availability, contamination, land use, and existing development significantly limit the places where developers may locate ecological restoration projects. The four restoration projects selected by the Settling Trustees represent four of the best available sites in light of these limitations. As documented in the SRP and made available for public comment, the Settling Trustees analyzed the four restoration projects included in the Restoration Credit Decree and confirmed that they meet the Settling Trustees' restoration goals and objectives stated in the PEIS to restore habitat for fish and wildlife injured by contamination in the Portland Harbor Assessment Area.

---

[209] The Broader Focus Area for restoration includes "the area outside of the [Portland Harbor Assessment Area] that includes the mainstem Willamette River up to Willamette Falls, the Multnomah Channel, the Oregon side of the lower Columbia River between the east end of Hayden Island and the Multnomah Channel outlet, and portions of Scappoose Bay" (NAT'L OCEANIC AND ATMOSPHERIC ADMIN., FINAL PORTLAND HARBOR PROGRAMMATIC EIS AND RESTORATION PLAN AT ES-6 (2017), https://pub-data.diver.orr.noaa.gov/portland-harbor/20170501_FINAL_PEIS_3953.pdf.)

**Projects Are Not Mature**

The comment YN6 states that "The four chosen restoration banks are not fully mature and are not yet providing the types, or projected values, of functioning habitats listed in the Trustees' objectives." Similarly, comment WR4 contends that "Sites that require ongoing management seem problematic at best when these areas have questionable long-term functionality . . . ." Both commenters express concern that the ecological restoration projects are not mature or are not yet providing all of the benefits the Settling Trustees expect them to ultimately provide. The Settling Trustees agree that the projects are not yet ecologically mature; however, they do disagree that this is a shortcoming.

There is no practical way for a proposed settlement to include only mature restoration. As the Settling Trustees noted above, the more typical paradigm for NRDA settlements has restoration beginning *after* the settlement has occurred. The projects at Portland Harbor are far more mature at the time of settlement than they otherwise would be, thanks to the early restoration approach undertaken by the third party restoration bankers and Settling Trustees.

These restoration projects are not yet fully mature, nor do the Settling Trustees expect them to be. Full development and habitat function does not occur in ecological systems over the course of months or years, but over decades. When the Settling Trustees consulted knowledgeable scientists on juvenile Chinook salmon in 2009 to inform their restoration planning efforts and develop habitat values and definitions for the HEA, the experts noted that it takes 1–40 years for different habitat types to develop and provide their full value. Shorter time periods (1–3 years) apply to aquatic habitats, such as shallow water or off channel, and longer time periods (10–40 years) apply for habitats that include vegetation establishment, such as riparian or uplands.[210] Further, the Settling Trustees' designed their process for "releasing" credits from the restoration banks as available for sale specifically to ensure that the projects are developing as expected and appropriate for their "age," and on a trajectory to achieve full maturity.

The Settling Trustees require a 10-year performance period for each project, during which adaptive management and annual monitoring will occur to ensure the project is establishing and maturing as expected, and any deficiencies are corrected. This keeps each project moving toward meeting its quantifiable habitat metrics. After this performance period comes long-term stewardship, which will occur for decades to come. At the Settling Trustees' direction, the third party restoration bankers have backed their commitment to monitoring, adaptive management, and stewardship by financial assurances that the Settling Trustees may access to ensure project performance. Each project also includes a schedule for incremental release of credits that become available for sale after the project meets important milestones and monitoring/performance standards. These milestones and standards correspond with the project creating measurable ecological benefits that will support injured natural resources.[211] As of 2024, the four projects are

---

[210] PORTLAND HARBOR NAT. RES. TR. COUNCIL, RELATIVE CHINOOK SALMON LOWER WILLAMETTE HABITAT VALUES (2012), https://pub-data.diver.orr.noaa.gov/portland-harbor/20120802_REV_HabitatValuesTable_1764.pdf.

[211] *See Restoration Credit Decree*, Dkt. #4-1, Section VII & Appendixes D–G.

82

in years 4–9 of their performance periods. All four projects have already conducted intensive monitoring and implemented adaptive management actions since project construction.

All ecological restoration projects take time to develop, face challenges, and require ongoing management. This is only more true in an area as heavily developed and modified as the Portland Harbor Assessment Area and Broader Focus Area. Providing ecological benefits within the area where injuries occurred, and benefiting the very same populations and life stages of fish and wildlife that were injured, is a high priority for the Settling Trustees. Ensuring a strong nexus between the injury and restoration is also a requirement of any NRDA. In addition, during the Settling Trustees' restoration planning efforts, the public voiced strong support for restoration in and close to the Portland Harbor Superfund Site so that the benefits gained from these projects would accrue to the fish, wildlife, and human communities that the contamination harmed most. Ecological restoration in such a heavily developed, multi-use geographic area takes time, adaptability, and requires more intensive management for urban issues like invasive species, trespassing, etc. These are some of the reasons behind the intensive approach to monitoring, adaptive management, and stewardship the Settling Trustees have taken with these NRDA restoration projects.

## Lack of Focus on Salmon

Comment YN6 contends that a "focus on designing and developing functioning habitat for juvenile Chinook and steelhead is lacking" in the Settling Trustees' restoration plans and the four restoration projects included in the Restoration Credit Decree. The comment supports the Settling Trustees' emphasis on Pacific lamprey but critiques the inclusion of riparian and terrestrial species. The Settling Trustees disagree.

As the commenter notes, salmonids are of critical cultural value and have suffered significant injury in the Portland Harbor Assessment Area. Salmonids, particularly the threatened Chinook salmon that migrate through the Portland Harbor Assessment Area, are of particular significance to the five tribes that are members of the Trustee Council (the Five Tribes),[212] as well as the state and federal agencies that make up the Settling Trustees. Under the ESA, NOAA has designated critical habitat within the Portland Harbor Assessment Area, which is used by ESA-listed juvenile Chinook salmon to rest and rear in preparation for entry into the lower Columbia River estuary. This critical habitat provides unique functions and features for a particular life stage of an ESA-listed species. The importance of this area to ESA-listed salmonids and indication of injury to their juvenile life stage are central tenets of the Settling Trustees' NRDA and restoration planning approach.

The habitat needs of juvenile Chinook salmon form the scientific foundation for the Settling Trustees' restoration planning approach and habitat valuation.[213] The Settling Trustees consulted

---

[212] The Five Tribes of the Trustee Council are the Confederated Tribes of the Grand Ronde Community of Oregon; the Confederated Tribes of Siletz Indians; the Confederated Tribes of the Umatilla Indian Reservation; the Confederated Tribes of the Warm Springs Reservation of Oregon; and the Nez Perce Tribe.

[213] NAT'L OCEANIC AND ATMOSPHERIC ADMIN., FINAL PORTLAND HARBOR PROGRAMMATIC EIS

83

scientists knowledgeable about juvenile Chinook salmon biology and ecology in 2009. The Settling Trustees' charge to these experts was to develop a scientific foundation for restoration planning for the Portland Harbor Assessment Area, based on the habitat needs of juvenile Chinook salmon. The Settling Trustees identified Juvenile Chinook salmon as a key representative species based on information indicating that injury and the species' habitat needs overlap with those of other injured or potentially injured resources. The experts helped the Settling Trustees to develop a geographic policy to guide ecological restoration, leading to the requirement of at least 50 percent of restoration occurring within the Portland Harbor Assessment Area, with no more than 50 percent of restoration in the Broader Focus Area. The Settling Trustees have applied this policy with each of the Settling Defendants to the Restoration Credit Decree. The scientists also identified the most limited or scarce habitat types beneficial for juvenile Chinook within the Portland Harbor Assessment Area to be those that provide refuge from mainstem Willamette River flows (alcoves and off-channel habitats, tributary mouths); shallow water and beach habitats, with or without large wood assemblages; and undulating, natural shorelines. Accordingly, the Settling Trustees' selected restoration approach focuses on these habitat types. The experts also identified the relative value of these different habitat types to juvenile Chinook salmon. This valuation of habitat specific to the needs of juvenile Chinook salmon forms the basis of the HEA that the Settling Trustees used in the settlement-based phase of the NRDA to quantify the benefits of restoration, as well as the injury to salmon caused by the contamination in the Portland Harbor Assessment Area. Thus, while other species, including upland and riparian species, are expected to benefit from these restoration projects, the primary focus of their design and crediting is on benefits to juvenile Chinook salmon.

As documented in the PEIS, the Settling Trustees selected an integrated habitat restoration approach for the Portland Harbor NRDA. The Settling Trustees have determined that several species, including salmon, steelhead, lamprey, bald eagle, osprey, mink, and others were injured or potentially injured by contamination in the Portland Harbor Assessment Area. The Settling Trustees chose an approach to restoration that will provide benefits to the suite of injured and potentially injured species. This approach focuses on the habitat needs shared by these species, with a particular focus on juvenile Chinook salmon, as described above. In cases where restoration projects are located in areas with existing habitat, the Settling Trustees have worked with the third party restoration bankers during project design to balance the habitat needs of juvenile Chinook salmon with those of other injured species and other native species already using a site (such as red-legged frogs at the Harborton site, or native turtles at the Rinearson Creek site).

The Settling Trustees require each third party restoration banker to conduct effectiveness monitoring in the first 10 years after implementation, which is known as the performance period. The Settling Trustees set forth the general framework for monitoring in the PEIS, with each developer creating a project-specific monitoring plan for each restoration project. The monitoring plans focus on confirming that the agreed-upon habitats are developing as expected at each site and include geomorphic, hydrological, and vegetative monitoring metrics that are

---

AND RESTORATION PLAN at 5-3 to 5-5 (2017), https://pub-data.diver.orr.noaa.gov/portland-harbor/20170501_FINAL_PEIS_3953.pdf.

tied to specific performance standards the projects must achieve in order for the Settling Trustees to recognize their full value and release credits for sale.[214] In this way, the Settling Trustees are ensuring that the projects are creating functional habitat for juvenile Chinook salmon and other species.

All four of the restoration projects have documented juvenile Chinook salmon use in the restored habitats in the year after project construction occurred. Regulatory agencies (including NOAA Fisheries) have limited further monitoring of juvenile Chinook salmon use of the restoration projects. Through the ESA consultation process, the regulatory agencies have allowed each of the four Portland Harbor restoration projects to monitor for salmonids using seines only once post-construction to verify Chinook presence on the site. To prevent unnecessary harm to this threatened species, once monitoring personnel handled a listed salmonid, they were required to cease seining efforts for the duration of the project's ten-year monitoring period. For the remainder of the monitoring period, they could only use visual observations to document fish presence. Unfortunately, snorkeling, underwater cameras, and visual observations from the shore have proven ineffective for monitoring fish presence at the four projects, given turbidity is high and visibility is low in the Lower Willamette River. While the Settling Trustees and the public desire more data on juvenile Chinook use of these restoration sites, this is not something that the projects' permits currently allow.

## Sedimentation Occurring at the Linnton Mill Project

Comments WR4 and YN6 question the design and sustainability of the Linnton Mill restoration project, specifically noting ongoing sedimentation issues the site is currently experiencing.

As the commenters note, sedimentation has occurred along the shoreline of the Linnton Mill restoration project. During low flow conditions, the sedimentation impacts the connectivity of the off-channel habitat to the Willamette River. This is a seasonal issue, most pronounced during the dry summer months, when many side-channel and off-channel habitats are less connected to the mainstem of the river. During high water conditions, when the largest number of juvenile Chinook are migrating down the Willamette River, the areas of the site where sediment has accumulated are inundated and provide juvenile Chinook and other native fish access to velocity refuge from the mainstem river. Monitoring reports documenting these varied conditions are available on the Settling Trustees' public website.

Consistent with the agreements laid out in the Habitat Development Plan for the Linnton Mill project, the Settling Trustees are providing oversight of the Linnton Mill project and are tracking the sedimentation issue carefully. The Settling Trustees conduct an in-depth review of, and provide feedback on, annual monitoring reports and work closely with the project developer to identify and implement adaptive management activities. The Settling Trustees have documented

---

[214] Monitoring plans include monitoring of fish and wildlife use of the projects, but the Settling Trustees do not consider this a reflection of project performance, since the presence or absence of fish and wildlife on an individual restoration project may vary due to conditions far beyond the individual project's control or influence (such as larger trends in population increases or declines).

this work in their public record.[215] To date the Linnton Mill project developer and the Settling Trustees have agreed upon intensified monitoring requirements to better characterize and understand the timing, severity, and likely persistence of sedimentation impacting the connectivity of aquatic habitats at the Linnton Mill site and inform future on-the-ground adaptive management activities.

One of the commenters, Yakama Nation, also plays an oversight role on the Linnton Mill project as a member of the Interagency Review Team (IRT) that has approved another credit type for the Linnton Mill project (Clean Water Act credits). Through this role, the Yakama Nation had the opportunity to review the project designs and participate in the negotiation of the project's mitigation banking instrument (the overarching agreement where monitoring requirements, adaptive management approach, etc., were set by the IRT, similar to the Settling Trustees' Habitat Development Plan). In this capacity as an IRT member, Yakama Nation has had and continues to have the opportunity to review monitoring reports, consider Clean Water Act credit releases, and perform other modes of project oversight.

Following the processes laid out in the Linnton Mill Habitat Development Plan, the Settling Trustees will continue to track the sedimentation issue and any other issues that may arise relating to ecological function and project performance at the Linnton Mill site. If the site is not meeting its agreed-upon performance standards and functioning as designed, the Settling Trustees reserve the right (as documented in the Habitat Development Plan and Restoration Credit Decree) to recalculate the total value of the Linnton Mill project and potentially reduce that ecological value, *i.e.*, reduce the total restoration credits, if the project does not achieve the planned ecological uplift. The Settling Trustees have not yet released all of the estimated credits for the Linnton project. If needed, the Settling Trustees will consider in the future devaluation of the project, or reduced credit releases, based on the results of continued monitoring to evaluate how the project is developing and the efficacy of adaptive management actions.

**Too Much Upland Habitat**

Comments NEDC and YN5 contend that the four restoration projects included in the Restoration Credit Decree include too much upland habitat, considering that the injury is aquatic.

---

[215] *See, e.g.,* PORTLAND HARBOR NAT. RES. TR. COUNCIL RESTORATION COMM., MONITORING REPORT REVIEW AND FEEDBACK (2022), https://pub-data.diver.orr.noaa.gov/portland-harbor/20220623_Linnton_Yr2RevRstrtnMntrngRptRvwFdbck_5339.pdf; RESTORCAP LLC, YEAR 3 (2022) MONITORING REPORT: LINNTON MILL RESTORATION SITE (2023), https://pub-data.diver.orr.noaa.gov/portland-harbor/20230301_Linnton_Yr3MntrngRptUpdtd_5546.pdf; Memorandum from Portland Harbor Nat. Res. Tr. Council to RestorCap, LLC (March 15, 2024), https://pub-data.diver.orr.noaa.gov/portland-harbor/20240315_Linnton_Yr3CrdtRlse_5640.pdf; Memorandum from RestorCap, LLC to Portland Harbor Nat. Res. Tr. Council (May 31, 2024), https://pub-data.diver.orr.noaa.gov/portland-harbor/20240531_Linnton_A9%20Fish%20Passage%20Memo_5793.pdf

The restoration designs for multiple sites converted existing upland habitat to aquatic habitat. Several of the comments suggest a misunderstanding of this fact. For example, NEDC suggests that removal of the mill infrastructure from the Alder Creek project area was not beneficial for salmon because the buildings were in upland areas. Construction involved more than 300,000 cubic yards of fill removal from the Alder Creek site, and the area where the mill building was located is now side channel and riparian habitat (not upland). Similar situations occurred at the Linnton Mill and Harborton sites, where third party restoration bankers removed and relocated large volumes of fill during restoration, converting previous uplands to aquatic habitats.

The majority of the restored area across all four projects is aquatic or riparian, not upland. YN5 erroneously states that ". . . the vast majority of the acreage at each of these sites is in terrestrial or upland habitat types." Of the 155 acres where developers conducted active restoration across the four sites, 70 acres were restored to aquatic habitats, such as shallow water, active channel margin, or off-channel habitats. Developers only restored 36 acres across all four projects to upland habitat. Developers restored an additional 49 acres to riparian habitat, which may be considered a terrestrial habitat by some; however, riparian habitats are part of the Willamette River floodplain and are inundated by major floods and provide enormous benefits to the river and aquatic species. As described by the experts on juvenile Chinook habitat that the Trustee Council consulted in 2009, riparian habitat

> performs a range of functions: traps/removes sediment from runoff; stabilizes stream beds and reduces channel erosion; as well as traps/removes phosphorus, nitrogen and other nutrients that can lead to eutrophication of aquatic ecosystems. Vegetated riparian habitat also traps/removes contaminants; stores flood waters; provides important wildlife habitat; maintains habitat for fish and other aquatic organisms (by moderating water temperatures and providing shelter during high-flow events), and it acquires woody debris for the ACM by snagging vegetation floating by and providing windfalls and deadfalls from trees in this zone. . . . For the ACM and shallow water habitat to be fully functioning there must be a riparian buffer of sufficient width."[216]

Protecting and restoring upland habitat does have benefits for juvenile Chinook salmon, as well as other potentially injured species such as birds and mammals. As the experts on juvenile Chinook habitat that the Trustee Council consulted in 2009 described, upland habitat is defined as follows:

> Uplands beyond the riparian (>200 ft from ACM) and outside the currently existing floodplain. Upland may contain trees and/or vegetated-grass/shrub (with or without invasive species), and can also be unvegetated, but coverage with native vegetative communities, structure such as snags and downed wood, and connectivity to other habitats can be beneficial for wildlife. This habitat provides indirect ecological

---

[216] PORTLAND HARBOR NAT. RES. TR. COUNCIL, DESCRIPTIONS OF HABITAT-RELATED TERMS at 2 (n.d.), https://pub-data.diver.orr.noaa.gov/portland-harbor/20120301_HabTermsHEA_0967.pdf.

services [such as a water quality buffer from neighboring industrial sites] to juvenile Chinook, and may provide significant benefits for wildlife.[217]

The HEA the Settling Trustees used to quantify the benefits of restored habitats places a lower value on uplands relative to aquatic habitats, as the crediting scheme they created is based on value provided to juvenile Chinook salmon. The Settling Trustees gave natively vegetated upland habitats outside the historic floodplain of the Willamette River a value of 0.1–0.2 (on a scale of 0–1). By comparison, they gave aquatic habitats such as shallow water, active channel margin, or off channel habitats a value of 1.0. As a result, the overall DSAYs they attributed to upland habitats is far less per acre of restoration than the credits they attributed to restored aquatic habitats.[218] This difference in value is a recognition of the differing benefits upland and aquatic habitats provide to injured aquatic resources.

Restored upland and riparian habitats provide important services for other potentially injured species. The upland and riparian areas at the four projects include snags, rock piles, and native and culturally significant vegetation species, all of which are of value to bald eagles, osprey, mink, river otter, and other wildlife that may have been injured by contamination in the Portland Harbor Assessment Area. Consistent with the Settling Trustees' integrated habitat restoration approach, each project includes a mosaic of habitats to serve the needs of a variety of species and provide more holistic ecological functions.

**More Restoration is Needed**

YN5 and YN7 argue that the amount of restoration achieved at the four restoration projects is insignificant, and more ecological restoration projects should be implemented. The Settling Trustees note that the commenter made these points as general assertions and did not state how they may render the settlements deficient. Assuming this was the underlying point, the Settling Trustees disagree for the following reasons that the existing restoration is insufficient for the current settlements.

Approximately 165 acres of restored habitat along the mainstem of the Willamette River in the Portland Metro area is not insignificant, particularly within the context of the Portland Harbor Assessment Area, where three of the projects are located. Combined, the Alder Creek, Linnton Mill, and Harborton projects restored 132 acres within the boundaries of the heavily developed and urbanized Portland Harbor Assessment Area, where other such restoration projects or natural areas do not exist. The four projects included in the Restoration Credit Decree collectively provide much needed refuge for juvenile Chinook salmon and other fish and wildlife that must navigate the 11-mile Portland Harbor Assessment Area.

The commenter notes that the Settling Trustees previously identified 44 potential ecological restoration projects in their ecological restoration portfolio, yet only four of those projects are

---

[217] *Id.* at 3.

[218] PORTLAND HARBOR NAT. RES. TR. COUNCIL, RELATIVE CHINOOK SALMON LOWER WILLAMETTE HABITAT VALUES (2012), https://pub-data.diver.orr.noaa.gov/portland-harbor/20120802_REV_HabitatValuesTable_1764.pdf.

included in this Consent Decree. It was never the Settling Trustees' intent to implement all of the projects they identified in the ecological restoration portfolio. As described in the PEIS:

> Appendix A, Ecological Restoration Portfolio, of this Final PEIS/RP contains 41 potential restoration sites that serve as examples of the types of projects and locations that NOAA and the Trustee Council have identified as potentially suitable for restoring lost resources in Portland Harbor. *The sites in the Portfolio are only examples; the Trustee Council does not anticipate that all of these sites will be used for restoration*, or that only these sites can be used for restoration (emphasis added).[219]

The Settling Trustees scaled the restoration included in these Consent Decrees to address the ecological injury that the settlements seek to resolve: the liability of the Settling Defendants included in the Consent Decrees—not all of the ecological injuries that the Settling Trustees calculated for the Portland Harbor Assessment Area.

Just as the current settlements do not resolve all NRDA liability in Portland Harbor, the restoration credits reflected in the settlements are only a portion of the restoration required to resolve site-wide NRDA liability. The Settling Trustees are currently engaged in two parallel processes intended to resolve liability site-wide: (1) The Settling Trustees are continuing the cooperative process that led to the current Consent Decrees with other participating potentially responsible parties; and (2) The Settling Trustees are engaged in the formal damage assessment process, intended to generate claims the Settling Trustees can assert against non-settling parties. The Settling Trustees share the sentiment expressed by the commenter that additional and larger restoration projects on both sides of the river and across a larger portion of the Broader Focus Area would be a desirable outcome.

**Biological Opinion is Necessary**

NEDC and WR6 state that the Settling Trustees lack a relevant Biological Opinion (BO) from NOAA related to the NRDA.[220] On the contrary, each of the individual projects the Settling

---

[219] NAT'L OCEANIC AND ATMOSPHERIC ADMIN., FINAL PORTLAND HARBOR PROGRAMMATIC EIS AND RESTORATION PLAN at 3-10 (2017), https://pub-data.diver.orr.noaa.gov/portland-harbor/20170501_FINAL_PEIS_3953.pdf.

[220] The commenters suggest that the present Consent Decrees themselves should have been the subject of consultation under the ESA. However, as noted in *United States v. PG&E,* "a proposed consent decree is not an 'agency action' under the ESA. There is nothing in the ESA or the regulations suggesting that a consent decree is an 'agency action.' The Court finds it significant that [plaintiff] has not been able to locate any authority interpreting a consent decree as an 'agency action' under the ESA, and that the only case squarely addressing the issue has held that it is not. As the United States argues, if the consent decree constitutes an 'agency action' that triggers Section 7 consultation, it would effectively remove the ability to settle environmental enforcement litigation." 776 F. Supp. 2d 1007, 1023 (N.D. Cal. 2011). Accordingly, this response focuses on those NRDA activities that may implicate "agency actions" under the ESA.

89

Trustees selected in their SRP to provide restoration credits, as well as the Settling Trustees' broader restoration strategy, have all been the subject of consultation with NOAA Fisheries under Section 7 of the ESA.[221]

As part of the environmental compliance associated with the PEIS, the Settling Trustees consulted with NOAA under the ESA. In its BO, NOAA evaluated the Settling Trustees' restoration strategy for potential impacts to 15 ESA-listed species.[222] The BO acknowledged that the PEIS was programmatic and, therefore, did not address impacts related to specific restoration projects. Regarding the Settling Trustees' overall goals and restoration strategy, the BO noted there would likely be some short-term adverse effects to listed species resulting from project construction activities. However, NOAA determined the potential impacts of these effects would be minimal: "Considering the low abundance and short residence time of juvenile ESA-listed salmonids, green sturgeon, and eulachon in the action area during the in-water work window, any adverse effects on the survival of ESA-listed species resulting from project construction in the action area are likely to be too small to significantly affect population abundance, productivity, distribution or diversity."[223] NOAA ultimately concluded that, "The long-term beneficial effects of the proposed action on listed species, primarily improved habitat conditions in the action area, are likely to far outweigh any of the short-term adverse effects."[224]

Subsequently, each of the four restoration projects from which the Settling Trustees accept credits in the Restoration Credit Decree was the subject of individual evaluation by NOAA under ESA Section 7 during the pre-construction permitting process. NOAA issued three of the

---

[221] 16 U.S.C. § 1536. "Under Section 7 of the Endangered Species Act, federal agencies must consult with NOAA Fisheries on activities that may impact ESA-listed species. These consultations are designed to help federal agencies meet the requirement that their actions do not jeopardize the continued existence of a species, or destroy or adversely modify designated critical habitat. The outcome of these consultations is a biological opinion. Biological opinions are issued on a wide range of actions." https://www.fisheries.noaa.gov/national/endangered-species-conservation/endangered-species-act-section-7-consultations.

[222] NAT'L MARINE FISHERIES SERV. WEST COAST REGION, NAT'L OCEANIC AND ATMOSPHERIC ADMIN., ENDANGERED SPECIES ACT SECTION 7(A)(2) BIOLOGICAL AND CONFERENCE OPINION, AND MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT ESSENTIAL FISH HABITAT RESPONSE FOR THE DRAFT NATURAL RESOURCES RESTORATION PLAN FOR THE PORTLAND HARBOR SUPERFUND SITE (2015). https://pub-data.diver.orr.noaa.gov/portland-harbor/20150130_BiOp_PHRestorationPlan_5792.pdf. The Settling Trustees' BO evaluated the following species: Lower Columbia River (LCR) Chinook salmon (*Oncorhynchus tshawytscha*), Upper Columbia River (UCR) spring-run Chinook salmon, Upper Willamette River (UWR) Chinook salmon, Snake River (SR) spring/summer run Chinook salmon, SR fall-run Chinook salmon, Columbia River chum salmon (*O. keta*), LCR coho salmon (*O. kisutch*), SR sockeye salmon (*O. nerka*), LCR steelhead (*O. mykiss*), UWR steelhead, Middle Columbia River steelhead, UCR steelhead, Snake River Basin (SRB) steelhead, Southern green sturgeon (*Acipenser medirostris*), and eulachon (*Thaleichthys pacificus*).

[223] *Id.* § 2.4, p.58.

[224] *Id.*

restoration banks project-specific BOs, and one was covered under an existing programmatic BO.[225] While there were some relatively minor variations reflecting the project implementation specifics, the conclusions of the individual BOs were similar, and consistent with the conclusions of the BO related to the PEIS. Specifically, the project-specific BOs noted the potential for "minor short-term effects"[226] on the listed species and their habitat from construction activities (*e.g.*, reduced water quality due to turbidity), monitoring (*e.g.*, harassment of fish), and long-term management (*e.g.*, application of herbicides to manage invasive species). However, the BOs ultimately concluded that, "None of the anticipated short-term adverse effects will reach a magnitude such that the conservation role of critical habitat will be impaired."[227]

In short, both the Settling Trustees' overarching restoration strategy and the individual projects implementing that strategy have undergone a full evaluation by NOAA Fisheries under Section 7 of the ESA. Given the commenters' interest in these BOs, and in order to make them more readily available to members of the public, the Settling Trustees have added these documents to their public record, which can be accessed at the following link: https://www.diver.orr.noaa.gov/web/guest/portland-harbor-admin-record.[228]

**Final Notes**

Several comments regarding the ecological restoration projects include inaccurate information, for which the Settling Trustees would like to provide clarification.

- NEDC critiques the lack of restoration focused on salmon spawning habitat. Salmon spawning habitats are not present or naturally occurring in the Portland Harbor Assessment Area. As described in the PEIS, spawning habitat is not a goal of the selected restoration approach. Relatedly, spawning gravels would not be an appropriate

---

[225] The Alder Creek, Linnton Mill, and Harborton projects were the subject of individual consultation and BOs, while the Rinearson Creek project was covered under an existing U.S. Army Corps of Engineers programmatic BO.

[226] Nat'l Marine Fisheries Serv. West Coast Region, Nat'l Oceanic and Atmospheric Admin., Endangered Species Act Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for the PGE Harborton Restoration Project, Willamette River (6th Field HUC 170900120302) and Multnomah Channel (6th Field HUC 170900120205), Multnomah County, Oregon (Corps No.: NWP-2013-338) § 2.7 (2018), https://pub-data.diver.orr.noaa.gov/portland-harbor/20181114_PGEHrbrtn_BiOp_5764.pdf.

[227] Nat'l Marine Fisheries Serv. Northwest Region, Nat'l Oceanic and Atmospheric Admin., Endangered Species Act Biological Opinion, Conference Opinion, and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response for Alder Creek Mill Restoration Project, Willamette River (6th Field HUC 170900120302) and Multnomah Channel (6th Field HUC 170900120205), Multnomah County, Oregon (Corps No.: NWP-2011-449) § 2.7 (2013), https://pub-data.diver.orr.noaa.gov/portland-harbor/20130503_AlderCreek_BiOp_5763.pdf.

[228] To locate the relevant documents, go to the link above and search for "biological opinion."

monitoring metric for the four ecological restoration projects.

- NEDC also references, "uncertain time-lines concerning when restoration will actually begin," reflecting its misunderstanding that the four restoration projects included in the Restoration Credit Decree have yet to be constructed. As documented in each project-specific Habitat Development Plan, Alder Creek was constructed between 2014–2016, Rinearson Creek was constructed between 2017–2018, Linnton Mill was constructed between 2017–2019, and Harborton was constructed in 2020–2021.

- YN6 appears to suggest that the Settling Trustees assigned higher values to the projects within the Portland Harbor Assessment Area than those in the Broader Focus Area, resulting in elevated DSAY values for the projects in the Portland Harbor Assessment Area. While the Settling Trustees have expressed a preference for habitat restoration within the Portland Harbor Assessment Area, reflected in the Settling Trustees' geographic policy for restoration described above, the ecological values (measured in DSAYs) of the projects in the Portland Harbor Assessment Area are not higher due to their geographic location. The Trustee Council used the same HEA to calculate the ecological value of each restoration project, regardless of its location, and applied the "Relative Chinook Salmon Lower Willamette Habitat Values" to value each restoration project.

92

## Public Comment Received 01/26/2024
## from the Yakama Nation, Introduction (YNA)

In the 1855 Treaty with the Yakamas, the Yakama Nation conditionally ceded 10 million acres of land and reserved for our People, among other things, the right to fish at all usual and accustomed places within the Columbia Basin. See *Sohappy v. Smith,* 529 F.2d 570 (9th Cir. 1976). Those rights, specifically reserved to the Yakama Nation by the Treaty, are the very essence of what defines us as a People. Fishing on the Columbia River has sustained our People since time immemorial, and we honor the fish with songs and stories that define our culture. The United States should take into account the Yakama Nation's significant treaty rights, and meaningfully involving the Yakama Nation in all decisions affecting its natural resources.

The federal Trustees (NMFS, USFWS) are well aware of Yakama Nation's interests. The Tribe was a member of the Portland Harbor Natural Resource Council until 2009, and withdrew only when it became clear that the Trustees would not commit to assessing the extent of natural resource injury in the Lower Columbia River – a fear that is now being realized with the very limited geographic scope of the assessment areas addressed by the Consent Decrees. At that time, the Tribe informed the United States and other trustees that it would remain active in matters concerning Portland Harbor, and that it would continue its work on natural resources damage claims both at the Portland Harbor Superfund Site, and in other areas where releases of hazardous substances have come to be located. *See*, Letter from Ralph Sampson, Jr., Chairman, to Authorized Officials of the Natural Resource Trustee Council (June 5, 2009). Yakama Nation has done both. EPA has continued to recognize Yakama Nation's status as a natural resource trustee. In August 2010, EPA's Director of the Office of Environmental Cleanup informed the Tribe that it was aware of its role in the NRDA process under CERCLA, and that it would continue to coordinate with the Tribe on matters related to the Portland Harbor Superfund Site. Nevertheless, in a circumstance in April 2015 starkly similar to the present, Yakama Nation noted in comments to the proposed settlement in *U.S. v. Linnton Plywood Assn*. that the United States "has made no effort to consult with or to include the Yakama Nation in any of its negotiations leading up to, or in implementing, the settlement…" Against this backdrop, it can come as no surprise to the United States that Yakama Nation has significant, and federally-recognized, rights and interests in the natural resources at issue in the instant settlements. The federal Trustees have simply ignored them throughout their negotiations and deliberations.

Yakama Nation is a trustee for natural resources under CERLA [sic] Section 107(f) and the National Contingency Plan, 40 C.F.R. § 300.610, and as such is entitled to seek damages for injuries to natural resources under its trusteeship under CERCLA, 42 U.S.C. § 9607(a)(4)(C), and the Oil Pollution Act, 30 U.S.C. § 2702. Natural resource have suffered, and continue to suffer, injuries from releases at the Portland Harbor Superfund Site. Those injuries are not limited to the arbitrarily-designated Portland Harbor Natural Resource Damage Assessment Area, but extend throughout the Lower Willamette River, Multnomah Channel, and Lower Columbia River. It is Yakama Nation's goal to fulfill its obligations as trustee by fully assessing all natural resource injuries, and seeking damages to make the public whole. Information that has been, and will be, developed regarding cleanup timelines, implementation of source control measures, and habitat mitigation measures, are greatly affecting the assessment of natural

resources, and the quantification of damages resulting therefrom. It is our hope that together with these settlements, any further Trustee Council settlements, and Yakama Nation's recoveries for ecological and Tribal lost services, that we can achieve a fully functioning, clean, and thriving ecosystem.

94

## Public Comment Received 01/26/2024 from
## the Yakama Nation, Closing (YNB)

The foregoing comments concern the lack of transparency of the process, and potential inadequacies of the compensatory restoration received from the Settling Defendants. But Yakama Nation is also concerned by the continued lack of a more meaningful role in the process that led to the proposed settlements. As recently as December 23, 2023, President Biden stated that his "Administration is committed to protecting and supporting Tribal sovereignty and self-determination, and to honoring our trust and treaty obligations to Tribal Nations." Executive Order 14112 (December 6, 2023). And in a Memorandum on January 26, 2021, the President emphasized that "[i]t is a priority of my Administration to make respect for Tribal sovereignty and self-governance, commitment to fulfilling Federal trust and treaty responsibilities to Tribal Nations, and regular, meaningful, and robust consultation with Tribal Nations cornerstones of Federal Indian policy." Presidential Memorandum on Tribal Consultation and Strengthening Nation-to-Nation Relationships (January 26, 2021). While we understand that the Justice Department has exempted the *content* of settlement negotiations from the full Executive Order requirements, Yakama Nation was never advised of the ongoing negotiations, and only learned of the proposed Consent Decrees through publication. Despite Yakama Nation's clear and obvious interests in the subject matter of the Consent Decrees, we are being treated as any other member of the public, not a Tribal sovereign to whom the United States owes significant trust and treaty obligations. This treatment falls far short of exercising the United States' responsibility to the Tribe in the coordinated and effective manner required by the President.

Consultation or, at a minimum, notification on a government-to-government basis would not affect the ability of the Attorney General to settle cases on behalf of the United States.

95

## Response to YNA, YNB

We agree that the Settling Trustees and Yakama Nation are fellow natural resource trustees at the Portland Harbor Superfund Site. As noted in its comments, the Yakama Nation was a member of the Portland Harbor Natural Resource Trustee Council until 2009, when it withdrew from the Council as a result of a disagreement with the Settling Trustees over the appropriate geographic scope of assessment of injuries to natural resources, as well as the legal risks of pursuing claims for injuries outside of the area studied by the Settling Trustees. Since that time, the Settling Trustees have continued with the early settlement process that resulted in the proposed Consent Decrees. While the Settling Trustees prefer our strategy for restoring natural resources injured by contaminants released at the Portland Harbor Superfund Site to that of the Yakama Nation, we respect the right of the Yakama Nation to pursue its own strategy, subject of course to CERCLA's bar on double recoveries against the same defendants for the same damages.[229]

We, however, respectfully do not agree that the federal agencies' decision to negotiate the proposed Consent Decrees with the other Settling Trustees constitutes a lack of transparency toward the Yakama Nation or a neglect of the Yakama Nation's interests in restoration of natural resources injured by contaminants originating at the Portland Harbor Superfund Site.

The Yakama Nation was not privy to the contents of the proposed Consent Decrees before they were lodged because the settlement negotiations were confidential and included only the natural resource trustees who remain members of the Trustee Council.[230] As one of the comments notes, sharing the content of settlement negotiations is not required by the referenced Executive Order. However, the fact that the Settling Trustees were continuing to pursue their early restoration strategy should not be a surprise, as they have communicated this point publicly on numerous occasions.[231] Indeed, the United States discussed the existence of ongoing settlement negotiations as part of this strategy in the litigation the Yakama Nation brought in the Oregon District Court for natural resource damages outside of the Settling Trustees' Assessment Area.[232]

---

[229] 42 U.S.C. § 9607(f)(1).

[230] *See* PORTLAND HARBOR NAT. RES. TR. COUNCIL, NATURAL RESOURCE TRUSTEE MEMORANDUM OF AGREEMENT FOR THE PORTLAND HARBOR SUPERFUND SITE § VII (2002), https://www.cerc.usgs.gov/orda_docs/DocHandler.ashx?task=get&ID=2314.

[231] *See, e.g.,* NAT'L OCEANIC AND ATMOSPHERIC ADMIN., FINAL PORTLAND HARBOR PROGRAMMATIC EIS AND RESTORATION PLAN (2017), https://pub-data.diver.orr.noaa.gov/portland-harbor/20170501_FINAL_PEIS_3953.pdf.; NAT'L OCEANIC AND ATMOSPHERIC ADMIN., PORTLAND HARBOR FINAL SUPPLEMENTAL RESTORATION PLAN AND ENVIRONMENTAL ASSESSMENT (2021), https://pub-data.diver.orr.noaa.gov/portland-harbor/20210304_SRP_Final_PH_SRP_EA_4877.pdf. (selecting the four restoration projects included in the Restoration Credit Decree). See also the responses to WR2 and WR3, below.

[232] See *Confederated Tribes & Bands of the Yakama Nation v. Air Liquide Am. Corp.*, No. 3:17-cv-00164-JR (D. Or.) (filed Jan. 30, 2017, currently stayed), United States' Mot. & Mem. in Supp. of its Mot. to Dismiss & Mot. for Stay, Dkt. # 253 at 9.

Thus, while the commenter may not have been aware that lodging of the Consent Decrees was imminent, the existence of ongoing settlement negotiations should have come as no surprise.

97

# Public Comment Received 01/26/2024 from
# the Yakama Nation, Section 1 (YN1)

<u>1.</u> <u>The Consent Decrees do not settle any of Yakama Nation's existing or potential claims for Natural Resource Damages.</u>

The Consent Decrees do not and cannot affect Yakama Nation's status as a natural resource trustee under the law. Nor does it foreclose Yakama Nation from pursuing claims against any or all of the Settling Defendants, and for any damages that are not fully recovered by the other Trustees. The measure of damages under CERCLA includes the costs of restoration, rehabilitation, replacement, and/or acquisition of the equivalent of injured natural resources, the value of services provided by those resources over time, and the reasonable costs of assessing natural resource injuries. This settlement falls far short of recovering the full amount of damages resulting from releases at and from the Portland Harbor Superfund Site, and Yakama Nation is entitled to seek those in a subsequent action.

# Response to YN1

We agree that the Consent Decrees do not and cannot affect the Yakama Nation's status as a natural resource trustee under the law. Nor do the Consent Decrees, by their terms, foreclose the Yakama Nation from pursuing claims against any or all of the Settling Defendants, though only to the extent that the Settling Trustees—comprising eight separate sovereigns, including the Five Tribes—have not fully resolved those claims for the same defendants. By way of explanation: the Consent Decrees include covenants by Plaintiffs not to sue Settling Defendants, and the Consent Decrees also include contribution protection for Settling Defendants from contribution claims by non-settling potentially responsible parties.[233] However, these provisions do not directly pertain to the Yakama Nation, as the Yakama Nation is not a Plaintiff, and the Yakama Nation's claims (like the Settling Trustees' claims) against Settling Defendants are not contribution claims.

Two provisions in CERCLA govern the effect of the Consent Decrees on the Yakama Nations' claims. The first provision prohibits double recoveries by different trustees against the same defendants for the same damages:

> There shall be no double recovery under this chapter for natural resource damages, including the costs of damage assessment or restoration, rehabilitation, or acquisition for the same release and natural resource.[234]

This provision allows natural resource trustees to assert separate claims, taking into account recoveries to date from responsible parties:

> The language of the statute dictates that a co-trustee acting individually or collectively with the other co-trustees may go after the responsible party or parties *for the full amount of the damage, less any amount that has already been paid as a result of a settlement to another trustee by a responsible party*.[235]

This reading of CERCLA section 107(f)(1) is consistent with the other relevant provision of CERCLA, which governs the effect of settlements on additional claims against non-settlors:

> Such [a judicially approved] settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it *reduces the potential liability of the others by the amount of the settlement*.[236]

---

[233] *Cash-Out Decree*, Dkt. #11-1, paragraphs 14, 21; *Restoration Credit Decree*, Dkt. #4-1, paragraphs 82, 89.

[234] 42 U.S.C. § 9607(f)(1).

[235] *Confederated Tribes & Bands of the Yakama Nation v. Airgas USA LLC*, 435 F. Supp. 3d 1103, 1126 (D. Or. 2019) (quoting *Asarco*, 471 F. Supp. 2d at 1068) (emphasis added).

[236] 42 U.S.C. § 9613(f)(2) (emphasis added).

# Public Comment Received 01/26/2024
## from the Yakama Nation, Section 4 (YN4)

4. <u>The releases of liability in the Consent Decrees are unjustifiably broad.</u>

Section IX of the Cash Out Decree, and Section XIII of the Restoration Credit Consent Decree, set forth covenants not to sue the Settling Defendants. Each provides releases for "Covered Natural Resource Damages." That term is defined to include all recoverable damages, under the law, resulting from releases of hazardous substances at and from the Settling Defendants' properties. The Trustees' damage assessment, however, has been limited to an area much smaller than where the Settling Defendants' releases have come to be located, referred to as the "Portland Harbor Natural Resource Damage Assessment Area." And the estimated DSAYs on which the settlements are based have been calculated only within that limited area. Natural resource injuries outside the Portland Harbor Natural Resource Damage Assessment Area undoubtedly exist but have not yet been fully assessed. And those injuries are undoubtedly compensable under the law. Thus, the Consent Decrees release the Settling Defendants from liability for these, as-yet unquantified injuries, and for the resulting damages. The Consent Decree should provide justification for such an extraordinarily broad release. The six Settling Defendants in the Restoration Credit Consent Decree in particular have some of the most extensive and harmful releases of hazardous substances within their facilities. It is not clear at all why the federal Trustees are releasing these responsible parties from further liability for any injuries to aquatic resources either in the Willamette or Lower Columbia Rivers.

100

## Response to YN4

As we explained above in the Arkema D response, information regarding contaminant concentrations in sediment downstream of the Portland Harbor Assessment Area indicates that concentrations are substantially lower than the concentrations within the Assessment Area. Therefore, the Settling Trustees have concluded that the large majority of injuries to natural resources from contaminants released into the Assessment Area occur within the Assessment Area itself. Moreover, as the court's decision in the Portland Harbor litigation filed by the Yakama Nation indicates, there is at least some litigation risk that some or all of any such "downstream" natural resource damages could be held to occur outside of the boundaries of the Portland Harbor Superfund Site, potentially rendering those claims time barred.[237] For both of these reasons, we believe that the geographic scope of the covenants not to sue reasonably tracks the quantum of risk-adjusted, recoverable natural resource damages.

---

[237] *Yakama Nation*, 435 F. Supp. 3d at 1109, 1122.

101

## Public Comment  Received 01/28/2024 from
## Willamette Riverkeeper, Section 2 (WR2)

**2. The NRDA process needs to be more inclusive and more transparent:** Although the NRDA process involves significant public interests (natural resources, recreation. etc.) it has occurred  largely behind closed doors with minimal public engagement. What little public engagement that has occurred has been episodic, often with years of virtual silence in between. In a complex process that has spanned more than two decades, and which intersects with other complex processes (*e.g.*, the in water cleanup program administered by EPA and the upland cleanup program administered by DEQ) it is extremely difficult for the public to track and understand the NRDA process, based on such limited information. It is fair to say that much of the public that is currently engaged in the Superfund process is not even aware that the NRDA process is running in parallel. Given the timeframe of this process, many people have both entered and exited the process since the Trustee Council last engaged in significant outreach. It is absolutely critical that the Trustee Council begin engaging with the public in a regular and ongoing manner similar to what is occurring through the cleanup programs.

It is important that the public have the opportunity to interact with the different representatives on the Trustee Council, gain a high level understanding of the overall NRDA process, and have adequate time to develop a deeper understanding of specific issues well in advance of formal opportunities for public input. It is not acceptable or realistic to expect the public to be able to effectively weigh-in on complex legal and scientific decisions without this kind of ongoing outreach and engagement. We urge the Trustee Council to begin engaging with the public on an ongoing basis via the public engagement structures established through the cleanup programs.

Our organization is familiar with this process, and has been engaged with Trustee representatives over the years. Even so, meaningful interaction in regard to the valuation of Willamette River habitat, and the function and value of the four mitigation sites has not occurred in the last four years. It seems to us that additional engagement should have occurred, even if *specifics* related to the proposed settlement could not be discussed.

102

# Response to WR2

The Settling Trustees have been, and will continue to be, committed to public engagement, to the extent possible, as they also participate in confidential settlement negotiations and ongoing claim preparation for potential litigation. The Settling Trustees acknowledge that balancing the need for confidentiality related to settlement negotiations and claim development with public transparency means that the public does not receive up-to-the minute information from the Settling Trustees related to all aspects of the NRDA process. This aligns with the recognition that confidentiality plays an important role in successful claim resolution because it provides needed space for candid conversation between negotiating parties.

> [T]he presumption of public access to settlement conferences, settlement proposals, and settlement conference statements is very low or nonexistent under either constitutional or common law principles. Weighed against this presumption is the strong public policy which encourages the settlement of cases through a negotiated compromise. . . . In a perfect world, the public would be kept abreast of all developments in the settlement discussions of lawsuits of public interest. In our world, such disclosure would . . . result in no settlement discussions and no settlements.[238]

While acknowledging this limitation on its ability to share information freely, the Settling Trustees take issue with the characterization of its public engagement being minimal or episodic. The Settling Trustees make non-sensitive information about the NRDA process for the Portland Harbor Assessment Area available to the public in a number of ways. As part of these efforts, the Settling Trustees strive to make complex issues comprehensible to the public to allow for informed public participation. Although it is not possible to detail here all the public outreach and engagement that the Settling Trustees have conducted since the Trustee Council' formal inception in 2002, this response provides examples of the Settling Trustees' various efforts.

The Settling Trustees maintain a public website with access to the Settling Trustees' public record and information including, but not limited to, NRDA generally; the Settling Trustees' NRDA activities, such as restoration and assessment planning; and status updates. The Settling Trustees have developed outreach materials, such as press releases, FAQ sheets, a YouTube video providing a virtual tour of the restoration banks (https://www.youtube.com/watch?v=nTbFPan7MwQ), and an interactive story map (https://storymaps.arcgis.com/stories/82b32b0ec3b94f299035f12f38d7b26c) to inform the public of its activities in approachable formats. These materials are located on the website and in the Settling Trustees' public record. The public website may be accessed here: https://www.fws.gov/portlandharbor/. In addition to its website, the Settling Trustees' digital presence extends to a partnership with the U.S. Army Corps of Engineers to host information

---

[238] *United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853, 855–56 (2nd Cir. 1998); see *United States v. Atl. Richfield Co.*, No. CV-89-39-BU-SEH, 2016 U.S. Dist. Lexis 169364, at *14–15 (D. Mont. Dec. 7, 2016) (upholding a confidentiality order between negotiating parties as part of the court's Article III duty to facilitate resolution).

103

about each of the restoration banks in its digital Regulatory In-Lieu Fee and Banking Information Tracking System. The Settling Trustees also distribute a newsletter to members of the public who have expressed an interest in learning more about the Settling Trustees' work. People are able to sign up for the newsletter on the Settling Trustees' website or at in-person events that the Settling Trustees participate in or host.

Since the inception of their restoration planning process, the Settling Trustees have sought public input and participation regarding actions to restore, replace, or acquire the equivalent of Portland Harbor injured natural resources. Before making any final restoration decisions, the Settling Trustees invited and incorporated public input. In 2008, the Settling Trustees developed and publicized criteria to identify and evaluate potential ecological restoration sites. Subsequently, in 2009, the Settling Trustees held a meeting with community partners to explain the NRDA process and discuss restoration opportunities. This was followed by a 2010 community partners meeting to discuss potential restoration sites in light of the Settling Trustees' ecological restoration criteria. Also in 2010, before beginning its Draft PEIS, the Settling Trustees hosted a public scoping meeting to gather public input related to issues of concern associated with the NRDA process and restoration. To notify the public of the scoping meeting, the Settling Trustees conducted outreach via email, newspaper notices, and local radio stations.

Informed by input the public provided during initial restoration planning efforts, the Settling Trustees then created the Draft PEIS and held a three-month long public comment period, during which the Settling Trustees held two public meetings. The Settling Trustees also provided notice of the three-month public comment period via newspaper, website, and direct outreach. During the public comment period for the Draft PEIS, the Settling Trustees invited the public to provide additional information about the type of restoration approaches that are appropriate to address Portland Harbor Assessment Area natural resource injuries. The Settling Trustees shared a list of potential restoration sites for comment as well. Moreover, in 2020, the Settling Trustees sought additional public comment and review on the Draft SRP to determine whether five restoration banks met the preferred restoration alternative and restoration criteria the Settling Trustees set forth in their prior restoration planning documents. Once again, the Settling Trustees provided notice of the comment period and held a public meeting. The Settling Trustees considered public comments before finalizing the Draft SRP.

In the summer of 2022, the Settling Trustees began informal outreach to the public to begin discussing priorities for the restoration of lost recreational uses in the Portland Harbor Assessment Area. This effort began with one-on-one conversations with leaders of recreation-related and river-focused organizations in the Portland Metro Area, including those advocating for historically underserved communities. The Settling Trustees followed those early outreach conversations with an online survey the Settling Trustees published in fall 2022 to gather early public input on how to improve recreation experiences in the Portland Harbor Assessment Area. The Settling Trustees are using the input gathered from these efforts to inform development of a Draft Recreation Restoration Plan, which will ultimately be published for public review and comment before the Settling Trustees make any final decisions regarding restoration for lost recreational uses. As the NRDA process proceeds, the Settling Trustees will continue to seek meaningful public input to inform future restoration decisions.

The Settling Trustees have also issued milestone draft assessment documents to the public for review and comment before those documents become final. For example, in late 2009, the Settling Trustees released their draft Injury Assessment Plan for public review and invited comments on the Settling Trustees' proposed approach to assessment activities for the Portland Harbor Assessment Area. In November 2009, as part of their outreach around the draft Injury Assessment Plan, the Settling Trustees presented information about the NRDA process to the Linnton Neighborhood Association. They followed this meeting with a December 2009 public meeting at the St. John's Community Center to present and explain the draft Injury Assessment Plan. More recently, before finalizing a 2018 addendum to the Injury Assessment Plan, the Settling Trustees released the draft "Portland Harbor Superfund Site Natural Resource Damage Assessment Plan Addendum 2: Phase 3 Damage Assessment Plan" for a 30-day public review and comment period. The Settling Trustees addressed the public comments before finalizing the addendum, which sets forth the Settling Trustees' anticipated assessment activities to prepare damages claims for litigation.

Unrelated to specific decisions or documents, representatives of the Settling Trustees also participate in public meetings to share information about the NRDA process. At the invitation of the Portland Harbor Community Advisory Group (CAG), representatives of the Settling Trustees have presented periodic updates on the NRDA and restoration activities. For example, in April 2023, representatives from NOAA and the Nez Perce Tribe presented on ecological restoration projects. During summer 2023, NOAA staff also participated in the CAG's River School, including a bus tour to visit and discuss some of the restoration projects. The Settling Trustees' representatives also participate in community events associated with the Willamette River to educate the public about the NRDA process and the natural resources being assessed, and to be available to answer questions. One recent example of event outreach is the October 2023 Willamette Cove Environmental Field Day, where U.S. Fish and Wildlife Service, Confederated Tribes of the Warm Springs Reservation of Oregon, and Confederated Tribes of the Grand Ronde staff attended to highlight lamprey presence in, and use of, the Portland Harbor Assessment Area and discuss their cultural importance to the Five Tribes included in the Settling Trustees. Representatives of the Settling Trustees also occasionally host break-out sessions at quarterly Portland Harbor Collaborative meetings, such as at the December 2022 meeting where the Settling Trustees shared information on early efforts to begin planning for the restoration of lost recreational resources in the Portland Harbor Assessment Area.

## Public Comment  Received 01/28/2024 from
## Willamette Riverkeeper, Section 3 (WR3)

**3. There is a lack of coherent vision or structure in terms of what NRDA anticipates achieving or how these settlements will advance those goals:** The Portland Harbor Superfund Site is the most degraded and polluted stretch of river in the State of Oregon. Decades of pollution have harmed fish and wildlife, restricted recreational opportunities and violated treaty rights of Native American Tribes.  Portland Harbor has been listed as a Superfund site since 2000. The NRDA Trustee Council was established in 2002. Despite the fact that more than two decades have elapsed since these processes were initiated, it is not clear what the Trustee Council hopes to achieve in the Portland Harbor Study Area in terms of restoring fish and wildlife habitat, mitigating for lost recreational  activities, or addressing lost opportunities for tribes. The settlement agreements and related documents do not provide the reader with any understanding of what the public can expect at the end of this process in terms of tangible outcomes: How many acres of in-water, riparian and upland habitat will be restored? How will this restoration be distributed within the study area? What species will benefit and how? What specific recreational opportunities will be provided? The reader is provided with information regarding  monetary obligations of a subset of responsible parties, but a [sic] virtually no understanding of how those funds will actually compensate for the real damages that have occurred. We question whether it makes sense to settle before the Trustee Council is able to fully describe what it is actually expecting to achieve on the river.

Case: 25-8129, 04/13/2026, DktEntry: 77.6, Page 230 of 237
Case 3:23-cv-01603-YY   Document 85-3   Filed 06/09/25   Page 112 of 119

Response to WR3

# Response to WR3

We disagree that the Consent Decrees lack a "coherent vision or structure in terms of what NRDA anticipates achieving or how these settlements will advance those goals." On the contrary, for both the injury assessment and restoration planning, the Settling Trustees have undertaken a robust planning process that has been subject to public review and comment at every significant step. The current Consent Decrees reflect only how that planning process and vision will be applied to the liability of the Settling Defendants. In other words, the Settling Trustees have long been laying the groundwork for how the assessment and restoration will be conducted for harbor-wide injuries resulting from contamination; the current settlements are just one piece of that broader plan.

The Settling Trustees have published draft injury assessment documents for public review and comment throughout the NRDA process. As discussed above, in late 2009 the Settling Trustees released their draft Injury Assessment Plan for public review and comment. This document, which the Settling Trustees finalized in 2010, outlined the Settling Trustees' proposed approach to assessment activities, including for the early settlement process that resulted in the current Consent Decrees. In 2018, the Settling Trustees published an addendum to the 2010 Injury Assessment Plan to provide an update on the current status of the NRDA and to provide more detailed information regarding the Settling Trustees' proposed focus for the formal damage assessment activities that are still ongoing.

The formal restoration planning process began in 2008, when the Settling Trustees developed and publicized criteria to identify and evaluate potential ecological restoration sites. They followed this with various public outreach and engagement activities in 2009 and 2010, culminating in the publication of the Settling Trustees' Draft PEIS in 2012. This robust and comprehensive document laid out a programmatic strategy for conducting restoration related to the Portland Harbor NRDA. It evaluated various restoration options and ultimately concluded that the most effective type would be "integrated habitat restoration." The Draft PEIS also contained a "restoration portfolio" of over 40 projects in the Portland Harbor Assessment Area and Broader Focus Area that were both examples of the type of restoration that the Settling Trustees considered appropriate, as well as potential restoration projects that might be used to resolve liability for Portland Harbor potentially responsible parties. In fact, all four of the restoration banks in the current Restoration Credit Decree were included in one or more versions of this portfolio. The Final PEIS, which the Settling Trustees released in 2017, has served as the foundation for the restoration planning efforts that have occurred since, and will continue to do so into the future.

The Settling Trustees undertook a more targeted restoration planning effort in 2020, when they recognized that settlements were nearing completion. The Settling Trustees published their Draft SRP, which they intended to apply the broader vision outlined in the Final PEIS to the specific restoration needed to resolve the liability of settling parties, including those in the current Consent Decrees. Specifically, the Settling Trustees identified the purchase of restoration credits from eligible restoration banks as their preferred restoration alternative. Like the Draft PEIS,

107

ER-998

they submitted the Draft SRP for public review and comment, and they published the Final SRP in 2021.

Restoration planning will continue. As noted above and in the Settling Trustees' Summer 2023 newsletter, the Settling Trustees are currently in the process of planning for a supplemental restoration plan to address lost recreational use. Like the previous restoration plans, the recreational restoration plan will be subject to public review and comment, and the Settling Trustees will use any monetary damages recovered in the current Consent Decrees to conduct restoration in accordance with this restoration plan.

The Settling Trustees have also provided information regarding injuries of particular interest to the Five Tribes included in the Settling Trustees. As noted on the Trustee Council's website:

> The Five Tribes of the Trustee Council are working to understand the impacts of contamination on Tribal relationships with the resources at Portland Harbor and to restore those lost resources and connections. Salmon, sturgeon, and Pacific lamprey in particular are culturally significant to the Five Tribes. The benefits to salmon and sturgeon of restoring aquatic-related habitats are well-documented, and are expected to result from the Trustee Council's ecological restoration projects. The Trustee Council's ecological restoration projects also incorporate the use of Tribally significant native plants such as camas, wapato, and sweetgrass. In contrast, data on lamprey habitat needs and preferences are insufficient to understand the benefits of ecological restoration projects to lamprey. Therefore, Tribal representatives developed a plan to monitor the effects of ecological restoration projects on lamprey over 20 years.[239]

The Settling Trustees will use funds from the current settlements to implement the lamprey monitoring plan developed by the Five Tribes.

The commenter also objects to a lack of specifics in the Consent Decrees regarding the final outcomes of the NRDA process.[240] The Settling Trustees have already provided some of this information in the restoration plans discussed above (*e.g.*, preferred types of restoration and which species will benefit). Certain outcomes remain unknown at this point because either the restoration planning has not yet occurred or because the Settling Trustees do not yet know all of the potential outcomes of future settlement negotiations or potential litigation (*e.g.*, what specific

---

[239] https://www.fws.gov/portlandharbor/Tribal-Focused-Restoration

[240] The commenter states that "The settlement agreements and related documents do not provide the reader with any understanding of what the public can expect at the end of this process in terms of tangible outcomes: How many acres of in-water, riparian and upland habitat will be restored? How will this restoration be distributed within the study area? What species will benefit and how? What specific recreational opportunities will be provided? The reader is provided with information regarding monetary obligations of a subset of responsible parties, but a virtually no understanding of how those funds will actually compensate for the real damages that have occurred. We question whether it makes sense to settle before the Trustee Council is able to fully describe what it is actually expecting to achieve on the river."

recreational use projects they will fund, how many acres and what type of habitat must be restored).

If the Settling Trustees were to wait for the final outcome of all NRDA injury assessment and restoration planning activities, this would effectively render early settlements like these impossible. Nor should it be underestimated the degree to which the potential for early settlements has benefitted the environment and, in turn, the public. Early settlements are an opportunity for potentially responsible parties to address the injuries to natural resources caused by their actions. The damages that settling potentially responsible parties resolve under an early settlement support actions that provide ecological services sooner rather than allowing additional injuries to occur over the course of time-consuming litigation. Here, not only are the benefits of restoration realized earlier under these Consent Decrees, but the four restoration banks with credits included in the Consent Decrees have been providing tangible ecological benefits for many years, including one that was constructed nearly a decade ago. Were it not for the early settlements and the restoration bank development, restoration would not have been implemented until some indeterminate time in the future rather than over the past several years.

That said, the Settling Trustees fully appreciate the public's desire for as much information as can be made available. Information regarding the planning process for injury assessment and restoration can be found in the Settling Trustees' public record, which can be accessed at the link below:

https://www.diver.orr.noaa.gov/web/guest/diver-admin-record/3301

As discussed in a response to Willamette Riverkeeper's comment about the Settling Trustees' public outreach, looking ahead, the Settling Trustees will continue to seek public involvement at various points in the NRDA process.

## Public Comment  Received 01/28/2024 from
## Willamette Riverkeeper, Section 5 (WR5)

**5. Recreational Damages:** The amount of funds dedicated to recreational damages strikes us as exceedingly low. The public has suffered through decades of restricted activity along Portland's premier natural resource, the Willamette River. This restricted activity has manifested itself in myriad ways including restricted access to significant portions of the river. Public beaches have been affected for decades. The opportunity to catch and consume fish has been affected (with significant health advisories posted for decades), and the overall recreational opportunity has been diminished by the reality of a river with contaminated sediments that span miles. The general public has taken home the message that Portland Harbor is not a place to spend time, nor are there many places to easily access the river. The amount of funding anticipated through NRDA to compensate for lost recreational activities is likely not enough to do more than one or two small projects along the entire 10+ mile Portland Harbor Superfund Site.

# Response to WR5

The Settling Trustees agree that the public has experienced decades of restricted activity along the lower Willamette River due to contamination in the Portland Harbor Assessment Area and associated fish consumption advisories. People have taken fewer trips to the Assessment Area for recreation than they otherwise would have, and many trips that have occurred were diminished in quality. Consistent with the Portland Harbor Superfund Site Natural Resource Damage Assessment Plan[241] and CERCLA,[242] the Settling Trustees estimated lost recreation services during their early settlement-based assessment. This estimate is based on existing information and calculated as the lost value associated with forgone and diminished recreational use. Using data from the State of Oregon on the number of fishing (including for resident species, sturgeon, and anadromous species such as salmon) and boating trips taken to the Portland Harbor Assessment Area and information from the peer-reviewed literature on the trip value lost due to contamination, the Settling Trustees calculated $5,402,400 in recreational service loss damages. Under the current Consent Decrees, the Settling Trustees will receive a portion of those damages. The Settling Trustees may collect additional recreational service loss damages through future settlements or litigation.

The Settling Trustees acknowledge that the types of river-based public recreational activities that occur in the Portland Harbor Assessment Area are broader than fishing and boating. While existing information is not sufficient to quantify impacts to these other recreational activities under the early settlement-based assessment, the Settling Trustees plan to consider a broad suite of recreational and community-based benefits (*i.e.*, beyond just fishing and boating) when identifying and selecting restoration projects. The Settling Trustees will share a recreation-focused restoration plan (a supplement to the Final PEIS) with the public for comments and feedback prior to implementing restoration.

---

[241] NAT'L OCEANIC AND ATMOSPHERIC ADMIN., FINAL PORTLAND HARBOR SUPERFUND SITE NATURAL RESOURCE DAMAGE ASSESSMENT PLAN ADDENDUM 2: PHASE 3 DAMAGE ASSESSMENT PLAN (2018), https://pub-data.diver.orr.noaa.gov/portland-harbor/20180309_PH%20DAP%20Addendum_1004_2018_Public%20Final%20%282%29.pdf; PORTLAND HARBOR NAT. RES. TR. COUNCIL, PORTLAND HARBOR SUPERFUND SITE: NATURAL RESOURCE DAMAGE ASSESSMENT PLAN (2010), https://pub-data.diver.orr.noaa.gov/portland-harbor/20100601_FNLAssessmentPlan_0930.pdf.

[242] 43 C.F.R. § 11.83(c).

111

## Public Comment  Received 01/28/2024 from
## Willamette Riverkeeper, Section 7 (WR7)

**7. Climate Change -** How has climate change figured into the NRDA process for Portland Harbor? Has the process changed or adapted over the years to reflect the increased value of lost habitat, and the need to accurately reflect the impact of habitat loss? Given this process by itself has taken many years, has the Trustee Council adapted new data in regard to climate change and the value of habitat for providing resiliency into account?

We very much appreciate the work of the Trustee Council, and understand that this has been a long process with a significant amount of technical and ecological work. We also understand that this is a very significant potential settlement, and that the vast amount of habitat the Willamette has lost since the inception of NRDA, and the increased need for increased healthy habitat due to climate change, is exceedingly important.

112

# Response to WR7

Natural resources in the Portland Harbor Assessment Area, and the Willamette River more broadly, have been and will continue to be affected by a variety of stressors. This includes not only climate change, but other factors, such as contaminant releases, dam operations, periodic droughts, shoreline hardening, wastewater and sewer discharges, and habitat loss. However, natural resource injury in the context of NRDA is limited to the effects of contaminant releases (hazardous substances and oil) on natural resources.[243] Therefore, the Settling Trustees' determination and quantification of injury only captures the adverse effects of a suite of contaminants on Portland Harbor Assessment Area natural resources.

In determining the amount and type of restoration necessary to compensate for natural resources damages in the Portland Harbor Assessment Area, the Settling Trustees explicitly consider climate change and how it may affect the future benefits of habitat restoration. This includes incorporation of both general climate adaptability principles and specific design elements.

Actions that support ecosystem resilience, habitat and species diversity, and connectivity provide the greatest likelihood of habitat sustainability, and are essential components of the Settling Trustees' selected restoration approach, integrated habitat restoration (described in the Final PEIS).[244] This multispecies, multi-habitat-based approach incorporates adaptability by focusing on increasing habitat connectivity and maintaining species and habitat diversity. For example, this approach includes restoration of off-channel habitats to provide resting and rearing habitat for juvenile salmon. Off-channel habitat will help to both address the current lack of this habitat type and ameliorate the anticipated effects of climate change by providing refuge areas designed to maintain the environmental conditions needed for juvenile salmon survival. Settling Trustees also identified floodplain reconnection as an effective option for gaining habitat functionality while addressing potential changes in peak flows and temperature due to climate change.

The restoration projects included in the Restoration Credit Decree all include a variety of interconnected habitat types consistent with the integrated habitat restoration approach. In addition, the Settling Trustees evaluated potential restoration designs to determine how, in light of the potential effects of climate change, ecological restoration benefits could be maintained in the long-term.

The Settling Trustees also incorporated best management practices and considerations to facilitate climate resiliency for the restoration projects included in the Restoration Credit Decree.[245] For example, each restoration project must include the following:

---

[243] 43 C.F.R. § 11.14(v).

[244] NAT'L OCEANIC AND ATMOSPHERIC ADMIN., FINAL PORTLAND HARBOR PROGRAMMATIC EIS AND RESTORATION PLAN (2017), https://pub-data.diver.orr.noaa.gov/portland-harbor/20170501_FINAL_PEIS_3953.pdf.

[245] *Id.;* PORTLAND HARBOR NAT. RES. TR. COUNCIL, PORTLAND HARBOR SUPERFUND SITE: NATURAL RESOURCE DAMAGE ASSESSMENT PLAN (2010), https://pub-data.diver.orr.noaa.gov/portland-harbor/20100601_FNLAssessmentPlan_0930.pdf.

ER-1004

- Plans to manage invasive plants and support the establishment of native plant assemblages, because higher air temperatures may result in longer growing seasons, especially for nonnative, invasive plant species that compete with native species.

- Flexible design to account for changing water levels, such that incremental water level rises do not inundate the entire project. A flexible design will maintain key transitional habitat types, such as shorelines and active channel margins, without generating isolated habitat features in locations where their function would be impaired by changing water levels.

- A range of elevations. For example, projects will plant at higher elevations where feasible to account for encroaching water levels into upland habitats. Transition and buffer zones will be incorporated to allow rising water levels to create additional habitat types and maintain connectivity.

114